Page 1

1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF ALASKA

2      _____

3   ABSOLUTE ENVIRONMENTAL SERVICES,)
    INC., an Alaskan Corporation,   )
4                                   )
            Plaintiff,              )
5                                   )
        vs.                         )  Case No. A-03-0199
6                                   )  Civil (RRB)
    FORREST J. McKINLEY and         )
7   "JANE DOE" McKINLEY, and the    )
    marital community property      )
8   composed thereof d/b/a "Imperial)
    Industrial Coatings" and EMERCO,)
9   INC., etc.,                     )
                                    )
10           Defendants.            )
    EMERCO, INC., a California      )
11  Corporation d/b/a Imperial      )
    Industrial Coatings, etc.,      )
12                                  )
            Counter-Claimant/       )
13          Third Party Claimant,   )
                                    )
14      vs.                         )
                                    )
15  ABSOLUTE ENVIRONMENTAL SERVICES,)
    INC., an Alaskan Corporation,   )
16  et al.,                         )
                                    )
17          Cross-Defendants/       )
            Third-Party Defendants.)

18  _____

19          DEPOSITION UPON ORAL EXAMINATION

20                          OF

21             JERRY R. HARDENBERGH

22  _____

23          Taken at 1900 Fifth Avenue
                 Seattle, Washington

24

25  DATE TAKEN:      FEBRUARY 10, 2005

EXHIBIT
B

Absolute Environmental Services, Inc. v. Emerco, Inc.                                   Jerry R. Hardenbergh

Page 46

1    and 2 of the NACE program.
2         Did you at some point in time complete
3    Session 3 and have peer review?
4    A.   Yes.
5    Q.   And when did that occur?
6    A.   I believe that happened in 2002.
7    Q.   Did that occur after the Swalling contract had
8    been performed?
9    A.   I believe so.
10   Q.   During the Swalling contract, did the absence
11   of that certification require anyone to supervise your
12   work?
13   A.   No.
14   Q.   What types of testing did you perform on the
15   Swalling Phase 1 project?
16   A.   As quality assurance auditing and oversight, I
17   would perform surface cleanliness inspections, surface
18   profile inspections, the DFT measurements, holiday
19   testing and adhesion testing.
20   Q.   As to any of those tests, did you perform them
21   any differently as to method or criteria on the Phase 1
22   project as compared to what you did on the Phase 2
23   project?
24   A.   No.
25   Q.   Were there any differences in the

Page 47

1    specifications between Phase 1 and Phase 2 as to the type
2    of coating, the thickness of the coating required or
3    anything else that you can recall?
4    A.   No. Not in regards to the coating material
5    thickness, no.
6         (Exhibit No. 2 marked.)
7    Q.   Let me show you what I will mark as Exhibit 2.
8    It's entitled "Organization Chart," and ask you if you
9    have seen this document before?
10   A.   Yes, I have.
11   Q.   Would you describe what it is?
12   A.   It's an organization chart of the cargo wharf
13   Phase 2 project.
14   Q.   Do you know who prepared it?
15   A.   I did.
16   Q.   Did you also prepare the second page?
17   A.   The phone list? Yes.
18   Q.   When did you prepare this document in relation
19   to the start of work?
20   A.   It was after the start of work on site.
21   Q.   And for what purpose did you prepare it?
22   A.   Just a quick look at who is related to the
23   project.
24   Q.   Did you pass this out to the participants?
25   A.   No, I don't believe I did.

