```
 1             IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
 4   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., An Alaska
 5   corporation,
 6                    Plaintiff,
 7        vs.
 8   FORREST J. McKINLEY and "JANE
     DOE" McKinley, et al.,
 9
                      Defendants.
10   _____
11   Case No A03-0199 Civil (RRB)
12
13
14
15
                   DEPOSITION OF DAVID OLSON
16
                     Taken March 30, 2006
17                  Commencing at 9:00 a.m.
18       Volume III - Pages 244 - 424, inclusive
19
20
                     Taken by the Defendant
21                            at
                         PERKINS COIE
22             1029 W. Third Av., Suite 300
                      Anchorage, AK  99501
23
24
25   Reported by:
     Susan J. Warnick, RPR
```

EXHIBIT D

Case No. A03-0199 Civil (RRB)　　　　　　　　　　　　　　　　　　　　David Olson

Page 297

1　A　This same definition that your client and Swalling
2　would have used on the Phase 1 portion, one through 12. I
3　would define it in that regard. I don't have the specific
4　Webster Dictionary definition on defective weld.
5　Q　So make sure I understand this. The only welds which
6　you're complaining about as having been defective and
7　adversely impacted your work would have been the same type
8　of welds that Coffman was referring to and Swalling was
9　referring to in Phase 1 as being defective?
10　A　I would -- any welds that -- I would be referring to
11　any welds that were not described in the plans and
12　specifications that impacted our ability to put up a
13　holiday-free coating.
14　Q　My question is: On Phase 2, having looked at all
15　these documents that you have looked at, in general terms,
16　what were those welds?
17　　　　MR. ELISON: Objection, overbroad.
18　　　　THE WITNESS: I don't have the technical
19　background to sit and describe welds to you and what type
20　and how they were applied.
21　BY MR. PARTNOW:
22　Q　Sitting here today, how do you even know what the
23　same weld conditions that were being complained about by
24　Swalling in bents -- the area of bents 1 through 5 existed
25　in the H pile part of the wharf that you were doing in

Page 298

1　Phase 2?
2　　　　MR. ELISON: Objection, asked and answered.
3　　　　THE WITNESS: I have already answered it, and
4　I'll restate. All you have to do is read the reports that
5　were prepared by Mr. Hardenbergh and the photographs that
6　were collected by Mr. Hardenbergh in the same areas that
7　were described on Phase 1 are the same areas that show up
8　in the photographs in Phase 2 and are described in
9　Mr. Hardenbergh's documents in Phase 2.
10　　　　(Exhibit 97 marked.)
11　　　　MR. BROWN: Peter, do you know what the Bates
12　stamp numbers of these documents are?
13　　　　MR. PARTNOW: No.
14　　　　MR. BROWN: Do you know why they are not Bates
15　stamped?
16　　　　MR. PARTNOW: Because I was trying to confuse
17　you. No, I don't know why they are not.
18　BY MR. PARTNOW:
19　Q　Let me know when you've had --
20　A　I have looked at them.
21　Q　I have given you Exhibit 97. You have seen this
22　previously?
23　A　This is addressed to me. You know, I don't know that
24　I have seen this before, this specific memo.
25　Q　It's dated August 19, 2003.

Page 299

1　A　Uh-huh. I see that.
2　Q　And it's to you from Mr. Hardenbergh?
3　A　Right.
4　Q　And it references numerous areas of coating defect
5　that Mr. Hardenbergh says were found?
6　A　Uh-huh. I'm just saying that I don't know that I
7　have seen this exact document, but the contents of it,
8　I -- I don't disagree with all of them.
9　Q　You don't or you do?
10　A　I don't.
11　Q　You were just talking about just look at the photos
12　and look at the paint. Are these the sort of photographs
13　you were referencing?
14　A　No, there were other photographs. These would be
15　part of the photographic record for the job, but this is
16　just a sampling.
17　Q　And my question is: Would this, in your view, be a
18　representative sampling of the types of photographs that
19　were taken and the paint that were put on to mark the
20　defective areas?
21　　　　MR. ELISON: Object to the use of the phase
22　"representative sampling" as vague here.
23　　　　THE WITNESS: You'd have to define
24　representative. Would you say -- ask the question back to
25　you. Are you asking me if these photographs are

