

# MKL Associates, LLC
## Construction Consultants

# Findings and Opinion Report

### *In the Matter of*

## Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.

## November 12, 2004

9427 N.E. 138th St.  •  Kirkland, WA 98034
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

Exhibit ___E___
Page _1_ of _29_



# MKL Associates, LLC
## Construction Consultants

**HAND DELIVERED**

November 12, 2004

Terry R. Marston II
Marston Heffernan Foreman
Anderson Park Building
16880 N.E. 79th Street
Redmond, WA 98052-4424

RE:    Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.

SUBJ:  **Findings and Opinion Report**

Dear Mr. Marston:

MKL Associates, LLC (MKL) has been retained by Absolute Environmental Services, Inc. to prepare its' claim for damages associated with its' completion of Imperial Industrial Coatings' work on the Cargo Pier Recoating project at the USCG base at Kodiak, Alaska. MKL has also been retained to evaluate Defendant's counterclaim quantification contained in various Responses to Interrogatories.

Attached is a *Findings and Opinion Report* containing background findings, damages calculations, and opinion relative to the counterclaim issues. Also enclosed is a Summary of Qualifications for myself. I have considerable experience in troubleshooting and evaluation of similar disputes, in the capacity of estimator, project manager, construction executive, and consultant.

I look forward to assisting the process of an expedient resolution of the matter for all parties.


Yours Very Truly,
**MKL Associates, LLC**



Michael Lembke,
Principal


C/ AESI-David Olson
    File


Exhibit ___E___
Page _2_ of _29_

## Table of Contents

I.     Qualifications

II.    Assignment

III.   Work Completed to Date

IV.    Project Background

V.     Problems Encountered

VI.    AESI Completion

VII.   AESI Damages

VIII.  Conclusion Relative to AESI Damages

IX.    Evaluation of Counterclaim Quantification

X.     Conclusion Relative to Counterclaim Quantification

## List of Exhibits

*Exhibit 1: MKL Associates, LLC Summary of Qualifications*

*Exhibit 2: Recent Depositions and Testimony*

*Exhibit 3: Job Cost Report, 2003*

*Exhibit 4: Labor and Vendor Cost Summary, 2003-2004*

*Exhibit 5: Labor Summary, 2003*

*Exhibit 6: Job Cost Report, 2004*

*Exhibit 7: Labor Summary, 2004*

*Exhibit 8: AESI Cost Calculation*

*Exhibit 9: Phase I Repairs*

*Exhibit 10: Contract Payments*

*Exhibit 11: Excerpts from AESI Financial Statements and Supplementary Information, 2202 and 2003*

*Exhibit 12: Eichleay Calculation*

Exhibit  E
Page  3  of 29

November 12, 2004

## FINDINGS and OPINION REPORT

*In the matter of* Absolute Environmental Services, Inc v. Forrest J. McKinley, et al.

Case No. A-03-0199 Civil (RRB)

## I. QUALIFICATIONS

I am the principal of MKL Associates, LLC (MKL), a licensed and registered consulting firm based in Kirkland, Washington.  I have formal education, training, and practical experience in the construction and management of contracts similar to the project at issue, including the problems encountered.  A Summary of Qualifications is attached to this report as *Exhibit 1*.  A listing of other cases for which I have been deposed or testified at trial within the last four years is attached to this report as *Exhibit 2*.

## II. ASSIGNMENT

MKL has been retained by Absolute Environmental Services, Inc. (AESI) to:

*A.* Evaluate AESI's claim and provide damages calculations for its' costs to complete the work of Imperial Industrial Coatings (IIC) for Section 09967 of the Cargo Pier Recoating, ISC Kodiak, Alaska for the United States Coast Guard, Contract No. DTCG650-02D-643J55, Delivery Order No. 643P92, AESI Project No. 2003-04. *and*

*B.*  Evaluate IIC's counterclaim quantification in Defendant's Response to First Set of Interrogatories to Defendant, Interrogatory No.1 and Interrogatory No.2 Responses.

1


Exhibit E
Page 4 of 29

## III. WORK COMPLETED TO DATE

MKL started work on the project July 1, 2004. Over the past approximately four months I have investigated the factual history of the project, including three days of documents review and interviews at AESI offices in Anchorage, Alaska.

Documents reviewed thus far include the Brechan-AESI subcontract and attachments; the AESI-IIC subcontract and attachments; the contract drawings and specifications; the project schedule and schedule-related documents; IIC documents, including correspondence to and from various parties; AESI documents, including correspondence to and from various parties; AESI daily reports; IIC daily reports; Coffman Engineers daily reports and other Coffman Engineers documents; KTA Tator daily reports and specific reports; AESI financial information and statements; Brechan Enterprises, Inc. correspondence; Specialty Polymer Coatings, Inc. specifications, technical data, product data, cost information, certification program information, invoices, and correspondence; IIC's original estimate; IIC cost information; IIC certified payrolls and other labor information produced; Mark Shilling reports; AESI certified payrolls, including certified payrolls for CORRPRO Companies, Inc. and CSI Coating Systems, Inc.; AESI cost information including invoices, accounting records, job cost reports, labor information, and overhead information; AESI video tapes; and misc. other AESI documents; Brechan-AESI change orders and extra work documents.

