```
                                                          Page 118
1              IN THE UNITED STATES DISTRICT COURT
2                    FOR THE DISTRICT OF ALASKA
3
4    ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., An Alaska
5    corporation,
6              Plaintiff,
7       vs.
8    FORREST J. McKINLEY and "JANE
     DOE" McKinley, et al.,
9
               Defendants.
10   _____
11   Case No A03-0199 Civil (RRB)
12
13
14
15
                    DEPOSITION OF TODD ELMORE
16
                      Taken March 29, 2006
17                   Commencing at 9:00 a.m.
18         Volume II - Pages 118 - 238, inclusive
19
20
                    Taken by the Defendant
21                            at
                         PERKINS COIE
22              1029 W. Third Av., Suite 300
                     Anchorage, AK  99501
23
24
25   Reported by:
     Susan J. Warnick, RPR
```

                    COPY

                    EXHIBIT G

Midnight Sun Court Reporters (907) 258-7100

Page 139
1      MR. ELISON: Objection. Foundation, assumes
2 facts not in evidence, to the extent that it's outside the
3 witness's personal knowledge.
4      THE WITNESS: Do I still have to answer?
5      MR. ELISON: Answer.
6 BY MR. NIST:
7 Q  Yeah. The way this works is --
8 A  By looking at this, I can't make that judgment. I
9 think we would need some more tools, like the schedule and
10 some other stuff around there.
11      MR. BROWN: I'm sorry. I didn't hear the
12 answer.
13      THE WITNESS: I said, by looking at this, do I
14 agree -- ask the question one more time.
15 BY MR. NIST:
16 Q  All right. Do you remember doing any kind of
17 independent analysis on whether Imperial lost nine days to
18 the schedule because of the sponge media?
19 A  I know I've worked around the schedule. I don't know
20 the issues per each -- per all the delays. And answering
21 this, I can't answer this without having all the other
22 tools, the schedule being one of them.
23 Q  Let's talk about the schedule. Did you create the
24 schedule for this project?
25 A  Did I put it into Microsoft Project, yes. Did I

Page 140
1 create it, no.
2 Q  And so somebody else gave you the dates for the
3 schedule?
4 A  Yes.
5 Q  And then you kind of just typed it in?
6 A  Yes.
7 Q  And who gave you the dates?
8 A  I believe Tom -- Peterson via Tom.
9 Q  Peterson via Tom?
10 A  Peterson would have given them to me. Tom would have
11 given them to Peterson.
12 Q  And the schedule, was it like handwritten out?
13 A  Oh sure, yes.
14 Q  And did you exercise any kind of independent
15 discretion in entering this thing into Microsoft -- I
16 forgot what you say the program was.
17 A  Microsoft Projects.
18 Q  Microsoft Projects?
19      MR. BROWN: Object to the question. It's
20 ambiguous.
21 BY MR. NIST:
22 Q  You can still go ahead and answer.
23 A  I would -- I didn't know how to break it down. I
24 didn't know bents and some of the other stuff around it.
25 But I did kind of, you know, a typical schedule, fashion

Page 141
1 it as a beginning and end date that should slant one way
2 or another.
3      Some projects start to start. Some start to
4 finish. I guess, is that -- I might have looked at it for
5 that logic.
6 Q  Let me rephrase that. Was there -- did you come up
7 with any of the dates as far as the schedule goes?
8 A  No.
9 Q  So if I understand your role in creating the
10 schedule, it was simply taking what Jason Peterson handed
11 you and literally typing it in?
12 A  Yes.
13      (Exhibits 29 and 30 marked.)
14      MR. NIST: And just so everybody is on the same
15 page here, 29, the e-mail has Jerry Hardenbergh's name on
16 the top; and 30 is the e-mail that has Todd Elmore's name
17 at the top.
18 BY MR. NIST:
19 Q  Mr. Elmore, you've been handed what's been marked as
20 Exhibits 29 and 30. Do you recognize these documents?
21      MR. BROWN: Can I interrupt? Do you know the
22 Bates stamp number for these documents? I could tell one
23 one -- is AES00399, but there's no Bates stamps on the
24 other. Do you know what they are?
25      MR. NIST: I do not know.

