IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, ) <br> INC., an Alaskan Corporation, ) <br>                                 ) <br>     Plaintiff,                  ) <br>                                 ) <br>  vs.                            ) <br>                                 ) <br> FORREST J. McKINLEY and         ) <br> "JANE DOE" McKINLEY, and the    ) <br> marital community property      ) <br> composed thereof d/b/a "Imperial) <br> Industrial Coatings" and EMERCO,) <br> INC., etc.,                     ) <br>                                 ) <br>     Defendants.                 ) <br> EMERCO, INC., a California      ) <br> Corporation d/b/a Imperial      ) <br> Industrial Coatings, etc.,      ) <br>                                 ) <br>     Counter-Claimant/           ) <br>     Third Party Claimant,       ) <br>                                 ) <br>  vs.                            ) <br>                                 ) <br> ABSOLUTE ENVIRONMENTAL SERVICES,) <br> INC., an Alaskan Corporation,   ) <br> et al.,                         ) <br>                                 ) <br>     Cross-Defendants/           ) <br>     Third-Party Defendants.)    | Case No. A-03-0199 <br> Civil (RRB) |

DEPOSITION UPON ORAL EXAMINATION

OF

L. SKIP VERNON

Taken at 1900 Fifth Avenue
Seattle, Washington

DATE TAKEN:       FEBRUARY 11, 2005

**EXHIBIT L**

Buell Realtime Reporting, LLC
(206) 287-9066

4d457464-67cb-41b1-82bc-593b57bbdff8

Page 54

1  Q. What did he say to you?
2  A. Of course, over the course of the two days he
3  said many things.
4     To the best of my recollection, he indicated
5  that he had met Mr. Puett previously. He believed that
6  Mr. Puett based on Mr. Puett's description of his talents
7  and abilities was qualified to do the work, and that
8  after his experience on the site with trying to get this
9  done, it was his opinion that he was not qualified, nor
10 was IIC qualified to undertake a project of this
11 magnitude.
12 Q. Can you recall anything else that he said?
13 A. Basically described the details of the failures
14 as their inability to comply with the schedule, the
15 difficulties they had putting their containment together,
16 the difficulties they had achieving acceptable services,
17 surfaces, their difficulties relating to properly
18 applying the coating. He described all the difficulties
19 that Imperial was having applying the paint to the
20 structure.
21 Q. When you heard of those difficulties, were any
22 of them familiar to your own experience?
23    MR. MARSTON: Objection; ambiguous.
24    Are you asking him whether these are problems
25 that exist in the industry or whether he had those

Page 55

1  problems himself?
2     MR. DUFFY: The question, I think, was clear,
3  whether he has ever experienced those personally.
4  Q. Have you ever had a situation in which you were
5  involved in some application of coating in which the
6  problems that were described by Mr. Olson were problems
7  that you or your forces encountered?
8  A. Yes.
9  Q. Can you indicate what the problems were that
10 you had experienced before and on what projects?
11    MR. MARSTON: Of the group he just listed?
12    MR. DUFFY: Of whatever Mr. Olson told him the
13 problems were.
14 A. The question is difficult. For example, in a
15 remote location such as Kodiak, difficulties in getting
16 supplies, difficulties in getting equipment, abrasives,
17 those types of things, every contractor, depending on if
18 they have done work in remote locations, can encounter
19 those types of problems.
20    Welds. It's well-known in the industrial
21 painting area when you have a surface that is to be
22 holiday-free that welds need to be addressed in that you
23 most frequently will have holidays on welds.
24    So many of the problems that or some of the
25 problems that they encountered are frequently encountered

Page 56

1  and mostly it's a matter of degree.
2     To the extent you have an experienced qualified
3  contractor, then problems with rigging over the ocean
4  with high tides will be better anticipated and planned
5  for.
6     So to the extent that you have the tides and
7  the swing in tides that you have at a location like this,
8  I think those are common problems, but it goes back to an
9  experience factor and a knowledge factor of how to
10 anticipate, plan for and avoid those becoming fatal
11 problems.
12 Q. What knowledge do you have concerning the
13 experience of IIC in that regard?
14    MR. DICKSON: In which regard?
15 Q. With regard to experience in the problems you
16 have just described.
17 A. It is my understanding that they had not had
18 done a job similar to the one at Kodiak where they dealt
19 with the tides and issues in a similar type project, and
20 that's based on my review of the documents.
21 Q. On this tour that you took on the first day, I
22 believe you said Mr. Hardenbergh was with you.
23    Did Mr. Hardenbergh express to you any opinions
24 concerning the quality of IIC's performance on the
25 project?

Page 57

1  A. Yes.
2  Q. What did he say in that regard?
3  A. That it was inadequate or less than
4  satisfactory.
5  Q. Did he provide you any details in that regard?
6  A. Yes.
7  Q. What did he say?
8  A. That essentially it was evident that IIC was
9  not successful in basically rigging and containing the
10 project such that their operations were expedited, that
11 this translated into defects in the coating, defects in
12 the surface preparation and very low productivity.
13 Q. Did he provide you any details or descriptions
14 as to why the problems they had with rigging and
15 containment had those effects?
16 A. Based on the way they had originally planned to
17 do it, I believe they had planned on some cofferdams to
18 originally do the work, and installing those cofferdams
19 apparently took more time than was indicated in the
20 schedule and ultimately proved to be unsuccessful in
21 isolating the work the way it was originally anticipated.
22    They essentially had to modify procedures then
23 and go to a deck-type operation, and with the changing of
24 the tides, that there were difficulties presented with
25 the way they had ultimately done that as well, and all of

Page 142

1      A F F I D A V I T
2
3
4    STATE OF NEW MEXICO  )
5                        ) ss
6    COUNTY OF BERNALILLO )
7
8        I have read my within deposition, and the
9    same is true and accurate, save and except for changes
10   and/or corrections, if any, as indicated by me on the
11   "CORRECTIONS" flyleaf page hereof.
12
13
14
15           L. SKIP VERNON
16
17
18
19       SUBSCRIBED AND SWORN TO before me this
20       day of     , 2005.
21
22
23           NOTARY PUBLIC in and for the
24           State of Mexico,
25           residing at            .

Page 143

1      C E R T I F I C A T E
2
3    STATE OF WASHINGTON  )
                          ) ss
4    COUNTY OF KING       )
5
6        I, JOLENE C. HANECA, a Certified Shorthand Reporter
7    and Notary Public in and for the State of Washington, do
8    hereby certify that the foregoing transcript of the
9    deposition of L. SKIP VERNON, having been duly sworn, on
10   FEBRUARY 11, 2005, is true and accurate to the best of my
11   knowledge, skill and ability.
12       IN WITNESS WHEREOF, I have hereunto set my hand and
13   seal this 24TH day of FEBRUARY, 2005.
14
15
16
            JOLENE C. HANECA, RPR, CCR
17
18   My commission expires:
     March 28, 2006
19
20
21
22
23
24
25