Michael E. Kreger
James N. Leik
Jacob Nist
Perkins Coie LLP
1029 W. Third Avenue, Suite 300
Anchorage, Alaska  99501
(907) 279-8561
(907) 276-3108 (Facsimile)
mkreger@perkinscoie.com

Attorneys for Defendants Brechan Enterprises, Inc. and
Safeco Insurance Company of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska corporation,<br><br>        Plaintiff,<br><br>v.<br><br>FORREST J. MCKINLEY, an individual, d/b/a "Imperial Industrial Coatings"; EMERCO, INC., a California corporation, d/b/a Imperial Industrial Coatings; Brechan ENTERPRISES, INC., an Alaska corporation; SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation; and COFFMAN ENGINEERS, INC., a Washington corporation,<br><br>        Defendants. | Case No. 3:03-cv-0199-RRB<br><br>**BRECHAN AND SAFECO'S MOTION FOR SUMMARY JUDGMENT-- NONDISCLOSURE** |

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Absolute Environmental v. McKinley, et al.
Case No. 3:03-cv-00199-RRB

[38599-0012/AA062060.004]

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................... 2

II.  FACTUAL AND PROCEDURAL BACKGROUND ...................................... 2

    A.    The Project ...................................................................... 2

    B.    The Litigation ................................................................... 4

III.  UNDISPUTED MATERIAL FACTS ...................................................... 5

    A.    The 2003 Cargo Wharf Task Order (Task Order
           P92) ("Phase II") ................................................................ 5

    B.    Formation of the Task Order and Brechan/Absolute
           and Absolute/Imperial Subcontracts ............................................. 10

    C.    Other Material Terms in the Specification ................................... 14

    D.    Performance of the Imperial Subcontract .................................... 16

    E.    The 2001 Task Order 7 and the Swalling
           Subcontract ..................................................................... 20

IV.  ARGUMENT ............................................................................. 24

    A.    Brechan And Safeco Are Entitled To Summary
           Judgment Against Absolute ...................................................... 24

           1.    Standard for Summary Judgment ................................... 24

           2.    There Was No Breach Of A Duty To
                 Disclose "Superior Knowledge" ................................... 25

           3.    Absolute Cannot Prove Tortious Non-
                 Disclosure ................................................................. 36

V.  CONCLUSION ........................................................................... 48

## I.  INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Brechan Enterprises, Inc. ("Brechan") and Safeco Insurance Company of America ("Safeco") hereby move for summary judgment dismissing with prejudice the claims of Absolute Environmental Services, Inc. ("Absolute" or "Absolute") against Brechan and Safeco in Absolute's Complaint for Damages and Restitution dated June 22, 2005.  The undisputed facts in this case as matter of law fail to make out a claim upon which the relief prayed for in the complaint can be granted. Brechan and its surety are entitled to summary judgment dismissing Absolute's claims against them.  The pleadings, memorandum of law, declarations and exhibits on record support this motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

**A.      The Project**

The United States Coast Guard ("USCG") issued a task order to Brechan on December 12, 2002 to perform work on the Coast Guard's large cargo wharf at its base in Kodiak.  The work primarily involved the erection of scaffolding and containment; the removal of the existing coatings and the extensive corrosion from the steel wharf's pilings ("H-piles") and steel connections; the preparation of the steel surfaces, including edges and welds for coating; the application of a plural component, polyurethane coating product; quality control, including testing for the presence of holidays (pinholes or thin spots in the coating); and the repair of areas not passing the "holiday-free" requirement.

The H-piles were located on a portion of the wharf called the original cargo wharf.  A more recent extension of the wharf was constructed with round steel piling.  The piles line up in rows, with horizontal steel cross members welded to piles across rows.  The rows of piles are called bents.  Photographs of typical H-piles and of the cargo wharf are provided for illustration as Ex. 1.  Many of the H-piles also have welded "splice plates" overlapping and joining a top section of H-pile to a bottom section.  Other "non-structural" items were also welded to the H-piles over the history of the wharf, including form brackets.

The work in the task order began from the cross members between bents 12 and 13 and continued to the end of the wharf, at bent 33.  This task order is sometimes referred to as Phase II. Brechan subcontracted this work with Absolute, which subcontracted with Imperial.  Coffman Engineers, Inc. ("Coffman") assisted with the preparation of the coating specification and provided daily, on-site quality assurance services.  Specialty Polymer Coatings ("SPC") supplied the coating products and certified the applicator to apply the products.

While work was in progress, SPC withdrew its certification of Imperial, and Imperial left the job the next day.  Absolute completed the work with other coating applicators.

Previously, in 2001, Brechan subcontracted with Swalling Construction Company ("Swalling") to perform work under a different contract and different a task order ("Task Order 7") on the Cargo Wharf.  Swalling coated the round piles on the wharf extension, and bents 1-12 of the original wharf.  The work under that earlier contract and task order is referred to as "Phase I."

**B.    The Litigation**

Absolute filed suit in 2003 against Imperial and its owners alleging Imperial breached its contract and seeking approximately $1.2 million in damages. Imperial counterclaimed and added claims against Brechan and Safeco. Imperial dismissed its claims with prejudice against Brechan, Safeco and Coffman in February 2005.

In May 2005, Absolute moved for leave to add Brechan and Safeco back into the case. At that time, Absolute argued:

> . . . newly discovered evidence has disclosed that Brechan possessed vital information regarding concealed conditions of the work that it <u>failed</u> to disclose to Plaintiff and Defendants at the time each was estimating and submitting its prices for the subcontract work out of which this lawsuit arises.

*See* Motion to Join Parties, May 22, 2005 at 3. None of the remaining parties opposed, and leave was granted. Brechan brought a third-party complaint against Coffman, and Absolute also filed a complaint against Coffman.

Absolute's complaint against Brechan and Safeco alleges that Brechan had actual knowledge of "material latent defective conditions" about which it had a duty but failed to notify Absolute. Absolute Complaint at 105, Docket No. 104.

As to Safeco, Absolute alleged that Safeco was the Miller Act payment bond surety and that, as Brechan's surety, Safeco was liable for all amounts claimed against Brechan. Absolute Complaint at 112-114.

Although Absolute has listed numerous legal theories in its complaint, Absolute identifies concealment of superior knowledge as the basis of its claim.

In response to Brechan's and Coffman's motions to dismiss Absolute's claims against them, Absolute argued: "Absolute's claims against Brechan are based on the legal doctrine of superior knowledge and evidence that Brechan had actual acknowledge about concealed defective site conditions and failed or declined to disclose that information to Absolute." Pl. Opp. to Motion to Dismiss, November 29, 2005, at 4.

This motion addresses those claims of concealment in contract and tort.[1] Brechan submits that as matter of law on the undisputed facts, Absolute is not entitled to relief for claims based on nondisclosure, either in contract or tort.

### III. UNDISPUTED MATERIAL FACTS

**A.    The 2003 Cargo Wharf Task Order (Task Order P92) ("Phase II")**

1.    In July of 2002, Brechan learned that the USCG would entertain a task order price proposal for the performance of coating work on the portion of the wharf that remained uncoated after the completion of Task Order 7 under an earlier contract. Ex. 2, Holmstrom Dep. at 294. Ex. 3, Holmstrom Dep. Ex. 25. Brechan's project manager for Coast Guard contracts was Matthew Holmstrom. Mr. Holmstrom passed that information on to Absolute's president, David Olson, in an email on July 24. *Id.*

2.    Mr. Holmstrom received an email from the USCG on October 8, 2002. Ex. 5, Peterson Ex. 12 at 3. The USCG October 8, 2002 email states: "I

---

[1] Absolute's complaint alleged other alternate legal theories which may also fit its alleged facts. The other theories of relief listed by Absolute are the subject of a separate motion for summary judgment.

would expect that we will be issuing an RFP sometime in the next month based on the specs that we finished phase I with. . . ." *Id.* at AESMAIL00481.

3.    Mr. Holmstrom forwarded that email to Coffman on October 24. Ex. 2, Holmstrom Dep. at 263-64; Ex. 7, Holmstrom Ex. 18.  When he forwarded the USCG's email, Mr. Holmstrom wrote:

> I'm interested in reviewing the coating spec., section 09967 to ensure we clear up the confusion regarding the seal weld issue.

Ex. 5, Peterson Ex. 12 at AESMAIL00480.

4.    Mr. Holmstrom forwarded these two emails to Mr. Olson, to Jason Peterson, an Absolute project manager, and to Tom Puett of Imperial on October 29th. Ex. 4, Peterson Dep. at 104-05.

5.    On November 18, 2002, Mr. Holmstrom sent an email to Mr. Peterson of Absolute and Mr. Puett, forwarding discussions between Brechan and Dan Stears, a corrosion engineer at Coffman, regarding a final coating specification.  Ex. 4, Peterson Dep. at 108-111; Ex. 8, Peterson Ex. 13.  Included in that email was an email between Holmstrom and Stears dated November 14, 2002, in which Holmstrom asked Stears:

> Dan -- Do you have a "final" coating spec. 09967 that includes the changes we made regarding the seal weld issue.  The CG wants a proposal to complete the project. From what I gather, this is the only change from phase I. thanks, matt.

