IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


ABSOLUTE ENVIRONMENTAL
SERVICES, INC., an Alaska Corporation,

    Plaintiff,

-vs-

FORREST J. MCKINLEY, an individual
d/b/a "Imperial Industrial Coatings",
EMERCO, INC., a California corporation,
d/b/a Imperial Industrial Coatings;
BRECHAN ENTERPRISES, INC., an
Alaska corporation; and SAFECO
INSURANCE COMPANY OF AMERICA,
a Washington corporation,

    Defendants.
_____/
EMERCO, INC., a California corporation,
d/b/a Imperial Industrial Coatings, and
the United States for the use and benefit
of EMERCO, INC.,

    Counterclaimant/Third-Party Claimant,

-vs-

ABSOLUTE ENVIRONMENTAL
SERVICES, INC., an Alaska corporation,
et al.,

    Cross-defendants/Third-party Defendants,
_____/



Exhibit 2

Page 1

Page 2

```
1
    THE UNITED STATES OF AMERICA for
2  the use and benefit of ABSOLUTE
    ENVIRONMENTAL SERVICES, INC., an
3  Alaska corporation,
4      Plaintiff,
5  -vs-
6  SAFECO INSURANCE COMPANY OF
    AMERICA, a Washington corporation,
7
       Defendant,
8  _____/
   BRECHAN ENTERPRISES, INC., an
9  Alaska Corporation,
10    Counterclaim Plaintiff,
11  -vs-
12  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., an Alaska Corporation,
13
       Counterclaim Defendant,
14  _____/
    BRECHAN ENTERPRISES, INC., an
15  Alaska Corporation,
16    Third-Party Plaintiff,
17  -vs-
18  COFFMAN ENGINEERS, INC., a
    Washington corporation,
19
       Third-Party Defendant,
20  _____/
21
22
23
24
25
```

Page 3

```
1
    ABSOLUTE ENVIRONMENTAL
2  SERVICES, INC., an Alaska corporation,
3      Plaintiff/Cross-claimant
4  -vs-
5  COFFMAN ENGINEERS, INC., a
    Washington corporation,
6
       Defendant/Cross-claim Respondent.
7  _____/
    Case No. A03-0199 Civil (RRB)
8
9      VIDEOTAPED DEPOSITION OF MATTHEW HOLMSTROM
10           Volume I
11        Pages 1 - 194 inclusive
12        February 8, 2006, 9:00 a.m.
13           Anchorage, Alaska
14
15  Taken on behalf of the Plaintiff pursuant to notice, at
16  the office of Alaska Stenotype Reporters, 511 West Ninth
17  Avenue, Anchorage, Alaska, before Britney Chonka, Court
18  Reporter for Alaska Stenotype Reporters and Notary Public
19  for the State of Alaska.
20
21
22
23
24
25
```

Page 4

```
1      A-P-P-E-A-R-A-N-C-E-S
2  MARSTON, HEFFERNAN & FOREMAN
    Terry R. Marston, Esquire
3  16880 NE 79th Street
    Redmond, WA  98052
4
5    LANE POWELL SPEARS LUBERSKY
    Peter Partnow, Esquire
5  301 West Northern Lights Blvd, Suite 301
6  Anchorage, AK  99503
7  ATKINSON, CONWAY & GAGNON
    Robert J. Dickson, Esquire
8  Chris Slottee, Esquire
    420 L Street, Suite 500
9  Anchorage, AK  99501
10  PERKINS COIE, LLP
    Michael E. Kreger, Esquire
11  1029 West Third Avenue, Suite 300
    Anchorage, AK  99501
12
    Bruce E. Davison, Esquire
13  3351 Arctic Boulevard
    Anchorage, AK  99503
14
    JERMAIN, DUNNAGAN & OWENS
15  Eric J. Brown, Esquire
    3000 A Street, Suite 300
16  Anchorage, Alaska  99503
17  ALSO PRESENT:
18  Tom Puett, Imperial Industrial Coatings
19  Dave Olson, Absolute Environmental
20  Bill Oliver, Brechan Enterprises
21  Jerry Hardenbergh, Coffman Engineers
22  Videotaped By:     Martha Enslow, Media Impressions
23  Reported By:     Britney Chonka, Court Reporter
24
25
```

