Case No. A03-0199 (RRB)                                        Jason Peterson

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
 4    ABSOLUTE ENVIRONMENTAL
      SERVICES, INC., An Alaska
 5    corporation,                          COPY
 6                   Plaintiff,
 7         vs.
 8    FORREST J. McKINLEY and "JANE
      DOE" McKinley, et al.,
 9
                     Defendants.
10    _____
11    Case No A03-0199 Civil (RRB)
12
13
14
15
                     DEPOSITION OF JASON PETERSON
16
                        Taken March 31, 2006
17                      Commencing at 9:00 a.m.
18           Volume I - Pages 1 - 238, inclusive
19
20
                        Taken by the Defendant
21                               at
                           PERKINS COIE
22              1029 W. Third Av., Suite 300
                     Anchorage, AK  99501
23
24
25    Reported by:
      Susan J. Warnick, RPR            Exhibit 4
```

1    A    Well, it wasn't actually a telephone conversation.

2    It was both when we were -- I was over there looking at

3    other projects, because at that point we were doing, you

4    know, a fair amount of work with Brechan.   And we just

5    drove by the cargo pier.   And we were standing out there,

6    you know, on the dock, just kind of looking at it.   And,

7    you know, at this point I knew, just from previous

8    conversations with Matt, that whatever happened it was a

9    mess and he wasn't pleased with it.   So I felt that at

10   this point, since it seemed to be more of a reality that

11   we were going to be taking over, I -- you know, I didn't

12   really consider it my business to really pry in deep, but

13   I did ask -- I said, well, can you tell me what happened

14   with Swalling.   And Matt told me some things.

15   Q    What did he tell you?

16   A    He told me -- well, I asked him, I said, what was

17   Swalling's problem.   And he told me that -- that they were

18   unorganized in their procedures.   He said that there would

19   be -- they would -- you know, they would show up all

20   different times; they weren't coordinating with the tides.

21   They were way behind schedule.   He said that they were

22   trying to -- some days they would try to set up

23   containment on an area, blast it and coat it all in one

24   tide.

25             Then he went on to say that he felt that the

1    whole key -- or a major key to performing the project

2    successfully is if you could somehow eliminate the tides

3    as a factor in the project.  And that was what he said.

4    Q    Did you say to him, Matt, are those the only problems

5    that Swalling had on the job?

6    A    No, I didn't.

7    Q    Did you ask him if there were any claims or change

8    orders on the project?

9    A    No, I didn't.

10    Q    Why didn't you ask him if there were change orders on

11    the project?

12    A    Well, again, I don't feel it's necessarily my

13    business to pry deep into their -- my understanding, the

14    whole subject was sour to him.  I had a good relationship

15    with Matt and George and everyone at Brechan.  I felt

16    that, when I asked that question, you know, he would tell

17    me what problems were.  And especially if, you know, some

18    problems were more of a problem than maybe other factors

19    on the project.  I figured -- I was satisfied with his

20    answer, that he'd told me everything I really needed to

21    know.

22         My overall impression was that they were

23    disorganized and maybe the project was, you know, too

24    complicated or, you know, too complex for them to perform

25    in a satisfactory way.

```
 1   Q    This conversation occurred in Kodiak?

 2   A    In Kodiak.

 3   Q    Was anybody else present?

 4   A    No.

 5   Q    Did you make notes of the conversation?

 6   A    No, I did not.  Not until later.

 7   Q    How much later did -- I assume that you're saying you

 8   did make notes of the conversation at some point later?

 9   A    Yes.

10   Q    When did you later makes these notes?

11   A    Maybe five or six months ago.

12   Q    At whose request did you make these notes?

13   A    Mr. Olson.

14   Q    Do they exist someplace in -- did you throw them

15   away?  Do you still have these notes?

16   A    No, I believe the notes -- I think everyone has a

17   copy of it, is what I've heard.

18   Q    Well, did you write something out?

19   A    Yes.

20   Q    In longhand or type it up?

21   A    No, I typed it up.

22   Q    And who did you give it to?  Mr. Olson?

23   A    Yes.

24   Q    And that happened about five or six months ago?

25   A    I -- something like that, yes.
```

1    Q    Did you have any other conversations with Matt about

2    how the Swalling project went, other than this one that

3    you've talked to us about now?

4    A    No, because Matt never talked about technical things

5    on pretty much any of the projects.  When I would ask Matt

6    a technical question or something in detail about the

7    project, Matt would always say, well, talk to George or

8    talk to Pete.  Matt wasn't really -- he was more of a

9    number cruncher than he was really involved with any of

10   the technical aspects of performing the work on the

11   project.  He would really say, just ask George.  You know,

12   I don't know; I don't bother with that stuff.

13        So I kind of got, from asking him on other

14   projects, technical questions, I got to the point where I

15   just knew, you know, not to ask Matt because he'd always

16   just -- you know, not want to even discuss it really.

17   Q    How about George or Jimmy or --

18   A    No, I did not.

19   Q    Didn't ask them about how the Swalling project went?

20   A    No.

21             MR. KREGER:  Would you mark that, please.

22             (Exhibit 1 marked.)

23   BY MR. KREGER:

24   Q    Mr. Peterson, you're looking at what's been marked as

25   Exhibit 1.  Is that your signature on the second page

66

```
 1   A     Yes, I did.

 2   Q     And what did you think "per Matt" referred to when

 3   you saw that?

 4   A     My understanding from talking to -- I think it was

 5   more to George Contra than to Matt -- is that they

 6   determined that there was not lead -- even though this

 7   said this, that there was not lead in the existing

 8   coatings.

 9   Q     This is a document that was marked at Mr. Puett's

10   deposition, marked Puett Exhibit 13.

11         For counsels' benefit it's a -- Bates stamped

12   AES 1498 through 1520.

13         MR. BROWN:  What was it marked?

14         MR. KREGER:  Puett Exhibit 13.  Bates stamp

15   1498.  It appears to be pages one through 23 of June 21st

16   specifications.

17   BY MR. KREGER:

18   Q     Now I'm going to ask you a couple questions about

19   this document, Mr. Peterson.

20   A     Okay.

21   Q     And if you need to review the document based on the

22   question, let me know and we'll take time and let you

23   review it.

24   A     Okay.

25   Q     Do you remember seeing a copy of the June 21st, 2001
```

```
 1    specifications for coating of steel waterfront structures?

 2    A    Is this this document?

 3    Q    Well, I would represent to you that I believe it is,

 4    but I'm going to let you --

 5    A    I believe seeing a document like this.  Whether this

 6    exact date there, I don't know, but I am familiar with

 7    seeing a document which this appears to be.

 8    Q    Now, when you submitted your October 22nd proposal to

 9    Brechan, you, as I understand it, were using the June 21st

10    specifications as your basis to submit your cost estimate

11    or your proposal; is that correct?

