Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3
 4  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., An Alaska
 5  corporation,
 6              Plaintiff,
 7       vs.
 8  FORREST J. McKINLEY and "JANE
    DOE" McKINLEY, et al.,
 9
                Defendants.
10  _____
11  Case No A03-0199 Civil (RRB)
12
13
14
15
              VIDEOTAPED DEPOSITION OF DAVID OLSON
16
                   Taken February 13, 2006
17                 Commencing at 9:00 a.m.
18        Volume I - Pages 1 - 243, inclusive
19
20
                  Taken by the Defendant
21                         at
                       PERKINS COIE
22            1029 W. Third Av., Suite 300
                    Anchorage, AK  99501
23
24
25  Reported by:
    Susan J. Warnick, RPR                    Exhibit 6
```

COPY

Page 70

1  Q  No, say it was in fact resolved by getting an
2  increase in their contract price of $90,000.
3  A  Well, I -- this document right here is dated March
4  13th of 2002.
5  Q  Right.
6  A  And it presupposes several things, one of which is
7  acceptance by the owner. It's here in bold --
8  Q  Yes.
9  A  -- "Approval of the Owner."
10 Q  Okay.
11 A  Now, had the owner not opted for Option 2, then I
12 would say that the $700,000 would be a problem at a
13 minimum.
14 Q  I agree with you. Did the owner opt for Option 2?
15 A  The owner --
16    MR. MARSTON: Objection. Vague with respect to
17 which Option 2.
18    THE WITNESS: That's exactly correct: Which
19 Option 2? We have to go through the variations of Option
20 2. And that came down to the holiday standards that were
21 associated with Option 2. There is a lot of
22 correspondence that goes back and forth between Swalling
23 and Brechan and Coffman.
24 BY MR. KREGER:
25 Q  Let me make this a little simpler: Did you -- do you

Page 71

1  know whether Absolute informed the court that there had
2  been this Modification No. 5 to the task order or that
3  there had been this Modification No. 1 to Swalling's
4  subcontract?
5  A  I don't know.
6  Q  Now, if someone made a representation to the court or
7  to any person that Absolute had no prior involvement in
8  this project prior to its subcontract with Brechan, that
9  would be incorrect, right?
10 A  One more time, please.
11 Q  If someone made a representation to the court that
12 Absolute had no prior involvement in the cargo wharf
13 project prior to entering into the subcontract with
14 Brechan, that would be incorrect; isn't that true?
15 A  That would be --
16    MR. MARSTON: Objection. Argumentative and
17 calls for speculation.
18    THE WITNESS: That would be incorrect in one
19 regard.
20 BY MR. KREGER:
21 Q  It would be incorrect because you bid the project,
22 right?
23 A  The original project?
24 Q  Yes.
25 A  Yes.

Page 72

1  Q  You submitted a bid, along with some company that Mr.
2  Puett had, to do the work. And the bid was submitted to
3  Brechan Enterprises, right?
4     MR. BROWN: Object to the form of the question.
5     THE WITNESS: With -- in conjunction with the
6  company that Mr. Puett was working for; that's correct.
7  BY MR. KREGER:
8  Q  Right.
9  A  And there's one other aspect, but...
10    MR. KREGER: Number 83, please. Let's staple
11 these or at least mark them all as one exhibit.
12    (Exhibit 83 marked.)
13    (Discussion off the record.)
14    MR. MARSTON: Is it 14717 through 20?
15    MR. KREGER: Yeah. And it also has 17 --
16 41715 [sic] and 4716.
17    And I've given away my copy. Could I get a copy
18 back?
19    MR. BROWN: This is it? And this is all one --
20    MR. KREGER: Yeah, all one exhibit.
21    MR. BROWN: -- with the letter on top?
22    MR. KREGER: Yeah.
23    MR. PARTNOW: -- with the fax on top?
24    MR. KREGER: Fax on top with the letter next.
25 Will that work?

Page 73

1     MR. DICKSON: Okay. Got it.
2     MR. KREGER: Okay?
3     MR. MARSTON: Bate No. 4715 on top.
4  BY MR. KREGER:
5  Q  Take a look at the exhibit, Mr. Olson, please.
6  A  Okay.
7  Q  Do you recognize the documents?
8  A  Yes.
9  Q  Can you tell us what they are?
10 A  This would have been our bid for the cargo pier back
11 in 2001.
12 Q  And your bid was for total of Section 1, Section 2,
13 and Section 3. What was the scope of work you were --
14 what was the amount that you were bidding and what was
15 your scope of work?
16 A  I'd need a calculator -- oh, the scope of work --
17 Q  Approximately.
18 A  -- would be the plans and specifications that we were
19 provided at that time.
20 Q  And which plans and specifications were you provided?
21 A  I'd have to look at which ones were there on May 23
22 of 2001. I don't know which -- which set of
23 specifications. I think there's probably five sets of
24 specifications on this job, or four. So --
25 Q  Okay. And how much were you --

Page 74

1  A  The one that preceded May 23 of '01.
2  Q  Okay. How much were you bidding to do that work, in
3  round numbers?
4  A  Oh, somewhere in the vicinity of 1.2 million. A
5  little over $1.2 million.
6  Q  Did you get that work?
7  A  No.
8  Q  Had you done any over-water coatings work prior to
9  submitting this particular bid in '01?
10 A  I hadn't performed any coatings work.
11 Q  Had you done any coatings work in '02?
12 A  Possibly some coatings removal. But coatings
13 application, no.
14 Q  What investigation of the site conditions did
15 Absolute make in May of 2001 when it submitted this
16 proposal to Brechan?
17 A  At this time, no investigation, other than we were
18 working at the cargo pier and knew of the project.
