Page 244

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3
 4  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., An Alaska
 5  corporation,
 6            Plaintiff,
 7       vs.
 8  FORREST J. McKINLEY and "JANE
    DOE" McKinley, et al.,
 9
              Defendants.
10  _____
11  Case No A03-0199 Civil (RRB)
12
13
14
15
                  DEPOSITION OF DAVID OLSON
16
                     Taken March 30, 2006
17                   Commencing at 9:00 a.m.
18        Volume III - Pages 244 - 424, inclusive
19
20
                     Taken by the Defendant
21                            at
                         PERKINS COIE
22               1029 W. Third Av., Suite 300
                     Anchorage, AK  99501
23
24
25  Reported by:
    Susan J. Warnick, RPR                    Exhibit 18
```

COPY

Page 249

1  A   Yes.
2  Q   And what did you do to satisfy yourself that
3  Mr. Puett and the company he would be working with had the
4  necessary experience and expertise to perform the work?
5  A   I don't recall that I did anything specifically to
6  verify. I mean, there was a resume from the previous
7  submission on Phase 1, and I took it at its -- on its
8  face, what his experience was.
9  Q   Did you have discussions with Mr. Puett?
10 A   Yeah, I believe so. That he was familiar with this
11 type of work, had done bridge work and things of that
12 nature.
13 Q   Did he indicate to you any doubt in his mind as to
14 whether he had experience doing this -- doing the
15 particular type of work that was going to have to be
16 performed on the Kodiak wharf?
17 A   When you say "particular"?
18 Q   Applying coatings in an area where there were going
19 to be tides above saltwater with the tides coming in and
20 going out in a marine environment?
21 A   Well, I don't know the extent of his involvement was
22 with the company he did. I just know they had done some
23 work. I remember one bridge specifically was the Coronado
24 Bridge in California, but to what level and whether they
25 had any tide-related work, I don't know.

Page 250

1  Q   Did you check any of his references?
2  A   No.
3  Q   Check with any other owner or any other contractor
4  with which he had previously worked in terms of his
5  expertise or experience or competence to perform this type
6  of work?
7  A   No.
8  Q   When you went out in, I think it was, February of '02
9  to do the inspection of the wharf in preparation for
10 submitting a proposal on Phase 2, do you recall you have
11 testified about that?
12       MR. ELISON: Object to the form of the question.
13       THE WITNESS: If I understand your question
14 correctly, there wasn't an indication. At the time we
15 went out there in February of '02, it was a possibility
16 that Phase 2 was going to occur. There wasn't any
17 certainty from Brechan. So to characterize it as a site
18 inspection, I don't see where that would be accurate.
19 BY MR. PARTNOW:
20 Q   Did you in fact perform a site inspection prior to
21 submitting a proposal?
22 A   In February we looked at the dock and the work that
23 Swalling had done, what we could see from shore. I'm
24 pretty sure I testified to that --
25 Q   Right.

Page 251

1  A   -- in questioning from you previously.
2  Q   Are you now saying that that was not a site
3  inspection?
4        MR. ELISON: Objection to the extent the term is
5  vague. Do you mean anything specific as "site
6  inspection"?
7        MR. PARTNOW: As is required under the
8  specifications for the work.
9        MR. ELISON: Object to that to the extent it
10 calls for a legal conclusion.
11       THE WITNESS: Now you're asking if I did a site
12 inspection per -- well, I don't even think we had a copy
13 of the specification, to be quite honest with you, when we
14 went out in February.
15 BY MR. PARTNOW:
16 Q   You had a copy at least of the specification for
17 Phase 1 prior to submitting your proposal?
18 A   Yeah. Because we had submitted a price on Phase 1
19 back in March, I believe it was, back in 2001, so we had a
20 preliminary spec, but the spec -- are you talking about
21 the June specification or which specification would you be
22 referring to?
23 Q   When Absolute and Imperial actually submitted their
24 price proposal to Brechan in November of 2002, you had --
25 you made that proposal based on the specification for

Page 252

