# CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ABSOLUTE ENVIRONMENTAL SERVICES,   )
INC., AN ALASKAN CORPORATION,    )
             )
    PLAINTIFF,       )
             )
  VS.          ) NO.  A-03-0199
             )
FORREST J. MC KINLEY, ET AL.,    )
             )
    DEFENDANTS.     )
             )
_____)
AND RELATED CROSS-ACTIONS.    )
_____)

DEPOSITION OF TOM PUETT

MAY 8, 2006

REPORTED BY:
SHERYL WILLIAMS
CSR NO. 7453

## *Seijas Court Reporters*

Exhibit 19

*A Professional Corporation*
*1260 Huntington Drive, Suite 107, South Pasadena, California 91030*
*(626) 799-0810 ~ Fax (626) 799-5565*

1    CONDITION.  COULD NOT MAKE THEM HOLIDAY FREE.  BUT YOU

2    WOULD NEVER KNOW THAT UNTIL THE COATING WAS OFF.  AND OTHER

3    PEOPLE THAT DID THEIR EVALUATIONS OF THAT PROJECT AND WROTE

4    THAT SPECIFICATION DID A MUCH PROBABLY MORE IN-DEPTH

5    INSPECTION THAN WE WERE EVER ALLOWED TO, AND THEY NEVER SAW

6    IT ALTHOUGH THEY KNEW IT FROM THE FIRST CONTRACT, AND THIS

7    IS WHERE THEY WITHHELD THE INFORMATION AGAIN.  THEY KNEW

8    IT, AND THEY COULD HAVE SHARED THAT WITH US.

9        MR. STOETZER:  MOVE TO STRIKE AS NONRESPONSIVE.

10       Q.   BY MR. NIST:  I TAKE IT THAT YOUR PREVIOUS

11   TESTIMONY WAS BASED ON WHAT YOU GATHERED FROM REVIEWING

12   DOCUMENTS AND LISTENING TO OTHER PEOPLE'S DEPOSITIONS?

13       A.   LISTENING TO SOME OTHER DEPOSITIONS.

14       Q.   WHEN YOU REMOVED THE COATING AND YOU SAW THESE

15   WELDS, WERE THOSE UNEXPECTED TO YOU AT THE TIME THAT YOU

16   REMOVED THE COATING?

17       A.   YES.  THAT WORK WAS SUPPOSED TO BE DONE BY

18   OTHERS.

19       Q.   ARE YOU TALKING ABOUT REMOVING THE COATING?

20       A.   THE WELDS AND THE GRINDING WAS SUPPOSED TO BE

21   DONE BEFORE WE GOT THERE.  THAT WAS SUPPOSED TO BE A WHOLE

22   POINT THAT COFFMAN SHOULD HAVE HAD.  ALSO IN OUR CONTRACT

23   THEY WERE SUPPOSED TO TAKE OUT THE CP, THE CATHODIC

24   PROTECTION.  THEY WERE SUPPOSED TO CUT OFF THE

25   NONSTRUCTURAL.  THOSE ITEMS WERE DELETED FROM OUR CONTRACT,

17

SEIJAS COURT REPORTERS

1     AND WE SPECIFICALLY EXCLUDED THEM.

2          Q.   SO I WANT TO BE PERFECTLY CLEAR ABOUT WHAT YOU'RE

3     SAYING HERE.   YOU'RE SAYING THAT THE WELDS WERE UNEXPECTED

4     WHEN YOU REMOVED THE COATING.   THERE WAS SOMETHING ABOUT

5     THE WELDS THAT WERE DIFFERENT.   THAT'S CORRECT?

6          A.   THEY WERE UGLY WELDS.

7          Q.   AND YOUR UNDERSTANDING WAS THAT YOU WERE GOING TO

8     REMOVE THE COATING OR IMPERIAL WAS GOING TO REMOVE THE

9     COATING AND THEN SOMEBODY WAS GOING TO DO WHAT WITH THESE

10    WELDS?

11         A.   IF YOU GO BACK TO THE SPECIFICATION, IT SAYS THAT

12    THE GRINDING AND THAT TYPE OF WORK WILL BE DONE PRIOR TO US

13    DOING THE BLASTING BECAUSE THEY WANTED TO MAKE SURE THAT

14    THE GRIND AREAS HAD A PROFILE.   AND IF YOU GRIND AFTER YOU

15    BLASTED, YOU WOULD HAVE SPOTS THAT WOULD NOT HAVE A VERY

16    GOOD PROFILE.   SO THAT WORK WAS SUPPOSED TO BE DONE, AND

17    THEN WE DO THE BLASTING.

18         Q.   WAS THIS ALL GRINDING ON THE PROJECT?

19         A.   YES.   ACCORDING TO SPECIFICATIONS.

20         Q.   MR. PUETT, YOU'VE BEEN HANDED WHAT'S BEEN MARKED

21    AS EXHIBIT 3 TO MR. ELMORE'S DEPOSITION.

22              AND ACTUALLY DO YOU MIND REMARKING THIS ONE AS

23    PUETT 38.

24         (DEFENDANTS'S EXHIBIT 38 WAS MARKED FOR

25         IDENTIFICATION AND IS ATTACHED HERETO.)


                                                        18


                  SEIJAS COURT REPORTERS

1    TELLING YOU.

2        Q.   WAS THAT DOCUMENT FINALLY INCORPORATED INTO THE

3    ACTUAL CONTRACT?

4        A.   YES.

5        Q.   IT WAS PHYSICALLY ATTACHED?

6        A.   YES.  THAT LETTER WAS REDONE TO REFLECT THE

7    24,500 SQUARE FEET, YES.

