Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL SERVICES, )
INC., an Alaskan Corporation,    )
                                 )
        Plaintiff,               )
                                 )
    vs.                          ) Case No. A-03-0199
                                 ) Civil (RRB)
FORREST J. McKINLEY and          )
"JANE DOE" McKINLEY, and the     )
marital community property       )
composed thereof d/b/a "Imperial )
Industrial Coatings" and EMERCO, )
INC., etc.,                      )
                                 )
        Defendants.              )
EMERCO, INC., a California       )
Corporation d/b/a Imperial       )
Industrial Coatings, etc.,       )
                                 )
        Counter-Claimant/        )
        Third Party Claimant,    )
                                 )
    vs.                          )
                                 )
ABSOLUTE ENVIRONMENTAL SERVICES, )
INC., an Alaskan Corporation,    )
et al.,                          )
                                 )
        Cross-Defendants/        )
        Third-Party Defendants.  )

DEPOSITION UPON ORAL EXAMINATION

OF

L. SKIP VERNON

Taken at 1900 Fifth Avenue
Seattle, Washington

DATE TAKEN:     FEBRUARY 11, 2005

Exhibit 24

Buell Realtime Reporting, LLC
(206) 287-9066

Page 2

```
 1        APPEARANCES
 2
 3  FOR EMERCO, INC.:      PATRICK J. DUFFY, III
                           Monteleone & McCrory
 4                         725 South Figueroa Street
                           Suite 3200
 5                         Los Angeles, California 90017
 6
 7  FOR ABSOLUTE ENVIRONMENTAL  TERRY R. MARSTON, II
    SERVICES, INC.:        Marston Heffernan Foreman
 8                         Anderson Park Building
                           16880 NE 79th Street
 9                         Redmond, Washington 98052
10
11  FOR SPECIALTY POLYMER     ROBERT J. DICKSON
    COATING USA, INC.:     Atkinson Conway & Gagnon
12                         420 "L" Street
                           Suite 500
13                         Anchorage, Alaska 99501
14
15
16  ALSO PRESENT:          Thomas Puett
                           David Olson
17
18            * * * * *
```

Page 3

```
 1      DEPOSITION OF L. SKIP VERNON
 2            EXAMINATION INDEX
 3  EXAMINATION BY                    PAGE
 4  Mr. Duffy . . . . . . . . . . . . . 4
 5
 6
 7
 8
 9
10           EXHIBIT INDEX
11  EXHIBITS FOR IDENTIFICATION       PAGE
12  1   Consulting Retainer Agreement    5
13  2   Curriculum Vitae                 7
14  3   Updated Curriculum Vitae         7
15  4   Report by L. Skip Vernon        42
16  5   Rebuttal Report by L. Skip Vernon  114
```

Page 4

```
 1       SEATTLE, WASHINGTON; FEBRUARY 11, 2005
 2                 9:08 A.M.
 3                 --oOo--
 4
 5  L. SKIP VERNON,     witness herein, having been
 6                first duly sworn on oath,
 7                was examined and testified
 8                as follows:
 9
10           E X A M I N A T I O N
11  BY MR. DUFFY:
12    Q.  Good morning.
13    A.  Good morning.
14    Q.  Would you please state your full name for the
15  record and spell your last name.
16    A.  Larry Skipper Vernon. Last name is
17  V-E-R-N-O-N.
18        What would you have me call you today?
19    Q.  You can call me Pat, if you like.
20    A.  Okay. The only other thing I would add, and I
21  guess it doesn't necessarily need to be on the record, is
22  I need to check out today at noon. So I'm hoping to
23  break for lunch just slightly before that so I can check
24  out of my room.
25    Q.  Sure. I understand that you anticipate
```

Page 5

```
 1  providing expert testimony in this litigation; is that
 2  correct?
 3    A.  Yes.
 4        (Exhibit No. 1 marked.)
 5    Q.  I have a document that is entitled "Consulting
 6  Retainer Agreement," which I will ask be marked as
 7  Exhibit 1, and ask you if that is the agreement by which
 8  you were retained to give expert opinions in this matter?
 9    A.  Yes, it appears to be.
10    Q.  Has the agreement ever been subsequently
11  modified?
12    A.  No.
13    Q.  How did it come to be that you were retained in
14  the first place?
15        MR. MARSTON: Objection; calls for speculation.
16    A.  I received a call from, and honestly I don't
17  remember whether it was Mr. Marston or Mr. Olson who
18  called me first and indicated that there was an issue or
19  problem on the job, asked me a few questions about it and
20  then asked if they needed help if I might be able to
21  assist them if there were any -- they couldn't resolve
22  the problems.
23        Some months later I received another call from
24  Mr. Marston, indicating that they were unable to resolve
25  problems and seeking to retain me.
```

2 (Pages 2 to 5)

Page 6

1  Q.  Before you were contacted, did you know Mr.
2  Marston or Mr. Olson previously?
3  A.  I did not.
4  Q.  Did they indicate to you how they obtained your
5  name?
6  A.  I don't recall.
7  Q.  Have you billed for consulting work in
8  accordance with this agreement?
9  A.  Yes.
10 Q.  How much have your billings been so far?
11 A.  I would have to go back and look at the exact,
12 to get the exact number, but I believe around $20,000.
13 Q.  Have you been paid?
14 A.  Timely. There are outstanding invoices, but
15 they are not yet due.
16 Q.  Have you had your deposition taken before?
17 A.  Yes.
18 Q.  On how many occasions?
19 A.  Twice in the last four years.
20 Q.  Was that in connection with providing expert
21 testimony?
22 A.  Yes.
23 Q.  Before the last four years, was your deposition
24 ever taken?
25 A.  Yes.

