IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL SERVICES, )
INC., an Alaskan Corporation,   )
                                )
        Plaintiff,              )
                                )
   vs.                          ) Case No. A03-0199CV
                                ) Civil (RRB)
FORREST J. McKINLEY and         )
"JANE DOE" McKINLEY, and the    )
marital community property      )
composed thereof d/b/a "Imperial)
Industrial Coatings" and EMERCO,)
INC., etc.,                     )
                                )
        Defendants.             )
_____)
EMERCO, INC., a California      )
Corporation d/b/a Imperial      )
Industrial Coatings, etc.,      )
                                )
        Counter-Claimant/       )
        Third Party Claimant,   )
                                )
   vs.                          )
                                )
ABSOLUTE ENVIRONMENTAL SERVICES,)
INC., an Alaskan Corporation,   )
et al.,                         )
                                )
        Cross-Defendants/       )
        Third-Party Defendants. )

DEPOSITION UPON ORAL EXAMINATION

OF

DAVID E. OLSON (VOLUME II)

Taken at 16880 NE 79th Street
Redmond, Washington

DATE TAKEN:      MARCH 8, 2005
REPORTED BY:     JOLENE C. HANECA, RPR, CCR #2741



Telephone: 206.287.9066

Exhibit 27

Page 244

1  Q. Do you recall receiving a copy of this e-mail?
2  A. Yes, I saw this.
3  Q. Is it true that at sometime before June 18,
4  2004, you had discussed or someone on your behalf had
5  discussed with Mr. Hardenbergh hiring KTA to become a QA
6  inspector on this project?
7  A. No.
8  Q. Can you explain why Mr. Hardenbergh is telling
9  Todd Elmore the type of equipment that KTA should have on
10 the project?
11 A. Yes. The circumstances of this was the fact
12 that Absolute, I, I wanted to complete the work, warranty
13 work on the cargo pier so that we could bring this job to
14 a close.
15 Mr. Hardenbergh was not available to perform
16 inspections for the work. So I believe we requested that
17 in an effort to get the project done if we could bring
18 KTA up to perform the inspections and at some subsequent
19 date in the future Mr. Hardenbergh would come out and
20 inspect the pier after we had completed those warranty
21 items and punch list items that needed to be completed.
22 Q. Does the punch list and warranty items refer to
23 Imperial's work or somebody else's?
24 A. I would -- how do you want -- I can't ask you a
25 question, but I would say how would we characterize it.

Page 245

1  I supplemented Imperial's work, but it was
2  Imperial's work to perform. And given the fact that they
3  left the project or abandoned the project, I had to
4  complete their work. So I would say it's Imperial's work
5  that we performed on their behalf.
6  Q. Imperial had not left the project by June 18,
7  2004, had it?
8  A. Yes. They left in August of 2003, almost a
9  year prior to that date.
10 Q. Did KTA perform this punch list and warranty
11 work?
12 A. They came -- yes, KTA was up on the project, I
13 believe, for about a week. And I don't believe during
14 the period that he was out there that we had appropriate
15 environmental conditions every day, but I would have to
16 refer to the record to see what portion of the work that
17 we had accomplished at that time.
18     (Exhibit No. 50 marked.)
19 Q. I will mark as Exhibit 50 a letter of June 18,
20 2003.
21 A. Yes.
22 Q. Did you send this letter?
23 A. Yes, I did.
24 Q. Did you prepare it?
25 A. Yes, I did.

Page 246

1  Q. What were the deficiencies that you were
2  referring to at bents 13 to 15 and in area "A"?
3  A. Deficiencies would be the apparent corrosion
4  and coating coming off the cargo pier, as they had not
5  completed the work in area "A" as scheduled.
6  Q. Did you send any written communication to
7  Imperial that specified what the deficiencies were and
8  where they were other than this letter?
9  A. I believe those deficiencies were self-evident,
10 as Imperial continued to work on correcting those
11 deficiencies. I can't list them at this time.
12     (Exhibit No. 51 marked.)
13 Q. I will mark as Exhibit 51 a letter of June 20,
14 2003.
15 A. Okay.
16 Q. Did you receive Exhibit 51 in response to your
17 letter, Exhibit 50?
18 A. Yes, I believe I did.
19 Q. Is it true that you sent Exhibit 50 without
20 knowledge of the actual condition of the work?
21 MR. ELISON: Object to the form.
22 A. No, I wouldn't say that.
23 Q. Did you respond in any way to this letter of
24 June 20, 2003, Exhibit 50?
25 A. I would have to -- I'm sorry, 50 or 51?

