```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3
 4   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., An Alaska
 5   corporation,
 6              Plaintiff,
 7       vs.
 8   FORREST J. McKINLEY and "JANE
     DOE" McKINLEY, et al.,
 9
                Defendants.
10   _____
11   Case No A03-0199 Civil (RRB)
12
13
14
15
                   DEPOSITION OF MICHAEL ANDERSEN
16
                         Taken May 1, 2006
17                    Commencing at 9:00 a.m.
18           Volume I - Pages 1 - 161, inclusive
19
20
                       Taken by the Defendant
21                              at
                            LANE POWELL
22              301 W. Northern Lights Boulevard
                        Anchorage, AK  99503
23
24
25   Reported by: Susan J. Warnick, RPR        Exhibit 28
```

COPY

Page 18

1  A   Correct.
2  Q   Just a quick reminder, you probably heard it before,
3  for the court reporter's benefit, it's a good idea if I
4  finish my question before you answer; likewise, I'll try
5  not to ask you questions when you're not in the middle of
6  the answer. I was tracking you completely, as we all were
7  here, and I know you were anticipating moving things along
8  quickly, which I appreciate. The court reporter will get
9  a ruler out and put it across our knuckles, if we don't
10 comply.
11 A   Noted.
12     MR. MARSTON: I'm glad you add that other part.
13 It did in fact cut out portions talking about the prebid.
14     MR. STOETZER: Okay. We will try to mind the
15 admonish bilaterally.
16     However, when you do speak, you'll have to speak
17 up a little bit because we couldn't quite hear all you
18 said. We heard you, but it could have been clearer, and I
19 think if you just got closer to the speaker box, you'll be
20 okay.
21     MR. MARSTON: I appreciate the guidance.
22 BY MR. STOETZER:
23 Q   I'd like to discuss in a little greater detail what
24 Swalling Construction did in connection with the bid it
25 provided to Brechan for this blasting and coating project.

Page 19

1      Did you personally visit the site prior to a bid
2  submittal?
3  A   No, I did not.
4  Q   So it was others, and you mentioned that Joe was
5  there?
6  A   Bill.
7  Q   I'm sorry. Bill. Do you know from memory any other
8  people who might have participated with an on-site
9  inspection?
10 A   No.
11 Q   Did you have access to the photos that are in front
12 of you when you prepared your bid?
13 A   Yes, I did.
14 Q   Could you briefly describe what other material you
15 would have had available?
16 A   Other than talking with Bill at length on methods of
17 doing staging, no other materials, other than the specs,
18 plans and specs.
19 Q   What happened next?
20 A   We put the bid together and submitted it to Brechan.
21 Q   If you would be so kind to flip through the photos
22 and tell us what kind of things you see in these photos
23 that would have an impact on the bid process?
24     MR. MARSTON: Objection, vague. Are you asking
25 him to identify those things that occurred to him at the

Page 20

1  time or based on the current knowledge he has of the
2  project?
3      MR. STOETZER: I think that I asked the former.
4  BY MR. STOETZER:
5  Q   As a matter of clarity, the question relates to what
6  items appear in these photographs that would have
7  significance to you at the time you were bidding the
8  project.
9  A   There is a lot of pack rust, which would indicate
10 hard blasting. Paint seems to be peeling off fairly well,
11 so that would indicate that most of the paint is not stuck
12 very good, so the paint would come off fairly easy, but
13 with the pack rust, that takes a longer time to blast off.
14     MR. PUETT: Do you have another set of those
15 photos, by chance?
16     MR. STOETZER: No.
17     THE WITNESS: Lots of angles, lot of attachments
18 to the pipe piling -- er -- to the H piles. And
19 scaffolding scenario, there is lot of places to hang
20 scaffolding and containment.
21 BY MR. STOETZER:
22 Q   Can you describe in a general fashion the scope of
23 the work?
24 A   Generally, we were to build scaffolding containment,
25 power wash the structure, removing all the barnacles off

Page 21

1  the steel, test the steel for soluble salts, chlorides,
2  sandblast the structure to a near white metal, check for
3  weld slag, skipped areas in the welding, repair necessary
4  defects in the steel, and then coat the steel with a
5  polyurea, an SPC product, and holiday test and touch up.
6  Q   At some point, was Swalling awarded the contract?
7  A   Yes.
8  Q   And what was the extent of the work to be performed
9  in connection with the entire structure?
10 A   As I recall, originally we had bid the whole
11 structure, the whole dock, and I'm not really familiar
12 with all the in's and out's of the contract, but for one
13 reason or another, what I have heard is that the Coast
14 Guard didn't have enough money to award Brechan the whole
15 contract that year, so it was broken up into two phases.
16 So we were awarded the first phase of the work.
17 Q   What was the first phase of the work?
18 A   It was starting on the pipe piling on the one end and
19 dock extension, I think, through H piles 1 through 15, if
20 I recall correctly.
21 Q   When you refer to the extension, was that the newer
22 part of the wharf?
23 A   The newer part, yes.
24 Q   That was at a little angle from the existing wharf;
25 was it not?

