Michael E. Kreger
James N. Leik
Melissa A. Bast
Perkins Coie LLP
1029 W. Third Avenue, Suite 300
Anchorage, Alaska  99501
(907) 279-8561
(907) 276-3108 (Facsimile)
mkreger@perkinscoie.com

Attorneys for Defendants Brechan Enterprises, Inc.
and Safeco Insurance Company of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL
SERVICES, INC., an Alaska corporation,

     Plaintiff,

v.

FORREST J. MCKINLEY, et al.,

     Defendants.

Case No. 3:03-cv-0199-RRB

**BRECHAN ENTERPRISES' AND SAFECO'S
MOTION TO EXCLUDE DAMAGES TESTIMONY
BY MICHAEL LEMBKE
AND MOTION FOR SUMMARY JUDGMENT**

     Pursuant to Federal Rules of Evidence 402, 403 and 702, defendants

Brechan Enterprises and Safeco Insurance move to exclude the testimony of

plaintiff's retained witness Michael Lembke regarding plaintiff's damages, and

pursuant to Federal Rule of Civil Procedure 56, defendants move for summary

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

judgment because plaintiffs are unable to meet their burden of proving damages, which is an essential element of their claims.[1]

Absolute proposes to meet its burden of proving damages through the testimony of a retained witness, Michael Lembke. But Lembke's proposed testimony is inadequate to meet Absolute's burden. Lembke has taken an extremely simplistic approach to damages. Instead of identifying and analyzing any extra costs allegedly imposed on Absolute by any breach by Brechan or other defendants, Lembke has simply claimed that Absolute is entitled to payment of the full difference between the costs of the project as contemplated by his reconstruction of Absolute's missing pre-contract estimate, and its actual costs. This proposed testimony is inadmissible under Federal Rules of Evidence 402, 403 and 702, and the Daubert/Kumho Tire line of cases, because Lembke's damages methodology is not reliable. His methodology simply assumes that the defendants are responsible for the entire gap between Absolute's pre-contract estimate and its actual costs, without giving any consideration to causal factors other than the alleged breach by defendants. Ignoring these other causal factors renders his opinions inadmissible. In addition, Lembke's opinion must be excluded because it uses the "total cost" method of proving damages, without satisfying the stringent requirements for such proof. Even if Lembke's testimony is admitted as offered,

---

[1] Brechan and Safeco have also filed summary judgment motions addressing liability. This motion for summary judgment presents an independent and alternative ground for entry of judgment in favor of defendants.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

his testimony is insufficient to meet Absolute's burden of proving causation, and therefore Brechan and Safeco are entitled to summary judgment.[2]

## I.    Absolute's Damages Analysis

Absolute intends to prove its damages through the testimony of a retained witness, Michael Lembke.  Mr. Lembke's damages methodology is as follows: First, he calculated the amount of additional compensation allegedly owed to Absolute.  He made this calculation using the following steps.  He began by setting the "as-planned" costs that he says Absolute originally expected to incur on the project (primarily its anticipated payment to Imperial), $913,865.[3]  He compared this amount with the costs Absolute actually incurred in performing the contract, $1,833,423.56.  The difference is approximately $920,000.  He adjusted this figure by subtracting legal costs and accepted backcharges.  These adjustments yielded a difference between Absolute's <u>anticipated</u> costs and its <u>actual</u> costs of $813,645.  Then he added amounts for Absolute's overhead ($125,301), 10% profit ($93,894) and unpaid task orders ($96,558).  These additions yielded a total claim by Absolute for its "excess costs + lost overhead & lost profits" of $1,129,399.  Ex. 1, Lembke Dep. Ex. 17; <u>see also</u> Ex. 2, Lembke Dep. at 188-193.

Next, Lembke testified that Absolute's owner, David Olson, asked him to divide this $1.13 million claim between Imperial and Brechan/Coffman.  Lembke

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

---

[2] Absolute has also disclosed a claim for "business devastation" damages. This claim is the subject of a separate motion for partial summary judgment.

[3] Lembke had to make assumptions in order to set the "as-planned costs" figure, because Absolute's estimate (if it ever existed) got lost.

testified that he told Absolute's owner that this task would be "very difficult."[4] Faced with the prospect of performing a "very difficult" analysis to divide the damages between Imperial and Brechan/Coffman, he abandoned the effort and instead made a simple division of the damages based solely on figures that he believed represented the square footage of work done by Imperial before it terminated its work on the dock, compared with the square footage of work done by Absolute after Imperial terminated its work on the project. He calculated that Imperial coated 30% of the dock, and Absolute coated 70% of the dock. He applied this 30/70 split to the $1.13 million extra-cost claim, yielding a division of $339,174 for the 30% that he attributed to Imperial's work, and $790,579 for the 70% that he attributed to Absolute's work.[5] Then, he decided that Brechan/Coffman should pay 100% of the "Absolute" portion of the claim, and 50% of the "Imperial" portion of the claim. As a result, he says Brechan/Coffman should pay 85% of Absolute's $1.13 million "excess costs + lost overhead + profits" claim, as follows:

| | |
|---|---|
| 70% of "Absolute" portion | $790,579 |
| 30% of "Imperial" portion, x 50% | |
| $338,820 x 50% | $169,410 |
| Total Claim Against Brechan/Coffman | $959,989[6] |

---

[4]  Ex. 2, Lembke Dep. at 185.

[5]  Ex. 2, Lembke Dep. at 190-91, 193, and Ex. 3, Lembke Dep. Ex. 2.

[6]  Ex. 3, Lembke Dep. Ex. 2.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

After he arrived at these figures, he testified that it was an "open question" whether he would do additional analysis to allocate the damages between Imperial and Brechan/Coffman.  He testified that he was "trying to figure out how to do it," and that "it's extremely complex."[7]

On its face, Lembke's methodology does not include any analysis to determine what damages, if any, were caused by any breach by Brechan.  He simply figured how much Absolute spent on the job, subtracted the amount that Absolute expected to spend, and then added overhead + profit.  Then he divided this "excess cost" among Imperial and "Brechan/Coffman" based on the square footage of the work done by Absolute and Imperial.

