# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

---

ABSOLUTE ENVIRONMENTAL SERVICES, )
INC., )
 )
    Plaintiff, )
 )
vs. ) No. 3:03-cv-0199-RRB
 )
FORREST J. MCKINLEY, et al. )
 )
    Defendants. )

---

Deposition Upon Oral Examination

of

MICHAEL LEMBKE

---

9:10 a.m.

May 17, 2006

1201 Third Avenue, Suite 4800

Seattle, Washington


Valerie L. Seaton, RPR

Court Reporter

Case 3:03-cv-00199-RRB  Document 218-4  Filed 08/04/2006  Page 3 of 8

Absolute vs. McKinley    5-17-2006                    Michael Lembke

### Page 130

1  Q. No. To support that. I know that's your
2  ultimate conclusion in your first report.
3  A. Yes. I found plenty of support for it.
4  Q. What findings -- are those findings reported
5  in your report?
6  A. Yes, they are.
7  Q. Are there any that are left out that you
8  thought of later as, gee, I wish I would have put that
9  in the report?
10 A. I don't know. I don't think so.
11 Q. What are the key findings that you remember
12 today to support your view that Imperial owed Absolute
13 a million dollars or more?
14     MR. MARSTON: Are you asking
15 entitlement, quantification or both? Objection;
16 ambiguous.
17     MR. KREGER: Appropriate. I'm talking
18 about entitlement at this point.
19     MR. MARSTON: You're talking about
20 entitlement.
21     MR. KREGER: Yes.
22     THE WITNESS: Could you read the
23 question back again, please.
24 Q. (BY MR. KREGER) I'll give it to you again.
25 What findings supported your conclusion that there was

### Page 131

1  entitlement from Imperial to Absolute?
2  A. Well, Imperial was basically incompetent.
3  They didn't know what they were doing and they got into
4  all sorts of difficulties out there. That was my
5  opinion then.
6  Q. What did you base that opinion on?
7  A. I looked at the job records, the daily
8  reports, how much work they got done, didn't get done,
9  the correspondence, the documents that I referred to
10 earlier.
11 Q. What did you rely on for project records to
12 reach that conclusion?
13 A. Well, most of them are referenced one way or
14 another in the report, but there's a whole volume of
15 IIC documents. There was some Brechan documents. A
16 lot of Absolute documents. I can't list them out for
17 you, but most of the most important ones are referenced
18 in that first report.
19 Q. Would they include reports by the Quality
20 Assurance representative?
21 A. Yes.
22 Q. Did you rely on the Quality Assurance
23 representative's reports to form your opinions?
24 A. I did consider his reports. Not so much in
25 terms of IIC's liability to Absolute, but rather to

### Page 132

1  give me factual background on what was going on day to
2  day on the job.
3  Q. Did you do an analysis to determine whether
4  Imperial was delayed in its completion of its work?
5      MR. MARSTON: Delayed by others?
6      MR. KREGER: Let's just start with
7  delayed first. Delayed for any reason by others or by
8  itself.
9      MR. MARSTON: Objection; ambiguous. Are
10 you talking about just completed late or there was
11 something that interfered with his performance because
12 it was self-imposed --
13 Q. (BY MR. KREGER) Did you understand my
14 question?
15 A. Well, I was going to reask it in a different
16 form.
17 Q. Okay. Let's try that.
18 A. I would differentiate between was Imperial
19 delayed versus did Imperial finish late with the
20 various aspects of the work.
21 Q. How about the latter part? Did they finish
22 late?
23 A. Yes.
24 Q. Why?
25 A. There are a lot of reasons.

### Page 133

1  Q. What were their main ones?
2      MR. MARSTON: As of what point in time?
3  Based on when his original report was drafted or based
4  on what he knows today?
5  Q. (BY MR. KREGER) You can go ahead.
6      MR. MARSTON: Objection; vague.
7  A. Well, we might as well get into this now, I
8  guess. Yes, Imperial was late performing some of their
9  work, most of their work. There are a lot of different
10 reasons for it. My opinions have changed as to what
11 some of those reasons were for some of those issues,
12 possibly not all, but there were a lot of factors.
13     I don't think they fully considered the tides
14 and how that was going to affect their work, for
15 example. I think they weren't very good with logistics
16 of getting what they needed over there in a timely
17 fashion. I don't think Mr. Puett properly knew how to
18 run his crew. But I also think that they were slowed
19 down by inspections and repairs that at the time that
20 this first report was written I really didn't
21 understand.
22     From my perspective now, I have changed my
23 opinion about some of those factors that did make them
24 finish late. I'm hoping I'm answering your question
25 here.

