# EXHIBIT 4

```
                                                              Page 1
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF ALASKA
 2
 3   ABSOLUTE ENVIRONMENTAL SERVICES,)
     INC., an Alaskan Corporation,   )
 4                                   )
              Plaintiff,             )
 5                                   )
         vs.                         ) Case No. A-03-0199
 6                                   ) Civil (RRB)
     FORREST J. McKINLEY and         )
 7   "JANE DOE" McKINLEY, and the    )
     marital community property      )
 8   composed thereof d/b/a "Imperial)
     Industrial Coatings" and EMERCO,)
 9   INC., etc.,                     )
                                     )
10            Defendants.            )
     EMERCO, INC., a California      )
11   Corporation d/b/a Imperial      )
     Industrial Coatings, etc.,      )
 2                                   )
              Counter-Claimant/      )
13            Third Party Claimant,  )
                                     )
14       vs.                         )
                                     )
15   ABSOLUTE ENVIRONMENTAL SERVICES,)
     INC., an Alaskan Corporation,   )
16   et al.,                         )
                                     )
17            Cross-Defendants/      )
              Third-Party Defendants.)
18
19   DEPOSITION UPON ORAL EXAMINATION
20   OF
21   MICHAEL K. LEMBKE
22
23   Taken at 1900 Fifth Avenue
     Seattle, Washington
24
25   DATE TAKEN:        FEBRUARY 11, 2005
```

Page 22

1   A.   Well, I basically started reading everything I
2   could find that was connected with the case.
3   Q.   Were you given access to the entire
4   correspondence file for the case?
5   A.   I'm not sure. I believe I was given access to
6   all of the documents that came in.
7   Q.   In what form were these documents? For
8   example, was there something that you could recognize as
9   an original Absolute correspondence file or were there
10  just collective letters you were given?
11  MR. MARSTON: Objection; form of the question.
12  A.   I'm not sure I understand what you are asking.
13  Q.   Let me ask this: Did you come, become
14  confident that you had reviewed all of the documents you
15  needed in order to form your opinions?
16  A.   Yes, I think so.
17  Q.   What occurred that lead you to that confidence?
18  A.   I pretty much reached the bottom of the stack
19  at some point and I had pretty well figured out what had
20  happened
21  Q.   What AESI financial information and statements
22  did you review?
23  A.   Just cost reports and I was given a copy of a
24  financial statement to review.
25  Q.   For what purpose did you review the financial

Page 23

1   statement?
2   A.   I wanted to look at various items on the
3   project, the billings on the project, profit and loss,
4   also G&A expenses, things of that nature.
5   Q.   What conclusion did you come to as to whether
6   or not Absolute made a profit or a loss on the project?
7   A.   Considering the work that they performed due to
8   Imperial's breach of contract, they lost a lot of money.
9   Q.   How much did they lose?
10  A.   I can't tell you that figure off the top of my
11  head.
12  Q.   When you are thinking of the losses, are you
13  including an amount as cost for the project for home
14  office overhead?
15  A.   Well, they lost a considerable amount of money
16  on the project itself without consideration of home
17  office overhead.
18  Q.   On page 1 of your report, there is a reference
19  to a set of interrogatories that you reviewed.
20  Let me show you some interrogatories with a
21  date of August 2, 2004, and ask you if those are the
22  interrogatories that you reviewed?
23  A.   I believe they are.
24  Q.   Did you review any other interrogatories that
25  were answered by IIC?

Page 24

1   A.   I think I did.
2   Q.   If you would turn to page 3. At the top of the
3   page there is a reference to certain interviews. One is
4   Dawni Haines, D-A-W-N-I, Haines.
5   Is she a full-time employee of Absolute?
6   A.   I don't know.
7   Q.   Is she an outside accountant?
8   A.   She's an accountant, yes.
9   Q.   What subjects did you discuss with Ms. Haines?
10  A.   What subjects? Job cost reports, financial
11  statements, how their accounting system worked.
12  Q.   Did she supply you with Absolute job cost
13  reports for the project?
14  A.   Yes.
15  Q.   Did she explain to you how Absolute maintained
16  its job costs for this project?
17  A.   In general terms, yes.
18  Q.   What did she tell you?
19  A.   Basically, that invoices would be received by
20  Absolute's office. They were coded by the project
21  manager or by Dave Olson, sent to her for input, and
22  after which she would compile them into reports and issue
23  reports periodically back to Absolute.
24  Q.   You said the costs were quoted by the project
25  manager or whom? Did you say Jay Wilson?

Page 25

1   A.   No, Mr. Olson.
2   Q.   Who did you understand the project manager to
3   be?
4   A.   Well, I think initially it was Todd Elmore, but
5   as things got out of hand, David Olson also got involved.
6   Q.   Did you perform any testing of the job cost
7   reports in an attempt to verify whether or not the
8   underlying records were in conformance with the job cost
9   reports?
10  A.   Yes, I did.
11  Q.   Would you describe what testing you did?
12  A.   I looked at invoices at Dawni Haines' office
13  and also at Absolute's office. They provided me with a
14  book of invoices which I reviewed.
15  I selected random entries and asked for copies
16  of the backup, copies of the checks, etc., just to trace
17  them through to make sure everything was legit.
18  Q.   And what did you find?
19  A.   I didn't find any discrepancies.
20  Q.   You also refer on page 3 to interviewing David
21  Olson. Were there any interviews with Mr. Olson --
22  strike that.
23  In this report, are you referring to the
24  initial interview that you described earlier?
25  A.   Yes, sir, I am.

