**EXHIBIT 7**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3
 4  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., An Alaska
 5  corporation,
 6              Plaintiff,
 7     vs.
 8  FORREST J. McKINLEY and "JANE
    DOE" McKINLEY, et al.,
 9
                Defendants.
10  _____
11  Case No A03-0199 Civil (RRB)
12
13
14
15
             VIDEOTAPED DEPOSITION OF DAVID OLSON
16
                   Taken February 13, 2006
17                 Commencing at 9:00 a.m.
18         Volume I - Pages 1 - 243, inclusive
19
20
                   Taken by the Defendant
21                           at
                        PERKINS COIE
22             1029 W. Third Av., Suite 300
                   Anchorage, AK  99501
23
24
25  Reported by:
    Susan J. Warnick, RPR
```

COPY

Page 138

1  22 pricing and our November 25th pricing to the time we
2  signed the contract.
3  Q   Now, your pricing never changed, correct?
4  A   Right, because it was --
5  Q   October it was 9,985 --
6      MR. MARSTON: Counsel. Counsel, let him answer
7  the question.
8  BY MR. KREGER:
9  Q   -- and November it was 985 --
10     MR. MARSTON: Counsel, you can keep asking that
11 over and over again --
12 BY MR. KREGER:
13 Q   -- and in December it was 985.
14     MR. MARSTON: -- but until he is done answering
15 the last question, I'm going to object to your stepping on
16 his answer and interrupting him.
17 BY MR. KREGER:
18 Q   Mr. Olson, can you answer the question?
19 A   The original question?
20 Q   Yup.
21 A   The original question: Does this have a
22 scope-related amount to it? Is there any way we can scope
23 between this e-mail and reconcile this --
24 Q   That wasn't my original question. Why don't we start
25 with that again.

Page 139

1  Q   Let's go to the original question, please.
2      Here's my question.
3      MR. MARSTON: We're going to take a break after
4  this.
5  BY MR. KREGER:
6  Q   How much painting-related work, such as weld cleaning
7  and stripe coat portion, did AESI anticipate doing as part
8  of this project?
9  A   I don't know. Or Absolute? Absolute, none.
10     MR. MARSTON: Okay. We're going to take a
11 break.
12 BY MR. KREGER:
13 Q   How much did your subcontractor anticipate doing?
14 A   I don't know.
15     MR. MARSTON: We're going to take a break now.
16     MR. KREGER: Let's take a break.
17     THE VIDEOGRAPHER: Conclude tape two and move
18 off record at 2:04.
19     (Recess taken.)
20     THE VIDEOGRAPHER: Tape three. We're back on
21 record at 2:15.
22 BY MR. KREGER:
23 Q   We were working before the break on the question
24 about what specifications you read prior to estimating the
25 project. And you asked me to look at your deposition and

Page 140

1  I was able to find it during the break. I direct your
2  attention to 195, the lower right-hand side. Take a
3  minute and read that and see if that refreshes your
4  recollection.
5      And the question is: Which specifications did
6  you read prior to estimating the project?
7  A   The only specification we could read prior to
8  estimating the project was June 21.
9  Q   Okay. New question then: Did you read the 2002
10 specification prior to signing the contract?
11     MR. MARSTON: Objection. Vague.
12     THE WITNESS: Yeah, I have no doubts that we
13 read it.
14 BY MR. KREGER:
15 Q   Okay. In what way did you estimate the project?
16     MR. MARSTON: Objection. Lack of foundation.
17     THE WITNESS: Did I estimate the project?
18 BY MR. KREGER:
19 Q   Let's start with that.
20 A   I didn't estimate the project.
21 Q   Did anybody at Absolute estimate the project?
22 A   Jason Peterson, probably with some involvement of
23 Todd Elmore because Todd entered, oh, values into the
24 means spreadsheet. So I suppose it was a collaborative
25 effort on their parts.

Page 141

1      MR. KREGER: Mark this as the next exhibit,
2  please.
3      (Exhibit 89 marked.)
4  BY MR. KREGER:
5  Q   Would you take a look at Exhibit 89, please.
6  A   I'm looking at it.
7  Q   Do you recognize this document?
8  A   I've seen it before, yes.
9  Q   When did you see it?
10     MR. MARSTON: First?
11     THE WITNESS: The first time I saw it?
12 BY MR. KREGER:
13 Q   Let's start with that.
14 A   I don't recall the first time I saw it, but I know I
15 saw it as we were getting all of our documents together
16 for the initial disclosure.
17 Q   Do you know whose handwriting this is?
18 A   I'm thinking it's Mr. Puett's handwriting.
19 Q   Do you recognize it as Mr. Peterson's handwriting?
