# EXHIBIT 8

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ALASKA

 3
     ABSOLUTE ENVIRONMENTAL
 4   SERVICES, INC., an Alaska Corporation.

 5        Plaintiff,

 6   -vs-

 7   FORREST J. MCKINLEY, an individual
     d/b/a "Imperial Industrial Coatings",
 8   EMERCO, INC., a California corporation,
     d/b/a Imperial Industrial Coatings;
 9   BRECHAN ENTERPRISES, INC., an
     Alaska corporation; and SAFECO
10   INSURANCE COMPANY OF AMERICA,
     a Washington corporation,
11
          Defendants.
12   _____/
     EMERCO, INC., a California corporation,
13   d/b/a Imperial Industrial Coatings, and
     the United States for the use and benefit
14   of EMERCO, INC.,

15        Counterclaimant/Third-Party Claimant,

16   -vs-

17   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., an Alaska corporation,
18   et al.,

19        Cross-defendants/Third-party Defendants,
     _____/
20

21

22

23

24

25
```

ORIGINAL

```
1    THE UNITED STATES OF AMERICA for
2    the use and benefit of ABSOLUTE
     ENVIRONMENTAL SERVICES, INC., an
3    Alaska corporation,

4         Plaintiff,

5    -vs-

6    SAFECO INSURANCE COMPANY OF
     AMERICA, a Washington corporation,
7
          Defendant,
8    _____/
     BRECHAN ENTERPRISES, INC., an
9    Alaska Corporation,

10        Counterclaim Plaintiff,

11   -vs-

12   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., an Alaska Corporation,
13
          Counterclaim Defendant,
14   _____/
     BRECHAN ENTERPRISES, INC., an
15   Alaska Corporation,

16        Third-Party Plaintiff,

17   -vs-

18   COFFMAN ENGINEERS, INC., a
     Washington corporation,
19
          Third-Party Defendant,
20   _____/

21

22

23

24

25
```

```
 1    ABSOLUTE ENVIRONMENTAL
 2    SERVICES, INC., an Alaska corporation,

 3         Plaintiff/Cross-claimant

 4    -vs-

 5    COFFMAN ENGINEERS, INC., a
      Washington corporation,
 6
           Defendant/Cross-claim Respondent.
 7    _____/

 8    Case No. A03-0199 Civil (RRB)

 9

10                  DEPOSITION OF DANIEL YELL

11                  Pages 1  -  120 inclusive

12                  April 27, 2006, 9:00 p.m.

13                       Anchorage, Alaska

14

15    Taken on behalf of the Defendant pursuant to notice, at

16    the office of Perkins Coie, 1029 West Third Avenue, Suite

17    300, Anchorage, Alaska, before Britney Chonka, Court

18    Reporter for Alaska Stenotype Reporters and Notary Public

19    for the State of Alaska.

