**EXHIBIT 10**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ALASKA

 3

 4  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., An Alaska
 5  corporation,

 6             Plaintiff,

 7       vs.                              ORIGINAL

 8  FORREST J. McKINLEY and "JANE
    DOE" McKINLEY, et al.,
 9
               Defendants.
10  _____

11  Case No A03-0199 Civil (RRB)

12

13

14

15
                    DEPOSITION OF TODD ELMORE
16
                      Taken March 29, 2006
17                   Commencing at 9:00 a.m.

18       Volume II - Pages 118 - 238, inclusive

19

20
                     Taken by the Defendant
21                            at
                         PERKINS COIE
22            1029 W. Third Av., Suite 300
                   Anchorage, AK  99501
23

24

25  Reported by:
    Susan J. Warnick, RPR
```

Midnight Sun Court Reporters   (907) 258-7100

**Page 163**

1  A   Which time?
2  Q   You've worked for Absolute on more than one occasion?
3  A   During college. Met him then.
4  Q   I don't recall. Maybe I just --
5  A   I did work while I went to the college.
6  Q   Most recently you worked for Absolute, I think you
7  said, from April of 2002 to about September of 2004?
8  A   Yes.
9  Q   And that was the period of time when this project was
10 being done?
11 A   Say that date again?
12 Q   From April of 2002 to September of 2004.
13 A   Yes.
14 Q   And now -- and you may have said this in your first
15 time, so I missed it, and I apologize: While you were in
16 college, which was -- you worked for Absolute for a period
17 of time?
18 A   Yes.
19 Q   Was this when you were at UAA working on your
20 business finance degree?
21 A   Yes.
22 Q   So that would have been sometime during the 1992-'96
23 time frame?
24 A   Yes.
25 Q   And what did you work, summers?

**Page 164**

1  A   Summers.
2  Q   And so you met Mr. Peterson at that time?
3  A   Yes.
4  Q   And did you have any ongoing dealings with
5  Mr. Peterson from that point in time until you went back
6  to work with Absolute in 2002?
7  A   No.
8  Q   And how would you describe your relationship with
9  Mr. Peterson? Did you guys get along okay?
10 A   Yes.
11 Q   Prior to your going to work with Absolute in 2002,
12 had you ever met Mr. Puett?
13 A   No.
14 Q   And at what point did you meet Mr. Puett?
15 A   I believe it was in the fall of 2002.
16 Q   Was the decision by Absolute to basically get into a
17 business relationship with Imperial to try to do this work
18 on the Kodiak project, were you involved in that decision
19 in any way?
20 A   No.
21 Q   Did you do any analysis with regards to Mr. Puett's
22 background or experience?
23 A   No.
24 Q   And since you left Absolute in 2004, until these
25 depositions, have you had any further contacts with

**Page 165**

1  Mr. Puett?
2  A   No.
3  Q   And am I correct in my understanding that you and
4  Mr. Puett didn't see to eye to eye on a lot of things,
5  during the course of the project?
6        MR. ELISON: Objection. Foundation. But go
7  ahead and answer.
8        THE WITNESS: On a few things, yes.
9  BY MR. PARTNOW:
10 Q   Well, let's put it this way: Did you form a belief
11 as to whether Imperial was competently performing their
12 work under their subcontract with Absolute?
13       MR. ELISON: Objection to the extent that it
14 calls for expert opinion.
15       MR. BROWN: I'll join in that objection.
16       THE WITNESS: Say that again?
17 BY MR. PARTNOW:
18 Q   As an employee of Absolute, were you satisfied with
19 the way that Imperial was performing its work under its
20 contract?
21 A   At what point?
22 Q   At any point -- or lack of expertise.
23       MR. ELISON: Objection --
24       THE WITNESS: I don't know. I mean, at any
25 point, I guess, after -- it's pretty obvious that it

**Page 166**

1  didn't go very well, so I wouldn't be satisfied.
2  BY MR. PARTNOW:
3  Q   Okay. My question is in terms of it not going well,
4  in your opinion, was that because Imperial was not
5  carrying out its end of the bargain or was Imperial being
6  asked to do things that were unfair for it to be asked to
7  do?
8  A   I would believe they were not fulfilling their part
9  of the contract.
10 Q   Prior to your -- all my questions with regards to now
11 with Absolute will deal with the time when you were
12 permanently working with -- or full time, 2002-2004, not
13 going back to the college stuff.
14 A   Correct.
15 Q   Just to make sure.
16       Prior to your work with Absolute, did you know
17 Jerry Hardenbergh?
18 A   No.
19 Q   My understanding is that you had some involvement in
20 preparing the bid or the quote to do the work that
21 Absolute submitted to Brechan, but that that involvement
22 was basically taking numbers and information that was
23 given to you by others and putting it into the Means?
24 A   Compiling them and input, yes.
25 Q   That you weren't independently doing cost estimating

Page 167

