# EXHIBIT 11

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
 4   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., An Alaska
 5   corporation,
 6              Plaintiff,
 7        vs.
 8   FORREST J. McKINLEY and "JANE
     DOE" McKinley, et al.,
 9
                Defendants.
10   _____
11   Case No A03-0199 Civil (RRB)
12
13
14
15
16              DEPOSITION OF JASON PETERSON

                    Taken March 31, 2006
17                 Commencing at 9:00 a.m.
18         Volume I - Pages 1 - 238, inclusive
19
20
                   Taken by the Defendant
21                            at
                        PERKINS COIE
22           1029 W. Third Av., Suite 300
                    Anchorage, AK  99501
23
24
25   Reported by:
     Susan J. Warnick, RPR
```

                                COPY

**Page 54**

1  Q    And that's the same language as typed up, right?
2  A    It appears to be, yes.
3  Q    So when you got this letter from Mr.
4  Peterson [sic] --
5  A    Puett.
6  Q    -- Mr. Puett. I'm sorry.
7       When you got this letter from Mr. Puett, and
8  Imperial is saying it's rated as QP 1, QP 2, and QP 3, did
9  you inquire as to what that meant and whether they were
10 rated or not? Whether Imperial was actually rated as a QP
11 1 or QP 2 --
12 A    Did I inquire into that?
13 Q    Yes, sir. Did you inquire?
14 A    Not that I remember specifically.
15 Q    How about the -- let's go to the second page of the
16 handwriting. I'm on what's been Bates stamped at the
17 lower left side as 1431. Would you find that, please.
18 Your counsel is assisting you.
19      MR. ELISON: Do you have any objection to that?
20      MR. KREGER: No. Showing it to him, that's
21 fine.
22 BY MR. KREGER:
23 Q    Are we on the same page here now, 1431 down at the
24 bottom?
25 A    Yes, we are.

**Page 55**

1  Q    Now, the third line of handwriting starts, "The
2  work." Do you see that?
3  A    Yes, I do.
4  Q    Would you read that into the record, please.
5  A    "The work for this project is for 12,755 square feet
6  on Section 2B of the cargo wharf supporting structural
7  steel."
8  Q    Go ahead, the next sentence, please.
9  A    "If there is no obligation [sic] the same coating
10 system used on 2A will be applied per plans and
11 specifications to the new work on 2B."
12 Q    Go back to that word "obligation." Would you take a
13 look at that again.
14 A    Oh, objection.
15 Q    Thank you. So it would be "objection" and not
16 "obligation"?
17 A    Looks like "objection" to me.
18 Q    So in the Attachment 2 to the subcontract, would you
19 read that into the record, please.
20 A    The same paragraph?
21 Q    Yes, sir.
22 A    "The work for this project is for 12,255 square feet
23 on Section 2B of the cargo wharf supporting structural
24 steel. If there is no objection the same coating system
25 used on 2A will be applied per plans and specifications to

**Page 56**

1  the new work on 2B."
2  Q    When you looked at this handwritten letter and saw
3  that the work for the project was being described as 275
4  square feet -- or excuse me -- 12,755 square feet, did you
5  make any effort to verify whether that was the accurate
6  amount of square footage that was going to be involved in
7  the work in Section 2B?
8  A    Per measurement?
9  Q    Anything that you did to verify the accuracy of that?
10 A    The only thing I can think that I usually do and what
11 I do on most -- if you look at most of my proposals, that
12 I -- that I'm involved in, I quantify what exactly we're
13 removing. Whether it would be so many square feet of
14 asbestos material or lead paint, I usually put that in my
15 proposal to the general contractor so they know, when they
16 get it, they can see that I'm on the same page they are.
17 So the only verification I can think -- you know, I might
18 have talked to Tom and, you know, said to Tom, you know,
19 are you comfortable with that. Possibly. I don't recall.
20 But I do know that I would send this along to Mr.
21 Holmstrom, that this is how we -- this is what we are
22 looking at the project as being.
23 Q    Do you have a specific recollection of talking with
24 Mr. Puett about whether that was the right amount of
25 square footage that he built his estimate up on?

**Page 57**

1  A    No. I might have.
2  Q    But you don't know for sure?
3  A    But I don't know for sure. I mean, we talked a lot
4  during this period of time, as things were going, you
5  know, back and forth.
6  Q    Did you look at Section 2B on the plans to see
7  whether or not that was the accurate amount of square
8  footage that was going to be removed from Section 2B?
9  A    No, I did not.
10 Q    Now on the page ending in 1534 -- excuse me; I
11 misspoke -- page ending in 1434 --
12 A    Okay. We're there.
13 Q    -- do you remember reading this about the time you
14 got it?
15 A    Yeah. I mean, I can't actually recall, but I'm quite
