# EXHIBIT 13



RECEIVED

HD NOV 3 0 2004 BT
11:14
PERKINS COIE
ANCHORAGE

PO Box 639
Tijeras, NM
87059
505/262-0732
Fax 505/286-4191

November 28, 2004

Marston Heffernan Foreman, LLC
Attn:   Terrry Marston
Anderson Park Building
16880 N. E. 79th Street.
Redmond, Washington 98052-4424

       RE:     Report - USCG Cargo Wharf Pile Painting Phase II
                  Kodiak, Alaska

Dear Mr. Marston,

       Attached is a copy of the report on the above-referenced project.

       Please contact us if you have any questions.

       Sincerely,

L. Skip Vernon
CLT, Inc

Enc: Report and Attachments

**Coating & Lining
Technologies, Inc.**



| | |
|---|---|
| **PROJECT:** | USCG Cargo Wharf Pile Painting Phase II<br>Kodiak, Alaska |
| **CONTRACT NO.:** | Contract # DTCG50-02-D-643J55 |
| **LOCATION:** | USCG Original Cargo Wharf<br>Kodiak, Alaska |
| **OWNER:** | USCG Integrated Support Command<br>Kodiak, Alaska |
| **GENERAL CONTRACTOR:** | Brechan Enterprises, Inc.<br>Kodiak, Alaska |
| **SUBCONTRACTOR:** | Absolute Environmental Services, Inc.<br>Anchorage, Alaska |
| **COATING SUBCONTRACTOR:** | Imperial Industrial Coatings<br>Grand Terrace, California |
| **PAINT DISTRIBUTOR:** | Polar Supply Co. Inc.<br>Anchorage, Alaska |
| **PAINT MANUFACTURER:** | Specialty Polymer Coatings, Inc.<br>Langley, BC, Canada |
| **ENGINEER:** | Coffman Engineers, Inc.<br>Anchorage, Alaska |
| **THIRD-PARTY COATING INSPECTION:** | KTA-Tator, Inc.<br>Pittsburgh, PA |
| **DATE (REPORT):** | November 27, 2004 |
| **REPORT BY:** | L. Skip Vernon<br>CLT, Inc.<br>Tijeras, New Mexico |

1

# INTRODUCTION

L. Skip Vernon, NACE Certified Coating Inspector (Certification # 669), SSPC Certified Protective Coating Specialist (# 688-593-1068) and ASPE Certified Professional Estimator (CPE) of Coating & Lining Technologies, Inc. (CLT) operating as an independent coating inspection and consulting firm was retained by Absolute Environmental Services, Inc. (AESI) to review documents, inspect surfaces, and provide a report regarding coating issues on the USCG Cargo Wharf Pile Painting Phase II in Kodiak, Alaska.

The United States Coast Guard contracted with Brechan Enterprises, Inc. (Brechan) to provide labor, equipment and materials to coat the original Cargo Wharf at the USCG facility at Kodiak, Alaska.  Brechan subcontracted with Absolute Environmental Services, Inc. (AESI) to complete particular tasks under the main contract.  AESI subcontracted with Imperial Industrial Coatings (IIC) to complete particular tasks under the subcontract, most notably, surface preparation and coating of the steel piles.  Coffman Engineers, Inc. (Coffman) provided quality assurance (QA) services.  The coating was manufactured by Specialty Polymer Coatings, Inc. (SPC) and supplied by Polar Supply Co., Inc. (Polar).  KTA-Tator, Inc. (KTA) was retained by AESI to provide coating inspection services.

Various disputes have arisen on the project leading to the case of *Absolute Environmental Services, Inc.  vs. Forrest J. McKinley, et al.*  in the US Federal District Court for the District of Alaska.  This report addresses some of those issues as identified herein.

2

## **DOCUMENTS**

The documents reviewed and considered for this report include:

- See Appendix A

## PURPOSE

Pursuant to a request from legal counsel for AESI, a field inspection of the coating work was performed and a review of the listed documents (Appendix A) was undertaken. The purpose of the inspection and review was to:

- evaluate the process, procedures and costs incurred by AESI in completing disputed work;
- analyze and render opinions on specified counterclaims asserted by IIC; and
- rebut contentions and opinions, if any, expressed by coatings experts that may have been retained by Forrest J. McKinley and/or Emerco, Inc., if any such opinions are found to be false or unsupported. Rebuttal opinions cannot be provided until after an opportunity to review the as yet untendered expert reports and opinions of defendants.

