# EXHIBIT 14

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

---

ABSOLUTE ENVIRONMENTAL SERVICES,)
INC., an Alaskan Corporation,   )
                                )
        Plaintiff,              )
                                )
    vs.                         ) Case No. A-03-0199
                                ) Civil (RRB)
FORREST J. McKINLEY and         )
"JANE DOE" McKINLEY, and the    )
marital community property      )
composed thereof d/b/a "Imperial)
Industrial Coatings" and EMERCO,)
INC., etc.,                     )
                                )
        Defendants.             )
EMERCO, INC., a California      )
Corporation d/b/a Imperial      )
Industrial Coatings, etc.,      )
                                )
        Counter-Claimant/       )
        Third Party Claimant,   )
                                )
    vs.                         )
                                )
ABSOLUTE ENVIRONMENTAL SERVICES,)
INC., an Alaskan Corporation,   )
et al.,                         )
                                )
        Cross-Defendants/       )
        Third-Party Defendants. )

---

DEPOSITION UPON ORAL EXAMINATION

OF

L. SKIP VERNON

---

Taken at 1900 Fifth Avenue
Seattle, Washington

DATE TAKEN:     FEBRUARY 11, 2005

Buell Realtime Reporting, LLC
(206) 287-9066

Page 78

1  through to complete the work.
2           Essentially bringing in the additional rigging,
3  the containments. They put that together. The number of
4  people that he had on site, the types of functions they
5  were performing, that he had hired Corrpro. He needed
6  some applicators that he felt would be qualified to spray
7  the product. Basically, just went through a complete
8  rendition of what Absolute had to do to finish this job.
9    Q.  Turn over to page 8. First --
10          MR. MARSTON: Do you have a page 8?
11          THE WITNESS: Yes.
12          MR. MARSTON: Our copies don't have an 8.
13          THE WITNESS: Page 8 is missing.
14   Q.  I will get a copy made and attached, I guess.
15          Let me just read to you a sentence from my
16  page 8, if I might.
17          It says, "Based on my review of activities
18  while on the jobsite along with information from informed
19  personnel, it appears much of the work performed by IIC
20  was subsequently repaired by AESI."
21          Other than what site personnel told you, do you
22  have any other basis for expressing the view that much of
23  the work performed by IIC was subsequently repaired by
24  AESI?
25   A.  My personal observations at the jobsite.

Page 79

1    Q.  What did you observe in the job that made you
2  believe that much of the work performed by IIC was
3  subsequently repaired by AESI?
4    A.  The visible -- of course, the first line was
5  all the visible markings that were there at the time I
6  was there. So numerous repairs were indicated at the
7  time I was on site.
8    Q.  What did you mean by the term "much of the
9  work"?
10   A.  I don't know that I can attach a quantification
11  to it. It just seemed to me that if you have work that
12  was represented as complete per the contract documents,
13  based on the number of repair markings and obvious
14  repairs that had taken place prior, much of the work had
15  to be repaired. I don't know that I can associate a
16  percentage of area with that.
17   Q.  The next -- again, I'm sorry, I will have to
18  read the sentence on page 8.
19          It says, "It is my opinion the actions taken by
20  AESI to supplement and complete IIC work were reasonable
21  and necessary to complete the project," unquote.
22          Isn't it true that that opinion is based upon
23  your being told by AESI people and Mr. Hardenbergh that
24  there were defects that were required to be repaired
25  beyond the corrosion marks that you saw?

Page 80

1           THE WITNESS: Could you read that back for me,
2  please.
3           (Record read.)
4    A.  Yes, but my opinion is based on the totality of
5  the circumstances, my knowledge and experience of what is
6  required in terms of coating application, the people that
7  I spoke to and the documents that I reviewed.
8    Q.  Do you have a page 9?
9    A.  I do have a 9.
10   Q.  This section is entitled "IIC Estimate, Bid and
11  Schedule," page 9 and 10.
12          What specific documents did you review
13  concerning your opinions about the IIC estimate bid and
14  schedule?
15   A.  Of course, the primary document is the schedule
16  and the handwritten estimate that IIC provided, along
17  with the bid, which, of course, is incorporated in their
18  subcontract and the specifications.
19          And, actually, there are three versions of the
20  specification that had to be reviewed in order to do a
21  complete analysis of what the expected work might be.
22          MR. MARSTON: Pat, just a reminder, at sometime
23  in the next 15 minutes he needs to go check out, too.
24   Q.  What opinions did you form with respect to the
25  IIC estimate and bid, if any?

