# EXHIBIT 2

Absolute vs. McKinley    5-17-2006                    Michael Lembke
Case 3:03-cv-00199-RRB    Document 219-3    Filed 08/04/2006    Page 2 of 7

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

```
ABSOLUTE ENVIRONMENTAL SERVICES,  )
INC.,                             )
                                  )
            Plaintiff,            )
                                  )
    vs.                           ) No. 3:03-cv-0199-RRB
                                  )
FORREST J. MCKINLEY, et al.       )
                                  )
            Defendants.           )
```

Deposition Upon Oral Examination

of

MICHAEL LEMBKE

9:10 a.m.

May 17, 2006

1201 Third Avenue, Suite 4800

Seattle, Washington

Valerie L. Seaton, RPR

Court Reporter

Case 3:03-cv-00199-RRB   Document 219-3   Filed 08/04/2006   Page 3 of 7

Absolute vs. McKinley       5-17-2006                Michael Lembke

Page 194

1  affected by the same problem with trying to meet the
2  specification for high voltage Holiday testing that
3  Absolute was affected by later on, and so Imperial's
4  costs were also impacted by this problem. They went
5  back time and time again making repairs because they
6  kept failing the Holiday testing in Areas A and B, and
7  those are the two areas that they actually did coatings
8  work on. They did primarily prep and other preliminary
9  work in the other two sections.
10         MR. MARSTON: It's 4 o'clock, Peter.
11     Q. (BY MR. KREGER) Have you done an independent
12  analysis of the so-called business devastation item
13  that you have reported in your recap under Line 12?
14     A. I read the report.
15     Q. Have you done an independent analysis of the
16  business devastation that you reported in Line 12?
17     A. No. I'm assuming that the expert that
18  prepared that report has done it properly and I'm
19  relying on his report.
20     Q. What do you mean in your report, Exhibit D,
21  by business devastation?
22     A. What do I mean by Exhibit D, the line item
23  regarding business devastation?
24     Q. Yes, sir.
25     A. Well, that is a separate element of a claim

Page 195

1  that my understanding Mr. Olson has that's part of this
2  overall litigation.
3     Q. Have you formed an opinion as to whether or
4  not -- excuse me. Have you been asked to express an
5  opinion about the relationship between the business
6  devastation number that you were supplied by the other
7  expert and the events that occurred on the project?
8     A. Have I been asked an opinion with respect to
9  the business devastation aspect of this lawsuit?
10     Q. Yes.
11     A. No.
12     Q. So are you going to express an opinion at
13  trial as to whether Absolute has experienced business
14  devastation?
15     A. I don't believe so.
16         MR. KREGER: Let's go off record
17  briefly.
18         (Off the record at 4:03 p.m.)
19         (Back on the record at 4:08 p.m.)
20     Q. (BY MR. KREGER) How does your method of
21  calculating the damages that you have opined are owed
22  by Brechan and Coffman account for the factors that you
23  identified in your first report having to do with
24  Imperial's poor performance on the work, lack of
25  quality control, improper pump equipment, improper

Page 196

1  sponge blast methods?
2     A. Well, I think Imperial absorbed most of those
3  costs if not all. The payments that Absolute made to
4  Imperial are very, very close to the amount of work
5  that they actually did get done. So most of those
6  costs that you're referring to are borne by Imperial.
7  They're not part of this claim.
8     Q. So if there was repair work that Absolute did
9  in Bents A and B and part of C as a result of
10  Imperial's defective work and those repair efforts
11  increased Absolute's costs, how have you accounted for
12  that extra work that Absolute had to do to repair
13  defective workmanship by Imperial?
14     A. Well, my opinion is based on the records that
15  Imperial spent the last two months doing repair work in
16  A and B sections of the project and that at the point
17  in time that they departed, the only thing that was
18  left to do by Absolute was to pour on enough coating to
19  finally pass these Holiday tests. There was so much
20  coating on that area already from the repair work that
21  Imperial had done that I think their defects had been
22  corrected. The only thing left was they could not
23  still at that stage get past the high voltage Holiday
24  testing.
25         So that's the portion of work that Absolute

Page 197

1  went back in to rectify. That's my opinion based on
2  the record.
3     Q. Have you made any attempt to segregate the
4  portion of the number that you have calculated on Line
5  8 between Coffman and Brechan?
6     A. No, sir, I have not.
7     Q. Do you have a pending assignment to do that?
8     A. No, sir.
9         MR. KREGER: Mr. Partnow, I'm going to
10  yield the floor to you. I will indicate that I may
11  make an effort to negotiate with Mr. Marston for
12  opportunity to finish my deposition of Mr. Lembke. And
13  I understand, Mr. Marston, you will make some
14  indication that you won't allow it, but I'm yielding
15  the floor at this point to Mr. Partnow.
16         MR. MARSTON: Let's take -- right now
17  I've got eleven minutes after. Let's take four minutes
18  that I'm going to add to your time, and I'll probably
19  even give you more than that, but let's just talk about
20  what it is that you have yet to complete that you want
21  to accomplish.
22         MR. KREGER: I've got some exhibits here
23  that I wanted to ask him about and I've got some
24  questions about the total costs calculation and I've
25  got some questions about whether he did a loss exposure

