# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
an Alaska Corporation,
       Plaintiff,

vs.

FORREST J. MCKINLEY, an individual, d/b/a
"Imperial Industrial Coatings" and EMERCO,
INC., a California Corporation, d/b/a Imperial
Industrial Coatings, BRECHAN ENTERPRISES, INC.,
an Alaska Corporation; and SAFECO INSURANCE
COMPANY OF AMERICA, a Washington Corporation.
       Defendants.
_____/



EMERCO, INC., a California Corporation d/b/a
Imperial Industrial Coatings, and the States
for Use and Benefit of EMERCO, INC.,

       Counterclaimant/Third-Party Claimant,

vs.

ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
an Alaska Corporation, et al.,

       Cross-Defendants/Third-Party Defendants.
_____/

THE UNITED STATES OF AMERICA for the use and benefit
of ABSOLUTE ENVIRONMENTAL SERVICES, INC., an
Alaska Corporation,

       Plaintiff,

vs.

SAFECO INSURANCE COMPANY OF AMERICA, a Washington
Corporation.
       Defendants.
_____/

## Page 2

```
 1  BRECHAN ENTERTAINMENT, INC., an
    Alaska Corporation,
 2
            Counterclaim Plaintiff,
 3
    vs.
 4
    ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
 5  an Alaska Corporation,
 6          Counterclaim Defendant.
    _____/
 7  BRECHAN ENTERPRISES, INC., an Alaska
    Corporation,
 8
            Third-Party Plaintiff,
 9
    vs.
10
    COFFMAN ENGINEERS, INC., a Washington
11  Corportation,
12          Third-Party Defendant.
    _____/
13  ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
    an Alaska Corporation,
14
            Plaintiff/Cross-Claimant
15
16  vs.
17  COFFMAN ENGINEERS, INC., a Washington
    Corporation,
18
            Third-party Defendant.
19  _____/
20
           DEPOSITION OF DONOVAN RULIEN
21             Pages 1-152 inclusive
                  June 27, 2006
22            Commencing at 9:00 a.m.
                Anchorage, Alaska
23
24
25
```

COPY

## Page 3

```
 1       IN THE UNITED STATES DISTRICT COURT FOR THE
 2                  STATE OF ALAKSA
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15       DEPOSITION OF DONOVAN RULIEN,
16  Taken on behalf of Third-party Defendant Coffman
17  Engineers, Inc., pursuant to Notice at the offices of
18  Lane Powell, 301 West Northern Lights Boulevard,
19  Anchorage, Alaska, before Patta K. Johnson, Shorthand
20  Reporter for Alaska Stenotype Reporters and Notary Public
21  In and for the State of Alaska.
22
23
24
25
```

## Page 4

```
 1              A P P E A R A N C E S
 2
 3  LANE POWELL
    By: Peter C. Partnow
 4  310 West Northern Lights
    Suite 301
 5  Anchorage, Alaska 99503
    907-277-9511
 6
    PERKINS COIE
 7  By: Jacob Nist
    1029 West Third Ave
 8  Suite 300
    Anchorage, Alaska 99501
 9  907-279-8561
10  PAUL J. NANGLE & ASSOCIATES
    By: Paul J. Nangle
11  101 Christensen Dr.
    Anchorage, Alaska 99501
12  907-274-8866
13
14
15
16
17
18
19
20
21
22
23
24       Reported By: Patta K. Johnson
25
```

## Page 5

```
 1                I N D E X
 2
 3  EXAMINATION BY:                        PAGE
 4
    Mr. Partnow                           6, 148
 5
    Mr. Nist                               80
 6
 7
 8
 9
10
    EXHIBITS:
11
12  Exhibit 1                               6
13  Exhibit 2                              25
14  Exhibit 3                              36
15  Exhibit 4                              40
16  Exhibit 5                              40
17  Exhibit 6                              67
18  Exhibit 7                              67
19  Exhibit 8                             104
20
21
22
23
24
25
```

