# EXHIBIT C

```
                                                                  Page 1
 1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ALASKA
 2    _____

 3    ABSOLUTE ENVIRONMENTAL SERVICES,)
      INC., an Alaskan Corporation,   )
 4                                    )
              Plaintiff,              )
 5                                    )
         vs.                          ) Case No. A-03-0199
 6                                    ) Civil (RRB)
      FORREST J. McKINLEY and         )
 7    "JANE DOE" McKINLEY, and the    )
      marital community property      )
 8    composed thereof d/b/a "Imperial)
      Industrial Coatings" and EMERCO,)
 9    INC., etc.,                     )
                                      )
10            Defendants.             )
      EMERCO, INC., a California      )
11    Corporation d/b/a Imperial      )
      Industrial Coatings, etc.,      )
12                                    )
              Counter-Claimant/       )
13            Third Party Claimant,   )
                                      )
14       vs.                          )
                                      )
15    ABSOLUTE ENVIRONMENTAL SERVICES,)
      INC., an Alaskan Corporation,   )
16    et al.,                         )
                                      )
17            Cross-Defendants/       )
              Third-Party Defendants.)
18    _____

19          DEPOSITION UPON ORAL EXAMINATION
20                         OF
21               JERRY R. HARDENBERGH
22    _____

23            Taken at 1900 Fifth Avenue
                  Seattle, Washington
24
25    DATE TAKEN:       FEBRUARY 10, 2005
```

EXHIBIT C

Page 102

1 Q. Isn't it true that that submission was in fact
2 approved for use on this project as the quality control
3 plan by the Coast Guard?
4 A. Not that I'm aware of by the Coast Guard, no.
5 Q. Was it approved by Absolute for use?
6    MR. MARSTON: Objection; lack of foundation.
7 A. I don't know.
8 Q. Was it approved for Brechan for use?
9 A. Again, I don't know.
10 Q. Isn't it true that you simply wanted to use the
11 forms that you were familiar with rather than, and that
12 were already existing on your computer rather than the
13 forms that were approved that Imperial submitted?
14    MR. DICKSON: Compound.
15    MS. PETRICH: Objection; assumes facts not in
16 evidence.
17 A. The forms were not on my computer to start
18 with. Most of the forms I had to create, and I created
19 them based on my experience, based on the specifications
20 for this job and what testing requirements were required
21 to be reported. I tailored them to make it easier to
22 report everything that was needed on this, on this
23 project.
24 Q. If you look at paragraph 2 of your memo, it
25 says, quote, "Since we did not have time for the QC plan

Page 103

1 to be rewritten and resubmitted, the QC plan was accepted
2 with notes."
3    Does that refresh your recollection that in
4 fact Imperial submitted a QC plan and it was accepted?
5    MS. PETRICH: Objection; mischaracterizes the
6 testimony and the exhibit.
7    MR. DICKSON: Same objection.
8 A. That's what I was just describing. The QC plan
9 that was submitted and that I looked at was not
10 project-specific.
11 Q. However, it was accepted; is that true?
12    MS. PETRICH: Same objection.
13 A. It was accepted with notes.
14 Q. Accepted by whom?
15 A. By me.
16 Q. Did you -- strike that.
17    Are you aware of any authority that you had
18 under the specifications or as a QA officer to insist
19 that an accepted QA plan should not be used and rather
20 one that you create should be used?
21    MR. DICKSON: Mischaracterization.
22    MS. PETRICH: Same.
23 A. I'm a little confused by your wording there.
24 Q. On what basis did you believe that you had the
25 right to tell Imperial that they should use this QA form

Page 104

1 instead of the approved forms?
2 A. Because I was the contractor's representative.
3 I was representing the design engineering firm that
4 specified this coating system be applied to the dock. I
5 was also providing technical oversight, including coating
6 quality assurance.
7 Q. How is it that you were representing the design
8 engineering firm?
9 A. The design engineering firm was Coffman
10 Engineers. I worked for Coffman.
11 Q. And for whom did Coffman perform this design
12 work?
13 A. Initially -- well, Brechan.
14 Q. Did they have any part in preparing design work
15 for the Coast Guard with respect to this project?
16 A. Not directly to the Coast Guard.
17 Q. So you saw your function not only as QA officer
18 but also as the engineer's, engineering representative on
19 the site?
20    MS. PETRICH: Objection; mischaracterizes his
21 testimony.
22    MR. DICKSON: Same objection.
23 Q. Is that correct?
24 A. Again, I was the contractor's representative
25 and the design engineering representative. I was the

Page 105

1 liaison back to the design engineer.
2    If there was any questions regarding the --
3 technical questions regarding changes in specification,
4 what have you on the job, I can liaison with the design
5 engineer to get resolution.
6 Q. And so you felt that one of your jobs was that
7 any engineering or technical question that arose that
8 after consulting with Coffman you had the right to decide
9 those issues?
10 A. I transmitted the decisions, yes.
11 Q. Is that how you got involved in the gray paint
12 issue, as a representative of Coffman?
13    MR. MARSTON: Objection; vague with respect to
14 the meaning of "got involved" with gray paint issue.
15 A. Can you be more specific?
16 Q. Did you become involved in making
17 determinations as to whether the gray paint constituted a
18 differing site condition as a representative of Coffman?
19    MS. PETRICH: Objection; assumes facts not in
20 evidence.
21 A. I still don't understand your question.
22 Q. Was there an issue that arose on the job as to
23 whether or not certain gray paint that was encountered
24 was a differing site condition that would entitle
25 Imperial to additional compensation?

27 (Pages 102 to 105)

Page 222

```
 1              A F F I D A V I T
 2
 3
 4    STATE OF ALASKA      )
 5                         ) ss
 6    COUNTY OF ANCHORAGE  )
 7
 8        I have read my within deposition, and the
 9    same is true and accurate, save and except for changes
10    and/or corrections, if any, as indicated by me on the
11    "CORRECTIONS" flyleaf page hereof.
12
13
14
15              JERRY R. HARDENBERGH
16
17
18
19        SUBSCRIBED AND SWORN TO before me this
20        day of      , 2005.
21
22
23              NOTARY PUBLIC in and for the
24              State of Alaska,
25              residing at              .
```

Page 223

```
 1              C E R T I F I C A T E
 2
 3    STATE OF WASHINGTON  )
                           ) ss
 4    COUNTY OF KING       )
 5
 6        I, JOLENE C. HANECA, a Certified Shorthand Reporter
 7    and Notary Public in and for the State of Washington, do
 8    hereby certify that the foregoing transcript of the
 9    deposition of JERRY R. HARDENBERGH, having been duly
10    sworn, on FEBRUARY 10, 2005, is true and accurate to the
11    best of my knowledge, skill and ability.
12        IN WITNESS WHEREOF, I have hereunto set my hand and
13    seal this 22ND day of FEBRUARY, 2005.
14
15
16
              JOLENE C. HANECA, RPR, CCR
17
18    My commission expires:
      March 28, 2006
19
20
21
22
23
24
25
```