# EXHIBIT F

```
                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF ALASKA


ABSOLUTE ENVIRONMENTAL
SERVICES, INC., An Alaska
corporation,
                Plaintiff,
       vs.
FORREST J. McKINLEY and "JANE
DOE" McKINLEY, et al.,

                Defendants.
_____

Case No A03-0199 Civil (RRB)
```

                                COPY

                   VIDEOTAPED DEPOSITION OF DAVID OLSON

                        Taken February 13, 2006
                        Commencing at 9:00 a.m.
                   Volume I - Pages 1 - 243, inclusive


                        Taken by the Defendant
                                  at
                             PERKINS COIE
                   1029 W. Third Av., Suite 300
                        Anchorage, AK  99501

Reported by:
Susan J. Warnick, RPR

EXHIBIT F

Page 38

1  jury."
2  Q  Has somebody made an effort to segregate the damages
3  between Mr. McKinley and Emerco, Inc, and those that
4  you're claiming against Brechan?
5      MR. MARSTON: Objection. Lack of foundation.
6      THE WITNESS: I don't know if we're actively
7  working on that right now or not.
8  BY MR. KREGER:
9  Q  Well, it says here, "It is not possible to
10  confidently segregate." Do you see that?
11  A  Yes.
12  Q  How do you know at the time it wasn't possible to
13  confidently segregate those damages?
14      MR. MARSTON: Objection. An incomplete
15  question. Document speaks for itself.
16      THE WITNESS: Because I'm unable to
17  differentiate what your client did not disclose for me and
18  what Imperial did on the job.
19  BY MR. KREGER:
20  Q  Are there agreements or understandings between
21  Imperial and Absolute about how much Absolute is going to
22  seek to recover against Imperial in this lawsuit?
23      MR. MARSTON: Objection. Vague.
24      THE WITNESS: No.
25  BY MR. KREGER:

Page 39

1  Q  Have there been any discussions like that?
2  A  No.
3  Q  So if I understand correctly, we have a situation
4  where Absolute is suing Imperial for a million two and
5  Absolute is suing Brechan for approximately a million
6  two -- and Absolute is also suing Coffman, correct?
7  A  I believe so, yes.
8  Q  And they're suing Coffman for a million two also,
9  correct?
10  A  Yes.
11  Q  So we have a situation where Absolute is suing
12  Imperial for a million two and Brechan for a million two
13  and Coffman for a million two and -- is that correct?
14      MR. MARSTON: Objection. Asked and answered.
15      THE WITNESS: I think I previously testified to
16  that, yes.
17  BY MR. KREGER:
18  Q  And so your total damages aren't a million two times
19  three -- three point six; your damages are approximately a
20  million two, correct?
21      MR. MARSTON: Objection. Assumes facts not in
22  evidence and misstates the witness's prior testimony.
23      THE WITNESS: That would represent the million
24  two, this aspect of --
25  BY MR. KREGER:

Page 40

1  Q  Not including the business devastation stuff. Let's
2  leave that out for now.
3  A  Yes. And not including attorneys' fees and whatever
4  other costs are associated.
5  Q  So if Absolute recovered $3.6 million from the three
6  defendants that it's suing, that would be a duplication or
7  a triplication of recovery, correct?
8      MR. MARSTON: Objection. Calls for speculation,
9  calls for a legal conclusion.
10     THE WITNESS: For this particular aspect of my
11  damages?
12  BY MR. KREGER:
13  Q  Yes.
14  A  You're saying that, if I received the same amount
15  that I'm asking for, or suing for, from each of the three
16  parties --
17  Q  Yes.
18  A  -- that it would be a triplication --
19  Q  Yes.
20  A  -- of this particular number?
21  Q  Yes.
22  A  I suppose it would be.
23  Q  What was your reason for deciding to attempt to bring
24  Brechan back into the lawsuit?
25  A  I discovered that Brechan's subcontractor on Phase 1

Page 41

1  had encountered a differing site condition that was never
2  disclosed to me by Brechan Enterprises.
3  Q  What was the differing site condition that you
4  believe you discovered?
5  A  Discovered a memorandum that spoke to the condition
6  -- poor condition of welds throughout the original cargo
7  pier that made it impossible or virtually impossible for
8  my predecessor to perform his work.
9  Q  What was the condition that you believe you
10  discovered that made it, as you say, impossible or
11  virtually impossible for your predecessor to do his work?
12  A  The condition of the cargo -- the original cargo pier
13  was such that you couldn't satisfy the requirement in the
14  specification for what they called a holiday-free coating.
15  Q  Anything else that you thought about or you
16  considered for your reasons for bringing Brechan back into
17  the lawsuit?
18  A  The fact that they didn't disclose it to me. I don't
19  know if it's the same -- it would be the same thing as
20  what I just answered to.
21  Q  Who brought this memorandum to your attention?
22      MR. MARSTON: Objection. Assumes facts not in
23  evidence, that anybody brought the memorandum to his
24  attention.
25      THE WITNESS: I discovered the memorandum as

