# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL )
SERVICES, INC., AN ALASKAN )
CORPORATION, )
)
    PLAINTIFF, )
)
VS. )  NO. A-03-0199
)
FORREST J. MCKINLEY AND )
"JANE DOE" MCKINLEY, ETC., )
ET AL., )
)
    DEFENDANTS. )
)
)
AND RELATED CROSS-ACTIONS. )

THE DEPOSITION OF TOM PUETT, TAKEN ON BE-
HALF OF THE DEFENDANTS, AT 725 SOUTH FIGUEROA STREET, SUITE
3200, LOS ANGELES, CALIFORNIA, AT 10:15 A.M., MONDAY,
MAY 8, 2006, BEFORE SHERYL WILLIAMS, CERTIFIED
SHORTHAND REPORTER NO. 7453, PURSUANT TO NOTICE.

SEIJAS COURT REPORTERS                                    1

---

EXHIBITS, CONT'D

| DEFENDANTS' | | PAGE |
|---|---|---|
| 46 | 7-31-2003 LETTER TO ABSOLUTE FROM TOM PUETT | 178 |
| 47 | FOREMAN'S DAILY LOGS | 179 |
| 48 | HANDWRITTEN NOTES | 194 |
| 49 | HANDWRITTEN NOTES | 202 |
| 50 | SUMMONS IN A CIVIL CASE | 204 |

SEIJAS COURT REPORTERS                                    4

---

APPEARANCES:
FOR PLAINTIFF ABSOLUTE ENVIRONMENTAL SERVICES:
(VIA TELEPHONE)

MARSTON HEFFERNAN FOREMAN, PLLC
BY: TERRY R. MARSTON II, ESQ
ANDERSON PARK BUILDING
16880 N.E. 79TH STREET
REDMOND, WASHINGTON 98052
(425) 861-5700
FOR DEFENDANT EMERCO, INC.:
MONTELEONE & MCCRORY, LLP
BY: WILLIAM R. BAERG, ESQ.
725 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CALIFORNIA 90017
(213) 612-8900

FOR DEFENDANTS BRECHAN AND SAFECO:

PERKINS COIE, LLP
BY: JACOB B. NIST, ESQ.
1029 WEST THIRD AVENUE
SUITE 300
ANCHORAGE, ALASKA 99501
(907) 263-6971
FOR DEFENDANT COFFMAN ENGINEERS, INC.:
LANE POWELL
BY: JAMES B. STOETZER, ESQ
1420 5TH AVENUE
SUITE 4100
SEATTLE, WASHINGTON 98101
(206) 223-7000

FOR DEFENDANT SPECIALTY POLYMER COATINGS:

ATKINSON, CONWAY & GAGNON, INC.
BY: ROBERT J. DICKSON, ESQ.
420 L STREET
SUITE 500
ANCHORAGE, ALASKA 99501
(907) 276-1700
ALSO PRESENT: JERRY HARDENBERGH (VIA TELEPHONE)
SEIJAS COURT REPORTERS                                    2

---

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| TOM PUETT | BY MR. NIST | 5 |
| | BY MR. STOETZER | 97, 228 |
| | BY MR. DICKSON | 174, 221, 230 |
| | BY MR. MARSTON | 212 |

EXHIBITS

| DEFENDANTS' | | PAGE |
|---|---|---|
| 38 | SCHEDULE OF VALUES | 18 |
| 39 | ESTIMATE SUMMARY SHEET | 21 |
| 40 | MEMO TO JASON | 30 |
| 2 | SUBCONTRACT | 34 |
| 41 | SUBMITTALS | 39 |
| 13 | COATING OF STEEL WATERFRONT STRUCTURES | 42 |
| 1 | WRITTEN RESPONSE OF DEFENDANT ENERCO, INC. | 62 |
| 42 | 6-27-03 LETTER TO DAVID OLSON FROM TOM PUETT | 72 |
| 43 | DECEMBER 6, 2002 LETTER TO MATT HOLMSTROM FROM JASON PETERSON | 78 |
| 44 | PROPOSED 2003 PRE-JOB CONSTRUCTION AGENDA | 86 |
| 45 | 7-1-03 LETTER TO DAVID OLSON FROM TOM PUETT | 91 |

SEIJAS COURT REPORTERS                                    3

---

LOS ANGELES, CALIFORNIA, MONDAY, MAY 8, 2006
10:15 A.M.

TOM PUETT,
CALLED AS A WITNESS ON BEHALF OF THE DEFENDANTS, HAVING
BEEN ADMINISTERED AN OATH IN ACCORDANCE WITH C.C.P. SECTION
2094, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

EXAMINATION

BY MR. NIST:

    Q.  GOOD MORNING, MR. PUETT.
    A.  GOOD MORNING.
    Q.  MY NAME IS JACOB NIST.  I REPRESENT BRECHAN
ENTERPRISES AND SAFECO INSURANCE COMPANY OF AMERICA.
        YOU'VE BEEN TO SEVERAL DEPOSITIONS IN THIS CASE;
IS THAT CORRECT?
    A.  YES.
    Q.  AND TO YOUR KNOWLEDGE IS THERE ANY DEPOSITION IN
THIS CASE THAT YOU HAVEN'T ATTENDED?
    A.  YES.
    Q.  WHICH ONE?
    A.  IF THERE'S MORE THAN ONE, YOU WANT TO KNOW MORE
THAN ONE?
    Q.  YES.
    A.  FORREST MCKINLEY.  LAURA EMERY.  AND THERE WAS

SEIJAS COURT REPORTERS                                    5

---

ANOTHER ACCOUNTANT FOR FORREST MCKINLEY, AND I DON'T
REMEMBER HIS NAME.
    Q.  WELL, THERE'S BEEN SEVERAL DEPOSITIONS TAKEN IN
THIS CASE.  YOU'RE FAIRLY FAMILIAR WITH THE PROCEDURE I
ASSUME?
    A.  YES.
    Q.  SO WE'LL SKIP THAT.
        FIRST OF ALL, WHAT DID YOU DO TO PREPARE FOR THIS
DEPOSITION?
    A.  I TALKED TO MARK SCHILLING.
    Q.  AND WHAT DID YOU AND MR. SCHILLING TALK ABOUT?
    A.  WELL, I EXPLAINED TO MARK SCHILLING TO GET A
CLARIFICATION ON AN ITEM FROM MIKE ANDERSON'S DEPOSITION
AND THAT WAS ABOUT THE REACTION OF MOISTURE WITH THE
ISOCYANATE THAT'S IN THE 1864 SPC COATING AND ALSO IN SPC'S
1842.  BECAUSE MR. ANDERSON HAD MADE IT VERY CLEAR THAT
THIS MATERIAL -- I KNOW IT WAS MOISTURE SENSITIVE, BUT MIKE
ANDERSON, WHO IS A NACE LEVEL 3 CERTIFIED WITH PEER REVIEW
INSPECTOR, HE MADE IT VERY CLEAR IN HIS DEPOSITION THAT
THIS MATERIAL IS VERY SENSITIVE.  SO I JUST ASKED MARK
SCHILLING FOR A POINT OF CLARIFICATION IF HE COULD GIVE ME
SOME KIND OF AN ANALOGY THAT WOULD EXPLAIN HOW SENSITIVE.
HE EXPLAINED TO ME THAT IF ONE MILLILITER OF MOISTURE COMES
IN CONTACT WITH THE ISOCYANATE THAT'S IN THE 1864 OR THE
1842 SPC MATERIAL, ONE MILLIGRAM OF MOISTURE HITS THE

