# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL
SERVICES, INC., An Alaska
corporation,

    Plaintiff,

vs.

FORREST J. McKINLEY and "JANE
DOE" McKinley, et al.,

    Defendants.

_____

Case No A03-0199 Civil (RRB)


DEPOSITION OF JASON PETERSON

Taken March 31, 2006
Commencing at 9:00 a.m.

Volume I - Pages 1 - 238, inclusive


Taken by the Defendant
at
PERKINS COIE
1029 W. Third Av., Suite 300
Anchorage, AK  99501


Reported by:
Susan J. Warnick, RPR

EXHIBIT K

Page 78

1  Q  That's a metal-to-metal connection, too?
2  A  I believe it's a metal-to-metal connection, yes.
3  Q  What other metal-to-metal connections were there?
4  A  I don't -- I mean, up at the top of the dock, I mean,
5  I know there was concrete there. I don't know if the --
6  if there was metal behind the concrete there or not.
7  But -- well, cathodic protection would be a metal-to-metal
8  -- you know, metal wire connected to the piles.
9  Q  Any others?
10 A  Not that I can think of off the top of my head. I
11 mean, there's various different bracings there.
12     MR. ELISON: I'll record an objection just to
13 the extent that it's outside of the witness's personal
14 knowledge.
15     THE WITNESS: None that I can think of
16 BY MR. KREGER:
17 Q  So the -- we're still on Section 1.7.3.9. And this
18 was the -- this was the specification set that you
19 submitted your first proposal to in October, correct?
20 A  That is correct.
21     MR. ELISON: Objection. Foundation.
22 BY MR. KREGER:
23 Q  So it says, "The contractor or applicator will seal
24 weld prior to surface preparation as required in 3.2.1.2."
25     Do you see that?

Page 79

1  A  I do see that.
2  Q  Let's take a look at 3.2.1.2 and see what that says.
3  See where it says, "Grind off the welds on the structure,"
4  under 3.2.1.2(c)?
5  A  I see that.
6  Q  Was that part of your initial scope of work, then,
7  when you bid this work?
8      MR. ELISON: Objection. Foundation.
9      THE WITNESS: Well, to the best of my knowledge
10 at this point, without being, you know, back involved with
11 it directly, I can't say whether I know for sure whether
12 it was part of a --
13 BY MR. KREGER:
14 Q  Did you exclude that in your letter?
15 A  Grinding of the welds on the structure?
16 Q  Yes.
17 A  I don't think I specifically -- I did put some
18 exclusions in. Whether that one was exactly included in
19 -- I listed some item numbers, it may have been. But I
20 can't say for sure without reviewing to tell you if it was
21 part of that.
22 Q  Well, this activity doesn't involve welding; it
23 involves grinding welds, right?
24 A  Grinding welds, right.
25 Q  Do you recall excluding grinding from your scope of

Page 80

1  work?
2      MR. ELISON: Objection. The document will speak
3  for itself.
4      THE WITNESS: I do not recall excluding
5  grinding.
6  BY MR. KREGER:
7  Q  And grinding was in Mr. Puett's schedule of values in
8  the schedule, wasn't it?
9      MR. ELISON: Objection. Foundation.
10     THE WITNESS: I could not tell you that without
11 looking at the spec.
12 BY MR. KREGER:
13 Q  We'll come to that later on. Remind me to ask the
14 question of you.
15 A  Okay.
16 Q  You don't remember there being grinding in Mr.
17 Puett's scope of work and the schedule of values?
18 A  Well, no, I can't remember if it was in Tom's exact
19 scope of work.
20 Q  Was it in the -- between Absolute and Imperial, was
21 it in one of those two parties' scope of work to do
22 grinding?
23     MR. ELISON: Objection. Foundation.
24     THE WITNESS: I could not tell you exactly if it
25 was or not.

Page 81

1  BY MR. KREGER:
2  Q  Now, in the June 21st specification, we talked a
3  little bit about the paragraph that says, "The applicator
4  shall inspect the wharf prior to the bid to determine
5  existing conditions." Do you remember that?
6  A  Yes, I do.
7  Q  Was Absolute relying on the owner or on the prime
8  contractor to describe the existing conditions on the
9  dock?
10     MR. ELISON: Object to the form of the question.
11     THE WITNESS: I would say, if they had the best
12 knowledge of the conditions on the dock, that they would
13 describe those things to us.
14 BY MR. KREGER:
15 Q  Now, when they said "determine existing conditions,"
16 what does that mean to you?
17     MR. ELISON: Same objection.
18     THE WITNESS: That means to me that -- that you
19 should probably go and look at it and look at the existing
20 conditions. That's what it means to me.
21 BY MR. KREGER:
22 Q  When it says down below, "The following descriptions
23 are provided as information only and shall not be utilized
24 as basis for a bid," what did you understand that to mean?
25     MR. ELISON: Same objection.

