# EXHIBIT M

Case 3:03-cv-00199-RRB   Document 225-13   Filed 08/04/2006   Page 1 of 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL SERVICES,  )
INC., an Alaskan Corporation,     )
                                  )
        Plaintiff,                )
                                  )
    vs.                           ) Case No. A-03-0199
                                  ) Civil (RRB)
FORREST J. McKINLEY and           )
"JANE DOE" McKINLEY, and the      )
marital community property        )
composed thereof d/b/a "Imperial  )
Industrial Coatings" and EMERCO,  )
INC., etc.,                       )
                                  )
        Defendants.                )
EMERCO, INC., a California        )
Corporation d/b/a Imperial        )
Industrial Coatings, etc.,        )
                                  )
        Counter-Claimant/          )
        Third Party Claimant,      )
                                  )
    vs.                           )
                                  )
ABSOLUTE ENVIRONMENTAL SERVICES,  )
INC., an Alaskan Corporation,     )
et al.,                           )
                                  )
        Cross-Defendants/          )
        Third-Party Defendants.    )

DEPOSITION UPON ORAL EXAMINATION

OF

L. SKIP VERNON

Taken at 1900 Fifth Avenue
Seattle, Washington

DATE TAKEN:     FEBRUARY 11, 2005

EXHIBIT

M

4d457464-67cb-41b1-82bc-593b57bbdff8

Page 118

1 environment defects will show evidence of the defect by
2 visible corrosion in a short period of time?
3     MR. DICKSON: Vague as to "short."
4  A. It can.
5  Q. How long do you think it would take before
6 someone could opine that the coating was properly
7 applied?
8  A. It depends on in which context you are talking
9 about. Clearly, the warranty is a year.
10    I think arguably that if you come back and note
11 defects at the end of the year, by contract you have
12 defined those as defects and the coating was not properly
13 applied. So anything less than a year would be out of --
14 would certainly be premature.
15    After that point in time, you are on the
16 slippery slope, two years, three years. My experience
17 indicates that if there are significant problems with the
18 application that they will typically manifest themselves
19 within the first few years.
20    The problem with this particular system and
21 that conclusion is that you can have corrosion that
22 begins under a film that is this thick and continue to
23 progress, sometimes not -- and sometimes not be visible.
24    So I hesitate to say at three years you could
25 deem the structure would serve for 22 more.

Page 119

1  Q. Did you become aware that on this project the
2 process by Mr. Hardenbergh was basically that if there
3 was any condition that he observed that he thought was
4 noncompliance that he insisted that that area be repaired
5 in fairly short order?
6  A. I don't know what "in fairly short order" is.
7 It's my understanding that Mr. Hardenbergh was pursuing
8 his duties diligently and if he saw things that were
9 noncompliant, then he certainly raised those issues, and
10 I feel he did a very reasonable job of documenting what
11 happened on the project.
12  Q. Would you agree that it would be a more
13 appropriate schedule, assuming that the contractor is
14 observed to be in substantial compliance with the
15 specifications, to allow the contractor to paint out the
16 work and then come back and repair defects at the end as
17 they appear?
18     MR. DICKSON: Foundation.
19     MR. MARSTON: Objection; relevance.
20     MR. DICKSON: And ambiguous as to "more
21 appropriate."
22  A. No, and that's especially important on a
23 project like this, because the contractor had already had
24 extreme difficulty rigging the project, getting back into
25 and getting to these areas to even access them for

Page 120

1 coating in the first place.
2    It would make no sense to dismantle all of that
3 rigging and containment, move on and especially have to
4 come back in more inclement weather, potentially more
5 inclement weather and have to try to make repairs and
6 have to rebuild all of that containment, rebuild the
7 rigging and reinstall all your ambient controls.
8  Q. Would it be a good procedure as to each of
9 those setups with the containment that if the contractor
10 is in substantial compliance, that as to that containment
11 area he should first complete the painting and then go
12 back and at that point repair any defects noted?
13     THE WITNESS: Could you reread the question,
14 please.
15     (Record read.)
16  A. I'm not sure I understand the question. Are
17 you talking about finishing the complete area inside a
18 containment?
19  Q. Yes.
20  A. That's difficult to answer without actually
21 being there at the time, because I'm not sure what the
22 consequences of moving past a given defect would be in
23 terms of potential time or ramifications.
24    Secondly, I'm not sure about the meaning of the
25 term "substantial compliance." That is subjective to the

Page 121

1 extent that what may be substantial compliance by a
2 contractor could be considered a gross deviation by a
3 qualified coating inspector.
4  Q. Did you ever discuss with Mr. Hardenbergh what
5 his philosophy was in terms of when in relation to the
6 coating work he was generally requiring repairs to be
7 made?
8  A. I did not ask Mr. Hardenbergh that specific
9 question. It was my understanding that the way it
10 happened on this project was that Mr. Hardenbergh would
11 be notified that the work was complete or at least
12 completed to a particular hold point and then he would be
13 asked to review the work that had been completed for
14 compliance, but ultimately it was Imperial's job to make
15 sure it was compliant before they called Mr. Hardenbergh.
16  Q. Would you agree that it is disruptive to the
17 painting work that in a particular day when the painting
18 is going on to stop that operation to move to a repair
19 location?
20  A. I could not answer that question out of
21 context. There may be occasions where that would be
22 disruptive. There may be occasions where that would be
23 completely legitimate, especially with the tidal concerns
24 on this project.
25  Q. Is it your opinion that at the conclusion of

31 (Pages 118 to 121)

Page 142

1        A F F I D A V I T
2
3
4   STATE OF NEW MEXICO  )
5                       ) ss
6   COUNTY OF BERNALILLO )
7
8        I have read my within deposition, and the
9   same is true and accurate, save and except for changes
10  and/or corrections, if any, as indicated by me on the
11  "CORRECTIONS" flyleaf page hereof.
12
13
14
15            L. SKIP VERNON
16
17
18
19        SUBSCRIBED AND SWORN TO before me this
20        day of     , 2005.
21
22
23        NOTARY PUBLIC in and for the
24        State of Mexico,
25        residing at           .

Page 143

1        C E R T I F I C A T E
2
3   STATE OF WASHINGTON  )
                         ) ss
4   COUNTY OF KING       )
5
6        I, JOLENE C. HANECA, a Certified Shorthand Reporter
7   and Notary Public in and for the State of Washington, do
8   hereby certify that the foregoing transcript of the
9   deposition of L. SKIP VERNON, having been duly sworn, on
10  FEBRUARY 11, 2005, is true and accurate to the best of my
11  knowledge, skill and ability.
12       IN WITNESS WHEREOF, I have hereunto set my hand and
13  seal this 24TH day of FEBRUARY, 2005.
14
15
16
              JOLENE C. HANECA, RPR, CCR
17
18  My commission expires:
    March 28, 2006
19
20
21
22
23
24
25

37 (Pages 142 to 143)

Buell Realtime Reporting, LLC
(206) 287-9066

4d457464-67cb-41b1-82bc-593b57bbdff8