Terry R. Marston, *pro hac vice,* terry@mhf-law.com
Jami K. Elison, *pro hac vice,* jamie@mhf-law.com
Jesse P. Elison, *pro hac vice,* jessee@mhf-law.com
MARSTON HEFFERNAN FOREMAN, PLLC
16880 N.E. 79th Street
Redmond, Washington 98052
(425) 861-5700

Lawrence A. Pederson
PAUL J. NANGLE & ASSOCIATES
Kerry Building
101 Christensen Drive
Anchorage, Alaska 99501
Telephone: (907) 274-8866

Attorney for Plaintiff ABSOLUTE ENVIRONMENTAL SERVICES, INC.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>FORREST J. MCKINLEY, an individual, d/b/a "Imperial Industrial Coatings" and EMERCO, INC., a California Corporation, d/b/a Imperial Industrial Coatings, BRECHAN ENTERPRISES, INC., an Alaska corporation; and SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation.<br><br>Defendants. | Case No.: A03-0199CV (RRB)<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT TO DISMISS CLAIM OF GOODS SOLD AND DELIVERED** |
| EMERCO, INC., a California corporation d/b/a Imperial Industrial Coatings, and the States for Use and Benefit of EMERCO, INC.,<br><br>Counterclaimant/Third-party Claimant,<br><br>v.<br><br>ABSOLUTE ENVIRONMENTAL SERVICES INC., an Alaska corporation, et al.,<br><br>Cross-defendants/Third-party Defendants. | |

| | |
|---|---|
| 1 | THE UNITED STATES OF AMERICA *for the use and benefit of* ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, )<br>)<br>)<br>)<br>) |
| 2 | |
| 3 | |
| 4 | Plaintiff, )<br>)<br>) |
| | vs. |
| 5 | )<br>) |
| 6 | SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation. )<br>)<br>) |
| 7 | Defendants. )<br>) |
| 8 | |
| 9 | BRECHAN ENTERPRISES, INC., an Alaska corporation, )<br>)<br>) |
| 10 | Counterclaim Plaintiff, )<br>) |
| 11 | vs. )<br>) |
| 12 | ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, )<br>)<br>) |
| 13 | Counterclaim Defendant. ) |
| 14 | BRECHAN ENTERPRISES, INC., an Alaska corporation, )<br>) |
| 15 | )<br>) |
| 16 | Third-Party Plaintiff, )<br>) |
| | vs. |
| 17 | COFFMAN ENGINEERS, INC, a Washington Corporation. )<br>)<br>) |
| 18 | |
| 19 | Third-Party Defendant. )<br>) |
| 20 | ABSOLUTE ENVIRONMENTAL SERVICES INC., an Alaska Corporation, )<br>)<br>) |
| 21 | Plaintiff/Cross-claimant, )<br>) |
| 22 | vs. )<br>) |
| 23 | COFFMAN ENGINEERS, INC, a Washington Corporation. )<br>)<br>) |
| 24 | Third-Party Defendant. ) |
| 25 | |
| 26 | |

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT TO DISMISS CLAIM OF
GOODS SOLD AND DELIVERED
Case No. A03-0199CV (RRB) -- 2

## I. RELIEF REQUESTED

Plaintiff, Absolute Environmental Services, Inc. ("Absolute") respectfully moves the Court for and order of summary judgment dismissing the "goods sold and delivered" counter-claim of Emerco, Inc.[1] or, failing that, an order capping the claim of Emerco, Inc. for the alleged "sale" of equipment to a maximum amount of $78,959.50.

## II. INTRODUCTION

The claim of "goods sold and delivered" does not provide a basis for Emerco's alleged damages. This is because (1) there is no proof that Emerco either owned or possessed the authority to sell equipment; (2) the elements of a theory of contract implied in law are absent; and (3) Emerco improperly seeks legal damages and not the value of the equipment. Therefore, summary judgment dismissing the claim is proper.

## III. RELEVANT MATERIAL FACTS

About December 18, 2002 Absolute entered into a subcontract with Brechan Enterprises, Inc. ("Brechan") to perform work on a United States Coast Guard construction project known as Cargo Wharf Pile Coating, Phase II on Kodiak Island. The terms of the subcontract called for Absolute to perform services related to the removal and replacement of protective coatings on Wharf Pilings at the Coast Guard facility. To accomplish this portion of the work, Absolute

---

[1] Plaintiff Absolute Environmental Services, Inc., subcontracted a portion of its work on the Kodiak Cargo Wharf project to "Imperial Industrial Coatings," a coating subcontractor. The subcontract did not identify whether or not "Imperial Industrial Coatings" was a sole proprietorship or a corporation. Immediately after "Imperial" declared it had terminated its subcontract with Absolute, it sued Absolute in California.

