### REPORT OF JEREMY HAILEY, P.E.
### NORTHWEST CORROSION ENGINEERING

I have been requested by Absolute Environmental Services, Inc. to provide my opinions in response to specific questions regarding the performance of Coffman Engineers, Inc. on the Kodiak Cargo Wharf Maintenance project. In order to answer the questions, I was provided with a binder of information by Absolute that was said to contain the documents most directly related to the questions.[1] I was also given the opportunity to request additional documents that I believed were necessary to fairly respond to the questions. I did ask for some extra documents and was provided with them if Absolute had them. I am satisfied that the documents I was provided constitute an adequate basis for the opinions I express below.

The documents in this binder and the additional documents I mention in this report constitute the documentary evidence I relied upon in reaching my opinions. In addition, I have spoken with David Olson at length and I have spoken to Jason Peterson of Absolute who were able to provide me with information that they personally knew of.

I was not asked to evaluate the performance of Absolute's subcontractor Imperial. Instead, I was asked to assume for the purpose of my analysis that any comments of Coffman's quality assurance inspector regarding Imperial's performance were correct. I have done so.

My report will begin with the following project background followed by my answers to the specific questions I was asked by Absolute. My answers to the questions are based on my review of all of the documents referenced here, and the bases for my opinions include the information included in the background information as well as the information provided in response to the specific questions.

### PROJECT BACKGROUND

On March 20, 2001, Brechan Enterprises, Inc. (BEI) entered into a design-build contract with the United States Coast Guard to perform design and construction of the Kodiak Cargo Wharf Maintenance project. A portion of the maintenance work included repairing failed coatings on selected pipe piles at the Cargo Wharf Extension and repairing failed coatings on H-piles, angles, and tube bracing at the Original Cargo Wharf. In addition, the design-build contract required an AE firm to provide designs and specifications for repairs to the failed coating systems associated with the wharf structure. Design criteria for this project included that maintenance options be designed for a useful life of 25 years.

Based upon an email from Matt Holmstrom (BEI) dated Monday, February 05, 2001 to Steven Locher (USCG):

---

[1] The pages of the documents in the binder had individual numbers preceded by the letters KEY. I may at times refer to those numbers in this report to identify documents that I believe are especially important. Among them are the following: KEY20064, KEY20076, KEY20294, KEY20319, KEY20172, KEY20168, KEY20167, KEY20165, KEY20157, KEY20123, KEY20122, KEY20128, KEY20150, KEY20175, KEY20177, KEY20180, KEY20181, KEY20199, KEY20331, KEY20337, KEY20338, KEY20339, KEY20396, KEY20402, and KEY20395.

A meeting was held in Anchorage on Friday February 2, 2001 whereby it was discussed that Coffman Engineers Inc. (CEI) "will be responsible for the coatings recommendations and the cathodic protection system repairs."

For the purposes of acquiring budgetary quotes, CEI issued a preliminary coating specification to Holmstrom. In an email from Dan Stears (CEI) to Holmstrom, dated February 28, 2001, Stears emphasized that:

> 3. The coating applicators MUST have previous experience in the application of Polyurethane's and MUST also have marine coating experience. Getting budgetary numbers from, or using applicators without the proper experience will likely result in cost overruns and failure of the coating system. The best coating system available will catastrophically fail if not applied correctly. The contractor must be thoroughly familiar with the application of these products and the environment they will be applying them at. Carefully analyze the budgetary numbers you receive.

It is common practice to solicit non-binding estimates from coating contractors for the purposes of establishing budgetary figures. It is also reasonable to provide bidders with enough information concerning site conditions and anticipated coating products that accurate estimates can be prepared.

CEI "strongly recommend[ed] blasting and coating all previously coated structure and pipe supports from the 107' elevation to the top of the piles at elevation 119'." Project Scope and Fee Narrative Dated 3/13/01, page 4 section 2.1.a Original Cargo Wharf coating. The same recommendations are outlined for the Cargo Wharf Extension (2.1.b).

It is my opinion that, based upon the existing condition of the wharf structures, the removal of all existing coatings combined with the proper application of an appropriate marine grade coating would likely result in the lowest cost option (as opposed to making an unknown quantity of spot repairs). In addition, a properly applied new coating system over all the existing structural components (from elevation 107' to elevation 119') would be more successful in fulfilling the design requirement of a 25-year useful life.

Crevice corrosion is localized corrosion occurring at an area that is shielded from full exposure to the environment because of close proximity of the metal to the surface of another material. The most effective way to slow the atmospheric crevice corrosion process in a marine environment will be to effectively seal all areas where crevice corrosion would normally occur. CEI recommends that all areas that will support crevice corrosion be seal welded and then states, "Assume 50' of 3/8" fillet weld will be required."

> Many of the utility hangers and braces were welded to the piles with fillet welds on one side only of the member. This will result in nearly immediate rust bleed thru from the resultant unsealed crevice between the brace and the pile. It is recommended that these areas be seal welded prior to recoating.

> Assume 50' of 3/8" fillet weld will be required to be accomplished prior to blasting and coating. It will be up to the contractor to identify incomplete and non-existing welds in advance of blasting operations and perform welding in a manner that does not impact coating operations.

