# Transcript of Jeremy Hailey, P.E.

**Case:** Absolute Environmental v. Emerco, Inc.

**Date:** May 16, 2006



RECEIVED

MAY 2 3 2006

LANE POWELL PC

TIME_____ATTY_____



BUELL
REALTIME REPORTING, LLC
Leaders in Realtime Technology

Phone: 206.287.9066
Fax: 206.287.9832
e-mail: info@buellrealtime.com
Internet: www.buellrealtime.com

EXHIBIT C
PAGE 1 OF 9

Absolute Environmental v. Emerco, Inc.

Jeremy Hailey, P.E.
5

### Page 17

1  review it. If it is as you described it, if it really is a
2  pleading that we've already been provided, then we don't need to
3  see another copy of that.
4       MR. MARSTON: Okay. I'll give you the entirely
5  accurate statement of it.
6       The Request For Admissions that you received were
7  Request For Admissions that were drafted by David Olson
8  personally, and he keyed them into a Word document in I think
9  about four different chunks, and he would send them to me over
10  time, and I don't remember actually sending it to him, but I'm confident
11  that what he got was evidently at least one chunk of that
12  material. I will not only verify that that's what it is, I will
13  provide you with a copy of it.
14       MR. STOETZER: Okay. And if it's other than as you
15  believe -- and I have no reason to believe otherwise, given your
16  explanation -- but I may need to reserve time to make inquiry of
17  the witness, if, in fact, it's some other kind of a document;
18  for example, if it's commentary by Mr. Olson rather than just
19  questions.
20       MR. MARSTON: Okay.
21       MR. STOETZER: If he has provided answers to his own
22  questions or such.
23       MR. MARSTON: No, I am confident that that doesn't
24  exist, but I accept your reservation.
25

### Page 18

1       MR. STOETZER: Okay.
2       Q. Is there anything else that you've relied upon or
3  reviewed in connection with your retention as an expert in this
4  case, sir?
5       A. Again, to the best of my knowledge, I don't recall.
6       Q. I would like to get a little background information on
7  you now.
8       What is your current profession?
9       A. I am a corrosion engineer.
10      Q. And by whom are you employed?
11      A. I am self-employed.
12      Q. And how long have you been self-employed?
13      A. For approximately five years.
14      Q. And what is the name of your company?
15      A. Northwest Corrosion Engineering, LLC.
16      Q. And is that at the address that you previously
17  identified?
18      A. Yes, sir.
19      Q. And is that also your home?
20      A. Yes, sir.
21      Q. How many employees do you have?
22      A. I am self -- just myself.
23      Q. Could you briefly outline your educational experience,
24  starting with and including high school.
25      A. I went to Connell High School. After high school, I

### Page 19

1  went to Washington State University and earned a bachelor's
2  degree in agricultural engineering.
3       Q. Where is the high school located?
4       A. Connell, Washington is approximately 30 miles north of
5  Tri-Cities.
6       Q. And when did you graduate from high school?
7       A. 1989.
8       Q. When did you begin your education at WSU?
9       A. The following fall, in 1989.
10      Q. In what year did you graduate?
11      A. 1994.
12      Q. Is that a five-year program?
13      A. It's a four-year program.
14      Q. Why did it take five years?
15      A. It took five years because it was a difficult program
16  to go through and I also got a minor in mathematics, so there
17  was additional classes that I took.
18      Q. Can you describe for the record what a degree in
19  agricultural engineering is.
20      A. Yes. It's broken into three parts: machine design,
21  soil and water, and food processing.
22      Q. Did you take any course work in corrosion engineering
23  while you were at WSU?
24      A. No, I did not.
25      Q. I understand that plants don't grow very well in

### Page 20

1  saltwater; is that your understanding?
2       A. No.
3       Q. Okay.
4       Strike that. Good point.
5       And I love seaweed.
6       MR. MARSTON: Plankton is a good one too.
7       Q. I'm just trying to get a sense of whether or not your
8  degree in agricultural engineering would have much to do with
9  marine coatings. We're going to talk about marine coatings this
10  morning.
11      Did you take any course work in connection with your
12  agricultural engineering degree program that relates to
13  industrial or marine coatings?
14      A. No, I did not.
15      Q. Did you have any formal education following your
16  college degree?
17      MR. MARSTON: Objection. Vague as to what
18  constitutes formal education.
19      A. I took, I believe, four classes at the University of
20  Alaska in their graduate program in engineering science and
21  management.
22      Q. Can you identify the four -- did you say classes or
23  courses?
24      A. Classes.
25      Q. Okay.

