ERIC J. BROWN, ESQ.
JERMAIN DUNNAGAN & OWENS, P.C.
3000 A. Street, Suite 300
Anchorage, Alaska 99503-4097
Telephone: (907) 563-8844
Facsimile: (907) 563-7322 (ebrown@jdolaw.com)

PATRICK J. DUFFY, III, ESQ.
WILLIAM R. BAERG, ESQ.
MONTELEONE & McCRORY, LLP
725 S. Figueroa Street, Suite 3200
Los Angeles, California 90017-5446
Telephone: (213) 612-9900
Facsimile: (213) 612-9930 (baerg@mmlawyers.com)

Attorneys for Defendant Forrest J. McKinley and
Defendant and Counter-Claimant EMERCO, INC.,
dba Imperial Industrial Coatings

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaskan Corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>FORREST J. McKINLEY and "JANE DOE" McKINLEY, and the marital community property composed thereof d/b/a/ "Imperial Industrial Coatings" and EMERCO, INC., a California Corporation d/b/a/ Imperial Industrial Coatings,<br><br>*Defendants.*<br><br>EMERCO, INC., a California Corporation d/b/a Imperial Industrial Coatings, and the United States for the Use and Benefit of EMERCO, Inc.,<br><br>*Counter-Claimant/Third Party Claimant,*<br><br>v.<br><br>ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaskan Corporation, et al.,<br><br>*Cross-Defendants/Third Party Defendants.* | CASE NO. A-03-0199<br>Civil (RRB)<br><br>**DECLARATION OF WILLIAM R. BAERG IN SUPPORT OF CROSS-CLAIMANT EMERCO, INC., DBA IMPERIAL INDUSTRIAL COATINGS' OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS CLAIM FOR GOODS SOLD AND DELIVERED** |

1  THE UNITED STATES OF AMERICA for the use )
   and benefit of ABSOLUTE ENVIRONMENTAL )
2  SERVICES, INC., and Alaska corporation, )
                                           )
3       *Plaintiff,*                       )
                                           )
4  v.                                      )
                                           )
5  SAFECO INSURANCE COMPANY OF             )
   AMERICA, a Washington corporation,      )
6                                          )
   Defendant.                              )
7  _____)
   BRECHAN ENTERPRISES, INC., an Alaska    )
8  corporation,                            )
                                           )
9  Counterclaim Plaintiff,                 )
                                           )
10 v.                                      )
                                           )
11 ABSOLUTE ENVIRONMENTAL SERVICES,        )
   INC., an Alaska corporation,            )
12                                         )
   Counterclaim Defendant.                 )
13 _____)
   BRECHAN ENTERPRISES, INC., an Alaska    )
14 corporation,                            )
                                           )
15 Third-Party Plaintiff,                  )
                                           )
16 v.                                      )
                                           )
17 COFFMAN ENGINEERS, INC., a Washington   )
   corporation,                            )
18                                         )
   Third-Party Defendant.                  )
19 _____)

20

21             DECLARATION OF WILLIAM R. BAERG

22 I, William R. Baerg, declare:

23        1.      I am an attorney duly licensed to practice my profession before the courts of the

24 State of Washington and the courts of the State of California. I am admitted to practice pro hac

25 vice in this court for purposes of this lawsuit. I am a partner at Monteleone & McCrory, LLP,

26 attorneys for Emerco, Inc., dba Imperial Industrial Coatings ("Emerco" or "Imperial Industrial

27 Coatings") in the above captioned matter. If called as a witness, I could and would competently

28 testify to the following facts.

1       2.     During the discovery phase of this matter, Emerco answered written

2 interrogatories which identified the damages sought by Emerco caused by Absolute

3 Environmental Services, Inc. retaining the equipment identified in the August 7, 2003, letter

4 attached to the declaration of David Olson as Exhibit 6. Attached hereto as Exhibit 1 is a true

5 and correct copy of those interrogatory responses. The answer identifying the damages incurred

6 for the retained goods is found on page 17 of the responses.

7       3.     During discovery in this case, Emerco produced written calculations and purchase

8 orders which formed the basis of the computation contained in my letter of August 7, 2003.

9       4.     Mr. Puett was deposed on November1, 1004, November 2, 2004, and May 8,

10 2006, leaving every opportunity for Absolute to interrogate him about the methods used to

11 estimate the value of the equipment. In fact, on November 1, 2004, Mr. Puett was asked about

12 the value of the equipment. Attached hereto as Exhibit 2 is a true and correct copy of pages 50 to

13 61 where in the value of the equipment was discussed. Mr. Puett testified that the value was

14 based on purchase orders for the equipment purchased by Imperial Industrial Coatings, many of

15 which were presented to his at his deposition.

16

17       I declare under penalty of perjury under the laws of the United States that the foregoing is

18 true and correct. Executed this 19th day of August, 2006, in Los Angeles, California.

19

20

21                     WILLIAM R. BAERG

22

23

24

25

26

27

28

# Exhibit 1

ERIC J. BROWN, ESQ.
JERMAIN DUNNAGAN & OWENS, P.C.
3000 A. Street, Suite 300
Anchorage, Alaska 99503-4097
Telephone: (907) 563-8844
Facsimile: (907) 563-7322

PATRICK J. DUFFY, III, ESQ.
WILLIAM R. BAERG, ESQ.
MONTELEONE & McCRORY, LLP
725 S. Figueroa Street, Suite 3200
Los Angeles, California 90017-5446
Telephone: (213) 612-9900
Facsimile: (213) 612-9930

Attorneys for Defendant and
Cross-Complainant EMERCO, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaskan Corporation,

    Plaintiff,

    v.

FORREST J. McKINLEY and "JANE DOE" McKINLEY, and the marital community property composed thereof d/b/a/ "Imperial Industrial Coatings" and EMERCO, INC., a California Corporation d/b/a/ Imperial Industrial Coatings;

    Defendants.

EMERCO, INC., a California Corporation d/b/a Imperial Industrial Coatings, and the United States for the Use and Benefit of EMERCO, Inc.,

    Counter-Claimant/Third Party Claimant,

    v.

ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaskan Corporation, et al.,

    Cross-Defendants/Third Party Defendants.

