```
 1                    UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF ALASKA
 2
     ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
 3                                             Case No. A03-0199CV (RRB)
          Plaintiff,
 4
     vs.
 5
     FORREST J. MCKINLEY, an individual        DEPOSITION OF
 6   "Imperial Industrial Coatings"            WILLIAM EDWARD OLIVER
     d/b/a Imperial Industrial Coatings,
 7   BRECHAN ENTERPRISES, INC., an Alaska
     corporation; and SAFECO INSURANCE COMPANY
 8   OF AMERICA, a Washington corporation,
 9        Defendants.
     _____
10   EMERCO, INC., a California corporation d/b/a
     Imperial Industrial Coatings, and the States
11   for Use and Benefit of EMERCO, INC.,
12        Counterclaimant/Third-Party Claimant,
                                                    June 7, 2006
13   vs.                                            9:10 a.m.
14   ABSOLUTE ENVIRONMENTAL SERVICES, INC., an
     Alaska corporation, et al.,
15
          Cross-Defendants/Third-Party Defendants.
16   _____
     THE UNITED STATES OF AMERICA for the use and
17   benefit of ABSOLUTE ENVIRONMENTAL SERVICES,
     INC., an Alaska corporation,
18
          Plaintiff,
19
     vs.
20
     SAFECO INSURANCE COMPANY OF AMERICA, a
21   Washington Corporation,
22        Defendants.
     _____
23
24
25
                                                            Page 1
```

```
 1   has proven himself to be talented and smart and tough and
 2   capable.
 3        Q    You said he had run his own business.  What
 4   business was that?
 5        A    He had a fishing boat.  Started out with
 6   something like a 36-foot seiner, and within a few years
 7   had sold that boat and bought a state-of-the-art twin
 8   screw 52-foot expensive seiner.  He was a very successful
 9   salmon fisherman.
10        Q    Was he fishing out of Kodiak during that time?
11        A    Yes.
12        Q    At the time you first began your employment with
13   Brechan -- I believe you said it was 1985 -- was Brechan
14   performing any work for the Coast Guard?
15        A    Yes.
16        Q    Who were your chief -- who was Brechan's chief
17   competitors on the island between 1985 and 1990?
18        A    It would be Anderson -- on the island?
19        Q    On the island.
20        A    Yeah.  The other two local contractors were
21   Anderson Construction and AK Construction.
22        Q    Is Anderson Construction still in existence?
23        A    Yes.
24        Q    Is AK Construction still in existence?
25        A    No.
```

```
 1      Q    Was AK Construction acquired by Brechan or F&R?
 2      A    Acquired is -- no, it wasn't acquired.
 3      Q    Okay.  Did -- I have information that leads me
 4 to conclude that Brechan bought AK Construction for
 5 $5,000,000.
 6      A    That's incorrect.
 7      Q    Okay.  Is there any truth at all in any aspect
 8 of that statement -- of that rumor, then?  What do you
 9 know about the -- any financial dealings between Brechan
10 and AK, or the ownership of Brechan and AK?
11      A    Brechan paid a sum of money to the two
12 principals in AK for seven-year noncompete agreements.
13 Also made arrangements to buy two material site leases
14 that AK controlled, and bought a significant amount of
15 AK's equipment.  There was also a noncompete agreement
16 with AK, the corporation itself.  The total sum was
17 3,000,000.
18      Q    And following the consummation of that deal, did
19 AK effectively cease to do business?
20      A    Yes.
21      Q    Who paid the principals of AK the $3,000,000?
22      A    Brechan Enterprises.
23      Q    And that is Brechan Enterprises, Inc., as
24 distinguished from F&R, Inc., and as distinguished from
25 Mr. and Mrs. Brechan?
```

Page 19

```
 1       A    That's correct.
 2       Q    What was the -- how would you describe the
 3  relative sizes of Anderson Construction and AK
 4  Construction to each other at the time of this deal?
 5            MR. KREGER:  Objection, foundation.
 6            THE WITNESS:  I don't know.
 7  BY MR. MARSTON:
 8       Q    Were they -- in your mind, were they -- did they
 9  appear to be doing roughly the same volume of business
10  each year?
11            MR. KREGER:  Foundation.  It's an
12  objection.  You can answer if you know what -- I think the
13  question was how much business was Anderson doing and how
14  much business was AK doing.
15            MR. MARSTON:  No, you are mistaken.  The
16  question was the one that I stated.
17            MR. KREGER:  Could you read the question
18  back, please?  I'm confused as to what it was.
19            MR. MARSTON:  Let me ask a different
20  question, save some time.
21  BY MR. MARSTON:
22       Q    Was AK Construction significantly larger than
23  Anderson Construction?
24       A    I don't know.
25       Q    Was the business that AK Construction did --
```

