U.S. Department
of Transportation 

**United States
Coast Guard**

Commanding Officer
Facilities Design and Construction
Center Pacific

915 Second Ave, Room 2664
Seattle, WA 98174-1011
Staff Symbol:
Phone: (206) 220-7400
FAX: (206) 220-7390

11000
25 Feb 2002

Mr. M. Martin
Brechan Enterprises, Inc.
2705 Mill Bay Road
Kodiak, AK 99615

SUBJ: DTCG50-01-D-643XXO; TASK ORDER #0007, CARGO WHARF MAINTENANCE –
PHASE I (PROJECT SERIAL NUMBER: 33-S01047)

Dear Mr. Martin

The current status of the Cargo Wharf Maintenance project has us very concerned with regards
to project completion and potential increases to project costs. Our concerns mainly stem from
your coating contractors' slow progress during last summer's construction season, which has
resulted in a delay of project completion by one year. This delay will undoubtedly have negative
impacts on other projects we have planned for the Cargo Wharf area during this upcoming
construction season. Furthermore, we understand that your coating contractor has submitted a
claim to address a changed site condition, namely additional coating preparation work that was
allegedly misrepresented in the contract specifications by your Design team. For these reasons,
and others noted below, we request you present to us a proposal detailing the actions you plan to
take to address the slow progress of your coating contractor, as well as their claim of changed
site conditions. Your proposal should include a detailed schedule, manpower loading chart,
critical milestones, and critical paths. Also include your technical recommendations on how to
proceed with coating the remaining portion of the Original Cargo Wharf and still achieve a
useful life of 25 years.

Background:
On 20 March 2001, we entered into a Design-Build (DB) contract with your firm to recoat the
Cargo Wharf Extension (7,400 sf) and Original Cargo Wharf (10,400 sf) at $40/sf for a total of
17,800 sf, or $712,000.00. Other work items included repair/replacement of the Cathodic
Protection System and miscellaneous repairs to fender piling and under pier utilities, to name a
few. Subsequently, your firm entered into a subcontract with Tryck Nyman Hayes, Inc., and
Coffman Engineers, Inc., as your Design team, as well as Swalling Construction Company, Inc.,
as your coatings contractor. The subcontract you initiated with Swalling was for $850,000.00,
Enclosure (1), and included coating the Cargo Wharf Extension and Bents 1-15 on the Original
Cargo Wharf, Enclosure (2). This discrepancy in contract funds needs to be resolved between
Brechan Enterprises and Swalling Construction. We do not plan on increasing our $712,000.00
contracted amount for coatings work. Please advise how you plan to correct this discrepancy.
Enclosure (3) details the actual limits of coatings work for this contract, taking into account
Swallings upfront costs for mobilization and equipment & material purchases.

SUBJ: DTCG50-01-D-643XXO; TASK ORDER #0007, CARGO WHARF MAINTENANCE –
PHASE I (PROJECT SERIAL NUMBER: 33-S01047)

**Design-Build (DB) Philosophy:**
As you may be aware, one of the advantages, to the owner, of a Design-Build contract is that the responsibility, and associated risk, of completing the design and construction is transferred from the owner to the prime contractor. It is the Design-Build teams' responsibility to complete all necessary preliminary studies, site investigations, contract specifications and drawings, construction activities, and to work together as a team to resolve design or construction issues that may arise during the project. On the other hand, one of the advantages to the Design-Build Contractor is that you have the flexibility to "re-design" the project if actual site conditions warrant a different approach. Please be aware that the "re-design" must be proposed to and approved by the owner before construction proceeds. More importantly, the "re-design" must meet the owner's initial scoping requirements, and all efforts associated with the "re-design" and construction will be at no cost to the owner.

**Concerns:**
- Coating Progress: As mentioned previously, our contract was to recoat the Cargo Wharf Extension and Bents 1-12 on the Original Cargo Wharf during the 2001 summer construction season. To date, you have completed the Cargo Wharf Extension and Bents 1-2 on the Original Cargo Wharf (Note: there are still some outstanding items with this portion of the work). Also, Bents 3-5 on the Original Cargo Wharf are 50% complete. Bents 6-12 on the Original Cargo Wharf remain to be blasted, coated, and inspected for compliance with contract specifications.
  - According to Swalling's letter to Brechan dated 22 June 01, Enclosure (4), their schedule shows them mobilizing to Kodiak on 9-10 July 01. Review of the Daily Reports actually shows them mobilizing 7 calendar days later on 17 July 01, Enclosure (5).
  - Swalling's schedule also indicates blasting and painting of the Cargo Wharf Extension was to start on 16 July 01 and be complete by 10 Aug 01. Again, after review of the Daily Reports, Enclosure (6), it shows an actual start date on 02 Aug 01, 13 days later excluding Holidays and weekends.
  - Lastly, Swalling's schedule shows them starting the Original Cargo Wharf section on 10 Aug 01. Enclosure (7) shows them actually starting work on 04 Oct 01, 38 days later, excluding Holidays and weekends.

Swalling attempts to explain the reasons for some of these delays in their letter to Brechan dated 11 Sep 01, Enclosure (8). We do not agree nor accept their reasons for the delays. Late arrival of critical equipment, ineffectiveness of the self-contained blasting unit, and changing blasting methods are all aspects of the job that fall under Swalling's responsibility to address and correct. Furthermore, once actual production rates were known for the Cargo Wharf Extension in Aug 01, it was Swalling's responsibility to plan out the remaining portion of the work, and increase personnel and equipment to improve production rates and get the project back on schedule. Swalling's letter presents a plan to improve the productivity of the remaining work, but it's evident that their plan was either insufficient or not implemented. Please advise us why Swalling's production was insufficient and how you will ensure the remaining work will be completed this construction season at no additional cost to the Government.

