IBCA

## APPEAL OF PIEDMONT PAINTING CONTRACTORS

Contract No. 1443-CX7000-94010
Decided: March 4, 1998
National Park Service
Sustained

APPEARANCE FOR APPELLANT:
  Joseph A. Piedmontese, Owner
  Piedmont Painting Contractors
  El Paso, Texas

APPEARANCE FOR GOVERNMENT:
  Robert C. Eaton
  Department Counsel
  Santa Fe, New Mexico

### OPINION BY ADMINISTRATIVE JUDGE PARRETTE

This is an appeal from the default termination by National Park Service (NPS or Government) of its contract with Piedmont Painting Contractors (Piedmont, contractor, or Appellant) for the painting of a 50,000 gallon steel water tank located at Capulin Volcano National Monument, Capulin, New Mexico (Capulin). The Government seeks unpaid excess reprocurement costs, and Appellant seeks payment of both the $19,866 balance of its contract and an additional $2,870 based on extra work caused by two alleged differing site conditions. An oral hearing was held in Albuquerque, New Mexico, on October 28 and 29, 1997, at which Appellant appeared pro se. We sustain the appeal and convert the default termination to one for the convenience of the Government, for the reasons set forth below.

### FINDINGS OF FACT

1. On July 18, 1994, the Intermountain Field Area office of the NPS in Santa Fe, New Mexico, issued an unrestricted Invitation for Bids for the "general construction of painting the interior and exterior of a 50,000 gallon steel water reservoir" at Capulin, estimating the price range of the project to be $25,000 to $100,000. Apparently no special instructions or caveats were issued with the solicitation, and the tank was full of water when the contractor made his pre-bid site visit. He therefore reasonably regarded the project as a normal industrial painting contract.

2. Bid items included (1) installation of a water piping inlet riser, (2) interior painting, and (3) exterior painting, on which Piedmont bid $1,400, $18,500, and $2,732, respectively, for a total of $22,632. Bids were opened on August 18, 1994, and the contract was awarded to Piedmont on September 26. After the commencement of work under the contract a year later, a change order was issued adding the installation of a replacement water leveling device to the project for an agreed price of $2,575, work which was agreed by the parties to have been satisfactorily performed.

3. The contract provided that performance would begin within 15 calendar days and be completed within 60 calendar days after receipt of the notice to proceed, but the parties agreed to delay performance until 1995 because of cold weather. The contractor wanted to begin work in May or June of 1995, but the Government did not schedule its preconstruction conference until August 7 of that year.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4. At the preconstruction conference, the contractor was informed for the first time of weight restrictions that the Capulin superintendent had imposed on the road leading to the water tank. During the meeting, attention was also called to a provision in the contract prohibiting Saturday, Sunday, holiday, and night work; but the meeting's minutes indicate that Piedmont was told that the prohibition could be waived if the contracting officer's technical representative (COTR) was advised at least 2 days in advance.

5. The notice to proceed is dated August 9, 1995, but the parties agreed that work would begin on August 8. The contractor immediately encountered problems with the inlet riser plans, which indicated that the riser should be made of ductile iron; but the underground exterior supply pipe proved to be made of PVC, which would have been incompatible with an iron pipe, so PVC materials had to be obtained. The contractor asserted that substantial delay resulted from the need to purchase PVC materials and then reroute the inlet pipe.

6. The contractor also submitted a claim for additional costs resulting from his inability to bring a semi-trailer loaded with 48,000 pounds of 50- and 100- pound bags of blasting sand up to the tank site because of road restrictions imposed by the Capulin Superintendent, that he did not know about when he bid. Because of these restrictions, the contractor had to use a forklift to unload the pallets of sand bags and then transfer them by hand to his two small trucks in order to take them uphill to the work site, a trip that involved a (disputed) distance of 2/3 of a mile to 3-1/2 miles per load.

7. The contractor's alleged extra costs for unloading, reloading, and transporting the sand included: (1) the use of 2 trucks, 3 men, and 46 man-hours at $1,840; (2) extra costs for rerouting the inlet pipe involving 28 man-hours at $550; and (3) extended overhead related to items (1) and (2) in the amount of $480, or approximately 20 percent of the $2,390 total of items (1) and (2). The parties disagree over whether these claims were ever submitted to the contracting officer (CO), but based on the literal language of the CO's March 19, 1997, default termination letter--viz., "the agency will not pay you any additional money for work under this contract"--the Board finds that these claims were effectively denied in the final decision terminating the contract for default. (Emphasis added).

