```
1   Terry R. Marston, pro hac vice, terry@mhf-law.com
    Jami K. Elison, pro hac vice, jamie@mhf-law.com
2   MARSTON HEFFERNAN FOREMAN, PLLC
    16880 N.E. 79th Street
3   Redmond, Washington 98052
    (425) 861-5700
4
    PAUL J. NANGLE & ASSOCIATES
    Kerry Building
5   101 Christensen Drive
    Anchorage, Alaska 99501
6   Telephone: (907) 274-8866
```

Attorney for Plaintiff ABSOLUTE ENVIRONMENTAL SERVICES, INC.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> FORREST J. MCKINLEY, an individual, d/b/a "Imperial Industrial Coatings" and EMERCO, INC., a California Corporation, d/b/a Imperial Industrial Coatings, BRECHAN ENTERPRISES, INC., an Alaska corporation; and SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation. <br><br> Defendants. | Case No.: A03-0199CV (RRB) <br><br><br><br><br> **SECOND DECLARATION OF DAVE OLSON IN SUPPORT OF ABSOLUTE'S OPPOSITION TO BRECHAN'S MOTION FOR SUMMARY JUDGMENT-NONDISCLOSURE** |
| EMERCO, INC., a California corporation d/b/a Imperial Industrial Coatings, and the States for Use and Benefit of EMERCO, INC., <br><br> Counterclaimant/Third-party Claimant, <br><br> v. <br><br> ABSOLUTE ENVIRONMENTAL SERVICES INC., an Alaska corporation, et al., <br><br> Cross-defendants/Third-party Defendants. | |

| | |
|---|---|
| 1 | THE UNITED STATES OF AMERICA *for the use and benefit of* ABSOLUTE ) |
| 2 | ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, ) |
| 3 | ) |
| 4 | Plaintiff, ) vs. ) |
| 5 | ) |
| 6 | SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation. ) |
| 7 | Defendants. ) |
| 8 | ) |
|  | BRECHAN ENTERPRISES, INC., an Alaska ) |
| 9 | corporation, ) |
| 10 | Counterclaim Plaintiff, ) |
| 11 | vs. ) |
| 12 | ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, ) |
| 13 | Counterclaim Defendant. ) |
| 14 | BRECHAN ENTERPRISES, INC., an Alaska corporation, ) |
| 15 | ) |
| 16 | Third-Party Plaintiff, ) vs. ) |
| 17 | COFFMAN ENGINEERS, INC, a Washington Corporation. ) |
| 18 | Third-Party Defendant. ) |
| 19 | ABSOLUTE ENVIRONMENTAL SERVICES ) |
| 20 | INC., an Alaska Corporation, ) |
| 21 | Plaintiff/Cross-claimant, ) vs. ) |
| 22 | COFFMAN ENGINEERS, INC, a Washington Corporation. ) |
| 23 | ) |
| 24 | Third-Party Defendant. ) |
| 25 | |
| 26 | |

SECOND DECLARATION OF DAVE OLSON IN SUPPORT OF ABSOLUTE'S OPPOSITION TO
COFFMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. A03-0199CV (RRB)-- 2

I, David Olson, being first duly sworn, declare and say as follows:

1. I am the president of Absolute Environmental Services, Inc. ("AESI"), the Plaintiff in this matter. I am the sole shareholder of Absolute Environmental, Inc. I have personal knowledge of the facts set out below.

2. AESI undertook to perform the Cargo Wharf Project without knowledge about the actual condition of the latent problems involving defective and omitted welds.

3. This information, knowledge about the actual condition of the welds and their propagation of holidays was "vital" was to our preparation of an accurate bid.

4. AESI prepared its bid based on a reasonable inquiry into project conditions made during the course of a site visit, an inquiry that is consistent with industry practices and standards. It is unreasonable, not a requirement, and it is certainly not industry practice, to expect contractors to invest the substantial amount of money and time into preparing a bid that would have been necessary to learn of the actual condition of the welds and other latent problems with surface conditions. If it was that easy and if it was that practical, Brechan and Coffman would have obtained that information themselves prior to entering the contract with the Coast Guard and prior to entering a subcontract with Swalling. But they did not, and they have no right to fault AESI for not obtaining the information that they too did not obtain when entering into contracts. Coffman itself admitted in Jerry Hardenbergh's October 30, 2001 report that it was not possible to have discovered the concealed conditions in an ordinary site visit, nor was it the type of defects that a coating contractor would expect to encounter in work of this nature.

5. AESI would not have performed the same project, and certainly not for the same price, if it had possessed knowledge about the actual condition of the defective and omitted welds.

6. AESI relied upon Brechan and Coffman regarding there representations about the surface conditions and the ability to meet a holiday-free coating standard using the coating techniques approved in the specifications. However, the stripe-coating and caulking procedures specified even when properly performed failed to yield a holiday-free coating.

