Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF ALASKA

 3   ABSOLUTE ENVIRONMENTAL SERVICES, )
     INC.,                            )
 4                                    )
                                      )
                  Plaintiff,          )
 5                                    )
        vs.                           ) No. 3:03-cv-0199-RRB
 6                                    )
     FORREST J. MCKINLEY, et al.      )
 7                                    )
                  Defendants.         )
 8   _____
 9

10           Deposition Upon Oral Examination
11                         of
12                   MICHAEL LEMBKE
13

14   _____

15
16
                        9:10 a.m.
17
                     May 17, 2006
18
             1201 Third Avenue, Suite 4800
19
                   Seattle, Washington
20
21
22
23
24   Valerie L. Seaton, RPR
25   Court Reporter
```

MOBURG & ASSOCIATES  
Court Reporters

1601 Fifth Avenue, Suite 860  
206-622-3110

EXHIBIT  1  
PAGE  1  OF  4

Seattle, WA 98101  
Fax 206-343-2272

Case 3:03-cv-00199-RRB    Document 262-3    Filed 08/21/2006    Page 2 of 4

Absolute vs. McKinley                    5-17-2006                    Michael Lembke

**Page 222**

1  Q. Have you done any other work in Alaska since
2  your deposition was taken in November of -- excuse me,
3  in last year?
4  A. In Alaska?
5  Q. Yes.
6  A. No. I went up there on a business trip and
7  talked to a couple of guys, but it didn't result in any
8  work. I can't remember honestly if that was before or
9  after that deposition, to tell you the truth.
10  Q. You talked about some before about having
11  made some -- in your deposition you discussed that.
12  A. It could have been before the deposition.
13  Q. And I take it your criticism of Coffman and
14  to also Brechan, in part, is an alleged failure to pass
15  certain information on to Absolute with regards to
16  things that had been encountered during Phase I; is
17  that correct?
18  A. That's one of them, yes.
19  Q. If it were to turn out that that type of
20  information had been passed on to Absolute or Imperial,
21  would that change your opinions?
22      MR. MARSTON: Objection; incomplete
23  hypothetical.
24  A. Possibly.
25  Q. (BY MR. PARTNOW) As part of your work in

**Page 223**

1  preparing your March report, did you review the
2  subcontract between Absolute and Imperial?
3  A. I think I did, yeah.
4  Q. Do you still have a copy of that?
5  A. I don't have it with me.
6  Q. Is that one of the documents that you think
7  you gave to Mr. Kreger?
8  A. I did produce it, yes. And I do have a copy
9  of the subcontract at my office, but I also produced it
10  a week ago or whenever it was.
11  Q. And in developing your opinion that no
12  information about problems encountered in Phase I had
13  been passed on or -- strike that. That
14  mischaracterizes your testimony that information you've
15  discussed you believe should have been passed on was
16  not passed on.
17      Did you review the subcontract between
18  Absolute and Imperial in forming that opinion?
19  A. Well, I'm not sure I understand your
20  question, but over the course of the last two years
21  I've reviewed the contract between Absolute and
22  Imperial several times.
23  Q. I know in November when you did your initial
24  report, your focus was different than what your focus
25  was when you did your report in March of this year,

**Page 224**

1  correct?
2  A. That's a fair statement.
3  Q. And my question is: In developing your
4  report that you did in March of this year, did you take
5  opportunity to again review the subcontract between
6  Imperial and Absolute?
7  A. I think I answered previously that, yes, I
8  did.
9  Q. I thought I understood you to say in response
10  to a question from Mr. Kreger that you had had a
11  conversation with Mr. Hardenbergh.
12  A. Yes.
13  Q. When did that occur?
14  A. It was right after his deposition in -- I'm
15  not sure if it was 2004 or early 2005. It was right
16  after Mr. Hardenbergh's deposition, whenever that date
17  was.
18  Q. And how is it that you came to have
19  conversation with Mr. Hardenbergh?
20  A. The attorney that represented Mr. Hardenbergh
21  turned out to be a friend of mine, and I saw her,
22  Annmarie Petrich, and I said hello to her and we kind
23  of had a chat and she introduced me to Mr. Hardenbergh.
24  Q. Other than saying, hi, nice to meet you, did
25  you have any other conversation with Mr. Hardenbergh?

**Page 225**

1  A. I think I asked him how his deposition went
2  or something like that. He seemed relieved to be done
3  with it.
4  Q. As you probably will be in a bit too. Did
5  you have any substantive discussions with
6  Mr. Hardenbergh about anything that relates to the
7  Kodiak Cargo Wharf other than the fact that his
8  deposition had been taken?
9  A. Not that I recall.
10  Q. Do you know Mr. Dan Yale?
11  A. Personally no.
12  Q. Do you know anything about his background,
13  experience or qualifications?
14  A. I know he's a painter and he's got coatings
15  experience and that he's been around up there for a
16  number of years.
17  Q. Do you have any knowledge as to whether or
18  not he has experience in terms of assessing site
19  conditions and filing notices of those and claims for
20  the owners when they arise?
21  A. I don't know.
22  Q. Do you know if on this project he encountered
23  any circumstances during the time the project was being
24  performed which led him to seek a change in the
