

# Findings and Opinion Report

*In the Matter of*

## Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.

## March 21, 2006

9427 N.E. 138th St.  •  Kirkland, WA 98034
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com • www.mklassociates.com

Exhibit B
Page 1 of 34

# MKL Associates, LLC
## Construction Consultants

**HAND DELIVERED**

March 21, 2006

Terry R. Marston
Marston Heffernan Foreman, PLLC
Anderson Park Building
16880 N.E. 79th Street
Redmond, WA 98052-4424

RE:    Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.

SUBJ:  **Findings and Opinion Report**

Dear Mr. Marston:

MKL Associates, LLC (MKL) has been retained by Absolute Environmental Services, Inc (AESI) to evaluate the loss exposures and conduct of Brechan Enterprises, Inc. (Brechan) for Phase 1 of ***Contract No. DTCG650-01-D-643XX0, Task Order 0007, Perform Design and Construction for Cargo Wharf Maintenance*** at the U.S. Coast Guard base at Kodiak, Alaska, and other work as outlined in the attached report.

The attached report contains background information, findings, opinions, and calculations relative to the referenced matter. Included are qualifications for myself, recent depositions and testimony, hourly rates and other pertinent information. I have considerable experience in troubleshooting and evaluation of similar disputes, in the capacity of estimator, project manager, construction executive and consultant.

I look forward to assisting the process of an expedient resolution of the matter for all parties.

Yours Very truly,
**MKL Associates, LLC**

Michael Lembke,
Principal

9427 N.E. 138th St.  •  Kirkland, WA 98034
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

Exhibit B
Page 2 of 34

March 21, 2006

**<u>Findings and Opinion Report</u>**

*In the matter of Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.*

## I. QUALIFICATIONS

I am the principal of MKL Associates, LLC (MKL), a licensed and registered consulting firm base in Kirkland, Washington. I have formal education, training, and practical experience in the construction and management of contracts comparable to the project at issue and with comparable types of problems as those encountered by Brechan on the Cargo Wharf projects..

A Summary of Qualifications is enclose with this report as *Enclosure A.* A listing of other cases for which I have been deposed or testified at trial within the last four years is enclose to this report as *Enclosure B.*

## II. ASSIGNMENT

MKL was been retained by Absolute Environmental Services, Inc. (AESI) to evaluate the knowledge, loss exposure, and contemporaneous conduct of Brechan Enterprises, Inc. (Brechan) during Phase 1 and portions of Phase 2 of the Cargo Wharf Maintenance project at the U.S. Coast Guard base at Kodiak, Alaska (Contract No. DTCG650-01-D-643XX0, Delivery Order No. 0007, Perform Design and Construction for Cargo Wharf Maintenance and Contract No. DTCG650-02-D-643J55, Cargo Pier Recoating, Delivery Order No. 643P92). The division of the Coast Guard administering both contracts was FD&CC-PAC, located in Seattle, Washington. Brechan was the design-build contractor for the project.

MKL was also requested to prepare a quantity survey ("takeoff") for steel to be coated under AESI's contract. Absolute understood that the scope of its subcontract included the coating of the those portions of the Original Cargo Wharf that had not been coated by the preceding contractor. While its contract indicated it was to perform the work from bents 13-33, there was an area of cross bracing between bents 12 and 13 that had not been coated by the preceding contractor. The quantity of steel to be coated by AESI under the Phase 2 (year 2) contract was interpreted to be from bent "12.5" through bent 33 of the Original Cargo Wharf. My quantity survey, or takeoff, established that the actual area to be coated was **31,393** square feet.

## III. WORK COMPLETED TO DATE

MKL started work on the project on January 20, 2006. Over the past several months I have investigated the factual history of the project, including a review of all documents contained in a set of documents entitled *Chronologized Key Documents, Key 20001 thru Key 20620, February 2001-August 2004* provided to me by Absolute. (Each of these documents is identified within the collection by a unique identifying number preceded by the letters KEY.") A complete set of these documents is provided in conjunction with this report. The entirety of these documents has been relied upon in forming the opinions and conclusions in this report even though identification of specific documents relied upon for a particular proposition may not in all instances be stated.

## IV. PROJECT BACKGROUND

Brechan and the CG negotiated a contract amount of $1,084,902 on or about February 12, 2001. Reference (Key Document *20003*). Task Order 0007 was issued by the CG on March 20, 2001. Reference *20019*. Brechan hired the design firm of Trick, Nyman, Hayes, which in turn hired Coffman Engineers (CE) as its corrosion consulting engineer. The work under Task Order 7 was to encompass the entire cargo wharf, including all of the wharf extension and the entire original cargo wharf, bents 1 through 33. The CG had made it clear that the budget for construction had a cap of $1,000,000. Reference *20001*. This required that the work be performed over two years, and under two separate contracts to Brechan.

