Terry R. Marston, *pro hac vice,* terry@mhf-law.com
Jami K. Elison, *pro hac vice,* jamie@mhf-law.com
MARSTON HEFFERNAN FOREMAN, PLLC
16880 N.E. 79th Street
Redmond, Washington 98052
(425) 861-5700

PAUL J. NANGLE & ASSOCIATES
Kerry Building
101 Christensen Drive
Anchorage, Alaska 99501
Telephone: (907) 274-8866

Attorney for Plaintiff ABSOLUTE ENVIRONMENTAL SERVICES, INC.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>FORREST J. MCKINLEY, an individual, d/b/a "Imperial Industrial Coatings" and EMERCO, INC., a California Corporation, d/b/a Imperial Industrial Coatings, BRECHAN ENTERPRISES, INC., an Alaska corporation; and SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation.<br><br>Defendants. | Case No.: A03-0199CV (RRB)<br><br>**DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL** |
| EMERCO, INC., a California corporation d/b/a Imperial Industrial Coatings, and the States for Use and Benefit of EMERCO, INC.,<br><br>Counterclaimant/Third-party Claimant,<br><br>v.<br><br>ABSOLUTE ENVIRONMENTAL SERVICES INC., an Alaska corporation, et al.,<br><br>Cross-defendants/Third-party Defendants. | |

DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 1

| | |
|---|---|
| 1  THE UNITED STATES OF AMERICA *for the use and benefit of* ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, | ) ) ) ) ) |
| 4          Plaintiff, vs. | ) ) ) |
| 5  SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation. | ) ) ) ) |
| 7          Defendants. | ) ) |
| 8  BRECHAN ENTERPRISES, INC., an Alaska corporation, | ) ) ) |
| 10          Counterclaim Plaintiff, vs. | ) ) ) |
| 11  ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, | ) ) ) ) |
| 13          Counterclaim Defendant. | ) |
| 14  BRECHAN ENTERPRISES, INC., an Alaska corporation, | ) ) ) |
| 15          Third-Party Plaintiff, vs. | ) ) ) |
| 17  COFFMAN ENGINEERS, INC, a Washington Corporation. | ) ) ) ) |
| 18          Third-Party Defendant. | ) ) |
| 19  ABSOLUTE ENVIRONMENTAL SERVICES INC., an Alaska Corporation, | ) ) ) |
| 21          Plaintiff/Cross-claimant, vs. | ) ) ) |
| 22  COFFMAN ENGINEERS, INC, a Washington Corporation. | ) ) ) ) |
| 24          Third-Party Defendant. | ) ) |

DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 2

I, Terry Marston, declare as follows:

1. I am counsel for plaintiff Absolute and am competent to testify to the statements made in this declaration.

2. Documents critical to this case were recently produced by the Coast Guard and AESI has only recently been able to assimilate them. For an extended period of time, the Coast Guard was recalcitrant to AESI's request for documents and requests for depositions. AESI was unable to obtain documents or take depositions until it was put to the trouble of commencing a lawsuit against the Coast Guard in Federal District Court in Washington.

3. After a lengthy resistance and when faced with a motion to compel, under the advice of the U.S. Attorney the Coast Guard finally produced documents and made individuals available for depositions. Shortly after the Coast Guard produced the documents, Brechan produced documents after the discovery cut-off that had allegedly "misplaced" up until then, but were coincidentally documents that AESI would be expected to received from Coast Guard production.

4. The prevailing knowledge of those of us in the local construction industry is that the Coast Guard is Brechan's largest customer and only significant customer. Discovery in this lawsuit has demonstrated multiple financial improprieties in Brechan's business deals with the Coast Guard

5. A government fraud scheme was initiated with the execution of a $3 million non-compete agreement. (Deposition transcript of William Oliver, 18:24-20:1)

6. Brechan "buys" the JOC Phase I portion of the Cargo Wharf Project with a 5% bid. (Anita Repanich Deposition Exhibit #2).

DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 3

7. FDCC "spend-down" necessitates the issuance of the Cargo Wharf Maintenance contract as a design-build.

8. Brechan hires designers, including Coffman Engineering, to prepare corrosion protection design. FDCC informs Brechan that there was a $1 million cap on construction.

9. Rather than risk bid prices exceeding $1 million construction cost cap (or doing further testing to determine likely extent of omitted seal welds), Brechan instead includes in its proposal a limitation to 100' the coating applicator's responsibility to perform seal welding and price of $44/sf. (BEI19745-47).

10. March 12, 2001 FDCC issues its own counter-proposal in the form of Technical Proposal for design-build contract. (BEI 9748-55).

11. March 19, 2001, Brechan and FDCC agree to $40/sf (Repanich deposition, Exhibit #2) and a Task Order 0007 is issued reciting the work scope is defined by a "March Specification" that has never turned up (Jerry Hardenbergh deposition Exhibit #49) (and which FDCC claims is a mistaken reference. The Coast Guard claims that "March Specification" refers to its own March Technical Requirement document that does not include the 100' limit. Brechan and Coffman claim that it refers to their own "Project Scope and Fee Narrative" document that does include the limitation).

