Terry R. Marston, *pro hac vice*, terry@mhf-law.com
Jami K. Elison, *pro hac vice*, jamie@mhf-law.com
MARSTON HEFFERNAN FOREMAN, PLLC
16880 N.E. 79th Street
Redmond, Washington  98052
(425) 861-5700

PAUL J. NANGLE & ASSOCIATES
Kerry Building
101 Christensen Drive
Anchorage, Alaska  99501
Telephone:  (907) 274-8866

Attorney for Plaintiff ABSOLUTE ENVIRONMENTAL SERVICES, INC.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>FORREST J. MCKINLEY, an individual, d/b/a "Imperial Industrial Coatings" and EMERCO, INC., a California Corporation, d/b/a Imperial Industrial Coatings, BRECHAN ENTERPRISES, INC., an Alaska corporation; and SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation.<br><br>Defendants. | Case No.: A03-0199CV (RRB)<br><br>**REPLACEMENT – DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL** |
| EMERCO, INC., a California corporation d/b/a Imperial Industrial Coatings, and the States for Use and Benefit of EMERCO, INC.,<br><br>Counterclaimant/Third-party Claimant,<br><br>v.<br><br>ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska corporation, et al.,<br><br>Cross-defendants/Third-party Defendants. | |

REPLACEMENT - DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 1

|   |   |
|---|---|
| 1 | THE UNITED STATES OF AMERICA *for the use and benefit of* ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, )<br>)<br>)<br>)<br>) |
| 2 | |
| 3 | |
| 4 | Plaintiff,<br>vs. )<br>)<br>) |
| 5 | |
| 6 | SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation. )<br>)<br>) |
| 7 | Defendants. )<br>) |
| 8 | |
| 9 | BRECHAN ENTERPRISES, INC., an Alaska corporation, )<br>) |
| 10 | Counterclaim Plaintiff,<br>vs. )<br>)<br>) |
| 11 | |
| 12 | ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation, )<br>)<br>) |
| 13 | Counterclaim Defendant. ) |
| 14 | BRECHAN ENTERPRISES, INC., an Alaska corporation, )<br>) |
| 15 | |
| 16 | Third-Party Plaintiff,<br>vs. )<br>)<br>) |
| 17 | COFFMAN ENGINEERS, INC, a Washington Corporation. )<br>)<br>) |
| 18 | |
| 19 | Third-Party Defendant. ) |
| 20 | ABSOLUTE ENVIRONMENTAL SERVICES INC., an Alaska Corporation, )<br>)<br>) |
| 21 | Plaintiff/Cross-claimant,<br>vs. )<br>)<br>) |
| 22 | |
| 23 | COFFMAN ENGINEERS, INC, a Washington Corporation. )<br>)<br>) |
| 24 | Third-Party Defendant. )<br>) |
| 25 | |
| 26 | |

REPLACEMENT - DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 2

I, Terry Marston, declare as follows:

1. I am counsel for plaintiff Absolute and am competent to testify to the statements stated in this declaration. I am competent to testify to these matters because they are not intended to establish the truth of the matters asserted. They are, instead, an identification of Plaintiff's theory of certain aspects of this case based and the documented bases for those beliefs.

2. Absolute learned for the first time nearly a year ago that Defendants Brechan and Coffman possessed detailed knowledge and documentation of defective welds hidden beneath the existing coatings on the Kodiak Cargo Wharf and, equally importantly, knowledge that these defective welds created "holidays" in a coating system that the project specifications required to be provided holiday-free. Absolute spent a tremendous sum of money in completing the coating of this wharf and correcting defective work after its own subcontractor Imperial abandoned the project prior to its completion. Absolute was sued by Imperial in California before the project was completed. Absolute obtained a dismissal of the California suit and filed suit against Imperial itself in this Court. Absolute proceeded to complete the project while also pursuing litigation with Imperial to recover the cost of completing the work.

