1  Terry R. Marston, *pro hac vice,* terry@mhf-law.com
   Jami K. Elison, *pro hac vice,* jamie@mhf-law.com
2  MARSTON HEFFERNAN FOREMAN, PLLC
   16880 N.E. 79th Street
3  Redmond, Washington 98052
   (425) 861-5700

4
   PAUL J. NANGLE & ASSOCIATES
5  Kerry Building
   101 Christensen Drive
   Anchorage, Alaska 99501
6  Telephone: (907) 274-8866

7

8  Attorney for Plaintiff ABSOLUTE ENVIRONMENTAL SERVICES, INC.

9              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ALASKA

10 ABSOLUTE ENVIRONMENTAL                )
   SERVICES, INC., an Alaska Corporation, )   Case No.: A03-0199CV (RRB)
11                                        )
                                          )
           Plaintiff,                     )
12                                        )
        vs.                               )
13                                        )   **DECLARATION OF DAVE OLSON**
   FORREST J. MCKINLEY, an individual,   )   **REGARDING MOTIONS FOR**
14 d/b/a "Imperial Industrial Coatings" and )  **SUMMARY JUDGMENT**
   EMERCO, INC., a California Corporation, )
   d/b/a Imperial Industrial Coatings,    )
15 BRECHAN ENTERPRISES, INC., an Alaska   )
   corporation; and SAFECO INSURANCE      )
16 COMPANY OF AMERICA, a Washington       )
   Corporation.                           )
17                                        )
                                          )
           Defendants.
18 _____
   EMERCO, INC., a California corporation d/b/a)
19 Imperial Industrial Coatings, and the States for )
   Use and Benefit of EMERCO, INC.,      )
20                                        )
   Counterclaimant/Third-party Claimant,  )
21                                        )
   v.                                     )
22                                        )
   ABSOLUTE ENVIRONMENTAL SERVICES)
23 INC., an Alaska corporation, et al.,    )
                                          )
24 Cross-defendants/Third-party Defendants. )
                                          )
25 _____)

26

THE UNITED STATES OF AMERICA *for the use and benefit of* ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation,

   Plaintiff,

 vs.

SAFECO INSURANCE COMPANY OF AMERICA, a Washington Corporation.

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

BRECHAN ENTERPRISES, INC., an Alaska corporation,

   Counterclaim Plaintiff,

 vs.

ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation,

   Counterclaim Defendant.

)
)
)
)
)
)
)
)
)
)

BRECHAN ENTERPRISES, INC., an Alaska corporation,

   Third-Party Plaintiff,

 vs.

COFFMAN ENGINEERS, INC, a Washington Corporation.

   Third-Party Defendant.

)
)
)
)
)
)
)
)
)
)

ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska Corporation,

   Plaintiff/Cross-claimant,

 vs.

COFFMAN ENGINEERS, INC, a Washington Corporation.

   Third-Party Defendant.

)
)
)
)
)
)
)
)
)
)

I, Dave Olson, declare as follows:

1.    I am the president of Absolute Environmental Services, Inc. ("AESI"), the Plaintiff in this matter. I am the sole shareholder of Absolute Environmental, Inc. I have personal knowledge of the facts set out below.

2. I have worked for Brechan Enterprises, Inc. as a subcontractor since 1996. I have completed a total of 35 projects for them. (See attached **Exhibit 1**, Absolute Environmental Services, Inc.'s Project Listing 1997-2005). AESI has an established course of dealing with Brechan regarding differing site conditions confirming that differing site conditions are compensable unless Brechan expressly requires AESI to waive a right to such compensation and increase its bid price at the beginning of the job. That practice was established on Project Demolish Building 52 and 53 performed in 2001, at which time Brechan actually required AESI to waive its understood right to compensation for differing site conditions. (See attached **Exhibit 2**, March 21, 2001 contract between Brechan and Absolute).

3.    Some time prior to January 2, 2001, Brechan entered into a contract with its only serious competitor for government contracts in Kodiak, AK Construction, Inc. Brechan paid $3 million to AK Construction for a non-compete agreement which prohibited AK Construction from contracting in Kodiak for a period of seven years. (See attached **Exhibit 3**, transcript of William Oliver deposition taken on June 7, 2006, page 19)**.** On or about January 2, 2001 Brechan was the successful bidder for a Job Order Contract ("JOC") with the United States Coast Guard ("USCG") to provide construction services for a base year with three option years. The JOC Contract once awarded was a sole-source noncompetitive construction contract for multiple projects at Integrated Support Command ("ISC") Kodiak for the USCG. Brechan obtained the award for the JOC contract with a "coefficient factor" bid of 5%. (See

attached **Exhibit 4,** page 3 of JOC). The 5% coefficient factor was unrealistically low given the fact that it was supposed to include all items listed on page 8 of 9, COEFFICIENT ¶ (a). Id. In essence, Brechan "bought" the JOC contract with its low-ball 5% bid to assure itself that it would be in a position to both exclusively contract with the USCG on Kodiak and to guarantee itself an opportunity to recoup its $3 million investment in the non-compete agreement with AK Construction. The evidence clearly suggests that Brechan's method of recouping its investment was by defrauding the USCG and the tax payers of this country.

