IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
an Alaska Corporation,
        Plaintiff,

vs.

FORREST J. MCKINLEY, an individual, d/b/a
"Imperial Industrial Coatings" and EMERCO,
INC., a California Corporation, d/b/a Imperial
Industrial Coatings, BRECHAN ENTERPRISES, INC.,
an Alaska Corporation; and SAFECO INSURANCE
COMPANY OF AMERICA, a Washington Corporation.
        Defendants.
_____/

EMERCO, INC., a California Corporation d/b/a
Imperial Industrial Coatings, and the States
for Use and Benefit of EMERCO, INC.,

        Counterclaimant/Third-Party Claimant,

vs.

ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
an Alaska Corporation, et al.,

        Cross-Defendants/Third-Party Defendants.
_____/

THE UNITED STATES OF AMERICA for the use and benefit
of ABSOLUTE ENVIRONMENTAL SERVICES, INC., an
Alaska Corporation,

        Plaintiff,

vs.

SAFECO INSURANCE COMPANY OF AMERICA, a Washington
Corporation.
        Defendants.
_____/


COPY

EXHIBIT 3
PAGE 1 OF 6

Page 1

### Page 2

```
 1  BRECHAN ENTERTAINMENT, INC., an
    Alaska Corporation,
 2
            Counterclaim Plaintiff,
 3
    vs.
 4
    ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
 5  an Alaska Corporation,
 6          Counterclaim Defendant.
                                              /
 7  BRECHAN ENTERPRISES, INC., an Alaska
    Corporation,
 8
            Third-Party Plaintiff,
 9
    vs.
10
    COFFMAN ENGINEERS, INC., a Washington
11  Corporation,
12          Third-Party Defendant.
                                              /
13  ABSOLUTE ENVIRONMENTAL SERVICES, INC.,
    an Alaska Corporation,
14
            Plaintiff/Cross-Claimant
15
16  vs.
17  COFFMAN ENGINEERS, INC., a Washington
    Corporation,
18
            Third-party Defendant.
19                                            /
20
            DEPOSITION OF DONOVAN RULIEN
21              Pages 1-152 inclusive
                   June 27, 2006
22              Commencing at 9:00 a.m.
                  Anchorage, Alaska
23
24
25
```

### Page 3

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE
 2                   STATE OF ALAKSA
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15        DEPOSITION OF DONOVAN RULIEN,
16  Taken on behalf of Third-party Defendant Coffman
17  Engineers, Inc., pursuant to Notice at the offices of
18  Lane Powell, 301 West Northern Lights Boulevard,
19  Anchorage, Alaska, before Patta K. Johnson, Shorthand
20  Reporter for Alaska Stenotype Reporters and Notary Public
21  In and for the State of Alaska.
22
23
24
25
```

### Page 4

```
 1              A P P E A R A N C E S
 2
 3  LANE POWELL
    By: Peter C. Partnow
 4  310 West Northern Lights
    Suite 301
 5  Anchorage, Alaska 99503
    907-277-9511
 6
    PERKINS COIE
 7  By: Jacob Nist
    1029 West Third Ave
 8  Suite 300
    Anchorage, Alaska 99501
 9  907-279-8561
10  PAUL J. NANGLE & ASSOCIATES
    By: Paul J. Nangle
11  101 Christensen Dr.
    Anchorage, Alaska 99501
12  907-274-8866
13
14
15
16
17
18
19
20
21
22
23
24          Reported By: Patta K. Johnson
25
```

### Page 5

