David Olson                          Deposition                    June 09, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL
SERVICES, INC., an Alaska Corporation

    Plaintiff,

vs.

FORREST J. MCKINLEY, an individual,
d/b/a "Imperial Industrial Coatings" and
EMERCO, INC., a California Corporation,
d/b/a/ Imperial Industrial Coatings, BRECHAN
ENTERPRISES, INC., an Alaska Corporation;
and SAFECO INSURANCE COMPANY OF
AMERICA, a washington Corporation.

    Defendants.



---

EMERCO, INC., a California corporation d/b/a
Imperial Industrial Coatings, and the States for
Use and benefit of EMERCO, INC.,

Counterclaimant/Third-party Claimant,

v.

Absolute Environmental Services
INC., an Alaska corporation, et al.,

Cross-defendants/Third-party Defendants.

---

THE UNITED STATES OF AMERICA for
The use and benefit of ABSOLUTE
ENVIRONMENTAL SERVICES, INC., an
Alaska Corporation,

    Plaintiff,

vs.

SAFECO INSURANCE COMPANY OF
AMERICA, a Washington Corporation.

    Defendants.

---

EXHIBIT __4__
PAGE __1__ OF __7__                          Page 1

David Olson                    Deposition                    June 09, 2006

Page 2

```
 1  _____
    Brechan Enterprises, INC., an Alaska
 2  Corporation,
 3      Counterclaim Plaintiff,
 4  vs.
 5  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., an Alaska Corporation,
 6
        Counterclaim Defendant.
 7  _____
    Brechan Enterprises, INC., an Alaska
 8  corporation,
 9      Third-Party Plaintiff,
10  vs.
11  COFFMAN ENGINEERS, INC,a Washington
    Corporation.
12
        Third-Party Defendant.
13  _____
    Absolute Environmental Services
14  INC., an Alaska Corporation,
15      Plaintiff/Cross-claimant,
16  vs.
17  COFFMAN ENGINEERS INC., a Washington
    Corporation.
18
        Third-Party Defendant.
19  _____
    Case No. A-03-0199CV (RRB)
20
21
22
23
24
25
```

Page 4

```
 1         UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA
 2
    ABSOLUTE ENVIRONMENTAL
 3  SERVICES, INC., an Alaska Corporation
 4      Plaintiff,
 5  vs.
 6  FORREST J. MCKINLEY, an individual,
    d/b/a "Imperial Industrial Coatings" and
 7  EMERCO, INC., a California Corporation,
    d/b/a/ Imperial Industrial Coatings, BRECHAN
 8  ENTERPRISES, INC., an Alaska Corporation;
    and SAFECO INSURANCE COMPANY OF
 9  AMERICA, a washington Corporation.
10      Defendants.
    _____
11  EMERCO, INC., a California corporation d/b/a
    Imperial Industrial Coatings, and the States for
12  Use and benefit of EMERCO, INC.,
13  Counterclaimant/Third-party Claimant,
14  v.
15  Absolute Environmental Services
    INC., an Alaska corporation, et al.,
16
    Cross-defendants/Third-party Defendants.
17  _____
    THE UNITED STATES OF AMERICA for
18  The use and benefit of ABSOLUTE
    ENVIRONMENTAL SERVICES, INC., an
19  Alaska Corporation,
20      Plaintiff,
21  vs.
22  SAFECO INSURANCE COMPANY OF
    AMERICA, a Washington Corporation.
23
        Defendants.
24  _____
25
```

Page 3

```
 1
 2
 3
 4
 5
 6
 7         DEPOSITION OF DAVID OLSON
 8          Pages 1-128, inclusive
 9          Commencing at 9:12 a.m.
10           Friday, June 9, 2006
11            Anchorage, Alaska
12
13
14
15
16
17
18        Alaska Stenotype Reporters
            511 West Ninth Avenue
19         Anchorage, AK 99501-3520
            Serving Alaska Since 1953
20
21
22  Rick D. McWilliams, RPR, Ret.    Telephone 907.276.1680
    Fred M. Getty, RPR, Ret.      Email AkSteno@aol.com
23            Fax 907.276-8016
24
25
```

