

**MKL Associates, LLC**
Construction Consultants

# Findings and Opinion Report

*In the Matter of*

## Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.

**March 21, 2006**

9427 N.E. 138th St. • Kirkland, WA 98034
425-823-6388 • Fax: 425-823-8332
email: mklassc@hotmail.com • www.mklassociates.com



**MKL Associates, LLC**
**Construction Consultants**

**HAND DELIVERED**

March 21, 2006

Terry R. Marston
Marston Heffernan Foreman, PLLC
Anderson Park Building
16880 N.E. 79th Street
Redmond, WA 98052-4424

RE: Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.

SUBJ: **Findings and Opinion Report**

Dear Mr. Marston:

MKL Associates, LLC (MKL) has been retained by Absolute Environmental Services, Inc (AESI) to evaluate the loss exposures and conduct of Brechan Enterprises, Inc. (Brechan) for Phase 1 of *Contract No. DTCG650-01-D-643XX0, Task Order 0007, Perform Design and Construction for Cargo Wharf Maintenance* at the U.S. Coast Guard base at Kodiak, Alaska, and other work as outlined in the attached report.

The attached report contains background information, findings, opinions, and calculations relative to the referenced matter. Included are qualifications for myself, recent depositions and testimony, hourly rates and other pertinent information. I have considerable experience in troubleshooting and evaluation of similar disputes, in the capacity of estimator, project manager, construction executive and consultant.

I look forward to assisting the process of an expedient resolution of the matter for all parties.

Yours Very truly,
**MKL Associates, LLC**

Michael Lembke,
Principal

C
2 of 9

March 21, 2006

**<u>Findings and Opinion Report</u>**

*In the matter of Absolute Environmental Services, Inc. v. Forrest J. McKinley, et al.*

## I. QUALIFICATIONS

I am the principal of MKL Associates, LLC (MKL), a licensed and registered consulting firm base in Kirkland, Washington. I have formal education, training, and practical experience in the construction and management of contracts comparable to the project at issue and with comparable types of problems as those encountered by Brechan on the Cargo Wharf projects..

A Summary of Qualifications is enclose with this report as *Enclosure A*. A listing of other cases for which I have been deposed or testified at trial within the last four years is enclose to this report as *Enclosure B*.

## II. ASSIGNMENT

MKL was been retained by Absolute Environmental Services, Inc. (AESI) to evaluate the knowledge, loss exposure, and contemporaneous conduct of Brechan Enterprises, Inc. (Brechan) during Phase 1 and portions of Phase 2 of the Cargo Wharf Maintenance project at the U.S. Coast Guard base at Kodiak, Alaska (Contract No. DTCG650-01-D-643XX0, Delivery Order No. 0007, Perform Design and Construction for Cargo Wharf Maintenance and Contract No. DTCG650-02-D-643J55, Cargo Pier Recoating, Delivery Order No. 643P92). The division of the Coast Guard administering both contracts was FD&CC-PAC, located in Seattle, Washington. Brechan was the design-build contractor for the project.

MKL was also requested to prepare a quantity survey ("takeoff") for steel to be coated under AESI's contract. Absolute understood that the scope of its subcontract included the coating of the those portions of the Original Cargo Wharf that had not been coated by the preceding contractor. While its contract indicated it was to perform the work from bents 13-33, there was an area of cross bracing between bents 12 and 13 that had not been coated by the preceding contractor. The quantity of steel to be coated by AESI under the Phase 2 (year 2) contract was interpreted to be from bent "12.5" through bent 33 of the Original Cargo Wharf. My quantity survey, or takeoff, established that the actual area to be coated was **31,393 square feet**.



C 1
3 of 9

## III. WORK COMPLETED TO DATE

MKL started work on the project on January 20, 2006. Over the past several months I have investigated the factual history of the project, including a review of all documents contained in a set of documents entitled *Chronologized Key Documents, Key 20001 thru Key 20620, February 2001-August 2004* provided to me by Absolute. (Each of these documents is identified within the collection by a unique identifying number preceded by the letters KEY.") A complete set of these documents is provided in conjunction with this report. The entirety of these documents has been relied upon in forming the opinions and conclusions in this report even though identification of specific documents relied upon for a particular proposition may not in all instances be stated.

