UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

---

ABSOLUTE ENVIRONMENTAL SERVICES, )
INC.,                            )
                                 )
            Plaintiff,           )
                                 )
vs.                              ) No. 3:03-cv-0199-RRB
                                 )
FORREST J. MCKINLEY, et al.      )
                                 )
            Defendants.          )

---

Deposition Upon Oral Examination

of

MICHAEL LEMBKE

---

9:10 a.m.

May 17, 2006

1201 Third Avenue, Suite 4800

Seattle, Washington

Valerie L. Seaton, RPR

Court Reporter

EXHIBIT D
PAGE 1 of 9

Case 3:03-cv-00199-RRB   Document 323-5   Filed 09/08/2006   Page 2 of 9

Absolute vs. McKinley    5-17-2006                         Michael Lembke

### Page 82

1  intention between the Coast Guard and Brechan was to do
2  the entire Cargo Wharf, including the extension in the
3  original wharf facility. Due to funding limitations,
4  they broke that into two separate contracts, if you
5  will.
6      I have probably misstated at some point in my
7  report which was which, but it's my understanding that
8  the original intention was to do it all. They couldn't
9  do it for funding reasons and so they broke it into two
10 pieces so they could keep it within their fiscal budget
11 for that particular year.
12     Q. And have you spoken with anybody at the Coast
13 Guard to verify your understanding of that?
14     A. I've reviewed correspondence from the Coast
15 Guard, but I haven't spoken with anyone.
16     Q. What correspondence supports your view of
17 that?
18     A. Well, there's e-mails back and forth stating
19 that they didn't have enough money to do it all and
20 they would have to issue it under two different years.
21     Q. What e-mails are you referring to?
22     A. I don't know what the document number is
23 offhand.
24     Q. Have you referenced them in your report?
25     A. They're contained in this binder. And I'm

### Page 83

1  referring to the Key Documents binder again.
2      Q. Have you referenced them in your report?
3          MR. MARSTON: Objection; assumes facts
4  not in evidence, that the binder is not part of the
5  report.
6      A. I reference this binder in my report, and I
7  made it clear that all of the documents in the binder
8  are included whether I referenced them or not.
9      Q. (BY MR. KREGER) So how would we find out
10 what you are relying on for your conclusion that, for
11 example, the Coast Guard and Brechan entered into a
12 single contract to do Bents 1 through 33?
13         MR. MARSTON: Objection; misstates the
14 witness's testimony.
15     A. My previous testimony is that I may have
16 misstated that it was a single contract, but my
17 understanding has been all along that it was broken up
18 into two pieces due to funding limitations.
19     Q. (BY MR. KREGER) Did Brechan have a
20 contractual obligation to do work outside of its
21 Delivery Order 7 prior to entering into the delivery
22 order for Phase II?
23         MR. MARSTON: With respect to the wharf?
24     A. There's no way for me to know that. I don't
25 know what work you're referring to.

### Page 84

1      Q. (BY MR. KREGER) When did Brechan become
2  contractually obligated to do the work identified in
3  the delivery order that was issued in 2002?
4          MR. MARSTON: Objection; calls for a
5  legal conclusion. You can go ahead and answer.
6      A. At this point in time that they signed the
7  contract with the Coast Guard, they became obligated,
8  but I can't quote that date to you offhand.
9      Q. (BY MR. KREGER) Which contract are you
10 referring to?
11     A. I thought you were talking about the 2002
12 contract.
13     Q. I am.
14     A. Well, that's the one I'm referring to then.
15     Q. Okay. Take a look at Exhibit 7.
16     A. Okay.
17     Q. What is the date in Box 15 that the
18 contractor is supposed to deliver services under this
19 delivery order?
20     A. Box 15 reads, "Deliver to FOB point on or
21 before 12-29-02."
22     Q. What's your understanding of when Brechan
23 became contractually obligated to deliver these
24 services?
25         MR. MARSTON: Objection; calls for a

