Page 1

1            IN THE UNITED STATES DISTRICT COURT
2                  DISTRICT OF ANCHORAGE
3

ABSOLUTE ENVIRONMENTAL SERVICES,    )
4  INC., an Alaska Corporation        )
                                     )        **COPY**
5            Plaintiff,              )
                                     )
6  vs.                              )
                                     )
7  FORREST J. McKINLEY, an individual)
   d/b/a "Imperial Industrial        )
8  Coatings"; and EMERCO, INC., a     )
   California corporation, d/b/a      )
9  BRECHAN ENTERPRISES, INC., an      )
   Alaska corporation; and SAFECO     )
10 INSURANCE COMPANY OF AMERICA,      )
   a Washington corporation,          )
11                                   )
            Defendants.             )
12 _____)
13

Case No. A03-199 CIVIL
14 _____
15                  ORAL ARGUMENTS
             (Coffman's Motion to Dismiss)
16 _____
17
18
19        BEFORE THE HONORABLE RALPH R. BEISTLINE
          January 27, 2006 - Pages 1 through 73
20
21
22
23
24
25

EXHIBIT 1
PAGE 1 OF 75

Page 2

```
 1              A P P E A R A N C E S
 2

    FOR ABSOLUTE ENVIRONMENTAL SERVICES, INC.:
 3

    Marston, Heffernan & Foreman
 4  16880 NE 79th Street
    Redmond, Washington 98052
 5  By:  TERRY R. MARSTON
 6

    FOR EMERCO, INC., IMPERIAL INDUSTRIAL COATINGS, and
 7  FORREST J. McKINLEY:
 8  JERMAIN, DUNNAGAN & OWENS
    3000 A Street, Suite 300
 9  Anchorage, Alaska 99503
    By:  ERIC J. BROWN (telephonic)
10
11  FOR BRECHAN ENTERPRISES, INC. and SAFECO INSURANCE
    COMPANY OF AMERICA:
12
    PERKINS COIE
13  1029 W. 3rd Avenue, Suite 300
    Anchorage, Alaska 99501
14  By:  JACOB NIST
15
    FOR COFFMAN ENGINEERS, INC.:
16
    LANE POWELL, LLC
17  301 W. Northern Lights Boulevard, Suite 301
    Anchorage, Alaska 99503
18  By:  PETER C. PARTNOW
19
    ALSO PRESENT:
20
    Forrest McKinley (telephonic)
21  Jerry Hardenbergh
22
23
24
25
```

EXHIBIT 1
PAGE 2 OF 75

1          THE CLERK:  All rise.  His Honor of

2     the Court, the United States District Court for

3     the District of Alaska is now in session, the

4     Honorable Ralph R. Beistline presiding.

5               Please be seated.

6               And, Your Honor, I have

7     Mr. McKinley on the overhead speaker.

8               THE COURT:  Okay.

9               MR. McKINLEY:  Good morning, Your

10    Honor.

11               THE COURT:  Good morning.

12               Who is who?  Start with the

13    Plaintiff.

14               MR. MARSTON:  Good morning, Your

15    Honor.  Terry Marston, the attorney for

16    Plaintiff, Absolute Environmental, and to my

17    right is David Olson, the president of that

18    company.

19               THE COURT:  Okay.  So I'll be

20    talking to you as -- on behalf of Absolute.

