1    come up in any appellate case either, so...

 2              Now, it's a -- and, again, Absolute

 3    is saying that, well, you know, we don't have

 4    standing to, you know, object to the pretrial

 5    order.  And, again, we disagree with that,

 6    because, you know, there is absolutely no reason

 7    why, because we were absent for this few month

 8    period of time, when we were signator -- or we

 9    signed the joint scheduling agreement and the

10    court entered the pretrial order, why we

11    shouldn't be protected by that.  And that's one

12    of the -- that's one of the functions of the

13    pretrial order is to get everybody together,

14    everybody agrees on discovery -- or on a

15    discovery plan, and agrees on a time line of when

16    things are supposed to happen so that there is

17    not any unfair surprises, and everybody can

18    expect what -- what to happen.

19              Now, apart from not -- not looking

20    at the records, which is what Absolute's claiming

21    in the first place -- again, this relates to

22    its -- its different set of facts, and it doesn't

23    speak to all -- about its passed through claims

24    to -- or any passed through claims that it might

25    assert against Imperial.

EXHIBIT ____1____

PAGE __51__ OF __75__

1           Absolute, as Mr. Partnow said, was

2    the one that actually working on the job.  And

3    it's -- you know, it -- from Mr. Olson's

4    affidavit, it appears that -- the argument is,

5    well, you know, we -- we're doing the job.  We

6    were looking at these welds that supposedly were

7    defective, but we didn't understand them to be

8    defective because, well, we're not a painting

9    contractor, and this isn't our line of work.

10           You know, whether -- that's a

11    significant question whether Absolute -- when

12    Absolute has the duty to undertake or has the

13    duty to, you know, have the knowledge of a

14    painting contractor, even in the absent -- or if

15    it undertakes that duty.  But in any event it's

16    undisputed that Imperial who was actually doing

17    the work on the first part of the project was a

18    painting contractor, would -- would have looked

19    at these welds, should have known what they were

20    doing.

21           Finally, what I would like to bring

22    up is Coffman's -- or our argument that we should

23    only be -- or Coffman should only be let out if

24    we're let out.  And I think that's -- I don't

25    know whether that's seriously in dispute or not.

EXHIBIT ____1____
PAGE __52__ OF __75__

1    You know, if Absolute asserted a claim against us

2    that, you know, alleged that Coffman may have --

3    may have been negligent and as a result we were

4    entitled to indemnity, we asserted that claim as

5    quickly as we could, and as a result -- I mean,

6    we couldn't have asserted a claim against Coffman

7    in the absence of any demands by Absolute.

8                So I think that's all I have, Your

9    Honor, unless you have any questions.

10                THE COURT:  No, I appreciate that.

11    I think you probably want to respond.

12                MR. MARSTON:  I surely do.  I'd

13    like to stand here.

14                For the record, again, this is, and

15    for our listeners, this is Terry Marston on

16    behalf of Absolute responding to --

17                MR. McKINLEY:  We -- we can't hear

18    you, Your Honor.

19                THE COURT:  Okay.  Well, that's

20    because there is so much distance between his

21    mouth and the microphone.  Why don't you just put

22    that walking mic. on?

23                MR. MARSTON:  I'll put this on

24    then.  At the court of appeals, they have little

25    buttons.  It actually come up.

EXHIBIT ____I____
PAGE _53_ OF _75_

1                    THE COURT:  Right, I know.  We're

2       not -- we're not that special.

3                    MR. MARSTON:  Can you hear me now,

4       Mr. McKinley?

5                    MR. McKINLEY:  Yes.  Thank you.

6                    THE COURT:  All right.

7                    MR. MARSTON:  Again, this is Terry

8       Marston speaking.

9                    The first thing that I want to do

10      is point out what is the motion that's pending

11      before this court today.  The motion is a motion

12      for sanctions under civil Rule 37 with the

13      specific sanction requested being the dismissal

14      of Absolute's claims against Brechan and against

15      Coffman.  In my arguments in my briefing back

16      against these arguments, I pointed out that they

17      are bringing in declarations, asserting factual

18      prejudice and that under the rules pertaining to

19      civil Rule 12B, any time that such things are

20      brought in, that converts it into a summary

21      judgment motion.