Page 48

1    Q.   You kept it for your own use?
2    A.   It was in the project documentation file that I
3    kept.
4    Q.   What was your understanding, if anything, as to
5    what Mr. Holmstrom should do on this project as project
6    manager for Brechan Enterprises?
7    A.   As the project manager, he was responsible for
8    the entire project.
9    Q.   Was Mr. Holmstrom ever physically present on
10   the project?
11   A.   Yes.
12   Q.   On how many occasions did you see him there?
13   A.   On the cargo wharf or on the base?
14   Q.   Let me restate it. How often during the
15   performance of Phase 2 did you see Mr. Holmstrom on the
16   cargo wharf where he was performing some function related
17   to the Phase 2 project?
18   A.   Not very many times.
19   Q.   Of those times when you did observe him, what
20   did you observe him doing?
21   A.   Just reviewing the project, oversight, looking
22   around at progress that has been made.
23   Q.   Did you have any understanding as to what
24   technical qualifications Mr. Holmstrom had, if any, in
25   order to be able to determine whether or not the work

Page 49

1    that was ongoing was being performed in accordance with
2    the project requirements?
3    A.   Mr. Holmstrom is a civil engineer and he was
4    the project manager for the project.
5    Q.   My question remains. Do you know what
6    qualifications he had, if any, to be able to determine
7    whether or not the work was being performed in accordance
8    with the contract requirements when he visited the job?
9    A.   No, I'm not aware of it.
10   Q.   Did Mr. Holmstrom ever indicate to you any
11   disagreement with any of the work or any objection to the
12   manner in which any of the contractors were performing
13   any of the work on Phase 2?
14   A.   Not specifically related to the work itself,
15   but he was always concerned about the project schedule.
16   Q.   Did he ask you to perform any functions on the
17   project related to the project schedule?
18   A.   Just to have a progress schedule. Since I was
19   on the project so much, I had a good idea of how far
20   along we were in each phase. So I created a schedule as
21   we went along, a progress schedule.
22   Q.   Did Mr. Holmstrom ask you to take steps to try
23   to assure that the contract schedule was adhered to?
24   A.   No.
25   Q.   What did he ask you to do, if anything, about

13 (Pages 46 to 49)

Page 50

1  his perceived concern with the fact that the project was
2  behind schedule?
3      A.   I don't believe he specifically asked me to do
4  anything in regards to that.
5      Q.   How did it come to pass that as a result of his
6  comments you began to prepare a progress schedule?
7      A.   I just normally -- I thought it would be
8  helpful to have a schedule as we moved along towards the
9  completion date.  It just gave everyone a good idea of
10  where we were at each phase.
11      Q.   But that was not done in any way at the request
12  of Mr. Holmstrom?
13      A.   No.
14      Q.   Did you keep a progress schedule on the Phase 1
15  project?
16      A.   I would have to look at my documentation, my
17  project documentation.  I don't recall.  I don't
18  remember.
19      Q.   Exhibit 2 also mentions a James Houck,
20  H-O-U-C-K, Superintendent, Brechan Enterprises.
21          What did Mr. Houck do on the project, to your
22  knowledge?
23      A.   He was a superintendent for the cargo wharf
24  project.
25      Q.   How often did you physically see Mr. Houck on

Page 51

1  the cargo wharf Phase 2 project?
2      A.   Not very many times.  I'd say occasionally I
3  guess he would come out maybe once or twice a week.
4      Q.   How long did he stay on the project when he
5  came out?
6      A.   It depends -- it depended on what he was trying
7  to do.  Anywhere from 5 minutes to 20 minutes.
8      Q.   Did Mr. Houck ever express to you any
9  objections or concerns with the quality of the
10  performance of any of the contractors on the Phase 2
11  project?
12      A.   As we slipped behind schedule, he mentioned it,
13  yes.
14      Q.   My question was not directed to schedule, but
15  directly at the quality of performance.  Let me ask it
16  again.
17          Did Mr. Houck ever indicate to you any
18  objections or concerns with the quality of the
19  performance of any of the Phase 2 contractors as related
20  to meeting the project requirements and specifications?
21      A.   Yes.
22      Q.   And what contractor did he have comments about?
23      A.   Imperial.
24      Q.   And what did he say to you?
25      A.   When we began having quality control,