Page 300

1　representative of what the, oh, markings on the coating at
2　every bent or is this representative throughout the entire
3　project? Because these purport to be 13 through 15.
4　BY MR. PARTNOW:
5　Q　I understand that. My question is you were saying
6　you just have to look at the photographs and see the paint
7　all over the place, and that will show where the problems
8　were, just look at the photographs. What I'm saying is
9　what --
10　A　Well, not just these. There are hundreds of
11　photographs.
12　　　　MR. ELISON: Let's not talk at the same time.
13　Make it easier on the court reporter.
14　BY MR. PARTNOW:
15　Q　Wouldn't you agree that these are, I suppose, typical
16　of the photographs that you were referring to?
17　A　I would say these are some of the photographs that I
18　was referring to. I would say that the photo on the
19　bottom left of page two, that would be typical of what I
20　was referring to.
21　　　　MR. KREGER: The one that says south side of
22　bent 14?
23　　　　THE WITNESS: South side of bent 14. And the
24　second photograph down in the right-hand column on page
25　three of three.

Page 301

1  BY MR. PARTNOW:
2  Q  The one that says north side of bent 19?
3  A  Uh-huh. And the one above it, north side of bent 17,
4  that would be part of it, when I'm referring to welds.
5  Q  Are there any of the photographs in this Exhibit 97
6  that you think are atypical?
7  A  Atypical?
8  Q  Not typical, that are unusual, or, gee, this is the
9  only picture I have ever seen that looks like that?
10 A  No. I mean, there is other photographs here of where
11 the paint wasn't adhering correctly, and any of a number
12 of reasons as listed in the first paragraph. I mean, it
13 wasn't exclusively in bent 14 through 15. It wasn't
14 exclusively the bend that were a problem. Imperial had
15 some application problems.
16 Q  Were you involved in the performance of the punch
17 list work?
18 A  In 2004 for Phase 2, or would you be speaking of the
19 punch list work for Phase 1 in 2003?
20 Q  The punch list work for the Phase 2 contract.
21 A  Yes. Was I involved how? Was I out there for it?
22 Q  Were you familiar with the areas that were dealt with
23 in the punch list?
24 A  Yes.
25    (Exhibits 98 and 99 marked.)

Page 302

1  BY MR. PARTNOW:
2  Q  Am I correct -- do you recognize Exhibit 98 as being
3  the punch list for Phase 2, the cargo wharf project?
4  A  I do.
5  Q  Can you identify -- strike that.
6     Are you generally familiar with the work that
7  was performed or needed to be performed in order to
8  complete this punch list?
9  A  I'm sorry?
10 Q  Are you generally familiar with the work that needed
11 to be performed in order to complete the punch list?
12 A  Yes.
13 Q  And Exhibit 99 is basically -- am I correct that that
14 basically shows where you've gone and dealt with the punch
15 list and the correction of the punch list items has been
16 signed off on on behalf of the engineer?
17 A  Yeah. And 99 also incorporates some other areas that
18 we found. And I think also warranty -- warranty items.
19 Q  So this is basically the final warranty sign-off?
20    MR. ELISON: I object to form.
21    THE WITNESS Yeah, I believe it was -- I'm sorry.
22 I believe it was. I'm just -- I'm looking at the dates up
23 here. The date at the top is October 23 of '04, and these
24 were approved on 12/12. So I'm not -- I'm not sure about
25 the dates on there. But I know that I've gotten a copy

Page 303

1  similar to this, if not this one.
2  BY MR. PARTNOW:
3  Q  You're talking about 99, when you say "this"?
4  A  Yeah, 99. Sorry.
5  Q  And my question is: Can you go through -- let's look
6  at Exhibit 98 -- and identify which of those items relate
7  to weld areas?
8  A  Number one, I don't --
9  Q  And again, I'm not asking you to speculate if you're
10 not sure.
11 A  No, actually, I don't think we can. I don't think
12 we'll be able to by looking, unless he specifically called
13 out a weld location. You know, like 37, diagonal square
14 tube at pile 25-F, on page 2 of 3?
15 Q  Yup.
16 A  You know, that could. It might have been an area
17 where that square tube met 25-F, and then it might have
18 been welded at that point, and it might not have. So I
19 don't know that we can -- I would say 32 would fall into
20 that category.
21 Q  So you expect it could or could not, but you don't
22 know for sure?
23 A  Yeah, I don't know for sure.
24    MR. BROWN: Excuse me. Do you folks have page
25 two of the exhibit or are you going one to three, like I