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com • www.mklassociates.com



I have also interviewed Dawni Haines, AESI's accountant; David Olson, Todd Elmore, and Jason Peterson of AESI; and Tim Lawrence of Polar Supply Co., Inc.  In addition, I have reviewed pertinent Interrogatories and Interrogatories Responses of the parties.

This list is not intended to include all documents reviewed.  I have attempted to review all pertinent documents produced to date by the parties.

Opinions have been formed relative to responsibility for delays and costs for work completed by AESI for IIC's contractual obligations, and damage calculations completed, including adjustments for costs not the responsibility of IIC.  Opinions have been formed relative to quantification of Defendant's counterclaim items

## IV. PROJECT BACKGROUND

Brechan Enterprises, Inc. (Brechan) and AESI entered into a subcontract agreement December 20, 2002 under Brechan's IDIQ MultiTrade Construction Contract DTCG50-01-D-643J55 for the project known as the *Cargo Wharf Pile Coating Phase II*. The project Owner was the DOT/USCG Facilities Design & Construction Center (Pacific), which was essentially the United States Coast Guard base at Kodiak, Alaska (USCG).

Previously, AESI had sought to team with a coatings contractor to qualify to perform the project work scope, which was to remove existing coatings and install new coatings on steel piling and attached steel bracing for an existing USCG wharf. The application of industrial coatings systems is highly specialized work, requiring qualifications and

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

3

Exhibit ___E___
Page _6_ of _29_

experience that AESI did not possess.   Subsequently, AESI teamed with IIC, which purported to have the required qualifications and experience.   AESI and IIC entered into a subcontract agreement dated December 20, 2002 for the project.

Under the subcontract between AESI and IIC (contract) AESI was to provide specific equipment and support services (*Subcontract Attachment VII*), and IIC was to provide other equipment and materials, and to perform the work of scaffolding and containment, removing the existing coatings, preparation of the steel surfaces, application of the new coatings system, and dismantlement of temporary facilities.   Other attachments to the contract included the specifications; AESI and IIC proposals; the completion schedule; an indemnification clause; and a no-lead report.

The work was divided into five segments, (A, B, C, D, and E), to be completed in sequential order, with each segment taking approximately 30 calendar days.   Work preparation activities were scheduled between January 20, 2003 and February 22, 2003. Mobilization to Kodiak was scheduled between March 3 and March 31, 2003.The IIC on-site work on the wharf proper was to start on April 1, 2003, and be completed no later than August 30, 2003, per *Attachment IV, Revision 3 Project Schedule*, thus allowing a maximum of 150 calendar days from start of containment work to demobilization from Kodiak.

9427 N.E. 138th St.   •   Kirkland, WA 98034-1822
425-823-6388   •   Fax: 425-823-8332
email: mklassc@hotmail.com   •   www.mklassociates.com

4
Exhibit ___E___
Page _7_ of _29_

The work preparation and mobilization phases of work apparently went more or less according to plan, as the project records do not suggest otherwise. However, once IIC began work on the wharf, on or about April 1, 2003, problems began to develop.

## V. PROBLEMS ENCOUNTERED

### April 2003

IIC missed its' first key date by failing to start ultra high-pressure water blasting to remove existing coatings on April 11, as planned. Subsequently, IIC also missed the completion date of blasting, which was scheduled to be finished by April 13 for Area A.

Schedule slippage continued, and by April 18, only 2 1/2 weeks into the work, IIC was already 5 days behind. By April 22, sponge blasting for profile was only 70% complete, which meant the project was now approximately 9 days behind schedule. There were some equipment problems in the first few weeks, but the main contributing factor was that IIC had only two men on the job until April 14, when two more were added. Four men were still well short of the seven-man crew allotted in IIC's original estimate. By April 26, only 21 of 51 piles in Area A had been sponge blasted, and only 15 of 51 coated, less than 29%.

The Quality Assurance Representative (QAR) for Brechan, Jerry Hardenbergh of Coffman Engineers, began to note schedule slippage in his daily reports on April 23, and quality problems began to be noted by April 25. At the end of April, Area A was to have been completed, but IIC was two weeks behind schedule after one month on the job.

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

5

Exhibit ___E___
Page __8__ of __29__

Other problems began to develop by the end of April 2003. The subject of quality control on IIC's part was becoming an issue for the QAR, AESI and Brechan. The contract and specifications, specifically paragraphs 1.5.8 through 1.5.10.5, required IIC to provide specific quality control testing and inspection, and documentation for both in the form of a *daily* written quality control report, including specific test results data. The QAR was not receiving the daily reports, despite directly asking for them from IIC. The QAR was performing much of the required testing himself to determine if the work was being performed to specifications.

QAR tests indicated two problems: *high chlorides content in the sponge blast media (strictly limited by the specifications), and low dry film thickness (DFT)* on the steel. The main problem was that IIC was not controlling the work process to insure proper quality was being achieved, nor providing the specific quality control (QC) information with which to track these issues. Put another way, the QAR was doing IIC's job, and the test results indicated trouble.