Page 142
1      THE WITNESS: What is this?
2      MR. BROWN: Which one is 29 and which one is 30?
3      MR. NIST: 29 is the one with Jerry
4 Hardenbergh's name on the top. And 30 is the one with
5 Todd Elmore's name on the top -- and Dave Olson's, I
6 guess, is above Todd's name.
7      MR. BROWN: Thank you.
8 BY MR. NIST:
9 Q  Which one are you asking me about?
10 A  This one (indicating).
11 Q  Okay. Well, let's talk about it. And I think you
12 referred to Exhibit 30 there.
13 A  Yes.
14 Q  Have you seen Exhibit 30 before?
15 A  I'd say no, until I understand what this is.
16 Q  Well, why don't you take a minute to review it.
17 A  I've reviewed it.
18 Q  Okay. And -- let's see. This appears to be an
19 e-mail string from -- and the original message appears to
20 be from Matt Holmstrom, who is a Brechan employee; is that
21 correct?
22 A  Yes.
23 Q  And then to Dave Olson, Jason Peterson, and Todd
24 Elmore. And then it appears that Matt writes you
25 something and then --

Page 143

1  A  Okay. Can I have a second to read it?
2  Q  Please do.
3  A  It just looks like a chopped-up e-mail here. Okay.
4  Q  Do you recognize Exhibit 30?
5  A  Yeah.
6  Q  And it appears to be talking about some -- let's
7  see -- repairing areas identified last fall. And this
8  appears to be an April 22nd, 2004.
9     Do you remember Absolute finished the project in
10 2003?
11 A  As far as all IWLs, punch lists or substantial
12 completion?
13 Q  Well, let's look at Exhibit 29.
14 A  Okay.
15 Q  This appears to be a punch list that Coffman
16 generated and an e-mail attached to that. Is that an
17 accurate description?
18 A  Yes.
19 Q  Okay.
20 A  Yeah, this looks to be a punch list.
21 Q  And just so we're all clear on this: What is a punch
22 list?
23 A  Incomplete. Things that need to be reworked or
24 they're incomplete work items. It's an IWL.
25 Q  What's IWL?

Page 144

1  A  Incomplete work list.
2  Q  So -- and the punch list appears to be dated December
3  7, 2003. Do you remember getting a punch list on or about
4  that date on the cargo wharf project?
5  A  There was one that came in, yes.
6  Q  So I guess the question is: So for 2004, when
7  Absolute came back to work on the cargo, was that to do
8  these punch list items?
9  A  We went over there to do repairs and punch list.
10 Q  Okay.
11 A  I don't know -- I won't -- the list could have grew
12 or shrunk; I'm not sure. But I know we did go over there
13 to do that.
14 Q  So you can't say one way or the other whether the
15 things on -- items listed on Exhibit 29 was fall work?
16 A  I couldn't tell you if something disappeared or
17 reappeared or anything on the list. I know it's rather
18 lengthy.
19 Q  Did Polar Supply have any role in this project?
20 A  Yes.
21 Q  What was their role?
22 A  Materials.
23 Q  What kind?
24 A  SPC.
25 Q  What does that mean?

Page 145

1  A  Coating material. SPC product.
2  Q  So the paint?
3  A  Yes. Coating.
4  Q  And what about -- as I understand it, before paint,
5  you have to blast the old paint off; is that correct?
6  A  Prep it.
7  Q  Prep it?
8  A  Yes.
9  Q  And what does the prep involve?
10 A  Whatever you have to do to get the coating to stick
11 on.
12 Q  As I understand it, that's a UHP water blaster
13 involved in that process?
14 A  The methods chosen here were to use the Ultra Low.
15 Q  Do you remember any kind of sandblaster being used on
16 this project?
17 A  Yes, we did.
18 Q  Did you guys -- where did you get your sand --
19 Absolute get sand for the project? Or blasting media, I
20 suppose it's called.
21 A  From Tom.
22 Q  From Tom Puett?
23 A  Yes.
24 Q  What about after he -- what about after Imperial left
25 the project; where did Absolute get blasting media from?

Page 146

1  A  I believe it came from Polar.
2  Q  Were you responsible for ordering blast media and
3  coating from Polar?
4  A  Not necessarily.
5  Q  Did you?
6  A  Have I, yes.
7  Q  And how would you determine what you needed to order?
8  A  Somebody would tell me what to order.
9  Q  And who was that?
10 A  At which point? At this point that we started
11 self-performing?
12 Q  Well, let's go through --
13 A  That would have been the only time. Prior to that I
14 didn't order for IIC, if that's what you're asking.
15 Q  So after Imperial was decertified, you guys -- or you
16 were responsible -- that was the first time you were
17 responsible for ordering anything from Polar? Or the
18 first time you did order anything from Polar?
19 A  Yes.
20 Q  And you figured out what to order because somebody
21 told you to?
22 A  Yes.
23 Q  Who was that person?
24 A  It could have been Jason or Dan Yell.
25 Q  And "Jason," you mean Jason Peterson?