*Id.* Mr. Stears' responded to the email on November 17.  "I believe there was about a half dozen issues to modify before proceeding to Phase II.  The chloride test levels need revision, the seal weld issue, the issue of coating to mudline . . . ."

*Id.* These two emails were forwarded to Mr. Peterson and Mr. Puett on November 18 with the statement, "We're getting input from the coatings designer. stay tuned." *Id.* Mr. Peterson responded: "I'm tuned!!!!!!!!" *Id.*

6.   On 11/26/02, Mr. Stears sent Holmstrom an email transmitting the proposed final coating specification for Phase II. Mr. Stears' email states:

> Attached is the revised coating specification. I made minor changes throughout the document to get rid of extraneous information and to incorporate "lessons learned." I suggest you look at Sections 1.7.3.6 and 3.1.1 in particular. I believe these modifications adequately incorporates (sic) what has been previously discussed.

Ex. 10, Olson Ex. 85 at AES000906, 909. This email was part of the string of emails forwarded to Absolute on November 27, 2002. Ex. 6, Olson Dep. (2/13/06) at 149-51. The entire string was included in the Absolute-Imperial subcontract. *Id.*, Ex. 6, Olson Dep. (2/13/06) at 95.

7.   Mr. Olson did not ask anyone about the "lessons learned" that Mr. Stears referred to in the email. Mr. Olson testified at deposition:

> A: We did look at 1.7.3.6., which brought about the email that Mr. Peterson sent forth. But me, did I respond to it? No. I mean I –I wouldn't know at that point what "lessons learned" is. I do know what "lessons learned", I believe, is now.
>
> Q: Did you ask at that point what "lessons learned" referred to?
>
> A: I had no reason to ask what "lessons learned" were. I don't even know if I read this. But no, I didn't have any reason to ask.
>
>    Lessons learned because the – certain sections that were of note had been brought forth by Mr. Holmstrom

> and addressed and looked at by Jason Peterson.  And I
> assume Mr. Puett also looked at them.

Ex. 6, Olson Dep. (02/13/06) at 150-51.

8.     Section 1.7.3.6 of the final coating specification, called out for

attention by Mr. Stears, states, in full:

> Structural members with poor quality, defective or water
> weeping welds shall be cleaned and seal welded prior to
> coating.  Structural members with good quality or non-
> defective welds shall be cleaned and stripe coated prior to
> final coating.  Nonstructural members with poor quality or
> defective welds shall be cleaned and stripe coated prior to
> coating.  Nonstructural members with water weeping
> welds shall be cleaned and seal welded prior to coating.
> Nonstructural members with good quality or non-defective
> welds shall be cleaned and stripe coated prior to final
> coating.  Abandoned nonstructural members may be
> removed to increase productivity.  The Owner's
> representative shall have final say as to the level of surface
> preparation required in cases in question or dispute.

Ex. 10, Olson Ex. 85 at AES000918.

9.     Absolute reviewed the specification, including Section 1.7.3.6. and

sent Brechan a response.  Ex. 4, Peterson Dep. at 118-120; Ex. 13, Peterson

Ex. 14.  In the response Absolute stated that it would not do any seal welding, but

it would caulk welds and it would stripe coat welds:

> AESI is excluding the following items from the finalized
> specifications:  . . . seal welding, we will caulk (seal) the
> welds, not seal weld and lastly AESI is excluding 3.2.1.4
> on page 13.  Matt, note on 1.7.3.6 on page 9, AESI will
> perform the painting related work such as the weld
> cleaning and stripe coat portion of 1.7.3.6.

Ex. 6, Olson Dep. (2/13/06) at 137, 150; Ex. 12, Olson Ex. 88;

10.    At his deposition, Mr. Peterson gave the following testimony concerning his understanding at the time of why Absolute was agreeing to stripe coat or caulk welds as part of its scope of work:

> Q    Now, in your e-mail to Mr. Holmstrom, you indicate that, "[Absolute] will perform d., f., and g.," and that would be of Section 3.2.1.2.  And you say you're going to – as to Section 3.2.1.3., you're going to seal weld – you will caulk (seal) the welds, but not seal weld, right?
>
> A    We will caulk the welds, which refers to what they were saying the seal welding was, was how I –
>
> Q    What was the purpose of caulking the welds?
>
> A    Well, at the time, I was still pretty ignorant of a lot of things on the project, especially – at that point I didn't really know what the holiday testing was.  Again, I was relying on Mr. Puett who, you know, this is his field.
>
> So my understanding what that for some reason these welds needed additional coating or caulking put on them prior to the coating.  That was my understanding.  I didn't know an exact reason why, though, at that point.

Ex. 4, Peterson Dep. at 118-120.

11.    Peterson recognized the difference between seal welding, which Absolute excluded, and treatment of the surface of welds for coating, which Absolute included in its scope of work.  Ex. 4, Peterson Dep. at 204-205.  Peterson testified Holmstrom told him welds need to be stripe coated or caulked, he relayed it to Puett, who told Peterson he had it covered. Ex. 4, Peterson Dep. at 206.

12.    Imperial's Tom Puett prepared the estimate Absolute relied upon for the cost to prep and coat the surfaces.  Ex. 19, Puett Dep. (5/8/06) at 60.  Puett testified he read the revised specification at 1.7.3.6 but he didn't change his price.

*Id.* at 139.  He testified that section 1.7.3.6. didn't mean anything to him because "We deleted all of that stuff in the Specification."  *Id.* at 44-47.  Mr. Puett said any problems found with defective welds were surprising to him because he believed defective welds were to have been taking care of "by others"  before Imperial got there.  *Id.* at 17-18.  Imperial didn't much care whether the specification at 1.7.3.6 dealing with the treatment of defective welds had been reworded, because "when you're dealing with welds, and you're dealing with all these other things. . .  I exclude them.  It just creates problems."  *Id.* at 48-49, 59-60.  Mr. Puett also testified he told Mr. Peterson at Absolute "It would be smart on his part if he got that stuff out of his contact."  *Id.* at 48, 60.

13.    Absolute did not exclude the surface preparation of welds.  *See* ¶¶ 9-10, *supra.*  Absolute's Peterson testified Mr. Puett had told him Imperial had such work covered.  Ex. 4, Peterson Dep. at 108 ("And at that time Tom indicated to me that he had that covered.")  *See also Id.* at 206.

**B.    Formation of the Task Order and Brechan/Absolute and Absolute/Imperial Subcontracts**

14.    The USCG formally published a scope of work and requested a proposal from Brechan for Phase II on 11/27/02.  Declaration of Matt Holmstrom at ¶ 5, Ex. 1.  The scope of work incorporated the 11/26 specification ("Phase II specification") transmitted by Coffman to the Coast Guard.  *Id.*

15.    The USCG issued Task Order P92 on 12/12/02.  Ex. 2, Holmstrom Dep. at 397; Ex. 14, Holmstrom Ex. 44.  The Task Order required Brechan to provide "labor, materials and equipment to provide steel waterfront coating

services on the original cargo wharf, Bents 12-33, including all access ramps in accordance with Scope of work, specifications and drawings." *Id.*

16.    Brechan then entered into a subcontract with Absolute for work in the task order.  The subcontract is dated effective December 18, 2002.  Ex. 6, Olson Dep. (2/13/06) at 124-25; Ex. 9, Olson Ex. 87.  The Absolute subcontract described the work "more particularly, though not exclusively as specified in Scope of Work dated 11/27/02 and your proposal dated 10/22/02." *Id.*

17.    Absolute's price didn't change after receiving and reviewing its final coating specification.  Its price stayed the same from its October 22nd pricing to its November 25th pricing, to the time it signed the subcontract.  Ex. 6, Olson Dep. at 137-38.

18.    Absolute entered into a subcontract with Imperial, also effective the 18th day of December, 2002.  Ex. 6, Olson Dep. (2/13/06) at 94-95; Ex. 10, Olson Ex. 85.  The Imperial subcontract contains seven signed attachments.  *Id.* Attachment 2 states that Mr. Puett had a job site visit "with Dave Olson (Absolute Environmental Services, Inc.) and Matt Holmstrom (Brechan Enterprises), February of 2002." Id. at AES000865.  Attachment VII identified support work to be performed by Absolute.  *Id.* at 928.

19.    Absolute and Imperial incorporated the November 26, 2002 specification into their subcontract.  Ex. 10, Olson Ex. 85, Attachment V at AES000903.  In addition to incorporating the specification, the Imperial subcontract includes (twice) the email from Coffman's Dan Stears mentioning

lessons learned and including the statement. "I suggest you look at section

1.7.3.6." Ex. 10, Olson Ex. 85, Attachment V at AES000909.