Page 5

```
1
2            I-N-D-E-X
2
    EXAMINATION BY:               PAGE
3
    Mr. Marston              8
4
5
6
7  EXHIBITS:
8  No. 1  Cargo Pier Upgrade          116
9  No. 2 Memorandum, 10/30/01         140
10  No. 3 E-mail from Ms. Repanich, 12/27/01   144
11  No. 4 Cargo Wharf Upgrades - Anchorage Meeting  153
12  No. 5 Meeting with Coffman & Swalling, 2/8/02  167
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 30

1  consists of a number of different contract documents; is
2  that right?
3      A. I'm familiar with many different types of
4  contracts, and they're not all formatted in the same
5  manner.
6      Q. Do you know what plans are?
7      A. Yes.
8      Q. What are plans?
9      A. For a construction contract?
10     Q. Yes. All my questions will pertain to
11  construction contracts and construction contracts only.
12     A. Drawings that describe the work to be completed
13  for a contract.
14     Q. Are they sometimes referred to as blueprints?
15     MR. KREGER: Objection.
16     THE WITNESS: Not anymore.
17  BY MR. MARSTON:
18     Q. Do you know what specifications are?
19     A. Yes.
20     Q. What are specifications?
21     A. Specifications define in words the work to be
22  accomplished.
23     Q. Do you know what a CSI division is?
24     A. Yes.
25     Q. Do you know what CSI stands for?

Page 31

1      A. No.
2      Q. Have you ever heard the phrase Construction
3  Specifications Institute?
4      A. Yes.
5      Q. Are you aware that construction specifications
6  are frequently divided into CSI divisions?
7      A. Yes.
8      Q. Are you generally familiar with the breakdown of
9  the CSI divisions?
10     A. Yes.
11     Q. You've already indicated that you have heard of
12  the term general conditions, have you heard of the term
13  special conditions?
14     A. Yes.
15     Q. Have you heard the term supplemental conditions?
16     A. Yes.
17     Q. What's the distinction, as you understand it,
18  between the general condition and a supplemental
19  condition?
20     A. A supplemental condition speaks to the
21  individual scope of work, individual project. General
22  conditions are general conditions for, overall conditions
23  for a -- the owner and how they conduct business.
24     Q. You've already informed us as to what your
25  understanding is of a specification. How do general

Page 32

1  conditions differ from specifications?
2      MR. KREGER: Objection, calls for a legal
3  conclusion, vague. Doesn't reference any particular
4  contract.
5      THE WITNESS: Could you re -- restate the
6  question, please?
7      MR. MARSTON: Britney, could you please read the
8  question back for the witness?
9      (Whereupon, the above referred to question
10     was read back by the court reporter, and the
11     following proceedings were had:)
12     THE WITNESS: General conditions do not speak to
13  the individual scope of work for a particular
14  project.
15  BY MR. MARSTON:
16     Q. Is it your understanding that the general
17  conditions govern how the contract is to be administered?
18     MR. DAVISON: Object to form.
19     THE WITNESS: Yes.
20  BY MR. MARSTON:
21     Q. And in your capacity as a project manager, you
22  testified earlier that part of your responsibilities
23  included contract administration. So is it the case that
24  you would need the general conditions in order to
25  properly administer a contract?

Page 33

1      MR. KREGER: Objection, compound. Calls for a
2  legal conclusion.
3      THE WITNESS: Yes.
4  BY MR. MARSTON:
5      Q. Did you have a copy of the general conditions of
6  the JOC contract in your construction trailer while you
7  were working for Brechan?
8      MR. DAVISON: Objection, lack of foundation.
9      THE WITNESS: I can't say that I had a copy at
10  all times in the construction trailer.
11  BY MR. MARSTON:
12     Q. Did you ever have a copy of the JOC general
13  conditions in the construction trailer, to your
14  knowledge?
15     A. Yes.
16     Q. When was that?
17     A. When?
18     Q. (Nods head in the affirmative.)
19     A. During the -- the job order contract.
20     Q. How many delivery orders were issued -- strike
21  that.
22        How many job order contracts did Brechan have
23  while you were employed there?
24     A. Two.
25     Q. Did you work on both of those job order

9 (Pages 30 to 33)

Matthew Holmstrom Vol. 1                    Deposition                    February 8, 2006

---

Page 34

1  contracts?
2      A. Yes.
3      Q. Did the two job order contracts address
4  different subject matter?
5      A. I don't understand the question.
6      Q. That's fair, because it wasn't a very good
7  question.
8          Were the two job order contracts awarded at the
9  same time?
10     A. No.
11     Q. How far apart were they awarded?
12     A. I can't give you an exact amount of time.
13     Q. An approximation will be fine.
14     A. My recollection is the first one was awarded in
15  the fall of 2000. And I believe the second one would
16  have been awarded summer of 2002.
17     Q. Was the first phase of the Kodiak cargo wharf
18  maintenance project performed under the first JOC
19  contract?
20         MR. KREGER: Objection, assumes facts not in
21  evidence.
22         THE WITNESS: Could you restate the question?
23  BY MR. MARSTON:
24     Q. Sure. Well, just internally within Brechan,
25  were there -- was there some different language used to

Page 35

1  describe the first JOC -- distinguish the first JOC
2  contract from the second?
3          MR. PARTNOW: Objection, misstates the evidence.
4          MR. MARSTON: Yeah, let me withdraw that.
5  BY MR. MARSTON:
6      Q. Were these consecutive contracts?
7      A. Yes.
8          MR. KREGER: Objection, vague.
9          THE WITNESS: Well, if you mean the first JOC
10  contract and the second JOC contract, yes.
11  BY MR. MARSTON:
12     Q. That's -- that's what I'm --
13     A. If that's what you're asking.
14     Q. -- getting. I'm just trying to determine what
15  the relative relationship, whether there was any overlap.
16  And the impression I'm getting now is that there was the
17  first JOC contract, and then by the time the second JOC
18  contract was awarded, the first JOC contract had ended;
19  is that correct or incorrect?
20     A. I -- I can't say that's for certain.
21     Q. Okay.
22     A. I don't know.
23     Q. So, to your knowledge, there was nothing in the
24  nature of a formal expiration or termination of the first
25  JOC contract?

Page 36

1      A. I know we received task orders on the -- the new
2  job order contract. And we understood that those task
3  orders were written under the new job order contract.
4          As far as, do I know when the first contract was
5  over, I -- we -- we dealt on a task order-by-task order
6  basis, project-by-project basis.
7      Q. Okay. For the purpose of our deposition here
8  today, would it be clear enough to you if I referred to
9  them as the first JOC contract and the second JOC
10  contract?
11     A. Yes.
12     Q. When you testified a moment ago that at some
13  time you had the general conditions of the JOC contract
14  in your construction trailer, were you referring to the
15  first or the second JOC contract?
16     A. I was referring to both.
17     Q. And so you -- your recollection is that you had
18  the general conditions to both the first and the second
19  job order contract in your trailer at some time?
20     A. Yes.
21     Q. Were they something you routinely referred to?
22     A. No.
23     Q. Do you recall what the document looked like that
24  had the general conditions for the JOC contract in it?
25     A. Yes.

Page 37

1      Q. Did it have an identification on the front of
2  that document as to who the parties to the contract were?
3      A. No.
4      Q. Were the parties of the contract identified
5  anywhere within that document?
6          MR. KREGER: Objection. Which document?
7          THE WITNESS: Yes.
8  BY MR. MARSTON:
9      Q. The document that included the general
10  conditions you've been testifying about.
11         MR. DAVISON: I'm going to object. That
12  mischaracterizes his prior testimony.
13  BY MR. MARSTON:
14     Q. Did you have a document that included the
15  general conditions of the JOC contract?
16     A. Yes.
17     Q. Did that document include an identification of
18  who the parties were to the JOC contract?
19     A. The cover to the contract had a Coast Guard --
20  United States Coast Guard cover page. That -- that's
21  what was on top of the contract of -- of the binder that
22  had the contract.
23     Q. Do you know whether the document that included
24  the general conditions that you've been referring to
25  anywhere within it identified who the parties were to

Alaska Stenotype Reporters (907) 276-1680

Page 38

1  that JOC contract?
2      A. Yes.
3      Q. And were the parties of that contract Brechan
4  and the Coast Guard?
5      A. Yes.
6      Q. Was there anything else in that document --
7  strike that.
8          If you look at the individual delivery orders
9  that were issued, these documents do not identify a
10  markup to which Brechan is entitled, correct?
11      MR. KREGER: Objection, calls for legal
12  conclusion, vague.
13      THE WITNESS: Could you restate the question,
14  please?
15  BY MR. MARSTON:
16      Q. The delivery order comes in the form of a signed
17  document from the Coast Guard, right?
18      A. Not always.
19      Q. Do some delivery orders come in the form of a
20  document signed by the Coast Guard?
21      A. Yes.
22      Q. Did delivery order number 7 that pertained to
23  the cargo wharf maintenance contract come in the form of
24  a writing signed by the Coast Guard?
25      A. Which was -- which was delivery order 7?

Page 39

1      Q. You don't know?
2      A. No -- know which project was delivery order 7?
3      Q. Yes, that's my question.
4      A. I -- I don't recall which project you're talking
5  about, the project scope of work.
6      Q. Were you Brechan's project manager on the Kodiak
7  cargo wharf maintenance project?
8      A. Yes.
9      Q. Was that project identified within one or more
10  delivery orders?
11      MR. KREGER: Objection, compound.
12      THE WITNESS: I don't believe so.
13  BY MR. MARSTON:
14      Q. Did Brechan have a contract to -- a contract
15  with the Coast Guard to perform maintenance work on the
16  Kodiak cargo wharf?
17      A. Yes.
18      Q. Was that contract in writing?
19      A. Yes.
20      Q. But your testimony is, to your understanding, it
21  was not a contract that was part of a delivery order?
22      MR. KREGER: Mischaracterizes the testimony.
23      THE WITNESS: I don't -- I don't understand what
24  you're asking me.
25          The cargo wharf maintenance project was a

Page 40

1  delivery order under the job order contract that we
2  had with the Coast Guard, that's true.
3  BY MR. MARSTON:
4      Q. Okay. I thought you'd testified to the contrary
5  a moment ago, so that's where my confusion came in.
6          Which delivery order?
7      A. You want -- I -- I don't understand the
8  question; which delivery order?
9      Q. Was there a particular delivery order that
10  pertained to the cargo wharf maintenance project?
11      A. Yes.
12      Q. Was there more than one delivery order that
13  pertained to the cargo wharf maintenance project?
14      A. There were two phases, there was a phase 1 and a
15  phase 2.
16      MR. MARSTON: Objection, nonresponsive, move to
17  strike.
18      Britney, would you read the questions back so
19  the witness can answer my question.
20      (Whereupon, the above referred to question
21      was read back by the court reporter, and the
22      following proceedings were had:)
23      MR. KREGER: Object, asked and answered.
24      THE WITNESS: There was one delivery order for
25  cargo wharf phase 1, one delivery order.

Page 41

1  BY MR. MARSTON:
2      Q. Do you know what delivery order number that was?
3      A. I don't recall.
4      THE VIDEOGRAPHER: Tape has one minute.
5  BY MR. MARSTON:
6      Q. Was there a delivery order for cargo wharf phase
7  2?
8      A. Yes.
9      Q. Was it under the same JOC contract?
10      A. No.
11      MR. MARSTON: We'll go ahead and break here
12  while we change the tape.
13      THE VIDEOGRAPHER: Off record, 10:17 a.m. This
14  is the end of tape number 1.
15      (Thereupon, a brief recess was taken, after
16      which the following proceedings were had:)
17      THE VIDEOGRAPHER: On record 10:18 a.m. This is
18  the start of tape number 2 in the Matt Holmstrom
19  deposition.
20  BY MR. MARSTON:
21      Q. Mr. Holmstrom, do you know whether the first JOC
22  contract was awarded based on a competitive bidding
23  process?
24      A. My understanding was it was a best-value
25  approach.

11 (Pages 38 to 41)

Matthew Holmstrom Vol. 1                    Deposition                    February 8, 2006

---

**Page 50**

1    coaching the witness. And I hadn't asked you for
2    what your understanding of direct cost was. I have
3    already asked the witness for what his understanding
4    was. And I'm satisfied with the answer that he gave
5    me.
6        Now, I -- again, I ask you not to have speaking
7    objections.
8        MR. KREGER: Well, the record will reflect
9    whether you have gotten an answer from the witness
10   as to what direct cost is.