12    A    That is my understanding at the time, because that

13    was the only one, to my understanding, we were given and

14    had access to at the time.

15    Q    Well, did the other one even exist?  Did the later

16    specifications even exist?

17    A    Well, obviously it does now, but at the time, we

18    certainly didn't know about it.

19    Q    Did you ask Mr. Holmstrom if there was going to be a

20    new spec coming out for the remainder of the work?

21    A    No, I did not.

22    Q    And you know that later on, before you signed the

23    contract, a new spec did come out, though, correct?

24    A    Yes.

25    Q    When the new spec came out, did you go back and check
```

1    to see whether the scope of work was similar to or

2    different from the scope of work that you had made your

3    proposal on in October?

4    A    I didn't -- I didn't look in detail but, moreover, I

5    sent it to Mr. Puett, who was performing the majority of

6    this work.  And it was his expertise -- again, I'm not a

7    coatings expert.  So I sent it -- as far as I can

8    recollect, forwarded it to Tom and asked him if he saw

9    anything that -- you know, big changes that would affect

10   our price.  But I don't know the dates of exactly when all

11   that happened.

12   Q    Did you transmit this 2001 specification to Mr.

13   Puett?

14   A    Originally?

15   Q    Yes, sir.

16   A    Oh, I believe so.  I would certainly hope I did.

17   Q    Now, would you go to page 1508.

18   A    I'm there.

19   Q    On 1508, I see that same Sticky on this page again.

20   Do you still recognize as being a Sticky that says,

21   "Reword"?

22   A    I do.

23   Q    Do you have any recollection now as to where that

24   Sticky came from?

25   A    I do not.  Unless it was a mistake and somehow got

1    stuck in there.  But I don't know who put it there or why.

2    Q    Now on the first page of this June 21st

3    specification, at Section 1.13, it says, "The applicator

4    shall inspect the wharf prior to bid to determine existing

5    conditions and quantities of surfaces to be recoated."

6         Do you see that?

7    A    I do see that.

8    Q    Did the applicator inspect the wharf prior to bid to

9    determine the existing conditions and quantities of

10   surfaces to be recoated?

11        MR. ELISON:  Objection.  Compound and to the

12   extent it calls for a legal conclusion.

13        THE WITNESS:  I would say, to my knowledge, that

14   the applicator viewed the dock.  The definition of

15   "inspection" might be another -- I mean, what you exactly

16   mean by inspection.  But I know that it was viewed.

17   BY MR. KREGER:

18   Q    If "inspection" meant doing a detailed investigation

19   of the condition of the steel underneath the coatings,

20   would you say that the applicator did an inspection of the

21   wharf?

22        MR. ELISON:  Object to the form of the question.

23        MR. BROWN:  Assumes facts not in evidence.

24        MR. ELISON:  And -- yeah, just object to the

25   form.

1    corner?

2    A    Yeah, that is our -- yeah, 4491.  Yes, that is our

3    fax number.

4    Q    Do you remember receiving something like this from

5    Mr. Puett at or about this time?

6    A    I can't recall for sure whether I remember receiving

7    it from him at that time.

8    Q    Your subcontract price to Brechan is $995,850, right?

9              MR. ELISON:  Objection.  Foundation.

10              THE WITNESS:  I believe that is correct.  I

11    haven't just reviewed it, but yeah, somewhere

12    approximately around there.

13    BY MR. KREGER:

14    Q    What was the work or profit or overhead markup that

15    -- what was the value of those three items that Absolute

16    added to Mr. Puett's subcontract price of 772,123?

17              MR. ELISON:  Objection.  Compound.

18              THE WITNESS:  I believe it was to the tune of

19    220-some thousand dollars.

20    BY MR. KREGER:

21    Q    And what -- did you take part in the estimating of

22    the money that was in the tune for Absolute, the 225,000?

23    A    No, I did not.

24    Q    Who did that?

25    A    Mr. Olson.

1    Q    I can't resist a question about the last page here,

2    where there's some calculation of $173,727. And then

3    that's added to Mr. Puett's -- or Imperial's price, that

4    is to say, of 772,123. And then added to that is another

5    $50,000. Comes up to equal the eventual subcontract price

6    between Brechan and Absolute. Do you see that?

7    A    Yes, I see that.

8    Q    Do you recall seeing those calculations and do you

9    know where those calculations on this third page come

10    from?

11    A    Well, I know that the 772 was Tom's number. And I

12    understood ours, you know, came to like the 220. But not

13    until, you know, later, after, you know, the project was

14    going, that I actually saw -- I believe I saw this. I

15    believe it's in the folder. And I understand this is AES,

16    which is us: Labor, you know, setup, and things. It

17    appears that we were going to -- our responsibilities on

18    the project included, you know, to the 945,850, then the

19    50,000 that brought it to 995.

20    Q    What was the -- what does it say there on the

21    right-hand side, if you know? It says, "50,000," and it

22    looks like D & T delays and something.

23    Did you ever try to read that in a better copy

24    than what we've got here and ever figure out what that

25    said?

1    A    No, I didn't, as my main -- my main dealings in this,

2    up to the bid date, was not so much the estimating,

3    because Tom was doing the estimating for his portion and

4    then Dave did for Absolute.

5         I was involved in estimating many other projects

6    at the time and taking care of projects that were going

7    on.  But I was the person who had to put things into

8    Means, because I spent a lot of time -- and I don't know

9    if you know what a Means book looks like and what you have

10   to do.  But there's all kinds of line items and codes.

11   And you got to -- you got to basically make the number

12   work in Means.  That's what they want to see for this

13   contract.  They want to see a Means number.

14        And, you know, I don't estimate jobs in Means.

15   I don't know if people actually go onto a job site and

16   estimate a job using Means.  But I -- a typical Brechan

17   job, even though I do my typical estimate for a project.

18   I estimate the way I normally do for any project, you

19   know.  But for the Means, once I got that estimate, I had

20   to justify it through the Means cost system.

21   Q    Yeah.

22   A    And that was primarily my involvement of this

23   proposal, was not so much, you know -- you know, the

24   calculations of how they came to the numbers, but I was

25   told what the final number was, and then I took it from

104

1   there and I had to break it down and try to make it fit

2   in.

3   Q    So, I take it, you didn't have any discussions with

4   Mr. Puett about using $38.60 a square foot times 4500

5   square feet and that being a significant portion of the

6   difference between Imperial's subcontract price and

7   Absolute's subcontract price?

8   A    No.

9   Q    Didn't have those discussions?

10  A    No.

11            (Exhibit 12 marked.)

12  BY MR. KREGER:

13  Q    Now, this is another document that's been previously

14  marked in a deposition.  We've remarked it as 12.

15            Take a look at this string of e-mails, if you

16  would, Mr. Peterson, please.

17            Have you had a chance to look at that?

18            Go ahead.  I see you're still reading.

19  A    Okay.

20  Q    Do you remember receiving this string of e-mails on

21  or about Tuesday, October 29th, 2002?

22  A    Well, not right clearly, because it's so long ago.

23  But it appears that I was involved with this.  I do

24  remember, to some degree, the issues being talked about

25  here.

1    Q    At this point in time, this is October 29th, 2002,

2    had that October 22nd letter been sent?

3    A    Well, it appears it had, unless the date on it -- the

4    fax date on it are different.  But I would -- since this

5    is after the 22nd, I would think that it had been sent.

6    Q    So in this e-mail Mr. Holmstrom has forwarded to you,

7    and to Dave Olson and to Tom Puett, a series of

8    discussions between the Coast Guard and Holmstrom and

9    Stears and Hardenbergh at Coffman, right?

10   A    Uh-huh.  Yes.

11   Q    So you get this e-mail where he says, "Gentlemen,

12   Things are starting to come together.  Note the discussion

13   on containment.  Matt."  Do you see that?

14   A    Now, what page are you looking at?

15   Q    I'm on the first page, right in the middle there, the

16   first one that's copied to you.

17   A    Yes.  Okay.  Yup.  All right.

18   Q    So what did you do after you got this e-mail from

19   Matt saying, "Things are starting to come together"?  What

20   did you understand him to mean by that?

21   A    That all the pieces were coming together for the

22   project.

23   Q    And one of the pieces was any tweaking or revision to

24   the specification for the coating, correct?

25        MR. ELISON:  Objection to the form of the

1    question.

2              THE WITNESS:  I don't know that -- exactly

3    whether they were planning to go in and tweak the

4    specification.  This refers to about relaxing of some

5    containment issues.  And someone, you know, I guess in