19 Q  What did you know of the project from working at the
20 cargo pier?
21 A  We were performing other work for Brechan and Matt
22 Holmstrom told me that this project was coming up.
23 Q  How often were you in Kodiak during the time Swalling
24 did its work?
25 A  Periodically. I mean, I can't give you -- I don't

Page 75

1  know an exact number.
2  Q  How often a period?
3  A  Dependent on how many projects we had going at the
4  time over there, whether my presence was requested or
5  required during the period of time.
6  Q  Did you have a routine schedule of how -- once a
7  year? Once a day? How often did you schedule yourself,
8  if you did have a routine schedule, to go out to Kodiak?
9  A  I did not have a routine schedule.
10 Q  Did Absolute -- I want to talk about the 2001, 2002,
11 and, if I may, the 2003 time frame.
12     Did any -- during any of those three years, did
13 Absolute keep a job trailer out at Kodiak?
14 A  No.
15 Q  Was Mr. Jason Peterson stationed out there?
16 A  No.
17 Q  Was Mr. Elmore stationed out there?
18 A  No. I don't think Mr. Elmore was with me in 2001, if
19 you're using all of those years.
20 Q  Yes, I am.
21 A  I don't think he was with me in 2001.
22 Q  Okay. For the years that he was with you, 2002,
23 2003, was he stationed out there?
24 A  No, he would visit out there, as would Mr. Peterson
25 and myself. Mr. Peterson would spend more time out there

Page 76

1  than myself or Mr. Elmore.
2  Q  Mr. Elmore has left the company, correct?
3  A  That's correct.
4  Q  What were his reasons for leaving?
5     MR. MARSTON: Objection. Lack of foundation.
6     THE WITNESS: I informed him that I couldn't
7  afford to have him on the payroll any longer.
8  BY MR. KREGER:
9  Q  When did he leave?
10 A  I don't know the exact date, but I think early 2005.
11 Q  Now, the later pages in this exhibit -- or actually
12 the first four pages -- appear to be a resume of Ralph T.
13 Puett. Do you see that?
14 A  Yes.
15 Q  And that's Tom Puett, correct?
16 A  That's correct.
17 Q  What investigation of the site did Mr. Tom Puett do
18 prior to Absolute and Techno Coatings of Anaheim
19 submitting this bid in 2001, to Brechan, to do the cargo
20 wharf maintenance project?
21    MR. MARSTON: Objection. Lack of foundation.
22    THE WITNESS: You're saying, did he come to the
23 project to investigate?
24 BY MR. KREGER:
25 Q  Well, that would be one way of answering it. It was

Page 77

1  a broader question than that. I think it was: What
2  investigation did he do?
3     MR. MARSTON: Same objection.
4     THE WITNESS: We sent him the plans and
5  specifications for the project. But as far as I know, he
6  didn't visit the project site.
7  BY MR. KREGER:
8  Q  Do you know whether anybody from Techno Coatings
9  visited the project site?
10 A  I don't believe so.
11    MR. KREGER: Let's take a break. We're at the
12 end of our tape here.
13    And how long will that take, Eric?
14    THE VIDEOGRAPHER: One minute.
15    MR. KREGER: Okay. Let's stay here and we'll
16 just punch through till lunch at noon.
17    THE VIDEOGRAPHER: Thank you. Let me conclude
18 tape one and move off record at 11:15.
19    (Off record.)
20    THE VIDEOGRAPHER: Beginning tape two. Back on
21 record at 11:17.
22 BY MR. KREGER:
23 Q  And you and Mr. Puett went to Kodiak in February of
24 '02, correct?
25 A  That's correct.

Case No. A03-0199 Civil (RRB)　　　　　　　　　　　　　　　　　　　　David Olson

### Page 94

1    MR. BROWN: I'll represent that the Olson
2    deposition Bates stamps, just for the record, are IIC
3    000001 through 7121.
4    MR. DICKSON: Exhibit 85 is marked in AES
5    numbers.
6    MR. BROWN: Okay. I was just trying to clarify.
7    THE WITNESS: Okay. But I -- anyway, what's
8    your question?
9    BY MR. KREGER:
10   Q   Okay.
11   A   Let's start there.
12   Q   All right. Let's start with Exhibit 85.
13      Do you recognize that as a true and correct copy
14   of your subcontract between Absolute and Imperial?
15   THE WITNESS: Do you want to mark it as 85?
16   MR. KREGER: Yes, please.
17   (Exhibit 85 marked.)
18   THE WITNESS: I need to get the pages in order
19   real quick.
20   MR. KREGER: Now you can get the pages in order.
21   MR. PARTNOW: And then I request, once you get
22   them in order, can you tell us what the inclusive Bates
23   numbers are?
24   MR. MARSTON: I'll get you a staple puller.
25   MR. KREGER: Let's go off record while we do

### Page 95

1    this.
2    THE VIDEOGRAPHER: Off record 11:47.
3    (Off record.)
4    THE VIDEOGRAPHER: On record 11:50.
5    BY MR. KREGER:
6    Q   All right. The question on the floor, I think, was
7    whether you recognized that as a true and correct copy of
8    your contract between Imperial and Absolute?
9    A   No. 58 -- or excuse me -- 85? I believe it is, yes.
10   Q   It's still missing page 15 of that specification,
11   right?
12   A   Still is, indeed.
13   Q   But the Bates stamping is consecutive, correct?
14   A   It is now, that's correct.
15   Q   So sometime we'll find that page 15 and, with
16   counsels' stipulation, we can add it to make sure we have
17   the whole specification.
18   MR. MARSTON: Assuming we're all in agreement on
19   it.
20   MR. PARTNOW: Can we get the Bates number for
21   that?
22   MR. KREGER: Yes.
23   BY MR. KREGER:
24   Q   Why don't you read the Bates numbers, so that people
25   can go back through.

### Page 96

1    A   AES 000858 through AES 000929.
2    Q   All right. And that's your signature on AES 860, the
3    third page in?
4    A   Yes.
5    Q   And there's a reference there to Attachments 1