1  Phase 1. You have already testified to that; haven't you?
2  A   That's correct.
3  Q   And then subsequently, you saw the Phase 2
4  specification and that didn't change your bid price?
5  A   It came in after we submitted our price, yeah. We
6  did look at the Phase 2.
7  Q   The specification that you prepared your bid based
8  upon stated that it was up to the contractor, the
9  subcontractor, since you were going to be the
10 subcontractor to Brechan, to perform a site inspection
11 prior to submitting your proposal, correct?
12 A   Yeah, we looked at the project in February. So,
13 yeah, I did. I looked at it. I don't know how you
14 categorize inspection. We'd have to look at the language
15 in the specifications to --
16       MR. ELISON: He's not going to ask you to reach
17 legal conclusions today, anyway.
18 BY MR. PARTNOW:
19 Q   What I'm trying to understand is: Was there any
20 other time where you, on behalf of Absolute, performed
21 what in your understanding, not asking for a legal
22 conclusion, was an inspection of the site to prepare the
23 price proposal to perform the work?
24 A   No.
25 Q   Was there any -- anybody else, any other employee of

Page 253

1  Absolute other than yourself who did what you would
2  understand to have been a site inspection prior to
3  submitting the proposal to perform the work?
4  A   I don't know if I asked any of my personnel to go out
5  there and take a look at it between the time I was out
6  there in February and bid time.
7  Q   Sitting here, I gather this is Mr. Peterson sitting
8  here, who I haven't met before. We'll chat with him
9  tomorrow. You have no recollection today as to whether
10 you asked Mr. Peterson to go out there and, in your
11 understanding, inspect the site prior to putting your
12 proposal together?
13 A   No, I don't recollect. I don't think I did.
14 Q   My understanding was you were there in February on
15 that visit and that Mr. Puett was with you, correct?
16 A   Correct.
17 Q   And do I correctly understand that you, essentially,
18 because of your lack of experience in doing this type of
19 work, you relied upon Mr. Puett to look at the conditions
20 that were there and make the professional judgment as to
21 how much it was going to cost to do the coating work?
22 A   The scope of the -- I guess you would have to look at
23 the context of the February site visit. At the request of
24 Brechan, we came out, and Matt wanted us to look at
25 Swalling's work, and they had some -- I think that

Page 254

1  Mr. Puett made reference. They had some high millage
2  spots and runs and sags and things of that nature. And
3  was it -- I'm just stating, as I said previously, was that
4  set forth as the prebid site inspection? No. It was all
5  in limbo at that time. It was based on if they we were
6  going to have the funding to continue on with Phase 2. I
7  don't even think they even knew if they were going to
8  continue on with Swalling or not, so.
9  Q   My question was: Isn't it true that in terms of how
10 much it was going to cost to do -- to remove the existing
11 coatings and to apply the new coatings to meet the
12 finished standards called for in the specifications, you
13 relied upon Mr. Puett and his background and experience?
14 A   Yes.
15 Q   You did not yourself have the knowledge, background,
16 and experience to estimate that work?
17 A   No.
18 Q   Did you request that Mr. Puett go out to the site at
19 some point after the February time that the two of were
20 there to make sure that his estimate to perform the work
21 was going to take into consideration the conditions -- the
22 existing conditions in the wharf?
23 A   Did I request him to go back out?
24 Q   Yes.
25 A   No, I don't think I did.

Page 255

1  Q   So you were satisfied that the visit that you and
2  Mr. Puett had done in February was sufficiently detailed
3  to allow an accurate price proposal to be submitted?
4  A   Well, I can't speak for Mr. Puett, but for what we
5  were going to do, I'd say yes, in working in support. I
6  knew, since we weren't doing the application, I wasn't
7  looking in the same manner that he would be looking at it.
8  Q   But Mr. Puett and his company were going to be your
9  subcontractor; weren't they?
10 A   Yes.
11 Q   And, ultimately, you know, in your understanding, not