8        Q.   I'VE SEEN A LETTER SIMILAR TO THIS LETTER WHERE

9    THE 12,255 SQUARE FEET IS CROSSED OUT AND THEN HANDWRITTEN

10   24,500.  IS THAT THE LETTER THAT YOU'RE REFERRING TO?

11       A.   YES.  BUT IT WAS RETYPED AS A SCOPE LETTER.  SO

12   THAT WAS CROSSED OUT AND CORRECTED AS 20,000 SQUARE FEET ON

13   THAT ITEM, BUT THEN THERE'S A SUBSEQUENT LETTER, OUR SCOPE

14   LETTER, THAT WAS RETYPED THAT SHOWED THE 24,500 SQUARE

15   FEET.  4,500 SQUARE FEET IN 13, 14 AND 15, AND 20,000

16   SQUARE FEET AT 2B.

17       Q.   CAN YOU EXPLAIN TO ME WHY THE LETTER WOULD BE

18   DATED SEPTEMBER 16, 2002, THIS MISSING SCOPE OF WORK, WHEN

19   THE TYPO WAS BROUGHT TO YOUR ATTENTION SOMETIME LATER?

20       A.   I HAVE NO IDEA.  I MAY HAVE CAUGHT IT WHEN IT

21   CAME BACK FOR REVIEW.  I DON'T KNOW.  BUT I KNOW JASON

22   CROSSED IT OUT AND PUT 20,000 FEET IN THERE.

23       (DEFENDANTS' EXHIBIT 41 WAS MARKED FOR

24       IDENTIFICATION AND IS ATTACHED HERETO.)

25       Q.   BY MR. NIST:  LOOKING AT EXHIBIT 41, AND ALSO FOR

39

SEIJAS COURT REPORTERS

1    THE BENEFIT OF PEOPLE ON THE PHONE IT'S EXHIBIT 5 TO THE

2    PETERSON DEPOSITION.

3          DO YOU RECOGNIZE THIS DOCUMENT, SIR?

4    A.    THERE'S A STICKY BLOCKING OUT PART OF THIS.

5    Q.    WHAT PAGE ARE YOU LOOKING AT, SIR?

6    A.    AES001526.

7    Q.    001526?

8    A.    YES.  THERE'S A STICKY BLOCKING OUT PART OF THE

9    SPECIFICATION.

10   Q.    WHAT DOES THE STICKY SAY?

11   A.    "REWORD."

12   Q.    LET ME JUST ASK YOU, THERE'S SOME HANDWRITTEN

13   NOTATIONS IN THE LEFT-HAND MARGIN.  DO YOU SEE THOSE

14   THROUGHOUT THE DOCUMENT?

15   A.    YES.

16   Q.    AND DO YOU KNOW WHO PUT THOSE HANDWRITTEN

17   NOTATIONS IN THERE?

18   A.    YES.

19   Q.    WHO WAS THAT?

20   A.    I DID.

21   Q.    SO THAT'S YOUR HANDWRITING?

22   A.    WELL, MAYBE NOT ALL OF THEM.  THAT'S WHY I'M

23   TRYING TO REVIEW THE DOCUMENT.  YOU DIDN'T LET ME FINISH

24   REVIEWING THE DOCUMENT.  DO YOU WANT ME TO REVIEW THE

25   DOCUMENT?

40

SEIJAS COURT REPORTERS

1       Q.   WELL, WHY DON'T YOU TAKE A LOOK.  ACTUALLY, WHY

2   DON'T YOU LOOK AT THE PAGE NUMBER YOU ALREADY CALLED OUT,

3   1526.