Page 7

1  Q.  On how many occasions?
2  A.  Approximately four, I believe.
3  Q.  Were all of those as consultants or were some
4  of them percipient?
5  A.  Consulting.
6        (Exhibit No. 2 marked.)
7  Q.  I also have what states to be a curriculum
8  vitae, which I will ask be marked as Exhibit 2.
9  A.  I would point out I have updated my resume
10 since that was delivered and I do have a copy of the
11 updated version. There are not a lot of changes, but
12 there are some changes in there.
13       (Exhibit No. 3 marked.)
14 Q.  Let's make the updated version 3, then. Do you
15 have a copy of it?
16 A.  I'm sorry, I only brought two.
17 Q.  All right.
18 A.  I don't believe I will need one, I hope.
19 Q.  What is the state of your education after high
20 school?
21 A.  I have a bachelor's degree from New Mexico
22 State University and a law degree from the University of
23 New Mexico and I'm currently enrolled in a bachelor's
24 program for Trinity University for a bachelor's degree in
25 biblical studies.

Page 8

1  Q.  In what studies?
2  A.  Biblical studies.
3  Q.  When did you obtain your bachelor's degree from
4  University of New Mexico?
5  A.  I didn't obtain a bachelor's degree from the
6  University of New Mexico. That was Mexico State, and
7  that was 1979.
8  Q.  Excuse me. What does a Bachelor of
9  Individualized Studies mean?
10 A.  I had intended to go to medical school and when
11 I had completed all of my medical requirements, rather
12 than proceeding through and getting the chemistry degree,
13 I decided to take some courses that would translate into
14 more value in real life. At least I thought so at that
15 time.
16      So I took some courses that involved law
17 school-type prerequisites and other courses. So I have
18 all the upper level credits and courses, but it's
19 individualized studies. So while the major emphasis of
20 my study was in chemistry, I did not get a chemistry
21 degree.
22 Q.  When you say the major emphasis was chemistry,
23 was that because you were pursuing a pre-med program?
24 A.  Yes.
25 Q.  After you graduated from New Mexico State

Page 9

1  University, what was your first employment?
2  A.  I always worked in the family-owned painting
3  business. So I worked for Heritage Painting and
4  Monticello Painting and I continued with my, working with
5  my parents through 1985 or -6, at which time I started
6  CLT and I'm currently employed there.
7  Q.  Were Heritage and Monticello Painting Company
8  related in some fashion?
9  A.  Yes.
10 Q.  And would you explain that?
11 A.  My father was a painting contractor and owned
12 Heritage Painting Company, which is a union shop. In
13 order to compete in other markets, he opened a nonunion
14 painting company, which was Monticello Painting Company.
15 I basically operated that one while he owned it and he
16 continued to operate the union shop.
17 Q.  Did both Heritage and Monticello operate in the
18 same general markets?
19 A.  Yes.
20 Q.  What type of painting did they do?
21 A.  All types.
22 Q.  Did it include residential houses?
23 A.  My father had a seventh-grade education.
24 Started a painting company when he was about 18 years
25 old.

Page 10

1  From the time I was born I was working. From
2  the time I can remember, not from the time I was born,
3  but from the time I can remember I was working with my
4  dad.
5     His company evolved over time from painting
6  homes to painting commercial buildings, and by the time I
7  was older and became more involved, we evolved into
8  industrial coatings. So there was a progression from one
9  to the other over time.
10    Q. Other than your work experience in industrial
11 coatings, have you had any formal education in industrial
12 coatings?
13    A. I'm not sure what you mean by "formal
14 education."
15    Q. Have you ever taken any engineering classes
16 that dealt with industrial coatings, their application or
17 their makeup or design?
18    A. Not on a university level. My training courses
19 I have attended are generally listed in my resume there.
20      I am a NACE-certified coating inspector and I
21 am also an instructor in that program. I was a lead
22 instructor for many years.
23      So certainly we could consider that formal, but
24 not formal to the extent that it is a university program.
25 That training is listed in the CV.

Page 11

1     Q. When did you get your NACE-certified coating
2  inspector's certification?
3     A. Approximately 1986.
4     Q. Have you ever worked as a certified inspector
5  on a project?
6     A. Yes.
7     Q. How many such projects?
8     A. Well, your question is not complete to the
9  extent the way the profession usually works. I have
10 owned a coating inspection company for many years where
11 we would be engaged to go in and provide third-party
12 coating inspection services.
13      I would go out, perform some of that work, but
14 more normally I would have employees who would be on that
15 project and we would be billing for their services and I
16 acted more in a supervisory capacity.
17    Q. What is the coating inspection company that you
18 referred to?
19    A. CLT.
20    Q. Is that the main business of CLT?
21    A. No, at this point it's not. It was for a
22 period of time, but I no longer am actively engaged in
23 providing coating inspection services.
24    Q. During what period of time were you so engaged?
25    A. Probably '92 to '95, but I would have to

Page 12

1  confirm those dates.
2     Q. What was the reason that you stopped providing
3  inspection services?
4     A. As my consulting practice expanded, frequently
5  we would find that we would run into conflicts where
6  there might be issues regarding the inspection on a
7  project or how the inspection might have been performed,
8  and to the extent that I was engaged in that business,
9  there was -- oftentimes I would be characterized as
10 having a conflict of interest in terms of rendering any
11 opinions regarding the quality of inspection.
12    Q. When you graduated from college, did you
13 directly at that point become a vice president of
14 Monticello?
15    A. No. I was a vice president in high school. I
16 was vice president from the time it was created.
17    Q. The same was true with Heritage?
18    A. Well, I have explained the nature of those
19 businesses, and I am sure you understand that process.
20      When I took over as vice president of
21 Monticello, then, of course, I disassociated from
22 Heritage. I no longer carried the title, but there was a
23 point in time where later on I was working for Heritage
24 again, but I couldn't at this point in time -- I left
25 there 21 years ago. I don't recall exactly when I moved