Page 247

1  Q. Excuse me, 51.
2  A. 51, I would have to look at my correspondence
3  file to see how I responded to this, if I did.
4  Q. Between June 18th and the end of June, did you
5  ever personally visit the wharf site to inspect the area
6  to determine whether or not Imperial's statement
7  concerning the correction of deficiencies was correct?
8  A. I don't recall if I was out there at that time.
9  Q. Did you ask anyone else on your behalf to
10 inspect the work area to see if Imperial's statement as
11 to the corrections of the deficiencies was correct?
12 A. No, I don't recall asking anybody to inspect on
13 my behalf.
14     (Exhibit No. 52 marked.)
15 Q. I will ask be marked as Exhibit 52 a letter of
16 June 23, 2003.
17 A. Okay.
18 Q. Did you send this letter of June 23, 2003?
19 A. Yes, I did.
20 We need to adjust that blind.
21 MR. DICKSON: I will get it.
22 THE WITNESS: Thank you.
23 A. I'm sorry. Yes, I did.
24 Q. This letter refers to a follow-up of a
25 telephone conversation on the date of the letter.

Page 256

1  Q. So you believe that Imperial should be
2  following the submittal; is that correct?
3  A. I think they should be following their
4  contractual obligations.
5  Q. Does that mean they should have followed the
6  submittal?
7  A. The submittal is part of the contract.
8  Q. Did you go to the submittal and see if it said
9  that only Mr. Puett and no one else would fill out these
10 reports?
11 A. No, but I believe that this correspondence was
12 followed up by two different letters from Mr. McKinley,
13 one of which provided some sort of inspector certificate
14 for Mr. Puett and then another one was an inspector
15 certificate for Mr. Belville.
16 Q. So when you got that, did you realize that your
17 complaint under the first bullet point was incorrect?
18 MR. DICKSON: Foundation.
19 MR. ELISON: Same objection.
20 A. Was, pardon?
21 Q. Was incorrect.
22 A. No. I would state that if Mr. McKinley sent me
23 the letter and certificate after June 26th, I would
24 venture to say the first one was correct on June 26th.
25 I don't think that getting a letter from Mr.

Page 257

1  McKinley after the fact would constitute an error on my
2  part at this juncture in the --
3  Q. So the failure was to have given you a copy of
4  Mr. Belville's certificate earlier?
5  MR. ELISON: Object to the characterization.
6  A. I'm sorry?
7  Q. Imperial's failure in this regard was that it
8  failed to give you a copy of Mr. Belville's certificate
9  until after this letter?
10 MR. ELISON: Same objection.
11 A. I would just say that Imperial failed to
12 fulfill their quality control obligations under the
13 specification.
14    (Exhibit No. 54 marked.)
15 Q. I will mark as Exhibit 54 another letter of
16 June 26, 2003.
17 A. Yes.
18 Q. Did you prepare this letter?
19 A. Yes, I did.
20 Q. Did anyone assist you in preparing it?
21 A. I consulted with my attorney.
22 Q. Other than that, did anyone help you in
23 preparing this letter?
24 A. No, I don't believe so.
25 Q. From what source did you obtain the information