Page 22

1  A  It just kind of went off -- it was an extension off
2  the T of the original dock system.
3  Q  What was the difference in construction between the
4  extension and the existing?
5  A  The extension was pipe piling and the existing was H
6  piles.
7  Q  As project manager for this first phase of the work
8  that included the two areas you have just described, what
9  what were your duties?
10 A  I was on site for the first phase probably 50 percent
11 of the time. My duties were to help out, record, report.
12 We also had a NACE certificated coating inspector, third
13 party, on site doing all the testing, recording daily
14 reports, recording environmentals.
15    On that particular job, I did a little bit of
16 everything. I prepped, I ran the plural component pump
17 when the spraying was being completed.
18 Q  Man for all seasons?
19 A  Yes.
20 Q  You mentioned that there was a reporting function.
21 I'm going to hand you a stack of documents that bear the
22 Bates number SCC000830 through 000964. The top sheet, and
23 that is 000830, bears a copy of a file folder with the
24 number 2107 and the words, "Coast Guard Dock Piling Daily
25 Reports."

Page 23

1     Can you describe generally what you have in
2  front of you? And before doing so, I'm going to mark this
3  as Exhibit No. 1 to this deposition.
4     (Exhibit 1 marked.)
5     THE WITNESS: These are daily reports generated
6  by our company, basically an in-house daily report that is
7  given, usually faxed, back to our company and given to the
8  construction manager of the general contractor, and I
9  think in this case these were given to Coffman. I'm
10 assuming they were given to Coffman, Jerry Hardenbergh on
11 site, for just a day-to-day rundown of what happened
12 during the day.
13 BY MR. STOETZER:
14 Q  What Swalling personnel would prepare the daily
15 reports that are reflected in Exhibit No. 1?
16 A  Usually a foreman or myself filled them out,
17 depending on who was on site. I do not see any coatings
18 reports in here. That is a whole other set of reports
19 that were done by our NACE coating inspector, so I'm
20 assuming they are in a different pile.
21 Q  By the way, who was the NACE inspector that you're
22 referring to?
23 A  It was Arthur DeLong, and he was employed by QA
24 Services.
25 Q  Was QA actually a sub to Swalling --

Page 24

1  A  Correct.
2  Q  -- to perform the inspection function?
3  A  Correct.
4  Q  Were Art DeLong's daily reports made available to
5  you?
6  A  Yes.
7  Q  And of the reports that are in Exhibit 1, were these
8  reports made available to you?
9  A  Yes.
10 Q  During the course of the job?
11 A  Yes.
12 Q  Typically on a daily basis, would you see them?
13 A  Not -- not necessarily on a daily basis. On a weekly
14 basis.
15 Q  And, then, of course the ones that you actually
16 prepared you would see them when you prepared them?
17 A  Correct.
18 Q  Could you give us an example or two so I can
19 determine the handwriting on these reports. At random, if
20 you could pick a report you prepared.
21 A  The first four or five are mine.
22 Q  Starting from the top down?
23 A  The top down, yes. From May 22 to May 26 are mine.
24 Q  So that signature where it says "project
25 superintendent"?

Page 25

1  A  Yeah.
2  Q  Is that your hieroglyphic?
3  A  Correct.
4  Q  It's a very interesting looking signature. I like
5  it.
6     The ones that you're referring to run -- let's
7  just say horizontally.
8  A  Right.
9  Q  If I flip through a little deeper, I come to an
10 example a report dated April 23, '02, and it runs
11 vertically. Is there a reason that this form looks
12 different from first 20 or so that we looked at?
13 A  There was done by a pilebuck, pile driving foreman,
14 that was doing the scaffolding, and that's how he was
15 doing was scaffolding.
16 Q  And what was the pile driver's name?
17 A  I believe it was Bill Nesheim. I'm not sure. They
18 had a couple of different ones there, but I believe that
19 is his writing.
20 Q  So, for example, the document that I referred to with
21 the April 23rd date, which SCC000850, you think may have
22 been filled out by Bill Nesheim?
23 A  Correct.
24 Q  If we dig down a little deeper, for example, to
25 SCC000873, there is a different form that is actually

Case No. A03-0199 Civil (RRB)                                    Michael Andersen

Page 50

1  Coast Guard from Jerry Hardenbergh, and the subject is
2  surface preparation prior to coating application.
3      Do you recognize this document?
4  A  No.
5  Q  At page two through page three, there are some
6  options listed?
7  A  Uh-huh.
8  Q  If you could just glance at those --
9  A  Okay.
10 Q  -- and tell me if those are consistent with the
11 options that you were referring to a few moments ago?
12 A  Yes, consistent.
13 Q  I know you're familiar -- well, strike that.
14     You are familiar; are you not, with the coatings
15 specification for the Swalling project 2107?
16 A  I was at one time. I have not reviewed it, yeah.
17 Q  And I take it there was a discussion which is partly
18 reflected in the Exhibit No. 3 about modifying that
19 specification or the job requirements due to conditions
20 that were encountered on the job?
21 A  Correct.
22 Q  And did those modifications get memorialized in any
23 way that you're familiar with?
24 A  Yes. There was actually a mod written by Brechan
25 Enterprises to Swalling.