To be more specific, he failed to analyze causation at two levels.  First, he says that Absolute planned to spend $914,000 on the project, but instead it spent $1,833,000.  He did not do any analysis to determine whether the difference was attributable to any breach by Brechan/Coffman/Imperial.  He did not attribute specific damages to specific conduct by Brechan (or other defendants), and he did not perform any analysis to rule out other potential causes of the gap between Absolute's expected and actual costs.[8]

Then, he failed to engage in any causation at a second level, when he decreed that 85% of Absolute's excess costs + overhead + profit should be paid by

---

[7] Ex. 2, Lembke Dep. at 187.

[8] Other potential causes of the gap between anticipated and actual costs include:  a) that Absolute's original cost estimate was too low; or b) that excess costs were attributable to Absolute's own errors and mismanagement; or c) that excess costs were attributable to some factor other than fault by Brechan/Coffman/Imperial.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Brechan and Coffman.  He recognized that if done correctly, this analysis would be "very difficult" and "extremely complex."  Again, he did no analysis to determine whether this 85% of the excess costs was caused by breaches by Brechan or Coffman or both.  He simply allocated a percentage of the excess costs + overhead + profit to them, based solely on the square footage of the areas worked on by Imperial and Absolute.  He could not identify any other basis for this opinion.[9]

## II.    Lembke's Testimony Concerning Absolute's Excess Costs and His Allocation of Damages to Absolute and Coffman is Inadmissible

Under Federal Rule of Evidence 702, the trial court must ensure that expert testimony is not only relevant, but reliable.  United States v. Prime, 431 F.3d 1147, 1152 (9th Cir. 2005).  The Court's obligation as gatekeeper applies with equal force to "non-scientific" experts.  Id.  See also United States v. Hermanek, 289 F.3d 1076, 1094 (9th Cir. 2002).[10]  To guide this evaluation, Rule 702 specifically requires that the proponent of expert testimony demonstrate that:  1) the testimony is based on sufficient facts or data; 2) the testimony is the product of

---

[9] Ex. 2, Lembke Dep. at 191.

[10] "An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist. . . . The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted."  Advisory Committee Note to 2000 Amendment to FRE 702.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

reliable principles and methods; and 3) the witness has applied the principles and methods reliably to the facts of the case.[11]

The court's obligation to exclude flawed expert testimony extends to testimony by proposed experts on damages.  Courts frequently exclude proposed expert testimony that does exactly what Lembke has done:  assumes causation but undertakes no analysis to connect the damages with the defendant's conduct, or to exclude other factors that may have caused the loss.

For example, in <u>McGlinchy v. Shell Chemical Co</u>., 845 F.2d 802 (9th Cir. 1988), the court affirmed the exclusion of the plaintiffs' damages experts' testimony regarding lost profits.  The expert acknowledged that he could not connect the total lost profits to particular conduct by Shell, and he had not analyzed the effects of Shell's conduct on the particular product lines at issue.  The Ninth Circuit recognized that such testimony posed a great danger of misleading the jury to think that the defendants' conduct caused the full loss, when in fact the expert had done no analysis to support that conclusion.  <u>Id</u>. at 806-07.

Other courts have reached similar conclusions regarding expert witness testimony similar to Lembke's.  For example, in <u>Microstrategy, Inc. v. Business Objects, SA</u>, 429 F.3d 1344 (Fed. Cir. 2005), the plaintiff claimed lost profits due to patent infringement.  As Lembke did here, the expert proposed to attribute all of the plaintiff's business losses to the defendant's conduct.  But the expert did no factual analysis to attribute the losses to the defendant's conduct, or to rule out the effects of other possible causes of these losses.  "In brief, Yukerwich's report

---

[11] The Court must make the relevance and reliability inquiries even if the witness is qualified to give expert opinions.  <u>Hermanek</u>, 289 F.3d at 1093-94.

**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

ignored any significant factor that might have attributed MicroStrategy's difficulties to factors other than the torts. Thus, the district court properly perceived that [the] report did not accurately link the alleged damages to the torts." Id. at 1354-55. The Federal Circuit agreed with the District Court that the report "does not pass the red face test [and] does not pass the Daubert test. . . . [T]he record shows that the excluded expert report did not link a single loss to a specific misconduct and ignored significant factors that might have excluded the torts as the reason for the losses." Id. at 1355-56 (emphasis added).

In Craftsmen Limousine, Inc. v. Ford Motor Co., 363 F.3d 761 (8th Cir. 2004), the Court of Appeals reversed the District Court's admission of expert testimony on damages that failed to consider other causal factors for the claimed damages. "[Plaintiff's damages expert] *assumed* that Craftsmen's alleged lost growth from 1995 through 1998 was caused by defendants' alleged conspiracy. He did not determine whether other factors . . . may have affected Craftsmen's growth rate. . . . Because [his] expert opinion failed to 'incorporate all aspects of the economic reality', it should not have been admitted." Id. at 777 (citations omitted).

Writing for the Seventh Circuit, Judge Posner described an expert's reports in an antitrust case as "worthless" when the expert ignored factors other than antitrust violations that may have caused the differences in prices. "Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment." Blue Cross & Blue Shield v. Marshfield Clinic, 152 F.3d 588, 593 (7th Cir. 1998) (citing cases).

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Finally, in <u>Sebastian International, Inc. v. Russolillo</u>, 2005 Westlaw 1323127 (C.D. Cal. 2005), the court excluded an expert's testimony on lost profits because, as here, the expert failed to do any analysis to connect the lost sales with the defendant's conduct:

> Kamin's report simply presumes that any lost profits must have been due to [defendant's conduct].  Plaintiff cannot use a cause of action for intentional interference with contractual relations to recover from Defendants for lost profits caused by these other, non-interference causes.  However, Kamin's report calculates Plaintiff's lost profits without taking into account these other possible causes and attributes the entire loss to diversion by Defendants.  The Court therefore excludes Kamin's report pursuant to <u>Daubert</u> and Federal Rule of Evidence 702, on the ground that its methodology is flawed and the Court cannot conclude that Kamin's report rests on a "reliable basis in the knowledge and experience of [Kamin's] discipline." . . . Plaintiff has failed to present sufficient evidence to allow a reasonable trier of fact to find that Plaintiff suffered lost profits as a result of interference by Defendants.  Further, even assuming Plaintiff suffered damages, the record does not supply the fact finder with any principled way of determining the level of such damages beyond mere speculation.