Case 3:03-cv-00199-RRB   Document 218-4   Filed 08/04/2006   Page 4 of 8

Absolute vs. McKinley    5-17-2006                          Michael Lembke

**Page 182**

1 Swalling, everybody, and they got into financial
2 trouble.
3     And then you follow the math on what they did
4 with their finances and how they dealt with Swalling
5 and how they dealt with the government to get
6 themselves back out of that financial position that
7 they were in, a loss exposure position, and you see
8 that at the end of the day via Modification Number 1
9 with Swalling, including relaxation of the
10 specifications to complete the work and Modification
11 Number 5 with the Coast Guard, attaining monies that
12 covered other issues that they had, that Brechan came
13 back out actually in better financial shape than when
14 they started.
15    And I think any person of normal intelligence
16 that pays attention to these documents can go through
17 and do the same thing.
18    Q.  (BY MR. KREGER) Let's go to Exhibit D.
19    A.  Exhibit D.
20    Q.  Why don't we work off of the errata that you
21 brought with you this morning. I think that's Exhibit
22 No. 2.
23    A.  Okay.
24    Q.  The figure on Paragraph 8 of 1,129,000,
25 what's the source of that figure?

**Page 183**

1    A.  I think of testified earlier that there was a
2 May of '05 revision to Absolute's claim to Brechan, and
3 that number comes from that revision.
4       MR. KREGER: Mark this as the next
5 document, please.
6       (Exhibit No. 17 marked for
7       identification.)
8    Q.  (BY MR. KREGER) Showing you now what has
9 been marked as 17, is that the revision you were
10 referring to?
11   A.  Yes.
12   Q.  You make mention of an Absolute claim against
13 Brechan. Was this the Request for Equitable Adjustment
14 that was done about this time in May 17 of '05?
15   A.  I believe this was an attachment -- I'm
16 sorry. I forgot to not speak until you were
17 completed. My apologies.
18   Q.  No. I forgot to ask you a quick question
19 too.
20      Did you take part in the preparation of the
21 Request for Equitable Adjustment?
22   A.  Not directly. Mr. Olson asked me to see if I
23 could break out the claim between Brechan and between
24 IIC. I told him that that would be very difficult and
25 so this was my effort to try to do that for him. And I

**Page 184**

1 believe it was an attachment to that REA, and I'm not
2 sure how they used it. But, no, I didn't have any
3 direct involvement in the REA.
4       (Exhibit No. 18 marked for
5       identification.)
6    Q.  (BY MR. KREGER) This is the Request for
7 Equitable Adjustment?
8       MR. MARSTON: Actually, it's not in
9 mine.
10      MR. KREGER: Let's go ahead anyway.
11 Sorry. I'll get you a copy.
12   Q.  (BY MR. KREGER) Did you review this REA
13 prior to or about the time it was prepared?
14   A.  No. The only involvement I had with this was
15 generating Exhibit 17. I didn't have any other
16 involvement in the REA itself, if that was the
17 question.
18   Q.  That's the question. Can I have that back
19 for a moment?
20   A.  Sure.
21   Q.  There's a statement in the REA that -- let's
22 see if I can find it now that I've turned it upside
23 down. This claim is not in conflict with the claim of
24 Absolute against Forrest J. McKinley and Emerco, Inc.
25 even though there is overlap in the amount of the

**Page 185**

1 claimed dollars. Do you see that?
2    A.  Yes.
3    Q.  Did you consult with Mr. Olson about whether
4 or not there was an overlap between the claim against
5 Absolute and the claim against Brechan in, at least,
6 the claim that was expressed in the REA against
7 Brechan?
8    A.  I had discussions with him to that effect
9 when I was preparing Exhibit 17, yes.
10   Q.  And there's another sentence that says,
11 Pending the outcome of many factual and legal issues,
12 it is not possible to confidently segregate all
13 portions of these damages between those that are
14 Brechan's responsibility and those that are the
15 responsibility of Forrest J. McKinley and Emerco, Inc.
16      Do you see that?
17   A.  Yes.
18   Q.  Did you consult with Mr. Olson about that
19 statement?
20   A.  Well, that is Mr. Olson's statement, but I
21 did tell him that -- or whoever signed this, but I did
22 tell him that it was very difficult to segregate these
23 costs.
24   Q.  Have you made an attempt at the present time
25 to segregate the costs?