Page 62

1  a certain point in time, the end of June, IIC had
2  expended 86 percent of its man-hours for the project.
3       What is the basis for that opinion?
4       A.  Well, the basis for that is I compared the
5  certified payrolls with their estimate.
6       Q.  And can you identify what you believed that you
7  reviewed which reflected the IIC estimate?
8       A.  Well, I don't know the Bates numbers offhand,
9  but there are three or four pages that I consider to be
10 ICC's original estimate that were produced.
11      Q.  In what format is this estimate?
12      A.  It's on an estimate worksheet. I believe it's
13 Mr. Puett's handwriting.
14      Q.  Are you aware of any other estimating
15 documents, other than the three or four pages of
16 handwriting that you described?
17      A.  Well, that was the original bid. There were
18 other documents that came after that that used the same
19 numbers that were generated in the original bid. I'm
20 referring to the original bid here.
21      Q.  On page 12, in the last sentence of the second
22 paragraph, you refer to IIC accidentally discharging
23 coatings, resulting in the job being shut down by
24 Brechan.
25      What is the basis for your belief that on that

Page 63

1  date the job was shut down by Brechan?
2       A.  Well, the documents that were generated that
3  day reflect it. There is a copy of the QAR'S NCR report,
4  and I think even the IIC report may refer to it as well.
5       Q.  For how long was the job shut down?
6       A.  I think it was one day.
7       Q.  The day that this occurred?
8       A.  I believe that's correct. It may have gone
9  into the second day as well. I'm not sure.
10      Q.  What is the basis for your opinion that the
11 incident, quote, upset the Coast Guard?
12      A.  Well, the Coast Guard base ends up with a spill
13 in its own waters, which was discussed at length on how
14 to avoid at the beginning of the job, and I know that the
15 Coast Guard discussed this with Brechan and Brechan
16 discussed it with Absolute and Imperial. So I think it
17 came down the chain of command from the Coast Guard.
18      Q.  I will have you turn to page 14.
19      The first sentence says, "AESI actual cost
20 records, with appropriate adjustments, have been used to
21 calculate its damages."
22      What are the adjustments that you have
23 reference to?
24      A.  Well, I spell all of them out in the notes in
25 the exhibits. They're pretty numerous.

Page 64

1       Q.  By "the notes," do you mean the notes on the
2  next page?
3       A.  There's note numbers and exhibit numbers to
4  each column of numbers, depending on what particular cost
5  item we're referring to, and those adjustments that you
6  are referring to are spelled out in those notes and in
7  the exhibits.
8       Q.  The AESI scope direct cost, first item, says,
9  "Note 5; Exhibit 8."
10      Would you explain to me how I would find the
11 appropriate references?
12      A.  Yes, sir. The note 5 is on the next page,
13 page 15 towards the bottom, and it refers you to
14 Exhibit 8, which is called the AESI Cost Calculation.
15      My report was tabbed, but you just have to find
16 Exhibit 8 in this copy.
17      Q.  Can I see what you found?
18      A.  It looks like that. I think you passed it.
19      Q.  The first part of your analysis shows that
20 there were as-planned costs of $956,845.54.
21      What is your understanding as to the basis for
22 the as-planned costs?
23      A.  I'm sorry, I was trying to get back here again.
24 Would you repeat your question? Do you have a sticky
25 note or something I can mark this with?

Page 65

1       Q.  Here is a paperclip.
2       What is the basis for your opinion that
3  Absolute's as-planned costs for the project was
4  956,000-odd-dollars?
5       A.  It's based on the contract with Imperial and
6  it's based on Absolute's scope that they were to perform
7  under that contract and it's also based on some warranty
8  work that they did for Brechan that was outside of the
9  contract.
10      Q.  What does the subcontract -- did Absolute have
11 any estimate that it prepared for this project that you
12 reviewed?
13      A.  Yes, sir.
14      Q.  And would you describe what that estimate
15 looked like?
16      A.  I'm sorry, did you say Absolute?
17      Q.  Absolute.
18      A.  Absolute had an estimate. Apparently, it got
19 lost. So I did not have an opportunity to review it.
20      Q.  Who told you their estimate got lost?
21      A.  Well, we couldn't find it. I asked for it and
22 we never did find it.
23      Q.  Did anyone tell you that there actually was an
24 estimate prepared?
25      A.  Yes.

C E R T I F I C A T E

STATE OF WASHINGTON    )
                       ) ss
COUNTY OF KING         )

I, JOLENE C. HANECA, a Certified Shorthand Reporter and Notary Public in and for the State of Washington, do hereby certify that the foregoing transcript of the deposition of MICHAEL K. LEMBKE, having been duly sworn, on FEBRUARY 11, 2005, is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 25TH day of FEBRUARY, 2005.

*Notary Public*
*State of Washington*
*JOLENE C. HANECA*
*My Appointment Expires Mar 28, 2006*

JOLENE C. HANECA, RPR, CCR

My commission expires:
March 28, 2006



**BUELL**

Telephone: 206.287.9066