20 A   No.
21 Q   The third line down says, "Pier 13, 14, 15, approx
22 4500 square feet." And then there's a dollar sign.
23     Do you see that?
24 A   Uh-huh.
25 Q   And then he's got initials AE over there. When you

Page 142

1  saw this for the first time, what did you think AE meant?
2  A  I didn't have any thought as to what it meant.
3  Q  Okay. How about the next line down, IIC; what did
4  you think that meant?
5  A  I didn't -- I could speculate, but I don't know that
6  I thought anything of it.
7  Q  Okay. Well, the number there, the 772,123, do you
8  see that?
9  A  Uh-huh.
10 Q  That's the subcontract price between Imperial and
11 Absolute, right?
12 A  I believe it's right in the vicinity of there, yeah.
13 Q  Well, let's not --
14 A  Well, no, I think it's --
15 Q  Let's make sure we --
16 A  It's 772 something.
17 Q  Well, let's look at it to be sure.
18 A  Okay. 772,123, I see on Exhibit No. 2.
19 Q  And that's the number -- right in the vicinity is
20 correct, right?
21 A  Correct.
22 Q  And the 995,850, that's the dollar amount of your
23 subcontract originally, correct?
24 A  Yup, it is.
25 Q  So have you talked with Mr. Puett about who had

Page 143

1  responsibility to do the work on piers 13, 14, and 15 at
2  the dock, that approximately 4500 square feet?
3  A  That would -- the work, meaning the coatings work for
4  the contract?
5  Q  Yes, sir.
6  A  That would have been Imperial's work.
7  Q  Okay. So new question: Were you involved in the
8  decision as to how you came up with this number of 995,850
9  to use on your subcontract proposal to Brechan?
10 A  Mr. Holmstrom indicated to myself, and I believe Mr.
11 Peterson also, that we needed to be under a million
12 dollars for the pricing. So I'm assuming we backed in to
13 see if we could do the work as it was scoped for that
14 money.
15 Q  Is that an assumption or something that you know
16 personally?
17 A  I didn't -- like I said, I didn't estimate it. Jason
18 is going to be the one to talk to on that.
19 Q  Well, there's sometimes a difference -- and maybe I'm
20 overworking this, but sometimes there's a difference
21 between estimating the cost of doing a job and sending a
22 proposal to another party for that job. One might say,
23 I'm estimating the cost for me to do it; and another might
24 say, this is the price I'll do it for, which might include
25 such things as overhead and profit.

Page 144

1  So did you -- were you involved in preparing
2  this proposal price of 995,850 to Brechan?
3  A  No.
4  Q  How much --
5  A  Short of what I just explained to you. Sorry for
6  interrupting you, but...
7  Q  Okay. How much profit did Absolute anticipate making
8  on this project?
9  A  I can't remember without taking a look at the
10 estimate we had worked up for our portion of the work. We
11 were providing vehicles and the vats and the sponge jet
12 units. And I believe there was an estimate put together
13 on that, which would detail our anticipated profit.
14 Q  Did that detail your anticipated profit on the entire
15 job or just on the cost of doing the work that you
16 referred to?
17 A  Yeah, I believe it would have the entire job.
18 Q  Have you seen that estimate recently?
19 A  No, not recently.
20 Q  I don't know where I heard it, but I believe I've
21 been told that -- oh, I believe in Mr. Lembke's
22 deposition, he indicated that he asked for it and was told
23 by Absolute that it had been lost. And I would represent
24 to you that I haven't seen what appears to me to be that
25 bidding document that would identify your profit.

Page 145

1  But you're -- are you quite comfortable, then,
2  that there is such a document and that it exists?
3  A  I think in order for Mr. Lembke to finish his report,
4  we had to have provided him with our estimate. But I --
5  I'd have to go check our records on that.
6  Q  So that would have been something important for
7  Mr. Lembke to have, correct?
8        MR. MARSTON: Objection. Foundation.
9        THE WITNESS: What our anticipated costs are and
10 how we exceeded that, yeah. I would --
11 BY MR. KREGER:
12 Q  Well, I was -- I'm still talking about the profit.
13 So -- and I'm still working on this missing document.
14       MR. KREGER: We'll write you a letter, counsel,
15 and ask for your effort to locate if there is a bid.
16       MR. MARSTON: I'll be happy to look for it.
17 BY MR. KREGER:
18 Q  So what -- strike that.
19       The 772,123, that's going to be paid to IIC,
20 right, as a part of their subcontract?