20

21

22

23

24

25
```

Page 78

1   A. No.
2   Q. How about the next day, August 11th?
3   A. I think that sometimes what happens here is if
4   you correlate these with the time cards, if -- you know,
5   it may have been just because I was breaking out the
6   different disciplines, just to keep track of them, too.
7   Q. I need an answer, sir. Do you have any entry of
8   time -- I mean, I appreciate your explanation.
9   A. Do I have an entry of time on what?
10  Q. On August 11th, on this daily report.
11  A. No.
12  Q. August 12th?
13  A. No.
14  Q. And I don't want to -- I would represent to you
15  that I don't see any breakout of activity by hours after
16  this August 9th date.
17  A. Okay.
18  Q. Do you see any?
19  A. I don't see any.
20  Q. Did you set up cost codes for particular types
21  of activity, like a cost code for grinding or a cost code
22  for applying coating or a cost code for doing touch-up
23  repairs?
24  A. No.
25  Q. If I went to your daily -- excuse me, if I went

Page 79

1   to your time cards, would I see any breakout of those
2   activities on your time cards?
3   A. I don't know.
4   Q. But there wouldn't be -- it wouldn't be coded by
5   a particular labor activity if there was something there,
6   right?
7   A. Not that I'm aware of. I don't remember doing
8   anything by code.
9   Q. Okay. When you were flipping through your
10  reports there to -- earlier, did you notice where you had
11  made a written note of a complaint about doing an
12  excessive amount of touch-up work?
13  A. I don't remember making the complaint.
14  Q. Did you form an opinion about the quality of
15  Imperial's work as a result of your engagement on this
16  project?
17  A. Nothing more than a personal one, if I did.
18  Q. What was your personal opinion?
19  A. I don't want to disclose that.
20  Q. I think you have to unless your lawyer says --
21  A. You want me to make a personal opinion of
22  Imperial's work?
23  Q. Yes, sir. Based on your experience in the
24  industry.
25  A. Due to the amount of repairs, I thought the

Page 80

1   repairs were excessive, and I had -- my opinion was, is
2   that Imperial got in over their head and didn't know what
3   to do, didn't know how to finish it. That's my opinion.
4       MR. KREGER: I think I'm about done. Let's take
5       a brief two-minute break, I'll look over my notes
6       and we'll try to wrap it up.
7       (Thereupon, a brief recess was taken, after
8       which the following proceedings were had:)
9   BY MR. KREGER:
10  Q. Let's go back on record. Mr. Yell, did you do
11  any work on the dock in 2004?
12  A. No.
13  Q. So when was the last day that you and your crews
14  were working out there?
15  A. 11/22.
16  Q. And on that --
17  A. Well, actually that was, we were back in town by
18  then, I'm sorry.
19  Q. So you demobilized by then?
20  A. Yeah, we pretty much demobed from the 20th to
21  the 22nd.
22  Q. Of November?
23  A. Yes.
24  Q. You mentioned warranty work for phase 1. I
25  wanted to ask you a couple questions about that.

Page 81

1   A. Okay.
2   Q. Tell me what it was, what you did, how much work
3   you did. Let's start with how much work you did.
4   A. I recall there was probably 100 to 150 repairs.
5   Q. What kinds of repairs were they?
6   A. Mostly the -- wherever the -- most of it was
7   holiday detector repairs that Jerry had marked. And then
8   for whatever -- whatever process he used, he marked and
9   said this is what I want repaired and I had a repair crew
10  that was working out of a boat and barge and they went on
11  down through and worked pretty much with him.
12  Q. They didn't use a sand blaster?
13  A. All mechanical.
14  Q. By mechanical you mean --
15  A. A grinder, sander.
16  Q. So for the sake of the record --
17  A. Small repairs.
18  Q. Right. These were small repairs that you did?
19  A. Yeah.
20  Q. How many hours did you spend on it?
21  A. I don't recall. I think I had -- I almost want
22  to say two guys for the better part of two weeks.
23  Q. Did you -- how did you know what warranty work
24  you were supposed to do for phase 1?
25  A. Jerry went through and marked them all and said

### Page 82

1  this is what I want fixed.
2     Q. Did you do any work that Jerry hadn't marked?
3     A. No.
4     Q. Did you give anybody an estimate before you
5  started about how much time and money would be involved
6  in doing those repairs?
7     A. No.
8        MR. KREGER: Those are all the questions I have
9  for you. Thank you, Mr. Yell. I appreciate you
10 coming in.
11       MR. PARTNOW: I'll go next.
12                EXAMINATION
13 BY MR. PARTNOW:
14    Q. Hi. My name's Peter Partnow. I represent