1  or take-offs or whatever; you were just putting the
2  information into the forms to get submitted to Brechan and
3  ultimately to the Coast Guard?
4  A  Yes.
5  Q  So in terms of like doing the estimating, to actually
6  perform the bid, to develop that price, that was not
7  something that you did?
8  A  No.
9  Q  And your understanding is that was done primarily by
10 Jason Peterson and Tom Puett?
11 A  Correct.
12 Q  And again, I just want to make sure my understanding
13 is correct. Your involvement -- you were aware of the
14 process and you were putting the information into the
15 Means sheets and spreadsheets and and so forth as those
16 numbers were being developed?
17 A  Yes.
18 Q  Am I correct in my understanding that Coffman
19 Engineers had no involvement during that point in time?
20     MR. ELISON: Objection. Foundation.
21     THE WITNESS: To my knowledge.
22 BY MR. PARTNOW:
23 Q  To your knowledge. You had no dealings with Coffman
24 at that time?
25 A  I had no dealings with Coffman.

Page 168

1  Q  Prior to the time that you went to the meeting at the
2  Coffman offices in February of 2003, had you had any
3  dealings with anybody from Coffman?
4  A  No.
5  Q  And was that the first time you met Jerry
6  Hardenbergh, as far as you can recollect? You know what
7  meeting I'm talking about?
8  A  Yes. But was Jerry at that meeting?
9  Q  Yes. Well, I'm not testifying, but assuming, you
10 know, for the sake of the record that Jerry was at that
11 meeting, would that have been, as far as you recollect,
12 the first time you would have met him?
13 A  Yes.
14 Q  Do you recall that Dan Stears was at that meeting?
15 A  That's what I recall.
16 Q  And had you ever met Mr. Stears before?
17 A  No.
18 Q  Do you recall if you'd had communications with Mr.
19 Stears or Mr. Hardenbergh prior to that time?
20 A  I don't recall.
21 Q  During the time that the work was being performed,
22 who at Coffman did you have the most dealings with?
23 A  Jerry.
24 Q  Did you deal with anybody else at Coffman other than
25 Jerry?

Page 169

1  A  Maybe Dan right in the very beginning, from time to
2  time. But it would have only been to get things set up.
3  Q  Do you have any specific recollection of any dealings
4  with Dan or just --
5  A  Just that when Jerry was gone and then we would
6  direct -- maybe invoicing or things of that nature.
7  Q  And what was the nature of your dealings with Jerry
8  Hardenbergh?
9  A  He was the QA.
10 Q  How frequently were you in contact with him?
11 A  Well, to update the schedule. He did the physical
12 percent complete, between him and the lady that was the
13 Coast Guard rep there. So, at a minimum, monthly on
14 invoices.
15 Q  And when this was done, was this just done by your
16 receiving paperwork and dealing with it or was there
17 face-to-face dealings, telephone calls?
18 A  Either way. If I was on the island, it would be face
19 to face. But typically it was over the phone because we
20 were preparing invoices. And then, once we got the
21 percent complete, then we would talk to IIC.
22 Q  And how -- were you satisfied with your dealings with
23 Mr. Hardenbergh?
24 A  Yes.
25 Q  Did you find him to be professional when you dealt

Page 170

1  with him?
2  A  Yes.
3  Q  Did he -- if you had questions, did he answer them to
4  your satisfaction?
5  A  Yes.
6  Q  Is there any aspect of anything that Mr. Hardenbergh
7  did, that you were aware of, that you were dissatisfied
8  with?
9  A  Not to my knowledge.
10 Q  What about Matt Holmstrom; was he your primary
11 contact with Brechan or did you deal with Mr. Houck more
12 or some third person?
13 A  Dealt with -- the commercial terms were with
14 Holmstrom. The day-to-day invoicing or the progressing or
15 such information passed back and forth would be Jessica
16 Wolf.
17 Q  What about Mr. Houck; did you have many dealings with
18 him?
19 A  Not much. He was there, but that -- he was around
20 Tom more, around the work itself.
21 Q  Were you satisfied in your dealings with
22 Mr. Holmstrom?
23 A  Yes.
24 Q  Were you on site, at the wharf, at any point prior to
25 the time that the contract was awarded to Brechan?

Page 231

1  it go.
2  Q  Who carried it on their shoulder?
3  A  Dan Yell.
4  Q  Did he ever talk to you about the problem he had with
5  MacLoed?
6  A  Well, one says he was drunk and the other says he
7  wasn't drinking, so -- I'm sure the truth was in between
8  there somewhere.
9       MR. BROWN: Thank you, sir. I think that's all
10 I have.
11      MR. NIST: Just a couple follow-up questions.
12         FURTHER EXAMINATION
13 BY MR. NIST:
14 Q  In your speaking with Mr. Brown, you guys talked
15 about Mr. Holmstrom. Did Matt ever say anything to you
16 you would consider false in relation to this project?
17      MR. ELISON: Objection. Overbroad.
18      THE WITNESS: No.
19 BY MR. NIST:
20 Q  Did he say anything that was misleading, in your
21 opinion?