16 sure I scanned through this and passed it on.
17 Q    Now, there's a total estimated price there of
18 772,123. Do you see that?
19 A    I do see that.
20 Q    Did you ever ask Mr. Puett how he came up with that
21 number?
22 A    I don't think I asked Tom specifically, you know,
23 like a breakdown, how did you come up with this number.
24 But I think I did -- yeah, I said to Tom, you know, a
25 couple times, I said, Tom, are you comfortable with your

Page 58

1  number; have you got everything covered.
2  Q  And what did he say?
3  A  He said he did.
4  Q  Would you go back a couple pages to the one that says
5  1432 on it.
6  A  Okay. I'm there.
7  Q  This has got page six at the top.
8  A  Yes.
9  Q  And then it's got a number eight, "Good weather day."
10     Do you see that?
11 A  I see that.
12 Q  And then the next page is just something preprinted
13 about statement of corporate policy. Do you see that?
14 A  The next page? Yeah, it's kind of just -- yeah,
15 okay.
16 Q  It's a preprinted document of some type.
17 A  Uh-huh.
18 Q  And then the next page is numbered page seven.
19     Do you see that?
20 A  Yes, I see that.
21 Q  And the page before it, that we were looking at that
22 had handwriting, that's numbered page six.
23 A  Right.
24 Q  So page seven, would you read that into the record?
25 A  All of page seven?

Page 59

1  Q  No, just the first line.
2  A  "As you can see the work items."
3  Q  Yes, sir. Then go to the attachments, if you would.
4  Go to the typed letter in Attachment 2.
5     Are you with me there?
6  A  Yes, I am.
7  Q  Look at No. 8, "On good weather days."
8  A  Uh-huh. I'm looking at it.
9  Q  And skip to the next page, where it says, "As you can
10 see." Do you see that?
11 A  Yes, I do.
12 Q  Now on this No. 9, where it says, "Stitch welds will
13 be caulked as needed." Do you see that?
14 A  I do see that.
15 Q  That's not written in the handwritten letter, is it?
16 A  No, it is not.
17 Q  Who wrote that in, if you know? Who wrote that in?
18 A  Well, I can't say for sure who wrote it in, but I
19 recollect it was discussed.
20 Q  Who discussed it?
21 A  Again, I don't know dates, but I discussed it with, I
22 believe, Mr. Holmstrom and with Tom.
23 Q  What did you discuss with Mr. Holmstrom about, "The
24 stitch welds will be caulked as needed"?
25 A  Well, again, I'm not all prepped on all the dates

Page 60

1  here.
2  Q  I didn't ask the dates.
3  A  Right, I know. But I believe, as I was proposing and
4  looking at the work, I wasn't quite sure what seal welding
5  was, but I knew that Tom and I both didn't want to have
6  anything to do with anything that had to do with welding
7  or modifying the structural steel of the project. We
8  wanted to, you know, do the coating removal and do
9  recoating. We didn't want to get involved with welding of
10 any type. And I wasn't sure exactly what the seal welding
11 was, but just the wording "seal welding," I thought, well,
12 welding, I don't want to be involved with it.
13 Q  Why not?
14 A  Because that wasn't our expertise of the work and
15 we're not iron workers.
16 Q  But the spec required that you bid on here, this 2001
17 specific, it required there to be seal welding done on the
18 project, right?
19     MR. ELISON: Object to the form of the question.
20 The spec will speak for itself.
21     THE WITNESS: Again, I don't have the
22 specifications in front of me but, from what I heard in
23 the conversations yesterday, it sounds like it was.
24 BY MR. KREGER:
25 Q  Well, we can look at the spec in a moment, but let me

Page 61

1  ask this question first: If seal welding was required, do
2  you know what it was required for?
3  A  No. Originally I did not know what it was required
4  for.
5  Q  Were you concerned when you -- well, strike that.
6  I'll come back to that.
7     So when is your -- what's your understanding
8  about when this paragraph nine got added? Was it in the
9  September 16th letter, when it was sent to you; do you
10 know?
11 A  Well, on the typed one?
12 Q  Yeah.
13 A  Well, if this is an accurate document of the date,
14 it's -- I'd say someone typed it so -- and it's there. I
15 would say it's in there.
16     MR. KREGER: Mark this next, please.
17     (Exhibit 5 marked.)
18 BY MR. KREGER:
19 Q  Do you have Exhibit 5 there?
20 A  I do.
21 Q  Do you recognize this document?
22 A  Well, I recognize it but, if you ask a lot of
23 specifics on it, I might not be able to answer.
24 Q  I'm not asking you specifics.
25 A  But I've seen this before, yes.

Page 98

1  corner?
2  A  Yeah, that is our -- yeah, 4491. Yes, that is our
3  fax number.
4  Q  Do you remember receiving something like this from
5  Mr. Puett at or about this time?
6  A  I can't recall for sure whether I remember receiving
7  it from him at that time.
8  Q  Your subcontract price to Brechan is $995,850, right?
9      MR. ELISON: Objection. Foundation.