4

## LIMITATIONS and QUALIFICATIONS

Information and supporting documentation for some of the IIC counterclaims and the associated costs is limited. A detailed analysis and report is not possible without complete information from IIC identifying activities and tasks allegedly causing damages to the defendants.

CLT, Inc has been retained to rebut contentions and opinions, if any, expressed by coatings experts that may have been retained by Forrest J. McKinley and/or Emerco, Inc., if any such opinions are found to be false or unsupported. Rebuttal opinions cannot be provided until after an opportunity to review the as yet untendered expert reports and opinions of defendants.

The completed opinions contained herein are based on the information known and available as of the date written. However, research, investigation, review and discovery continue and to the extent significant new or previously unknown information becomes available, the report and opinions may be subject to revision.

The opinions expressed herein are based on the knowledge, skill, experience, training and education of Mr. L. Skip Vernon in conjunction with a personal review of the project documents (as identified herein), pertinent industry literature, interviews with various project personnel, and inspection of the jobsite.

# I. Discussion

A site visit was scheduled for September of 2004. Prior to the site visit, an initial review of contract requirements was performed. The specification and limited correspondence relating to disputed issues were reviewed prior to meeting Dave Olson (AESI) at the USCG facility at Kodiak.

The site visit was made on September 8th and 9th of 2004. During the site visit coating repair operations by AESI personnel were being completed in areas previously coated by both IIC and AESI. In addition to Mr. Olson, Jerry Hardenbergh (Coffman) was in attendance on the first day of my visit. Over the course of the visit an extensive review of previous jobsite activities was accomplished with both men. Mr. Hardenbergh described his activities, including inspection procedures and findings; interactions with project personnel; and the underlying rationale for some of the engineering/QA decisions. Mr. Olson covered jobsite activities, including IIC process and procedures; AESI process and procedures; and a detailed description of the actions taken by AESI to complete the work.

In addition to extensive discussions regarding jobsite activities, an inspection of the facility was performed. The inspection consisted of general visual inspection, as well as different typical coating tests including microscopic observations, dry film thickness readings, adhesion testing, and photography. An effort was made to observe all coated surfaces both from the shore and from a small boat provided and piloted by Mr. Olson.

After returning from Kodiak, additional project documents were received over time. Once a significant number of documents were received, the review was begun. To date the documents listed in Appendix A have been reviewed.

6

Due to the number of issues in this case this report has been organized by topic. Some of the IIC counterclaim issues have been sufficiently described by IIC, and enough information is available to provide an opinion. However, some of the counterclaim issues have not been sufficiently described by IIC to permit a substantive response. Those counterclaim issues will be identified with a brief description of the nature of the inadequate information provided by IIC.

## AESI – Work to Complete the Contract

IIC fell significantly behind schedule and ultimately failed to complete the contract. AESI initially supplemented IIC workforces in an effort to recapture schedule time, but AESI was eventually required to complete the remainder of IIC's work. The project documents indicate that at the time of AESI supplementation IIC was significantly behind schedule; IIC was unable or unwilling to take the necessary actions to accelerate the work in a manner so as to regain the schedule; and, without supplementation, additional loss of schedule would result.

In addition to review of project documentation, extensive discussions were had with Mr. Hardenbergh, Mr. Olson and Mr. Peterson both at the jobsite and subsequent thereto. All were present at various times during the project. Mr. Olson described in detail the activities, process and procedures employed to both supplement IIC work and to complete the work after IIC's departure. Mr. Olson described the means and methods used by AESI to complete the work and he discussed the basis for selecting the particular means and methods and the rationale supporting those decisions.

Not only was it necessary for AESI to supplement IIC forces, it ultimately became necessary for AESI to take over completion of IIC's contract. The work to complete the project included not only the work IIC failed to begin, but also included extensive repair to work IIC had declared

7

complete. Based on my review of activities while on the jobsite along with information from informed personnel, it appears much of the work performed by IIC was subsequently repaired by AESI. Because much of the work declared complete by IIC was in need of remediation, an accurate analysis of work completed by IIC is problematic.

It is my opinion the actions taken by AESI to supplement and complete IIC work were reasonable and necessary to complete the project. The work performed by AESI was reasonably performed in accord with standard industry practice.