Page 81

1    A.  That it failed to properly consider many of the
2  costs that were going to be included in the project and
3  it was inadequate for the work that was specified to be
4  done.
5    Q.  What costs did you believe it failed to
6  properly consider?
7    A.  To the extent that the takeoff and estimate of
8  square footage was incorrect by approximately a factor of
9  two, all of the costs would be inaccurate.
10          According to the handwritten estimate, there
11  was 13,000 feet of steel to be coated. That appears to
12  be inaccurate.
13   Q.  In what way is it inaccurate?
14   A.  Well, on the drawings, it indicates
15  20,000 square feet on just a sub-area of that contracted
16  for by IIC and an actual takeoff of the area results in
17  approximately 30,000 square feet of area to be coated
18  under this contract.
19   Q.  Did you perform a takeoff?
20   A.  Yes.
21   Q.  Was that during the visit that you have
22  described?
23   A.  No, subsequent. Well, let me clarify that. To
24  do an accurate takeoff of this, one must observe the site
25  because the drawings do not accurately reflect every

Page 82

1  single member that might be encountered on the wharf.
2      So the drawings themselves, doing a takeoff of
3  those will result in one number. There is a -- there's
4  some additional area that has been subsequently added
5  which you have to actually observe so that you know that
6  that's there from a physical observation.
7    Q.  How did you discover that there had been an
8  area added beyond that shown on the drawings?
9    A.  The subcontract indicates painting from bents
10 13 to 33, I believe. I'm going from memory. I would
11 want to confirm that with the document.
12     Looking at the drawings, the line indicating
13 20,000 square feet actually is at bent 15, I believe. So
14 the 20,000 feet doesn't even indicate to the limits of
15 the contract.
16   Q.  Did you perform -- strike that.
17     Did you make a subsequent visit to the jobsite
18 after the two-day visit in September that we have
19 discussed?
20   A.  No.
21   Q.  How did you do the takeoff then? I thought you
22 told me that you performed a takeoff of the actual work
23 at a later time after your September visit.
24   A.  Certainly. I have the drawings and I also have
25 the photographs that are included both, of course, in

Page 83

1  everybody's documentation, as well as my own so that you
2  can -- I take panorama-type pictures of certain areas.
3      So you go to the drawings, take those off and
4  then look to confirm those are correct by the photographs
5  that Mr. Hardenbergh took and -- well, just about
6  everybody has taken pictures out there.
7    Q.  And how did you estimate the quantities of work
8  in the areas beyond those shown in the drawings? You
9  said were added from what is shown on the drawings. Is
10 that also from the pictures?
11   A.  No. You may be misunderstanding what I'm
12 saying.
13     There is a drawing of the wharf and there is a
14 line drawn through that wharf with a line at the other
15 end and it says, indicates 20,000 square feet. The rest
16 of the area is still shown on the drawings.
17   Q.  So when you say you did a takeoff that resulted
18 in 30,000 square feet, that is a takeoff of the drawing
19 going beyond the line that you have indicated?
20   A.  Right. You would have to look at the drawing
21 to understand what I'm talking about.
22   Q.  All right. But when you say you did a takeoff,
23 what you used to do that is the drawings rather than some
24 physical measurement at the site; is that correct?
25     MR. MARSTON: Object to the form of the

Page 84

1  question.
2    A.  The estimate that I did was based on the
3  drawings, coupled with a field review of the actual
4  conditions at the site.
5    Q.  Did the field review that you performed
6  indicate to you any errors in the drawings, other than
7  the 20,000 foot indication?
8      MR. MARSTON: Objection; assumes facts not in
9  evidence --
10     MR. DICKSON: Foundation.
11     MR. MARSTON: -- that the 20,000 square foot
12 was erroneous.
13   A.  I have not concluded that the 20,000 was
14 erroneous and I did not do that comparison. I simply did
15 an analysis of how many square feet were to be coated
16 under this contract.
17   Q.  When you did your site investigation, did it
18 indicate that if you used the drawings as to and did a
19 takeoff of the bents required under the contract that the
20 result would be inaccurate?
21     MR. MARSTON: Read that question back again.
22   Q.  I will restate it. In your opinion, could
23 someone use the drawings to perform an accurate takeoff
24 of the work that was required under this contract?
25     MR. MARSTON: In isolation?

Page 85

1    A.  Yes, depending on your definition of accuracy.
2      There were some additional members that were
3  not shown on the drawings. I don't have in my mind
4  exactly how much they equated to, but I believe there is
5  approximately 28-, 29,000 square feet shown on the
6  drawings. There is another, maybe, thousand, 1500 that
7  are there that is not shown.
8    Q.  And the part that is not shown, are these
9  additional bents or some other kind of steel?
10   A.  Basically, supporting steel or additional
11 cross-member in a few locations, pipe supports.
12   Q.  And how did you perform a takeoff of those,
13 that portion of the work?
14   A.  Count the members, calculate the size and run
15 the square footage.
16   Q.  And you could do that simply by looking at
17 them? Did you have to actually measure them with a tape
18 measure or some other device?
19   A.  Well, most of them are common elements. So to
20 the extent the tube steel out there is 4X4 tube steel or
21 6X6 tube steel, most of it was common.
22   Q.  On page 9 where you are indicating errors in
23 the estimate, there is a statement that says, "The
24 estimate calculates labor on a time basis only, not
25 accounting for task, production rate, specified