Case 3:03-cv-00199-RRB   Document 219-3   Filed 08/04/2006   Page 4 of 7

Absolute vs. McKinley        5-17-2006                Michael Lembke

Page 198

1  analysis for Absolute. I've got questions about
2  whether there are different types of loss exposures.
3  Those are the ones that I see in my notes here that I
4  haven't asked him.
5      MR. MARSTON: Okay. This is what I'll
6  agree to do: I'll agree to confer with you after the
7  deposition is over and maybe we can make some
8  reciprocal accommodations or something along those
9  lines, but we can take that up when the deposition's
10 concluded.
11     Mr. Partnow?
12         EXAMINATION
13 BY MR. PARTNOW:
14  Q. Mr. Lembke, hi. I'm Peter Partnow. I
15 represent Coffman Engineers. I have as many questions
16 that I can get in. I'll see how we do.
17     In Exhibit D to your report, just look at
18 Errata 2, in terms of the business devastation, I
19 understand you've just plugged in the number that you
20 got from Mr. Bullion. I think that's the expert who
21 developed that number?
22     MR. MARSTON: Rulene.
23  Q. (BY MR. PARTNOW) Rulene. Sorry. I
24 apologize to him.
25  A. Yes. In the business devastation line item

Page 199

1  of Number 12, that is the number that comes directly
2  from his report.
3   Q. And in terms of putting that totally under
4  the Coffman/Brechan as opposed to attributing any of
5  that to Imperial, why did you make that determination?
6   A. I don't remember. Quite honestly, I don't
7  remember.
8   Q. In terms of -- you yourself, as I understand,
9  you're not going to express any -- you have not formed
10 any opinion in terms of -- strike that.
11     You haven't done any analyses yourself in
12 terms of Absolute's alleged business devastation?
13  A. Is the question: Have I done any analysis in
14 terms of Absolute's business devastation?
15  Q. Yes.
16  A. No.
17  Q. For instance, let's assume for the sake of
18 argument that Absolute's business is less robust now
19 than it was a couple years ago. You haven't done
20 anything, for instance, to determine whether Absolute
21 grew too quickly and had problems or whether they took
22 too much capital out of the business or whether
23 Mr. Olson's health affected the business? You haven't
24 done any of that sort of thing, have you?
25  A. Well, I have knowledge of the fact that he

Page 200

1  spent an awful lot of money on this lawsuit and it has
2  been a hardship on him, but I haven't done any analysis
3  of the problem, no.
4   Q. And as far as you know, that's not on your
5  to-do list for trial, the scope of opinions you're
6  going to be expressing?
7   A. No.
8   Q. Do you currently have plans to further
9  supplement either your March 2006 report or your
10 November 2004 report?
11  A. I'm certain that I will supplement my second
12 report.
13  Q. And when is it that you think that
14 supplementation is going to be done by?
15  A. That will be driven by the discovery and the
16 cutoff for that, I would assume.
17     MR. MARSTON: Now, let me jump in
18 there. He's not been asked to do anything more. The
19 only supplementation is, like Mr. Kreger said, the duty
20 upon all experts to supplement their opinions, to the
21 extent that discovery required -- information gleaned
22 through further discovery impacts their opinions. Same
23 thing all experts are going to do.
24  Q. (BY MR. PARTNOW) In your March report of
25 this year, as well as responding to Mr. Kreger's

Page 201

1  questions, if I understand correctly, you are of the
2  opinion that there was an ongoing business relationship
3  between Brechan and the Coast Guard that Brechan didn't
4  want to lose, and the Coast Guard having a desire to
5  not have a half-finished wharf, and the combination of
6  those led to the need to get a new contractor in. Is
7  that a fair summary of your opinion?
8      MR. MARSTON: Objection; asked and
9  answered.
10  A. Those were two of the elements. I don't
11 think that was everything involved, but those were two
12 things, yes.
13  Q. (BY MR. PARTNOW) And my question is: Do you
14 have any opinion as to whether Coffman had any similar
15 motivation or interest in terms of the continuation of
16 the Cargo Wharf project?
17  A. I'm sorry. I'll have to have that read
18 back.
19     (The record was read back by
20      the reporter.)
21     MR. MARSTON: Objection; vague.
22  A. Well, I don't pretend to understand what
23 Coffman's motives were, but they were in the middle of
24 this fray all the way through. And I presume it's
25 common sense to think that they would want to preserve