### Page 18

1  statements for Absolute Environmental Services.
2     Q.  I note -- and correct me if I'm wrong -- I
3  understand that your report, Exhibit 1, values the
4  combined -- both Absolute and SAD Leasing?
5     A.  That's correct.
6     Q.  My understanding is that those two
7  companies are separately incorporated; is that your
8  understanding?
9     A.  That's correct.
10    Q.  Do the papers that you brought with you
11 today, which we are having copied now, reflect the
12 relative size, assets, property ownership, so on and
13 so forth of the two entities?
14    A.  Yes, they do.
15    Q.  Is that reflected anywhere else in the
16 report itself?
17    A.  Yes, it is.
18    Q.  Okay.  Could you direct me in the report
19 to where one would distinguish between what is SAD
20 Leasing versus what is Absolute?
21    A.  Oh, I guess I didn't understand your
22 question.
23    Q.  I apologize.
24    A.  In the report it states who the owner is;
25 100 percent owned by Dave Olson, each entity.

### Page 19

1     Q.  Right.  For instance, is there a page I
2  can look at here to find out how much of anything is
3  SAD Leasing versus how much of anything is Absolute?
4     A.  Not specifically within this report, no.
5     Q.  But the backup documentation that you have
6  with you that I haven't looked at yet should allow me
7  to figure that out?
8     A.  Yes.
9     Q.  Just in general terms and I realize you
10 don't have the information in front of you, can you
11 describe the relative size of the two entities?
12    A.  SAD Leasing basically is an equipment
13 holding company and Absolute Environmental Services
14 is the contractor that does the actual construction
15 work and the bidding and so on.  And SAD Leasing owns
16 the large pieces of equipment for liability purposes,
17 and then leases them back to Absolute Environmental
18 on an as-need basis.
19    Q.  For instance, in terms of the value of the
20 equipment, that is owned by SAD Leasing as of the
21 date of this report, do you have some recollection as
22 to what that would be?
23    A.  If I remember right it was about 175 to
24 180,000 was the fair value based on discussions with
25 Mr. Olson.

### Page 20

1     Q.  Does SAD Leasing pay a salary or anything
2  like that to anybody?
3     A.  Not that I recall.
4     Q.  What does SAD Leasing do with the revenue
5  it generates?
6     A.  It is set up to not make money.  It's set
7  up to -- Absolute pays rent to SAD Leasing and that
8  is used to pay off the debts.
9     Q.  Were you involved in setting up SAD
10 Leasing with Mr. Olson or was it done with other
11 folks?
12    A.  I worked with him and then there were
13 attorneys who set it up.
14    Q.  I note that your report selects December
15 31, 2003 as the date of the valuation.  Whose
16 determination was it to perform the valuation as of
17 that date?
18    A.  It was probably a combination of myself,
19 Mr. Marston, and Mr. Olson.
20    Q.  What is your understanding as to why that
21 particular date was chosen other than it happens to
22 coincide with the end of a tax year?
23    A.  Other than it happens to coincide with the
24 end of the tax year and that 2003 was the year the
25 loss -- Mr. Olson's company had the large contract

### Page 21

1  that went south on him.  And we had all the tax
2  information and financial data for that year as of
3  December 31, so we could do a better job of valuation
4  based on that instead of trying to go to find a
5  specific period in time.
6     Q.  If I understood your report, you indicated
7  if a different date was chosen, an earlier date, any
8  other date, then the valuation would likely be
9  different?
10    A.  That is correct.
11    Q.  Have you performed any assessment, for
12 instance, if date were chosen today, how would that
13 affect the value of the company?
14    A.  No.  I haven't been asked to do that.
15    Q.  So your opinion is limited to the value of
16 the company on that date?
17    A.  That's correct.
18    Q.  Have you been asked to supplement this
19 report in any way?
20    A.  Yes, I have.  One supplement I entered in
21 because Mr. Marston asked me to clarify a couple of
22 pieces of information.
23    Q.  I'm sorry, I've asked a bad question.
24 Your report dated, I think, it was March of -- we
25 received it in March of this year, have you been