Page 122

1  A   Oh, 54. I'm sorry. Line 21?
2  Q   Yes.
3  A   Okay.
4  Q   And I would represent to you that we don't start to
5  get an answer to that until we get down to -- back to page
6  55. Mr. Vernon states, "The question is difficult."
7      Do you see that?
8  A   Yes.
9  Q   And then he talks about welds. Take a minute and
10 read that to yourself, just the six or seven lines at the
11 top of 55 and the first line on the top of 56.
12 A   Okay. I saw the -- do you want me to read it out
13 loud or --
14 Q   Yeah, why don't You do that.
15 A   Okay. Starting at line 14: "The question is
16 difficult. For example, in a remote location such as
17 Kodiak, difficulties in getting supplies, difficulties in
18 getting equipment, abrasives, those type of things, every
19 contractor, depending on if they have done work in remote
20 locations, can encounter those types of problems."
21 Q   Okay. Go ahead, please. On welds?
22 A   "Welds. It's well known in the industrial painting
23 area, when you have a surface that is to be holiday free,
24 that welds need to be addressed in that you most
25 frequently will have holidays on welds."

Page 123

1      Continue?
2  Q   Please.
3  A   "So many of the problems that were some of the
4  problems that they encountered are frequently encountered
5  and mostly it's a matter of degree."
6  Q   Now, who is Mr. Vernon?
7  A   Skip Vernon is a consultant, I guess, or expert
8  witness that I've retained.
9  Q   What area does he have expertise in?
10 A   Coatings.
11 Q   Do you disagree with what he says there about welds?
12     MR. MARSTON: Objection. Lack of foundation.
13     THE WITNESS: In what context, that they will
14 be -- most frequently have holidays on welds or --
15 BY MR. KREGER:
16 Q   Just what he said --
17 A   Honestly, I don't --
18 Q   You don't take any issue with what he said there?
19 A   I'll tell you this, having -- not being a coatings
20 contractor and not knowing going into this, I don't know
21 about welds and what they do. I know now, after reading
22 what I've read, that welds are a problem in relations to
23 coatings, especially when you're going for a holiday-free
24 surface.
25 Q   Can you tell me how much of the work that you had to

Page 124

1  do for -- going for a holiday-free surface was more than
2  what an experienced coating contractor would have expected
3  to do?
4      MR. MARSTON: Objection. Lack of foundation.
5      THE WITNESS: I have no idea.
6      MR. KREGER: Would you mark this next, please.
7      (Exhibit 87 marked.)
8      (Discussion off record.)
9  BY MR. KREGER:
10 Q   Take a look at that, Mr. Olson, while we're --
11 background noisy.
12 A   Just the front page or the whole thing?
13 Q   I'm going to ask you whether you recognize the
14 agreement.
15     MR. MARSTON: Objection. Vague.
16     THE WITNESS: I recognize portions of it. As it
17 being one entire document, I don't recognize it.
18 BY MR. KREGER:
19 Q   Can you identify this as the subcontract between
20 Brechan and Absolute?
21 A   Yes. This one, two, three, four, these pages would
22 be part of the contract. Or the -- did you say the
23 contract?
24 Q   Yes, I did. Yes, I did.
25     Okay. Let's just take the first four pages.

Page 125

1      MR. MARSTON: Is that through 168?
2      THE WITNESS: Yeah. 165 through 168.
3  BY MR. KREGER:
4  Q   Okay. What do you recognize those four pages as?
5  A   My subcontract with Brechan Enterprises.
6  Q   Okay. And the subcontract there on Article 2 in the
7  middle says something about scope of work dated 11/27/02
8  and your proposal dated 10/22/02. Do you see that?
9  A   Yes.
10 Q   And -- this is the second October 22nd letter that
11 we've seen that you've signed. And, as you know, it's
12 different than the October 22nd letter in your subcontract
13 with Imperial.
14     But what I want to know is whether this October
15 22nd letter is the one that you intended to have
16 referenced in your subcontract with Brechan.
17 A   I know we had some November correspondence as well,
18 but this is the one that was incorporated into the
19 contract.
20 Q   Why were there three different October 22nd letters
21 signed by you?
22 A   I don't recall at this time. If I put all three of
23 in front of me, I might know the difference between them,
24 but...
25 Q   You don't remember why you did, at this point?

Page 122

1  A  Oh, 54. I'm sorry. Line 21?
2  Q  Yes.
3  A  Okay.
4  Q  And I would represent to you that we don't start to
5  get an answer to that until we get down to -- back to page
6  55. Mr. Vernon states, "The question is difficult."
7     Do you see that?
8  A  Yes.
9  Q  And then he talks about welds. Take a minute and
10 read that to yourself, just the six or seven lines at the
11 top of 55 and the first line on the top of 56.
12 A  Okay. I saw the -- do you want me to read it out
13 loud or --
14 Q  Yeah, why don't You do that.
15 A  Okay. Starting at line 14: "The question is
16 difficult. For example, in a remote location such as
17 Kodiak, difficulties in getting supplies, difficulties in
18 getting equipment, abrasives, those type of things, every
19 contractor, depending on if they have done work in remote
20 locations, can encounter those types of problems."
21 Q  Okay. Go ahead, please. On welds?
22 A  "Welds. It's well known in the industrial painting
23 area, when you have a surface that is to be holiday free,
24 that welds need to be addressed in that you most
25 frequently will have holidays on welds."