SEIJAS COURT REPORTERS                                    6

---

EXHIBIT
J

**Column 1 (Page 13)**

1  TWO DISCUSS?
2      A.  WE WENT DOWN.  WE TOOK A LOOK.  AND THEN HE
3  SHOWED US THE AREA THAT WAS GOING TO BE DONE ON THE
4  FOLLOWING CONTRACT ON PHASE TWO, AND MATT ACTUALLY LEFT,
5  AND DAVE AND I STOOD THERE BY OURSELVES FOR A WHILE.
6      Q.  IN THIS 30-MINUTE PERIOD OF TIME HE MENTIONED
7  SWALLING?
8      A.  YES.
9      Q.  DID YOU ASK HIM WHY SWALLING WASN'T DOING PHASE
10 TWO?
11     A.  NO.
12     Q.  DIDN'T YOU CONSIDER THAT TO BE IMPORTANT?
13     A.  NO.
14     Q.  WHY NOT?
15     A.  BECAUSE IT WASN'T IMPORTANT.  I WAS THERE TO DO A
16 SURVEY FOR A PHASE TWO PROJECT.
17     Q.  DID YOU EVER CONSIDER CONTACTING SWALLING AND
18 ASKING THEM ABOUT THE PROJECT?
19     A.  NO.
20     Q.  WHY NOT?
21     A.  BECAUSE I DIDN'T CONSIDER IT.
22     Q.  WOULDN'T IT BE REASONABLE TO ASSUME THAT SWALLING
23 MIGHT HAVE INTERESTING INFORMATION ABOUT THIS PROJECT OR
24 SOMETHING THAT MIGHT BE HELPFUL?
25     MR. MARSTON:  OBJECTION.  ARGUMENTATIVE.
                                           13
                SEIJAS COURT REPORTERS

**Column 1 (Page 14)**

1      THE WITNESS:  I DO NOT TALK TO THE OTHER BIDDERS ON
2  ANY JOBS THAT I BID HERE IN CALIFORNIA OR NEVADA OR ARIZONA
3  OR WHEREVER I BID.  I DON'T CALL AND INQUIRE ABOUT THE
4  OTHER CONTRACTORS THAT ARE BIDDING.  IT'S JUST NOT MY
5  POLICY.
6      Q.  BY MR. NIST:  DID MR. HOLMSTROM SAY THAT SWALLING
7  HAD MADE ANY CLAIMS IN RELATION TO PHASE ONE?
8      A.  NO.
9      Q.  DID MR. HOLMSTROM MENTION THERE WAS ANY PROBLEMS
10 WITH SWALLING RELATED TO PHASE ONE?
11     A.  NO.
12     Q.  PRIOR TO BIDDING THIS JOB, DID YOU BELIEVE THAT
13 YOU HAD SUFFICIENT EXPERIENCE TO PERFORM THIS CONTRACT
14 SUCCESSFULLY FOR IMPERIAL?
15     A.  YES.
16     Q.  IS THAT STILL YOUR BELIEF TODAY THAT YOU HAD
17 SUFFICIENT EXPERIENCE --
18     A.  YES.
19     Q.  AND AS I UNDERSTAND IT, YOU WERE RESPONSIBLE FOR
20 ADMINISTERING THE CONTRACT FOR IMPERIAL; IS THAT CORRECT?
21     A.  WHAT DO YOU MEAN BY ADMINISTERING THE CONTRACT?
22     Q.  PROVIDING THINGS LIKE ESTIMATES, DIRECTING LABOR.
23     A.  ESTIMATES, NOT DIRECTING LABOR NECESSARILY.
24     Q.  WHO WAS DIRECTING LABOR FOR IMPERIAL?
25     A.  AT THAT TIME?  BEFORE WE WENT TO THE PROJECT?
                                           14
                SEIJAS COURT REPORTERS

**Column 1 (Page 15)**

1      Q.  YES.
2      A.  A PERSON BY THE NAME OF JERRY MORGAN.
3      Q.  DIDN'T HE LEAVE IMPERIAL BEFORE THIS CONTRACT
4  STARTED?
5      A.  YES.
6      Q.  SO WHEN THE CONTRACT STARTED, WERE YOU
7  RESPONSIBLE FOR DIRECTING IMPERIAL'S EFFORTS?
8      A.  IN REGARDS TO THIS CONTRACT.
9      Q.  IN REGARDS TO THIS CONTRACT.
10     A.  YES.
11     Q.  DID YOU BELIEVE YOU WERE COMPETENT TO DO THAT?
12     A.  YES.
13     Q.  IS THAT STILL YOUR BELIEF TODAY?
14     A.  YES.
15     Q.  PRIOR TO THIS JOB DID YOU BELIEVE YOU HAD
16 SUFFICIENT EXPERIENCE TO RECOGNIZE A DIFFERING SITE
17 CONDITION ON THE PROJECT?
18     MR. BAERG:  OBJECTION.  OVERBROAD.
19     MR. MARSTON:  OBJECTION.  VAGUE.
20     THE WITNESS:  WHAT DO YOU MEAN BY DIFFERING SITE
21 CONDITION?
22     Q.  BY MR. NIST:  DO YOU UNDERSTAND WHAT I'M SAYING
23 WHEN I TALK ABOUT A DIFFERING SITE CONDITION?
24     A.  YES.
25     Q.  YOU DID MAKE CLAIMS ON THE PROJECT RELATING TO
                                           15
                SEIJAS COURT REPORTERS

**Column 2 (Page 16)**

1  DIFFERING SITE CONDITIONS, DID YOU NOT?
2      A.  YES.
3      Q.  WHAT IS YOUR UNDERSTANDING ABOUT WHAT A DIFFERING
4  SITE CONDITION IS?
5      A.  COULD BE 23 FEET OF SNOW ON THE PROJECT TOMORROW.
6  THAT WOULD BE DEFINITELY A DIFFERING SITE CONDITION.
7      Q.  A MORE BROAD DEFINITION WHAT WOULD YOU DEFINE IT
8  AS?
9      A.  23 FEET OF SNOW AND A LARGE ICE BERG COULD BE A
10 DIFFERING SITE CONDITION.
11     Q.  I UNDERSTAND THAT SPECIFIC EXAMPLE YOU WANT TO
12 GIVE ME.  IS THERE A BIT MORE BROAD DEFINITION THAT YOU
13 WOULD USE TO MAKE A CLAIM?
14     A.  WELL, A COAST GUARD CUTTER COULD RAM INTO THE
15 DOCK TOMORROW, AND IT COULD FALL DOWN IN A PORTION.  THAT
16 WOULD BE A DIFFERING SITE CONDITION.
17     Q.  SO ABSENT 23 FEET OF SNOW AND AN ICE BERG OR A
18 COAST GUARD CUTTER RAMMING INTO THE DOCK, ARE THOSE THE
19 ONLY THINGS THAT YOU WOULD THINK OF AS A DIFFERING SITE
20 CONDITION?
21     A.  YOU KNOW, I WOULDN'T WANT TRY TO DREAM UP A SITE
22 CONDITION.  A SITE CONDITION BECOMES ITSELF WHEN IT'S
23 EXPOSED.  IF YOU'RE TRYING TO ALLUDE TO THE FACT THAT, YES,
24 WHEN WE STARTED BLASTING AND WE OPENED UP THESE WELDS, WE
25 COULD THEN SEE THAT THERE WERE BAD WELDS.  DIFFERING SITE
                                           16
                SEIJAS COURT REPORTERS