Page 98

1  corner?
2  A  Yeah, that is our -- yeah, 4491. Yes, that is our
3  fax number.
4  Q  Do you remember receiving something like this from
5  Mr. Puett at or about this time?
6  A  I can't recall for sure whether I remember receiving
7  it from him at that time.
8  Q  Your subcontract price to Brechan is $995,850, right?
9     MR. ELISON: Objection. Foundation.
10    THE WITNESS: I believe that is correct. I
11 haven't just reviewed it, but yeah, somewhere
12 approximately around there.
13 BY MR. KREGER:
14 Q  What was the work or profit or overhead markup that
15 -- what was the value of those three items that Absolute
16 added to Mr. Puett's subcontract price of 772,123?
17    MR. ELISON: Objection. Compound.
18    THE WITNESS: I believe it was to the tune of
19 220-some thousand dollars.
20 BY MR. KREGER:
21 Q  And what -- did you take part in the estimating of
22 the money that was in the tune for Absolute, the 225,000
23 A  No, I did not.
24 Q  Who did that?
25 A  Mr. Olson.

Page 99

1  Q  Did you assist Mr. Olson in determining what work
2  Absolute was going to do that Imperial wasn't going to
3  do that Imperial and Absolute together were going to do in
4  this subcontract?
5     MR. ELISON: Object to the form of the question.
6     THE WITNESS: I don't believe I assisted in
7  deciding what work we were going to do, other than Mr.
8  Olson telling me what our responsibilities were going to
9  be on the project.
10 BY MR. KREGER:
11 Q  What did he tell you your responsibilities were going
12 to be?
13 A  My recollection is that we are going to provide
14 vehicles, some sponge blast unit, the UHP. I think -- I
15 think -- again, I'm trying to recollect. I think we were
16 taking care of the housing. And we were to help them with
17 -- when they needed to set up containments and move the
18 containments along, we would provide a few people, two to
19 three, generally speaking, to assist IIC in the building
20 and moving of the tarps and containment.
21 Q  Did you help Mr. Olson do a takeoff or a bottom's up
22 estimate to determine how much those activities were
23 likely to cost Absolute?
24 A  No, I did not.
25 Q  Did anyone at Absolute do that kind of an estimate,

Page 100

1  to your knowledge?
2  A  For coming up with that 220,000?
3  Q  Yes.
4  A  Not to my knowledge.
5  Q  Have you seen a document -- you know what a bid work
6  sheet looks like; don't you?
7  A  Yes, I do.
8  Q  Have you seen a bid work sheet that Absolute did to
9  build this additional number for the work that it was
10 going to do?
11 A  I did not.
12 Q  Have you ever seen one?
13 A  For this project?
14 Q  Yes, sir.
15 A  Not that I recall. That I've seen the breakdown, is
16 what we call it.
17 Q  Right. For the breakdown, do you know what, if
18 anything, was in the breakdown for overhead for Absolute?
19 A  Well, since I can't recall that I've ever seen this
20 particular breakdown, generally we do put our marks on
21 projects. I mean, that's how we -- profit and overhead.
22 Q  But since you haven't seen this breakdown, you don't
23 know what the markup for overhead or profit was on this
24 project?
25 A  I do not know.

Page 101

1     MR. KREGER: We have reached the noon hour. Why
2  don't we take our lunch break here and we'll start again
3  at 1:15. Thank you, sir.
4     (Lunch recess taken.)
5     EXAMINATION (Resumed)
6  BY MR. KREGER:
7  Q  Mr. Peterson, did you have occasion to review the
8  estimate that Imperial prepared for its scope of work?
9  A  I might have, but I can't tell you for certain. I
10 may have to see it and see if I recognize it.
11 Q  Let's take a quick look at it and see.
12    MR. KREGER: Mark that next, please.
13    (Exhibit 11 marked.)
14 BY MR. KREGER:
15 Q  Three-page document. Take a look at it and tell me
16 if you've seen this before.
17 A  I believe I have seen this before. But I can't tell
18 you exactly when -- when I saw it.
19 Q  Did you see it in connection with the litigation or
20 did you see it around the time it was prepared when the
21 project was under way?
22 A  I think I saw it sometime after.
23 Q  After --
24 A  Just in the project documents, while the project was
25 going on.