In the California suit, the caption identified Imperial as "Imperial Industrial Coatings, Inc., a California corporation." This was the first notice Absolute had that McKinley would be claiming that Absolute had subcontracted with a corporation, rather than him. Absolute researched filings in the State of California to determine whether there was a corporation named, "Imperial Industrial Coatings," but could find none. Absolute did ultimately locate a county filing that identified "Imperial Industrial Coatings" as a d/b/a for a corporation named Emerco, Inc. The corporation was owned by Forrest J. McKinley.

Absolute obtained the dismissal of the California suit without prejudice on grounds of forum non conveniens and then filed this lawsuit in Alaska. Absolute named Forrest J. McKinley and Emerco, Inc., in the alternative, as defendants. During the course of discovery, Absolute would object to questions that assumed that Emerco, Inc. was Absolute's subcontractor; likewise, counsel for McKinley and Emerco, Inc. would object to questions that assumed that McKinley was Absolute's subcontractor. Rather than be perpetually objecting to such characterizations throughout discovery, the parties reached an accommodation where neither McKinley nor Emerco, Inc. was mentioned. Instead, the parties agreed to refer to Absolute's subcontractor as "Imperial" and reserve the dispute over the true identity of the contractor to the time of trial. For this reason, the Court will usually see in discovery documents references to McKinley and/or Emerco, Inc. identified in the non-confrontational form of simply "Imperial." That convention will be followed here unless expressly stated otherwise.

subcontracted with McKinley d/b/a Imperial Industrial Coatings to perform the required removal and reapplication of new coatings.[2]

Absolute provided Imperial with plans and specifications for the project. About January 31, 2003, Imperial entered into a written subcontract with Absolute which was dated December 18, 2002. The subcontract price between Absolute and Imperial was $772,123 for the completion of all work required under the subcontract.[3]

Imperial, as the coatings applicator, was required to be certified as an applicator of the material it was using to coat the pilings on the cargo wharf. Under the specifications, Imperial had to provide "documentation of Applicator's qualifications, *manufacturer's certification to apply the product*, and successful application of the product on similar projects."[4] Approximately two months into the project, Imperial was decertified by the coatings manufacturer, Special Polymer Coating USA, Inc., ("SPC"), which cited material violations of its mandatory application procedures for Imperial's decertification. SPC decertified Imperial on August 5, 2003 stating:

1. Imperial Industrial Coatings failed to follow SPC Applications Specifications.
2. Reports provided by Engineering showed an increasing problem with poor workmanship.
3. Sending SPC Products to an independent lab without notification.
4. On site tampering of products, i.e. thinning of product with solvent.
5. On site inspection by SPC technician provided confirmation of all above statements and called for immediate de-certification.[5]

Upon learning of Imperial's decertification, Absolute issued a cure notice directing Imperial to obtain recertification and, once doing so, to resume work. Absolute notified Imperial that

[i]t was [Absolute's] understanding that without the certification [Imperial] was incapable of performing [Imperial's] work. This [was] obviously and extremely serious situation and, unless corrected immediately, would constitute a material breach of the contract between [Imperial] and [Absolute]. * * * [Imperial was] directed to contact [Absolute] within twenty-four hours and provide [Absolute]

---

[2] Olson's Decl., Exhibit 1, Absolute's Complaint Against Emerco at ¶¶ 7 & 10.
[3] Id. at ¶¶ 11 & 12.
[4] Olson Decl. Exhibt 2, Specifications (emphasis added).
[5] Olson Decl., Exhibit 3, Decert. ltr.

with [Imperial's] immediate advice as to whether and how [it] intended to cure this breach.[6]

Pending Imperial's obtaining re-certification, Absolute denied it access to the site.

Despite providing Absolute with written assurance of its intent to cure its certification problem, Imperial abandoned the project by issuing a unilateral termination of its subcontract with Absolute. Ignoring its decertification and abandonment of the project, Imperial claimed that Absolute had breached the subcontract (though never identifying how and never providing any opportunity to cure if a breach existed).[7]

Within days after abandoning the subcontract, leaving more than half of the work incomplete, Imperial transmitted a letter to Absolute ordering it to turn over specified materials and equipment it left on the project. The letter recited, without Absolute's consent, that Absolute would be deemed to have purchased them for the sum of $518,320.

> You are hereby given until August 8, 2003, by 5:00 p.m., PDT, to notify this office of your decision as to whether you will return the property. If you do not notify this office by this deadline, then by operation of law you shall be deemed to have elected to purchase each of the above listed items at the prices stated.[8]

Absolute neither returned the materials (that were needed to complete the project) nor agreed to pay the exaggerated prices Imperial quoted. The prices were "grossly overstated," and Absolute was going to arrange a return of materials that were not going to be used to finish the project.[9]

Absolute brought suit in this Court against Forrest McKinley, Emerco, Inc. and Imperial for the cost of correcting and completing Imperial's abandoned work.