Project Scope and Fee Narrative Dated 3/13/01, page 6.

Quotations were received from contractors to perform the requirements of the project coating specification, "Section 09967 Coating of Steel Waterfront Structures." Four price quotations were reviewed by CEI in its "Kodiak Dock Coating Submittal Review" email dated May 29, 2001. The email was transmitted from Lawrence Radcliffe of CEI to Stears, John Daly of Trick, Nyman, Hayes (TNH), and Holmstrom. The detailed review outlines the contractors' submittals and comments on each of the bids. Radcliffe recommended rejecting the low bid provided by Absolute Environmental Services Inc. (AESI) due to its submittal of a non-approved coating. This was a reasonable response by CEI as it noted the coating would not be able to perform as required, especially in regard to required cure time prior to immersion.

## JUNE 21, 2001 COATING SPECIFICATION

The final version of the coating specification for Phase 1 of the Cargo Wharf work, "Section 09967 Coating of Steel Waterfront Structures," was dated June 21, 2001. The specification provides a detailed description of the existing site conditions such as degree of rusting, location of rust occurrences, condition of field-applied coatings in relation to shop-applied coatings, adhesion characteristics of the existing coating, and degree of rust adhesion from the uppermost elevations to the lower elevations. Approximate percentages associated with the various conditions are stated along with rust grades using industry accepted visual standards. This information is provided for the splash and tidal zones for both the Original Wharf and the Wharf Extension.

Two sections included within the coating specification direct the applicator to inspect the wharf to determine existing conditions prior to bidding: "The Applicator shall inspect the wharf prior to bid to determine existing conditions and quantities of surfaces to be recoated. The existing coatings on the original wharf and the wharf extension are coal tar epoxies from different manufacturers. The following descriptions are provided as information only and shall not be utilized as basis for bid" (Section 1.1.3) and "The Contract Drawings and Specifications do not purport to describe construction information in absolute detail. An applicator site visit is required prior to bidding and starting work" (Section 3.1.4).

Regarding the existing site conditions, Section 09967 states in subsection 1.7.3.9 that,

> A number of utility hangers and brackets were welded to the piles with fillet welds on one side only of the member. All metal-to-metal connections shall be seal welded prior to coating. An estimated 100 feet of seal welding will be required. The Contractor or Applicator will seal weld prior to surface preparation as required in 3.2.1.2.

This subsection references an existing condition that will require repair in order to meet the holiday testing requirements (outlined below). Additionally, this section

appears to describe seal welding requirements for utility hangers and brackets only and not other locations that may require seal welding such as H-pile splice locations.

> Detailed information addressing holiday testing is also included in Section 09967.
>
> Holiday test fully cured coatings on the entire structure using methods and voltages in NACE RP0188 (Latest Revision), "Discontinuity (Holiday) Testing of Protective Coatings" and the manufacturer's approved holiday test procedure. The voltage setting shall be set for the actual thickness of the coating being tested. All holidays shall be marked. Pile and attachments not meeting the holiday requirements shall have the holidays repaired as specified in Section 3.7.

Section 3.5.8.12. This requirement establishes that the "entire structure" will be free of holidays.

## INSPECTION REPORTS

> Contractor did not coat this area and is considering the possibility of hiring a welder for the amount of seal welding that will be required on the H-pile section of the wharf.

05 October 2001 CEI Daily Summary Report, last bullet item on page 1 of 3. This statement made by the on-site Quality Assurance inspector indicates that a significant amount of area requiring seal welding had been discovered on the H-pile structures. The coating specifications do not specifically call out the necessary seal welding that will be required on the H-piles.

> Teleconference meeting today with Dan Stears, Matt Holmstrom, Jerry Hardenbergh [CEI], Andy Romine [Swalling Construction Company, Inc. (SCCI)] and Mike Anderson (SCCI) regarding the amount of surface prep required prior to coating application, *i.e.* seal welding, grinding, cutting, etc. Still waiting on info from SPC [Specialty Polymer Coatings] regarding an epoxy "caulking" for the weld areas. Will also get more input from coating manufacturer regarding surface prep. Recommended additional conversations with the CG [Coast Guard] regarding this issue.

10 October 2001 CEI Daily Summary Report, first bullet item on page 3 of 3, Miscellaneous. The above-mentioned teleconference between the individuals responsible for the development and inspection requirements of the coating specification indicates they are aware that a significant amount of surface preparation is required on the H-pile structures, specifically bents 1, 2, and 3 on the Original Wharf. Locher states in item 2 that, "The welds are continuing to have problems with holidays. Is this attributed to temperatures and humidity's [sic]? Are environmental conditions correct for coating applications?" October 10, 2001 Email from Steven Locher (USCG) to Paul Rendon (USCG). Hardenbergh responds on October 10, 2001:

> Not attributable to temps or humidity. Environmental conditions are monitored and verified before the start of blasting and before coating application. The coating inspector continuously monitors this and the contractor is using a dehumidification unit that can improve the

> environmental conditions when needed. The welds are giving them difficulty because they have a rough and irregular surface profile that is difficult to completely cover without strip [sic] coating prior to coating application. They cannot strip [sic] coat with this material as it hardens in a few minutes. They are grinding the welds, but some holidays still come through. The coating contractor is also researching the use of an epoxy "caulking" to cover the weld area prior to coating, like a strip [sic] coat. I think that may work.