(Pages 17 to 20)

EXHIBIT C
PAGE 2 OF 9



Absolute Environmental v. Emerco, Inc.                                    Jeremy Hailey, P.E.
6

## Page 21

1    A.   Arctic engineering was one of them.  A corrosion
2    engineering course was one of them.  There was a process class,
3    and I don't recall what the fourth one was.
4        Q.   Were you formally registered at the University of
5    Alaska in connection with taking these classes?
6        A.   Yes, I was a registered student there.
7        Q.   And were you in a degree program?
8        A.   I had not -- I had not filled out the required
9    paperwork for a degree program.
10       Q.   In what years did you take these classes?
11       A.   I believe it would have been '98, '99 and maybe 2000,
12   or '99, 2000, 2001.
13       Q.   Did you receive grades?
14       A.   Yes.
15       Q.   Is there a transcript?
16       A.   Yes.
17       Q.   Could we get a copy of that transcript?
18       A.   Yes, you may.
19       Q.   Thank you.
20            If you could make a note, there may be other things
21   that I'll ask you to provide.  I appreciate your cooperation.
22            MR. MARSTON:  And for future requests for
23   documentation from this expert witness, I'm going to ask him to
24   defer answering whether or not you're going to provide stuff
25   like that until you've had an opportunity to confer with me

## Page 22

1    afterwards, because there is a formal process the courts have
2    set aside for obtaining documents, and in the representation of
3    Absolute Engineering, I have a role to play in deciding when and
4    what circumstances to produce new documents that have been
5    requested.
6        Q.   Who is the professor of the corrosion engineering
7    class that you took at the University of Alaska?
8        A.   The instructor was Dr. Baker.  I don't recall his
9    first name.
10       Q.   And what was the -- were there textbooks.
11       A.   Yes.
12       Q.   And can you identify the textbooks.
13       A.   It was authored by Denny Jones, and I don't recall the
14   name of the textbook.  Possibly "Corrosion Science and
15   Engineering," but I don't recall.  I have it on my -- in my
16   library.
17       Q.   Did you complete the class?
18       A.   Yes.
19       Q.   Any other formal education following your degree in
20   agricultural engineering?
21       A.   I did not take any other classes at the university.
22       Q.   In what states are you licensed to practice
23   engineering?
24       A.   Washington, Alaska, Oregon, Idaho and Colorado.
25       Q.   And what's the nature of your licenses in each of

## Page 23

1    those states?
2        A.   I'm licensed as a civil engineer.
3        Q.   What other types of engineers are there from a
4    licensing perspective?
5        A.   In the state of Washington, mechanical, chemical,
6    electrical, and I'm not aware of any others, but I'm sure that
7    there's a couple others.
8        Q.   You're not licensed in any state as an electrical
9    engineer, as I understand it?
10       A.   I am not, no.
11       Q.   You're not licensed in any state as a chemical
12   engineer, as I understand it; is that correct?
13       A.   That is correct.
14       Q.   How would you describe your current practice?
15       A.   I don't understand the question.
16       Q.   Fair enough.
17            Are you practicing civil engineering currently?
18       A.   I'm practicing corrosion engineering.
19       Q.   Is there a license for corrosion engineering?
20       A.   No, there is not.
21       Q.   And can you describe what corrosion engineering is.
22       A.   Corrosion engineering is -- it's the discipline of
23   developing techniques and systems for stopping the natural
24   corrosion process.
25       Q.   Anything else?

## Page 24

1        A.   I'm sure that there's a very strict definition, but
2    those are the typical things that corrosion engineers do, is
3    develop systems and systems to keep corrosion from occurring, or
4    to slow the corrosion process.
5        Q.   Are there categories of systems that are designed and
6    developed to inhibit corrosion?
7        A.   Yes.
8        Q.   Can you give me some examples.
9        A.   Corrosion inhibitors, coating systems, cathodic
10   protection systems, anodic protection systems.
11       Q.   Let's turn to your work experience.
12            Did you do any kind of construction or engineering
13   work as employment while you were in college?
14       A.   During the spring breaks and summer breaks, I worked
15   for a contractor who was installing a cathodic protection system
16   at a refinery in Anacortes.
17       Q.   Describe cathodic protection, please.
18       A.   Cathodic protection is -- is the application of
19   protective current to a metallic structure to keep the surface
20   from supporting an oxidation reaction, essentially keeping the
21   structure from corroding.
22       Q.   What was your next job following the summer work that
23   you did for this contractor?
24       A.   After I graduated, I went to work for him full time.
25       Q.   Could you identify the contractor.

(Pages 21 to 24)

Buell Realtime Reporting, LLC
206-287-9066

EXHIBIT   C
PAGE   3   OF   9

Absolute Environmental v. Emerco, Inc.