**WRITTEN RESPONSE OF DEFENDANT EMERCO, INC. D/B/A IMPERIAL INDUSTRIAL COATINGS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT EMERCO, INC. D/B/A IMPERIAL INDUSTRIAL COATINGS**

CASE NO. A-03-0199
Civil (RRB)

EXHIBIT 1          1 of 20

1  PROPOUNDING PARTY:    ABSOLUTE ENVIRONMENTAL SERVICES, INC.
2  RESPONDING PARTY    :    EMERCO, INC., dba IMPERIAL INDUSTRIAL
3                                          COATINGS
4  SET NUMBER                :    ONE
5
6  **INTERROGATORY NO. 1**
7  Identify each entitlement theory you are relying upon as a basis for your
8  damage claim(s) in this action (e.g., non-payment; changes in the work;
9  differing site conditions; interference; delay; conversion; goods bought and
10  sold; misrepresentation; etc.)
11  **ANSWER:**
12  Responding party, defendant Emerco, Inc., dba Imperial Industrial Coatings
13  ("IIC"), relies on theories of (a) Differing Site Condition/Misrepresentation; (b)
14  Non-Payment; (c) Changes in the Work/Extra Work; (d) Conversion/Goods
15  Sold and Delivered; (e) Lost Profits; and (f) Interference/Delay.
16  **INTERROGATORY NO. 2**
17  For each entitlement theory identified in response to the proceeding
18  interrogatory, provide the following information:
19        (a)    The material events upon which the claim is based;
20        (b)    The dates of the identified events;
21        (c)    Each person with knowledge of the material events;
22        (d)    Each document pertaining to the event;
23        (e)    The portion of your total damages (in dollars) attributable to this
24  claim item;
25        (f)    The identity of the individual(s) who calculated this aspect of
26  your damages; and
27        (g)    The method used to quantify the damages.
28

**ANSWER:**

**Changes in the Work/Extra Work**

*Failure of Absolute Environmental Services ("AES") to Remove CP (Spec. Sections 1.7 to 1.7.6.*

    (a)   IIC's subcontract and attachments show its scope of work as being piles (bents) 13, 14, and 15 of 2A and 17 through 33 of 2B. IIC's scope letter dated September 16, 2002, attachment II, set forth the following exclusions from its work: welding, structural repairs, removal of termite grounds, removal of CP circuit headers, removal of rectifier cable bonds, and items 1.7 through 1.7.6 of the specifications.

    It transpired that Absolute Environmental Services neglected to remove the CP as specified. ICC was scheduled to start productive work on 4-2-03. At the site meeting with Brechan Enterprises ("Brechan"), AES, the United States Coast Guard ("USCG"), Local Electric ("Local"), Coffman Engineering ("Coffman") and IIC, it was learned that AES had failed to remove the CP excluded from IIC's contract. Although this issues was discussed at the pre-construction meeting, it was not reflected in any meeting minutes but is noted in Jerry Hardenbergh's dailies. At the site meeting, Chris Lynch, Todd Elmore, Jason Peterson, Tom Puett, George Kontra, Charlie Jerling, Matt Holmstrom, Jim Houck, David Olson, Jason Peterson, Paul Agostine, and Jerry Hardenbergh went under the Wharf at bents 13 to 15 and Mr. Puett directed all the parties to the CP and advised them that they were supposed to have been removed. AES thereafter ordered IIC to proceed with blasting with CP in place even though it was excluded from the IIC contract.

    (b)   April 2, 2003 through August 5, 2003.

    (c)   Chris Lynch, Todd Elmore, Jason Peterson, Tom Puett, George Kontra, Charlie Jerling, Matt Holmstrom, Jim Houck, David Olson, Jason

1 | Peterson, Paul Agostine Jerry Hardenbergh.

2 |     (d)    IIC's contract and attachments (IIC 000001-000009); the pre-
3 | construction meeting agenda dated April 2, 2003.

4 |     (e)    $7,476.32.

5 |     (f)    Tom Puett.

6 |     (g)    Labor costs for IIC to perform the work, calculated as follows:
7 | 11 days, 4 hours a day, 3 men = 32 regular hours, 12 overtime hours.

8 | Jason 32 hrs x $32.57 =  $1,042.24

9 |     12 ot  x  $44.25 = $ 531.00

10 | Paul  32 hrs x $43.91 =  $1,405.12

11 |     12 ot x   $61.35 =   $ 736.20

12 | David  32 hrs x $35.56 = $1,137.92

13 |     12 ot  x  $48.82 = <u>$584.84</u>

14 | <u>Total</u> $5,437.32 + 25% overhead of $1,359.33 + 10% profit of $679.67
15 | = $7,476.32.

16 | *Failure of AES to Removal Non-Structural Steel (Spec section 1.7 to 1.7.6).*

17 |     (a)    IIC's subcontract and attachments show its scope of work as
18 | being piles (bents) 13,14, and15 of 2A and 17 through 33 of 2B. IIC's
19 | scope letter dated September 16, 2002, attachment II set forth the following
20 | exclusions from its work: welding, structural repairs, removal of termite
21 | grounds, removal of CP circuit headers, removal of rectifier cable bonds, and
22 | items 1.7 through 1.7.6 of the specifications.

23 |     It transpired that Absolute Environmental Services neglected to remove
24 | the non-structural steel (26 removed). ICC was scheduled to start
25 | productive work on 4-2-03. At the site meeting with Brechan Enterprises
26 | ("Brechan"), AES, the United States Coast Guard ("USCG"), Local Electric
27 | ("Local"), Coffman Engineering ("Coffman") and IIC, it was learned that AES

28 |

1  had failed to remove the non-structural steel excluded from IIC's contract.
2  Although this was discussed at the pre-construction meeting, it was not
3  reflected in any meeting minutes.  At this meeting, Tom Puett and Matt
4  Holstrom as well as the other parties listed in (c) went under bent 13 to 15
5  and Mr. Puett directed Mr. Holstrom to the non-structural steel and advised
6  him that it was supposed to be removed.  Thereafter, AES ordered IIC to
7  remove the non-structural steel or coat over them, even though it was not in
8  the IIC subcontract.