Page 20

```
 1   well, was AK Construction a competitor of Brechan prior to
 2   the time it ceased to do business?
 3        A    Yes.
 4        Q    Was Anderson Construction a competitor of
 5   Brechan?
 6        A    Yes.
 7        Q    And Anderson Construction is still in business
 8   today?
 9        A    That's correct.
10        Q    Who is the principal at Anderson Construction?
11        A    A man named Mike Anderson, who incidentally
12   has -- is not the same man named Mike Anderson who worked
13   for Swalling.
14        Q    Thank you for saving me that question.  And to
15   your knowledge, Mr. Anderson lives on Kodiak?
16        A    Yes.
17        Q    Did Anderson Construction, to your knowledge,
18   ever perform any government contracts?
19        A    Yes.
20        Q    Did they ever perform any government contracts
21   for the Coast Guard base on Kodiak?
22        A    Ever?  Yes.
23        Q    Was -- to your knowledge, did Anderson
24   Construction perform as much Coast Guard work as AK
25   Construction did?
```

Page 21

# TABLE OF CONTENTS

## PART I – THE SCHEDULE

| SECTION | TITLE | PAGES |
|---|---|---|
| A | Solicitation & TOC | 1 - 2 |
| B | Supplies or Services and Prices/Costs | 3 - 5 |
| C | Description/Specifications/Statement of Work | 6 - 24 |
| D | Packaging and Marking | 25 |
| E | Inspection and Acceptance | 26 - 27 |
| F | Deliveries or Performance | 28 - 32 |
| G | Contract Administration Data | 33 - 35 |
| H | Special Contract Requirements | 36 - 40 |

## PART II – CONTRACT CLAUSES

| I | Contract Clauses | 41 - 47 |
|---|---|---|

## PART III – LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

| J | List of Attachments | NA |
|---|---|---|

## PART IV – REPRESENTATIONS AND INSTRUCTIONS

| K | Representation, Certifications, and Other Statement of Offerors | 48 - 55 |
|---|---|---|
| L | Instructions, Conditions, and Notice to Offerors or Respondents | 56 - 64 |
| M | Evaluation Factors for Award | 65 - 68 |

3

## SECTION B - SCHEDULE OF PRICES

### OFFERS

    (a) The offeror must submit **one coefficient factor** for the **line items below**, supported by a detailed cost breakdown on how the coefficient factor was developed. **Refer to Paragraph L.8.2 (Volume II Cost)** for instructions on submitting your cost proposal.

| CONTRACT LINE ITEM NUMBER | DESCRIPTION | COEFFICIENT % FACTOR |
|---|---|---|
| 0001 | DELIVERY ORDER COEFFICIENT FOR ALL WORK | 1.05 |

NOTES

## COEFFICIENT

(a) **The coefficient factor** will be the multiplier used to determine the price of the work for each task on individual delivery orders. The offeror's price coefficient must be all inclusive and must contain the Prime Contractor's and Subcontractor's overhead, profit, bond premiums, social security contributions, general insurances, workman's compensations insurance, state unemployment insurance, federal unemployment insurance, mobilization and demobilization costs, labor factor adjustments between the Means given labor rates and the Davis/Bacon Labor Rates included in the contract, Prime's overhead and profit on Subcontractors, supervision, transportation, adjustment factors to account for small jobs, incidental tools and equipment, Means Division 1 items identified below, Section 01300 requirements of this contract, any markups for materials and all contingencies in connection therewith, since no allowance will be made later for additional costs. The offeror's price coefficient should not include any costs for Longshoremen and Harbor Worker's Act Insurance. These costs will be compensated as non-pre-priced work when applicable.

    (a)(1) Means Division I Items: The following line items are to be included in the Contractor's coefficient:

        i. From line number 010 000 up to 015 000 and

        ii. From line number 015 300 up to 016 400.

(a)(2) The coefficient is to be applied to that work anticipated to be accomplished during normal working hours, Monday thru Friday (0700 t0 1700 Hrs) excluding holidays.

(b) Coefficients should be represented in your proposal as follows. An offer of "net" would be represented by "1.0". An example of a decrease from the prices listed in RS MEANS ® would be "0.98". An example of an increase above the prices in RS MEANS ® would be "1.10"

(c) The coefficients will remain unchanged throughout the term of the contract including option years.

## NON-PRE-PRICED WORK

(a)   Non-pre-priced work is categorized as follows:

(i) Facilities engineering tasks that are not specifically included in the Means Facilities Construction Cost Data but that are within the basic intent and general scope of the contract.

4

(ii) Facilities engineering tasks that are included in the Means Facilities Construction Cost Data but require adjustment because of unusual site conditions which differ materially from those ordinarily encountered and generally inherent in the character of the work provided for in the contract.

(iii) Longshoremen & Harbor's Worker's Act Insurance Costs.

(b) Non-pre-priced work will be negotiated by the Contracting Officer and added at any time during the contract term. Added items of work shall be incorporated into and made a part of the delivery order and shall be performed at the negotiated unit price multiplied by the applicable bid coefficient. Previously non-pre-priced work items may subsequently be added to the contract as pre-priced items for use on additional delivery orders.

(c) For categories (i) and (ii) above, the labor rate taken shall be the bare cost from Means for the particular trade involved. This information is available from the "Crews" section. This rate shall then be multiplied by the appropriate installation weighted average city cost index. Productivity, (i.e. the number of man hours required), shall be from Means for work of a similar nature whenever possible. Finally, line items shall be multiplied by the contractor's coefficient to account for the items identified in paragraph F.2(a) above.