2

BEI4101
38599-0012

SUBJ: DTCG50-01-D-643XXO; TASK ORDER #0007, CARGO WHARF MAINTENANCE –
PHASE I (PROJECT SERIAL NUMBER: 33-S01047)

- Changed Site Condition: We have been informed that Swalling claims a changed site
  condition exists with the Original Cargo Wharf H-Piles. In particular, Swalling claims
  additional preparation work is required due to the amount of metal to metal connections,
  and their associated fillet welds, that require "seal welding" before coating begins.
  Swalling claims the contract specifications for the seal welding effort were
  misrepresented and therefore they are due compensation for the additional preparation
  work. Paragraph 1.7.3.9 of the specification reads: "A number of the utility hangars and
  braces were welded to the piles with fillet welds on one side only of the member. All
  metal to metal connections shall be seal welded prior to coating. An estimated 100 feet
  of seal welding will be required. The Contractor or Applicator will seal weld prior to
  surface preparation as required in 3.2.1.2." Apparently, the amount of seal welding
  required is substantially more than 100 feet. Please advise why Coffman Engineers did
  not more accurately represent the amount of seal welding that would be required for this
  job. In addition, paragraph 1.1.3 of the specification reads: "The Applicator shall inspect
  the wharf prior to bid to determine existing conditions and quantities of surfaces to be
  recoated...", and paragraph 3.1.4 reads: "The Contract Drawings and Specifications do
  not purport to describe construction information in absolute detail. An Applicator site
  visit is required prior to bidding and starting work.". Please present information detailing
  the site inspections and site visits conducted by Swalling prior to bidding the work.
  While it is unfortunate that Coffman Engineers did not accurately measure the amount of
  seal welding required, we find it hard to believe that this alleged changed condition could
  not have been detected during proper site inspections by both Coffman Engineers during
  the design phase and Swalling Construction during bid preparation. We base this
  statement on information presented in the "United States Coast Guard Cargo Wharf and
  Fuel Pier Inspection" report, dated Sep 21 – Oct 02, 2000, which was provided to the
  Design-Build team. The report clearly references the "non-structural steel elements" on
  the Cargo Wharf that were "only welded on one side, not 100 percent", which "results in
  a small gap on one side of the connection into which moisture can penetrate. These areas
  are quick to rust and the weld can be attacked from the back (non-welded) side of the
  member." Furthermore, the report references, numerous times, the "poor quality welds"
  associated with the utility system attachments, as well as the water, sewer, and steam
  system hangars in which "Field welds were not 100 percent around the perimeter of the
  joint resulting in crevices left between the angle iron and the base metal". The report also
  provides photographs documenting this condition. This clearly indicates this was a
  known condition that the Design-Build team had knowledge of. For these reasons we do
  not agree with, nor accept, Swalling's claim that a changed site condition exists. Please
  advise us how you plan to address this issue for the remaining portion of work, and how
  you intend to hold Coffman Engineers and Swalling Construction responsible for these
  errors.

- Performance: As a result of Swalling's slow progress last summer, we had to extend the
  services of the Quality Assurance representative (Mr. Jerry Hardenbergh) by two months.
  We agreed to pay for only one month. We do not plan to pay for his services this
  construction season, but expect him to be on-site for the entire project. We believe
  Swalling should be held directly responsible for this expense this construction season, as
  it was their slow progress which has caused the delay in project completion. Our other
  concerns stem from our on-site Coast Guard inspector's observations of Swalling's

BEI4102
38599-0012

SUBJ: DTCG50-01-D-643XXO; TASK ORDER #0007, CARGO WHARF MAINTENANCE –
PHASE I (PROJECT SERIAL NUMBER: 33-S01047)

performance. It has been revealed that Swalling did not provide adequate containment
for the blasting operations. There were many days when blasting grit could be seen in the
water and drifting away with the current. Please ensure adequate containment is provided
to capture 100% of the blasting material. It was also noted that Swalling provided
substandard scaffolding that was marginally safe, did not have the proper certified
coating inspection equipment until 24 Sep 01, and their CQC person arrived on the job
late. Please ensure this does not happen again this summer.

Technical Proposal:
Please prepare a technical proposal with recommendations on how you plan to proceed with
coating the remaining portion of the Original Cargo Wharf, and ensure project completion this
construction season. Your proposal should consider alternative coating systems and
methodologies (i.e.. "re-design"), as well as the pro's and con's of continuing with the present
coating system. It should also study the "seal welding" condition and recommend how you plan
to address this issue. We are open to new ideas and different approaches that will provide the
Wharf with an additional 25 years of useful life. Please note that your recommendations and
plans for continuing work should be at no additional cost to the Government.

Lastly, the award of this Design-Build contract was not based on a Low-Bid competition, but
rather on a Best Value for the Government. We fully expected to get a Design-Build team well
experienced in the work at hand, and fully knowledgeable of the critical aspects of this type of
construction. We understand Coffman Engineers recommended Swalling Construction as a
reputable firm, well skilled and qualified for the job. With that said, we do not understand why
Swalling's experience in this field of work did not adequately prepare them for this project.

We request you present your proposal with your Design-Build Team at our office in Seattle,
WA, or at another mutually agreeable location no later than 11 Mar 02. If you have any
questions, please feel free to contact me, or my Project Manager, LT Paul E. Rendon at (206)
220-7437.

Sincerely,

ANITA REPANICH
Contracting Officer

4.

BEI4103
38599-0012

# MEMORANDUM

PRELIM.