8. Further, the appeal file in this case also reflects numerous other gaps, some of which would clearly be relevant to the Board's considerations. For example, the record contains no information about what other bids, if any, resulted from the solicitation, and we do not know whether this contractor's bid was ever verified by the CO. Even the CO's notes of the post-completion "non-compliance meeting," which the CO referred to during his testimony at the hearing, were not included in the appeal file. The Board had to request from the bench that they be included as an exhibit for the record. Given these omissions, we accept the contractor's statement that his claims were in fact submitted to the Government prior to the CO's final decision.

9. At the hearing, the contractor's problems with the blasting sand and inlet riser appeared to be relatively minor in comparison with the difficulties that resulted from the poor condition of the water tank as discovered by the contractor when he reinspected the then-empty tank before commencing his work. He found that the roof of the tank was not flush with the top of the tank and not completely welded to it, with the result that there appeared to be as much as an inch of airspace between the roof and the sides of the tank in some places, and that, in addition, the top edge of the tank's sides had crevices (channels, "caves," or "hidden ledges") containing old dirt and debris that the contractor

could not easily remove by usual cleaning methods. These crevices also caught and retained sand from the contractor's own sand blasting efforts and interfered with his painting.

10. Tim Lynch, the Government's expert witness, testified to the same conditions as the contractor, referring to design defects in the tank, including sharp, jagged edges, and welds that were not properly done, which resulted in inadequate paint retention. The expert noted that the tank needed those areas to be ground down to provide a surface that would accept the coating. But on cross-examination, he effectively agreed with the contractor that the completed job was not "94 percent bad" (referring to the percentage of the contract price that the CO had withheld pending compliance with the Government's punch list), and he further agreed that a "profile test" of the new coating would have been needed for an accurate measurement of the paint's thickness. He admitted that there were old welds, involving "just the general construction of the tank," that would have been impossible to paint so the coating would stay on. He agreed that there were areas where moisture was coming in "from the top edges," with rust spots running down the side of the inside tank wall, which were large enough that the paint would not seal over them.

11. The COTR said that the water tank, which was used for both drinking water and for fire protection, was 8-feet high but normally was filled only to a height of 6 feet. He testified that the contractor had poor equipment and had made slow work progress, but confirmed that he had discretion to allow the contractor to work on weekends or holidays and more than 40 hours per week upon request. Contrary to prior testimony, the COTR asserted that the tank wall was directly connected to its roof by welds, and he categorically denied the existence of any ledge, cave, or opening between the circular side wall and the ceiling of the tank that would have made the upper parts of the tank difficult to sandblast or paint. He said that wherever there were any holes in existing welds, the contractor was required to weld over them and then grind them down to a finish that would accept a proper application of paint--citing a provision in the contract (FF 27) as his authority. He admitted that on the Thursday preceding Labor Day, the contractor had asked for permission to work over the long weekend but said that he had denied such permission because he had made plans to go hunting, and no one else was available to monitor the project.

12. When the COTR returned to the site on the Tuesday after the Labor Day weekend, he discovered that the contractor had almost completely painted the tank--but unsatisfactorily, in his view, because the COTR had not had an opportunity to inspect the tank before its painting, and because the paint was spread too thick in some places and too thin in others, and allegedly contained dust. He said that this was the first time he had had any difficulties working with the contractor. When the COTR asked the contractor at the time why he had worked without authorization, the contractor said that it was too far to go back to El Paso for the weekend, so he decided to work instead. The COTR then decided that the whole tank needed to be re-sandblasted and repainted. He testified that the contractor had agreed to correct deficiencies in his work, but that he never came back to do so. The COTR also testified that when he and the contractor went back to the tank a year later to take pictures of it, there was substantial rust on the inside of the tank and that a number of areas were without paint. He concluded that the paint job, which should have lasted 15 years, had effectively lasted less than 1 year.

13. On September 13, 1995, the CO issued a cure notice to the contractor directing him to "cure" the following "problems" immediately: (1) the COTR had not seen the sandblasted surface prior to painting, (2) on one occasion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

after Labor Day the contractor had worked without wearing adequate protective equipment, (3) the contractor had worked over Labor Day without allowing the COTR to inspect the work, and (4) the paint had been applied to surfaces that had not been properly cleaned. The CO's notice gave no indication of how all of these past deficiencies could be "cured."