7. Brechan and Coffman knew AESI lacked knowledge of the actual conditions of the welds and other latent problems with surface conditions. Given the nature of the concealed defects it was impossible for AESI to have known of the problems unless Brechan or Coffman had told them. In fact, I now know that that is why Brechan brought us onto the job.

8. Brechan and Coffman failed to disclose their knowledge about the actual condition of the welds and other latent problems with surface conditions.

9. The facts above are the facts that substantiate AESI's claim of superior knowledge; however, the remaining facts are far more offensive than that.

10. By first obtaining from Imperial, AESI's subcontractor, a document Imperial had itself obtained through a FOIA request to the Coast Guard Station, AESI came to learn that it had been defrauded by Brechan with the active participation of its corrosion engineering firm, Corrosion Engineers.

11. The details of these events are laid out in the timeline and supporting documents submitted along with this Opposition. The evidence presented supports a reasonable conclusion that the following occurred resulting in Brechan's and Coffman's decision to deceive and defraud me and my company.

12. Brechan decided to increase its profits by paying its only serious competitor on Kodiak Island $3 million dollars for a non-compete agreement. Because the vast majority of BEI's work came from government contracts work, it evidently believed that it would somehow be able to obtain enough money from the government if it did not have to compete with this competitor to recover it's $3M plus make a sufficiently great profit to make an investment of this magnitude pay off.

13. It is evident that Brechan had devised a means of accomplishing this by substantially overcharging the government for the work it was to perform under its construction contracts. The documentation obtained for the pricing of Cargo Wharf Phase II included with these papers discloses that on that one contract alone, BEI was able to inflate the direct cost portion of the work to be done by my firm and thereby obtain an $120,000 unearned "bonus" for itself at the expense of the U.S. Government. I personally observed on one other occasion Matt Holmstrom's making a comparable calculation for BEI's work on its Hangar 25 project where his calculations showed a profit – supposedly based on a 5% markup -- of several hundred thousand dollars.

14. Clearly, BEI had to maintain its relationship with the Coast Guard and could not afford to jeopardize the "relationship" it had carefully cultivated with the "A-Team at FD&CC, the Coast Guard's administrators of its construction projects. Brechan's relationship, as is extensively documented in voluminous amounts of paperwork we have obtained in discovery and

under the FOIA, with the Alpha Team enabled it to obtain compensation for charges it was not entitled to under the terms of its contract with the Coast Guard. The A-Team simply disregarded the contract terms and agreed to whatever terms it felt would facilitate getting the work done and its customer, the Coast Guard station satisfied – irrespective of what it eventually cost the government to achieve that.

15. When BEI encountered the defective and omitted welds, it was unable to persuade the Coast Guard to pay for the actual expense of performing this work. It was also unable to blame its subcontractor, Swalling. So rather than eat the massive financial loss it was exposed to in dealing with the defective welds, and rather than walking away from the gravy train that was the Coast Guard contracts it needed to recover on its $3M dollar investment and more, it instead elected – at the suggestion of Paul Rendon of the Coast Guard itself – to bring in a "new guy", my company Absolute, to be the fall guy.

16. Despite my having no prior experience with coatings, much less the specified experience required for this contract, Matt Holmstrom of BEI solicited only my firm to perform the balance of the Wharf work after it elected not to complete the project with the existing experienced coating subcontractor, Swalling. I now am confident in my belief based on the substantial documentation submitted along with our opposition to Brechan's motion for summary judgment that my firm was picked specifically because we were unlikely to figure out what was causing the proliferation of holidays we were bound to encounter.

17. It is also now clear why Brechan would not be able to use Swalling to complete the project. On Swalling's work on Bents 6-12 of the Original Cargo Wharf, Brechan contracted with Swalling to caulk the omitted and defective welds without the required high voltage holiday testing to establish that the holiday-free standard had been met. In the accompanying deposition testimony of Mike Anderson, Swalling's project manager, he confirms that with the knowledge of Matt Holmstrom, Brechan's project manager, Coffman's Quality Insurance Inspector Jerry Hardenbergh omitted high voltage holiday testing of the remaining welds on Bents 1-12 of the original Cargo Wharf.

18. Though Brechan contracted with Swalling to forego high voltage holiday testing of welds, Brechan itself was forced by circumstances to contract with the Coast Guard to perform high voltage holiday testing of all welds – and furthermore to maintain the holiday-free acceptance

standard. Swalling had clearly informed Brechan that it would not perform to such a standard with substantially more compensation. On the other hand, the Coast Guard had also informed Brechan that it would not pay anything more than the $90,000 it had agreed to for this work. Brechan found itself caught in the middle. It could not afford to offend FDCC and jeopardize the "relationship" it was relying on to recover its $3M dollar investment by demanding additional compensation or refusing to maintain the unachievable standard, nor was it willing to pay Swalling the substantially greater additional charges required to induce it to perform the work in this more difficult manner. Brechan solved its problem through deception. It simply never told Swalling about the higher level of performance the Coast Guard was requiring of it under its own Modification number 0005 and it never told the Coast Guard about the lower level of performance it was paying Swalling for under Swalling's change order number one with Swalling.