25  procedures that were being employed by Coffman?

57 (Pages 222 to 225)

MOBURG & ASSOCIATES              1601 Fifth Avenue, Suite 860                      Seattle, WA 98101
Court Reporters                         206-622-3110              EXHIBIT  1       Fax 206-343-2272
                                                                  PAGE  2  OF  4

Case 3:03-cv-00199-RRB    Document 262-3    Filed 08/21/2006    Page 3 of 4

Absolute vs. McKinley                          5-17-2006                          Michael Lembke

Page 226

1    MR. MARSTON: Objection; lack of
2 foundation.
3    A.  Is the question do I have any knowledge that
4 Mr. Yale sought a change in how Coffman was performing
5 on the project?
6    Q.  (BY MR. PARTNOW) Yes, that's the question.
7    A.  Not to my knowledge.
8    Q.  Are you planning to revise your November 2004
9 report in any way?
10    MR. MARSTON: Objection; asked and
11 answered.
12    A.  I think that some of the opinions and
13 conclusions in that first report will be dealt with in
14 revisions to my second report, but I don't have any
15 intention to revise the first report per se.
16    Q.  (BY MR. PARTNOW) Whose idea was it for you
17 to do a quantity survey as part of your March report?
18    A.  Mr. Olson asked me to do that.
19    Q.  Did he say for what purpose?
20    A.  He wanted to know, basically, I think, if his
21 claim was reasonable. And he also wanted to know how
22 much footage was actually out there.
23    Q.  Is there any -- other than your 37 years of
24 experience, which I don't mean to downplay, but other
25 than that, is there any learned treatise, text,

Page 227

1 generally accepted principle in the construction
2 industry that you would point to that would suggest
3 that performing that quantity survey was a viable
4 method to allocate damage claims among parties against
5 whom there was a claim?
6    A.  Well, I didn't use that quantity survey to
7 allocate damages amongst the parties.
8    Q.  Isn't that essentially what you done in your
9 Exhibit D, by using those percentages to allocate
10 responsibility among the parties?
11    A.  No. I used the original Brechan, if you
12 will, slash, Coffman footage figures. Also, the
13 figures of the government we used just to avoid
14 controversy of how much footage there actually was.
15    Q.  When was a determination made to then turn
16 around and use those figures to allocate liability or
17 damages among the various parties?
18    MR. MARSTON: Objection; vague with
19 respect to identification of those figures that are
20 being referred to.
21    A.  You're referring to my Exhibit D again?
22    Q.  (BY MR. PARTNOW) Yes, sir.
23    A.  And your question is, when did I make the
24 decision to use the original footages versus the
25 quantity survey that I performed?

Page 228

1    Q.  No. I'm sorry. What I'm trying to figure
2 out is -- and maybe I'm misreading your Exhibit D. But
3 it appears to me that at some point you're taking the
4 percentage of the work, the quantities that were done
5 and, based upon those that were done by Absolute versus
6 those which were done by Imperial, attempting to
7 allocate Absolute's damages as between Imperial and
8 Brechan/Coffman based upon those numbers. And I'm
9 trying to understand when you made the determination
10 that that was an appropriate analysis.
11    A.  Well, I made the determination to use square
12 footage at some point in the development of my second
13 report. I don't remember the exact date. But my
14 intent was that it was a reasonable way to come up with
15 percentages and that the original square foot figures
16 that I used as opposed to the quantity survey that I
17 performed for Mr. Olson wouldn't be subject to a lot of
18 controversy. I think it all comes out in the wash
19 pretty much the same way based on percentages either
20 way you figure, but that was my thinking at the time.
21    Q.  And in your exhibit -- the Exhibit 2 to the
22 deposition which is your errata that you gave us this
23 morning, am I correct that under entry number 8, the
24 1.129 million figure and the $1.2 million figure
25 largely involve the same items? The majority of the

Page 229

1 number in those two numbers is the same number?
2    A.  Yes. There is a large amount of overlap
3 there.
4    Q.  And am I correct that the primary difference
5 is that with regard to Brechan/Coffman you are
6 asserting a back charge that Brechan made against
7 monies to be payable to Absolute that you think should
8 be paid to Absolute?
9    A.  I'll have to have you repeat that question or
10 have it read back.
11    Q.  Let me try it again. My recollection is that
12 on the 1.129 figure, the Brechan/Coffman figure, that
13 includes a back charge for monies that were not paid to
14 Absolute, that were withheld by Brechan?
15    A.  That's possible. I would have to go back and
16 look at that adjustment, that revised estimate to be
17 able to tell you one way or the other.
18    Q.  Where are your notebooks? The one notebook,
19 I think it's an exhibit too here.
20    A.  I think it's in here. It's in the sleeve
21 there too, I think.
22    Q.  (BY MR. PARTNOW) Actually, I would like to
23 have this whole section marked as an exhibit if we can
24 because it has the revisions both as to the Brechan
25 claim and as to the Imperial claim plus the various

EXHIBIT  1
PAGE  3  OF  4

Case 3:03-cv-00199-RRB   Document 262-3   Filed 08/21/2006   Page 4 of 4

Absolute vs. McKinley                    5-17-2006                         Michael Lembke

Page 230