Brechan subsequently solicited subcontractor bids to perform the work, including electrical, concrete, wood, utilities and metal work, as well as recoating the steel wharf structure and appurtenances. Swalling Construction Company, Inc. was selected to do the work, even though two other bidders offered lower pricing. AESI in fact submitted a lower bid, but was an "unknown" and had no "over water experience." Reference *20064*.

Swalling and Brechan negotiated a proposed contract price of $1,533,000 for the entire wharf and then entered into a subcontract with Swalling for $850,000 for the first phase, which included the wharf extension and the first 15 bents of the original wharf. Reference *20068* and *20092-20093*. Because Brechan could not assure Swalling that it would receive a contract for the second phase of the work, Swalling insisted on recovering the cost of its purchase of specialized equipment and its mobilization and demobilization expenses within its pricing for the Phase 1 subcontract. The CG had only budgeted $712,000, plus Brechan's 5% markup coefficient, for a total of $747,600, for coatings work in phase 1. Reference 20018-20020. This meant that Brechan had obligated itself to pay Swalling more than it would be paid itself, thus exposing itself to a loss of $102,400 plus it's markup of $35,660, <u>a total loss exposure of</u> **$138,000.**

Brechan also failed to properly account for the costs of scaffolding for electrical work in its contract price, and thus exposed itself to an additional loss of several thousand dollars. The CG later paid Brechan $25,000 to cover the cost of scaffolding under Modification 0004. Reference *20202-20203* and *20208-20209*. However, these are costs that should have been included in Brechan's bid price to the CG. Worse, the funds were specifically identified to be used to scaffold bents 16-33 to allow electrical work to be performed during phase 1, but this scaffolding was never erected during phase 1. AESI provided the scaffolding for bents 16 through 33 under its contract for Phase 2 (year 2).

Swalling performed work on the pier extension, but immediately ran into problems when it began work on bent 1 of the original cargo wharf. The conditions encountered required excessive amounts of extra preparation and repair work to meet the project specifications for zero holidays, and exceeded by a wide margin the 100 lineal feet of seal welding included in the specifications. Swalling put Brechan on notice and Brechan, Coffman, and CG management teams began to discuss what actions to take. The costs to comply with the specifications were initially estimated to be **$500,000**, or even higher. Brechan was now faced with another potentially ruinous cost overrun to meet its own design-build specifications. Reference *20100; 20122; 20123-20125; 20166-20168;* and *20174-20176.* Brechan's loss exposure for Phase 1, through bent 15 of the original wharf, was now as high as **$638,000**.

Swalling provided estimates to repair bents 1-5 of $55,065 and to repair bents 6 - 15 of $241, 254, using a proposed solution *that did not meet the project specifications*. To meet project specifications would cost significantly more. At this point, Brechan's loss exposure was $138,000 for the subcontract shortfall, $55,065 for bent 1-5 repairs, and $241,254 for bent 6-15 repairs, a total of **$434,319**, *without even meeting specifications*. This was nearly *31% of the entire contract amount* through Modification 0004.

Brechan, with the assistance of Coffman Engineers, followed three main paths to reduce Brechan's loss exposure. First, Brechan and Coffman attempted to reduce the specifications' requirements, especially with respect to weld repairs, seal welding, and zero holidays. Second, Brechan and Coffman repeatedly pursued Swalling to revise it's cost estimates for the additional work downward. Third, Brechan decided to reduce the scope of work that Swalling was contracted to perform. The third path appears to have been related to eliminating the gap between Swalling's $850,000 subcontract and the $747,600 payment the CG was going to pay Brechan for this work. That issue had also come to a head when Swalling's billings exceeded the money available from the Coast Guard, resulting in a stoppage of further payment to Swalling. Brechan at first refused to fund a Swalling billing of $57,863 until Swalling demanded payment. Reference *20249-20250*.

Brechan and Coffman continually requested that Swalling provide price estimates for a variety of modifications to the scope and requirements of the work to save the project. On January 30, 2002, Swalling submitted its estimate for Phase 2 weld repairs (again under the reduced specification requirements) of $621,834 – nearly equaling the entire base contract price of $683,000 for its for year 2 work.

At this juncture, BRECHAN's exposure for bents 1-15 alone, the phase 1 work, included the $57,863 payment on hold to Swalling; the $138,000 buyout loss on Swalling's contract; the $17,681 in disputed items with Swalling; the $55,065 repair cost for bents 1-5; at least $128,835 in repairs for bents 6-15; and $21,600 in other cost overruns due to underestimation – a total of

**$419,044**.  If the Phase 2 repair costs of $621,834 were also considered, <u>Brechan faced a combined loss exposure of $1,040,878.</u>

The Coast Guard was also aware of the funding gap Brechan was dealing with.  Reference *20229 and 20248.*  The Coast Guard project manager had participated in attempting to devise a solution to Brechan's costs overruns arising out of the effect of defective welds in coating the piling and steel.  On February 5,2002, Brechan's project manager received an e-mail from the Coast Guard's project manager explaining that the Executive Director and Commanding Officer at FD&CC-PAC would not be bailing Brechan out.  They would be looking to Brechan "as the design-build contractor" to figure out what to do to keep the project viable and at its own expense.  Reference *20264-20265* and *20268.*