12. On May 13, 2001, Brechan solicits bids to perform the coating application work from coating subcontractors. The plans and specification used for the bid are not 100% complete though. Just prior to bid a very significant change is made in the specification. Instead of allowing a certain amount of "holidays" or pinholes in the coating, the specification is changed to require the work performed by "holiday-free".

DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 4

13. Though the work will be separated into two "Task Orders" (contacts), the bid documents solicit prices to perform the renovation of the entire Cargo Wharf.

14. Brechan bypasses the two lowest bidders, Absolute Environmental (unqualified and unrealistic pricing) and Alaska Blasting & Coating (based on a negative reaction from Coffman). (BEI4781-4783, BEI19994-95, BEI4666).

15. However, after deciding to award the contract to Swalling Construction, Inc. ("Swalling"), Brechan discovers that Swalling's bid was based on an earlier set of plans that mistakenly understated the quantity of work to be performed. Brechan negotiated the work based on the increased quantities.

16. Worse yet for Brechan, Swalling declines to simply divide its total price in half to perform the first of the two phases of work. Because, it explains, it has no assurances that the government will actually go forward with Phase II or, if so, that Swalling will be awarded the work it refuses to sign a subcontract for Phase I unless it is increased to $850,000 to enable it to cover the entirety of its mobilization, demobilization, and special equipment purchased. (BEI4545).

17. After signing all subcontracts and supply contracts, Brechan finds that it has exceeded its estimated costs for this work by a net amount of $159,600. Under Brechan's fixed price design/build contract with the Coast Guard, it was not entitled to any additional compensation from the Coast Guard for its error.

18. Nevertheless, on August 21, 2001 Brechan's project manager, Matt Holmstrom, approaches FDCC's project manager, Paul Rendon, and ask him for a change order of $24,310 (no request is made at this time for the $138,000 for Swalling because Bechan expects that it

will balance out once Phase II is awarded for the smaller balance of Swalling's bid price.) (BEI20138-39, BEI3710).

19. Paul Rendon is inexplicably receptive to Matt Holmstrom's request and in his email response requests ideas from Holmstrom on how to justify paying him for the additional costs. (BEI20138-39).

20. On August 24, 2001, six weeks into the project, Paul Rendon again emails Matt Holmstrom. This time he repeats that he has recommended to upper management to "continue with Swalling as the coating sub-kr for the Cargo Wharf Phase II." His recommendation is based on the savings the government will obtain by not having to pay a second time for mobilization, demobilization, and specialized equipment costs as well as retaining the benefit of Swalling already having gone through the leaning curve. (BEI19482-83).

21. On September 20, 2001, after two months of work on the job, Brechan and Swalling come to an agreement on the remaining terms of their subcontract and Swalling signs and returns it to Brechan. (BIE4560-61). Just two days later, Matt Holmstrom writes to his assistant, Jessica Wolfe, and instructs her to reduce the scheduled value for Swalling's subcontract from its actual price of $850,000 to Brechan's own budgeted amount of $747,000 for future pay requests to FDCC. This change results in a wrongful underpayment of Swalling by more than $100,000 over time, but it saves Brechan from going out of pocket to pay Swalling. (BIE4044).

22. On October 5, 2001, Swalling had completed work on the "Wharf Extension" and began work on the older "Original Cargo Wharf." (BEI5958-60).

23. Immediately after starting work there, Jerry Hardenbergh, a Coffman employee, but also Brechan's superintendent and FDCC's Quality Assurance inspector, noted that,

"surface preparation inspection revealed a substantial amount of seal welding [required] before coating." Because Swalling had already performed 100' of seal welding in its work on the Wharf Extension, all of the new seal welding was a compensable change in its work. (BEI5958-60).

24. Four days later, the situation goes from bad to worse for Brechan when Jerry Hardenbergh reports that defective welds that were hidden beneath the old coatings are propagating holidays in a coating that is required to be holiday-free. (BEI6008-10).

25. Swalling is required to engage is what Jerry Hardenbergh describes as an extraordinary amount of additional surface preparation including cutting and grinding of weld. (BEI6019-21, BEI6038-40).

26. When even after extensive cutting and grinding, Swalling is unable to obtain a holiday-free coating. Jerry Hardenbergh reports that Swalling attempts to solve the problem by caulking the defective and omitted welds. On October 24, 2001, Matt Holmstrom included in his notes of a telephone conversation with Jerry Hardenbergh, Swalling, and the FDCC that "caulking performance is not as expected." (BEI6506-08, BEI6019-21, BEI6038-40, BEI7181, and BEI3617).

27. Jerry Hardenbergh then prepares an October 30, 2001 report that offers FDCC three option to deal with the holiday problems arising from defective welds.

(1) For about $500,000 more, FDCC can have Swalling perform extensive grinding and stripe coating of the welds to obtain a holiday-free coating.

(2) If FDCC is willing to allow some level of holidays, a moderate level of surface preparation at less cost can be performed.

DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 7

>  (3) If FDCC wants to spend no more money, it will have to expect a significant amount of holidays.