3. One of the dilemmas Absolute always struggled with was accounting for the magnitude of the costs it had incurred in completing the project. Even with the cost of correcting defects in the portion of the work Imperial had performed, the total expense incurred in correcting and completing the project seemed to exceed what it should have. As a result, the amount of the costs was continually reviewed and questioned by Absolute to determine whether there was an error in its accounting of these costs. Despite this extended scrutiny, the same magnitude of expense incurred was always confirmed. Absolute eventually decided that there

was nothing more that it could do to examine the magnitude of these costs and elected to simply rely on the fact that the costs incurred were (for whatever reason) what they were.

4. Then, on the eve of the original discovery cut-off in this case, Imperial produced to Absolute a copy of a Coffman quality assurance (QA) report from the earlier first phase of the wharf project that it had obtained from ISC Kodiak through a FOIA request. This document demonstrated beyond any argument that there were defects in the welds on the Cargo Wharf and – more importantly – defects that <u>caused</u> holidays to be formed in the coatings applied over them. Absolute had gone to extraordinary efforts to eliminate the proliferation of holidays it experienced in completing the project and in correcting the work its subcontractor had performed. The primary defect Brechan's QA inspector had complained about during the project was the proliferation of holidays that Absolute had been required to repair – holidays that inexplicably occurred wherever welds were found or where welds had been omitted.

5. The discovery of the existence of defective welds and their being the cause of the holidays that appeared in the coatings over them, clearly accounted for the massive cost overruns AESI had experienced in completing the project – these were costs incurred in cutting off any unnecessary metal welded to the wharf and in grinding down the remaining residue of those welds plus all other welds existing on the piles in order to achieve the required holiday-free coating.

6. AESI then pursued additional documentation from Imperial which it had obtained from BEI's Phase I records earlier in the lawsuit. This subsequently resulted in Absolute's joinder of Brechan as a defendant and then its cross-claim against Coffman when Coffman's complicity in Brechan's actions became apparent. AESI then transmitted detailed requests for production of documents to Brechan and Coffman asking for access to their project records.

Documents were provided. Slowly. The documents Absolute was provided were said to be everything responsive in Brechan's and Coffman's possession. Later events would demonstrate that this was far from true in both the case of Brechan and Coffman.

7. After coming across a February 5, 2001 email from Lt. Rendon of the US Coast Guard (prominently marked both "Important" and "Confidential") addressed to Brechan, Absolute began actively pursuing discovery from the Coast Guard's FDCC. The "confidential" email shows that the Coast Guard had declined to pay Brechan for what appeared to be a $500,000 cost overrun on the project (due to the defective welds). The Coast Guard's project manager, Mr. Rendon, in the balance of his email proceeded to recommend ways that Brechan might consider to impose the half million dollar loss on its then subcontractor (Swalling) or its corrosion engineer (Coffman) or some "new guy." Absolute decided it was necessary to pursue evidence from the Coast Guard directly.

8. After a lengthy delay before receiving any substantive response to AESI's FOIA request for access to the Coast Guard's Cargo Wharf project records, FDCC agreed to make the documents available. However, AESI was told by FDCC that it would have to pay that agency $5,000, in advance, to obtain copies of the documents. The Agency's rationale was that the documents would have to be located, identified by staff engineers as responsive, reviewed by staff attorneys to establish they weren't protected and would have to be withheld, and then copied by outside contracted personnel so as not to disrupt FDCC's work. (The documents were all later found to be maintained in electronic form requiring only that they be printed out.)

9. Absolute protested these charges as being preposterous, but to no avail. When all efforts to reason with FDCC about document production failed, Absolute determined it would, instead, depose the FDCC personnel involved in the project. FDCC then refused to allow its

personnel (including retired personnel) to testify in deposition or trial. AESI was unable to obtain either documents or depositions from the Coast Guard and was therefore forced to actually sue the Coast Guard in Federal District Court in Washington to compel their providing access to their documents and witnesses. Eventually, following the intervention of an Assistant U.S. Attorney, they were persuaded to produce both their witnesses and their documents.