4.      Early in 2001 the USCG's Facilities Design and Construction Center ("FDCC") was in the midst of a "spend-down." The quarterly spend-down is a name given to that time of the year in which FDCC was challenged with the task of spending all money that had been budgeted for that agency prior to the end of the fiscal quarter to guarantee that the money did not revert back to the federal government as not having been used. (See attached **Exhibit 5**, transcript of Anita Repanich deposition taken June 28, 2006, 182:18-25, 184:8-185:23**).** In order to "obligate" the funds necessary to avoid losing them back to the federal treasury, FDCC quickly issued a Task Order to Brechan Enterprises for a design-build contract to perform maintenance on the Cargo Wharf at ISC Kodiak. (See attached **Exhibit 6**, Order for Supplies and Services dated March 20, 2001)**.**

5.      Ordinarily the Task Orders did not oblige the JOC contractor to provide design services; instead the design was normally provided by FDCC and simply executed by the contractor. In this instance, the design-build approach was used because it enabled FDCC to "commit" the funds in the course of its spend-down without the lengthy delay associated with preparing the plans and specifications and submitting them to the contractor to prepare a proposal for the Task Order. This Task Order for the Cargo Wharf maintenance contract would

eventually be referred to as Task Order 0007. Id.  Task Order 0007 involved design and construction of the Cargo Wharf Maintenance Project, which primarily consisted of the removal and replacement of the coatings (paint) on the steel piles supporting the concrete surface of the Cargo Wharf. Id. The USCG had earlier hired the engineering firm Tryck, Nyman, Hayes ("TNH") to prepare plans and specifications before the decision was made to convert the contract into a design-build contract. (See attached **Exhibit 7**, excerpts of Tryck Nyman Hayes, Inc Cargo Wharf and Fuel Pier Document). Once the design-build contract decision was made, Brechan was invited to submit a proposal to the Coast Guard that provided a price for the design and construction of the Cargo Wharf Maintenance Project.

6.      In March 2001, Brechan submitted its proposal to FDCC. (See attached **Exhibit 8**, March 8, 2001 letter from Brechan to FDCC). A price was negotiated that culminated in Task Order 007.  Brechan was introduced to TNH, and TNH's corrosion engineering sub consultant Coffman Engineers, Inc ("CEI").  Brechan then contracted with TNH, which in turn contracted with CEI, to prepare the corrosion prevention aspect of the design for the Cargo Wharf Maintenance contract.  In the course of preparing that design, Brechan was informed that the USCG's budget restrictions precluded it from spending more than $1 million during the current fiscal year for the construction portion of the work.  Brechan's negotiated price was $40 per square foot to perform the construction portion of the Cargo Wharf Project, Task Order 0007. In May 2001, Brechan issued to potential coatings subcontractors, a bid package and an addendum. (See attached **Exhibit 9**, including email from TNH to Brechan re 65% coating submittal, specifications, and addendum). This addendum required that the coatings work to be performed by the subcontractor be performed "holiday-free". Id.

7.    Following the bidding for the coating subcontract, Brechan awarded the subcontract to Swalling Construction Company, Inc. ("Swalling"). Swalling's bid price was originally based on performing the entirety of the coatings work on the Cargo Wharf, which included the "Wharf Extension" and bents (a "bent" is simply a row of piles) 1-33 of the Original Wharf. (See attached **Exhibit 10**, letter from Swalling to Brechan dated May 23, 2001). Due to the restrictions on available funding, Brechan was only able to award a portion of the project the first year. This portion was referred to as Phase I. Phase I included the entirety of the Wharf Extension and bents 1-15 of the Original Wharf. When Swalling was asked to enter into a subcontract with Brechan for the first half of the work, Phase I, the Wharf Extension and bents 1-15 of the Original Wharf, Brechan was surprised to find that the subcontractor was not willing to contract for one-half of his bid price. (See attached **Exhibit 11**, letter from Swalling to Brechan dated June 7, 2001 re proposal and letter from Brechan to Swalling dated June 12, 2001 re acceptance). Because Swalling had no guarantee that it would be awarded the Phase II, it informed Brechan that it would have to recoup its costs for mobilization, demobilization and for the specialized equipment it was required to purchase in its entirety on the first phase of the contract. Id. As a result of this requirement, the price that Brechan had to pay for the coatings application work was $138,000 greater than it had budgeted for with the USCG. In other words, Brechan was facing a $138,000 loss during Phase I. (See attached **Exhibit 12**, August 21 and 22, 2001 email exchange between Rendon and Holmstrom with attachment).

8.    After the coating subcontract was awarded to Swalling in June 2001, CEI completed its specifications for the coatings work on June 21, 2001. That specification included a limitation on the amount of "seal welding" work the coating applications

subcontractor, Swalling, would be required to perform. The maximum amount it would have to perform was limited to 100 feet. On August 21, Matt Holmstrom, the Project Manager for Brechan, sent an email to Paul Rendon, the Project Manager for FDCC. In that email, Mr. Holmstrom included a spreadsheet of his costs budget and the costs he would actually have to pay for that same work. Id. (This phase of contract administration in which the subcontracts and material contracts are executed is known to as the "buy-out.") Based on the table prepared by Mr. Holmstrom and provided to Mr. Rendon, it was evident that Brechan had suffered a $156,000 cost overrun in its "buy-out" before it even commenced work. Holmstrom, in his email to Rendon of August 21, 2001, was requesting FDCC to pay Brechan additional money for its "buy-out" losses. Id. This is unheard of. Nevertheless, Mr. Rendon of the Coast Guard's "Alpha Team" was inexplicably receptive to the idea and discussed with Holmstrom how they could make up the difference and "justify it" to Rendon's superiors. Id. On August 24, 2001, Rendon sent another email to Matt Holmstrom in which he expressed his intent to recommend to his "upper management" that they stay with Swalling next year for the Phase II work because the USCG would realize savings by not having to mobilize a second subcontractor and because Swalling's overall cost (Phase I plus Phase II combined) was $38 per square foot, a figure below the USCG's own upper limit of payment of $40 per square foot. (See attached **Exhibit 13**, August 24, 2001 email exchange between Rendon and Holmstrom).