```
 1              I N D E X
 2
 3  EXAMINATION BY:                        PAGE
 4
    Mr. Partnow                           6, 148
 5
    Mr. Nist                                80
 6
 7
 8
 9
10
    EXHIBITS:
11
12  Exhibit 1                               6
13  Exhibit 2                              25
14  Exhibit 3                              36
15  Exhibit 4                              40
16  Exhibit 5                              40
17  Exhibit 6                              67
18  Exhibit 7                              67
19  Exhibit 8                             104
20
21
22
23              EXHIBIT 3
24              PAGE 2 OF 6
25
```

Page 54

1    Q. Do you have any recollection when this
2 conversation occurred?
3    A. Probably when we were getting ready to
4 start the original valuation. I don't know if the
5 bankruptcy was from personal or business; I don't
6 remember that.
7    Q. You just anticipated my question.
8 Mr. Nangle I'm sure would have told you not to do --
9        MR. NANGLE: I'll let you get away with it
10 this time.
11 BY MR. PARTNOW:
12    Q. Next section there is Pratts Private
13 Record Report of several pages?
14    A. Yes.
15    Q. What is that?
16    A. Basically, I was looking at comparable
17 sales of companies that are basically the same size
18 companies like Absolute Environmental. And these are
19 past sales of similar sized companies.
20    Q. And then farther down, we start to get
21 into some of these tax returns, and the most current
22 one that I saw was 2003 for SAD Leasing. I think you
23 said this morning you haven't done the 2005 taxes
24 yet.
25    A. For either SAD Leasing or Absolute.

Page 55

1    Q. Have you done the 2004 returns?
2    A. Yes, we have.
3    Q. And, again, I don't believe we have a copy
4 of that.
5    A. It is not, since I didn't look at that
6 when we were doing the valuation, since we ended on
7 '03.
8    Q. My understanding is there are basically
9 three general approaches that one can use to value a
10 business?
11    A. Yes.
12    Q. And one of those is what is called a net
13 asset value approach?
14    A. That's correct.
15    Q. Do I understand correctly that you felt
16 that was an inappropriate tool to use to value
17 Absolute's SAD Leasing?
18    A. What I looked at was the three approaches.
19 And from those three approaches, I made a
20 determination what I thought would be a better way to
21 do the valuation to use as my final number.
22    Q. Isn't your valuation, do I misunderstand,
23 essentially, capitalization of earnings approach?
24    A. That's correct.
25    Q. And did you reject the net asset value

Page 56

1 approach as being appropriate or reliable for this
2 valuation?
3    A. I looked at that as being really the floor
4 of valuation saying this is probably the low end of
5 it and reviewing all the different valuation
6 processes I went through.
7    Q. What was your basis for concluding that it
8 was the low end?
9    A. Because normally you look at -- the net
10 asset is usually deemed to be the low end. Normally
11 you have to look at is the business going to ongoing.
12 If it's not going to be ongoing, then it's a
13 liquidation value to do and usually the net asset
14 value would be your liquidation or basically your low
15 end of your valuation spectrum.
16        This is probably more of a safe harbor
17 look and see how close you are. Are you under this?
18 If you're under this, then this is incorrect then you
19 need to use the net asset value.
20    Q. On page 22, do I correctly understand that
21 one of the elements that you consider as appropriate
22 to consider in terms of valuing a company is the
23 reliance on key personnel of a small business of this
24 sort?
25    A. Correct.

Page 57

1    Q. And in terms of Absolute that would be
2 Mr. Olson primarily?
3    A. Primarily, Mr. Olson.
4    Q. Your ultimate valuation is based upon, am
5 I correct, is based upon what a rational buyer would
6 pay to a rational seller in order to purchase the
7 business?
8    A. That's correct.
9    Q. And if that were to occur, would the
10 assumption not be that Mr. Olson was no longer
11 involved in business?
12    A. Sometimes, yes.
13    Q. To what extent did you consider a loss of
14 the key person or personnel of Absolute in terms of
15 coming to your conclusion as to the value of the
16 business as of December 31, 2005?
17    A. I was looking at that somebody had to be
18 qualified to purchase the businesses. You and I
19 couldn't go out and buy the business.
20    Q. I don't know about you, but I'll stipulate
21 that for me.
22    A. Yes.
23    Q. So in other words, you were assuming
24 somebody with similar background, training, abilities
25 as Mr. Olson had as being the purchaser?

15 (Pages 54 to 57)

Page 98

 1  and we look at what are the strong points and what
 2  are the weak points of the business. So I came up
 3  with a midrange, if you want to call it that, of 30
 4  percent.
 5      Q. And I think it said in your marketability
 6  discount it can go from 10 percent to 90 percent?
 7      A. I don't remember what I stated in there.
 8      Q. But you're saying 10 percent to 50 percent
 9  is more common in your experience?
10      A. What page is that on?
11      Q. I'm going off memory here.
12      A. It says 10 to 90. I have never had a
13  discount above 50 percent.
14      Q. Okay. How many businesses have you helped
15  people value and sale? Actual sales?
16      A. I have no idea.
17      Q. Okay. Would it be more than 10 less than
18  10?
19      A. Probably more than 10.
20      Q. Less than 20?
21      A. Less than 20, more than ten.
22      Q. Can you give me an idea about what the
23  marketability discount typically was?
24      A. Right. You have to remember on all the
25  sales we worked with, we don't always do a business

Page 99

 1  valuation for them. We work-up a number for them
 2  that we think is a fair number and they usually think
 3  it's worth a lot more. And so we say, for this
 4  reason -- and we give them a range saying, you know,
 5  you can go in with this number, but you have to
 6  understand you're going to want to back down or the
 7  sale may not take place and depending on how it's
 8  sold.
 9      Q. So, typically, when you're advising people
10  as far as the sale of a business you wouldn't give
11  any marketability discount on the front end? This is
12  just the fair number you tell them to start out
13  with --
14      A. Correct.
15      Q. -- and they back down from there?
16      A. They usually come in with a high number
17  and I back them down.