Page 5

```
 1  _____
    Brechan Enterprises, INC., an Alaska
 2  Corporation,
 3      Counterclaim Plaintiff,
 4  vs.
 5  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., an Alaska Corporation,
 6
        Counterclaim Defendant.
 7  _____
    Brechan Enterprises, INC., an Alaska
 8  corporation,
 9      Third-Party Plaintiff,
10  vs.
11  COFFMAN ENGINEERS, INC,a Washington
    Corporation.
12
        Third-Party Defendant.
13  _____
    Absolute Environmental Services
14  INC., an Alaska Corporation,
15      Plaintiff/Cross-claimant,
16  vs.
17  COFFMAN ENGINEERS INC., a Washington
    Corporation.
18      Third-Party Defendant.
19  Case No. A-03-0199CV (RRB)
20      DEPOSITION OF DAVID OLSON, taken on behalf of the
21  Defendants, pursuant to notice, at the Law Offices of
22  Perkins, Coie, 1029 West Third Avenue, Suite 300
23  Anchorage, Alaska, before Rosie S. Scott, Certified
24  Shorthand Reporter for Alaska Stenotype Reporters and
25  Notary Public for the State of Alaska.
```

2 (Pages 2 to 5)

EXHIBIT 4
PAGE 2 OF 4

Page 18

1  deposition and seeking a protective order. I would ask
2  that you reserve that question until later on so that we
3  can continue on with the deposition.
4       Actually, I'm not instructing the witness not
5  to answer. I'm just advising you that if you insist on
6  an answer to that question right now, I'll adjourn the
7  deposition and file a motion for protective order and
8  fees. I think the better course is to just defer that to
9  the end -- ask those type of questions at the end that we
10 have a problem with, that way you can get through the
11 questions that you --
12      MR. NIST: I understand your objection. And I
13 understand your proposed solution.
14      MR. PARTNOW: If I can interpose here. I would
15 request, Mr. Marston, would you consider his opinion,
16 since you have submitted an expert report from
17 Mr. Rulien, which combines the valuation of Absolute and
18 Sad Leasing for the purposes of the business devastation
19 clause.
20      You brought this into issue. I think that it
21 is entirely appropriate to ask the questions to determine
22 the distinction between the two to try to sort out the
23 expert report that has been filed, and Mr. Nist is
24 entirely within his right. And if there is going to be
25 cost for adjourning this, I think you're looking at them,

Page 19

1  not Brechan.
2       MR. MARSTON: Well, I think that's why we have
3  a judge assigned to this case, rather than having you
4  make those decisions.
5       MR. PARTNOW: I don't make the decisions, and
6  if you continue --
7       MR. MARSTON: I'm sorry, Mr. Partnow -- I am
8  not finished completing my thought. Now, did I interrupt
9  you while you were rendering your opinion? I did not. I
10 would appreciate the same courtesy from you. I don't
11 expect it, but I would appreciate it.
12      And what I was saying is that it might be an
13 appropriate question to ask Mr. Olson, and it would be
14 certainly an appropriate question to ask of Mr. Rulien,
15 but this is a 30(b)(6) deposition of Absolute.
16      MR. PARTNOW: A 30(b)(6) deposition on damages
17 you -- Absolute has brought into this case an allegation
18 of a business devastation, which combines both Absolute
19 and Sad Leasing. And I think I've got a copy of the
20 report if you would like to take a look at it.
21 BY MR. NIST
22   Q.  Well, let's see. Does Absolute and Sad Leasing
23 share any employees?
24   A.  No. The accountant does separate taxes on both
25 of them. I don't know how to answer that. I mean, if

Page 20

1  you could define --
2    Q.  Share employees. Do employees who do work for
3  Absolute Environmental Services, also do work for Sad
4  Leasing?
5    A.  Well, I'm an employee of Absolute Environmental
6  personally, and I've done things for Sad Leasing.
7    Q.  What about Mr. Peterson?
8    A.  No.
9    Q.  Is there anybody else, other than yourself?
10   A.  Not that I can think of right now, no.
11   Q.  Is Sad Leasing asserting a claim in this
12 lawsuit?
13      MR. MARSTON: Objection. Calls for a legal
14 conclusion.
15      THE WITNESS: Yeah, I believe that what I've
16 gone over with Mr. Rulien is included in Mr. Rulien's
17 report. And whatever extent I have a claim from
18 Mr. Rulien's report, and that would be the claim of Sad
19 Leasing.
20 BY MR. NIST:
21   Q.  Has Absolute executed any kind of assignment of
22 a claim to Sad Leasing?
23   A.  Could you define that? Explain it to me.
24   Q.  Is there any agreement that Absolute and Sad
25 Leasing, that Absolute will present a claim on behalf of