## IV. PROJECT BACKGROUND

Brechan and the CG negotiated a contract amount of $1,084,902 on or about February 12, 2001. Reference (Key Document *20003*). Task Order 0007 was issued by the CG on March 20, 2001. Reference *20019*. Brechan hired the design firm of Trick, Nyman, Hayes, which in turn hired Coffman Engineers (CE) as its corrosion consulting engineer. The work under Task Order 7 was to encompass the entire cargo wharf, including all of the wharf extension and the entire original cargo wharf, bents 1 through 33. The CG had made it clear that the budget for construction had a cap of $1,000,000. Reference *20001*. This required that the work be performed over two years, and under two separate contracts to Brechan.

Brechan subsequently solicited subcontractor bids to perform the work, including electrical, concrete, wood, utilities and metal work, as well as recoating the steel wharf structure and appurtenances. Swalling Construction Company, Inc. was selected to do the work, even though two other bidders offered lower pricing. AESI in fact submitted a lower bid, but was an "unknown" and had no "over water experience." Reference *20064*.

2

Swalling and Brechan negotiated a proposed contract price of $1,533,000 for the entire wharf and then entered into a subcontract with Swalling for $850,000 for the first phase, which included the wharf extension and the first 15 bents of the original wharf. Reference *20068* and *20092-20093*. Because Brechan could not assure Swalling that it would receive a contract for the second phase of the work, Swalling insisted on recovering the cost of its purchase of specialized equipment and its mobilization and demobilization expenses within its pricing for the Phase 1 subcontract. The CG had only budgeted $712,000, plus Brechan's 5% markup coefficient, for a total of $747,600, for coatings work in phase 1. Reference 20018-20020. This meant that Brechan had obligated itself to pay Swalling more than it would be paid itself, thus exposing itself to a loss of $102,400 plus it's markup of $35,660, a total loss exposure of $138,000.

Brechan also failed to properly account for the costs of scaffolding for electrical work in its contract price, and thus exposed itself to an additional loss of several thousand dollars. The CG later paid Brechan $25,000 to cover the cost of scaffolding under Modification 0004. Reference *20202-20203* and *20208-20209*. However, these are costs that should have been included in Brechan's bid price to the CG. Worse, the funds were specifically identified to be used to scaffold bents 16-33 to allow electrical work to be performed during phase 1, but this scaffolding was never erected during phase 1. AESI provided the scaffolding for bents 16 through 33 under its contract for Phase 2 (year 2).

Swalling performed work on the pier extension, but immediately ran into problems when it began work on bent 1 of the original cargo wharf. The conditions encountered required excessive amounts of extra preparation and repair work to meet the project specifications for zero holidays, and exceeded by a wide margin the 100 lineal feet of seal welding included in the specifications. Swalling put Brechan on notice and Brechan, Coffman, and CG management teams began to discuss what actions to take. The costs to comply with the specifications were initially estimated to be **$500,000**, or even higher. Brechan was now faced with another potentially ruinous cost overrun to meet its own design-build specifications. Reference *20100; 20122; 20123-20125; 20166-20168;* and *20174-20176*. Brechan's loss exposure for Phase 1, through bent 15 of the original wharf, was now as high as $638,000.

3

Swalling provided estimates to repair bents 1-5 of $55,065 and to repair bents 6 - 15 of $241,254, using a proposed solution *that did not meet the project specifications*. To meet project specifications would cost significantly more. At this point, Brechan's loss exposure was $138,000 for the subcontract shortfall, $55,065 for bent 1-5 repairs, and $241,254 for bent 6-15 repairs, a total of **$434,319**, *without even meeting specifications*. This was nearly *31% of the entire contract amount* through Modification 0004.