### Page 85

1  legal conclusion.
2      A. Well, my understanding is that once this
3  order is issued to Brechan that there is, in fact, a
4  contract in existence.
5      Q. (BY MR. KREGER) Was this delivery order
6  issued prior to the "Notice of Award" that we looked at
7  in Exhibit 6?
8      A. Well, the date on this Exhibit 7 that I'm
9  looking at, I can't quite -- it's got a hole punched
10 through the date, so I can't read it. The notice of
11 award is dated 17 July 2002. This date, the month is
12 missing. I can't read it.
13     Q. Would the delivery order have been issued
14 prior to the contract under which the delivery order
15 was authorized, in your experience?
16     A. Say again.
17     Q. Would the delivery order have been issued
18 prior to the contract which authorized it to be issued,
19 in your experience?
20     A. Usually not.
21     Q. Would it be fair to assume that the delivery
22 order was issued sometime after July 17, 2002 then?
23     A. That would be fair to assume.
24     Q. When -- and just to see if we've got this.
25 Is it correct then that Brechan did not become

Case 3:03-cv-00199-RRB    Document 323-5    Filed 09/08/2006    Page 3 of 9

Absolute vs. McKinley    5-17-2006    Michael Lembke

Page 86

1  obligated to do the work described in this delivery
2  order ending in P92 until sometime after July 17, 2002,
3  whenever we can figure out the date that the delivery
4  order was issued?
5      MR. MARSTON: Objection; calls for a
6  legal conclusion and assumes there's no duplication of
7  work. It assumes facts not in evidence.
8      A. I'll answer this way: I'm not certain as to
9  the legal obligation point between Brechan and the
10 Coast Guard relative to Exhibit 6 which is a "Notice of
11 Award" and Exhibit 7 which is a specific order from a
12 contracting officer to perform work.
13     MR. KREGER: Can I have that answer read
14 back, please.
15     (The record was read back by
16     the reporter.)
17     Q. (BY MR. KREGER) Did Brechan have a
18 contractual obligation, in your opinion, to perform the
19 work described in Delivery Order P92 prior to the date
20 the delivery order was issued?
21     MR. MARSTON: It in its entirety or in
22 part? Objection; vague.
23     A. I'm sorry. I'll have to have that read
24 back. I was searching the documents.
25     (The record was read back by

Page 87

1      the reporter.)
2      MR. MARSTON: Same objection.
3      A. I think I testified earlier that I'm not
4  certain as to that. But typically Brechan would not
5  want to perform work before they did get the task order
6  to perform that work.
7      Q. (BY MR. KREGER) If they had refused to do
8  Bents 12 through 33 in the absence of this delivery
9  order, would they have been, in your experience, in
10 breach of contract?
11     MR. MARSTON: Objection; vague with
12 respect to which contract and at what time.
13     A. I'm not certain. I think that is a legal
14 question, and I'm not a lawyer.
15     Q. (BY MR. KREGER) Did Brechan have a
16 requirement to do the work in Bents 12 through 33
17 that's described in this delivery order prior to
18 entering into this agreement, in your experience?
19     MR. MARSTON: Object to the form of the
20 question and object to its ambiguity as to whether
21 you're talking about the entirety of the work
22 referenced in Exhibit 7 or any portion of it.
23     A. I can't answer that question without being
24 able to review the contract under which this order is
25 written. And there may be other documents relative to

Page 88

1  task P92 that would shed light on whether they were
2  obligated or not. So I'm sorry, but I can't really
3  answer that question. Or I don't know the answer.
4  Let's put it that way.
5      Q. (BY MR. KREGER) Would you go to Page 6 of
6  your report, please.
7      A. All right.
8      Q. On the bottom paragraph you've written,
9  "Brechan needed a new Phase II coatings application
10 subcontractor and a way to keep Phase II within
11 budget. Do you see that?
12     A. Yes.
13     Q. There's no Key document number called out
14 after the word budget. What budget are you referring
15 to there?
16     A. Well, there are documents between the Coast
17 Guard and Brechan that indicate that they had a
18 specific budget that they couldn't exceed for the
19 construction of the second phase of the work, and
20 Swalling was not interested or willing to perform the
21 work within those budget constraints.
22     Q. What was the budget number that you recall
23 seeing in a budget relevant to the Phase II Bents 12
24 through 33 work?
25     A. Well, I think it was a million dollars for