21    Okay.

22               MR. PARTNOW:  Peter Partnow on

23    behalf of Co -- Coffman Engineering.  I have

24    Jerry Hardenbergh of Coffman here with me today.

25               MR. NIST:  And Jacob Nist, on

EXHIBIT ___1___
PAGE _3_ OF _75_

Page 4

```
 1    behalf of Brechan Enterprises and SAFECO
 2    Insurance Company of America.
 3                    THE COURT:  These are new players,
 4    since I last met some of you, aren't you?
 5                    MR. MARSTON:  We'll explain it all,
 6    Your Honor.
 7                    THE COURT:  I don't think -- okay,
 8    just be seated.  And then we have on the
 9    telephone?
10                    MR. McKINLEY:  Mr. McKinley.
11                    THE COURT:  On behalf of?
12                    MR. McKINLEY:  Mr. McKinley.
13                    THE COURT:  On behalf of?
14                    MR. McKINLEY:  EMERCO.
15                    MR. MARSTON:  He's a party.
16                    MR. BROWN:  Your Honor, Eric Brown,
17    for Mr. McKinley and EMERCO.
18                    THE COURT:  Aren't you supposed to
19    be here?
20                    MR. BROWN:  I'm here, not in this
21    argument.
22                    THE COURT:  Okay.
23                    MR. BROWN:   This argument is
24    between these folks.
25                    THE COURT:  Well, it's so doggone
```

EXHIBIT ___1___
PAGE ___4___ OF ___75___

Page 5

1    interrelated.

2              Let's start off with a couple of

3    ground rules.  Anybody who can speak English gets

4    extra points.  I don't want any more confusion.

5    Okay?  I don't mean that literally, I mean that

6    figuratively.  This thing is -- substantively,

7    the dispute here is not near as complicated as it

8    has become procedurally, and that's very

9    frustrating, because I have a general -- after

10   drawing diagrams and everything last night.

11             You notice there is a diagram

12   there.  If you could start off diagraming for me.

13   Go ahead.

14             MR. MARSTON:  Do I get to --

15             THE COURT:  Who sued who, why, and

16   how do we get to there?

17             I've done this as an attorney

18   before, so I figured, Why not start off with a

19   picture?

20             MR. MARSTON:  I -- I can assure

21   you --

22             THE COURT:  Or is it -- there

23   are --

24             THE CLERK:  There's a -- there's a

25   clip-on mic. right there to the side.

EXHIBIT ___1___
PAGE _5_ OF _75_

Page 6

```
 1                    THE COURT:  And there's a bunch of

 2      pencil -- pens here, aren't there, some dark

 3      pens?

 4                    THE CLERK:  Right here, right

 5      there.

 6                    THE COURT:  Yeah, right there on

 7      the bar.

 8                    MR. MARSTON:  No, behind, right

 9      here, the pens.

10                    THE COURT:  The pens are up by the

11      bar.

12                    MR. MARSTON:  Oh, I see, gotcha.

13      Do I need to disconnect this and clip it here?

14                    THE CLERK:  Yeah.

15                    THE COURT:  Okay.

16                    MR. MARSTON:  This is Mr. Marston.

17                    THE COURT:  I know it began with

18      Absolute upset as a result of the car -- cargo

19      work project and filing a lawsuit against Forrest

20      McKinley.

21                    MR. MARSTON:  Yeah, I'm going to

22      actually draw you two pictures, because there's

23      two phases to this contract.

24                    THE COURT:  Okay.

25                    MR. MARSTON:  And -- and --
```

EXHIBIT ___1___
PAGE _6_ OF _75_

```
 1                    THE COURT:  Are you standing on a
 2    box, or is it just my --
 3                        (Laughter)
 4                 MR. MARSTON:  When I first started
 5    practicing law, the partner I was working for was
 6    about a foot and a half shorter than me, and so I
 7    learned very quickly to sit down and -- okay.
 8                 THE COURT:  Is it that complicated?
 9                 MR. MARSTON:  Well, I'm almost
10    thinking of whether to draw you three pictures
11    because if you develop it in sequence -- because
12    part of this is based on what my client
13    understood and when he understood it.
14                 THE COURT:  See, I've got pictures
15    drawn, too.
16                 MR. MARSTON:  Yeah.
17                 THE COURT:  But I -- I don't want
18    argument as much as just a picture right now.
19                 MR. MARSTON:  Okay.  I'll diagram
20    parties for you.
21                 THE COURT:  I see you're using all
22    kinds of initials, so if you can --
23                 MR. MARSTON:  Coast Guard, a --
24    Brechan Enterprises.
25                 THE COURT:  Okay.  Good.
```