22                   However, in response to those

23      arguments, the reply came back absolutely

24      positively not, we are not asserting summary

25      judgment.  We're not saying that there aren't

1    facts to support your argument, nor are we

2    arguing a CR 12 motion that there is no law to

3    support your argument.  All we're arguing is that

4    the combination of CR 16, the scheduling order,

5    and CR 37 provides for a sanction for a failure

6    to comply with the court's discovery order and

7    the sanction -- the specific sanction they're

8    requesting is the dismissal of our lawsuit.

9            Now in that context, we're not even

10   talking about whether there's issues of fact or

11   law.  We're talking about whether there was a

12   presentation of an argument, if it came to be

13   substantiated, that would demonstrate that my

14   client had a good and valid claim.  That is good

15   cause.  So, that's the issue -- issue that we

16   want to address.

17           Now, your first question that you

18   were asking counsel is whether or not there was

19   prejudice -- excuse me, not prejudice, it was

20   whether there was --

21           THE COURT:  Good cause.

22           MR. MARSTON:  -- good cause for

23   Absolute not to have known about the absence of

24   seal welds and defective welds causing the

25   coating system to not work.  And the answer is:

1    There is no -- my client has submitted

2    declaration that says categorically that he had

3    no knowledge, and I will read exactly what his

4    words were in terms of his declaration, and those

5    are:  Contrary to the arguments of Brechan in the

6    sworn statement of Michael Martin, Absolute did

7    not know prior to the date of the original

8    deadline for amendment of the pleadings that

9    defective welds would cause holidays in coatings,

10   that the amount of defective welds on the cargo

11   wharf was unusual, or that defective welds

12   constituted a differing site condition.  And

13   we've got evidence of fact on that point.

14            Now, Mr. Partnow, in his argument,

15   said, Your Honor, Imperial had alleged all of

16   these things in its answers to discovery

17   questions.  Well, those interrogatories that were

18   sent to Imperial were sent by me.  And I invite

19   the Court to scour Imperial's responses to those

20   discovery requests.  At no point will you find

21   any allegation of a differing site condition

22   based on defective welds or absence of seal

23   welds.

24            Mr. Partnow is just kind of

25   slipping sideways on that and says, well, they're

EXHIBIT ____1____

PAGE _56_ OF _75_

Page 57

1    alleging differing site conditions, but, as

2    Mr. Nist properly noted, there is no factual

3    argument ever presented by Imperial of a

4    differing site condition claim based on defective

5    welds.  They're differing site condition claim

6    had to do with a second grade coating underneath

7    the piles.  So, at no point was there any factual

8    argument whatsoever prior to the expiration of

9    that pretrial order that raised it as an issue at

10   all, at this point.  So we had no basis to know

11   about it.

12              Now, there was the allegation that

13   there was a conspiracy.  My client didn't

14   conspire with anybody.  So why would he do

15   research into a portion of the project that

16   didn't have anything to do with the portion that

17   he worked on and that from his perspective didn't

18   even relate to a conspiracy on the part that he

19   did?  And yet Mr. Partnow is saying that we have

20   a lack of diligence to go and study, you know,

21   3,000 pages of documents that appear to have no

22   weld links to anything whatsoever.

23              I submit that if this issue had

24   never come up and I submitted a bill to this

25   court in support of a fee request saying that I

EXHIBIT ___1___
PAGE _57_ OF _75_

1    had spent, you know, a week studying these

2    documents, he would challenge that as being an

3    unreasonable expenditure.  Litigation is

4    expensive enough without going off on wild goose

5    chases.

6              So, again, remembering that this is

7    in the context of a CR 16 motion, simply whether

8    there is good cause; not whether there is law

9    supporting our -- our position, they have not

10   challenged that; not whether there are facts

11   supporting our position, they have not challenged

12   that.  In fact, to the extent that they would

13   challenge that, we would submit that we have

14   submitted in the declarations on our motion proof

15   that there are facts to support our allegations.

16              In addition to that, well, we

17   invited the opportunity to submit additional

18   evidence to the court under CR 56F.  But they say

19   that they're not asking for relief under those.

20   All they're asking you for is to impose the

21   ultimate sanction on my client for not having

22   discovered the deception that they were

23   perpetrating on my client.

24              Now let's ultimately get to the

25   real pragmatic issue.  What would be a

Page 59

1   consequence of your decision?