Page 52

1  quality-related issues, he would come down and take a
2  look at what was going on and he expressed concern as to
3  how we were going to correct those, how we were going to
4  get everything passed and back on schedule.
5      Q.   What month and what year did these
6  conversations occur?
7          MR. DICKSON:  Foundation.  It assumes only one
8  month.
9      A.   Throughout the duration of the project.
10      Q.   When is the first time that you can recall
11  Mr. Houck expressing concern over the quality of
12  Imperial's work?
13      A.   May, May of 2003.
14      Q.   Can you recall any specific area or the
15  specific nature of the concern that Mr. Houck expressed?
16      A.   I believe it began in area "A", bents 13
17  through 15.  We had some coatings over rusted areas.  He
18  expressed concern to that.
19      Q.   How did Mr. Houck come to know that there were
20  some coatings over rusted areas in these bents 13
21  through 15?
22      A.   During some of his stop-by visits, he would
23  come underneath the dock and he may come up to me and we
24  would review the project, go through the bents, looking
25  at the work in progress and some issues that I may have

Page 53

1  had.  So you pointed out to Mr. Houck your concerns
2      Q.   So you pointed out to Mr. Houck your concerns
3  with respect to the coatings over the rusted areas in
4  bents 13 through 15?
5      A.   Yes.
6      Q.   And he then shared your concerns?
7      A.   Yes.
8      Q.   Did Mr. Houck, to your knowledge, have any
9  technical expertise by which he could have independently
10  inspected the work to determine whether or not it was
11  being performed in accordance with the contract
12  specifications?
13      A.   No.
14      Q.   So he had to rely on you?
15      A.   Yes.
16      Q.   What did Mr. Houck ask you to do, if anything,
17  when you pointed out to him your concerns over the
18  quality of Imperial's work?
19      A.   He did not ask me to specifically do anything.
20  He would ask me what we were going to do in regards to
21  this.
22      Q.   And what was your response?
23      A.   Well, most likely I would tell him that the
24  contractor would have to repair these areas.
25      Q.   And did the contractor repair those areas?

14 (Pages 50 to 53)

Absolute Environmental Services, Inc. v. Emerco, Inc.                    Jerry R. Hardenbergh

Page 94

1    Q.   So your assumption on this product -- excuse
2  me, your assumption on this project was that Imperial
3  performed the repairs in that industry standard method
4  that you described?
5    A.   There was overlap on the repairs that they
6  made, yes.
7          (Interruption.)
8    MR. DICKSON:  Was there a question on the
9  table?
10   Q.   Let me ask another one.  Strike that.
11         In performing Imperial's repairs, did the
12  amount of overspray generally, was it generally in
13  conformance with the industry standard that you described
14  or was it wider?
15   A.   I'm not sure how far they sprayed beyond.  They
16  may have.
17   Q.   So isn't it possible that when you performed
18  your testing that you described that you were testing in
19  the overspray area?
20   MR. DICKSON:  Calls for speculation.
21   A.   No.
22         (Exhibit No. 8 marked.)
23   Q.   I will mark as Exhibit 8 what is called
24  "Standard Test Method For Pull-Off Strength of Coatings
25  Using Portable Adhesion."

Page 95

1          Is this also a referenced document that was
2  referenced by the contract plans and specifications?
3    A.   Yes.
4    Q.   And did you use it in some fashion in
5  performing your quality assurance work?
6    A.   Yes.
7    Q.   And in what fashion did you use it?
8    A.   It describes the method of using the dolly with
9  a hydraulic tester to pull coating adhesion tests.
10   Q.   And does it describe the method that you were
11  to use in your QA function for adhesion tests?
12   A.   Yes.
13   Q.   Did you follow it?
14   A.   Yes.
15   Q.   In all cases?
16   A.   Yes.
17   Q.   Would you turn back to Exhibit 6, please.
18         Is it correct that Exhibit 6 describes the PA2
19  test method that you mentioned earlier?
20   A.   No.
21   Q.   Excuse me, is Exhibit 5 that test?
22   A.   Yes.
23   Q.   Is the PA2 test some sort of an averaging test?
24   A.   Yes.
25   Q.   And would you describe how it works?