Page 304

1  am?
2     MR. ELISON: We have page two.
3     MR. PARTNOW: Pardon?
4     THE WITNESS: We don't.
5     MR. PARTNOW: Oh, 99? I'm sorry.
6     MR. PUETT: No, no two.
7     MR. PARTNOW: I'm sorry. I've got it here. Can
8  we --
9     MR. KREGER: I don't have page two either.
10    MR. PARTNOW: I've got a copy of it here.
11    MR. KREGER: Shall I make another copy of it?
12    MR. PARTNOW: Sure.
13    (Off record.)
14 BY MR. PARTNOW:
15 Q  I take it your testimony is, without having the
16 specific pictures or indications of the punch list items,
17 you can't, sitting here today, testify as to which of
18 those areas involved weld areas and which of them did not?
19 A  I would have to speculate.
20 Q  We wouldn't want you to do that.
21 A  No.
22 Q  Do you have any complaint about the work that Mr.
23 MacLeod from KTA Tator did while he was involved in the
24 project?
25 A  No.

```
 1                    REPORTER'S CERTIFICATE

 2            I, SUSAN J. WARNICK, RPR, and Notary Public in

 3    and for the State of Alaska do hereby certify:

 4            That the witness in the foregoing proceedings was

 5    duly sworn; that the proceedings were then taken before me

 6    at the time and place herein set forth; that the testimony

 7    and proceedings were reported stenographically by me and

 8    later transcribed under my direction by computer

 9    transcription; that the foregoing is a true record of the

10    testimony and proceedings taken at that time; and that I

11    am not a party to nor have I any interest in the outcome

12    of the action herein contained; that signature is

13    requested.

14            IN WITNESS WHEREOF, I have hereunto subscribed my

15    hand and affixed my seal this 19th day of April,

16    2006.

17

18

19                                SUSAN J. WARNICK,
                                  Registered Professional Reporter
20                                Notary Public for Alaska

21
      My Commission Expires:  April 8, 2010
22

23

24

25
```