**May 2003**

On May 2, 2003 the QAR made note that virtually every pile coated with new material had holiday or low DFT problems. All of these defects required repairs and additional testing to insure the repairs had successfully corrected the problems. ICC began to go back and repair numerous defects, which created impacts to their productivity, material quantities, and work schedule.

9427 N.E. 138th St. • Kirkland, WA 98034-1822
425-823-6388 • Fax: 425-823-8332
email: mklassc@hotmail.com • www.mklassociates.com

6

Exhibit  E
Page  9  of  29

With respect to the high chlorides issue (chlorides are highly corrosive to steel), the QAR issued a Non-Conformance Report (NCR) (a serious citation to correct a significant problem immediately) on May 2, related to the use of seawater-saturated sponge media. The NCR was revised on May 7 when the QAR observed saturated media being mixed with new media by IIC.

Brechan and AESI became concerned about schedule in early May, and requested IIC's plan to get back on-track. IIC's recovery plan consisted of working during morning and evening tides, changing blast media from sponge to copper slag, and adding one additional blast pot. IIC did not, however, add any manpower, with only 5 men on the job.

The QAR received the first IIC QC reports on May 8, *5 weeks late*. The reports were incomplete and lacked the required test results needed to insure the work was being performed properly. The quality problems continued, resulting in more defects to be corrected, more labor expended, more material consumed, and additional schedule slippage. IIC could not afford more defects problems, and the five man crew was not able to maintain schedule. Nevertheless, IIC continued with the same crew and **failed to correct the quality problems.**

As May continued, other problems emerged. IIC did not possess enough environmental control equipment to stabilize the environmental conditions inside their containment

9427 N.E. 138th St. • Kirkland, WA 98034-1822
425-823-6388 • Fax: 425-823-8332
email: mklassc@hotmail.com • www.mklassociates.com

7
Exhibit E
Page 10 of 29

areas during inclement weather. Without proper temperature and humidity conditions, blasting and coating work cannot be properly done. Also, IIC's Graco coatings pumps started to leak-a problem that continued until the end of IIC's on-site work.

The quality issues worsened. Reports were not submitted timely or complete by IIC. IIC's testing was inadequate, according to the QAR. IIC did not even have all of the test equipment on-site that it needed to perform to the requirements of the contract. Defects in the work continued to consume valuable time and resources for both IIC and the QAR. Worse, it was discovered that *IIC was not performing the defect corrections properly*. IIC had painted over rust in some areas. The repair areas were still low DFT and had holiday problems. IIC was now spending time and money to repair repairs.

A second Non-Conformance Report was issued by the QAR on May16 addressing adhesion problems related to improper surface preparation prior to coating in Area A (Area A repairs were still incomplete at this time).

Area A was finally 100% coated on May 19, but still had numerous defects to be corrected. At this point, after completion of only one area out of five, IIC was 19 days behind schedule. More significantly, IIC had consumed **2,168 man-hours of labor out of a total of 4,704 in its estimate**. This represented **46% of IICs' entire labor budget consumed in the first area,** with many repairs in Area A still left to complete.

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

8

Exhibit ___E___
Page __11__ of __29__

On May 21, blasting operations commenced in Area B. This was only 10 days behind the scheduled start, but this ignores the fact that a large amount of work was not yet completed in Area A. On May 21, the gray material was uncovered in Area C, Bent 21/A-C. This item is addressed in the counterclaim section of this report.

Work progress proceeded slowly in Area B. IIC was attempting to utilize only four men to deal with repairing the defects problems in Area A, and to do blasting, preparation work, blasting to profile, coatings work, quality control, equipment movement, and cleanup in Areas B. Working in 2 areas required many changes of equipment and materials, excessive movements to and from different areas, and generally inefficient use of the limited manpower. The QC work alone is normally a full-time job for one man, considering the testing and inspection work required by the contract. IIC continued to create problems for itself that only made matters worse due to lack of diligent, proactive quality control.

By the end of May, IIC had consumed **2,794 man-hours** of labor-**59% of the entire project man-hour budget**, with Area A still not finished and little work accomplished in Area B.

**June 2003**

At the start of June, IIC workmen had had only *one day off* (May 26) after working two full months of hard physical labor, 7 days a week, in difficult conditions. The loss of efficiency effects of working extended periods of overtime and weekends are well

9427 N.E. 138th St.   •   Kirkland, WA 98034-1822
425-823-6388   •   Fax: 425-823-8332
email: mklassc@hotmail.com   •   www.mklassociates.com

9

Exhibit  E
Page  12  of  29

recognized within the construction industry, with this situation an extreme example. The same 4 men were now spread out over 3 different areas.

IIC's crew continued to have problems with the leaking pumps. As early as June 9, ICC was moving tarps and cables into *Area D*, stretching their resources even thinner. On June 12, the coatings pumps began causing serious problems, impacting labor efficiency, and schedule. More pump problems occurred on June 13, again with a cost in time and money. Additional pump problems occurred on June 14.