Page 151

1  because -- well, it was -- they put a description down
2  there. Brader's union and so was I, so -- I think he just
3  -- it's the same amount.
4  Q  Did you -- were you involved at all about negotiating
5  these rates?
6  A  Yes.
7  Q  And what was your role?
8  A  To get this request back from him.
9  Q  Okay.
10 A  Kind of define what they'd be doing and the
11 environment they'd be working in and what we would do and
12 what they needed to do, what they were going to provide
13 and what we would provide.
14 Q  I see. And were these -- did you consider ever
15 hiring somebody just out of the painters' hall rather than
16 hiring Corrpro?
17 A  No.
18 Q  And why not?
19 A  We're not union.
20 Q  So am I saying that wasn't a realistic option for --
21 A  Not unless we wanted to go signatory and have the
22 whole company union.
23 Q  And were these rates higher or lower than if you had
24 gone -- had decided to hire union employees?
25 A  I don't know that I can make that -- I mean, it's

Page 152

1  measured, you know. If I could answer that, I'd have a
2  lot of money. There's big arguments between nonunion and
3  union. So I don't know that two people could -- if you go
4  union, then there's a lot of things that change in your
5  company. So I don't think I can answer that.
6  Q  Okay.
7  A  Do I think it's a fair and marketable rate? Sure.
8  Q  Do you know what people out of the union -- or what
9  applicators out of the union hall were charging or -- I
10 suppose this was a Davis-Bacon job.
11 A  Well, we all do. We all go. We go get their
12 schedule and look at it.
13 Q  Are these Davis-Bacon rates that Corrpro was
14 proposing here?
15 A  Yes. Due to where we were working.
16    MR. NIST: 22nd of April is 32 and then other
17 one is 33.
18    (Exhibits 32 and 33 marked.)
19 BY MR. NIST:
20 Q  Mr. Elmore, you've been handed what's been marked as
21 Exhibits 32 and 33. Do you recognize these documents?
22 A  Yes.
23 Q  And they appear to be bills from Absolute to Brechan
24 on the cargo wharf project; is that correct?
25 A  Yes.

Page 153

1  Q  Let's take a look at No. 32 first.
2  A  Okay.
3  Q  It says that Areas A through E have been -- are a
4  hundred percent complete; is that right?
5  A  That's what it says.
6  Q  Do you know if that's true or not?
7  A  I would imagine it is.
8  Q  And then it says, "Mobe/Demobe/Materials, 96 percent
9  complete;" is that right?
10 A  Yes.
11 Q  And what is that other four percent that's hanging
12 out there, on the Mobe/Demobe/Materials line, if you know?
13 A  Probably the IWLs.
14 Q  That's the punch list items?
15 A  Yes.
16 Q  And then -- let's see. Under No. 7 there, it says,
17 "Phase 1 Repairs."
18 A  Yes.
19 Q  What's that about?
20 A  Phase 1 repairs. Repairs for Phase 1.
21 Q  Why is Absolute billing for Phase I repairs?
22 A  Brechan probably had us go over and do some repairs
23 on Phase 1.
24 Q  Do you know if Absolute did do repairs on Phase 1?
25 A  According to this we did.

Page 154

1  Q  You don't have any kind of independent knowledge of
2  that?
3  A  Well, I would get this from somewhere, to invoice
4  them a hundred percent.
5  Q  How did you come up with the $42,980.54 figure for
6  the Phase 1 repairs?
7  A  There's probably a memo or a change order somewhere
8  out there.
9  Q  You say a memo or change order.
10 A  Some vehicle to get this budget to 42,980.54 and for
11 us to go perform it.
12 Q  And it says that's a hundred percent complete. So it
13 looks like this work has already happened.
14 A  It looks like it's finished.
15 Q  Moving on to Exhibit 33. Are you with me?
16 A  Uh-huh.
17 Q  And this one has got the Mobe/Demobe/Materials.
18 That's up to a hundred percent; is that right?
19 A  Uh-huh.
20 Q  And it says here that -- let's see.
21    This is a final invoice; is that correct?
22 A  Yup.
23 Q  What does that mean, "a final invoice"?
24 A  An invoice that's final. The work is finished. It
25 looks like somebody bought off a lot of IWLs or punch

1          REPORTER'S CERTIFICATE

2          I, SUSAN J. WARNICK, RPR, and Notary Public in
3  and for the State of Alaska do hereby certify:
4          That the witness in the foregoing proceedings was
5  duly sworn; that the proceedings were then taken before me
6  at the time and place herein set forth; that the testimony
7  and proceedings were reported stenographically by me and
8  later transcribed under my direction by computer
9  transcription; that the foregoing is a true record of the
10  testimony and proceedings taken at that time; and that I
11  am not a party to nor have I any interest in the outcome
12  of the action herein contained.
13          IN WITNESS WHEREOF, I have hereunto subscribed my
14  hand and affixed my seal this 17TH day of April,
15  2006.

                                _____
                                SUSAN J. WARNICK,
                                Registered Professional Reporter
                                Notary Public for Alaska

20  My Commission Expires:  April 8, 2010