20.    Earlier, in August of 2002, Brechan's Matt Holmstrom had sent

Absolute and Imperial a coating specification, dated June 21, 2001, in anticipation

of the possible task order price proposal to the USCG. Ex. 19, Puett Dep. (5/8/06)

at 39-43; Ex. 16, Puett Ex. 41; Ex. 4, Peterson Dep. at 66-67.

The "June 21 specification" at section 1.7.3.9, provided:

> A number of utility hangers and braces were welded to the
> piles with fillet welds on one side only of the member. All
> metal to metal connections shall be seal welded prior to
> coating. An estimated 100 feet of seal welding will be
> required. The Contractor or applicator will seal weld prior
> to surface preparation as required in 3.2.1.2.

Ex. 16 at AES001526.

21.    Section 1.7.3.9 in the June 21, 2001 specification was removed from

the Phase II Specification. Compare Ex. 11, Puett Ex. 13 with Ex. 10, Olson Ex.

85 at AES000903-26.

22.    AESI did a fair amount of work with Brechan in Kodiak prior to the

Cargo Wharf project. Ex. 4, Peterson Dep. at 30. Once, when Mr. Peterson was

in Kodiak looking at other projects, he and Matt Holmstrom drove by the cargo

wharf. At that time, Peterson thought it "seemed more of reality" that Absolute

was going to do coating work and he had a conversation with Mr. Holmstrom

about the Swalling job. _Id._ Mr. Peterson didn't consider it his business to pry in

deep. However, according to Mr. Peterson's deposition testimony:

> "I asked him, I said, what was Swalling's problem. And he
> told me that -- that they were unorganized in their

procedures.  He said that there would be -- they would --
you know, they would show up all different times; they
weren't coordinating with the tides.  They were way behind
schedule.  He said that they were trying to -- some days
they would try to set up containment on an area, blast it
and coat it all in one tide.  Then he went on to say that he
felt that the whole key -- or a major key to performing the
project  successfully is if you could somehow eliminate the
tides as a factor in the project.  And that was what he said."

Mr. Peterson was then asked, and answered, as follows :

Q   Did you say to him, Matt, are those the only problems
that Swalling had on the job?

A   No, I didn't.

Q   Did you ask him if there were any claims or change
orders on the project?

A   No, I didn't.

Q   Why didn't you ask him if there were change orders on
the project?

A   Well, again, I don't feel it's necessarily my business to
pry deep into their -- my understanding, the whole subject
was sour to him.  I had a good relationship with Matt and
George and everyone at Brechan.  I felt that, when I asked
that question, you know, he would tell me what problems
were.  And especially if, you know, some problems were
more of a problem than maybe other factors on the project.
I figured -- I was satisfied with his answer, that he'd told
me everything I really needed to know.  My overall
impression was that they were disorganized and maybe the
project was, you know, too complicated or, you know, too
complex for them to perform in a satisfactory way.

Ex. 4, Peterson Dep. at 30-31.

Peterson did not discuss technical issues on projects with Mr. Holmstrom. *Id.* at 33. He testified: "Matt never talked about technical things on pretty much any of the projects…. Matt wasn't really—he was more of a number cruncher than he was really involved with any of the technical aspects of performing the work on the project. He would really say, just ask George [Kontra]. . . . So I kind of got, from asking him on other projects, technical questions, I got to the point where I just knew, you know, not to ask Matt because he'd always just—you know, not want to even discuss it really." *Id.* Mr. Peterson also did not talk with George Kontra about the Swalling project. *Id.* at 33. He never talked to Swalling about the project. *Id.* at 113-14.

## C.    Other Material Terms in the Specification

23.    In addition to section 1.7.3.6., the Phase II specification contained other terms relating to welds. Section 3.2.2 provided:

> 3.3.2. . . . Edges, including welds, shall be rounded to 1/8" radius, minimum, and prior to abrasive blasting. Remove all slivers, scale, weld splatter, and other imperfections by filing, grinding or other suitable means prior to abrasive blasting. ….See section 1.7 for other additional requirements.

Ex. 10, Olson Ex. 85 at AES000922.

24.    The specification also required an inspection to determine conditions.

> 1.1.3. The Applicator shall inspect the wharf prior to bid to determine existing conditions and quantities of surfaces to be recoated.

Ex. 10, Olson Ex. 85 at AES000910.

25.    The specification provided information about the condition of the
original coating on the dock:

> 1.1.3.1.  The original dock coating, applied in
> 1989, is in relatively poor condition.  The following
> descriptions are provided as information only and shall not
> be utilized as basis for bid.  It is the Applicators
> responsibility to inspect and determine the actual
> conditions that is present, prior to bid.
>
> (a)    Splash zone, between elevations
> 114' and 119:.  The degree of rusting of structure is Rust
> Grade 4 (approximately 10% of the surface is rusted) to
> Rust Grade 2 (approximately 33% of the surface is rusted),
> per SSPC-VIS-2.  <u>Rust occurs primarily near edges, welds
> or corners</u>.  Field applied coatings are in generally worse
> condition than shop-applied coatings with a Rust Grade of
> 1 (approximately 50% of the surface is rusted).  . . .  <u>Some
> rust and pitting is anticipated beneath the coating</u>. . . .
>
> (b)    Intertidal zone, between
> elevations 107' and 114'.  The degree of rusting of
> structure is Rust Grade 2, (approximately 33% of the
> surface is rusted), per SSPC-VIS-2.  <u>Again, rust is more
> prevalent near edges, welds and corners</u>.  Field applied
> coatings are in generally worse condition than shop applied
> coatings with a Rust Grade of 1 (approximately 50% of the
> surface is rusted) to Rust Grade 0 (approximately 100% of
> the surface is rusted). . . .  <u>Rust and pitting is anticipated
> beneath the coating.</u>

*Id.* at AES000910-11 (emphasis added).

26.    The specification described a performance requirement for coating
coverage.

> 3.5.8.10.  Holiday test fully cured coatings on
> the entire structure using methods and voltages in NACE
> RP0188 (Latest Revision), "Discontinuity (Holiday)
> Testing of Protective Coatings" and the manufacturers
> approved holiday test procedure.  The voltage setting shall

> be set for the actual thickness of the coating being tested.
> All holidays shall be marked.  Pile and attachments not
> meeting the holiday requirements shall have the holidays
> repaired.

*Id.* at AES000925.

27.    Absolute retained L. Skip Vernon as an expert.  Ex. 24, Vernon Dep. at 5-6.  Mr. Vernon has expertise in industrial coatings.  Ex. 24, Vernon Dep. at 7-34.  During his deposition, Mr. Vernon was asked to describe problems he had encountered in the application of coating.  Ex. 24, Vernon Dep. at 55.  He responded, in part:

> Welds.  It's well-known in the industrial painting area
> when you have a surface that is to be holiday-free that
> welds need to be addressed in that you most frequently will
> have holidays on welds.

Ex. 24, Vernon Dep. at 55-56.  Mr. Vernon testified that the requirement to obtain a holiday free condition under the circumstances at the wharf was very difficult but reasonably attainable.  Ex. 24, Vernon Dep. at 120-121.

**D.    Performance of the Imperial Subcontract**

28.    Absolute encountered problems with Imperial, even before it started work.  Complaint at 38.  At the pre-construction conference in Kodiak, Imperial demanded additional compensation to do the coating work  on the horizontal steel between bents 12 and 13.  *Id.* at 39.  Once it started to work, Imperial failed to perform its quality control ("QC") work.  *Id.* at 40.  Absolute issued a cure notice to Imperial.  *Id.* at 41.  When Imperial failed to comply with the cure notice, Absolute hired a QC inspector for Imperial.  *Id.*

29.     On June 26, 2003, Absolute issued a second Notice to Cure to Imperial based on Imperial's slow performance. *Id.* at 50; *see also* Ex. 27, Olson Dep. (03/08/05) at 257; Ex. 15, Olson Ex. 54. Absolute directed Imperial to cure its poor performance and advised Imperial,

> In the event you fail to cure this defect in the time allotted, and thereafter continue with the full and timely performance of these responsibilities, Absolute reserves the right to perform your work itself on your behalf and backcharge your contract for the cost it incurs.

*Id.* at IIC000508.

30.     In early August, SPC withdrew its certification of Imperial to apply the SPC coating product. Complaint at 60. Without a certification Imperial could not perform the coatings application work. *Id.* at 62.

31.     About that time, Imperial's attorneys wrote Absolute a letter indicated that the contract was terminated and that Imperial would not be returning to Kodiak. *Id.* at 65. Following Imperial's decertification and abandonment of the project, Absolute completed the remainder of the subcontract work. *Id.* at 66.