11       MR. MARSTON: Britney, would you read back my
12   last question and the last answer that I got from
13   the witness?
14       Never mind. I recall what it is now anyway.
15   BY MR. MARSTON:
16   **Q. Mr. Holmstrom, you've already testified that you**
17   **understand the distinction between direct cost and home**
18   **office overhead, irrespective of what a dictionary may**
19   **define it as, you understand their distinct concepts,**
20   **right?**
21   A. Yes.
22   **Q. My question was, did you, in your proposal to**
23   **the Coast Guard for the cargo wharf --**
24       MR. PARTNOW: Phase 1, are you asking?
25   BY MR. MARSTON:

**Page 51**

1    **Q. Phase 1, treat your home office overhead,**
2    **Brechan's home office overhead as a direct cost?**
3    A. Again, not seeing the proposal, I would say -- I
4    would believe that it would not have been included.
5        **Q. Did you prepare the estimate for Brechan on**
6    **phase 1 of the cargo wharf project?**
7    A. No.
8        MR. KREGER: Objection.
9    BY MR. MARSTON:
10       **Q. Did you participate in the preparation of the**
11   **estimate?**
12   A. Yes.
13       **Q. Who were the participants in the preparation of**
14   **that estimate?**
15   A. Again, if I had a copy of the proposal, it would
16   be a lot easier to answer that question.
17       Do you want me to give you my belief of
18   something that we prepared in the spring of 2001?
19       **Q. Mr. Holmstrom, at the outset of this deposition,**
20   **you were sworn under oath to testify to the truth. And**
21   **so what I need you to do in response to my questions is**
22   **answer the questions that I ask you with respect to the**
23   **knowledge that you actually have.**
24       **If you don't have that knowledge, it is fair to**
25   **tell me you don't know. If you do have the knowledge, I**

**Page 52**

1    **would appreciate a simple, clear answer.**
2    A. Fair enough. So could you ask me the question
3    again?
4        MR. MARSTON: Britney, would you please read it
5    back.
6        (Whereupon, the above referred to question
7        was read back by the court reporter, and the
8        following proceedings were had:)
9        THE WITNESS: Brechan enterprises and Swalling
10   Construction and a dive company.
11       MR. DICKSON: I'm sorry?
12       THE WITNESS: A dive company.
13       And Coffman Engineers and Tryck Nyman Hayes.
14   BY MR. MARSTON:
15       **Q. Was the phase 1 delivery order a design-build**
16   **contract?**
17       MR. DAVISON: Object to the form.
18       THE WITNESS: It was a modified design-build
19   contract.
20   BY MR. MARSTON:
21       **Q. In what way was it modified?**
22   A. The Coast Guard was already under contract with
23   Tryck Nyman Hayes. And when the Coast Guard issued us
24   the task order, the design team was already formulated.
25   We inherited the design team.

**Page 53**

1    **Q. Did you sign -- did you, Brechan, sign a**
2    **contract with Tryck Nyman Hayes to design -- to perform**
3    **the design work on phase 1?**
4    A. I believe so.
5        **Q. To your knowledge, did Tryck Nyman Hayes sign a**
6    **subcontract with Coffman Engineers to prepare the**
7    **corrosion protection portion of the design?**
8        MR. PARTNOW: Objection, foundation.
9        THE WITNESS: I don't know.
10   BY MR. MARSTON:
11       **Q. Were there corrosion engineers involved in this**
12   **phase 1 project?**
13   A. Yes.
14       **Q. Who were the corrosion engineers?**
15   A. Coffman Engineers.
16       **Q. Did anybody from Coffman Engineers or from any**
17   **other source ever tell you that they had been hired by**
18   **Tryck Nyman Hayes?**
19       MR. KREGER: Objection, as to which contract.
20   BY MR. MARSTON:
21       **Q. We're still talking about phase 1.**
22   A. Yes.
23       **Q. So it was your understanding during the course**
24   **of the project, phase 1, that Coffman engineers had been**
25   **hired by Tryck Nyman Hayes?**

14 (Pages 50 to 53)

Matthew Holmstrom Vol. 1      Deposition      February 8, 2006

Page 54

1   A. Yes.
2   Q. And they had been hired for the purpose of doing
3 their corrosion protection design?
4   A. Yes. The cathodic protection and the coatings.
5   Q. Both of which are portions of corrosion
6 protection; is that right?
7   A. Yes, those are two components.
8   Q. So Brechan contracted with Tryck Nyman to
9 perform the design work, correct?
10   MR. KREGER: Objection mischaracterizes
11 testimony.
12   THE WITNESS: Yes.
13 BY MR. MARSTON:
14   Q. Did Brechan perform any of the design work
15 itself?
16   A. We assisted Tryck Nyman Hayes.
17   Q. Assisted in the performance of design work; is
18 that your testimony?
19   A. We assisted Tryck Nyman Hayes in design work,
20 some of the design work, yes.
21   Q. Did your assistance go beyond merely providing
22 factual information?
23   A. No.
24   Q. Swalling Construction was a -- eventually became
25 a subcontractor to you on phase 1?

Page 55

1   A. For the coating work, that's correct.
2   Q. And the dive company became a subcontractor to
3 you on phase 1?
4   A. That's my recollection.
5   Q. Did Swalling, the dive company and Tryck Nyman
6 Hayes each provide you with cost proposals for the work
7 on phase 1?
8   A. Yes.
9   Q. And did you utilize those cost proposals in
10 preparing Brechan's own cost proposal to the Coast Guard?
11   A. They were part of it, not all of it.
12   Q. Did you utilize the information they provided as
13 part of Brechan's own cost proposal to the U.S.
14 Government?
15   A. Yes.
16   Q. Who are the individuals within Brechan's employ
17 who actually prepared Brechan's own proposal that
18 incorporated the information from these other companies?
19   A. I know I did. And as far other personnel,
20 I -- I can't recall.
21   Q. Did Mr. Oliver participate in performing the
22 estimate?
23   A. No.
24   Q. Did Mr. Martin participate in performing the
25 estimate?

Page 56

1   A. No.
2   MR. KREGER: Object, vague as to estimate.
3 BY MR. MARSTON:
4   Q. Is there -- was there at the time that you were
5 working on that estimate --
6   MR. MARSTON: Is the light bothering you?
7   THE WITNESS: Yes, it is actually. Because the
8 glare right there, I got it there and then I got it
9 coming through here. So it's like having those
10 bright lights, you know, like the movies.
11   MR. MARSTON: We have to pay the court reporters
12 extra to get that.
13   Let's take a break right now while we fix that
14 for you.
15   Are we off record?
16   THE VIDEOGRAPHER: No.
17   Off record, 10:42.
18   (Thereupon, a brief recess was taken, after
19   which the following proceedings were had:)
20   THE VIDEOGRAPHER: On record 10:44.
21   MR. MARSTON: Britney, would you read back the
22 last question.
23   Never mind, I got it.
24 BY MR. MARSTON:
25   Q. Your recollection is that Mr. Oliver did not

Page 57

1 assist in the preparation of the phase 1 estimate; is
2 that right?
3   MR. KREGER: Objection.
4   THE WITNESS: Of the estimate, that's correct.
5 BY MR. MARSTON:
6   Q. And it's also your recollection that Mr. Martin
7 did not participate in the preparation of that estimate?
8   MR. KREGER: Objection as to estimates.
9   THE WITNESS: There is a difference between the
10 estimate and the proposal.
11 BY MR. MARSTON:
12   Q. Is the proposal based on an estimate?
13   A. The proposal includes the estimate, yes.
14   Q. And can you distinguish an estimate and a
15 proposal?
16   A. Yes. The estimate, you estimate your costs, you
17 include your costs, try to make sure you get all your
18 costs in your estimate. And that estimate is then
19 included in your cost proposal.
20   Q. And with that clarification, let's go back and
21 make sure then that neither Mr. Oliver nor Mr. Martin
22 participated, to your knowledge, in the preparation of
23 the phase 1 estimate?
24   MR. KREGER: Assumes that an estimate was
25   prepared.

15 (Pages 54 to 57)

Page 98

1  the specifications of a contract that took place five
2  years ago.
3       A. Thank you.
4       Q. What I'm asking you to do is --
5          MR. KREGER: We'll hold to you do that.
6  BY MR. MARSTON:
7       Q. What I'm simply asking you to do is tell me if
8  you remember that the contract told the coating
9  applicator that he should expect to provide a hundred
10  feet of seal welds?
11      A. I believe that it didn't say "expect," I believe
12  the wording was "estimated" a hundred feet. That's my
13  recollection in the specifications.
14      Q. Okay. So there was some statement about a
15  hundred feet of seal welds in the specifications, as you
16  recall?
17      A. Yes.
18      Q. Did that have anything to do with Swalling's
19  differing site condition claim?
20      A. Yes.
21      Q. How so?
22      A. My recollection was their claim was that there
23  were more than a hundred feet.
24      Q. Of missing seal welds?
25      A. Well, again, of -- of that whole surface prep,

Page 99

1  having to prep the welds prior to coating, it was -- it
2  was a significant issue obviously, because they brought
3  it -- they brought it up to us.
4       Q. I don't understand your answer.
5          You said your recollection is that they were
6  saying that there was more than a hundred feet. And what
7  I want to know is, more than a hundred feet of what?
8       A. Defective welds.
9       Q. Defective welds. Okay.
10         Did they define what they meant by defective
11  welds?
12      A. They brought it up to our attention as a
13  differing site condition.
14      Q. Did they mention an excessive amount of omitted
15  seal welds?
16      A. I don't recall.
17      Q. Did they mention that there were very poorly
18  performed welds?
19      A. I don't recall the exact wording they put in
20  their changed site condition.
21      Q. Okay. Now, you're actually making this more
22  difficult than it need be, because I'm not asking you for
23  exact things, but you keep answering as if I was. I'm
24  just simply asking you whether you recall there having
25  been any mention by them in the differing site condition

Page 100

1  claim of defective welds in addition to omitted seal
2  welds?
3       A. I don't recall.
4       Q. Was their differing site condition claim
5  regarding welds a valid claim?
6       A. There were more weld -- there was more weld work
7  involved with surface prep than what was estimated.
8          MR. MARSTON: Object as nonresponsive. Move to
9  strike.
10         Britney, would you please read the question
11  back.
12         And I'd like you to answer the particular
13  question I asked.
14         MR. KREGER: I'm going to object as asked and
15  answered.
16         (Whereupon, the above referred to question
17         was read back by the court reporter, and the
18         following proceedings were had:)
19         MR. KREGER: Also object as vague.
20         MR. PARTNOW: Object as calls for a legal
21  conclusion.
22         THE WITNESS: I don't know.
23  BY MR. MARSTON:
24      Q. Did Coffman Engineers tell you that it was a
25  valid claim?

Page 101

1       A. I don't recall.
2       Q. Did you pay Swalling additional money for
3  surface preparation based upon this claim?
4       A. I believe we did as part of that partnered
5  agreement at the end of phase 1. I -- I believe that was
6  a component, yes.
7       Q. So you view that partnered agreement at the end
8  of the project as having included compensation for a
9  claim that Brechan had never concluded was a valid
10  claim at that time?
11         MR. PARTNOW: Mischaracterizes's testimony.
12         MR. DAVISON: Same objection.
13         THE WITNESS: Could you restate the question,
14  please?
15  BY MR. MARSTON:
16      Q. Let me give it a shot.
17         You said they submitted a claim. And I asked
18  you if it was a valid claim or not. And I honestly don't
19  remember what your answer was. Did you say it was or was
20  not?
21         MR. DAVISON: He said he didn't recall.
22  BY MR. MARSTON:
23      Q. He didn't recall whether it was a valid claim.
24  But you did recall that, as a portion of the negotiated
25  termination or descoping of their contract, that they

26 (Pages 98 to 101)

Matthew Holmstrom Vol. 1                     Deposition                     February 8, 2006

---

Page 102

1   received compensation for additional surface preparation
2   based on that claim?
3       MR. PARTNOW:  Objection, mischaracterized the
4   testimony.
5       MR. KREGER:  Join in the objection.
6   BY MR. MARSTON:
7       Q.  Is that characterization correct?
8       MR. KREGER:  Objection, vague.
9       THE WITNESS:  As -- as part of the overall -- as
10  part of the overall resolution, yes.
11  BY MR. MARSTON:
12      Q.  Okay.  Why did you pay them for a claim that you
13  had not determined was valid?
14      MR. DAVISON:  Objection, mischaracterizes
15  testimony.
16      THE WITNESS:  I -- I don't recall.
17  BY MR. MARSTON:
18      Q.  Who made the decision to pay Swalling for
19  surface preparation associated with a claim that had not
20  been determined as valid?
21      A.  I don't recall.
22      Q.  Did Mr. Oliver participate in that negotiation?
23      A.  Yes.
24      Q.  Did you say that that negotiation took place in
25  Coffman's office?

---

Page 103

1       A.  We had a meeting in Coffman's office.  As far as