6    here makes mention that -- you know, I guess it was from

7    Dan -- that he said, I agree the spec could be modified to

8    clarify a few issues for the new coating contractor.  But

9    I don't know if that necessarily meant any -- did happen

10    or were going to happen.

11    BY MR. KREGER:

12    Q    Okay.  What about where -- the e-mail at the bottom

13    of the first page, where Matt is writing to Andy Brown and

14    he says, "We're slowly working toward refining the Phase 2

15    coating spec."  Do you see that?

16    A    I see that.

17    Q    Wouldn't that indicate to the reader that there's

18    some refining of the specification that's going to be used

19    for coating 2 under way?

20              MR. ELISON:  Object to the form of the question.

21              THE WITNESS:  Well, it appears that it could

22    apply or, you know, imply that.

23    BY MR. KREGER:

24    Q    Do you remember reading that at the time?

25    A    I don't particularly remember but, if I did receive

107

1   this, which it appears I did, and I read it, I wouldn't

2   have -- knowing myself, I would have waited to see.  Okay,

3   they're talking about refining the spec.  I'm not going

4   to, you know, jump up in the air and get excited about it.

5   I'll wait and see if they are thinking about doing it.

6   And, again, I'm talking about knowing myself, what I would

7   have thought.  I would have said, well, let's wait and see

8   what happens, you know?  I mean --

9   Q    And then reading down on the second page, there's a

10  discussion where Mr. Holmstrom says to Mr. Stears, quote,

11  "I'm interested in reviewing the coating spec section

12  09967, to ensure we clear up the confusion regarding the

13  seal weld issue."  Do you see that?

14  A    Yes, I see that.

15  Q    And when you read that, what did you think he was

16  talking about?

17  A    Well, I didn't know for sure because, again, at that

18  time I wasn't sure what the seal weld issue was.  If I

19  remember correctly, all along I excluded this work to

20  Brechan, and so he was -- you know -- but I know those two

21  had the whole -- you know, they're responsible for all the

22  work that was going to happen, the cathodic protection

23  redoing.  And so I thought that had nothing really to do

24  with me, as I excluded that work.

25  Q    Did you ask Matt what the seal weld issue was that --

1    A    Yes, I did.

2    Q    And what did he say?

3    A    Well --

4    Q    When did you ask him this?

5    A    Well, I excluded it to him.  I don't know if I

6    actually asked Matt what it was or just stated to Matt

7    that I wasn't including that in our work; I was excluding

8    that to Brechan; I wouldn't have anything to do with it.

9         At some point -- and again, I don't remember the

10   exact point in time, but Matt got back to me and said, oh,

11   that seal welding thing, that means stripe coating or

12   caulking over welds.

13        And at that point I'm pretty sure I let

14   Mr. Puett know, oh, the seal welding that we're looking

15   at, they want, you know, these welds either stripe coat or

16   caulked, and made sure Tom was aware of that.  And at that

17   time Tom indicated to me that he had that covered.

18             (Exhibit 13 marked.)

19   BY MR. KREGER:

20   Q    So when you asked Mr. Puett about having the seal

21   weld issue covered with either stripe coating or caulking,

22   do you recall what exactly he said, how he had that

23   covered?

24   A    I believe -- well, given -- I wasn't all familiar

25   with all the terms.  I know what caulking is.  And the

1    stripe coating was told me -- I don't know if Matt told me

2    or Tom told me that you -- you know, you stripe coat it

3    either with something -- I don't know if it was the same

4    coating or a different material -- either prior to the

5    actual coating or after.  I kind of thought it went on

6    before, but as we saw yesterday, I guess it can be applied

7    after.  But my understanding was additional coating that,

8    before you sprayed on the final coating, you -- stripe

9    coat, you just either paint it on with a brush or

10    something, on the welds.

11    Q    Right.  And the purpose of that is what?

12    A    I guess would be to put an extra layer on the welds

13    or whatever.

14    Q    And what would be the advantage of putting that extra

15    layer on the welds?

16    A    I guess the advantage would be, it would -- by doing

17    it with a brush or something, it would -- if there's a

18    problem in that weld area, it would fill in gaps and, you

19    know, help to keep it from sparking out or holiday --

20    testing, whatever you want to call it.

21    Q    So on this exhibit here, another e-mail string -- one

22    of my favorites actually.  The, "What do you means,"

23    caught my attention here.  You're a literary genius.  I

24    like that.

25            Let's go down to the bottom here, the last

110

1    e-mail in the string.

2    A    Uh-huh.

3    Q    Again, this is Mr. Holmstrom writing to Mr. Stears on

4    the 14th.

5    A    How many have you got?

6            MR. ELISON:  You might have attached --

7            MR. KREGER:  Yeah, I've got -- one on the end

8    here talks about RSMeans and things.  I'm just going to

9    talk about the first two pages for now.

10           MR. ELISON:  Oh, okay.

11   BY MR. KREGER:

12   Q    I misspoke.  The second page.

13   A    Second page.  Okay.

14   Q    Here Mr. Holmstrom has sent an e-mail to Mr. Stears,

15   and again, he has forwarded this e-mail to you.  And in

16   this forwarded e-mail, Mr. Holmstrom is asking Dan, quote,

17   "Do you have a 'final,' quote, unquote, coating spec.

18   09967 that includes the changes we made regarding the seal

19   weld issue?"  Do you see that?

20   A    Uh-huh.

21   Q    And you would have gotten this e-mail in the string

22   that you received four days later on the 18th of November,

23   right?

24   A    Correct.

25   Q    And when you got that e-mail string, Mr. Holmstrom

1  wrote to you and said, "We're getting input from the

2  coatings designer.  Stay tuned.  Thanks.  Matt."

3          Do you see that?

4  A    Yes.  Okay.

5  Q    And he says to you, "Stay tuned."

6  A    Correct.

7  Q    And you write back.  "I'm tuned."

8  A    Okay.

9  Q    What were you staying tuned for?

10 A    What am I staying -- tuned to hearing back for

11 whatever input the coatings designer might have.

12 Q    About what?

13 A    Well, let's see.  What are the dates here.  18, 18,

14 18.  I'm not --

15 Q    How about this?  Were you staying tuned for the half

16 dozen issues that Dan told Matt were going to be worked

17 on?

18          MR. ELISON:  Object to the form of the question.

19          THE WITNESS:  Well, that could be, but I can't

20 say for sure whether I was -- that I knew exactly what

21 these half dozen issues were at the time, other than what

22 we read here, which I do recall seeing something like

23 this, you know, chloride test, the seal weld issue, the

24 coating, the mud line.  I vaguely remember looking at

25 something like this, but again, I would have just waited

1    -- I'm in tune.  In other words, I'm here.  I'm available,

2    you know; keep me posted.

3    BY MR. KREGER:

4    Q    Right.  I need to go back to an earlier exhibit, just

5    one e-mail earlier.  This is, I think, No. 11 we're on?

6              MR. ELISON:  We're on 13 now.

7              MR. KREGER:  We're on 12 then.

8              MR. ELISON:  If you want to identify the date?

9              MR. KREGER:  It's October 29th.

10             THE WITNESS:  Okay.  I got it.

11   BY MR. KREGER:

12   Q    In that e-mail, you wrote back to Matt at the top,

13   giving Matt Tom Puett's e-mail address.  And then you

14   asked him a couple questions.  You asked, "When are you

15   thinking about getting together with Coffman?  Where will

16   it be at?"  Do you see that?

17   A    Yes.

18   Q    What was that -- was that a meeting that you were

19   going to attend?

20   A    Well, possible.  Again, I don't know if there was one

21   prior to this or a discussion we had on the phone that he

22   was meeting with Coffman to finalize things, and I was

23   just asking, you know, when is this going to take place.

24   I mean, I'm kind of --

25   Q    How about the next sentence; it says, "Tom needs to

113

1   visit the site to take measurements and stuff."

2              Why did Tom need to visit the site?  I thought

3   he had done his site visit back in February of '02?

4              MR. ELISON:  Object to form of the question.

5              THE WITNESS:  Well, he did do a site visit back

6   in February of 2002.  But again, I believe Tom revisited

7   it again at some point.

8   BY MR. KREGER:

9   Q    Before the contracts were signed?

10  A    I believe so.

11  Q    And why do you think that?

12  A    It just seems I remember that he needed to take

13  measurements for the project.

14  Q    And then at the bottom it says, "Also, we know how

15  well Swalling's containment worked."

16             Do you see that -- where you wrote that?

17  A    Right.

18  Q    How well did you know Swalling's containment worked?

19  A    Well, again, I knew, from comments from my guys -- I

20  mean, it doesn't mean I knew how they set it up or

21  anything, but I know that, you know, there was dust clouds

22  going across.  I know from Mr. Holmstrom that they tried

23  to do it daily on the areas they were working.  So I knew

24  it was a problem.

25  Q    What was Swalling's side of the story?