6    through 7. Do you see that?
7    A   Yes.
8    Q   Go to Attachment No. 1, if you would, please.
9        This is Bates stamp 861.
10   A   Yes.
11   Q   See that? Is that your signature down at the bottom
12   of that page?
13   A   Yes, it is.
14   Q   And is the next page the Attachment 1?
15   A   Yes.
16   Q   Go to page two of this October 22nd, 2002 letter.
17   A   Yes.
18   Q   Would you read paragraph nine into the record.
19   A   Line item 9?
20   Q   Yes, sir?
21   A   "The utility hangers/braces fillet welds will be
22   caulked, not welded, as needed per 1.7.3.9."
23   Q   And "caulked" is underlined, right?
24   A   Yes.
25   Q   And 1.7.3.9 is a reference to a specification section

### Page 97

1    in the June 21st, 2001 specification, correct?
2    A   No.
3    Q   Look at the first page, please.
4    A   I'm sorry. Yeah, this is dated October 22, so we're
5    working off of the June specification.
6    Q   So, was I correct or was I not?
7    A   No, you're correct.
8    Q   I was correct.
9    A   Yeah.
10   Q   I'm going to show you now what's been marked as Mr.
11   Puett's deposition 13, and ask you if that's the June 21,
12   2001 specification that you are referring to in your
13   October 22nd, 2002 letter?
14   MR. DICKSON: When you say "Puett 13," Exhibit
15   13?
16   MR. KREGER: Yes.
17   THE WITNESS: Yes, it sure looks like it.
18   BY MR. KREGER:
19   Q   Would you go to page 11 of that exhibit.
20   A   Yes, I am at page 11.
21   Q   You have there a section number 1.7.3.9. I wonder if
22   you'd read that into the record, please.
23   A   "A number of the utility hangers and braces were
24   welded to the piles with fillet" -- or fillet, I think it
25   is -- "welds on one side only of the member. All metal to

25 (Pages 94 to 97)

Page 122

1  A   Oh, 54. I'm sorry. Line 21?
2  Q   Yes.
3  A   Okay.
4  Q   And I would represent to you that we don't start to
5  get an answer to that until we get down to -- back to page
6  55. Mr. Vernon states, "The question is difficult."
7      Do you see that?
8  A   Yes.
9  Q   And then he talks about welds. Take a minute and
10 read that to yourself, just the six or seven lines at the
11 top of 55 and the first line on the top of 56.
12 A   Okay. I saw the -- do you want me to read it out
13 loud or --
14 Q   Yeah, why don't You do that.
15 A   Okay. Starting at line 14: "The question is
16 difficult. For example, in a remote location such as
17 Kodiak, difficulties in getting supplies, difficulties in
18 getting equipment, abrasives, those type of things, every
19 contractor, depending on if they have done work in remote
20 locations, can encounter those types of problems."
21 Q   Okay. Go ahead, please. On welds?
22 A   "Welds. It's well known in the industrial painting
23 area, when you have a surface that is to be holiday free,
24 that welds need to be addressed in that you most
25 frequently will have holidays on welds."

Page 123

1      Continue?
2  Q   Please.
3  A   "So many of the problems that were some of the
4  problems that they encountered are frequently encountered
5  and mostly it's a matter of degree."
6  Q   Now, who is Mr. Vernon?
7  A   Skip Vernon is a consultant, I guess, or expert
8  witness that I've retained.
9  Q   What area does he have expertise in?
10 A   Coatings.
11 Q   Do you disagree with what he says there about welds?
12     MR. MARSTON: Objection. Lack of foundation.
13     THE WITNESS: In what context, that they will
14 be -- most frequently have holidays on welds or --
15 BY MR. KREGER:
16 Q   Just what he said --
17 A   Honestly, I don't --
18 Q   You don't take any issue with what he said there?
19 A   I'll tell you this, having -- not being a coatings
20 contractor and not knowing going into this, I don't know
21 about welds and what they do. I know now, after reading
22 what I've read, that welds are a problem in relations to
23 coatings, especially when you're going for a holiday-free
24 surface.
25 Q   Can you tell me how much of the work that you had to

Page 124

1  do for -- going for a holiday-free surface was more than
2  what an experienced coating contractor would have expected
3  to do?
4      MR. MARSTON: Objection. Lack of foundation.
5      THE WITNESS: I have no idea.
6      MR. KREGER: Would you mark this next, please.
7      (Exhibit 87 marked.)
8      (Discussion off record.)
9  BY MR. KREGER:
10 Q   Take a look at that, Mr. Olson, while we're --
11 background noisy.
12 A   Just the front page or the whole thing?
13 Q   I'm going to ask you whether you recognize the
14 agreement.
15     MR. MARSTON: Objection. Vague.
16     THE WITNESS: I recognize portions of it. As it
17 being one entire document, I don't recognize it.
18 BY MR. KREGER:
19 Q   Can you identify this as the subcontract between
20 Brechan and Absolute?
21 A   Yes. This one, two, three, four, these pages would
22 be part of the contract. Or the -- did you say the
23 contract?
24 Q   Yes, I did. Yes, I did.
25     Okay. Let's just take the first four pages.

Page 125

1      MR. MARSTON: Is that through 168?
2      THE WITNESS: Yeah. 165 through 168.
3  BY MR. KREGER:
4  Q   Okay. What do you recognize those four pages as?
5  A   My subcontract with Brechan Enterprises.
6  Q   Okay. And the subcontract there on Article 2 in the
7  middle says something about scope of work dated 11/27/02
8  and your proposal dated 10/22/02. Do you see that?
9  A   Yes.
10 Q   And -- this is the second October 22nd letter that
11 we've seen that you've signed. And, as you know, it's