12 asking for a legal conclusion, but in your understanding
13 and your experience in the contracting business, you were
14 going to be responsible to your contractor, Brechan, for
15 the work Mr. Puett did; weren't you?
16 A   Ultimately I'm responsible for it, yes, correct, in
17 any subcontract situation. I may have five potential
18 bidders on a project, and, you know, I've got to look at
19 when their proposal comes in, what their inclusions and
20 exclusions and scope of work and price, all of those
21 items, and take them into consideration.
22 Q   Right. So you wanted to be fairly confident that
23 Mr. Puett's price proposal was a solid proposal that you
24 were going to be able to have the work performed and not
25 have it cost substantially more than what his estimate to

Page 256

1  you indicated?
2  A   Well, you also have to keep in mind, we were given a
3  million dollar budget on it, as I testified to previously.
4  Matt Holmstrom told us we needed to be under a million
5  dollars. So we had to back out of the number to see if we
6  could do it for that much money.
7  Q   But you have also testified; haven't you, that if it
8  was a three million dollar job, you were going to offer to
9  do it for a million dollars, just to stay in his budget;
10 weren't you?
11 A   Oh, no --
12     MR. ELISON: Objection, asked and answered and
13 mischaracterization.
14     THE WITNESS: No, I testified earlier if the job
15 was a million and a half or two million dollar job, I
16 certainly wouldn't bid it for a million dollars.
17 BY MR. PARTNOW:
18 Q   Right. So you wanted to be confident, even though
19 there was a number that Mr. Holmstrom may have given you,
20 that the numbers Mr. Puett were giving to you were
21 reliable estimates?
22 A   I have to rely -- if he gives me a number, we ask,
23 you know, are these budgetary numbers working for you
24 based on the square footage of the job. I mean, I don't
25 imagine that they would submit a price to me if they

Page 261

1  Q  And he would have been the person from Coffman with
2  whom you had the most interactions?
3  A  That's correct.
4  Q  You met with him both here in Anchorage and out in
5  Kodiak?
6  A  First -- the first time I met him?
7  Q  I'm just saying that over the course of the project,
8  you met with Mr. Stears -- I'm sorry -- Mr. Hardenbergh --
9  both here in Anchorage and out in Kodiak?
10 A  That is correct, yeah.
11 Q  And also had phone conversations with him?
12 A  Yes.
13 Q  And was Mr. Hardenbergh always responsive to any
14 questions or concerns you brought to his attention?
15 A  Yes. As far as I remember, he was always responsive.
16 Q  Did you at any point have any question in your mind
17 with regards to Mr. Hardenbergh's competence in the way he
18 was performing his work?
19      MR. ELISON: Objection, compound, lacking a time
20 frame. Are you again asking during the performance of the
21 work?
22      MR. PARTNOW: Yes. During the time that
23 Absolute was on the job, at any point, did you have any
24 question with regards to Mr. Hardenbergh's competence?
25      THE WITNESS: Well, not being a coatings

Page 262

1  professional or expert in that regard, I would say no.
2  BY MR. PARTNOW:
3  Q  Did you have any -- strike that.
4      My understanding is that when when Absolute
5  took -- basically decided -- I think, to use the phrase
6  that Mr. Elmore was using, self-performed after Imperial
7  was no longer on the job, am I correct in my understanding
8  that sort of the main person on site performing the work
9  was Dan Yell?
10 A  He was my project supervisor on the site. I like to
11 use the word "supplemented" their forces. We had to
12 supplement their forces in June or July, and Mr. Yell was
13 our supervisor for those activities.
14 Q  How did you come to meet Mr. Yell?
15 A  I don't remember exactly when we met, under what
16 circumstances.
17 Q  Do you recall how you became aware of Mr. Yell? I
18 mean, I assume he didn't just show up in your office one
19 day and go to work.
20 A  No. I can't -- I can't remember the exact
21 circumstances of how I met him or when, why.
22 Q  Was it your understanding that Mr. Yell was a
23 competent, experienced coatings applicator?
24 A  Yeah, he purported himself to be an experienced, I'm
25 assuming, competent, coatings contractor.

Page 263

1  Q  During the time that he was out on the job, did you