4       A.   IS THAT THE ONLY ONE YOU'RE GOING TO ASK ME TO

5   TESTIFY TO?

6       Q.   WELL --

7       A.   I'M NOT GOING TO TESTIFY TO THE WHOLE DOCUMENT

8   THAT THESE ARE ALL MY HANDWRITINGS.

9       MR. DICKSON:  BILL, WOULD YOU ASK THE WITNESS TO JUST

10  ANSWER THE QUESTION, AND THIS WILL GO A LOT FASTER.

11      MR. NIST:  I AGREE.

12      THE WITNESS:  HE HANDED ME A DOCUMENT, AND HE WANTS ME

13  TO TESTIFY THAT THESE ARE ALL MY HANDWRITINGS.  I'M NOT

14  GOING TO TESTIFY TO THAT UNLESS I HAVE A CHANCE TO LOOK AT

15  THE DOCUMENT.

16      Q.   BY MR. NIST:  MR. PUETT, I'LL REASK THE QUESTION

17  THEN.  LOOKING AT THE PAGE STAMPED AES1526, DO YOU SEE THE

18  HANDWRITING ON THE LEFT HAND THERE?

19      A.   YES.

20      Q.   IS THAT YOUR HANDWRITING?

21      A.   YES.

22      Q.   WHAT ABOUT THE PLACE THAT IS BLOCKED OUT

23  SAYING -- THE LITTLE STICKY SAYING "REWORD," IS THAT YOUR

24  HANDWRITING?

25      A.   NO.

41

SEIJAS COURT REPORTERS

1          Q.    THIS ONE HAS ALREADY BEEN MARKED AS PUETT 13.

2                MR. PUETT, YOU'VE BEEN HANDED WHAT'S BEEN

3    PREVIOUSLY MARKED AS EXHIBIT 13.   WELL, FIRST OFF, THE

4    SPECIFICATION APPEARS TO BE DATED JUNE 21, 2001.   DO YOU

5    SEE THAT?

6          A.    YES.

7          Q.    IS THIS THE SPECIFICATION THAT YOU BASED YOUR

8    ESTIMATE ON FOR THIS PROJECT?

9          A.    NO.

10         Q.    WHAT SPECIFICATION WAS THE SPECIFICATION YOU

11   BASED YOUR ESTIMATE ON?

12         A.    NOVEMBER 26, 2002.

13         Q.    I THOUGHT YOU PREVIOUSLY TESTIFIED THAT YOU

14   CREATED YOUR -- YOU CREATED YOUR ESTIMATE SOMETIME PRIOR TO

15   SEPTEMBER 16 WHEN YOU CREATED THAT LETTER?

16         A.    THAT'S RIGHT.   BUT I BASED THAT ESTIMATE ON THE

17   NOVEMBER 26TH SPECIFICATION, NOT THIS SPECIFICATION.

18   THAT'S THE QUESTION YOU ASKED ME.

19         Q.    WELL, LET'S -- I WANT TO BE CRYSTAL CLEAR ABOUT

20   THE TIME LINE HERE.   LOOKING AT PUETT EXHIBIT NO. 19 AND 39

21   WHERE YOU COME UP WITH THE FIGURE OF 772 AND CHANGE TO DO

22   THIS PROJECT.

23         A.    WHICH TWO DOCUMENTS?   19 AND?

24         Q.    NO.   IT'S THE SAME ONE.   PUETT EXHIBIT NO. 19

25   WHERE YOU GO THROUGH THE CALCULATIONS TO COME UP WITH THE

42

SEIJAS COURT REPORTERS

1    FIGURE OF --

2        A.    EXHIBIT 39, NOT 19.

3        Q.    YOU COME UP WITH THE CALCULATIONS TO COME UP WITH

4    THE FIGURE OF $772,123.  DO YOU SEE THAT?

5        A.    YES.

6        Q.    AND I'M ASSUMING THIS WAS CREATED SOMETIME PRIOR

7    TO SEPTEMBER 16, 2003?

8        A.    THAT'S CORRECT.

9        Q.    SO I GUESS WHAT I'M ASKING IS IS THIS JUNE 21,

10   2001 SPECIFICATION WHAT YOU USED TO CREATE THE ESTIMATE

11   THAT'S EXHIBIT 19 AND EXHIBIT 39?

12       A.    NOT MY FINAL ESTIMATE.

13       Q.    NOT YOUR FINAL ESTIMATE?

14       A.    THAT'S RIGHT.

15       Q.    I THOUGHT YOU SAID THAT THIS WAS -- EXHIBIT NO.

16   19 WAS THE ONLY ESTIMATE THAT YOU CREATED FOR THIS PROJECT?

17       A.    THIS IS THE ONLY ESTIMATE.  BUT I WENT AND

18   REVIEWED THE NOVEMBER 26TH SPECIFICATIONS BEFORE I OKAYED

19   THIS TO PUT THIS INTO THE CONTRACT.  THE CONTRACT WASN'T

20   DONE AND SIGNED UNTIL AFTER THE FIRST OF THE YEAR IN 2003.

21   SO I DID GO BACK AND REVIEW THAT SPECIFICATION.

22       Q.    I UNDERSTAND THAT, SIR.  WHEN YOU CREATED EXHIBIT

23   NO. 19/EXHIBIT 39, WHAT SPECIFICATION WERE YOU USING TO

24   CREATE THIS ESTIMATE?

25       A.    AT THAT TIME THE MOST CURRENT ONE THAT WE HAD

43

SEIJAS COURT REPORTERS

1  WHICH IS THE ONE IN 2001, JUNE.

2       Q.   JUNE 21, 2001?

3       A.   RIGHT.

4       Q.   I WANT TO BE CLEAR ABOUT THAT.  AND IF WE LOOK AT

5  EXHIBIT NO. 13, IS THAT THE JUNE 21, 2001 DOCUMENT THAT

6  WE'RE REFERRING TO?  I DON'T WANT YOU TO GO THROUGH IT LINE

7  BY LINE.

8       A.   I BELIEVE IT TO BE.  I DON'T KNOW THAT THIS

9  CORRESPONDS WITH THE ONE THAT I HAVE IN MY OFFICE EVEN.  I

10  DON'T KNOW THAT IT'S THE SAME.

11       Q.   IF YOU WILL, GO TO PAGE AES001508, PLEASE.

12       A.   OKAY.

13       Q.   ARE YOU WITH ME?

14       A.   YES.

15       Q.   AND IT APPEARS IT'S GOT THE SAME STICKY SAYING

16  "REWORD" ON IT; IS THAT CORRECT?