Page 13

1  from one to the other.
2     Q. I believe you said you came to operate
3  Monticello. Did that occur directly after you graduated
4  college?
5     A. No. I was operating Monticello while I was in
6  college.
7     Q. Were you a full-time student?
8     A. Yes.
9     Q. In the years in which you were in college, can
10 you describe the type of painting projects that
11 Monticello was typically involved in?
12    A. Mexico State University is located in Las
13 Cruces, New Mexico, and during the time I was in college,
14 we would look for jobs in that area to bid.
15      The largest one I recall is that we redid all
16 the housing in the married student housing section there
17 at the university and I hired the football players to
18 assist me in doing that painting.
19      And I believe at that time we also did some
20 work on the wastewater treatment plant, but I can't be
21 certain now about the concurrence.
22    Q. After you graduated college, did Monticello's
23 work area change?
24    A. It was facilitated to the extent I could go to
25 Phoenix, El Paso, Amarillo, wherever there might be local

Page 14

1  jobs bidding in the Southwest geography.
2          While going to college, that was very
3  difficult. So what we really did was -- it's not as if
4  we said we are going to expand into new territory. We
5  always looked for work in those areas. It was just
6  easier to do that.
7     Q.   In the years after you graduated college and
8  were involved with Monticello, would you describe the
9  nature of any industrial coatings projects Monticello
10 performed?
11    A.   Wastewater treatment facilities, water storage
12 tanks, bridges, pumping stations, water treatment plants.
13 That's all I can recall off the top of my head.
14    Q.   In what state or states were these facilities
15 located?
16    A.   Colorado, New Mexico, Arizona, Texas.
17    Q.   Were any of these projects in a marine
18 environment?
19    A.   I don't know. Would you characterize the
20 wastewater treatment plant as a marine environment?
21    Q.   My question relates to an environment in which
22 the facility is located on or near an ocean or other
23 similar body of water.
24    A.   No, Monticello did no marine work.
25    Q.   How many wastewater treatment plants were you

Page 15

1  involved with?
2     A.   Four. I recall four at this time. There may
3  have been more.
4     Q.   Excuse me, go ahead.
5     A.   I would just point out that when I answered
6  four, those are four plants, which is what you asked me.
7  That's multiple phases at different plants. So that
8  certainly wouldn't be representative of the jobs.
9     Q.   Was the type of coating work similar at the
10 four plants?
11    A.   Generally, as one would characterize work at a
12 wastewater treatment plant as being similar. You may be
13 painting piping, you may be painting clarifiers, you may
14 be painting digesters.
15         There are a lot of different substrates that
16 need to be painted in a wastewater treatment plant, but
17 they are generally similar from plant to plant with minor
18 exceptions.
19    Q.   What products did you use at these wastewater
20 treatment plants for performing the coating work?
21    A.   When you say type of projects, what you do you
22 mean?
23    Q.   Well, were they coal tar based, were they epoxy
24 based?
25    A.   Yes, all of the above. Coal tars, epoxies

Page 16

1  urethanes, enamels, latex, vinyl esters.
2     Q.   I believe you also indicated that Monticello
3  worked on some bridges.
4          Would you describe how many bridges it worked
5  on while you were there?
6     A.   I want to be clear. Both Monticello and
7  Heritage worked on bridges. Monticello phased out over a
8  period of time and did not do as much work and Heritage
9  did and I moved back to Heritage.
10         So there is a concurrent run there where both
11 companies were owned, were operating and much of the
12 actual application work was being done under one company
13 banner or the other. In terms of number of bridges that
14 I worked on, I don't know, ten, fifteen.
15    Q.   Were any of these bridges supported by steel
16 piling?
17    A.   Yes.
18    Q.   How many?
19    A.   Well, you are asking for something 25 years
20 ago. I will guess three, four.
21    Q.   What was the reason that Monticello, if I
22 understood you correct, faded out and Heritage took over?
23         MR. MARSTON: Objection; mischaracterizes the
24 witness's testimony.
25    A.   It was based on union conditions and the market

Page 17

1  at that time.
2     Q.   It became more difficult to get nonunion work?
3     A.   To some extent, and the prices that were bid,
4  there was not as great a discrepancy.
5     Q.   Did Monticello cease to do active business as a
6  corporation at some point in time?
7     A.   Yes, but not before my departure.
8     Q.   When did it cease?
9     A.   I don't know.
10    Q.   Was your father still operating Monticello when
11 you left?
12    A.   Yes. It still existed as an entity. I can't
13 tell you if I recall that he did any projects after that,
14 or not. He may have. He may have just done everything
15 under the Heritage title after that.
16    Q.   Did Heritage cease operations at some point in
17 time?
18    A.   Yes, Heritage is no longer in operation.
19    Q.   What was the cause of Heritage ceasing
20 operations?
21    A.   My father and mother's deteriorating health.
22    Q.   Where is it that you grew up?
23    A.   Albuquerque, New Mexico.
24    Q.   And what year did you leave either Monticello
25 or Heritage?

Page 18

1  A. Approximately 1986, I believe.
2  Q. And that's when you founded CLT?
3  A. Actually, there was some small overlap. My
4  father and I started having some difficulties in 1984. I
5  got a contractor's license and had CLT operational.
6      Although I still worked in the family business
7  for a period of time, ultimately our relationship
8  deteriorated and I left in 1986 and operated CLT
9  full-time from that period on.
10 Q. Was the contractor that you founded in 1984 the
11 same corporate entity, CLT?
12 A. Yes, it has always been.
13 Q. Did you obtain a contractor's license?
14 A. Yes.
15 Q. In what state or states?
16 A. It's listed in there. At one time I had
17 licenses in New Mexico, Arizona. I don't recall. I
18 think I had one in California for a while. But they're
19 now all inactive. So as we sit here today, I am not
20 licensed to do application in any jurisdiction.
21 Q. What occurred that caused you to attend law
22 school?
23 A. I served in the New Mexico Senate for 16 years
24 and observed many of my colleagues seeming to enjoy an
25 advantage having attended law school and decided that

Page 19

1  that would be a beneficial education to have.
2  Q. Did you do this at night or part-time or
3  full-time?
4  A. The first semester first year was full-time.
5  I'm classified as a full-time student, but, of course, I
6  have three children and a business. So I ran both
7  concurrently. I ran my business while I was a full-time
8  law student.
9  Q. Did you ever become admitted to practice law?
10 A. Yes.
11 Q. In which state or states?
12 A. New Mexico.
13 Q. Are you still so admitted?
14 A. No. Well, I am inactive.
15 Q. Did you ever practice law?
16 A. Yes.
17 Q. For how long?
18 A. Ten years.
19 Q. When did you become elected to the New Mexico
20 Senate?
21 A. In 1984.
22 Q. Did your electoral process play any part in
23 your difficulties that you said you had with your father?
24 A. Yes.
25 Q. And how is that?