Page 258

1  for this letter?
2  A. From daily reports from Imperial, daily reports
3  from the QA.
4  Q. Did you also receive information for this
5  letter from Mr. Holmstrom and Mr. Hardenbergh?
6  A. I don't recall. I may have. I don't know. I
7  can't remember.
8  Q. Can you recall why you wrote two letters
9  generally on the -- strike that.
10 Do you recall why you wrote two letters on
11 June 26th rather than one?
12 MR. ELISON: Object to the form.
13 A. At this time, I was writing letters almost
14 daily, because I was receiving letters almost daily.
15 So why I wrote this? I wrote this because I
16 had been assured by Mr. Puett and Imperial that they
17 would be able to catch up to schedule, as noted in
18 numerous pieces of correspondence in the file on this
19 project.
20 It had been addressed at nearly every, every
21 weekly progress meeting since the middle of May, and we
22 saw no -- I saw no efforts on the part of Imperial to
23 fulfill its obligations to maintain the schedule on this
24 project.
25 Q. So by June 26, 2003, you had decided that you

Page 259

1  were going to have to terminate Imperial; isn't that
2  right?
3  MR. ELISON: Object to the recharacterization.
4  A. I don't know where you would come up with that.
5  Q. By June 26, 2003, were you considering the
6  possibility of terminating Imperial?
7  A. No.
8  Q. If you were not considering the possibility of
9  terminating Imperial, why did you provide a three-day
10 notice that said that if you don't perform, we are going
11 to terminate you?
12 A. I didn't say that I was going to terminate
13 them. I was merely exercising a portion of the contract
14 between myself and Imperial in order to prompt them to
15 fulfill their contractual obligations and complete the
16 work in a timely manner.
17 Q. As of June 26, 2003, it was not in your mind at
18 all that you might be terminating Imperial from this
19 project?
20 MR. ELISON: Objection; asked and answered.
21 A. No. It wouldn't benefit me to terminate
22 Imperial.
23 Q. However, it would please Brechan, wouldn't it?
24 MR. DICKSON: Ambiguous.
25 MR. ELISON: Object to the form.

25 (Pages 256 to 259)

### Page 304

1  Q. Do you see the first sentence says -- excuse
2  me, the second sentence, "Henceforth from the date of the
3  original letter SPC will no longer SELL or provide
4  Technical Support to Imperial Industrial Coatings for any
5  application or project involving our products," unquote?
6  That means that Imperial could still apply the product
7  and make repairs, doesn't it?
8  MR. DICKSON: Foundation.
9  MR. ELISON: Objection to the testimony of
10 counsel, foundation.
11 A. As of August 11th?
12 Q. Yes.
13 A. Well, I'm not certain, given that they had
14 terminated their contract with me prior to this
15 correspondence.
16 Q. Did you ever ask Specialty Polymer Coatings,
17 Inc., what the effect of the decertification was on
18 Imperial's ability to apply the paint that it had or make
19 repairs on the project?
20 A. No.
21 Q. Did you ever ask anyone at Specialty Polymer
22 Coatings, Inc., what the words, large typed words
23 "WITHOUT PREJUDICE" meant?
24 A. No.
25    (Exhibit No. 75 marked.)

### Page 305

1  Q. I will mark as Exhibit 75 a letter of August 7,
2  2003.
3  A few minutes ago you referred to a termination
4  letter. Is that the letter you had in mind?
5  A. Yes, I believe this is it.
6     (Exhibit No. 76 marked.)
7  Q. I will mark as Exhibit 76 another letter of
8  August 7, 2003.
9  A. Yes, I have seen this.
10 Q. Is it correct that after August 7th -- excuse
11 me, is it correct that on or about August 7, 2003,
12 Absolute took possession of all of the material,
13 equipment and tools that were on the wharf site that were
14 Imperial's?
15 MR. ELISON: Objection; foundation.
16 A. I'm sorry?
17 Q. Is it true that on or about August 7, 2003,
18 Absolute took possession of the equipment, materials and
19 tools that were on the site that were being used by
20 Imperial?
21 MR. ELISON: Same objection.
22 A. You say that we took possession. Well, I
23 don't, I don't know that I would answer it that way. We
24 had just been sued, or served. I had been served by a
25 process server, I believe, and Imperial had just