Page 51

1  Q  And would that be what people have identified to as
2  Mod 5?
3  A  No. I don't believe so.
4  Q  Was this modification memorialized in a letter or
5  change order?
6  A  I think it was just -- well, I don't know. I
7  remember seeing it, but I can't remember whether it was a
8  change order or just they called it a mod.
9  Q  But to your recollection, there was some change in
10 the requirements for the coating procedures that you were
11 otherwise employing?
12 A  Correct.
13 Q  And did that change take effect beginning in the fall
14 on bents 1 through 5 or the following spring when you
15 recommenced work?
16 A  The following spring. And I believe it was Mod 1 to
17 us, to Swalling. I might be mistaken, but I believe it
18 was Mod 1.
19     MR. STOETZER: I'm going to mark now or have
20 marked Exhibit No. 4.
21     (Exhibit 4 marked.)
22 BY MR. STOETZER:
23 Q  And ask you if you have ever seen that document?
24 A  This one -- the one I'm holding?
25 Q  Right. Which otherwise is a one-page document that's

Page 52

1  not self-defining. In the upper right-hand corner, there
2  is some references, including to Mod 005, and there are
3  paragraphs A through F, and I'm just asking you if you
4  recognize the document
5  A  I don't ever recall seeing this document, no.
6  Q  But you did mention a moment ago that -- although, by
7  the way, I've handed you a document that in part says
8  Modification No. 5 -- we will come back to that -- you're
9  familiar with something called Modification No. 1?
10 A  Correct.
11 Q  So I'm going to hand you the next exhibit in order,
12 which is I believe is 5, which is Brechan document 13354,
13 and has an effective date of March 13, 2002.
14     (Exhibit 5 marked.)
15 BY MR. STOETZER:
16 Q  Does that document look familiar?
17     MR. OLSON: That's a I, not a one. FYI.
18     MR. STOETZER: Brechan Inc. document 13354.
19     MR. OLSON: No. 3354.
20     MR. STOETZER: Let me get my bifocals on.
21     MR. OLSON: BEI3354.
22     MR. STOETZER: 3354, says the old guy with
23 bifocals.
24     THE WITNESS: Yes, this is the modification that
25 we received from Brechan.

Page 53

1  BY MR. STOETZER:
2  Q  From memory or using this document, what were the
3  substantial components of this modification?
4  A  Well, this is -- we gave them back a credit for not
5  completing -- we had decided sometime during that winter
6  to not do the second portion or the second phase of work,
7  and we gave back -- I can't remember how many bents. I
8  think it was three or four bents of work of the H piles of
9  1 through 15. I think we went through 12. So we gave
10 back three bents of work, and we gave them a credit for
11 reducing the square footage from 12,800 feet to 8100
12 square feet. And then we got compensated for some extra
13 work that we had done the previous year, and then there
14 was a $50,000 increase to our contract to do preparation
15 work on the upcoming year work of $50,000.
16 Q  Can you describe Modification 5?
17 A  Modification 5 is Option 2, doing extra caulking,
18 extra prep work for the remainder of the piles that
19 Swalling Construction was to complete in '02.
20     MR. KREGER: Did you mean Modification 5 or
21 this modification?
22     MR. STOETZER: No, my questions may have been
23 confusing. It just happens to be item number five, but
24 it's referred to as a modification. So for clarity in the
25 record, I'm referring your attention to item number five

14 (Pages 50 to 53)

Page 54
1  of Modification No. 1.
2  MR. KREGER: Thank you.
3  THE WITNESS: Again, it was for the extra
4  caulking, extra prep work for the bad welds, missing
5  welds, missing skip welds, prep work for the work that we
6  were to complete the following year in 2002.
7  BY MR. STOETZER:
8  Q   May I see that for a second?
9  In further response to my question, maybe you
10 could actually just read item number five?
11 A   "Modify the preparation specs per Option 2 of the
12 specification preparation technical proposal dated
13 February 26, 2002 prepared by Coffman Engineers. This
14 spec will be applies to work remaining to completed.
15 Scheduling as required by the Anita Repainch letter to M.
16 Martin, dated 25 February 2002."
17 Q   So is it your understanding that this Option 2 is a
18 reference to Option 2 that you referred to earlier?
19 MR. MARSTON: Objection, vague. The document
20 speaks for itself. Lack of foundation.
21 THE WITNESS: It refers to, yeah, I consider it
22 referring back to our original Option 2. I think there is
23 a letter that Dan wrote out there that actually references
24 our option -- in his Option 2 response to the Coast Guard
25 or to Brechan. I think his Option 2 refers to our Option

Page 55
1  2.
2  BY MR. STOETZER:
3  Q   So, I take it, you raise an issue, there was a
4  discussion that involved Brechan, Swalling, Coffman and
5  the Coast Guard, and there was a resolution that resulted
6  in this modification?
7  A   The Coast Guard was never involved in any meetings
8  that we had, that I had or that Swalling Construction had
9  with Brechan and Coffman. The only meetings we had was
10 with Coffman and Brechan.
11 Q   You raise some issues, there were discussions, and
12 there was a resolution?
13 A   Correct.
14 Q   Have you ever seen the modified specification that
15 was utilized in Phase 2 of the project? I recognize it
16 was done by another contractor, but did you personally
17 ever see the November 26, 2002 specification?
18 A   No.
19 Q   Would you agree that with regard to Swalling's work,
20 the resolution that is otherwise identified as Option 2
21 was a relaxation of the requirements of the specification
22 to accommodate the concerns Swalling had raised and the
23 conditions that it was confronted with?
24 A   Yes, I would.
25 Q   Did it make your job easier?