Id. at *8, *9.

Just as these courts excluded expert testimony that did not consider and evaluate alternative causes of the claimed damages, this Court should exclude Lembke's testimony.  Lembke did not consider and evaluate the other factors that could have caused Absolute's alleged losses on the dock project.  In the absence of such evaluation, his opinion is inadmissible.

Similarly, Lembke's opinion allocating responsibility for the alleged losses between Imperial, Brechan and Coffman is arbitrary on its face.  Lembke

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

conceded that his sole basis for apportioning responsibility for damages was the square footage of the work performed by Imperial (before it was terminated) and Absolute (after Imperial left the job). But there is no necessary or even apparent correlation between the square footage of the work done by Imperial, and the amount of Absolute's excess costs attributed to Imperial. If -- as Absolute alleges -- Imperial did poor work on 30% of the dock, and no work on 70% of the dock, Absolute would have additional costs to finish the 30% properly, and additional costs to mobilize and do the work on the remaining 70%. In any event, without some analysis to support the 70/30 split, it is simply arbitrary, and does not pass the "gatekeeper" inquiry imposed by Rule 702. The further allocation of all of Absolute's 70% share, and half of Imperial's 30% share, to Brechan and Coffman is even more arbitrary.[12]

Lembke's own testimony demonstrates the arbitrary nature of his apportionment. He recognized that Imperial's conduct caused losses, and he identified specific factors that produced Imperial's errors:

> Imperial was basically incompetent. They didn't know what they were doing and they got into all sorts of difficulties out there. . . . Imperial was late performing some of their work, most of their work. There are a lot of different reasons for it. . . . I don't think they fully

---

[12] Lembke's cursory explanation for this allocation also does not satisfy the reliability requirement of Rule 702. Generalized statements of the basis for the opinion are not sufficient. "Under Rule 702, the proffered expert must establish that reliable principles and methods underlie the particular conclusions offered. . . ." Hermanek, 289 F.3d at 1094. Thus, the expert must explain in detail the facts and knowledge that he draws from, and how he has applied that knowledge in a reliable manner to reach a conclusion. When, as here, the expert fails to do so, the opinion testimony must be excluded. Id. at 1094-95.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

> considered the tides and how that was going to affect their work, for example. I think they weren't very good with logistics of getting what they needed over there in a timely fashion. I don't think Mr. Puett properly knew how to run his crew. But I also think that they were slowed down by inspections and repairs . . . .

Ex. 2, Lembke Dep. 131, 133. A proper analysis of damage responsibility would consider the effects that these errors had on Imperial's performance and Absolute's costs. Instead, Lembke arbitrarily declares that Imperial is responsible for 15% of the loss, and Brechan/Coffman are responsible for 85%, without any analysis of these factors. His stated rationale for the division—the square footage completed by Imperial—has no relationship to any of the above factors.

The arbitrariness of the result can be further illustrated with an example. Assume before Imperial was decertified, Imperial had applied coating to 65% of the dock, instead of the 30% Mr. Lembke calculated. Changing this assumption changes the damages Mr. Lembke must opine, by his method, were caused by Brechan/Coffman. Yet the determining fact about when Imperial was decertified by SPC or how much it had coated when it was decertified are unrelated to Brechan's alleged concealment of information about events during Phase I. A causal relation between conduct and damages is presumed and disregarded by Lembke's method.

Besides being arbitrary, the method defies sense because it assumes and entirely excuses Absolute of its contractual obligation to finish work left undone by Imperial. Lembke's arbitrariness effectively treats whatever is left of the project after Imperial abandoned it as an open account chargeable to Brechan, with no linkage to underlying facts.

**PERKINS COIE** LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Another indication of the unreliability of his method lies in Mr. Lembke's unexplained reversal of his prior opinion.  Before Absolute had "discovered its claims" against Brechan and Coffman, Mr. Lembke calculated the damages caused by Imperial.  To do so, he interviewed witnesses and familiarized himself with the project.  He opined at that time that Imperial had caused Absolute $1.2 million dollars in damages.   He read everything he could find that was connected with the case and was confident that he had "pretty well figured out what had happened."  See Ex. 4, Lembke Dep. (2/11/05) at 22.  After that study, he concluded that "considering the work that they performed due to Imperial's breach of contract, [Absolute] lost a lot of money."  Id. at 23.  Mr. Lembke prepared a report prior to his deposition.  He concluded in his report that Absolute was due compensation from Imperial and its owner in the amount of $1,266,927.89.  Ex. 5, Lembke Ex. 4 at 17.  In reaching that decision, he found numerous examples of non-compliance and poor performance by Imperial prior to its departure, including having only two men on the job until April 14th, failure to ensure proper quality was being achieved, holiday and low dry film thickness problems on coating, lack of environmental control equipment to stabilize the environmental conditions, loss of efficiency due to working seven days a week in difficult conditions, leaking pumps, lack of abrasive blast media, coating over defects without correcting them directly, and eventually decertification.  Ex. 5, Lembke Report, Ex. 4 at 5-13.  In short, after a substantial amount of study, Mr. Lembke was confident that he had reasonably captured the damages Imperial's failed performance caused Absolute.  Nothing in his latest report or its method reliability accounts for the reversals in his conclusion.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

The inadmissibility of Lembke's opinion on the division of responsibility is demonstrated by the District Court's thorough opinion in <u>Lake Michigan Contractors, Inc. v. Manitowoc Co.</u>, 225 F.Supp. 2d 791 (W.D. Mich. 2002). In that case, the owner claimed overcharges by a contractor. The owner proposed to support its claim with the testimony of a retained expert. The court excluded the expert's testimony. The court took the guidance provided by the advisory committee note to the 2000 amendment to Rule 702:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

225 F.Supp.2d at 798.

With this in mind, the court evaluated the reliability of the expert's analysis. The court rejected a number of opinions offered by the expert concerning the effect of work interruptions caused by the contractor, because the expert failed to give an adequate basis for the calculations:

> The basic premise of Willis' opinion is sound: interruptions reduce work efficiency. That premise is a truism for any task, be it a simple household chore, a summary judgment brief, or an opinion on a motion in limine to exclude expert testimony. There is also a factual basis for Willis' opinion because there is no dispute that the move interrupted work . . . and that some of the 705 hours spent on the Dredge during the five-day period involved demobilizing . . . and remobilizing. Finally, as noted above, Willis' experience, by itself, is sufficient to allow him to testify as an expert. <u>However, none of this means that the court is required to accept Willis' testimony because he is an expert and says "it is so."</u> . . . Rule 702 does not allow the Court to take Willis merely at his word,

**PERKINS COIE** LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

> but rather requires an examination of both the "sufficiency of the testimony's basis" and "the application of a methodology to the facts" to ensure some degree of reliability.