Case 3:03-cv-00199-RRB   Document 218-4   Filed 08/04/2006   Page 5 of 8

Absolute vs. McKinley    5-17-2006    Michael Lembke

Page 186

1  A. Well, it's an ongoing effort; let's put it
2  that way.
3  Q. What's the current status of the effort?
4  A. Well, I've given an allocation in my report
5  on my second report dated March --
6  Q. What other --
7     MR. MARSTON: Wait a minute.
8  Q. (BY MR. KREGER) I'm sorry. I thought you
9  were done.
10 A. -- dated March 21.
11 Q. Mr. Marston is urging us to finish, so I --
12    What other efforts are ongoing besides what's
13 been reported here in Exhibit D and the errata to
14 Exhibit D that you brought with you?
15 A. The Errata Number 2 is the latest effort.
16 Q. Do you have any other assignments with
17 respect to the segregation of damages besides those?
18 A. Well, not specifically. But I learn more
19 about this case every day.
20 Q. Do you have a pending task asking you to do a
21 study that is geared toward further segregation of the
22 damages between those claimed against Brechan and
23 Coffman and those claimed against Imperial, other than
24 what's been reported in your expert report?
25 A. Well, Mr. Olson may very well ask me to do

Page 187

1  additional work along those lines.
2  Q. I understand that. Has he currently asked to
3  you do that?
4  A. Well, it's kind of an open issue at this
5  point, I think, is the best way to put it. As I said
6  earlier, it's an ongoing effort. I'm trying to figure
7  out how to do it and it's extremely complex.
8     MR. MARSTON: I'll state for the benefit
9  of the record that the only assignment he'll have on
10 that is to modify that allocation to the extent any new
11 information comes to light in accordance with his duty
12 to supplement based on new information that changes his
13 opinions. But he has not been asked to do anything
14 further in that regard.
15 Q. (BY MR. KREGER) What's the relationship
16 between your calculation of the amount of square
17 footage remaining to be done at the time Imperial was
18 terminated and your opinion that Brechan or Coffman are
19 liable for the costs of the work that were occurred
20 after Imperial departed from the job?
21    MR. MARSTON: Objection; assumes facts
22 not in evidence. Imperial terminated the contract not
23 Absolute.
24    THE WITNESS: I'll have to have that
25 read back.

Page 188

1     (The record was read back by
2     the reporter.)
3     MR. MARSTON: Same objection.
4  A. I think I answered that question previously,
5  but, basically, Absolute was out there trying to get
6  the job done, working very hard and they were spending
7  lots and lots of money going back trying to get areas
8  passed that were not passing the high voltage Holiday
9  testing that was being performed. And so it's my
10 opinion that the work that Absolute performed with
11 their own forces or with supplemented forces after IIC
12 left the job, those cost overruns should be borne by
13 Brechan.
14 Q. And how have you calculated those cost
15 overruns?
16 A. Well, I know what the actual costs are on the
17 project.
18 Q. What's the relationship between the cost
19 overruns and the actual costs on the project?
20 A. What's the relationship?
21 Q. Yes, sir.
22 A. Well, it's something in excess of 1.1, 1.2
23 million dollars.
24 Q. How did you calculate the actual costs on the
25 project?

Page 189

1  A. I didn't calculate it per se. I pulled it
2  off the job costs and accounting records that Absolute
3  has.
4  Q. And that's the same number that you used to
5  calculate the damage figure that you opined was owed by
6  Imperial to Absolute in your first report, right?
7  A. No. It's -- per Errata 2, that figure has
8  been revised to reflect the calculation that was done
9  on the May '05 revision to that claim.
10 Q. Is the revision still based on the actual
11 costs that Absolute encountered during the project as a
12 whole from start to finish?
13 A. Well, cost plus appropriate markups, yes.
14 Q. So how was the number -- I think we
15 understand how we go through a revision and I think
16 we've had that marked. How was the original number
17 derived? Can you answer that question?
18 A. How was which original number?
19 Q. The original number derived that you opined
20 was the costs that -- or the damages that you thought
21 Imperial owed to Absolute. How did you calculate that
22 number?
23 A. On my first report?
24 Q. Yes, sir.
25 A. Can I refer to that report?

48 (Pages 186 to 189)

Case 3:03-cv-00199-RRB   Document 218-4   Filed 08/04/2006   Page 6 of 8

Absolute vs. McKinley    5-17-2006                Michael Lembke

Page 190

1   Q. You sure can.
2   A. I'm looking at Page 14 of the November 12,
3   '04 report, Section 7 entitled "AESI Damages." And if
4   you look at that particular document, I have an
5   "As-Planned Costs" section with notes, and then I have
6   an "Actual Costs Incurred" section with notes, and then
7   I have a section where I back out the costs that
8   shouldn't be considered in this claim, and then markups
9   on top of those numbers leading to a bottom line of
10  $1,266,927.89.
11  Q. Then we take that number and we go through
12  the revision that we've had marked here as an exhibit
13  and we'll get to the number that you were using in your
14  reviewed Exhibit D, correct?
15  A. That's right.
16  Q. And in the revised Exhibit D, you took that
17  number and you said that when Imperial left the job the
18  terminator or the terminatee, when they left the job --
19      MR. MARSTON: Abandoned is a good word.
20  Q. (BY MR. KREGER) -- 70 percent of the initial
21  coatings remained to be applied, correct?
22  A. Approximately. But it's not that
23  cut-and-dried, in fact.
24  Q. You multiplied 70 percent times the revised
25  actual costs less as-planned costs and you got a number