21 A  That was the amount of their subcontract.
22 Q  So that leaves whatever my calculator would show me
23 between 772 and 995 to Absolute, correct?
24 A  That's -- would be the amount we contracted for, was
25 995.

Page 162

1  understanding that we had a million dollar cap from
2  Mr. Holmstrom, and we plugged the Means estimate in. I
3  don't know if Tom did the same or not. But we had to
4  build -- put the estimate -- convert it into the Means in
5  order for the Coast Guard to deal with it; that was the
6  protocol, so.
7         Beyond that, I didn't deal with the preparation
8  of selecting categories and things of that nature sure.
9  It was done by Mr. Peterson.
10 Q  If you would have estimated this job to cost a
11 million five, what would you have bid to do it?
12        MR. MARSTON: Objection. Calls for speculation.
13        THE WITNESS: You mean if the job cost was a
14 million five?
15 BY MR. KREGER:
16 Q  If you would have estimated this job to cost a
17 million five to do, what would you have bid it for?
18 A  If we -- we normally put on 10 and 15. We'll put 15
19 percent overhead on a project, and then put 10 percent
20 profit on it.
21 Q  So a million five plus 10 for --
22 A  15 percent overhead --
23 Q  15 overhead, 10 profit.
24 A  Yes.
25 Q  So that comes up somewhere around a million six or

Page 163

1  seven; I haven't done the math. But -- so what would you
2  have bid to do the work?
3  A  Well, it depends -- and we can't do that if we have
4  -- in this case, we had a subcontractor, and we can't very
5  well put 10 and 15 on them, being a large portion of the
6  work. It just changes from job to job, depending upon how
7  much work we're doing versus how much we have a
8  subcontractor doing. As I said, I let Mr. Peterson deal
9  with most of those. Occasionally we'll confer on mark-ups
10 on certain things.
11 Q  Would you have bid it for something more than $1
12 million?
13        MR. MARSTON: Objection. Calls for speculation,
14 incomplete hypothetical.
15        THE WITNESS: If we had a job cost of $1.5
16 million?
17 BY MR. KREGER:
18 Q  Yes.
19 A  I think that it would be an affirmative answer, given
20 the -- what I just told you.
21 Q  I didn't understand your answer.
22        MR. KREGER: Could you read me that answer
23 again?
24        THE WITNESS: Could I have that question and
25 answer read back again?

Page 164

1         MR. KREGER: Let's not interrupt. Let's --
2  BY MR. KREGER:
3  Q  Could you -- when you said that would be an
4  affirmative answer, what are you saying?
5  A  If I knew I had a job cost on a job of 1.5 million,
6  would I bid it for a million dollars?
7  Q  Yes, sir.
8  A  No.
9  Q  Thank you.
10 A  Sorry.
11 Q  What efforts did you make, if any, to verify the
12 accuracy of Imperial's proposal to you.
13        MR. MARSTON: Him personally?
14        THE WITNESS: I was just about to say, me
15 personally, I didn't -- I didn't do anything to verify it.
16 BY MR. KREGER:
17 Q  How about Absolute in general?
18 A  Jason had the ongoing communications, and Todd did,
19 with Mr. Puett and Imperial.
20 Q  So you personally didn't make any effort and you --
21 do you know or not know whether Mr. Peterson made any
22 efforts to verify the accuracy of the bid that --
23 A  I don't know what efforts he did.
24 Q  -- was given? You don't know what efforts he made?
25 A  I don't know what efforts he went to.

Page 165

1  Q  He may have done nothing; he may have done a lot.
2  You don't know?
3  A  That's correct.
4  Q  Would you agree with me that both Mr. Vernon and
5  Mr. Lembke have written reports that opine that Imperial
6  had a substantial bid error in their project?
7         MR. BROWN: Object to the extent he's going to
8  testify to hearsay.
9         MR. MARSTON: Objection. Vague.
10        THE WITNESS: Would I say that they said that in
11 that report?
12 BY MR. KREGER:
13 Q  In their reports.
14 A  In their reports. Given what I know -- did they
15 write that? I don't know if they did or not. I'd have to
16 look at the reports.
17 Q  Okay. On page nine of the report by Mr. Vernon, he
18 writes, "In my opinion, the IIC schedule, estimate and bid
19 are not based on a reasonable analysis and compilation of
20 cost factors resulting in the specified requirement and
21 reasonably anticipated field impact."
22        Does that refresh your recollection as to
23 whether Mr. Vernon included comments in his report about
24 IIC's bid.
25        MR. BROWN: Same objection to the extent he