15 Coffman. And I've got a few questions for you.
16       First of all, you said early on that you've been
17 an expert witness?
18    A. I had been in the past.
19    Q. In more than one occasion?
20    A. One.
21    Q. What was your -- your area of recognized
22 expertise that you testified in?
23    A. General knowledge of industrial coatings.
24    Q. Was this a case that actually went to court?
25 Did you testify in court?

### Page 83

1     A. I believe it was settled before it went to
2  court, but I don't know that for a fact.
3     Q. After your compelling testimony, the other side
4  gave up?
5     A. I don't know. It was a death situation where a
6  person got killed in an industrial coating accident.
7     Q. On these -- this Exhibit 1 that Mr. Kreger had
8  you go through, I have a few questions I wanted to ask.
9  I notice that the first several days, until about the
10 27th to the 25th of July, that would be from the start of
11 that Bates number 227, there appears to be one form, the
12 type form itself is one way and then started on page --
13 Bates page 222 on the 27th there's a different form. If
14 you turn over to July 27th, it's Bates number 222.
15    A. I got July 27 on 222.
16    Q. Okay. You see the actual form, the Absolute
17 Environmental form that you used, the type form that
18 you're putting your handwritten notes on is different?
19    A. I just use what was supplied to me.
20    Q. My question is did you have any knowledge as to
21 why?
22    A. No.
23    Q. Or any involvement or any suggestion that the
24 form ought to be changed?
25    A. No. I didn't even realize it was changed, to be

### Page 84

1  honest with you.
2     Q. I'm glad I pointed that out to fulfill your
3  knowledge.
4        Also, it looks to me like if you go through --
5  let's just look at the July 15 entry, page 259. There
6  appear to be 7 numbered entries there.
7     A. Okay.
8     Q. And if you look at some of the other pages,
9  there are -- there will be numbers -- I've seen 1 through
10 7 here and there, but on many of the pages, for instance,
11 turn over to the next page for July 16, next to 1 and 2,
12 the numbers are there but there is nothing -- no text for
13 them, but then there is text as to 3 and 4.
14       And my assumption, and I want to ask if it's
15 correct, is that somehow there were 7 coated areas that
16 were -- or enumerated areas that were set up to divide
17 the work that you were doing, with number 1 being
18 scaffolding, number 2 having to do with tarps, number 3,
19 water jetting number 4, grinding, number 5, cleanup,
20 number 6, water -- time per I-beam, number 7, cutting and
21 cleaning, something like that.
22       Do I have that right or --
23    A. You know, it seems to be. But I don't really
24 recall that there was --
25       MR. ELISON: Object to the form of the question.

### Page 85

1        THE WITNESS: If it was something I just did or
2     if it was something we did for a while and I was
3     told we didn't need it or whatever, I really don't
4     recall.
5  BY MR. PARTNOW:
6     Q. You don't recall?
7     A. It does look like that's what the deal was.
8     Q. I was just wondering if you have any
9  recollection as to whether this was something you set up
10 or something Mr. Olson --
11    A. It's probably something that I did, I mean, if I
12 had to guess, because it's something that would be
13 typical of me to try to keep track of what was going on.
14    Q. And I was -- number 4, which talks about
15 grinding and number 7, which talks about cutting, what
16 was -- do you recollect what the difference was in the
17 type of work that you were trying to track?
18    A. There was a couple of different disciplines in
19 the grinding and cutting section. There was grinding
20 involved wherever there was cutting. But there was also
21 grinding of all the edges of the H beam, so that might
22 have been the distinction I was trying to pull out there.
23 I don't recall, but I think that's what it was.
24       In other words, we were chamfering edges and
25 that was separate from stuff that we would have cut off

Page 86

1  and ground.
2     Q. In other words, if there was some nonstructural
3  steel that you were actually removing, you'd still be
4  doing some grinding in that area?
5     A. Yeah, the grinding and cutting would be on
6  nonstructural steel and the grinding alone would have
7  been on structural steel.
8     Q. Okay.
9        I notice that Mr. Kreger was asking you some
10 questions about up to a point in early August it looked
11 like you were keeping track of hours, manhours per task,
12 so forth. And then, as far as I could tell from my
13 review of the stuff, after that date it didn't happen