22 A  The only thing that Matt did that I didn't appreciate
23 was all the stuff, the cable and stuff, that local bought
24 -- let's see. How does this work? That local electric
25 was reimbursed -- and I'm talking about the temporary

Page 232

1  stuff for that power unit that was up on the top side of
2  the wharf. That was -- I heard that somehow they -- well,
3  I know accidentally -- that they sold it back -- the
4  material back to local at a discounted price and it was --
5  I don't remember the value, but I felt that it was pretty
6  shitty.
7  Q  Can you give me a rough magnitude of value? $10,000,
8  $20,000?
9  A  Under 10.
10 Q  Do you know anything that Brechan did or didn't do
11 that they should be sued over for in relation to this
12 project?
13      MR. ELISON: Object to the form of the question.
14      THE WITNESS: No, I don't.
15 BY MR. NIST:
16 Q  Asked you about false or misleading statements on
17 this job. What about other projects? Did Matt or anybody
18 from Brechan say anything that you would consider false or
19 misleading on this project or any other project?
20 A  No.
21 Q  And finally, you mentioned, in relation to a question
22 that Mr. Brown asked, that working in the winter was
23 harder. Can you explain how it was harder?
24 A  The temperatures were cooler and it was harder to get
25 -- we had to get another dehumidifier. The days were

Page 233

1  shorter; more lights. I recall them working all -- I
2  think at least that -- around November is whenever they
3  all came in, the first of November. So at that time it
4  was a lot colder than working in the summer. Tides were
5  different. They were split-shifting to chase tides.
6  Q  And did you know anything about whether this working
7  in winter increased the cost of the work at all?
8       MR. ELISON: Objection to the extent it calls
9  for expert or specialized testimony.
10      THE WITNESS: My opinion, I'm sure it did.
11      MR. NIST: I don't have any further questions.
12      MR. PARTNOW: Just one thing real quick.
13         FURTHER EXAMINATION
14 BY MR. PARTNOW:
15 Q  Pull out Exhibit 13, if you can real quick. I just
16 want to see if this refreshes your recollection. If you
17 look at -- it's an agenda for the meeting at Coffman's
18 office.
19      And if you look over at page two of the
20 document, item B indicates that there was discussion about
21 abrasive and dust on ships was a problem last year; how do
22 we reduce. Item C said paint and storage was an issue
23 last year. Item F says inadequate amount of coating
24 materials on site, material logistics problem last year,
25 do not want do repeat.

Page 234

1       Does that refresh your recollection as to
2  whether there was discussions about problems that occurred
3  during Phase 1 at this meeting at Coffman's office on
4  February 18?
5  A  Well, you know, I -- not really, but it fits in line
6  with what I'm saying, is, you know, given the many jobs,
7  in my position I cared how it would all fit together and
8  how everybody interacted together.
9       And the dust issue, that was -- and we had dust,
10 too. I think this does ring -- you know, one thing that
11 there -- we did have to work around the ship's schedule
12 and Matt did publish that. And Chris was active in
13 getting updates to when the ship was going to be there or
14 where it was going to be.
15 Q  My question was: Does this refresh your recollection
16 that there was discussions at this meeting about problems
17 encountered during Phase 1 or you still just don't
18 remember --
19 A  I just don't remember going there.
20      MR. PARTNOW: Okay. Nothing further.
21      MR. BROWN: Just a couple, and I apologize.
22         FURTHER EXAMINATION
23 BY MR. BROWN:
24 Q  IIC had a Grayco pump -- I think you answered a
25 couple questions about that earlier on in your

```
 1                    REPORTER'S CERTIFICATE

 2         I, SUSAN J. WARNICK, RPR, and Notary Public in

 3    and for the State of Alaska do hereby certify:

 4         That the witness in the foregoing proceedings was

 5    duly sworn; that the proceedings were then taken before me

 6    at the time and place herein set forth; that the testimony

 7    and proceedings were reported stenographically by me and

 8    later transcribed under my direction by computer

 9    transcription; that the foregoing is a true record of the

10    testimony and proceedings taken at that time; and that I

11    am not a party to nor have I any interest in the outcome

12    of the action herein contained.

13         IN WITNESS WHEREOF, I have hereunto subscribed my

14    hand and affixed my seal this 17TH day of April,

15    2006.

16

17

18                         _____
                           SUSAN J. WARNICK,
19                         Registered Professional Reporter
                           Notary Public for Alaska
20
      My Commission Expires:  April 8, 2010
21

22

23

24

25
```