10     THE WITNESS: I believe that is correct. I
11 haven't just reviewed it, but yeah, somewhere
12 approximately around there.
13 BY MR. KREGER:
14 Q  What was the work or profit or overhead markup that
15 -- what was the value of those three items that Absolute
16 added to Mr. Puett's subcontract price of 772,123?
17     MR. ELISON: Objection. Compound.
18     THE WITNESS: I believe it was to the tune of
19 220-some thousand dollars.
20 BY MR. KREGER:
21 Q  And what -- did you take part in the estimating of
22 the money that was in the tune for Absolute, the 225,000?
23 A  No, I did not.
24 Q  Who did that?
25 A  Mr. Olson.

Page 99

1  Q  Did you assist Mr. Olson in determining what work
2  Absolute was going to do that Imperial wasn't going to
3  do that Imperial and Absolute together were going to do in
4  this subcontract?
5      MR. ELISON: Object to the form of the question.
6      THE WITNESS: I don't believe I assisted in
7  deciding what work we were going to do, other than Mr.
8  Olson telling me what our responsibilities were going to
9  be on the project.
10 BY MR. KREGER:
11 Q  What did he tell you your responsibilities were going
12 to be?
13 A  My recollection is that we are going to provide
14 vehicles, some sponge blast unit, the UHP. I think -- I
15 think -- again, I'm trying to recollect. I think we were
16 taking care of the housing. And we were to help them with
17 -- when they needed to set up containments and move the
18 containments along, we would provide a few people, two to
19 three, generally speaking, to assist IIC in the building
20 and moving of the tarps and containment.
21 Q  Did you help Mr. Olson do a takeoff or a bottom's up
22 estimate to determine how much those activities were
23 likely to cost Absolute?
24 A  No, I did not.
25 Q  Did anyone at Absolute do that kind of an estimate,

Page 100

1  to your knowledge?
2  A  For coming up with that 220,000?
3  Q  Yes.
4  A  Not to my knowledge.
5  Q  Have you seen a document -- you know what a bid work
6  sheet looks like; don't you?
7  A  Yes, I do.
8  Q  Have you seen a bid work sheet that Absolute did to
9  build this additional number for the work that it was
10 going to do?
11 A  I did not.
12 Q  Have you ever seen one?
13 A  For this project?
14 Q  Yes, sir.
15 A  Not that I recall. That I've seen the breakdown, is
16 what we call it.
17 Q  Right. For the breakdown, do you know what, if
18 anything, was in the breakdown for overhead for Absolute?
19 A  Well, since I can't recall that I've ever seen this
20 particular breakdown, generally we do put our marks on
21 projects. I mean, that's how we -- profit and overhead.
22 Q  But since you haven't seen this breakdown, you don't
23 know what the markup for overhead or profit was on this
24 project?
25 A  I do not know.

Page 101

1      MR. KREGER: We have reached the noon hour. Why
2  don't we take our lunch break here and we'll start again
3  at 1:15. Thank you, sir.
4      (Lunch recess taken.)
5      EXAMINATION (Resumed)
6  BY MR. KREGER:
7  Q  Mr. Peterson, did you have occasion to review the
8  estimate that Imperial prepared for its scope of work?
9  A  I might have, but I can't tell you for certain. I
10 may have to see it and see if I recognize it.
11 Q  Let's take a quick look at it and see.
12     MR. KREGER: Mark that next, please.
13     (Exhibit 11 marked.)
14 BY MR. KREGER:
15 Q  Three-page document. Take a look at it and tell me
16 if you've seen this before.
17 A  I believe I have seen this before. But I can't tell
18 you exactly when -- when I saw it.
19 Q  Did you see it in connection with the litigation or
20 did you see it around the time it was prepared when the
21 project was under way?
22 A  I think I saw it sometime after.
23 Q  After --
24 A  Just in the project documents, while the project was
25 going on.

**Page 102**

1  Q   I can't resist a question about the last page here,
2  where there's some calculation of $173,727. And then
3  that's added to Mr. Puett's -- or Imperial's price, that
4  is to say, of 772,123. And then added to that is another
5  $50,000. Comes up to equal the eventual subcontract price
6  between Brechan and Absolute. Do you see that?
7  A   Yes, I see that.
8  Q   Do you recall seeing those calculations and do you
9  know where those calculations on this third page come
10 from?
11 A   Well, I know that the 772 was Tom's number. And I
12 understood ours, you know, came to like the 220. But not
13 until, you know, later, after, you know, the project was
14 going, that I actually saw -- I believe I saw this. I
15 believe it's in the folder. And I understand this is AES,
16 which is us: Labor, you know, setup, and things. It
17 appears that we were going to -- our responsibilities on
18 the project included, you know, to the 945,850, then the
19 50,000 that brought it to 995.
20 Q   What was the -- what does it say there on the
21 right-hand side, if you know? It says, "50,000," and it