Numerous factors impacted the costs incurred by AESI in completion of IIC contract work. Based on the specifications and product data sheets (PDS) there are specific ambient conditions necessary prior to performing certain coating activities. Because the project was significantly delayed, weather conditions at the time of the AESI completion work increasingly worsened. The effort required to meet the specified ambient conditions would become progressively more difficult causing decreased productivity and increased cost. Furthermore, because much of the work performed by AESI was repair of defective or non-compliant work previously performed by IIC, the area of AESI work was much larger than initially assumed.

An extensive review of job costs was not performed by CLT. A detailed cost review and report was completed by MKL Associates, LLC (MKL). CLT job cost analysis included review of the MKL report; limited review of job cost records; a comparison of costs for general conformity with industry standards; and a general review for task cost balance and uniformity.

Based on my review, it is my opinion the costs incurred by AESI to supplement IIC forces and complete IIC's contract work are reasonable considering all of the factors impacting that work

8

**IIC Estimate, Bid and Schedule**

A review of the specification, schedule, handwritten IIC estimate and IIC bid was performed. A reasonable and accurate estimate and bid must be predicated on the specified requirements and the actual field conditions under which the work is to be performed. At a minimum, a competent and reasonable estimate considers tasks and activities on a discrete basis, accounting for production rates, sequencing and field limitations. In my opinion, the IIC schedule, estimate and bid are not based on a reasonable analysis and compilation of cost factors resulting from the specified requirements and reasonably anticipated field impacts.

In my opinion, there are numerous errors and defects in the IIC estimate. They include, but are not limited to: the estimate calculates labor on a time basis only, not accounting for task, production rate, specified cleanliness, or pre-existing substrate condition; the estimate fails to properly consider the amount of abrasive and paint necessary for the area to be prepared and coated; the estimate underestimates numerous aspects of the required quantities; the bid fails to accurately evaluate the time necessary for numerous tasks; and, the estimate fails to accurately estimate the area to be prepared and coated.

The estimate fails to accurately estimate the area to be coated. According to the available records and the deposition testimony of Mr. Puett, there was not even an effort to estimate the area to be prepared and coated. Considering that IIC had access to drawings and made a visit to the jobsite, it is my opinion the failure to even attempt to calculate the area to be coated is gross neglect. The estimate was based on a rudimentary estimate of time and none of the calculations except "paint" and "sand" even consider the area to be coated (and they are both incorrect).

The bid submitted by IIC appears to contain numerous inaccuracies (such as hourly rates compared to overtime rates, cost of coating, cost of abrasive, etc.). Of course, the bid is inaccurate to the extent the estimate is inaccurate. But, in addition, the bid appears inconsistent in its calculation of labor rates, allocation of costs, and estimates of lump sum costs.

The schedule submitted by IIC is inaccurate to the extent it fails to consider the area to be prepared and coated. The schedule provides for the same amount of time to complete a specified task in a given area (A, B, C, D, or E) even though the area to be coated is substantially different.

The schedule submitted by IIC is inaccurate based on the sequencing of events. Final cleaning of steel, inspection, and coating application must take place on the same day. It is not reasonable to schedule 4 days between profiling (final cleaning) and coating activities.

The schedule reflects that IIC will work 150 days straight without a day off. This is not realistic, nor does it reconcile with the bid.

The schedule indicates that IIC intended to "sponge blast" to achieve the required surface profile. This operation would be exceedingly slow, if not completely inadequate in this application, to achieve an SP 10 and the specified profile on rusted, pitted steel. It would not only be an inappropriate means and methods selection, the time reflected in the schedule would be completely inadequate.

It is my opinion there are numerous errors and inaccuracies in the IIC estimate, bid and schedule. It does not appear all cost factors were recognized or considered. It does not appear the estimate considered and adequately addressed all reasonably anticipated jobsite impacts. It appears certain cost factors were underestimated and there appear to be errors in the compilation of costs.

10

**Defendants Written Response to Plaintiff's First Set of Interrogatories**

In IIC's Response to Plaintiff's First Set of Interrogatories (Answer), IIC identifies the entitlement theories upon which it bases its damages. An opinion in response to the information offered by IIC in its Answer is provided. The issues are presented in the order presented in the Answer.

In some instances IIC failed to provide sufficient information in the Answer to allow for an analysis of the claim, but additional information was available in other documents such that a response was possible. In other instances, IIC failed to provide sufficient information in the Answer to allow for an analysis of the claim nor was sufficient information available from other sources (or that other information was inconsistent with the Answer).