Page 86

1  cleanliness, or pre-existing substrate condition."
2      Would you explain what you meant by that
3  statement?
4      A.  Yes. The handwritten estimate simply
5  calculates labor as a function of seven men times so many
6  days times so many hours times so many weeks.
7      There is no accomodation for the tasks that
8  they are performing, whether they're installing -- how
9  long it will take to install cofferdams, how long it may
10 take to install containment, how long it will take to
11 water-blast, how long it will take to abrasive-blast, how
12 long it will take to stripe coat, how long it will take
13 to caulk, how long it will take to finish coat; each one
14 of those functions involving a separate production rate
15 and, therefore, a time factor.
16     None of those are included. It's simply a
17 rudimentary calculation of so many men, so many days, so
18 many hours, so many weeks.
19     Q.  The next statement says, "The estimate fails to
20 properly consider the amount of abrasive and paint
21 necessary for the area to be prepared and coated."
22     Would you explain what you meant by that
23 statement?
24     A.  Yes. The estimate calculates that there will
25 be three pounds of abrasive used per square foot to

Page 87

1  prepare the steel.
2      The specification calls for an SP-10 finish
3  over a substrate that is both pitted and rusted, as well
4  as covered with coal tar epoxy.
5      Three pounds per square foot, in my opinion, is
6  a completely inadequate number for that amount,
7  notwithstanding the fact that the area over which it is
8  calculated is less than half of the actual area to be
9  painted.
10     In addition, the paint calculation was only
11 calculated for 13,000 square feet and it was only
12 calculated and appears to be for 44 mils.
13     Since we now know, of course, that the paint
14 was applied much thicker than that and there is more than
15 double the area, they missed the paint estimate by more
16 than half or double.
17     Q.  On page 9, it further states, "The bid fails to
18 accurately evaluate the time necessary for numerous
19 tasks."
20     Would you explain what you meant by that
21 statement?
22     A.  Yes. In many areas, and in fact in combination
23 with the schedule, it shows that the time allocated to
24 certain tasks would be insufficient.
25     Now, to the extent the bid even fails to

Page 88

1  allocate time for tasks, of course, then it's not
2  accurate, and that statement is most easily verified by
3  what actually happened in the field, but the schedule
4  points out that the sequencing and amount of time
5  duration for given tasks was incorrect.
6      Q.  On page 9, there is a statement that says,
7  quote, "According to the available records and the
8  deposition testimony of Mr. Puett, there was not even an
9  effort to estimate the area to be prepared and coated,"
10 unquote.
11     What is the basis of that statement?
12     A.  Mr. Puett in his deposition when asked how the
13 estimate of area was done indicated that it was simply
14 taken off the drawings.
15     Q.  And in what way does the statement that his
16 takeoff was made from the drawings make you believe that
17 there was no effort to estimate the area to be prepared
18 and coated?
19     MR. MARSTON: Objection; ambiguous with respect
20 to the meaning of the phrase "takeoff" in this context,
21 takeoff as a term of art or utilized from in a lay sense.
22     MR. DUFFY: I have refrained from objecting to
23 your talking, speaking objections, but I'm going to do so
24 now.
25     Q.  Can you answer the question?

Page 89

1      A.  Mr. Puett's deposition, and I'm simply
2  paraphrasing, indicated that -- and the deposition can be
3  read. I would be happy to go back and look and find the
4  exact language, but that the amount of area was taken off
5  the drawings.
6      There are three separate numbers used by IIC in
7  their contract and bid, and that's what I'm relying on
8  for that statement, is his comment in his deposition.
9      Q.  Would you turn to page 10, please.
10     The first sentence says, "The bid submitted by
11 IIC appears to contain numerous inaccuracies (such as
12 hourly rates compared to overtime rates, cost of coating,
13 cost of abrasive, etc.)"
14     Would you explain what you meant by that
15 statement?
16     A.  Yes. Based on the information available to me
17 at that time, in the estimate it appears that the
18 calculation was for $54 or, excuse me, $47 an hour for
19 straight-time labor and $54 an hour for overtime labor.
20     And I'm quoting that from memory. I would have
21 to look at that to make certain those numbers are
22 absolutely correct.
23     Based on the prevailing wage of the job and if
24 it was anticipated that overtime was paid at time and a
25 half, then the numbers don't correspond to what would be