Case 3:03-cv-00199-RRB    Document 219-3    Filed 08/04/2006    Page 5 of 7

Absolute vs. McKinley    5-17-2006    Michael Lembke

Page 202

1  their relationship with Brechan and probably with the
2  Coast Guard as well. You know, everybody would like to
3  walk away from a project without people being upset
4  with them about how the project went.
5      So I don't understand all of Coffman's
6  motives, but I will say that Coffman was involved in
7  both the identification of the problem, trying to get
8  the costs for the problem resolved and in the
9  relaxation of the specifications. And so I'm assuming
10 that they had some interest there that was driving
11 their participation trying to help this issue other
12 than just a simple contractual obligation that they had
13 to Brechan.
14     Could I add one thing for the record? I just
15 recalled why I put the business devastation number
16 under Item 12 Brechan/Coffman. That was at the request
17 of Mr. Olson. I just remembered that.
18     Q. (BY MR. PARTNOW) So you yourself have no
19 basis for allocating it one place or another, just that
20 that's what Mr. Olson asked you to do?
21     A. That's correct.
22     Q. In terms of saying that Coffman was in the
23 middle of things and so forth, based upon the work that
24 you've done to date and the opinions you've expressed
25 in your reports, are you critical of anything that

Page 203

1  Coffman did?
2      A. I would have to say yes.
3      Q. Okay. What are the things that Coffman did
4  that you were critical of?
5      A. For one, I don't think they did a very good
6  site investigation at the beginning of the project when
7  they were charged with engineering the corrosion
8  control aspects of it.
9      Q. Okay --
10         MR. MARSTON: Excuse me. Did you want a
11 complete list or just that one item?
12         MR. PARTNOW: I want a complete list,
13 but --
14         MR. MARSTON: Why don't you let him
15 finish his answer then.
16         MR. PARTNOW: Why don't you let me ask
17 the questions the way I want to.
18         MR. MARSTON: You did. And he will be
19 allowed to answer the question. Is there any other
20 criticism --
21     Q. (BY MR. PARTNOW) Regarding the question of
22 the site investigation --
23         MR. MARSTON: Okay. I object and move
24 to strike the last question and answer because
25 Mr. Partnow would not allow the witness to complete his

Page 204

1  answer.
2      Q. (BY MR. PARTNOW) Regarding the site
3  investigation, Mr. Lembke, are you talking about the
4  site investigation prior to the commencement of Phase I
5  of the project?
6      A. Yes.
7      Q. And are you under the impression that Coffman
8  was under some contractual obligation to perform that
9  site investigation?
10     A. Yes, I'm under that impression.
11     Q. Who was Coffman contracted with to do that?
12     A. Well, I think Coffman's contract was with
13 Tryck Nyman Hayes who was contracted to Brechan.
14     Q. And it's your testimony today that the
15 responsibility for doing the site investigation prior
16 to Phase 1 was Coffman's?
17     A. Well, not in its entirety. But, certainly,
18 Coffman, in my opinion again, had an obligation to do a
19 proper site investigation because the bulk of the cost
20 of the project involved the corrosion control measures
21 that were to be taken and, therefore, it's a very
22 important element to the overall project. So to the
23 extent that they were involved in corrosion engineering
24 on a project, I believe that they had an obligation to
25 do a thorough site investigation to find out what the

Page 205

1  conditions of the existing wharf were.
2      Q. Have you reviewed the Tryck Nyman Hayes
3  contract out with Coffman to determine what contractual
4  responsibilities Coffman had?
5      A. Not specifically, but I'm familiar with these
6  types of contracts and the obligations that flow
7  between the parties in general terms and that's
8  typically one of them.
9      Q. That's your first criticism of Coffman, is
10 your opinion that they did an inadequate initial site
11 investigation. What else are you critical of Coffman
12 about?
13     A. Well, I think Coffman withheld that
14 information from Absolute when Absolute was contracted
15 to do Phase II.
16     Q. When you say Coffman withheld that
17 information, what is, quote, that information?
18     A. Well, the information about all the
19 difficulties that were encountered in Phase I.
20     Q. And you believe that Coffman withheld that
21 information from Absolute?
22         MR. MARSTON: Objection; asked and
23 answered.
24     A. Yes. Yes, I do.
25     Q. (BY MR. PARTNOW) And is it your

Michael Lembke

C E R T I F I C A T E

STATE OF WASHINGTON  )
                     ) SS.
COUNTY OF PIERCE     )

       I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

       That the annexed and foregoing deposition of each witness named herein was taken stenographically before me and reduced to typewriting under my direction;

       I further certify that the deposition was submitted to each said witness for examination, reading and signature after the same was transcribed, unless indicated in the record that the parties and each witness waive the signing;

       I further certify that I am not a relative or employee or attorney or counsel of any of the parties to said action, or a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

       I further certify that each witness before examination was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

       I further certify that the deposition, as transcribed, is a full, true and correct transcript

MOBURG & ASSOCIATES - SEATTLE, WA (206) 622-3110

Michael Lembke

1 | taken at the time of the foregoing examination;

2 |      IN WITNESS WHEREOF, I have hereunto set my

3 | hand and affixed my official seal this __31st__ day of

4 | __July_____, 2006.

```
                    _Valerie Seaton_____
                    VALERIE L. SEATON, RPR, CCR
                    Notary Public in and for
                    the State of Washington,
                    residing at Tacoma.
                    License No. 2557
```

[Notary seal: VALERIE SEATON, COMMISSION EXPIRES 07-07-07, NOTARY PUBLIC, STATE OF WASHINGTON]