Page 22

1  asked to supplement this report, to change this
2  report in any way since the date it was issued?
3      A.  I did not change the report per se. I
4  added a supplement to the report to further clarify
5  some information.
6      Q.  Since it was issued?
7      A.  Yes.
8      Q.  Do you recall which information was
9  clarified in your supplement? I don't recall that I
10 have seen that.
11     A.  It's in my binder there. But yes, there
12 was specific areas Mr. Marston requested me to say
13 what the information was for and that was on the net
14 asset value.
15     Q.  Do you know what the date of your
16 supplement was?
17     A.  Yesterday.
18     Q.  Okay. We'll, get back to that after we've
19 had chance to look. Do you know if you are
20 anticipated -- have you been requested to do any
21 further supplementation other than what you have
22 completed as of yesterday?
23     A.  No.
24     Q.  From the date this report was completed
25 until today, have you changed any of the opinions

Page 23

1  that you have stated in your report?
2      A.  No.
3      Q.  Did anybody else work on this report other
4  than you?
5      A.  Yes.
6      Q.  At your firm?
7      A.  No. I requested some information from the
8  National Association of CVA's.
9      Q.  Your report comes to the conclusion, does
10 it not, that as of December 31, 2003, the value of
11 the combined SAD Leasing slash Absolute Environmental
12 was $2.28 million?
13     A.  That's correct.
14     Q.  Did you come to some conclusion as to how
15 that value was affected by the litigation that this
16 report was issued for?
17     A.  How do you mean?
18     Q.  In other words, whether that value as of
19 that date was higher or lower than it would been but
20 for the Kodiak Cargo Wharf Project. Let me just add
21 for clarification, I understand one of the things you
22 did in doing the valuation is you added back in -- if
23 I can use the word "the loss" attributed to that
24 project so that it wouldn't affect your valuation;
25 did I understand that correctly?

Page 24

1      A.  I added in the loss back to the valuation
2  report, yes.
3      Q.  And so does that mean, in terms of your
4  opinion, basically, no consideration is given to the
5  adverse impact of the Cargo Wharf Project for the
6  purpose of valuing the company as of December 31,
7  2003?
8      A.  How you mean?
9      Q.  I'm not sure. I'm trying to determine
10 whether this report -- let me ask it a different way.
11 To what extent does this report reflect some change
12 in value of the company as a result of the Kodiak
13 project?
14     A.  All I did was normalize the company to
15 reflect what the company was worth if the loss had
16 not incurred.
17     Q.  So in other words this report assumes
18 there was a contract for a certain amount of money
19 and that contract was performed without unusual
20 circumstances having been generated?
21     A.  Correct.
22     Q.  And does your report in any way indicate
23 the amount of business devastation which Absolute may
24 have suffered?
25     A.  No. The valuation is based on a specific

Page 25

1  date as if the devastation did not occur.
2      Q.  So if there was business devastation, as
3  you understand it, that would then be the difference
4  between that $2.28 million, and what would be the
5  value of the company today, for instance?
6      A.  I haven't been asked to look at that.
7      Q.  But in fact, in other words, one cannot
8  look at your report and put a number to so-called
9  business devastation because you need to know what
10 it's gone to. In other words, what change there has
11 been from the 2.28 to something else?
12     A.  Correct.
13     Q.  Have you ever spoken with Mr. Lembke?
14     A.  No, have I not.
15     Q.  Have you ever seen Mr. Lembke's report?
16     A.  I think I was faxed that report yesterday.
17     Q.  Let me -- Mr. Lembke in his report,
18 Exhibit D to his report, and also Exhibit 2 to his
19 deposition --
20         MR. NANGLE: Why don't we make a copy of
21 that.
22         MR. PARTNOW: And I'll make it an exhibit.
23         (Off record. Exhibit 2 marked for
24 identification.)
25 BY MR. PARTNOW:

Page 26

1   Q. We have marked the revision to Exhibit D,
2 Michael Lembke's expert report in Exhibit 2. And I
3 apologize for the writing on the document which is
4 stuff that I put on. Do you know if you have seen
5 this before?
6   A. Is Mr. Lembke your expert?
7   Q. No.
8   A. Then I have not seen this one then.
9   Q. If you look down, do you see on there the
10 numbers, down to number 12?
11   A. Yes.
12   Q. And then say Brechan/Coffman Recap?
13   A. Yes.
14   Q. And then the big number and the subtotal
15 under that it says, Plus Business Devastation and it
16 says $2.28 million?
17   A. Yes.
18   Q. And that is the number -- your expert
19 opinion as to the value of the company as of December
20 31, 2003?
21   A. Correct.
22   Q. So it appears from this, does it not, that
23 Mr. Lembke has assumed that as of May 16, 2006 that
24 the company has a value of zero; would that be your
25 understanding?