Page 123

1     Continue?
2  Q  Please.
3  A  "So many of the problems that were some of the
4  problems that they encountered are frequently encountered
5  and mostly it's a matter of degree."
6  Q  Now, who is Mr. Vernon?
7  A  Skip Vernon is a consultant, I guess, or expert
8  witness that I've retained.
9  Q  What area does he have expertise in?
10 A  Coatings.
11 Q  Do you disagree with what he says there about welds?
12    MR. MARSTON: Objection. Lack of foundation.
13    THE WITNESS: In what context, that they will
14 be -- most frequently have holidays on welds or --
15 BY MR. KREGER:
16 Q  Just what he said --
17 A  Honestly, I don't --
18 Q  You don't take any issue with what he said there?
19 A  I'll tell you this, having -- not being a coatings
20 contractor and not knowing going into this, I don't know
21 about welds and what they do. I know now, after reading
22 what I've read, that welds are a problem in relations to
23 coatings, especially when you're going for a holiday-free
24 surface.
25 Q  Can you tell me how much of the work that you had to

Page 124

1  do for -- going for a holiday-free surface was more than
2  what an experienced coating contractor would have expected
3  to do?
4     MR. MARSTON: Objection. Lack of foundation.
5     THE WITNESS: I have no idea.
6     MR. KREGER: Would you mark this next, please.
7     (Exhibit 87 marked.)
8     (Discussion off record.)
9  BY MR. KREGER:
10 Q  Take a look at that, Mr. Olson, while we're --
11 background noisy.
12 A  Just the front page or the whole thing?
13 Q  I'm going to ask you whether you recognize the
14 agreement.
15    MR. MARSTON: Objection. Vague.
16    THE WITNESS: I recognize portions of it. As it
17 being one entire document, I don't recognize it.
18 BY MR. KREGER:
19 Q  Can you identify this as the subcontract between
20 Brechan and Absolute?
21 A  Yes. This one, two, three, four, these pages would
22 be part of the contract. Or the -- did you say the
23 contract?
24 Q  Yes, I did. Yes, I did.
25    Okay. Let's just take the first four pages.

Page 125

1     MR. MARSTON: Is that through 168?
2     THE WITNESS: Yeah. 165 through 168.
3  BY MR. KREGER:
4  Q  Okay. What do you recognize those four pages as?
5  A  My subcontract with Brechan Enterprises.
6  Q  Okay. And the subcontract there on Article 2 in the
7  middle says something about scope of work dated 11/27/02
8  and your proposal dated 10/22/02. Do you see that?
9  A  Yes.
10 Q  And -- this is the second October 22nd letter that
11 we've seen that you've signed. And, as you know, it's
12 different than the October 22nd letter in your subcontract
13 with Imperial.
14    But what I want to know is whether this October
15 22nd letter is the one that you intended to have
16 referenced in your subcontract with Brechan.
17 A  I know we had some November correspondence as well,
18 but this is the one that was incorporated into the
19 contract.
20 Q  Why were there three different October 22nd letters
21 signed by you?
22 A  I don't recall at this time. If I put all three of
23 in front of me, I might know the difference between them,
24 but...
25 Q  You don't remember why you did, at this point?

32 (Pages 122 to 125)

Page 126
1  A  No. And I -- keep in mind, as I said previously, I
2  didn't prepare the letters. I signed them, but I didn't
3  prepare them.
4  Q  Who did?
5  A  I believe it was Mr. Peterson was typing these up.
6  Q  Now, article nine, under procedures on this letter,
7  has different language than the article nine in the letter
8  that's part of your subcontract with Imperial. This says,
9  "The stitch welds will be caulked as needed."
10    Do you see that?
11 A  I see that.
12 Q  Do you have any understanding what the different is,
13 if any, that was intended by that?
14 A  No.
15 Q  Let's talk about the reference here to scope of work
16 dated 11/27/02. What was that in reference to, Mr. Olson?
17 A  I believe that was in reference to this -- this --
18 what is document BEI0171.
19 Q  The fifth page in the packet that I gave you, right?
20 A  Yes.
21 Q  And it says, "Provide labor, materials and equipment
22 for steel waterfront coating services on the original
23 cargo wharf, bents 12-33 including all access ramps
24 IAW" -- I think that means "in accordance with" --
25 A  Uh-huh.

Page 127
1  Q  -- "attached specifications and drawings."
2    Do you see that?
3  A  Yes.
4  Q  So what are the attached specifications and drawings
5  that you were supposed to do work in accordance with?
6    MR. MARSTON: Objection. Assumes facts not in
7  evidence.
8    THE WITNESS: After we had turned in our
9  proposal, we got this revised specification, November --
10 dated November 26, 2002. And these were the
11 specifications and the drawings. I don't recall if they
12 were revised or not and I don't see them here. So I can't
13 -- I can't remember the date on the drawings.
14 BY MR. KREGER:
15 Q  Does this subcontract have a differing site condition
16 clause in it?
17 A  Not specifically.
18 Q  Does it generally?
19 A  No.
20 Q  When you reviewed the specifications for November 26
21 2002, I believe you testified -- I'll start again. I'm
22 sorry.
23    You testified at your last deposition that you
24 had read the specification prior to estimating.
25    Do you remember that?