**Column 2 (Page 17)**

1  CONDITION.  COULD NOT HAVE THEM HOLIDAY FREE.  BUT YOU
2  WOULD NEVER KNOW THAT UNTIL THE COATING WAS OFF.  AND OTHER
3  PEOPLE THAT DID THEIR EVALUATIONS OF THAT PROJECT AND WROTE
4  THAT SPECIFICATION DID A MUCH PROBABLY MORE IN-DEPTH
5  INSPECTION THAN WE WERE EVER ALLOWED TO, AND THEY NEVER SAW
6  IT ALTHOUGH THEY KNEW IT FROM THE FIRST CONTRACT, AND THIS
7  IS WHERE THEY WITHHELD THE INFORMATION AGAIN.  THEY KNEW
8  IT, AND THEY COULD HAVE SHARED THAT WITH US.
9      MR. STOETZER:  MOVE TO STRIKE AS NONRESPONSIVE.
10     Q.  BY MR. NIST:  I TAKE IT THAT YOUR PREVIOUS
11 TESTIMONY WAS BASED ON WHAT YOU GATHERED FROM REVIEWING
12 DOCUMENTS AND LISTENING TO OTHER PEOPLE'S DEPOSITIONS?
13     A.  LISTENING TO SOME OTHER DEPOSITIONS.
14     Q.  WHEN YOU REMOVED THE COATING AND YOU SAW THESE
15 WELDS, WERE THOSE UNEXPECTED TO YOU AT THE TIME THAT YOU
16 REMOVED THE COATING?
17     A.  YES.  THAT WORK WAS SUPPOSED TO BE DONE BY
18 OTHERS.
19     Q.  ARE YOU TALKING ABOUT REMOVING THE COATING?
20     A.  THE WELDS AND THE GRINDING WAS SUPPOSED TO BE
21 DONE BEFORE WE GOT THERE.  THAT WAS SUPPOSED TO BE A WHOLE
22 POINT THAT COFFMAN SHOULD HAVE HAD.  ALSO IN OUR CONTRACT
23 THEY WERE SUPPOSED TO TAKE OUT THE CP, THE CATHODIC
24 PROTECTION.  THEY WERE SUPPOSED TO CUT OFF THE
25 NONSTRUCTURAL.  THOSE ITEMS WERE DELETED FROM OUR CONTRACT.
                                           17
                SEIJAS COURT REPORTERS