Page 106

1  question.
2      THE WITNESS: I don't know that -- exactly
3  whether they were planning to go in and tweak the
4  specification. This refers to about relaxing of some
5  containment issues. And someone, you know, I guess in
6  here makes mention that -- you know, I guess it was from
7  Dan -- that he said, I agree the spec could be modified to
8  clarify a few issues for the new coating contractor. But
9  I don't know if that necessarily meant any -- did happen
10 or were going to happen.
11 BY MR. KREGER:
12 Q  Okay. What about where -- the e-mail at the bottom
13 of the first page, where Matt is writing to Andy Brown and
14 he says, "We're slowly working toward refining the Phase 2
15 coating spec." Do you see that?
16 A  I see that.
17 Q  Wouldn't that indicate to the reader that there's
18 some refining of the specification that's going to be used
19 for coating 2 under way?
20     MR. ELISON: Object to the form of the question.
21     THE WITNESS: Well, it appears that it could
22 apply or, you know, imply that.
23 BY MR. KREGER:
24 Q  Do you remember reading that at the time?
25 A  I don't particularly remember but, if I did receive

Page 107

1  this, which it appears I did, and I read it, I wouldn't
2  have -- knowing myself, I would have waited to see. Okay,
3  they're talking about refining the spec. I'm not going
4  to, you know, jump up in the air and get excited about it.
5  I'll wait and see if they are thinking about doing it.
6  And, again, I'm talking about knowing myself, what I would
7  have thought. I would have said, well, let's wait and see
8  what happens, you know? I mean --
9  Q  And then reading down on the second page, there's a
10 discussion where Mr. Holmstrom says to Mr. Stears, quote,
11 "I'm interested in reviewing the coating spec section
12 09967, to ensure we clear up the confusion regarding the
13 seal weld issue." Do you see that?
14 A  Yes, I see that.
15 Q  And when you read that, what did you think he was
16 talking about?
17 A  Well, I didn't know for sure because, again, at that
18 time I wasn't sure what the seal weld issue was. If I
19 remember correctly, all along I excluded this work to
20 Brechan, and so he was -- you know -- but I know those two
21 had the whole -- you know, they're responsible for all the
22 work that was going to happen, the cathodic protection
23 redoing. And so I thought that had nothing really to do
24 with me, as I excluded that work.
25 Q  Did you ask Matt what the seal weld issue was that --

Page 108

1  A  Yes, I did.
2  Q  And what did he say?
3  A  Well --
4  Q  When did you ask him this?
5  A  Well, I excluded it to him. I don't know if I
6  actually asked Matt what it was or just stated to Matt
7  that I wasn't including that in our work; I was excluding
8  that to Brechan; I wouldn't have anything to do with it.
9      At some point -- and again, I don't remember the
10 exact point in time, but Matt got back to me and said, oh,
11 that seal welding thing, that means stripe coating or
12 caulking over welds.
13     And at that point I'm pretty sure I let
14 Mr. Puett know, oh, the seal welding that we're looking
15 at, they want, you know, these welds either stripe coat or
16 caulked, and made sure Tom was aware of that. And at that
17 time Tom indicated to me that he had that covered.
18     (Exhibit 13 marked.)
19 BY MR. KREGER:
20 Q  So when you asked Mr. Puett about having the seal
21 weld issue covered with either stripe coating or caulking,
22 do you recall what exactly he said, how he had that
23 covered?
24 A  I believe -- well, given -- I wasn't all familiar
25 with all the terms. I know what caulking is. And the

Page 109

1  stripe coating was told me -- I don't know if Matt told me
2  or Tom told me that you -- you know, you stripe coat it
3  either with something -- I don't know if it was the same
4  coating or a different material -- either prior to the
5  actual coating or after. I kind of thought it went on
6  before, but as we saw yesterday, I guess it can be applied
7  after. But my understanding was additional coating that,
8  before you sprayed on the final coating, you -- stripe
9  coat, you just either paint it on with a brush or
10 something, on the welds.
11 Q  Right. And the purpose of that is what?
12 A  I guess would be to put an extra layer on the welds
13 or whatever.
14 Q  And what would be the advantage of putting that extra
15 layer on the welds?
16 A  I guess the advantage would be, it would -- by doing
17 it with a brush or something, it would -- if there's a
18 problem in that weld area, it would fill in gaps and, you
19 know, help to keep it from sparking out or holiday --
20 testing, whatever you want to call it.
21 Q  So on this exhibit here, another e-mail string -- one
22 of my favorites actually. The, "What do you means,"
23 caught my attention here. You're a literary genius. I
24 like that.
25     Let's go down to the bottom here, the last

Case 3:03-cv-00199-RRB   Document 225-11   Filed 08/04/2006   Page 6 of 7
Case No. A03-0199 (RRB)                           Jason Peterson

## Page 118

1  Q   And while we're looking at that, let's have another
2  exhibit marked. Just keep that open for me, if you would,
3  please, Mr. Peterson.
4        MR. KREGER: Will you mark this next.
5        (Exhibit 14 marked.)
6  BY MR. KREGER:
7  Q   So let's authenticate this next exhibit. This is
8  your handwriting at the top, "To Matt From Jason," I take
9  it?
10 A   Yes, that is.
11 Q   And that's your handwriting there where it says,
12 "will perform" written in?
13 A   Yes.
14 Q   It looks as though you sent Matt an e-mail where you
15 make some reference to this section that we have turned
16 open; that namely is Section 1.7.3.6, right, on page nine?
17 A   Yes, it does make reference to that.
18 Q   So am -- is it fair to say that you and Matt
19 communicated regarding who's going to be doing what part
20 of Section 1.7.3.6?
21 A   Yes.
22 Q   You said, "AESI will perform the painting-related
23 work such as the weld cleaning and the stripe coat portion
24 of 1.7.3.6," right?
25 A   That's correct.