After Absolute served its Complaint for breach of contract, Imperial asserted several counterclaims, among them, a claim that Absolute had purchased the materials left behind for $518,320. Specifically, Imperial alleged

> [b]y operation of law, IMPERIAL sold and delivered to ABSOLUTE the goods and property referred to in [the counterclaim], and ABSOLUTE agreed to pay IMPERIAL the property and goods at the prices set forth in the August 7, 2003 letter, which prices total $518, 320.00. For purposes of asserting this claim in this

---

[6] Olson Decl., Exhibit 4, Notice to Cure ltr.
[7] Olson Decl., Exhibit 5, Term ltr.
[8] Olson Decl., Exhibit 6, Notice ltr.

GOODS SOLD AND DELIVERED
Case No. A03-0199CV (RRB) -- 5

Counter-Claim <u>IMPERIAL waives the tort of conversion</u> and elects to proceed instead on a contract implied by law on the part of ABSOLUTE to purchase the property and goods taken by ABSOLUTE on August 7, 2003, for a total price of $518,320.00."[10]

*Emphasis added.*

In the course of discovery, Absolute submitted document requests to Emerco for all documents establishing its proof of ownership of the materials, as well as for tax returns with depreciation schedules for any equipment Emerco owned. The only evidence Imperial offered to support ownership (or the value) of the materials are purchase orders Imperial itself.[11] These purchase orders are devoid of any acknowledgement by the original vendors of any sale to Emerco or the actual cost of the goods. Imperial's tax returns do not show the equipment Emerco claims to own on its depreciation schedules.[13] In short, Emerco has no evidence that (a) it owns the equipment its purporting to have sold, (b) that it had authority to sell the goods, or (c) that Emerco's attorneys had the authority to sell the goods on anyone else's behalf.

In the deposition of Forrest McKinley, the sole shareholder of Emerco, the topic of ownership and proof of ownership was covered. McKinley was asked who purchased the equipment. McKinley answered that <u>he</u> did.[14] He was not forthcoming on how the purchases were done or whether any records of ownership exist.[15] When asked if Imperial had sold the equipment to Absolute after Imperial had terminated the contract, McKinley stated the contention was "False."[16] He explained by stating "Nothing was sold to Absolute... Absolute kept the equipment... It was wrongful."[17] Asked if he wanted the equipment back, McKinely responded, "In its entirety, in the shape it was in, yes."[18] McKinley then claimed that the equipment was

---

[9] Olson Decl., Exhibit 7, Absolute's response to Conversion
[10] Olson Decl., Exhibit 8, Emerco, Inc.'s Answer to the First Amended Complaint and Counterclaim at ¶38.
[11] Olson Decl, Exhibit 9, Example Purchase Orders Received in Discovery.
[13] ¶Olson Decl., Exhibit 10, Tax Returns.
[14] Olson Decl., Exhibit 11, excerpts from McKinley Deposition Vol. 2.
[15] Olson Decl., Exhibit 11
[16] Olson Decl., Exhibit 11
[17] Olson Decl., Exhibit 11
[18] Olson Decl., Exhibit 11
[18a]. Counsel for Absolute informed counsel for McKinley and Emerco that the equipment was available to them any time they cared to pick it up. No action has yet been taken on the offer, which remains open to this day.

owned by Emerco, Inc.; however, he was unable to offer any facts to support his claim that Emerco (and not he personally or one of his other corporations) was the equipment's true owner.:

```
                              329
 4  Q.  Do you have any interest in getting the
 5  property back?
 6  A.  In its entirety, in the shape it was in, yes.
 7  Q.  Is that because you believe that it's yours?
 8  A.  I believe it belongs to Emerco.
 9  Q.  What makes you believe it belongs to Emerco?
10  MR. DUFFY:  Objection; calling for a legal
11  conclusion, but you can answer.
12  A.  I believe it belongs to Emerco.
13  Q.  On what facts do you base your belief that the
14  equipment retained by Absolute after your termination of
15  the contract belongs to Emerco?
16  MR. DUFFY:  Objection; calls for a legal
17  conclusion, but you can answer.
18  A.  I just believe that.
19  Q.  Did Emerco buy it?
20  A.  Yes.
          *       *       *
22  Q.  May I conclude then that you don't have any
23  recall at this time of exactly how you made the equipment
24  purchases?
25  A.  Yes.
                              332
 1  Q.  What records would you look at in order to
 2  answer those questions?
 3  A.  Various records.
 4  Q.  Can you list the ones for me that you can think
 5  of?
 6  A.  Not at this time.
 7  Q.  Is that because you can't think of any at this
 8  time?
 9  A.  My memory doesn't go that clear that far back.
10  Q.  Do you know whether you received any bill of
11  sale for the equipment you purchased?
12  A.  No, not at this time.
13  Q.  Do you know whether you received any invoice or
14  statement from the vendors from whom you purchased the
15  equipment?
16  A.  Not at this time.
17  Q.  Do you recall when you purchased the equipment?
18  A.  Not at this time.
19  Q.  Do you recall what year you purchased the
20  equipment?
21  A.  No.
22  Q.  Absolute requested that you produce
23  documentation establishing the value of that equipment,
24  and the only thing we received is Imperial Industrial
25  Coatings' purchase orders.
```

```
                          333
 1  Are you aware of any other documentation that
 2  exists to establish what that equipment was purchased for
 3  or what its value is?
 4  A.  No.[19]
```