Jerry Hardenbergh email to Steven Locher dated October 10, 2001.

It is common to include language in coating specifications requiring a stripe coat over edges, sharp corners, and welds. The purpose of the stripe coat is to add additional coating thickness to those areas that are susceptible to coating pull back and to ensure that surface imperfections and profile irregularities on properly prepared weld beads are coated. Section 1.8.5 of the specification requires, as part of the project work plan, the contractor to submit any plan for stripe coating. There are no requirements to stripe coat, or other references to stripe coating, in the June 21, 2001 specification, nor are there approved stripe coat materials, surface preparation requirements, or application procedures.

> Scaffolding is in place on bents 1, 2, 3, and 4. Abrasive blasting began and revealed a large number of surface defects that require an excessive amount of grinding, seal welding, and flame cutting. This amount of surface prep was not anticipated and the contractor is not properly equipped to handle all of this in a timely manner.

04-11 October 2001 CEI Weekly Summary Report. The surface defects described by Hardenbergh were noted once scaffolding was in place and the surfaces were abrasive blasted.

> After grinding and welding surface prep, caulking of all weld joints was performed with SPC SP-2888 RG. Coating of all welds will hopefully reduce the number of holidays after final coating is applied.

23 October 2001 CEI Daily Summary Report, second bullet item under "Coatings (Original Wharf)."

> Holiday detection testing performed on bent 4 and 5, elevation 119' to 113'. Test results indicated 22 total holidays.

24 October 2001 CEI Daily Summary Report, first bullet item under "Coatings (Original Wharf)."

### PROJECT CORRESPONDENCE

> On 10/04/01 Swalling Construction started abrasive blasting on the Original Wharf H-pile supports. During the surface preparation inspection, after abrasive blasting, a large number of surface defects became very apparent. The majority of these surface defects are almost impossible to see without removing the old coatings and corrosion build-

up. Basically, there is a lot more surface preparation required, before coating application, than anyone had anticipated.

The surface defects being encountered include: weld spatter, poor weld workmanship, very rough weld profiles, weld undercutting, column splice run-off tabs, and areas requiring seal welding.

The coating contractor is having difficulties obtaining a holiday free coating system on the H-pile splice weld locations. The only areas that are not passing the holiday testing are the welded areas; splice plate locations in the upper elevations.

The contractor has tried numerous times to coat the holiday areas and has spent an excessive amount of time trying to obtain a holiday free coating. But do [sic] to the nature of this coating system, accessibility, and surface conditions; it's going to be difficult to achieve a holiday free coating at the H-pile splice locations.

30 October 2001 Memorandum from Hardenbergh to Scott Bonney (USCG). Hardenbergh then provides three options to address this issue:

Continue following the project specifications and achieve a surface that is free of coating holidays (specification section 3.5.8.12). Estimated additional $500,000 to complete the work as described in the current coating specification.

Relaxing the requirements of a holiday free surface over the entire structure and develop an acceptance criteria for the holiday testing.

Establish criteria to allow for a larger number of holidays, basically complete the work without increasing the current funding.

CEI recommended that option #2 be followed for the remainder of the project. A number of reasons are provided to justify its recommendation including, "Most bridge and dock coating systems are not 100% holiday free. Typically, a holiday free coating is required for immersion and not for atmospheric application."

In my opinion, achieving a holiday free coating over the "entire structure" as required in section 3.5.8.12 would not be economically feasible on the Original Cargo Wharf taking into consideration the number of irregular surfaces (H-piles), existing surface conditions (very rough weld profiles and weld undercutting), and the environmental conditions surrounding the Kodiak Cargo Wharf.

November 13, 2001 project meeting minutes include a description of the recommended acceptance criteria for the surface preparation of the H-piles based upon the 30 October 2001 memorandum.

Acceptable criteria shall be as follows: The modified coating acceptance criteria is only applicable between pile elevations 119' and 116'. The acceptance criteria will be 2 or fewer holidays per lineal foot of weld; size not to exceed 1/8" diameter per holiday and cumulative length not to exceed ½ inch per foot of weld. In case of conflict or questions in regards to acceptance of coating system, the ultimate determination of number and

size of holidays will be determined by the USCG QA on-site representative.

November 13, 2001 Project Meeting Agenda.

In a letter dated December 21, 2001, Andrew Romine (SCCI) provided Holmstrom with a proposal for completing the Phase 1 work utilizing caulk in lieu of removing the brackets and repairing the defective welds. In his proposal, Romine states that both SPC and Sherwin Williams have provided information on recommended materials to reduce the cost of preparation work. However, neither company would guarantee that their recommended products would provide a holiday free application in the field because the products were "essentially untested for this purpose." Romine's letter also states, "We have also discussed the recommendations of the coatings' suppliers with Coffman Engineers and have come to the agreement that the best procedure available in lieu of removing the brackets and repairing the defective welds is caulking the areas in question."

A February 8, 2002 meeting at CEI's offices included representatives from CEI, BEI, and SCCI. During the meeting, Stears stated that the quality of the welding on the Cargo Wharf, and the amount of unwelded adjacent surfaces amounted to a change in conditions. The condition was not detectable by normal inspection, and was not a condition one would normally expect. The minutes then included the following statement.