Jeremy Hailey, P.E.
7

## Page 25

1   A.   Premier Cathodic Protection.
2   Q.   Who are the principals of Premier?
3   A.   The owner is Mac Engh.
4   Q.   And where is this organization located?
5   A.   Freeland, Washington.
6   Q.   And how long did you work there?
7   A.   I worked there for approximately two years.
8   Q.   Can you give me the years?
9   A.   1994 to 1996.
10   Q.   And generally, what did you do while you were working
11   at this company?
12   A.   I was doing the site work, doing -- recording soil --
13   or collecting soil samples and soil resistivity testing,
14   installing cathodic protection systems, troubleshooting.
15   Q.   Did you do any work involving coatings?
16   A.   No, I did not.
17   Q.   On what type of structure or structures did you have
18   involvement with where there was cathodic protection?
19   A.   Above-ground storage tanks and buried pipelines.
20   Q.   Any marine structures?
21   A.   A wharf structure at the refinery.
22   Q.   While at this company, did you have occasion to draft
23   any specifications?
24   A.   No.
25   Q.   So I take it that with this employer, you didn't draft

## Page 26

1   any specifications for a marine coating project, for example?
2   A.   Correct.
3   Q.   What was your job title at this company?
4   A.   I wasn't -- we weren't given titles, I guess.
5   Q.   What did you do?
6       MR. MARSTON:  Objection.  Asked and answered.
7   A.   I would collect field data for system design work.  I
8   would -- I was involved with the installation of cathodic
9   protection systems, doing troubleshooting work, doing system
10   commissioning and adjustment.
11   Q.   And the installation, did that include physical
12   installation --
13   A.   Yes.
14       MR. MARSTON:  Stop.
15   Q.   -- as a laborer?
16       MR. MARSTON:  Stop here a second, Counselor.
17       MR. STOETZER:  Sorry.
18       MR. MARSTON:  If he asks you a question that is the
19   same question that you think has been asked before, it is your
20   right to say, "The answer that I gave you before still stands."
21       Go ahead.
22       You don't have to repeat yourself, in other words.
23       MR. STOETZER:  I didn't recall asking him previously
24   about his installation activities.  I was just trying to drill
25   down.  We could save time if you would allow me to ask the

## Page 27

1   questions.  I don't want to argue with you, Mr. Marston.  I get
2   your point.  We don't want any repetition.  We'll try to avoid
3   it.  Sometimes with a witness who has not been deposed before,
4   who has limited experience testifying as an expert witness, it's
5   helpful to have context.  So that's all I was trying to do.
6       MR. MARSTON:  Counsel, I understand that, and I know
7   you've been practicing a long time, but I've been practicing
8   over 20 years myself.  While I do appreciate your words of
9   wisdom there, it's not really necessary.
10   Q.   Can you describe the physical installation activities
11   that you experienced at this employer.
12   A.   We installed several different types of anode systems
13   that required the installation of -- I'm sorry, the drilling of
14   ground beds, which would involve an 8-inch to 12-inch-diameter
15   holes drilled at a 45-degree angle underneath the tanks and then
16   installing anodes and surrounding backfill around the anodes.  I
17   was also involved with installing vertical anode systems and
18   galvanic anode systems for other structures.
19   Q.   Was this done on new work or existing work?
20   A.   Both.
21   Q.   Who was your next employer?
22   A.   Intermountain Corrosion Service.
23   Q.   Where are they located?
24   A.   They were located in Tacoma, Washington.
25   Q.   What type of work did you do there?

## Page 28

1   A.   Corrosion engineering work, field work.
2   Q.   What was your job title?
3   A.   I was a corrosion engineer.
4   Q.   Can you describe all coating-related work you did at
5   Intermountain Corrosion.
6   A.   I started doing coating inspection work with them,
7   just on a couple -- actually, just one project that I can think
8   of off the top of my head.
9   Q.   What was the name of that project?
10   A.   That was a water tank at Jim Hill Creek.
11   Q.   Was there a specification prepared in connection with
12   the coating of that tank?
13   A.   Yes.
14   Q.   Who drafted the specification?
15   A.   I believe it was drafted by the United States Army,
16   but I'm not certain of that.
17   Q.   You didn't draft it?
18   A.   That is correct.
19   Q.   And how long a project was this?
20   A.   It may have lasted for somewhere between four and six
21   months, perhaps.
22   Q.   Were you on site for the entire four to six months?
23   A.   No, I was not.
24   Q.   How often did you visit the site?
25   A.   I probably made site visits on a weekly type of basis.

(Pages 25 to 28)

Buell Realtime Reporting, LLC
206-287-9066



EXHIBIT C
PAGE 4 OF 9

Absolute Environmental v. Emerco, Inc.
8

Jeremy Hailey, P.E.