9      (b)    April 2, 2003 through August 5, 2003.

10     (c)    Chris Lynch, Todd Elmore, Jason Peterson, Tom Puett, George
11 Kontra, Matt Holmstrom, Jim Houck, David Olson, Jerry Hardenbergh.

12     (d)    IIC's contract and attachments (IIC 000001 to 000009); the pre-
13 construction meeting agenda dated April 2, 2003.

14     (e)    $47,305.69.

15     (f)    Tom Puett.

16     (g)    Labor and material costs for IIC to perform this work, calculated
17 as follows:  Labor: 1 hour per pile x 3 men x 118 pile x Painter rate $43.91
18 = $16,544.14 plus 25% overhead $3,886.03 and 10% profit of $1,943.00
19 totals $21,373.19.  Extra paint materials: 8 Liters SPC 1864 per pile x 118
20 piles = 944 liter $16,400 kit x 1.15 kits, totals $18,860.00.  25%
21 Overhead = $4,715.00.  10% Profit = $2,357.50.  The total of all these
22 figures is $47,305.69 for bents 13 - 15 A-Q;  16 - 20  A-H; and  21 - 23 I-
23 Q .

24 *Failure of AES to Stripe Coat Welds and Caulking*

25     (a)    IIC's contract and attachments show its scope of work as being
26 piles (bents) 13,14, and15 of 2A and 17 through 33 of 2B.  IIC's scope
27 letter dated September 16, 2002, attachment II set forth the following

28

1  exclusions from its work: welding, structural repairs, removal of termite

2  grounds, removal of CP circuit headers, removal of rectifier cable bonds, and

3  items 1.7 through 1.7.6.

4      It transpired that Absolute Environmental Services neglected to stripe

5  coat and caulk the welds.  ICC was scheduled to start productive work on 4-

6  2-03. At the site meeting with Brechan Enterprises ("Brechan"), AES, the

7  United States Coast Guard ("USCG"), Local Electric ("Local"), Coffman

8  Engineering ("Coffman") and IIC, it was learned that AES would not stripe

9  coat and caulk the welds, even though this item was excluded from IIC's

10  subcontract.  Although this was discussed after the pre-construction

11  meeting, it was not reflected in any meeting minutes.  At this meeting, Tom

12  Puett and Jason Peterson went under the wharf at bent 13 to 15 and Mr.

13  Puett notified Mr. Peterson that the welds had to be stripe coated and

14  caulked and advised AES that it was supposed to be performed prior to

15  coating.  Thereafter, AES ordered IIC to stripe coat and caulk the welds,

16  even though it was not part of IIC's subcontract.

17      (b)    April 2, 30, May 2, 8, 11, June 6, 12, 17, 18, 21, 22, 24, and

18  July 15, 2003.

19      (c)    Jason Peterson, Tom Puett; work performed by Josh Bellville

20  ("Josh"), Mario Dix ("Mario"), Jason Tenderella ("Jason"), David Rohner

21  ("David"), Paul Pederson ("Paul"), Steve McKinley ("Steve").

22      (d)    IIC's contract and attachments (IIC 000001 to 000009); the pre-

23  construction meeting agenda dated April 2, 2003; IIC 001397, 001342,

24  001404, 001407, 001419, 001434, 001416, 001452, 001536, 001554,

25  001556, 001527.

26      (e)    $29,898.64.

27      (f)    Tom Puett.

28

EXHIBIT 1        6 of 20

(g)    Labor costs to stripe coat and caulk the welds at bents 13-15 A-Q, 16-20 A-H, and 21-23 I-Q, calculated as follows:

7-15-03

Josh   8 hrs x $54.47  =  $435.76

Dave   8 hrs x $35.56  =  $284.48

Bob    8 hrs x $35.56  =  $284.48

Mario  8 hrs x $31.20  =  $249.60

$1,254.32

6-24-03

Josh   8 hrs x $54.47 =  $435.76

2 ot  x $80.48 =  $160.96

Paul   8 hrs x $43.91 =  $351.28

2 ot  x $61.35 =  $122.70

Dave   8 hrs x $35.56 =  $284.48

2 ot  x $48.82 = $ 97.70

Jason  8 hrs x $32.57 = $260.56

2 ot x  $44.25 = $ 88.50

$1,801.88

6-22-03

Josh   12 ot x $80.48 = $965.76

Paul   12 ot x $61.35 = $736.20

Jason  12 ot x $44.25 = $531.00

$2,232.96

6-21-03

Josh   10 ot x $80.48 = $804.48

Paul   10 ot x $61.35 = $613.50

EXHIBIT 1        7 of 20

1    Dave   10 ot x $48.82 = $488.20

2    Jason  10 ot x $44.25 = $442.50

3                            $2,348.68

4

5    6-17-03

6    Josh  8 hrs x  $54.47 = $435.76

7          2 ot   x  $80.48 = $160.96

8    Paul  8 hrs x  $43.91 = $351.28

9          2 ot   x  $61.35 = $122.70

10   David 8 hrs x  $35.56 = $284,48

11         2 ot   x  $48.82 = $ 97.64

12   Jason 8 hrs x  $32.57 = $260.56

13         2 ot   x  $44.25 = $ 88.50

14                            $1,801.88

15

16   6-12-03

17   Josh   8hrs x $54.47 = $435.76

18          8 ot  x $80.48 = $643.84

19   Paul   8 hrs x $43.91 = $351.28

20          8 ot  x $61.35 = $490.80

21   Jason 8 hrs x $32.57 = $260.56

22          8 ot  x $44.25 = $354.00

23                           $2,536.24

24

25   6-18-03

26   Josh   10 ot x $80.48 = $804.80

27   Paul   10 ot x $61.35 = $613.50

28

EXHIBIT 1          8 of 20

1     Jason10 ot x $44.25 =  $442.50

2                           $1,860.80

3

4     6-6-03

5     Paul  8 hrs x $43.91 = $351.28

6          4 ot  x $61.35 = $245.40

7     Jason 8 hrs x $32.57 = $260.56

8          4 ot   x $44.25 = $177.00

9                           $1,034.24

10

11    5-8-03

12    Josh   8 hrs x $54.47 = $435.76

13          2 ot  x $80.48 = $168.96

14    Paul   8 hrs  x  $43.91 = $351.28

15          2 ot   x  $61.35 = $122.70

16    Jason 8 hrs x $32.57 = $260.56

17          2 ot  x  $44.25 =  $88.50

18                           $1,427.76

19

20    5-2-03

21    Josh   8 hrs x $54.47 = $435.76

22          3 ot  x $80.48 = $241.44

23    Paul   8 hrs x $43.91 = $351.28

24          3 ot  x $61.35 = $184.05

25    Jason 8 hrs x $32.57 = $260.56

26          3 ot x $44.25  = $132.75

27                           $1,605.84

28

4-30-03

Josh    8 hrs x $54.47 = $435.76

          2 ot   x $80.48 = $168.96

Paul    8 hrs  x $43.91 = $351.28

          2 ot   x $61.35 = $122.70

Jason  8 hrs  x $32.57 = $260.56

          2 ot   x $44.25 =   $88.50

                                  $1,427.76


5-11-03 (Caulking)

Josh   10 ot x $80.48 = $804.80

Steve 10 ot x $50.56 = $505.60

Paul   10 ot x $61.35 = $613.50

Dave  10 ot x $48.82 = $488.20

                            $2,412.10

These figures total $21,744.46, plus 25% overhead of $ 5,436.12, and 10% profit of $2,718.06, for a total of $29,898.64.

*Failure to Remove Conduit*

(a)    IIC's contract and attachments show its scope of work with AES was for work at piles (bents) 13, 14, 15 of 2A and 17 through 33 of 2B. IIC's scope letter dated September 16, 2002, attachment II, set forth the following exclusions from its work: welding, structural repairs, removal of termite grounds, removal of CP circuit headers, removal of rectifier cable bonds, and items 1.7 through 1.7.6 of the specifications. Nevertheless, AES directed IIC to remove conduits, including conduit at bent 21-23 Pile I - Q, which were not part of IIC's subcontract. IIC performed the work, submitted invoices, but was not paid.

1      (b)     August 2003.

2      (c)     Chris Lynch, Todd Elmore, Jason Peterson, Tom Puett, George

3 Kontra, Matt Holmstrom, Jim Houck, David Olson, Jason Peterson, Jerry

4 Hardenbergh.

5      (d)     IIC 000114-000115.

6      (e)     $850.00.

7      (f)     Tom Puett.

8      (g)     Invoice 174, dated 8/1/03 for $850.00.

9 _Ordering IIC to Perform Non-IIC Subcontract Work at Bent 12-13_

10     (a)     IIC's contract and attachments show its scope of work with AES

11 was for work at piles (bents) 13, 14, 15 of 2A and 17 through 33 of 2B,

12 and excluded work for items 1.7 through 1.7.6 of the specifications. The

13 subcontract between IIC and AES did not include bent 12-13. Nevertheless,

14 on the first day of the job, April 2, 2003, Jason Peterson ordered IIC to

15 perform work at bent 12-13.

16     (b)     April 2, 2003 through August 5, 2003.

17     (c)     Tom Puett, Jason Peterson.

18     (d)     IIC 000001 to 000009; 000096 to 111100; 000714 to

19 000719; 000546, 000596 to 000617.

20     (e)     $29,202.64.

21     (f)     Tom Puett.

22     (g)     This is based on labor, equipment and material costs all as set

23 forth in the daily logs and Q.C. reports and in IIC Invoice 176, dated 8/5/03.

24 **Differing Site Condition/Misrepresentation/Extra Work**

25 _Undisclosed Gray Paint_

26     (a)     The specifications for the Cargo Wharf Project did not indicate

27 the existence of gray paint beneath the existing coal tar epoxy, and neither

28

1    AES, Coffman, Brechan or the USCG disclosed to IIC the existence of the
2    gray paint.  The existence of the gray paint could not have been known to
3    IIC from a site inspection or at any time prior to the removal of the single
4    coating of coal tar epoxy that had been represented to IIC by AES/Coffman
5    as the only coating IIC would be obligated to remove.  On the first day of
6    water blasting, IIC discovered this differing/changed condition shortly after
7    the start of water blasting. Representatives from AES and Brechan did not
8    come to inspect the condition until on or about May 28, 2003.  AES ordered
9    IIC to remove the gray paint, which IIC did.  IIC submitted an invoice to AES
10   for this work, but it has not been paid.

11        (b)    April 2003 through August 5, 2003.

12        (c)    Chris Lynch, Todd Elmore, Jason Peterson, Tom Puett, Forrest
13   McKinley, George Kontra, Matt Holmstrom, Jim Houck, David Olson, Jerry
14   Hardenbergh, Joshua Belville, Paul Pederson, David Rohmer, Jason
15   Tenderella, and Lt. Andrew Brown

16        (d)    IIC 000096 through 000115, 000714 through 000716,
17   000717, 000718, 000719, 000546, 000600, 000596, 000597, 000598,
18   000600 through 000617, 001269 through 001592.

19        (e)    $92,029.21.

20        (f)    Tom Puett

21        (g)    Days of actual work noted on Q.C. report and Daily Logs, and
22   invoice dated August 5, 2003 (IIC 000101 through 000113).

23   **Lost Profits**

24   *Lost Profits Due on Cargo Wharf Project*

25        (a)    On August 7, 2003, AES escorted IIC off the project site, which
26   prevented IIC from completing the Cargo Wharf Project. As a result, IIC was
27   not able to realize its profit from the work that remained to be complete.

28

1    (b)    April 2, 2003 through August 7, 2003.

2    (c)    Chris Lynch, Todd Elmore, Jason Peterson, Tom Puett, Forrest

3  McKinley, George Kontra, Matt Holmstrom, Jim Houck, David Olson, Jerry

4  Hardenbergh.

5    (d)    IIC 000096 through 000690, 003626-003628.

6    (e)    $130,952.06.

7    (f)    Tom Puett.

8    (g)    Actual job costs for original contract work was $264,384.79.