COFFMAN ENGINEERS

| | | | |
|---|---|---|---|
| To | Matt Holmstrom | Date | February 26, 2002 |
| Company | Brechan Enterprises | Project | Cargo Wharf Maintenance Project |
| From | C. Dan Stears | Location | USCG ISC Kodiak, AK |
| Subject | Surface Preparation Technical Proposal | Project No. | DTCG50-01-D-643XX0 Task 7 |

The original RFP for this project called for "Designs shall extend the life of the facility, be feasible and practical, and shall repair design deficiencies identified in the report. Determine practical elevations for extent of repairs. Determine practical construction techniques for coating removal and recoating of existing structures".

The project coating specification that we developed was intended to coat as much of the pile as feasibly possible (lowest practical elevation) and provide a finished product that had a minimal amount of defects (no such thing as a defect free coating). The specification provides an industrial grade coating system that will extend the life of the facility. A part of the specified coating system included the surface preparation requirements. The intent of the surface preparation requirements was to provide surface cleanliness and anchor profile conditions conducive to the specified coating, while minimizing imperfections related to prior construction techniques (slivers, scabs, weld splatter, etc.).

During the preliminary design phase of this project a number of different types of surface imperfections were noted. The contract specifications identified the known types of imperfections and in the case of seal welds, quantified the amount that was anticipated to be encountered. Quantification of the seal welding was performed so that the coating contractor could provide a reasonable cost for performing this work. The exact amount of seal welding could not be estimated without removing all of the existing coating or corrosion products and inspecting the entire project area. Therefore, the estimated amount of seal welding was based on the preliminary design information obtained and by keeping the scope of the surface preparation activity practical (the intent of this specification was to provide a coating system for the dock, not to structurally modify it).

In approximately October of last year, Swalling Construction started abrasive blasting the original wharf H-pile supports. During the surface preparation inspection, after abrasive blasting, a number of surface imperfections became apparent. The majority of these imperfections were almost impossible to see without removing the old coatings and/or corrosion products. Although the project specifications identified the types of defects that the coating contractor could expect to find, more surface imperfections were found than could have reasonably been anticipated. Most, but not all, of these areas are between elevations 116 and 119 (above the tidal zone).

The extent of the substandard quality of the original construction workmanship was concealed by the existing coatings and corrosion products and was more than could have been reasonably anticipated by any of the parties involved. Therefore, in keeping with the "spirit" of the original RFP (feasible and practical), Coffman recommends proceeding with modified surface preparation requirements.

BEI4481

38599-0012

Jiak Cargo Wharf Maintenance Project
Preparation Technical Proposal

...en substandard quality welds and surface imperfections are discovered, a standard industry approach to the problem would provide the following options:

*Option 1* would be to follow the project specifications and correct the surface imperfections by grinding, seal welding, etc. Since the extent of the defects exceeds the amount that could reasonably be expected, a change of conditions would be warranted to follow the existing specification. If the Coast Guard wants to consider this option, the coating contractor has submitted a cost proposal to perform this work. From a practical and feasibility perspective, Coffman feels that this approach is not justifiable. The intent of the specification, to provide a coating system to extend the life of the facility, not to structurally modify it, should be kept in perspective.

*Option 2* would be to modify the project specification requirements by requiring the contractor to improve, but not to modify, the surface imperfections. The standard industry approach to this would be to "stripe coat" or caulk the poor quality or nonexistent welds. This approach provides a cost effective method for minimizing the amount of coating defects that would result from the adverse surface conditions. Sharpe edges, slivers and weld splatter will continue to be ground smooth after sandblasting. Defective welds that compromise the integrity of the structure or that weeps water, could be repaired on a unit cost basis (the number of these type of welds is not known, but is anticipated to be minimal). Since the coating contractor would be requested to perform additional work and supply additional materials, a scope modification would be necessary. If the Coast Guard wants to consider this option, the coating contractor has submitted a cost proposal to perform this work. Coffman feels that this approach is practical and feasible. This approach is a compromise between doing no additional surface preparation (Option 3) and doing extensive modifications to the facility (Option 1). This approach would minimize the amount of coating defects and would extend the useful life of the facility an additional 25 years.

*Option 3* would be to modify the project specification to eliminate the seal welding and the additional surface preparation work related to poor quality welds, crevices, etc. The contractor would continue to provide blasting, cleaning and minor grinding of small imperfections. This approach would result in a no cost modification to the existing contract, however the subject areas will experience small defects in the coating system. In the tidal zone, cathodic protection will be provided to the defects while submerged. In the atmospheric zone, some corrosion and rust streaking will occur. Coffman feels that this approach meets the intent of the RFP, to extend the useful life of the facility an additional 25 years, however it will obviously provide more coating defects than Option 2.

Regardless of the option selected, there will be some coating defects, corrosion at the defects and staining of the adjacent coating in the future. Future construction, maintenance, inspections, etc., are likely to reduce the effectiveness of the coating system more than the imperfections previously discussed.

Alternate coating systems were previously evaluated and the current contract specifications allow the contractor to use five different coating systems or provide an approved "equal" system. The contractor is presently considering an "equal" product that was test applied last year on the USCG Kodiak Fuel Pier. Coffman feels that the coating system being applied is a quality product, however we are receptive to alternate equal systems if the contractor

BEI4482
38599-0012

# MEMORANDUM



| To | Matt Holmstrom | Date | February 26, 2002 |
|---|---|---|---|
| Company | Brechan Enterprises | Project | Cargo Wharf Maintenance Project |
| From | C. Dan Stears | Location | USCG ISC Kodiak, AK |
| Subject | Surface Preparation Technical Proposal | Project No. | DTCG50-01-D-643XX0 Task 7 |

The original RFP for this project called for "Designs shall extend the life of the facility, be feasible and practical, and shall repair design deficiencies identified in the report. Determine practical elevations for extent of repairs. Determine practical construction techniques for coating removal and recoating of existing structures".