14. On September 27, 1995, the COTR sent a memorandum to the CO responding to the CO's post-site-visit memorandum dated September 19 (not contained in the appeal file) which apparently had found, among other things, that the painting of the exterior surface of the tank was acceptable. The COTR's memorandum took issue with the CO's proposed finding and insisted that the exterior of the tank was not acceptable. The COTR also openly refused to coordinate a requested on-site meeting with the contractor because of "Mr. Piedmont's total disregard for my authority." Thus, the next document in the appeal file is a letter from the CO to the contractor confirming an agreement, apparently reached during a general post-construction meeting held on October 3 in the CO's office, to have a "tri-conference call" on October 6 concerning the outcome of the meeting.

15. On October 6, 1995, the CO wrote to the contractor allegedly confirming their earlier conversation that day to the effect that the work both on the interior and exterior of the water tank was "deficient and unacceptable" and requesting advice within 10 days of the actions the contractor would take to cure the deficiencies that were previously noted in the ambiguous September 13 cure notice. The contractor responded on October 10 that he had followed specifications and done an excellent job and was entitled to full payment in the amount of $25,207. He followed up this letter with another letter on October 15 alleging that he had been told "in our meeting" that all of the painting was defective and had to be redone, whereas the cure notice had referred only to "deficiencies in selected portions of the work." He asked for a copy of the COTR's diary, and categorically denied having painted over dirty surfaces.

16. On October 19, 1995, Ramon Cintron, identified at the hearing as the CO's boss, wrote to the contractor confirming a conversation that day to the effect that they would meet at the site on October 23 in regard to the cure notice. On November 3, the contractor, who had not yet received any money, sent the CO an invoice for 90 percent of the original contract price, less a 1-percent discount for a 10-day payment.

17. On December 1, 1995, the CO wrote a letter confirming the results of the October 23 meeting, at which the Government's coating expert was present, which enumerated in the form of a punch list the defects that had allegedly been mutually compiled at the site meeting. The punch list included such items as overspray on the tank roof, rust on the top rim, water infiltration from the outside on top of the tank, weld areas needing heavier paint applied with a brush, and the need for brush blasting of the entire tank and full blasting of some areas. The letter said the parties had agreed that the work would be postponed "until warm/spring weather returns," which was expected to be in May or June 1996. As to payment, the CO requested that the contractor submit an invoice with the concurrence of the COTR stating the amount of payment that should be allowed, along with certified payrolls for all of the personnel who had worked on the site, including subcontractors.

18. But the appeal file reflects that on December 20, 1995, the contractor's lawyer wrote to the CO resubmitting the contractor's November 3 invoice, pointing out that the contractor had not only done additional work through a contract modification but also had performed extra work because of the differing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

site conditions, and asserting further that the contractor had already submitted the certified payrolls. The letter said that the contractor did not agree that all of the punch list items required corrective action on his part and maintained that he should be paid the amount requested by his invoice. The CO responded by letter dated January 9, 1996, that he would authorize payment of $5,230 but withhold any further payment until all of the punch list deficiencies had been corrected. Testimony at the hearing indicated that the amounts ultimately paid included $1,400 for the inlet riser, $1,366 (or 50 percent of the contract amount) for exterior work, and $2,575 for additional change order work. Nothing was paid toward the price of the interior work.

19. Also at the hearing, the contractor testified that he had never agreed to all of the items on the punch list nor on the extent of correction required. He said, for example, that the COTR initially said that only 1 percent of the exterior of the tank needed correction and that he had gone back in November 1996 and made those corrections, but he still had not been paid more than half of the contract amount allocated to exterior painting.

20. On January 22, 1996, the CO replied further to the contractor's lawyer, formally denying the requested 90-percent payment until the unacceptable work was corrected, requesting documentation of the contractor's additional costs, and alleging that the Government had not received certified payrolls for the plumber who had finally corrected the inlet riser problem or for the subcontractor who had removed the spent sand from the construction site. The CO said that he stood by the punch list items. The appeal file contains no further correspondence involving the contractor's lawyer.

21. On June 6, 1996, the CO wrote to the contractor saying that because of a fire hazard in the area, the water tank could not be emptied, and no work on it could be done until further notice, but that conditions were expected to improve sufficiently for the work to be completed by August 15.

22. On August 14, 1996, the CO received a memorandum from the area's support engineer to the effect that the contractor had not been able to return to the site because of the continued drought, but that the fire danger had eased enough for him to return to the site to correct the deficiencies identified the year before. Accordingly, the CO wrote to the contractor on August 15 giving a nominal 7-day notice for him to resume work by August 22 to correct the punch list deficiencies. Apparently no oral communication with the contractor preceded this letter.