19. The only thing Brechan required to pull off this deception, in addition to the willingness to engage in such conduct, was an inspector who either was himself never informed of the modified contract requirements or who, if he was informed, was willing to look the other way when Swalling performed its work in accordance with its own contract and not in accordance with Brechan's Coast Guard contract. At his deposition, which I attended, Mr. Hardenbergh claimed to have been fully informed of the terms of Brechan's Mod. 0005 with the Coast Guard at the time the work was performed. If he was informed, and if as Mr. Anderson testified, no high voltage holiday testing of the welds were performed, then Mr. Hardenbergh violated his duty of trust to the Coast Guard as well as his professional responsibilities as a certified coatings inspector.

20. Mr. Hardenbergh, in his declarations, and deposition testimony implies if not states that he did perform high voltage holiday testing of the welds on Swalling's work in 2002, notwithstanding Mr. Anderson's unequivocal testimony to the contrary. Mr. Hardenbergh can carefully parse his statements in declarations and his answers to questions, so at this time I am uncertain whether he has actually lied under oath on these points or has merely told half-truths. In either event, his positions are not supported by the record and his statements are clearly intended to mislead.

21. With the huge discrepancy between the quality of the work the Coast Guard required and was willing to pay for and the amount that Swalling was requiring as payment in order to achieve that quality Coast Guard wanted with the problems caused by the omitted and defective

welds, Brechan had another dilemma. Unless it were able to persuade Coffman to once again, look the other way while it paid for non-conforming work from its subcontractor, or unless it was willing to absorb the increased cost of paying its subcontractor out of its own pocket for the increased cost of performance, Brechan could not utilize Swalling to complete the work in Phase II – even though replacing Swalling would be a costly proposition given the expense of mobilizing a new contractor to the site when Swalling was already mobilized.

22. However, the consequence of using Swalling was even worse; namely, paying Swalling itself for the increased level of performance, or risking raising questions within the Coast Guard regarding why Swalling had been willing to perform its work on Bents 1-12 the year before so much more cheaply than it was willing to perform the same work on Phase II. Such questions could lead to the disclosure of the deception practiced by Brechan and Swalling on Phase I. Swalling had to go. And Swalling had to be replaced with someone who would cost less than Swalling would have.

23. The only way to achieve such a result, bearing in mind the duplication of the mobilization costs, was to select a contractor that was unlikely to understand the significance of the defective welds, to conceal from that new contractor the existence of those defective welds, and finally to modify the terms of the specifications to eliminate the language that had relieved Swalling from the risk of loss due to these weld defects. In Dan Stears of Coffman Engineers, Brechan found a willing assistant. Stears' cooperation was doubtless encouraged by the Coast Guard's suggestion, repeated to Coffman by Brechan, that Coffman itself might be liable for the additional cost of the weld repairs due to its negligence in the preparation of the plans and specifications.

24. Brechan solicited pricing proposals from my company based on the June 21 specifications that Swalling had used. After my pricing had been submitted based on the first set of specifications, Stears issued a new set of specifications with the changes apparently sought by Brechan to immunize itself from liability. These changes were presented to AESI without any disclosure of what brought about the changes, all of which were minimized by Brechan as insignificant housekeeping-type changes.

25. Even after the work was commenced, Brechan refused to divulge any information that might have alerted us our own subcontractor Swalling to the true source of the proliferation of the

SECOND DECLARATION OF DAVE OLSON IN SUPPORT OF ABSOLUTE'S OPPOSITION TO
COFFMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. A03-0199CV (RRB)-- 7

holidays that we were plagued with on the project. On June 10th of 2003, Imperial submitted to us a request for documentation of Swalling's performance on Phase I of the project. Though we promptly passed this request onto Brechan, which we have now learned passed the request along to Coffman. Neither Brechan nor Swalling ever transmitted the requested documentation, documentation that would doubtless have alerted us to the trap we had been snared in. this failure alone on Brechan's part constitutes unequivocal evidence of its violation of the implied duty of good faith and fair dealing, in addition to its other misconduct including actual fraud.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this ___ day of August, 2006 at Grangville, Idaho.

_____
Dave Olson

SECOND DECLARATION OF DAVE OLSON IN SUPPORT OF ABSOLUTE'S OPPOSITION TO COFFMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. A03-0199CV (RRB)-- 8