```
 1  notes.
 2          MR. MARSTON: Do you want to put a clip
 3  on it to identify it?
 4          THE WITNESS: I thought we already had
 5  that as to --
 6          MR. PARTNOW: I don't think we have the
 7  one as to Imperial.
 8          MR. KREGER: I thought we did.
 9          THE WITNESS: You may be correct. I
10  think you're right.
11          MR. KREGER: Isn't it Exhibit 17?
12          THE WITNESS: It's just Brechan. It's
13  not the Imperial portion.
14          MR. KREGER: What's your Exhibit 17?
15  Does it say Brechan on it?
16          THE WITNESS: Yes. My 17 is the
17  Brechan.
18          MR. PARTNOW: Mine says 17. We've got
19  two different things. So in order to get them both,
20  let's make this one.
21             (Exhibit No. 19 marked for
22              identification.)
23      A. Is my understanding you want -- there are
24  some duplicated copies in here, but you want this
25  entire packet to be the exhibit?
```

Page 231

```
 1      Q. (BY MR. PARTNOW) What I wanted to have is
 2  the full revision as to Brechan/Coffman and the full
 3  revision as to Imperial and make sure I have all the
 4  notes that go with them.
 5      A. Okay. There's one version that's marked with
 6  a marker. There's another version that is printed in
 7  color and then there is some other miscellaneous things
 8  in here that don't pertain to it.
 9      Q. Just to be sure we have everything, make the
10  whole thing an exhibit. It's easier.
11      A. Maybe if I could have you just look at this
12  and see if this will do it for you.
13      Q. I'm not sure. What did you take out?
14      A. Here's the rest of it. You can select what
15  you want.
16      Q. For the sake of saving time, I want the whole
17  thing. I just want to remark -- let's just mark the
18  whole thing that came out of your notebook.
19      A. Fair enough. And if there's more that should
20  be there, we can make the adjustment. So this whole
21  packet is going to be marked as Exhibit 19.
22      Q. And, again, it came out of Tab 2 out of the
23  notebook you had. One of the notebooks that you
24  brought with you today, I think.
25      A. I believe so, yes.
```

Page 232

```
 1      Q. Quickly, what I'm trying to verify is the
 2  differences in the numbers as to Brechan. You have a
 3  number for a back charge that you think Absolute is
 4  due. There may be a couple of other things, but my
 5  recollection, that was the primary number that's in the
 6  Brechan part that is not in the Imperial part?
 7      A. Well, there's some unpaid task order balances
 8  that are not included in the Imperial part that are
 9  included in the Brechan part, and there are some other
10  adjustments. KTA Tator adjustment, for example, is
11  also included in the Brechan document that is not
12  included in the Imperial documents. There's also the
13  balance due on the Phase I warranty work that Absolute
14  performed for Brechan that is not in the Imperial
15  document.
16      Q. Okay. And I take it your -- you wouldn't be
17  suggesting that as to the back charge on the contract
18  and the alleged failure to pay for warranty work, that
19  those would be things for which Coffman would be
20  responsible?
21      A. Well, I have not made any distinction between
22  Brechan and Coffman in the allocation. But if you're
23  asking me a specific question, could you just ask
24  again?
25      Q. My question was: I'm assuming it's not your
```

Page 233

```
 1  opinion sitting here today that Coffman's responsible
 2  for, let's say, a back charge that Brechan may have
 3  withheld from Absolute?
 4      A. Well, I'm not certain that that is the case.
 5  The reason being is there were back charges concerning
 6  Coffman costs that came from Brechan to Absolute that
 7  may be related to some of the difficulties that they
 8  had out there performing the work under the original
 9  spec, for lack of a better term. Did that answer the
10  question?
11      Q. Yes, it did.
12         And then in the Imperial one, you have the
13  chart, for instance, such as the cost of repairing the
14  Imperial -- I think it was doing repairs on the
15  Imperial work that you have there that isn't in the
16  Absolute?
17      A. I think I lost you.
18      Q. The number -- okay. What is there in the
19  number in Line 8 as to Imperial that is not also
20  included in the number in Line 8 for Absolute/Coffman?
21      A. Could you just give me a moment to find that
22  exhibit again. I've got too much paper here.
23      Q. Exhibit 2 is your errata to Exhibit D.
24  The deposition exhibit 2. The question I'm asking now
25  is on the second line of that where you have the 1.2
```

59 (Pages 230 to 233)

MOBURG & ASSOCIATES          1601 Fifth Avenue, Suite 860         EXHIBIT   1          Seattle, WA 98101
Court Reporters                       206-622-3110                                      Fax 206-343-2272
                                                                PAGE  4  OF  4