Brechan and Coffman continued attempting to cut Brechan's losses through discussions and meetings with Swalling in Anchorage.  Reference *20269* and *20272-20273.* The cost for bent 1-5 repairs was reduced to $33,441, but Brechan's Phase 1 risk was still in excess of $313,000 (even without the disputed payment issue).   On February 12, 2002, Swalling revised its pricing to complete bents 6-15 from $621,834 to $996,639.  <u>Brechan still faced over $1,000,000 in losses on the project.</u>

Evidently, the Coast Guard itself was in a quandary.  Reference 20285-20287. The official CG notice to Brechan came on February 25 in a letter signed by the contracting officer.  Her letter stated that that it was up to Brechan to figure out what to do, including redesign, if necessary, but the Coast Guard's initial scoping requirements would still have to be met and there would be no financial contribution from the Coast Guard.  The Coast Guard also refused to pay Brechan for its $138,000 buy-out loss with Swalling.   Reference *20291-20294; 20297; 20302-20304.* Nevertheless, *Enclosure (3)* included to the contracting officer's letter details a virtual roadmap of how Brechan can avoid its buy-out loss to Swalling through a de-scoping of the project. Document *20297.*  Brechan made note of the opportunity and the scope of the Phase 1 work with the Coast Guard was reduced from completion through bent 15 to completion through bent 12. Reference *20297.*

Brechan also immediately grasped the opportunity presented in "Enclosure (3)," by signing a deductive change order with Swalling reducing Swalling's work scope from completion through bent 15 to completion through bent 12 (piles only). Reference *20302-20303* and *20331*, Change Order 1 to Swalling saved Brechan $145,298 by virtue of Swalling's scope reduction. See also *20332*. Swalling had also reduced its pricing to only $30,242 for the bent 1-5 weld repair work and to only $50,000 for bent weld repair work 6-15 (along with the acceptance requirements for that work). At this juncture, <u>Brechan's loss exposure was down to less than $100,000 for Phase 1</u>. That $100,000 problem was soon largely resolved when Brechan received payment from the Coast Guard of an additional $90,000 under its Modification 0005. With that modification in hand, Brechan's loss exposure was completely eliminated, and it was once again in a profitable position relative to all of the issues discussed – for Phase 1. Reference *20335-20339* and *20369-20370*.

However, the problem for Phase 2 was not yet resolved. Swalling refused to honor its pricing for Phase 2 based on the discovery of the weld defect problems. Brechan would have to pay Swalling a substantial additional amount for the cost of the required weld repairs in Phase 2. This would be the case whether Swalling performed its work under Option 2, allowing caulking and stripe coating some welds, or Option 1 that retained the original procedures and acceptance criteria. However, its situation was worse than this because Swalling's Option 2 work in phase 1 was by the terms of its contract modification very different than the work that had been required of Brechan under phase 1 under the terms of its own contract Modification number 0005. The amount Swalling would charge Brechan for the work in phase 2, under the Coast Guard's Mod. 0005 terms, would likely have been many times higher than the rate it charged Brechan to complete Phase 1.

Brechan could not contract with Swalling. Brechan needed a new Phase 2 coatings application subcontractor, and a way to keep Phase 2 within budget. AESI, although rejected for Phase 1 as unqualified and unknown, was suddenly a prospect for Brechan to work with. In fact, AESI was the only subcontractor Brechan approached to provide a bid for the work in Phase 2, even though there were evidently far more qualified candidates available (such as Alaska Blasting & Coating). Nevertheless, Brechan negotiated a contract with AESI for the work on bents 13-33,

for the sum of $995,850. AESI was only provided with the Phase 1 specifications to prepare its bid with. AESI was never told of the enormous problem with the welds. And after its proposal had been submitted, Brechan requested and obtained from Coffman a revised set of specifications that instituted performance procedures and acceptance criteria that had been attempted with Swalling and then abandoned when they failed to work, i.e., stripe coating and high voltage holiday testing to confirm zero holidays. AESI therefore had no prior knowledge or any notice of the difficulties encountered on Phase 1 – and no opportunity to price the actual difficulty of the work. AESI's final costs on the project as of October 20, 2004 – after performing a coating project that included a finished product with zero holidays – reflected a cost overrun of $1,110,458.23 (without profit).

Below is a summary of the Changes in Position I have reached conclusions on thus to date.