(IIC-013523-25).

28. Swalling is asked to provide costs for the various options. On November 2, 2001, Swalling informs Brechan that the first five Bents will cost them $37,383 more for the work already performed. (BEI7203, BEI6602, and BEI4503).

29. Three days later, Swalling informs Brechan that it will require payment of an additional quarter of a million dollars just to do the 10 bents between 6-15. At this price though, Swalling will not provide a holiday-free coating for the "splice zone" elevations 116-119. (BEI4176-77).

30. On November 13, 2001, Brechan attempts to reduce Swalling's change order proposal by asking Jerry Hardenbergh to critique its accuracy. Following a meeting in which the issue is discussed, Swalling is instructed to review and revise its price proposal. (BEI6007-79, BIE4165-66, and BEI4501).

31. Swalling responds on December 21, 2001 with a new pricing proposal for Bents 6-15. It will accept $227,542 for Option #1 grinding and stripe coating (Hardenbergh had attempted to reduce Swalling's number for this option to $120,000). Or option #2 with caulking in lieu of any weld "repair" (cutting and grinding) for $128,835 – however, without any guarantee because the coating manufactures who have not tested their products for this use won't provide Swalling with a guarantee. At this price, Swalling requires an agreement that no holidays) pinholes the welded areas will be repaired. (BEI4501 and BEI4139-4141).

32. Brechan is facing losses at this point approaching $1 million (when Swalling's pricing is extended to the end of the project, unless it can get FDCC to pay for the extra work or

unless it can persuade FDCC to reduce the holiday-free standard and pay Brechan the increased cost). (BEI5202, BEI4117-18, and BEI8254-8255).

33. It then attempted to negotiate an elimination of the holiday free standard of yielding lower subcontract prices plus government agreement to pay the reduced amount. This nearly succeeded. In fact, BEI had signed a subcontract Change Order with its subcontractor or SCCI in which BEI agreed to eliminate high voltage holiday testing of weld in exchange for reduced prices. BEI issued its subcontractor a notice to proceed with the change only to later learn that FDCC had refused to eliminate the requirements of repairing all defect identified by the high voltage holiday tester.

34. At this point, BEI had signed two contracts for the same work all conflicting obligations. To make matters worse its original JOC contract was expiring and it was in the process of submitting a competitive proposal for the new JOC contract-a contract it had to have in order to continue recovery of its $3.0 million dollar investment much less turn handsome profits once it had done so. It would not serve BEI's purposes to offend the agency that would be subjectively grading BEI's proposal on the second JOC contract by demanding an extra quarter of a million dollars to complete Phase I-nor would it serve BEI's interest to lose a quarter of a million dollars to pay SCCI the additional preparation for a holiday free coating out of its own pocket.

35. Brechan chose instead to deceive the Coast Guard by allowing SCCI to ignore the high voltage holiday testing standard without inform the Coast Guard of its intention to do so. This it accomplished with the willing assistance of Koffman Engineers on site inspector who-after some apparent instruction-was induced to approve work within a week that had repeatedly denied repeated attempts over many moths to yield that status. While the inspector, Mr.

Hardenbergh, in his unique fashion appears to deny having relaxed the testing requirement. The photographs of his work and the sworn testimony of SCCI's project manager prove otherwise.

36. Brechan was not, as it claims, able to turn down the Phase II Task Order. It could not afford to jeopardize the extraordinary – in fact- illegal helpful assistance it was obtaining from Anita Repanich – or her 'upper management" in particular – on the eve of award of the second JOC contract and allow questions to arise regarding how the Phase I work had been performed so economically by Swalling, when prices demanded by a substitute contractor turned out to be so much higher. On the other hand, it could not expect to perform work on Bents 12-33 in the same way it had surreptitiously completed Bents 6-12.

37. The only way out of Brecha's dilemma was to take advantage of a trusting long-term reliable contractor- and one especially who had no appreciable knowledge of coatings work. Brechan hired Absolute just such a contractor. Absolute who had worked with them successfully for years, who was so patently unqualified for work of this type and who had underbid the work by $300,000 was lured into taking the project. Absolute was incurred into pricing the work with not only no hint of the grave problems that Swalling had been struggling with for a year, but without even being provided the specifications under which the work would be performed. Absolute's bid was submitted before Dan Stears changed two specifications. Stears modified the description of the existing site conditions, but not in a way that disclosed the weld problems. Stears did make other modifications through at Brechan's requests. Without mentioning that there was any likelihood of encountering the defective or omitted welds, the specifications what must be done if they were. Neither Stears, nor Hardenbergh, nor

Holmstrom, nor anyone else breathed a word of the problems to Absolute either before signing its contract or afterwards.

38. Absolute's theory of this case are stated and supported by the detailed timeline previously submitted. There is ample justification for access to Brechan's financial records that would prove its only customer was the Coast Guard its inexplicable profits earned that would cause it to sacrifice Absolute on the alter of its greed.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this _____ day of August, 2006, at Redmond, Washington.

_____/s/_____
TERRY R. MARSTON