10. Curiously, as soon as AESI had secured the right to access to FDCC documents and its personnel for depositions, Brechan "discovered" that it had failed to produce a six-inch stack of **2,121 documents** of communications with the Coast Guard (Bate numbers BEI 8380-8578 and BEI 18759-20501). Counsel for Brechan was asked to explain why these documents had taken so long to produce. He blamed it on a Brechan secretary who had made an inadequate search of email records.) The documents (many of which can now be found included in the timeline graphic earlier provided to this Court in opposition to the motions for summary judgment of Brechan and Coffman) proved to be a treasure trove of critical information. The documents demonstrate the existence of an unusually close -- and unsavory -- relationship between a government contractor (Brechan) and the government agency staff assigned to administer its contracts with that agency. Among other things, they demonstrate that FDCC's Alaska management team ("Alpha Team" or, sometimes, "A-Team") not only gave preferential treatment to Brechan in bidding for Coast Guard contracts, but also conspired with Brechan to facilitate – and even initiate – efforts to take financial advantage of other participants in Brechan's ISC Kodiak JOC contracts, most notably Absolute.

11. At his deposition, Matt Holmstrom, Brechan's project manager testified that to his knowledge the Coast Guard is Brechan's only significant customer. (Counsel for Brechan intimated that he may present testimony that Brechan has other substantial customers

Holmstrom is unaware of). Discovery in this lawsuit has demonstrated multiple instances of financial wrong-doing in Brechan's contracts with the Coast Guard. It is Absolute's belief, based upon substantial documentary evidence (provided to this court in its opposition to Brechan's Motions for Summary Judgment), that Brechan pursued a purposeful scheme to defraud the government through its contracts with the United States Coast Guard on Kodiak Island when it paid its only competitor $3 million dollars to not compete for Coast Guard work on the Island. ***An integral part of Absolute's claim that Brechan – to protect its ability to continue defrauding the government – chose to perpetrate a fraud against Absolute as well includes presenting proof of the <u>absence</u> of Brechan having other significant customers and the <u>presence</u> of Brechan having major profits that cannot be reconciled with the 5% cap on its overhead and profit it contracted for with the Coast Guard.*** The relationship of the claims of Absolute in this case and Brechan's scheme to defraud the government is that (a) Brechan admits having made a huge ($3 million, Deposition transcript of William Oliver, 18:24-20:1) financial investment to eliminate competition for Coast Guard work and (b) Brechan's ability to continue its scheme being threatened by the discovery of latent defective welds exposing it to major losses (1) it was unwilling to absorb, (2) it could not pursue a claim for against the Coast Guard without risking offending FDCC and being denied the award of the second JOC contract, (3) and therefore required the designation of a fall guy, Absolute.

12.   A government fraud scheme was initiated with the execution of a $3 million non-compete agreement.

13.   Brechan "buys" the JOC Phase I portion of the Cargo Wharf Project with a 5% bid. (Anita Repanich Deposition Exhibit #2).

14. FDCC "spend-down" necessitates the issuance of the Cargo Wharf Maintenance contract as a design-build.

15. Brechan hires designers, including Coffman Engineers to prepare corrosion protection design. FDCC informs Brechan that there was a $1 million cap on construction.

16. Rather than risk bid prices exceeding $1 million construction cost cap (or doing further testing to determine likely extent of omitted seal welds), Brechan instead includes in its proposal a limitation to 100' the coating applicator's responsibility to perform seal welding and price of $44/sf. (BEI19745-47).

17. March 12, 2001 FDCC issues its own counter-proposal in the form of Technical Proposal for design-build contract. (BEI 9748-55).

18. March 19, 2001, Brechan and FDCC agree to $40/sf (Repanich deposition, Exhibit #2) and a Task Order 0007 is issued reciting the work scope is defined by a "March Specification" that has never turned up (Jerry Hardenbergh deposition Exhibit #49) (and which FDCC claims is a mistaken reference. The Coast Guard claims that "March Specification" refers to its own March Technical Requirement document that does not include the 100' limit. Brechan and Coffman claim that it refers to their own "Project Scope and Fee Narrative" document that does include the limitation).