9.    On September 20, long after Swalling had commenced work on the Project, Swalling signed Brechan's subcontract for $850,000. (See attached **Exhibit 14**, subcontract between Swalling and Brechan). Brechan itself was only going to be paid $747,000 by the Coast Guard for the same work. Two days later, Matt Holmstrom of Brechan instructed Brechan's bookkeeper to reduce the value of the coatings contract in the schedule of values

used for payment purposes from $850,000 to $747,000. (See attached **Exhibit 15**, Brechan Price Schedule with Holmstrom handwritten notes date September 22, 2001). The result of this reduction would mean that the payment Swalling would receive for the percentage of the work it had performed each month would be based on the lower price of $747,000 and not the actual subcontract price of $850,000. It is evident that this change was made by Brechan without any approval from Swalling and undoubtedly for the purpose of Brechan's avoiding having to pay Swalling any portion of the increased contract price. Swalling's performance of its work on the Wharf Extension was delayed by a variety of circumstances, which appear to have been mostly Swalling's own responsibility. However, surface problems that appeared on the Original Wharf on October 5, 2001, were unquestionably not Swalling's responsibility. (See attached **Exhibit 16,** Coffman Daily Report dated Oct 5, 2001). On that date, Jerry Hardenbergh, Brechan's superintendent and quality assurance (QA) representative, reported that his surface preparation inspection revealed a substantial amount of seal welding required before coating. Id. By the time Swalling had commenced work on the Original Wharf it had already exceeded the 100 foot seal welding limit included in the specifications. All additional seal welding would entitle Swalling to additional compensation. The situation then worsened when on October 9, 2001 Mr. Hardenbergh reported the appearance of numerous holidays and extensive surface imperfections in the vicinity of welds following the application of coatings. (See attached **Exhibit 17**, Coffman Daily Report dated October 9, 2001).

10.    Mr. Hardenbergh determined that the problems with holidays were not attributed to temperatures or humidity, but to defective welds that were causing problems due their rough and irregular surfaces that are difficult to coat. Id. In his October 10, 2001 email to Paul Rendon, Jerry Hardenbergh mentioned that Swalling was grinding welds, but holidays still

came through. (See attached **Exhibit 18**, email exchange between Rendon and Hardenbergh dated October 10, 2001). He also said Swalling was to be researching the use of epoxy coating to cover weld areas like a stripe coat. Id. On October 17, Mr. Hardenbergh's daily reports indicated that Swalling was testing the performance of a caulk on its work at Bents 4 and 5 before it suspended work for the winter. (See attached **Exhibit 19**, Coffman Daily Report Addendum dated October 17, 2001). On October 23, 2001, Mr. Hardenbergh's daily report indicated that after grinding and welding surface preparation at Bents 4 and 5 all weld joints were caulked with a product referred to as SPC SP-2888 RG, "Coating all welds will hopefully reduce the number of holidays after final coating is applied." (See attached **Exhibit 20**, Coffman Daily Report dated October 23, 2001). However, the following day, October 24, 2001, Mr. Hardenbergh's report stated that "holiday detection testing performed on Bent 4 and 5 Elevation 119-113 test results indicated 22 total holidays." (See attached **Exhibit 21**, Coffman Daily Report and Report Addendum dated October 24, 2001)**.** Holidays on Bent 1 were repaired by caulking with SPC SP-2888 RG. Once again the following day, October 25, 2001, Mr. Hardenbergh's report indicated that holiday detection testing was performed on Bent 1 elevation 119-113 where thereafter, holidays on Bent 1 were again repaired by caulking with SPC SP-2888 RG. (See attached **Exhibit 22**, Coffman Daily Report dated October 25, 2001). The day before in a telephone conversation with representatives of Brechan, CEI, USCG, and Swalling, it was learned that the caulking was not performing as expected. (See attached **Exhibit 23**, Holmstrom handwritten notes dated October 24, 2001). In the course of that conversation, the idea was apparently first discussed of proposing 3 different options for addressing the holiday problems arising out of the defective and omitted welds. Matt Holmstrom's notes indicate that it would cost an additional $500,000 to perform the additional

prep work required to comply with an intermediate level of a holiday-free standard of the contract given the presence of the weld defects. Id.

11.     On October 30, 2001, Mr. Hardenbergh wrote a memorandum to Scott Bonney with FDCC. In that memorandum, Mr. Hardenbergh states the following:

> The amount of poor welding and lack of consideration for corrosion engineering design has resulted in an enormous amount of surface preparation. The only areas not passing the holiday testing are the welded areas splice plate locations in the upper elevations. The contractor has ... spent an excessive amount of time trying to obtain a holiday-free coating at the H-piles splice locations. ... Coffman has developed three options for the Coast Guard to choose from considering it's their structure and money involved. Option 1: Extensive surface preparation and stripe coating to achieve no coating holidays. Very expensive option. Estimated $500,000 to complete the wharf. Option 2: Moderate surface preparation to result in a minimum level of holidays to remain. This would require establishing an acceptance criterion. Option 3: No additional manpower equipment or time resulting in a large number of holidays.

See attached **Exhibit 24,** Coffman memorandum to Scott Bonney of FDCC dated October 30, 2001). Afterwards he added, "Most bridge and docks are not holiday-free. We recommend Option 2 which will still realize a 25-year life." Id. Though Brechan and the USCG were each provided with a copy of this memorandum, Swalling was not. On November 2, 2001, Swalling submitted a change order proposal or bill to Brechan of $37,383.50 for H-pile weld repair on Bents 1-5 (consisting of only 20 piles). (See attached **Exhibit 25**, letter from Swalling to Brechan dated November 2, 2001). This reflected an average cost per pile of over $1,000 in additional expense to deal with the cutting and grinding required to attempt a holiday-free coating. Id. *Three days later* on November 5, 2001, Hardenbergh prepared a second version of his October 30, 2001 memo to Scott Bonney regarding the weld defects. In the second version, the wording had changed. The original version under Option 1 stated that extensive surface preparation and stripe coating of welds, which was estimated to cost $500,000 to complete the remainder of the wharf, would achieve "no coating holidays." In the revised version marked

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

"Not For Distribution," the Option 1 work would result in only a "virtually holiday-free coating" (See attached **Exhibit 26**, Coffman November 5, 2001 Memorandum and Daily Report). (emphasis added).