18      Q. You back them down to something that would
19  include the marketability discount?
20      A. Yes.
21      Q. When you tell them to start out and
22  include the marketability discount, what is that
23  discount figure you normally use?
24      A. Again, it will vary based on the positives
25  and negatives of the company. What kind of industry

Page 100

 1  they're in; what kind of employee background they
 2  have; what's the trend in the future look like.
 3      Q. Have you ever done this with a
 4  construction contractor?
 5      A. Not a sale, no.
 6      Q. Looking at negative factors, not enough
 7  cash retained in business, are we looking at what
 8  Absolute was normalized or what Absolute was
 9  actually?
10      A. Actually.
11      Q. Okay. And can you describe why that is
12  important?
13      A. Well, it's important because you want to
14  be properly capitalized and it falls in the place,
15  too, with the debts of the business. If you're not
16  correctly capitalized, you're going to borrow to
17  capitalize your company and that's not ever good.
18      Q. And so if there was more cash in the
19  business, your valuation would have come out higher,
20  you would have put less of a discount in there?
21      A. Probably less of a discount, maybe lower
22  premiums. Because what we are looking at is if there
23  is more cash, there's less debt therefore there's a
24  stronger position.
25      Q. In Exhibit 3 you provided us with some

Page 101

 1  financial statements from Absolute from 1999 to 2003;
 2  is that correct? You don't actually have to go
 3  through each one of them.
 4      A. Yes, that's correct. But it's not the
 5  complete financial. It's not the footnotes, other
 6  than the job schedule.
 7      Q. What information do you prepare for
 8  Absolute Environmental Services that is not in this
 9  2003 -- well, let me just ask you first: Are you the
10  author of this portion here, Absolute Environmental
11  Service, Inc., Financial Statements and Supplementary
12  Information for the Years Ending December 31, 2003
13  and 2002?
14      A. Yes, I am.
15      Q. And you're saying that there's information
16  that you provided to Absolute or you authored some
17  document that is not included in this?
18      A. That's correct.
19      Q. What is that?
20      A. That is the footnotes.
21      Q. What do the footnotes say?
22      A. Basically, the verbiage is discussing and
23  explaining what notes payable are, what their
24  accounting policies are; their accrual basis for
25  accounting purposes; cash basis for tax purposes.

Page 102

1  Things like that that weren't relevant when I was
2  preparing the valuation because I was basing it on
3  the numbers there.
4      Q. I see. Did you prepare something like
5  this for Absolute in 2004?
6      A. No, I did not.
7      Q. Why not?
8      A. They didn't ask for it.
9      Q. Every year they would come back and say we
10 want you to prepare one of these?
11     A. Yes.
12     Q. Why is that?
13     A. Because they needed it for their bonding
14 company.
15     Q. Let's take a break. I feel bad beating up
16 on your witness.
17        (A recess was taken.)
18 BY MR. NIST:
19     Q. You say they needed it for their bonding
20 company, you mean Absolute?
21     A. That's correct.
22     Q. And I take it you didn't prepare one for
23 2005, either?
24     A. No. We haven't done any accounting work
25 for '05, yet.

Page 103

1      Q. Are you familiar with Absolute
2  Environmental Services' current or ongoing projects?
3      A. No. I have no idea.
4      Q. Have you seen their 2004 profit and loss
5  statement?
6      A. Yes, I have seen that.
7        (Exhibit 8 marked for identification.)
8  BY MR. NIST:
9      Q. I want to turn your attention to the last
10 page of Exhibit 8. Are you with me?
11     A. Uh-huh.
12     Q. And it says there was net income of -1.06
13 million dollars, give or take?
14     A. Uh-huh.
15     Q. Have you ever had any discussion with Dave
16 Olson about why there was a million dollar loss in
17 2004?
18     A. I'm sure I have, but I don't remember why.
19     Q. Looking at these spread sheets, can you
20 give me some indication of the problems Absolute was
21 having in 2004?
22     A. No, I can't. Based on this alone, no.
23     Q. Okay. Your report comes up with a figure
24 for valuating Absolute Environmental Services and SAD
25 Leasing of $2.28 million; is that correct?

Page 104

1      A. Yes, it is.
2      Q. Okay. It looks like this question may
3  have been answered, but I want to make sure it's
4  crystal clear. The $2.28 million, if you look at
5  page 33, there is the net asset value method, the
6  capitalization method and the discounted future
7  earnings method; you see that?
8      A. Yes, I do.
9      Q. And I'm wondering whether the $2.28
10 million is some kind of an averaging between the
11 three of those, or is it based off one more than it
12 is the other, or are there some values you just
13 discounted or didn't consider. What is the $2.28
14 million?
15     A. I basically looked at the capitalization
16 earnings method as the best method to value this
17 company.
18     Q. Would my assumption be correct that you
19 took the capitalization earnings method, bumped it up
20 to kind of a round number about $2,500 and that's how
21 you came up with the $2.28 million?
22     A. That's correct.
23     Q. Okay. Let's look at capitalization of
24 earnings method and direct your attention to page 28.
25 Looking at the first paragraph it says: "The

Page 105

1  capitalization of earnings method is suitable for
2  application when a company's recent historical
3  normalized earnings, assuming an anticipated growth
4  rate, are expected to be indicative of the company's
5  future operations and where future returns are
6  expected to grow at a predictable rate." Did I read
7  that right?
8      A. Yes.
9      Q. The historical normalized earnings, that's
10 what we are talking about here on page 28?
11     A. That's correct.
12     Q. And so the historical normalized earnings
13 we'd be looking at would be listed on page 35; is
14 that correct?
15     A. That's correct.
16     Q. So the figures from 1999 to 2003 those
17 swing pretty wildly, don't they?
18     A. A normal contractor, yes.
19     Q. And you think that's typical for most
20 contractors? They have really bad years one year and
21 really good years in future years?
22     A. They could have good years and bad years,
23 yes.
24     Q. There is nothing unexpected in that for
25 contractors?

Page 150