Page 21

1  Sad Leasing?
2    A.  I don't know. I can find out.
3    Q.  What would you have to do to find out?
4    A.  I have to look through exhaustive paperwork on
5  the lawsuit, I suppose.
6    Q.  You mentioned Mr. Rulien's report as -- for
7  your business devastation. Has there been any steps to
8  separately value Sad Leasing as a business?
9    A.  Yeah.
10      MR. MARSTON: Objection. Calls for
11 speculation. Lack of foundation.
12      THE WITNESS: I can't recall without looking at
13 the report.
14 BY MR. NIST:
15   Q.  It would be in the expert -- Mr.Rulien's expert
16 report if such valuation did exist?
17   A.  In Mr. -- well, I've retained numerous experts.
18 There may be within Mr. Lembke's report that pertain to
19 it as well. But I would have to look at both reports and
20 refer you to both of them, as I have retained those
21 people for those reports and am satisfied with those
22 reports.
23   Q.  So again, I just want to make sure I'm clear on
24 this: The experts' reports is the only basis of the
25 valuation -- you have to evaluate business -- Absolute

6 (Pages 18 to 21)

EXHIBIT __4__
PAGE __3__ OF __7__

David Olson                     Deposition                     June 09, 2006

Page 22

1  and Sad Leasing?
2      A.  I would say whatever work went into the report
3  would be whatever data is referred to or documents that
4  were provided to prepare said reports, would be germane
5  as well to your question.
6      Q.  Okay.  So Mr. -- am I correct in hearing that
7  you don't have any kind of independent basis for
8  valuating these claims, that you'd have to -- for
9  evaluating the business you would have to defer to
10 Mr. Rulien and whatever work that he did?
11     A.  I said I would have to look at the reports.
12     Q.  Okay.
13     A.  And --
14         MR. MARSTON:  Objection.  Misstates the
15 witness' testimony.
16         THE WITNESS:  I just can't recite back to you
17 the exact documents, sitting here right now, that were
18 used to prepare those reports.  And like I said, I have
19 reviewed those reports and concur with the opinions
20 expressed in those reports.
21 BY MR. NIST:
22     Q.  Have all those documents been produced as part
23 of this litigation?
24         MR. MARSTON:  Objection.  Lack of foundation.
25         THE WITNESS:  I don't know, but I believe so.

Page 23

1  BY MR. NIST:
2      Q.  You've provided them to your attorney?
3          MR. MARSTON:  Objection.  Privileged
4  communication.  What he provides to me and he says is
5  communications to me, would be anything that I asked for,
6  and that invades the attorney/client privilege.  And I'm
7  directing him not to answer that question.  Plus, it's
8  vague.  The documents have not been identified.
9  BY MR. NIST:
10     Q.  Well, that's what we're trying to do here.
11 Back in 2003, how much time did you spend managing
12 Absolute Environmental Services?
13         MR. MARSTON:  That was 2003?
14         MR. NIST:  Yes.
15         THE WITNESS:  My full-time job?
16 BY MR. NIST:
17     Q.  How many hours a week do you think you spent
18 doing that?
19     A.  Managing?
20     Q.  Yeah.
21     A.  Including thinking about it, 70 or 80 hours a
22 week.
23     Q.  What about time in the office?
24         MR. MARSTON:  Does that include on site time,
25 or do you mean literally in the office?  Objection.

Page 24

1  Vague.
2          THE WITNESS:  I was about to ask him.
3  BY MR. NIST:
4      Q.  How much time did you spend, literally, in the
5  office or in Absolute's offices?
6      A.  In Absolute's offices?
7      Q.  In 2003.
8      A.  Do you have a figure?
9      Q.  Do I have a figure?
10     A.  I'm going to say 50 percent -- I mean, I'm just
11 saying over 60 percent or 70, if you can give me
12 something to work with as a baseline.
13     Q.  Baseline, can you give me an approximate number
14 of average hours per week?
15     A.  At the end of 2003 I was in the field quite a
16 bit dealing with this particular project.  I -- so I
17 can't give you an exact amount.  I was in the office for
18 a lot of -- well, when I wasn't in the field I was in the
19 office, is the best way I can answer that.
20         MR. MARSTON:  If you know an answer to the
21 question go ahead and answer it.  If you don't know,
22 don't speculate.
23         THE WITNESS:  I don't know exactly.
24 BY MR. NIST:
25     Q.  Okay.  Would you feel more comfortable breaking