Brechan, with the assistance of Coffman Engineers, followed three main paths to reduce Brechan's loss exposure. First, Brechan and Coffman attempted to reduce the specifications' requirements, especially with respect to weld repairs, seal welding, and zero holidays. Second, Brechan and Coffman repeatedly pursued Swalling to revise it's cost estimates for the additional work downward. Third, Brechan decided to reduce the scope of work that Swalling was contracted to perform. The third path appears to have been related to eliminating the gap between Swalling's $850,000 subcontract and the $747,600 payment the CG was going to pay Brechan for this work. That issue had also come to a head when Swalling's billings exceeded the money available from the Coast Guard, resulting in a stoppage of further payment to Swalling. Brechan at first refused to fund a Swalling billing of $57,863 until Swalling demanded payment. Reference *20249-20250*.

Brechan and Coffman continually requested that Swalling provide price estimates for a variety of modifications to the scope and requirements of the work to save the project. On January 30, 2002, Swalling submitted its estimate for Phase 2 weld repairs (again under the reduced specification requirements) of $621,834 – nearly equaling the entire base contract price of $683,000 for its for year 2 work.

At this juncture, BRECHAN's exposure for bents 1-15 alone, the phase 1 work, included the $57,863 payment on hold to Swalling; the $138,000 buyout loss on Swalling's contract; the $17,681 in disputed items with Swalling; the $55,065 repair cost for bents 1-5; at least $128,835 in repairs for bents 6-15; and $21,600 in other cost overruns due to underestimation – a total of

4

6 of 9

**$419,044**. If the Phase 2 repair costs of $621,834 were also considered, <u>Brechan faced a combined loss exposure of $1,040,878.</u>

The Coast Guard was also aware of the funding gap Brechan was dealing with. Reference *20229 and 20248*. The Coast Guard project manager had participated in attempting to devise a solution to Brechan's costs overruns arising out of the effect of defective welds in coating the piling and steel. On February 5, 2002, Brechan's project manager received an e-mail from the Coast Guard's project manager explaining that the Executive Director and Commanding Officer at FD&CC-PAC would not be bailing Brechan out. They would be looking to Brechan "as the design-build contractor" to figure out what to do to keep the project viable and at its own expense. Reference *20264-20265* and *20268*.

Brechan and Coffman continued attempting to cut Brechan's losses through discussions and meetings with Swalling in Anchorage. Reference *20269* and *20272-20273*. The cost for bent 1-5 repairs was reduced to $33,441, but Brechan's Phase 1 risk was still in excess of $313,000 (even without the disputed payment issue). On February 12, 2002, Swalling revised its pricing to complete bents 6-15 from $621,834 to $996,639. <u>Brechan still faced over $1,000,000 in losses on the project</u>.

Evidently, the Coast Guard itself was in a quandary. Reference 20285-20287. The official CG notice to Brechan came on February 25 in a letter signed by the contracting officer. Her letter stated that that it was up to Brechan to figure out what to do, including redesign, if necessary, but the Coast Guard's initial scoping requirements would still have to be met and there would be no financial contribution from the Coast Guard. The Coast Guard also refused to pay Brechan for its $138,000 buy-out loss with Swalling. Reference *20291-20294; 20297; 20302-20304*. Nevertheless, *Enclosure (3)* included to the contracting officer's letter details a virtual roadmap of how Brechan can avoid its buy-out loss to Swalling through a de-scoping of the project. Document *20297*. Brechan made note of the opportunity and the scope of the Phase 1 work with the Coast Guard was reduced from completion through bent 15 to completion through bent 12. Reference *20297*.