Page 89

1  the construction.
2      Q. Would you take a look at Exhibit 7, please.
3      A. Yes.
4      Q. What's the dollar value of the delivery order
5  that's issued under this Exhibit 7?
6      A. It's one million --
7      MR. MARSTON: Object to the form of the
8  question.
9      A. The dollar value on Block 17 of the schedule
10 is $1,413,020.
11     Q. (BY MR. KREGER) Was this 1,413,000 based on
12 some budget that you had seen?
13     A. Yes, I believe it was.
14     Q. How much funding did the Coast Guard have
15 authorized to obligate itself to when it entered into
16 this contract for 1.413 million?
17     A. Well, I'm not sure of the Coast Guard's budget
18 for the entire task order because that included design
19 and engineering and other scopes of work other than the
20 coatings construction work involved.
21     Q. How much did the Coast Guard have in this
22 1.413 for design?
23     A. Well, it was broken down into several
24 components. Not just design but quality assurance and
25 other line items --

### Page 98

1  the issue. But he's the witness, not me.
2  Q. (BY MR. KREGER) Did you look at some
3  documents?
4      MR. MARSTON: One.
5  Q. (BY MR. KREGER) Did you look at a document
6  that Mr. Marston provided you?
7  A. Yes, I did.
8  Q. Do you have that with you here today?
9  A. It's right here.
10     MR. KREGER: Let's get that marked.
11 Mark that as Exhibit 9, please.
12     (Exhibit No. 9 marked for
13     identification.)
14     MR. MARSTON: For the record, this is a
15 document that does not have a Bates number on it, but
16 it is a document that we received under the Freedom of
17 Information Act from the Coast Guard and it is in the
18 group of documents that was supplied to all counsel
19 about a week ago, I believe.
20     MR. PARTNOW: Just to be clear: What
21 you're saying is, this was not a document that
22 Mr. Lembke saw before today but it falls in line with
23 the other documents that he identified that he has
24 looked at?
25     MR. MARSTON: I think that's the case.

### Page 99

1      THE WITNESS: I think that's the case as
2  well.
3  Q. (BY MR. KREGER) Okay. Have you identified
4  for me the documents that you were attempting to locate
5  which support --
6  A. Well, I keep finding --
7  Q. I'm sorry. Let me finish my question.
8  A. Excuse me.
9  Q. Which sport the proposition that there was a
10 budget that Brechan was trying to keep Phase II within?
11 A. Yes. And I apologize for stepping on your
12 comments. I'm still finding documents, so there's
13 another one here that I would add, which is 20528.
14 That's a Key 20528.
15 Q. Are you comfortable that the opinion that you
16 expressed on Page 6 of your March 6th report that
17 Brechan needed a Phase II coatings application
18 subcontractor, and a way to keep Phase II within budget
19 is supported by the document numbers that you've called
20 out in the exhibit that we've marked?
21 A. It is if you consider the fact that Swalling
22 was unwilling to hold to their original bid price for
23 what we call the Phase II work.
24 Q. Let me ask the question a little bit more
25 narrowly. I'm interested, actually, in the second part

### Page 100

1  of the sentence that implies there was a budget within
2  which Phase II had to be kept. And my question again,
3  I'll repeat it, is: Are you comfortable that you have
4  found documents that support the proposition that there
5  was a budget within which Phase II had to be kept?
6  A. Yes.
7  Q. When did those documents that you've
8  identified come into existence, if you know?
9  A. When did the documents come into existence?
10 Q. Yeah. Let's start with 20517.
11 A. Are you asking me what the date of that
12 document is.
13 Q. Well, if you know when they were created, I
14 would like to know that. If you don't know, just tell
15 me as much as you know about the date.
16 A. Well, Key 20517 is dated December 4, 2002.
17 Q. Have you spoken with Mr. Holmstrom about when
18 he prepared this letter?
19 A. No.
20 Q. So the budget that Mr. Holmstrom was working
21 for for Phase II is based on Brechan's estimate that it
22 would cost $1,413 to do the work in Phase II; is that
23 correct?
24 A. No, that's not correct. I think you
25 misstated the number.