EXHIBIT __1__
PAGE _7_ OF _75_

Page 8

```
 1                    MR. MARSTON:  CEI will be Coffman

 2      Environmental.

 3                    THE COURT:  Okay.

 4                    MR. MARSTON:  I'll put a little T&H

 5      up here because actually Coffman Environmental

 6      was a subcontractor to T&H, but for the purpose

 7      of our discussion here, you can just consider a

 8      line of privity in this direction.

 9                    THE COURT:  Okay.

10                    MR. MARSTON:  And then over here we

11      have Swalling Construction Company.  And then,

12      again, I'm simplifying the picture, down here you

13      have SPC, which is Specialty Polymer Coatings,

14      and off over here, we have SAFECO, the surety.

15                    Phase 1 of this contract went in

16      this manner.  The Coast Guard hired Brechan as a

17      general contractor to do two things.  One is to

18      design and two is to build a renovation of a

19      cargo wharf out in Kodiak.  The major portion of

20      that work had to do with stripping off paint, we

21      refer to them as coatings, and then recoating

22      that in order to make the -- the wharf last for

23      25 years.

24                    THE COURT:  Okay.

25                    MR. MARSTON:  In order to do this
```

EXHIBIT    1
PAGE  8  OF  75

Page 9

1    design/build contract, which is a little bit

2    unusual because ordinarily owners design and the

3    contractor simply follows the design --

4                THE COURT:  Right.

5                MR. MARSTON:  -- Brechan hired this

6    engineering firm, which, in turn, subcontracted

7    to Coffman to provide the coatings engineering.

8    Tryck Nyman & Hayes is this engineering firm.

9    Like I say, there's no disputes involving them,

10   so we'll go directly to Coffman.

11               THE COURT:  Okay.

12               MR. MARSTON:  Coffman prepare --

13   prepared the design, provided to Brechan.  Then

14   Brechan went out to bid to hire a coatings

15   applicator to actually strip off the old coatings

16   and put on the new ones.

17               THE COURT:  Okay.

18               MR. MARSTON:  The successful bidder

19   was Swalling.  Swalling, in turn, purchased the

20   coatings that had been specified by Coffman from

21   Specialty Polymer Coatings.  So in this lawsuit,

22   at present, you have Brechan as a party, Swalling

23   is not a party, Specialty Polymer Coatings is a

24   party and Coffman is a party.

25               Okay.  Remember, we're talking

EXHIBIT ___1___
PAGE _9_ OF _15_

1    about Phase 1, though.

2            Now, this -- this project to

3    renovate this wharf involved two different

4    phases.  The wharf is this dog leg shape here.

5    It was originally only this portion here,

6    referred to as the original wharf.  It was --

7    subsequently had an extension added on to it,

8    referred to as the extension.

9            THE COURT:  Okay.

10           MR. MARSTON:  The contract that was

11   originally let by the Coast Guard or solicited by

12   the Coast Guard from Brechan was to renovate this

13   whole thing.  But the Coast Guard determined that

14   they didn't have the funds available in that

15   fiscal year to do that, and so they broke it down

16   into two phases.  This would be Phase 1, and this

17   would be Phase 2.

18           The contract for Phase 1 was

19   awarded to Brechan, the design/build contract,

20   and Brechan, in turn, awarded the subcontractor

21   coatings for Phase 1 only to Swalling.

22           Now, what happened is that -- and,

23   at this point, we're going to come into

24   submissions that are in dispute, but what

25   happened is prior to the completion of the entire

EXHIBIT ___1___
PAGE _10_ OF _75_

1    scope of work through Phase 1, which we call Bent

2    15 -- a bent is a row of piles -- it was

3    discovered by Swalling that there were all kinds

4    of defects in the welds underneath the coatings,

5    and these defects in the welds prevented the

6    coating applicator from achieving the test

7    standards that were required.