2            Well, what is CR 16 about?  CR 16

3   is not normally considered a basis for dismissing

4   lawsuits.  CR 16 is a rule designed -- may I have

5   some water, please -- is a rule designed to

6   facilitate the economical, coordination, and

7   presentation of a lawsuit.  And toward that end,

8   the purpose is -- and the purpose is stated

9   expressly in the rule itself:  We're expediting

10  continuing control, discouraging wasteful

11  pretrial activities, encouraging thorough

12  preparation, facilitating settlement.  At no

13  place does it say this is supposed to act as an

14  auxiliary statute of limitations.

15           So, ultimately, if the court were

16  to ever even consider granting this motion, the

17  consequence would simply be my client would have

18  to bring a separate lawsuit.

19           Now, Mr. Partnow said that I tried

20  to slip something past you, or some words to that

21  effect, because the only people that had any

22  interest in whether or not they were joined were

23  Brechan and Coffman.  Well, again, CR 16 is to

24  govern the -- the prosecution of the case for the

25  existing parties.  Well, Specialty -- Specialty

EXHIBIT ___1___
PAGE _59_ OF _75_

Page 60

 1   Polymers were still a party to the lawsuit, and

 2   EMERCO and McKinley were still parties to the

 3   lawsuit.

 4               And the joinder of these two

 5   additional parties posed the possibility -- in

 6   fact, the fact of a continuance in the trial

 7   date, because the trial date was rescheduled by

 8   this court's order to July with the participation

 9   of the parties bringing these motions today by

10   the way.  So, if anybody had standing to object

11   to bringing these additional parties in, it was

12   the existing parties in the case, and they did

13   not object to it.

14               So the question before this --

15               THE COURT:  I -- I --

16               MR. MARSTON:  Go ahead.

17               THE COURT:  You know, I'm not --

18   obviously that's true, but had I known -- had

19   it -- had it been flagged, we probably would have

20   had a motion and then something to make sure they

21   were aware of it.  I mean, I'm just think --

22   knowing how I think, if I realized that these

23   people had been dismissed and now they're being

24   brought in, I probably would have wanted their

25   input.

EXHIBIT ___1___

PAGE __60__ OF __75__

1          MR. MARSTON:  And that certainly

2    would have been within your purview to do that.

3          THE COURT:  It's just the way I

4    think.  I probably would have, and I know at the

5    moment it passed right -- it just was a

6    stipulated motion that I signed --

7          MR. MARSTON:  Right.

8          THE COURT:  -- as we routinely do,

9    as I will be --

10          MR. MARSTON:  Certainly.

11          THE COURT:  -- much more careful in

12    the future.

13          MR. MARSTON:  But as a matter of

14    law and as we've cited in our briefing, that's

15    not a requirement, and the -- the law is that the

16    parties to be -- sought to be joined do not need

17    to have notice and do not have standing to argue.

18    Now I'm not saying the federal district court

19    doesn't have the right to call them up and say

20    excuse me --

21          THE COURT:  All I'm saying is that

22    I wish someone would have said, By the way,

23    Judge, better take note.  These people have

24    already been dismissed once.  I don't know what

25    it would have done other than I would have

1   probably had a hearing or said, I'd like them to

2   know about this.  That's all -- it may not change

3   a thing.

4                   MR. MARSTON:  Right.

5                   THE COURT:  But it would have just

6   made things a little smoother from my

7   perspective.

8                   MR. MARSTON:  Okay.  In any event,

9   had they been invited to participate, we would be

10  where we are today.

11                  THE COURT:  Right.

12                  MR. MARSTON:  And so we're having

13  that argument today.

14                  THE COURT:  Right.  I under- -- I

15  understand that.

16                  MR. MARSTON:  And the argument is

17  not, you know, personally, we did -- we didn't

18  stipulate to any dismissal of any claims that

19  Absolute had against any of these parties.

20  Mr. Partnow refers to a stipulated dismissal to

21  their participation in the lawsuit or some

22  verbiage to that effect.  That wasn't the case.

23  We had no notice that this was going to happen.

24  It was just announced to us as a fait accompli.

25                  Number two, the dismissal was only

EXHIBIT ___1___

PAGE __62__ OF __75__

1    of the claims that Imperial had against them.  We

2    weren't asked to stipulate to it.  We did not

3    stipulate to it.  You know, we had no standing in

4    Imperial's claims against them.  And, in addition

5    to that, at that time we had no knowledge of any

6    basis for asserting any claims of our own against

7    them.  So that's all a red herring.