Page 96

1    A.   On a hundred square foot area of coating, you
2  will make five spot measurements of three individual
3  measurements.  The three individual measurements would be
4  taken in a one-and-a-half-inch diameter circle.  Those
5  measurements are averaged.
6          That spot average cannot be less than
7  80 percent of the minimum specified coating thickness.
8  The average of all the spot measurements cannot be less
9  than the minimum specified coating thickness.
10   Q.   Early in this project did representatives of
11  Imperial Industrial Coatings complain to you that you
12  were not following PA2 in performing your tests?
13   A.   No, I don't believe so.
14   Q.   Isn't it true that you were not following PA2?
15   A.   No, it is not true.
16   Q.   Isn't it true that you did not average the
17  tests but instead considered a failure any single spot
18  point that was below the thickness measurement?
19   A.   No, that's not true.
20   Q.   Isn't it true that at a point in time in May
21  that after complaints by Imperial you in fact ordered a
22  copy of PA2 to be sent to the job so you would be able to
23  use that for further testing after that?
24   A.   No.
25   MS. PETRICH:  Objection; assumes facts not in

Page 97

1  evidence.
2    Q.   Is it true that you ordered a copy of PA2 be
3  sent to the job?
4    A.   I do not recall ordering a copy.
5    Q.   Did you have one at the job at the beginning?
6    A.   I'm not sure.  I had a variety of reference
7  materials at the job with me.
8    Q.   If you did do your testing by PA, by the PA2
9  method, we should be able to tell that from the results
10  that you kept, right?
11   A.   Yes.
12   Q.   And if your test results show no attempt at
13  averaging, would we be able to conclude that you did not
14  use PA2?
15   A.   They do show an average.
16   Q.   You are sure of that?
17   A.   Yes.
18   Q.   All of them?
19   A.   Yes.
20         (Exhibit No. 9 marked.)
21   Q.   I will mark as Exhibit 9 a particular
22  inspection report for December 19, 2003.
23         Can you identify Exhibit 9?
24   A.   It's an inspection report written by myself.
25   Q.   Was it an inspection report performed when

Buell Realtime Reporting, LLC
(206) 287-9066

Absolute Environmental Services, Inc. v. Emerco, Inc.                                    Jerry R. Hardenbergh

Page 98

1    there was substantial completion for the overall Phase 2
2    project?
3        A.    Yes, it appears to be.
4        Q.    How would you describe the overall coating
5    quality of the coating on the cargo wharf at the end of
6    the Phase 2 project?
7            MR. DICKSON:  You mean for both Phase 1 and
8    Phase 2?
9            MR. DUFFY:  No.
10       Q.    Let me restate the question.  How would you
11   describe the quality of the coating that had been
12   performed in the Phase 2 project on the cargo wharf pile,
13   piles?
14       A.    Can you be more specific?
15       Q.    By December 19, 2003, did you feel that the
16   coating that had been performed on the Phase 2 project
17   for the cargo wharf was generally satisfactory?
18       A.    Yes, there was -- the structure was receiving
19   adequate corrosion protection by the coatings applied.
20   There was a punch list generated with a few items that
21   were missed.
22       Q.    Was there a final report issued by Coffman
23   Engineers after this?
24           MS. PETRICH:  Are you referring to inspection
25   reports?

Page 99

1            MR. DUFFY:  Yes.
2        A.    An inspection report after this one?
3        Q.    Yes, was there one?
4        A.    Yes.  After all the repairs had been completed,
5    the punch lists and the warranty items, yes, there was.
6        Q.    Was that report provided to Brechan?
7        A.    That report was submitted to my supervisor for
8    review and that's as far as I know where it went.
9        Q.    Do you have any reason to believe that Brechan
10   and Absolute did not receive copies of that report?
11       A.    No.
12       Q.    Other than the preparation problems that you
13   have so far described, were there any other problems that
14   you observed with the performance of IIC's work when it
15   was on the Phase 2 project?
16       A.    As far as coating quality control, yes, there
17   was additional problems.
18       Q.    And would you describe what they were?
19       A.    The quality control was not adequate, timely
20   and in accordance with the project specifications.  I had
21   problems receiving reports in a timely manner.
22           In the beginning there was no specific quality
23   control plan, no forms, no project-specific forms
24   provided to report quality control inspections, and
25   throughout my observations it looked as if there was