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
 4   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., An Alaska
 5   corporation,
 6                Plaintiff,
 7        vs.                                    COPY
 8   FORREST J. McKINLEY and "JANE
     DOE" McKinley, et al.,
 9
                  Defendants.
10   _____
11   Case No A03-0199 Civil (RRB)
12
13
14
15
                  VIDEOTAPED DEPOSITION OF DAVID OLSON
16
                       Taken February 13, 2006
17                     Commencing at 9:00 a.m.
18            Volume I - Pages 1 - 243, inclusive
19
20
                       Taken by the Defendant
21                                at
                             PERKINS COIE
22                 1029 W. Third Av., Suite 300
                        Anchorage, AK  99501
23
24
25   Reported by:
     Susan J. Warnick, RPR
```

Page 122

1  A   Oh, 54. I'm sorry. Line 21?
2  Q   Yes.
3  A   Okay.
4  Q   And I would represent to you that we don't start to
5  get an answer to that until we get down to -- back to page
6  55. Mr. Vernon states, "The question is difficult."
7      Do you see that?
8  A   Yes.
9  Q   And then he talks about welds. Take a minute and
10 read that to yourself, just the six or seven lines at the
11 top of 55 and the first line on the top of 56.
12 A   Okay. I saw the -- do you want me to read it out
13 loud or --
14 Q   Yeah, why don't You do that.
15 A   Okay. Starting at line 14: "The question is
16 difficult. For example, in a remote location such as
17 Kodiak, difficulties in getting supplies, difficulties in
18 getting equipment, abrasives, those type of things, every
19 contractor, depending on if they have done work in remote
20 locations, can encounter those types of problems."
21 Q   Okay. Go ahead, please. On welds?
22 A   "Welds. It's well known in the industrial painting
23 area, when you have a surface that is to be holiday free,
24 that welds need to be addressed in that you most
25 frequently will have holidays on welds."

Page 123

1      Continue?
2  Q   Please.
3  A   "So many of the problems that were some of the
4  problems that they encountered are frequently encountered
5  and mostly it's a matter of degree."
6  Q   Now, who is Mr. Vernon?
7  A   Skip Vernon is a consultant, I guess, or expert
8  witness that I've retained.
9  Q   What area does he have expertise in?
10 A   Coatings.
11 Q   Do you disagree with what he says there about welds?
12     MR. MARSTON: Objection. Lack of foundation.
13     THE WITNESS: In what context, that they will
14 be -- most frequently have holidays on welds or --
15 BY MR. KREGER:
16 Q   Just what he said --
17 A   Honestly, I don't --
18 Q   You don't take any issue with what he said there?
19 A   I'll tell you this, having -- not being a coatings
20 contractor and not knowing going into this, I don't know
21 about welds and what they do. I know now, after reading
22 what I've read, that welds are a problem in relations to
23 coatings, especially when you're going for a holiday-free
24 surface.
25 Q   Can you tell me how much of the work that you had to

Page 124

1  do for -- going for a holiday-free surface was more than
2  what an experienced coating contractor would have expected
3  to do?
4      MR. MARSTON: Objection. Lack of foundation.
5      THE WITNESS: I have no idea.
6      MR. KREGER: Would you mark this next, please.
7      (Exhibit 87 marked.)
8      (Discussion off record.)
9  BY MR. KREGER:
10 Q   Take a look at that, Mr. Olson, while we're --
11 background noisy.
12 A   Just the front page or the whole thing?
13 Q   I'm going to ask you whether you recognize the
14 agreement.
15     MR. MARSTON: Objection. Vague.
16     THE WITNESS: I recognize portions of it. As it
17 being one entire document, I don't recognize it.
18 BY MR. KREGER:
19 Q   Can you identify this as the subcontract between
20 Brechan and Absolute?
21 A   Yes. This one, two, three, four, these pages would
22 be part of the contract. Or the -- did you say the
23 contract?
24 Q   Yes, I did. Yes, I did.
25     Okay. Let's just take the first four pages.

Page 125

1      MR. MARSTON: Is that through 168?
2      THE WITNESS: Yeah. 165 through 168.
3  BY MR. KREGER:
4  Q   Okay. What do you recognize those four pages as?
5  A   My subcontract with Brechan Enterprises.
6  Q   Okay. And the subcontract there on Article 2 in the
7  middle says something about scope of work dated 11/27/02
8  and your proposal dated 10/22/02. Do you see that?
9  A   Yes.
10 Q   And -- this is the second October 22nd letter that
11 we've seen that you've signed. And, as you know, it's
12 different than the October 22nd letter in your subcontract
13 with Imperial.
14     But what I want to know is whether this October
15 22nd letter is the one that you intended to have
16 referenced in your subcontract with Brechan.
17 A   I know we had some November correspondence as well,
18 but this is the one that was incorporated into the
19 contract.
20 Q   Why were there three different October 22nd letters
21 signed by you?
22 A   I don't recall at this time. If I put all three of
23 in front of me, I might know the difference between them,
24 but...
25 Q   You don't remember why you did, at this point?

1  REPORTER'S CERTIFICATE

2  I, SUSAN J. WARNICK, RPR, and Notary Public in

3  and for the State of Alaska do hereby certify:

4  That the witness in the foregoing proceedings was

5  duly sworn; that the proceedings were then taken before me

6  at the time and place herein set forth; that the testimony

7  and proceedings were reported stenographically by me and

8  later transcribed under my direction by computer

9  transcription; that the foregoing is a true record of the

10 testimony and proceedings taken at that time; and that I

11 am not a party to nor have I any interest in the outcome

12 of the action herein contained; that signature was

13 requested.

14 IN WITNESS WHEREOF, I have hereunto subscribed my

15 hand and affixed my seal this 28th day of February

16 2006.

17

18 _____
   SUSAN J. WARNICK,
19 Registered Professional Reporter
   Notary Public for Alaska
20

21 My Commission Expires: April 8, 2006

22

23

24

25