On June 18, *IIC ran completely out of abrasive blast media and coating product*, making further progress impossible until additional materials arrived on the job. The lack of materials left IIC with limited options. No new production work could be performed, and IIC worked only on repairs, equipment maintenance, containment work, and grinding.

On June 21, IIC was issued a directive from Brechan to *stop work* and install filter tarps, which IIC apparently disregarded. After written notices from Brechan and AESI, the *owner* of IIC called IIC's project manager on June 23 and instructed him to stop work and install the tarps. Additional coating and abrasive blast media material was finally delivered on June 25, after 8 days of waiting, but no new production work was completed in June.

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

10

EXHIBIT   E
Page   13  of  29

The schedule and quality problems continued to worsen towards the end of June. After many letters and counter-letters had been written in May and June, without significant progress, AESI issued a cure notice to IIC on June 12 to correct the quality control problems within the 3 day contractual period or face the cost of AESI doing it for them. After many more letters and no improvement in quality control, AESI notified IIC on June 26 that an independent quality control representative would be placed on-site to do the required work at IIC's expense. The new quality control representative, Mr. Macleod of KTA-Tator, arrived on-site June 28.

The schedule situation was similar. By June 25, the project had fallen behind by 4 weeks. AESI issued a cure notice to IIC on June 26 to recover the schedule. Without materials, only four men working, and repair and other failures piling up, IIC was not in a position to improve the situation. No production work had taken place since June 18.

On June 27 the QAR documented serious quality problems. IIC had sprayed repair areas in Area B *without doing the repairs*. Painted color markings to denote the extent of repairs were found under the newly-applied coatings. IIC was coating over the defects without correcting them first. The QAR's photographic evidence was contemporaneous, clear, and convincing.

By the end of June IIC had expended 4,048 man-hours of labor, 1,968 of which were *overtime.* The original estimate contained only 1,344 overtime hours, so IIC was already nearly 50% *over* budget for overtime hours. Fully **86%** of the estimated man hours for

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

11

Exhibit E
Page 14 of 29

the project had been consumed without a single area completed, and serious quality problems remained that would be costly and time consuming to correct. Only 60 days of schedule remained to complete the work on time.

**July 2003**

Due to the lack of an effective response from IIC, AESI began a major effort to send additional manpower and equipment to Kodiak over the 4th of July holiday, to try to salvage the project. AESI increased its manpower from 2 to 5 by July 12, with the arrival of additional equipment. AESI work on the wharf began on July 13, in Area C.

Meanwhile, IIC was not on-site July 1 to July 7, with only two men on-site July 8. July 11 more IIC equipment problems prevented coatings work. High tides damaged IIC's flotation platforms on July 12, July 14, July 16, and July 25. The project was now 6 weeks behind schedule, remaining stalled since June 18. On July 15 IIC accidentally discharged coatings material into the bay, resulting in the job being *shut down* by Brechan, upsetting the Coast Guard, and the QAR's issuance of NCR-003.

While AESI continued to ramp up (AESI had 8 men working on the job during the week of July 26), IIC continued to struggle with repair problems, with no new production work accomplished since June 18. Graco pump malfunctions continued to contribute significantly to IIC's difficulties during the last 2 weeks of July. On July 29 and 30, the QAR documented additional repair failures and adhesion problems in Area A. IIC simply did not repair the defects, and the areas affected quickly failed. These repair failures

9427 N.E. 138th St.   •   Kirkland, WA 98034-1822
425-823-6388   •   Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

12

were very costly to IIC in terms of labor, material, and schedule, and were entirely within IIC's control.

**August 2003**

The Specialty Polymers Coatings, Inc. (SPC) representative arrived in Kodiak on August 4, and determined that the problems with the Graco pump related to not properly cleaning the mixing block.  SPC also thought the problems IIC was having with the SPC repair kits were applicator-related.  SPC *decertified* IIC on August 4.  AESI sent IIC a cure notice on the certification issue on August 6, with a follow-up letter on August 8.  IIC legal counsel sent AESI a *Notice of Termination and Default* on August 7, thus ending IIC's on-site involvement.  IIC never resolved the certification problem.

 Reference:
 *COF000007-COF000383; IIC001269-IIC001592; COF0000800-COF000989; AES000024-AES000266; AES002930-AES002962; BEI-0557-BEI-0869*

# VI. AESI COMPLETION

By August 9 AESI had 17 men on the job, additional equipment and supervision, and proceeded to complete the work as best it could. AESI performed the balance of IIC's work, and extensive repairs and rework to the work-in-place performed by IIC.  AESI manpower peaked the week of August 16, with 20 men working on the job, leveled off, and averaged 12 men for the balance of the project.  Harsh winter weather and tide conditions and ever-shorter daylight hours were significant contributing factors to costs. Additional containment and repairs work was slow and difficult to accomplish.  The project was finally completed, including extensive repairs to IIC's failures in Areas A and B, on November 22, 2003, 84 calendar days past the August 30 completion date.