32.     Absolute employed Daniel Yell to supervise new coating applicators. Ex. 18, Olson Dep. (03/30/06) at 262-68.

33.     Mr. Yell testified that he thought the testing for holidays done by Coffman was excessive. He raised the issue with Mr. Olsen, and Coffman and AES resolved the issue, after which, Yell said, things went smoothly. He testified that the concern he raised to Mr. Olson was excessive testing, and was not a concern of the condition of the welds that he encountered. Ex. 17, Yell Dep. at 111.

34.    Chris Lynch was the USCG's contracting officer technical representative ("COTR") on Phase II.  Ex. 22, Lynch Dep. at 14.  Her duties were "[e]nsuring that the contractor was building the project per the plans and specifications".  *Id.*  She made daily appearance at the project to observe the progress of the work.  She had that job from when the project started to when they left.  Imperial brought up a claim regarding "a grey coating" on the project.  Other than a grey coating claim, there were no other claims from Imperial for unexpected site conditions.  Ex. 22, Lynch Dep. at 26-27.  Absolute never brought any unexpected site conditions to her attention.  No one from Imperial or Absolute told her that they were encountering poor weld workmanship on the project.  *Id.*  No one from Absolute told her they were doing extra work on account of the conditions of the welds, defective welds or missing welds.  *Id.*

35.    Ms. Lynch observed the H-piles after the old coating had been taken off and before the new coating was applied.  Ex. 22, Lynch Dep. at 29.  She did not observe anything she thought was unusual about the condition of the welds after the old coating was gone and before re-coating.  *Id.*

36.    Mark S. Schilling is an expert in coatings who was retained by Imperial.  Ex. 25, Schilling Dep. (6/5/06) at 49.  Mr. Schilling traveled to Kodiak during the performance of coating on the project in July 2003.  Ex. 25, Schilling Dep. (6/5/06) at 28.  At his deposition, Mr. Schilling was asked, "When you were at the site in July of '03 . . . did anyone point out to you or ask you to investigate other surface imperfections [besides grey coating and rust pitting]?"  Mr. Schilling answered yes and the following questions and answers followed:

Q   What were you asked to examine?

A   I looked at welds, and I looked at some edges on piles that had been ground.

Q   This was in July of '03?

A   Yes.

Q   Who asked to you (sic) look at welds?

A   I believe it was Tom Puett.

Q   What did he ask you to look at?

A   We just looked to see what he was doing.  As I testified earlier, I was there to observe the work in progress.  We looked at the condition of the structure that he was cleaning.

Q   What did you observe in connection with Mr. Puett's request.

A   That's a good question, and the answer is nothing terribly unusual for this kind of structure in this kind of an environment.  I advised Tom Puett that this was not an inordinate amount of pitting, and that these welds were not atypical.  That I didn't see that this was anything out of the ordinary.

Ex. 25, Schilling Dep. (6/5/06) at 167-168.  Mr. Schilling testified that, based on his observation during construction at the site in July, there was nothing about the welds that precluded ordinary preparation and that even after having done that, welds can be subsequently caulked after coating.  *Id*. at 39.  *See also Id.* at 40 ("Q: . . .  There was nothing about the welds that precluded effective coating of the surfaces that you observed?  A:  Again, I agree.  The emphasis is on preclude. There is nothing that precluded getting good protection.").

37.    Absolute gave no written notice of claims related to differing site conditions or seal welding or improper work by Coffman during the time it was on the project.  Ex. 6, Olson Dep. at 202-03.

**E.    The 2001 Task Order 7 and the Swalling Subcontract**

38.    The references to "Phase I" and to "the specification we finished Phase I with" in the emails sent to Absolute in October and November 2002 set out above refer to events in 2001 and require review.

39.    On March 20, 2001, the USCG issued a delivery order, Task Order 7, to Brechan under an earlier, separate IDIQ contract.  Ex. 2, Holmstrom Dep. at 33-41, 218-19; Ex. 26, Holmstrom Ex. 7; Holmstrom Declaration, ¶¶ 3, 4. That task order had one item, to "[p]erform design and construction for Cargo Wharf Maaintenance (sic) in accordance with attached Drawings and Specifications Dated March 2001." *Id.*

40.    Brechan had given a proposal to the USCG to do coating work on the cargo wharf earlier in 2001.  Ex. 2, Holmstrom Dep. at 51-55.  Brechan's proposal was based, in part, on prices obtained from potential coating application subcontractors. *Id.*  Absolute was one of the proposers on Phase I.  Ex. 6, Olson Dep. (02/13/06) at 71-77.  Brechan had subcontracted with Absolute on several prior tasks orders issued to Brechan under that first JOC contract. *Id.* at 74. Absolute's proposal incorporated a sub-proposal from a company called Techno Coatings.  Tom Puett was the proposed project manager for Techno Coatings. *Id.* at 72, 76.

41.   Brechan subcontracted with Swalling Construction Company to perform coating work on the cargo wharf for Task Order 7.  Ex. 2, Holmstrom Dep. at 51-55.  Swalling initially performed its work under the coating specification, 09967, dated June 21, 2001.  *Id.* at 228-29; Ex. 28, Anderson Dep. at 50.  On September 12, 2001, Swalling sent a letter to Matt Holmstrom, under the subject "welding or removal of brackets."  Ex. 28, Anderson Dep. at 83-84; Ex. 31, Anderson Ex. 11.  Swalling pointed out that per specification section 1.7.3.9

> their [sic] were an estimated 100 feet of welding required for the Cargo dock project to seal weld a number of utility hangers and braces.  To date Swalling has either welded or remove[d] by torching over 70 feet of braces or hangers on the pipe piling portion of bents 1 through 23."[2]

Ex. 31, Anderson Ex. 11.  Swalling also pointed out that it believed the amount of welding or removal was far greater than estimated due to the poor quality of workmanship on the welding, areas not welded, scabbed together pieces, and steel not cut to fit.  *Id.*

42.   The quality assurance ("QA") inspector for Task Order 7 was Jerry Hardenbergh.  Mr. Hardenbergh was employed by Coffman.  He was the "QA" on both Phase I and Phase II.  Ex. 2, Holmstrom Dep. 142-43.

43.   Hardenbergh wrote a memorandum to Scott Boney of the USCG on or about October 30, 2001.  Ex. 32, Holmstrom Ex. 2.  The memorandum states, in part:

---

[2] Swalling started its work at the Wharf Extension, which had 23 bents and is built on round or "pipe" piles.  Ex. 28, Anderson Dep. at 21.

. . .

The coating contractor [Swalling] is having difficulties obtaining a holiday free coating system on the H-pile splice weld locations.  The only areas that are not passing the holiday testing are the welded areas; splice plate locations in the upper elevations.

The contractor has tried numerous times to coat the holiday areas and has spent an excessive amount of time trying to obtain a holiday free coating.  But do (sic) to the nature of this coating system, accessibility and surface conditions; it's going to be difficult to achieve a holiday free coating at the H-pile splice locations.

After many discussions about the surface preparation difficulties, Coffman Engineers has developed three options for the CG to choose from, considering that it is their structure and money involved.

. . .

Coffman Engineers would recommend option 2 surface preparation to be used.

. . .

With option 2 selected, we believe the CG cargo wharf coating system will still realize a 25-year life.

*Id.*

44.    The USCG, Brechan, Coffman and Swalling then had discussions about weld surface preparation options.  Ex. 28, Anderson Dep. at 55; Ex. 2, Holmstrom Dep. at 101-04, 174.  Contract modifications to Task Order 7 (Modification 5) and to the Swalling subcontract were signed in April 2002. Anderson Dep., 54-55, Ex. 5; and Holmstrom Dec., Ex. A.

Modification 5 to Task Order 7 provided, in pertinent part at A(2)(b)(ii) and (iii):

>    ii)    Structural members with good quality or non-defective welds shall be prepared (i.e., abrasive blast cleaned, "stripe coated" or caulked, inspected, etc.) coated, tested, and warranted in accordance with the original contract specifications Section 09967 "Coating of Steel Waterfront Structures", dated March 2001.

>    iii)    Abandoned non-structural members such as utility supports and unused angle clips may be removed if determined to be cost effective and increase overall worker productivity.

*Id.*

45.    The modification to the Swalling subcontract provided, at paragraph 5:

>    5.    Modify the preparation spec as per *Option 2* of the Surface Preparation Technical Proposal dated February 26, 2002, and prepared by Coffman Engineers. This spec will be applied to work remaining to be completed.

Ex. 38, Anderson Dep. Ex. 5.

46.    Option 2 of the 02/26 Coffman memo provides, in part:

>    The standard industry approach to this would be to "stripe coat" or caulk the poor quality or nonexistent welds. This approach provides a cost effective method for minimizing the amount of coating defects that would result from the adverse surface conditions.

Holmstrom Dec., Ex. D.

47.    The modification to the Swalling subcontract was a relaxation of the requirements of the specification to accommodate the concerns Swalling had

raised and the conditions that it was confronted with. Ex. 28, Anderson Dep. at 55. The relaxed specification enabled Swalling to do its work in 2002 more efficiently and faster. *Id.* at 69-72.