2   the content of that meeting, I can't say that the whole
3   negotiation took place that day in that room.
4       Q.  Okay.  During the course of this project, on how
5   many occasions were meetings held at Coffman's office
6   that involved project managers or principals of Swalling,
7   Coffman and Brechan?
8       A.  I don't recall.
9       Q.  Was there at least one?
10      A.  Yes.
11      Q.  Was there more than one?
12      A.  I -- I don't recall.
13      Q.  What was the one that you do recall?
14      A.  The meeting with the Coast Guard, and the Coast
15  Guard was on the phone and the rest of us were in the
16  room.
17      Q.  Who was on the phone from the Coast Guard?
18      A.  I don't recall.
19      Q.  Was it Paul Rendon?
20      A.  I don't recall.
21      Q.  I'm just proposing names to see if it refreshes
22  your recollection.
23      A.  Well, Paul Rendon was -- I believe was still
24  with FD & CC at that time.  I -- I believe he was.
25      Q.  But, nevertheless, you don't actually recall who

---

Page 104

1   was on the phone?
2       A.  That's correct.
3       Q.  Okay.  But you're absolutely certain, though,
4   that somebody from the Coast Guard was on the phone
5   during the course of that meeting?
6       A.  No.
7       Q.  What was the purpose of that meeting?
8       A.  To come to a resolution of phase 1 of the cargo
9   wharf pile coating.
10      Q.  What needed to be resolved?
11      A.  Swalling had that outstanding claim and we
12  wanted to resolve it.  A partner rather than -- no -- no
13  disrespect, but rather than getting into a bunch of
14  lawsuits, we tried to use a partnered approach to resolve
15  the issues, shake hands and -- and get on with phase 2.
16  That -- that was really the intent.  That -- that was the
17  overall intent was -- was to do that.
18      Q.  And at the conclusion of the meeting, the issues
19  were resolved?
20      A.  I believe, yes, materially, they -- you know,
21  I'm not saying that -- that everyone had signed on a
22  piece of paper, but I believe the issues were resolved by
23  all parties, yes.
24      Q.  And that included a descoping of Swalling's
25  subcontract?

---

Page 105

1       MR. DAVISON:  Object to form.
2       THE WITNESS:  A modification to their scope,
3   yes.
4   BY MR. MARSTON:
5       Q.  A reduction of the number of bents that Swalling
6   was going to perform under its subcontract?
7       A.  We reduced the amount of coating area that --
8   that they were supposed to do, that's correct.
9       Q.  And that reduction --
10      A.  That's my recollection.
11      Q.  And that reduction, was it agreed upon at the
12  meeting?
13      A.  Yes, that's my recollection.
14      Q.  And since you had agreed upon a reduction in the
15  amount of coating, I assume that you're speaking terms of
16  square feet?
17      A.  Yes, area.
18      Q.  That that could be converted into number of
19  piles?
20      A.  Yes.
21      Q.  And -- and, in fact, somebody at some point did
22  make such a conversion and determined that Swalling
23  wouldn't have to perform certain bents that were
24  otherwise within its contract?
25      A.  Yes, that's my recollection.

---

27 (Pages 102 to 105)

Page 142

1    Coffman Engineers for QA services.
2    BY MR. MARSTON:
3        Q. As a quality assurance inspector, was it your
4    understanding that his responsibility was to the project
5    owner, the U.S. Coast Guard?
6        A. His job was to ensure the subcontractor followed
7    his quality control program. So Jerry had the QA
8    function for the subcontractor's QC.
9        Q. And Jerry reported directly to the Coast Guard;
10   is that right?
11       A. Do you mean as far as communication? He -- he
12   did not work for the Coast Guard. He -- obviously he
13   wrote this memorandum to Scott Bonney who was an employee
14   of the Coast Guard.
15       Q. So it's your understanding then that
16   Mr. Hardenbergh was acting as your quality assurance
17   inspector rather than the Coast Guard's quality assurance
18   inspector?
19       A. That's correct.
20       Q. When did you first meet Mr. Hardenbergh?
21       A. Some -- sometime prior to the start of cargo
22   wharf pile coating phase 1.
23       Q. Did you have an opportunity to observe Mr.
24   Hardenbergh's performance on cargo wharf phase 1?
25       A. Yes, I did.

Page 143

1        Q. Did you find that Mr. Hardenbergh was
2    competent --
3        A. Yes.
4        Q. -- a competent, thorough and reliable QA
5    inspector?
6        A. Yes.
7        Q. Did you consider Mr. Hardenbergh an expert,
8    using the definition that we described earlier, when it
9    came to quality assurance inspections for coatings?
10       A. Yes.
11       Q. You have been provided with Exhibit 2 to this
12   deposition. Can you tell me whether you recognize that
13   document?
14       A. Yes.
15       Q. Did you first see this document on or about
16   October 3rd of 2001?
17       A. October 30th, 2001.
18       Q. Did you first see this document on or about
19   October 30th, 2001?
20       A. Yes.
21       Q. I notice that you took the opportunity to read
22   through the entire text of Exhibit 2. In the course of
23   doing that, did you recognize any statements made by Mr.
24   Hardenbergh in Exhibit 2 that you do not believe are
25   true?

Page 144

1        A. There -- there's nothing in here that I don't
2    believe is true.
3            (Exhibit 3 was marked.)
4    BY MR. MARSTON:
5        Q. Take a moment to look at Exhibit 3, please, and
6    let me know if you recognize that document.
7            Do you recognize Exhibit 3?
8        A. Yes.
9        Q. Is Exhibit 3 an exchange of e-mails between
10   yourself and the Coast Guard's contracting officer Anita
11   Repanich?
12       A. Yes.
13       Q. Turning to the second page of Exhibit 3, Ms.
14   Repanich writes: Matt, I checked with my leaders
15   yesterday and the spend-down has indeed came and went.
16   Dollars were pulled from the 15th and spend-down recorded
17   from that. We met Kodiak's spend-down through our
18   projects with you.
19           And then to paragraphs below that it says: I
20   should have written this on the 17th. We exceeded our
21   spend-down, thanks Matt, we do that through you. You
22   make us look good here.
23           Do you know what she was talking about there?
24       A. No.
25       Q. Let's go to the first page of the exhibit, have

Page 145

1    you read the area that's encompassed in the handwritten
2    box?
3        A. Yes.
4        Q. That area is captioned "cargo pier" in
5    handwriting?
6        A. Yes.
7        Q. Is that your handwriting?
8        A. Yes.
9        Q. On the, let's see, one, two, three, four, fifth
10   line down, the words are found: About the 100K we have
11   hanging out there, I can see Bill Oliver's concern.
12   Technically if we don't award the second half, I guess we
13   could stick you with it.
14           Do you see that language?
15       A. Yes, I do.
16       Q. Do you have any idea what she's talking about
17   there?
18       A. It's about the funding for the cargo wharf
19   project.
20       Q. Do you know anything in detail about the 100K
21   she's referring to?
22       A. The -- you know, again, there's a lot of
23   correspondence backing this up. So for me to give you a
24   detailed response to that question, this probably has to
25   do with our subcontract with Swalling.

Page 174

1   5, at any time after the date of this meeting, February
2   8th, 2002?
3       A. Yes.
4       Q. What do you recall?
5       A. What do I recall?
6       Q. Were proposals, in fact, prepared?
7       A. I don't recall.
8       Q. So would it also be true, then, that you don't
9   recall whether any proposals were forwarded to the Coast
10  Guard?
11      A. That wouldn't be true.
12      Q. So do you recall proposals being forwarded to
13  the Coast Guard for their consideration?
14      A. Again, it was a joint resolution. So if you
15  want me to say, did Brechan Enterprises forward proposals
16  by themselves to the Coast Guard, I -- I don't know. I
17  know we came to a joint resolution.
18      Q. What was their resolution?
19      A. I -- again, I would refer to the record. We
20  revised that seal weld spec, the surface prep spec and,
21  um, we mod'd Swalling's subcontract.
22      Q. Why was the surface preparation spec modified?
23      A. Well, I guess, again, I would refer to whatever
24  follow-on correspondence came from these meeting notes.
25      Q. Is that because you don't recall why it was

Page 175

1   modified?
2       THE VIDEOGRAPHER: Tape has one minute.
3       THE WITNESS: I would -- I would speculate -- I
4   would be speculating for Coffman if I told you why, I
5   the technical reasons why we modified the spec.
6   BY MR. MARSTON:
7       Q. Okay. Remind you once again that the oath that
8   you swore to at the outset was to testify as to what you
9   knew, and only that. So if you are speculating, you're
10  saying things that aren't within your knowledge. So tell
11  us what you know. But if you don't recall anything, tell
12  us honestly that you don't recall.
13      MR. KREGER: Objection.
14      THE WITNESS: Okay.
15      MR. MARSTON: Okay. We have to flip the tape,
16  so we'll take a five-minute.
17      THE VIDEOGRAPHER: Off record 3:34 p.m. This is
18  the end of tape number 5.
19      (Thereupon, a brief recess was taken, after
20      which the following proceedings were had:)
21      THE VIDEOGRAPHER: On record 3:42 p.m. This is
22  the start of tape number 6 of the Matt Holmstrom
23  deposition.
24  BY MR. MARSTON:
25      Q. Mr. Holmstrom, we're back on the record once

Page 176

1   again.
2       Q. Do you know why the acceptance criteria for
3   holidays was modified in Swalling's subcontract?
4       MR. KREGER: Object to foundation.
5       MR. PARTNOW: Object, assumes facts not in
6   evidence.
7       THE WITNESS: I don't recall.
8   BY MR. MARSTON:
9       Q. Do you know how it was modified?
10      MR. KREGER: Objection, assumes facts not in
11  evidence.
12      THE WITNESS: How the repair method was
13  modified?
14  BY MR. MARSTON:
15      Q. How the acceptance criteria was modified.
16      MR. KREGER: Same objection.
17      THE WITNESS: Coffman Engineers revised the
18  acceptance criteria.
19  BY MR. MARSTON:
20      Q. Was there a modification to both the acceptance
21  criteria and the repair method?
22      A. I don't recall.
23      Q. Who was Brechan's coating subcontractor on phase
24  2 cargo wharf project?
25      A. Absolute Environmental.

Page 177

1       Q. What were the qualifications that Brechan relied
2   upon to select Absolute Environmental to perform that
3   work?
4       A. I don't recall.
5       Q. Who selected Absolute Environmental to perform
6   that work?
7       A. I did.
8       Q. Were there any other candidates to perform the
9   work that you contacted?
10      MR. KREGER: Objection as to time.
11      THE WITNESS: Are you asking me if I contacted
12  any other subs other than Absolute to do the phase 2
13  Work?
14  BY MR. MARSTON:
15      Q. Yes.
16      A. The answer is no.
17      Q. Why not?
18      A. Because Absolute Environmental presented to me
19  they had a top-notch team to get out and execute phase 2.
20      Q. Did you believe that they were, Absolute
21  Environmental's team was qualified to perform their work?
22      A. Yes.
23      Q. Do you recall having been told by Dan Stears
24  that -- that the coating applicator's qualifications were
25  a crucial element to a successful project prior phase --

1

2                          REPORTER'S CERTIFICATE

3

4            I, Britney E. Chonka, Court Reporter, hereby

5      certify:

6            That I am a Court Reporter for Alaska Stenotype

7      Reporters and Notary Public in and for the State of

8      Alaska at large.  I certify Hereby that the forgoing

9      transcript is a true and correct transcript of said

10     proceedings taken before me at the time and place stated

11     in the caption therein.

12            I further certify that I am not of counsel to

13     either of the parties hereto or otherwise interested in

14     said cause.

15            In witness whereof, I hereunto set my hand and

16     affix my official seal this 15th day of May, 2006.

17

18

19

20                     BRITNEY E. CHONKA, REPORTER

21               Notary Public - State of Alaska

22

23                          NOTARY PUBLIC
                       BRITNEY E. CHONKA
24                        STATE OF ALASKA
                   My Commission Expires Apr. 25, 2007
25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL
SERVICES, INC., an Alaska Corporation,

    Plaintiff,

-vs-

FORREST J. MCKINLEY, an individual
d/b/a "Imperial Industrial Coatings",
EMERCO, INC., a California corporation,
d/b/a Imperial Industrial Coatings;
BRECHAN ENTERPRISES, INC., an
Alaska corporation; and SAFECO
INSURANCE COMPANY OF AMERICA,
a Washington corporation,

    Defendants.
_____/

EMERCO, INC., a California corporation,
d/b/a Imperial Industrial Coatings, and
the United States for the use and benefit
of EMERCO, INC.,

    Counterclaimant/Third-Party Claimant,

-vs-

ABSOLUTE ENVIRONMENTAL
SERVICES, INC., an Alaska corporation,
et al.,

    Cross-defendants/Third-party Defendants,
_____/



Page 195

## Page 196