```
1    A    That I don't know.

2    Q    Did you ever ask?

3    A    Did I ask anyone?

4    Q    Yeah.

5    A    You mean Swalling or someone else?

6    Q    Yes.

7    A    No, I did not.  Except for the time I asked Matt what

8    -- well, I guess that wouldn't be Swalling's side of the

9    story.  I just asked Matt what Swalling's problems were.

10   Q    Now, after this -- I'm back to the November 18th

11   e-mail, sir.  We're going to talk about Means in a moment,

12   but my question is:  After you got this indication from

13   Mr. Holmstrom that there was going to be input from the

14   coatings designer and you should say tuned, there was

15   eventually a revised specification, correct?

16   A    Yes, I believe that is correct.

17   Q    And let's go back to the subcontract.  If you would,

18   please, go to -- I think it's Attachment 5, Bates stamp

19   AES 903.

20            MR. BROWN:  Back to Exhibit 85?

21            MR. KREGER:  Yes.

22            MR. BROWN:  What was the exhibit?  I'm sorry.  I

23   mean, the Bates stamp?

24            MR. PARTNOW:  904.  AES 904.

25   BY MR. KREGER:
```

```
1    Q    And while we're looking at that, let's have another

2    exhibit marked.  Just keep that open for me, if you would,

3    please, Mr. Peterson.

4              MR. KREGER:  Will you mark this next.

5              (Exhibit 14 marked.)

6    BY MR. KREGER:

7    Q    So let's authenticate this next exhibit.  This is

8    your handwriting at the top, "To Matt From Jason," I take

9    it?

10   A    Yes, that is.

11   Q    And that's your handwriting there where it says,

12   "will perform" written in?

13   A    Yes.

14   Q    It looks as though you sent Matt an e-mail where you

15   make some reference to this section that we have turned

16   open; that namely is Section 1.7.3.6, right, on page nine?

17   A    Yes, it does make reference to that.

18   Q    So am -- is it fair to say that you and Matt

19   communicated regarding who's going to be doing what part

20   of Section 1.7.3.6?

21   A    Yes.

22   Q    You said, "AESI will perform the painting-related

23   work such as the weld cleaning and the stripe coat portion

24   of 1.7.3.6," right?

25   A    That's correct.
```

119

```
1    Q    The specification says, "Abandoned nonstructural

2  members may be removed to increase productivity."

3            See that?

4    A    Yes.

5    Q    That's painting-related work, right?

6    A    Well, structural members is -- where are you reading

7  this again at?

8    Q    Towards the second sentence from the bottom, at

9  1.7.3.6.  It's talking about, "Abandoned nonstructural

10  members may be removed to increase productivity."

11   A    Right.

12   Q    It's going to increase the productivity of the

13  painting work by -- instead of doing something, you're

14  just going to take this off, correct?

15            MR. ELISON:  Object to the form.

16            THE WITNESS:  It appears that that's what it

17  would refer to, yes.