12 different than the October 22nd letter in your subcontract
13 with Imperial.
14     But what I want to know is whether this October
15 22nd letter is the one that you intended to have
16 referenced in your subcontract with Brechan.
17 A   I know we had some November correspondence as well,
18 but this is the one that was incorporated into the
19 contract.
20 Q   Why were there three different October 22nd letters
21 signed by you?
22 A   I don't recall at this time. If I put all three of
23 in front of me, I might know the difference between them,
24 but...
25 Q   You don't remember why you did, at this point?

### Page 134

1  A   This would imply that there's a scope of work
2  associated with this. This does not show a scope. This
3  just talks about a remedy of a -- if then. There isn't
4  even any mention of what might be there, in this
5  paragraph. So I would say, no, there is no substantial
6  similarity between that paragraph and this paragraph.
7  Q   Okay. Did you review paragraph 1.7.3.6 prior to
8  signing your subcontract with Brechan?
9  A   We did and sent out an e-mail that made it painfully
10 clear what our exclusion was. Mr. Peterson wrote that
11 e-mail and it's out there.
12        MR. KREGER: You can have that back.
13        THE WITNESS: And I will further say that, since
14 we had no scope change as to footage -- you know, what we
15 had was the June 21st specification to work with that
16 talked about a hundred feet of welding on utility hangers
17 and braces, up until the day we submitted our bid. This
18 was a dramatic change that wasn't pointed out in the -- in
19 the -- now -- now that I know about these things. It
20 wasn't reflected in the string of e-mails that your client
21 and the Coast Guard and Coffman passed back and forth.
22        MR. KREGER: Objection. Nonresponsive. Move to
23 strike.
24        Let's see if we can find that e-mail. 24, Bill,
25 please.

### Page 135

1         THE WITNESS: Any chance we can take a break
2  here in a minute?
3         MR. KREGER: Let's get through this one.
4         Mark this next, please.
5         (Exhibit 88 marked.)
6  BY MR. KREGER:
7  Q   Mr. Puett [sic], is this the e-mail that you were --
8  one of the e-mails that you were referring me to, Mr.
9  Olson?
10 A   Mr. Olson would say --
11 Q   I beg your pardon.
12 A   -- that's okay -- would say this would be one of the
13 e-mails that I'm referring to.
14 Q   This is an e-mail from Jason Peterson to Matt
15 Holmstrom, correct?
16 A   The top portion is, yes.
17 Q   Yeah, that's the portion I'm interested in. Thank
18 you. Sent -- appears to be sent on December 2nd, 2002,
19 correct?
20 A   Yes, December 2nd, 2002.
21 Q   Now, at the last sentence of that e-mail sent on
22 2:19, it states, "Matt, note on 1.7.3.6 on page 9, AESI
23 will perform the painted related work such as the weld
24 cleaning and stripe coating portion of 1.7.3.6."
25        Do you see that?

### Page 136

1  A   Uh-huh.
2  Q   Have you spoken with Mr. Peterson about this?
3  A   About this e-mail? I believe I have.
4  Q   Yeah. And it's got, "To Matt/From Jason," written at
5  the top. Is that -- do you recognize Mr. Peterson's
6  handwriting there?
7  A   I do.
8  Q   And the word "perform," do you recognize that as Mr.
9  Peterson's handwriting?
10 A   I do.
11 Q   So what amount of work did AESI anticipate that it
12 was going to perform involving weld cleaning and stripe
13 coating portion of 1.7.3.6?
14        MR. MARSTON: Objection. Lack of foundation,
15 asked and answered.
16        THE WITNESS: Well, first off, I'd like to state
17 that the 1.7.3.6 one would presume that the direction
18 given in there would get a coating contractor, or a person
19 trying to paint this, would get them in conformance with
20 the holiday-free standard. And I'm going to preface my
21 answer with that.
22        MR. KREGER: Objection. Nonresponsive. Move to
23 strike.
24 BY MR. KREGER:
25 Q   What amount of painting-related work --

### Page 137

1         MR. MARSTON: Wait a minute. Did the question
2  get --
3         MR. KREGER: I'm asking the question again.
4         THE WITNESS: I'm not done with my answer.
5         MR. MARSTON: There's a question pending. He's
6  entitled to answer it.
7         THE WITNESS: I'm not done with my answer.
8  BY MR. KREGER:
9  Q   Go ahead, please.
10 A   You asked me what I felt that this would be. And we
11 -- I'm telling you that we were asked, when we told
12 Brechan we were excluding all welding, to caulk in certain
13 areas. How much of it was, I don't know specifically.
14 Right here. You have to go see Mr. Peterson about that.
15        But what I do know is that -- back to the
16 presumption that this will work to take care of the
17 deficiency: Keep in mind that the goal is to create a
18 holiday-free coating. That's the performance standard in
19 here. Now, this doesn't imply that we have any specified
20 amount. This is dated December 2nd, based on a
21 specification that came out November 26th in response to
22 our submitting a price on November 25th, is the last time
23 I believe we priced this, or November 24th.
24        So do I think that it had a big jump? I don't
25 think so, because our price didn't change from our October

Case No. A03-0199 Civil (RRB)  David Olson

### Page 138

1. 22 pricing and our November 25th pricing to the time we
2. signed the contract.
3. Q   Now, your pricing never changed, correct?
4. A   Right, because it was --
5. Q   October it was 9,985 --
6.       MR. MARSTON: Counsel. Counsel, let him answer