2  ever come to question whether he was competently
3  performing the work on behalf of Absolute?
4  A  Did I question whether he was competently performing
5  work? Oh, I would do checks. We were trying to control
6  man-hours. I subsequently went out and stayed on the
7  project for great lengths of time to see if there were any
8  position that we could cut, because we were consuming so
9  many man-hours out there. After analyzing the job and
10 being out there, I was satisfied with his performance and
11 his judgment as to how it was manned up and how it was
12 performed.
13 Q  And in terms of the conditions that were being met
14 and the applications of the coatings material and so
15 forth, was Mr. Yell the person you relied on in terms of
16 how the job was being performed?
17 A  I would speak with Mr. Yell. I would speak with
18 Mr. Hardenbergh. I would speak with the fellows from
19 Corrpro. And, yeah, gather input from various people
20 overall of the status of the project.
21 Q  Did Mr. Yell at any time tell you that he was having
22 difficulty meeting the specifications in terms of
23 achieving the type of finish that was called for in the
24 specifications?
25 A  Yes.

Page 264

1  Q  He did tell you that?
2  A  Yes.
3  Q  And did he tell you those difficulties related to any
4  specific condition that was being encountered on the site?
5  A  He just said that they had some areas where they were
6  having to go back and repair areas for one reason or
7  another. I think primarily holidays, in upwards of three
8  and four times.
9  Q  Now, was this in terms of the work that they were
10 performing for the first time or was this in terms of work
11 that Imperial had done prior to leaving the project, if
12 you recall?
13 A  It would be -- over the life of the project, it would
14 be both. We started on -- I believe we started coatings
15 in Area E, at the opposite end of the portion where
16 Imperial started. They started at Area A, and as we were
17 supplementing their forces in the removing of coatings and
18 then the application of coatings, I think we began
19 applying coatings in Area E. We were running into
20 problems of not being able to satisfy the holiday-free
21 requirement.
22 Q  Did Mr. Yell tell you why it was in his opinion that
23 these problems were being experienced?
24 A  I don't recall specifically what he said, but
25 anywhere -- I just know we had to undertake a lot of

Page 265

1  grinding. Had to grind the hell out of the cargo pier,
2  out of the steel, to get it down to a surface where he
3  could put a surface profile on it, where it -- where the
4  paint would adhere, and we could get rid of the holidays.
5  Q   Did he tell you at some point that he was
6  encountering conditions that couldn't reasonably have been
7  anticipated when the job was bid?
8  A   No. He didn't participate in the bid aspect of the
9  project, so he wouldn't have any knowledge in that regard.
10 So, no.
11 Q   Did he at any point tell you that he was encountering
12 conditions that, from his experience, could not reasonably
13 have been anticipated?
14 A   I don't think he mentioned that, no.
15 Q   Did he mention that he was having particular problems
16 in the weld areas?
17 A   I don't recall him specifically mentioning the weld
18 areas, no.
19 Q   Did you at any point make any request to Jerry
20 Hardenbergh to give a clarification or some additional
21 direction or assistance because of the problems that
22 Mr. Yell told you he was having in obtaining a
23 holiday-free finish?
24 A   Would you read that back, please?
25     (Requested record read.)

Page 266

1       THE WITNESS: You're asking two or three
2  different things. First part of that question, did we ask
3  for any direction or assistance from Mr. Hardenbergh?
4  BY MR. PARTNOW:
5  Q   Yes.
6  A   Is basically what you're asking?
7  Q   Yes.
8  A   Boy, I don't recall if we did or not.
9  Q   I mean, as a contractor, from your experience, if you
10 encounter an unanticipated condition that's going to cost
11 you more money, is it your first response to go back to
12 the owner or somebody on the project and say, he, we got a
13 problem here, how are we going to deal with it?
14      MR. ELISON: Objection, foundation.
15      THE WITNESS: Typically, my business, when we
16 find an unanticipated problem?