17       A.   YES.

18       Q.   SO MY QUESTION IS DID THE -- IT APPEARS THAT THIS

19  REWORD STICKY WAS ON THE SPECIFICATION, A CLEAN COPY OF THE

20  SPECIFICATION AND THEN THE SPECIFICATION THAT YOU MARKED

21  UP.  AND I'M WONDERING WHETHER THAT STICKY WAS ON THERE, IF

22  YOU REMEMBER, WHEN YOU MARKED EXHIBIT 41 UP?

23       A.   I DON'T KNOW -- YOU KNOW, I DON'T KNOW, AND IT

24  REALLY DIDN'T MATTER BECAUSE WE EXCLUDED ALL THAT.  THEY

25  COULD HAVE REWORDED IT HOWEVER THEY WANTED TO WORD IT.  IT

44

SEIJAS COURT REPORTERS

1    STILL WOULD HAVE BEEN EXCLUDED.

2        Q.    SO I TAKE IT THEN THAT THE TERM "REWORD" THAT

3    MEANT NOTHING TO YOU?  ANYTHING THAT THEY REWORDED IT TO

4    YOU WOULD HAVE CONSIDERED EXCLUDED?

5        A.    SHORT OF THEM OFFERING TO GIVE ME $100,000 FREE

6    AND CLEAR, YOU KNOW, SOME FINANCIAL BENEFIT, THEN, NO, IT

7    DIDN'T MEAN ANYTHING TO ME.

8        Q.    AND YOU TESTIFIED TO THIS PREVIOUSLY, BUT THE

9    FINAL SPEC WAS INDEED REWORDED IN THESE SECTIONS; IS THAT

10    CORRECT?  THE 1.7 SECTIONS.

11        A.    IF YOU WANT ME TO COMPARE THEM, I BELIEVE THEY

12    WERE CHANGED.

13        Q.    DID YOU REVIEW THE --

14        A.    I READ THROUGH THEM, YES.  I READ THROUGH THAT

15    NOVEMBER 26 SPEC.  THERE WAS ONE ON NOVEMBER 25TH, AND

16    THERE WAS A NEW ONE THAT CAME OUT ON THE 26TH.

17        Q.    AND THE NOVEMBER -- LET'S LOOK AT PUETT EXHIBIT

18    2.

19        A.    IS THIS THE CONTRACT AGAIN?

20        Q.    YES.

21        A.    THE ALLEGED CONTRACT.

22        Q.    IF YOU GO DOWN TO IIC AND IT ENDS WITH 52.

23        A.    YES.

24        Q.    TURN IF YOU WILL TO PAGE OR SECTION 1.7.

25        A.    YES.

45

SEIJAS COURT REPORTERS

1    Q.   AND I M LOOKING SPECIFICALLY AT THE PAGE MARKED

2    IIC-00060.  DO YOU SEE THAT THERE?

3    A.   YES.

4    Q.   NOW, YOU PREVIOUSLY TESTIFIED THAT THIS MEANT OR

5    THAT THESE SECTIONS IF THEY WERE REWORDED THEY MEANT

6    NOTHING TO YOU BECAUSE THOSE WERE ALL ITEMS THAT YOU

7    CONSIDERED EXCLUDED; IS THAT CORRECT?

8    A.   YES.

9    Q.   SO DID YOU BOTHER TO REVIEW THEM OR REVIEW THEM

10   CLOSELY WHEN THESE SPECIFICATIONS CAME OUT ON NOVEMBER 26,

11   2002?