Page 20

1  A. New Mexico has a citizens legislature year-end.
2  We are in session 30 and 60 days in alternating years,
3  and, of course, that time away from the business is
4  difficult.
5      So I had decided to pursue that. He felt that
6  was taking away from my work.
7  Q. Has CLT ever consulted for the state of New
8  Mexico?
9  A. No.
10 Q. From what area of New Mexico were you elected?
11 A. Albuquerque.
12 Q. Did you represent the city of Albuquerque or
13 that general area?
14 A. No. There are 42 senators in the state of New
15 Mexico and, of course, the districts are divided by
16 population. I believe 16 senators cover different
17 segments of the Albuquerque area based on the district
18 lines.
19 Q. During what years did you practice law?
20 A. '93 to 2003.
21 Q. In what locale?
22 A. Well, I was in Albuquerque, although very few
23 of my cases originated there.
24 Q. Did you specialize in any particular area of
25 law?

Page 21

1  A. I was of counsel with a local firm there in
2  Albuquerque. At the same time I also ran CLT. The
3  majority of my income derived from CLT.
4      To the extent that there was any legal
5  representation that I might be involved in, I was
6  affiliated then with other lawyers in the firm.
7  Q. How do you mean legal representation that you
8  would be involved in?
9  A. At that point in time, I was still being
10 engaged as a technical expert. So I may be engaged as an
11 expert of CLT, which would not be a legal engagement.
12     In other cases, I may be acting as an attorney,
13 although not nearly as frequently as acting as a
14 consultant. So those were handled under two different
15 corporate entities.
16 Q. What type of matters did you act as an attorney
17 in?
18 A. Some coating-related issues, various
19 business-type issues, leasing companies. I did very
20 little PI work. Did some insurance defense.
21 Q. Did you ever have any coating-related
22 litigation where you represented one of the parties as
23 their attorney?
24 A. Yes.
25 Q. Would you describe that litigation?

Page 22

1   A. There was a case here in Washington with the
2  Grant County Public Utility District. My client was
3  Oregon Ironworkers. The lead lawyer was a gentleman by
4  Pete Ralston at the Oles Morrison firm here.
5      I was engaged as co-counsel and was admitted
6  pro hac vice to assist him with deposition issues and
7  expert issues. He was lead counsel. I assisted him.
8      There was another --
9   Q. What was the nature of the dispute in that
10 case?
11  A. The coating contractor was painting some of the
12 gates at the dam and various disputes arose as to
13 requirements for removing the lead-based paint and costs.
14  Q. What was the name of that case?
15  A. I don't recall. Grant County PUD and OIW were
16 the parties.
17  Q. What year or years did this transpire in?
18  A. '93 to '95 or '96. I don't recall exactly when
19 it settled.
20  Q. I think you were about to mention another case
21 when I interrupted you. Proceed.
22  A. The other case that I remember, and there may
23 be more, is a small coating manufacturer from, I believe
24 South Carolina contacted me and had manufactured some
25 paint that was applied to a floor in a dairy in Las

Page 23

1  Cruces.
2      There was a subsequent failure of that coating
3  and I was retained as legal counsel on that case. I
4  ultimately had to pass it off to one of the partners in
5  the firm, because depositions and settlement conferences
6  and other important things were being scheduled during
7  the legislative session. So I ended up not doing too
8  much of the work, other than taking the other expert's
9  deposition.
10  Q. Do you recall the name of the other expert?
11  A. I do not.
12  Q. Your resume, Exhibit 3, refers to the Gateway
13 Company, Inc., and experience in that company from '87 to
14 '92.
15      What was that company?
16  A. When I took the NACE certification courses, I
17 was introduced to a gentleman by the name of Gene Dewer,
18 who worked for the Gateway Company out of St. Louis.
19      He introduced me to the owner of the Gateway
20 Company, a gentleman by the name of Bob Harold, who was
21 looking for, to open an office in basically what would be
22 considered a warm-weather area.
23      They wanted to try to increase their work
24 outside of the St. Louis area, the Midwest area, and go
25 into an area where they might have more opportunity to

Page 24

1  have some winter work. And, basically, I was retained by
2  them to assist them in trying to obtain work in that
3  Southwest geographical area.
4   Q. And you performed this service while continuing
5  to also operate CLT?
6   A. Yes. It was somewhat of an adjunct, kind of a
7  contract management function of CLT, although for, and I
8  don't recall the exact reasons, I went on their payroll.
9  So I became an employee of the Gateway Company.
10  Q. Did you on behalf of the Gateway Company
11 prepare any estimates for any bids on any painting work?
12  A. Yes.
13  Q. What is the nature of your experience in
14 preparing estimates for bids on public works contracts
15 for painting work?
16  A. I've been doing that since 1973.
17  Q. Would you describe the manner in which you
18 typically undertake an estimate on a public works project
19 that involves coatings of some sort?
20  A. The standard process would be to gather the
21 documents and drawings, review the specifications and
22 contract documents, review the drawings.
23      If it was new work, such that the only
24 information available was the drawings, then, of course,
25 the estimate and takeoff would be done from the drawings