### Page 306

1  terminated their contract with us.
2  So took possession? I don't know. As
3  security, I don't know, for their abandonment. I don't
4  know how to answer that.
5  Q. You made sure that Imperial was locked out of
6  the Coast Guard base so they could not retrieve any of
7  their equipment, materials or tools, correct?
8  MR. ELISON: Object to the form.
9  A. I wrote a letter to keep them from coming onto
10 the project until such time that they had resolved cure
11 notice No. 3.
12 Q. Is it true that after or about August 7, 2003,
13 that you took physical possession of Imperial equipment,
14 materials and tools?
15 MR. ELISON: Objection; asked and answered.
16 A. I think I have already answered that.
17 Q. I don't believe so.
18 A. To the extent that I don't know. I mean how do
19 we define "possession." It was there at the project
20 site. I was still waiting for them to respond to my cure
21 notice.
22 Q. What response, if any, did you make to this
23 letter of August 7th?
24 A. I believe that counsel responded to this
25 letter.

### Page 307

1  Q. Did you at any time through counsel or
2  otherwise in response to this letter write back and say
3  you may have access for the limited purpose of retrieving
4  any of your equipment, materials or tools?
5  A. I think a request was made for people to come
6  and pick up their personal items. And, obviously,
7  through this letter you demanded the -- could you repeat
8  the question, please?
9     (Record read.)
10 A. At the time that this was written?
11 Q. Yes.
12 A. I don't believe so. I'm not certain.
13 Q. Did you ever do that?
14 A. I believe in our offer to your client, we said
15 we'd give these materials back to you if we were
16 compensated for the supplementation that we had to
17 provide to your client in order to finish this project.
18 Q. What offer are you referring to?
19 A. I believe we tendered an offer to settle this
20 case at some point in time in the not too distant past.
21 MR. DUFFY: I will move to strike the response
22 as improper.
23 Q. Did you -- and I would ask you in response to
24 this question not to refer to settlement negotiations.
25 After August 7, 2003, did you ever write a

Page 312

1  A. No, not specifically.
2  Q. Did you ever gain any knowledge as to who did
3  this testing?
4  A. Yeah, I came to find out it was Mr. Puett and,
5  I believe, Mr. Schilling.
6  Q. And did you ever observe what is considered to
7  be the destructive testing area?
8  A. Did I see it actually occur or the results of
9  it?
10 Q. The results of it.
11 A. Yes, I saw evidence of testing.
12 Q. What did you observe?
13 A. Oh, areas where somebody had taken a hacksaw
14 blade and cut into the coatings. Others where dollies
15 had been, adhesion test dollies had been placed on the
16 coating surface and tests run. And that's all I can
17 recall at this time.
18 Q. In the second paragraph, it says, quote, "I
19 understand you disagree with our position that a NACE
20 certified QC person shall be on site while repairs are
21 made," unquote.
22 Is it correct that you disagreed with that
23 position?
24 A. For warranty and repair work, Absolute had
25 expended so much money completing the work and correcting

Page 313

1  deficient work, that in an effort to control the outflow
2  of money, I read the specification, at the very end of
3  the specification, and I didn't necessarily see a
4  requirement for an inspector to be there to see the
5  repairs.
6  Q. So you believe that beginning on August, on or
7  about August 20th it was no longer necessary to have an
8  inspector on the project?
9  MR. ELISON: Object to the recharacterization.
10 A. No, I didn't say that.
11 Q. You didn't think it was necessary for an
12 inspector to observe, to be present while repairs were
13 made or warranty work was made? Is that it?
14 MR. ELISON: Same objection.
15 A. No. I would have to review the specifications
16 to give you an exact paragraph that I would be referring
17 to.
18 Q. The next paragraph of the e-mail says, quote,
19 "Our concern is that to lessen the requirement to have a
20 full-time QC person on site while making repairs at this
21 date may expose us to hostile parties who could claim we
22 lessened the QC requirements at the end of the job,"
23 unquote.
24 Did you discuss with Mr. Holmstrom what he
25 meant by that paragraph?