Page 56
1  A   Yes. Still difficult, but easier.
2  Q   I take it from your prior testimony --
3  MR. MARSTON: Easier, you're talking about
4  easier, easier than what it would have required with the
5  site condition problems as opposed to what had been
6  anticipated on bid day?
7  MR. KREGER: Whose turn is it?
8  MR. STOETZER: Why don't you hold that thought.
9  You can ask him that question, because I couldn't actually
10 hear most of what you just said. So it might be better,
11 if you have a question, to raise it later.
12 MR. MARSTON: Okay. Just looking for
13 clarification of his answer. Useful to all of us. Go
14 ahead.
15 MR. STOETZER: I think we all understood it
16 here.
17 BY MR. STOETZER:
18 Q   I understand from your testimony and reports that you
19 were on site during the period of time that these issues
20 were encountered, and your daily reports reflect you were
21 on site in the fall of 2001. Do you recall if you were on
22 site when the project recommenced the following spring?
23 A   Not for the first two or three weeks, I was not, no.
24 I was -- I arrived -- I was actually on Shemya Island and
25 arrived, I think, two weeks after it had started. I was

Page 57
1  not there during any of the scaffold erection or right
2  when we started commencing the grinding, blasting and
3  painting.
4  Q   What was the condition -- what was the status of the
5  job when you did arrive?
6  A   As I recall, I think we were up through about bent 8
7  when I arrived.
8  Q   Had the blasting work been done through -- well, what
9  was the extent of the blasting, if you recall?
10 A   I think we were -- if I remember correctly, I think
11 we were painted through bent 8 when I arrived.
12 Q   Why don't we take a look at Exhibit No. 1, the daily
13 reports. And pick them up -- again, they are not all in
14 strict chronological order, but you have them as produced.
15 There aren't very much in this packet involving April
16 reports, and, perhaps, you could scan those quickly to
17 determine whether you came onboard in the spring of 2002.
18 MR. KREGER: At a convenient place, can we take
19 a courtesy break?
20 MR. STOETZER: Absolutely not. We're slugging
21 right through it.
22 Why don't we take a break right now.
23 (Off record.)
24 BY MR. STOETZER:
25 Q   During a break, we asked you to kind of look at the

Page 62

1  A  Not really. I just remember talking, telling him,
2  talking to him about them. We had asked the question, you
3  know, who did it. In fact, I don't know if it was
4  officially asked, but Jerry and I both had talked to Matt
5  Holmstrom about how come these were so bad, and he didn't
6  know. It was done -- I think he said it was done long
7  before he ever showed up there. So we didn't have any --
8  no clue of how come they were in such bad shape compared
9  to the pipe piling.
10 Q  I understand, though, that the coating was
11 accomplished, that there was some relaxation or
12 modification of the efforts that would be employed, and
13 that when you returned in the fall, you did final repair
14 and touch-up at bents 1 through 5?
15     MR. MARSTON: Objection, vague and compound.
16     THE WITNESS: We went through and completed
17 touch-up, to the best of my knowledge, 1 through 5. And
18 they were -- those touch-ups were holiday tested again,
19 and then we went through and tested and completed 6
20 through 12 at the relaxed specification.
21 BY MR. STOETZER:
22 Q  Do you recall how much faster things went or how much
23 faster you anticipated they would go with the relaxed
24 specification?
25     MR. MARSTON: Objection, vague. Faster

Page 63

1  than what?
2      THE WITNESS: No, not really. I know it went a
3  little faster, for one reason, because we knew what we
4  were going to be doing. We had everything on site for
5  bents 6 through 12.
6  BY MR. STOETZER:
7  Q  Would it go faster in part because you were permitted
8  to caulk rather than seal weld in certain areas?
9  A  Yes.
10     MR. MARSTON: Same objection.
11 BY MR. STOETZER:
12 Q  By the way, what is a seal weld?
13 A  A seal weld is a weld that is a continuous weld
14 around a given area instead of a skip weld. It seals the
15 whole plate to whatever structure you're welding to a
16 hundred percent.
17 Q  Do I understand correctly that the modification
18 permitted the use of caulk rather than seal welding?
19 A  Correct.
20 Q  And do I understand that seal welding, which is
21 literal welding, is less expensive than caulking?
22 A  No. Caulking is less expensive than seal welding.
23 Q  Correct.
24 A  Correct.
25 Q  That was not a trick question; it was just a

Page 64

1  misstatement by me.
2      So it was cheaper for you to perform caulking
3  than seal welding?
4  A  It was cheaper for the Coast Guard to give us a
5  modification for caulking than it was for seal welding,
6  yes.
7  Q  Did you have welders as part of your work force?
8  A  Yes.
9  Q  Let me hand you what the court reporter will mark as
10 No. 6.
11     (Exhibit 6 marked.)
12 BY MR. STOETZER:
13 Q  For the record, these are meeting minutes dated
14 February 8, 2002, that reflects participants were Coffman
15 Engineers and Swalling Construction, and it appears that
16 the witness, Mike Andersen, was present.
17     Can I direct your attention to the second page,
18 and there is reference to the second proposal. Could you
19 read that paragraph to yourself.
20 A  Okay.
21 Q  Do you understand that the second proposal is a
22 reference to the second option that we have previously
23 discussed?
24 A  Correct.
25 Q  And did you, at this meeting and as reflected in