Id. at 800 (emphasis added) (quoting Rudd v. General Motors Corp., 127 F.Supp. 2d 1330, 1336 (M.D. Ala. 2001)).  In this analytical framework, the Court considered the expert's opinion that the contractor's hours should be reduced by 30% because of the contractor's inefficiency.  For this opinion, the expert relied in part upon a simple division of the hours originally budgeted for the construction by the hours actually spent.  This simplistic method was not sufficient to support the expert's opinion concerning the division of responsibility for inefficiency. Lake Michigan Contractors, Inc., 225 F.Supp.2d at 802.  The court excluded the expert's opinion because the expert's methodology failed to adequately account for the facts of the case, and  the expert was unable to articulate an acceptable rationale for the division of responsibility.

Lembke's opinion on Absolute's damages should also be excluded because it constitutes a "total cost" approach to damages, as discussed in part II B, below. Under Alaska law, use of a total cost method to prove damages is permitted only if the plaintiff establishes four threshold elements.  Absolute cannot satisfy these four requirements for submission of total cost proof.  Therefore, Lembke's damages testimony is inadmissible in its entirety.

For the foregoing reasons, the Court should exclude Lembke's testimony concerning damages allegedly caused by Brechan's breach.

**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

## II. Brechan is Entitled to Summary Judgment Because Absolute Has Not Met its Burden of Proving Causation of its Claimed Damages

"[T]he plain language of [Fed.R.Civ.P.] 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1996). Once the moving party has pointed out the lack of any genuine issue of material fact, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial. In so doing, the nonmoving party may not rest upon mere allegations, but must show that there is sufficient evidence to support a verdict in its favor at trial. "Put another way, summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. . . . The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). See also Forest Oil Corp. v. Union Oil Co., 2006 WL 1096312 (D. Alaska 2006).

One of the elements of Absolute's burden of proof is proof that Brechan's conduct caused Absolute's damages. "Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed *resulted from and were caused by* the breach." Fairbanks North Star Borough v. Kandik Construction, Inc., 795 P.2d 793, 798 (Alaska 1990) (quoting Boyajian v. United States, 423 F.2d 1231, 1235 (Ct. Cl. 1970) (emphasis added).

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Similarly, Absolute must prove causation with respect to the damages it claims under its tort theories.  "Proximate cause is just as much an element of tort damages as it is an element of contract damages."  <u>Conam Alaska v. Bell Lavalin, Inc.</u>, 842 P.2d 148, 155 (Alaska 1992)  "The evidence must prove that the loss was caused by the tort."  <u>Id.</u> at 154 (affirming trial court's rejection of negligence claims in construction case due to failure of expert testimony to establish proximate cause of damages).[13]

Thus, Absolute must prove that its damages were proximately caused by Brechan's breach, and not through some other cause.  If the losses cannot be allocated between those caused by the defendant's breach and those that are not, the entire claim may be rejected.  <u>National Controls Corp. v. National Semiconductor Corp.</u>, 833 F.2d 491, 496 (3d Cir. 1987).

### A.    Plaintiffs Lack Any Admissible Testimony to Support Their Claimed Damages

For the reasons stated above, Michael Lembke's damages testimony should be excluded.  Absolute has no other proof of its damages, and therefore defendants are entitled to summary judgment, because Absolute lacks admissible evidence to support this essential element of its claim.

---

[13] <u>See also</u> <u>Brady v. State</u>, 965 P.2d 1, 12 n. 28 (Alaska 1998) ("A misrepresentation is only actionable if it causes harm"); <u>Power Constructors v. Taylor & Hintze</u>, 960 P.2d 20, 41 (Alaska 1998) (plaintiff must present evidence sufficient to calculate amount of loss caused by breach); <u>City of Palmer v. Anderson</u>, 603 P.2d 495, 500 (Alaska 1979).

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

### B.     Lembke's Conclusory Testimony Does Not Satisfy Absolute's Burden of Proving Causation

If admitted, Lembke's testimony is inadequate to meet Absolute's burden of proving causation.  Lichter v. Mellon-Stuart Co., 305 F.2d 216 (3d Cir. 1962) illustrates the point.  There, the masonry subcontractor claimed lost profits, based on testimony similar to Lembke's.  "[T]he subcontractor introduced testimony as to what it would have cost to perform all of the masonry work if that undertaking had proceeded without untoward occurrences in the manner contemplated at the time of contracting.  Next, the actual cost of the entire masonry job as delayed, interrupted and hindered by all causes was proved.  The entire difference was claimed as damages without any itemization."  Id. at 219.  The court rejected this flawed proof.  As in this case, it was undisputed that factors unrelated to the defendant's fault contributed to the losses, but the expert's methodology did not account for these factors.  "Since the court could find no basis for allocation of this lump sum between those causes which were actionable and those which were not, it was proper to reject the entire claim."  Id. at 220.