Page 191

1   of $790,579.86, right?
2   A. Correct.
3   Q. What judgment or analysis have you used to
4   support your conclusion that some entity called
5   Brechan/Coffman is responsible for 70 percent of the
6   actual costs minus the as-planned costs?
7   A. Well, that's the approximate percentage of
8   the work that was performed by AESI after IIC left the
9   job.
10  Q. After IIC left the job, did Absolute have an
11  obligation to continue to perform the work?
12  A. Yes. They had a contract with Brechan to
13  perform the work.
14  Q. If IIC had been on the job, let's say they
15  switched, and instead of Absolute being the support
16  folks doing the surface preparation and Imperial being
17  the coating guys, they flip-flopped and Imperial was
18  the surface prep guy now and Mr. Yale or CORRPRO came
19  in and did the certified coating application work. Can
20  you assume that with me so far?
21  A. I'm lost already.
22  Q. All right. Fair enough.
23      MR. KREGER: Let me start over again if
24  he's lost.
25      MR. MARSTON: Let me tell you one of the

Page 192

1   concerns I have, because I'm going to object. You seem
2   to be asking him to assume that originally Absolute had
3   responsibility for surface preparation and that
4   Imperial had responsibility for applying the coatings.
5       MR. KREGER: I'm not asking him to
6   assume that. I'll start again.
7       MR. MARSTON: It sounded that way.
8   Q. (BY MR. KREGER) Assume that Imperial stayed
9   on the project and did additional work even though they
10  were -- assume that they were decertified but they
11  stayed on the project and did more work. Would the
12  cost to complete to Absolute have been reduced by
13  whatever work Imperial did, assuming it stayed on and
14  didn't leave?
15      MR. MARSTON: Objection; calls for
16  speculation.
17  A. If Absolute didn't pay Imperial for doing
18  that work, quite possibly.
19  Q. (BY MR. KREGER) So what relevance does the
20  70 percent initial coating have to the damages that you
21  believe were caused by Brechan or Coffman on this
22  project?
23      MR. MARSTON: 70 percent initial
24  coating? Object to the form of the question.
25  Q. (BY MR. KREGER) Your opinion -- let's start

Page 193

1   over again.
2   A. Okay.
3   Q. Your opinion says that Brechan and Coffman
4   are responsible for 70 percent of Absolute's actual
5   costs, right? Or Absolute's actual costs minus
6   as-planned costs?
7       MR. MARSTON: Losses.
8   A. Cost overruns, yes.
9   Q. (BY MR. KREGER) Where does the 70 percent
10  figure come from?
11  A. I think I testified that that's the
12  approximate amount of square footage that Absolute's
13  supplemented forces performed separately from IIC.
14  Q. If Imperial had left the project with 50
15  percent of the initial coating done, would your damage
16  calculation against Brechan and Coffman change?
17  A. Possibly but not necessarily.
18  Q. Can you explain that?
19  A. Well, I'm not sure, but I'll give it a try.
20  Imperial was incurring a lot of costs that they
21  absorbed that they never did get paid for. So there
22  was a lot of money that was put into Area A and about
23  half of Area B and, actually, a little bit in Area C
24  and D as well that Imperial didn't get compensated for.
25  By the same token, Imperial was being

Michael Lembke

```
                C E R T I F I C A T E
STATE OF WASHINGTON  )
                     ) SS.
COUNTY OF PIERCE     )
```

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the annexed and foregoing deposition of each witness named herein was taken stenographically before me and reduced to typewriting under my direction;

I further certify that the deposition was submitted to each said witness for examination, reading and signature after the same was transcribed, unless indicated in the record that the parties and each witness waive the signing;

I further certify that I am not a relative or employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

I further certify that each witness before examination was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

I further certify that the deposition, as transcribed, is a full, true and correct transcript

MOBURG & ASSOCIATES - SEATTLE, WA (206) 622-3110

Michael Lembke

1 taken at the time of the foregoing examination;

2          IN WITNESS WHEREOF, I have hereunto set my

3 hand and affixed my official seal this __31st__ day of

4 __July_____, 2006.

*Valerie Seaton*

VALERIE L. SEATON, RPR, CCR
Notary Public in and for
the State of Washington,
residing at Tacoma.
License No. 2557

[Notary seal: VALERIE SEATON, COMMISSION EXPIRES 07-07-07, NOTARY PUBLIC, STATE OF WASHINGTON]