```
 1                REPORTER'S CERTIFICATE

 2        I, SUSAN J. WARNICK, RPR, and Notary Public in

 3   and for the State of Alaska do hereby certify:

 4        That the witness in the foregoing proceedings was

 5   duly sworn; that the proceedings were then taken before me

 6   at the time and place herein set forth; that the testimony

 7   and proceedings were reported stenographically by me and

 8   later transcribed under my direction by computer

 9   transcription; that the foregoing is a true record of the

10   testimony and proceedings taken at that time; and that I

11   am not a party to nor have I any interest in the outcome

12   of the action herein contained; that signature was

13   requested.

14        IN WITNESS WHEREOF, I have hereunto subscribed my

15   hand and affixed my seal this 28th day of February

16   2006.

17

18                        _____
                          SUSAN J. WARNICK,
19                        Registered Professional Reporter
                          Notary Public for Alaska
20

21   My Commission Expires:  April 8, 2006
22

23

24

25
```

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3
 4   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., An Alaska
 5   corporation,
 6              Plaintiff,
 7        vs.
 8   FORREST J. McKINLEY and "JANE
     DOE" McKINLEY, et al.,
 9
                Defendants.
10   _____
11   Case No A03-0199 Civil (RRB)
12
13
14
15
                    DEPOSITION OF DAVID OLSON
16
                    Taken March 30, 2006
17                  Commencing at 9:00 a.m.
18        Volume III - Pages 244 - 424, inclusive
19
20
                    Taken by the Defendant
21                          at
                        PERKINS COIE
22            1029 W. Third Av., Suite 300
                  Anchorage, AK  99501
23
24
25   Reported by:
     Susan J. Warnick, RPR
```

                         COPY

Page 253

1  Absolute other than yourself who did what you would
2  understand to have been a site inspection prior to
3  submitting the proposal to perform the work?
4  A  I don't know if I asked any of my personnel to go out
5  there and take a look at it between the time I was out
6  there in February and bid time.
7  Q  Sitting here, I gather this is Mr. Peterson sitting
8  here, who I haven't met before. We'll chat with him
9  tomorrow. You have no recollection today as to whether
10 you asked Mr. Peterson to go out there and, in your
11 understanding, inspect the site prior to putting your
12 proposal together?
13 A  No, I don't recollect. I don't think I did.
14 Q  My understanding was you were there in February on
15 that visit and that Mr. Puett was with you, correct?
16 A  Correct.
17 Q  And do I correctly understand that you, essentially,
18 because of your lack of experience in doing this type of
19 work, you relied upon Mr. Puett to look at the conditions
20 that were there and make the professional judgment as to
21 how much it was going to cost to do the coating work?
22 A  The scope of the -- I guess you would have to look at
23 the context of the February site visit. At the request of
24 Brechan, we came out, and Matt wanted us to look at
25 Swalling's work, and they had some -- I think that

Page 254

1  Mr. Puett made reference. They had some high millage
2  spots and runs and sags and things of that nature. And
3  was it -- I'm just stating, as I said previously, was that
4  set forth as the prebid site inspection? No. It was all
5  in limbo at that time. It was based on if they we were
6  going to have the funding to continue on with Phase 2. I
7  don't even think they even knew if they were going to
8  continue on with Swalling or not, so.
9  Q  My question was: Isn't it true that in terms of how
10 much it was going to cost to do -- to remove the existing
11 coatings and to apply the new coatings to meet the
12 finished standards called for in the specifications, you
13 relied upon Mr. Puett and his background and experience?
14 A  Yes.
15 Q  You did not yourself have the knowledge, background,
16 and experience to estimate that work?
17 A  No.
18 Q  Did you request that Mr. Puett go out to the site at
19 some point after the February time that the two of were
20 there to make sure that his estimate to perform the work
21 was going to take into consideration the conditions -- the
22 existing conditions in the wharf?
23 A  Did I request him to go back out?
24 Q  Yes.
25 A  No, I don't think I did.