14 again for the rest of the project.
15       I'm wondering, did that change in approach have
16 anything to do with the fact that at a point in early
17 August Imperial was no longer on the job, if you
18 recollect?
19    A. If there -- I don't. And I think the only thing
20 that I would say about that is that Dave may have said,
21 you know, don't keep track of this or keep track of that.
22 He asked specifically for how I did the time, and how
23 they correlated and what he wanted, I just wrote it down
24 the way he wanted. So I don't know what his reasons were
25 for what he did. I didn't confer with him on it. It

Page 87

1  wasn't my business.
2     Q. If you can turn over to your September 10 entry,
3  it's Bates number 108.
4     A. Okay.
5     Q. And that appears to me that you had a safety
6  meeting on that day?
7     A. Yes.
8     Q. And there are 13 individuals listed there, some
9  of which names I can read and some of which I can't. Can
10 I assume that those are the Absolute folks who were
11 working under your supervision at that time?
12    A. Yes.
13    Q. So that at least as of September 10, you had a
14 crew of 13 people?
15    A. Right.
16    Q. And that if you go back to September 2, I think
17 you had another safety meeting?
18    A. September 2, what page?
19    Q. Page 120, Bates number 120.
20    A. Okay.
21    Q. And there it appears ten people. So can I
22 correctly assume that your crew size increased, looks
23 like, from ten on September 2 until, up to ten on
24 September 10th [as spoken]?
25    A. I wouldn't make that assumption. I mean, it

Page 88

1  could have been a guy off sick, could have been a guy off
2  for a couple days, any number of reasons why a person
3  wouldn't be at one safety meeting or another.
4     Q. So would the best record of how large your crew
5  was in size be to review these payroll records?
6     A. You would have to go with Absolute on that. I
7  don't know. I didn't keep track of that. I mean, I
8  had -- we worked the crew. When I needed more people, I
9  hired more people and when I didn't need them, we laid
10 them off. But as far as from a week-to-week basis, I
11 didn't keep no records of crew size.
12    Q. If you turn over to August 28th, page 126, it
13 indicates a class for painter certificate. I assume
14 that's the certification to apply the SPC product?
15    A. Yes.
16    Q. Do you recall who did the certification, was it
17 Mr. Mathias?
18    A. Yes.
19    Q. And so these four people indicated -- would
20 those have been -- those would have been the four people
21 working for Absolute at that time who became certified to
22 apply the SPC product?
23    A. Well, that's what they went to the class for.
24 Some of them didn't fulfill the class.
25    Q. Because if you look over to the next page on

Page 89

1  page 125 it says finish certification course, everyone
2  passed. So I assume --
3     A. Well, we all passed the written. I'm the one
4  that failed. I was called out the next day, I couldn't
5  go out on the wharf and do the physical part, so I was
6  gone for whatever reason and you have to do the
7  certification in the class and then go out the field and
8  apply the coating. And I missed the field application,
9  so I failed, which I didn't have any intention of putting
10 it on anyway.
11    Q. So Clay Yell, can I assume he's related to you
12 in some way?
13    A. He was my son.
14    Q. And would Clay Yell, Randy Power and Pete
15 Williams, as the three people who were certified to apply
16 the SPC product, how would their responsibilities have
17 differed from the other 13 people, or the other 10
18 people, say, who we see at the safety meeting?
19    A. Well, they don't correlate at all. It's just
20 that the only people that are -- that can apply the SPC
21 coating are people that are certified by SPC to actually
22 do the hands-on application.
23    Q. So, in other words, the --
24    A. The two things don't correlate.
25    Q. I probably am asking my question badly. Let me

Page 106

1 the quality of the work that you and the crew did?
2    A. Not that I'm aware of.
3    Q. Did the amount of time and manpower that you had
4 to devote to correcting defects in the work that Imperial
5 had done increase the amount of time that you and your
6 crew had to spend on the job?
7    A. Yes.
8    Q. Did it have a significant effect on the amount
9 of time that you folks had to spend out there?
10    A. Yes.
11    Q. Did you rent some of your equipment to Absolute
12 as well as being an employee?
13    A. Yes.
14    Q. And you had -- did you have a contract or
15 something, or just a word-of-mouth deal?
16    A. Verbal.