22 looks like D & T delays and something.
23       Did you ever try to read that in a better copy
24 than what we've got here and ever figure out what that
25 said?

**Page 103**

1  A   No, I didn't, as my main -- my main dealings in this,
2  up to the bid date, was not so much the estimating,
3  because Tom was doing the estimating for his portion and
4  then Dave did for Absolute.
5        I was involved in estimating many other projects
6  at the time and taking care of projects that were going
7  on. But I was the person who had to put things into
8  Means, because I spent a lot of time -- and I don't know
9  if you know what a Means book looks like and what you have
10 to do. But there's all kinds of line items and codes.
11 And you got to -- you got to basically make the number
12 work in Means. That's what they want to see for this
13 contract. They want to see a Means number.
14       And, you know, I don't estimate jobs in Means.
15 I don't know if people actually go onto a job site and
16 estimate a job using Means. But I -- a typical Brechan
17 job, even though I do my typical estimate for a project.
18 I estimate the way I normally do for any project, you
19 know. But for the Means, once I got that estimate, I had
20 to justify it through the Means cost system.
21 Q   Yeah.
22 A   And that was primarily my involvement of this
23 proposal, was not so much, you know -- you know, the
24 calculations of how they came to the numbers, but I was
25 told what the final number was, and then I took it from

**Page 104**

1  there and I had to break it down and try to make it fit
2  in.
3  Q   So, I take it, you didn't have any discussions with
4  Mr. Puett about using $38.60 a square foot times 4500
5  square feet and that being a significant portion of the
6  difference between Imperial's subcontract price and
7  Absolute's subcontract price?
8  A   No.
9  Q   Didn't have those discussions?
10 A   No.
11       (Exhibit 12 marked.)
12 BY MR. KREGER:
13 Q   Now, this is another document that's been previously
14 marked in a deposition. We've remarked it as 12.
15       Take a look at this string of e-mails, if you
16 would, Mr. Peterson, please.
17       Have you had a chance to look at that?
18       Go ahead. I see you're still reading.
19 A   Okay.
20 Q   Do you remember receiving this string of e-mails on
21 or about Tuesday, October 29th, 2002?
22 A   Well, not right clearly, because it's so long ago.
23 But it appears that I was involved with this. I do
24 remember, to some degree, the issues being talked about
25 here.

**Page 105**

1  Q   At this point in time, this is October 29th, 2002,
2  had that October 22nd letter been sent?
3  A   Well, it appears it had, unless the date on it -- the
4  fax date on it are different. But I would -- since this
5  is after the 22nd, I would think that it had been sent.
6  Q   So in this e-mail Mr. Holmstrom has forwarded to you,
7  and to Dave Olson and to Tom Puett, a series of
8  discussions between the Coast Guard and Holmstrom and
9  Stears and Hardenbergh at Coffman, right?
10 A   Uh-huh. Yes.
11 Q   So you get this e-mail where he says, "Gentlemen,
12 Things are starting to come together. Note the discussion
13 on containment. Matt." Do you see that?
14 A   Now, what page are you looking at?
15 Q   I'm on the first page, right in the middle there, the
16 first one that's copied to you.
17 A   Yes. Okay. Yup. All right.
18 Q   So what did you do after you got this e-mail from
19 Matt saying, "Things are starting to come together"? What
20 did you understand him to mean by that?
21 A   That all the pieces were coming together for the
22 project.
23 Q   And one of the pieces was any tweaking or revision to
24 the specification for the coating, correct?
25       MR. ELISON: Objection to the form of the

```
 1                    REPORTER'S CERTIFICATE

 2          I, SUSAN J. WARNICK, RPR, and Notary Public in

 3   and for the State of Alaska do hereby certify:

 4          That the witness in the foregoing proceedings was

 5   duly sworn; that the proceedings were then taken before me

 6   at the time and place herein set forth; that the testimony

 7   and proceedings were reported stenographically by me and

 8   later transcribed under my direction by computer

 9   transcription; that the foregoing is a true record of the

10   testimony and proceedings taken at that time; and that I

11   am not a party to nor have I any interest in the outcome

12   of the action herein contained; that signature was

13   requested.

14          IN WITNESS WHEREOF, I have hereunto subscribed my

15   hand and affixed my seal this 21st day of April,

16   2006.

17

18                          _____
                            SUSAN J. WARNICK,
19                          Registered Professional Reporter
                            Notary Public for Alaska
20

21   My Commission Expires:  April 8, 2010
22

23

24

25
```