For example, in its first response, IIC identifies the failure of AESI to remove cathodic protection (CP) as a theory of recovery. IIC states that AESI was to remove CP, AESI failed to remove the CP and IIC incurred labor costs as a result. However, IIC fails to describe the tasks allegedly performed by IIC, the time it took, the number of times the task was performed, or the impacted area. Regular hours and overtime hours are charged with no explanation of how the tasks required both straight time and overtime. There is no explanation or breakdown of the labor charges. The labor charges are inconsistent with the bid and other claims for damages. Where these infirmities in the IIC response are noted, a brief bulleted response is provided. Where sufficient additional information was available, a more expansive response is provided.

<u>Failure to Remove CP – (Interrogatory # 2, p. 3, L. 3)</u>

•        The causal relationship between labor, task, time and area is unexplained.

11

- There is no support or foundation provided for the claimed damages.

<u>Failure to Remove Non-Structural Steel – (Interrogatory # 2, p. 4, L. 16)</u>

- The causal relationship between crew size, labor, task, time and area is unexplained.

- The relationship of area, coverage, and cost of material is unexplained and is inconsistent with the bid.

- There is no support or foundation provided for the claimed damages.

<u>Failure to Stripe Coat Welds and Caulking – (Interrogatory # 2, p. 4, L. 16)</u>

While information is limited, there is additional information in the project documents regarding stripe coating and caulking.  In its letter dated September 16, 2002, IIC provides for exclusion of certain tasks.  The wording of the "Exclusion" portion of the letter is unclear.  It appears IIC is attempting to exclude the "Removal 1.7 – 1.7.6."  This exclusion does not harmonize with any of the specification provided to CLT (June 21, 2002, November 25, 2002 and November 26, 2002).  The June 21, 2002 specification was the only known specification in IIC possession before writing the September 16, 2002 proposal letter.  There are no requirements for caulking or striping in the excluded sections in the June 21, 2002 specification.

It is neither customary nor logical for an experienced industrial coating applicator to intentionally exclude striping, especially in this environment.  Striping can only be accomplished after final surface preparation (performed by IIC) and immediately prior to first coat application (performed by IIC).  It is somewhat unbelievable for IIC to suggest they intended to abrasive blast a surface, blow down, leave and wait for a different (certified) contractor to stripe coat the surface, then return to apply

12

the first coat of paint. Such a process would virtually guarantee the surface would flash rust requiring additional blasting.

While IIC fails to describe having performed striping operations, review and information regarding actual jobsite procedures would indicate IIC was not required by Coffman to stripe coat the surface as that term is commonly defined. Available information indicates that IIC did not stripe coat the welds prior to application of the first coat of paint.

Striping and caulking are separate procedures. They would be performed in separate operations. IIC has priced them as a single operation. The damages alleged by IIC do not comport with the typical field process for striping. There is no description of the work completed during the time claimed.

Order to Perform Non-Subcontract Work – (Interrogatory # 2, p. 11, L. 9)

- The causal relationship between labor, task, time and area is unexplained.
- The reasonableness of costs can be ascertained on a unit basis.

Undisclosed Gray Paint – (Interrogatory # 2, p. 11, L. 24)

IIC asserts it is entitled to an extra for removing a gray coating which was not referenced in the specification. IIC maintains that the specifications "did not indicate the existence of gray coating beneath the existing coal tar epoxy" and "the existence of the gray coating could not have been known

13

to IIC from a site inspection or any time prior to removal of the single coating of coal tar epoxy that had been represented to IIC by AES/Coffman as the only coating IIC would be obligated to remove."

There are numerous problems with IIC's position. To begin, the specification requires the contractor to "inspect the wharf prior to bid to determine existing conditions and quantities of surfaces to be coated" and makes clear "[I]t is the Applicator's responsibility to inspect and determine the actual conditions . . ." prior to bid. By executing the contract, IIC acknowledged it had satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as that information was reasonably ascertainable from an inspection of the site.

It is obvious that while Mr. Puett visited the site, he did not make a reasonable inspection of the site. Based on review of jobsite photographs, gray or white coating was visible from the shore during Mr. Puett's visit and before the work began. Once a different color coating was observed (gray or white), if it was a concern, further inquiries and investigations could have been made.