Page 90

1  an appropriate spread between the straight-time and
2  overtime rate. That's why I say they appear to contain
3  inaccuracies and that's my rationale for that one.
4      The cost of the coating, of course, is
5  inaccurate to the extent that less than half of the
6  coating needed was ordered. So cost is inaccurate.
7      Also, on the estimate, it appears that, in my
8  opinion, Mr. Puett didn't know the exact cost of the
9  coating, because he put a $70 next to it or put 70 in the
10 line and then put a question mark next to that, which
11 indicates to me that he wasn't sure what the coating
12 costs.
13     On the back side of the page, he does an
14 analysis of how much coating and abrasive will be needed
15 and then when he brings those forward, he doesn't use the
16 same numbers. So there seems to be a lack of certainty
17 in terms of what those numbers are.
18 Q.  When you began your answer, you said based on
19 the estimate available at that time.
20     Have you received any later information which
21 has changed anything, any opinion you have or just
22 expressed?
23     MR. MARSTON: Based on the estimate available
24 or information available?
25     MR. DUFFY: Any information.

Page 91

1  A.  No, not in any substantive manner. Mr. Puett's
2  deposition certainly added some clarifications in some
3  areas, but it wasn't enough for me to change some of the
4  questions that I had.
5      So I have not received any new information that
6  would cause me to change my opinions as they are
7  currently characterized in my report.
8      MR. MARSTON: Excuse me, is this a good time to
9  break and let him check out?
10     THE WITNESS: I have to check out by 12.
11 Q.  It's 20 to 12. Let's go another few minutes.
12 Are you here at this hotel?
13 A.  Yes, but I have got to throw a few things in a
14 bag, so.
15 Q.  Let me just finish this page. It will just
16 take a moment.
17     The fourth full paragraph says, "The schedule
18 reflects that IIC will work 150 days straight without a
19 day off. This is not realistic, nor does it reconcile
20 with the bid."
21     What is there about the schedule that makes you
22 believe that IIC intended to work 150 days straight
23 without a day off?
24 A.  Based on the way that the schedule is
25 configured and reading the tasks and adding those task

Page 92

1  days together individually from the tasks, it comes to
2  150 days.
3  Q.  Is it still your opinion that IIC intended to
4  work 150 straight days without a day off?
5  A.  I'm not sure that I say they intended to do
6  that. That doesn't make sense to me. That's why I say
7  the schedule reflects that that's what they will be
8  doing.
9      So there is a question, I guess, as far as
10 schedule. I don't know that they intended to do that. I
11 can't know their intent. I simply based my comment on a
12 reading of the schedule and the fact that the estimate is
13 based on 12 weeks, the first schedule that is included
14 then shows 150 days.
15     MR. DUFFY: Let's take our lunch break at this
16 time.
17     (A lunch recess was taken
18     from 11:44 to 1:05 p.m.)
19     E X A M I N A T I O N (Continued)
20 BY MR. DUFFY:
21 Q.  Mr. Vernon, this morning I asked you about some
22 corrosion you observed on your September site visit.
23     Do you recall or can you identify which bent or
24 bents that corrosion, it was told to you was corrosion
25 caught from IIC work, which bents they were on?

Page 93

1  A.  I couldn't identify that at this point.
2  Q.  If you would turn, please, to page 11 of your
3  report.
4      Were you asked to review IIC answers to
5  interrogatories for some reason?
6  A.  I was asked to review the claims, and as it
7  turned out, the interrogatories essentially contained
8  those claims.
9  Q.  The first item you have listed is "Failure to
10 Remove CP" and you indicate "The causal relationship
11 between labor, task, time and area is unexplained."
12     Would you explain what you meant by that?
13 A.  It would be easier to do if I had the
14 interrogatory actually in front of me, but essentially
15 the allegation amounted to that Absolute had a duty to
16 remove CP. They did not remove that CP and Imperial
17 incurred costs.
18     There was no discrete or identification of
19 discrete incidents that took place that essentially led
20 to damages. So there was no way to respond. It didn't
21 indicate what Imperial's response was, what they did, how
22 many times they had to do it. So there was insufficient
23 information to respond.
24 Q.  Did you form any opinions as to whether or not
25 Imperial was right in their contention that the work of

C E R T I F I C A T E

STATE OF WASHINGTON   )
                     ) ss
COUNTY OF KING       )

I, JOLENE C. HANECA, a Certified Shorthand Reporter and Notary Public in and for the State of Washington, do hereby certify that the foregoing transcript of the deposition of L. SKIP VERNON, having been duly sworn, on FEBRUARY 11, 2005, is true and accurate to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 24TH day of FEBRUARY, 2005.

Notary Public
State of Washington
JOLENE C. HANECA
My Appointment Expires Mar 28, 2006

JOLENE C. HANECA, RPR, CCR

My commission expires:
March 28, 2006



BUELL
REALTIME REPORTING, LLC
leaders in Realtime Technology

Telephone: 206.287.9066