Page 27

1   A. It looks that way. I haven't been asked
2 to do any calculations on this. I have never seen
3 it.
4   Q. Do you know if Absolute is still in
5 business?
6   A. Yes, they are.
7   Q. And you're still doing their tax returns?
8   A. We haven't done a tax for '05 at this
9 point in time.
10   Q. For '05?
11   A. Yes.
12   Q. To prepare your report you looked at
13 various documents; correct?
14   A. Correct.
15   Q. And those documents are included in the
16 notebook that is currently being copied?
17   A. Yes, they are.
18   Q. And you also spoke to several people?
19   A. Yes, I did.
20   Q. And that included Mr. Olson?
21   A. That's correct.
22   Q. And Mr. Marston?
23   A. Yes, that's correct.
24   Q. Were there any other individuals that you
25 spoke to in preparing or prior to preparing your

Page 28

1 report other than Mr. Olson and Mr. Marston?
2   A. Yes, there was.
3   Q. Who else did you speak with.
4   A. Donnie Hains?
5   Q. And she is the bookkeeper at Absolute?
6   A. Yes.
7   Q. Anyone else?
8   A. No.
9   Q. Did you speak to any of the other
10 management-type people at Absolute or SAD?
11   A. No, I didn't.
12   Q. Didn't speak to Jason Peterson?
13   A. No.
14   Q. Didn't speak to Todd Elmore?
15   A. No.
16   Q. On Exhibit 2, the cover letter, dated
17 March 15, to Mr. Olson, do you see that?
18   A. The report?
19   Q. The transmittal letter dated March 15,
20 2006?
21   A. Yes.
22   Q. And the second paragraph of that indicates
23 it is based upon historical information provided to
24 us by management and other third parties. Other than
25 Mr. Marston and Ms. Hains are there any -- who is

Page 29

1 included in that "other third parties"?
2   A. Other than Donnie Hains, none.
3   Q. Have you ever done an audited financial
4 statement of Absolute or SAD Leasing?
5   A. No, I haven't.
6   Q. Never during your entire relationship with
7 those companies?
8   A. Never.
9   Q. Do your records reflect when you met with
10 Mr. Olson?
11   A. I don't know.
12   Q. Strike that. That was an unfair question.
13 When you went with Mr. Olson specifically to discuss
14 information that you were going to use to prepare
15 your report, do you know how many occasions you met
16 with Mr. Olson?
17   A. Meeting with Mr. Olson, very few.
18 Normally, it would be telephonically.
19   Q. Did you make notes of either your meetings
20 or telephone conversations with Mr. Olson?
21   A. Only notes as needed.
22   Q. Would those notes be in the file being
23 copied at the moment?
24   A. Yes.
25   Q. Did you also communicate with Mr. Olson

Page 90

```
 1  the normalized income statement; and then 2003, you
 2  change it to $250,000. What was your source of
 3  information for that?
 4      A.  Because the revenue was so much higher,
 5  they would have paid themselves higher wages.
 6      Q.  I appreciate that. I'm trying to figure
 7  out how did you come to the conclusion between
 8  2002 -- in 1999, $125,000 was the typical or
 9  average --
10      A.  Experience.
11      Q.  Experience. Okay. And that's from
12  working with what?
13      A.  Contractors.
14      Q.  And you see that most contractors are
15  paying themselves $125,000?
16      A.  Depending on the revenue that is generated
17  by the company, yes.
18      Q.  Is there a cutoff that you use between
19  $125,000 to $250,000? Essentially, people who earned
20  this much gross revenue doubled their income?
21      A.  No.
22      Q.  That was a judgement call on your part?
23      A.  Purely judgement.
24      Q.  Were there ever any discussions about
25  using a before-and-after method of valuing the
```