Page 128
1    MR. MARSTON: Objection. Misstates the
2  witness's testimony.
3    THE WITNESS: June specification.
4  BY MR. KREGER:
5  Q  Well, that was my question. I don't know which
6  specification -- at your testimony last time, you just
7  said you reviewed a specification or the specification.
8    MR. MARSTON: Same objection.
9    THE WITNESS: Can you show me the context or
10 the --
11 BY MR. KREGER:
12 Q  Sure. It may take me a minute to flip to it.
13    Okay. We'll come back to that because I'm not
14 finding it, but I'll have a note on it.
15    Let's take a look at the specification 3.2.1-3
16 [sic]. Do you see that? 3.2.1.3.
17    MR. MARSTON: In the June 21?
18 BY MR. KREGER:
19 Q  Do you understand my question?
20 A  In this specification?
21 Q  Yes, sir.
22 A  Okay. Yeah, I --
23    MR. MARSTON: Counsel, I didn't understand your
24 question. Were you referring to the June 21
25 specification?

Page 129
1    MR. KREGER: No, I'm talking about the
2  specification for this scope of work.
3    THE WITNESS: Yeah, I see 3.2.1.3.
4  BY MR. KREGER:
5  Q  Would you read that into the record, please.
6  A  It says, "Seal welding were required," which I assume
7  is a typo, "with a minimum fillet -- fillet weld size of
8  three-sixteenths inch shall be performed prior to
9  coating."
10 Q  So the "were required" is, you assume, a typo for
11 "where required"?
12 A  Right now, as I read it, it wouldn't make sense with
13 the word "were."
14 Q  And that's a change from the June 21st, 2001
15 specification; isn't it?
16 A  Can I get the June 21st specification?
17 Q  It's right there, sir. Please do look at it.
18 A  Yeah, it's different than the other one.
19 Q  In what way is it different?
20 A  Well, the June specs says, "Seal welding with a
21 minimum fillet weld size of three-sixteenths inch shall be
22 performed prior to blasting."
23 Q  Okay.
24 A  The other paragraph says, "Seal welding where
25 required with a minimum fillet weld size of

```
 1                    REPORTER'S CERTIFICATE

 2           I, SUSAN J. WARNICK, RPR, and Notary Public in

 3    and for the State of Alaska do hereby certify:

 4           That the witness in the foregoing proceedings was

 5    duly sworn; that the proceedings were then taken before me

 6    at the time and place herein set forth; that the testimony

 7    and proceedings were reported stenographically by me and

 8    later transcribed under my direction by computer

 9    transcription; that the foregoing is a true record of the

10    testimony and proceedings taken at that time; and that I

11    am not a party to nor have I any interest in the outcome

12    of the action herein contained; that signature was

13    requested.

14           IN WITNESS WHEREOF, I have hereunto subscribed my

15    hand and affixed my seal this 28th day of February

16    2006.

17

18                              _____
                                SUSAN J. WARNICK,
19                              Registered Professional Reporter
                                Notary Public for Alaska
20

21    My Commission Expires:  April 8, 2006
22

23

24

25
```

```
                                                              Page 244
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3
 4   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., An Alaska
 5   corporation,
 6             Plaintiff,
 7       vs.
 8   FORREST J. McKINLEY and "JANE
     DOE" McKINLEY, et al.,
 9
               Defendants.
10   _____
11   Case No A03-0199 Civil (RRB)
12
13
14
15
                    DEPOSITION OF DAVID OLSON
16
                     Taken March 30, 2006
17                   Commencing at 9:00 a.m.
18          Volume III - Pages 244 - 424, inclusive
19
20
                     Taken by the Defendant
21                            at
                         PERKINS COIE
22                1029 W. Third Av., Suite 300
                     Anchorage, AK  99501
23
24
25   Reported by:
     Susan J. Warnick, RPR
```

Page 253

1  Absolute other than yourself who did what you would
2  understand to have been a site inspection prior to
3  submitting the proposal to perform the work?
4  A   I don't know if I asked any of my personnel to go out
5  there and take a look at it between the time I was out
6  there in February and bid time.
7  Q   Sitting here, I gather this is Mr. Peterson sitting
8  here, who I haven't met before. We'll chat with him
9  tomorrow. You have no recollection today as to whether
10 you asked Mr. Peterson to go out there and, in your
11 understanding, inspect the site prior to putting your
12 proposal together?
13 A   No, I don't recollect. I don't think I did.
14 Q   My understanding was you were there in February on
15 that visit and that Mr. Puett was with you, correct?
16 A   Correct.
17 Q   And do I correctly understand that you, essentially,
18 because of your lack of experience in doing this type of
19 work, you relied upon Mr. Puett to look at the conditions
20 that were there and make the professional judgment as to
21 how much it was going to cost to do the coating work?
22 A   The scope of the -- I guess you would have to look at
23 the context of the February site visit. At the request of
24 Brechan, we came out, and Matt wanted us to look at
25 Swalling's work, and they had some -- I think that

Page 254

1  Mr. Puett made reference. They had some high millage
2  spots and runs and sags and things of that nature. And
3  was it -- I'm just stating, as I said previously, was that
4  set forth as the prebid site inspection? No. It was all
5  in limbo at that time. It was based on if they we were
6  going to have the funding to continue on with Phase 2. I
7  don't even think they even knew if they were going to
8  continue on with Swalling or not, so.
9  Q   My question was: Isn't it true that in terms of how
10 much it was going to cost to do -- to remove the existing
11 coatings and to apply the new coatings to meet the
12 finished standards called for in the specifications, you
13 relied upon Mr. Puett and his background and experience?
14 A   Yes.
15 Q   You did not yourself have the knowledge, background,
16 and experience to estimate that work?
17 A   No.
18 Q   Did you request that Mr. Puett go out to the site at
19 some point after the February time that the two of were
20 there to make sure that his estimate to perform the work
21 was going to take into consideration the conditions -- the
22 existing conditions in the wharf?
23 A   Did I request him to go back out?
24 Q   Yes.
25 A   No, I don't think I did.