**Column 2 (Page 18)**

1  AND WE SPECIFICALLY EXCLUDED THEM.
2      Q.  SO I WANT TO BE PERFECTLY CLEAR ABOUT WHAT YOU'RE
3  SAYING HERE.  YOU'RE SAYING THAT THE WELDS WERE UNEXPECTED
4  WHEN YOU REMOVED THE COATING.  THERE WAS SOMETHING ABOUT
5  THE WELDS THAT WERE DIFFERENT.  THAT'S CORRECT?
6      A.  THEY WERE UGLY WELDS.
7      Q.  AND YOUR UNDERSTANDING WAS THAT YOU WERE GOING TO
8  REMOVE THE COATING OR IMPERIAL WAS GOING TO REMOVE THE
9  COATING AND THEN SOMEBODY WAS GOING TO DO WITH WITH THESE
10 WELDS?
11     A.  IF YOU GO BACK TO THE SPECIFICATION, IT SAYS THAT
12 THE GRINDING AND THAT TYPE OF WORK WILL BE DONE PRIOR TO US
13 DOING THE BLASTING BECAUSE THEY WANTED TO MAKE SURE THAT
14 THE GRIND AREAS HAD A PROFILE.  AND IF YOU GRIND AFTER YOU
15 BLASTED, YOU WOULD HAVE SPOTS THAT WOULD NOT HAVE A VERY
16 GOOD PROFILE.  SO THAT WORK WAS SUPPOSED TO BE DONE, AND
17 THEN WE DO THE BLASTING.
18     Q.  WAS THIS ALL GRINDING ON THE PROJECT?
19     A.  YES.  ACCORDING TO SPECIFICATIONS.
20     Q.  MR. PUETT, YOU'VE BEEN HANDED WHAT'S BEEN MARKED
21 AS EXHIBIT 3 TO MR. ELMORE'S DEPOSITION.
22     AND ACTUALLY DO YOU MIND REMARKING THIS ONE AS
23 PUETT 38.
24     (DEFENDANTS'S EXHIBIT 38 WAS MARKED FOR
25     IDENTIFICATION AND IS ATTACHED HERETO.)
                                           18
                SEIJAS COURT REPORTERS

```
 1   FIGURE OF --
 2       A.   EXHIBIT 39, NOT 19.
 3       Q.   YOU COME UP WITH THE CALCULATIONS TO COME UP WITH
 4   THE FIGURE OF $772,123.  DO YOU SEE THAT?
 5       A.   YES.
 6       Q.   AND I'M ASSUMING THIS WAS CREATED SOMETIME PRIOR
 7   TO SEPTEMBER 16, 2003?
 8       A.   THAT'S CORRECT.
 9       Q.   SO I GUESS WHAT I'M ASKING IS IS THIS JUNE 21,
10   2001 SPECIFICATION WHAT YOU USED TO CREATE THE ESTIMATE
11   THAT'S EXHIBIT 19 AND EXHIBIT 39?
12       A.   NOT MY FINAL ESTIMATE.
13       Q.   NOT YOUR FINAL ESTIMATE?
14       A.   THAT'S RIGHT.
15       Q.   I THOUGHT YOU SAID THAT THIS WAS -- EXHIBIT NO.
16   19 WAS THE ONLY ESTIMATE THAT YOU CREATED FOR THIS PROJECT?
17       A.   THIS IS THE ONLY ESTIMATE.  BUT I WENT AND
18   REVIEWED THE NOVEMBER 26TH SPECIFICATIONS BEFORE I OKAYED
19   THIS TO PUT THIS INTO THE CONTRACT.  THE CONTRACT WASN'T
20   DONE AND SIGNED UNTIL AFTER THE FIRST OF THE YEAR IN 2003.
21   SO I DID GO BACK AND REVIEW THAT SPECIFICATION.
22       Q.   I UNDERSTAND THAT, SIR.  WHEN YOU CREATED EXHIBIT
23   NO. 19/EXHIBIT 39, WHAT SPECIFICATION WERE YOU USING TO
24   CREATE THIS ESTIMATE?
25       A.   AT THAT TIME THE MOST CURRENT ONE THAT WE HAD
```
                    SEIJAS COURT REPORTERS
                                                    43

```
 1   WHICH IS THE ONE IN 2001, JUNE.
 2       Q.   JUNE 21, 2001?
 3       A.   RIGHT.
 4       Q.   I WANT TO BE CLEAR ABOUT THAT.  AND IF WE LOOK AT
 5   EXHIBIT NO. 13, IS THAT THE JUNE 21, 2001 DOCUMENT THAT
 6   WE'RE REFERRING TO?  I DON'T WANT YOU TO GO THROUGH IT LINE
 7   BY LINE.
 8       A.   I BELIEVE IT TO BE.  I DON'T KNOW THAT THIS
 9   CORRESPONDS WITH THE ONE THAT I HAVE IN MY OFFICE EVEN.  I
10   DON'T KNOW THAT IT'S THE SAME.
11       Q.   IF YOU WILL, GO TO PAGE AES001508, PLEASE.
12       A.   OKAY.
13       Q.   ARE YOU WITH ME?
14       A.   YES.
15       Q.   AND IT APPEARS IT'S GOT THE SAME STICKY SAYING
16   "REWORD" ON IT; IS THAT CORRECT?
17       A.   YES.
18       Q.   SO MY QUESTION IS DID THE -- IT APPEARS THAT THIS
19   REWORD STICKY WAS ON THE SPECIFICATION.  A CLEAN COPY OF THE
20   SPECIFICATION AND THEN THE SPECIFICATION THAT YOU MARKED
21   UP.  AND I'M WONDERING WHETHER THAT STICKY WAS ON THERE, IF
22   YOU REMEMBER, WHEN YOU MARKED EXHIBIT 41 UP?
23       A.   I DON'T KNOW -- YOU KNOW, I DON'T KNOW, AND IT
24   REALLY DIDN'T MATTER BECAUSE WE EXCLUDED ALL THAT.  THEY
25   COULD HAVE REWORDED IT HOWEVER THEY WANTED TO WORD IT.  IT
```
                    SEIJAS COURT REPORTERS
                                                    44

```
 1   STILL WOULD HAVE BEEN EXCLUDED.
 2       Q.   SO I TAKE IT THEN THAT THE TERM "REWORD" THAT
 3   MEANT NOTHING TO YOU?  ANYTHING THAT THEY REWORDED IT TO
 4   YOU WOULD HAVE CONSIDERED EXCLUDED?
 5       A.   SHORT OF THEM OFFERING TO GIVE ME $100,000 FREE
 6   AND CLEAR, YOU KNOW, SOME FINANCIAL BENEFIT, THEN, NO, IT
 7   DIDN'T MEAN ANYTHING TO ME.
 8       Q.   AND YOU TESTIFIED TO THIS PREVIOUSLY, BUT THE
 9   FINAL SPEC WAS INDEED REWORDED IN THESE SECTIONS; IS THAT
10   CORRECT?  THE 1.7 SECTIONS.
11       A.   IF YOU WANT ME TO COMPARE THEM, I BELIEVE THEY
12   WERE CHANGED.
13       Q.   DID YOU REVIEW THE --
14       A.   I READ THROUGH THEM, YES.  I READ THROUGH THAT
15   NOVEMBER 26 SPEC.  THERE WAS ONE ON NOVEMBER 25TH, AND
16   THERE WAS A NEW ONE THAT CAME OUT ON THE 26TH.
17       Q.   AND THE NOVEMBER -- LET'S LOOK AT PUETT EXHIBIT
18   2.
19       A.   IS THIS THE CONTRACT AGAIN?
20       Q.   YES.
21       A.   THE ALLEGED CONTRACT.
22       Q.   IF YOU GO DOWN TO IIC AND IT ENDS WITH 52.
23       A.   YES.
24       Q.   TURN IF YOU WILL TO PAGE OR SECTION 1.7.
25       A.   YES.
```
                    SEIJAS COURT REPORTERS
                                                    45

```
 1       Q.   AND I'M LOOKING SPECIFICALLY AT THE PAGE MARKED
 2   IIC-00060.  DO YOU SEE THAT THERE?
 3       A.   YES.
 4       Q.   NOW, YOU PREVIOUSLY TESTIFIED THAT THIS MEANT OR
 5   THAT THESE SECTIONS IF THEY WERE REWORDED THEY MEANT
 6   NOTHING TO YOU BECAUSE THOSE WERE ALL ITEMS THAT YOU
 7   CONSIDERED EXCLUDED; IS THAT CORRECT?
 8       A.   YES.
 9       Q.   SO DID YOU BOTHER TO REVIEW THEM OR REVIEW THEM
10   CLOSELY WHEN THESE SPECIFICATIONS CAME OUT ON NOVEMBER 26,
11   2002?