## Page 119

1  Q   The specification says, "Abandoned nonstructural
2  members may be removed to increase productivity."
3        See that?
4  A   Yes.
5  Q   That's painting-related work, right?
6  A   Well, structural members is -- where are you reading
7  this again at?
8  Q   Towards the second sentence from the bottom, at
9  1.7.3.6. It's talking about, "Abandoned nonstructural
10 members may be removed to increase productivity."
11 A   Right.
12 Q   It's going to increase the productivity of the
13 painting work by -- instead of doing something, you're
14 just going to take this off, correct?
15       MR. ELISON: Object to the form.
16       THE WITNESS: It appears that that's what it
17 would refer to, yes.
18 BY MR. KREGER:
19 Q   Now, in your e-mail to Mr. Holmstrom, you indicate
20 that, "AESI will perform d., f., and g.," and that would
21 be of Section 3.2.1.2. And you say you're going to -- as
22 to Section 3.2.1.3, you're going to seal weld -- you will
23 caulk (seal) the welds, but not seal weld, right?
24 A   We will caulk the welds, which refers to what they
25 were saying the seal welding was, was how I --

## Page 120

1  Q   What was the purpose of caulking the welds?
2  A   Well, at the time, I was still pretty ignorant of a
3  lot of things on the project, especially -- at that point
4  I didn't really know what the holiday testing was. Again,
5  I was relying on Mr. Puett who, you know, this is his
6  field.
7        So my understanding was that for some reason
8  these welds needed additional coating or caulking put on
9  them prior to the coating. That was my understanding. I
10 didn't know an exact reason why, though, at that point.
11 Q   How many feet of welds did you plan on caulking?
12 A   I left that up to Tom.
13 Q   How many feet did you put into the Means data for
14 caulking?
15 A   I can't tell you -- I can't tell you off the top of
16 my head.
17 Q   Do you have a round number?
18 A   No. I mean -- I mean, there's a lot of numbers on
19 the Means sheet. I can't remember exactly how many. I
20 can't even remember if I actually had a line for it. I
21 may have; I may not have. The Means sometime works that
22 way. You don't have particular lines. As you notice in
23 that past e-mail, we were trying to search for a
24 cofferdams line.
25 Q   Yeah.

## Page 121

1  A   So I don't even know if I actually put one in there,
2  but we might.
3  Q   Let's take a look.
4        MR. KREGER: Let's have these marked as one
5  exhibit, please.
6        (Exhibit 15 marked.)
7  BY MR. KREGER:
8  Q   A two-page exhibit here. Let's start with the second
9  one. Did I give him my --
10 A   That is definitely my writing.
11 Q   The handwritten stuff?
12 A   Yes. I recognize that.
13 Q   Call out the Bates number that you're looking at,
14 please, if you would.
15 A   1338.
16 Q   How about 1339; that's your handwriting, too?
17 A   That is my handwriting also.
18 Q   Go to line five, please, on 1339?
19 A   Okay. I see it, yes.
20 Q   Would you read that into the record, please.
21 A   Well, it looks like there's a --
22 Q   Since this your handwriting --
23 A   Yes.
24 Q   -- I'll trust you on that.
25 A   It looks like there's a minus there, but I don't know

31 (Pages 118 to 121)
Midnight Sun Court Reporters    (907) 258-7100

```
 1                    REPORTER'S CERTIFICATE

 2            I, SUSAN J. WARNICK, RPR, and Notary Public in

 3   and for the State of Alaska do hereby certify:

 4            That the witness in the foregoing proceedings was

 5   duly sworn; that the proceedings were then taken before me

 6   at the time and place herein set forth; that the testimony

 7   and proceedings were reported stenographically by me and

 8   later transcribed under my direction by computer

 9   transcription; that the foregoing is a true record of the

10   testimony and proceedings taken at that time; and that I

11   am not a party to nor have I any interest in the outcome

12   of the action herein contained; that signature was

13   requested.

14            IN WITNESS WHEREOF, I have hereunto subscribed my

15   hand and affixed my seal this 21st day of April,

16   2006.

17

18                              _____
                                SUSAN J. WARNICK,
19                              Registered Professional Reporter
                                Notary Public for Alaska
20

21   My Commission Expires:  April 8, 2010

22

23

24

25
```