In an earlier deposition, McKinley specifically stated that he retained legal representation for Imperial and not for him personally:

```
129
25  Q.  AT THE TIME THAT YOU FIRST RETAINED THE LAW FIRM

                          130
 1  OF MONTELEONE & MCCRORY, WERE YOU RETAINING IT ON BEHALF OF
 2  EMERCO INCORPORATED?
 3     A.  IMPERIAL INDUSTRIAL COATINGS.
 4     Q.  THAT IS NOT A DISTINCT ENTITY, AND THERE'S SOME
 5  DISPUTE WITH RESPECT TO WHAT IS MEANT BY IMPERIAL
 6  INDUSTRIAL COATINGS.  SO LET'S TALK ABOUT THE CORPORATE
 7  ENTITIES OR YOU PERSONALLY.  AT THE TIME THAT YOU RETAINED
 8  THE FIRM OF MONTELEONE & MCCRORY, WERE YOU RETAINING IT ON
 9  BEHALF OF EMERCO INCORPORATED?
10     A.  YES.
11     Q.  AT THAT TIME HAD YOU RETAINED THEM TO REPRESENT
12  YOU PERSONALLY?
13     A.  NO.
            *     *     *
23     Q.  YOU ARE THE SOLE DIRECTOR ON THE BOARD OF
24  DIRECTORS OF EMERCO, INCORPORATED?
25     A.  YES, SIR.

                          131
 1     Q.  YOU ARE THE PRESIDENT OF EMERCO INCORPORATED?
 2     A.  YES, SIR.
 3     Q.  AND AS SUCH, YOU ARE AN EMPLOYEE OF EMERCO
 4  INCORPORATED IRRESPECTIVE OF WHETHER YOU RECEIVE ANY
 5  COMPENSATION FROM THAT COMPANY; CORRECT?
 6     A.  YES, SIR.
 7     Q.  AND IN EACH OF THOSE CAPACITIES, OR AT LEAST AS A
 8  CAPACITY AS A DIRECTOR AND PRESIDENT OF THE COMPANY, YOU
 9  ARE REPRESENTING THE INTERESTS OF EMERCO, CORRECT?
10     A.  YES.
11     Q.  AND WHEN YOU RETAINED THE SERVICES OF MONTELEONE
12  & MCCRORY, YOU RETAINED THEM IN YOUR CAPACITY AS THE
13  PRESIDENT OF EMERCO, CORRECT?
14     A.  CORRECT.
15     Q.  AND THAT'S THE ONLY CAPACITY IN WHICH YOU
16  RETAINED THEM?  THEY WEREN'T REPRESENTING YOU PERSONALLY?
17     A.  NO.  THEY WERE REPRESENTING THE CORPORATION.[20]
```

---

[19] Olson Decl., Exhibit 11
[20] Olson Decl., Exhibit 12, excerpts from McKinley Deposition Vol. 1.

If Mr. McKinley personally owns the equipment, then Emerco, Inc. does not. Emerco, Inc. brought the counterclaim.[21] In his Answer to Plaintiff's First Interrogatory, Mr. McKinley confirmed that he had not brought the counterclaim on his behalf personally: "Mr. McKinley does not personally assert a claim in this action."[22]

The documents produced to date demonstrate that Emerco, Inc. never owned the property in question. David Olson (the president of Absolute) sued Ralph T. ("Tom") Puett, Imperial's project manager, for the repayment of a personal loan of $6,000 in the District Court for the State of Alaska. Puett counterclaimed alleging conversion of two pieces of equipment seeking $4781 Absolute had retained after Imperial terminated their contract. Puett testified on direct examination at trial that some of the testing equipment retained by Absolute included his personal items: a "Tinker Raiser" and an "adhesion tester."[23] Among other defenses to the claim, Olson pointed out to the Court that Emerco, Inc. was claiming to be the owner of these devices, not Mr. Puett. He pointed out that Emerco, Inc. was relying on its own purchase orders exclusively as documentation of its ownership. Puett rebutted this evidence by testifying under oath that "items were put on (purchase orders) for tracking purposes only."[24] Puett testified that his items were "never sold to Imperial."[25] The assertion that purchase orders were for "tracking purposes" and not proof of ownership was repeated throughout the trial.[26] The state district court ruled the testing equipment was Mr. Puett's and offset Mr. Olson's judgment by this amount.[28]

Absolute hired an independent appraiser to determine the actual fair market value of the materials. The figure he arrived at was $78,959.50, not the $518,320.00 claimed by Emerco.[29] The expert report was provided on November 24, 2004. Emerco, Inc. has never offered a rebuttal appraisal or valuation, Emerco never asked to depos this expert.