> After considerable discussion, a consensus emerged that a twenty-five year life extension of the dock would be achieved even with the existence of pinholes in the coating surface, and the resulting staining that would occur.

As described in the meeting minutes, Stears agreed with Hardenbergh's 30 October 2001 memorandum statement that the existing surface conditions were not detectable by normal inspection and were not conditions that would normally be expected. Hardenbergh stated in his memorandum that, "An amount of grinding is expected by any coating contractor, however the amount of poor welding and lack of consideration for corrosion engineering design has resulted in an enormous amount of surface preparation."

In a letter dated February 25, 2002, the USCG Contracting Officer, Anita Repanich, in the first bullet item on page three, responds to the alleged changed site conditions (quality of the welding on the cargo dock and the existing surface conditions) on the Kodiak Cargo Wharf:

> While it is unfortunate that Coffman Engineers did not accurately measure the amount of seal welding required, we find it hard to believe that this alleged changed condition could not have been detected during proper site inspections by both Coffman Engineers during the design phase and Swalling Construction during bid preparation. We base this statement on information presented in the 'United States Coast Guard Cargo Wharf and Fuel Pier Inspection' report, dated Sep 21 – Oct 02, 2000, which was provided to the Design-Build team. The report clearly references the 'non-structural steel elements' on the Cargo Wharf that were 'only welded on one side, not 100 percent', which 'results in a small gap on one side of the connection into which moisture can penetrate. These areas are quick to rust and the weld can be attacked from the back (non-welded) side of the member.' Furthermore, the report references, numerous times, the 'poor quality welds' associated with the utility system attachments, as well as the water, sewer, and steam joint resulting in crevices left between the angle iron and the base metal'. The report also provides photographs documenting this condition. This clearly indicates this was a known condition that the Design-Build team had knowledge of. For theses reasons we do not agree with, nor accept, Swalling's claim that a changed site condition exists.

Letter from A. Repanich (USCG) to M. Martin (BEI) dated 25- Feb –02. Repanich also instructs the Design-Build team to "prepare a technical proposal with recommendations on how you plan to proceed with coating the remaining portion of the Original Cargo Wharf" and to "study the 'seal welding' condition and recommend how you plan to address this issue."

In response to Repanich's letter, Stears drafted a memorandum in which the following statements were made:

> The project coating specification that we developed was intended to coat as much of the pile as feasibly possible (lowest practical elevation) and provide a finished product that had a minimal amount of defects (*no such thing as a defect free coating*).

> The exact amount of seal welding could not be estimated without removing all of the existing coating or corrosion products and inspecting the entire project area.

> The majority of these imperfections were almost impossible to see without removing the old coatings and/or corrosion products.

> The extent of the substandard quality of the original construction workmanship was concealed by the existing coatings and corrosion products and was more than could have been reasonably anticipated by any of the parties involved.

Memo from D. Stears (CEI) to M. Holmstrom (BEI) dated 27- Feb –02.

In an email dated March 28, 2008, Holmstrom asks Stears if he could "roughly estimate the amount of seal welding on structural members we're going to do?" Stears

responds that "As we have discussed before, until you blast the surface and can see what is under the existing coating and corrosion products it is difficult to determine the amount of structural seal welding that would be required. I personally do not feel comfortable with guessing the amount."

Within modification number five to BEI's contract, the USCG defined the required repair procedures for the Kodiak Cargo Wharf structure. The modification addresses the following conditions:

> Structural members with poor quality or defective welds shall be prepared (*i.e.* abrasive blast cleaned, seal welded, inspected, etc. ...), coated, tested, and warranted in accordance with the original contract specifications Section 09967, "Coating of Steel Waterfront Structures", latest version.
>
> Structural members with good quality or non-defective welds shall be prepared (*i.e.* abrasive blast cleaned, "stripe coated" or caulked, inspected, etc. ...), coated, tested, and warranted in accordance with the original contract specifications, Section 09967 "Coating of Steel Waterfront Structures", latest version.
>
> Abandoned non-structural members such as utility supports and unused angle clips may be removed if determined to be cost effective and increase overall worker productivity.
>
> Non-structural members such as utility supports with poor quality or defective welds shall be prepared (*i.e.*, abrasive blast cleaned, "stripe coated" or caulked, inspected, etc. ...), coated, and tested, in accordance with the original contract specifications, Section 09967 "Coating of Steel Waterfront Structures", latest version, but not warranted in accordance with the contract specifications.

April 25, 2002 From USCG Modification 0005 to Task Order 0007, page 2 of 2

### ELIMINATION OF HIGH-VOLTAGE HOLIDAY TESTING OF WELDS

It appears that Coffman eliminated high-voltage holiday testing of coatings applied over welds at bents 6-12. Swalling's subcontract modification of 3/13/02 only required it to perform in accordance with "Option 2" requirements. Bill Oliver's signature on Swalling's letter of 3/18/02 confirmed that Swalling's performance and acceptance requirements included only "the use of caulking to repair welds and seal metal-to-metal connections not welded." It also said that the "inspection criteria for these caulking repairs will be visual inspection for bare spots only and no pinhole holiday detection or repairs will be done at these areas."