---

**Page 29**

1  Q.  What would you do on those site visits?
2  A.  I would review the work that the contractor had done
3  and take some preliminary data, such as dry film thicknesses,
4  review the types of materials that the contractor was using and
5  applying.
6  Q.  Did you prepare reports?
7  A.  I'm sure that I did.
8  Q.  Did you do any testing, other than DFT testing, dry
9  film thickness testing?
10  A.  I may have done ambient condition type of testing,
11  environmental condition testing.
12  Q.  Did you do any high-voltage testing?
13  A.  No, I did not.
14  Q.  Can you describe for us what is high-voltage testing.
15  A.  High-voltage testing is the application of either a
16  high voltage AC or DC between two structures to determine if an
17  electrical continuity exists between the holiday detector and
18  the structure itself.
19  Q.  And did you say discontinuity or --
20  A.  A continuity between the holiday detector and the
21  structure itself to determine if an electrical continuity can be
22  made between those two.
23  Q.  What does it signify or indicate if there is
24  electrical continuity?
25  A.  It indicates that the coating has experienced a

---

**Page 30**

1  holiday or was applied thinner than the breakdown voltage of the
2  coating.
3  Q.  Can you describe what a holiday is, please.
4  A.  A holiday is a discontinuity in the coating.  In the
5  strictest sense, it may even imply that the coating was applied
6  too thin, and was not -- and did not pass the holiday testing,
7  holiday detection testing.
8  Q.  What type of coating was on the water tank at Jim Hill
9  Creek?
10  A.  I do not recall that.  It -- I'm sorry.
11  Q.  Was it a plural component --
12  A.  No, it was not.
13  Q.  -- product?
14     Do you recall the manufacturer?
15  A.  I do not.
16  Q.  Do you recall how thick it was applied?
17  A.  It was a thin film coating, so it was applied
18  somewhere between 10 and 20 mils, but I don't recall
19  specifically.
20  Q.  And I take it this was not a marine environment in
21  which this tank was in?
22  A.  That is correct.
23  Q.  Any other coating projects that you worked on at
24  Intermountain Corrosion in Tacoma, Washington?
25     MR. MARSTON:  Any other projects or any other

---

**Page 31**

1  projects that had coating -- they worked on coatings?
2     MR. STOETZER:  Coating.
3  A.  No coating inspection projects that I can think of.
4  Q.  Did you draft any coating specifications?
5  A.  No, I did not.
6  Q.  Up to and through your employment at Intermountain
7  Corrosion, do I understand correctly that you did not draft any
8  coating specifications?
9  A.  Yes, that's correct.
10  Q.  Who was your next -- oh, give me again the dates of
11  employment with Intermountain Corrosion.
12  A.  That was 1996 through I think the beginning of 19 --
13  or to the end of 1996.
14  Q.  Any projects in Alaska with Intermountain Corrosion?
15  A.  I'm trying to recall the dates on that employment so I
16  can give you an accurate answer.
17     Yes, with Intermountain, I believe it was through the
18  end of 1996.
19  Q.  Who was your next employer?
20  A.  Corrpro Companies.
21  Q.  Where was Corrpro located?
22  A.  Mukilteo, Washington.
23  Q.  What was your job at Corrpro?
24  A.  I was a corrosion engineer there.
25  Q.  And during what years were you employed at Corrpro?

---

**Page 32**

1  A.  From the end of my employment with Intermountain
2  Corrosion Service to the spring of 2001.
3  Q.  At the Corrpro office located in Mukilteo, Washington,
4  did you have any experience with marine coating projects?
5  A.  I do not recall any.
6  Q.  Did you do cathodic protection work?
7  A.  Yes.
8  Q.  Fair to say your corrosion background has focused
9  primarily with cathodic protection?
10  A.  That would be a fair statement.
11  Q.  While at Corrpro, can you list all of the projects
12  that you participated in that were on or over water.
13  A.  While I was working with Corrpro in Mukilteo?
14  Q.  Did you move at some point to another Corrpro office?
15  A.  Yes.
16  Q.  Let's first take your employment with Corrpro in the
17  state of Washington.
18  A.  I'm sorry, what was the question again?
19     (Question was read back as follows:
20     "QUESTION:  While at Corrpro, can you list all of the
21     projects that you participated in that were on or
22     over water.")
23  A.  I do not recall any projects that I worked on, on or
24  over water while I was with the Mukilteo office.
25  Q.  Did you write any specifications for any kind of

---

(Pages 29 to 32)

Buell Realtime Reporting, LLC
206-287-9066

EXHIBIT ___C___
PAGE __5__ OF __9__

Absolute Environmental v. Emerco, Inc.