9  This is based on the following calculation:

10  Total Job Costs    $454,859.51

11  Less extra work    $      850.00    Conduit removal

12                              $ 92,029.21    Gray coating

13                              $ 29,202.64    Bent 12-13

14                              $   7,476.32    non-removal of CP

15                              $ 47,305.69    non-removal of non structural

16                              $ 29,898.64    Stripe coat/caulking

17                              $248,097.01    Total original job cost for contract work

18  Although the existing coating removal was at 52% complete, the completed

19  coating removal and coating application was 47% complete. Thus, 47% of

20  the total contact price of $772,123.00 is $362,897.81.  As noted above,

21  IIC's total original job costs were $248,097.01. Deducting those original job

22  costs from the contract amount due for completing 47% of the work

23  ($362,897.81), results in $114,800.80 for profit on that 47% of the work

24  completed. Thus, IIC is entitled to 32% profit on the remaining contract

25  balance. The remaining contract balance was $409,225.19. Thus, 32% of

26  that figure is $130,952.06 in lost profits for the Cargo Wharf Project.

27

28

1 | _Lost Profits Due for Coating Tanks N 12 and N 60_

2 |      (a)    AES requested IIC to re-write portions of the specifications of

3 | Tanks N 12 and N 60, which are used for jet fuel storage, in order to

4 | facilitate the use of coating in a humid environment.  IIC ultimately selected

5 | Wasser material, which was going to be supplied by Polar Supply.  IIC was

6 | also requested to give AES a price to do the work either in the Fall of 2003

7 | or the Summer 2004.  IIC's price of $374,226.00 was given approval in

8 | July 2003 by Jason Peterson, who had obtained approval from Matt

9 | Holstrom of Brechan.  IIC is informed and believes AES made use of IIC's

10 | specifications but did not permit IIC to perform the work, which IIC believes

11 | was completed in 2004 by others using the equipment of IIC which was

12 | taken by AES.

13 |      (b)    January through February 2003.

14 |      (c)    Tom Puett, David Olson, Matt Holstrom, Jason Peterson.

15 |      (d)    IIC 001024 to 001268.

16 |      (e)    $119,752.32.

17 |      (f)    Tom Puett.

18 |      (g)    The damages are calculated based on the profit of 32% actually

19 | obtained by IIC for the Cargo Wharf project. $374,226.00 x 32% =

20 | $119,752.32.

21 | **Non-Payment**

22 | _AES Failed to Pay IIC the Full Amount Due for Completed Original Contract_

23 | _Work_

24 |      (a)    IIC performed 47% of the total original contract work, but has

25 | not been paid the full 47% of the total contract price since AES terminated

26 | the contract and escorted IIC off the project site.

27 |      (b)    April 2, 2003 through August 7, 2003.

28 |

1    (c)    Chris Lynch, Todd Elmore, Jason Peterson, Tom Puett, Forrest

2  McKinley, George Kontra, Matt Holmstrom, Jim Houck, David Olson, Jerry

3  Hardenbergh.

4    (d)    IIC 000074 to 000094; 000683 to 000690.

5    (e)    $116,309.68.

6    (f)    Tom Puett.

7    (g)    The total original contract work completed was 47%, or

8  $362,897.81.  AES only paid IIC $246,588.13 for this work.  This leaves a

9  balance due of $116,309.68 for original contract work.

10  *AES Failed to Pay IIC the Full Amount Due for Mobilization.*

11    (a)    IIC's agreement with Matt Holstrom of Brechan and Todd Elmore

12  of AES for mobilization was that the material and equipment IIC delivered to

13  the job site would be paid from invoices at time of delivery at the Cargo

14  Wharf.  AES, however, unilaterally deducted 20% of the amount due for

15  "demobilization."  In addition, IIC's mobilization monies were further reduced

16  when Brechan directly paid Polar Supply $50,815 for materials without IIC's

17  authorization.

18    (b)    April 2003.

19    (c)    Tom Puett, David Olson, Matt Holstrom, Todd Elmore.

20    (d)    IIC 000074 - 78 (Invoice 162).

21    (e)    $91,763.88.

22    (f)    Tom Puett.

23    (g)    IIC's invoice No. 162 was reduced as follows:  $ 204,743.94

24  was the agreed amount due for mobilization, but AES deducted $40,948.15

25  for demobilization, and $50,815 was deducted to pay Polar Supply, leaving

26  $91,763.88.

27

28

EXHIBIT 1    *15 of 20*

1   *AES Makes Improper Deductions From IIC's Billings*

2      (a)   IIC's invoice No. 164 was reduced by $12,000.00 for UHP

3   Waterblaster that IIC had to share with AES causing additional set up time

4   and delay. IIC was willing to pay 50% of $12,000.00 rental rate under the

5   joint use forced upon IIC by AES.  IIC's invoice No.168 was reduced by

6   $15,879.63 for "inspection" by AES with no valid basis. IIC was

7   backcharged for anode and CP damage in the amount of $15,000.00 that

8   was to be removed by others (because it was excluded from IIC/AES

9   contract).

10      (b)   June 2003.

11      (c)   Chris Lynch, Todd Elmore, Jason Peterson, Tom Puett, George

12   Kontra, Matt Holmstrom, Jim Houck, David Olson, Jason Peterson, Jerry

13   Hardenbergh.

14      (d)   IIC 000079 to 000092.

15      (e)   $42,879.63.

16      (f)   Tom Puett

17      (g)   Monies due IIC for invoices 164, 168 are as follows:

| | | |
|---|---|---|
| Invoice 164 | UHP Waterblaster | $ 6,000.00 |
| Invoice 168 | Inspection | $ 15,879.63 |
| Invoice 168 | Anode/CP | $ 15,000.00 |
| Invoice 168 | UHP Waterblaster | $ 6,000.00 |
| Total | | $42,879.63 |

23   **Conversion/Good Sold and Delivered**

24      (a)   On August 7, 2003, AES ordered IIC off the Cargo Wharf Project

25   job site and seized and exercised control over certain goods and property

26   over the property of IIC.  Immediately thereafter, IIC demanded that AES

27   return the property and goods, which were itemized in a letter dated August

28

1    7, 2003 to David Olson. IIC notified AES that unless the property were

2    returned by 5:00 p.m. on August 8, 2003, that the property would be

3    deemed converted and AES would thereby be agreeing to purchase the

4    property at the prices listed in the August 7, 2003 letter. AES did not return

5    the goods and property.