*The project coating specification that we developed was intended to coat as much of the pile as feasibly possible (lowest practical elevation) and provide a finished product that had a minimal amount of defects (no such thing as a defect free coating).* The specification provides an industrial grade coating system that will extend the life of the facility. A part of the specified coating system included the surface preparation requirements. The intent of the surface preparation requirements was to provide surface cleanliness and anchor profile conditions conducive to the specified coating, while minimizing imperfections related to prior construction techniques (slivers, scabs, weld splatter, etc.).

During the preliminary design phase of this project a number of different types of surface imperfections were noted. The contract specifications identified the known types of imperfections and in the case of seal welds, quantified the amount that was anticipated to be encountered. ⎡⎤⎡⎤ Quantification of the seal welding was performed so that the coating contractor could provide a reasonable cost for performing this work. The exact amount of seal welding could not be estimated without removing all of the existing coating or corrosion products and inspecting the entire project area. Therefore, the estimated amount of seal welding was based on the preliminary design information obtained and by keeping the scope of the surface preparation activity practical. The intent of this specification was to provide a coating system for the dock, not to structurally modify it.

In approximately October of last year, Swalling Construction started abrasive blasting the original wharf H-pile supports. During the surface preparation inspection, after abrasive blasting, a number of surface imperfections became apparent. The majority of these imperfections were almost impossible to see without removing the old coatings and/or corrosion products. Although the project specifications identified the types of defects that the coating contractor could expect to find, more surface imperfections were found than could have reasonably been anticipated. Most, but not all, of these areas are between elevations 116 and 119 (above the tidal zone).

The extent of the ⎡⎤⎡⎤ was concealed by the existing coatings and corrosion products and was more than could have been reasonably anticipated by any of the parties involved. ⎡⎤⎡⎤

BEI8213
38599-0012

USCG Kodiak Cargo Wharf Maintenance Project
Surface Preparation Technical Proposal

[illegible text] Therefore, in keeping with the "spirit" of the original RFP (feasible and practical), Coffman recommends proceeding with [illegible] modified surface preparation requirements.

[illegible paragraph]

[illegible paragraph]

[illegible paragraph]

[illegible text] modify the project specification to eliminate the seal welding and the additional surface preparation work related to poor quality welds, crevices, etc.  The contractor would continue to provide blasting, cleaning and minor grinding of small imperfections.  This approach would result in a no cost modification to the existing contract, however the subject areas will experience small defects in the coating system.  In the tidal zone, cathodic protection will be provided to the defects while submerged.  In the atmospheric zone, some corrosion and rust streaking will occur.  [illegible] This approach meets the intent of the RFP; to extend the useful life of the facility an additional 25 years [illegible text]

[illegible text] here will be some coating defects, corrosion at the defects and staining of the adjacent coating in the future.  Future construction, maintenance,

BEI8214
38599-0012

USCG Kodiak Cargo Wharf Maintenance Project
Surface Preparation Technical Proposal

inspections, etc., are likely to reduce the effectiveness of the coating system more than the imperfections previously discussed.

Alternate coating systems were previously evaluated and the current contract specifications allow the contractor to use five different coating systems or provide an approved "equal" system. The contractor is presently considering an "equal" product that was test applied last year on the USCG Kodiak Fuel Pier. Coffman feels that the coating system being applied is a quality product, however we are receptive to alternate equal systems if the contractor chooses. The vast majority of a coating system cost is in the mobilization, staging and surface preparation; therefore it is not recommended to apply substandard coatings.

The surface preparation methods previously identified and the new coating system that is being applied is superior to the previous coating systems. The new coating has been achieving 2000-psi adhesion strengths and few quality control issues have been identified to date.

If you or the USCG has any questions regarding this technical proposal, please feel free to contact me at (907-276-6664).

Sincerely,

C. Dan Stears
Principal Corrosion Control Engineering

BEI8215
38599-0012

## MEMORANDUM



| To | Matt Holmstrom | Date | February 27, 2002 |
|---|---|---|---|
| Company | Brechan Enterprises | Project | Cargo Wharf Maintenance Project |
| From | C. Dan Stears | Location | USCG ISC Kodiak, AK |
| Subject | Draft    Surface    Preparation Technical Proposal | Project No. | DTCG50-01-D-643XX0 Task 7 |

The original RFP for this project called for "Designs shall extend the life of the facility, be feasible and practical, and shall repair design deficiencies identified in the report. Determine practical elevations for extent of repairs. Determine practical construction techniques for coating removal and recoating of existing structures".

The project coating specification that we developed was intended to coat as much of the pile as feasibly possible (lowest practical elevation) and provide a finished product that had a minimal amount of defects (no such thing as a defect free coating). The specification provides an industrial grade coating system that will extend the life of the facility. A part of the specified coating system included the surface preparation requirements. The intent of the surface preparation requirements was to provide surface cleanliness and anchor profile conditions conducive to the specified coating, while minimizing imperfections related to prior construction techniques (slivers, scabs, weld splatter, etc.).

During the preliminary design phase of this project a number of different types of surface imperfections were noted. The contract specifications identified the known types of imperfections and in the case of seal welds, quantified (100 feet) the amount that the coating contractor would need to address. This amount was double the amount (50 feet) that was required by the final Project Scope and Fee Narrative, dated 3/13/01. Quantification of a practical amount of seal welding was established for bidding purposes and to keep within the budget limitations and intent of the project. The exact amount of seal welding could not have been established without removal of all the existing coatings and/or corrosion products and inspecting the entire project area. Therefore, the quantity of seal welding was based on the preliminary design information and by keeping the scope of the surface preparation activity practical (The intent of this project was to provide a coating system for the dock, not to extensively and structurally modify welds).