23. When the contractor did not respond to the August 22, 1996, letter, the CO sent him a show cause notice dated September 9, giving him 10 days to present in writing any facts bearing on his failure to honor the August 15 letter, under threat of default termination if he did not respond. The contractor responded on September 17 that he had previously been given conflicting evaluations of the work, in one case alleging defects in selected portions of the work (the cure letter) and in the other alleging that the entire job had to be redone (presumably correspondence subsequent to the October 23, 1995, site visit). He said he had made numerous calls to the CO but that his calls had not been answered. (We note that December 1995 was the period of the general Government shutdown.) He also requested an opportunity to take pictures of the water tank. On October 4, the CO responded that the Government's December 1, 1995, letter had been specific as to the corrections required. He added that pictures could be taken of the water tank upon 5 days' notice.

24. On October 10, 1996, the contractor wrote to the CO again asserting that he had done

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a good job of painting and that it had been the Government that had postponed his going back to correct deficiencies, a statement consistent with the record. In addition, he pointed out that he had been paid only $1,366 of the $22,632 contract amount and that the CO's withholding of 94 percent of the contract price was totally unfair. Thus, he had no choice but to request a legal hearing. He asked to inspect the tank on October 25. On October 17, 1996, the CO wrote to grant permission for the contractor to inspect the water tank on that date.

25. The contractor's next letter to the CO is dated November 11, 1996, stating that he had inspected the tank but that the COTR had told him that the matter was already under litigation. He said that he was anxious to settle the matter and get his money, alleging that the rust deficiency was minimal in comparison to all the monies that had been withheld and that his additional claims were much greater than the cost of correcting the deficiencies. He said that the CO's "continuous stalling" had virtually bankrupted him. This allegation is consistent with the contractor's testimony at the hearing. When the Board asked why the contractor had not attempted to return to correct the defects in the paint job that he did agree with, he explained that he had no money because the Government had not paid him and that NPS kept delaying his return and changing its mind on the amount of rework required.

26. The next item in the appeal file is a January 13, 1997, memorandum from the COTR to the CO reporting on the joint October 25 site visit by him and the contractor and stating that the inside of the water tank showed excessive signs of rust in virtually all areas. He said that the contractor continued to assert that he had done a good job, but that the COTR was unable to accept deficient work and therefore recommended hiring another contractor, using the funds withheld from Piedmont for that purpose. The COTR asserted that any determination to pay Piedmont would have to be that of the CO or the field solicitor.

27. On March 9, 1997, the contractor again wrote to the CO saying that he still had not been paid and asking what he had to do to file and go to court. The CO responded on March 19 with a final decision terminating the contract for default and asserting the right to assess excess reprocurement costs upon completion of the new contractor's corrective work. This appeal followed.

28. The two provisions of the contract primarily relevant to this dispute are contained 90-some pages toward the end of the contract, in Section 09870, Painting - Steel Water Tank; Part 3, Execution; Paragraphs 3.1 E and F, which are as follows:

> E. Fill all major pits by welding and grinding smooth. Major pits are defined as pits whose depth equals or exceeds one-half plate thickness. Check existing welds and repair as required. Remove welding burrs and grind smooth.
>
> F. Coat metal on same day as finish blasting. If any finish blasted surface should rust before priming, re-blast as necessary. Clean finish-blasted surfaces of all dust before applying prime coat. The Contracting Officer will approve blasted sections before the Contractor applies the prime coat.

29. The estimates from the two other prospective bidders to repaint the tank obtained by the COTR also shed light on the present contract. One estimated $20,850, plus taxes and any welding costs, to paint the interior of the tank and $6,285 plus taxes for painting the exterior. The other prospective bidder estimated $24,680 plus taxes for repainting the interior, with the notation that "there will be bare steel between the channel beam and the roof which will rust when exposed," stating that there were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unknowns that would have to be addressed before a firm price could be given and estimating $4,893 plus taxes to "brush blast approximately 30% of exterior surface." At the very least, these estimates confirm (a) that the exterior paint job by Piedmont was essentially salvageable, (b) that there was indeed an interior welding problem that needed to be addressed, and (c) that there also was an unspecified and unquantified painting problem in the interior of the tank with respect to the beams supporting the roof.