**Prior to Swalling C.O.1**

| COST TO BEI | ISSUE | SCCI C.O.I | MOD 5 | NET CHANGE |
|---|---|---|---|---|
| $102,400.00 | Contract Shortfall   850,000 v. 712.000 | -$145,298 | $0.00 | $42,898.00 |
| $30,242.00 | Repair Bents 1-15     Swalling C.O.R. | $30,242 | $30,000.00 | -$242.00 |
| $13,017.00 | Scaffolding CP/Insul  Swalling C.O.R. | $13,017 | $0.00 | -$13,017.00 |
| $50,000.00 | Prep. Bents 6-15      Swalling C.O.R. | $50,000 | $50,000.00 | $0.00 |
| $10,000.00 | QA Cost Increase For DSC Delays | $0 | $10,000.00 | $0.00 |
| $7,100.00 | Fuel Pier Test (See MOD. 3) | $7,100 | $0.00 | -$7,100.00 |
| $212,759.00 | | -$44,939 | $90,000.00 | $22,539.00 |
| | | CG PAID BEI MOD. 3 | | $7,455 |
| | | | **TOTAL** | $29,994.00 |
| | Scaffolding under Mod 4 - not performed | | | $25,000.00 |
| | **Final Change in Financial Position for Brechan Despite Million Dollar Loss Exposure** | | | **$54,994.00** |

# EXHIBIT A

# MKL Associates, LLC
## Construction Consultants

## *SUMMARY OF QUALIFICATIONS*
### For Michael Lembke

Mr. Lembke has over thirty-five years of experience in construction supervision and management in a variety of roles: superintendent, estimator, project manager, general contracting executive, and consultant.

During a highly successful career he has managed construction of virtually all types of commercial and industrial projects: schools, courthouses, jails, military aircraft hangars, barracks, headquarters buildings, bridges, office buildings, churches, low income housing complexes, industrial plants, substations, multiplex cinemas, camps, athletic fields, auto dealerships, retail stores, research facilities, laboratories, mid-rise office towers, warehouses, college buildings, airport baggage facilities, hospitals, clinics, auditoriums and performing arts centers, shopping centers, military maintenance and communications centers, parking lots, street improvements, cooling towers and other projects.

Mr. Lembke has worked in the roles of construction manager, design-build contractor, and consultant to owners and contractors, as well as the traditional design-bid-build, hard-bid contractor. He has considerable experience in public works, federal government contracting and military construction, including numerous projects in Washington, Alaska, California, and Hawaii. Mr. Lembke also has experience in Florida.

Mr. Lembke has extensive experience in construction scheduling, delay/acceleration claims, impact claims, subcontractor and supplier disputes, large change orders and owner-contractor issues, insurance claims, and resolution of a variety of disputes through negotiation, mediation, arbitration, and litigation.

Mr. Lembke has taught construction scheduling on several occasions, written scheduling specifications, performed constructability reviews and represented owners as a scheduling consultant for on-going projects. He has worked closely with insurance companies, sureties, owners, subcontractors, and suppliers to resolve relatively small, as well as multi-million dollar construction disputes.

## *RELEVANT WORK EXPERIENCE*

**2003-Present  Principal**
MKL Associates, LLC
Kirkland, WA 98034

Principal for construction consulting firm specializing in project assessment, project management, constructability reviews; schedule and delay analysis; management support; disputes resolution; claims preparation and analysis; and litigation support for insurance companies, sureties, owners, contractors, subcontractors, and suppliers.

**1998- 2002    Executive Vice President**
Strand Hunt Construction, Inc.
Kirkland, WA 98034

Worked with department heads to formulate business plans, company policies and procedures. Worked directly and indirectly with project teams to insure successful project completion and good results. Assisted company president with banking, bonding, and insurance issues, specialized assistance to project teams for negotiations, dispute resolution, troubleshooting, and various activities. $238 million in projects delivered.

MICHAEL LEMBKE

**1995-1998**    **Vice President**
Strand Hunt Construction, Inc.
Kirkland, WA 98034

In charge of construction and company operations for established commercial and industrial general contractor. In charge of all project teams and responsible for proper and effective completion of all company projects of approximate aggregate value of $100 million. Assisted project teams with major change orders, claims, partnering efforts, subcontractor issues, high level strategy, negotiations, and other specialized activities. Implemented training programs and company policies

**1990-1995**    **Project Manager/Estimator**
Strand Hunt Construction, Inc.
Kirkland, WA 98034

Project Manager for a medium-sized commercial general contractor. Completed $17 million, 200,000 SF high school, $20 million, seven story courthouse building, and various other commercial and industrial projects. Duties also included bridge estimating, general construction estimating, construction management services, CPM scheduling and claims preparation and analysis for a variety of projects, project troubleshooting, resolution and closeout of numerous subcontractor, supplier and owner disputes.

**1989-1990**    **Vice President for Contract Management**
RG & B Contractors, Inc.
Anchorage, AK 99521

Developed programs for standardization of cost/schedule systems, assisted project managers with specialized areas of contract management, estimating, disputes resolution, preparation and negotiation of changes and claims, and contract audits. Assisted top management with implementation of reporting systems for project status and company cash flow forecasts, and corporate operating instructions.