19. On May 13, 2001, Brechan solicits bids to perform the coating application work from coating subcontractors. The plans and specification used for the bid are not 100% complete though. Just prior to bid a very significant change is made in the specification. Instead of allowing a certain amount of "holidays" or pinholes in the coating, the specification is changed to require the work performed by "holiday-free".

20. Though the work will be separated into two "Task Orders" (contacts), the bid documents solicit prices to perform the renovation of the entire Cargo Wharf.

21. Brechan bypasses the two lowest bidders, Absolute Environmental (unqualified and unrealistic pricing) and Alaska Blasting & Coating (based on a negative reaction from Coffman). (BEI4781-4783, BEI19994-95, BEI4666).

22. However, after deciding to award the contract to Swalling Construction, Inc. ("Swalling"), Brechan discovers that Swalling's bid was based on an earlier set of plans that mistakenly understated the quantity of work to be performed. Brechan negotiated the work based on the increased quantities.

23. Worse yet for Brechan, Swalling declines to simply divide its total price in half to perform the first of the two phases of work. Because, it explains, it has no assurances that the government will actually go forward with Phase II or, if so, that Swalling will be awarded the work it refuses to sign a subcontract for Phase I unless it is increased to $850,000 to enable it to cover the entirety of its mobilization, demobilization, and special equipment purchased. (BEI4545).

24. After signing all subcontracts and supply contracts, Brechan found that it had exceeded its estimated costs for this work by a net amount of $159,600. Under Brechan's fixed price design/build contract with the Coast Guard, it was not entitled to any additional compensation from the Coast Guard for its error.

25. Nevertheless, on August 21, 2001 Brechan's project manager, Matt Holmstrom, approaches FDCC's project manager, Paul Rendon, and ask him for a change order of $24,310 (no request is made at this time for the $138,000 for Swalling because Bechan expects that it

will balance out once Phase II is awarded for the smaller balance of Swalling's bid price.) (BEI20138-39, BEI3710).

26. Paul Rendon is inexplicably receptive to Matt Holmstrom's request and in his email response requests ideas from Holmstrom on how to justify paying him for the additional costs. (BEI20138-39).

27. On August 24, 2001, six weeks into the project, Paul Rendon again emails Matt Holmstrom. This time he repeats that he has recommended to upper management to "continue with Swalling as the coating sub-kr for the Cargo Wharf Phase II." His recommendation is based on the savings the government will obtain by not having to pay a second time for mobilization, demobilization, and specialized equipment costs as well as retaining the benefit of Swalling already having gone through the leaning curve. (BEI19482-83).

28. On September 20, 2001, after two months of work on the job, Brechan and Swalling come to an agreement on the remaining terms of their subcontract and Swalling signs and returns it to Brechan. (BIE4560-61). Just two days later, Matt Holmstrom writes to his assistant, Jessica Wolfe, and instructs her to reduce the scheduled value for Swalling's subcontract from its actual price of $850,000 to Brechan's own budgeted amount of $747,000 for future pay requests to FDCC. This change results in a wrongful underpayment of Swalling by more than $100,000 over time, but it saves Brechan from going out of pocket to pay Swalling. (BIE4044).

29. On October 5, 2001, Swalling had completed work on the "Wharf Extension" and began work on the older "Original Cargo Wharf." (BEI5958-60).

30. Immediately after starting work there, Jerry Hardenbergh, a Coffman employee, but also Brechan's superintendent and FDCC's Quality Assurance inspector, noted that,

"surface preparation inspection revealed a substantial amount of seal welding [required] before coating." Because Swalling had already performed 100' of seal welding in its work on the Wharf Extension, all of the new seal welding was a compensable change in its work. (BEI5958-60).