12.     In the original October 30 memorandum, Option 2 was described as requiring, "additional manpower and equipment and a little extra time for moderate surface preparation [that] would result in a minimal level of holidays to remain." No acceptance criteria for the minimal level of holidays was defined, however. In the November 5 version of that report, an "acceptance criterion" was actually provided. It reads as follows, "The modified coating acceptance criteria are only applicable between pile Elevations 119 feet and 116 feet. The acceptance criteria will be 2 or fewer holidays per linear foot of weld; size not to exceed $1/8^{th}$ inch diameter per holiday and cumulative length not to exceed ½ inch per foot of weld. In case of conflict or questions in regard to acceptance of coating system, the ultimate determination of number and size of holidays will be determined by the US Coast QA on-site representative [Hardenbergh]." The November 5 version concludes with a recommendation section in which Coffman recommends Option 2 be used. Coffman's recommendation is based upon four considerations that it identifies, among which are the following: "The allowable holidays will be restricted to the atmospheric zone of the H-pile (lower corrosion rates than in the splash and submerged zones). Most of the defects will result in "cosmetic" corrosion staining in the areas of the defect. Eventually an increase in the number and size of the holidays will be expected." The recommendation section of the original October 30 memorandum stated at #4, "Similar applications. Most bridges and dock coating systems are not 100% holiday-free. Typically a holiday free coating is required for immersion and not for atmospheric application." Recommendation #4 from the "Not For Distribution" version of October 30 memorandum

(November 5, 2001) reads, "No coating system is 100% holiday-free. By nature, bridges and docks are difficult to coat. The structural integrity of the asset typically has more significance than a few cosmetic blemishes."

13.     On November 5, 2001, Swalling Construction submitted a revised estimate for the cost of additional surface preparation to be performed at Bents 6-15. That revised estimate came to an additional cost of $261,254. (See attached **Exhibit 27**, letter from Swalling to Brechan dated November 5, 2001 with attachments). Swalling's proposal rejected the acceptance criteria proposed by Jerry Hardenbergh of Coffman in successive emails dated October 30, 2001 and November 3, 2001. (See attached **Exhibit 28**, email exchanged between Coffman and Swalling dated October 30 and November 3, 2001). Swalling's November 5th proposal was based on allowing "twelve each pin-hole type holidays in the coatings around the welds per H-pile from Elevation 119-116. (See **Exhibit 27**). These criteria would allow up to twelve holidays, even if they were within a "1 l.f. area." Id. In addition, Swalling's price had further significant express limitations which included restricting any welding repair to 20 linear feet per cell, restricting grinding to a maximum of 20 man-hours per cell [a "cell" was two bents and the bracing between them], restricting caulking to a maximum 8 man-hours per cell. Id. Furthermore, Swalling's proposal did not include "any contract time for interference with [its] original work or rework of areas due to holidays caused by weld or grinding defects". Id. It excluded the cost of any "re-prep and re-spray." Id. And stated that the cost of materials, notably additional paint, were only estimates and that Brechan as a result would be required to pay the actual cost of whatever coating overruns were experienced. Id. Between Nov. 5, 2001 and Nov. 13, 2001 Swalling's proposals were commented on by Brechan and CEI. This culminated in a meeting between Brechan, CEI and Swalling at CEI's office in Anchorage.

(See attached **Exhibit 29**, November 13, 2201 Project Meeting Agenda and Summary). On December 21, 2001, Swalling submitted to Brechan finalized changed condition costs for Option 1 and Option 2 of Phase I. (See attached **Exhibit 30**, letter from Swalling to Brechan dated December 21, 2001). This pricing represented a $227,542 loss exposure for the balance of the Option 1 work and $128, 835 loss exposure for Option 2 on the balance of the Phase I contract. Id. These prices were for 87 H-piles on the Original Cargo Wharf. Id.

14.    On December 27, 2001, the FDCC Contracting Officer for the project, Anita Repanich, sent an email to Matt Holmstrom again referring to Brechan's $156,000 buyout losses for which Brechan had requested additional compensation, albeit informally, from FDCC in a letter in which Ms. Repanich emphasized the importance of protecting the "relationship" between FDCC's Alpha Team and Brechan. She offered the comment regarding whether she would approve payment of the $100,000 buyout loss as follows, "I guess we could stick you with it." (See attached **Exhibit 31**, email exchange between Repanich and Holmstrom dated December 21 and 27, 2001). "If the second half doesn't come through, it would be in my opinion that we need to square that $100,000 away with you." Id.

15.    On December 31, 2001, Matt Holmstrom wrote to Swalling claiming, falsely, that Swalling was overpaid on the project. Holmstrom created this rationale by evaluating Swalling's payment for the work performed on the combined unit prices for Phase I and II, rather than using the actual subcontract price with Swalling for Phase I. (See attached **Exhibit 32**, letter from Brechan to Swalling).

16.    On January 3, 2002, Dan Steers of Coffman stated that Swalling's December 21st proposal was fair and reasonable, if Swalling were to agree with four modifications that he proposed. (See attached **Exhibit 33**, email exchanges between Holmstrom and Stears darted

January 2-4, 2002, with attached letter dated January 4, 2002). Those modifications included a requirement that the manufacturer guarantee the compatibility of the caulking and coating system and the replacement of a statement that "no holidays (pinholes) at connections will be repaired" be changed to read "holidays (coating defects) at the connections will typically not be repaired. However, visible holidays (visible bare metal areas) at the connections will be prepared." Id. at p 5 of 6. Twelve days later in an email from Holmstrom to Stears and Hardenberg, Holmstrom states that FDCC's project manager is frustrated and concerned that Brechan hasn't made more progress on the additional H pile preparation. (See attached **Exhibit 343**, email exchange between Holmstrom, Stears, and Hardenbergh dated January 16, 2001).

17.    During the week of January 25, 2002, the FDCC's Alpha Team agreed to schedule a meeting in Anchorage sometime the week of February 4, 2002 in which it would negotiate with Brechan for the resolution of the weld defect problem. (See attached **Exhibit 35**, email from Rendon to Repanich, Locker, and Holmstrom). On February 1, 2002, in an email to Matt Holmstrom, Anita Repanich reported that she had received a telephone call from Andy Romine of Swalling where Swalling was complaining that it was being required to bankroll the project; She also reported to Holmstrom that Swalling felt that, "you're not passing his concerns to the CG {yada, yada, yada...}". I'll give him the information ... but not today ... sometime soon." Her disparagement of the coatings subcontractor was followed-by a conspiratorial discussion of how to proceed on Phase II: "We should get together with CEI and decide how to proceed with Phase II. New coating, new Swalling? Those costs from SCCI this morning make that decision real easy. Should maybe de-scope your work on the current task to align with your subcontract to Swalling." (Emphasis added). "We'll probably need to de-scope the work, not

the dollars." (Emphasis added). "Whatever we decide, you are not going to be left out there for that $100,000K and our decision/negotiations need to keep you out of court with Coffman." "Sounds like Anchorage next week." (Emphasis added). (See attached **Exhibit 36**, email from Repanich to Holmstrom dated February 1, 2002).