```
 1      A.  No.  I have no recollection other than I
 2  would have stated that I wanted a contractor for
 3  State of Alaska that does asbestos abatement.
 4      Q.  Do you know if it was a single e-mail or
 5  was there an exchange of e-mails?
 6      A.  I don't remember.
 7      Q.  When you normalized the officers' salary
 8  for 2003, you changed that $250,000.  What
 9  consideration, if any, did you give to the fact that
10  Mr. Olson gave himself a $263,000 distribution that
11  year as well?
12      A.  None.
13      Q.  Why not?
14      A.  Because, basically, I thought that should
15  have been salary.  Distribution is not deductible, so
16  it wouldn't have been reflected in the income
17  statement.  I would rather show it as wages, which is
18  a deductible item, so it reduces net income.
19          MR. PARTNOW:  I have nothing further.
20  Thank you.
21          (Proceedings concluded at 3:15 p.m.)
22
23
24
25
```

Page 151

```
 1      WITNESS CERTIFICATE
 2  Case No. 3:03-cv-00199 RB  June 27, 2006
 3          Donovan Rulien
 4  I hereby certify that I have read the foregoing deposition
    and accept it as true and correct, with the following
 5  exceptions:
 6  ═══════════════════════════════════════════════════════
 7  PAGE   LINE    CORRECTION AND REASON
 8  ═══════════════════════════════════════════════════════
 9  _____  _____   _____
10  _____  _____   _____
11  _____  _____   _____
12  _____  _____   _____
13  _____  _____   _____
14  _____  _____   _____
15  _____  _____   _____
16  _____  _____   _____
17  _____  _____   _____
18  _____  _____   _____
19  _____  _____   _____
20  _____
      (Date Read)     (Signature)
21
    Use additional paper to note corrections as needed,
22  and signing each one. (PKJ)
23
24
25
```

Page 152

```
 1      CERTIFICATE
 2      I, the undersigned Notary Public in and for the
 3  State of Alaska, do hereby certify that:
 4      I am not a relative or employee or attorney or
 5  counsel of any of the parties to said action, or a relative
 6  of employee of any such attorney or counsel, and that I am
 7  not financially interested in the said action or the
 8  outcome thereof;
 9      The witness, before examination, was by me duly
10  sworn to testify the truth, the whole truth, and nothing
11  but the truth; and
12      The deposition, as transcribed, is a true
13  record of the testimony given by the witness.
14      IN WITNESS WHEREOF, I have hereunto set my hand
15  and affixed my official seal this 7th day of July, 2006.
16
17
18  _____
19  PATTA K. JOHNSON
    My commission expires
20  07/04/08
21
22
23
24
25
```

39 (Pages 150 to 152)