Page 25

1  it down by percentages?
2      A.  Well, I can't recall in 2003 what my percentage
3  would be between the field and office.
4      Q.  All right.  Did Absolute pay you a salary in
5  2003?
6      A.  Yes.
7      Q.  And how much?
8      A.  I don't recall.  I'd have to refer to my W2 for
9  that.
10     Q.  Can you give me a rough order of magnitude?
11     A.  I think you -- I don't know if you have it or
12 not as part of the tax returns.  I don't know without
13 checking, but I can find out.
14     Q.  Approximately, how many hours a week in 2003
15 did you spend attempting to get Absolute work?
16         MR. MARSTON:  In 2003 or from 2003?  I didn't
17 get what you said.
18         MR. NIST:  In 2003.
19         THE WITNESS:  I don't know how to quantify
20 that.
21 BY MR. NIST:
22     Q.  You can't give me any kind of hourly figure?
23     A.  Well, I can't because part of my job is
24 business development, and talking to clients.  If that's
25 included in getting work, yeah, I have no idea.  I have

EXHIBIT  4
PAGE  4  OF  7

David Olson                                    Deposition                                  June 09, 2006

Page 50

1    Q.    And is your lack of memory about the specific
2    amount?
3    A.    Yes.
4    Q.    Okay. So do you remember that there was some
5    shareholder distribution made during 2003?
6    A.    Yes.
7    Q.    Okay. Was that distribution in cash?
8    A.    Yes.
9    Q.    And who did that distribution go to?
10   A.    Given David Olson is the only shareholder it
11   would go to David Olson.
12   Q.    And when Absolute determines how to -- whether
13   to make distributions and how much, how does Absolute go
14   about arriving at that decision?
15   A.    Absolute determines how much cash it has
16   available and it will make a decision to make a
17   distribution to its shareholder.
18   Q.    And is -- who personally is involved in that
19   decision for Absolute?
20   A.    That would be the board of directors, my wife
21   and I.
22   Q.    Was there any concern about cash flow when
23   Absolute made this distribution of $263,216?
24   MR. MARSTON: Objection. Question assumes that
25   it was a single distribution as opposed to multiple.

Page 51

1    THE WITNESS: I don't believe -- I don't
2    believe it was in a lump sum, first of all, but the
3    answer would be no. It wasn't concerned. I mean -- I
4    believe I got the question correct.
5    BY MR. NIST:
6    Q.    Okay. What's the -- you say it wasn't -- it
7    was multiple distributions. Do you know how many?
8    A.    No.
9    Q.    Can you give me an approximate number?
10   A.    No, I can't. I just don't recall issuing a
11   lump sum check for that amount.
12   Q.    Okay. Can you -- do you remember when these
13   distributions were made in 2003?
14   A.    I believe earlier in the year. I believe in
15   the first half of -- let's just say prior to August 1st
16   of 2003.
17   Q.    I want to direct your attention to the next
18   page, Page 6. In 2003 it looks like Absolute
19   Environmental Services incurred $388,407 -- rather as
20   cash payment for purchase of property. Do you see that?
21   A.    Down at the bottom?
22   Q.    Yes.
23   A.    Third line up?
24   Q.    Correct.
25   A.    Cash payments for the purchase of property. I

Page 52

1    see the $388,407, yes.
2    Q.    Do you have any reason to disagree with that
3    number?
4    A.    I don't know that I would. I don't prepare
5    this document, Don Rulien does. So I don't -- at this
6    particular moment I can't think of a reason.
7    Q.    Was cash flow a concern for Absolute
8    Environmental Services when it expended $388,407 to
9    purchase property?
10   A.    To -- would --
11   MR. MARSTON: Object to the form of the
12   question. Cash flow is always a concern for business.
13   Objection. Vague.
14   MR. NIST: Vague. That will work.
15   THE WITNESS: At what point in time? If the
16   expenditure was in the first half of 2003, the question
17   is: Was Absolute concerned? Absolute had quite a bit of
18   cash in 2003. So, no, I wouldn't have been concerned.
19   At the end of 2003 -- well, yeah, I would say Absolute
20   was pretty concerned about cash flow at that particular
21   moment in time. It wouldn't be pretty, it would be
22   very.
23   BY MR. NIST:
24   Q.    I want to direct your attention to the -- some
25   of the last pages here that have the text written