5

7 of 9

Brechan also immediately grasped the opportunity presented in "Enclosure (3)," by signing a deductive change order with Swalling reducing Swalling's work scope from completion through bent 15 to completion through bent 12 (piles only). Reference *20302-20303* and *20331*, Change Order 1 to Swalling saved Brechan $145,298 by virtue of Swalling's scope reduction. See also *20332*. Swalling had also reduced its pricing to only $30,242 for the bent 1-5 weld repair work and to only $50,000 for bent weld repair work 6-15 (along with the acceptance requirements for that work). At this juncture, <u>Brechan's loss exposure was down to less than $100,000 for Phase 1</u>. That $100,000 problem was soon largely resolved when Brechan received payment from the Coast Guard of an additional $90,000 under its Modification 0005. With that modification in hand, Brechan's loss exposure was completely eliminated, and it was once again in a profitable position relative to all of the issues discussed – for Phase 1. Reference *20335-20339* and *20369-20370*.

However, the problem for Phase 2 was not yet resolved. Swalling refused to honor its pricing for Phase 2 based on the discovery of the weld defect problems. Brechan would have to pay Swalling a substantial additional amount for the cost of the required weld repairs in Phase 2. This would be the case whether Swalling performed its work under Option 2, allowing caulking and stripe coating some welds, or Option 1 that retained the original procedures and acceptance criteria. However, its situation was worse than this because Swalling's Option 2 work in phase 1 was by the terms of its contract modification very different than the work that had been required of Brechan under phase 1 under the terms of its own contract Modification number 0005. The amount Swalling would charge Brechan for the work in phase 2, under the Coast Guard's Mod. 0005 terms, would likely have been many times higher than the rate it charged Brechan to complete Phase 1.

Brechan could not contract with Swalling. Brechan needed a new Phase 2 coatings application subcontractor, and a way to keep Phase 2 within budget. AESI, although rejected for Phase 1 as unqualified and unknown, was suddenly a prospect for Brechan to work with. In fact, AESI was the only subcontractor Brechan approached to provide a bid for the work in Phase 2, even though there were evidently far more qualified candidates available (such as Alaska Blasting & Coating). Nevertheless, Brechan negotiated a contract with AESI for the work on bents 13-33,

6

8 of 9

for the sum of $995,850. AESI was only provided with the Phase 1 specifications to prepare its bid with. AESI was never told of the enormous problem with the welds. And after its proposal had been submitted, Brechan requested and obtained from Coffman a revised set of specifications that instituted performance procedures and acceptance criteria that had been attempted with Swalling and then abandoned when they failed to work, i.e., stripe coating and high voltage holiday testing to confirm zero holidays. AESI therefore had no prior knowledge or any notice of the difficulties encountered on Phase 1 – and no opportunity to price the actual difficulty of the work. AESI's final costs on the project as of October 20, 2004 – after performing a coating project that included a finished product with zero holidays – reflected a cost overrun of $1,110,458.23 (without profit).

Below is a summary of the Changes in Position I have reached conclusions on thus to date.

**Prior to Swalling C.O.1**

| COST TO BEI | ISSUE | SCCI C.O.I | MOD 5 | NET CHANGE |
|---|---|---|---|---|
| $102,400.00 | Contract Shortfall   850,000 v. 712.000 | -$145,298 | $0.00 | $42,898.00 |
| $30,242.00 | Repair Bents 1-15   Swalling C.O.R. | $30,242 | $30,000.00 | -$242.00 |
| $13,017.00 | Scaffolding CP/Insul  Swalling C.O.R. | $13,017 | $0.00 | -$13,017.00 |
| $50,000.00 | Prep. Bents 6-15   Swalling C.O.R. | $50,000 | $50,000.00 | $0.00 |
| $10,000.00 | QA Cost Increase For DSC Delays | $0 | $10,000.00 | $0.00 |
| $7,100.00 | Fuel Pier Test (See MOD. 3) | $7,100 | $0.00 | -$7,100.00 |
| $212,759.00 | | -$44,939 | $90,000.00 | $22,539.00 |
| | | CG PAID BEI MOD. 3 | | $7,455 |
| | | | TOTAL | $29,994.00 |
| | Scaffolding under Mod 4 - not performed | | | $25,000.00 |
| | **Final Change in Financial Position for Brechan Despite Million Dollar Loss Exposure** | | | **$54,994.00** |

7