### Page 101

1  Q. All right. What's the correct number?
2  A. I'm looking at Key Document 20517.
3  Q. Yes, sir.
4  A. And this is Brechan's cost proposal to the
5  Coast Guard to do what I term the second phase of the
6  work. And their proposed amount to accomplish the work
7  is $1,413,020.
8  Q. Why wasn't that a big enough budget to
9  encompass Swalling's proposal for the Phase II work?
10 A. Well, that budget included elements beyond
11 the scope of Swalling's work.
12 Q. Such as?
13 A. Such as design and engineering, repair of
14 defective structural welds, cathodic protection
15 commissioning, quality assurance services, markups, et
16 cetera.
17 Q. How much was in that budget for the coating
18 contractor to do its work?
19 A. The budget that Brechan developed that the
20 Coast Guard ultimately accepted, the bottom line of
21 that budget is detailed on Key Document 20521. And I
22 did not have time to go back through and look at all of
23 the elements that comprised that total which are on the
24 two previous documents, but that number is 1,116,065.
25 Q. What do you understand that number

Case 3:03-cv-00199-RRB   Document 323-5   Filed 09/08/2006   Page 5 of 9

Absolute vs. McKinley    5-17-2006                    Michael Lembke

Page 102

1  represents?
2      A.  Well, as I just testified, I would have to go
3  through and review everything that was included in this
4  estimate.  It appears to be the construction costs for
5  the Phase II contract.
6      Q.  And you're assuming that these construction
7  costs include the coating contractor application work?
8      A.  I believe that's correct.  In other words,
9  what I'm saying is the coatings application work and
10 all the preparation that's attendant to that, including
11 containment and mobilization and equipment and all
12 that, is included in the 1,116,055 number, but there
13 are also elements included within that estimate that
14 have nothing to do with the coatings application phase
15 or -- excuse me.  That's a bad word to use.  Nothing to
16 do with the coating application's scope of the
17 contract.
18     Q.  Which numbers are those?
19     A.  I'm referring to -- well, it's the -- the
20 breakdown itself that I'm referring to is contained in
21 Key 20519, -520 and it's bottom-line totaled on -521.
22     Q.  And what work, again, is it your testimony
23 was represented in this document for Phase II work
24 other than coating application and design?
25     A.  Well, this is a three-page list of cost

Page 103

1  elements, but there are things in there like concrete
2  finishing, asbestos abatement, some mechanical work.
3      Q.  Where is asbestos abatement?
4      A.  I'm finding that on Key Document 20520.  It's
5  under Section 13 on the left, about two sections up
6  from the bottom.
7      Q.  I see.  $3,900?
8      A.  Yes, correct.
9      Q.  And have you spoken with Mr. Peterson or
10 Mr. Elmore or Mr. Holmstrom about the process of
11 putting the coating work that was required into a means
12 prepriced format for the Coast Guard's contract
13 purposes?
14     A.  I've spoken to Mr. Elmore and Mr. Peterson
15 about it.  I have not spoken to Mr. Holmstrom about
16 anything.
17     Q.  So when you spoke to Mr. Elmore or
18 Mr. Peterson, did you ask him is this asbestos work
19 that's here or is this work that you pigeonholed under
20 the asbestos category but is still part of the scope of
21 work for Absolute?
22     A.  I didn't ask that specific question.
23     Q.  Do you know whether that work is within
24 Absolute's scope in its subcontract or in somebody
25 else's scope?