8         The test standard required was that

9    there can be zero holidays, in other words, zero

10   holes in the paint.  However, because the welds

11   were defective or because there was missing

12   welds, that, for reasons that we don't need to go

13   into here, precipitated the holes.  And then when

14   that was discovered, Mr. Hardenbergh, who is

15   sitting right there, wrote a memo saying, Wow,

16   this is a massive differing site condition.  This

17   is something that nobody had any right to expect,

18   and this is something for which the contractor is

19   entitled additional compensation.

20        At this point, Swalling asked for

21   additional compensation, again, the exact amount

22   is in dispute because it varied over time, but

23   anywhere between half a million and a million

24   dollars to complete the original wharf.  At that

25   point, Brechan entered into a agreement whereby

EXHIBIT      1
PAGE    11 OF 75

Page 12

```
1        Swalling's work was what we call de-scoped.
2        Instead of ending it Bent 15, they stopped them
3        back here at Bent 12, sent them away.  And
4        instead they brought in my client, which brings
5        us to the second chart.
6                        So, again, we have the U. S. Coast
7        Guard, Brechan, Coffman, and Swalling is gone now
8        and instead is my client, Absolute.  My client,
9        Absolute, is not a coatings applicator.  It's a
10       demolition contractor an abatement contractor.
11       It hired a company referred to as Imperial
12       Industrial Coatings to actually be the applicator
13       for the paint, so that my client is a first tier
14       subcontractor, imperial is a second tier
15       subcontractor.  If you'll look in the pleadings,
16       you'll see McKinley, who is on the phone with us,
17       and EMERCO, Incorporated, there is a dispute as
18       to what exactly Imperial was, doesn't have
19       anything to do with this motion today.
20                        Okay.  Underneath Imperial, again
21       I'm simplifying this, we get back down again to
22       Specialty Polymer Coatings, the manufacturer of
23       the coating material.  My client, and this is our
24       contention -- I think I'm going to break it this
25       way.  This is for Phase 2 of the contract
```

EXHIBIT ___1___
PAGE __12 OF 75__

1    supplemented by the additional bents that

2    Swalling did not do.

3              My client was brought in, told by

4    Brechan that they had had problems with Swalling

5    and that they had been given a black eye with the

6    Coast Guard, they needed to get somebody else in

7    there they could depend upon.  My client came in

8    to perform this work, started doing the work, and

9    in the course of the work, they encountered

10   problems with Imperial.  These problems generated

11   three tier notices and ultimately ended up with

12   Imperial terminating the contract, leaving the

13   job.  At which point, my client picked up the

14   ball, actually went out and hired people to spray

15   the coatings itself and completed the work all by

16   itself.

17             So, when we first started this

18   lawsuit, my client spent about a million dollars

19   over what it was supposed to do this work, filed

20   the lawsuit against McKinley and EMERCO, i.e.,

21   Imperial.  Imperial counterclaimed against my

22   client saying that my client owed it money.

23             THE COURT:  Okay.  What you've done

24   so far, a very nice job, on pages 1 and 2 is

25   out -- graphed for me the project.

EXHIBIT ___1___
PAGE _13_ OF _75_

```
 1                    MR. MARSTON:  Yeah.

 2                    THE COURT:  And how everyone

 3     interrelates.  Now I would like a graph of the

 4     litigation.

 5                    MR. MARSTON:  That's what I'm doing

 6     right now with these arrows.

 7                    THE COURT:  I know, but I don't

 8     want to confuse -- I want you to turn the page

 9     and then give me a litigation chart.

10                    MR. MARSTON:  That's what I'm doing

11     right now with these arrows.

12                    THE COURT:  Okay.  If don't think

13     that's going to be confusing, okay.

14                    MR. MARSTON:  I'm going to take my

15     chances here, but I -- I've drawn these diagrams

16     myself so many times I --

17                    THE COURT:  Well, you're going to

18     have to do it at least one more time to the jury.

19                    MR. MARSTON:  Yes.

20                    THE COURT:  You might as well --

21     practice never hurt.

22                    MR. MARSTON:  I've got no problem

23     doing that.  As a matter of fact, this is -- I

24     really appreciate the opportunity to do this.

25                    Okay.  Like I said, we're in
```