8                    But it's important to recognize,

9    though, that there is no release of claims

10   against them.  There is no waiver of claims

11   against them.  There is no stipulation of

12   dismissal of claims against them.  There is no

13   exploration of a statute of limitations against

14   them.  There is no argument that there was no law

15   to support my client's position.  There is no

16   argument that there are inadequate facts to

17   support my client's position.

18                    All they are saying is that my

19   client should have known by looking at these

20   welds that they would cause holidays to appear.

21   But the reality is they picked my client because

22   he wouldn't know that.  And they have submitted

23   no evidence to the court to suggest that he

24   should have had knowledge of that, law or fact.

25   And if they did submit evidence of that what it

 1    would be doing is arguing affirmative defenses of

 2    either estoppel or failure to comply with the

 3    condition precedent.  That goes back to

 4    Mr. Nist's argument.

 5                    Mr. Nist says that, in the ordinary

 6    course of things, what would have happened is

 7    that the general contractor would have been

 8    notified by the subcontractor of the differing

 9    site condition, and then that general contractor

10    would have had the opportunity to present a claim

11    to the owner to get compensation itself.  There

12    are no facts to support that argument as a

13    starting position.  Mr. Martin submitted a

14    declaration, but all it is is a conclusory

15    deposition -- declaration saying that we were

16    prejudiced, we couldn't pass through our claims.

17                    The reality is -- and, again, this

18    goes to a 56 motion, as if this was an

19    affirmative defense that they were seeking

20    summary judgment on, is that it was a differing

21    site condition.  It was a superior knowledge

22    condition for us but not for them, because they

23    had enormous knowledge of this situation.  And I

24    would like to draw the court's attention to

25    Exhibit 3 to my own declaration.  Or is this an

1     appendix?

2                    It's Exhibit 3, page 3 of 11 is

3     what it says, and it is a letter from the

4     contracting officer, Anita Reckenich, during

5     Phase 1 of the contract, not Phase 2, and this is

6     in response to Brechan's having sent them a

7     letter saying, We have discovered this differing

8     site condition and want additional compensation

9     for it.  She responds, at page 2 of the letter,

10    with the statement -- let me see.  Let's start at

11    page 1.  She says:  Furthermore, we understand

12    that your coating contractor has submitted a

13    claim to address a change site condition, namely,

14    addition -- additional coating preparation work

15    that was allegedly misrepresented in the contract

16    specifications by your design team.  That's the

17    factual issue that we're talking about on

18    Phase 1, that they knew about; they didn't

19    disclose to us.

20                    But the significant fact is the

21    Coast Guard denied them additional compensation

22    for that claim on the next page.  More

23    importantly, the redesign must meet new --

24    they're saying that you can fix this yourself.

25    If you have to, you can redesign it; but, more

1    importantly, the redesign must meet the owners

2    initial scoping requirements and all efforts

3    associated with the redesign and construction

4    will be at no cost to the owner.  That was on a

5    previous contract.  So, if it was a surprise to

6    us and we're entitled to make a claim to them

7    about it, they were never in a position to claim

8    in the subsequent contract that it was a surprise

9    to them.  So, even if my client had been aware of

10   it, had given them notice, they would not be in a

11   position to ask for any additional money.  Since

12   they had done the first phase of the contract,

13   had encountered the condition, new about it, and

14   had an opportunity to price it in their second

15   contract, they had no legal right to pursue such

16   a claim.

17              THE COURT:  Last question.  Your

18   time is --

19              MR. MARSTON:  Yes.

20              THE COURT:  -- well-spent -- are

21   spent.  Why do you want them back in?  Why do you

22   need them back in?

23              MR. MARSTON:  I need them back in

24   because as soon as we got these documents from

25   Imperial that said there was an enormous problem,

Page 67

1    again, this is Mr. Hardenbergh's October 30th

2    report, there was enormous problem with the

3    welds.  Our claim against Imperial had been

4    that -- where is Imperial?  Over here.  Up there.