Page 100

1    inexperience with quality control inspections and some of
2    them just not being performed.
3        Q.    Other than you so far described, can you recall
4    any other performance failings or defects by IIC while it
5    was on the project?
6        A.    The coating application problems, defects.
7        Q.    And what was that problem?
8        A.    Well, that was applying coatings over
9    improperly prepared surfaces.
10       Q.    You have described that already?
11       A.    Yes.
12       Q.    I'm asking you if there is anything that IIC
13   did improperly or not in accordance with the
14   specifications beyond what you have told us so far in
15   your deposition?
16       A.    Not that I can think of at the moment.
17           (Exhibit No. 10 marked.)
18       Q.    We will mark as Exhibit 10 a memorandum of
19   May 8, 2003, and ask you to identify that document, if
20   you can.
21       A.    It's a memo that I wrote to Brechan
22   Enterprises, describing the contractor QC inspection
23   requirements, testing and how to report those findings.
24       Q.    What caused you to prepare this document?
25       A.    From my quality assurance observations, the QC

Page 101

1    inspections were not being performed adequately or in
2    accordance with the specification.
3            Originally, we didn't have inspection forms and
4    a quality control plan.  From the beginning there was
5    problems and I made attempts to help provide the
6    inspection forms and help provide training on how to use
7    some of the testing equipment.
8            And that wasn't helping, so I issued this
9    letter specifically stating what was required by the
10   applicator's quality control as far as testing and
11   reporting.
12       Q.    Isn't it true that at the start of the project
13   Imperial submitted a quality control plan that was in
14   effect a standard plan of SPC?
15       A.    No, not that I'm aware of.
16       Q.    You aren't aware there was a quality control
17   plan that was officially submitted on this project and
18   approved for use on the project?
19       A.    I know of a plan that was submitted by
20   Imperial.  The plan that I reviewed was not
21   project-specific.  It was tailored to another project, I
22   believe, in California and there was no project specifics
23   as far as the testing required on this project, nor
24   inspection forms including all the data that was
25   required.

26 (Pages 98 to 101)

Absolute Environmental Services, Inc. v. Emerco, Inc.                    Jerry R. Hardenbergh

Page 146

1    Q.    I will mark as Exhibit 20 what purports to be
2 an employee expense report with a date on it of July
3 something. I can't quite read it.
4        Can you identify this document?
5    A.    It looks like an expense report from Coffman
6 Engineers.
7    Q.    And does it in fact show that on June 10, 2000,
8 for this project that you are asking for reimbursement
9 for purchasing an electronic copy of PA2?
10   A.    Yes, it does.
11   Q.    And did you in fact obtain and purchase an
12 electronic copy of PA2 at that time?
13   A.    It appears that way, yes.
14   Q.    Do you recall why you did it?
15   A.    So that I could have an electronic copy in my
16 computer.
17   Q.    Did you do it because of the complaints of
18 Imperial that you were not following PA2 and that caused
19 you to order a copy?
20   A.    No.
21   Q.    When you ordered the electronic copy, did you
22 already have a copy at the jobsite?
23   A.    Yes.
24   Q.    Why did you order another copy?
25   A.    Maybe for ease of printing. I know I printed

Page 147

1 some copies.
2    Q.    Can you specifically recall ordering this
3 electronic copy so that you would have an ease of
4 printing?
5    A.    Not specifically, no.
6        (Exhibit No. 21 marked.)
7    Q.    We will mark as Exhibit 21 what appears to be
8 final inspection PA2 test results.
9        Can you identify Exhibit 21?
10   A.    Yes, it looks like the final dry film thickness
11 measurements reported by me.
12   Q.    And reported by you for what portion of the
13 project?
14   A.    I would have to look through here. This first
15 one, pile 13E, pile 13F. It continues, pile 20, pile 17.
16 There are various piles in here.
17   Q.    All right. Does it appear to be all of the
18 work required for the project?
19   A.    It does not appear to contain all the piles,
20 no.
21   Q.    Is it true that as to whatever piles were
22 tested here, as you look through this, that all of the
23 test data reports passing results?
24   A.    Yes, I believe so.
25       (Exhibit No. 22 marked.)