9427 N.E. 138th St.   •   Kirkland, WA 98034-1822
425-823-6388   •   Fax: 425-823-8332
email: mklassc@hotmail.com   •   www.mklassociates.com

13

EXHIBIT E
Page 16 of 29

## VII. AESI DAMAGES

AESI actual cost records, with appropriate adjustments, have been used to calculate its damages.

### As-Planned Costs

| | | |
|---|---|---|
| A. AESI scope direct costs | $141,742.00 | Note 5; *Exhibit 8* |
| B. Phase I warranty work | 42,980.54 | Note 6; *Exhibit 9* |
| C. IIC subcontract | 772,123.00 | |
| **As-Planned Costs:** | **$956,845.54** | |

### Actual Costs Incurred

| | | |
|---|---|---|
| D. 2003 Vendors | $1,024,461.76 | Note 1; *Exhibit 3* |
| E. 2003 Labor | 694,977.24 | Note 2; *Exhibits 4 & 5* |
| F. 2004 Vendors | 135,390.92 | Note 3; *Exhibit 6* |
| G. 2004 Labor | 24,089.98 | Note 4; *Exhibit 4 & 7* |
| H. Brechan Backcharges | 198,905.75 | Note 8; *Exhibit 10* |
| Actual costs to date | $2,077,825.65 | |
| Less as-planned costs | (956,845.54) | |
| Less 2003-2004 legal costs | (33,267.14) | |
| Less AESI interference | ( 964.80) | Note 7 |
| Less conduit removal | (850.00) | Note 11 |
| Subtotal | $1,085,898.17 | |
| Plus 2004 overhead | 24,560.06 | Note 10; *Exhibit 11 & 12* |
| Subtotal | $1,110,458.23 | |
| 10% Profit | 111,045.82 | |
| Subtotal | $1,221,504.05 | |
| Plus 2003 extended overhead | 45,423.84 | Note 9; *Exhibits 11 & 12* |
| **Total compensation due AESI** | **$1,266,927.89** | |

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

14

**Note 1.** The term *vendor* includes suppliers, retail outlets, subcontractors, misc. invoices, and per diem payments to employees.  Reference *Exhibit 3, Job Cost Report, 2003.* Reference *AES002388-AES002929.*

**Note 2.**  Reference AESI certified payrolls *AES-001762-AES-001875; AES002930-AES002962.*  Reference *Exhibit 4, Labor and Vendor Cost Summary, 2003-2004.* Reference *Exhibit 5, Labor Summary, 2003.*

**Note 3.** The term *vendor* includes suppliers, retail outlets, subcontractors, misc. invoices, and per diem payments to employees.  Reference *Exhibit 6, Job Cost Report, 2004.* Reference *AES002388-AES002929.*

**Note 4.**  Reference AESI certified payrolls *AES-001762-AES-001875; AES002930-AES002962.*  Reference *Exhibit 7, Labor Summary, 2004.*

**Note 5.**  Reference *Exhibit 8, AESI Cost Calculation.*  Reference *AES002388-AES002929.*

**Note 6.** AESI performed warranty work for Brechan on Phase I bents of the cargo wharf. Reference *Exhibit 9, Phase I Repairs.* Reference *AES002388-AES002929.*

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

15

E
18  29

**Note 7.**  IIC daily reports list impacts to productivity due to AESI interference. Allowance has been made for 16 listed impact hours, without evaluation, at a composite overtime rate of $60.30.

Reference *IIC-001574, IIC-001573, IIC-001572, IIC-001530.*


**Note 8.**

| | |
|---|---|
| Cargo Wharf current contract | $972,987.56 |
| Plus Phase I Warranty Work | 42,980.00 |
| Plus Balance of Additional Delivery Order | 45,000.00 |
| | --------------- |
| Less Paid to Date | (862,061.81) |
| | --------------- |
| Current Balance Due AESI | $198,905.75 |

The contract balance currently is $198,905.75.  Brechan has indicated backcharges are forthcoming with respect to IIC's performance problems.  Brechan has not yet definitized the amount of the backcharges.  An appropriate adjustment to the claim amount will be made upon receipt of the Brechan backcharges.  The claim amount may decrease, but will not increase.  Reference *Exhibit 10, Contract Payments.*


**Note 9.**  Eichleay calculation based on AESI financial records. Reference *Exhibit 11, Excerpts from AESI Financial Statements and Supplementary Information, 2002 and 2003* and *Exhibit 12, Eichleay Calculation.*

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388 • Fax: 425-823-8332
email: mklassc@hotmail.com • www.mklassociates.com

16

E
Page 19 29

**Note 10.** AESI actual overhead 15.4% on 2004 costs. Reference *Exhibit 11, Excerpts from AESI Financial Statements and Supplementary Information, 2002 and 2003* and *Exhibit 12, Eichleay Calculation.*


**Note 11.** Per IIC proposal dated 08/01/2003.  Reference *AES-002138*


## VIII. CONCLUSION RELATIVE TO AESI DAMAGES

AESI is due compensation from Defendant(s) in the amount of **$1,266,927.89**.