48.    Swalling remobilized to the cargo wharf in the spring of 2002 and completed a revised scope of work under the modified specification around the first week of June. Ex. 28, Anderson Dep., at 65, 69-72.

49.    Sometime after Swalling completed its work, Mike Anderson, Swalling's project manager on the wharf project, was at a seminar in Anchorage. He met there an employee of Imperial whom he learned was headed to Kodiak to work on the cargo wharf project. Anderson offered to talk with the Imperial employee about Swalling's experiences and challenges on the part of the project it had performed. Imperial's employee didn't take him up on the offer. Ex. 28., Anderson Dep., at 72-75.

## IV.  ARGUMENT

### A.    Brechan And Safeco Are Entitled To Summary Judgment Against Absolute

#### 1.    Standard for Summary Judgment

Summary judgment may be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. The party that does not bear the burden of proof at trial is not required to offer any evidence disproving the plaintiffs' case, notwithstanding that it raised the issue on summary judgment. *See Forest Oil Corp. v. Union Oil Co. of America*, Slip Copy, 2006

WL 1096312 (D. Alaska 2006) *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, (1986) *and Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Summary judgment in "superior knowledge" claims is appropriate where the contractor has failed to produce facts that, assumed to be true, would constitute a breach of the duty to disclose superior knowledge. *GAF Corp. v. United States*, 19 Cl. Ct. 490, 497 (1990); *aff'd* 932 F.2d 947 (Fed. Cir. 1991), *cert. denied,* 502 U.S. 1071 (1992). Summary judgment is also appropriate under the same standard on Absolute's claims on concealment in tort. *Valdez Fisheries v. Development Ass'n v. Alyeska Pipeline Service Co.,* 45 P.3d 657, 672 (Alaska 2002) (summary judgment on omission and negligent misrepresentation claims). *See also Lee v. LPP Mtg. Ltd.*, 74 P.3d 152, 163 (Wyo. 2003) (summary judgment granted on concealment and non-disclosure claims).

**2.    There Was No Breach Of A Duty To Disclose "Superior Knowledge"**

**a.    The doctrine of "superior knowledge"**

The doctrine of "superior knowledge" is primarily a creature of federal common law and frequently an alternative pleading to a differing site condition claim.[3] The claim occasionally is raised in private contracts, and is analogized to misrepresentation, concealment, or deceit. *See, e.g., Morrison-Knudsen Company, Inc. v. State of Alaska*, 519 P.2d 834, 839-42 (Alaska 1974) (citing federal superior knowledge cases) *and B-E-C-K Constructors v. DOTPF*, 604 P.2d 578, 584-85 (Alaska 1979). Federal common law decisions often set out a four-part test: A

---

[3] The Absolute subcontract has no differing site condition clause.

contractor claiming superior knowledge must produce specific evidence that it:
(1) undertook to perform without vital knowledge of a fact that affects
performance costs or direction; (2) the government was aware the contractor had
no knowledge of and had no reason to obtain such information; (3) any contract
specification supplied misled the contractor, or did not put it on notice to inquire;
and (4) the government failed to provide the relevant information. *See, e.g., GAF
Corp.* at 949. Other federal decisions, perhaps more succinctly, provide that the
owner breaches a duty of disclosure where the information withheld was "not only
vital to successful performance but, more importantly, was information of a
character which the Government knew or should have known the contractor was
neither aware of nor reasonably likely to become so." *Intercontinental
Manufacturing Co. v. United States,* 4 Cl. Ct. 591, 598-99 (1984) ("*IMCO*"); *J.F.
Shea Co. v. United States*, 4 Cl. Ct. 46, 53 (1983) *cited in Granite Construction
Co. v. United States*, 24 Cl. Ct. 735, 744 (1991)(history of "superior knowledge"
doctrine.)

Alaska's standard for an owner's duty to disclose was developed in
*Morrison-Knudsen Company, Inc. v. State of Alaska*, 519 P.2d 834 (Alaska 1974).
The Supreme Court in *Morrison-Knudsen* assimilated the standards of disclosure
used by the U.S. Court of Claims and summarized the liability test as follows:

> Did the state occupy so uniquely-favored a position with
> regard to the information at issue that no ordinary bidder in
> the plaintiff's position could reasonably acquire the
> information without resort to the state? Where resort to the
> state is the only reasonable avenue for acquiring the
> information, the state must disclose it, and may not claim
> as a defense either the contractor's failure to make an

> independent request or exculpatory language in the
> contract language.

*Morrison-Knudsen,* 519 P.2d, 839-841 (citations omitted).

Absolute's claim centers not on any unique site studies known only to Brechan, but on site condition information Brechan and others acquired during Phase I. The cases with facts most closely analogous arise in the federal decisions involving the government's obligation to disclose information acquired during prior, similar projects. Those cases and the superior knowledge test used in those cases are set out in detail below. Defendants submit that a similar result obtains under Alaska's "uniquely favored position" test, just as a similar result obtains under the tortious concealment analysis in section 3, below.

In sum, Absolute cannot produce evidence that knowledge of the Hardenbergh 10/30/01 memorandum and other details of Swalling's claims during Phase I was known to be <u>vital</u> to Absolute's performance. Absolute also cannot produce evidence that Brechan knew that Absolute was unaware of or could not obtain any information it thought it needed concerning the prior project. For these reasons, Absolute cannot prevail on a claim for failure to disclose "superior knowledge."

> **b.    Knowledge that Swalling encountered an
> undescribed and unexpected site condition in 2001
> was NOT vital information for the next project**

To be "vital" information, courts require a showing that the owner actually recognized the "vitality" of the non-disclosed information. *American Ship Building Co. v. United States*, 654 F.2d 75, 80 (1981) ("[The government] is not found to have any way of knowing that details as to the troubles of the other

contractors for different ships were necessary to [the contractor]."  In this case, details of the unexpected conditions encountered in Phase I, and how the specification was revised to address those conditions, were not believed to be vital to Absolute's performance on the next project.  The details were not vital because the Coast Guard, Brechan and Swalling revised the specification in Phase I, and used a comparable revision for the coating specification in Phase II.

The United States Claims Court's decision in *Granite Construction Co. v. United States*, 24 Cl. Ct. 735 (1991) illustrates this point under similar facts. Granite Construction Co. contracted with the Corps of Engineers to build a salmon fingerling bypass system at the John Day Dam on the Columbia River.  Granite was required to excavate approximately 1000 feet of tunnel through a concrete dam.  Granite used an excavating machine, called a "roadheader" to excavate the tunnel.  *Granite* at 743-44.  The machine worked poorly, at best.  *Id.*  Through "perseverance, ingenuity and intense labor, the project, was eventually completed, but at a cost far in excess of that anticipated."  *Id.* at 744.  Granite then discovered that the Corps had recent experience with a similar failing by a contractor to tunnel with its roadheader on another concrete dam.  Granite brought a claim against the United States for a breach of the implied obligation to disclose "superior knowledge."

The court dismissed the claim after a lengthy review of the case law and detailed analysis.  To reach its result, the court first asked:  What did the government know?  In that regard, "the Corps had information that the contractor [on the prior project] had serious problems with productivity on Little Goose and

that the Corps attributed those problems, at least in part, to using a smaller machine than the one listed in the bid." *Granite*, 24 Cl. Ct. at 745.

The court next asked what the contractor knew. The court accepted that the contractor did not know and had no reason to know of the prior difficulties encountered by Groves in tunneling through concrete with a roadheader.

The court held that what was missing from Granite's proofs was "a basis for finding that the Little Goose experience *uniquely informed the Corps* that roadheaders are inherently unfit for tunneling in concrete." *Granite* at 745 (emphasis added). In operative terms, the Corps' undisclosed information about problems on the prior project was not vital. The reason why the knowledge -- that a prior contractor's attempt at using a roadheader under similar conditions failed -- was not vital, was that there were other reasonable alternative conclusions which the Corps *could have reached* regarding the prior contractor's experience in using the roadheader on concrete dams. Specifically, the court held that it would not have been unreasonable for the Corps to have concluded that the "salient lesson to learn" about the first project was something other than roadheaders will always fail to cut through mass concrete. *Granite* at 745. The Corps' "salient lesson to learn" could have been that bidders in future projects should be warned about the size and quantity of the aggregate in the concrete. *Id.* Because the Corps was not "uniquely informed that roadheaders are inherently unfit for tunneling in concrete" it was not a breach to fail to disclose the earlier contractor's comparable problems. *Id.*

Applying the law in *Granite*, Brechan's knowledge that there had been a problem on Phase I in 2001 would only be known to be <u>vital to Absolute's performance</u> in 2003 if Brechan knew (1) that the conditions Swalling found must reoccur; and that, (2) when they did, a different specification was needed to effectively address them; and (3) such a different specification was not in place for Absolute's project.  As in *Granite*, even if Brechan knew that poor weld workmanship ("defective welds") would be found on the H-piles where Absolute was to work, Brechan could have reasonably concluded that the revision in the contract's specification for Phase II to allow alternate methods of preparing the surfaces of the defective welds (e.g., caulking or stripe coating, or removal of non-structural steel), rendered Swalling's experience in 2001 unique to that specification, and not vital to the next project.