```
 1
 2      THE UNITED STATES OF AMERICA for
        the use and benefit of ABSOLUTE
 2      ENVIRONMENTAL SERVICES, INC., an
        Alaska corporation,
 3
 4        Plaintiff,
 5      -vs-
        SAFECO INSURANCE COMPANY OF
 6      AMERICA, a Washington corporation,
 7
          Defendant,
 8      _____/
        BRECHAN ENTERPRISES, INC., an
 9      Alaska Corporation,
10        Counterclaim Plaintiff,
11      -vs-
12      ABSOLUTE ENVIRONMENTAL
        SERVICES, INC., an Alaska Corporation,
13
          Counterclaim Defendant,
14      _____/
        BRECHAN ENTERPRISES, INC., an
15      Alaska Corporation,
16        Third-Party Plaintiff,
17      -vs-
18      COFFMAN ENGINEERS, INC., a
        Washington corporation,
19
          Third-Party Defendant,
20      _____/
21
22
23
24
25
```

## Page 197

```
 1
 2      ABSOLUTE ENVIRONMENTAL
        SERVICES, INC., an Alaska corporation,
 3        Plaintiff/Cross-claimant
 4      -vs-
 5      COFFMAN ENGINEERS, INC., a
        Washington corporation,
 6
          Defendant/Cross-claim Respondent.
 7      _____/
        Case No. A03-0199 Civil (RRB)
 8
 9        VIDEOTAPED DEPOSITION OF MATTHEW HOLMSTROM
10               Volume II
11            Pages 195 - 405 inclusive
12         February 14, 2006, 1:00 p.m.
13               Anchorage, Alaska
14
15      Taken on behalf of the Plaintiff pursuant to notice, at
16      the offices of Lane Powell Spears Lubersky, 301 West
17      Northern Lights, Suite 301, Anchorage, Alaska, before
18      Britney Chonka, Court Reporter for Alaska Stenotype
19      Reporters and Notary Public for the State of Alaska.
20
21
22
23
24
25
```

## Page 198