18  BY MR. KREGER:

19   Q    Now, in your e-mail to Mr. Holmstrom, you indicate

20  that, "AESI will perform d., f., and g.," and that would

21  be of Section 3.2.1.2.  And you say you're going to -- as

22  to Section 3.2.1.3, you're going to seal weld -- you will

23  caulk (seal) the welds, but not seal weld, right?

24   A    We will caulk the welds, which refers to what they

25  were saying the seal welding was, was how I --
```

1    Q    What was the purpose of caulking the welds?

2    A    Well, at the time, I was still pretty ignorant of a

3    lot of things on the project, especially -- at that point

4    I didn't really know what the holiday testing was.  Again,

5    I was relying on Mr. Puett who, you know, this is his

6    field.

7            So my understanding was that for some reason

8    these welds needed additional coating or caulking put on

9    them prior to the coating.  That was my understanding.  I

10   didn't know an exact reason why, though, at that point.

11   Q    How many feet of welds did you plan on caulking?

12   A    I left that up to Tom.

13   Q    How many feet did you put into the Means data for

14   caulking?

15   A    I can't tell you -- I can't tell you off the top of

16   my head.

17   Q    Do you have a round number?

18   A    No.  I mean -- I mean, there's a lot of numbers on

19   the Means sheet.  I can't remember exactly how many.  I

20   can't even remember if I actually had a line for it.  I

21   may have; I may not have.  The Means sometime works that

22   way.  You don't have particular lines.  As you notice in

23   that past e-mail, we were trying to search for a

24   cofferdams line.

25   Q    Yeah.

121

```
1    A    So I don't even know if I actually put one in there,

2    but we might.

3    Q    Let's take a look.

4         MR. KREGER:  Let's have these marked as one

5    exhibit, please.

6         (Exhibit 15 marked.)

7    BY MR. KREGER:

8    Q    A two-page exhibit here.  Let's start with the second

9    one.  Did I give him my --

10   A    That is definitely my writing.

11   Q    The handwritten stuff?

12   A    Yes.  I recognize that.

13   Q    Call out the Bates number that you're looking at,

14   please, if you would.

15   A    1338.

16   Q    How about 1339; that's your handwriting, too?

17   A    That is my handwriting also.

18   Q    Go to line five, please, on 1339?

19   A    Okay.  I see it, yes.

20   Q    Would you read that into the record, please.

21   A    Well, it looks like there's a --

22   Q    Since this your handwriting --

23   A    Yes.

24   Q    -- I'll trust you on that.

25   A    It looks like there's a minus there, but I don't know
```

1    and so -- we've got quite a few questions.  And I know

2    I've asked Jami about making Mr. Peterson available again

3    and he won't commit or can't commit to that without

4    talking to Marston.  I thought maybe I'd suggest that

5    Mr. Peterson might come back when Mr. Olson comes back to

6    finish his 30(b)(6), whenever that occurs.  So for

7    whatever it's worth, that's what I'm suggesting.

8            So I don't know when that's going to occur.

9    Have you talked about that?  Does anybody know when that

10   30(b)(6) will continue?

11           MR. KREGER:  No, I don't know yet.

12           MR. ELISON:  I'm not going to make a

13   representation on either one of those issues today.

14           MR. BROWN:  All I want to put on record -- I

15   don't want to waste a lot of the witness's time.  It's my

16   point of view, given the fact that we have a multi-party

17   case and with each party having distinct interests, that I

18   believe that, in spite of the best efforts of counsel, the

19   length of depositions will -- has and probably will

20   continue with a number of witnesses to exceed the seven

21   hours that's provided in the rules.

22           My suggestion is that, recognizing, you know,

23   it's not fair to beat up on a witness for too long a

24   period of time, that we, the counsel in the case, ought to

25   stipulate that, as long as people are not beating around

1    the bush and wasting time, abusing the witness, that we

2    don't have to go to court for a court order every time a

3    deposition goes longer.  And we should reschedule as

4    necessary for the convenience of counsel and the witnesses

5    without keeping a witness too long or without keeping the

6    court reporter too long.

7         And all I'll put on the record -- and I want you

8    to convey this back to Mr. Marston as well -- that if

9    we -- if that's not the way we're going to go, then either

10   myself or I assume someone else will file something in

11   court getting such a order.  And when somebody says,

12   that's enough, and walks out because their witness has

13   been taken advantage of, rather than trotting over every

14   time something goes wrong -- maybe with the exception of

15   Mr. Cole, who set a record for the longest deposition of

16   all time --

17        MR. KREGER:  Eric, were you suggesting that

18   Peter not start his questioning?

19        MR. BROWN:  No, no, no.  It's 3:30 now.  I was

20   just concerned about the time.  And so I thought maybe I'd

21   put that on the accord and we'll see what happens here.

22        MR. ELISON:  I don't have anything that needs to

23   be said right now.  We're not going to --

24        MR. BROWN:  I understand that.  I just wanted to

25   make sure my position is clear and let everyone think

1     about it.

2     BY MR. PARTNOW:

3     Q     Again, I'm Peter Partnow.  I represent Coffman

4     Engineers.  I'll try to be as brief as I can.

5              Mr. Peterson, do you recall having attended a

6     meeting at the offices of Coffman Engineers here in

7     Anchorage at some point prior to the job actually

8     commencing?

9     A     Yes, I do.

10    Q     And prior to that meeting, had you ever met anybody

11    from Coffman?

12    A     No, I had not.

13    Q     And am I correct in my understanding that both you

14    and Mr. Elmore attended that meeting on behalf of

15    Absolute?

16    A     Yes, we did.

17    Q     And do you recall how it was that you came to be

18    nominated for the honor to attend that meeting on behalf

19    of Absolute?

20    A     Well, along with Todd, we were the most familiar

21    people with the aspects of that project at that time.  And

22    Dave, you know, appointed both Todd and myself to attend

23    the meeting.

24    Q     Do you know why Dave himself didn't attend?

25    A     I can't remember exactly why Dave didn't attend.

```
 1   Q    Do you have any recollection if, after the meeting,

 2   you reported back to Dave what had transpired at the

 3   meeting?

 4   A    I'm sure I said a few things but, if I recollect

 5   correctly, it was a pretty short meeting.

 6   Q    Do you remember that there was an agenda for the

 7   meeting?

 8   A    You mean like a written handout?

 9   Q    Yeah.

10   A    I think there was, but don't quote me on it.  I think

11   they had a little printout thing, you know, this is what

12   we're going to discuss.

13   Q    And since this lawsuit has started, have you had the

14   opportunity to review the documents and see the agenda for

15   that meeting?

16   A    No, I have not.

17   Q    We actually marked these before, but let's do them

18   again.  Let's make this 24.

19            (Exhibits 24 and 25 marked.)