7. the question.
8. BY MR. KREGER:
9. Q   -- and November it was 985 --
10.      MR. MARSTON: Counsel, you can keep asking that
11. over and over again --
12. BY MR. KREGER:
13. Q   -- and in December it was 985.
14.      MR. MARSTON: -- but until he is done answering
15. the last question, I'm going to object to your stepping on
16. his answer and interrupting him.
17. BY MR. KREGER:
18. Q   Mr. Olson, can you answer the question?
19. A   The original question?
20. Q   Yup.
21. A   The original question: Does this have a
22. scope-related amount to it? Is there any way we can scope
23. between this e-mail and reconcile this --
24. Q   That wasn't my original question. Why don't we start
25. with that again.

### Page 139

1. Q   Let's go to the original question, please.
2.       Here's my question.
3.       MR. MARSTON: We're going to take a break after
4. this.
5. BY MR. KREGER:
6. Q   How much painting-related work, such as weld cleaning
7. and stripe coat portion, did AESI anticipate doing as part
8. of this project?
9. A   I don't know. Or Absolute? Absolute, none.
10.      MR. MARSTON: Okay. We're going to take a
11. break.
12. BY MR. KREGER:
13. Q   How much did your subcontractor anticipate doing?
14. A   I don't know.
15.      MR. MARSTON: We're going to take a break now.
16.      MR. KREGER: Let's take a break.
17.      THE VIDEOGRAPHER: Conclude tape two and move
18. off record at 2:04.
19.      (Recess taken.)
20.      THE VIDEOGRAPHER: Tape three. We're back on
21. record at 2:15.
22. BY MR. KREGER:
23. Q   We were working before the break on the question
24. about what specifications you read prior to estimating the
25. project. And you asked me to look at your deposition and

### Page 140

1. I was able to find it during the break. I direct your
2. attention to 195, the lower right-hand side. Take a
3. minute and read that and see if that refreshes your
4. recollection.
5.       And the question is: Which specifications did
6. you read prior to estimating the project?
7. A   The only specification we could read prior to
8. estimating the project was June 21.
9. Q   Okay. New question then: Did you read the 2002
10. specification prior to signing the contract?
11.      MR. MARSTON: Objection. Vague.
12.      THE WITNESS: Yeah, I have no doubts that we
13. read it.
14. BY MR. KREGER:
15. Q   Okay. In what way did you estimate the project?
16.      MR. MARSTON: Objection. Lack of foundation.
17.      THE WITNESS: Did I estimate the project?
18. BY MR. KREGER:
19. Q   Let's start with that.
20. A   I didn't estimate the project.
21. Q   Did anybody at Absolute estimate the project?
22. A   Jason Peterson, probably with some involvement of
23. Todd Elmore because Todd entered, oh, values into the
24. means spreadsheet. So I suppose it was a collaborative
25. effort on their parts.

### Page 141

1.       MR. KREGER: Mark this as the next exhibit,
2. please.
3.       (Exhibit 89 marked.)
4. BY MR. KREGER:
5. Q   Would you take a look at Exhibit 89, please.
6. A   I'm looking at it.
7. Q   Do you recognize this document?
8. A   I've seen it before, yes.
9. Q   When did you see it?
10.      MR. MARSTON: First?
11.      THE WITNESS: The first time I saw it?
12. BY MR. KREGER:
13. Q   Let's start with that.
14. A   I don't recall the first time I saw it, but I know I
15. saw it as we were getting all of our documents together
16. for the initial disclosure.
17. Q   Do you know whose handwriting this is?
18. A   I'm thinking it's Mr. Puett's handwriting.
19. Q   Do you recognize it as Mr. Peterson's handwriting?
20. A   No.
21. Q   The third line down says, "Pier 13, 14, 15, approx
22. 4500 square feet." And then there's a dollar sign.
23.      Do you see that?
24. A   Uh-huh.
25. Q   And then he's got initials AE over there. When you

36 (Pages 138 to 141)

Page 146

1  Q   And in your scope of work with Imperial, Absolute
2  retained some work items, correct?
3  A   I need to refer to my contract with them to go into
4  specifics.
5  Q   It should be right -- I think it's right there. Do
6  you want to sort through the exhibits and find it?
7      MR. PARTNOW: Now that's Exhibit 85 you're going
8  back to.
9      MR. MARSTON: Imperial's subcontract, is it?
10     THE WITNESS: It's 2.
11     MR. PARTNOW: From a prior deposition.
12 BY MR. KREGER:
13 Q   I think we're probably on Attachment 7.
14 A   Yeah, I've got Attachment 7 here.
15 Q   Does that describe the work that AES was going to do
16 to support Imperial on the project?
17 A   This is what was prepared for our subcontract. I
18 didn't prepare this document. I believe Todd and Jason
19 did; it would have to be Todd and Jason. But yes, this
20 was an attachment of the support we're going to give to
21 Imperial Industrial Coatings for the work to be performed
22 at the cargo pier.
23 Q   What was the cost of doing this work, to Absolute?
24 A   I don't know. I can't tell you right now. I don't
25 have those documents.

Page 147

1  Q   Was there -- is it your testimony that there was some
2  document that actually figured out how much this was going
3  to cost Absolute?
4  A   I'm pretty certain that it's out there.
5  Q   And you didn't at the time try to calculate the
6  number of hours that this work involved, I take it?
7  A   Me? No. I had another project that was going on at
8  this time that I was dealing with.
9  Q   What was that other project that you were dealing
10 with?
11 A   A project out at St. Lawrence Island, a demolition
12 project.
13 Q   That one turned out pretty well for Absolute; didn't
14 it?