17 BY MR. PARTNOW:
18 Q   Yes.
19 A   Yes.
20 Q   But you didn't do that on the cargo wharf project;
21 did you?
22 A   I didn't know it was an unanticipated problem at the
23 time I was there.
24 Q   Well, when Mr. Yell was telling you that he was
25 having problems, did you go out to the site and look at

Page 267

1  the specific conditions that were causing the problem?
2  A   Yeah, we looked at it, and he told me he couldn't get
3  the areas turned over because of the holidays, and I said,
4  what do we do; he said, we're going to have to remove the
5  steel, and I made the call to grind and remove, do what we
6  needed to do to meet the holiday-free criteria.
7  Q   When you say grind the steel, you're talking about
8  the nonstructural steel, the various hangers and so forth
9  that were on the various piers?
10 A   No. That's not what I said.
11 Q   What steel are you referring to?
12 A   Whatever steel needed to be ground.
13 Q   Are you talking about actually removing it or
14 smoothing or both?
15 A   Grinding would be a method of removing it. Whatever
16 we needed to do to prep the surface so we could obtain a
17 profile to put the coating on. And Corrpro was making --
18 I can't remember the fellow's name. Since they had
19 experience with this material, he had a good idea of what
20 level we needed to get to to put the material on.
21 Q   You don't recall the name of the person or people
22 from Corrpro with whom you dealt?
23 A   No, I can't remember the fellow's name out of Canada.
24 Q   What was the relationship between them and Dan Yell?
25 Was he basically supervising their work or were they

Page 268

1  supervising his work?
2  A   We were supervising his work. Dan Yell was my
3  employee. So Corrpro was my subcontractor. I mean, they
4  worked at our direction, insofar as they were a
5  subcontractor, but we were relying on their expertise in
6  actually applying the coatings.
7  Q   Did the person or people from Corrpro tell you that
8  they were encountering some condition that they could not
9  reasonably have anticipated, that it was making it
10 difficult for them to obtain a holiday-free coating?
11 A   No, not -- no, they didn't mention that to me.
12 Q   And do you recall that the specifications for Phase 2
13 gave you the discretion about whether to remove
14 nonstructural steel, whether to stripe coat it, or to
15 caulk it?
16      MR. ELISON: Objection, documents will speak for
17 themselves.
18      THE WITNESS: I'd have to take a look at it, but
19 I believe that it gave us those options.
20 BY MR. PARTNOW:
21 Q   And so in terms of which of those approaches would be
22 pursued, you or your subcontractor could make the
23 determination as to what was the most efficient, cost-
24 effective approach to pursue?
25      MR. ELISON: As between those choices?

Page 273

1  correct?
2  A  Yes.
3  Q  Let's start with the things that they did do that
4  they shouldn't have done. What, in your view, sitting
5  here today, did Hoffman do during Phase 2 that they should
6  not have done?
7  A  I think if would fall into the latter category of
8  things that they should have done and did not do.
9  Q  Well, I'm just trying to --
10 A  They are kind of the same answer to the -- it's a
11 description --
12 Q  In terms of anything -- sorry to interrupt. In terms
13 of anything that Coffman did that they should not have
14 done, I take it your answer is there is nothing that you
15 can think of today that they did that they should not have
16 done? You're saying --
17 A  I would say that they issued -- are you done with the
18 question?
19 Q  Uh-huh.
20     MR. ELISON: Object to the form of the question.
21     THE WITNESS: I would say that they issued a
22 specification that didn't adequately describe the project.
23 I guess that is something that would fall into the
24 category of something they did and shouldn't have done.
25 BY MR. PARTNOW:

Page 274

1  Q  And in terms of the specifications, in what way did
2  the specification that Coffman issued not adequately
3  describe the project?
4  A  You said what I know today, correct?
5  Q  Yeah.
6  A  They didn't describe the fact that a holiday-free
7  coating was impossible to attain on this project or nearly
8  impossible to attain.
9  Q  When you say that a holiday-free coating was
10 impossible to obtain or nearly impossible to attain, you