12   A.   I JUST TESTIFIED THAT I READ THEM.

13   Q.   DID THEY MEAN ANYTHING TO YOU?

14   A.   I TESTIFIED THEY DIDN'T MEAN ANYTHING TO ME, NO.

15   Q.   THEY DID NOT.  OKAY.

16   A.   ONLY THE FACT THAT SOMEBODY ELSE WAS GOING TO

17   HAVE TO PERFORM THAT WORK BEFORE I COULD DO MINE.

18   Q.   WHAT WORK ARE YOU REFERRING TO?

19   A.   WELL, REMOVING ALL THE ANODE CABLES, REMOVING THE

20   ANODES THEMSELVES, REMOVING NONSTRUCTURAL STEEL AND TAKING

21   CARE OF DEFECTIVE WELDS.  SOMEBODY ELSE WAS SUPPOSED TO DO

22   THAT WORK.

23   Q.   AND AS FAR AS TAKING CARE OF THE NONDEFECTIVE

24   WELDS, WHAT DO YOU MEAN BY THAT?

25   A.   IT SAYS HERE -- IT SAYS A LOT ABOUT WELDS IN THIS

46

1    IF YOU WANT ME TO READ IT TO YOU INTO THE RECORD.  IT ALSO

2    TALKS ABOUT STRIPE COATING.  WE DELETED ALL OF THAT STUFF

3    IN THE SPECIFICATION.

4        Q.    YOU SAY REMOVING NONSTRUCTURAL STEEL.  THAT WAS

5    SOMETHING THAT YOU WOULD CONSIDER TO BE EXCLUDED; IS THAT

6    CORRECT?

7        A.    I SPECIFICALLY EXCLUDED IT.

8        Q.    AND THAT'S GOING TO BE REFLECTED IN THE CONTRACT

9    BETWEEN YOU AND ABSOLUTE; IS THAT CORRECT?

10        A.    IT'S REFLECTED IN OUR PROPOSAL OR IN OUR SCOPE

11    LETTER.  THESE ITEMS OF 1.7 ALL THE WAY THROUGH TO 1.7.5,

12    ALL THAT WAS EXCLUDED IN OUR CONTRACT.

13        Q.    AND IT SAYS STRIPE COATING.  YOU SAID THAT YOU

14    WERE GOING TO -- YOU WERE NOT GOING TO BE PERFORMING STRIPE

15    COATING; IS THAT CORRECT?

16        A.    THAT'S CORRECT.  BECAUSE WITH THIS MATERIAL, YOU

17    CAN'T STRIPE COAT.  THAT WAS ALSO IN MIKE ANDERSON'S

18    DEPOSITION.  YOU JUST CAN'T STRIPE COAT WITH A MATERIAL

19    THAT GETS HARD IN 8 TO 10 SECONDS.  IT'S JUST -- IT'S AN

20    IMPOSSIBILITY.

21        Q.    WELL, I UNDERSTAND THAT YOU'RE LOOKING THROUGH

22    THIS THROUGH THE LENS OF LISTENING TO MR. ANDERSON'S

23    DEPOSITION.  AT THE TIME THAT YOU ENTERED INTO THIS

24    CONTRACT, DID YOU UNDERSTAND THAT YOU WOULD BE DOING OR

25    IMPERIAL WOULD BE DOING STRIPE COATING?

47

SEIJAS COURT REPORTERS

1    A.    NO.  I WAS A SMART ENOUGH GUY BECAUSE I'VE BEEN

2    TO ENOUGH OF THESE NACE CLASSES AND STUFF TO KNOW THAT WITH

3    THIS MATERIAL, THE 1864 -- THIS IS AN OFFSHOOT OF THE

4    ZEBRON MATERIAL.  YOU CAN'T STRIPE COAT WITH MATERIAL THAT

5    CURES IN 8 TO 10 SECONDS.  IT'S AN IMPOSSIBILITY TO DO.  SO

6    THAT'S WHY I WANTED ALL THAT STUFF DELETED.  WHEN THEY'RE

7    ASKING ME TO DO IMPOSSIBLE THINGS, I SURE DIDN'T WANT TO

8    GET INVOLVED WITH IT.

9    Q.    DID YOU COMMUNICATE THAT TO ABSOLUTE?

10    A.    YES.

11    Q.    THAT THE STRIPE COATING WOULD BE IMPOSSIBLE UNDER

12    THIS CONTRACT?

13    A.    I DID NOT EXPRESS THAT TO THEM.  BUT I EXPRESSLY

14    PUT IT IN THE CONTRACT THAT WE WERE EXCLUDING ALL OF THIS

15    WORK -- 1.7 TO 1.7.5.

16    Q.    WHAT CONVERSATIONS, IF ANY, DID YOU HAVE WITH

17    ANYBODY AT ABSOLUTE REGARDING STRIPE COATING?

18    A.    I TOLD PETERSON SPECIFICALLY THAT THESE SECTIONS

19    I WANTED EXCLUDED FROM MY WORK, AND I ALSO THOUGHT IT WOULD

20    BE SMART ON THEIR PART IN THEIR EXCLUSIONS TO BRECHAN TO

21    NOT ONLY EXCLUDE THIS BUT ALSO EXCLUDE THE STUFF IN 3.2 I