Page 25

1  only.
2      You would do a detailed analysis of all the
3  substrates included, what coating system was to be
4  applied to those systems and an exact sequence of the
5  process that would be necessary in order to accomplish
6  the coating system.
7      You would then reconcile that with location,
8  materials costs, equipment needed and an entire checklist
9  of cost factors that would be included in the estimate.
10     If it were an existing project or maintenance
11 painting, as it is sometimes referred to, then you would
12 go to the site, do a field takeoff to make sure that it
13 corresponds to whatever the drawings were, note the
14 condition of the coating, note the surrounding
15 conditions, the environment.
16     Normally, you would look to see what types of
17 equipment supply was available, material supply was
18 available and document essentially the condition of the
19 coating. Gather as much information as you possibly
20 could, if you had an opportunity to look at the actual
21 work site.
22  Q. On what project or projects have you ever done
23 a field takeoff where you actually just for purposes of
24 bids went to the site and measured the amount of work?
25  A. I can't possibly list all of those. I've been

Page 26

1  doing that for too long to possibly go through all them.
2      The bridges that I discussed. Many of the
3  phases of the wastewater treatment plants where it is
4  rework, 91st Avenue treatment plant in Phoenix. The
5  bridges, of course, most of that is rework. There were
6  very few new bridges that I recall.
7      Q. And prior to bid you actually went to the
8  bridge and physically measured the painting work that was
9  required?
10     A. It would depend on whether that is necessary or
11 not. Certainly, if you had columns or beams, you would
12 look to check and see what the size was of those so you
13 could calculate the area and confirm that it matches up,
14 if you even had documents.
15     On some of those jobs, you may not have
16 documents. So in those instances, then all of that would
17 have to be measured, counted and essentially do a
18 takeoff.
19     Q. Did you ever obtain any projects for the
20 Gateway Company?
21     A. Yes.
22     Q. Would you describe what those projects were?
23     A. Worked at the local Albuquerque wastewater
24 treatment plant. I believe we did some work at the
25 Clovis, New Mexico, wastewater treatment plant.

Page 27

1      We did, I believe, two 5-million gallon water
2  storage tanks for the city of Albuquerque. We did the
3  remodel for the Albuquerque Airport, remodel and
4  expansion. That's all I'm recalling right now.
5      Q. What was the cause of your leaving your
6  position at Gateway Company in 1992?
7      A. Gateway was not -- we were not as successful as
8  we had hoped in terms of establishing warm-weather work.
9  While we did work, it was not of the sufficient volume
10 for Gateway.
11     I also was spending an increasing amount of
12 time on my senate duties and was also going to law school
13 and just felt that it would be better for both if we
14 separated at that point.
15     Gateway did not have a New Mexico office
16 anymore, but they continued to bid work in that area.
17     Q. Do they still at this time?
18     A. To the best of my knowledge, they still bid
19 work in that area. I have not seen them actually be
20 successful on any of it for a while.
21     Q. On how many occasions have you been retained as
22 an expert witness in a litigation where the issues
23 involved industrial coatings of some sort?
24     A. Pat, I don't understand your question, and the
25 reason is because when you say "litigation," very few of

Page 28

1  these go to litigation in my experience.
2      So I have been retained on industrial-
3  coatings-related issues. I think we ran over 200 -- we
4  opened over 200 files in the last four years. Very few
5  of those have gone to litigation.
6      Q. And that's the ones I'm asking you about at
7  this point. On what occasions did you act as a
8  consultant, how many occasions where there was active
9  litigation going on?
10     MR. MARSTON: By "active litigation," you mean
11 a complaint having been filed?
12     MR. DUFFY: Yes.
13     A. I don't know that I can answer that question
14 accurately, because I don't always know when a complaint
15 has been filed.
16     I am retained to come in and do an evaluation,
17 do a failure analysis, whatever the work it is that I may
18 be doing, and I may never ever know that a complaint has
19 been filed. There may be one, there may not be one. So
20 I just -- I don't know that for sure.
21     Q. You know there is one in this case, right?
22     A. I do.
23     Q. So on how many occasions have you been engaged
24 as an expert where you understood that there was ongoing
25 litigation and you would potentially testify as an expert

Page 29

1  either at deposition or trial?
2      A. I can tell you with certainty three. And then
3  I will guess another ten where I know with certainty
4  there was a complaint, but I would have to go back and
5  look at all the files to refresh my memory on exactly
6  which ones had a complaint filed and that I knew about.
7      Q. Can you identify the three that come
8  particularly to your mind?
9      A. Well, the two that are listed on my, in my
10 disclosures for my expert report, along with this one.
11     Q. Has CLT ever consulted before this engagement
12 concerning issues of the application of coatings on metal
13 structures in a marine environment before this case?
14     A. Yes.
15     Q. Can you identify those occasions?
16     A. I don't know that I can recall all of them. I
17 can identify the ones I remember.
18     There were two cases in Alaska with bridges
19 over ocean water. I don't know what to call them at that
20 point. River outlets. But the tide would come up and
21 down at those areas with similar problems to what
22 happened here.
23     One in Juneau. I don't remember where the
24 other bridge was. A wharf in Homer. That's all I can
25 recall off the top of my head. I would have to go back

Page 30

1  and look at my files.
2      Q.  What was the wharf in Homer made of?
3      A.  Steel, steel piles.
4      Q.  What was CLT engaged to do in each of these
5  projects that you just referred to?
6      A.  Perform a failure analysis and deliver a
7  report.
8      Q.  What was the nature of the failure in each of
9  these three situations?
10     A.  The paint was delaminating or being impacted
11 off.
12     Q.  And what kind of paint was used on these three
13 projects?
14     A.  I believe one had a combination of different
15 coatings, coal tar epoxy and some mastics. The other
16 one, I'm not recalling the generic resin right now. I'm
17 not recalling exactly which product it was. I would have
18 to go back and look.
19     Q.  At the Juneau bridge, did you make any
20 determination as to the cause of the failure?
21     A.  The issue there was not so much the cause of
22 the failure as to whether it would be the contractor
23 should have discovered that prior to painting the bridge.
24 So the cause of the failure was basically the age of the
25 coating.