Page 314

1  A. No, I can't speak to what he felt his concerns
2  were.
3  Q. Did you have any understanding at the time of
4  who he was referring to as the hostile parties?
5  A. I would have to figure that that was Imperial,
6  given the fact we were involved in litigation with them.
7  Q. After this -- strike that.
8  At any time has Absolute been assessed any
9  liquidated damages with respect to this wharf project?
10 A. Liquidated damages?
11 Q. Yes.
12 A. As I understand liquidated damages, no.
13 MR. DUFFY: That's all the questions I have for
14 this afternoon. I will reserve my right to redepose the
15 deponent, should it become necessary when the additional
16 ordered production of documents are produced.
17 MR. ELISON: And we will reserve the right to
18 oppose the motion as necessary.
19 MR. DUFFY: Okay.
20 MR. DICKSON: I have no questions.
21
22    (Deposition concluded at 4:35 p.m.)
23       (By agreement between counsel and
24       the witness, signature was reserved.)
25 -oOo-

Page 315

1  AFFIDAVIT
2
3
4  STATE OF WASHINGTON  )
5                       ) ss
6  COUNTY OF KING       )
7
8     I have read my within deposition, and the
9  same is true and accurate, save and except for changes
10 and/or corrections, if any, as indicated by me on the
11 "CORRECTIONS" flyleaf page hereof.
12
13
14
15       DAVID E. OLSON (VOLUME II)
16
17
18
19       SUBSCRIBED AND SWORN TO before me this
20 day of      , 2005.
21
22
23       NOTARY PUBLIC in and for the
24       State of Washington,
25       residing at

```
                                                  Page 316
 1  CERTIFICATE
 2
 3  STATE OF WASHINGTON  )
                         ) ss
 4  COUNTY OF KING       )
 5
 6      I, JOLENE C. HANECA, a Certified Shorthand Reporter
 7  and Notary Public in and for the State of Washington, do
 8  hereby certify that the foregoing transcript of the
 9  deposition of DAVID E. OLSON, having been duly sworn, on
10  MARCH 8, 2005, is true and accurate to the best of my
11  knowledge, skill and ability.
12      IN WITNESS WHEREOF, I have hereunto set my hand and
13  seal this 21ST day of MARCH, 2005.
14
15
16
            JOLENE C. HANECA, RPR, CCR
17
18  My commission expires:
    March 28, 2006
19
20
21
22
23
24
25
```



**BUELL**
REALTIME REPORTING, LLC
Leaders in Realtime Technology

## DEPOSITION TRANSCRIPT NOTICE

TO: Patrick J. Duffy, III                         DATE: May 19, 2005

CASE NAME:   Absolute v. Emerco

WITNESS: David E. Olson, Vol. II           DATE TAKEN: March 8, 2005

XXX     The above original deposition is hereby released to you for filing with the Clerk of the Court.

_____     Enclosed are two forms: "Affidavit" and a Correction Sheet. Please review the deposition, record any corrections over the signature on the Correction Sheet, and sign the Affidavit. You have thirty days to do so.

_____     Return both forms to this office with the original transcript. Transcript will be released on_____

_____     The transcript of the above deposition is ready for you to read and sign at 1411 Fourth Avenue, Suite 803, Seattle, Washington. You must by read and sign the deposition or state in writing your reason for refusal to sign, or state in writing the fact that you waive your right to sign. Failing to do so, signature will be deemed for all purposes waived and your deposition will be filed with the Clerk of the Court.

XXX     No Correction/Affidavit pages have been submitted within the thirty day reserve period.

<u>Jolene Haneca, RPR, CCR</u>

CC:   Jami K. Elison
      Robert J. Dickson

RECEIVED BY MAIL
MAY 24 2005
ATKINSON CONWAY & GAGNON, INC.

1411 Fourth Avenue, Suite 803  Seattle, Washington 98101  Telephone 206.287.9066  Facsimile 206.287.9832
e-mail lisabuell@aol.com   www.buellrealtime.com

316

# C E R T I F I C A T E

STATE OF WASHINGTON  )
                     ) ss
COUNTY OF KING       )

I, JOLENE C. HANECA, a Certified Shorthand Reporter and Notary Public in and for the State of Washington, do hereby certify that the foregoing transcript of the deposition of DAVID E. OLSON, having been duly sworn, on MARCH 8, 2005, is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 21ST day of MARCH, 2005.

JOLENE C. HANECA, RPR, CCR

My commission expires:
March 28, 2006



Telephone: 206.287.9066