Page 65

1  these minutes, make an statement of how much faster
2  caulking or strip painting would be than welding?
3  A  Yes.
4  Q  What did you estimate?
5  A  It looks like I said it would go four times faster.
6  Q  So, I take it, you completed your work in the spring
7  of 2002, utilizing the relaxed specification, and then you
8  concluded your work approximately when?
9  A  I think it was the first week in June.
10 Q  And was that pretty much consistent with the schedule
11 that you had anticipated for the conclusion of your
12 effort?
13 A  Actually, I think the schedule, we were going to
14 finish before Memorial Day, if I recall correctly, but we
15 had a problem with coatings arriving on site. Lost in
16 shipment. So I think we finished a week or so late.
17 Q  I have some schedule information that I may not
18 inquire of in any detail, but I would like to get the some
19 documents authenticated on the schedule subject, if I take
20 a minute to put them in chronological order.
21     Let's get this marked.
22     (Exhibit 7 marked.)
23 BY MR. STOETZER:
24 Q  Let me hand you what's been identified as Exhibit No.
25 7. For the record, this is a June 22, 2001 letter

Page 66

1  addressed to Matt Holmstrom at Brechan, and it is signed
2  by Mike Andersen, and it appears to be a preliminary
3  schedule for the Kodiak Coast Guard dock facility coating
4  project.
5      Mr. Andersen, do you recognize this document?
6  A  Yes, I do.
7  Q  And what was the purpose of this document?
8  A  Matt had inquired about a schedule and wanted to --
9  wanted me to give him a preliminary schedule, what I
10 thought it was going to take to complete the project.
11 Q  How long did you think the project would take
12 initially?
13 A  Well, for planning purposes, we figured we'd start,
14 it looks like, the 9th and 10th of July and completing it
15 by the first of October.
16 Q  Did this preliminary schedule get revised and
17 modified as time went on?
18 A  Yes.
19 Q  Did you keep track of your schedules in some graphic
20 form?
21 A  No.
22 Q  Do you know if others did?
23 A  No.
24 Q  Let me just show you a graphic schedule and ask you
25 if Swalling prepared that kind of graphic depiction of its

Page 67

1  scheduled work through the course of the project?
2  A  No, we did not.
3  Q  That will save you some time.
4      Were you able to maintain the schedule through
5  the summer of 2001 that you had originally anticipated?
6  A  No.
7  Q  What were the kinds of things that slowed you down?
8  A  Well, originally, equipment deliveries were late, and
9  then we were going to attempt to use a vacuum blasting
10 system that we had never used before and were basically
11 sold a bill of goods, and used it for a couple of weeks,
12 then decided it wasn't going to work, so we restarted
13 doing conventional blasting on it. So that held us up.
14 And we were probably a month late finishing the pipe
15 piling, and then we were held up for about a week or 10
16 days because of 9/11.
17 Q  Yeah. I'm going to hand you a letter that Swalling
18 wrote to Brechan. It's just, coincidentally, dated
19 September 11, 2001, and if you could scan that document
20 that we're making at Exhibit No. 8 and see if relates to
21 this discussion we're having right now.
22     (Exhibit 8 marked.)
23     THE WITNESS: Okay.
24 BY MR. STOETZER:
25 Q  This letter is actually signed by Andy Romine. Is

Page 68

1  that how you pronounce that?
2  A  Yes.
3  Q  He is the operations manager at Swalling.
4      Are you familiar with this correspondence?
5  A  Yes.
6  Q  Did you assist Andy in putting it together?
7  A  Yes, I believe I was on site during the time.
8      MR. MARSTON: Jim, can you identify the date of
9  the letter?
10     MR. STOETZER: September 11, 2001. There are
11 multiple copies in the record. This one happens to be
12 Coffman 000021.
13 BY MR. STOETZER:
14 Q  Fair summary of the job status --
15 A  Yes.
16 Q  -- on September 11, 2001?
17     And I understand that at the time of this
18 letter, you had not yet begun work on the existing
19 original wharf?
20 A  Correct.
21 Q  And when you started work on the original wharf
22 structure beginning with bent 1, you anticipated -- excuse
23 me -- you encountered problems of a different sort,
24 correct?
25 A  Correct.

Page 69

1  Q  We need to come back now to when you returned in the
2  spring to complete the work. Do you recall through what
3  bent Swalling performed coating services?
4  A  Through 2002, it was bent 12, I believe.
5  Q  And you previously testified that you had been there
6  for setup of scaffolding, then you left for two to three
7  weeks, then you came back?
8  A  Correct.
9  Q  Can you tell from your daily reports or from memory
10 can you tell us what work -- what was the status of the
11 work when you returned -- this would be trip number two in
12 2002 -- to the project?
13 A  We were -- I believe that we were blasting on bent 8
14 when I returned. I'm not -- we did -- we had scaffolding
15 around the cell, which is eight piles, so we were either
16 on 7 or 8 or 8 or 9. I can't determine, however we did
17 them. Contained them at eight piles at a time.
18 Q  Had any coating commenced by the time you returned?
19 A  Yes.
20 Q  Was any welding required in bents 6 through 12?
21 A  Only structural. If a weld was broke that was
22 structural, we had to reweld it, but if it wasn't
23 considered a structural weld, no, we weren't doing any
24 welding.
25 Q  And was that a rare occurrence or common occurrence?