In Net Construction, Inc. v. C&C Rehab & Construction, Inc., 256 F.Supp. 2d 350 (E.D. Pa. 2003), the court followed the principles stated in Lichter. "[Plaintiff] failed to distinguish losses suffered as a result of delays by [defendant] from losses that it might have suffered because of [plaintiff's] own performance problems, weather, unsuitable soils, or the existence of asbestos at the site.  There is simply no basis on which to conclude that [plaintiff's] losses were the result of delays caused by [defendant].  Accordingly, [plaintiff] is not entitled to recover damages on its claim of lost productivity."  Id. at 355.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Alaska courts have reached similar results.  For example, in <u>Conam Alaska v. Lavalin, Inc.</u>, 842 P.2d 148 (Alaska 1992), the plaintiff's expert claimed inadequate and inconsistent specifications.  The plaintiff's expert did more analysis than Lembke, by attempting to eliminate some causes other than the defendant's negligence.  But ultimately, the plaintiff's expert relied on methods that looked at the "effect of the negligence on the whole project, rather than creating a link between a specific delay and a specific cost," and his final analysis was a lot like Lembke's:  "I know that the total money spent by Conam in performing approximately 87 percent of the work was roughly 11.7 million dollars.  I know that they were paid approximately 5.4 million dollars.  And, all I can say is that a portion of that difference is attributable to the lack of engineering."  <u>Id</u>. at 156.  Moreover, just as Lembke has not segregated damages allegedly caused by Brechan and Coffman, the expert witness in <u>Conam</u> could not segregate the damages caused by the separate conduct of the contractor (Bell Lavalin) and the engineers/designers (Partec).  Under these circumstances, the Alaska Supreme Court concluded that the plaintiff had not met its burden of proving causation of the claimed damages.  "Despite Conam's effort, cause remained too speculative to submit the issue of damages arising from professional negligence to a jury."[14]  <u>Id</u>. at 157.

_____

[14] <u>See also</u> <u>Ben Lomond, Inc. v. Schwartz</u>, 915 P.2d 632, 636-37 (Alaska 1996) (testimony regarding lost profits inadequate when plaintiff did not demonstrate causal link between breach of duty and lost profits); <u>John E. Green Plumbing & Heating Co. v. Turner Construction Co.</u>, 742 F.2d 965 (6th Cir. 1984) (plaintiff failed to prove damages when it presented lump sum without causation analysis).

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

The same is true here.  Absolute cannot meet its burden of proving that Brechan's conduct caused the damages that it claims.  Therefore, Brechan is entitled to summary judgment.

### C.    Absolute Cannot Satisfy the Requirements for Proof of Causation Using the Disfavored "Total Cost" Method

In limited cases, plaintiffs are allowed to prove their damages using the so-called "total cost" method.  The total cost method is disfavored because it assumes that the defendant's breach was the cause of all the extra cost, it assumes the plaintiff's bid was accurately computed, and it assumes that the plaintiff was not responsible for any increases in cost.  K&K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702, 722 (Alaska 2003); Geolar, Inc. v. Gilbert/Commonwealth, 874 P.2d 937, 943 (Alaska 1994); see Conam Alaska v. Bell Lavalin, Inc., 842 P.2d 148, 155 (Alaska 1992); Southeast Alaska Constr. Co., Inc. v. Alaska, 791 P.2d 339, 340 n.1 (Alaska 1990).[15]  Consequently, the plaintiff may use a "total cost" method only if the plaintiff proves each of the following elements: (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the

---

[15] The most recent Alaska case to address the total cost methodology was Fletcher v. Trademark Constr., Inc., 80 P.3d 725 (Alaska 2003). Fletcher had included 635 hours of labor in his bid, but used 1,946 hours to complete the work and claimed that the 1,311 hour difference was related to change order extra work. The Supreme Court denied Fletcher's appeal, noting general principles of damages require the claimed damages to be the result of and caused by the alleged breach, or in the case of a construction contract, the extra or change order work. Id.  In a footnote, the Court referred to the four-factor test, and indicated that Fletcher had not satisfied these requirements.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

added expenses. <u>K&K Recycling, Inc.</u>, 80 P.3d at 723 n. 62; <u>Municipality of Anchorage v. Frank Coluccio Constr. Co.</u>, 826 P.2d 316, 325 (Alaska 1992). The contractor claiming damages bears the burden of proving each of the four elements. <u>Geolar, Inc.</u>, 874 P.2d at 945. If the contractor is unable to prove any one element of the test, it cannot submit its total cost claim to the finder of fact. Under the <u>Celotex</u> standard, this means that if plaintiff proposes to satisfy its burden of proof using the total cost approach, plaintiff must respond to a summary judgment motion by producing admissible evidence sufficient to support all four of the required elements for total cost proof. For example, in <u>Ryco Construction, Inc. v. United States</u>, 55 Fed. Cl. 184 (2002), the court granted defendant's motion for summary judgment to exclude total cost proof when plaintiff did not meet its burden of establishing two of the four elements: "The failure of proof on two elements is fatal to plaintiff's claim of entitlement to utilize the total cost method of recovery. Because plaintiff has not carried its burden, the court cannot permit the computation of damages using the total cost method." <u>Id.</u> at 201.

Absolute cannot meet its burden of demonstrating all four elements required for total cost proof.

### 1.     Other Methods To Prove Costs Were Available

"Before a contractor may rely on a total cost method, it must show that such a method is the only one available under the circumstances." <u>Municipality of Anchorage</u>, 826 P.2d at 326. A contractor is not excused by its failure to keep records of actual costs. "Where it is impractical for a contractor to prove its actual costs because it failed to keep accurate records, when such records could have been kept, and where the contractor does not provide a legitimate reason for its

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

failure to keep the records, the total cost method of recovery is not available to the contractor." See Propellex Corp. v. Brownlee, 342 F.3d 1335, 1342 (Fed. Cir. 2003).[16]

In Propellex, the court held that the contractor was not entitled to use the total cost method to calculate damages because the contractor did not prove that it was impractical to prove its actual costs with a reasonable degree of accuracy.

The contractor's witnesses testified both that it was standard procedure for the contractor to set up special cost accounting codes when it engaged in rework or special testing, and that the contractor could have set up a separate cost accounting system, but didn't do so because it believed the added costs were its responsibility, and there was "no reason to set up an account to track such costs." Id. at 1341-42. The court noted that because the contractor believed it was to blame for the added costs, it was "all the more important for it to segregate costs relating to that problem from costs incurred under the contracts for which it was entitled to be paid." Id. at 1342. Because the contractor failed to keep accurate records when they should have been kept and the contractor could not offer a legitimate reason

---

[16] Citing WRB Corp. v. United States, 183 Ct. Cl. 409, 426 (1968) (noting the contractor's failure to maintain accurate cost records during performance and that its only excuse for the failure was that it did not expect to become involved in litigation over the project, and stating that this "was a feeble justification for taking refuge in the total-cost approach"); S.W. Elecs. & Mfg. Corp., ASBCA Nos. 20,698 & 20,860, 77-2 B.C.A. (CCH) ¶ 12,631, 1977 WL 2297 (June 23, 1977) (noting that if it is impossible to detail the cost impact of a change because the contractor failed to keep accurate records when they could have been kept, the total cost method will not be used), aff'd 228 Ct. Cl. 333, 655 F.2d 1078 (1981).