Page 255

1  Q  So you were satisfied that the visit that you and
2  Mr. Puett had done in February was sufficiently detailed
3  to allow an accurate price proposal to be submitted?
4  A  Well, I can't speak for Mr. Puett, but for what we
5  were going to do, I'd say yes, in working in support. I
6  knew, since we weren't doing the application, I wasn't
7  looking in the same manner that he would be looking at it.
8  Q  But Mr. Puett and his company were going to be your
9  subcontractor; weren't they?
10 A  Yes.
11 Q  And, ultimately, you know, in your understanding, not
12 asking for a legal conclusion, but in your understanding
13 and your experience in the contracting business, you were
14 going to be responsible to your contractor, Brechan, for
15 the work Mr. Puett did; weren't you?
16 A  Ultimately I'm responsible for it, yes, correct, in
17 any subcontract situation. I may have five potential
18 bidders on a project, and, you know, I've got to look at
19 when their proposal comes in, what their inclusions and
20 exclusions and scope of work and price, all of those
21 items, and take them into consideration.
22 Q  Right. So you wanted to be fairly confident that
23 Mr. Puett's price proposal was a solid proposal that you
24 were going to be able to have the work performed and not
25 have it cost substantially more than what his estimate to

Page 256

1  you indicated?
2  A  Well, you also have to keep in mind, we were given a
3  million dollar budget on it, as I testified to previously.
4  Matt Holmstrom told us we needed to be under a million
5  dollars. So we had to back out of the number to see if we
6  could do it for that much money.
7  Q  But you have also testified; haven't you, that if it
8  was a three million dollar job, you were going to offer to
9  do it for a million dollars, just to stay in his budget;
10 weren't you?
11 A  Oh, no --
12      MR. ELISON: Objection, asked and answered and
13 mischaracterization.
14      THE WITNESS: No, I testified earlier if the job
15 was a million and a half or two million dollar job, I
16 certainly wouldn't bid it for a million dollars.
17 BY MR. PARTNOW:
18 Q  Right. So you wanted to be confident, even though
19 there was a number that Mr. Holmstrom may have given you,
20 that the numbers Mr. Puett were giving to you were
21 reliable estimates?
22 A  I have to rely -- if he gives me a number, we ask,
23 you know, are these budgetary numbers working for you
24 based on the square footage of the job. I mean, I don't
25 imagine that they would submit a price to me if they

Page 257

1  weren't comfortable with the price.
2  Q   If you had had a question in your mind as to whether
3  his visit to the site was an adequate visit for him to
4  prepare an accurate estimate, you would have specifically
5  asked him about that; wouldn't you have?
6  A   If I saw a problem?
7  Q   Yeah.
8  A   I suppose if I saw a problem, yeah, I would ask him
9  about it.
10 Q   If you had some concern as to whether he had a
11 sufficient opportunity to look at the site to submit an
12 accurate bid, you would have either directed him to go
13 back out and look some more or at least questioned him to
14 make sure --
15     MR. ELISON: Objection, calls for speculation,
16 assumes facts not in evidence.
17     THE WITNESS: I would be directing subs. I
18 mean, we bid work all the time that we either, A, don't
19 look at it. Sometimes we do look at it. More often than
20 not, Mr. Peterson will take a look at a project. The
21 asbestos work we do, look at it and formulate his bid, but
22 sometimes time doesn't allow you to do that. So I don't
23 know what you're asking as far as my responsibility to
24 request or force Mr. Puett and his firm to go out and do
25 additional site visits. I wouldn't have any reason to ask