17    Q. And that got completed, taken care of --
18    A. No.
19    Q. How -- in what way not?
20    A. I didn't get paid.
21    Q. Do you have any idea sitting here today as to
22 how much is owed to you?
23    A. About 70, 80,000, plus interest.
24    Q. And do you have any understanding or agreement
25 with Mr. Olson how that's going to be taken care of?

Page 107

1    A. Soon as his ship comes in, he'll pay me.
2    Q. And can I assume, as far as he told you, his
3 ship is this particular lawsuit?
4    A. He didn't say that.
5    Q. Just some ship?
6    A. Some ship, any ship. We don't care.
7    Q. Have you ever discussed with Mr. Olson the
8 issues that are involved in this lawsuit?
9    A. No.
10    Q. So you don't know exactly what Absolute is
11 claiming against the other parties in this case?
12    A. I have a vague, general idea what's going on,
13 that's it. I know it's complicated and I don't -- I
14 don't really know.
15    Q. Did you have any dealings with Mr. McLeod, Keith
16 McLeod?
17    A. No. Refresh my memory.
18    Q. Was he the QC -- he had been the QC person for
19 Imperial, did he continue --
20    A. No, I've never met him, that I can recall, you
21 know. I don't recall any other QC person.
22    Q. How about somebody from KTA-Tator?
23    A. Yes, okay.
24       Yes, I remember Keith.
25    Q. Okay.

Page 108

1    A. It takes me a while here.
2    Q. What were your dealings with him?
3    A. Well, let me see. He came on -- you know, I'm
4 not really sure if he worked for Absolute or if he worked
5 for Imperial. I really don't recall. I didn't have a
6 lot of dealings with him. He kind of worked with Jerry.
7 And, you know, he was taking ambience and doing general
8 stuff -- he seemed like an amicable fellow, and wasn't
9 there all that long and then left.
10    Q. Do you know if, as part of his QC work, if he
11 found a holiday or some other inadequate condition, that
12 he would mark it for repair?
13    A. Yes, he did that.
14    Q. And do you remember how he marked things that he
15 found?
16    A. I can't remember. I think it was spray painted
17 on. I'm not sure. Then he'd document it. I'm not
18 really sure. He tied ribbons around a bunch of stuff.
19    Q. On the one exhibit --
20    A. He tied, like, orange ribbons, like surveyor's
21 tape on things.
22    Q. For instance if, going back to Exhibit 4 that
23 Mr. Kreger showed you, that's the July 30th, 2003 report
24 Coffman.
25    A. Okay.

Page 109

1    Q. If you turn over to page 3 where there's the
2 yellow stuff that's showing on the picture in the left.
3    A. Uh-huh.
4    Q. Do you recall if Mr. McLeod marked problem areas
5 with yellow spray paint?
6    A. You know, I don't. The reason is, is because he
7 worked right with Jerry. I believe Jerry was gone for a
8 while and Keith came in, or something. They talked on
9 the telephone all the time. And he was over working
10 areas where I wasn't even at, doing test reports. And
11 when it came to us to actually getting directed to do the
12 repairs, they had either the orange fluorescent paint on
13 there or ribbons, or something.
14       And I would give them two or three guys,
15 whatever it took, and they would go down there with the
16 inspectors and do what he wanted. That's how that
17 happened. I wasn't always on site, or very rarely. I
18 walked through it a couple times with Keith, but it got
19 so extensive that I just designated people to him to get
20 the work done.
21    Q. Do you recall having had any particular problems
22 achieving holiday-free, or meeting the contract
23 specifications for the coating over the weld areas?
24    A. Yes.
25    Q. More so than you would have anticipated in any

```
 1
 2                    REPORTER'S CERTIFICATE
 3
 4
 5         I, Britney E. Chonka, Court Reporter, hereby
 6   certify:
 7         That I am a Court Reporter for Alaska Stenotype
 8   Reporters and Notary Public in and for the State of
 9   Alaska at large.  I certify Hereby that the forgoing
10   transcript is a true and correct transcript of said
11   proceedings taken before me at the time and place stated
12   in the caption therein.
13         I further certify that I am not of counsel to
14   either of the parties hereto or otherwise interested in
15   said cause.
16         In witness whereof, I hereunto set my hand and
17   affix my official seal this 8th day of May, 2006.
18
19
20                    [signature]
21                    BRITNEY E. CHONKA, REPORTER
22                    Notary Public - State of Alaska
23
24                    NOTARY PUBLIC
                      BRITNEY E. CHONKA
25                    STATE OF ALASKA
                      My Commission Expires Apr. 25, 2007
```