Common site visit activities include computation of area, ~~observation of the substrate and its~~ ~~condition,~~ measurement of existing DFT, removal and/or ~~close observation . . . to obtaining coating samples~~ and ~~observations of local conditions affecting the works.~~ It does not appear IIC performed any of these tasks.

It is obvious from the IIC estimate and bid that the existence of CTE or any other coating was neither a concern nor a factor in IIC's computations. There is no evidence IIC relied upon the reference to CTE in preparing its bid. In fact, the estimate and bid make clear that neither the initial condition of the steel, the coating on the steel or the degree of specified surface cleanliness were material factors in the compilation of IIC costs.

14

It is not clear what IIC relies upon to assert there was only one coat of CTE to remove.  The June 21, 200█ version of the specifications put IIC on notice there could be more than one coat of CTE.  It is unreasonable to assume there is only one coat of CTE.  Verification of CTE thickness is easily ascertainable during a reasonable site investigation.  The number of coats of CTE would not be the sole determinant of the effort necessary to remove the CTE.

To assert a changed condition, there must be a material difference between the CTE and the gray coating.  The simple fact the gray coating may not contain coal tar resin is immaterial.  If the difference in coatings does not materially adversely impact the effort necessary to complete the work, a changed condition would not exist.

IIC has provided no evidence ~~the gray coating resulted in production rates in excess of those originally anticipated.~~ There is no evidence that it took IIC longer to remove the gray coating than it did the CTE.  There is no evidence that excess costs (if they exist) were solely attributable to the gray coating and not a result of IIC inefficiencies.

The Coatings Laboratory (TCL) report indicates the black topcoat on the gray coating was only 1 mil thick and was likely a polyurethane.  The lab report also states the gray coating was 25 – 45 mils thick and that any difficulty in removal was "largely due to the thickness of the coating."  That it is more difficult to remove a coat ~~that is four times thicker than that in its thickest~~, is not surprising.  IIC acknowledges that in some locations the gray coating has CTE beneath it.  This would affect removal rates.

15

There was rusted and pitted steel in many locations. ~~Aggressive blasting pitted steel to an SSPC SP-10 cleanliness level can be difficult and time consuming.~~  This factor does not appear to have been considered in the productivity analysis.

Deposition testimony indicates it only took ~~33~~ minutes to remove the gray coating on a pile. There is no information on how long it took to clean an equivalent area of CTE.  With only 33 minutes per pile the damages claimed by IIC are excessive.

The methodology utilized by IIC to establish the difficulty of removing the gray coating is faulty and raises numerous issues.  The CTE was being removed by UHP water jetting.  The gray coating, especially that over CTE, would also be removed by UHP.  The removal of 1 mil of polyurethane would not be the same as removing 16 mils (or whatever the actual thickness was) of CTE.  To the extent the ~~steel beneath the gray coating was rusted and pitted the analysis is flawed.~~

<u>Lost Profits Due to Cargo Wharf Project – (Interrogatory # 2, p. 12, L. 25)</u>

This claim was not reviewed by CLT.

<u>Lost Profits Due for Coating Tanks N 12 and N 60 – (Interrogatory # 2, p. 14, L. 1)</u>

This claim was not reviewed by CLT.

<u>Failure to Pay Amount Due on Original Contract – (Interrogatory # 2, p. 14, L. 1)</u>

This claim was not reviewed by CLT.

Interference/Delays – (Interrogatory # 2, p. 17, L. 23)

IIC claims "Throughout the project, the inspector Jerry Hardenbergh of Coffman Engineers, disrupted and interfered with IIC's performance of its subcontract work by over-inspecting IIC's work, imposing requirements on IIC's work that were not required by law or contract, including but not limited to the improper employment of SSPC PA 2 testing standards, the High Voltage Holiday Testing, Adhesion Testing; failing to provide certificates of calibration of his testing equipment prior to administering tests on IIC's work; requiring additional grinding, and failing to show up at scheduled inspections." The issues will be presented and discussed in the order presented in the Answer.

Before proceeding with a response to the individual allegations, it should be noted that IIC represents itself to be a competent, professional industrial coating applicator with "safety and quality programs under the direction of Tom Puett" that "meet all the requirements as rated in 55 SSPC QP 1, QP 2, & QP 3." (The reference to "as rated in 55" is unclear.) According to the SSPC website, IIC is not QP 1, QP 2, or QP 3 certified. Thus, the IIC statement appears calculated to mislead AESI into believing IIC is an SSPC certified contractor or at a minimum, lead AESI to believe IIC has safety and quality control programs equivalent to a QP certified contractor. In any event, a high level of expertise relative to coating quality control is claimed by IIC. If IIC was aggrieved by alleged Hardenbergh errors, it is not clear why it did not raise them prior to the engagement of the consulting firm of MS2.