Page 91

```
 1  business rather than doing all this normalization?
 2      A.  I don't understand the question.
 3      Q.  Essentially, as I understand Absolute's
 4  claim, they did this Cargo Wharf Project and they
 5  incurred losses. Is that your understanding, as
 6  well?
 7      A.  Yes.
 8      Q.  And it looks like what this report does is
 9  that it adds those losses back into the business,
10  essentially?
11      A.  That's correct.
12      Q.  So I'm wondering whether if it was ever
13  considered to value the business before they had
14  performed the contract and after they performed the
15  contract and see what the difference would have been
16  there?
17      A.  I have never been asked to do that, no.
18      Q.  Is that something you considered or ever
19  discussed doing?
20      A.  No, we never discussed that.
21      Q.  And why not?
22      A.  I don't know.
23      Q.  And refresh my recollection, how did you
24  come up with December 31, 2003 date to value the
25  business?
```

Page 92

```
 1      A.  Because that was the year of the loss and,
 2  therefore, we had all the accounting records were
 3  current and we had that information readily
 4  available. We used the 2003 cutoff other than -- we
 5  had discussed cutting it off in August or something
 6  but we thought, well, we have the accounting
 7  information through December 31, and we know that's
 8  pretty good information, so it's the best time to cut
 9  it off.
10      Q.  Okay. So you said this is the first time
11  you ever did any kind of business valuation for a
12  business devastation type claim; did I get that
13  right?
14      A.  That's correct.
15      Q.  Does PPC talk at all about how to value
16  business for a business devastation claim?
17      A.  No, it does not.
18      Q.  What about Ibbotson, does that discuss at
19  all how to value a business for a business
20  devastation claim?
21      A.  No, it does not.
22      Q.  How did you come up with the idea, or did
23  you come up with the idea of adding the $748,000 back
24  into the business? As far as valuation method, how
25  was that arrived at?
```

Page 93

```
 1      A.  Again, when I'm doing the valuation, I'm
 2  doing the valuation on what we think the business is
 3  worth on that date in time. So what we had to look
 4  at is, well -- and we discussed this with Mr. Olson
 5  and Mr. Marston -- is that if you incurred an
 6  extraordinary loss, the $764,000, whatever the number
 7  is, that that's extraordinary and we need to put that
 8  back in because those losses are gone, we are trying
 9  to normalize. I'm looking at what do I think, in my
10  opinion, the value of the business is as of that
11  date.
12      Q.  Okay. I'm trying to figure out whether
13  this was something you heard about somewhere or
14  whether this is just your solution to the problem of
15  trying to value the business?
16      A.  My solution to the problem to the value
17  business correctly.
18      Q.  How did you arrive at that solution, I
19  guess, is my question?
20      A.  I guess, I don't know how to answer that
21  question. Based on my expertise and my background
22  and the history I've had with contractors.
23      Q.  Have you ever done this with any other
24  contractors?
25      A.  Normalizing income?
```

```
 1              C E R T I F I C A T E
 2              I, the undersigned Notary Public in and for the
 3   State of Alaska, do hereby certify that:
 4              I am not a relative or employee or attorney or
 5   counsel of any of the parties to said action, or a relative
 6   of employee of any such attorney or counsel, and that I am
 7   not financially interested in the said action or the
 8   outcome thereof;
 9              The witness, before examination, was by me duly
10   sworn to testify the truth, the whole truth, and nothing
11   but the truth; and
12              The deposition, as transcribed, is a true
13   record of the testimony given by the witness.
14              IN WITNESS WHEREOF, I have hereunto set my hand
15   and affixed my official seal this 7th day of July, 2006.
16
17
18   _____
19   PATTA K. JOHNSON
     My commission expires
20   07/04/08
21
22
23
24
25
```

[Notary Public seal: PATTA K. JOHNSON, NOTARY PUBLIC, STATE OF ALASKA, July 4, 2008]