Page 255

1  Q   So you were satisfied that the visit that you and
2  Mr. Puett had done in February was sufficiently detailed
3  to allow an accurate price proposal to be submitted?
4  A   Well, I can't speak for Mr. Puett, but for what we
5  were going to do, I'd say yes, in working in support. I
6  knew, since we weren't doing the application, I wasn't
7  looking in the same manner that he would be looking at it.
8  Q   But Mr. Puett and his company were going to be your
9  subcontractor; weren't they?
10 A   Yes.
11 Q   And, ultimately, you know, in your understanding, not
12 asking for a legal conclusion, but in your understanding
13 and your experience in the contracting business, you were
14 going to be responsible to your contractor, Brechan, for
15 the work Mr. Puett did; weren't you?
16 A   Ultimately I'm responsible for it, yes, correct, in
17 any subcontract situation. I may have five potential
18 bidders on a project, and, you know, I've got to look at
19 when their proposal comes in, what their inclusions and
20 exclusions and scope of work and price, all of those
21 items, and take them into consideration.
22 Q   Right. So you wanted to be fairly confident that
23 Mr. Puett's price proposal was a solid proposal that you
24 were going to be able to have the work performed and not
25 have it cost substantially more than what his estimate to

Page 256

1  you indicated?
2  A   Well, you also have to keep in mind, we were given a
3  million dollar budget on it, as I testified to previously.
4  Matt Holmstrom told us we needed to be under a million
5  dollars. So we had to back out of the number to see if we
6  could do it for that much money.
7  Q   But you have also testified; haven't you, that if it
8  was a three million dollar job, you were going to offer to
9  do it for a million dollars, just to stay in his budget;
10 weren't you?
11 A   Oh, no --
12     MR. ELISON: Objection, asked and answered and
13 mischaracterization.
14     THE WITNESS: No, I testified earlier if the job
15 was a million and a half or two million dollar job, I
16 certainly wouldn't bid it for a million dollars.
17 BY MR. PARTNOW:
18 Q   Right. So you wanted to be confident, even though
19 there was a number that Mr. Holmstrom may have given you,
20 that the numbers Mr. Puett were giving to you were
21 reliable estimates?
22 A   I have to rely -- if he gives me a number, we ask,
23 you know, are these budgetary numbers working for you
24 based on the square footage of the job. I mean, I don't
25 imagine that they would submit a price to me if they

4 (Pages 253 to 256)

**Page 265**

1  grinding. Had to grind the hell out of the cargo pier,
2  out of the steel, to get it down to a surface where he
3  could put a surface profile on it, where it -- where the
4  paint would adhere, and we could get rid of the holidays.
5  Q   Did he tell you at some point that he was
6  encountering conditions that couldn't reasonably have been
7  anticipated when the job was bid?
8  A   No. He didn't participate in the bid aspect of the
9  project, so he wouldn't have any knowledge in that regard.
10  So, no.
11  Q   Did he at any point tell you that he was encountering
12  conditions that, from his experience, could not reasonably
13  have been anticipated?
14  A   I don't think he mentioned that, no.
15  Q   Did he mention that he was having particular problems
16  in the weld areas?
17  A   I don't recall him specifically mentioning the weld
18  areas, no.
19  Q   Did you at any point make any request to Jerry
20  Hardenbergh to give a clarification or some additional
21  direction or assistance because of the problems that
22  Mr. Yell told you he was having in obtaining a
23  holiday-free finish?
24  A   Would you read that back, please?
25      (Requested record read.)

**Page 266**

1       THE WITNESS: You're asking two or three
2  different things. First part of that question, did we ask
3  for any direction or assistance from Mr. Hardenbergh?
4  BY MR. PARTNOW:
5  Q   Yes.
6  A   Is basically what you're asking?
7  Q   Yes.
8  A   Boy, I don't recall if we did or not.
9  Q   I mean, as a contractor, from your experience, if you
10  encounter an unanticipated condition that's going to cost
11  you more money, is it your first response to go back to
12  the owner or somebody on the project and say, he, we got a
13  problem here, how are we going to deal with it?
14      MR. ELISON: Objection, foundation.
15      THE WITNESS: Typically, my business, when we
16  find an unanticipated problem?
17  BY MR. PARTNOW:
18  Q   Yes.
19  A   Yes.
20  Q   But you didn't do that on the cargo wharf project;
21  did you?
22  A   I didn't know it was an unanticipated problem at the
23  time I was there.
24  Q   Well, when Mr. Yell was telling you that he was
25  having problems, did you go out to the site and look at