12       A.   I JUST TESTIFIED THAT I READ THEM.
13       Q.   DID THEY MEAN ANYTHING TO YOU?
14       A.   I TESTIFIED THEY DIDN'T MEAN ANYTHING TO ME, NO.
15       Q.   THEY DID NOT.  OKAY.
16       A.   ONLY THE FACT THAT SOMEBODY ELSE WAS GOING TO
17   HAVE TO PERFORM THAT WORK BEFORE I COULD DO MINE.
18       Q.   WHAT WORK ARE YOU REFERRING TO?
19       A.   WELL, REMOVING ALL THE ANODE CABLES, REMOVING THE
20   ANODES THEMSELVES, REMOVING NONSTRUCTURAL STEEL AND TAKING
21   CARE OF DEFECTIVE WELDS.  SOMEBODY ELSE WAS SUPPOSED TO DO
22   THAT WORK.
23       Q.   AND AS FAR AS TAKING CARE OF THE NONDEFECTIVE
24   WELDS, WHAT DO YOU MEAN BY THAT?
25       A.   IT SAYS HERE -- IT SAYS A LOT ABOUT WELDS IN THIS
```
                    SEIJAS COURT REPORTERS
                                                    46

```
 1   IF YOU WANT ME TO READ IT TO YOU INTO THE RECORD.  IT ALSO
 2   TALKS ABOUT STRIPE COATING.  WE DELETED ALL OF THAT STUFF
 3   IN THE SPECIFICATION.
 4       Q.   YOU SAY REMOVING NONSTRUCTURAL STEEL.  THAT WAS
 5   SOMETHING THAT YOU WOULD CONSIDER TO BE EXCLUDED; IS THAT
 6   CORRECT?
 7       A.   I SPECIFICALLY EXCLUDED IT.
 8       Q.   AND THAT'S GOING TO BE REFLECTED IN THE CONTRACT
 9   BETWEEN YOU AND ABSOLUTE; IS THAT CORRECT?
10       A.   IT'S REFLECTED IN OUR PROPOSAL OR IN OUR SCOPE
11   LETTER.  THESE ITEMS OF 1.7 ALL THE WAY THROUGH TO 1.7.5,
12   ALL THAT WAS EXCLUDED IN OUR CONTRACT.
13       Q.   AND IT SAYS STRIPE COATING.  YOU SAID THAT YOU
14   WERE GOING TO -- YOU WERE NOT GOING TO BE PERFORMING STRIPE
15   COATING; IS THAT CORRECT?
16       A.   THAT'S CORRECT.  BECAUSE WITH THIS MATERIAL, YOU
17   CAN'T STRIPE COAT.  THAT WAS ALSO IN MIKE ANDERSON'S
18   DEPOSITION.  YOU JUST CAN'T STRIPE COAT WITH A MATERIAL
19   THAT GETS HARD IN 8 TO 10 SECONDS.  IT'S JUST -- IT'S AN
20   IMPOSSIBILITY.
21       Q.   WELL, I UNDERSTAND THAT YOU'RE LOOKING THROUGH
22   THIS THROUGH THE LENS OF LISTENING TO MR. ANDERSON'S
23   DEPOSITION.  AT THE TIME THAT YOU ENTERED INTO THIS
24   CONTRACT, DID YOU UNDERSTAND THAT YOU WOULD BE DOING OR
25   IMPERIAL WOULD BE DOING STRIPE COATING?
```
                    SEIJAS COURT REPORTERS
                                                    47

```
 1       A.   NO.  I WAS A SMART ENOUGH GUY BECAUSE I'VE BEEN
 2   TO ENOUGH OF THESE NACE CLASSES AND STUFF TO KNOW THAT WITH
 3   THIS MATERIAL, THE 1864 -- THIS IS AN OFFSHOOT OF THE
 4   ZEBRON MATERIAL.  YOU CAN'T STRIPE COAT WITH MATERIAL THAT
 5   CURES IN 8 TO 10 SECONDS.  IT'S AN IMPOSSIBILITY TO DO.  SO
 6   THAT'S WHY I WANTED ALL THAT STUFF DELETED.  WHEN THEY'RE
 7   ASKING ME TO DO IMPOSSIBLE THINGS, I SURE DIDN'T WANT TO
 8   GET INVOLVED WITH IT.
 9       Q.   DID YOU COMMUNICATE THAT TO ABSOLUTE?
10       A.   YES.
11       Q.   THAT THE STRIPE COATING WOULD BE IMPOSSIBLE UNDER
12   THIS CONTRACT?
13       A.   I DID NOT EXPRESS THAT TO THEM.  BUT I EXPRESSLY
14   PUT IT IN THE CONTRACT THAT WE WERE EXCLUDING ALL OF THIS
15   WORK -- 1.7 TO 1.7.5.
16       Q.   WHAT CONVERSATIONS, IF ANY, DID YOU HAVE WITH
17   ANYBODY AT ABSOLUTE REGARDING STRIPE COATING?
18       A.   I TOLD PETERSON SPECIFICALLY THAT THESE SECTIONS
19   I WANTED EXCLUDED FROM MY WORK, AND I ALSO THOUGHT IT WOULD
20   BE SMART ON THEIR PART IN THEIR EXCLUSIONS TO BRECHAN TO
21   NOT ONLY EXCLUDE THIS BUT ALSO EXCLUDE THE STUFF IN 3.2 I
22   BELIEVE IT WAS.  THERE WAS A BUNCH OF EXCLUSIONS THAT THEY
23   EXCLUDED IN THEIR CONTRACT WITH BRECHAN, AND I TOLD HIM IT
24   WOULD BE SMART ON HIS PART IF HE GOT THAT STUFF OUT OF HIS
25   CONTRACT.  WHEN YOU'RE DEALING WITH THE WELDS AND YOU'RE
```
                    SEIJAS COURT REPORTERS
                                                    48

```
 1  DEALING WITH ALL THESE OTHER THINGS. CATHODIC PROTECTION
 2  STUFF THAT WE'RE NOT FAMILIAR WITH, I DON'T WANT THEM IN MY
 3  CONTRACT. I EXCLUDE THEM. IT JUST CREATES PROBLEMS.
 4      Q.  WHAT ABOUT CAULKING? DID YOU PLAN ON DOING ANY
 5  CAULKING AS PART OF THIS CONTRACT?
 6      A.  YOU'LL SEE IN OUR SCOPE LETTER THAT -- I BELIEVE
 7  IT'S ITEM NO. 8 IN OUR SCOPE LETTER THAT SPECIFICALLY SAYS
 8  THAT WE'RE GOING TO CAULK STITCH WELDS.
 9      Q.  CAULK STITCH WELDS?
10      A.  YES.
11      Q.  AND A STITCH WELD IS A WELD WHERE THERE'S -- AS I
12  UNDERSTAND IT, IT'S JUST WELDED IN A PART. IT'S
13  METAL-METAL CONNECTION WHERE IT'S JUST WELDED IN A PART OF
14  THE WELD, AND THEN THERE'S METAL-TO-METAL CONNECTIONS WHERE
15  THERE IS NO WELD. IS THAT CORRECT?
16      A.  THAT'S CORRECT. AND THE ONLY PLACE YOU'RE GOING
17  TO FIND THAT ON THIS PROJECT IS ON THE UNISTRUTS.
18      Q.  THAT'S NONSTRUCTURAL STEEL WE'VE BEEN TALKING
19  ABOUT?
20      A.  IT'S A NONSTRUCTURAL BECAUSE IT'S JUST THERE FOR
21  ELECTRICAL, TO HOLD UP ELECTRICAL BOXES AND STUFF, AND IF
22  IT WAS ATTACHED TO THE STRUCTURE AND IT WAS A PIECE OF
23  UNISTRUT AND IT HAD A STITCH WELD, WE AGREED TO CAULK JUST
24  THOSE STITCH WELDS. NO OTHER WELDS, JUST STITCH WELDS, AND
25  THAT WAS SPECIFICALLY AT THE UNISTRUTS.
                                                    49

 1      Q.  WHAT ABOUT THESE CONCRETE FORM SUPPORTS?
 2      A.  DIDN'T AGREE TO CAULK THOSE. ONLY STITCH WELDS
 3  AT THE UNISTRUTS.
 4      Q.  WERE THERE STITCH WELDS ON THE CONCRETE FORM
 5  SUPPORTS?
 6      A.  NO. THOSE WERE A CONTINUOUS WELD AT ONE TIME,
 7  BUT THOSE PIECES WERE CORRODED SO BADLY BEHIND THEM THAT
 8  THEY HAD RUPTURED THE WELDS BECAUSE OF THE POOR QUALITY
 9  WELDS, AND THEY WERE NOT COMPLETELY TIGHT AGAINST THE
10  STEEL.
11      Q.  LET'S LOOK AT THIS HANDWRITTEN SCHEDULE OF
12  VALUES. WELL, FIRST OF ALL, HOW MUCH CAULKING AT THE
13  UNISTRUTS DID IMPERIAL ANTICIPATE DOING AS PART OF THIS