---

[21] Olson Decl., Exhibit 7, Emerco's Answer to First Amended Complaint and Counterclaim.
[22] Olson Decl, Exhibit 13, written response of Defendant Forrest J. McKinley to Plaintiff's First Set of Interrogatories to Defendant Forrest J. McKinley and "Jane Doe" McKinely, D/B/A Emerco Industrial Coatings.
[23] Olson Decl. Exhibit 14, Summary of Proceedings Day 1 of Olson vs Puett, p. 8 (10:49:26 AM).
[24] Olson Decl. Exhibit 14, Summary of Proceedings Day 1, p. 8 (10:54:04 AM).
[25] Olson Decl. Exhibit 14, Summary of Proceedings Day 1, p. 8 (10:56:53 AM).
[26] Olson Decl, Exhibit 14, Summary of Proceedings Day 1, p. 8 (11:01:57 AM), p. 9 (11:33:21 AM), p. 10 (11:45:22 AM); Olson Decl, Exhibit 17, Summary of Proceedings Day 2: p. 2 (8:42:22 AM), p. 3 (9:03:43).
[28] Olson Decl., Exhibit 15, Findings of Fact, Conclusions of Law and Judgment, Ex., p. 2.
[29] Olson Decl., Exhibit 16, Tope expert report.

Absolute has offered, through its counsel, on multiple occasions to return the equipment since completing the Cargo Wharf project, but Emerco, Inc., through its counsel, has rejected the return of the equipment.[30] Absolute is still willing to return the equipment. In accordance with documents produced during discovery and Mr. McKinley's deposition, the only possible owner, Mr. McKinley, wants the equipment returned because it was never sold to Absolute.

## IV.  ISSUES PRESENTED

The following issues are raised by Absolute's motion for partial summary judgment:

A. A contract implied in law requires the retention of a benefit by a defendant without payment for its value to be inequitable. The counterclaimant Imperial was contractually obligated to perform coating maintenance and failed to perform. Absolute retained Imperial's equipment to perform Imperial's contractual obligation which was equitable under the circumstances. This Court can determine whether counterclaimant meets the elements of a contract implied in law (quasi-contract) justifying pursuit of an equitable remedy.

B. The equitable theory of "goods sold and delivered" is grounds for the equitable remedy of the fair market value. Imperial improperly alleged the legal damages of an account stated and not the value of the equipment. This Court can determine whether Imperial's "goods sold and delivered" claim affords the legal remedy that Imperial has requested.

C. Ownership of "goods sold and delivered" is required for this Court to order an equitable remedy. Counterclaimants have provided no proof of ownership. This Court can determine whether Imperial can prove it owned the goods in question in order to receive a remedy under the equitable theory it alleges.

## V.  ARGUMENT

Imperial has alleged an equitable theory and improperly sought a legal remedy. Notwithstanding, Imperial is not entitled to an equitable remedy either because the actions of Absolute under the circumstances were equitable and Imperial has not proved it owned the equipment allegedly sold and delivered.

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

---

[30] See Olson Decl. at ¶ 19.

The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. Catrett*, 477 U.S. 317, 323 (1986). Regarding the choice of law, "To determine the applicable law, a federal district court is to apply the choice of law rules of the state in which it sits." *Federal Ins. Co. v. Scarsella Brothers, Inc.*, 931 F.2d 599, 602 (9th Cir. 1991). There are no genuine issues of material fact in this case as demonstrated by the pleadings and documents produced during discovery.

The following are key <u>undisputed</u> <u>facts</u>. Absolute kept equipment to finish the project Imperial was contractually obligated to finish. In Imperial's attempt to void the cost of its breach of contract with Absolute, Imperial has maintained it sold equipment to Absolute at a stated price completely divorced from the value of the equipment. The Counterclaimants, Imperial, Inc. and Imperial have not produced any proof of ownership of the equipment, but rather have produced conflicting claims of ownership during discovery in this federal case between Absolute and Imperial/Imperial/McKinley and at trial in the related state case between David Olson, individually, and Tom Puett, individually, over some of the same equipment.

Because there are no genuine issues of material fact and Absolute is entitled to a judgment as a matter of law, this court should grant this summary judgment.