Jerry Hardenbergh's email of 5/28/02 states that, "We have a serious conflict between the contract that is between Brechan and the USCG and what Swalling agreed to with Brechan. It is in regards to stripe coating welds." Swalling's letter of 5/31/02 just three days later restates that it will not perform the work in accordance with any requirements other than those it agreed to in its contract modification. There is no statement in Jerry Hardenbergh's QA reports for May and June of 2002 that he ever specifically performed high-voltage holiday testing of coatings over welded areas. Jerry Hardenbergh's June 2002 QA reports indicate that in just three days Swalling repaired all

holidays detected on bents 6-12. In comparison, his reports for bents 1-5 indicate that holidays continued to be detected <u>for seven months</u> after the work was performed in October of 2001 despite repeated repair attempts. Also numerous holidays in the Phase 1 coatings were discovered at the time of the Phase 1 one-year warranty inspection.

Based upon my conversation with David Olson (AESI), I was informed that Olson was told by Mike Anderson (SCCI) that high voltage holiday testing was not performed on welds at bents 6 - 12. Furthermore, coating inspection documentation completed on bents 1 – 7 and 11 and bents 13 – 33 was significantly more detailed and specific as to testing locations and results of testing. Coating inspection documentation for bents 8, 9, 10 and 12 was general in nature and included the term holiday "detection" (CEI Daily Summary Reports dated 10-13, June 2002) whereas Daily Summary Reports prior to and after 10-13 June 2002 describe the inspection procedure as holiday "Test". It appears that Hardenbergh distinguishes between "testing" – using a high voltage holiday tester – and "detection" – using visual inspection techniques. However, there is no statement in Hardenbergh's reports that he tested coatings over welds with the high voltage tester. And I have seen no documents that SCCI asked for added compensation for being required to perform repairs of pinhole holidays in welds when its subcontract did not permit it.

## AESI PHASE 2 PROPOSAL

On October 22, 2002, Absolute Environmental Services, Inc. (AESI) provided BEI with a proposal to perform the Phase 2 work based upon the June 21, 2001 plans and specifications, but not the USCG requirements defined in modification number 5, which were not provided to AESI in any form until after its price proposal had already been submitted.

Holmstrom stated in an October 24, 2002 email to Stears that he was "interested in reviewing the coating spec. section 09967, to ensure we clear up the confusion regarding the seal weld issue." In Stears' reply, he stated, "I agree that the spec. could be modified to clarify a few issues for the new coating contractor." These emails along with others were forwarded to AESI on October 29, 2002. In the forwarded message, Holmstrom stated to AESI, "Gentlemen – things are starting to come together. Note the discussion on containment." In the forwarded message, Holmstrom did *not* make any mention of "the seal weld issue."

In a November 24, 2002 email, Stears informs Holmstrom that Stears will "revise the specification Monday night and have it to you on Tuesday morning." Stears then provides comments/questions concerning the revised specifications, including, "2h. Does the applicator that you are going to use meet the qualifications listed in the spec or should that be revised."

In a November 26, 2002 email, Stears informs Holmstrom that Stears has forwarded a copy of the final coating specification (the November 26, 2002 revision) to Holmstrom and states that,

> I made minor changes throughout the document to get rid of extraneous information and to incorporate 'lessons learned.' I suggest you look at Sections 1.7.3.6 and 3.1.1 in particular. I believe these modifications adequately incorporate what has been previously discussed.

November 26, 2002 Email from Stears to Holmstrom and Andy Brown.

As described by Stears, minor changes were incorporated into the November 26, 2002 coating specifications. However, no mention was made as to the lesson learned that "During the surface preparation inspection, after abrasive blasting, a large number of surface defects became very apparent. The majority of these surface defects are almost impossible to see without removing the old coatings and corrosion build-up. Basically, there is a lot more surface preparation required, before coating application, than anyone had anticipated." 30 October 2001 Memorandum from Hardenbergh to Scott Bonney (USCG). Additionally, it was not disclosed that the previous "contractor has tried numerous times to coat the holiday areas and has spent an excessive amount of time trying to obtain a holiday free coating. But do to the nature of this coating system, accessibility, and surface conditions; it's going to be difficult to achieve a holiday free coating at the H-pile splice locations." 30 October 2001 Memorandum from Hardenbergh to Scott Bonney (USCG). It seems contrary that such a detailed coating specification would not elaborate on a known condition that CEI estimates would cost an additional $500,000 in order to achieve the inspection requirements of the specification. 30 October 2001 Memorandum from Hardenbergh to Scott Bonney (USCG).

Revised Section 1.7.3.6 describes the requirements for cleaning and coating the steel structures and is similar to the requirements described by the USCG in its letter dated April 25, 2002. One exception being that the revised specification does not allow for the caulking of structural members with good quality or non-defective welds or caulking of non-structural members such as utility supports with poor quality or defective welds (as described in project modification number 5). Another being the requirement to warranty the coatings over all welds that was not the same as the requirement of BEI's modification number five.