Jeremy Hailey, P.E.

9

---

**Page 33**

1 coating?
2   A.  Not to my recollection.
3   Q.  And, thus, you would not have written, while at
4 Corrpro Mukilteo office, a specification for a marine coating?
5   A.  That is correct.
6   Q.  How long did you work at the Mukilteo office?
7   A.  I believe I was there for approximately six months.
8   Q.  And what happened after six months?
9   A.  I transferred offices.
10   Q.  And where did you transfer to?
11   A.  Anchorage.
12   Q.  And what work did you do with the Anchorage office of
13 Corrpro?
14   A.  I was a corrosion engineer.
15   Q.  And was that primarily in the area of cathodic
16 protection?
17   A.  Yes, it was.
18   Q.  While you were employed by Corrpro through, as I
19 understand it, year 2000, did you draft any specifications for a
20 marine coating project?
21   A.  Through 2001?
22   Q.  I wrote down 2000. Was it through 2001?
23     MR. MARSTON: He said 2001.
24   Q.  Same question, but through 2001.
25   A.  I do not recall drafting any coating specifications

---

**Page 34**

1 from scratch, but I did get involved with reviewing and revising
2 and updating coating specifications.
3   Q.  And were any of those coating specifications to which
4 you just referred for jobs on or over water?
5   A.  There were coating specifications that dealt with
6 structures that were over water on the berth -- on the berths at
7 the marine terminal from a review of the coating specifications.
8   Q.  My question has to do with drafting, not reviewing.
9 Did you draft any specifications for a marine-oriented project?
10     MR. MARSTON: Objection. Are you intending to
11 exclude review and revising and updating coating specifications,
12 and therefore, only including drafting something from scratch?
13     MR. STOETZER: I'm just trying to better understand
14 what the witness said in response to my question of whether or
15 not he had drafted, and I understood that he said that he may
16 not have drafted, but he may have redrafted, that he reviewed
17 and revised and updated certain things, so I'm trying to find
18 out what the detail of that is.
19     MR. MARSTON: For the purpose of your question,
20 you're talking about drafting a set of corrosion specifications
21 from scratch as opposed to updating and revising; is that right?
22     MR. STOETZER: Actually, the question relates to
23 coating specifications specifically as opposed to corrosion
24 generally.
25     MR. MARSTON: But you're intending to exclude

---

**Page 35**

1 reviewing and revising and updating from your question.
2     Objection. Ambiguous until it's clarified.
3   Q.  Did you understand my question?
4   A.  No, I did not.
5   Q.  Okay.
6     While employed at Corrpro through and including 2001
7 at or out of the Anchorage, Alaska office, did you draft any
8 coating specifications?
9   A.  I did not draft any coating specifications from
10 scratch, no.
11   Q.  With regard to the project that you mentioned at
12 Valdez, did you redraft, review, revise or update a marine
13 coating specification?
14   A.  I would have reviewed coating specifications for
15 structures that were over the marina.
16   Q.  But you didn't draft them for that project?
17   A.  That is correct.
18   Q.  And your work on that particular project had to do
19 with cathodic protection, correct?
20     MR. MARSTON: Objection. Vague as to whether you're
21 talking exclusively or not.
22   A.  My work with that project would have been reviewing
23 the project documents, reviewing coating specifications, among
24 others.
25   Q.  And the others included cathodic protection?

---

**Page 36**

1   A.  I don't believe, for that particular project, there
2 was cathodic protection involved with that particular one.
3 There was --
4   Q.  I just want to make sure I'm understanding your
5 testimony.
6     You reviewed some specifications in connection with a
7 facility at Valdez, correct?
8     MR. MARSTON: Objection. Misstates the witness's
9 testimony. Asked and answered.
10   A.  My responsibilities for that were to review the
11 documents, and if I felt necessary, provide updated information
12 to them also, make them project-specific.
13   Q.  Who drafted the specifications?
14   A.  They were standard specifications that Alyeska had.
15   Q.  And what type of structure was this specification for?
16   A.  It was for the berth loading arm work.
17   Q.  How long did you work on that project?
18   A.  I was a project engineer for that for a portion of
19 that project, and I don't recall how long that was. It may have
20 been four months; six months, perhaps.
21   Q.  And were you on site?
22   A.  I was on site, but I was not continually on site.
23   Q.  Did you make any changes to the standard
24 specification?
25   A.  I don't recall if I did or not.