6             (b)    August 6 to 8, 2003.

7             (c)    Tom Puett, Josh Belville, Tom Puett, Forrest McKinley, Dave

8    Olson, Matt Holstrom, Chris Lynch, Jerry Hardenbergh, Jason Peterson,

9    Todd Elmore, Dan Yell, Keith McCloud.

10           (d)    IIC 000001 - 002482; IIC 000116 to 000225; IIC 002666 to

11   002668, 002672 to 002678.

12           (e)    $518,320.00, or alternatively the sum of $771,626.91.

13           (f)    Tom Puett.

14           (g)    The total amount of Purchase Orders for the property in question

15   is set forth in IIC-000116 to IIC-000225 total $561,183.85, plus overhead

16   of 25% is $140,295.81, equals $701,479.06, plus profit of 10% of

17   $70,147.91, totals $771,626.91. IIC is informed and believes that some of

18   the material were used to complete the project by AES. This is the cost that

19   IIC anticipates AES would have incurred had AES rented or purchased said

20   goods on Kodiak Island. Alternatively, the cost of $518,320 is based on

21   estimates furnished by Tom Puett at the time of the conversion and set forth

22   in the August 7, 2003 letter.

23   **Interference/Delays**

24           (a)    Throughout the project, the inspector Jerry Hardenbergh of

25   Coffman Engineers, disrupted and interfered with IIC's performance of its

26   subcontract work by over-inspecting IIC's work, imposing requirements on

27   IIC's work that were not required by law of contract, including but not

28

1  limited to the improper employment of SSPC PA 2 testing standards, the

2  High Voltage Holiday Testing, Adhesion Testing; failing to provide

3  certificates of calibration of his testing equipment prior to administering tests

4  on IIC's work; requiring additional grinding, and failing to show up at

5  scheduled inspections. Moreover, AES was supposed to help IIC move

6  scaffolds, set up containment, and operate equipment for all phases of the

7  work, but after bents 13-15, AES failed to supply adequate personnel.

8      (b)    April 2, 2003 through August 5, 2003.

9      (c)    Jerry Hardenbergh, Tom Puett, Dave Olson, Jason Peterson.

10     (d)    IIC.001269 - 001592; 002361-002482.

11     (e)    Unknown at present; to be determined.

12     (f)    Unknown at present; to be determined.

13     (g)    Unknown at this time; analysis to be performed.

15  DATED: August 2, 2004              MONTELEONE & McCRORY LLP

16                                      Attorneys for Emerco, Inc.

18                                  By _____

19                                      WILLIAM R. BAERG, ESQ.
                                        CSBN 167399
20                                      WSBN 23052

EXHIBIT 1        18 of 20

# V E R I F I C A T I O N

STATE OF CALIFORNIA    )
                        )ss.
COUNTY OF RIVERSIDE    )

I have read the foregoing **WRITTEN RESPONSE OF EMERCO, INC. D/B/A IMPERIAL INDUSTRIAL COATINGS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT EMERCO, INC. D/B/A IMPERIAL INDUSTRIAL COATINGS** and know its contents.

I am a Project Manager of Emerco, Inc., a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.

The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on _____8 - 2_____, 2004, at Riverside, California. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____TOM PUETT_____
Type/Print Name

Signature _Tom Puett_

1

**CERTIFICATE OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3        I am employed in the County of Los Angeles, State of California. I am over the age of 18
and not a party to the within action; my business address is 725 South Figueroa Street, Suite 3200,
4   Los Angeles, California 90017-5446.

5        On this date, I served the foregoing document(s) described as **WRITTEN RESPONSE OF
DEFENDANT EMERCO, INC. D/B/A IMPERIAL INDUSTRIAL COATINGS TO
6   PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT EMERCO, INC.
D/B/A IMPERIAL INDUSTRIAL COATINGS** on the interested parties in this action by First
7   Class U.S. Mail by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

8                          SEE ATTACHED SERVICE LIST

9        I declare under penalty of perjury under the laws of the United States that the above is true
and correct. Executed on August 2, 2004, at Los Angeles, California.

10

11

12                          _Sallie Raspa_
                            SALLIE RASPA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 2

Page 1

1              UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF ALASKA
3
4    ABSOLUTE ENVIRONMENTAL
     SERVICES, INC. an Alaska corporation,
5
                  Plaintiff,
6                                        
         vs.
7
     FORREST J. MCKINLEY, an individual,
8    d/b/a "Imperial Industrial Coatings"
     and EMERCO, INC., a California
9    Corporation, d/b/a Imperial Industrial
     Coatings,
10
                  Defendant.
11   _____
12   Case No. A03-0199 CV (RRB)
13
14
15
16
             DEPOSITION OF RALPH THOMAS PUETT
17
                 Taken November 1, 2004
18              Commencing at 9:45 a.m.
19       Volume I - Pages 1 - 163, inclusive
20
21
             Taken by the Plaintiff
22                      at
               PERKINS, COIE
23        1029 W. Third Av., Suite 300
             Anchorage, AK  99501
24
25

EXHIBIT 2    Midnight Sun Court Reporters (907) 258-7100    1 of 4

Case No. A03-0199 Civil (RRB)

Ralph Thomas Puett

Page 50

1 whether the labor reflected in that PO was used for the
2 construction of coffer dams?
3 A   I may not have used Exhibit 7. I may have just taken
4 the information off of POs.
5 Q   So as you sit here today, you don't honestly recall
6 whether you used Exhibit 7 or not in the calculation of
7 your damages?
8 A   Don't know that for a fact. I would have to guess at
9 it.
10 Q   To your knowledge, does Imperial have any type of
11 computerized bookkeeping system?
12 A   No.
13 Q   To your knowledge, is there anything that would
14 constitute a compilation of all costs incurred by Imperial
15 on the wharf project?
16 A   I don't have knowledge of that.
17 Q   So if I were to ask you how much money Imperial spent
18 on this project, you wouldn't be able to answer that for
19 me; is that true?
20 A   Yes.
21 Q   And to your knowledge, nobody either employed by
22 Imperial or in any way associated with Imperial has ever
23 made an attempt to quantify the total cost that Imperial
24 incurred in performing this project?
25 A   I don't know that.