In approximately October of last year, Swalling Construction started abrasive blasting the original wharf H-pile supports. During the surface preparation inspection, after abrasive blasting, a number of surface imperfections became apparent. The majority of these imperfections were almost impossible to see without removing the old coatings and/or corrosion products. Although the project specifications identified the types of defects that the coating contractor could expect to find, more surface imperfections were found than could have reasonably been anticipated. The amount of work required to address these areas was in excess of that required by this contract and the intent of this project. Most, but not all, of these areas are between elevations 116 and 119 (above the tidal zone).

BEI4992
38599-0012

USCG Kodiak Cargo Wharf Maint    nce Project
Surface Preparation Technical Proposal

The extent of the nonexistent and substandard quality of the original construction welding was concealed by the existing coatings and/or corrosion products and was more than could have been reasonably anticipated by any of the parties involved. Therefore, in keeping with the "spirit" of the original RFP (feasible and practical), Coffman recommends proceeding with one of the following modified surface preparation requirements.

When substandard quality welds and surface imperfections are discovered, a standard industry approach to the problem would provide the following options:

*Option 1* would be to follow the project specifications and correct the surface imperfections by grinding, seal welding, etc. Since the extent of the defects exceeds the project scope and the intent of the project, a change of conditions would be warranted to follow the existing specification. If the Coast Guard wants to consider this option, the coating contractor has submitted a cost proposal to perform this work. From a practical and feasibility perspective, Coffman feels that this approach is not justifiable. The intent of the project, to provide a coating system to extend the life of the facility, not to extensively and structurally modify welds, should be kept in perspective.

*Option 2* would be to modify the project specification requirements by requiring the contractor to improve, but not to modify, the surface imperfections. The standard industry approach to this would be to "stripe coat" or caulk the poor quality or nonexistent welds. This approach provides a cost effective method for minimizing the amount of coating defects that would result from the adverse surface conditions. Sharpe edges, slivers and weld splatter will continue to be ground smooth after sandblasting. Defective welds that compromise the integrity of the structure or that weeps water, could be repaired on a unit cost basis (the number of these type of welds is not known, but is anticipated to be minimal). Since the coating contractor would be requested to perform additional work and supply additional materials, a scope modification would be necessary. If the Coast Guard wants to consider this option, the coating contractor has submitted a cost proposal to perform this work. Coffman feels that this approach is practical and feasible. This approach is a compromise between doing no additional surface preparation (Option 3) and doing extensive modifications to the facility (Option 1). This approach would minimize, but not eliminate, the amount of coating defects (primarily pinholes) at the subject areas and would continue to extend the useful life of the facility an additional 25 years.

*Option 3* would be to modify the project specification to eliminate the seal welding and the additional surface preparation work related to poor quality welds, crevices, etc. The contractor would continue to provide blasting, cleaning and minor grinding of small imperfections. This approach would result in a no cost modification to the existing contract, however the subject areas will experience numerous small defects in the coating system. In the tidal zone, cathodic protection will be provided to the defects while submerged. In the atmospheric zone, some corrosion and rust streaking will occur. Coffman feels that this approach would also meet the intent of the RFP, to extend the useful life of the facility, however it will obviously result in more coating defects and subsequent corrosion of the structure than Option 2.

Regardless of the option selected, there will be some coating defects, corrosion and coating disbondment at the defects and staining of the adjacent coating in the future. Future

BEI4993
38599-0012

USCG Kodiak Cargo Wharf Maintenance Project
Surface Preparation Technical Proposal

construction, maintenance, inspections, etc., are likely to reduce the effectiveness of the coating system as much or more than the imperfections previously discussed.

Alternate coating systems were previously evaluated and the current contract specifications allow the contractor to use five different coating systems or provide an approved "equal" system. The contractor is presently considering an "equal" product that was test applied last year on the USCG Kodiak Fuel Pier. Coffman feels that the coating system being applied is a quality product, however we are receptive to alternate equal systems if the contractor chooses. The vast majority of a coating system cost is in the mobilization, staging and surface preparation; therefore it is not recommended to apply substandard coatings.

The surface preparation methods previously identified and the new coating system that is being applied is superior to the previous coating systems. The new coating has been achieving 2000-psi adhesion strengths and few quality control issues have been identified to date.

If you or the USCG has any questions regarding this technical proposal, please feel free to contact me at (907-276-6664).

Sincerely,

C. Dan Stears
Principal Corrosion Control Engineering

BEI4994
38599-0012

From:       Stears, Dan [Stears@alaska.coffman.com]
Sent:       Tuesday, February 26, 2002 10:07 PM
To:         'Mike Martin'; 'Bill Oliver'; 'Matt Holmstrom'; Hollis, Harold
Cc:         Hardenbergh, Jerry
Subject:    Kodiak Dock Coating Cost Negotiations

The following is a copy of an email message from Steve Locher to Matt
Holmstrom. Matt is likely to have the original. During the fee
negotiations, the USCG wanted the cost of the coating system to be reduced
to fit their budget. The scope of work and the potential liabilities were
all be discussed and negotiated. As you will see in item #1, the USCG
agreed to "not make your company bear all cost overruns or mistake in
bids...." This obviously is an important statement.

Dan


        -----Original Message-----
        From: Locher, Steven [mailto:SLocher@pacnorwest.uscg.mil]
        Sent: Friday, March 09, 2001 3:03 PM
        To: Matt Holmstrom
        Subject: Kodiak Cargo Wharf Maintenance


        Matt,
        1.  Things are progressing well on this side. We had a meeting today
with Jerry, Anita and Paul Rendon. I explained the design-build issues, and
we have pretty much bought into being somewhat flexible, in an effort to
better our cause, and to reduce your risks. The main issue being a
deviation in quote once the plans and specifications are finalized.