30. The final witness at the hearing and, together with the Government's expert, one of the two most impressive, was Charles Dixon, an industrial coatings contractor with 25 years of experience, who had helped with the touchups during the contractor's last 2 days on the site. He said that he came to testify because the contractor had in fact gotten a note from "the park people" to stop work because the job had already been completed. He testified that the defects were "nothing like" those he had heard about at the hearing; that the only defects he had found were related to the structure itself, which he said required major rebuilding, and that because of the open spaces between welds at the top of the tank, rust from condensation inevitably would have occurred with as little as a gallon of water in the tank. Specifically, he testified that (TII 96-98):

> The problem of this rust and stuff is the structure of the tank, not the performance of Joe's job. Any time you * * * get two pieces of metal and only part of it is welded and there is still a little hairline crack or whatever between the welds, that's going to get moisture and the rust is going to ooze out of it, so, I mean, it's obvious.

> You can't calk it, you can't sandblast it; it's got to be seamless to keep moisture out of it. Now, this would cost more than even the paint job, you know.

JUDGE PARRETTE: The welding?

MR. DIXON: The welding, because you have to remember this is way in the middle of nowhere, like everything they have talked about, it had substandard water line supplies, you know, everything, no backfill, you know, this thing was like--that's why some of their questions, when was this tank built, who built it, you know, it was never properly built. The bottom of it was never-- you know, you could walk on that thing and feel it, the un-levelness.

JUDGE PARRETTE: Feel it what, vibrate?

MR. DIXON: Oh, yes, the vibration, but, you know, the soft pack, it is not packed down. It was never packed properly, you know, it was probably just cleared off and the tank laid on there.

JUDGE PARRETTE: And built on the spot?

MR. DIXON: Right, even when they put up their little stem wall; it's impossible to get it straight because your floor is crooked. * * *

* * * * * * *

JUDGE PARRETTE: But to get back to the painting, you are saying that there's no way that it could have been built up to 30 or 35 mils with just two applications?

MR. DIXON: Yes, there's no way, you know, that's very thick, you know, it would roll off, even on the floor. You get it that thick, it would crack, it would wrinkle. * * * We do all these special coatings, and have never been able to put it on that thick. I mean, I would love to make my job easier, you know, instead of backfill primers, go in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there and shoot something that thick. I couldn't even try it on there.

The Government was offered an opportunity to cross-examine this witness but declined.

## DISCUSSION

As the statement of facts indicates, the gathering of evidence in this appeal was a highly unsatisfactory experience. The diametrically contradictory testimony at the hearing, coupled with the Government's inadequate appeal file, made it virtually impossible for the Board to get a clear picture of either the chronology or importance of events as they had transpired. Nor can either side be commended on their half-hearted attempts to settle this dispute. Thus, we are left to rely on inferences based on the record as a whole.

Our first inference is that this appeal involves a "painting" contract that never should have been let. Although the Government was understandably interested in saving money, it realized at the outset that the work it wanted done was likely to cost between $25,000 and $100,000. But instead of making the welding and rehabilitation of the tank a major portion of the contract--i.e., including it as a specific bid item--it instead tucked the welding portion of the project into the very back of the solicitation, disguised as merely surface preparation work; namely, "Check existing welds and repair as required." Moreover, there is no indication in the appeal file that the Government made any effort in its solicitation to call bidders' attention to the actual condition of the tank, even though it was normally kept full of water and bidders inspecting the tank would have had no reason to suspect the welding problems that the painting job might involve.

As the testimony at the hearing progressed, it became increasingly evident that the primary cause of the flawed painting by the contractor who had won the bid was not so much the existing welds but, rather, the nonexistent welds. What was needed, as the last witness believably emphasized, was not mere repainting, or even more elaborate painting preparation, but virtually a complete rebuilding of the tank itself. Similarly, the problem of the old welds was suggested not only by the contractor's witnesses but also by the Government's own expert and by the wording of the reprocurement bids (FF 29) that NPS saw fit to obtain some 5 months before the contract was terminated. It was clear to the Board that major rehabilitation work was needed in both cases, regardless of which contractor did the work. See, e.g., *G & G Western Painting*, PSBCA No. 3843, 97-1 BCA 28,734.