**1988-1989**    **Senior Construction Manager**
RG & B Contractors, Inc.
Anchorage, AK 99521

Oversaw construction management functions and assisted other project managers with contract matters and disputes resolution, estimating, CPM scheduling, cost engineering, claims, audit preparations, and other specialized areas of contract management for a $50 million per year government contractor. Assisted corporate Vice President/General Manager with various tasks and negotiations, and implementation of corporate policies and procedures

**1987-1988**    **Estimator/Project Manager**
RG & B Contractors, Inc.
Anchorage, AK 99521

Managed closeout of $8 million new construction project and preparation of comprehensive Request for Equitable Adjustment, warranty and subcontract administration. Estimated projects ranging from $750,000 to $10 million. Developed and implemented CPM schedules on various contracts. Prepared and settled $2.2 million claim.

**1983-1987**     **Estimator/Project Manager**
Steenmeyer Corporation
Anchorage, AK 99501

Estimated and managed approximately $25 million worth of military construction contracts ranging in size from $250,000 to $14 million. Responsibilities included preparation of estimates, procurement of contract goods and services, administration of contracts, preparation, negotiation, and implementation of changes, CPM scheduling, administration of subcontractors and suppliers, contract closeout and warranty. Prepared and negotiated contract changes valued in excess of $5.5 million. Completed multi-million dollar takeover closeout for Fidelity and Deposit Company of Maryland (F&D).

**1982-1983**     **Vice President**
Commercial Design & Brokerage, Inc. - A Subsidiary of Steenmeyer Corporation
Anchorage, AK 99501

Vice President in charge of operations for Commercial Design, a subsidiary of Steenmeyer Corporation specializing in commercial interior finishes construction. Specialized in acoustical engineering and installation of acoustical wall and ceiling systems and integrated mechanical-electrical-acoustical systems. Estimated and managed approximately $5 million worth of state and federal contracts and subcontracts. Designed acoustical systems, including preparation of detailed shop and fabrication drawings, installation drawings, and other architectural coordination and detail drawings.

**1979-1982**     **President**
Lembke Construction Company, Inc.
Orlando, FL 32803

Florida Class A Certified General Contractor specializing in residential and commercial renovations. Produced designs and architectural working drawings for company projects. Performed all phases of estimating and construction with in-house personnel. Performed carpentry and concrete subcontracts for other general contractors, including shopping centers, medical office buildings, commercial offices, new and renovated residential and multi-family projects, hotels, churches and industrial facilities.

**1973-1979**     **General Superintendent/Estimator**
W.S. Pyne Construction Co., Inc.
Orlando, FL 32801

Worked full and part-time (while continuing education) as a General Superintendent and Estimator for commercial and industrial general contracting firm. Estimator and General Superintendent on $2.3 million, 144 unit HUD 236 project in Orlando, 1974-75. Superintendent and Estimator on various commercial projects. Supervised all aspects of construction and field management on new and renovation projects.

**1970 -1973**

Trained as an apprentice carpenter with various companies, specializing in framing for residential and commercial buildings and formwork for commercial concrete structures.

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-3332
email: mklassc@hotmail.com  •  www.mklassociates.com

Exhibit B
Page 13 of 34

## EDUCATION

2005  Certified, The American Association of Cost Engineers International
as a ***Planning and Scheduling Professional (PSP)***
1997  Graduated, Associated General Contractors ***Advanced Management Program***
1993  Graduated, University of Washington ***Computer Aided Design Program***
1979  Graduated, Valencia Community College ***Architectural and Building Construction Technolgy***
1977  Graduated, Commercial Trades Institute program in ***Building Construction***

## PROFESSIONAL AFFILIATIONS

Construction Financial Management Association
Society of American Military Engineers
National Contract Management Association
Project Management Institute and PMI College of Scheduling
American Association of Cost Engineers International
Associated Builders and Contractors
Associated General Contractors