31. Four days later, the situation goes from bad to worse for Brechan when Jerry Hardenbergh reports that defective welds that were hidden beneath the old coatings are propagating holidays in a coating that is required to be holiday-free. (BEI6008-10).

32. Swalling is required to engage in what Jerry Hardenbergh describes as an extraordinary amount of additional surface preparation including cutting and grinding of weld. (BEI6019-21, BEI6038-40).

33. When even after extensive cutting and grinding, Swalling is unable to obtain a holiday-free coating. Jerry Hardenbergh reports that Swalling attempts to solve the problem by caulking the defective and omitted welds. On October 24, 2001, Matt Holmstrom included in his notes of a telephone conversation with Jerry Hardenbergh, Swalling, and the FDCC that "caulking performance is not as expected." (BEI6506-08, BEI6019-21, BEI6038-40, BEI7181, and BEI3617).

34. Jerry Hardenbergh then prepares an October 30, 2001 report that offers FDCC three option to deal with the holiday problems arising from defective welds.

(1) For about $500,000 more, FDCC can have Swalling perform extensive grinding and stripe coating of the welds to obtain a holiday-free coating.

(2) If FDCC is willing to allow some level of holidays, a moderate level of surface preparation at less cost can be performed.

REPLACEMENT - DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 11

(3) If FDCC wants to spend no more money, it will have to expect a significant amount of holidays.

(IIC-013523-25).

35. Swalling is asked to provide costs for the various options. On November 2, 2001, Swalling informs Brechan that the first five Bents will cost them $37,383 more for the work already performed. (BEI7203, BEI6602, and BEI4503).

36. Three days later, Swalling informs Brechan that it will require payment of an additional quarter of a million dollars just to do the 10 bents between 6-15. At this price though, Swalling will not provide a holiday-free coating for the "splice zone" elevations 116-119. (BEI4176-77).

37. On November 13, 2001, Brechan attempts to reduce Swalling's change order proposal by asking Jerry Hardenbergh to critique its accuracy. Following a meeting in which the issue is discussed, Swalling is instructed to review and revise its price proposal. (BEI6007-79, BIE4165-66, and BEI4501).

38. Swalling responds on December 21, 2001 with a new pricing proposal for Bents 6-15. It will accept $227,542 for Option #1 grinding and stripe coating (Hardenbergh had attempted to reduce Swalling's number for this option to $120,000). Or option #2 with caulking in lieu of any weld "repair" (cutting and grinding) for $128,835 – however, without any guarantee because the coating manufactures who have not tested their products for this use won't provide Swalling with a guarantee. At this price, Swalling requires an agreement that no holidays) pinholes the welded areas will be repaired. (BEI4501 and BEI4139-4141).

39. Brechan is facing losses at this point approaching $1 million (when Swalling's pricing is extended to the end of the project (Bent 33), unless it can get FDCC to pay for the

REPLACEMENT - DECLARATION OF TERRY MARSTON IN SUPPORT OF REPLY MOTION TO COMPEL
Case No. A03-0199CV (RRB)-- 12

extra work or unless it can persuade FDCC to reduce the holiday-free standard and pay Brechan the increased cost). (BEI5202, BEI4117-18, and BEI8254-8255).

40.    It then attempted to negotiate an elimination of the holiday free standard of yielding lower subcontract prices plus government agreement to pay the reduced amount. This nearly succeeded. In fact, BEI had signed a subcontract Change Order with its subcontractor or SCCI in which BEI agreed to eliminate high voltage holiday testing of weld in exchange for reduced prices. BEI issued its subcontractor a notice to proceed with the change only to later learn that FDCC had refused to eliminate the requirements of repairing all defect identified by the high voltage holiday tester.