18.    The only interpretation that can be drawn from this February 1st email from FDCC's Contracting Officer, Ms. Repanich is that she was proposing three possible resolutions to the problem: 1) obtaining a substitute coating for SPC's product, 2) replacing Swalling as the subcontractor, and 3) doing nothing to assist Brechan which would leave them with either accepting a huge financial loss or suing CEI to pass off the losses to them. Of these, the only alternative she seems to reject is the one that would leave Brechan to litigate with CEI. Notably, she fails to explain how replacing Swalling, a contactor who has already mobilized to the site and benefited from the learning curve, would result in a cost savings to the government or Brechan – unless of course the new contractor was kept in dark about the existing conditions on the original Cargo Wharf.

19.    On February 5th, just four days later, Brechan received some costly news. Paul Rendon reported to them in an email that upper management at the FDCC (namely the Captain and Martin Boivin, the FDCC Executive Director) had rejected the Alpha Team's idea of paying Brechan for the additional surface preparation because they felt that Brechan was responsible for the design and any deficiencies of the design as a design-build contractor. In subsequent statements that can only be described as astonishing, Mr. Rendon then proceeds to inform Holmstrom that he and the other two members of his Alpha Team, Steven Locher (project engineer) and Anita Repanich considered themselves to be "in this together" with Brechan and "now with all that said/ written, I still feel that we" '(you and me and Anita and

whoever else) are in this together and have to figure out what to do." He then sets forth a series of options for Brechan to consider that include firing Swalling for allegedly defective performance and using the unpaid balance of Swalling's contract price to pay "this 'new' guy" Rendon's next conspiratorial proposal is to "de-scope" Swalling's subcontract. Rendon proposes to manipulate the square footages and dollars within the Brechan/Coast Guard contract, thereby de-scoping Swalling's subcontract while giving Brechan $145,000 to fix its "buy-out" problem. Further, Rendon's states "Coffman is liable since they wrote the spec for 100 lf of seal welding ... Design-Build contract puts all the risks on the designers and construction contractors, we should not have to pay for Coffman's... lack of upfront site investigations..." Lastly, Rendon states "one caveat Matt,... whatever we decide to do, Marty did agree to settle with you later, whether it be on another task order or something else." In the end, Rendon made it clear to Brechan that FDCC would not be in attendance at a February 8, 2002 meeting between Brechan, Coffman, and Swalling. (See attached **Exhibit 37**, February 5, 2002 email from Rendon to Holmstrom).

20.    On February 6, 2002 Holmstrom notified Stears of "late breaking news... the Coast Guard will not be attending our meeting. They are taking the position that it is our responsibility as the design/build team to figure this out." (See attached **Exhibit 38**, email exchange between Holmstrom and Stears). This correspondence shows that upper management at FDCC is not going to simply give Brechan money for its buy-out problem. Between Feb. 6 and Feb. 7, Matt Holmstrom wrote several notes to himself sorting out ways to fix the weld problem and saddle Swalling with the costs. (See attached **Exhibit 39,** Holmstrom handwritten notes dated February 5-7, 2002). On February 8, 2002 a meeting was held in Coffman's office in Anchorage. Those in attendance included Brechan, CEI and Swalling.

> The meeting opened with a problem statement by Dan Stears. Stears stated that the quality of the welding on the cargo dock and the amount of unwelded adjacent surfaces amounted to a change in conditions. The conditions was not detectable by normal inspection, and was not a condition you would normally expect. The rough existing welds and the voids between adjacent pieces of metal will call pinholes in the finish of the protective coating."

(See attached **Exhibit 40**, February 8, 2002 meeting minutes). The quote of Dan Stears unequivocally demonstrates that the rough existing welds and voids between adjacent pieces of metal cause pinholes in the coating <u>and</u> that CEI and Brechan knew it.      Mike Martin (president), Bill Oliver (vice-president), and Matt Holmstrom (project-manager), were all present for Brechan.    Harold L. Hollis (vice-president and general manager), Dan Stears (Cathodic Protection Specialist), and Jerry Hardenbergh (Quality Assurance Specialist), were present for CEI. <u>Id.</u>

21.     Brechan and CEI <u>cannot deny</u> they had this knowledge.  Jerry Hardenbergh does, however, claim that all of the weld defects that created the holidays Swalling encountered disappeared by bent 12. **This is a lie and can be proved to be so**.  (See attached **Exhibit 41** (Coffman Daily Reports with photo examples of defective and omitted welds from Phase I), **Exhibit  42** (Coffman photo examples of defective and omitted welds on Phase I – obtained through discovery from USCG <u>only</u>), **Exhibit 43** (Coffman photos of "last year's [2002] coating problems – obtained through discovery), and **Exhibit 44** (Coffman photos of defective and omitted welds on Phase II - obtained through discovery from USCG <u>only</u>).

22.     In response to the February 8, 2002 meeting, Swalling prepared a revised pricing proposal for the changed conditions.   In a February 12, 2002 proposal, Swalling clearly describes the increased quantity of seal welds and the poor quality of the existing welds. Based on the discussion from the February 8 meeting, Swalling described the proposed scope of the structural steel repairs.  The proposal states that surface imperfections will be caulked and that

"bare spots will be determined by visual examination... no testing or repairs will be made for pinhole-type defects." In the end, Swalling requested an additional $313, 639 to perform the additional work required on Phase II, which at that time included only bents 16-33. This additional cost assumed repair criteria that <u>eliminated</u> holiday testing in weld and caulk areas. (See attached **Exhibit 45**, letter from Swalling to Brechan dated February 12, 2002).