Page 53

1    sideways.
2    MR. PUETT: Do you have an Absolute number?
3    MR. NIST: Bates Number AES 8649.
4    THE WITNESS: I have that page in front of me.
5    BY MR. NIST:
6    Q.    Does Absolute Environmental Services create
7    documents like this, or has Absolute Environmental
8    Services created a document that looks similar to this in
9    2004 and 2005?
10   MR. MARSTON: Itself or its representatives?
11   THE WITNESS: Has Absolute done that?
12   BY MR. NIST:
13   Q.    Yes.
14   A.    Or has Absolute's CPA done it?
15   Q.    Well, has Absolute done it, whether through a
16   CPA or not?
17   A.    Well, in this format right here?
18   Q.    Something that looks substantially similar to
19   that format?
20   A.    No. And I will explain that I didn't have
21   audited -- I elected not to go through the expense to
22   have it set up in this format.
23   Q.    And what is the expense for having it set up in
24   this format?
25   A.    I can't remember how much the CPA charges.

14 (Pages 50 to 53)

EXHIBIT 4
PAGE 5 OF 7

David Olson                              Deposition                              June 09, 2006

Page 54

1  It's in the thousands of dollars. I know that.
2      Q.   Does Absolute Environmental Services create
3  profit and loss statements for its contracts, whether
4  completed or in progress?
5          MR. MARSTON:  Individual contracts?
6          MR. NIST:  Yes.
7          THE WITNESS:  Absolute is in the habit of
8  creating profit and loss statements to a certain degree
9  on projects, yes.
10 BY MR. NIST:
11     Q.   We've requested the profit and loss statements
12 for Absolute Environmental Services services for 2004 and
13 I believe 2005. And your attorney's paralegal indicated
14 that she hasn't seen them yet. Have they been completed?
15     A.   I don't know if they have. I put the request
16 in to the bookkeeper. But you asked -- no.
17         (Exhibit 3 marked.)
18 BY MR. NIST:
19     Q.   Mr. Olson, you've been handed what's been
20 marked as Exhibit 3. Do you recognize this document?
21     A.   I do.
22     Q.   And what is this document?
23     A.   This is an internal profit and loss and balance
24 sheet put together by Absolute's bookkeeper and forwarded
25 to Absolute's counsel so it could be provided to you.

Page 55

1      Q.   And who is Absolute's bookkeeper?
2      A.   Donny Haines.
3      Q.   Okay. I'm going to direct your attention to
4  the last page. Are you with me?
5      A.   I'm at the last page.
6      Q.   And it looks like Absolute Environmental
7  Services had a net loss of $1,060,000 or a little above
8  that; is that correct?
9          MR. MARSTON:  Objection. Document speaks for
10 itself.
11         THE WITNESS:  The net income as shown here is a
12 negative $1,060,402.90.
13 BY MR. NIST:
14     Q.   Do you know if that's true or not?
15         MR. MARSTON:  Objection. Lack of foundation.
16         THE WITNESS:  I would have to get with Donny.
17 I didn't prepare the document.
18 BY MR. NIST:
19     Q.   Do you have any basis to disagree with that
20 number?
21     A.   Sitting here today, I don't have any reason to
22 doubt Donny Haines' numbers.
23     Q.   Which projects was Absolute Environmental
24 Services working on in 2004? List them, if you will.
25     A.   I can't list them. I just can't --

Page 56

1      Q.   Can you list the larger contracts?
2          MR. MARSTON:  Let him finish the answer.
3          THE WITNESS:  I can't remember the projects we
4  did from 2004 without looking at the records.
5  BY MR. NIST:
6      Q.   Can you list any of them?
7          MR. MARSTON:  Objection.
8          THE WITNESS:  No, no, I can't.
9  BY MR. NIST:
10     Q.   You can't list a single project that Absolute
11 Environmental Services worked on in 2004?
12     A.   We did do -- I believe we did a couple of
13 projects for your client. I can't remember how many we
14 did or what the names of them were. I'm pretty sure we
15 did a couple of projects for your client.
16     Q.   What did these projects include?
17         MR. MARSTON:  You mean for your client?
18         THE WITNESS:  I don't know exactly.
19         MR. MARSTON:  Objection. Vague.
20         THE WITNESS:  It wouldn't be hard to get a job
21 list for 2004.
22 BY MR. NIST:
23     Q.   Do you remember whether projects that Absolute
24 Environmental Services worked on in 2004 were profitable
25 or not?