Page 104

1      A.  It's not in Absolute's scope.
2      Q.  Your testimony is that the work that's
3  described here as asbestos abatement disposable worker
4  protection whole body suit, that that's not part of
5  Absolute's scope of work in its subcontract?
6      A.  No.  I'm testifying I did not ask that
7  specific question of Mr. Peterson and that asbestos
8  abatement is not within the scope of Absolute's
9  contract.
10     Q.  But you don't know whether this work item
11 that's described here was within or not?
12         MR. MARSTON:  Objection; asked and
13 answered.  Go ahead.
14     A.  This is Mr. Holmstrom's estimate and I have
15 not had the opportunity to discuss it with him.
16         If I might.  I need to locate my copy of that
17 report because it looks as though you're about to ask
18 me another question concerning that and I haven't yet
19 been able to lay my hands on it here.
20         MR. MARSTON:  Which report is that?
21         THE WITNESS:  The second report.
22         MR. KREGER:  I have a copy to mark for
23 you here, but let's go off record while you locate your
24 original.
25         (Off the record at 1:36 p.m.)

Page 105

1          (Back on the record at 1:36 p.m.)
2          MR. KREGER:  All right.  Let's have this
3  document marked as Exhibit 10.  For identification,
4  this is the March 21st, 2006 report prior to errata.
5          (Exhibit No. 10 marked for
6           identification.)
7      Q.  (BY MR. KREGER) Now, Mr. Lembke, I'm handing
8  you what has been marked as Exhibit 10.  Do you
9  recognize that as the March 21, 2006 report prior to
10 your first and second errata?
11     A.  Well, this is my March 21, 2006 report.  It
12 was issued after the first errata.  So if I understood
13 your question correctly, you mentioned both the
14 errata?
15     Q.  Yeah.
16     A.  And there's only one errata that was issued
17 after this report.  There was one before and one after.
18     Q.  Well, I don't want to get bogged down too
19 far.  I'm just talking about the second report now.
20 And as far as I knew, there was one errata, that you
21 made some corrections in handwriting on one report and
22 I think you may have actually typed them up.
23     A.  You're right.  I stand corrected.  That's
24 true.  I have two errata that pertain to this report.
25 That's true.

27 (Pages 102 to 105)

Page 162

1  Q. Yes, sir.
2  A. Okay.
3  Q. That's, Scope of Year 1 was end of extension
4  to Bent 15 of original cargo pier. Do you see that?
5  A. Yes.
6  Q. What did you rely upon, according to your
7  work papers, to reach that conclusion?
8  A. Well, there's several documents, including
9  the Swalling subcontract.
10 Q. What did you identify in your worksheet as
11 being the document that you relied on to reach that
12 conclusion?
13     MR. MARSTON: Objection; assumes facts
14 not in evidence that it was limited to a single
15 document.
16 A. Well, I relied -- I understand your
17 question. There are several documents in the whole of
18 the documents that concern this case that make it very
19 clear what the original scope of the work was for that
20 phase. This particular notation here is just a
21 notation that there is at least one document in this
22 particular binder that also makes reference to that.
23 Q. (BY MR. KREGER) And that's the document
24 numbered 20095?
25 A. Correct.

Page 163

1  Q. Go to the last page, if you would, please.
2  A. Yes.
3     MR. MARSTON: Of the exhibit?
4     MR. KREGER: Yeah.
5  Q. (BY MR. KREGER) What's the last event or
6  transaction that you reported in your worksheet here?
7  A. Well, I think it has to do with Mod. 5
8  between Brechan and the Coast Guard.
9  Q. What's the date that that occurred?
10 A. Well, the date I have on here is 4-25-02.
11 Q. Is it your opinion that Brechan continued to
12 have a loss exposure after Modification 5 was entered
13 into?
14     MR. MARSTON: Objection; vague with
15 respect to what scope of work.
16 A. It depends on which phase of the work we're
17 talking about. Phase I with Swalling or for the
18 follow-on work in the next year?
19 Q. (BY MR. KREGER) Let's break it down. Take
20 the first one.
21 A. With respect to Modification 5 and Phase I?
22 Q. Yes.
23 A. I don't believe Brechan was in a loss
24 position anymore after Mod. 5.
25 Q. What learned treatises, textbooks, if any,