EXHIBIT ___1___

PAGE __14_OF _35_

```
 1    litigation now.  So we filed this lawsuit right
 2    here, Absolute against --
 3                    THE COURT:  So you're the
 4    plaintiff.
 5                    MR. MARSTON:  We're the plaintiff.
 6                    THE COURT:  That's how we start the
 7    lawsuit.
 8                    MR. MARSTON:  Plaintiff.  We sued
 9    Imperial.
10                    THE COURT:  That red is not very
11    good.  It's squeaking.  Here is the --
12                    MR. MARSTON:  It's --
13                    THE COURT:  Here is a blue.  Okay.
14    So you start the lawsuit, and the first person
15    you sue is your sub.
16                    MR. MARSTON:  I sued my sub because
17    my sub abandoned the project and left my client
18    to finish it.
19                    THE COURT:  Okay.
20                    MR. MARSTON:  That's pretty --
21                    THE COURT:  Simple lawsuit.
22                    MR. MARSTON:  -- type of lawsuit.
23                    THE COURT:  I've got another couple
24    of --
25                    MR. MARSTON:  Thank you.
```

1                    MR. BROWN:  For the record, that is

2    in dispute.

3                    THE COURT:  What is?

4                    MR. BROWN:  Whether or not we

5    abandoned.

6                    THE COURT:  Oh, I -- I understand

7    that.

8                    MR. MARSTON:  I shouldn't have used

9    the word "abandoned."  They terminated the

10   contract and left.

11                   THE COURT:  Okay.  I -- I

12   understand.

13                   MR. MARSTON:  That's not in

14   dispute.

15                   THE COURT:  I'm just trying to get

16   a flow chart.  Okay.

17                   MR. MARSTON:  Okay.  So we have a

18   plaintiff and a defendant on a simple type of --

19                   THE COURT:  Simple lawsuit.

20                   MR. MARSTON:  Costs (inaudible) the

21   contract.

22                   (Simultaneously speaking)

23                   THE COURT:  That's what I thought

24   we had.

25                   MR. MARSTON:  Imperial sued

EXHIBIT ___1___
PAGE _16_ OF _75_

1   Absolute saying that we had breached the contract

2   and they had a right to leave and we owed them

3   money.  That's a simple counterclaim.

4                    THE COURT:  Right.

5                    MR. MARSTON:  Imperial went beyond

6   that though.  They said not only that, they had a

7   second cause of action out there of conspiracy.

8                    THE COURT:  Okay.

9                    MR. MARSTON:  They sued Specialty

10  Polymer Coatings, and they sued us on the second

11  cause of action, and they sued Brechan on this

12  second cause of action, and they sued Coffman on

13  this second cause of action.  And, oh,

14  incidentally, they also sued the surety, but

15  we'll just consider that Brechan for the purposes

16  of simplifying the chart.

17                    So we've got the ordinary type of

18  contract claims, but now we have this conspiracy

19  claim where Imperial is claiming that all these

20  parties got together to cheat them, to take over

21  the work and capture all their profits.  As an

22  alleged conspirator, my client knew that there

23  was no conspiracy, at least no conspiracy that it

24  was involved in.  Nevertheless, Imperial sent out

25  discovery that pertains in not only Phase 2 of

1    the contract but Phase 1 as well, which as far as

2    we knew had nothing whatsoever to do with

3    anything that happened on Phase 1.

4                One of the things that they asked

5    for was documents from Brechan pertaining to

6    Phase 1.  Those documents were all circulated.

7    We got copies of them.  We didn't look at them

8    because it alleged a conspiracy that we were

9    supposedly a conspirator in, and, therefore,

10   since we didn't -- knew it didn't exist, we

11   didn't waste time looking at those documents.

12               Sometime thereafter Brechan and

13   Coffman negotiated a dismissal of Imperial's

14   claims.  Absolute was not a participant in that,

15   received no prior notice of it, and did not sign

16   any stipulation.  This is just Imperial

17   stipulating to dismiss it's conspiracy claims

18   here.  We're sitting here in the middle going,

19   you know, as far as we knew, their conspiracy

20   claim against us still exists and they're still

21   asserting their conspiracy claim against SPC.