5                    Our claim against Imperial had been

6    that you didn't do your work properly and failed

7    to complete it, leaving us to spend over a

8    million dollars to get that done.  Their defense

9    now would be to come back and say, The reason it

10   cost you a million dollars is not simply because

11   we left but because the work itself cost a

12   million dollars more than you were led to believe

13   to begin with.  So they'll be asserting that as

14   the defense, and we have nobody to turn to

15   because we were, and I use this word advisedly,

16   "deceived" into entering into this contract.

17                    Now, if I'm wrong about that, their

18   approach is to bring a summary judgment motion

19   and get this dismissed on the merits, not this

20   procedural thing.

21                    THE COURT:  Okay.  Thank you.

22                    MR. MARSTON:  Thank you, Your

23   Honor.

24                    THE COURT:  Mr. Partnow, do you

25   have any response?

Page 68

1          MR. PARTNOW:  Just very briefly,

2    Your Honor.  I think -- I think with the diagram

3    there, I think you've got a --

4          THE COURT:  I've got plenty to

5    listen to.  I'll listen to this all again.

6          MR. PARTNOW:  No, I think -- I

7    think you -- I don't want to beat a dead horse.

8    I -- I did not intend to say and do not intend to

9    say and never intended to say that the issue that

10   was raised by Imperial against Absolute said --

11   talked about this particular weld problem.  And

12   the reason they didn't talk about it because --

13   is because it didn't exist on Phase 2, but that's

14   a whole factual dispute.

15          What isn't in dispute is that

16   Mr. Marston -- there was a claim by Absolute,

17   while we were in the lawsuit, while they were in

18   the lawsuit, back against -- Imperial against

19   Absolute, saying, Tell us everything that caused

20   you a problem.  And their response is Exhibit 1

21   to our motion, which lists everything that they

22   say caused the problem.  Now, as Mr. Nist said,

23   if the things that Imperial said were true, some

24   of those things or -- or all of those things

25   would have gone back to Brechan, to the -- you

1    know, to the Coast Guard or whatever, and they

2    were on notice that this is what Imperial was

3    saying.

4              That memo shows two things.  First

5    of all, as Mr. Nist said, that was the point

6    where if Absolute had claims to go back upstream,

7    they had to file them, and, secondly, it shows

8    the people who were actually out there doing the

9    work, the experts, who they think, these are the

10   experts, we don't know that much, so we hired

11   guys who did, they were out there, and this

12   thing, whatever this undisclosed thing that

13   they're saying exists, which they don't even

14   point even sitting here today ever, that they

15   haven't said, here it was, it happened here, or

16   it happened there.  They haven't even said that

17   it happened on Phase 2.  All they're saying is

18   there is a problem on Phase 1.

19             But here they have this qualified

20   second tier sub who they hired, who said, We're

21   getting killed out on this job for all these

22   reasons, and they went on it for 20 pages listing

23   everything that they ran into that caused them a

24   problem.  And there is not one mention of this

25   supposed issue that they're now trying to bring

1    in in -- in November of 2005; that somehow with

2    two years working out on this project, not a

3    single person noticed that there was this

4    problem, actually doing the work, which they're

5    now trying to bring us and Brechan back in for.

6              And I -- the only other thing I can

7    say, it's a -- we've -- there's been some

8    attempt -- you know, we as -- we -- we -- at Your

9    Honor's direction, we participated in the

10   schedule -- the second scheduling conference.

11   And I understand, you know, you wanted to get the

12   calendar.  That all made sense.  And you were

13   aware of the fact that there were some

14   substantial issues with regards to whether we

15   should even be here or not and -- and because of

16   the late briefing, we're now here, I haven't had

17   a chance to do it.

18              If the case is going ahead, and --

19   and, again, in terms of talking prejudice, there

20   is going to be a meeting for counsel, and the

21   suggestion from counsel, if I count correctly, is

22   18 depositions that are going to be occurring

23   here and, you know --

24              THE COURT:  Are you saying the

25   trial date is not realistic?

Page 71

1           MR. PARTNOW:  No, I'm not saying

2    the trial date is real -- is not realistic.  I'm

3    saying that, you know, there is a huge expense

4    that's involved, you know, for -- for my client,

5    which is who I'm here about to deal with issues

6    that could have been raised, that should have

7    been raised.  And the re- -- you know, the

8    purpose of Rule 16, you know -- you know, it's

9    routine for the court to not allow new claims or

10   additional parties to an ongoing litigation if

11   there isn't good cause and if there is prejudice.