Page 148

1    Q.    I will mark as Exhibit 22 what purports to be
2 the Coffman daily summary reports.
3        Of course, you can't verify they're all there,
4 but in general does it look like my description of the
5 document?
6    A.    Yes, it does.
7    Q.    Would you please turn to May 2nd? If you would
8 read the second bullet point to yourself.
9    A.    Okay, I have read it.
10   Q.    And in reading it, are you able to identify
11 where on the particular pile that was inspected that day
12 the low areas of DFT were?
13   A.    No.
14   Q.    Can you identify the size of the low area?
15       MR. DICKSON: Foundation, to the extent that
16 your question implies that there is only area in that
17 pile.
18   Q.    I will rephrase. Can you identify the size of
19 any of the low areas referred to in the report?
20   A.    Not in this report, no.
21   Q.    Is there some other way that you could do that?
22   A.    On this day, when performing inspections with
23 the QC representative, we would go side-by-side under the
24 dock, look at the work activity, look at what has been
25 performed, what needs -- basically, an inspection.

Page 149

1        We would perform the inspections together, take
2 measurements, whatever testing necessary, mark the areas
3 at that time, and the contractor indicated they would
4 begin repairs on that.
5        There was no need for me to document every spot
6 when the contractor and the applicator knew from us
7 working together and marking the piles which areas they
8 needed to repair.
9    Q.    How would you then follow up to determine
10 whether or not the repairs were actually made?
11   A.    The applicator's QC would indicate to me that
12 the repairs had been made and we would go look at it
13 together, and if the marks had been removed, new coating
14 applied, we would look at the repair areas and perform an
15 inspection on the repairs.
16   Q.    Were there ever occasions when you inspected
17 repairs where you concluded the repair was not properly
18 done?
19   A.    Say that again.
20   Q.    Were there ever occasions where you inspected a
21 repair area after it had been repaired where you
22 concluded the repair was not properly done?
23   A.    Yes.
24   Q.    And what would you do in that case?
25   A.    Well, we would discuss it between the two of us

38 (Pages 146 to 149)

Absolute Environmental Services, Inc. v. Emerco, Inc.                    Jerry R. Hardenbergh

Page 222

1          A F F I D A V I T
2
3
4     STATE OF ALASKA        )
5                      ) ss
6     COUNTY OF ANCHORAGE   )
7
8          I have read my within deposition, and the
9     same is true and accurate, save and except for changes
10    and/or corrections, if any, as indicated by me on the
11    "CORRECTIONS" flyleaf page hereof.
12
13
14
15          JERRY R. HARDENBERGH
16
17
18
19          SUBSCRIBED AND SWORN TO before me this
20    day of        , 2005.
21
22
23          NOTARY PUBLIC in and for the
24          State of Alaska,
25          residing at           .

Page 223

1          C E R T I F I C A T E
2
3     STATE OF WASHINGTON   )
                            ) ss
4     COUNTY OF KING        )
5
6          I, JOLENE C. HANECA, a Certified Shorthand Reporter
7     and Notary Public in and for the State of Washington, do
8     hereby certify that the foregoing transcript of the
9     deposition of JERRY R. HARDENBERGH, having been duly
10    sworn, on FEBRUARY 10, 2005, is true and accurate to the
11    best of my knowledge, skill and ability.
12          IN WITNESS WHEREOF, I have hereunto set my hand and
13    seal this 22ND day of FEBRUARY, 2005.
14
15
16          JOLENE C. HANECA, RPR, CCR
17
18    My commission expires:
      March 28, 2006
19
20
21
22
23
24
25