## IX. EVALUATION OF IIC COUNTERCLAIM QUANTIFICATION

MKL has evaluated the quantification of counterclaim elements contained in *Written Response of Defendant Emerco, Inc. d/b/a Imperial Industrial Coatings to Plaintiff's First Set of Interrogatories to Defendant Emerco, Inc. d/b/a Imperial Industrial Coatings,* for Interrogatory No.1 and Interrogatory No.2. Each interrogatory answer has been addressed individually, and numbered for clarity.


**1. Failure of Absolute Environmental Services (AES) to Remove CP (Specification Sections 1.7 to 1.7.6.)**

No support for the damages claimed in the project records has been found.  No record of the hours claimed exists in the project records linked to cathodic protection removal.

**2. Failure of AES to Remove Non-Structural Steel (Specification Section 1.7 to 1.7.6.)**

No support for the damages claimed in the project records has been found.

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

17

E
20 of 29

No record of the hours claimed exists in the contemporaneous record linked to removal of non-structural steel, or the coating work relative to the removal of non-structural steel. The claimed 944 liters of material and 354 man-hours of labor bear no realistic relationship to the issue.

### 3. Failure of AES to Stripe Coat Welds and Caulking

No support for the damages claimed in the project records has been found.

No record of the hours claimed exists in the contemporaneous record linked to stripe coating or caulking. 100% of all man-hours are claimed for many of the days in which IIC workmen were actually engaged in multiple activities having no relationship to stripe coating or caulking. The 30 hours of overtime claimed for June 18 is incorrect: the job records show only 12 hours of overtime were worked that day.

The record clearly shows that IIC anticipated performing the caulking and stripe coating work scope. *Reference IIC-000525-IIC-000527; IIC-002884-IIC-002890.*

### 4. Failure to Remove Conduit

The project records indicate that both Brechan and AESI solicited proposals for this scope of work, and that IIC actually performed at least part of this work. The $850.00 proposed appears reasonable.  Reference *IIC-000114, IIC-000115, AES002138, IIC-000498, IIC-000497.*

### 5. Ordering IIC to Perform Non-IIC Subcontract Work at Bent 12-13

No support for the damages claimed in the project records has been found.

100% of all man-hours are claimed for all of the days listed, but IIC workmen were actually engaged in multiple activities. The 100% of hours claimed for May 8 are also partially claimed under item 3 above. The IIC proposal contains a duplication error for

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

18

E
21  29

$2,756.32 equipment costs. Reference *IIC-000097*. Mr. Puett has admitted in deposition that he saw the extent or work required at Bents 12-13. The project record also shows that IIC knew the work at Bents 12-13 was its responsibility. *Reference AES001113-AES001115.*

### 6. Differing Site Condition/Misrepresentation/Extra Work-Undisclosed Gray Paint

Reference *IIC-000102 to IIC-000111; IIC-000714 to IIC-000719.*

No support for the damages claimed in the project records has been found.

No record of the hours claimed exists in the contemporaneous record linked to work to remove gray paint except IIC's proposal. 100% of all man-hours are claimed for all of the days listed, but IIC workmen were actually engaged in multiple activities having no relationship to work to remove gray paint. On several of the days listed, daily report notes state explicitly that *no gray paint was removed*, in direct contradiction to the claimed days this work is purported to have been accomplished. IIC's foreman daily reports indicate the impact of gray paint removal was 24 man-hours. Reference *IIC-001449 to IIC-001454*. IIC conducted a test on May 23 and determined that it took 1 hour to remove gray paint on 1 pile. Reference *IIC-001491*. IIC conducted a second test on May 28, witnessed by Brechan, Coffman Engineers, and AESI and determined that it took ½ hour to remove the gray paint from 1 pile. Reference *IIC-001479 to IIC-001481*.

Mr. Puett indicated in deposition that 118 piles were involved with the gray paint issue, and that all gray material could be removed from one pile in one-half hour, which computes to be 59 man-hours, not 601.5 man-hours as claimed.

### 7. Lost Profits Due on Cargo Wharf Project

The lost profit calculation contained in the interrogatory answer is predicated on:

9427 N.E. 138th St. • Kirkland, WA 98034-1822
425-823-6388 • Fax: 425-823-8332
email: mklassc@hotmail.com • www.mklassociates.com

19

E
22  29

**A. Total job costs of $454,859.51.** No clear indication of how this figure has been derived has been provided to date. Reference *IIC-002664 to IIC-003712*. Without a clear and concise calculation to derive this figure, it cannot reasonably be used as the starting point for a claim.

**B. Acceptance of all quantification of items 1 through 6 above.** See comments relative to quantification for items 1 through 6 above.

**C. Completion by IIC of 47% of existing coating removal and coating application.** The contemporaneous project records do not support this contention. Area A of the job had been 100% coated, but contained extensive defects which were definitely incomplete at the time of IIC's departure from the project. Coatings removal and new coatings application were also incomplete in Area B when IIC was decertified by SPC, and Area B also contained defects which were not corrected by IIC.