The law does not place an evidentiary burden on Brechan to show that it subjectively, in fact, concluded that its undisclosed information was not vital.  It was enough in *Granite* and under the case law cited in *Granite* that it <u>would have been reasonable</u> under the circumstances for the government to have looked at the so-called "vital" information as mooted by other events.  *Granite* at 752.  It would not have been unreasonable for Brechan to conclude that the revised coating specification might yield a different experience for the next contractor, even assuming defective welds were found to be present.  Consistent with such a conclusion, the USCG requested a revised specification based on "the spec. we finished Phase I with," and Brechan twice told Coffman in emails in October and mid-November to put the revision that had been in place for Swalling into the next

project.  Coffman made such a revision and told Brechan that section 1.7.3.6

addressed the issue.  Brechan had reason to believe Swalling's experience with

seal welding would be unique to that project.

The *Granite* court closely relied on *Intercontinental Manufacturing Co. v.*

*United States,* 4 Cl. Ct. 591 (1984) ("*IMCO*"), which involved a contract for the

manufacture of containers for sea mines.  *IMCO* is pertinent here.  In *IMCO,* prior

contractors had encountered difficulties and filed claims under previous contracts.

The claimant contended that in the earlier contracts "there were experienced

manufacturing difficulties similar, and in some instances, identical to the problems

that IMCO encountered."  *Id.* at 596.  As in this case, the contractor in *IMCO*

contended that the information disclosed was insufficient and misleading.

The *IMCO* court questioned the premise underlying the claim – that the

Government owed a duty of disclosure – and concluded there was no duty:

> [T]he case for imposing upon the Government a duty of
> disclosure proceeds entirely upon the assumption that since
> manufacturing difficulties of varying degrees had been
> experienced by all prior contractors, it could reasonably be
> anticipated that [plaintiff] too would come to share this
> plight and that it was the Government's responsibility to
> forestall that occurrence. . . [I]t is simply too large an
> assumption to rest upon.

*Id.* at 599.

Absolute's claim rests upon the same assumption here:  that Brechan

necessarily and in fact anticipated that Absolute would come to share the same

plight as Swalling.  The assumption is too large here, as well.  First, neither

Brechan nor anyone else knew whether the weld conditions Swalling found in 2001 were in fact present in the work at Bents 13-33.

In hindsight, there is no evidence today that there were "defective welds," i.e., welds that couldn't effectively be coated.  Imperial's coating expert testified there was nothing atypical about the welds, and that nothing about them precluded effectively coating the welds.  *See* ¶ 37.  Neutral observers (COTR Lynch and Absolute's coating supervisor Dan Yell) also testified they saw nothing unusual about the welds.  *See* ¶¶ 33-36.

Second, Brechan knew that specification revisions – which had addressed those conditions in 2001 -- had been drafted into the specifications for the next project.

### c.    Brechan was not aware that Absolute had no ability to obtain any "vital" information

The other side of the issue of vital knowledge is that the owner must know not only that the information is "vital," but it must know that it is the only source of the knowledge.  Knowledge is not "superior knowledge" where the contractor could have obtained it from a source other than the owner. *See Northrop Grumman Corp.*, 63 Fed. Cl. 12, 16 n.1. (Fed. Cl. 2004) ("The government will not be held liable for nondisclosure of information which the contractor could or should have known."); *cf. Morrison-Knudsen v. State of Alaska*, 519 P.2d at 841 (state must be "uniquely favored" in its information).

Brechan had no reason to believe that Absolute could not obtain information about the events in Phase I leading up to the revision of the specification for Phase II.  Brechan disclosed to Absolute--prior to contracting--

that the specification had been revised.  Brechan disclosed that there was a seal weld issue, and that lessons were learned.  Brechan could reasonably expect that Absolute could have inquired further about Phase I and the lesson learned. Absolute could have asked any of several sources involved in Phase I what the "seal weld issue" was.  The information was not exclusive to anyone.  Indeed, Swalling's Mike Anderson offered to talk with an Imperial employee bound for Kodiak on Phase II about the sorts of challenges Swalling had on the job.  See Facts, ¶ 49.

This ability of a contractor to obtain information from the project's prior contractor was one of the factors which defeated the contractor's claim in *Aerojet-General Corp. v. United States*, 199 Ct. Cl. 422, 467 F.2d 1293, 1301 (1972). (emphasis added)  In *Aerojet*, the Court of Claims dealt with a contractor, who had acquired a shipyard and with it a contract to build two hydraulic survey ships.  The court rejected a claim for costs associated with failure to disclose information related to the status of the contract, based, in part, on the finding that the contractor "was not disabled from obtaining, on its own, more complete information on that subject (if it wished to spend the time and effort)."  *Aerojet-General Corp.*, 467 F.2d at 1301.  In this case Absolute knew that Swalling had worked at the wharf and that Swalling was not completing the work.

Information known in a particular industry is also considered knowledge that the contractor could or should know.  *Northrop Grumman Corp.*, 63 Fed. Cl. 12, 16 n.1 (Fed. Cir. 2004).  *Lewis v. Anchorage Asphalt Paving Co.*, 535 P.2d 1188, 1197-1198 (Alaska 1975)(no affirmative duty to inform paving contractor

that existing road fill was glacial till on a peat bog). The difficulty of applying coating over welds is well known in the industry. Absolute's own coating expert, Skip Vernon, has testified to that. See ¶ 27. According to Mr. Vernon, it is well known that you most frequently have holidays on welds. *Id.* Absolute's inexperience in choosing a subcontractor or understanding the work does not, as a matter of law, put the upstream "owner" at risk for non-disclosure of information which a more experienced contractor would have had or could have obtained.

Also, the specification indicates at section 1.7.3.6 that defective welds may be encountered. Absolute is charged with the specification's disclosures that welds could be defective and could involve special coating work. Mr. Peterson understood that the welds would require additional treatment prior to coating. *See* Ex. 13, Peterson Dep., Ex. 14; *see also* Ex. 4, Peterson Dep. at 118-20, *supra*, ¶ 10. When Absolute failed to give any significance to the information which was disclosed, the responsibility does not lie with Brechan.

> **d.    Absolute was on inquiry notice of the possible existence of the conditions which Absolute now claims it encountered**

To prevail of a claim of superior knowledge, the contractor must also produce evidence that it was not on notice to inquire about the alleged undisclosed conditions. *Petrochem Servs. v. United States,* 837 F.2d 1076, 1079 (Fed. Cir. 1988) ("[p]lacing a party on notice shifts the burden to that party to inquire further.") Notice to a contractor need not be express, but can be deemed by what an "experienced and reasonably prudent contractor" should have known from the information that was provided. *Hardwick Brothers Co., II v. United States*, 36

Fed. Cl. 347, 386 (1996) (vital information regarding site's moisture levels was disclosed implicitly in plans and field notes so that "experienced and reasonable prudent contractor" should have known).

In this case, Absolute was on inquiry notice. Brechan transmitted emails to Absolute and Imperial in October and mid- November of 2002. The emails disclosed Brechan's concern that the resolution of the seal weld issue be brought forward into the next subcontract. Brechan transmitted an email in late November that said that section 1.7.3.6 had been added to address a "lesson learned." Absolute included Coffman's references to the importance of Section 1.7.3.6, in their own subcontract with Imperial.

Brechan's circulation of the emails alerted Absolute to the existence of an issue regarding seal welding arising out of the prior specification. In the December fax Absolute reconfirmed that it had excluded seal welding and confirmed an obligation to use caulk or to stripe coat on welds. To the extent Absolute now claims there was more it needed to know, Brechan's disclosures gave Absolute, or its coating applicator, ample reason to ask. That inquiry notice precludes Brechan from being liable under the "doctrine of superior knowledge."

>          e.      **The final contract specification itself put Absolute
>                  on inquiry notice of the possibility of problems with
>                  missing or defective welds**

Obviously, the contract documents themselves can provide notice. Specification section 1.7.3.6. put the applicator on notice of the possibility of encountering missing or poor quality welds as well as the available methods of resolving the conditions, if encountered. 1.7.3.6. makes repeated reference to

"poor quality" and "defective welds" and lists the options for dealing with them, depending on where they may be encountered. This specification section disclosed possible "bad welds." That disclosure also precludes Brechan from being held liable for non-disclosure of "superior knowledge."