```
 1              A-P-P-E-A-R-A-N-C-E-S
 2      MARSTON, HEFFERNAN & FOREMAN
        Terry R. Marston, Esquire
 3      16880 NE 79th Street
        Redmond, WA  98052
 4
        LANE POWELL SPEARS LUBERSKY
 5      Peter Partnow, Esquire
        301 West Northern Lights Blvd, Suite 301
 6      Anchorage, AK  99503
 7      ATKINSON, CONWAY & GAGNON
        Robert J. Dickson, Esquire
 8      Chris Slotte, Esquire
        420 L Street, Suite 500
 9      Anchorage, AK  99501
10      PERKINS COIE, LLP
        Michael E. Kreger, Esquire
11      1029 West Third Avenue, Suite 300
        Anchorage, AK  99501
12
        Bruce E. Davison, Esquire
13      3351 Arctic Boulevard
        Anchorage, AK  99503
14
        JERMAIN, DUNNAGAN & OWENS
15      Eric J. Brown, Esquire
        3000 A Street, Suite 300
16      Anchorage, Alaska 99503
17      ALSO PRESENT:
18      Tom Puett, Imperial Industrial Coatings
19      Dave Olson, Absolute Environmental
20      Bill Oliver, Brechan Enterprises
21      Jerry Hardenbergh, Coffman Engineers
22      Videotaped By:    Eric Cossman, Alaska Legal Video
23      Reported By:      Britney Chonka, Court Reporter
24
25
```

## Page 199