20   BY MR. PARTNOW:

21   Q    First, I'd like you to look at Exhibit 24.  And this

22   is -- purports to be a job -- a pre-job conference agenda,

23   February 18th, 2003.  And if you will note, it has Bates

24   stamp numbers down in the lower right-hand corner, which

25   would suggest that it was -- this particular copy of the
```

```
 1   document was produced by Absolute.

 2   A     Uh-huh.

 3   Q     Does this document -- is this something you've seen

 4   before?

 5   A     Yes.  1340?

 6   Q     The two-pages, 1340 and 1341.

 7   A     Yes, it is.

 8   Q     And there's some handwriting on that; is that your

 9   writing?

10   A     That's my writing.

11   Q     Those would have been notes that you took during that

12   meeting?

13   A     Yes.  That's correct.

14   Q     And can you recall -- this particular document

15   doesn't indicate that you were there, but in fact you were

16   there; weren't you?

17   A     Yes, I was.

18   Q     And you didn't prepare this agenda; did you --

19   A     No, I did not.

20   Q     -- or have any involvement in preparing the agenda?

21   A     No, I did not.

22   Q     Let me have you look at Exhibit 25.  There's

23   handwriting on Exhibit 25.  Is that your handwriting?

24   A     No, it is not.

25   Q     Can I safely assume you don't know whose handwriting
```

1    it is?

2              Do you know whose handwriting that is?

3    A    I would -- I would make assumption that it is Matt

4    Holmstrom's, but I'm not --

5    Q    Have you dealt with Mr. Holmstrom on enough occasions

6    that you think you could identify his writing?

7    A    Well, no.  I mean, I haven't seen it for a while.  I

8    haven't seen a lot of people's for a while.  At the time,

9    though, I certainly could have.

10   Q    Why is it you think this is Mr. Holmstrom's writing?

11   A    Just because of the notes he has.  You know, he

12   listed me down here and Todd and Tom and Tim.  So -- you

13   know, on mine, I wouldn't list myself, so.

14   Q    I mean, I'm just trying -- why would you think that

15   these were his notes any more than Tim Lawrence's notes or

16   Dan Stears's notes?

17   A    Well, I'm also looking at the stamp down below, the

18   BEI, and I assume that they produced this.

19   Q    Okay.  So you've been going to these depositions too

20   long.

21   A    Two and two equals four sometimes.

22   Q    Do you recall -- sitting here today, do you recall

23   Mr. Lawrence having been present?

24   A    Yes, he was.

25   Q    And do you recall Mr. Puett and Mr. McKinley being

```
 1    present at the meeting?

 2    A    For some reason I don't remember Forrest being there,

 3    but maybe he was.  I guess this says Mac.

 4    Q    Do you have any memory --

 5    A    I remember Tom being there, but I just couldn't --

 6    until you just said that now, I just, you know, couldn't

 7    remember, you know, or didn't recollect that Mac was

 8    there.  But now that he's mentioned, I believe Mac was

 9    there; and I think this was the only time I actually have

10    met Mac.

11    Q    And do you recall -- do you remember who basically

12    chaired the meeting?

13    A    I believe it was -- I believe it was Dan Stears.

14    Q    Was this the first time you'd met Dan Stears?

15    A    Yes.

16    Q    Did you -- have you met him on any other occasions?

17    A    Yesterday.

18    Q    Here -- sitting here at the deposition?

19    A    Yeah.

20    Q    And other than this meeting and seeing him here

21    yesterday, those are the only two times that you've met

22    Mr. Stears?

23    A    That is correct.

24    Q    Did you have any occasion to have conversations --

25    telephone conversations with Mr. Stears, if you recall?
```

181

1   A    No, I do not recall having any conversations with

2   Mr. Stears.

3   Q    Do you recall whether Jerry Hardenbergh was present

4   at the meeting?

5   A    It's been a while ago.  I believe -- I believe Jerry

6   was there.

7   Q    There's a mention of Mr. Lawrence Radcliffe.

8        Do you remember Mr. Radcliffe being there?

9   A    No, I can't recollect -- or I can't picture him.

10   Q    Do you recall ever having met somebody named Mr.

11   Radcliffe?

12   A    No, not this far out.

13   Q    What do you remember about this meeting?

14   A    I remember -- what I remember of the meeting, that

15   didn't last very long; I want to say maybe 45 minutes, an

16   hour.

17        What I gathered from the meeting was that I was

18   more of an observer.  I believe Todd and I let Mr. Puett,

19   our subcontractor, do most of the talking because pretty

20   much he was performing the majority of the work and this

21   was his line of work.  So Tom did a lot of the answering

22   of questions and concerns.  It seemed like the meeting

23   went very well.  It seemed to me that they were

24   comfortable with Mr. Puett's answers.  Seemed they talked

25   a lot about coordinating on the dock, about the ships

1    being in, our access on the dock, keeping the dock clean.

2    They were real worried about -- it seemed like a lot of --

3    I recollect a lot of the meeting being on that aspect of

4    it.

5    Q    In addition to answering questions, did Mr. Puett

6    also ask questions of the folks from Coffman or Brechan at

7    the meeting, if you recall?

8    A    Well, I don't recall any in particular, but I guess

9    I'd make the assumption that some questions were asked.

10   Q    Did you have any sense that anybody from Brechan or

11   Coffman was reluctant to answer any questions that might

12   be raised on behalf of Absolute or Imperial?

13   A    Not that I recall, no.

14   Q    Over on the handwriting on the right-hand side here

15   on the Exhibit 25, there's a handwritten -- I think it

16   says, "Containment," and then it has a question mark.

17        Do you have recollection, sitting here today, as

18   to what was discussed at that meeting with regards to

19   containment?

20   A    Well, if I recollect correctly, it was just a

21   brief -- what our containment was going to be.

22   Q    Do you know why, you know -- again, I understand this

23   isn't in your handwriting -- why there is a question mark

24   there?  Do you recall there being some question with

25   regard to containment?

1    A    There could have been, but I can't say specifically,

2    you know --

3    Q    I'm not asking you to speculate.

4    A    Right.  I don't know why that's there with a question

5    mark.

6    Q    Then there's -- the next item says, "Seal weld," and,

7    "weld repair."  Do you recollect what was discussed with

8    regard to seal welds and weld repair at that meeting?

9    A    Well, what I recollect of the discussion of the welds

10   was just affirming that they were either going to be

11   stripe coat or caulked per the specification.

12   Q    And my understanding from your testimony earlier this

13   morning is your understanding on behalf of Absolute was

14   you guys weren't iron workers; you weren't going to be

15   doing any welding?

16   A    Right.  That's correct.

17          MR. ELISON:  Object to the form of the question.

18   BY MR. PARTNOW:

19   Q    But you knew that there were going to be weld areas

20   that you had to coat over?

21   A    That was my understanding, that I was told by Matt

22   Holmstrom later, that the seal welds were just areas where

23   we had to stripe coat or caulk.

24   Q    And where it says -- under "seal weld," where it

25   says, "Caulk seal weld prior to coating," do you remember

1   what was discussed about caulking welds at that meeting?

2   A    No, I do not, except that maybe someone sent us what

3   they wanted for the caulking, the Secoflex (ph) or

4   whatever it was called.

5   Q    And what about this question about removing unused

6   appurtenances?  Was this the grinding issue that you

7   talked about earlier with Mr. Kreger?

8   A    No.  My understanding of it would be -- remove the

9   unused appurtenances -- would be the nonstructural steel

10  that could be removed as a option.

11  Q    That was an option you knew that Absolute and

12  Imperial had?

13  A    Right.  Well, that was in the contract.

14  Q    Right.

15       Can I safely assume that your primary dealings

16  with Coffman during your involvement in the project were

17  with Mr. Hardenbergh?

18  A    That's -- solely with Mr. Hardenbergh.

19  Q    And what was the nature of your dealings with Mr.

20  Hardenbergh?

21  A    I was there at the beginning, again to represent

22  Absolute Environmental, Tom being our subcontractor and

23  Jerry being what I would say either owner's representative

24  or Brechan's representative for the owner.

25       And I knew what Jerry's -- well, I guess I

1    believe I understand what Jerry's responsibilities were.

2    And I was just more of an in between -- if Jerry had

3    concerns on how the project was going and -- then Jerry

4    would tell me when I was there.  And then I would, you

5    know, pass those on to Mr. Puett.

6    Q    Did you from time to time ask questions of Mr.

7    Hardenbergh with regard to the job?

8    A    Oh, certainly.

9    Q    And did he at any point refuse to answer questions

10   that were asked of him?

11   A    No, not at all.

12   Q    Did you ever find him to be evasive in answering your

13   questions?

14   A    No, not in answering my questions.

15   Q    Did you find him to be evasive in --

16   A    Sometimes he was hard to find, but not evasive in my

17   questions.

18   Q    Did you -- during the course of your dealings with

19   Mr. Hardenbergh, did you believe that he'd ever told you

20   anything that was inaccurate or untrue?

21   A    I do not.

22   Q    And in fact, am I correct in my understanding that

23   Absolute requested to have Mr. Hardenbergh as their QA on

24   other -- at least one other project after this project?

25   A    Well, not that I can recall.  I'm not saying it