15 A   It wasn't too bad.
16 Q   Do you remember what the profit margin was on that
17 project?
18     MR. MARSTON: If you're going to start talking
19 about profit margins on other projects, we can talk about
20 hanger projects that were done by Brechan. Right now I'm
21 objecting to this as irrelevant. Does it have any
22 relevance, counsel?
23 BY MR. KREGER:
24 Q   Can you answer the question?
25 A   Do I know --

Page 148

1  Q   What the profit margin was on the --
2  A   Not without going back and referencing job cost
3  documents.
4  Q   We'll come back to that.
5      While you're on that exhibit there, Mr. Olson, I
6  wonder if you'd take a look at Attachment 5.
7  A   Yes.
8  Q   Now, Attachment 5 is, on my document, Bates stamp
9  903.
10 A   Okay. I've got -- AES Bates stamp or --
11 Q   Yes, sir. The page immediately in front of that, I
12 think, is --
13 A   I've got the IIC -- I've got IIC-000045.
14 Q   Okay. Well, we can work with that.
15 A   Now if I have the -- you know what? I've got --
16 Q   Okay. Let's use that one so we can talk about Bates
17 stamp numbers.
18 A   What's your number on the Bates stamp?
19 Q   903.
20 Q   902, 903. Attachment 5. Got it.
21     MR. MARSTON: Which exhibit are we on?
22     THE WITNESS: It appears to be 85. Went from 2
23 to 85.
24     MR. MARSTON: That's one I don't have.
25     THE WITNESS: Okay.

Page 149

1  BY MR. KREGER:
2  Q   The attachment has, on 904 through -- well, I think
3  it's several pages of printed-out e-mails. Looks like 904
4  through 909 are printed out e-mails. Do you see that?
5  A   That's correct.
6  Q   Was it your intention to incorporate these
7  printed-out e-mails as part of the contract document?
8  A   I believe that, at Imperial's request, these were
9  incorporated into the -- into the -- our subcontract with
10 Imperial.
11 Q   Okay. So, would you take a look at 909.
12 A   909, yes.
13 Q   And this is an e-mail from Stears to Matt Holmstrom
14 and Andy Brown, "Subject: Kodiak 2002 Coating
15 Specification." Do you see that?
16 A   Yes.
17 Q   And he writes, quote, "I suggest you look at Sections
18 1.7.3.6 and 3.1.1 in particular." Do you see that?
19 A   I see that.
20 Q   Did you have take up this suggestion, to look at
21 sections 1.7.3.6, prior to signing your contract?
22     MR. MARSTON: Objection. Mischaracterizes the
23 evidence as to who the suggestion was being made to.
24     THE WITNESS: That suggestion was made to Matt
25 and Andy for the lessons learned.

38 (Pages 146 to 149)

Page 150

1  BY MR. KREGER:
2  Q   And did you notice this suggestion when you read the
3  specifications prior to signing the contract?
4       MR. MARSTON: Objection. Assumes facts not in
5  evidence, that it was in the specifications.
6       THE WITNESS: Did I read this e-mail prior to --
7  BY MR. KREGER:
8  Q   Yes, sir.
9  A   This first part wasn't addressed to me. I'm not in
10 the loop here until -- oh, I can't remember how much
11 further along. But I remember this e-mail because it had
12 come up to -- Matt Holmstrom had brought certain things
13 regarding the specification changes up to our attention.
14 And then I believe we asked him if -- what had changed
15 and -- what specifically we needed to look at. And we
16 were talking about boulders and containment situations and
17 other things.
18      But did I look at it in what way?
19 Q   Any way.
20 A   I guess I need you to qualify it.
21 Q   Did you look at the specification 1.7.3.6 after
22 reading the suggestion that somebody look at it?
23 A   We did look at 1.7.3.6, which brought about the
24 e-mail that Mr. Peterson sent forth. But me, did I
25 respond to it? No. I mean, I -- I wouldn't know at that

Page 151

1  point what "lessons learned" is. I do know what "lessons
2  learned," I believe, is now.
3  Q   Did you ask at that point what "lessons learned"
4  referred to?
5  A   I had no reason to ask what "lessons learned" were.
6  I don't even know if I read this. But no, I didn't have
7  any reason to ask.
8       Lessons learned because the -- certain sections
9  that were of note had been brought forth by Mr. Holmstrom
10 and addressed and looked at by Jason Peterson. And I
11 assume Mr. Puett also looked at them.
12      MR. KREGER: Mark that now.
13      (Exhibit 90 marked.)
14      THE WITNESS: Are we done with this one?
15      MR. KREGER: Yeah, if you can put that binder
16 back on it.
17      MR. MARSTON: Are we at 87 now?
18      THE REPORTER: 90.
19      MR. MARSTON: Must have dozed off.
20      MR. BROWN: Mike, is it okay if would he open
21 these doors?
22      MR. KREGER: Sure.
23      THE WITNESS: Okay. I've read it.
24 BY MR. KREGER:
25 Q   Do you remember seeing this before?

Page 152

1  A   Yes, I've seen it before.
2  Q   Now, when did you see it?
3  A   I probably saw it around the time it was sent to me
4  in October. And then I obviously printed it off in June
5  of 2004; I'm sure I looked at it then.
6  Q   That would have been October 29th, 2002?
7  A   Yeah.
8  Q   And this is a three-page string of e-mails; would
9  that be fair to describe it in that way?
10 A   Yes.
11 Q   And there's a reference to you in the second e-mail,
12 "From: Matt Holmstrom; To: Tom Puett, Dave Olson, Jason
13 Peterson," correct?
14 A   In the second of the string?
15 Q   Yes, sir.
16 A   Let's see. Here's first --
17 Q   I'm starting first from the top. I'm sorry.
18 A   Not the third, okay. I'm actually -- fourth. I'm
19 actually at the fifth.
20 Q   Fifth from the bottom.
21 A   Fifth from the back. You got to read it from the