11 yourself, I take it, at least as of the time that you
12 performed the project, didn't have the background and
13 experience to make that sort of determination?
14 A  You just asked me what I know today.
15 Q  Answer my question, please. I'm saying --
16 A  Okay.
17 Q  -- I understand what you said. I'm asking what you
18 know today. What I'm saying is: Your position, in this
19 litigation, is at the time that you did the work, you just
20 showed up, you know, nominal experience, and relied upon
21 Puett to know what was going on. You yourself did not
22 have the knowledge, background or experience to speak with
23 any authority with regards to coatings work?
24     MR. ELISON: Object to the form of the question.
25     THE WITNESS: I relied on the plans and

Page 275

1  specifications and Mr. Puett's bid.
2  BY MR. PARTNOW:
3  Q  And so --
4  A  We submitted our pricing to Brechan, based on what
5  Brechan had told us. And did I have any expertise in that
6  matter at that time? No, I didn't.
7  Q  At the time that you submitted your proposal to
8  Brechan on this job, I take it, then, you did not have a
9  question in you mind as to whether the holiday-free
10 coating called for in the specification was achievable or
11 not?
12 A  No, I had no reason to question that.
13 Q  But sitting here today, the educated Mr. Olson says
14 that there was a problem in the specification that Coffman
15 prepared because they were requiring you to do something
16 that couldn't be accomplished. Did I understand that
17 correctly?
18 A  Well, obviously it could be accomplished because we
19 did accomplish it at the end of day, but at great expense.
20 So, as I testified previously, there were surface
21 conditions that weren't described in the specifications.
22 There were a lot of surface conditions that were
23 described in the specifications, being Section 1, a lot of
24 things that a guy should be made aware of when proposing
25 on this project. I don't recall the weld issue being one

Page 276

1  of them.
2  Q  I'm just trying to make sure I understand what your
3  position is, and it's not -- apologize for my denseness.
4  Let me try again.
5      I thought, in response to my question, you said
6  that Coffman did something wrong because they required --
7  they required you to get a holiday-free finish, which was
8  impossible or nearly impossible to achieve. And then I
9  thought that when you gave your further answer, you said,
10 well, it was possible to achieve because we finally did
11 it, but at great expense. So now my question is: Is the
12 second thing you said what your position is now, that the
13 requirement of the specifications was achievable, but not
14 -- but at a cost that was more extensive than what you had
15 anticipated?
16     MR. BROWN: Objection, misstates his testimony.
17     MR. PARTNOW: I'm just trying to --
18     THE WITNESS: No, I understand I think what you
19 are saying. You have taken what I said earlier out of
20 context. You asked me originally: Did Coffman do
21 something that they shouldn't have done, was your original
22 question. Then you were going to move on to: Did they
23 not do something that they should have done.
24 BY MR. PARTNOW:
25 Q  Okay.

```
 1                    REPORTER'S CERTIFICATE

 2          I, SUSAN J. WARNICK, RPR, and Notary Public in

 3   and for the State of Alaska do hereby certify:

 4          That the witness in the foregoing proceedings was

 5   duly sworn; that the proceedings were then taken before me

 6   at the time and place herein set forth; that the testimony

 7   and proceedings were reported stenographically by me and

 8   later transcribed under my direction by computer

 9   transcription; that the foregoing is a true record of the

10   testimony and proceedings taken at that time; and that I

11   am not a party to nor have I any interest in the outcome

12   of the action herein contained; that signature is

13   requested.

14          IN WITNESS WHEREOF, I have hereunto subscribed my

15   hand and affixed my seal this 19th day of April,

16   2006.

17

18

19                          SUSAN J. WARNICK,
                            Registered Professional Reporter
20                          Notary Public for Alaska

21
     My Commission Expires:  April 8, 2010
22

23

24

25
```