22    BELIEVE IT WAS.  THERE WAS A BUNCH OF EXCLUSIONS THAT THEY

23    EXCLUDED IN THEIR CONTRACT WITH BRECHAN, AND I TOLD HIM IT

24    WOULD BE SMART ON HIS PART IF HE GOT THAT STUFF OUT OF HIS

25    CONTRACT.  WHEN YOU'RE DEALING WITH THE WELDS AND YOU'RE

48

SEIJAS COURT REPORTERS

1    DEALING WITH ALL THESE OTHER THINGS, CATHODIC PROTECTION

2    STUFF THAT WE'RE NOT FAMILIAR WITH, I DON'T WANT THEM IN MY

3    CONTRACT.  I EXCLUDE THEM.  IT JUST CREATES PROBLEMS.

4        Q.    WHAT ABOUT CAULKING?  DID YOU PLAN ON DOING ANY

5    CAULKING AS PART OF THIS CONTRACT?

6        A.    YOU'LL SEE IN OUR SCOPE LETTER THAT -- I BELIEVE

7    IT'S ITEM NO. 8 IN OUR SCOPE LETTER THAT SPECIFICALLY SAYS

8    THAT WE'RE GOING TO CAULK STITCH WELDS.

9        Q.    CAULK STITCH WELDS?

10       A.    YES.

11       Q.    AND A STITCH WELD IS A WELD WHERE THERE'S -- AS I

12   UNDERSTAND IT, IT'S JUST WELDED IN A PART.  IT'S

13   METAL-METAL CONNECTION WHERE IT'S JUST WELDED IN A PART OF

14   THE WELD, AND THEN THERE'S METAL-TO-METAL CONNECTIONS WHERE

15   THERE IS NO WELD.  IS THAT CORRECT?

16       A.    THAT'S CORRECT.  AND THE ONLY PLACE YOU'RE GOING

17   TO FIND THAT ON THIS PROJECT IS ON THE UNISTRUTS.

18       Q.    THAT'S NONSTRUCTURAL STEEL WE'VE BEEN TALKING

19   ABOUT?

20       A.    IT'S A NONSTRUCTURAL BECAUSE IT'S JUST THERE FOR

21   ELECTRICAL, TO HOLD UP ELECTRICAL BOXES AND STUFF, AND IF

22   IT WAS ATTACHED TO THE STRUCTURE AND IT WAS A PIECE OF

23   UNISTRUT AND IT HAD A STITCH WELD, WE AGREED TO CAULK JUST

24   THOSE STITCH WELDS.  NO OTHER WELDS, JUST STITCH WELDS, AND

25   THAT WAS SPECIFICALLY AT THE UNISTRUTS.

49

1      A.    OKAY.

2      Q.    THERE'S A REFERENCE HERE THAT DAN STEARS HAS

3    MODIFIED THE SPECIFICATIONS AND TO GET RID OF EXTRANEOUS

4    INFORMATION AND TO INCORPORATE ANY LESSONS LEARNED.  DO YOU

5    REMEMBER SEEING THAT E-MAIL BEFORE?

6      A.    I DON'T REMEMBER SEEING THIS ONE.  I DON'T SEE MY

7    NAME ON THE DOCUMENT OR IMPERIAL OR -- I DON'T SEE IT.

8      Q.    ARE YOU DENYING THAT THERE WAS AN E-MAIL ATTACHED

9    TO THE CONTRACT BETWEEN IMPERIAL AND ABSOLUTE THAT -- DO

10   YOU DENY THAT THIS E-MAIL WAS ATTACHED TO THE CONTRACT

11   BETWEEN IMPERIAL AND ABSOLUTE FOR THIS CONTRACT?

12     A.    I'M NOT DENYING IT.

13     Q.    YOU CAN'T SAY ONE WAY OR THE OTHER?

14     A.    THAT'S A FACT.

15     Q.    I TAKE IT THEN YOU DON'T HAVE ANY UNDERSTANDING

16   OR HAVE NEVER PONDERED WHAT THE LESSONS LEARNED THAT IS

17   REFERRED TO IN THIS E-MAIL?

18     A.    I DON'T HAVE A CLUE.

19     Q.    YOU SAID THAT YOU REVIEWED THE FINAL SET OF

20   SPECIFICATIONS THAT CAME OUT; IS THAT CORRECT?

21     A.    YES.

22     Q.    AND ALSO WERE YOU THE PERSON RESPONSIBLE FOR

23   REVIEWING IT ON BEHALF OF ABSOLUTE?

24     MR. MARSTON:  COULD YOU RESTATE THAT QUESTION OR HAVE

25   THE COURT REPORTER READ IT BACK.

59

SEIJAS COURT REPORTERS

1          (THE QUESTION WAS READ.)

2          MR. MARSTON:  I DIDN'T HEAR THE QUESTION.

3          MR. NIST:  I'LL STRIKE IT AND ASK ANOTHER QUESTION.

4          Q.    WHAT EFFORTS ARE YOU AWARE OF THAT ABSOLUTE TOOK

5    IN REVIEWING THE FINAL SPECIFICATIONS DATED NOVEMBER 26,

6    2002?