Page 31

1      Q.  I'm not understanding. What is it that the
2  contractor should or should not have discovered?
3      A.  On tops of the -- on the tops of the flanges of
4  the I-beams underneath the bridge there was some severe
5  degradation and actually significant loss of metal up
6  there, and when the contractor went up to do this
7  preparation work, there were extra costs involved in
8  trying to deal with the condition that he found there.
9         So the issue was should the contractor have
10 discovered that on a reasonable site inspection.
11     Q.  And what was your opinion in that regard?
12     A.  That to the extent the contractor walked all
13 the way around the bridge, rented a boat and went
14 underneath the bridge and that it was not visible from
15 that point, it would not be reasonable to expect a
16 contractor during a pre-job walk during a bid estimate to
17 actually scaffold the bridge and go up on top and look
18 into areas that were not readily visible from accessible
19 adjoining areas.
20     Q.  Then you mentioned a second bridge. I'm not
21 sure you indicated to me where it was, but somewhere in
22 Alaska. You said you couldn't remember where.
23        What was the issue or failure problem on that
24 bridge?
25     A.  The specifications called for the, what we call

Page 32

1  a spot-blast, touch up those areas and then for a
2  complete re-coat, topcoat.
3         When the contractor went to spot-blast the
4  areas of corrosion, the coating continued to fall off.
5  Basically, he was chasing it all the way across the beam,
6  the I-beams and the piles such that he was blasting an
7  area much larger than that indicated in the plans. The
8  plans indicated to spot-blast corrosion.
9         When he started blasting that, it was
10 determined that the paint was not well-adhered in many
11 other areas. He ended up blasting most of the bridge.
12 So the issue was how much of that should he have
13 anticipated.
14     Q.  What opinions did you form on that subject?
15     A.  Based on the contractor's observations of the
16 rust and corrosion that would reasonably be expected with
17 the type of system in place, that he would blast back
18 some distance to find coating reasonably adhered to coat
19 over and the fact that that kept chasing off was not
20 readily visible based on a reasonable site inspection.
21     Q.  Then you mentioned a wharf in Homer. Excuse my
22 geography, but is Homer in Alaska?
23     A.  Yes.
24     Q.  What was the nature of the failure issue or
25 other issue on that wharf?

Page 33

1      A.  That is an ongoing file. That file has not
2  closed. And there would be another one that I do know
3  has gone to complaint, but that I did not include in my
4  previous list.
5         The issue there is the sufficiency of the
6  surface preparation and the adhesion of the coating
7  applied by the contractor.
8      Q.  Have you formed any opinion on that issues?
9      A.  I have to the extent based on the information
10 currently available.
11     Q.  Who engaged you on the wharf in Homer?
12     A.  The reason I hesitate, and I'm not sure how to
13 answer that, I was contacted and engaged by Mr. Pete
14 Ralston from the Oles Morrison law firm.
15        My client on that is ACC Hurlen, the general
16 contractor. I can't -- I would have to go back and look
17 at the file to make sure whether I'm actually retained by
18 the law firm or whether I'm retained by ACC.
19     Q.  Is ACC the actual applicator that ran into the
20 surface preparation issues?
21     A.  No.
22     Q.  Who is the applicator?
23     A.  You have a situation similar to what you have
24 here where you have --
25        MR. MARSTON: I think he was looking for the

Page 34

1  identity of the company.
2      A.  The problem is you have -- I can't tell you the
3  contract privity all the way down. There is Athery-Halt
4  (phonetic) Industries that is involved.
5          If they are prime to ACC and then they have
6  subbed the work out to a Calvert Industries -- I know
7  those are the names of the parties, but I couldn't tell
8  you what the chain of contract is through there.
9      Q.  Where is this case pending? You said you
10 thought a complaint was filed. In what locale?
11     A.  I don't know for sure. I don't know if it was
12 filed here in Seattle or if it's been filed in Alaska. I
13 have not seen the pleadings.
14     Q.  Who is the owner of the wharf?
15     A.  City of Homer. Village of Homer. Whatever
16 entity Homer is.
17     Q.  Do you know whether or not the city is a party
18 to the action?
19     A.  I believe they are.
20     Q.  So is this generally a situation in which the
21 applicator made a claim for extra work against whoever he
22 contracted with and it has been passed up through the
23 chain and Hurlen is seeking indemnity to the extent the
24 claim has validity from the owner of the wharf?
25         MR. MARSTON: Objection; lack of foundation.

Page 35

1      A.  Some of what you said is accurate. Some of the
2  other is not. I am not familiar with the pleadings, so I
3  don't know.
4          My understanding is that there is a complaint
5  regarding paint that is not performing as expected and
6  that Hurlen is in the middle of that, but exactly which
7  direction it's going, I couldn't tell you. I've simply
8  been asked to evaluate it for Hurlen.
9      Q.  So my description might actually be backwards.
10 It's the owner seeking a remedy against --
11     A.  You may be right. I haven't looked at the
12 pleadings.
13     Q.  Your resume or curriculum vitae identifies you
14 as a NACE training and certification program instructor.
15         In what areas have you been a course
16 instructor, what areas of the country?
17     A.  All areas of the country.
18     Q.  On a project such as the one at issue in this
19 matter, would the quality control person for the
20 representing the prime contractor either need to be
21 certified or work under the direction of someone who is
22 certified?
23         MR. MARSTON: Objection; ambiguous. Are you
24 talking about QA, QC?
25         MR. DUFFY: QA.

Page 36

1      A.  The question as you have phrased it is not
2  answerable.
3      Q.  Let me restate it. You were present yesterday
4  at the deposition that we took?
5      A.  Yes.
6      Q.  Mr. Hardenbergh testified at one point, I
7  believe, that on the Phase 1 portion of the project he
8  was not NACE-certified and that he acted as QA without
9  any supervision.
10         In your opinion, was that appropriate?
11     A.  Yes.
12         MR. MARSTON: Objection; misstates the
13 witness's testimony.
14     Q.  And why do you believe that was appropriate?
15     A.  That is a common practice all over the country.
16 There are NACE -- there are inspectors around the country
17 who have no NACE training who can ultimately be very
18 qualified for the work they are performing.
19         There are also people who have completed NACE
20 Level 1, Session 1, who are excellent inspectors and do
21 an excellent job.
22         There are three levels to the NACE
23 certification, along with peer review, and it's my
24 understanding that there are very qualified people who
25 are available who have only completed Session 1.