Page 70

1  A  Rare --
2     MR. MARSTON: Objection --
3  BY MR. STOETZER:
4  Q  Was your agreement with Brechan that Swalling forces
5  would actually do such wedding, as opposed to Brechan or
6  someone else?
7  A  The second year, if I recall, Brechan was going to
8  supply us a welder, but failed to do so. So we ended up
9  doing the welding in-house.
10 Q  And how many welds do you believe you had to
11 accomplish?
12 A  Very few. I would say probably, at the very most, 10
13 lineal feet.
14 Q  Would you consider that consequential,
15 inconsequential; can you give me an area of magnitude?
16 A  Well, every foot is consequential, but in the scheme
17 of things, it was a minute amount.
18 Q  From personal observation, do you recall any
19 different between the quality of the welding -- strike
20 that.
21    From your personal observations, do you recall
22 that the welding in bents 6 through 12 was better than
23 what you had previously observed and described on bents 1
24 through 5?
25    MR. MARSTON: Just a moment. Sue, could read

Page 71

1  that question back again, please?
2     (Requested record read.)
3     MR. MARSTON: Thank you. Objection, assumes
4  facts not in evidence, that the welds were better.
5     THE WITNESS: The welds, as I stated before,
6  some of them were better, but the majority of them were
7  still bad. Just like I stated before, it appeared that
8  they had people on the job that knew how to weld, but
9  other people that weren't so proficient at it. So there
10 might be a pile or two piles in a bent that were better,
11 still having problems, but better welds, but the majority
12 of them were still in bad shape. In fact, it was kind of
13 an ongoing joke on the site that, oh, they put their good
14 welder on this pile. Or a blaster would come up, oh,
15 yeah, I got the good welder this time. Because it was
16 random. It wasn't the same row of piles, but on every
17 bent there was some good welds and there was a lot of bad
18 welds.
19 BY MR. STOETZER:
20 Q  But with the relaxed specification, I understand that
21 your work proceeded more quickly in bents, say, 6 through
22 12 than 1 through 5 because, for example, you didn't have
23 to seal weld defective welds that described seal welding,
24 you could caulk them?
25 A  Correct.

Page 72

1  Q  So the relaxed specification enabled you to work more
2  efficiently and faster --
3     MR. MARSTON: Objection, to vague with respect
4  to the reference.
5     THE WITNESS: Correct.
6  BY MR. STOETZER:
7  Q  -- than what you had experienced on bents 1 through
8  5?
9  A  Correct.
10 Q  Did Swalling make a decision not to bid on Phase 2 of
11 the project?
12 A  Yes.
13 Q  Did you ever have occasion to speak with the Phase 2
14 contractor prior to the Phase 2 contractor commencing
15 work?
16 A  Yes, prior to, just briefly, we were all at the -- my
17 crew and myself were at a hazardous -- well, they call it
18 it a HAZWOPER refresher class. Their crew was at the
19 Alaska state paint handling course, and during a break,
20 one time I talked to -- I don't know who it was. It was
21 one of their foreman. I don't know. I can't remember his
22 name. Or lead man. And I said, if you guys want to get
23 together, I'd be happy to talk to you, and my foreman, Tim
24 Boils, and another one of our guys were with me, and he
25 just said, I don't think we need to hear anything you guys

Page 73

1  have to say.
2  Q  So do I understand correctly that you had a
3  discussion with personnel from Absolute Environmental, the
4  successor coating contractor?
5  A  No, it was with Imperial Coatings.
6  Q  And Imperial Coatings was a subcontractor for
7  Absolute, correct?
8  A  I'm assuming.
9  Q  And you had come to learn that they were going to be
10 doing the Phase 2 work?
11 A  Yes. We had -- there was two guys that were from
12 Anchorage that were going to go to work for Imperial that
13 were friends of some of the guys I had working for me.
14 They informed us they were doing the work.
15 Q  So you offered to sit down with the Imperial
16 personnel to share your experiences regarding the wharf
17 coating project?
18 A  Correct.
19    MR. MARSTON: Objection, misstates the witness's
20 testimony as leading.
21    THE WITNESS: I offered information to one of
22 their hands, who I believed to be a foreman or lead man.
23 BY MR. STOETZER:
24 Q  And what were you offering to do?
25 A  Sit down and discuss the problems that we had with

Page 74

1 the previous Phase 1 work.
2 Q  And why would you make that offer?
3 A  It was something that they probably would have wanted
4 to know.
5 Q  And why did you think that the successor contractor
6 would want to know about your experiences on the same
7 site?
8 A  Because what we found when we bid the plans and
9 specs, a lot of the problems that we were having were
10 unforeseen or differing site conditions, and just thought
11 that they would probably be interested in knowing the
12 problems and potential problems that they might have.
13 Q  And what was the response to your offer of assistance
14 to Imperial?
15 A  He said -- I'm not quoting exactly, but something
16 like you -- we don't need to know anything you have to
17 say.
18 Q  Did you find that surprising?
19 A  Yeah, it was kind of arrogant, I thought.
20 Q  Do you recall the name of the individual that you
21 spoke with?
22 A  No, I don't.
23 Q  Do you know if Mr. Puett was at that same
24 conferences?
25 A  I remember seeing him there, yes.