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

for its failure to keep the records, the court held that the contractor could not rely on the total cost method.  Id.

Similarly, Absolute was in a position to maintain detailed information concerning the work its employees performed in connection with the Cargo Wharf Maintenance Project.  It is standard practice in the construction industry to track additional and unanticipated costs separately from costs incurred in performing the work required by the contract.  See Deposition of Michael Anderson, attached hereto as Ex. 6, at 105:06-107:10; cf Ex. 17 (Exhibit 21 to M. Anderson Dep.) (weekly job cost report illustrating tracking of labor and materials expended by activity codes and showing similar tracking for "extra work" category). Deposition of David Olson, attached hereto as Ex. 7, at 266:09-19.  Absolute, however, did not keep track of the costs it incurred in performing what it now alleges was "extra work." See Ex. 15, Absolute's Responses to Safeco's Discovery Requests at 9:14-15 (July 7, 2006); Deposition of David Olson, attached hereto as Ex. 7, at 266:09-19.  Dan Yell, Absolute's supervisor after Imperial's termination, attempted to keep track of the number of hours each employee under his supervision spent repairing Imperial's work.  Yell eventually stopped keeping track of these hours and labor activities, and "wrote it down the way [Dave Olson] wanted." See Deposition of Daniel Yell, attached hereto as Ex. 8, at 84:02-87:01.

Absolute did not keep accurate job cost records to track the extra work it seeks payment for and cannot establish any justification for its failure to maintain such records.  Any impracticality Absolute encountered in proving its actual costs in doing the work it claims was extra stemmed from its own decision not to keep

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

track of costs.  Like the plaintiff in <u>Propellex</u>, Absolute is not entitled to recover under the total cost method.

Absolute may argue that its failure to track the costs it incurred in performing work which it now claims as damages should be excused because, at the time it performed the work, it believed Imperial – having consistently performed poor quality work and then abandoned the project – was responsible for all the extra work Absolute had to perform.  Absolute's belief that Imperial was responsible for all of Absolute's problems on the project did not excuse Absolute's obligation to track the amount of extra work it was performing, regardless of who it thought caused the loss.

After Imperial left, Absolute did both re-work of Imperial's poor work and new coating work left undone by Imperial.  As to the new coating work, accurately tracking the labor, equipment and material costs of the work remained necessary and prudent for Absolute to prove that its completion costs were reasonable.  If, as an apt example, Imperial had substantially underbid the job, Absolute's completion costs would have substantially exceeded the amount left in the contract for payment.  To recover that over-run, Absolute would have needed to be able to defend the reasonableness of the costs it incurred (in other words, be ready to show it had mitigated its losses).  As another example, if Absolute caused a cost over-run while doing the takeover work, it would need to be able to segregate that non-recoverable cost from the reasonable costs of completion.

Absolute's cost of repairing Imperial's work is also subject to the same reasonableness and mitigation requirements.  Absolute must show a reasonable baseline cost for repairing the defective work.  Repair work that was grossly

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

inefficient, or made inefficient due to self-inflicted problems by the repairing contractor, must be segregated from the reasonable costs of doing repairs. Absolute's obligation to track its costs and to prove its damages did not disappear simply because Absolute believed Imperial in one way or another had caused all its damages.

### 2.    Absolute's Bid Was Not Realistic

The second element that Absolute must prove is that Absolute's bid was realistic.  K&K Recycling, Inc., 80 P.3d at 723 n. 62; Municipality of Anchorage, 826 P.2d at 325.  Without such proof, the baseline for the damages calculation is distorted, and the plaintiff would be rewarded (i.e., forgiven) for its own unrealistic bid.  The plaintiff should not "get the benefit of its own failure to anticipate that level of difficulty that a reasonable contractor should have expected."  Youngdale & Sons Const. Co., Inc. v. United States, 27 Fed. Cl. 516, 542 (1993), citing Servidone Constr. Co. v. United States, 19 Cl. Ct. 346, 384-84 (1990).

Absolute submitted a subcontract price of $995,850.  There were two components to this price:  the price for work to be done by Absolute's subcontractor, Imperial, and the price for Absolute's own work.  Absolute cannot show that either component was realistic.[17]

---

[17] Imperial's subcontract price to Absolute was $772,123.  Absolute agreed in its subcontract with Imperial to retain a portion of the subcontract work and do that work with its own forces.  See Ex. 9, at Attachment 7 (Absolute/Imperial subcontract) at AES000928.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

In the first instance, Absolute's employees cannot testify to the reliability of the estimate, because everyone at Absolute has denied that they had any involvement in preparing it. Absolute's David Olson testified that he did not estimate the Project, and that Jason Peterson, Absolute's estimator, and Todd Elmore, Absolute's General Manager, estimated the Project for Absolute. See Deposition of David Olson, attached hereto as Ex. 7, at 140:15-25; 143:07-144:19. But Elmore testified that he did not perform any actual cost estimating or take-off calculations. According to Elmore, Jason Peterson of Absolute and Tom Puett of Imperial developed the estimate. See Deposition of Todd Elmore, attached hereto as Exhibit 10, at 166:19-167:17. But, Jason Peterson testified that David Olson of Absolute and Tom Puett of Imperial developed Absolute's estimate for the Project. See Deposition of Jason Peterson, attached hereto as Ex. 11, at 98:08-100:04; 102:02-104:02.