Page 258

1  them to go make an additional site visit. If he's
2  comfortable with his number and he is proposed the number,
3  and I can do the work for this many dollars, I'm going to
4  take that at face value.
5  BY MR. PARTNOW:
6  Q   But you have to be comfortable with his number as
7  well or you're not going to include it in your proposal;
8  are you?
9  A   Well, I had budgetary numbers from Brechan of what
10 they had under budget and what they previously had in the
11 budget, and what from I understood, we were consistent
12 with what their budgetary numbers were.
13 Q   Did you have any question as to whether or not
14 Mr. Puett had had an adequate opportunity to view the site
15 and make an accurate estimate as to what it was going to
16 cost Imperial to do that work?
17 A   First part of your question again?
18     MR. PARTNOW: Can you read back the question.
19     (Requested record read.)
20     THE WITNESS: That's a compound question.
21 You're kind of asking two questions there, and my answer
22 would be, no, to did you have cause or reason.
23 BY MR. PARTNOW:
24 Q   From your earlier testimony, my recollection is the
25 only two people that you dealt with from Coffman with

Page 259

1  regard to this project were Mr. Stears and
2  Mr. Hardenbergh?
3  A   Yes.
4  Q   Did you have -- actually, meet Mr. Stears or were
5  your conversations either telephonically or through
6  e-mail?
7  A   I don't think I met Mr. Stears until very late in the
8  project. Probably in July or August of 2003.
9  Q   Do you recall if you met Mr. Stears before or after
10 the time that Imperial was no longer on the job?
11 A   I don't know. That's why I just said July or August,
12 somewhere in that vicinity.
13 Q   Did you meet Mr. Stears here in Anchorage or out in
14 Kodiak?
15 A   Would have been here. I don't recall ever meeting
16 him out in Kodiak.
17 Q   What was the occasion for your meeting Mr. Stears?
18 A   Stopping by their office to say hello.
19 Q   Were there any particular issues that were discussed
20 with Mr. Stears that you recall other than, hi, I'm Dave
21 Olson?
22 A   Oh, I wanted to meet Mr. Stears, and I'm sure we
23 chatted along with Mr. Hardenbergh. I know I met with
24 them after we were off the project, but I can't remember
25 when exactly or what we talked about.

Page 260

1  Q   When you met with Mr. Stears, did you have any
2  complaints that you did pass on to him about the work that
3  Coffman was performing in conjunction with the project?
4  A   No.
5  Q   Did you have complaints that you were aware of at
6  that time that for some reason you didn't pass on to
7  Mr. Stears?
8  A   With Coffman's work?
9  Q   Yes.
10 A   No.
11 Q   Did you have any problems with Mr. Stears in terms of
12 his -- as far as you could tell, his responsiveness?
13 A   No.
14 Q   His professionalism, as far as you could tell?
15 A   No.
16 Q   During the entire time that Absolute was actually
17 doing -- performing the work on the cargo wharf project,
18 did you at any point have any concern about anything that
19 Mr. Stears had done or not done?
20 A   During our work on the cargo pier?
21 Q   Yes.
22 A   No.
23 Q   What about Mr. Hardenbergh? You didn't know
24 Mr. Hardenbergh before this project started; did you?
25 A   No.

Page 265

1  grinding. Had to grind the hell out of the cargo pier,
2  out of the steel, to get it down to a surface where he
3  could put a surface profile on it, where it -- where the
4  paint would adhere, and we could get rid of the holidays.
5  Q   Did he tell you at some point that he was
6  encountering conditions that couldn't reasonably have been
7  anticipated when the job was bid?
8  A   No. He didn't participate in the bid aspect of the
9  project, so he wouldn't have any knowledge in that regard.
10 So, no.
11 Q   Did he at any point tell you that he was encountering
12 conditions that, from his experience, could not reasonably
13 have been anticipated?
14 A   I don't think he mentioned that, no.
15 Q   Did he mention that he was having particular problems
16 in the weld areas?
17 A   I don't recall him specifically mentioning the weld
18 areas, no.
19 Q   Did you at any point make any request to Jerry
20 Hardenbergh to give a clarification or some additional
21 direction or assistance because of the problems that
22 Mr. Yell told you he was having in obtaining a
23 holiday-free finish?
24 A   Would you read that back, please?
25     (Requested record read.)