Based on review of project documentation and discussions with personnel present during coating application and inspection operations, it is my opinion the Coffman's QA activities appear to comport with normally accepted industry standards for field coating quality assurance.

17

*Improper Employment of SSPC PA 2 standards*

IIC does not provide specific identification of the alleged improper acts by Mr. Hardenbergh relative to PA 2 in the Answer so a detailed response to the allegation in the Answer is not possible at this time.  (See also CLT response to MS2 report.)

*High Voltage Holiday Testing*

IIC does not provide specific identification of the alleged improper acts by Mr. Hardenbergh relative to high voltage holiday testing in the Answer so a detailed response to the allegation in the Answer is not possible at this time.  (See also CLT response to MS2 report.)

*Adhesion Testing*

IIC does not provide specific identification of the alleged improper acts by Mr. Hardenbergh relative to adhesion testing in the Answer so a detailed response to the allegation in the Answer is not possible at this time.  (See also CLT response to MS2 report.)

*Failing to provide certificates of calibration of testing equipment prior to administering tests*

The nature of the allegation is unclear.  It is not clear whether IIC is alleging there was a contract obligation to provide certificates and the obligation was not met, or whether the allegation is that a failure to provide certificates would result in improper or inaccurate testing.  There is no contract obligation for the Engineer, the government or its representative to provide certificates of calibration to

18

a subcontractor prior to testing. A failure to provide certificates of calibration prior to testing would not disqualify, nor render inaccurate, readings taken with said testing equipment.

### *Requiring additional grinding*

The nature of the allegation is unclear. The reason for requiring the additional grinding is not stated. Thus it is not clear whether additional grinding would be a compensable act or was required for compliance with contract requirements.

### *Failing to show up at scheduled inspections*

IIC alleges Coffman failed "to show up at scheduled inspections." There is no information regarding the circumstances, when the alleged failure took place or how many times it is alleged to have happened. There is no explanation for the basis for asserting there is a liability on behalf of the Engineer, the government and/or their representative for not attending an inspection.

### *Failure by AES to supply adequate personnel to help move scaffolds, set up containment, and operate equipment.*

No details are provided so a response is not possible at this time.

**MS2 Report to IIC dated October 21, 2003**

As of the date of this writing, it is not clear whether the October 21, 2003 MS2 report is to be construed as an expert report with the positions and opinions stated therein adopted and tendered by IIC or merely a copy of a site visit report forwarded under the pertinent discovery request.

The MS2 report indicates Mr. Shilling visited the site on July 15, 2003.  There is no indication Mr. Shilling spent more than one day onsite.  Mr. Puett performed the coating operations while Mr. Shilling was onsite.

Environmental Controls

The specification and PDS identify requirements for the multiple ambient environmental conditions (not just steel substrate temperature and dew point) that must be met prior to, and during, coating operations.  The ambient environmental requirements are easily established with commonly used instruments.  The coating Applicator has primary responsibility for controlling, creating, verifying and assuring proper ambient conditions prior to engaging in coating operations.

While the final determinant of the sufficiency of environmental controls is whether conditions were met at the time of application, comments regarding the efficacy of the controls can only be made in consideration of the outside conditions.  MS2 conclusions regarding the efficacy of IIC environmental controls based on IIC data on temperature increases inside containment while heating are questionable without information on the conditions outside containment.

Outside conditions can be critical when trying to determine whether to proceed with coating operations.  Not only are the conditions at the time of application important, but the conditions prior to coating and during cure must be considered.  If environmental controls are not sufficient to maintain

20

ambient conditions inside containment when conditions outside containment are deteriorating, then coating operations should not take place.

The MS2 report states Mr. Shilling "saw no evidence that poor environmental controls had been manifested by coating." Coating recently applied outside the required ambient conditions may not be immediately visible. Evidence of coating recently applied over moisture condensation may not be immediately visible.

The MS2 report spends a significant amount of time criticizing the content of Coffman QA reports. However, in the final analysis, the MS2 report acknowledges, "coating application was allowed to proceed." It is not clear how the complaints in the MS2 report, including those regarding inspector comments on IIC environmental controls and the recording of information Mr. Shilling considers irrelevant, equate to IIC damages.