**Page 267**

1  the specific conditions that were causing the problem?
2  A   Yeah, we looked at it, and he told me he couldn't get
3  the areas turned over because of the holidays, and I said,
4  what do we do; he said, we're going to have to remove the
5  steel, and I made the call to grind and remove, do what we
6  needed to do to meet the holiday-free criteria.
7  Q   When you say grind the steel, you're talking about
8  the nonstructural steel, the various hangers and so forth
9  that were on the various piers?
10  A   No. That's not what I said.
11  Q   What steel are you referring to?
12  A   Whatever steel needed to be ground.
13  Q   Are you talking about actually removing it or
14  smoothing or both?
15  A   Grinding would be a method of removing it. Whatever
16  we needed to do to prep the surface so we could obtain a
17  profile to put the coating on. And Corrpro was making --
18  I can't remember the fellow's name. Since they had
19  experience with this material, he had a good idea of what
20  level we needed to get to to put the material on.
21  Q   You don't recall the name of the person or people
22  from Corrpro with whom you dealt?
23  A   No, I can't remember the fellow's name out of Canada.
24  Q   What was the relationship between them and Dan Yell?
25  Was he basically supervising their work or were they

**Page 268**

1  supervising his work?
2  A   We were supervising his work. Dan Yell was my
3  employee. So Corrpro was my subcontractor. I mean, they
4  worked at our direction, insofar as they were a
5  subcontractor, but we were relying on their expertise in
6  actually applying the coatings.
7  Q   Did the person or people from Corrpro tell you that
8  they were encountering some condition that they could not
9  reasonably have anticipated, that it was making it
10  difficult for them to obtain a holiday-free coating?
11  A   No, not -- no, they didn't mention that to me.
12  Q   And do you recall that the specifications for Phase 2
13  gave you the discretion about whether to remove
14  nonstructural steel, whether to stripe coat it, or to
15  caulk it?
16      MR. ELISON: Objection, documents will speak for
17  themselves.
18      THE WITNESS: I'd have to take a look at it, but
19  I believe that it gave us those options.
20  BY MR. PARTNOW:
21  Q   And so in terms of which of those approaches would be
22  pursued, you or your subcontractor could make the
23  determination as to what was the most efficient, cost-
24  effective approach to pursue?
25      MR. ELISON: As between those choices?

Page 273

1 correct?
2 A Yes.
3 Q Let's start with the things that they did do that
4 they shouldn't have done. What, in your view, sitting
5 here today, did Hoffman do during Phase 2 that they should
6 not have done?
7 A I think if would fall into the latter category of
8 things that they should have done and did not do.
9 Q Well, I'm just trying to --
10 A They are kind of the same answer to the -- it's a
11 description --
12 Q In terms of anything -- sorry to interrupt. In terms
13 of anything that Coffman did that they should not have
14 done, I take it your answer is there is nothing that you
15 can think of today that they did that they should not have
16 done? You're saying --
17 A I would say that they issued -- are you done with the
18 question?
19 Q Uh-huh.
20     MR. ELISON: Object to the form of the question.
21     THE WITNESS: I would say that they issued a
22 specification that didn't adequately describe the project.
23 I guess that is something that would fall into the
24 category of something they did and shouldn't have done.
25 BY MR. PARTNOW:

Page 274

1 Q And in terms of the specifications, in what way did
2 the specification that Coffman issued not adequately
3 describe the project?
4 A You said what I know today, correct?
5 Q Yeah.
6 A They didn't describe the fact that a holiday-free
7 coating was impossible to attain on this project or nearly
8 impossible to attain.
9 Q When you say that a holiday-free coating was
10 impossible to obtain or nearly impossible to attain, you
11 yourself, I take it, at least as of the time that you
12 performed the project, didn't have the background and
13 experience to make that sort of determination?
14 A You just asked me what I know today.
15 Q Answer my question, please. I'm saying --
16 A Okay.
17 Q -- I understand what you said. I'm asking what you
18 know today. What I'm saying is: Your position, in this
19 litigation, is at the time that you did the work, you just
20 showed up, you know, nominal experience, and relied upon
21 Puett to know what was going on. You yourself did not
22 have the knowledge, background or experience to speak with
23 any authority with regards to coatings work?
24     MR. ELISON: Object to the form of the question.
25     THE WITNESS: I relied on the plans and

Page 275

1 specifications and Mr. Puett's bid.
2 BY MR. PARTNOW:
3 Q And so --
4 A We submitted our pricing to Brechan, based on what
5 Brechan had told us. And did I have any expertise in that
6 matter at that time? No, I didn't.
7 Q At the time that you submitted your proposal to
8 Brechan on this job, I take it, then, you did not have a
9 question in you mind as to whether the holiday-free
10 coating called for in the specification was achievable or
11 not?
12 A No, I had no reason to question that.
13 Q But sitting here today, the educated Mr. Olson says
14 that there was a problem in the specification that Coffman
15 prepared because they were requiring you to do something
16 that couldn't be accomplished. Did I understand that
17 correctly?
18 A Well, obviously it could be accomplished because we
19 did accomplish it at the end of day, but at great expense.
20 So, as I testified previously, there were surface
21 conditions that weren't described in the specifications.
22 There were a lot of surface conditions that were
23 described in the specifications, being Section 1, a lot of
24 things that a guy should be made aware of when proposing
25 on this project. I don't recall the weld issue being one