14  CONTRACT?
15      A.  INCIDENTAL. VERY SMALL. WE BOUGHT TWO BOXES OF
16  SIKKAFLEX CAULK FOR THIS JOB, AND THERE'S ABOUT 8 TUBES. I
17  THINK THEY'RE 16 OUNCE TUBES OF CAULKING IN EACH ONE OF
18  THOSE BOXES. IT WAS A MINUSCULE AMOUNT.
19      Q.  LET'S LOOK AT THE SCHEDULE OF VALUES MARKED AS
20  PUETT EXHIBIT NO. 38. THE HANDWRITTEN ONE.
21      MR. DICKSON:  WHAT ARE YOU REFERRING TO?
22      MR. NIST:  EXHIBIT 38.
23      THE WITNESS:  YES.
24      Q.  BY MR. NIST:  AND THERE'S AN ITEM 7 ON THIS
25  SCHEDULE OF VALUES FOR CAULKING; IS THAT RIGHT?
                                                    50

 1      A.  YES.
 2      Q.  AND IT LOOKS LIKE THERE'S ROUGHLY $30,000 IN THIS
 3  SCHEDULE OF VALUE FOR CAULKING; IS THAT CORRECT?
 4      A.  YES.
 5      Q.  SO THIS MINUSCULE AMOUNT OF CAULKING THAT YOU
 6  WERE REFERRING TO IS THAT WHAT THIS $30,000 IS MEANT TO
 7  REFLECT?
 8      A.  YES.
 9          THIS IS FOR JUST FOR BILLING PURPOSES. YOU
10  UNDERSTAND THAT; RIGHT?
11      Q.  WELL, WHY DON'T YOU TESTIFY, AND TELL ME IF IT'S
12  JUST FOR BILLING PURPOSES.
13      A.  THIS IS JUST FOR BILLING PURPOSES. THESE ARE
14  NUMBERS THAT ARE PLUGGED IN, AND LIKE I SAY, THERE'S NOT A
15  HELL OF A LOT OF LOGIC PUT TO IT. YOU JUST PUT NUMBERS IN
16  THOSE PLACES.
17      Q.  NOW, ON THE SPECIFICATION DATED JUNE 21, 2001,
18  THERE IS NO -- YOU SAID THAT YOU REVIEWED THAT; RIGHT?
19      A.  THE LAST TIME I REVIEWED IT WAS PROBABLY IN 2002,
20  ABOUT FOUR YEARS AGO.
21      Q.  AND DO YOU REMEMBER IF THERE WAS ANY PROVISION IN
22  THAT SPECIFICATION FOR THE CONTRACTOR TO PERFORM CAULKING?
23      A.  I DON'T REMEMBER THAT.
24      Q.  DO YOU REMEMBER IN THE JUNE 21, 2001
25  SPECIFICATION WHETHER IT DEALS WITH MISSING OR STITCH WELDS
                                                    51

 1  AND WHETHER THOSE AREAS SHOULD BE SEAL WELDED?
 2      A.  I BELIEVE ON THAT STICKY THAT WE WERE JUST
 3  LOOKING AT IN THAT SECTION OF 1.7 THROUGH 1.75 THERE IS
 4  SOMETHING IN THERE ABOUT DEFECTIVE WELDS, WEEPING WELDS.
 5  THERE'S DIFFERING THINGS THAT TALK ABOUT WELDS.
 6      Q.  AND DOESN'T IT -- DIDN'T IT AT THE TIME SAY THAT
 7  ANY OF THESE PROBLEMS WOULD BE CORRECTED BY THE USE OF SEAL
 8  WELDING?
 9      A.  I DON'T REMEMBER THAT. I REMEMBER THAT FROM SOME
10  OTHER PEOPLE'S TESTIMONY, YES.
11      Q.  AND YOU SAID THAT YOU'VE LISTENED TO OTHER
12  PEOPLE'S TESTIMONY. YOU HEARD MIKE ANDERSON SAY THAT HE
13  SOLVED PROBLEMS WITH -- HIS PROBLEMS WITH THE WELD THROUGH
14  THE USE OF CAULKING; IS THAT CORRECT?
15      A.  YES.
16      Q.  AND WAS THAT COMMUNICATED TO YOU AT ANY TIME AND
17  THAT'S WHY YOU DECIDED TO USE CAULKING RATHER THAN SOME
18  OTHER PROPOSED SOLUTION?
19      A.  ABSOLUTELY NOT.
20      Q.  WHAT IS THE PURPOSE OF STRIPE COATING?
21      A.  WELL, TYPICALLY --
22      MR. MARSTON:  OBJECTION. LACKS FOUNDATION.
23      THE WITNESS:  THEY TYPICALLY -- MARSTON, YOU'VE GOT TO
24  SPEAK UP A LITTLE BIT. WE CAN BARELY HEAR YOU.
25      MR. MARSTON:  OKAY. I SAID OBJECTION. LACK OF
                                                    52

 1  FOUNDATION.
 2      THE WITNESS:  STRIPE COATING IS PRIMARILY USED ON FUEL
 3  OIL TANKS OR WELDS, AND TYPICALLY YOU WILL USE A MATERIAL
 4  THAT HAS A LOWER VISCOSITY, THAT HAS A LONGER POT LIFE
 5  WHERE YOU CAN TAKE A BRUSH, AND YOU CAN WORK THE COATING
 6  INTO THE WELD.
 7      Q.  BY MR. NIST:  WHAT'S THE PURPOSE OF THAT?
 8      A.  WELL, IN CASE YOU'VE GOT -- YOU KNOW, IF YOU'VE
 9  GOT SOME BAD WELDS, AND IT'S A HARD PLACE TO COAT. I MEAN
10  EVEN IF YOU DIDN'T HAVE A BAD WELD, EVEN IF IT WAS A GOOD
11  WELD YOU WOULD STILL WANT TO MAKE SURE YOU GOT A GOOD
12  COATING ON THOSE WELDS.
13      Q.  CAN YOU EXPLAIN TO ME WHAT DO YOU MEAN -- HOW
14  DOES HAVING A BAD WELD, HOW DOES THE STRIPE COATING AFFECT
15  THAT?
16      A.  WELL, IT CAN HELP FILL IN IF THERE'S ANY VOIDS OR
17  ANYTHING.
18      Q.  WHAT DOES THAT GET FOR YOU AT THE END OF THE DAY?
19      MR. MARSTON:  OBJECTION. VAGUE.
20      THE WITNESS:  IF YOU HAD A LOW VISCOSITY MATERIAL THAT
21  YOU COULD WORK INTO THE WELD, IT COULD AVOID SOME OF THE
22  HOLIDAYS THAT MAY SHOW UP WHEN I DO THE HIGH VOLTAGE
23  HOLIDAY TESTING.
24      Q.  AND YOU SAID THEY'RE TRICKY AREAS
25  TO COAT. WHY IS THAT? WELDS ARE.
                                                    53

 1      A.  I THINK I SAID THEY'RE HARD AREAS. IRREGARDLESS,
 2  THEY'RE JUST A HARD AREA TO COAT BECAUSE THEY'RE AN
 3  IRREGULAR AREA. THEY'RE NOT SMOOTH LIKE A PIECE OF STEEL
 4  IS.
 5      Q.  SO AGAIN IT REDUCES THE NUMBER OF HOLIDAYS IN THE
 6  FINAL COAT IF YOU PERFORM A STRIPE COATING FUNCTION?
 7      A.  IT CAN.
 8      MR. MARSTON:  OBJECTION. LACK OF FOUNDATION.
 9      Q.  BY MR. NIST:  IS THAT WHAT YOU UNDERSTOOD THE
10  STRIPE COATING SPECIFICATION AT 1.3.6 TO DO WHEN YOU
11  ENTERED INTO THE CONTRACT?
12      MR. MARSTON:  SAME OBJECTION.
13      THE WITNESS:  NO. BECAUSE AS I'VE TESTIFIED TO AND
14  OTHER PEOPLE HAVE TESTIFIED TO THE FACT THAT WITH THIS
15  MATERIAL WHETHER IT'S THE REPAIR KITS OF THE 1842 OR THE
16  1864, I MEAN IT'S AN IMPOSSIBILITY. THE STUFF CURES OUT
17  IN -- THE 1864 PROBABLY IN 8 TO 10 SECONDS, AND THE POT
18  LIFE ON THE 1842, THE PATCH MATERIAL IS PROBABLY 25 OR 30
19  SECONDS. IT'S JUST -- IT'S AN IMPOSSIBILITY TO WORK IT
20  INTO ANYTHING.
21      Q.  BY MR. NIST:  SO ESSENTIALLY WHAT I HEAR YOU
22  SAYING IS THAT YOU EXCLUDED STRIPE COATING BECAUSE YOU
23  THOUGHT IT WAS IMPOSSIBLE, AND THAT YOUR UNDERSTANDING THEN
24  WAS THAT NOBODY WAS GOING TO BE DOING STRIPE COATING
25  BECAUSE IT WAS IMPOSSIBLE?
                                                    54
```