**A. IMPERIAL'S CLAIM OF "GOODS SOLD AND DELIVERED" FAILS TO SATISFY THE ELEMENTS OF ANY RECOGNIZED THEORY IN ALASKA**

**1. All Equitable Claims Are Treated The Same In Alaska.**

It is well understood that, "A contract implied in law is an equitable principle that is totally unrelated to traditional concepts of contract law." *Mueller v. The City of Highland Park*, 166 Ill.App.3d 114, 120 (1988). The Alaska Supreme Court has "made it clear that we will 'generally treat actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law and quantum meruit as essentially the same.'" *Old Harbor Native Corporation v. Afognak Joint Venture*, 30 P.3d 101, 107 (Alaska 2001) (quoting *Parliament v. Yukon Flats Sch.*

*Dist.*, 760 P.2d 513, 518 n. 15 (Alaska 1988). In its counterclaim, Emerco acknowledges that its claim is based "on a contract implied by law."[31]

A claim for goods sold and delivered is an obsolete concept now absorbed under the modern concept of a contract implied in law. Interpreting Alaska law, the Ninth Circuit described the claim of goods sold and delivered as follows:

> At common law, under the older rule, the result of waiving the tort in a case of conversion and sale was a right to recover the amount received upon the sale, as for money had and received, but later cases hold that the action can be maintained as for *goods sold and delivered* without awaiting sale, or even after sale, and the measure of recovery is the <u>market value of the property</u>. [Citation omitted.] In a case where the owner waives the tort, if he accepts the tort-feasor as his agent both in the taking and in the sale, he would necessarily be limited in his recovery to the money received by the agent. There seems, however, to be no good reason why the owner cannot waive the tortuous taking and ignore the subsequent sale and recover the <u>reasonable</u> value of the property taken as for *goods sold and delivered*.

<u>Felder v. Reeth</u>, 34 F.2d 744, 746-47 (9th Cir. 1929) (citations omitted) (emphasis added). The cause of action of goods sold and delivered is derived from the common-law action of *assumpsit*.

> The common counts in *assumpsit* are merely abbreviated and stereotyped statements that the defendant is indebted to the plaintiff for a variety of commonly recurring reasons such as…goods sold and delivered. They are allegations of indebtedness, and the action may be properly described as *indebitatus assumpsit*…. The common counts could be used for the express enforcement of express promises if they were such as to create a money debt, *as well as for the enforcement of implied promises and quasi contracts*. [Emphasis in original.]

<u>H. Russel Taylor's Fire Prevention Service, Inc v. Coca-Cola Bottling Corp.</u>, 99 Cal.App.3d 711, 717-18 (1979) (citing 1 Corbin, Contracts (1st ed. 1963) sec. 20, p. 51). The California court provided an analysis of "the historical evolution of *indebitatus assumpsit*." Id. at 718. Quoting from various sources the court explained the development of *assumpsit* as a basis for an equitable remedy in the following representative excerpts: "This kind of equitable action to recover back

---

[31] Olson Decl., Exhibit.8, Emerco, Inc.'s Answer to the First Amended Complaint and Counterclaim at ¶38.

money, which ought not in justice to be kept, is very beneficial...". Id. "It was thus in the action of *indebitatus assumpsit* that the larger part of our modern law of quasi-contract has originated." Id. at 718-19. "Based at first only upon an express promise, it was afterwards supported upon an implied promise, and even upon a fictitious promise... [It] competed with equity in the case of essentially equitable quasi-contracts growing out of the principle of unjust enrichment." Id. at 719. The older claim of goods sold and delivered is properly understood under the modern concept of quasi-contract (or a contract implied in law).

**B.     The Elements Of An Implied Contract Are Not Satisfied By Emerco.**

A quasi-contract has identifiable elements that must be applied to this case. Alaska courts have required the following three elements for a quasi-contract claim:

1) a benefit conferred upon the defendant by the plaintiff;

2) appreciation by the defendant of such benefit; and

3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof.

*Reeves v. Alyeska Pipeline Service Co.*, 926 P.2d 1130, 1143 (Alaska 1996). The first and second elements are satisfied in this case because Absolute needed the equipment to finish the coating maintenance project. However, the third element clearly is <u>not</u> satisfied because the acceptance and retention of the equipment under the circumstances was equitable and will ultimately be shown to have mitigated damages caused by Imperial.

Imperial was obligated under contract with Absolute to complete the coating maintenance project that required specialized certifications and the equipment. Imperial breached the contract when it failed to maintain its certifications and unilaterally left the job. Imperial's breach exposed

Absolute to extensive liability in its contract with the prime contractor Brechan. Instead of breaching its contract with Brechan, Absolute finished the coating maintenance project at enormous cost to itself. The retention of the equipment allowed Absolute to finish the job, which mitigated the damages between Absolute and Imperial due to its breach. Had Absolute not finished the job, increased delay to bring in another second tier subcontractor to replace Imperial would have only increased damages as it as now clear that another subcontractor would have conceivably faced the same challenges and suffered the same economic loss consistent with the experience of each subcontractor who worked on the Cargo Wharf project. Imperial was spared responsibility of additional incidental costs to those it already is responsible for because Absolute retained the equipment and finished the job.