## WAIVING EXPERIENCE REQUIREMENTS

Coffman never objected to Brechan's hiring AESI for the Phase 2 coating work or required the production of documentation of experience even though neither Absolute nor its coating application subcontractor had the experience specifically required by Coffman in its specifications.

During the development of the coating specifications for Phase I, CEI made the observation that, "The coating applicators MUST have previous experience in the application of Polyurethane's and MUST also have marine coating experience. Getting budgetary numbers from, or using applicators without the proper experience will likely result in cost overruns and failure of the coating system. The best coating system available will catastrophically fail if not applied correctly. The contractor must be thoroughly familiar with the application of these products and the environment they will be applying them at." Section 1.5.10.3 in the coating specification requires that the

applicator have a minimum of 5 years documented experience blasting and coating marine structures and applying 100% polyurethane coatings.

AESI and its coating subcontractor made it known to the prime contractor that they did not possess either the required marine structure blasting and coating experience or polyurethane plural component application experience. Given the known difficulties encountered during Phase 1 (using a qualified coating contractor), it is my opinion that effort should have been made to solicit proposals from qualified coating applicators with the proper experience as outlined in both the June 21, 2001 and the November 26, 2002 specifications.

Revised Section 3.1.1 describes additional surface area to be coated at the mud line and discusses large rocks or boulders that may be present near the piles.

## PRE-JOB CONFERENCE

<u>February 18th, 2003, Proposed Pre-Job Conference Agenda</u>

Introduction of Participants

| Matt Holmstrom | Brechan Construction | General Contractor |
| Dan Stears | Coffman Engineers | |
| Jerry Hardenbergh | Coffman Engineers | |
| Lawrence Radcliffe | Coffman Engineers | |

\*\*\*

Review Coating Specification and specifically discuss the following:

1.1.5   Abrasive and dust on ships was <u>a problem last year</u>. How will you reduce the amount of dust landing on ships?

1.1.14.2   Paint and thinner storage was <u>an issue last year</u>. Need better containment of coating materials.

1.7.3.6   Discuss weld preparation. Structural members that need replacing?

2.2.5   Ensure adequate amount of coating materials on-site. Material logistic <u>problems last year</u>. Do not want to repeat.

The abovementioned items were four of the topics to be discussed on the agenda. Dust on ships, containment of coating materials, and material logistics were noted as issues and problems. However, attention was <u>not</u> drawn to the difficulties in achieving the specified requirements of the holiday testing due to the existing surface defects.

### A. OPINIONS & BASES FOR OPINIONS

1. **Failure to Disclose Weld Defects in the Phase 2 Specifications:** Whether in your opinion Coffman breached its standard of care when it failed to disclose the existence and severity of defective and omitted welds discovered during Phase 1 within its November 26, 2001 revised specifications?

   Yes. Information concerning the actual site conditions regarding weld defects encountered during the work of Phase 1 was not transferred to the specifications associated with Phase 2. Known information in regard to the existence, quantity, and severity, of weld defects would have allowed AESI to provide an accurate price proposal and realistic schedule for completing the work.

   The project specifications clearly state in sections 1.1.3 and 3.1.4 that a site visit must be completed. However, based upon its own experience, CEI states that the existing condition "was not detectable by normal inspection, and was not a condition you would normally expect." Furthermore CEI states, "The exact amount of seal welding could not be estimated without removing all of the existing coating or corrosion products and inspecting the entire project area."

   It is my opinion that no effort was made to make AESI aware of the differing site conditions discovered in Phase 1. Previous years coating inspection reports and site photographs should have been made available for review prior to AESI submitting their bid.

2. **Specifying a "Holiday-Free" Coating:** Whether in your opinion Coffman breached its standard of care when it required the applicator to provide a holiday-free coating in its November 26, 2001 Phase 2 specifications?

   Yes. Section 3.5.8.10 (November 26, 2002 revision) of the coating specification requires, "Holiday test fully cured coatings on the entire structure using methods and voltages in NACE RP0188 (Latest Revision), "Discontinuity (Holiday) Testing of Protective Coatings" and the manufacturers approved holiday test procedure. The voltage setting shall be set for the actual thickness of the coating being tested. All holidays shall be marked. Pile and attachments not meeting the holiday requirements shall have the holidays repaired."

   Dan Stears of Coffman stated himself that he did not believe it was possible to achieve a "holiday-free" coating. Coffman knew that Swalling could not achieve a "holiday-free" coating on the Original Wharf in Phase 1 without extraordinary efforts and excessive expense and agreed with Brechan to eliminate the requirement of a holiday-free coating for welds on bents 6-12. Coffman then stated that a holiday free coating was not necessary to achieve a 25-year service life for the coatings. Nevertheless, Coffman specified stripe coating rather than repair of defective welds, to obtain a "holiday-free" coating on Phase 2, even though SCCI had failed to achieve a holiday free coating by stripe coating/caulking on bents 4 and 5.