**(Pages 33 to 36)**

EXHIBIT C
PAGE 6 OF 9

Absolute Environmental v. Emerco, Inc.                    Jeremy Hailey, P.E.
10

---

**Page 37**

1  Q.  Is it likely you did or not?
2      MR. MARSTON: Objection. Calls for speculation.
3  A.  It's more likely that I did not.
4  Q.  Did you do any testing of the coatings on that
5  project?
6  A.  I recall that we did a number of tests on perhaps half
7  a dozen different coatings to find out what their mechanical
8  properties were relative to each other.
9  Q.  Is this work that you personally performed or was
10  otherwise done by other people?
11  A.  No, the work was done by an outside office, but it
12  was --.
13      MR. MARSTON: I'm going to have to caution you about,
14  if you do that, she can't read your lips as well as listen to
15  you.
16  A.  The testing of the coatings was done by an outside
17  facility.
18  Q.  And, by the way, you mentioned a loading arm. Did
19  your project involve any part of the wharf that was in the tidal
20  zone or immersed?
21  A.  No.
22  Q.  So this loading arm did not extend into the water?
23  A.  That is correct.
24      And I want to clarify that the project that I'm
25  talking about was not my project. As a project engineer, I was

**Page 38**

1  tasked with overseeing various different projects, and to the
2  best of my recollection, a portion of my projects intersected
3  with the berth structures.
4  Q.  I just want to know precisely what experience you had
5  with this project, to the extent that you were personally tasked
6  with coatings that were underwater or in the tidal zone.
7  A.  None.
8  Q.  Maybe to speed this up, can you identify for us all
9  major projects you were involved with regarding marine coatings
10  while employed by Corrpro in Alaska?
11      MR. MARSTON: Objection. Vague with respect to what
12  constitutes a major project.
13      Can I have that question read back, please.
14      (Question was read back as follows:
15      "QUESTION:  Maybe to speed this up, can you identify
16      for us all major projects you were involved with
17      regarding marine coatings while employed by Corrpro
18      in Alaska?")
19  A.  I do not recall any.
20  Q.  By whom were you next employed?
21  A.  That's when I became self-employed.
22  Q.  Can you identify all the major projects you have had
23  with your current employer, your business, a sole
24  proprietorship, that involve writing coating specifications for
25  marine projects.

**Page 39**

1  A.  I have not wrote any coating specifications for marine
2  projects for coatings in the marine environment.
3      MR. MARSTON: Hang on just a second.
4      (Off-the-record discussion between
5      Mr. Marston and the witness.)
6  Q.  Now that you've conferred with Mr. Marston off record,
7  does that change your answer to any of my questions?
8      MR. MARSTON: Well, I'll tell you what I asked him
9  was, what about marine ballast tanks?
10  A.  The -- at the marine Valdez terminal, they have
11  ballast water tanks that off-load water from the ships, and I
12  was involved with reviewing coating specifications for repair
13  work on those tanks.
14  Q.  Was that freshwater or saltwater?
15  A.  That was saltwater.
16  Q.  Who drafted the specification?
17  A.  Again, that was a standard specification.
18  Q.  Please identify each and every change you made to the
19  standard specification.
20  A.  I don't recall that.
21  Q.  What was the coating material that was utilized in
22  connection with the repair of the water tanks at Valdez?
23  A.  I don't recall.
24  Q.  Was this a major project for you?
25      MR. MARSTON: Objection. Vague.

**Page 40**

1  A.  I don't understand what a vague -- sorry, I don't
2  understand what a major project is.
3  Q.  How many months did you work on that project that
4  specifically related to the water tanks?
5  A.  It would have been less than a month.
6  Q.  And how much time did you spend reviewing the
7  specification for the repair work?
8  A.  I don't recall.
9  Q.  Did you retain copies of any of these specifications
10  that you reviewed at the Valdez project?
11  A.  No, I did not.
12  Q.  Do you write specifications for cathodic protection
13  work?
14  A.  Yes.
15  Q.  And when did you start doing that?
16  A.  I would have started doing coating -- I'm sorry,
17  cathodic protection specification work with Intermountain
18  Corrosion Service.
19  Q.  Did you also write cathodic protection specifications
20  while employed by Corrpro?
21  A.  Yes.
22  Q.  By the way, with regard to the water tanks at Valdez,
23  do I understand that these are closed vessels?
24  A.  I don't understand what you mean by "closed vessels."
25  Q.  Well, a tank, was the tank -- was the work that you

(Pages 37 to 40)

EXHIBIT  C
PAGE  7  OF  9



Absolute Environmental v. Emerco, Inc.