Page 51

1 Q   If you were to attempt to quantify all costs incurred
2 by Imperial on this project, how would you do that?
3      MR. BROWN: I'll object to the extent it calls
4 for speculation, but you can answer if you know.
5      THE WITNESS: Well, I'd have to put some thought
6 into it.
7 BY MR. MARSTON:
8 Q   Did Imperial itself pay for all the materials that it
9 used on this project?
10 A   I don't know.
11 Q   Did Imperial itself pay for any of the materials it
12 used on this project?
13 A   I don't know that as a fact.
14 Q   Why don't you know that?
15 A   Because I don't pay the bills. I don't know where
16 the money comes from.
17 Q   Who pays the bills?
18 A   Laura Emery.
19 Q   Does Forrest McKinley pay any of the bills?
20 A   I don't know.
21 Q   Again directing you to Exhibit 7, first line at the
22 very top reads, "Equipment shop, $82,000."
23      Do you know what that's referring to?
24 A   No.
25 Q   Does Imperial have an equipment shop?

Page 52

1 A   Not that I'm aware of.
2 Q   To your knowledge, did Imperial contract with any
3 organization named Equipment Shop?
4 A   Not to my knowledge.
5 Q   Do you have any knowledge of any costs being incurred
6 by Imperial for this project, on or around March 17th of
7 2003, in the approximate value of $82,000?
8 A   No.
9 Q   Do you have any reason to believe that $82,000 has
10 anything to do with the coffer dams?
11 A   Could be, but that would be a guess.
12 Q   So you honestly have no idea what the entry dated
13 March 17th, '03, equipment shop, for $82,000 refers to?
14 A   I don't know. But if you looked at PO 1317, it would
15 probably clarify that. But here today, I truthfully can't
16 answer that.
17 Q   Did you participate -- strike that.
18      Did you help Mr. McKinley quantify the damages
19 for what you referred to earlier as conversion?
20 A   Yes.
21 Q   What role did you play in that quantification?
22 A   We went through POs and identified items that were
23 withheld from Imperial at the cargo wharf after August the
24 7th when we were escorted off the base.
25 Q   Again referring to Exhibit 1, could you please turn

Page 53

1 to page 16. Are you there?
2 A   Yes, sir.
3 Q   Do you see the title at line 23, "Conversion/Goods
4 Sold and Delivered?"
5 A   Yes.
6 Q   Do you know what the word "conversion" means in this
7 context?
8      MR. BROWN: You're asking for a legal definition
9 or his idea?
10      MR. MARSTON: I'm asking for his personal
11 understanding, if any, of what that word means as used
12 here.
13      THE WITNESS: My understanding is that, on a
14 construction job, somebody takes something from you, you
15 have a right to get paid for it. And that's equipment and
16 materials. So as in this case, when we were escorted off
17 the base, could not retrieve our equipment and material,
18 it was my understanding from our attorneys that we would
19 put together a list of items and we would list those items
20 under conversion.
21 BY MR. MARSTON:
22 Q   Now the next phrase reads, "Goods Sold and
23 Delivered" --
24 A   I didn't finish that.
25 Q   I'm sorry. Continue.

14 (Pages 50 to 53)

EXHIBIT 2

Case No. A03-0199 Civil (RRB)                                    Ralph Thomas Puett

Page 54

1  A  And to the best of my knowledge, we were to price
2  these items at what their value would be on Kodiak Island,
3  not what I can purchase them at a Wal-Mart in southern
4  California, with profit and overhead.
5  Q  The next phrase reads, "Goods Sold and Delivered."
6     What do you understand that to mean?
7  A  I don't know.
8  Q  Is it your understanding that Absolute bought the
9  equipment that you left behind after Imperial terminated
10  the contract?
11  A  That wasn't my understanding.  It was my
12  understanding that they would pay us under conversion.
13  Q  Next page, page 17, line 14, reads, "The total amount
14  of purchase orders for the property in question is set
15  forth in IIC-000116 to -000225."  Do you see that?
16  A  Yes.
17  Q  And that that totals $561,183.  That would be this
18  package of documents.
19     MR. MARSTON:  Go ahead and mark that.
20     (Exhibit 8 marked.)
21  BY MR. MARSTON:
22  Q  And if you look at these beginning and ending Bate
23  numbers, you'll see it starts with 116 and ends with 225,
24  inclusive.
25     MR. DICKSON:  Are there copies for other

Page 55

1  counsel?
2     MR. MARSTON:  No, there are not.  It's just this
3  stack.  And I'm not going to go through all the things.
4  They're all available in the production that they made.
5  BY MR. MARSTON:
6  Q  I'm not asking you to go through each one of them and
7  spend two hours verifying they're in consecutive order.  I
8  just want you to verify for me that that stack begins with
9  that number and ends with 225.
10     MR. BROWN:  He means the IIC Bates stamp.
11     THE WITNESS:  So I don't need to look at any
12  other documents in there, just those two documents?
13  BY MR. MARSTON:
14  Q  You do not.  As a matter of fact, I'm going to
15  represent to you and for the record that includes IIC Bate
16  Nos. 116 through 225.  And whether I'm correct or not can
17  be determined by anybody coming back and looking at that
18  exhibit itself.
19  A  I will testify that in this stack of papers I saw
20  IIC-000116 and IIC-000225 --
21  Q  And in Imperial's --
22  A  -- only.
23  Q  -- document production, in addition to those, were
24  IIC Bate Nos. 000226 through -275, which I'll also have
25  marked.