        We would agree not to make your company bear all cost overruns or
mistake in bids, if you would share with us the benefits of getting reduced
prices, which in-turn would expand or improve the final product.

        Having said that, we will probably shoot for a negotiated amount of
$40/SF coating cost, and expect some economy of scale in the extension
(newer) wharf, built-in at final design.

        2.  We have taken a closer look at the design costs and have some
concerns. Part of this is my error in misreading the spreadsheet. I know
I said the design costs look good, but I was looking at design costs
inclusive in the $113K. What we are concerned about at this point is the
high percent of design to construction cost. Additionally, allot of the
work is repetitive, and we are not clear on just why the design costs would
be so high. There does not seem to be much analysis involved.

        3.  We will probably forgo most of the field inspection. We are
considering using Scott or other on-site inspectors. We would need to use
your inspector however to train ours so some site inspection will still be
required.

        4. Can we finalize the numbers on Monday? My calendar is clear.

        Thanks Matt.


------- End of forwarded message -------

BEI6811
38599-0012

FW: Kodiak Cargo Wharf

| From: | Stears, Dan [Stears@alaska.coffman.com] |
|---|---|
| Sent: | Thursday, March 07, 2002 9:40 PM |
| To: | 'Steve Locher' |
| Cc: | Radcliffe, Lawrence; Hardenbergh, Jerry; 'Matt Holmstrom'; 'John |

**Subject:** FW: Kodiak Cargo Wharf

Steve,

In reference to the seal welding issue, I have prepared a draft Memorandum to Matt Holmstrom dated 2/27/02 regarding this issue and options that we can use to proceed to finish the coating work for Phase I. I believe Matt was going to forward you a copy of it. In summary, during the fee and scope negotiation process we agreed to limit the seal welding to a practical quantity (50 feet). When we wrote the specification, we doubled the amount to 100 feet (contingency factor).

In reference to your angle clip question, I believe it would be cheaper to stripe coat these areas rather than grinding and removing them. We could have this as a contractor option if you like.

If you have any other questions, please feel free to contact me on them. I would like to remain the central point of contact at Coffman, so we can more efficiently respond to you. If need be, I will forward all questions to the best person to answer them for you.

Thank you,

Dan

PS: I will be in Atlanta next week for an emergency surgery on my sister. I will have my cell phone with me (907-441-7999) if you need to contact me. I will also try to access my email remotely.

-----Original Message-----
**From:** Radcliffe, Lawrence
**Sent:** Thursday, March 07, 2002 9:02 PM
**To:** Stears, Dan
**Subject:** RE: Kodiak Cargo Wharf

Dan,
Steve Locher has a question on the determination of the extent of seal welding. Can you respond to this inquiry?
Thanks

Lawrence J. Radcliffe
Coffman Engineers, Inc.
800 F Street
Anchorage, AK 99501
Ph. (907) 276-6664
Fx. (907) 276-5042
radcliffe@alaska.coffman.com
Visit our web site at:
http://www.coffman.com

      -----Original Message-----
      **From:** Locher, Steven [mailto:SLocher@pacnorwest.uscg.mil]
      **Sent:** Thursday, March 07, 2002 6:22 AM
      **To:** Radcliffe, Lawrence
      **Cc:** John Daley

BEI6557
38599-0012

9/28/04

**Subject:** FW: Kodiak Cargo Wharf

Lawrence,

As you can see from below, I am interested on how we estimated the 50LF and 100LF of seal welding. I believe if it was doubled arbitrarily, that is not such a bad strategy, but I could not find anything in my records. Do you have anything on how the 50LF or the 100LF were estimated?

Apparently, they are running into more seal welding than they had estimated. If a significant amount of the seal welding is on angle clips, some of those clip are serving no purpose. Would it be cheaper to remove the clips rather than seal weld prior to painting?

Thanks
SL

-----Original Message-----
From: John Daley [mailto:JohnD@tnh-inc.com]
Sent: Wednesday, March 06, 2002 5:30 PM
To: Locher, Steven
Cc: Mike Shoemaker; Ted Trueblood
Subject: Re: Kodiak Cargo Wharf


Steve,

Nice to hear from you. I understand that the seal welding is a big issue / problem on the cargo wharf project. Sorry to hear this.

As I recall, Lawrence Radcliffe from Coffman first brought up the idea of seal welding in relation to the many utility supports that were welded to the piling. Many of these supports were only partially welded and there were clear indications of rust in the remaining crevices between the supports and the piling. The idea was to fix these areas such that the new paint wouldn't immediately start to show rust streaks etc.

I believe that the initial estimate of 50 feet was advanced at the time the design build team was negotiating the fees for the project. The team wanted to provide some number for this item to base a fee on. At the time we were discussing ways to keep the unit costs for coating down and this appeared a reasonable minimum. Prior to finalizing the specs for coating, Coffman decided to up the number to 100 feet to provide more of a margin of safety with the bid.

I believe that Coffman may have more detailed information regarding this issue. I hope this helps.

Regards,

John Daley

BEI6558
38599-0012

9/28/04

FW: Kodiak Cargo Wharf

| | |
|---|---|
| From: | "Locher, Steven" <SLocher@pacnorwest.uscg.mil> |
| To: | John Daley <JohnD@tnh-inc.com> |
| Subject: | Kodiak Cargo Wharf |
| Date sent: | Wed, 6 Mar 2002 09:49:16 -0800 |

John,

Long time no hear. I hope all is well. We had a meeting this morning with
our executive director on the cargo wharf. I am looking for some background
information for my reference. Could you tell me how we came up with the 50
LF of seal welding in the proposal narrative, and the 100 LF of seal welding
in the specifications? Thanks.
SL

BEI6559
38599-0012

9/28/04

## MEMO
## from the desk of Bill Oliver

March 7, 2002

Andrew Romine
Swalling Construction Co.
via fax# 907 274-6002

Re:    Kodiak Cargo Wharf

Andy:

Following is the result of running your H- pile repair bill thru the DOTPF
procedure as we discussed earlier. The result is a total of $30,241.95.
Most of the change is due to reducing the per diem ✹ by eliminating hours
worked by local Kodiak labor, charging welder consumable on pullback hours,
and a nine hour discrepancy in labor hours.