Having let the contract as simply a painting contract, however, it was the duty of the Government to cooperate fully with the contractor to enable him to proceed efficiently. That apparently did not happen. Not only was the notice to proceed not given until nearly a year after the contract was signed, virtually at the end of the next painting season, but there is ample testimony in the record that the COTR was not always available when needed for decisions as the work commenced (TII 25-26); that when he was present he apparently gave little guidance (see, e.g., TI 27-31 and 129); and that despite the contractor being in the critical stages of the project and having duly given the 2 days' notice to the COTR as prescribed at the preconstruction conference, little or no effort was made to enable him to continue working over the Labor Day weekend.

It was not until the end of September 1995, 3 weeks after the work was completed, that the COTR notified the CO that he considered all of it to be unacceptable. It was the end of October before the parties met at the work site and agreed that some corrective work was required, and it was not until December 1 that a punch list allegedly reflecting the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

conclusions of the October meeting was sent to the contractor (who remained completely unpaid in the meantime), telling him, not surprisingly, that the work could not be done until the following year. Then, the following year, allegedly because of the fire hazard (which the contractor denies existed), it was once more mid-August before NPS was willing to empty the water tank so that the punch list corrections could be made. By that time, the contractor had gone back to his home state, where he presumably had other things to do. Nevertheless, the CO's August 15, 1996, notice to proceed gave the contractor only until August 22 to complete the very elaborate reworking of the tank that the Government demanded, and when the contractor did not perform within that time limit, the Government promptly issued its September 9 Show Cause Order threatening termination.

Whether we base our decision on the Government's superior knowledge (See, e.g., discussion in *Midland Maintenance, Inc.*, ENG BCA No. 6085, et al., 96-2 BCA 28,539, at 142,501), its defective contract specifications, its failure to issue a timely notice to proceed, its failure to cooperate with the contractor in his need to continue working over the Labor Day weekend, its failure to pay the contractor either on time or in an adequate amount, or its failure to permit the contractor to make corrections for nearly a year and then terminating him without an adequate opportunity to perform, it is clear that the Government was as much at fault in this matter as the contractor; and there is adequate precedent for converting its default termination into one for its own convenience. See, e.g., *D.W. Sandau Dredging*, ENG BCA No. 5812, 96-1 BCA 28,064; especially 140,159-140,163. The poor condition of the tank was the Government's responsibility. *National Interior Contractors, Inc.*, ASBCA No. 46012, 96-1 BCA 28,250. The contractor did the work as best he could, and he is entitled to be paid for it, despite the obstacles involved, which were largely not his fault. See, e.g., *Bechtel Environmental, Inc.*, ENG BCA No. 6137, 6166, 97-1 BCA 28,640, and specifically, discussion at 143,021 and 143,024-25.

We note in this context that although the Government has the burden of proof in this matter (*Masco, Inc.*, HUD BCA No. 95-G-146-C15, 97-1 BCA 28,631), it has cited no authorities in its post-hearing brief in support of its position. Suffice it to say, we have researched this matter sufficiently to be confident that our decision is supported by established case law.

Similarly, the contractor is entitled to additional compensation for his unanticipated need to transfer sand from his semi-trailer to his small vehicles for transport to the work site and for the extra work involving the inlet pipe. As to the road, as the Court of Claims noted a half-century and more ago, "Defendant cannot enter into a binding agreement that it will not exercise a sovereign power [i.e., to impose weight limits on the access road], but it can say, if it does, it will pay you the amount by which your costs are increased thereby" (*Gerhardt F. Meyne Co. v. United States*, 110 Ct. Cl. 527, 550 (1948), citing cases). As to the inlet pipe, although the difference was small, the inconvenience was large; and the PVC supply line clearly was not in accord with the contract's specifications. Thus, in the absence of any Government challenge, we will accept the costs claimed. We need not decide whether the closing of the road and the PVC pipe constituted differing site conditions, as Appellant claims, or a constructive contract change, because the result is the same.

## DECISION

Accordingly, the Appellant's default termination is converted to a termination for the convenience of the Government. The contractor is entitled to the balance of the contract price in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the amount of $19,866 plus $2,870 for extra work. In accordance with the Contract Disputes Act, he is also entitled to interest on the $19,866 from October 11, 1995, when the Government received his October 10 demand for full payment under the contract and to interest on the $2,870 from March 19, 1977, when the CO unequivocally denied any further payment under the contract. The Government's claim for excess reprocurement costs is hereby denied.

Bernard V. Parrette, Administrative Judge

I concur: Gene Perry Bond, Chief Administrative Judge

1998 WL 97787 (I.B.C.A.), 98-1 BCA P 29618, 98-1 BCA P 88052, IBCA 3772

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.