## ADDITIONAL QUALIFICATIONS AND TRAINING

- Construction Claims, Wilson Management, 1985
- Project Safety and First Aid, Safety Consultants, Inc., 1985
- PMS-II Project Management/Scheduling, 1988
- Property and Casualty Insurance, Agency Development Services, 1988
- CPM Fundamentals (Instructor), 1988
- Government Contracts Program, The George Washington University, 1988 – 1990
  - Federal Contracting Basics
  - Formation of Government Contracts
  - Administration of Government Contracts
  - Operating Practices in Contract Administration
- Pertmaster Advanced Project Management, 1989
- Construction Scheduling, High-Point Schaer, 1991
- Avoidance and Resolution of Construction Delay Claims, University of Washington, 1991
- Construction Disputes, Constructive Resolve, 1992
- CPM Fundamentals (Instructor), Strand Hunt, 1994
- Construction Insurance, Parker, Smith, & Feek, 1995
- General Contractor Safety Liability, Stanislaw Ashbaugh, et al, 1995
- Primavera Planning & Scheduling, Informatics, 1996
- CPM Fundamentals (Instructor), Strand Hunt, 1996
- Construction Delay and Disruption Claims, Federal Publications, 1996
- Primavera Cost and Resource Analysis, Informatics, 1998
- General Liability Insurance, Hurley, Atkins, & Stewart, 1998
- Dispute Review Boards, Stanislaw Ashbaugh, 1998
- 1997 AIA Documents, AGC Education Foundation, 1998
- Primavera Scheduling, Project Control Solutions, 1999
- Construction Quality Management, US Army Corps of Engineers, 2000
- Practical Construction Project Scheduling (Instructor), 2001
- Primavera Specialized Training, Project Control Solutions, 2001
- Practical Construction Project Scheduling (Instructor), 2002
- Primavera Specialized Training, Project Control Solutions, 2002
- Liens and Bonds, Washington Projects, Short, Cressman & Burgess, 2003
- LAW 120704/REG Construction Insurance, AGC, 2005
- COMP022305/REG Microsoft Project, AGC, 2005
- COMP031505/REG Microsoft Project, AGC, 2005
- PSP Certification Review and Examination, AACE International, 2005

9427 N.E. 138th St.  •  Kirkland, WA 98034-1822
425-823-6388  •  Fax: 425-823-8332
email: mklassc@hotmail.com  •  www.mklassociates.com

Exhibit B
Page 14 of 34

# EXHIBIT B



# MKL Associates, LLC
## Construction Consultants

# Michael Lembke

## _Depositions and Testimony within the Last Four Years_

### As of January, 2006

**1.** Storey Construction, Inc. v. Sun Valley Trust, et al.
AAA No. 77Y 110 00066
Deposition Only  August 29, 2003

**2.** Old Time Woodwork, Inc. v. Strand Hunt Construction, Inc.
No. 02-2-15873-1 SEA
Deposition Only  February 16, 2004

**3.** Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.
No. A-03-0199 Civil (RRB)
Deposition Only  February 11, 2005

## _Publications within the Last Ten Years_

None

## _Compensation_

| | |
|---|---|
| Normal Work Scope | $130.00 per hour, plus expenses marked-up 10% |
| Deposition and Testimony | $260.00 per hour, plus expenses marked-up 10% |

9427 N.E. 138th St.  •  Kirkland, WA 98034
425-823-6388  •  Fax: 425-823-8332

# EXHIBIT C

Form 3 — Printed USA Rev 7/85

**QUANTITY SURVEY SHEET**

Project: SARGO WHARF PH. II    Location: KODIAK, AK    Item No.: STL SF

Description: STEEL SURFACES    Estimated By: MM    Sheet No. 1 Of 5

Date: REV. 2  3-20-06    Checked By: MM    Estimate No. ——

| Description | No. Pcs. | Dimensions | | | | | |
|---|---|---|---|---|---|---|---|
| | | L | W | H | | | |
| STEEL SURFACE AREAS RECEIVING COATING | | | | | | | |
| | | | | | REG. PILES | BATTER PILES | TOTAL |
| AREA A | | | | | 51 | 3 | 54 |
| B | | | | | 40 | 5 | 45 |
| C | | | | | 51 | 3 | 54 |
| D | | | | | 40 | 5 | 45 |
| E | | | | | 67 | 6 | 73 |
| TOTAL | | | | | 249 | 22 | 271 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ① HP14X73 BATTER PILE  22 EA | | | | | | | 2246.40 SF |
| ② HP12X53 REG. PILE  249 EA | | | | | | | 16,761.38 SF |
| ③ LONGITUDINAL BRACE FRAMES 112 EA TS5X5 | | | | | | | 7403.2 SF |
| ④ TRANSVERSE BRACE FRAMES 102 EA TS5X5 | | | | | | | 1907.40 SF |
| ⑤ TRANSVERSE BRACE FRAMES 102 EA L4X4X3/8 | | | | | | | 2307.24 SF |
| ⑥ FORM BRACKETS  64 EA 1/2" PLATE | | | | | | | 103.04 SF |
| ⑦ PIPE RACK @ A-B LINE  21 PCS L4X4X3/8 | | | | | | | 251.37 SF |
| ⑧ MC BRACE @ B-C LINE  21 PCS MC6X15.3 | | | | | | | 378.0 SF |
| ⑨ PIPE BRACKETS @ 30 LINE 17 EA | | | | | | | 35.36 SF |

TOTAL  SF STEEL SURFACE →      31,393.39 SF

Exhibit
Page 18 of 34

Form 3 — Printed USA Rev 7/85    **QUANTITY SURVEY SHEET**

Project **CARGO WHARF PH.II** Location **KODIAK, AK** Item No. **STL SF**

Description **STEEL SURFACES** Estimated By **MM** Sheet No. **2** Of **5**

Date **REV.2 3-20-06** Checked By **MM** Estimate No. **—**



| Description | No. Pcs. | L | W | H |
|---|---|---|---|---|
| ① HP14X73 BATTER PILE | 22 | 12'-0" | | HP14X73 |