41.    At this point, BEI had signed two contracts for the same work with conflicting obligations. To make matters worse its original JOC contract was expiring and it was in the process of submitting a competitive proposal for the new JOC contract-a contract it had to have in order to continue recovery of its $3.0 million dollar investment much less turn handsome profits once it had done so. It would not serve BEI's purposes to offend the agency that would be subjectively grading BEI's proposal on the second JOC contract by demanding an extra quarter of a million dollars to complete Phase I-nor would it serve BEI's interest to lose a quarter of a million dollars to pay SCCI the additional preparation for a holiday free coating out of its own pocket.

42.    Brechan chose instead to deceive the Coast Guard by allowing SCCI to ignore the high voltage holiday testing standard without informing the Coast Guard of its intention to do so. This it accomplished with the willing assistance of Coffman Engineers on site inspector who-after some apparent instruction-was induced to approve work within a week that had repeatedly failed approval after repeated attempts over many moths to yield that status. While

the inspector, Mr. Hardenbergh, in his unique fashion appears to deny having relaxed the testing requirement. His photographs of the work and the sworn testimony of SCCI's project manager prove otherwise.

43. Brechan was not, as it claims, able to turn down the Phase II Task Order. It could not afford to jeopardize the extraordinary – in fact- illegal helpful assistance it was obtaining from Anita Repanich – or her 'upper management" in particular – on the eve of award of the second JOC contract and allow questions to arise regarding how the Phase I work had been performed so economically by Swalling, when prices demanded by a substitute contractor turned out to be so much higher. On the other hand, it could not expect to perform work on Bents 13-33 in the same way it had surreptitiously completed Bents 6-12.

44. The only way out of Brechan's dilemma was to take advantage of a trusting long-term reliable contractor- and one especially who had no knowledge of coatings work. Brechan hired Absolute - just such a contractor. Absolute: who had worked with Brechan successfully for years, who was so patently unqualified for work of this type, and who had underbid the work by $300,000 was lured into taking the project. Absolute was incurred into pricing the work with not only no hint of the grave problems that Swalling had been struggling with for a year, but without even being provided the specifications under which the work would be performed. Absolute's bid was submitted before Dan Stears issued the specifications. Stears modified the description of the existing site conditions, but not in a way that disclosed the weld problems. Stears did make other modifications, though, at Brechan's requests. Without mentioning that there was any likelihood of encountering the defective or omitted welds, the specifications described what must be done if they were encountered. Neither Stears, nor

Hardenbergh, nor Holmstrom, nor anyone else breathed a word of the problems to Absolute either before signing its contract or afterwards.

45.  Absolute's theory of this case are stated and supported by the detailed timeline previously submitted. There is ample justification for access to Brechan's financial records that would prove its only customer was the Coast Guard and its inexplicable profits earned would cause it to sacrifice Absolute on the alter of its greed

46.  And these "Alpha Team" managers had scant motivation to do so. If they could rationalize BEI's pricing to their own superiors, BEI would do whatever it took (save foregoing its predatory pricing) to make them "look good."

47.  Brechan's program was working well until it entered into the design-build contract for the Cargo Wharf Project. In the Cargo Wharf project, BEI found itself in a situation when it had no good answers.

48.  It signed a contract with the Coast Guard for provide a new holiday–free coating on the Cargo Wharf Piles for a fixed fee. However, when latent defective welds were encountered, they created circumstances where providing a holiday-free coating was (1) impossible to accomplish under Coast Guard provided specifications and (2) prohibitively expensive to accomplish even if the specified procedures were abandoned.

49.  Brechan first tried to bargain its subcontractor, into lowering its prices, but failed,  it then nearly succeeded in getting the USCG to pay for the extra work, but that failed as well.

//

//

//

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 25th day of August, 2006, at Redmond, Washington.

_____
TERRY R. MARSTON

I hereby certify that on the date given a copy of the forgoing was electronically filed with the Clerk of Court using the CM/ECF system and was served electronically on the following:

William R. Baerg, Patrick J. Duffy
Eric J. Brown
Robert J. Dickson
Michael E Kreger, Jacob Nist
James B. Stoetzer, Peter C. Partnow

s/Terry R. Marston