23.    On February 25, 2002 Anita Repanich of FDCC wrote a letter to Brechan. In her letter, she told Brechan that since the contract was a Design-Build contract, Brechan had the responsibility and bore the risks of completion. She identified the slow progress of Swalling and the miscalculations of CEI as areas of concern to FDCC. Furthermore, she pointed out a previous government report that identified the seal welding and defective weld problems being claimed as differing site conditions by Brechan, CEI and Swalling, should have been identified and addressed by CEI in its drawings and specifications. Repanich told Brechan that FDCC would <u>not</u> authorize an increase in funding above the $712,000.00 already contracted for with Brechan for the coating work even though Brechan awarded the contract to Swalling for $850,000. She demanded a proposal to correct the problems <u>at no additional cost to the government</u>. She clearly stated FDCC would not increase funding to fix Brechan's buy-out problem: "This discrepancy in contract funds needs to be resolved between Brechan and Swalling Construction." (See attached **Exhibit 46**, Repanich letter to Brechan dated February 25, 2002, with enclosure 3).

24.    In a bold deception of their upper management in the letter, Rendon and Repanich manipulated the scope of work in enclosure 3 of the Feb. 25 letter, thereby de-scoping Brechan's contract with the USCG from 17,800 square feet of coating to 15,500 square feet of coating with no consideration to the government. (See **Exhibit 47**, Enclosure 3). This de-

scoping allowed Brechan to obtain a $145,000 credit, on March 13, 2002, from Swalling. This was a financial benefit that the February 25 Repanich letter itself categorically refused to provide.

25.     On February 27, 2002, Dan Stears drafted a memorandum which provided three options for remedying defective and omitted welds on the Original Cargo Wharf. (See attached **Exhibit 46**, Dan Stears memorandum dated February 27, 2002).

26.     Though, over time, Coffman proposed a variety of different forms of its Options 1, 2, and 3, none of the variants was adopted -- by anyone. Swalling countered with its own proposal for responding to defective and omitted welds; Swalling's proposal involved (1) caulking all defective and omitted welds, (2) prohibiting high voltage testing of the areas caulked, and (3) then repairing only pinholes that were visible after the spray coating was applied. Brechan signed a subcontract modification with Swalling on this basis and Swalling's Mike Anderson has testified that this was how Swalling completed its work. Irrespective of Jerry Hardenbergh's statements or (more accurately) suggestions to the contrary, Jerry Hardenbergh ultimately discontinued use of High Voltage Holiday testing of welded areas as a basis for rejecting coatings applied by Swalling. Jerry Hardenbergh has never testified to the contrary. Nor Has Jerry Hardenbergh ever testified that the welds in Phase II were "good" welds (i.e., welds that were sufficiently improved so as not to generate holidays, as had occurred repeatedly during Swalling's work.) The most he has ever said is that the welds in Phase II were "significantly improved" over the Phase 1 welds. (One could say that Benito Mussolini was a "significant improvement" over Adolph Hitler, but that doesn't make Mussolini "good".) Jerry Hardenbergh repeatedly employs a deliberate formula of evasion and misinformation in this manner, wrongly believing that he is not perpetrating

misrepresentation to this court as long as what he says is literally correct – even though grossly and deliberately misleading. His practice is evident in his deposition testimony, his sworn declarations, and most evidently of all in his QA report dated June 5, 2002, (See Exhibit 48) in which he claims that Swalling's home office was "confused" over the acceptance standard to be used on the completion of Phase I, but that everyone in the field is in agreement and has been using the same standard from the resumption of work in 2002. Note, that Hardenbergh never identifies what standard the personnel in the field are in agreement on!

27.    The Coast Guard did not accept any of Coffman's variations of Options 1, 2 and 3, either. Brechan proposed to FDCC using a version of Coffman's Option 2 – as *substantially* modified by the counter-proposal of Swalling. FDCC rejected BEI's proposal – *after BEI had already accepted Swalling's proposal on this basis* – and instead imposed terms that FDCC had written itself. These terms were agreed to in Mod. 0005 to Brechan's Task Order No. 0007 with the Coast Guard. The Mod. 0005 terms required welding of all structural steel – not caulking – and required high voltage holiday testing in accordance with the original specifications, irrespective of whether some aspects of the work would not be warranted. (Hardenbergh admits that he [wrongfully] did not perform the required high voltage holiday testing of caulked areas non-structural steel)

28.    Also on March 7, 2002, Martin Boivin, the Executive Director of FDCC, expressed his concern to Paul Rendon over the proposed change in "surface preparation" methods. He stated, "If what you and Matt say is what they intend, then two things must happen … We must have a deeper discussion on responsibility for the change and must understand this caulking system is going to last for 25 years." (See attached **Exhibit 48**, email

from Boivin to Rendon dated March 7, 2002). When Boivin speaks of "responsibility," he is referring to the fact that this is a "Design-Build" issue and Brechan is responsible.

29. On March 13, 2002, Brechan executed modification 1 to its subcontract with Swalling Construction, whereby Brechan reduced Swalling's scope of work on the Original Wharf from 12,800 square feet to 8,100 square feet and relieved Swalling of any responsibility for fixing or repairing holidays at weld locations. Swalling was not required to provide a holiday-free coating on the Original Cargo Wharf portion of the project under the terms of Modification 1 to the Brechan/Swalling contract. In exchange for this de-scoping Swalling gave Brechan a credit of $145,298. (See attached **Exhibit 49**, March 13, 2002 Modification 1 to Brechan/Swalling subcontract). None of this money was given back to the USCG by Brechan.

30. Also on March 13, Repanich of FDCC sent Matt Holmstrom an email. She stated, "Marty [Boivin] says if he doesn't get option 1 for $70 to $90K, then 'we need to further discuss responsibility with Brechan.'" (See attached **Exhibit 50**, email exchange between Repanich and Holmstrom dated March 12 & 13, 2002). The email exchange between Repanich and Holmstrom clearly demonstrates that they were conspiring to deceive her superiors at FDCC. (This exchange was not produced to Absolute by Brechan until after Absolute had already deposed all the USCG personnel). It is one of many key documents produced by Brechan only after we were successful in compelling the USCG to provide documents and depositions.