Page 57

1      A.   Without looking at each job I -- were any of
2  them profitable, or any of them, or all of them?
3      Q.   Were any of them profitable?
4      A.   Oh, I'm sure some of them were profitable.
5      Q.   Okay. Do you know which ones?
6      A.   No.
7      Q.   The general description of the work, even if
8  you don't remember the exact contract name?
9      A.   Not sitting here right this minute, no.
10     Q.   Do you remember what problems Absolute
11 Environmental Services encountered in 2004 to attribute
12 to this $1.06 million loss?
13     A.   I just remember a job.
14     Q.   Okay. And what was the job?
15     A.   It was the rest of the cargo pier. Gee, that
16 one, by the way, would answer your question. That one
17 would have contributed handily to the losses in 2004.
18     Q.   And would the amount of Absolute's loss be
19 included in Mr. Lembke's report for 2004?
20     A.   The loss we suffered on the cargo wharf?
21     Q.   Correct.
22     A.   In 2004, would that be in Mr. Lembke's report?
23     Q.   Yes.
24     A.   Oh, yeah.
25     Q.   So other than the cargo wharf project, can you

15 (Pages 54 to 57)

EXHIBIT 4
PAGE 6 OF 7

Page 126

1  anything like that?
2  BY MR. NIST:
3     Q.   I am meaning it in the broadest sense as
4  possible, sir.
5        MR. MARSTON:  Any request for additional
6  compensation arising out of the defective welds?
7        THE WITNESS:  I have no idea.
8        MR. MARSTON:  These are terms of art.
9        MR. NIST:  I don't think I have any further
10 questions.  Peter can take the rest of my time if he
11 needs it.
12       MR. PARTNOW:  Have we used up all the time
13 we're allowed?
14       MR. PUETT:  That's the end of time.
15       (Proceedings concluded at 12:40 p.m.)
16       (Signature reserved.)
17
18
19
20
21
22
23
24
25

Page 127

1           REPORTER'S CERTIFICATE
2        I, ROSIE S. SCOTT, CSR, hereby certify:
3     That I am a Certified Shorthand Reporter
4  for Alaska Stenotype Reporters and Notary Public for the
5  State of Alaska; that the foregoing proceedings were
6  taken by me in computerized machine shorthand and
7  thereafter transcribed by me; that the transcript
8  constitutes a full, true and correct record of said
9  proceedings taken on the date and time indicated therein.
10       Further, that I am a disinterested person to
11 said action.
12       IN WITNESS WHEREOF, I have hereunto
13 subscribed my hand and affixed my official seal this
14 _____ day of _____, 2006.
15
16
17
18
19    _____
      ROSIE S. SCOTT
      Certified Shorthand Reporter
20    My Commission Expires
      8/16/08
21
22
23
24
25

Page 128

1              WITNESS CERTIFICATE
2  Absolute Environmental Services versus Forrest J.
   McKinley, et al., Case No. A03-0199CV (RRB)
3
4  DAVID OLSON        Taken June 9, 2006
5     I hereby certify that I have read the foregoing
   deposition and accept it as true and correct, with the
6  following exceptions:
7  ================================================
8  Page   Line   Description   Reason for Change
9  ================================================
10 ____  ____  _____  _____
11 ____  ____  _____  _____
12 ____  ____  _____  _____
13 ____  ____  _____  _____
14 ____  ____  _____  _____
15 ____  ____  _____  _____
16 ____  ____  _____  _____
17 ____  ____  _____  _____
18 ____  ____  _____  _____
19 ____  ____  _____  _____
20 ____  ____  _____  _____
21 ____  ____  _____  _____
22 ____  ____  _____  _____
23 ____  ____  _____  _____
   (Date read)      (Sign name here)
24
   (Use additional paper to note corrections as needed,
25 dating and signing each one.) (RS)

EXHIBIT  4
PAGE  7  OF  7