Page 164

1  did you use to do this loss exposure analysis?
2  A. Well, I don't know that I used learned
3  treatises or textbooks. I used common sense and
4  experience and I looked at the facts as they were
5  written in the documents to come up with those
6  conclusions.
7  Q. What was the point of doing a loss exposure
8  analysis?
9  A. Well, I think the point was, is that Brechan
10 got into problems on Phase I and they needed to get
11 themselves out -- and financial problems I'm referring
12 to here -- because of the defective welds. And they
13 couldn't find an easy way out of that dilemma in
14 financial terms, so they had to come up with a way of
15 making that financial problem go away.
16     And this also relates to what happened in
17 Phase II as to whether or not they're aware of the
18 financial implications of what the actual site
19 conditions out there entailed. And so this analysis
20 related to what happened on Phase I so that you can
21 understand what went on in Phase II.
22 Q. Does your opinion, with respect to Brechan's
23 loss exposure, make some issue in this case more likely
24 true than not?
25     MR. MARSTON: Objection; vague.

Page 165

1  A. With respect to what?
2  Q. (BY MR. KREGER) I don't know. What's the
3  point of the loss exposure analysis?
4     MR. MARSTON: Objection; asked and
5  answered. If you're content with your last answer, you
6  can stand by it.
7  A. I stand by my last answer. I mean, that is
8  the point.
9  Q. (BY MR. KREGER) Does the outcome of your
10 loss exposure evaluation relate to your assumptions
11 about how Brechan contracted for Absolute's work in
12 Phase II?
13 A. Could you repeat that or have it read back?
14     MR. KREGER: Would you read it back,
15 please.
16     (The record was read back by
17     the reporter.)
18 A. Yes, it definitely has a bearing on what I
19 think about what happened in Phase II.
20 Q. (BY MR. KREGER) In what way?
21 A. Well, in a lot of ways. For example, I said
22 in my report that Brechan needed another contractor if
23 they were going to do the Phase II work because
24 Swalling was not willing to do it at the budgeted
25 amounts. You challenged the budgeted amounts at that

42 (Pages 162 to 165)

### Page 182

1  Swalling, everybody, and they got into financial
2  trouble.
3       And then you follow the math on what they did
4  with their finances and how they dealt with Swalling
5  and how they dealt with the government to get
6  themselves back out of that financial position that
7  they were in, a loss exposure position, and you see
8  that at the end of the day via Modification Number 1
9  with Swalling, including relaxation of the
10 specifications to complete the work and Modification
11 Number 5 with the Coast Guard, attaining monies that
12 covered other issues that they had, that Brechan came
13 back out actually in better financial shape than when
14 they started.
15      And I think any person of normal intelligence
16 that pays attention to these documents can go through
17 and do the same thing.
18      Q.  (BY MR. KREGER)  Let's go to Exhibit D.
19      A.  Exhibit D.
20      Q.  Why don't we work off of the errata that you
21 brought with you this morning.  I think that's Exhibit
22 No. 2.
23      A.  Okay.
24      Q.  The figure on Paragraph 8 of 1,129,000,
25 what's the source of that figure?

### Page 183

1       A.  I think of testified earlier that there was a
2  May of '05 revision to Absolute's claim to Brechan, and
3  that number comes from that revision.
4       MR. KREGER:  Mark this as the next
5  document, please.
6       (Exhibit No. 17 marked for
7       identification.)
8       Q.  (BY MR. KREGER)  Showing you now what has
9  been marked as 17, is that the revision you were
10 referring to?
11      A.  Yes.
12      Q.  You make mention of an Absolute claim against
13 Brechan.  Was this the Request for Equitable Adjustment
14 that was done about this time in May 17 of '05?
15      A.  I believe this was an attachment -- I'm
16 sorry.  I forgot to not speak until you were
17 completed.  My apologies.
18      Q.  No.  I forgot to ask you a quick question
19 too.
20      Did you take part in the preparation of the
21 Request for Equitable Adjustment?
22      A.  Not directly.  Mr. Olson asked me to see if I
23 could break out the claim between Brechan and between
24 IIC.  I told him that that would be very difficult and
25 so this was my effort to try to do that for him.  And I