22   But, at this point, Brechan has left the lawsuit,

23   as has Coffman.

24               A year goes by, and at the end of

25   discovery, Imperial does one additional thing.

```
 1    They send a Freedom of Information Act request up

 2    to the Coast Guard.  The Coast Guard sends back

 3    some documents that Imperial provides to us in

 4    their continuing discovery disclose ours.  We

 5    find a document in there, on October 30th of

 6    2001, a daily report that was authored by

 7    Mr. Hardenbergh, that arose in Phase 1.  And it's

 8    the thing that identifies the fact that Swalling

 9    had massive cost overruns on this project and was

10    given additional compensation for these massive

11    cost overruns and requested hundreds of thousands

12    of dollars to complete the project.  And,

13    instead, their contract was terminated, and my

14    client was brought in without knowledge of that,

15    without being told about that.  The

16    specifications were modified to make --

17                THE COURT:  You're kind of getting

18    into argument here but --

19                MR. MARSTON:  It's kind of -- I

20    understand that, but it's kind of hard to not do

21    that --

22                THE COURT:  Okay.

23                MR. MARSTON:  -- in order to

24    explain.

25                My client was -- was brought in,
```

EXHIBIT __I__
PAGE _19_ OF _75_

Page 20

1    from our perspective, for the purpose of picking

2    up the loss.  They wanted to move it off to us.

3    So we -- what happens is when we get this

4    document, we suddenly realize, wow, there was

5    this massive change in the first part of this

6    project.  Brechan knew about it.  Brechan didn't

7    tell us about it.  There is a doctrine in the law

8    called the superior knowledge doctrine that says,

9    if you know that there is some defect that you're

10    contractor or sub contractor is not likely to

11    discover, you cannot keep quiet about it and let

12    them basically step into a hole that's coverage

13    the path.

14                    THE COURT:  So you did what?

15                    MR. MARSTON:  So, at that point, we

16    brought -- we brought a motion to this court

17    saying we have discovered this document, and we

18    went back to the original Brechan documents that

19    we hadn't bothered looking at and found a panoply

20    of additional documents and said we have found

21    additional documents that we had no knowledge of

22    prior to this time that demonstrates that Brechan

23    had superior knowledge of a material difference

24    in the contract that caused us to incur massive

25    additional costs in performing this work that

EXHIBIT ___I___
PAGE __20_ OF 75

1    they're liable for.  And we asked this court for

2    permission, under CR 15, to rejoin them, and it

3    was granted.  So, at that point --

4                    THE COURT:  Well, in your con- --

5    to rejoin them.  They had -- you had never sued

6    them before.

7                    MR. MARSTON:  Yes, but they had

8    been in the lawsuit, sued by Imperial.

9                    THE COURT:  I -- I understand that.

10                   MR. MARSTON:  Yeah.

11                   THE COURT:  So what did you call

12   your --

13                   MR. MARSTON:  It's called joinder

14   them.

15                   THE COURT:  So you wanted to join

16   them in a -- it's a direct claim against them?

17                   MR. MARSTON:  Absolutely.

18                   THE COURT:  So you just want to

19   join them as a -- as a defendant, not as a --

20   just a plain old defendant?

21                   MR. MARSTON:  Correct.

22                   THE COURT:  Okay.

23                   MR. MARSTON:  And that motion was

24   granted.  So Absolute filed suit against Brechan

25   and its surety.  Brechan and it's surety --

EXHIBIT ___1___
PAGE _21_ OF _75_

1    excuse me, Brechan filed an indemnity claim

2    against Coffman.  And then after reviewing more

3    documents and finding out how Coffman was

4    involved in it, we filed a direct claim here as

5    well.  So I'm going to, as you requested, draw

6    one final chart that shows who is in it now and

7    who is making claims against who.