12   And that's what's happened here.

13           We're not -- we're not asking for a

14   dismissal of the lawsuit.  We're just saying

15   these new claims can't be brought against us, if

16   they should have -- were going to be brought,

17   they had to have been brought before April, and

18   they had good cause.  They were on discovery

19   notice to find out if such claims existed prior

20   to that time, and they haven't come forward with

21   any reason why they should be allowed a year and

22   a half more with the prejudice that has developed

23   in the interim.

24           Thank you, Your Honor.

25           THE COURT:  All right.  Thank you.

1    Mr. Nist.

2                    MR. NIST:  Yes, Your Honor.

3                    THE COURT:  If you would like to

4    remain seated, that would be fine.

5                    MR. NIST:  Okay.  Thank you, Your

6    Honor.

7                    When you asked Mr. Marston why he

8    needed Coffman and Brechan in this lawsuit, his

9    response was, well, I've got -- you know, I'm out

10   a million dollars, and Imperial is going to --

11   has claimed that this million dollars wasn't

12   caused by them, it was caused by somebody else.

13   That's a causation problem for Mr. Marston's

14   case, but that's not a basis to keep us in this

15   case, Your Honor.  This case is very complex.

16   It's very tricky.  We've got allegations of

17   conspiracy running around.  Specialty Polymer

18   Coatings, which is a party to this case.

19   Imperial is a party to this case.  This case

20   involves potential pass through claims that we

21   argue shouldn't be asserted because they've been

22   in this case since the inception in the fall of

23   2003, and it creates incredible additional

24   expense, both for trial preparation for us and

25   for discovery.  So for that -- for that reason we

1    don't think it's proper for us to be in this
2    case.
3              THE COURT:  Very well.
4              MR. MARSTON:  Ten seconds regarding
5    prejudice, and that is none of the prejudice that
6    has been argued by both --
7              MR. McKINLEY:  Your Honor, we can't
8    hear.
9              MR. MARSTON:  None of the prejudice
10   that has been argued by either attorney falls
11   under the category of unfair prejudice.  That's
12   the only thing that's recognizable by the court.
13   The kind of prejudice they're talking about is
14   simply the fact that they will incur costs in
15   defending themselves.  Well, the statutes of
16   limitations on their claims hasn't expired yet.
17   So they would obviously be exposed to those kind
18   of quote, unquote, prejudices in any event.
19             Mr. Nist did make the point that in
20   the -- my response to your questions of why do I
21   need them back in.  Well, the way I responded to
22   that was based on the initial shock of finding
23   these documents.  But, in addition, what I said
24   then, it is also very much true, and I don't mind
25   saying this on the record, that I believe that

Page 74

1    the majority of the cost overrun on this project,

2    and I believe a substantial portion of the

3    problems that Imperial encounter would do to

4    these various situations and there -- they are

5    liable for them.  They created them.  The costs

6    logically should remain with them.

7                    Thank you, Your Honor.

8                    A SPEAKER:  Well, have a heck of a

9    good week.  Okay?

10                   THE COURT:  I'm going to go to

11   work.  Thank you all very much.

12                   SPEAKERS:  Thank you, Your Honor.

13                   THE CLERK:  All rise.  This matter

14   is now adjourned.  Court stands in recess until

15   10:30.

16

17

18

19

20

21

22

23

24

25

EXHIBIT ___1___

PAGE _74_ OF _75_

1                    TRANSCRIBER'S CERTIFICATE

2         I, M. Nancy Capetillo, Court Reporter, hereby

3    certify that the foregoing pages numbered 1 through

4    18 are a true, accurate, and complete transcript of

5    proceedings in Case No. A03-199 CIVIL, Absolute

6    Environmental Services, Inc., an Alaska Corporation

7    versus Forrest J. McKinley, an individual, d/b/a

8    "Imperial Industrial Coatings"; and EMERCO, INC., a

9    California corporation, d/b/a Imperial Industrial

10   Coatings; Brechan Enterprises, Inc., an Alaska

11   Corporation; and SAFECO Insurance Company of

12   America, a Washington corporation, transcribed by me

13   from a copy of the electronic sound recording to the

14   best of my knowledge and ability.

15

16   _____         _____

     Date                     M. Nancy Capetillo, Transcriber

17

18

19

20

21

22

23

24

25

EXHIBIT ____ 1
PAGE 75 OF 75