**D. A reasonable, complete, and accurate estimate for the contracted work scope.** Reference *IIC-002852 to IIC -002854*. IIC's contention for lost profits also is dependent on a good estimate as a starting point. The record demonstrates this was not the case.

**Labor**

Two of the important elements for this project were labor and coatings material. IIC's original estimate contains a rudimentary calculation that seven men would be required to work 10 hours a day, 5 days a week for 12 weeks, or 3,369 straight-time hours and 1,344 overtime hours to accomplish all of the work required under its contract. From the start of work, IIC did not prosecute the work according to this plan.

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

20

E
23   29

As stated previously, IIC had used up 2,168 man hours, including 996 overtime hours by May 19, when it achieved 100% coatings complete in Area A, with only containment and some preliminary grinding completed in Area B. By the end of May, 2,794 man hours were used, 59% of the budget, with Area A still incomplete and little accomplished in Area B.

The estimate contained no production rates, nor was the work divided into separate operations, which was inappropriate given the nature of the work. Labor for logistics, extensive containment setup and moving, work above water, weather protection maintenance in the harsh climate of Kodiak Island, quality control requirements , and many other factors that should have been considered are not included in the estimate worksheets. No level of difficulty factor appears on the estimate worksheets.

**Materials**

The estimate contains a question mark (?) next to the unit price of the coating material, with 600 gallons figured for the entire project. The question mark suggests that the estimator was not sure what the material would actually cost. At $70.00 per gallon, IIC had a budget of $42,000.00 for all SPC coating material. Reference *IIC-002852 to IIC - 002854*. IIC's first purchase of SPC material was for 650 gallons at a cost of $49,200.00, a 17% material cost overrun before any product was applied. Although the original estimate was for 600 gallons, Mr. Puett of IIC later estimated the original work to require 740 gallons, which means IIC's original estimate was, at *minimum*, approximately 23% low on quantity (and consequently application labor), and approximately 17% low on coatings material cost. These are not insignificant errors considering the cost of labor and SPC's material. Reference *IIC-000602, IIC-000603, IIC-003586.*

IIC's estimate was based on **13,000 square feet of work**. The engineer's estimate was 20,000 square feet for bents 16 through 33 only. Reference *the contract drawings*. Other

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

21

E
24 of 29

IIC documents indicate the total work was 24,500 square feet. IIC underestimated the quantity of work by 47%. Reference *IIC-002852 to IIC –002854 and IIC-002831*.

IIC spent <u>**$240,755.52**</u> in equipment, labor, supplies, freight, and services before even arriving in Kodiak. This figure does *not* include $35,414.70 in insurance charges against the job or a charge of $82,000.00 for "equipment shop." Put another way, IIC spent <u>31.2% of the entire project budget before *any* work was performed on-site, and before a</u> <u>significant portion of the planned equipment costs had been incurred.</u> In other words, the $240,755.52 did not include all equipment and materials IIC needed, by their estimate, to do the work. Reference *IIC-003629 to IIC-003632*.

**Conclusion**

IIC failed to prepare a reasonable, complete, and accurate estimate for the contracted work scope, and experienced significant overruns in all cost elements of the project. Many overruns were incurred prior to jobsite work commencement. IIC's estimate was defective in that not all cost elements were accounted for; important productivity factors were not applied; the quantity takeoff conflicts with the engineer's estimate and other IIC records; proper costs of SPC material was not used in the bid calculation; the bid contains mathematical errors; and the degree of difficulty of the work was not properly addressed.

**<u>8. Lost Profits Due for Coating Tanks N12 and N60</u>**

MKL did not investigate this issue. Therefore, no opinions are expressed.

**<u>9. AES Failed to Pay IIC the Full Amount Due for Mobilization</u>**

MKL did not investigate this issue. Therefore, no opinions are expressed.

**<u>10. AES Makes Improper Deductions from IIC's Billings</u>**

MKL did not investigate this issue. Therefore, no opinions are expressed

**<u>11. Conversion/Good(s) Sold and Delivered</u>**

MKL did not investigate this issue. Therefore, no opinions are expressed.

**<u>13. Interference/Delays</u>**

9427 N.E. 138th St.   •   Kirkland, WA 98034-1822
425-823-6388   •   Fax: 425-823-8332
email: mklassc@hotmail.com   •   www.mklassociates.com

22

E
25  29

IIC has provided no specific information on interference and delays, stating that the alleged damages are "unknown at this time; analysis to be performed." Therefore, MKL cannot evaluate this item based upon IIC's position. However, as part of the evaluation of AESI's claim, opinions have been formed on the subject of impacts to IIC's costs, productivity, and work schedule.

Factors impacting IIC costs, productivity and schedule include:

*Under-manning the project.* It was evident early on that a four or five man crew could not maintain schedule. IIC attempted to overcome this problem by working the men extended overtime hours and weekends, far in excess of what was provided for in IIC's estimate work plan. **This lead to a fatigued work force.**

*Fatigue* The crew had only one day off from April 1 until May 26, a period of eight weeks. After the one-day break, IIC went back to 7 days a week, overtime every day, with no additional days off until July 1. The fatigue factor impact to labor productivity is well established and accepted within the construction industry, and this was an extreme example. After 4 weeks time, working 10-hour days 7 days a week results in worker efficiency dropping *below 65%*. Reference *EP 415-1-3, Modification Impact Evaluation Guide, U.S. Army Corps of Engineers.* All IIC labor expended after April 30 falls into this low-efficiency category.