### 3.    Absolute Cannot Prove Tortious Non-Disclosure

#### a.    Non-disclosure is the tort equivalent of superior knowledge

The elements of a claim in tort for non disclosure are substantially indistinguishable from a claim in contract for breach of an implied duty to disclose superior knowledge. *See, e.g., B-E-C-K Constructors v. State of Alaska*, 604 P.2d 578, 582-85(Alaska 1979) (finding that "the State had no duty to disclose the earthquake damage reports"). The linkage between "superior knowledge" and tortious concealment is illustrated in *Aerojet-General Corp. v. United States*, 199 Ct. Cl. 422, 467 F.2d 1293 (1972). A takeover contractor alleged a failed duty to disclose information about the status of the target contractor's project. The Court of Claims dismissed the contractor's superior knowledge claims using an analysis based on the tort standard for nondisclosure liability. *Id.* at 1301-02 (citing Restatement (2d) Torts, Tent. Draft No. 12 (1966) § 551).

#### b.    There was no duty in tort to disclose all facts about the Swalling project

Alaska follows the Restatement (2d) of Torts ("Restatement") § 551 with respect to a duty to disclose facts to another party to a contract.[4] Section 551

---

[4] Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell, 956 P.2d 1199, 1202 (Alaska 1998).

recognizes the general rule that parties negotiating contracts <u>do not</u> have a duty to disclose facts to each other, subject to certain limited exceptions, defined in section 551(2).[5] "In the absence of a duty of disclosure, under the rule stated in subsection (2) of this section, one who is negotiating a business transaction is not liable in deceit because of his failure to disclose a fact that he knows his adversary would regard as material."  Restatement § 551, comment b.  The Restatement rule reflects the traditional ethics of bargaining between adversaries:

> When the facts are patent, or when the plaintiff has equal opportunity for obtaining information that he may be expected to utilize if he chooses to do so, or when the defendant has no reason to think that the plaintiff is acting under a misapprehension, there is no obligation to give aid to a bargaining antagonist by disclosing what the defendant has himself discovered.  The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indolent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies.

*Id*., comment k.

Alaska law reflects this general rule of non-liability in tort for failure to disclose facts to another party to a business transaction.  For example, in *Matthews*

---

[5] § 551.  Liability for Nondisclosure

(1)  One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

*v. Kincaid*, 746 P.2d 472 (Alaska 1987), plaintiff claimed fraud or negligent misrepresentation in the sale of a four-plex, because the seller had not disclosed the lack of off-street parking.  A jury found in favor of the plaintiff, but the Supreme Court reversed, finding no liability for non-disclosure as a matter of law. In applying section 551(2), the Court recognized that "[a] duty to disclose is rarely imposed where the parties deal at arm's length and where the information is the type which the buyer would be expected to discover by ordinary inspection and inquiry."  746 P.2d at 742.  In *Valdez Fisheries v. Development Ass'n v. Alyeska Pipeline Service Co.*, 45 P.3d 657, 672 (Alaska 2002), the court addressed a claim for negligent misrepresentation and omission, brought by the prospective purchaser of property, claiming that Alyeska misled it into believing Alyeska would lease the property.  The Alaska Supreme Court again stated that a duty to disclose is rarely imposed where parties deal at arms length, and affirmed summary judgment dismissing the misrepresentation and omission claims against Alyeska.  *See also Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1202 (Alaska 1998) (relying on section 551 and finding no duty of disclosure in business transaction).

Restatement § 551(2) describes five exceptions to the general rule that there is no tort liability for nondisclosure.[6]  In light of the general rule *against* tort

_____

[6] Section 551(2) provides:

(2)  One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

liability for nondisclosure, each of these exceptions is narrow, and each relies heavily upon proof that the defendant (the non-discloser) had actual subjective awareness (scienter) that it was not disclosing facts to the other party, that the other party was not aware of these facts, that the other party could not discover these facts on its own, and that the other party would consider the facts material.

Subsection 2(e) appears to be the provision Absolute will rely upon. To establish a duty of disclosure under section 551(2)(e), Absolute must show that Brechan knew: (1) that Absolute was about to enter into the subcontract under a mistake as to facts basic to the subcontract, and (2) that Absolute would reasonably expect Brechan to disclose those facts. Thus, under Section 551(2)(e),"a duty to disclose arises only when a defendant has <u>actual knowledge </u>of both the undisclosed information and the fact that the plaintiff is proceeding in

---

(a)  matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b)  matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c)  subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d)  the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that he other is about to act in reliance upon it in a transaction with him; and

(e)  facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

ignorance of facts basic to the transaction; it is not enough to show that the defendant <u>should have known</u> the information or its importance to the plaintiff." *McElhannon v. Ford*, 73 P.3d 827, 831 (N.M. App. 2003) (emphasis added).[7]  As such, this subsection states a very narrow exception to the general rule stated above, and requires a high standard of proof:  "In general, the cases in which the rule stated in clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is <u>shocking to the ethical sense of the community</u>, and is <u>so extreme and unfair, as to amount to a form of swindling</u>, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware."  Restatement (2d) § 551, comment l (emphasis added).

Applying these requirements to this motion, to survive summary judgment, Absolute must demonstrate its ability to establish each of the following points with admissible proof:  1) that during contract negotiations, Brechan <u>knew</u> that Absolute would encounter undisclosed conditions that would impose significant unexpected costs on Absolute's performance of the subcontract; 2) that Absolute (and its subcontractor, Imperial) were unaware of these conditions and costs; 3) that Brechan <u>knew</u> that Absolute/Imperial was unaware of these

---

[7] The stringent requirements of proof of scienter are demonstrated by Restatement § 551's Illustrations 9-12.  Those illustrations repeatedly refer to these requirements for establishing a duty of disclosure:  the defendant knows the negative fact; the defendant knows that the other party is unaware of the negative fact; the defendant knows that the other party cannot discover the negative fact on its own; the defendant knows that the other party would not enter into the transaction if it knew the negative fact; and the defendant fails to disclose the negative fact.

conditions and costs; 4) that Brechan <u>knew</u> Absolute/Imperial could not identify these conditions and costs unless Brechan told Absolute about them; and 5) that Brechan <u>knew</u> that Absolute would not enter into the subcontract if it was aware of these conditions and costs.[8]

Absolute cannot meet its burden of proof, for reasons similar to its failure of proof under the doctrine of superior knowledge.

**First**, there is no evidence that Brechan knew that there would in fact be defective welds on Phase II.

**Second**, even if Brechan knew that Absolute would encounter defective welds on Phase II, there is no evidence that Brechan knew that Absolute would incur unexpected costs due to these defective welds, or that Absolute would incur any other unexpected costs similar to those previously incurred by Swalling on Phase I.  To the contrary, it is undisputed that Brechan asked Coffman to change the contract specification for Phase II to avoid exactly those occurrences.

It is important to emphasize that in this context, it does not matter if Brechan was <u>correct</u> in its belief that the revision to the specification precluded the problems encountered by Swalling from recurring.  The issue instead is Brechan's state of mind.  For purposes of this claim, Absolute must show that Brechan had subjective knowledge that the issues encountered by Swalling <u>had not</u> been addressed by the revisions in the specification, and that Absolute <u>would</u> incur

---

[8] *See Thomson v. Wheeler Construction Co.,* 385 P.2d 111, 113 (Alaska 1963) (affirming judgment for defendant on fraud claims against contractor based on alleged statement that cost of house would not exceed $30,000, where there was no evidence that the contractor <u>knew</u> that the cost would exceed $30,000).

unknown and unexpected costs despite the revisions in the specifications.  There is no such proof.

**Third**, there is no evidence to demonstrate that Brechan <u>knew</u> that Absolute had made a mistake about the scope and cost of its work.  To the contrary, Brechan knew that Coffman had revised the coating specification in order to address the problems experienced by Swalling, and Brechan informed Absolute about the revision to the specification.  *See Lee v. LPP Mtg. Ltd.*, 74 P.3d 152, 163 (Wyo. 2003) (summary judgment granted that there was no duty under section 551, where plaintiff did not come forward with facts to show that the defendant knew the plaintiff was operating under a mistake).

**Fourth**, there is no evidence to support the proposition that Brechan <u>knew</u> that Absolute could not independently determine the condition of the wharf, the scope of the work, and the costs that Absolute would incur on the job, including costs associated with prepping and coating the weld areas.  Nor is there any evidence to support the proposition that Brechan knew that Absolute could not find out what issues Swalling had encountered on Phase I before it signed the subcontract.  To the contrary, these facts are undisputed, and disprove any contention that Brechan knew Absolute could not look out for itself:

- Absolute held itself out as a contractor capable of performing this work, and Absolute retained a specialty subcontractor (Imperial) to assist it in evaluating the project and preparing its bid.

- Absolute and Imperial had the specifications and inspected the dock before Absolute agreed to sign the subcontract.

- Absolute knew Phase I was complete, knew Swalling did the coating work on Phase I, and knew how to contact Swalling in Alaska to discuss its experience on Phase I.