```
 1              I-N-D-E-X
 2      EXAMINATION BY:                      PAGE
 3      Mr. Marston                        202, 396
 4      Mr. Brown                          280, 401
 5      Mr. Partnow                          342
 6      Mr. Dickson                          397
 7      EXHIBITS:
 8      No. 6 Diagram of Original Cargo Wharf        207
 9      No. 7 Order for Supplies and Services        219
10      No. 8 Coating of Steel Waterfront Structures  228
11      No. 9 Cargo Wharf Technical Requirements     231
12      No. 10 Project Scope and Fee Narrative       233
13      No. 11 Handwritten document, BEI 3989        246
14      No. 12 Packet of handwritten documents, BEI 4447  248
15      No. 13 Handwritten document, BEI 4484        249
16      No. 14 Handwritten document, BEI 4080        249
17      No. 15 E-mail string, 2/6/02                 261
18      No. 16 E-mail string, 2/26/02                262
19      No. 17 E-mail from Mr. Holmstrom, 3/10/3     263
20      No. 18 E-mail string, 10/29/02               263
21      No. 19 E-mail from Mr. Brown, 10/8/02        264
22      No. 20 E-mail from Mr. Holmstrom, 11/5/03    264
23      No. 21 E-mail from Mr. Peterson, 9/17/02     265
24      No. 22 E-mail string, 8/2/04                 265
25      No. 23 E-mail from Mr. Stears, 3/28/02       265
```

2 (Pages 196 to 199)

Page 216

1    Q. And as a result of that the Coast Guard reduced
2  the scope of the delivery order for maintenance of the
3  cargo wharf to less than the entirety of the wharf?
4    A. Delivery order 7, that's --
5       MR. DAVISON: Object to the form.
6       Go ahead.
7  BY MR. MARSTON:
8    Q. You can go ahead and --
9    A. Delivery order 7, that's -- that's correct.
10  My -- my recollection was, again, my recollection was
11  they referred to the pipe pile portion as section one.
12  But again, I -- I can't say it with absolute certainty.
13    Q. And do you believe that they referred to bents
14  one through 15 of the original wharf as section 2A?
15    A. Yes.
16    Q. And do you believe that they referred to
17  section -- or excuse me, bent 16 through 33 of the
18  original wharf as section 2B?
19    A. Yes.
20    Q. Do you believe that the scope of delivery order
21  number 7 encompassed section 1 and section 2A, but not
22  section 2B?
23       MR. KREGER: Objection.
24       THE WITNESS: With absolute certainty, no.
25  BY MR. MARSTON:

Page 217

1    Q. Is that what you believe, though?
2       MR. KREGER: Object.
3  BY MR. MARSTON:
4    Q. You're mincing words with me. I didn't ask you
5  anything about absolute certainty. I could ask everybody
6  around this table what their names are with absolute
7  certainty and they could say they don't know, because
8  they've been told by their parents what their name was.
9  That's not the standard here.
10       What I'm asking for is what your reasonable
11  recollection is, and that is, is your reasonable
12  recollection that the scope of delivery order number 7
13  encompassed section 1, the wharf extension, section 2A,
14  bents 1 through 15 of the original cargo wharf, but not
15  section 2B, bents 16 through 33 of the original cargo
16  wharf.
17       MR. KREGER: Objection.
18       MR. DAVISON: Objection, argumentative.
19       MR. KREGER: Argumentative. The contract would
20  speak for itself and if the contract were provided,
21  it might speed this up.
22       MR. MARSTON: I doubt it.
23       You can go ahead and answer the question.
24       THE WITNESS: You asked me if that's my
25  reasonable recollection?

Page 218

1  BY MR. MARSTON:
2    Q. Yes.
3    A. Yes.
4    Q. Mr. Kreger suggested that if the contract was
5  produced to you that that might speed things up. Would
6  providing the specifications to you, in fact, speed
7  things up in assisting and identifying what the original
8  scope of the work was in terms of bents under delivery
9  order number 7?
10    A. I -- I would say complete plan specs, statement
11  of work and request for proposal would speed things up,
12  yes.
13       MR. MARSTON: I don't have a copy of this
14  available for everybody, but at least at this moment
15  I'll hand it to you to the extent that it may assist
16  you in refreshing your recollection. And we may
17  mark it and ask Mr. Partnow to have copies of it
18  made if that's desired.
19       Go ahead and take a look at that document, which
20  I have not marked yet.
21       MR. PARTNOW: Can we have it at least
22  identified? Is it Bates numbered, or anything?
23       MR. MARSTON: Not at this point.
24       Go ahead and take a look at it.
25       Got a finite amount of time, Peter, and --

Page 219

1  BY MR. MARSTON:
2    Q. Do you recognize that document?
3    A. Yes.
4    Q. Is that a true and correct copy of delivery
5  order number 7?
6       MR. KREGER: Objection, calls for a legal
7  conclusion.
8       THE WITNESS: Yes.
9       MR. MARSTON: Let's go ahead and mark that as
10  Exhibit Number 7.
11       (Exhibit 7 was marked.)
12  BY MR. MARSTON:
13    Q. Does Exhibit Number 7, delivery order number 7,
14  assist you in identifying what the limits in terms of
15  bents of your scope of work were under delivery order
16  number 7?
17       MR. DAVISON: Object to form.
18       MR. BROWN: Excuse me, is there a Bates stamp on
19  that?
20       MR. MARSTON: It's a FOIA document. Let's move
21  through this as quickly as we can, because --
22       THE WITNESS: No.
23  BY MR. MARSTON:
24    Q. Does not assist you in identifying work scope?
25    A. Of delivery order 7?

7 (Pages 216 to 219)

Page 228

1    to drawings and specifications dated 3/2001. That's
2    confusing to me.
3    BY MR. MARSTON:
4        Q. It may be confusing to you, but it would be
5    simpler if you just thought in terms of the question that
6    I asked you. And that is, do you recognize the documents
7    that I just handed you as the June 21st set of
8    specifications that was applicable to the cargo wharf
9    contract?
10       A. Yes.
11       Q. And that was what was used to actually perform
12   the work on the cargo wharf contract for phase 1?
13       MR. KREGER: Object to the form.
14       THE WITNESS: It -- it does say "final specs"
15   and that's my handwriting.
16   BY MR. MARSTON:
17       Q. And so does that lead you to conclude that that
18   is, in fact, the set of specifications that you used to
19   perform phase 1 of the cargo wharf maintenance contract?
20       A. Yes.
21       MR. MARSTON: Let's go head and mark that.
22       (Exhibit 8 was marked.)
23   BY MR. MARSTON:
24       Q. Now, you've just identified Exhibit 8 as a true
25   and correct copy of the specifications -- excuse me, the

Page 229

1    final set of specifications that was used to perform your
2    work on the first phase of the cargo wharf maintenance
3    contract, correct?
4        MR. DAVISON: Object to form.
5        THE WITNESS: Yes.
6    BY MR. MARSTON:
7        Q. And section 1.10 of those specifications
8    identify what the scope of work is under that contract?
9        MR. DAVISON: Object to form, mischaracterizes
10   testimony.
11       THE WITNESS: Yes.
12   BY MR. MARSTON:
13       Q. And does that indicate that Brechan's work ended
14   at bent 15 of the original cargo wharf under delivery
15   order number 7, as issued?
16       MR. KREGER: Object, contract speaks for itself.
17       THE WITNESS: Yes.
18   BY MR. MARSTON:
19       Q. Okay. Let's move on to another topic.
20       Can you return the exhibits to our reporter?
21       Are you familiar with a document pertaining to
22   this project entitled "technical requirements"?
23       A. No.
24       Q. I'm going to hand you a copy, my marked-up copy
25   of it, just to see if it -- if handing this to you

Page 230

1    refreshes your recollection. If it does, then -- as a
2    matter of fact, might I have it back just a moment?
3    There's some notes on there that are my notes.
4        Go ahead.
5        MR. KREGER: What was the question?
6        MR. MARSTON: Question was: Has he ever seen
7    that document before.
8        MR. DAVISON: Without any of the markings?
9        MR. MARSTON: Correct, all the highlighting's
10   mine. All the colorful highlighting.
11       THE WITNESS: I believe so.
12   BY MR. MARSTON:
13       Q. Does looking at that document refresh your
14   recollection as to what it is, beyond simply what it's --
15   what the title reads?
16       MR. MARSTON: Just a second, are there Bates
17   numbers on that that would help counsel be able to
18   follow --
19       MR. MARSTON: That's a -- that's a FOIA
20   document, I was just provided. I'll go ahead and
21   mark it as an exhibit.
22       THE WITNESS: This looks to me like a document
23   that the Coast Guard would have provided possibly to
24   Tryck Nyman Hayes, because, again, recognizing this
25   was a modified design-build, it looks -- this looks

Page 231

1    to me as though the Coast Guard was laying out their
2    criteria. They've got some design requirements.
3    Some of the lines -- some of the work items have
4    been lined out, not really sure why this is.
5        MR. MARSTON: Okay.
6        THE WITNESS: But, yeah, this -- this looks like
7    a document that would have been prepared by the
8    Coast Guard, is what it looks like to me.
9    BY MR. MARSTON:
10       Q. And you think you've seen it before, but you
11   thought you saw it -- you think you saw it at Coffman or
12   Tryck Nyman, rather?
13       A. I -- I -- I don't recall where I saw it.
14       Q. Okay. So you don't know if you have a copy or
15   not?
16       A. That's correct, I don't know.
17       Q. Okay. Is it your understanding that that
18   document, and we will go ahead and mark it; with
19   everybody's approval, I'll substitute a clean copy for
20   that one. We'll mark it as Exhibit 9.
21       (Exhibit 9 was marked.)
22       MR. KREGER: Does it have a date on it or
23   anything to reference it?
24       MR. MARSTON: I think it has something in the
25   title.

Page 260

1    Q. Is that a e-mail string that you were a party to
2  during the course of the cargo wharf maintenance project?
3    A. Yes.
4    Q. Okay. Put that in the "yes" pile, then. We'll
5  create two piles.
6       Same question with the next.
7    A. Yes.
8    Q. Same question with respect to the next.
9       MR. KREGER: I don't know if there's any
10  particular --
11      THE WITNESS: Oh, is this the pile?
12      MR. KREGER: Is there any order --
13      MR. MARSTON: No.
14      THE WITNESS: Little bit of the problem is all
15  of the dates are all over the board, so it's --
16      MR. KREGER: Take your time.
17      THE WITNESS: Well, from a flow standpoint, you
18  know, it doesn't flow.
19      MR. MARSTON: Well, just do your best at it.
20      THE WITNESS: Oh, I'll do my best.
21      MR. KREGER: You have to answer his --
22      THE WITNESS: Oh, yes.
23  Yes.
24      MR. BROWN: Transcript's going to be good
25  reading: Answer, yes, answer, yes.

Page 261

1       MR. MARSTON: The videotape's going to be even
2  better.
3       MR. MARSTON: Okay. I'll concede.
4       I'm going to withdraw the question with respect
5  to the remainder of the dock -- of these e-mails
6  once you get through that one. And if you gentlemen
7  would just return to me the ones that I handed, that
8  he has not looked at.
9       THE WITNESS: Yeah, I don't -- I don't recall
10  that one.
11  BY MR. MARSTON:
12    Q. Okay. This is the stack that you have indicated
13  that you do recall?
14    A. Yes.
15      MR. MARSTON: Okay. Let's mark that as an
16  exhibit.
17      (Exhibit 15 was marked.)
18  BY MR. MARSTON:
19    Q. And the stack that you just referred to, is that
20  the stack which has now been marked as Exhibit 15?
21    A. Yes.
22      MR. DAVISON: May I, just for the record, would
23  you count the number of pages in that exhibit?
24      THE WITNESS: Seven.
25      MR. MARSTON: Okay. Let's mark that one 16.

Page 262

1       (Exhibit 16 was marked.)
2  BY MR. MARSTON:
3    Q. Do you recognize number 16? Okay. Is there an
4  attachment to number 16?
5    A. This part here?
6    Q. Yes.
7    A. Yes.
8    Q. Before we go on to the attachment, do you
9  recognize the e-mail that is the first page of Exhibit
10  16?
11    A. Yes.
12    Q. Do you recall that there was an attachment to
13  that that constituted a memo prepared by Coffman
14  Engineers that had been edited by Bill Oliver?
15    A. Well, again, this e-mail refers to an
16  attachment, so, yes.
17    Q. That wasn't my question, though. Do you recall?
18    A. What's the question --
19    Q. That the e-mail had an attachment that was an
20  edit of a Coffman memorandum that had been performed by
21  Bill Oliver?
22    A. No.
23    Q. What do you recall the attachment as having
24  been?
25    A. I don't recall.

Page 263

1    Q. Okay.
2       Do you recall Bill Oliver having edited any
3  Coffman memorandums?
4    A. No.
5       (Exhibit 17 was marked.)
6       MR. DIXON: What's the Bates of 16?
7       MR. KREGER: 7098, I think.
8       MR. MARSTON: That's correct --
9       MR. KREGER: How many pages was it?
10      MR. PARTNOW: Was that a Bates number or a date?
11      MR. KREGER: Was a Bates number.
12      You asked for a date, Robert? I'm sorry, I said
13  Bates.
14      MR. MARSTON: The date is February 26.
15      MR. BROWN: What's the Bates?
16      MR. MARSTON: It is Brechan 7098. And then
17  Brechan 18213 through 18215.
18      THE WITNESS: Yes.
19  BY MR. MARSTON:
20    Q. Is Exhibit Number 17 a true and correct copy of
21  an e-mail that you were a party to during the course of
22  the cargo wharf maintenance project?
23    A. Yes.
24      (Exhibit 18 was marked.)
25  BY MR. MARSTON:

18 (Pages 260 to 263)

Page 264

1    Q. Please review Exhibit 18. Let me know when you