```
 1    Q     Right, including a seal weld issue.

 2    A     Right.  I see that, yes.

 3    Q     And then you wrote a memo to Mr. Holmstrom, Exhibit

 4    13 -- or an e-mail to Mr. Holmstrom, on December 2nd?

 5    A     Okay.

 6    Q     And in that e-mail to him you indicated that Absolute

 7    would be caulking seal welds but not doing, quote, "seal

 8    welds"; is that correct?

 9          MR. ELISON:  Objection.  Foundation.

10          THE WITNESS:  Where is that?

11   BY MR. PARTNOW:

12    Q     Exhibit 14.

13    A     Oh, 14.

14    Q     Right.

15          MR. ELISON:  And also record an objection that

16   the e-mail has mischaracterized with respect to who was

17   receiving input from the coatings designer.

18          THE WITNESS:  And 14 I got to look at.

19          MR. ELISON:  Is there a question pending right

20   now, counsel?

21          MR. PARTNOW:  There was before you started your

22   speaking objection.

23          MR. ELISON:  Counsel, you need to reference a

24   document if you want us to be able to --

25          MR. PARTNOW:  I did.  I referenced Exhibit 14.
```

1    BY MR. PARTNOW:

2    Q    My question is:  In Exhibit 14 -- that's an e-mail

3    you wrote to Mr. Holmstrom; isn't it?

4              MR. ELISON:  Objection.  Asked and answered.

5              THE WITNESS:  Yes, it is.

6    BY MR. PARTNOW:

7    Q    And in that you drew a distinction between performing

8    seal welds, which Absolute was not going to do, and

9    caulking welds and cleaning and stripe coating, which you

10   were going to do?

11             MR. ELISON:  Objection.  Foundation and

12   compound.

13             THE WITNESS:  Correct.

14   BY MR. PARTNOW:

15   Q    So having received, for instance, and been involved

16   in all that information, there was nothing that prevented

17   you from specifically questioning Mr. Holmstrom about what

18   the, quote, "seal weld issue" was.

19             MR. ELISON:  Object to the form of the question.

20             THE WITNESS:  Nothing that prevented me from?

21   BY MR. PARTNOW:

22   Q    No.  I mean, he -- on numerous e-mails you received,

23   there was reference to a fact that there was a seal weld

24   issue?

25             MR. ELISON:  Objection.

```
 1              THE WITNESS:  That there were seal welds and
 2    I -- I was told by Mr. Holmstrom that they needed to be
 3    stripe coat or caulked.
 4              MR. ELISON:  Objection.  Compound.
 5              THE WITNESS:  And that's all I -- and I relayed
 6    that to Mr. Puett and Tom, do you have this covered, and
 7    yes.  I went, okay.
 8    BY MR. PARTNOW:
 9    Q    Is there anything you're aware of that suggests to
10    you that Mr. Holmstrom concealed to you the fact that
11    there was a seal weld issue from the prior phase that had
12    to be cleared up?
13              MR. ELISON:  Object to the form of the question
14    and outside the scope of personal knowledge.
15              THE WITNESS:  At this time, definitely not.
16    BY MR. PARTNOW:
17    Q    When you say "at this time," you mean sitting here
18    today or at the time you were receiving this information?
19    A    I'm saying at the time I received this information.
20    Q    Again, what I'm trying to understand is, having
21    received this, there is nothing that prevented you from
22    saying to Mr. Holmstrom, can you explain exactly what you
23    mean by this seal weld issue?
24              MR. ELISON:  Objection.  Asked and answered and
25    calls for speculation.  It's an improper hypothetical.
```

```
 1   you had excluded the welding?

 2   A    That's correct.

 3   Q    And Mr. Holmstrom understood this; is that correct?

 4   A    That is correct.

 5   Q    There wasn't any question in your mind that he might

 6   not understand what was going on with regard to the seal

 7   welding?

 8   A    There was no question in my mind that he didn't

 9   understand what was going on with regard to the seal

10   welding.

11   Q    And you were asked a question about whether or not

12   Mr. Holmstrom concealed anything from you -- or from

13   Absolute.  And you -- as I recall your testimony, it was

14   not that you knew at the time.