22 back forward, so I'm the fifth guy in line here.
23 Q   Okay. So by the time you got this fifth -- by the
24 time this e-mail was sent to you, it had four prior
25 attachments to it, right?

Page 153

1  A   Yes.
2       MR. MARSTON: You mean messages rather than
3  attachments.
4       MR. KREGER: Messages. Thank you.
5  BY MR. KREGER:
6  Q   So one of the messages -- the first message that your
7  name shows up on is one that says, "Gentlemen - things are
8  starting to come together." Do you see that?
9  A   Yes, I do.
10 Q   And that message to you forwarded some other e-mails,
11 right?
12 A   From there down and behind it, yes.
13 Q   Right. So one of the ones that's behind it is the
14 one dated Thursday, October 24th, 2002, at 1:46 P.M.
15 That's five days before the 29th when you got in the
16 string.
17 A   Uh-huh.
18 Q   This is an e-mail from Matt to Dan Stears.
19      Do you see that?
20 A   Yes.
21 Q   And Mr. Holmstrom writes, in the middle paragraph
22 there, quote, "I'm interested in reviewing the coating
23 spec. section 09967, to ensure we clear up the confusion
24 regarding the seal weld issue." Do you see that?
25 A   I see that.

Page 154

1  Q  And Mr. Holmstrom eventually forwarded this e-mail to
2  you, along with several other e-mails that he'd written,
3  correct?
4      MR. MARSTON: Objection. Mischaracterizes the
5  evidence.
6      THE WITNESS: What's the last part of your
7  question?
8  BY MR. KREGER:
9  Q  Mr. Holmstrom eventually forwarded this e-mail, along
10 with several others, to you on October 29th; didn't he?
11 A  This one -- several other e-mails. You're talking
12 about outside of this one right here or just --
13 Q  No, this string.
14 A  This string. Yes, he did send it to me on the 29th.
15 Yes.
16 Q  When you got the e-mail on the 29th, did you read
17 down through it to the various strings that were attached?
18 A  I don't know if I did or not. As I stated
19 previously, Jason was handling the estimating on this. So
20 did I read it on that day? I'm not absolutely certain.
21 Q  Do you think it would be important for a prudent
22 contractor to read e-mails regarding preparations for
23 proposals?
24     MR. MARSTON: Objection. Incomplete
25 hypothetical.

Page 155

1      THE WITNESS: What are you stating that this is
2  then?
3  BY MR. KREGER:
4  Q  Well, I'm just asking you: Don't you think a prudent
5  contractor should have read all the way down through the
6  bottom of these?
7      MR. MARSTON: Form objection.
8      THE WITNESS: I think a prudent contractor
9  should look at the plans and specifications and bid the
10 job. To read this up and down, I don't know, to answer
11 that question. There were a great number of e-mails, as
12 you probably know, back and forth between Brechan and
13 ourselves on several different jobs, even at this time.
14 BY MR. KREGER:
15 Q  Look at the -- what you're calling the first; I'm
16 calling the last e-mail. This is the one from Lieutenant
17 Brown to Matt Holmstrom. Do you remember reading this one
18 at the time that you received this in October of '02?
19 A  I don't know. I don't even know if I was in town on
20 October 29, so I don't -- I can't say with certainty.
21 Q  Mr. Brown writes in this e-mail, "I would expect that
22 we will be issuing an RFP sometime in the next month based
23 on the specs that we finished Phase 1 with."
24     What specs is he referring to there as he
25 finished Phase 1 with?

Page 156

1      MR. MARSTON: Objection. Lack of foundation.
2      THE WITNESS: Would I --
3      MR. MARSTON: Are you asking for his current
4  knowledge?
5      THE WITNESS: Yeah, I was about to say: Would
6  you want me to answer with my knowledge I have today or
7  the knowledge I had purportedly on October 24?
8  BY MR. KREGER:
9  Q  Let's start with purportedly on October 29th when the
10 string got forwarded to you.
11 A  Okay. I would venture to say the June specification,
12 because that's the only one we had at that time.
13 Q  Well, you didn't do Phase 1, right?
14 A  Well, I bid on Phase 1. But that's -- what my point
15 is is that's what was forwarded to us from Brechan. So it
16 goes without saying that's the only specification we had
17 to work with.
18 Q  And what -- what were the specifications that Phase 1
19 was finished with, if you know?
20 A  What I assume --
21 Q  I'm talking now about whatever you know at the
22 present time.
23 A  Now?
24 Q  Yes.
25 A  Now, it appears that they finished Phase 2 -- or

Page 157

1  Phase 1 without any holiday testing other than a visual
2  look at the dock. They didn't have a holiday requirement,
3  based on the correspondence that I've seen between
4  Swalling and Coffman and Coffman and Brechan. And I don't
5  know if the Coast Guard is privy to that fact, but it
6  certainly appears that there was no holiday requirement.
7  Q  And there was never --
8  A  And a visual -- excuse me. I'm sorry.
9      And when a -- there was a visual standard for
10 holidays, it appears, but at certain levels and at the
11 weld areas, that, if they could see that there was some
12 bare metal or a pinhole of some kind, without the use of a
13 -- oh, what they call a holiday detector, that that
14 pinhole or those bare spots would be covered with caulk
15 that was manufactured by SPC. And that that was the
16 acceptance criteria and that was the end of it. There
17 wasn't any mechanical holiday testing as there was on
18 Phase 2 of our work.
19     So that would be my understanding now, based on
20 the documents that I've read since then.