7          A.    I DON'T KNOW.

8          Q.    FROM YOUR COMMUNICATIONS WITH THEM, DID IT APPEAR

9    THAT THEY WERE RELYING ON YOU TO INTERPRET THE

10   SPECIFICATIONS FOR THEM?

11         A.    I TESTIFIED EARLIER THAT WHEN I READ THE

12   SPECIFICATIONS, I SPECIFICALLY TOLD THEM THERE WAS ITEMS

13   THAT THEY SHOULD EXCLUDE IN THIS CONTRACT, AND THEY TOOK MY

14   GOOD ADVICE, AND THEY DID THAT.  WE EXCLUDED ITEMS, AND

15   ALSO ITEMS I TOLD THEM THEY SHOULD EXCLUDE.  I KNOW THEY

16   EXCLUDED SOME ITEMS IN 3.2, AND MINE WAS IN 1.7.  I KNOW

17   THEY EXCLUDED THOSE.  SO, YEAH, THEY LOOKED FOR ME.  THEY

18   LOOKED TO ME FOR HELP ON THIS THING, SPECIFICALLY ON ITEMS

19   THAT NEITHER I NOR THEM HAD A CLUE ON WHAT TO DO.  CP

20   ELECTRICAL STUFF AND ALL THAT I DON'T WANT NOTHING TO DO

21   WITH IT.

22         MR. MARSTON:  I'LL OBJECT AS SPECULATIVE.  LACK OF

23   FOUNDATION.

24         Q.    BY MR. NIST:  YOU TESTIFIED A COUPLE TIMES ABOUT

25   THE CONTRACT BETWEEN ABSOLUTE AND BRECHAN, AND SO I TAKE IT

                                                            60

                    SEIJAS COURT REPORTERS

1      Q.    AND WERE THERE CHANGES?

2      A.    YOU KNOW, I DON'T RECALL AT THIS TIME.  HERE

3   AGAIN, I COULD LAY THEM DOWN AND LOOK AT THEM, BUT IT'S

4   BEEN FOUR YEARS AGO.

5      Q.    BUT DO YOU RECALL THAT THE NOVEMBER 26, 2002

6   SPECIFICATION WAS A RELAXATION OVER THE REQUIREMENTS OF THE

7   JUNE 2001 SPECIFICATION THAT WAS PART OF THE PHASE ONE

8   CONTRACT?

9      A.    YOU'RE SAYING THAT THE NOVEMBER 26TH WAS A

10   RELAXATION OF THE JUNE 1ST?

11      Q.    YES.

12      A.    I'M NOT AWARE OF THAT.  YOU MIGHT WANT TO HELP ME

13   OUT ON WHAT AREA.

14      Q.    JUST TELL ME WHAT YOU THINK THE CHANGES ARE IF

15   YOU CAN NOW.

16      A.    WELL, I DIDN'T CHANGE MY PRICE.  I'M JUST

17   SURMISING HERE, BUT WHEN I PAGED THROUGH THEM, I DIDN'T SEE

18   A WHOLE LOT OF CHANGE.

19      Q.    DID YOU HAVE AN OPINION AT THE TIME THAT OPTIONS

20   OF CAULKING RATHER THAN SEAL WELDING MIGHT BE A RELAXED

21   STANDARD?

22      A.    NO.

23      Q.    WHY IS THAT?

24      A.    BECAUSE I EXCLUDED WELDING.  I KNEW THERE WOULD

25   BE SOME WELDING AT STITCH WELDS ON UNISTRUTS AS I TESTIFIED

139

SEIJAS COURT REPORTERS

1    TO EARLIER.  OTHER THAN THAT, I WASN'T GOING TO DO ANY

2    CAULKING.

3         Q.   I KNOW THAT YOU EXCLUDED WELDING BECAUSE I CAN

4    READ THAT.  THE PARAMETERS OF IT I DON'T YET KNOW.  YOU'VE

5    TESTIFIED YOU'VE EXCLUDED GRINDING, AND ARE YOU NOW

6    TESTIFYING THAT YOU EXCLUDED CAULKING FROM YOUR CONTRACT?

7         A.   NO.  BECAUSE ON THE ITEMS IN MY SCOPE LETTER IT

8    SAYS THAT WE'RE GOING TO CAULK STITCH WELDS, STITCH WELDS

9    AT THE UNISTRUTS.  THAT'S WHAT I WAS REFERRING TO.

10        Q.   BUT NOTHING ELSE?

11        A.   RIGHT.

12        Q.   WERE THERE OTHER WELDS THAT WERE, IN FACT,

13   CAULKED DURING PHASE TWO?

14        A.   THERE MAY HAVE BEEN A FEW THAT WE DID ON SOME

15   NONSTRUCTURAL ITEMS THAT THEY DIDN'T GET REMOVED.  WE

16   REQUESTED TO HAVE THEM REMOVED AND SMART TO HAVE THEM

17   REMOVED, BUT NOBODY WANTED TO DO IT.  THEY WERE CORRODED

18   BEHIND AND THEY WERE STICKING OUT FROM THE SURFACE, AND SO

19   WE CAULKED THOSE.  SO THAT RUST WOULDN'T RUN DOWN AND LOOK

20   UGLY, WE CAULKED THEM JUST TO MOVE ON WITH THE JOB.  WE HAD

21   TOO MANY PEOPLE CLAMORING ABOUT SCHEDULES, AND I WANTED TO

22   MOVE ON.

23        Q.   DID YOU ASK ABSOLUTE TO REMOVE NONSTRUCTURAL

24   STEEL?

25        A.   YES.

140