Page 37

1          There, frankly, are some people who are
2  certified who may not be as good as some of those who
3  aren't.
4      Q.  Is there such a thing as failing these NACE
5  courses?
6      A.  Yes.
7      Q.  So there are tests involved?
8      A.  Yes. In fact, there's both written tests and
9  practical exams. You have to actually demonstrate your
10 proficiency with the equipment.
11     Q.  On the particular curriculum vitae you supplied
12 me this morning, which has been marked as Exhibit 3,
13 there is a pen line through "New Mexico General Building
14 and Painting (GB-98)."
15         Did you do that?
16     A.  Yes.
17     Q.  Why?
18     A.  Because it came to my attention yesterday that
19 our office had not received -- we recently moved,
20 recently, it's been about two years ago, and forgot to
21 update our address with the State of New Mexico and we
22 did not receive our renewal. So I did not pay to renew
23 that license and it has expired.
24         So one of the things I have to do when I get
25 back to New Mexico is decide whether to reinstate that

Page 54

1  Q. What did he say to you?
2  A. Of course, over the course of the two days he
3  said many things.
4       To the best of my recollection, he indicated
5  that he had met Mr. Puett previously. He believed that
6  Mr. Puett based on Mr. Puett's description of his talents
7  and abilities was qualified to do the work, and that
8  after his experience on the site with trying to get this
9  done, it was his opinion that he was not qualified, nor
10 was IIC qualified to undertake a project of this
11 magnitude.
12 Q. Can you recall anything else that he said?
13 A. Basically described the details of the failures
14 as their inability to comply with the schedule, the
15 difficulties they had putting their containment together,
16 the difficulties they had achieving acceptable services,
17 surfaces, their difficulties relating to properly
18 applying the coating. He described all the difficulties
19 that Imperial was having applying the paint to the
20 structure.
21 Q. When you heard of those difficulties, were any
22 of them familiar to your own experience?
23     MR. MARSTON: Objection; ambiguous.
24     Are you asking him whether these are problems
25 that exist in the industry or whether he had those

Page 55

1  problems himself?
2      MR. DUFFY: The question, I think, was clear,
3  whether he has ever experienced those personally.
4  Q. Have you ever had a situation in which you were
5  involved in some application of coating in which the
6  problems that were described by Mr. Olson were problems
7  that you or your forces encountered?
8  A. Yes.
9  Q. Can you indicate what the problems were that
10 you had experienced before and on what projects?
11     MR. MARSTON: Of the group he just listed?
12     MR. DUFFY: Of whatever Mr. Olson told him the
13 problems were.
14 A. The question is difficult. For example, in a
15 remote location such as Kodiak, difficulties in getting
16 supplies, difficulties in getting equipment, abrasives,
17 those types of things, every contractor, depending on if
18 they have done work in remote locations, can encounter
19 those types of problems.
20     Welds. It's well-known in the industrial
21 painting area when you have a surface that is to be
22 holiday-free that welds need to be addressed in that you
23 most frequently will have holidays on welds.
24     So many of the problems that or some of the
25 problems that they encountered are frequently encountered

Page 56

1  and mostly it's a matter of degree.
2      To the extent you have an experienced qualified
3  contractor, then problems with rigging over the ocean
4  with high tides will be better anticipated and planned
5  for.
6      So to the extent that you have the tides and
7  the swing in tides that you have at a location like this,
8  I think those are common problems, but it goes back to an
9  experience factor and a knowledge factor of how to
10 anticipate, plan for and avoid those becoming fatal
11 problems.
12 Q. What knowledge do you have concerning the
13 experience of IIC in that regard?
14     MR. DICKSON: In which regard?
15 Q. With regard to experience in the problems you
16 have just described.
17 A. It is my understanding that they had not had
18 done a job similar to the one at Kodiak where they dealt
19 with the tides and issues in a similar type project, and
20 that's based on my review of the documents.
21 Q. On this tour that you took on the first day, I
22 believe you said Mr. Hardenbergh was with you.
23     Did Mr. Hardenbergh express to you any opinions
24 concerning the quality of IIC's performance on the
25 project?

Page 57

1  A. Yes.
2  Q. What did he say in that regard?
3  A. That it was inadequate or less than
4  satisfactory.
5  Q. Did he provide you any details in that regard?
6  A. Yes.
7  Q. What did he say?
8  A. That essentially it was evident that IIC was
9  not successful in basically rigging and containing the
10 project such that their operations were expedited, that
11 this translated into defects in the coating, defects in
12 the surface preparation and very low productivity.
13 Q. Did he provide you any details or descriptions
14 as to why the problems they had with rigging and
15 containment had those effects?
16 A. Based on the way they had originally planned to
17 do it, I believe they had planned on some cofferdams to
18 originally do the work, and installing those cofferdams
19 apparently took more time than was indicated in the
20 schedule and ultimately proved to be unsuccessful in
21 isolating the work the way it was originally anticipated.
22     They essentially had to modify procedures then
23 and go to a deck-type operation, and with the changing of
24 the tides, that there were difficulties presented with
25 the way they had ultimately done that as well, and all of

15 (Pages 54 to 57)

Page 118

1  environment defects will show evidence of the defect by
2  visible corrosion in a short period of time?
3      MR. DICKSON: Vague as to "short."
4  A.  It can.
5  Q.  How long do you think it would take before
6  someone could opine that the coating was properly
7  applied?
8  A.  It depends on in which context you are talking
9  about. Clearly, the warranty is a year.
10     I think arguably that if you come back and note
11 defects at the end of the year, by contract you have
12 defined those as defects and the coating was not properly
13 applied. So anything less than a year would be out of --
14 would certainly be premature.
15     After that point in time, you are on the
16 slippery slope, two years, three years. My experience
17 indicates that if there are significant problems with the
18 application that they will typically manifest themselves
19 within the first few years.
20     The problem with this particular system and
21 that conclusion is that you can have corrosion that
22 begins under a film that is this thick and continue to
23 progress, sometimes not -- and sometimes not be visible.
24     So I hesitate to say at three years you could
25 deem the structure would serve for 22 more.