Page 75

1 Q  Did Mr. Puett introduce himself to you and make
2 inquiry about how you might be able to share information
3 regarding your experience?
4 A  No.
5 Q  Back to a schedule document, just to get them in the
6 record. I'm going to next hand you a letter to Matt
7 Holmstrom at Brechan, again signed by Andy Romine, dated
8 September 12, 2001.
9     (Exhibit 9 marked.)
10 BY MR. STOETZER:
11 Q  Okay. Do you recall why this letter was written just
12 the day after Exhibit 8 was written?
13 A  No, I do not.
14 Q  Do you recall if you were involved in the drafting of
15 this letter?
16 A  No, I do not.
17 Q  Quick question regarding the bad welds that you
18 encountered between bents 6 and 12. You did indicate that
19 you only had to repair welds if they were structural,
20 correct?
21 A  Correct. If they were broken. Completely broken.
22 Q  And then you indicated that it was in the
23 neighborhood of 10 feet of actual welding?
24 A  Correct.
25 Q  Do you recall the lineal feet of welding that was

Page 76

1 required in bents 1 through 5?
2 A  I want -- I think it was, like, 40 feet per bent. 40
3 lineal feet per bent.
4 Q  So 40 times five would be 200 feet?
5 A  200 feet.
6 Q  200 feet of bad welds requiring welding repair in
7 bents 1 through 5, as compared to 10 feet in bents 6
8 through 12?
9 A  Correct.
10 Q  That would suggest to me that, at least from a
11 repair, preparation and coating perspective, that things
12 got better in bents 6 through 12 than you had experienced
13 in 1 through 5. Is that not a fair assumption?
14     MR. MARSTON: Objection --
15     THE WITNESS: Yes, it takes longer to weld than
16 it is to caulk. One of the main problems with the welding
17 is they had splice plates. When they drove the piles,
18 they spliced had them, the H piles, and there was weld
19 plates inside of the flanges of the H piles that were
20 really difficult to weld. You couldn't get -- it took
21 just a tremendous amount of time to do that welding, just
22 because it was not unaccessible, but virtually
23 unaccessible.
24     THE REPORTER: Excuse me. Mr. Marston, you had
25 an objection?

Page 77

1     MR. MARSTON: Yes, I did. Object to the form of
2 the question.
3     THE REPORTER: Thank you. I didn't hear it.
4 BY MR. STOETZER:
5 Q  You earlier mentioned that you had a new in-house
6 inspector for quality control?
7 A  Correct.
8 Q  Did you utilize the same protocol in the spring of
9 2002 with regard to testing where you would work
10 collaboratively with the inspector and the quality
11 assurance representative, Jerry Hardenbergh?
12 A  Yes.
13 Q  So for bents 6 through 12, you would do the standard
14 testing that had otherwise been employed?
15 A  The testing in the weld areas where all the angles
16 met, and I believe it was between elevation 113 and 115, I
17 might be incorrect on that, but right where everything
18 came together, it got relaxed to visual inspection on
19 holidays. If you saw a holiday, if you saw a pinhole, we
20 would repair it, in those areas where it wasn't high
21 voltage holiday detected. Everything else was all high
22 voltage holiday detected, but right where all the welds
23 were or all the welds would have been, where we caulked
24 everything, it was visual inspection.
25 Q  In just those areas?

Page 82

1  you know, usually a pinhole of two inches. I mean, there
2  would be, even if it looked like a good weld, it would
3  still pinhole.
4      So the amount of welding that we actually had to
5  redo versus the stuff that we had to just respray or patch
6  after we painted it was different.
7      Does that make sense?
8  Q  Well, the upshot is that the relaxed specification
9  made your job easier?
10 A  Correct.
11     MR. MARSTON: Objection, asked and answered,
12 argumentative.
13     MR. STOETZER: Anything else, Mr. Marston?
14     MR. MARSTON: I'll let you know if there is.
15 I'm just doing my job. I don't know why you're implying
16 that there is anything improper about it.
17     MR. STOETZER: Well, we're just trying to get
18 through the deposition, and I think sometime needless
19 objections slow things down.
20     MR. MARSTON: Well, I tell you what, my client
21 is not prepared to rely on your judgment as to when an
22 objection is needless or not, nor am I. So comments like
23 yours, in fact, slow the process down, not mine.
24     MR. STOETZER: Let's mark this.
25     (Exhibit 11 marked.)

Page 83

1  BY MR. STOETZER:
2  Q  The court reporter has handed you what has been
3  marked as Exhibit No. 11. There is a Swalling
4  Construction letter dated September 12, 2001 from your
5  company, apparently, from Andy Romine, and the subject
6  matter is welding or removal of brackets.
7      If you will hand that back, I think actually
8  several documents got incorporated here. I think that
9  there was a miscollation. So if you can pull those back
10 in, because they are subsequent exhibits.
11     MR. PUETT: What do you want us to keep?
12     MR. STOETZER: What you should keep is a
13 September 12 letter, as I described, without attachments.
14 So it's a single sheet.
15     MR. PUETT: 0002?
16     MR. STOETZER: Correct. Sorry for the
17 confusion.
18     We may have to go off record, now that I realize
19 the exhibits maybe cattywhompas, but let's get through
20 this one, then I'll reshuffle the deck.
21 BY MR. STOETZER:
22 Q  Are you familiar with the content of this September
23 12 letter?
24 A  Yes.
25 Q  And what is being addressed here?