Nor is there any written record to establish a reliable estimating process by Absolute. Absolute's retained expert, Mr. Lembke was forced to conclude that the elusive estimate prepared by Absolute "got lost." Deposition of Michael Lembke, attached hereto as Ex. 4, at 65:18-19 (February 11, 2005). Exhibit 89 to Mr. Olson's deposition is a handwritten sheet by Mr. Tom Puett, who prepared Imperial's estimate. It shows Imperial's contract price of $772,123, plus $173,727 for another 4,500 sq. feet of coating and $50,000 for "TD." It has a line saying "total lump sum AE/Imperial/TD = $995,850." See Ex. 12 (Ex. 89 to Deposition of David Olson). Mr. Puett's handwritten note is the closest anyone has come to finding anything resembling a "written estimate" of Absolute's share of the contract price. On its face, this document does nothing to demonstrate a reliable

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

process for estimating Absolute's costs.  In short, there is no documentary evidence and no testimony by Absolute's personnel that can demonstrate that Absolute followed a reliable process to submit a realistic bid.

On similar facts, the court in <u>Youngdale & Sons Constr. Co., Inc. v. United States</u>, 27 Fed. Cl. 516 (1993), rejected a contractor's argument on this element of the total cost requirements.  The court held that the contractor's bid was unreasonable where the contractor's witness regarding the estimate (1) had no specific knowledge as to how the project estimates were developed; (2) specifically testified that he did not prepare the estimates, but instead reviewed them with the superintendent of the project too see if "anything was out of line"; (3) indicated that he did not specifically take part in preparing the bid; and (4) was unable to "identify what *actually* took place during the preparation [of the estimate]."  (emphasis in original).  Moreover, the only documentary evidence submitted by the contractor in order to prove the reasonableness of its estimate was a one-page summary bid sheet.  <u>Id.</u> at 543.

Like the plaintiffs in <u>Youngdale</u>, Absolute's witnesses (1) had no specific knowledge as to how the project estimates were developed; (2) specifically testified that they did not prepare the estimates, but instead relied upon the expertise of a subcontractor without independently verifying the estimate calculations; (3) indicated that they did not specifically take part in preparing the estimate; and (4) were unable to identify what actually took place during the preparation of the estimate.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Absolute may argue that it based its estimate on the estimate prepared by its subcontractor, Imperial. <u>See</u> Deposition of David Olson, attached hereto as Ex. 7, at 253:17-258:04. But this argument is also bound to fail.

First, Absolute did not independently verify Imperial's estimate. <u>Id</u>. at 164:11-165:03. <u>See</u> Deposition of Jason Peterson, attached hereto as Ex. 11, at 57:17-58:03.

Second, Absolute has repeatedly stated that Imperial's bid was not realistic. Absolute's own expert, Michael Lembke, opined that Imperial's estimate was unreasonable. In his November 2004 expert report, Mr. Lembke stated:

> IIC failed to prepare a reasonable, complete, and accurate estimate for the contracted work scope, and experienced significant overruns in all cost elements of the project. . . . IIC's estimate was defective in that not all cost elements were accounted for; important productivity factors were not applied; the quantity takeoff conflicts with the engineer's estimate and other IIC records; proper costs of SPC material was not used in the bid calculation; the bid contains mathematical errors; and the degree of difficulty of the work was not properly addressed.

Ex. 5, Lembke Report, p. 22 (November 12, 2004). At a later deposition, taken after Absolute had sued Brechan and Coffman, Mr. Lembke said that he no longer thought Imperial's bid was unreasonable. He has not supplemented his expert report to so state.

L. Skip Vernon, another expert commissioned by Absolute, also opined that Imperial's estimate was unreasonable. <u>See</u> Ex. 13, Vernon Report, p. 9-10 (November 2004); Deposition of L. Skip Vernon, attached hereto as Ex. 14, at 80:10-92:14. He stated that Imperial's estimate "failed to properly consider many of the costs that were going to be included in the project and it was inadequate for

**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

the work that was specified to be done."  Deposition of L. Skip Vernon, attached

hereto as Ex. 14, at 80:24-81:04.  Mr. Vernon also gave the following testimony

regarding Imperial's estimate:

> Q.   What costs do you believe it failed to properly consider?
>
> A.   To the extent that the takeoff and estimate of square footage was incorrect by approximately a factor of two, all of the costs would be inaccurate.  According to the handwritten estimate, there was 13,000 feet of steel to be coated.  That appears to be inaccurate.
>
> Q.   In what way is that inaccurate?
>
> A.   Well, on the drawings, it indicates 20,000 square feet on just a sub-area of that contracted for by IIC and an actual takeoff in the area results in approximately 30,000 square feet of area to be coated under this contract.
>
> Q.   Did you perform the takeoff?
>
> A.   Yes.
>
> Id. at 81:05-20.

In his report, Mr. Vernon also stated that Imperial's estimate was deficient

because its labor calculations did not account for task, production rate, specified

cleanliness of the steel, and pre-existing substrate condition; the estimate failed to

evaluate the time necessary to perform certain tasks; and the estimate failed to

consider the amount and cost of abrasive and paint necessary to perform the

coating work.  See Ex. 13, Vernon Report, p. 9-10; see also Deposition of L. Skip

Vernon, attached hereto as Ex. 14, at 85:22-91:07.  Mr. Vernon has not issued a

report or given testimony modifying his opinions.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

### 3.    Absolute's Actual Costs Were Unreasonable.

The third element requires Absolute to prove that its actual costs were reasonable.  Failure to do so is grounds for rejecting a total cost claim.  For example, in <u>Cavalier Clothes, Inc. v. United States</u>, 51 Fed. Cl. 399 (2001), a clothing manufacturer entered into a contract with the government to produce coats for the military.  The manufacturer sought an equitable adjustment to its contract price due to an alleged change in the clothing specifications, and utilized the total cost method in preparing its claim.  The court determined that some of the contractor's costs were attributable to its own decision to dedicate labor to certain tasks, reasoning that:

> [I]t is essentially impossible to evaluate the reasonableness of plaintiff's costs without knowing how many coats were reworked as a result of the six disputed modifications – and that figure again remains unverifiable.  In such circumstances, plaintiff has not shown that its additional costs, though actually incurred, were not in the nature of 'mere[] overruns that any contractor with a fixed price contract would be required to absorb.'

<u>Id.</u> at 423 (internal citations omitted).  The court held that because the contractor did not prove that its actual costs were reasonable and caused by the changes in the specifications, it was not entitled to utilize the total cost method.  <u>Id.</u>

Here, Absolute must prove that its extra costs on the Project were reasonable, and were not caused by errors and inefficiency of Imperial and Absolute.  Absolute cannot meet this burden.