Page 266

1      THE WITNESS: You're asking two or three
2  different things. First part of that question, did we ask
3  for any direction or assistance from Mr. Hardenbergh?
4  BY MR. PARTNOW:
5  Q   Yes.
6  A   Is basically what you're asking?
7  Q   Yes.
8  A   Boy, I don't recall if we did or not.
9  Q   I mean, as a contractor, from your experience, if you
10 encounter an unanticipated condition that's going to cost
11 you more money, is it your first response to go back to
12 the owner or somebody on the project and say, he, we got a
13 problem here, how are we going to deal with it?
14     MR. ELISON: Objection, foundation.
15     THE WITNESS: Typically, my business, when we
16 find an unanticipated problem?
17 BY MR. PARTNOW:
18 Q   Yes.
19 A   Yes.
20 Q   But you didn't do that on the cargo wharf project;
21 did you?
22 A   I didn't know it was an unanticipated problem at the
23 time I was there.
24 Q   Well, when Mr. Yell was telling you that he was
25 having problems, did you go out to the site and look at

Page 267

1  the specific conditions that were causing the problem?
2  A   Yeah, we looked at it, and he told me he couldn't get
3  the areas turned over because of the holidays, and I said,
4  what do we do; he said, we're going to have to remove the
5  steel, and I made the call to grind and remove, do what we
6  needed to do to meet the holiday-free criteria.
7  Q   When you say grind the steel, you're talking about
8  the nonstructural steel, the various hangers and so forth
9  that were on the various piers?
10 A   No. That's not what I said.
11 Q   What steel are you referring to?
12 A   Whatever steel needed to be ground.
13 Q   Are you talking about actually removing it or
14 smoothing or both?
15 A   Grinding would be a method of removing it. Whatever
16 we needed to do to prep the surface so we could obtain a
17 profile to put the coating on. And Corrpro was making --
18 I can't remember the fellow's name. Since they had
19 experience with this material, he had a good idea of what
20 level we needed to get to to put the material on.
21 Q   You don't recall the name of the person or people
22 from Corrpro with whom you dealt?
23 A   No, I can't remember the fellow's name out of Canada.
24 Q   What was the relationship between them and Dan Yell?
25 Was he basically supervising their work or were they

Page 268

1  supervising his work?
2  A   We were supervising his work. Dan Yell was my
3  employee. So Corrpro was my subcontractor. I mean, they
4  worked at our direction, insofar as they were a
5  subcontractor, but we were relying on their expertise in
6  actually applying the coatings.
7  Q   Did the person or people from Corrpro tell you that
8  they were encountering some condition that they could not
9  reasonably have anticipated, that it was making it
10 difficult for them to obtain a holiday-free coating?
11 A   No, not -- no, they didn't mention that to me.
12 Q   And do you recall that the specifications for Phase 2
13 gave you the discretion about whether to remove
14 nonstructural steel, whether to stripe coat it, or to
15 caulk it?
16     MR. ELISON: Objection, documents will speak for
17 themselves.
18     THE WITNESS: I'd have to take a look at it, but
19 I believe that it gave us those options.
20 BY MR. PARTNOW:
21 Q   And so in terms of which of those approaches would be
22 pursued, you or your subcontractor could make the
23 determination as to what was the most efficient, cost-
24 effective approach to pursue?
25     MR. ELISON: As between those choices?

```
 1                    REPORTER'S CERTIFICATE

 2            I, SUSAN J. WARNICK, RPR, and Notary Public in

 3    and for the State of Alaska do hereby certify:

 4            That the witness in the foregoing proceedings was

 5    duly sworn; that the proceedings were then taken before me

 6    at the time and place herein set forth; that the testimony

 7    and proceedings were reported stenographically by me and

 8    later transcribed under my direction by computer

 9    transcription; that the foregoing is a true record of the

10    testimony and proceedings taken at that time; and that I

11    am not a party to nor have I any interest in the outcome

12    of the action herein contained; that signature is

13    requested.

14            IN WITNESS WHEREOF, I have hereunto subscribed my

15    hand and affixed my seal this 19th day of April,

16    2006.

17

18                              _____
                                SUSAN J. WARNICK,
19                              Registered Professional Reporter
                                Notary Public for Alaska
20

21    My Commission Expires:  April 8, 2010

22

23

24

25
```