Dry Film Thickness Testing

The Applicator has primary responsibility for application and verification (quality control) of proper coating thickness. SSPC PA 2 (PA 2) is a commonly used standard for the calibration of the referenced gauges and verification of coating thickness. An Applicator with quality control programs meeting the requirements of the SSPC QP 1, QP 2 and QP 3 standards would be very familiar with PA 2 and its requirements. Because the Applicator has primary responsibility, it is presumed the Applicator has already performed the required QC duties and measured the coating in accord with PA 2 before requesting QA. Experienced and knowledgeable contractors would recognize immediately if PA 2 was being improperly or unfairly implemented and would instantaneously raise objection.

21

The MS2 report states, "[T]here is some evidence that Coffman QA did not (emphasis in original) perform DFT testing in accordance with SSPC-PA 2." The MS2 report acknowledges Mr. Shilling "did not observe Coffman QA or the KTA inspector making any DFT measurements." The MS2 report does not identify the "evidence" to which it refers.

The MS2 report states its findings are based on review of a single QA report dated May 17, 2002. Apparently, neither Mr. Shilling, nor IIC had thoroughly reviewed the DFT data such that specific identification of acts of noncompliance with PA2 could be identified.

High Voltage Holiday Testing

The MS2 report correctly states that holiday testing was to be done by the Applicator in accord with NACE RP0188-99. MS2 then asserts that neither the standard nor the specification requires the coating to be holiday free. It is true the standard, when read alone, does not require a surface to be "holiday free." However, when the contract documents are read as a whole and given their customary meaning, it is my opinion the contract requires the coating to be "holiday free" as that term is commonly used in the coating industry. The specification requires holidays to be repaired. The specification requires the surface be free of pinholes. The specification requires the surface be free of "skips" (a paint term generally considered synonymous with holiday). The specification requires that all repairable defects disclosed by the holiday detector be repaired by the Applicator. Not only are the documents clear, in my experience when high voltage holiday detection is specified it is expected that all holidays be repaired.

If there is any doubt as to whether there is a contract requirement for the surface to be holiday or pinhole free, an experienced industrial coating applicator will clarify the issue prior to bid, and

certainly before the Applicator is to begin testing.  Considering the service environment, contract language and actions of the parties it is my opinion the specification requires all holidays to be located and repaired and the final surface to be "holiday free."


The MS2 report states that Mr. Shilling "did not observe Coffman QA or the KTA inspector doing any high voltage testing."  The MS2 report bases most of its discussion on statements in IIC daily reports.  It is not clear whether the MS2 report is alleging faults with Coffman QA high voltage holiday testing.


Adhesion Testing


The contract required the Applicator to test the adhesion of the coating.  The specified standard was ASTM D4541.  The parties agreed to a test value of 1900 psi.  The MS2 report states, "IIC was ill-advised to have accepted . . . " the testing criteria and IIC ". . . should avoid it on future work . . ."  With QC programs meeting the requirements of QP 1, 2 and 3, IIC is fully familiar with adhesion testing and its limitations.  A minimum adhesion value is often established for acceptance or rejection on industrial coating projects.  The advisability of a given value is left to the discussion and negotiation of the parties.  IIC, based on its representations as to its greater expertise and experience with industrial coating application, should be expected to be fully capable of identifying the drawbacks and consequences of specified testing criteria.


There is no indication of how adhesion testing adversely impacted IIC operations.  There is no description of extra work performed by IIC as a result of adhesion-related testing errors.  There is no description of damages associated with extra work due to defective adhesion-related testing.

23

<u>Gray Coating</u>

The gray coating issue has been previously addressed in this report.

The MS2 report raises the issue as to whether the gray coating should have been left in place and over-coated. In my opinion, that would have been ill advised, and likely would have resulted in less than optimal coating performance.

This completes the CLT analysis (based on information available to date). CLT appreciates the opportunity to work with you on this project. If you have any questions please do not hesitate to call.

Very truly yours,

By _____

L. Skip Vernon
CLT, INC.
NACE Certified Coating Inspector #669
SSPC Certified Protective Coating Specialist
ASPE Certified Professional Estimator (Coating)
CSI, CCS, CCCA

LSV:lav

C:/CLT/Absolute Environmental/Report AESI 112904

24

[SEAL]