Page 276

1 of them.
2 Q I'm just trying to make sure I understand what your
3 position is, and it's not -- apologize for my denseness.
4 Let me try again.
5     I thought, in response to my question, you said
6 that Coffman did something wrong because they required --
7 they required you to get a holiday-free finish, which was
8 impossible or nearly impossible to achieve. And then I
9 thought that when you gave your further answer, you said,
10 well, it was possible to achieve because we finally did
11 it, but at great expense. So now my question is: Is the
12 second thing you said what your position is now, that the
13 requirement of the specifications was achievable, but not
14 -- but at a cost that was more extensive than what you had
15 anticipated?
16     MR. BROWN: Objection, misstates his testimony.
17     MR. PARTNOW: I'm just trying to --
18     THE WITNESS: No, I understand I think what you
19 are saying. You have taken what I said earlier out of
20 context. You asked me originally: Did Coffman do
21 something that they shouldn't have done, was your original
22 question. Then you were going to move on to: Did they
23 not do something that they should have done.
24 BY MR. PARTNOW:
25 Q Okay.

Page 393

1  what was going to be most cost effective, whether just
2  doing grinding or doing some combination of grinding and
3  caulking or grinding and stripe coating, correct?
4  A  No.
5  Q  I won't find in the records some calculation or --
6  A  No, I didn't. No. I've got correspondence from, you
7  know, your client saying they're depending on me to get
8  the job done; get it done. We got it done.
9  Q  Let me see if I understand. After Imperial left and
10 Mr. Yell and Corrpro began applying coatings, did they,
11 for a period of time, try to do stripe coating or caulking
12 or did they just go to either removal of the nonstructural
13 steel or grinding of both welds and nonstructural steel?
14 A  I don't -- I don't remember exactly how we did it.
15 We didn't start into the application side of things. I
16 don't think Corrpro's people showed up until early August
17 and -- in the first week of August. And then we started
18 applying coatings, I think, somewhere in the second week
19 of August. But I'd have to look at the project records to
20 be --
21 Q  Do you think there's something in the project records
22 that would indicate whether Mr. Yell and company were
23 stripe coating or caulking?
24 A  I don't know. I'd be relying on Mr. Hardenbergh's
25 records.

Page 394

1  Q  Before Imperial stopped production and stopped
2  coating, they were coating first and applying stripe coat
3  or caulking second, right?
4  A  Yes.
5  Q  And just --
6  A  I don't know if they start -- I can't remember how
7  they started out.
8  Q  Eventually --
9  A  I know eventually, yeah, they were putting it on the
10 outside.
11 Q  What was your source of information about agreement
12 or Mr. Hardenbergh's exercise of discretion or whatever
13 with respect to allowing the stripe coating to happen
14 after the application of coating? Where did you hear
15 about that agreement or that representation?
16 A  I don't remember where.
17 Q  Not something that you participated in?
18 A  I don't think so.
19 Q  Did Absolute take any photographs, itself, of the
20 physical conditions at the project?
21 A  For Absolute's benefit, not that I recall, no.
22 Q  For anybody else's benefit?
23 A  I think I took some for Jerry one day, or a couple
24 days.
25 Q  I just want to make sure I get this right. The

Page 395

1  thousand wheels of grinding that you eventually went
2  through, what were you grinding?
3  A  Areas where we had proliferations of holidays.
4  Q  Would that include welds?
5  A  Yeah, most certainly.
6  Q  Would it include edges?
7  A  Yeah, we were grinding edges.
8  Q  Now, the specification, 2002, required the contractor
9  to grind edges including welds, correct?
10 A  It required the contractor to grind the edges of the
11 H pile.
12 Q  And it also required that grinding to include welds,
13 correct?
14 A  Not that I'm -- I would have to look at the
15 specification.
16 Q  I want to direct your attention to Exhibit 85,
17 Section 3.3.2, and ask you to read the second sentence
18 into the record there, please.
19      MR. ELISON: Let me look at that with you.
20      THE WITNESS: Okay.
21 BY MR. KREGER:
22 Q  Would you read that into the record?
23 A  It says, "Edges, including welds, shall be rounded to
24 one-eighth-inch radius, minimum, and prior to abrasive
25 blasting"

Page 396

1  Q  Can I have that back? That's my only copy.
2  A  Do I get to opine on this?
3  Q  If I ask you a question about it. And I'm sure
4  you'll have an opportunity to opine at a later point in
5  time.
6  A  That doesn't tell -- I'll just state for the record,
7  that doesn't tell me to grind the welds. It tells me to
8  grind edges. And I suppose, if the weld has an edge, they
9  want a round radius on that.
10 Q  So your interpretation is this sentence that you just
11 read into the record doesn't require you to grind welds?
12 A  Every weld?
13 Q  Yes, every weld.
14 A  Does that require me to grind every weld?
15 Q  It says what it says.
16 A  It tells me to grind edges that need a
17 one-eighth-inch radius. If something already has a
18 one-eighth-inch radius or a round surface to it, I would
19 say it doesn't require any grinding; it's already got a
20 profile.
21 Q  How much more grinding did you do of welds than was
22 required by the contract?
23 A  I don't know.
24 Q  Pardon?
25 A  I don't know.