SEIJAS COURT REPORTERS

1  MR. MARSTON: OBJECTION. MISSTATES THE WITNESS'
2  TESTIMONY AND ASKED AND ANSWERED.
3  THE WITNESS: NO, NO.
4  Q.  BY MR. NIST: WHAT EXPECTATION, IF ANY, DID YOU
5  HAVE ABOUT WHO WAS GOING TO DO STRIPE COATING OR HOW THE
6  STRIPE COATING WOULD BE PERFORMED?
7  MR. MARSTON: OBJECTION. COMPOUND.
8  Q.  BY MR. NIST: GO AHEAD AND ANSWER.
9  A.  I EXPECTED SOMEBODY ELSE TO DO THAT FUNCTION. I
10  EXPECTED SOMEBODY ELSE TO HAVE THAT AS A HOLD POINT SINCE
11  IT WAS IN THE SPEC. SOMEBODY SHOULD HAVE HAD IT AS A HOLD
12  POINT AND HAD OTHER PEOPLE DOING THESE OTHER OPERATIONS
13  BEFORE WE GOT THERE. THAT'S WHAT I ANTICIPATED.
14  Q.  DID IMPERIAL DO ANY STRIPE COATING ON THIS
15  PROJECT?
16  A.  WE WERE FORCED TO MAKE A FEEBLE ATTEMPT ON WELDS,
17  AND IN SOME AREAS, AS I TESTIFIED EARLIER TODAY, SOME OF
18  THOSE AREAS WERE ATTEMPTED TO BE TOUCHED UP OR STRIPE
19  COATED WITH THIS FAST CURE MATERIAL FOUR TO SIX TIMES, AND
20  THIS STUFF ENDS UP JUST BEING UGLY.
21  Q.  WELL, LET ME SAY -- LET'S JUST GET BACK TO
22  IMPERIAL'S FEEBLE ATTEMPT. YOU SAID YOU WOULD GO BACK
23  AND -- JUST WALK ME THROUGH THE PROCESS HERE. YOU WOULD
24  BLAST OFF THE ORIGINAL COATING; IS THAT CORRECT?
25  A.  YES.

                                           55
           SEIJAS COURT REPORTERS

1  Q.  AND THEN WOULD YOU DO THE STRIPE COATING ON THE
2  WELDED AREAS?
3  A.  NO.
4  Q.  WHAT WOULD YOU DO NEXT?
5  A.  WELL, THE FIRST OPERATION WAS TO ULTRA HIGH
6  PRESSURE WATER BLAST TO REMOVE THE COATING. THEN WE
7  ABRASIVE BLASTED AND THEN WE APPLIED THE COATING. SPRAY
8  APPLIED.
9  Q.  SPRAY APPLIED THE COATING?
10  A.  YES.
11  Q.  AND THEN YOU SAID THAT YOU HAD SOME FEEBLE
12  ATTEMPTS TO STRIPE COAT, AND WHEN WAS THAT IN THIS PROCESS?
13  A.  WELL, THE STRIPE COATING BEGAN WHEN WE WENT OUT
14  TO HOLIDAY TEST AFTER WE COATED, AND TYPICALLY ON ALL THE
15  WELDS, ESPECIALLY AT THE SPLICE PLATES, WE HAD A BAZILLION
16  HOLIDAYS. AND THEN WE CAME BACK, AND WE TRIED TO TOUCH
17  THOSE AREAS UP. THAT'S WHAT I'M REFERRING TO WE TRIED TO
18  STRIPE COAT THOSE WELDS IN THOSE AREAS WHERE THEY JEEPED
19  OUT.
20  Q.  SO YOU WOULD -- SO THE SPRAY COATING WOULD BE
21  APPLIED. IT WOULD BE HOLIDAY TESTED. IT WOULD SHOW
22  HOLIDAYS, AND THEN IMPERIAL WOULD GO BACK AND ATTEMPT TO
23  STRIPE COAT THE AREA; IS THAT CORRECT?
24  A.  YES.
25  MR. MARSTON: OBJECTION. ASKED AND ANSWERED.

                                           56
           SEIJAS COURT REPORTERS

1  Q.  BY MR. NIST: ARE YOU AWARE THAT ABSOLUTE HAS
2  CONTENDED THAT AT SOME POINT COFFMAN WAIVED A STRIPE
3  COATING REQUIREMENT BEFORE THE SPRAY PAINTING, SPRAY
4  COATING WAS APPLIED?
5  MR. STOETZER: OBJECT TO THE FORM OF THE QUESTION.
6  THE WITNESS: ARE YOU TELLING ME THAT?
7  Q.  BY MR. NIST: I'M ASKING IF YOU'RE AWARE OF
8  THAT CONTENTION.
9  A.  I HAVEN'T HEARD THAT ONE.
10  Q.  WAS THERE EVER A REQUIREMENT THAT THERE -- DID
11  MR. HARDENBERGH EVER EXPLAIN TO YOU THAT HE EXPECTED THE
12  STRIPE COATING TO GO ON BEFORE THE SPRAY COATING WAS
13  APPLIED?
14  A.  JERRY TOLD US THAT IT WOULD BE VERY DIFFICULT TO
15  TRY TO PUT THE STRIPE COATING ON BEFORE.
16  Q.  WHY IS THAT?
17  A.  WELL, BECAUSE OF THE TIDES. BECAUSE OF THE
18  ENVIRONMENT. WE HAD A SHORT WINDOW TO GET THE COATING ON
19  THE SURFACE AFTER WE BLASTED IT. I MEAN, TO STOP AND GO
20  BACK AND TRY TO STRIPE COAT WITH SOMETHING THAT'S
21  IMPOSSIBLE TO STRIPE COAT WITH, IT'S TOTALLY IMPRACTICAL.
22  YOU DON'T HAVE TIME FOR THAT.
23  Q.  SO THE PROPOSED FIX, AS I UNDERSTAND IT, WAS TO
24  PUT ON THE STRIPE COAT AFTER THE SPRAY COATING WAS APPLIED?
25  A.  WELL, YOU KNOW, I ASKED JERRY SPECIFICALLY IF WE