### B. UNDER AN EQUITABLE REMEDY ONLY THE VALUE OF PROPERTY IS RECOVERABLE AND NEITHER AN EQUITABLE NOR A LEGAL REMEDY IS APPROPRIATE HERE.

#### 1. The Value Of The Property Is The Appropriate Measure Of Equitable Damages.

The antiquated equitable theory of "goods sold and delivered" and its modern equivalent of quasi-contract each confirm that the <u>value</u> of the property is the appropriate measure of damages when an equitable remedy is granted. For example, in the Ninth Circuit and California cases cited above that addressed the theory of goods sold and delivered, both cases specifically address the reasonable value of the property in equitable claims.

The Ninth Circuit explained the owner could "recover the reasonable value of the property taken as for goods sold and delivered." *Felder v. Reeth*, 34 F.3d at 746-47. In the California case explaining the history of assumpsit, the court explained "The owner may sue for the value of the property converted by proceeding in assumpsit as for goods sold and delivered." *H. Russell Taylor's Fir Prevention Service, Inc. v. Coca Cola Bottling Corporation*, 99

Cal.App.3d at 720 fn. 3. In *Felder*, the Ninth Circuit court held that the "measure of recovery is the market value of the property."[32] Id. at 746. It further explained, "For in case of a waiver of a tort in conversion the action ex contractu is sustained rather on the theory of benefit derived by the taker than of damage to the owner." Id. at 748. The appellant plaintiff had moved in the court below on the damages in the appellee defendant's counterclaim for goods sold and delivered but "the demurrer raising the point was overruled." Id. at 747. The Ninth Circuit court held "It [the demurrer] should have been sustained for lack of an allegation as to the value of the property impliedly sold by the appellee to the appellant." Id. Similarly, the value of the property was not alleged by Imperial in the counterclaim before this Court. Dismissal of Imperial's "goods sold and delivered" claim is required because the claim asserted had nothing to do with equity and did not even allege the reasonable value of the property.

## 2.   Imperial's Proposed Legal Remedy Of "Price Stated" Is <u>Not</u> Proper.

In *H. Russell Taylor*, the plaintiff had waived conversion and sought recovery under multiple theories, both equitable and legal. One of the legal theories the court in *H. Russell Taylor* addressed and rejected was the legal theory of account stated. The court explained:

> To constitute an account stated, it must appear that at the time of the statement an indebtedness from one party to the other existed, that a balance was then struck and agreed to be the correct sum owing from the debtor to the creditor, and that the debtor expressly or impliedly promised to pay the creditor the amount thus determined to be owing. Id. at 726.

The court further explained:

> The argument that Coca Cola acquiesced to the statements submitted is without merit. The court in <u>Hemenover v. Lynip, supra, 107 Cal.App. at page 363</u> stated: 'It was never

---

[32] The measure of damages was at issue in *Felder*. The owner, Defendant, had waived the tort of conversion and relied "upon an implied contract" that was "created by law" and required the plaintiffs "to pay him the said sum of $10,000 for said machinery and equipment." *Felder v. Reeth*, at 745. The plaintiffs sold the equipment for $550. Id. at 746. The total cost of the equipment had been $3,000. Id. at 747.

intended that through the mere means of sending out a claim that through the mere means of sending out a claim that thereby a legal and recoverable demand might be created unless the adverse party made prompt and effectual denial. The law was intended to preserve and protect legitimate demands *but not to create obligations independent of prior indebtedness*. (Emphasis in original). Id. at 727.

Under no reasonable interpretation of the undisputed facts can Absolute be considered to have acknowledged a debt owed and agreed to pay it. Absolute made no agreement with Imperial as to the inflated sum Imperial demanded. Absolute's inaction cannot be construed as acquiescence to the stated price.

### 3.   **Absolute Was Not Unjustly Enriched By Keeping Imperial's Equipment.**

The concept of unjust enrichment also informs the appropriateness of equitable remedies. "Unjust enrichment is a broad equitable concept... It is most closely linked with the law of restitution and implied (quasi) contracts." *Alaska Sales and Service, Inc. v. Millet*, 735 P.2d 743, 746 (Alaska 1987).

Because all equitable theories are treated the same in Alaska, the concept of unjust enrichment is applicable here. In *Millet*, the Supreme Court of Alaska applied the theory of unjust enrichment and determined that the remedy of restitution was improper because the enrichment was not unjust. Id. at 747. The court explained, "It is axiomatic that a party cannot be enriched at the expense of another for receipt of that to which the party is legally entitled." Id. It concluded that "There are many circumstances, however, where an individual may confer benefits upon another for which equity will give no remedy." Id. Absolute was legally entitled under the contract with Imperial to have the coating maintenance work performed, and Absolute retained the coating equipment to that end. The circumstances of Absolute's retention of the equipment allow no equitable remedy for Imperial. There is no risk of prejudice because the

value of the equipment will be accounted in mitigating damages caused by Imperial's breach and Absolute is otherwise ready and able to return the equipment to its owner.