   Based upon the previous experiences encountered by SCCI on bents 1–12 while coating the Original Cargo Wharf, it was evident that achieving the requirement of a

holiday free structure was excessively costly and time consuming. As stated by Stears in reference to CEI's project responsibilities, "The project coating specification that we developed was intended to coat as much of the pile as feasibly possible (lowest practical elevation) and provide a finished product that had a minimal amount of defects (no such thing as a defect free coating)." It is understood that the intent of the specification was to provide a structure that was adequately coated and was capable of extending the useful life by 25 years. However, it is also reasonable to assume that the coating would soon experience damage and continue to do so throughout its life (from floating debris, ice conditions, vessel contact, general deterioration, etc) and that minor maintenance will be required on a regular basis. Under these circumstances, it was not necessary or feasible to provide a holiday-free coating.

3. <u>Specifying High-Voltage Testing Over "Very Rough Weld Profiles"</u>: **Whether in your opinion Coffman breached its standard of care when it specified a "holiday-free" coating established by high-voltage testing methods on piles with an enormous quantity of defective welds?**

Yes. It is my opinion that requiring a holiday free coated surface, given the known existing surface imperfections and quantity of defective welds, would be unreasonable for a coating contractor to complete in a practical manner. The very poor welds described by Mr. Hardenbergh can themselves create holidays when combined with High Voltage testing. Jagged welds can create peaks where dry film thickness is lower. Pullback can cause a coating to thin in certain areas. In areas where the coating was thin, a High Voltage Tester can actually burn through a coating creating a holiday where one had not existed before. Mr. Hardenbergh himself contacted SPC and asked why after repeated patches in certain areas he continued to find holidays in the patched area when using high voltage testing. A better approach would have been to outline and inspect to a more practical coating holiday acceptance criteria.

4. <u>Specifying Stripe Coating To Obtain Holiday-Free Coating</u>: **Whether in your opinion Coffman breached its standard of care when it specified the use of stripe coating/caulking over defective welds despite knowing that SPC would not guarantee a holiday free coating under these circumstances?**

Yes. Due to the quantity of irregular surface conditions brought about by the presence of defective and non-existent welds, CEI developed a proposed procedure for repairing the surface imperfections. The proposal included using a "stripe coat" or caulking to add additional coating thickness at appropriate locations. This approach is a compromise between doing no additional surface preparation (Option 3) and doing extensive modifications to the facility (Option 1). This approach would minimize, but not eliminate, the amount of coating defects (primarily pinholes) at the subject areas and would continue to extend the useful life of the facility an additional 25 years. February 27, 2002 Memorandum from Stears to Holmstrom, page 2 of 3.

A version of this procedure was adopted by the USCG and is included in modification number 5 Part A.2.b ii and iv. As stated in Section 1.7.3.6 of the November 21, 2002 coating specifications: "Structural members with poor quality, defective or

water weeping welds shall be cleaned and seal welded prior to coating." Allowing the application of a stripe coat over welded surfaces would result in a coating system which would be more likely to meet the outlined holiday testing criteria. However, the language in the modification does not allow for the presence of holidays. The original criteria of a holiday-free structure remains intact. April 25, 2002 From USCG Modification 0005 to Task Order 0007, page 2 of 2

Information was gathered from two manufactures of caulking products, Sherwin Williams and SPC. In a letter to Holmstrom, SCCI describes that "Unfortunately, neither supplier is able or willing to guarantee their recommended products will provide a holiday free (pin-holes) application in the field, as these products are essentially untested for this purpose." December 21, 2001 Letter Romine to Holmstrom, Option 2 located on page 2 of 3. It is reasonable to conclude that if SPC and Sherwin Williams were not willing to warrantee their products to be holiday free in a specific application, then the design team should also not require that the surfaces to be coated using the products be holiday free.

Mr. Hardenbergh testified in his deposition that there was not enough time to stripe coat and spray coat before the tides returned. Elsewhere, Coffman personnel mention that the very short pot life of the stripe coating material made it difficult to perform a stripe coat. Coffman eliminated the requirement to perform stripe coating before spray application of the SP-1864 product in Phase 2., but it continued to require a holiday-free coating Coffman evidently believed that stripe coating could be performed <u>after</u> the spray coating was applied. Such a sequence does not constitute "stripe coating," though, as that term is normally used in the coating and corrosion industry.

Given the problems with the low pot lift of the stripe coating material, Coffman then provided verbal authorization to use Sikaflex caulk to apply to defective welds. If properly applied, Sikaflex will provide additional coating thickness at areas of surface irregularities. However, compatibility with SPC's coating and saltwater immersion service conditions should have been verified. It is not known if the application of Sikaflex would provide the required holiday free criteria of the coating specification. The Sikaflex product literature also states that it should not be immersed in water within 12 hours after it is used.

5. **Causation of Substantial Damages**: **Whether in your opinion Coffman's breaches of its standard of care caused Absolute to suffer substantial financial losses?**

Yes. The combined effect of these breaches of Coffman's standard of care resulted in Absolute's having to grind most of, if not all, the welds on the Original Wharf in order to provide the specified holiday-free coating. Given the conditions of the welds, obtaining a holiday-free coating was almost impossible. In addition, Absolute was required to time and time again make repairs to the many holidays that were found. As a result Absolute spent much more time and money than it should have if the site conditions were the way they appeared to be in Coffman's specifications. Had Coffman provided a fair description of the true condition of the welds and the problems the first contractor had with obtaining a holiday free coating because of defective welds, Absolute could have prepared a bid that was based on the true difficulty of the work. Or, if

Coffman had eliminated the holiday-free requirement that it said could not be achieved and was not necessary, Absolute would not have had to perform the large amount of extra work that it did.