Jeremy Hailey, P.E.
11

---

**Page 41**

1 were describing on the outside of the tank or the inside of the
2 tank?
3    A.   It was the interior of the tank.
4    Q.   So, for example, there was no UV exposure?
5    A.   That is correct.
6    Q.   Does that make a difference?
7         MR. MARSTON:  Objection.  Vague with respect to what
8 issue.
9    A.   A difference with respect to what?
10   Q.   Well, tell me what the differences are between any
11 other kind of coating.
12        MR. MARSTON:  Objection.  No -- objection.  Vague.
13 No identification of any kind of coating, much less one to
14 compare with another.
15        MR. STOETZER:  I understand that you've offered him
16 as an expert, and I'm trying to learn, the jury will try to
17 learn what he knows about coating, and so I'm asking him to
18 describe -- I'll try the question a different way.
19        MR. MARSTON:  Okay.
20   Q.   Based on your experience, is there a difference
21 between the design criteria for the inside of a water tank on
22 the one hand, and a, oh, let's say a marine structure that is
23 immersed in saltwater and exposed to tidal action and otherwise
24 exposed to the elements of the outside.
25   A.   Yes, there would be a difference.

---

**Page 42**

1    Q.   So what are those differences?
2    A.   The robustness of the coating would probably -- would
3 probably require a more robust coating on the marine structure
4 than you would inside the water tank.
5         It would need to be more abrasive-resistant in order
6 to retain its physical properties when subjected to outside
7 influences, such as wind, waves, debris in the water.
8    Q.   Did the specification for that water tank require any
9 testing for holidays?
10   A.   It most likely did, but I don't specifically recall.
11   Q.   What would be the purpose of having holiday detection
12 testing?
13   A.   To ensure that your structure is -- does not come into
14 contact with a corrosive environment.
15   Q.   And do you think that's important?
16   A.   Yes.
17   Q.   How many design-build coating projects have you been
18 involved with?
19   A.   Design-build coating projects, none.
20   Q.   How many design-build corrosion specs have you
21 written?
22   A.   I don't understand.
23        MR. MARSTON:  Objection.  Vague.  I don't know what
24 the distinction is, or if there is such a thing as a
25 design-build corrosion spec, so objection.  Vague.

---

**Page 43**

1    Q.   Do you know what a design-build project is?
2    A.   Yes, I do.
3    Q.   Okay.
4    A.   Are you asking --
5    Q.   I was asking the broader question.  The next question
6 will be if you have drafted any marine coating specifications
7 for design-build, but I'm presuming the answer to that question
8 is no, because you haven't had the experience of drafting from
9 scratch, as I understand it, marine coating specifications.  So
10 I intentionally broadened the question to include any kind of
11 corrosion specification.
12        MR. MARSTON:  Okay.  Wait a minute.  With that
13 explanation, would you please restate your question or we can
14 have it read back, your preference.
15   Q.   How many design-build corrosion-related specifications
16 have you drafted?
17        MR. MARSTON:  Same objection.
18        Go ahead.
19   A.   I'm going to guess somewhere on the order of 30 or so.
20   Q.   But of the 30, none have involved a marine coating,
21 correct?
22   A.   That is correct.
23   Q.   Have many of them involved cathodic protection?
24   A.   Yes.
25   Q.   Of the 30, how many involved cathodic protection?

---

**Page 44**

1    A.   They all -- they all would have.
2    Q.   In your various employments, did you ever have
3 assignments where your employer was actually the coating
4 contractor?
5    A.   I don't believe so.
6    Q.   Have you ever prepared a bid for a coating job?
7    A.   I have wrote specifications for coating jobs, but I
8 have not prepared a complete bid, which includes putting it out
9 for bid, having the typical boilerplate information that you
10 would require of a contractor, such as insurances and licenses
11 and that, but I have written coating specifications that were
12 included in those bid documents.
13   Q.   But I think we've established none of those were for
14 marine coatings?
15   A.   Correct.
16   Q.   How many of them involved plural component coatings?
17   A.   None.
18        MR. MARSTON:  Clarification.  When you say "marine,"
19 you are specifically referring to saltwater; is that right?
20        MR. STOETZER:  Correct.  Except when I've otherwise
21 asked questions about whether the work was over or in water;
22 that would be any kind of water.
23   Q.   Does that clarification change any of your answers?
24   A.   I have done coating work over water, such as inside of
25 water tanks over rivers, freshwater stuff, potable water.