Page 56

1     (Exhibit 9 marked.)
2     MR. DICKSON:  What Bates number?
3     MR. MARSTON:  The inclusive numbers are 226
4  through 275.
5  BY MR. MARSTON:
6  Q  Now my question for you, if you know the answer, is:
7  Do you know why the Exhibit 9 purchase orders, numbers 226
8  through 275, were excluded from the conversion
9  computation?
10  A  Don't know.
11  Q  Do you know why the purchase orders in Exhibit 8 were
12  included in the conversion computation?
13  A  Don't remember.
14  Q  Did you assist Mr. McKinley in identifying what
15  purchase orders were properly included as part of the
16  conversion claim and those which were properly excluded?
17  A  Yes.
18  Q  And did you look at each of the purchase orders
19  included in the package in support of the purchase claim
20  and personally verify that it was relevant to the
21  conversion claim?
22  A  Well, I don't know that these packages of POs are the
23  ones that are for the conversion.  It says that here, but
24  I don't know that to be a fact.  I did not initial each
25  one of these POs to identify which ones.  I identified

Page 57

1  which ones Mac identified.  So I can't -- I can't say that
2  absolutely; I would be guessing at it, unless I went back
3  and reviewed it again.
4  Q  And hand me Exhibit 8.  Again, as I indicated,
5  Exhibit 8 -- as I represented to you, Exhibit 8 includes
6  IIC Bate numbers 116 through 225.  And that's included
7  here in Exhibit 1, which is the damage computation that
8  you said that you prepared jointly with Mr. McKinley.
9     Are you prepared to testify that each of the
10  purchase orders that are identified by these Bate numbers,
11  116 through 225, are in fact costs of materials that you
12  allege were converted by Absolute?
13  A  Yes, I believe that to be the case.  What I don't
14  know is that there may have been other purchase orders.  I
15  don't know that for a fact because I'm not sitting here
16  today adding those up.
17  Q  So you're saying that there may be purchase orders in
18  addition to 116 through 225?
19  A  That's correct.
20  Q  Is this figure of 561,183.85 correct?
21  A  I believe it to be.
22  Q  And if these exhibits, 116 through 225, total to that
23  number, then would you state that these are in fact all of
24  -- this is in fact all of the backup for the conversion
25  claim?

15 (Pages 54 to 57)

EXHIBIT 2      Midnight Sun Court Reporters (907) 258-7100      3 of 4

Case No. A03-0199 Civil (RRB)                                    Ralph Thomas Puett

Page 58

1    A   Yes.
2    Q   And if it in fact totals 561,183, these would all be
3    the purchase orders that you personally looked at and you
4    personally verified pertain to the conversion claim?
5    A   Yes.
6    Q   So you could independently testify to the correctness
7    of this number, $561,183.85, without any -- without having
8    to rely upon anything that Mr. McKinley did?
9    A   That's correct.
10        MR. MARSTON: Let's go ahead and break for
11   lunch.
12        (Lunch recess taken.)
13        (Exhibit 10 marked.)
14            EXAMINATION (Resumed)
15   BY MR. MARSTON:
16   Q   We're back on the record again. I've handed you
17   what's been marked as Exhibit 10, and I'll represent to
18   you that this is a photocopy taken off of the drawings for
19   this project. However, there's been some non-original
20   marks added to it, and they've been identified as A, B, C,
21   D and E on there. The reason that I'm marking this is for
22   your reference, to the extent you should care to use it,
23   to refresh your recollection as to where the different
24   bents are and that type of thing. I just want to make it
25   available to you.

Page 59

1        Let's chat about the gray coating. As I
2    understand Imperial's position, it's that it encountered
3    a differing site condition on the project with respect to
4    the discovery of a gray coating that was contrary to what
5    the contract documents indicated would be present. And
6    that, as a result of the presence of this gray coating,
7    that Imperial is entitled to additional compensation for
8    the cost of removing that; is that correct?
9    A   Yes.
10   Q   In the damage interrogatory, you prepared a
11   quantification of what that damage claim is worth; is that
12   right?
13   A   Yes.
14   Q   And that figure came to $92,029?
15   A   Which exhibit is that?
16   Q   You have them all in front of you.
17   A   Which one is the interrogatories? That's the
18   contract. No. 2 is the contract.
19   Q   We're looking for 1. I think you'll find it on page
20   11 at the bottom.
21   A   The amount's on page 12 -- yeah, item E, 92,029.21.
22   Q   And that's a damage claim that you calculated?
23   A   Yes.
24   Q   And you calculated that independently?
25   A   Yes.

Page 60

1    Q   Can you tell me how many piles had the gray coating
2    on it?
3    A   346, I believe.
4    Q   Can you tell me which 346 piles had the gray coating
5    on it?
6    A   Piles in bent 13, 14, 15, 16, 17, 18, 19, 20, 21, 22,
7    23, 24, 25, 26, 27, 28, 29, 30, 31, 32 and 33.
8    Q   So is your testimony, then, that every single pile in
9    this project had gray coating on it?
10   A   No.
11   Q   Did you just identify every bent in the subcontract?
12   A   Yes.
13   Q   So is it your testimony that every pile within every
14   bent in the subcontract had gray coating on it?
15   A   Not every pile.
16   Q   How many piles are there total within the scope of
17   your subcontract?
18   A   I believe there was like 320. And that's a guess at
19   this time. I mean, I could add them up here.
20   Q   Didn't you just tell me, though, that 346 had the
21   gray coating on it?
22   A   That's correct. And that was incorrect.
23   Q   That was correct and incorrect?
24   A   Yes.
25   Q   How can something be both correct and incorrect?

Page 61

1    A   My testimony for 346 was incorrect. After looking at
2    this drawing, most of the items between I and Q did not
3    have gray and A through H did have gray. And there were
4    some items in I through Q -- and I'd have to go back and
5    look at the records -- that did have gray coating, but not
6    all of them.
7    Q   Did Imperial keep an inventory of which particular
8    piles had the gray coating on it?
9    A   Yes.
10   Q   And did that inventory survive?
11   A   I don't know. There were some things that were left
12   at Kodiak that were in our containers when we were
13   escorted off the base. So those records may have been in
14   those containers.
15   Q   When is the last time you saw the inventory of which
16   piles had gray coating on it?
17   A   My last time on base was sometime near the end of
18   July.
19   Q   And you haven't seen it since you left the base?
20   A   No.
21   Q   So you didn't utilize that inventory when you
22   prepared your damage quantification?
23   A   Went by the records that I just told you here when I
24   said that, between A and H, all those had gray. The items
25   I through Q that had gray would be items or piles that had

16 (Pages 58 to 61)
EXHIBIT 2                     Midnight Sun Court Reporters  (907) 258-7100                4 of 4