Also attached is a copy of a letter from the Coast Guard that we have been
dealing with. We are proposing to complete this project by caulking as required,
and limiting the project scope to 15,500 square feet. At our meeting next week
we hope to finalize your proposal of February 12, and get a draft of the schedule
the Coast Guard is asking for on page one of their letter.

See you next week.

Bill Oliver

Fax totals 6 pages

BEI5009
38599-0012

## Jarrell, Amy (Perkins Coie)

| | |
|---|---|
| **From:** | Boivin, Martin [MBoivin@pacnorwest.uscg.mil] |
| **Sent:** | Thursday, March 07, 2002 2:47 PM |
| **To:** | Rendon, Paul LT; Johnson, Jerald |
| **Cc:** | Repanich, Anita; Locher, Steven; 'mholmstrom-bei@gci.net' |
| **Subject:** | RE: CARGO WHARF - PHASE I |

Paul I need to check with Mike-----If what you and matt say is what they intend then two things must happen.... we must have a deeper discussion on responsibility for the change and must understand how this caulking system is going to last for 25 years------ so please give me mike's phone number.

-----Original Message-----

**From:** Rendon, Paul LT

**Sent:** Thursday, March 07, 2002 2:06 PM

**To:** Johnson, Jerald; Boivin, Martin

**Cc:** Repanich, Anita; Locher, Steven; mholmstrom-bei@gci.net

**Subject:** CARGO WHARF - PHASE I

Marty,

there seems to be some confusion between what you discussed during your meeting with Mike Martin & what I discussed with Matt last week.

There are currently 3 Options available for the remaining work on the Cargo Wharf:

- Option # 1: continue as specified with grinding & seal welding. Estimated cost exceeds $250K.
- Option # 2: proceed with work using "stripe coat" or caulking the poor quality or nonexistent welds. Estimated cost $70K-$90K. This is the total cost to the Gov't and includes QA (Jerry Hardenbergh) costs, and costs incurred during Bents 1-5.
- Option # 3: modify contract requirements to eliminate the seal welding & additional surface prep work related to poor quality welds, crevices, etc.. Estimated cost = $0.00.

This is what Matt & I discussed last week, but is different from what you presented during our meeting yesterday. I just don't want you to be surprised when the final proposal/recommendation comes in presenting Option # 2 for $70K-$90K.

v/r,

## LT Paul E. Rendon

Facilities Design & Construction Center Pacific
Civil Engineer, Alpha Team
Phone:  (206) 220-7437
Fax:     (206) 220-7391

**BEI20390**
38599-0012

## MODIFICATION OF SUBCONTRACT

Modification # 1     Effective Date: March 13, 2002
Project: USCG Cargo Wharf Maintenance Project
Owner: USCG FD&CC (PAC)
Contractor: Brechan Enterprises, Inc.
Subcontractor: Swalling Construction Company, Inc.

**This modification of the above referenced subcontract is entered into
pursuant to the mutual agreement of the signatory parties, and
contingent upon the approval of the Owner.**

Description of Modification:

| | | |
|---|---|---|
| 1. | Reduce scope of H Pile Section from 12,800 sf to 8,100 sf | $(145,298.00) |
| 2. | Compensate subcontractor for fuel pier test coat | $ 7,100.00 |
| 3. | Compensate subcontractor for cathodic protection, conduit, insulation scaffolding | $ 13,017.50 |
| 4. | H pile welding repair | $ 30,241.95 |
| 5. | Modify the preparation spec as per *Option 2* of the Surface Preparation Technical Proposal dated February 26, 2002, and prepared by Coffman Engineers. This spec will be applied to work remaining to be completed | ≤50,000.00 MRM ~ $ 39,682.00 |
| 6. | Scheduling as required by the Anita Repanich letter to M. Martin dated 25 Feb 2002. | |

Total modification is a reduction of      (44,938.55) $(55,256.55) MRM

Contractor                                  Subcontractor:
Brechan Enterprises, Inc.                   Swalling Construction Company, Inc.

by _Michael Mart_                           by _J. Michael Swalling_

its _President_                             its _President_

BE I3354
38599-0012

## Jarrell, Amy (Perkins Coie)

| | |
|---|---|
| **From:** | Repanich, Anita [ARepanich@pacnorwest.uscg.mil] |
| **Sent:** | Wednesday, March 13, 2002 12:58 PM |
| **To:** | 'Matt Holmstrom'; Repanich, Anita; Rendon, Paul LT |
| **Cc:** | Brown, Andrew LT |
| **Subject:** | RE: partnering |

I would like for you to tell me at what point we at the PM level went to the exec level and said "We can't resolve this cargo wharf issue, we need you guys to". I don't doubt the exec level here doesn't find the partnering very beneficial, they were never listening.

Marty says if he doesn't get option 1 for 70-90K then "we need to further discuss responsibility with Brechan". Everyone back to their corners.

He also says that he will let Paul and I do whatever we want with this, just let him know before I sign it. I'm going to go with that one, once we've agreed, to me it's a done deal, doesn't matter if I've signed it. I'll just let Paul explain to him what we've done.

If we don't partner in April, then we don't partner anymore. Your right Matt, with or without the partnering we just need to continue together the way we have been. I know that Bill's understanding is skin deep, that's true from here too. I just need to consistently demonstrate our commitment to the partnering...and wear earplugs when I meet with Marty.