PERIMETER = 13.625 + 14.625 + 13.625 + 14.625 + 28.00" = 84.50

84.50" = 7.042 SF/LF

22 EA X 14.5' X 7.042 = 2246.40 ────► 2246.40

② HP12X53 PILE    249 TOTAL    HP12X53

PERIMETER = 11.75 + 12.0 + 11.75 + 12.0 + 23.0 = 70.50"

70.50" = 5.875 SF/LF

222 EA X 12.0 X 5.875 = 15,651 SF ────► 15,651.0

27 EA X 7.0' X 5.875 = 1110.38 SF ────► 1110.38

16,761.38

Form 3 — Printed USA Rev 7/85    **QUANTITY SURVEY SHEET**

Project CARGO WHARF PHII Location KODIAK AK    Item No. STL SF

Description STEEL SURFACES    Estimated By WL    Sheet No. 3 Of 5

Date REV. 2 3-20-06    Checked By WL    Estimate No. —



③
DIAGONAL/HORIZ. BRACING
LONGITUDINAL

TS5X5

④
TRANSVERSE BRACING
TS 5X5 ③

⑤
L4X4X³/8

① 20.625' + ② 19.0 = 39.425' X ③ 1.668 = 66.10 SF/FRAME

66.10 SF X 112 FRAMES = 7403.2 SF

④ 11.2087 X ③ 1.668' = 18.70 SF/FRAME
18.70 X 102 FRAMES = 1907.40 SF

⑤ L4X4X³/8 ⑤ 7 LF X 1.33 X 2 PCS = 18.62/FRAME X 102 = 1899.24
2 LF X 1.0' X 2 PCS = 4.0'/FRAME X 102 = 408.00

Exhibit
Page 20 of 34

SF 7307.74

Form 3 — Printed USA Rev 7/85

**QUANTITY SURVEY SHEET**

Project CARGO WHARF PH II   Location KODIAK, AK        Item No. STL SF

Description STEEL SURFACES   Estimated By MLL        Sheet No. 4 Of 5

Date REV. 3-20-06        Checked By MLL        Estimate No. —

| Description | No. Pcs. | Dimensions | | |
| --- | --- | --- | --- | --- |
| | | L | W | H |



⑥ FORM BRACKETS 16 LINE THRU 19 LINE

1/2" STL PLATE

⑥ .5 + .5 + 5 + .11 = 1.6 SF/BRKT
1.6 SF X 64 BRKTS = 103.04 SF

⑦ A-B LINE PIPE RACK

L 4X4X3/8          L 4X4X3/8

⑦ 9 LF X 1.33 = 11.97 SF/PC
11.97 SF X 21 PCS = 251.37 SF

⑧ MC BRACE B-C LINE

MC 6X15.3

⑧ 9 LF X 2.0 = 18 SF/PC
18 SF X 21 PCS = 378 SF

Exhibit B
Page 21 of 34

Form 3 — Printed USA Rev 7/85

**QUANTITY SURVEY SHEET**

Project CARGO WHARF PH. II   Location KODIAK, AK   Item No. STL SF
Description STEEL SURFACES   Estimated By WW   Sheet No. 5 Of 5
Date REV. 2 3-20-06   Checked By WW   Estimate No. ———



| Description | No. Pcs. | Dimensions | | |
|---|---|---|---|---|
| | | L | W | H |

⑨ PIPE BRACKETS @ 30 LINE

L 3×2×⅛

⑨ L 3×2×⅛

30

12"

18"