31. On March 15, 2002, Brechan responded to Repanich's February 25, 2002 letter. In its response, Brechan requests $90,000 for additional surface preparation costs in accordance with Option 2 of CEI's memorandum. (See attached **Exhibit 51**, Brechan letter to FDCC dated

March 15, 2002). Brechan received its own Modification # 5 from FDCC in the amount of $90,000 on April 25, 2002. The modification eliminated the requirement for seal welding, of non-structural steel, and replaced it with caulking and stripe coating, but did not eliminate the requirement for high voltage holiday testing of <u>all</u> coating surfaces. (See attached **Exhibit 52**, Modification #5 to Brechan/FDCC contract).

32.     On March 18, 2002, Andy Romine of Swalling sent Bill Oliver of Brechan a letter regarding Swalling's Phase I completion work for 2002. He states,

> This schedule is based on the reduced scope of work (15,500 SF/Bent 12) and the use of caulking to repair welds and seal metal-to-metal connections not welded. It is our understanding that the inspection criteria for these caulking repairs will be visual inspection for bare spots only and <u>no pinhole holiday detection or repairs will be done</u> at these areas.

(See attached **Exhibit 53**, letter from Swalling to Brechan dated March 18, 2002). (emphasis added).

33.     On March 28, 2002, Matt Holmstrom asked Dan Stears and Jerry Hardenbergh of CEI to estimate the amount of seal welding of structural members that would be required during the 2002 work period. Stears responded to Holmstrom: "As we have discussed before, until you blast the surface and can see what is under the existing coating and corrosion products, it is difficult to determine the amount of structural seal welding that would be required. I personally do not feel comfortable with guessing the amount." (See attached **Exhibit 53,** email exchange between Holmstrom, Stears, and Hardenbergh dated March 28, 2002).

34.     On April 1 and 2, Repanich and Rendon of FDCC exchanged emails with Matt Holmstrom of Brechan. The subject of these emails was advice to Brechan on how to win the upcoming 5 year 50 million dollar JOC contract. At a minimum, Repanich and Rendon coached Holmstrom how to beat the competition. Repanich specifically mentions Brechan's

coefficient of 1.05 and how suspect its competitors were about the figure. (See attached **Exhibit 55,** email exchange between Repanich, Rendon, Holmstrom). These documents were also produced <u>only</u> after Absolute had fought to get documents and depositions of FDCC employees, including Repanich.

35.    On April 3, 2002, Bill Oliver of Brechan issued a notice to proceed to Swalling utilizing the revised procedures and inspection criteria. He stated, "FDCC has accepted our proposal which was based on the agreement Swalling and Brechan came to on March 12, 2002." (See attached **Exhibit 56**, letter from Brechan to Swalling dated April 3, 2002).

36.    On April 23, 2003, Repanich sent Holmstrom an email:

> Matt, good news! Got the approval/money for the $90K cargo wharf Mod this morning. I'll process it today and send to you for signature. Although <u>you probably won't agree with me</u>... I'm glad we had this project under the JOC. It was <u>really messy</u> from our end, <u>still not sure it should have been fixed price</u>. If this had been a low bid out there, <u>we would be so deep into a claim situation...For much more than $90K</u>... Thanks Anita.

(See attached **Exhibit 57**, email from Repanich to Holmstrom dated April 23, 2002) **.** (emphasis added). This document was also not produced until we deposed Repanich.

37.    On May 28, 2002, Jerry Hardenberg (CEI) sent Holmstrom (Brechan) an email. He stated, "Matt, we have a serious conflict between the contract that is between Brechan and the USCG and what Swalling agreed to with Brechan. It is in regards to stripe coating welds. Call me when you have time for me to come by and discuss." (See attached **Exhibit 58**, email exchange between Hardenbergh and Holmstrom dated May 28, 2002). At this time, Swalling had begun work on May 1 of 2002 to complete its Phase 1 work on bents 1-12 of the Original Cargo Wharf. Its scheduled completion was June 15, 2002.

38.    On May 31, 2002 Andy Romine of Swalling sent a letter to Bill Oliver of Brechan stating,

There has been some discussion on site as to the quality control criteria for the metal-to-metal and weld areas that we are caulking on the cargo wharf. The inspection criteria agreed to by Brechan and Swalling at the meeting of March 12, 2002 is all caulking repairs will be visually inspected for bare spots only and no pinhole holiday detection or repairs will be done at the caulked areas. We are proceeding with the work under those terms and conditions. If you have any questions please contact me or Mike Anderson on site.

(See attached **Exhibit 59**, letter from Swalling to Brechan dated May 31, 2002). On May 30, 2002, Holmstrom misrepresents to Andy Brown, the new FDCC project manager, the contents of Jerry Hardenberg's May 28, 2002 concerns by not addressing the subject of holiday testing. (See attached **Exhibit 60**, email exchange between Holmstrom and Brown dated May 30, 2002). On June 3, 2002, Holmstrom writes himself a note of a telephone conversation with Swalling stating there is "no agreement" on testing flat surfaces. (See attached **Exhibit 61**, Holmstrom handwritten notes dated June 3, 2002). This confirms that there was an agreement for no holiday testing of weld areas – a fact concealed from FDCC.

39.    In CEI's June 5, 2002 Daily Summary Report, Jerry Hardenberg wrote:

Meeting between Matt Holmstrom, Grant DeLine, Jerry Hardenberg and Mike Anderson to discuss what appears to be some confusion with Swalling's office in Anchorage regarding the quality criteria on this project, reference letter date 31 May 2002 from Swalling Construction. All of the on-site construction management personnel are in agreement with the quality control criteria for the modified scope and have been working with this criteria since the beginning of this years construction season.