### Page 184

1  believe it was an attachment to that REA, and I'm not
2  sure how they used it.  But, no, I didn't have any
3  direct involvement in the REA.
4       (Exhibit No. 18 marked for
5       identification.)
6       Q.  (BY MR. KREGER)  This is the Request for
7  Equitable Adjustment?
8       MR. MARSTON:  Actually, it's not in
9  mine.
10      MR. KREGER:  Let's go ahead anyway.
11 Sorry.  I'll get you a copy.
12      Q.  (BY MR. KREGER)  Did you review this REA
13 prior to or about the time it was prepared?
14      A.  No.  The only involvement I had with this was
15 generating Exhibit 17.  I didn't have any other
16 involvement in the REA itself, if that was the
17 question.
18      Q.  That's the question.  Can I have that back
19 for a moment?
20      A.  Sure.
21      Q.  There's a statement in the REA that -- let's
22 see if I can find it now that I've turned it upside
23 down.  This claim is not in conflict with the claim of
24 Absolute against Forrest J. McKinley and Emerco, Inc.
25 even though there is overlap in the amount of the

### Page 185

1  claimed dollars.  Do you see that?
2       A.  Yes.
3       Q.  Did you consult with Mr. Olson about whether
4  or not there was an overlap between the claim against
5  Absolute and the claim against Brechan in, at least,
6  the claim that was expressed in the REA against
7  Brechan?
8       A.  I had discussions with him to that effect
9  when I was preparing Exhibit 17, yes.
10      Q.  And there's another sentence that says,
11 Pending the outcome of many factual and legal issues,
12 it is not possible to confidently segregate all
13 portions of these damages between those that are
14 Brechan's responsibility and those that are the
15 responsibility of Forrest J. McKinley and Emerco, Inc.
16      Do you see that?
17      A.  Yes.
18      Q.  Did you consult with Mr. Olson about that
19 statement?
20      A.  Well, that is Mr. Olson's statement, but I
21 did tell him that -- or whoever signed this, but I did
22 tell him that it was very difficult to segregate these
23 costs.
24      Q.  Have you made an attempt at the present time
25 to segregate the costs?

Michael Lembke

```
 1              C E R T I F I C A T E
 2   STATE OF WASHINGTON  )
                          ) SS.
 3   COUNTY OF PIERCE     )
 4              I, the undersigned Notary Public in and
 5   for the State of Washington, do hereby certify:
 6              That the annexed and foregoing
 7   deposition of each witness named herein was taken
 8   stenographically before me and reduced to typewriting
 9   under my direction;
10              I further certify that the deposition
11   was submitted to each said witness for examination,
12   reading and signature after the same was transcribed,
13   unless indicated in the record that the parties and
14   each witness waive the signing;
15              I further certify that I am not a
16   relative or employee or attorney or counsel of any of
17   the parties to said action, or a relative or employee
18   of any such attorney or counsel, and that I am not
19   financially interested in the said action or the
20   outcome thereof;
21              I further certify that each witness
22   before examination was by me duly sworn to testify the
23   truth, the whole truth and nothing but the truth;
24              I further certify that the deposition,
25   as transcribed, is a full, true and correct transcript
```

MOBURG & ASSOCIATES - SEATTLE, WA (206) 622-3110

Michael Lembke

1 | taken at the time of the foregoing examination;

2 |       IN WITNESS WHEREOF, I have hereunto set my

3 | hand and affixed my official seal this __31st__ day of

4 | __July_____, 2006.

10-14 |
```
          _Valerie Seaton_____
          VALERIE L. SEATON, RPR, CCR
          Notary Public in and for
          the State of Washington,
          residing at Tacoma.
          License No. 2557
```

[Notary seal: VALERIE SEATON, COMMISSION EXPIRES 07-07-07, NOTARY PUBLIC, STATE OF WASHINGTON]