8                   THE COURT:  So far, I believe there

9    not -- I understand what you're talking about,

10   but I wanted to have it on the record from

11   somebody.

12                  MR. MARSTON:  Yes.

13                  THE COURT:  And on this tape,

14   everything is being recorded, and I go back in

15   the -- in the peace and quite of my office, and I

16   can listen to this carefully and compare your

17   charts with my charts to make sure I understand.

18                  MR. MARSTON:  Very good.  So

19   currently in the lawsuit we have Brechan and its

20   surety, SAFECO.

21                  THE COURT:  But they're in as

22   defendants, though.  Usually don't you start your

23   chart with the plaintiff at the top?  Okay.  I

24   don't-- I'll let you --

25                  MR. MARSTON:  I have found over the

1    years that a privity of contract charting works

2    better but --

3                    THE COURT:  Go ahead.

4                    MR. MARSTON:  Absolute; EMERCO and

5    McKinley, a/k/a Imperial; and SPC.  I think I've

6    got everybody.

7                    Now, the claims that my client is

8    asserting -- we decided the blue did or didn't

9    work?

10                   The claims that my client is

11   asserting are here and here and there.  These are

12   all direct claims.

13                   THE COURT:  You filed directly

14   against SAFECO?

15                   MR. MARSTON:  That's right.  As a

16   surety, they have a direct obligation to us,

17   third party beneficiary type analysis.

18                   And I don't know if I need to add

19   the claims of the other parties to this chart,

20   because I don't know if it adds anything, other

21   than the fact that Brechan has an indemnity claim

22   against Coffman.  But for the purpose of the

23   motion here today, I think this --

24                   THE COURT:  And your contention is

25   that the reason you didn't serve all -- sue all

1    those other parties initially, when you filed

2    your complaint, is you just didn't know?

3              MR. MARSTON:  Absolutely, had no

4    knowledge of it.  In fact, we had a joint defense

5    agreement with these parties thinking that --

6    that, you know, this guy -- this guy was the bad

7    actor.

8              THE COURT:  Okay.

9              MR. MARSTON:  We still have

10   problems with his performance, but now we've got

11   graver problems with the performance here.

12             THE COURT:  Okay.  All right.  Who

13   is next to speak?

14             MR. PARTNOW:  I'd probably cause

15   the next bit of confusion.

16             THE COURT:  Okay.  Mr. Partnow.

17   Thank you, sir.  I appreciate that.

18             MR. PARTNOW:  If you want me to

19   make that agreement, you know --

20             THE COURT:  Oh, I don't care.  I --

21   or you can use those diagrams or whatever.

22             MR. PARTNOW:  Largely, I'm --

23   there's a few adjectives and adverbs that I think

24   people might, but we're not here to argue summary

25   judgment.

EXHIBIT ___1___
PAGE _24_ OF _75_

Page 25

```
 1                    THE COURT:  Right.
 2                    MR. PARTNOW:  Generally what
 3      Mr. Marston presented is pretty accurate.  One
 4      thing that, in terms of claims --
 5                    THE COURT:  Who do you represent?
 6                    MR. PARTNOW:  I represent Coffman.
 7      One things, in terms of the claim, is the
 8      Imperial claim back against Absolute from the
 9      original lawsuit said basically we lost our shirt
10      on this project because of, quote, undisclosed
11      conditions.  We -- and we went out to the job,
12      and we started scrubbing, and we found conditions
13      that we didn't think were going to be there, and
14      various other things happened.  And because of
15      all of this, this contract that we had bid --
16      this subcontract that we had bid at X dollars
17      cost us, you know, 10 X.
18                    And one of the things that we
19      submitted in our initial motion as Exhibit 1 is
20      a -- I think it's about a 20-page interrogatory
21      response to the damages interrogatory where
22      Imperial was asked, List all the stuff that went
23      wrong, all the reasons why you think you were
24      damaged.  And in it they go and they talk about
25      the various undisclosed conditions, including the
```

EXHIBIT ___1___
PAGE _25_ OF _75_