*Level of Difficulty* IIC's estimate does not reflect any serious consideration of the level of difficulty this project represented. Work over water requires safety precautions of a higher level than normally encountered. Working in rhythm with the tides is a challenging proposition. Work under the wharf required difficult and expensive containment, extensive scaffolding and work platform erection and dismantlement. For example, the cofferdams experienced leaking problems, and IIC's flotation device platforms were damaged by high tides on July 12, July 14, July 16, and July 25.

*Environmental Conditions* The harsh climate of Kodiak, Alaska is not particularly conducive to specialized coatings work, which is highly sensitive to temperature and

9427 N.E. 138th St. · Kirkland, WA 98034-1822
425-823-6388 · Fax: 425-823-8332
email: mklassc@hotmail.com · www.mklassociates.com

23

E
26   29

humidity. Temperature and humidity also have an effect on *labor productivity*. The salt atmosphere under the wharf is another challenge. Lack of environmental control equipment cost IIC several days due to inclement weather.

*Logistics* Kodiak, Alaska is fairly remote from sources of supply. If additional materials or equipment is needed, it is expensive and time consuming to ship it to the jobsite. IIC's estimate included only $10,000 for freight *and* misc. travel. IIC spent $26,491.34 on freight alone prior to work starting in Kodiak- *265%* of its estimated costs.

*Out-Of- Sequence Work* The record details IIC jumping back and forth, starting areas before finishing the area at hand, and using the same 4 or 5 men to do multiple tasks requiring different tools and equipment, all of which are inefficient and cost time and money. IIC generally did not control excessive crew movements, nor did it prosecute the work according to the planned sequence, or it's estimate.

*Underestimation of Quality Requirements* IIC used its foreman as the contractor quality control representative. This was far too great a burden for one man to handle. IIC had no budget in its estimate for test equipment that would be needed to satisfy the testing requirements for the project, and displayed little inclination to make quality control a priority during the job, with predictable results.

*Excessive Defective Work and Defective Repairs* IIC's lack of diligence on quality control was a major source of cost and schedule overruns. IIC was in and out of Area A for the entire duration of their time in Kodiak without ever achieving the desired results. Area B experienced similar problems.

*Material Problems and Shortages* IIC's difficulties with the chloride-contaminated sponge blast media impacted costs and schedule. IIC ran out of blast media and coatings product on June 18, with no new material available until June 25, a period of 8 days. Once the materials finally arrived, IIC was completely occupied repairing defects in Areas A and B, and never completed any new production work.

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

24

*Stop-Work Orders* IIC was shut-down by stop-work directives on June 23 (no filter tarps) and July 15 (coating material spill into bay).

*Equipment Problems* IIC's foreman began logging leaking pump problems on May 1, 2003, and made similar entries nearly every day until IIC left Kodiak. From June 12 on, IIC's foreman recorded serious impacts due to pump problems.

## X. CONCLUSION RELATIVE TO COUNTERCLAIM QUANTIFICATION

IIC failed to prepare a reasonable, complete, and accurate estimate for the contracted work scope, and experienced significant overruns for all cost elements of the project. Many overruns were incurred prior to jobsite work commencement.

IIC did not properly account for the above-stated factors impacting IIC costs, productivity, and schedule in its original estimate, *or* in quantification of its claims against AESI.

**MKL Associates, LLC**

Michael Lembke,

Principal

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

25

*Exhibit 12*

**Eichleay Formula:**

**A.** Total contract billings
─────────────────────────  X   Home office overhead   =   Home office
Total company billings for          for actual contract            overhead
actual performance period          performance period            allocable to
                                                                              contract

**B.** Home office overhead
allocable to contract
─────────────────────  =   Daily home office
Actual days of contract            overhead allocable
performance                             to contract

**C.** Daily home office overhead   X   Number of days delay   =   Extended home
allocable to contract                                                              office overhead

───────────────────────────────────────────────

**A.** $938,194   Note 1.
─────────────  = 15.4%  X   $927,014  Note 3.   =   $142,760.16
$6,085,327 Note 2.

**B.** $142,760.16
──────────────                = $540.76 Allocable overhead per calendar day
264CD     Note 4.

**C.** $540.76                   X   84CD  Note 5.   =   **$45,423.84**
                                                                            Extended home
                                                                            office overhead

Note 1. Billings for project

Note 2. Billings for 2003

Note 3. Overhead adjusted downward $38,571.00 for penalties and contributions

Note 4. Performance period mobilization March 3, 2003 to actual completion November
22, 2003 = 264 calendar days

Note 5. Original completion August 30, 2003 to actual completion November 22, 2003 =
84 calendar days

9427 N.E. 138th St.   •   Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

E
29 of 29