- Absolute knew that the specifications for the work had been revised to address "lessons learned" in Phase I; and

- Absolute knew that it was agreeing to stripe coat, or caulk any defective welds as additional surface preparation.

Again, in this context it is important to emphasize that it is not enough for Absolute to merely produce evidence concerning reasons that Absolute allegedly was unable to accurately determine its costs for performing this work. That is not enough to support a tort claim for deceit, or on the contract for "superior knowledge." Instead, Absolute must show that during the contract negotiations, Brechan knew that Absolute was mistaken about the scope/cost of the work and that Absolute could not find out what it was going to cost Absolute to do the work, and that armed with this knowledge, Brechan took advantage of Absolute. There is no such evidence.

### c.   There Was No Misrepresentation By Omission

Absolute's complaint indicates that it may also rely on Restatement section 551(2)(b), and a related provision of the Restatement, section 529. These provisions also require proof of Brechan's subjective knowledge that it had provided Absolute with misleading information about the contract. Section

Absolute Environmental v. McKinley, et al.
Case No. 3:03-cv-0199-RRB          -43-          [38599-0012/AA062060.004]

551(2)(b) requires proof that the defendant <u>knew</u> that disclosure of undisclosed facts was necessary in order to prevent the defendant's previous statement of facts from being misleading.  Section 529 requires proof that the defendant <u>knew or believed</u> that a statement was materially misleading because of failure to state additional or qualifying information.[9]

Absolute is likely to refer to a conversation between Peterson and Holmstrom during the summer of 2002.  Mr. Peterson testified that when he asked Mr. Holmstrom what was Swallings' problem, Holmstrom stated that eliminating tides as a factor was a major key to success.  Holmstrom omitted any reference to a problem Swalling experienced with seal welding.  See ¶ 22.  Taking this conversation in the light most favorable to Absolute, it is insufficient to meet Absolute's burden of proof.  There is no evidence that Holmstrom knew or believed that his response regarding Swalling's experience was misleading in any way.  To the contrary, Brechan's later emails demonstrate that Holmstrom believed that the seal weld issue in the Swalling contract had been resolved at the time through modifications to that contract.  Holmstrom's "failure" to identify the seal weld issue as a "key to success" was not a knowing omission of some vital fact and the Swalling subcontract does not render Mr. Holmstrom's opinion about the importance of working the tides and their containment misleading.

---

[9] Restatement (2d) § 529 states:

> A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation.

Moreover, Mr. Peterson's own testimony undercuts any assertion that Absolute reasonably relied upon Mr. Holmstrom's opinion as a source of technical information about the project.  Prior to that conversation, Mr. Peterson did not view Mr. Holmstrom as a source of technical information about a project.  See ¶ 22, *supra*.  Ex. 4, Peterson Dep. at 33.  He viewed Mr. Holmstrom instead as more of a "number cruncher" who deferred technical question to others.  *Id*.  It would not have been reasonable for Absolute to assume it had anything other than Mr. Holmstrom's personal opinion about the challenges Swalling faced on the project.

### d.    There Was No Reliance By Absolute on any Non-Disclosure

Reliance is an essential element of a tort claim for fraud.  <u>Barber v. National Bank of Alaska</u>, 815 P.2d 857, 862 (Alaska 1991).  In order to demonstrate reliance, Absolute must show that when it prepared its estimate, Absolute relied upon Brechan's description of the project, and specifically, relied upon Brechan's alleged omission of information about the difficulties to expect in preparing the welds for coating.  The facts do not demonstrate any such reliance by Absolute.  None of Absolute's employees testified that they relied on Brechan's statements in preparing an estimate.  To the contrary, Absolute's employees all deny that they had <u>any</u> role in preparing Absolute's estimate for the project.  Absolute's President, David Olson, testified that he did not estimate the Project.  He said that Jason Peterson, Absolute's estimator, prepared the estimate, in conjunction with Todd Elmore, Absolute's General Manager.  Ex. 6, Olson Dep. (02/13/06) at 140.  But Jason Peterson testified that he did not estimate the project

and he thought Mr. Olson did.  Ex. 4, Peterson Dep. at 98.  Todd Elmore denied

performing any estimating on the project.  He believed that the estimating was

performed by Jason Peterson and Tom Puett (of Imperial).  Ex. 29, Elmore Dep. at

166-67.  In short, nobody working for Absolute admits to performing any

estimating on this project.  Thus, no one at Absolute can testify that they "relied"

on Brechan's statements (or omissions) when preparing Absolute's price proposal.

　　　　The only person who admits to preparing an estimate for Absolute is Tom

Puett of Imperial.  Ex. 19, Puett Dep. (05/08/06) at 61-62.  But Puett's testimony

also shows that any statements or omissions by Brechan about the cost of

addressing the welds had no effect on the price.  Puettt testified that he gave no

consideration whatsoever to the cost of preparing welds, because he believed that

preparation of the welds for coating was excluded from the Imperial/Absolute

contract, and was the responsibility of some other contractor.

|   |   |
|---|---|
| Q | When you removed the coating and you saw these welds, were those unexpected to you at the time that you removed the coating? |
| A | Yes.  That work was supposed to be done by others. |
| Q | Are you talking about removing the coating? |
| A | The welds and the grinding was supposed to be done before we got there. . . . Those items were deleted from our contract and we specifically excluded them. |
|   | . . . |
| Q | Was this all the grinding on the project? |
| A | Yes, according to specifications. |
|   | . . . |
| Q | So did you bother to review them or review them closely when these specifications came out on November 26, 2002. |
| A | I just testified that I read them. |
| Q | Did they mean anything to you? |
| A | I testified that they didn't mean anything to me.  No. |
| Q | They did not, okay. |

A       Only the fact that somebody else was going to have to
        perform that work before I could do mine.

Q       What work are you referring to?

A       Well, . . . removing nonstructural steel and taking care of
        defective welds.  Somebody else was supposed to do that
        work.

Q       And as far as taking care of the nondefective [sic] welds,
        what do you mean by that?

A       It says here – it says a lot about welds in this [referring to
        specification] if you want me to read it to you into the record.
        It also talks about stripe coating.  We deleted all of that stuff
        in the specification.

Ex. 19, Puett Dep. at 17-18, 45-47; *see also* Ex. 19, Puett Dep. at 44-45.

(Whatever the specification stated about addressing defective welds "really didn't

matter because Imperial excluded all that.")

        In short, when Puett estimated the project for Imperial and Absolute, he

did not care about the condition of the welds, or the amount of work it would take

to prepare them for coating, because he believed that this work was outside the

scope of the contract.  Thus, the person who prepared the Absolute/Imperial bid

did not rely in any way upon any representation or omission by Brechan

concerning the difficulty, time or expense likely to be encountered in connection

with the welds.[10]  This utter absence of reliance is a fatal flaw to Absolute's claims,

and warrants summary judgment in Brechan's favor.  See, e.g., Brady v. State, 965

_____

        [10] Imperial's belief that it was not required to perform any weld
preparation appears to be a miscommunication between Imperial and Absolute.
Absolute's estimator, Jason Peterson, acknowledged Absolute would perform the
weld cleaning and stripe coating on the Project.  Peterson Dep. at 118-19.
Mr. Peterson also testified that he spoke to Mr. Puett and informed him that
Absolute and Imperial were responsible for performing stripe coating on the
welds.  Peterson Dep. at 108-09.

P.2d 1, 15 (Alaska 1998) (summary judgment on misrepresentation / fraud claim based on lack of evidence of reliance); Barber v. National Bank of Alaska, 815 P.2d 857, 863 (Alaska 1991) (affirming directed verdict against misrepresentation and fraud claims when facts did not establish reliance).

## V. CONCLUSION

The laws of "superior knowledge" in contract and nondisclosure in tort have significant threshold requirements of objective knowledge and scienter. Admissible, undisputed facts preclude Absolute from meeting those thresholds. Brechan and its surety are entitled to summary judgment dismissing Absolute's claim for breach of an implied contract duty to disclose superior knowledge and for nondisclosure or concealment in tort.

DATED:  August 3, 2006.

**PERKINS COIE LLP**
Attorneys for Defendant
Brechan Enterprises, Inc.


By   /s/ James N. Leik
     James N. Leik
     Alaska Bar No. 8111109


By   /s/ Michael E. Kreger
     Michael E. Kreger
     Alaska Bar No. 8311170
     Perkins Coie LLP
     1029 W. Third Avenue, Suite 300
     Anchorage, Alaska  99501
     (907) 279-8561
     (907) 276-3108 (Facsimile)
     Email:  mkreger@perkinscoie.com

I hereby certify that on August 3, 2006, the foregoing has been served by electronic mail on Robert J. Dickson, Peter C. Partnow, William R. Baerg, Terry R. Marston II, James B. Stoetzer, and Eric J. Brown.

  /s/ Michael E. Kreger
    Michael E. Kreger