2  have completed that so as to be able to let me know
3  whether it is a true and correct copy of a e-mail string
4  that you were a party to during the course of the cargo
5  wharf maintenance project.
6       MR. PARTNOW: For the record, could you identify
7  what Exhibit 17 was? Bates number?
8       MR. MARSTON: I'll hand it down to you -- I'll
9  hand it to you in just a moment.
10      THE WITNESS: Yes.
11 BY MR. MARSTON:
12   Q. Is that a true and correct copy of the e-mail
13 that you were a party to during the course of that
14 project?
15   A. Yes.
16      (Exhibit 19 was marked.)
17 BY MR. MARSTON:
18   Q. Same question with respect to Exhibit 19.
19   A. Yes, this was already over here. Same thing.
20   Q. Okay.
21      So the answer to that is, yes, this is a true
22 and correct copy of an e-mail string --
23   A. Yes.
24   Q. Okay.
25      (Exhibit 20 was marked.)

Page 265

1  BY MR. MARSTON:
2    Q. Handing you what's been marked as Exhibit 20,
3  same question.
4       MR. KREGER: For purpose of identification,
5  could you tell us what the Bates number is on that?
6       THE WITNESS: Yes.
7       MR. KREGER: On that, could you call out the
8  Bates number in the lower right-hand side.
9       THE WITNESS: This thing here?
10      MR. KREGER: Yes, sir.
11      THE WITNESS: AES mail, M-A-I-L, dash 000332.
12      MR. KREGER: Thanks.
13      (Exhibit 21 was marked.)
14 BY MR. MARSTON:
15   Q. Same question with respect to Exhibit 1, which
16 is Absolute 490 dated September 17th, 2002.
17      MR. PARTNOW: Exhibit 21 or 1?
18      THE WITNESS: Exhibit 21?
19      MR. MARSTON: 21.
20      THE WITNESS: Yes.
21      (Exhibit 22 was marked.)
22 BY MR. MARSTON:
23   Q. Same question with respect to Exhibit 22, which
24 is Brechan 7071. The top date is August 2nd, 2004.
25      (Exhibit 23 was marked.)

Page 266

1       THE WITNESS: This has nothing to do with the
2  cargo wharf pile coating project.
3  BY MR. MARSTON:
4    Q. Exhibit 22 does not?
5    A. That's correct.
6    Q. Okay.
7       Same question with respect to Exhibit Number 23.
8    A. Yes.
9       MR. KREGER: Can I get that number?
10      (Exhibit 24 was marked.)
11      THE WITNESS: BEI 6529.
12 BY MR. MARSTON:
13   Q. We are returning to Exhibit Number 22, can you
14 identify that as a true and correct copy of a e-mail
15 inquiry you received from Chris Lynch and responded back
16 to Ms. Lynch.
17   A. Well, again, this top one is between Bob
18 Mallahan and me. So it -- it -- you know, depends on
19 which piece you're talking about.
20   Q. Okay. Let's talk about the top one, then. Do
21 you recognize the top message where the message is
22 limited to the statement: Thanks Matt, as an e-mail that
23 was exchanged between you and Robert Mallahan on August
24 2nd, 2004?
25   A. Yes.

Page 267

1    Q. Still on Exhibit Number 22, do you recognize
2  this segment of the message as being a response that you
3  provided to an inquiry from Chris Lynch, and your
4  response is dated July 30th, 2004 [ as spoken]?
5    A. Yes.
6    Q. And the third segment down is an inquiry from
7  Chris Lynch to you asking you to answer the questions
8  regarding costs that were in the preceding strings on
9  that e-mail; is that correct?
10   A. Generally, but not completely.
11   Q. Oh --
12   A. You don't have the right people asking
13 questions.
14   Q. I don't have the right people?
15   A. Well, look at the bottom e-mail, it's not from
16 Chris Lynch to me. It's from John Miller.
17   Q. Did it appear -- does it appear to your
18 understanding to be an inquiry, the bottom e-mail, from
19 John Miller to Chris Lynch regarding the cost to coat
20 piles?
21      MR. DAVISON: Objection --
22      THE WITNESS: No, it's from John to me.
23      MR. DAVISON: Hold on. Hold on just a second.
24 Matt, before you answer, let me put my objection.
25      THE WITNESS: My bad.

Matthew Holmstrom Vol. 2                      Deposition                      February 14, 2006

Page 292

1      MR. DAVISON:  Objection, ambiguous.
2      THE WITNESS:  I -- I can't recall any specifics.
3  BY MR. BROWN:
4      Q.  If I represent to you that Mr. Olson here
5  adamantly denies that you told him and Mr. Puett about
6  the problems that Swalling encountered on phase 1, would
7  you change your testimony, or are you going to say
8  Mr. Olson's lying?
9      MR. DIXON:  Foundation.
10     MR. DAVISON:  Objection, form.
11     MR. KREGER:  Objection.
12     THE WITNESS:  Could you ask that -- ask me that
13  question again?
14  BY MR. BROWN:
15     Q.  Yeah.  You testified, did you not, at your first
16  part of this deposition that you met with Mr. Olson and
17  Mr. Puett on the cargo wharf and that you told -- you
18  specifically told them about the problems that Swalling
19  had encountered; is that true?
20     THE WITNESS:  I testified about problems that I
21  knew of, problems that -- that I knew from my
22  perspective as project manager.  That's what I
23  testified to.
24  BY MR. BROWN:
25     Q.  Well, maybe I'm mistaken, and you correct me if

Page 293

1  I am, but I thought you testified that you told,
2  specifically told Mr. Olson and Mr. Puett at this meeting
3  about the problems they had with these welds?
4      A.  Yes.  I -- I testified to that.
5      Q.  And so --
6      A.  And I also testified that because we revised the
7  welds repair specification, that it was a moot point,
8  which it was.
9      Q.  But the spec that you said that was changed that
10  you now claim made it a moot point on phase 2, I don't
11  think that I heard your answer as to why specifically
12  that spec was changed.
13     MR. PARTNOW:  Is that a question?
14     MR. BROWN:  Yes.
15  BY MR. BROWN:
16     Q.  Why was that spec changed?
17     A.  Well, again, not being a coatings person, we
18  knew that it created some issues on phase 1, contractual
19  issues.  And so we recognized that it was an issue, so we
20  took those steps to make sure that it wasn't an issue on
21  phase 2.
22     (Exhibit 25 was marked.)
23  BY MR. BROWN:
24     Q.  Do you recall that e-mail?
25     A.  Yes.

Page 294

1      Q.  That's been marked Exhibit 25?  And it says:
2  Dave, I just -- it's from you to Dave Olson, correct?
3      A.  Yes.
4      Q.  Dated July 24, 2002.  And it says:  Dave, I just
5  told Jason that I met with Coast Guard today.  We talked
6  specifically about finishing the cargo wharf and the fuel
7  pier.  The GC (sic) wants to obligate the funds in early
8  October.  They're open to alternative concepts, so now is
9  the time to show them that we have our staff together,
10  and can do the job.  Somebody throw me a freakin bone.
11  Matt?
12     What does "somebody throw me a freakin bone"
13  mean?
14     A.  Dave Olson came to me representing he had a
15  top-notch team to -- to -- to be our pile coating
16  subcontractor.  And so with that representation, all this
17  was about was the Coast Guard said they want to get after
18  it.  They want to do the work.  And that's what we're all
19  about was executing their projects.
20     So all I'm saying here is:  Let's go.  That's --
21  other than that, I -- I don't know what else to tell you.
22     Q.  So "throw me a freakin bone" to you, you meant
23  let's get going; you wanted Olson to do something?
24     A.  Yes.
25     Q.  What did you want Olson to do?

Page 295

1      A.  Get moving on putting together a cost proposal
2  so we can do the cargo wharf.
3      Q.  And Absolute was the only company you talked
4  about -- talked to about doing this work, correct?
5      A.  That's correct.
6      Q.  And why didn't you talk to some other companies
7  or look around, see if anybody else was interested in
8  doing this work?
9      A.  Why didn't I?
10     Q.  Yeah.
11     A.  Because Dave told me that he had the right team
12  to do the job.
13     Q.  Do you recall what Dave said specifically?
14     A.  No.
15     Q.  You were convinced, based on what Mr. Olson
16  said, that they, that Absolute could do the job?
17     A.  Well, I -- based on information that he
18  presented to me, not just, you know, what he said, but
19  information that he presented to me, yes.
20     Q.  Now, in your first deposition, I think
21  Mr. Marston asked you about what a spend-down -- had you
22  ever heard of the term spend-down?
23     A.  Yes.
24     Q.  And as I recall, you said no.  Am I mistaken?
25     A.  I don't recall saying that.

26 (Pages 292 to 295)

Page 396

1      don't disagree that it's inauthentic.
2           MR. MARSTON:  But you're not willing to
3      stipulate as to what it is?
4           MR. KREGER:  I'll let you ask Mr. Holmstrom a
5      question about it.
6           MR. MARSTON:  Okay.  With your permission, Bob?
7           MR. DICKSON:  Sure.
8                EXAMINATION
9      BY MR. MARSTON:
10          Q.  Handing you what's been marked as Exhibit Number
11     43, Mr. Holmstrom, do you recognize that document?
12          A.  What's the question?
13          Q.  Do you recognize that document?
14          A.  Yes.
15          Q.  Is that a true and correct copy of Brechan's
16     proposal to the Coast Guard for phase 2 of the cargo
17     wharf maintenance project?
18          A.  This -- this looks like a copy of our proposal,
19     yes.
20          Q.  And as far as you can tell from having reviewed
21     it, it looks like a complete and accurate copy of your
22     proposal?
23          A.  Yes.
24          Q.  Okay.  Handing you what's been marked as Exhibit
25     number 44, do you recognize that document?

Page 397

1      A.  Yes.
2           Q.  Can you identify, for the record, what Exhibit
3      Number 44 is?
4           A.  This is the delivery order for cargo wharf phase
5      2.
6           Q.  Is that a true and correct copy of the delivery
7      order for the cargo wharf for phase 2?
8           A.  I don't understand what "true and correct copy"
9      means.
10          Q.  I'm sorry.
11          A.  This looks as though this is the delivery order,
12     that's what I'd tell you.
13          Q.  It looks authentic to you?
14          A.  Yes.
15          Q.  Okay.
16          MR. MARSTON:  Thank you, Bob.
17               EXAMINATION
18     BY MR. DICKSON:
19          Q.  Mr. Holmstrom, I'm Bob Dickson.  I represent
20     Specialty Polymer.  I just have one point to cover before
21     we move along.
22          Based upon your knowledge, generally what work
23     Brechan did within house on the cargo wharf maintenance
24     project and what work was done by Coffman, at least
25     through December 2002, based upon that knowledge, as

Page 398

1      between Brechan and Coffman, who prepared the quantity
2      estimates for the surface to be coated on the wharf?
3           MR. PARTNOW:  Objection, assumes facts not in
4      evidence.
5           THE WITNESS:  So your question is who --
6      BY MR. DICKSON:
7           Q.  As between Brechan and Coffman prepared the
8      quantity estimates for the surface area to be covered --
9      coated?
10          MR. KREGER:  Objection.
11          THE WITNESS:  For phase 1 or the whole thing?
12     BY MR. DICKSON:
13          Q.  Whole thing.
14          A.  Coffman did.
15          Q.  Okay.  Now, is that true for that portion of the
16     cargo compartment of the wharf referred to as the
17     original wharf?
18          A.  Yes.
19          Q.  Is that true for that portion of the wharf that
20     was referred to as the extension?
21          A.  Yes.
22          Q.  And was that true for what be -- came to be
23     known as phase 1?
24          A.  I'm not sure about that last question about
25     phase 1, on who made the call.

Page 399

1      Q.  Okay.  And then my -- and my -- same question as
2      to phase 2.  Is it true that Coffman prepared the
3      quantity estimate for what was ultimately called phase 2?
4           A.  I don't know.
5           MR. KREGER:  Objection.
6      BY MR. DICKSON:
7           Q.  Okay.  And who within Brechan would have the
8      best information on that question?
9           A.  I would.
10          Q.  Okay.  And you don't know.  Is there any
11     documentation that you would -- that would have that
12     answer for you if you were so inclined to look for it?
13          A.  Yes.
14          Q.  And where -- where would you look for that
15     answer or that information?
16          A.  I would look -- I would go to Brechan and --
17     that's where I would go.
18          Q.  Sure.  And are there any particular records you
19     would research to find that information?
20          A.  Yes.
21          Q.  What records are those?
22          A.  I would look at my project files.
23          Q.  Okay.  And would there be any particular part of
24     your project files that you'd focus on, at least
25     initially?

52 (Pages 396 to 399)

1

2                     REPORTER'S CERTIFICATE

3

4

5          I, Britney E. Chonka, Court Reporter, hereby

6     certify:

7          That I am a Court Reporter for Alaska Stenotype

8     Reporters and Notary Public in and for the State of

9     Alaska at large.  I certify Hereby that the forgoing

10    transcript is a true and correct transcript of said

11    proceedings taken before me at the time and place stated

12    in the caption therein.

13          I further certify that I am not of counsel to

14    either of the parties hereto or otherwise interested in

15    said cause.

16          In witness whereof, I hereunto set my hand and

17    affix my official seal this 15th day of May, 2006.

18

19

20

21          BRITNEY E. CHONKA, REPORTER

22          Notary Public - State of Alaska

23

24                     NOTARY PUBLIC
                       BRITNEY E. CHONKA
                       STATE OF ALASKA
25             My Commission Expires Apr. 25, 2007