15        Do you know now that they concealed something?

16   A    I would say most definitely.

17   Q    Tell me in detail what you believe Mr. Holmstrom or

18   Brechan and/or Coffman concealed.

19   A    Well, my understanding is from -- again, I haven't

20   seen, you know, 99.9 percent of the documents; I have seen

21   a couple.  And my understanding is that, through the Phase

22   1 Swalling work, that they were fully aware that there was

23   a major problem that could not be anticipated.  From these

24   weld areas that Swalling ran into, it's my understanding

25   that they fully were aware of them.
```

```
 1              It's my understanding that Swalling may have got
 2    a compensation for the additional work.  There was
 3    recommendations made on what to do with these locations,
 4    different procedures that could be done or, you know, a
 5    specification that could be relaxed because of them.
 6    There was a scenario. I think, of three things that could
 7    be done.
 8              And frankly, I was just really amazed that, with
 9    all this knowledge, that wasn't passed on into the new
10    specifications.  Or if they knew it was a hidden condition
11    that no one really could anticipate, why not incorporate
12    that whole document and condition right into the
13    specification, let the next guy know that they're going to
14    have problems with this that they couldn't really
15    anticipate from doing a visual or a site inspection.  And
16    that's my understanding.
17              And I was just really amazed, almost kind of
18    hurt, when I saw it because of our relationship with
19    Brechan.  It makes me feel like -- they used the word
20    yesterday -- trapped.
21    Q    With regard to these -- the welds that we've talked
22    about over and over, what's your understanding of the
23    difficulty that was encountered with these welds in trying
24    to obtain a holiday-free coating?
25    A    Well, they had to be gone over and over and over
```

1    representative for Brechan.  So I assume he had some

2    authority on whether to approve work or not approve of the

3    coating system that was applied.

4    Q    I guess that's -- I don't think that answers my

5    question.  I understand he had the right to say, I don't

6    approve of these coatings or these procedures or whatever.

7            What I'm asking is whether or not it was your

8    understanding that he the right to direct Mr. Puett and

9    the IIC crew in its operations?

10   A    To directly, like, say, I want you to go here --

11   Q    Right.

12   A    -- and that?  I don't know any person that really has

13   that right to do that on a project, other than if he's the

14   one approving either the condition of the steel or the

15   prep before it's coated.  I mean, I certainly wouldn't

16   want to go against it, because you'd just be going back

17   and doing it if he doesn't approve it.  But again, I don't

18   think it was Jerry's, you know, authority to actually say,

19   you go there, in that manner.

20   Q    Because there's a chain of command, right?

21   A    Right, there's a chain of command.

22   Q    There is also privy of the contact; in other words,

23   IIC had a contract with Absolute?

24   A    Right.

25   Q    And Absolute had a contract with Brechan?

1   A    Right.

2   Q    So there was a chain there?

3   A    But understand, though, a lot of people get

4   comfortable working on a project, you know, you know if

5   the chain goes from here to here what the outcome is going

6   to be.  A lot of times, it might be just as easy for Jerry

7   to say, Tom, this area failed, it needs to be redone.  If

8   you want to call that directing, you know, I don't know,

9   but.  I would assume that, you know, if I wasn't there or

10  someone else wasn't there, Jerry would, you know, mark an

11  area and show Tom, this area didn't pass the prep

12  standard.  So if you want to call that directing, I don't

13  know.

14  Q    If you will look -- what exhibit is this.  I'm

15  referring you to the Coffman agenda at the precon.

16  Actually, there is two, 24, and 25, and I have forgotten.

17  I think it was 24.  You said that was your writing maybe?

18  A    Yes, 24 is mine.

19  Q    If you will look at Item 4C.

20  A    Okay.

21  Q    It says, "Does Jerry have the authority to stop

22  work"?

23  Q    Was that discussed this meeting?

24  A    If it was, I do not know what the answer was.  I

25  imagine, since it is on the agenda, that most of the time

1    you go through the agenda, you know, line item by line

2    item.  I would have to say it was probably discussed, but

3    I can't remember, you know, did someone says, yes, he

4    does; no, he doesn't.  I don't recall that.

5    Q    You do recall; don't you, that Mr. Puett complained

6    about not having access to the high pressure water

7    blaster?

8    A    In a past-tense form, yes.  I don't think Tom

9    actually complained to me that I recall, because by the

10   time I got there it already had been resolved, so he might

11   have in a past tense told me and said, I wanted the

12   blaster and I didn't get it and blah, blah, but at that

13   time, you know, it was already past and gone, so maybe in

14   the past-tense form he complained.  I mean, to me.  You're

15   talking to me?

16   Q    Right.  I'm talking to you.

17   A    Right.

18   Q    So it was your understanding that the problem had

19   been resolved by the time you became aware there was a

20   problem?

21   A    Right.

22   Q    And that blaster was being used in the hangar at the

23   same time Phase 2 was going on?

24   A    Right.  I can say for certainly, because if I was

25   there, I would most certainly been the in-between person.

1    Tom wouldn't have gone to Wade Lewis; it would have been

2    me that would have been the in-between between Mr. Lewis

3    and Tom.  I would have been directly involved in that.

4    Q    Were you involved with regard to the testing of the

5    removal of the gray coating?

6    A    Yes, I was.

7    Q    Can you tell me about that?

8    A    Well, we wanted to do a time study, so I went down

9    with cathodic protection on, and, actually, Tom at that

10   point, had removed the top coatings from the gray coatings

11   on certain piles.  You know, there was different examples

12   of them.  Some were just around where, I guess, a cross

13   member would come into a pile.  Others were at the top.

14   So he wanted to do a time study using sandblasting methods

15   to see how long it took just to remove the gray coating,

16   which, again, was underneath, you know, the final coating.

17   So I was there down below for that.

18   Q    And when you say "he", you mean Tom requested that

19   there be a time study done?

20   A    I don't know if Tom requested it or if it Tom and I

21   together suggested or someone suggested we do it.  I can't

22   remember.  I was talking with Dave daily.  But at some

23   point, I guess we had, if there was going to be a claim

24   for this or something and it's going to need to continue

25   on, we're going to have to know, what is this exact gray

REPORTER'S CERTIFICATE

1

2          I, SUSAN J. WARNICK, RPR, and Notary Public in

3     and for the State of Alaska do hereby certify:

4          That the witness in the foregoing proceedings was

5     duly sworn; that the proceedings were then taken before me

6     at the time and place herein set forth; that the testimony

7     and proceedings were reported stenographically by me and

8     later transcribed under my direction by computer

9     transcription; that the foregoing is a true record of the

10    testimony and proceedings taken at that time; and that I

11    am not a party to nor have I any interest in the outcome

12    of the action herein contained; that signature was

13    requested.

14          IN WITNESS WHEREOF, I have hereunto subscribed my

15    hand and affixed my seal this 21st day of April,

16    2006.

17

18

19                              SUSAN J. WARNICK,
                                Registered Professional Reporter
20                              Notary Public for Alaska

21
      My Commission Expires:  April 8, 2010
22

23

24

25

Midnight Sun Court Reporters  (907) 258-7100