21 Q  Okay. I was asking you about changes in
22 specifications, written specifications. And so I'm going
23 to have to ask the question again because I think your
24 answer dealt with some document besides specifications.
25 So let's try to narrow it just to specifications.

40 (Pages 154 to 157)

Page 202

1 charge to Brechan for the work?
2 Q  Yeah.
3 A  At that time, no.
4 Q  Did you give Brechan notice in writing that you
5 believed there was a different site condition on the
6 project related to seal welding?
7     MR. MARSTON: At what point in time?
8     THE WITNESS: It's in this stack of documents.
9 BY MR. KREGER:
10 Q  So your answer, I take it, would be a yes, you
11 believe you did?
12 A  Yeah. Like I said, it's in here.
13 Q  What is it you're referring to?
14 A  The letter that we sent -- that I signed and sent to
15 Brechan.
16 Q  That request for equitable adjustment?
17 A  Yeah.
18 Q  But prior to that, while you were on the project, did
19 you give them written notice that there was an issue and
20 you were incurring costs as a result of a seal welding
21 issue?
22 A  Did I send them any letters on that?
23 Q  Yeah.
24 A  No.
25 Q  How about Coffman's work on the project; did you ever

Page 203

1 send Brechan a letter saying you think Coffman is doing
2 something improper on the project?
3 A  Did I author a letter to that effect?
4 Q  Yes.
5     MR. MARSTON: Again, during the course of the
6 project?
7     THE WITNESS: At any time or --
8 BY MR. KREGER:
9 Q  During the course of the project.
10 A  During the course of the project? I don't think I
11 did. I know my subcontractor had some issues, and they
12 sent me correspondence. And I covered it and sent it to
13 Brechan. And I'm sure they distributed it to Coffman.
14 Q  Did Absolute send such a letter on its own, however?
15 A  I don't think so.
16 Q  Mr. Nist has asked me to ask you about cofferdams,
17 and I think it's an appropriate question.
18     MR. KREGER: Can you mark this as the next
19 exhibit, please.
20     (Exhibit 93 marked.)
21     MR. KREGER: That is -- for counsel's benefit,
22 it should be in our slot number 26, Bill. I put some back
23 in there a while ago, I think.
24     MR. MARSTON: Sue, what is this?
25     THE REPORTER: 93.

Page 204

1 BY MR. KREGER:
2 Q  This is a letter Mr. Peterson sent on or about
3 December 6, 2002. Do you recognize this document?
4 A  I'm reading it real quick.
5     MR. MARSTON: Objection. Assumes facts not in
6 evidence.
7     THE WITNESS: Yes, I have seen this letter.
8 BY MR. KREGER:
9 Q  Okay. And when did you see it?
10 A  I don't know the first day I saw it, but it was in
11 response to questions that I believe came down from the
12 Coast Guard to Brechan regarding the cofferdams.
13     And then Mr. -- I've seen handwritten, I think,
14 of this as well that Mr. -- that Imperial had sent to us,
15 and then we put it into computer format and then forwarded
16 it on.
17 Q  Now, Mr. Peterson writes here on the second page,
18 "Trying to perform the project with lesser containment
19 systems or eliminating cofferdams is not an option."
20     Do you see that?
21 A  Yeah. On the second page?
22 Q  Yeah. Do you know what he was talking about there?
23 A  No, but --
24     MR. MARSTON: Objection. Lack of foundation.
25     THE WITNESS: As I stated previously, Mr. --

Page 205

1 there's a handwritten copy of this that Mr. Puett wrote.
2 And Jason entered into it the computer and sent it.
3 BY MR. KREGER:
4 Q  Eventually cofferdams were eliminated, not used on
5 the project. I believe you testified to that, right?
6 A  Yeah, we didn't use cofferdams.
7 Q  Well, how did it become an option, then, for Absolute
8 to use them, when Mr. Peterson is saying it's not an
9 option here.
10     MR. MARSTON: Objection. Argumentative.
11     THE WITNESS: Mr. Peterson is not saying that;
12 Mr. Puett is saying that.
13 BY MR. KREGER:
14 Q  Well --
15 A  I understand that the letter is penned by Mr.
16 Peterson, but I -- tomorrow I can bring you a handwritten
17 letter that Mr. Puett wrote that says the exact same thing
18 and we put it into a computer for format in order to
19 answer the Coast Guard's question.
20 Q  Are you distancing yourself from the accuracy of this
21 letter?
22 A  No, not at all.
23 Q  You wouldn't have sent it out if you didn't believe
24 it, right?
25 A  Do we -- do you want to find the comments? We can go

52 (Pages 202 to 205)

```
 1                    REPORTER'S CERTIFICATE

 2        I, SUSAN J. WARNICK, RPR, and Notary Public in

 3   and for the State of Alaska do hereby certify:

 4        That the witness in the foregoing proceedings was

 5   duly sworn; that the proceedings were then taken before me

 6   at the time and place herein set forth; that the testimony

 7   and proceedings were reported stenographically by me and

 8   later transcribed under my direction by computer

 9   transcription; that the foregoing is a true record of the

10   testimony and proceedings taken at that time; and that I

11   am not a party to nor have I any interest in the outcome

12   of the action herein contained; that signature was

13   requested.

14        IN WITNESS WHEREOF, I have hereunto subscribed my

15   hand and affixed my seal this 28th day of February

16   2006.

17

18                              _____
                                SUSAN J. WARNICK,
19                              Registered Professional Reporter
                                Notary Public for Alaska
20

21   My Commission Expires: April 8, 2006
22

23

24

25
```