SEIJAS COURT REPORTERS

1      Q.    YOU'RE AWARE THAT PEOPLE AT SWALLING WERE READY,

2   WILLING AND ABLE TO DISCUSS PHASE ONE WITH YOU?

3      A.    I DIDN'T KNOW IT.  I KNOW IT NOW.  SOMEBODY HAS

4   TESTIFIED TO THAT, BUT THAT'S HEARSAY.

5      Q.    YOU ALREADY TESTIFIED THAT YOU DON'T ENGAGE IN

6   THAT KIND OF DISCUSSION?  YOU DON'T DISCUSS JOBS WITH A

7   PREDECESSOR CONTRACTOR?

8      A.    YOU KNOW, I REALLY DON'T.  IT JUST SLANTS YOUR

9   PERSPECTIVE OF PEOPLE, YOU KNOW.  BECAUSE THIS GUY IS GOING

10  TO SAY SOMETHING ABOUT THIS GUY.  THIS GUY IS GOING TO SAY

11  SOMETHING BAD OVER HERE, AND I DON'T CARE TO GET INTO THAT

12  MICKEY MOUSE KIND OF STUFF.

13     Q.    KNOWING NOW THAT MR. ANDERSON WAS READY, WILLING

14  AND ABLE TO DISCUSS THE JOB AND HIS EXPERIENCE ON PHASE

15  ONE, DO YOU WISH THAT YOU OR SOMEONE IN YOUR ORGANIZATION

16  HAD SPOKEN WITH MR. ANDERSON?

17     A.    YES.  BUT IT NEVER CAME TO ME.  NOBODY STOPPED ME

18  AND ASKED ME IN PARTICULAR.  IF YOU'RE SUGGESTING WOULD I

19  HAVE TALKED TO HIM?  I PROBABLY WOULD NOT HAVE, BUT NOBODY

20  CAME AND SUGGESTED IT TO ME.

21     Q.    WHAT ABOUT THE CONTRACT THAT TALKS ABOUT LESSONS

22  LEARNED AND EFFORTS TO SHAPE THE SPECIFICATION AND JOB

23  REQUIREMENTS CONSISTENT WITH THE OWNER'S REQUIREMENTS.

24  YOU'RE SUGGESTING THAT THAT SHOULDN'T AND DIDN'T ALERT YOU

25  THAT YOU MIGHT WANT TO TALK TO PEOPLE ABOUT THE PRIOR JOB?

142

SEIJAS COURT REPORTERS

1      A.    BECAUSE I WANTED IT BACK.

2      Q.    DO YOU KNOW SKIP VERNON?

3      A.    ONLY BECAUSE I SAT IN ON ONE OF HIS DEPOSITIONS.

4      Q.    DO YOU KNOW ANYTHING ABOUT HIM BEYOND THAT?  DO

5  YOU KNOW HIM TO BE A KNOWLEDGEABLE PERSON?

6      A.    ABSOLUTELY NOT.

7      Q.    DO YOU THINK HE'S A KNOWLEDGEABLE PERSON?

8      A.    I DON'T KNOW.  PUT HIM IN A DEBATE WITH MARK

9  SCHILLING, AND I CAN GIVE YOU A BETTER ANSWER.

10     Q.    HOW WOULD YOU COMPARE MARK SCHILLING AND SKIP

11 VERNON?

12     A.    FAR AND ABOVE.

13     Q.    WHO IS ABOVE WHOM?

14     A.    MARK SCHILLING IS ABOUT ON TOP OF EVERYBODY.  I

15 HAVEN'T FOUND ANYBODY YET THAT'S OVER AND ABOVE HIM.

16     Q.    SO YOU WOULD DISAGREE WITH SKIP VERNON'S CRITIQUE

17 OF MARK SCHILLING'S REPORT WITH RESPECT TO COFFMAN'S

18 PERFORMANCE?

19     A.    I DIDN'T READ THAT.

20     Q.    HOW MANY TIMES HAVE YOU MET FACE TO FACE WITH MR.

21 SCHILLING?

22     A.    IN MY LIFETIME?

23     Q.    YES.  FOR STARTERS.

24     A.    SEVERAL HUNDRED.

25     Q.    SO YOU'VE KNOWN HIM FOR YEARS?

168

SEIJAS COURT REPORTERS

1 <u>REPORTER'S CERTIFICATE</u>

2

3        I, SHERYL WILLIAMS, CSR NO. 7453, CERTIFIED

4 SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA DO

5 HEREBY CERTIFY:

6        THAT PRIOR TO BEING EXAMINED THE WITNESS

7 NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN

8 TO TESTIFY THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

9 THE TRUTH;

10        THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN

11 SHORTHAND AT THE TIME AND PLACE NAMED HEREIN AND WAS

12 THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION AND

13 SUPERVISION;

14        THAT THE FOREGOING DEPOSITION IS A FULL, TRUE

15 AND CORRECT TRANSCRIPTION OF MY ORIGINAL SHORTHAND

16 NOTES.

17        I FURTHER CERTIFY THAT I HAVE NO INTEREST IN

18 THE OUTCOME OF THE ACTION.

19        WITNESS MY HAND THIS ___24TH___ DAY OF

20 _____MAY_____, __2006___.

21

22        _Sheryl Williams_

23        SHERYL WILLIAMS, CSR NO. 7453

24        CERTIFIED SHORTHAND REPORTER IN

25        AND FOR THE STATE OF CALIFORNIA