Page 119

1  Q.  Did you become aware that on this project the
2  process by Mr. Hardenbergh was basically that if there
3  was any condition that he observed that he thought was
4  noncompliance that he insisted that that area be repaired
5  in fairly short order?
6  A.  I don't know what "in fairly short order" is.
7  It's my understanding that Mr. Hardenbergh was pursuing
8  his duties diligently and if he saw things that were
9  noncompliant, then he certainly raised those issues, and
10 I feel he did a very reasonable job of documenting what
11 happened on the project.
12 Q.  Would you agree that it would be a more
13 appropriate schedule, assuming that the contractor is
14 observed to be in substantial compliance with the
15 specifications, to allow the contractor to paint out the
16 work and then come back and repair defects at the end as
17 they appear?
18     MR. DICKSON: Foundation.
19     MR. MARSTON: Objection; relevance.
20     MR. DICKSON: And ambiguous as to "more
21 appropriate."
22 A.  No, and that's especially important on a
23 project like this, because the contractor had already had
24 extreme difficulty rigging the project, getting back into
25 and getting to these areas to even access them for

Page 120

1  coating in the first place.
2      It would make no sense to dismantle all of that
3  rigging and containment, move on and especially have to
4  come back in more inclement weather, potentially more
5  inclement weather and have to try to make repairs and
6  have to rebuild all of that containment, rebuild the
7  rigging and reinstall all your ambient controls.
8  Q.  Would it be a good procedure as to each of
9  those setups with the containment that if the contractor
10 is in substantial compliance, that as to that containment
11 area he should first complete the painting and then go
12 back and at that point repair any defects noted?
13     THE WITNESS: Could you reread the question,
14 please.
15     (Record read.)
16 A.  I'm not sure I understand the question. Are
17 you talking about finishing the complete area inside a
18 containment?
19 Q.  Yes.
20 A.  That's difficult to answer without actually
21 being there at the time, because I'm not sure what the
22 consequences of moving past a given defect would be in
23 terms of potential time or ramifications.
24     Secondly, I'm not sure about the meaning of the
25 term "substantial compliance." That is subjective to the

Page 121

1  extent that what may be substantial compliance by a
2  contractor could be considered a gross deviation by a
3  qualified coating inspector.
4  Q.  Did you ever discuss with Mr. Hardenbergh what
5  his philosophy was in terms of when in relation to the
6  coating work he was generally requiring repairs to be
7  made?
8  A.  I did not ask Mr. Hardenbergh that specific
9  question. It was my understanding that the way it
10 happened on this project was that Mr. Hardenbergh would
11 be notified that the work was complete or at least
12 completed to a particular hold point and then he would be
13 asked to review the work that had been completed for
14 compliance, but ultimately it was Imperial's job to make
15 sure it was compliant before they called Mr. Hardenbergh.
16 Q.  Would you agree that it is disruptive to the
17 painting work that in a particular day when the painting
18 is going on to stop that operation to move to a repair
19 location?
20 A.  I could not answer that question out of
21 context. There may be occasions where that would be
22 disruptive. There may be occasions where that would be
23 completely legitimate, especially with the tidal concerns
24 on this project.
25 Q.  Is it your opinion that at the conclusion of

Page 142

```
 1           A F F I D A V I T
 2
 3
 4    STATE OF NEW MEXICO  )
 5                         ) ss
 6    COUNTY OF BERNALILLO )
 7
 8        I have read my within deposition, and the
 9    same is true and accurate, save and except for changes
10    and/or corrections, if any, as indicated by me on the
11    "CORRECTIONS" flyleaf page hereof.
12
13
14
15           L. SKIP VERNON
16
17
18
19        SUBSCRIBED AND SWORN TO before me this
20        day of      , 2005.
21
22
23           NOTARY PUBLIC in and for the
24           State of Mexico,
25           residing at            .
```

Page 143

```
 1           C E R T I F I C A T E
 2
 3    STATE OF WASHINGTON  )
                           ) ss
 4    COUNTY OF KING       )
 5
 6        I, JOLENE C. HANECA, a Certified Shorthand Reporter
 7    and Notary Public in and for the State of Washington, do
 8    hereby certify that the foregoing transcript of the
 9    deposition of L. SKIP VERNON, having been duly sworn, on
10    FEBRUARY 11, 2005, is true and accurate to the best of my
11    knowledge, skill and ability.
12        IN WITNESS WHEREOF, I have hereunto set my hand and
13    seal this 24TH day of FEBRUARY, 2005.
14
15
16
             JOLENE C. HANECA, RPR, CCR
17
18    My commission expires:
      March 28, 2006
19
20
21
22
23
24
25
```

37 (Pages 142 to 143)

Buell Realtime Reporting, LLC
(206) 287-9066

4d457464-67cb-41b1-82bc-593b57bbdff8

C E R T I F I C A T E

STATE OF WASHINGTON    )
                       ) ss
COUNTY OF KING         )

I, JOLENE C. HANECA, a Certified Shorthand Reporter and Notary Public in and for the State of Washington, do hereby certify that the foregoing transcript of the deposition of L. SKIP VERNON, having been duly sworn, on FEBRUARY 11, 2005, is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 24TH day of FEBRUARY, 2005.

*Notary Public*
*State of Washington*
*JOLENE C. HANECA*
*My Appointment Expires Mar 28, 2006*

_____
JOLENE C. HANECA, RPR, CCR

My commission expires:
March 28, 2006



Telephone: 206.287.9066