Page 84

1  A  It starts out saying that we have encountered a great
2  deal more than a hundred feet of welding that was required
3  in the contract, and it talks about poor welds, pieces of
4  steel scabbed together, steel not cut to fit. Talks about
5  the first H pile bent having over 47 feet of welding,
6  cutting, or grinding with the second and third bents
7  having an estimate minimum of 30 feet.
8  Q  And, again for context, this relates to the section
9  that we have been talking about most recently, bents 1
10 through 5 of the existing wharf?
11 A  Right.
12 Q  This is further information regarding that subject
13 and the impact on your work and schedule?
14 A  Correct.
15     MR. STOETZER: Let's go off record for a minute.
16     (Off record.)
17     (Exhibit 12 marked.)
18 BY MR. STOETZER:
19 Q  We have had handed you another Swalling document.
20 This is SCC 9 And this will be Exhibit No. 12.
21     For those of you who got two pages, it's only
22 the first page that is the exhibit.
23     And this is a letter to Brechan over your
24 signature with regard to your October billing --
25 A  Uh-huh.

Page 85

1  Q  -- for the Coast Guard dock facility coating project.
2  What is the purpose of this particular document?
3  A  This was a billing, and evidently had backup time
4  cards for the above-referenced project for a breakdown of
5  the extra work portion of the contract, which was the H
6  pile weld repair, I'm assuming it was for bents 1 through
7  5, and then we had some CP scaffold installation, and the
8  equipment that -- labor and equipment was charged to do
9  that.
10 Q  This doesn't have your normal billing format, but if
11 I understand what you did, in this November 2, 2001
12 document, was quantify that work and those materials that
13 you felt constituted an extra as a consequence of the
14 conditions that you encountered on bents 1 through 5?
15 A  Yes, correct.
16 Q  And was thereafter a negotiation with respect to how
17 much you would be paid for the extra work?
18 A  Yeah, I think that all this writing on here, I
19 believe, is Brechan's writing, and we broke down instead
20 of charging the rental per day, they broke to down for the
21 Blue Book rate for state of Alaska and did a monthly
22 rental rate on it.
23 Q  With regard to the handwritten interlineations, the
24 very bottom right has a number, $33,440.50 with a date of
25 February 12, '02. Do you see that?

22 (Pages 82 to 85)

159

```
 1                    REPORTER'S CERTIFICATE

 2            I, SUSAN J. WARNICK, RPR, and Notary Public in

 3    and for the State of Alaska do hereby certify:

 4            That the witness in the foregoing proceedings was

 5    duly sworn; that the proceedings were then taken before me

 6    at the time and place herein set forth; that the testimony

 7    and proceedings were reported stenographically by me and

 8    later transcribed under my direction by computer

 9    transcription; that the foregoing is a true record of the

10    testimony and proceedings taken at that time; and that I

11    am not a party to nor have I any interest in the outcome

12    of the action herein contained.

13            IN WITNESS WHEREOF, I have hereunto subscribed my

14    hand and affixed my seal this 16th day of May,

15    2006.

16

17

18                              _____
                                SUSAN J. WARNICK,
19                              Registered Professional Reporter
                                Notary Public for Alaska
20
      My Commission Expires:  April 8, 2010
21

22

23

24

25
```

# MODIFICATION OF SUBCONTRACT

Modification # 1    Effective Date: March 13, 2002
Project: USCG Cargo Wharf Maintenance Project
Owner: USCG FD&CC (PAC)
Contractor: Brechan Enterprises, Inc.
Subcontractor: Swalling Construction Company, Inc.

**This modification of the above referenced subcontract is entered into pursuant to the mutual agreement of the signatory parties, and contingent upon the approval of the Owner.**

Description of Modification:
1. Reduce scope of H Pile Section from 12,800 sf to 8,100 sf    $(145,298.00)
2. Compensate subcontractor for fuel pier test coat             $    7,100.00
3. Compensate subcontractor for cathodic protection,
   conduit, insulation scaffolding                              $   13,017.50
4. H pile welding repair                                        $   30,241.95
5. Modify the preparation spec as per *Option 2* of the
   Surface Preparation Technical Proposal dated February
   26, 2002, and prepared by Coffman Engineers. This spec will    50,000.00 *MRM*
   be applied to work remaining to be completed                 $   ~~39,682.00~~
6. Scheduling as required by the Anita Repanich letter
   to M. Martin dated 25 Feb 2002.

   Total modification is a reduction of                         (44,938.55)
                                                                $~~(55,256.55)~~ *MRM*


Contractor                              Subcontractor:
Brechan Enterprises, Inc.               Swalling Construction Company, Inc.

by _Michael Martin_                     by _J. Michael Swalling_
its _President_                         its _President_


Ex. 5    Date 5.1.06
Witness Andersen
S. WARNICK 907-258-7100

# 5

BE13354
38599-0012