### 4.    Absolute is Responsible for a Substantial Amount of its Expenses

Finally, Absolute must show that Absolute, including its subcontractor, Imperial, was not responsible for <u>any</u> of the added expenses.  <u>K&K Recycling,</u>

**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Inc., 80 P.3d at 723 n. 62; Municipality of Anchorage, 826 P.2d at 325.  Absolute

cannot meet this burden.

It cannot be disputed that Absolute expended substantial amounts of

labor, equipment and materials repairing Imperial's failed work.  The project

record is replete with references to the defective work performed by Imperial.

Imperial's performance required that Absolute put forth substantial efforts to

initially supplement Imperial's workforce prior to termination, and later to correct

Imperial's defective work and to complete the remainder of the contract work.  See

Ex. 13, Vernon Report, p.7-8.

Dan Yell, Absolute's supervisory employee on the Project, testified:

Q.    Did you form an opinion about the quality of Imperial's work as a
      result of your engagement on this project?
…
A.    You want me to make a personal opinion of Imperial's work?

Q.    Yes, sir.  Based on your experience in the industry.

A.    Due to the amount of repairs, I thought repairs were excessive, and I
      had – my opinion was, is that Imperial got in over their head and
      didn't know what to do, didn't know how to finish it.  That's my
      opinion.
…
Q.    Did the amount of time and manpower that you had to devote to
      correcting defects in the work that Imperial had done increase the
      amount of time that you and your crew had to spend on the job?

A.    Yes.

Deposition of Daniel Yell, attached hereto as Ex. 8, at 79:14-16; 79:21-80:03;

106:03-07.

Other factors, such as the weather, complicated Absolute's efforts and

increased its costs.  "Because the project was significantly delayed, weather

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

conditions at the time of the AESI completion work increasingly worsened.  The effort required to meet the specified ambient conditions would become progressively more difficult causing decreased productivity and increased cost."  Ex. 13, Vernon Report, p. 8.  Absolute admits that the cost of its performance "was increased to some extent due to deteriorating weather," but it has not adjusted its actual cost calculation accordingly.  Ex. 16, Absolute Environmental's Responses to Coffman's Second Discovery Requests, p. 18 (July 7, 2006); Deposition of Todd Elmore, attached hereto as Ex. 10, at 232:21-233:10.  No credible effort has been made to account for these costs.

In a comparable case, the California Supreme Court held that it was improper to allow the plaintiff to use the total cost method.  See Amelco Elec. v. City of Thousand Oaks, 38 P.3d 1120 (Cal. 2002).  The City of Thousand Oaks awarded a contract to Amelco Electric for a lump sum price of $6,158,378.  Amelco sued the city for breach of contract and submitted a "total cost" damages claim.  Id. at 1122.  Amelco asserted that the project involved an unusually high number of changes, while the city asserted that Amelco lost money on the project because it failed to promptly start work, did not coordinate its work with other trades, reduced its workforce and was unable to complete its work efficiently, was disorganized, and generally mismanaged its work.  Id. at 1122-23.

The jury awarded Amelco more than 95% of what Amelco sought.  The city appealed, contending that the jury should not have been instructed on the total cost measure.  The court agreed because "Amelco failed to adduce evidence to satisfy at least the fourth element of the four-part test, i.e., that it was not

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

responsible for the added expenses." <u>Id</u>. at 1131.  After noting that the total cost

approach is disfavored, the court found Amelco's proof lacking in several respects:

> Amelco never attempted to demonstrate how a particular alleged breach
> caused certain damages.  Rather, Amelco conceded no effort was made
> during the project to distinguish between those inefficiencies that were
> Amelco's and those believed to be the responsibility of the City (and
> presumably other prime contractors and subcontractors).  Moreover,
> Amelco conceded it had been inefficient in performing the contract and that
> it had reduced its claim by an apparently arbitrary 5 percent … to account
> for any inefficiency on its part in performing the contract.  For the
> remaining 95 percent, the jury was simply asked to assume this inefficiency
> was the fault of LMB.  Nor did Amelco demonstrate when any particular
> breach occurred.  Rather, it sought to recover all of its costs over the life of
> the contract if the jury found at any undetermined point the contract had
> been breached.

<u>Id</u>. at 1132.

Here, too, it is undisputed that substantial but unmeasured costs incurred

on this project were Imperial's fault and the responsibility of Absolute.  Absolute's

cost experience is infused with the inefficiencies of completing  Imperial's delayed

work and the costs to re-work the errors Imperial left.  Absolute cannot use the

total cost method to prove its damages.

## CONCLUSION

As an essential element of its claims, Absolute must prove damages

proximately caused by defendant's breach.  Absolute cannot do so.  The testimony

of its proposed witness on damages must be excluded under Federal Rules of

Evidence 402, 403 and 702, and the <u>Daubert/Kumho Tire</u> line of cases, and under

the prohibition against "total cost" proof of damages.  Even if his testimony is

admissible, Absolute cannot meet its burden.  Absolute's damages analysis does

not draw the required causal link between any breach by Brechan and the alleged

**PERKINS COIE LLP**
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

damages.  Absolute's burden of proving causation cannot be met by its retained

witness's "total cost" approach, because Absolute cannot establish all four

essential prerequisites for proving damages using the total cost method.

Therefore, Brechan is entitled to summary judgment.

DATED:  August 4, 2006.

PERKINS COIE LLP
Attorneys for Defendant
Brechan Enterprises, Inc.


By   /s/ Michael E. Kreger
        Michael E. Kreger
        Alaska Bar No. 8311170
        James N. Leik
        Alaska Bar No. 8111109
        Perkins Coie LLP
        1029 W. Third Avenue, Suite 300
        Anchorage, Alaska  99501
        (907) 279-8561
        (907) 276-3108 (Facsimile)
        Email:  mkreger@perkinscoie.com

I hereby certify that on August 4, 2006, the
foregoing has been served by electronic mail on
Robert J. Dickson, Peter C. Partnow, William R.
Baerg, Terry R. Marston II, James B. Stoetzer, and
Eric J. Brown.

  /s/ Michael E. Kreger
      Michael E. Kreger

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108