Page 397

1  Q  You would agree that some grinding of welds was
2  required by the contract, correct?
3  A  I don't know that, because we can't see the surfaces
4  underneath the -- underneath the coating. And as I've
5  stated previously, I'm not a -- I don't have any base line
6  with which to measure what my expectations were or were
7  not at the time that we put the proposal in on this
8  project.
9  Q  The specifications required that there be no runs or
10 sags, correct?
11     MR. ELISON: Objection. They speak for
12 themselves.
13     THE WITNESS: I believe that's what they stated,
14 yes.
15 BY MR. KREGER:
16 Q  And if one went to the dock and looked around, one
17 would find a lot of runs and sags on bents 13 through 33,
18 correct?
19 A  I would imagine you'd find them there and on bent
20 extension one through 12.
21 Q  And what was your understanding of why Absolute was
22 not required to eliminate runs or sags that were in bents
23 13 through 33?
24 A  I don't know.
25 Q  Pardon me?

Page 398

1  A  I don't know.
2  Q  Did you ever ask Mr. Hardenbergh about that?
3  A  I don't know if I did or not. I don't recall if we
4  had any conversations about runs and sags.
5  Q  I think you testified about what Swalling was
6  permitted to do or not permitted to do with respect to its
7  surface preparation and in particular its surface
8  preparation around corners that had welds on them.
9      What is the source of your information that the
10 specification permitted Swalling to stripe coat or caulk
11 welded areas?
12 A  Well, that wasn't my prior testimony.
13 Q  Good. I'm glad I wrote that down wrong, because I
14 wasn't --
15 A  As far as you said corners or -- I didn't make any
16 reference to corners.
17 Q  Did you --
18 A  What I made reference to is the fact that they had a
19 reduced holiday requirement.
20 Q  Is it your testimony that the specification permitted
21 Swalling to do stripe coating and caulking as a means of
22 surface preparation for welds?
23 A  On Phase 1?
24 Q  Yes, sir.
25 A  I don't know if it permitted it or prohibited it or

Page 399

1  -- either way.
2  Q  Do you know whether Swalling attempted to stripe coat
3  an existing weld and then, after stripe coating it, spray
4  painted it and still couldn't get a holiday-free
5  condition?
6  A  Yes, I've seen documents to that effect.
7  Q  So what documents would I go look at to see what
8  you've seen to that effect?
9  A  The ones in your files.
10 Q  Can you be any more specific than that? I have a
11 whole room full of them.
12 A  No. I'd suggest you purge through those; they're all
13 from you.
14 Q  Who were the authors of these documents?
15 A  Coffman, Swalling. Maybe Brechan had some.
16 Q  So you're saying that you've seen correspondence or
17 project records that indicate that Swalling had actually
18 stripe coated a weld -- an existing weld as opposed to a
19 mission weld. Had stripe coated an existing weld and then
20 spray painted over that and still had a holiday problem?
21 A  I believe so. I know I've read correspondence that
22 they'd been back over weld areas three and four times.
23 Q  Now, were those weld areas where there was a missing
24 weld or a weld that was in place?
25 A  I don't know.

Page 400

1  Q  Did you discuss with Mr. Lembke his method of
2  analyzing data that he came up with to have as Attachment
3  D or Attachment E to his latest report?
4  A  Yes, I had conversations with him.
5  Q  What input did you give to Mr. Lembke about that
6  analysis?
7  A  Do we have it handy?
8  Q  No.
9  A  I think I have it handy.
10 Q  Pardon me?
11 A  I said, I think I have it handy.
12 Q  Okay. Well, if that will help you to tell me what
13 input you gave to Mr. Lembke, I would appreciate it.
14 A  Okay. Would you like a copy of it?
15 Q  No, I don't want a copy it. Not right now.
16    MR. PARTNOW: For the record, can you just
17 identify what you're referring to?
18    THE WITNESS: I'm referring to Exhibit D, which
19 is an attachment to the findings and opinion report that
20 was produced most recently by Mr. Lembke.
21    MR. PARTNOW: Thank you.
22    THE WITNESS: I went over the plans -- these
23 were provided to us by Mr. Lembke -- as far as the square
24 footages that were put forth in the project plans for the
25 total square footage on the cargo pier.

40 (Pages 397 to 400)

```
 1                    REPORTER'S CERTIFICATE

 2         I, SUSAN J. WARNICK, RPR, and Notary Public in

 3    and for the State of Alaska do hereby certify:

 4         That the witness in the foregoing proceedings was

 5    duly sworn; that the proceedings were then taken before me

 6    at the time and place herein set forth; that the testimony

 7    and proceedings were reported stenographically by me and

 8    later transcribed under my direction by computer

 9    transcription; that the foregoing is a true record of the

10    testimony and proceedings taken at that time; and that I

11    am not a party to nor have I any interest in the outcome

12    of the action herein contained; that signature is

13    requested.

14         IN WITNESS WHEREOF, I have hereunto subscribed my

15    hand and affixed my seal this 19th day of April,

16    2006.

17

18

19                          SUSAN J. WARNICK,
                            Registered Professional Reporter
20                          Notary Public for Alaska

21
      My Commission Expires:  April 8, 2010
22

23

24

25
```