                                           57
           SEIJAS COURT REPORTERS

1  COULD GO AHEAD AND CAULK THOSE WELDS IN SEVERAL
2  CONVERSATIONS. BECAUSE IT WOULD HAVE BEEN EASY TO GO
3  AROUND AND CAULK THEN AND THEN GO AHEAD AND COAT OVER THE
4  TOP OF IT, AND JERRY REFUSED THAT. JERRY ALSO REFUSED
5  AFTER WE GOT DONE SPRAY APPLYING AND WE FOUND THESE
6  HOLIDAYS TO CAULK OVER THE TOP OF THE COATING.
7  MR. STOETZER: MOVE TO STRIKE AS NONRESPONSIVE.
8  Q.  BY MR. NIST: LET'S LOOK AGAIN AT EXHIBIT NO. 2,
9  AND LOOK AT THE PAGE MARKED IIC-51, AND THIS APPEARS TO BE
10  AN E-MAIL STRING THAT'S EVENTUALLY FORWARDED TO YOU AND
11  INCORPORATED INTO YOUR CONTRACTS. DO YOU REMEMBER IF THERE
12  WAS SUCH AN E-MAIL STRING INCORPORATED IN YOUR CONTRACT?
13  A.  WHERE DOES IT SHOW IT CAME TO US?
14  Q.  WHY DON'T YOU LOOK AT THE PAGE MARKED IIC-46. IT
15  SAYS IT'S FROM MATT HOLMSTROM TO JASON PETERSON AND CC TOM
16  PUETT. AND IT APPEARS TO BE ATTACHED AS ATTACHMENT 5 TO
17  THE CONTRACT BETWEEN IMPERIAL AND ABSOLUTE ENVIRONMENTAL
18  SERVICES.
19  ARE YOU WITH ME SO FAR?
20  A.  WELL, I AM EXCEPT I DON'T SEE -- I SEE THAT WE
21  GOT COPIED. I DON'T KNOW THAT WE GOT A COPY.
22  Q.  DO YOU KNOW WHETHER THERE WAS AN E-MAIL STRING
23  ATTACHED TO THE CONTRACT BETWEEN IMPERIAL AND ABSOLUTE?
24  A.  I DON'T REMEMBER THAT.
25  Q.  LET'S LOOK AT THE PAGE MARKED IIC-48.

                                           58
           SEIJAS COURT REPORTERS

1  A.  OKAY.
2  Q.  THERE'S A REFERENCE HERE THAT DAN STEARS HAS
3  MODIFIED THE SPECIFICATIONS AND TO GET RID OF EXTRANEOUS
4  INFORMATION AND TO INCORPORATE ANY LESSONS LEARNED. DO YOU
5  REMEMBER SEEING THAT E-MAIL BEFORE?
6  A.  I DON'T REMEMBER SEEING THIS ONE. I DON'T SEE MY
7  NAME ON THE DOCUMENT OR IMPERIAL OR -- I DON'T SEE IT.
8  Q.  ARE YOU DENYING THAT THERE WAS AN E-MAIL ATTACHED
9  TO THE CONTRACT BETWEEN IMPERIAL AND ABSOLUTE THAT -- DO
10  YOU DENY THAT THIS E-MAIL WAS ATTACHED TO THE CONTRACT
11  BETWEEN IMPERIAL AND ABSOLUTE FOR THIS CONTRACT?
12  A.  I'M NOT DENYING IT.
13  Q.  YOU CAN'T SAY ONE WAY OR THE OTHER?
14  A.  THAT'S A FACT.
15  Q.  I TAKE IT THEN YOU DON'T HAVE ANY UNDERSTANDING
16  OR HAVE NEVER PONDERED WHAT THE LESSONS LEARNED THAT IS
17  REFERRED TO IN THIS E-MAIL?
18  A.  I DON'T HAVE A CLUE.
19  Q.  YOU SAID THAT YOU REVIEWED THE FINAL SET OF
20  SPECIFICATIONS THAT CAME OUT; IS THAT CORRECT?
21  A.  YES.
22  Q.  AND ALSO WERE YOU THE PERSON RESPONSIBLE FOR
23  REVIEWING IT ON BEHALF OF ABSOLUTE?
24  MR. MARSTON: COULD YOU RESTATE THAT QUESTION OR HAVE
25  THE COURT REPORTER READ IT BACK.

                                           59
           SEIJAS COURT REPORTERS

1  (THE QUESTION WAS READ.)
2  MR. MARSTON: I DIDN'T HEAR THE QUESTION.
3  MR. NIST: I'LL STRIKE IT AND ASK ANOTHER QUESTION.
4  Q.  WHAT EFFORTS ARE YOU AWARE OF THAT ABSOLUTE TOOK
5  IN REVIEWING THE FINAL SPECIFICATIONS DATED NOVEMBER 26,
6  2002?
7  A.  I DON'T KNOW.
8  Q.  FROM YOUR COMMUNICATIONS WITH THEM, DID IT APPEAR
9  THAT THEY WERE RELYING ON YOU TO INTERPRET THE
10  SPECIFICATIONS FOR THEM?
11  A.  I TESTIFIED EARLIER THAT WHEN I READ THE
12  SPECIFICATIONS, I SPECIFICALLY TOLD THEM THERE WAS ITEMS
13  THAT THEY SHOULD EXCLUDE IN THIS CONTRACT, AND THEY TOOK MY
14  GOOD ADVICE, AND THEY DID THAT. WE EXCLUDED ITEMS, AND
15  ALSO ITEMS I TOLD THEM THEY SHOULD EXCLUDE. I KNOW THEY
16  EXCLUDED SOME ITEMS IN 3.2, AND MINE WAS IN 1.7. I KNOW
17  THEY EXCLUDED THOSE. SO, YEAH, THEY LOOKED FOR ME. THEY
18  LOOKED TO ME FOR HELP ON THIS THING, SPECIFICALLY ON ITEMS
19  THAT NEITHER I NOR THEM HAD A CLUE ON WHAT TO DO. CP
20  ELECTRICAL STUFF AND ALL THAT I DON'T WANT NOTHING TO DO
21  WITH IT.
22  MR. MARSTON: I'LL OBJECT AS SPECULATIVE. LACK OF
23  FOUNDATION.
24  Q.  BY MR. NIST: YOU TESTIFIED A COUPLE TIMES ABOUT
25  THE CONTRACT BETWEEN ABSOLUTE AND BRECHAN, AND SO I TAKE IT

                                           60
           SEIJAS COURT REPORTERS

1              REPORTER'S CERTIFICATE

2

3         I, SHERYL WILLIAMS, CSR NO. 7453, CERTIFIED

4    SHORTHAND REPORTER IN AND FOR THE STATE OF CALIFORNIA DO

5    HEREBY CERTIFY:

6         THAT PRIOR TO BEING EXAMINED THE WITNESS

7    NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY SWORN

8    TO TESTIFY THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

9    THE TRUTH;

10        THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN

11   SHORTHAND AT THE TIME AND PLACE NAMED HEREIN AND WAS

12   THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION AND

13   SUPERVISION;

14        THAT THE FOREGOING DEPOSITION IS A FULL, TRUE

15   AND CORRECT TRANSCRIPTION OF MY ORIGINAL SHORTHAND

16   NOTES.

17        I FURTHER CERTIFY THAT I HAVE NO INTEREST IN

18   THE OUTCOME OF THE ACTION.

19        WITNESS MY HAND THIS ___24TH___ DAY OF

20   _____MAY_____, _2006___ .

21

22        _Sheryl Williams_

23   SHERYL WILLIAMS, CSR NO. 7453

24   CERTIFIED SHORTHAND REPORTER IN

25   AND FOR THE STATE OF CALIFORNIA