### C. IMPERIAL DOES NOT SATISFY THE REQUISITE ELEMENT OF OWNERSHIP TO JUSTIFY AN EQUITABLE REMEDY.

Every contract for the sale of goods contains a warranty of title. A sale contract contains a "warranty by the seller that the title conveyed shall be good, and its transfer rightful; and the goods shall be delivered free from a security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge." Alaska Stat. § 45.02.312. The seller essentially warrants that the good is unencumbered by other interest—namely that the seller is conveying unencumbered title. Accordingly, Imperial, Inc., Imperial or Mr. McKinley cannot allege ownership unless they provide that one of them rightfully possesses title of the equipment.

Ownership is essential to the equitable remedies invoked by assumpsit and unjust enrichment. The court in *H. Russell Taylor* explained:

> The rule allowing the plaintiff to waive a tort and sue in assumpsit applies to cases involving conversion of personal property. The right of the **owner** to waive the tort and sue in assumpsit is not limited, as in some jurisdictions, to those cases where the wrongdoer has sold the property or otherwise converted it into money and recovery of the proceeds is sought. The **owner** may sue for the value of the property converted by proceeding in assumpsit as for goods sold and delivered. The basis of recovery is that he consents to the taking of his property and affirms the act of the wrongdoer. He treats it as a sale, and may recover the value due him as under a contract of sale." *H. Russell Taylor*, 99 Cal.App.3d 711, 720 fn. 3 (quoting 7 Cal.Jur.3d Supp., Assumpsit, ss 11-12, pp. 21-22, fns. omitted).

In order to prevail under the law of restitution, the plaintiff must prove that he or she actually owned the property in question in order to receive a remedy. See, e.g., Reeves v. Alyeska Pipeline Serv. Co., 926 P.2d 1130, 1143-44 (1996) (stating that plaintiff cannot receive restitution for conveying intellectual property it never owned). There is no evidence Imperial owned the goods allegedly sold to Absolute. Purchase orders, drafted by Imperial, list the goods

as a request to a vendor but are not evidence that Imperial actually purchased the goods. Imperial's tax return also show no evidence that Imperial acquired such assets.

Consequently, partial summary judgment should be granted. Summary judgment is appropriate where a party fails to show evidence in support of its claims. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Fed.R.Civ.P. 56(c).

## VI. CONCLUSION

Plaintiff, Absolute Environmental Services, Inc. ("Absolute") respectfully moves the Court for and order of summary judgment dismissing the "goods sold and delivered" counter-claim of Emerco, Inc.[33] or, failing that, an order capping the claim of Emerco, Inc. for the alleged "sale" of equipment to a maximum amount of $78,959.50.

---

[33] Plaintiff Absolute Environmental Services, Inc., subcontracted a portion of its work on the Kodiak Cargo Wharf project to "Imperial Industrial Coatings," a coating subcontractor. The subcontract did not identify whether or not "Imperial Industrial Coatings" was a sole proprietorship or a corporation. Immediately after "Imperial" declared it had terminated its subcontract with Absolute, it sued Absolute in California.

In the California suit, the caption identified Imperial as "Imperial Industrial Coatings, Inc., a California corporation." This was the first notice Absolute had that McKinley would be claiming that Absolute had subcontracted with a corporation, rather than him. Absolute researched filings in the State of California to determine whether there was a corporation named, "Imperial Industrial Coatings," but could find none. Absolute did ultimately locate a county filing that identified "Imperial Industrial Coatings" as a d/b/a for a corporation named Emerco, Inc. The corporation was owned by Forrest J. McKinley.

Absolute obtained the dismissal of the California suit without prejudice on grounds of forum non conveniens and then filed this lawsuit in Alaska. Absolute named Forrest J. McKinley and Emerco, Inc., in the alternative, as defendants. During the course of discovery, Absolute would object to questions that assumed that Emerco, Inc. was Absolute's subcontractor; likewise, counsel for McKinley and Emerco, Inc. would object to questions that assumed that McKinley was Absolute's subcontractor. Rather than be perpetually objecting to such characterizations throughout discovery, the parties reached an accommodation where neither McKinley nor Emerco, Inc. was mentioned. Instead, the parties agreed to refer to Absolute's subcontractor as "Imperial" and reserve the dispute over the true identity of the contractor to the time of trial. For this reason, the Court will usually see in discovery documents references to McKinley and/or Emerco, Inc. identified in the non-confrontational form of simply "Imperial." That convention will be followed here unless expressly stated otherwise.

RESPECTFULLY SUBMITTED this _____ day of August, 2006.

MARSTON HEFFERNAN FOREMAN, PLLC

By _____
    Terry R. Marston II, WSBA No. 14440
    Jami K. Elison,   WSBA No. 31007
    Jesse P. Elison   WSBA No. 36914
Attorneys for Plaintiff Absolute Environmental Service, Inc.