I was not asked to calculate the amount of money Absolute actually lost because of these problems. I am told that Mr. Lembke has been hired to determine the specific amount of Absolute's losses. I have only been asked to confirm that the breaches of Coffman's standard of care I have described probably caused Absolute to suffer a substantial financial loss. It is my opinion that Coffman's breaches did cause Absolute to suffer a substantial financial loss.

### B. INFORMATION CONSIDERED

The data or other information I have considered in forming these opinions include the following:

- The project documentation accompanying this report and marked with KEY numbers in the upper right corners of each document.
- The four binders of project data pertaining to the Phase 2 work prepared by Jerry Hardenbergh of Coffman Engineers.
- 2001 Daily Summary Reports and Test reports of Jerry Hardenbergh
- Conversations with David Olson and Jason Peterson
- The DVD of the inspection conducted by Mark Schilling
- The expert report previously issued by Skip Vernon on behalf of Absolute Environmental Services.
- A review of the legal requirements upon a contractor making a pre-bid site visit and a review of the enforceability under law of exculpatory clauses accompanying disclosures of project site conditions in project bid documents.
- The deposition transcript of Jerry Hardenbergh
- NACE International Coating Inspector Training and Certification Program Session 1 Manual.
- NACE International Coating Inspector Training and Certification Program Session 2 Manual.
- Good Painting Practice, Steel Structures Painting Manual Volume 1.
- "Corrosion Prevention by Protective Coatings" Second Edition, by Charles Munger.

### C. SUPPORTING EXHIBITS OR SUMMARIES

The exhibits to be used as a summary of or support for the opinions identified here include those documents identified immediately above.

### D. QUALIFICATIONS

See Curriculum Vitae attached.

### E. PUBLICATIONS

None.

### F. COMPENSATION

Absolute Environmental Services, Inc. has agreed to provide compensation for the time required for my study, report preparation, and testimony at the rate of $100.00 per hour.

### G. PRIOR TESTIMONY AS AN EXPERT WITNESS

None.

Respectfully submitted this 21st day of March, 2006.

*[signature]*

Jeremy A. Hailey, P.E.
NACE Certified Corrosion Specialist, P #5401
NACE Certified Coating Inspector #5672

# CURRICULUM VITAE



10995 Warfield Road, Sedro-Woolley, WA 98284
Phone: (360) 826-4570   Fax: (360) 826-6321

## Jeremy A. Hailey, P.E.

### Education
Bachelor of Science, Agricultural Engineering - Washington State University

### Professional Licenses/Certifications
Registered Professional Civil Engineer: Washington, Oregon, Alaska, Idaho, Colorado
Licensed Electrical Administrator, Washington State
Certified by the National Association of Corrosion Engineers in the following categories:
- NACE International Corrosion Specialist, P
- NACE International Cathodic Protection Specialist
- NACE International Certified Coating Inspector

Washington State Department of Ecology ICC Underground Storage Tank – Cathodic Protection Certification

### Experience
Mr. Hailey is the President and Owner of Northwest Corrosion Engineering, a consulting firm providing specialized engineering services in the field of corrosion control. Mr. Hailey has over ten years experience providing Professional Corrosion Engineering services. Specific areas of expertise include: corrosion control engineering, cathodic protection system design, specification development, design review, corrosion surveys, soil and water analysis, coating evaluation/inspection, material selection, failure analysis, data interpretation, installation supervision, and system troubleshooting.

Mr. Hailey has been involved with the development of comprehensive corrosion control programs for several clients including petroleum refineries, natural gas companies, and sewer and water districts. Additional clients include consulting engineering firms, local, state, and federal agencies, and municipal utilities.

Mr. Hailey has several years of experience providing corrosion engineering services to operators and owners of Underground Storage Tanks (UST's). Northwest Corrosion Engineering provides corrosion control system checkouts, impressed current cathodic protection system commissioning, detailed cathodic protection system design, and system installation support/inspection.

Prior to establishing Northwest Corrosion Engineering, Mr. Hailey provided corrosion engineering consulting services to Alyeska, stewards of the trans-Alaska pipeline system.

His responsibilities included providing corrosion engineering design for both impressed current and galvanic anode cathodic protection systems for the buried portions of the pipeline from the north slope of Alaska to the Valdez Marine Terminal. Additional responsibilities included corrosion control system design and design oversight for numerous other Alyeska facilities including aboveground/belowground petroleum storage tanks, natural gas piping, and marine berth loading structures.

Mr. Hailey currently serves as a lead instructor for the National Association of Corrosion Engineers Cathodic Protection Certification and Training Program, providing instruction for the associations Cathodic Protection Tester (CP Level 1) and Cathodic Protection Technician (CP Level 2) certification programs. In addition, Mr. Hailey serves as the Past-Chairman for the Puget Sound Section of the National Association of Corrosion Engineers, is the Chairman of the American Water Works Association Pacific Northwest Engineering Committee, and is currently a director of the American Water Works Association Northwest subsection.

## Professional Affiliations
NACE – National Association of Corrosion Engineers
AWWA – American Water Works Association