(Pages 41 to 44)

---

Buell Realtime Reporting, LLC
206-287-9066



EXHIBIT C

PAGE 8 OF 9

Absolute Environmental v. Emerco, Inc.                                      Jeremy Hailey, P.E.
40

**Page 157**

1    Q.   Do you know Skip Vernon?
2    A.   I have -- I have not met Skip, Mr. Vernon,
3    face to face.  I believe that we had a phone conversation, and
4    I've read his report.
5    Q.   What was the context in which you had the phone
6    conversation?
7    A.   It was the discussion -- it was a discussion of the
8    degree of rusting standards, and actually, I don't believe it
9    was a phone conversation -- yes, it was a phone conversation, if
10   I remember correctly.
11   Q.   And when did this phone conversation occur?
12   A.   I do not remember the exact date, but it would have
13   been early in the -- towards the beginning of March.
14   Q.   Did you take any notes of this conversation?
15   A.   No.
16   Q.   Did you call Skip Vernon or did Skip Vernon call you?
17   A.   I believe I called Mr. Vernon.
18   Q.   At whose suggestion?
19   A.   I don't know that there was a suggestion on it.  I
20   know that I asked Mr. Marston if Mr. Vernon had -- or if I could
21   purchase a document and have -- yeah, purchase a document, and
22   Mr. Marston suggested that I speak with Mr. Vernon as he might
23   already have that.
24   Q.   Did you discuss Mr. Vernon's report with Mr. Vernon?
25   A.   No, I did not.

**Page 158**

1    Q.   Have you reviewed Mr. Vernon's report?
2    A.   I have read Mr. Vernon's report.
3    Q.   Have you been asked to assess or contradict
4    Mr. Vernon's report?
5    A.   I have not been asked to assess or contradict
6    Mr. Vernon's report.
7    Q.   Would you agree that Mr. Vernon's report concludes
8    that Jerry Hardenbergh's quality assurance inspections were in
9    compliance with industry standards?
10   A.   Yes, I would agree with that.
11   Q.   And would you agree with Mr. Vernon's conclusion that
12   he saw no problems with Jerry Hardenbergh's inspections?
13   A.   Based upon the information that I reviewed, I would
14   agree with that.
15   Q.   Back to your report, which is Exhibit 12, there's a
16   discussion regarding Absolute's prior experience with marine
17   coatings and the experience of its subcontractor, Imperial.
18   Could I direct your attention to page 12, the second paragraph?
19        MR. PARTNOW:  It's Exhibit 7.
20        MR. STOETZER:  Sorry.  Exhibit 7.
21   Q.   I want to make sure I'm understanding what you're
22   saying here about Absolute and its subcontractor coating
23   company.
24        By the way, does the coating subcontractor refer to
25   Imperial?

**Page 159**

1    A.   Yes.
2    Q.   And what do you know, based on documents you've
3    reviewed or personal knowledge, regarding the coating experience
4    of Absolute?
5    A.   Based upon my conversations with Mr. Olson, they did
6    not have coating experience, or if they did, it was very, very
7    minimal.
8    Q.   And what was your understanding with regard to
9    Imperial's marine coating experience?
10   A.   I was under the impression, based on the documents,
11   that they had very little marine experience.
12   Q.   And what documents did you review in that regard?
13   A.   I believe it was the bid provided by Absolute.
14   Q.   So you reviewed the submittal from Absolute, which
15   included information about Imperial?
16   A.   Yes.
17   Q.   What, if any, was Coffman's role with regard to the
18   contracting for Phase I?
19   A.   As I understand it, Coffman was responsible for
20   developing the coating specifications and for doing other
21   corrosion-related type of work to deal with the cathodic
22   protection and then providing on-site quality assurance
23   inspector.
24   Q.   Are you describing Phase I or Phase II?
25   A.   Phase I, as I understand it.

**Page 160**

1        MR. MARSTON:  That was your question.
2    Q.   Have you reviewed the contract documents for Phase I?
3        MR. MARSTON:  Objection.  Vague, with respect to
4    which contract documents.
5    Q.   Have you reviewed the contract between Brechan and
6    Absolute?
7        MR. MARSTON:  That's Phase II.
8    A.   If I did, I don't recall it right off the top of my
9    head.
10   Q.   Did you review the contract between Swalling and
11   Brechan?
12   A.   There's a -- I've reviewed multiple contracts between
13   Swalling and Brechan, yes.
14   Q.   Have you reviewed the contract between Brechan and
15   Trick Nyman?
16   A.   This document that I have here is the project scope
17   and fee narrative, and I believe that's between Coffman and
18   Brechan, so I don't -- I don't recall reviewing the document
19   between Brechan and Trick Nyman Hayes.
20   Q.   Well, in Phase I, did Coffman work for Trick Nyman or
21   did Coffman work for Brechan?
22   A.   I believe that Coffman worked for Trick Nyman.
23   Q.   And have you reviewed the contractual obligations of
24   Coffman during Phase I?
25   A.   If this document, dated 3/13/01 project scope and fee

(Pages 157 to 160)

Buell Realtime Reporting, LLC
206-287-9066

EXHIBIT  C
PAGE  9  OF  9