-----Original Message-----
**From:** Matt Holmstrom [mailto:mholmstrom-bei@gci.net]
**Sent:** Wednesday, March 13, 2002 10:04 AM
**To:** Repanich, Anita; Rendon, Paul LT
**Cc:** Andy Brown
**Subject:** RE: partnering

Anita/Paul - I think we should switch positions...from my standpoint the longer we go, and the more successful we are, the more "guidance" I get. It's kind of funny. I basically ran 9 months on my own...the cargo wharf was my downfall.

Regarding the partnering, you 2 know where I stand. I believe the only way this has worked is the relationship and commitment between the three of us. Then with this commitment we have been able to "preach the gospel" to the people we work with. For your information, Mike Martin and Bill Oliver thought we were going to get stuck with the $100k on the Cargo Wharf until Anita had a conversation with Bill. Their understanding is "skin deep" at best.

So...setting a partnering date. Let me think this one through...there are so many new faces, and no matter how well-intentioned there will be confusion. Mid-April is the right time...the end of the Summer the battle is over. I will push from this end to make sure we have a session. I believe that the partnering session would also be beneficial for Andy. That way he can see the other Brechan players.

I will say that a new COR coming in mid-stream could make things more interesting than any of us need. I'll push. Matt

-----Original Message-----
**From:** Repanich, Anita [mailto:ARepanich@pacnorwest.uscg.mil]
**Sent:** Tuesday, March 12, 2002 2:34 PM
**To:** Rendon, Paul LT; 'mholmstrom-bei@gci.net'
**Subject:** partnering

Matt,
   I'm at a dead end from here on the partnering. maybe when we get a new COR, maybe when the new FE at the ISC comes in...maybe later in the summer.....the hang up is at the exec level. Don't see the need.

BEI19039
38599-0012

**Jarrell, Amy (Perkins Coie)**

| | |
|---|---|
| **From:** | Rendon, Paul LT [PRendon@pacnorwest.uscg.mil] |
| **Sent:** | Wednesday, March 13, 2002 3:01 PM |
| **To:** | Johnson, Jerald; Boivin, Martin |
| **Subject:** | JOC PARTNERING |

**Importance:**    High

Jerry/Marty,
alot of e-mails flying around about Partnering dates, with no real resolution.

From my point of view as PM, it is always beneficial for the PM Team & Technical Team (Superintendents/CI's, COR) to get together and discuss processes (DCR's, Submittals, Modifications, individual responsibilities, flow of communications: horizontally & vertically, etc..) and conflict resolution issues face to face. Besides being rewarding, it reinforces the "Team" or "Partnering" attitude and demonstrates to the Field Level personnel (Superintendent's/CI's/COR) how serious the PM's are about it and therefore so should they (i.e. "buy-in"). It also reminds everyone that if there are disagreements in the field that cannot be resolved, then elevate it to the PM level who *will* resolve and subsequently report to the Executive level that all is taken care of......rarely will Matt & I elevate a problem to the Execs to solve a problem for us & I don't believe you want to be that far in the weeds....Cargo Wharf is heading that way.

Timing: timing is always a problem when trying to get these many people together...we're always having to weigh the pros & cons of getting the majority of people to show up & missing a few people OR waiting until everyone is available at an inopportune time (i.e. middle of the construction season). Mid-April was chosen as the "tentative" date for the Partnering session because the pros of having the majority number of people show up & missing one COR outweighed the mid-May date when everyone would be "on-island (not necessarily available) and during the middle of the construction season. Mid-May is too disruptive for the JOC and our own CI's....I hate it when people have to bounce in and out of conferences/meetings in order to answer cell-phones and put out fires on their jobs. I really hate it when they have to leave early to put out fires and wind up missing the discussions. This happened at our last Partnering session and it wasn't even during a busy'time of the year. Mid-May: we are *hoping* to have the new COR onboard by mid-May, but this is not definite, as the new employee may need time to wrap up loose ends on their side as well as need time for moving household goods if coming from off-island. We are also *still hoping* that Chris Lynch takes another look at this job and considers applying for it, which would work in everyone's favor if she gets it (hypothetically speaking). Again, this is not definite, but we know for sure that Chris will be around for the entire summer, and having her involved in the Partnering will be time well spent, especially if she gets the COR job.

With all that said (& I can't believe I'm going to say this, because it means another trip to Kodiak for me): I recommend only the PM Team & Technical Team meet in Mid-April to prepare for this summer's construction season. We know what needs to be done, but how we get there needs to be agreed upon by ALL. Our scoping processes with ISC Kodiak have been established, but yet to be implemented. We have construction processes (DCR, Submittal, Modification processes) in place that need dusting off & re-vamping, due to dropping ISCK from issuing Task Orders, as well as educating new personnel. Past Partnering sessions have revealed that the majority of discussions are among the PM & Technical Level.
  We then present our issues & resolutions to the Execs for buy-off, which normally get accepted. I also recommend keeping Tom Brascher as the facilitator. I heard a nasty rumor that a LT could do it....I tried this once between CEUJ, ISCK and the JOC and although we accomplished our goals, it was difficult to keep everyone focused, and we mostly agreed to disagree on many fronts. Having the new COR present is important, but not critical: what's critical is re-evaluating our construction processes. With these processes established, the new COR will fall right into place, just as he/she will with the new scoping processes.

Marty,
Cargo Wharf: I'm expecting the Coating Proposal this week, if not, then next week. We'll be in Kodiak next week for the POP Board, so we may be able to meet with Mike Martin, Bill Oliver, and Matt (via phone) while we are there.

Please advise if you agree with the Partnering schedule above.

v/r,

LT Paul E. Rendon

4

**BEI19041**
38599-0012