⑨ 2.5 LF × .83 = 2.08 SF / BRACKET

2.08 × 17 BRACKETS = 35.36 SF

NOTES:
1. ALL STEEL SHAPE DIMENSIONS PER AISC STEEL CONSTRUCTION MANUAL, 7TH EDITION

2. PLAN SHTS 1 THRU 13 DATED 5/3/01 AND 5/8/01 S2 3/29/01; CO2 6/21/01



# I  HP SHAPES
## Dimensions for detailing

| Designation | Depth $d$ | Flange Width $b_f$ | Flange Thickness $t_f$ | Web Thickness $t_w$ | $\frac{t_w}{2}$ | Distance $a$ | Distance $T$ | Distance $k$ | Distance $k_1$ | Distance $g_1$ | Distance $c$ | Usual Gage $g$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In. | In. | In. | In. | In. | In. | In. | In. | In. | In. | In. | In. |
| HP 14×117 | 14¼ | 14⅞ | 13/16 | 13/16 | ⅜ | 7 | 11¼ | 1½ | 1 1/16 | 2¾ | 7/16 | 5½ |
| ×102 | 14 | 14¾ | 11/16 | 11/16 | ⅜ | 7 | 11¼ | 1⅜ | 1 | 2¾ | 7/16 | 5½ |
| ×89 | 13⅞ | 14¾ | ⅝ | ⅝ | 5/16 | 7 | 11¼ | 1 5/16 | 15/16 | 2½ | ⅜ | 5½ |
| ×73 | 13⅝ | 14⅝ | ½ | ½ | ¼ | 7 | 11¼ | 1 3/16 | ⅞ | 2½ | 5/16 | 5½ |
| HP 12×74 | 12⅛ | 12¼ | ⅝ | ⅝ | 5/16 | 5¾ | 9½ | 1 5/16 | 15/16 | 2½ | ⅜ | 5½ |
| ×53 | 11¾ | 12 | 7/16 | 7/16 | 7/16 | 5¾ | 9½ | 1⅛ | ⅞ | 2½ | ¼ | 5½ |
| HP 10×57 | 10 | 10¼ | 9/16 | 9/16 | 5/16 | 4⅞ | 7¾ | 1⅛ | 13/16 | 2½ | ⅜ | 5½ |
| ×42 | 9¾ | 10⅛ | 7/16 | 7/16 | 3/16 | 4⅞ | 7¾ | 1 | ¾ | 2¼ | ¼ | 5½ |
| HP 8×36 | 8 | 8⅛ | 7/16 | 7/16 | ¼ | 3⅞ | 6⅛ | 15/16 | ⅝ | 2¼ | 5/16 | 5½ |



AISC STEEL
CONSTRUCTION
MANUAL
7TH EDITION

3-20-06 REV.

AMERICAN INSTITUTE OF STEEL CONSTRUCTION

(8) MC BRACE @ B-C LINE ONLY

(4)(5) TRANSVERSE FRAME:
DIAGONAL BRACE = TS5X5
HORIZ. BRACE = 2 EA. L4X4X3/8

AVERAGE LENGTH = 7'-0" FOR O, P, Q

16 SPACES @ 8'-0"

A SECTION
C02 C02 SCALE 1/8"=1'-0"

3-20-06 REV.



CARGO
WHARF EXTENSION

ORIGINAL
CARGO WHARF

BULLRAIL NOT SHOWN
FOR CLARITY

EXISTING PLATE

PRECAST DECK PANEL

GRID

EXIST STIRRUPS

(4) 1⅜" ⌀ A 325 HOT DIP GALV
THRU BOLTS @ 8" O.C.

CIP PILE CAP

REMOVE EXIST SPALLED CONC TO SOUND
CONC AND REPAIR WITH MODIFIED
POLYMER REPAIR CONCRETE

℔ 1¼"x2'-8"

℔ 1¼"x2'-8"

1"

1"

WELD BATTER PILE TO
PLATE AFTER INSTALLATION

℔ 1¼"x2'-8"

℔ 1"

℔ 1¼"

HP 12"x53" PILE

1'-9" MIN

12
5

EXISTING HP 14x73 BATTER PILE
FIELD CUT AT PILE CAP TO INSTALL
REPAIR PLATE

℔ ½x11"

1'-3"
FIELD VERIFY

1'-3"
FIELD VERIFY

**REPAIR SEQUENCE:**

1. CUT EXISTING HP 14x17 BATTER PILING AT PILE CAP.

2. REMOVE ALL UNSOUND AND SPALLED CONCRETE.

3. REPAIR CONCRETE TO ORIGINAL DIMENSIONS OF CAP.

4. INSTALL REPAIR PLATES AS SHOWN.

5. EPOXY INJECT  ANY REMAINING SPACES BETWEEN PLATES AND CAP.



**1** **EXISTING PILE CAP REPAIR AT ROW 1**
S2 S2  SCALE: 1 1/2" = 1'-0"



3-20

Exhibit B
Page 25 of 54

REV.



⑦ = L 4 X 4 X 3/8 PIPE RACK, TYP.

3-20-06 REV.

SECTION 2B    ⑧ = MC BRACE, TYP.

⑥ = FORM BRACKET

⑨ = PIPE BRACKET, TYP.

32 SPACES @20' 0"

① ORIGINAL CARGO WHARF
C02 C02 SCALE: 1"=20'-0"



Exhibit B
26 of 34



③ ▬▬▬ = LONGITUDINAL BRACE FRAME

④⑤ ▬▬▬ = TRANSVERSE BRACE FRAMES

SECTION 2B

3-20-06 REV.

COAT 100% OF ALL NON-GALVINIZED PILE, PILE SUPPORTS AND CONDUIT SUPPORTS BETWEEN ELEVATIONS 107' & 119'
ENGINEERS ESTIMATE OF SURFACES TO BE COATED IS 20,000 SQ. FT. APPLICATORS SHALL VERIFY QUANITES PRIOR TO BIDDING.

NO LONGITUDINAL FRAMES @ THESE LOCATIONS

NO TRANSVERSE FRAMES @ THESE LOCATIONS

32 SPACES @20' 0"

① ORIGINAL CARGO WHARF
SCALE: 1"=20'-0"

Exhibit B
27 of 34