(See attached **Exhibit 62**, Coffman Daily Report dated June 5, 2002). This confirms that there was some controversy over holiday inspections of the weld areas. In this same report of June 5, 2002, holidays still need to be fixed on bents 1-2 and 8-11. Id.

40.    In characteristically Hardenberghian wording though, there is no identification of what or whose procedures were agreed upon. What is known though is that by June 14, 2002 all of Swalling's coatings work was accepted as complete through bent 12 and in accordance

with the project specifications - an inexplicable feet. There were no outstanding items left on the Original Cargo Wharf. (See attached **Exhibit 63**, Coffman Daily Report dated June 14, 2002). Swalling was miraculously able to fix every coating holiday on bents 1-12 of the Original Wharf, which represents 56 piles, in 9 days, from June 5 to June 14, when they hadn't been able to get the previous 8 piles in bents 1 & 2 holiday-free since October 5th of the previous year.

41.    On July 18, 2002, Brechan was in fact awarded the new 5 year 50 million dollar JOC contract, which included a 12% coefficient [mark-up] this time. (See attached **Exhibit 63**, excerpts from Brechan/FDCC contract July 18, 2002).

42.    In September of 2002, Brechan solicited Absolute to provide pricing to coat the remaining work on the Cargo Wharf. On September 17, Holmstrom of Brechan told Jason Peterson of Absolute that Absolute should plan on 24,500 square feet to be coated. (See attached **Exhibit 65**, email exchange between Holmstrom and Peterson dated September 17, 2002). Holmstrom told me, David Olson, around that same time that Absolute had to be under $1,000,000 to perform the balance of the work, otherwise the work would have to go out for bid. Absolute forwarded a proposal to Brechan on October 22, 2002 for $995,850. This worked out to $40.65 per square foot. In its proposal, Absolute excluded all welding related work. (See attached **Exhibit 66**, proposal letter from Absolute to Brechan dated October 22, 2002). The price Absolute proposed was the price we were told to propose by Holmstrom. There was no risk or contingency money in the bid.

43.    On October 23, 2002 Bill Oliver sent a fax to the Brechan job-site trailer mentioning that Brechan paid Swalling roughly $51.60 per square foot on the Phase I coating contract. (See attached **Exhibit 67**, fax from Bill Oliver to Brechan dated October 23, 2002).

44.    On November 26, 2002 a month after Absolute bid was submitted, CEI provided Brechan with a revised specification that incorporated "lessons learned." (See attached **Exhibit 68**, internal Brechan email dated November 26, 2002 and excerpts of revised specifications). Based on those specifications, FDCC issued a proposal package titled "Cargo Wharf Maintenance Phase II Coating SOW [Statement of Work]" dated 11/27/02. (See attached **Exhibit 69**). On November 27, 2002, Jason Peterson of Absolute asked Holmstrom what had changed in the specifications. Holmstrom informed Peterson nothing significant had changed. (See attached **Exhibit 70**, email exchange between Brechan, Coffman, et al. dated November 26 & 27, 2002).

45.    On December 4, 2002, Brechan submitted a cost proposal to FDCC for the Phase II coating work. (See attached **Exhibit 71**). On the second page of Brechan's proposal, Brechan stated that the coating cost for Phase II with markups was $1,249,982 when in fact it should have been $1,115,352. Brechan stole $134,630 from the government by exaggerating what it would be paying Absolute. It effectively put a 25% mark-up on Absolute's number when they were only allowed a 12% mark-up. It was able to get away with this because it had charged the government $51/square foot based on the previous Phase I contract. This is confirmed by Holmstrom's hand-written notes of December 18, 2002, where he estimates Brechan's margin on the whole job at $271,600. (See attached **Exhibit 72**, Holmstrom handwritten notes dated December 18, 2002).

46.    On February 18, 2003, a pre-job conference for the Phase II project took place at CEI's office. Representatives from Brechan, CEI, Absolute, Imperial and Polar Supply (coating sales company) attended. Various topics were discussed. (See attached **Exhibit 73**, February 18, 2003 Pre-Job Conference Agenda). Coffman claims that weld defects problems

that Swalling encountered were discussed at length at this meeting. <u>This is not true</u>. They were not mentioned at all.

47.    Absolute and its subcontractor, Imperial Industrial Coatings, began work on Phase II on April 2, 2003. On April 25, 2003, Jerry Hardenberg of CEI performed an inspection of the Phase I work, and found a great number of areas of rusting and rust leaching, especially over weld areas. He called most of these areas acceptable. (See attached **Exhibit 74**, Coffman Inspection Report dated April 28, 2003). That same day, the FDCC's project manager Andy Brown issued a Warranty Call for unacceptable rusting. The Warrant Call speaks to several unacceptable rusting areas and directed Brechan to fix them. (See attached **Exhibit 75**, Warranty Call issued on April 25, 2003 and signed on June 27, 2003).

48.    On May 1, 2003 George Kontra, Chief of Quality Control for Brechan, made comments on CEI's April inspection report. (See attached **Exhibit 76**, email from Brechan's Chief QC to Brechan's PM dated May 1, 2001 with attached April 28, 2003 Coffman Inspection Report with Kontra's margin notes).

49.    On May 6, 2003, five months after Absolute entered its contract with Brechan to perform the Phase II work and one month after Absolute began work on the project, Jerry Hardenberg of CEI sent an email to Stears of CEI regarding cargo wharf caulking material, stating the caulk might last a year and was better than nothing (See attached **Exhibit 77**, email exchange between Stears, Hardenbergh, and Radcliff dated May 6, 2003).

50.    On June 4, 2003 Jerry Hardenberg replaced his April 2003 Phase I Inspection Report with a different one. (See attached **Exhibit 78**, Coffman Inspection Report dated June 4, 2003). Hardenbergh obviously replaced the original report to cover-up the fact that CEI and

1    Brechan allowed substandard work to occur on Phase I which did not comply with the project

2    specifications.

3        I declare under penalty of perjury that the foregoing is true and correct.

4        EXECUTED this 25th day of August, 2006, at Redmond, Washington.

5

6

7                                        DAVE OLSON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26