Absolute v. McKinley                                  Jerry R. Hardenbergh, Vol. II
                                                                              41

Page 384

1   Q.  And is that revised criteria the February 27th memo --
2   or excuse me -- 26th memo that we previously marked, Exhibit 74?
3        MR. STOETZER:  Object on the basis of foundation to
4   the extent Exhibit 74 is watermarked a draft.
5   Q.  Well, there's multiple different copies of it, and
6   this is the one that was sent to the Coast Guard.
7        MR. KREGER:  Objection.
8   A.  Yes, I think that's the one we are talking about here.
9   Q.  Okay.  Would you take a look at the second page
10  entitled "Option 2," about the fourth paragraph down.
11  A.  Okay.
12  Q.  It says, "Option 2 would be to modify the project
13  specification requirements by requiring the contractor to
14  improve but not to modify the surface imperfections.  The
15  standard industry approach to this would be to stripe coat or
16  caulk the poor quality or nonexistent welds.  This approach
17  provides a cost-effective method for minimizing the amount of
18  coating defects that would result from the adverse surface
19  conditions.  Sharp edges, slivers and weld splatter will
20  continue to be ground smooth after sandblasting.
21       "Defective welds that compromise the integrity of the
22  structure or that weep water could be repaired on a cost unit
23  basis.  The number of these type of welds is not known but is
24  anticipated to be minimal.  Since the coating contractor would
25  be requested to perform additional work and supply additional

Page 385

1   materials, a scope modification would be necessary if a Coast
2   Guard wants to consider this option.
3        "The coating contractor has submitted a cost proposal
4   to perform this work.  Coffman feels that this approach is
5   practical and feasible.  This approach is a compromise between
6   doing no additional surface preparation, Option 3, and doing
7   extensive modifications to the facility, Option 1.
8        "This approach would minimize but not eliminate the
9   amount of coating defects, primarily pinholes at the subject
10  areas and would continue to extend the useful life of the
11  facility an additional 25 years."
12       Is that your understanding of the option, the terms
13  of the Option 2 proposal that was made by Coffman, or
14  recommended by Coffman?
15       MR. STOETZER:  Which document are you reading from?
16       MR. MARSTON:  74.
17  A.  Yes, I believe this Option 2 is the one that was
18  proposed.
19  Q.  Is there any identification in the paragraph that I
20  just read about what the acceptance criteria would be for the
21  holiday -- or excuse me -- the number of holidays on the relaxed
22  criteria?
23  A.  What was that question again?
24  Q.  Does that paragraph or anywhere else in this
25  memorandum from Mr. Stears identify a acceptance criteria for

Page 386

1   holidays under Option 2?
2   A.  No.
3   Q.  Was it your understanding that the work that Swalling
4   did on bent 6 through 12 was done pursuant to Option 2?
5   A.  Their work was completed pursuant to the Coast Guard's
6   Mod 5, not this, not Option 2.
7        THE WITNESS:  Can we close that?
8        MR. KREGER:  Is the sun getting in your eyes, Jerry?
9        THE WITNESS:  Yes.
10  Q.  So is it your understanding that the Coast Guard
11  rejected Option 2?
12       MR. KREGER:  Objection.  Mischaracterizes his
13  testimony.
14  Q.  Is it your understanding that the Coast Guard rejected
15  Coffman's recommended Option 2?
16  A.  I don't know that they rejected it.  I know that Mod 5
17  came from the Coast Guard to be used.
18  Q.  Who drafted the provisions of Mod 5?
19       MR. STOETZER:  If you know.
20  A.  I don't know.
21  Q.  To your knowledge, was it somebody within the Coast
22  Guard?
23  A.  I would assume.
24  Q.  But, to your knowledge, it's not anybody from Coffman
25  who drafted those?

Page 387

1   A.  No.
2   Q.  Are the requirements of the Coast Guard's Mod 5 terms
3   comparable to Option 2?
4        MR. KREGER:  Objection.  Vague.
5   A.  Not entirely.  I believe the Coast Guard's Mod 5
6   pretty much stated to follow most of the specification, except
7   there was some components that would not be warrantied.
8   Q.  What did it say about whether or not holidays were
9   permissible?
10       MR. STOETZER:  Objection.  Foundation.  Do you have a
11  copy of whatever it is you wanted him to compare?
12       MR. MARSTON:  Well, I do, but right now, I want to
13  know what his recollection is.
14  A.  My recollection is that there were to be no holidays
15  in accordance with the project specifications, inspection
16  thresholds.  Their original specification.
17  Q.  So to the extent that the June 21 specification was a
18  holiday-free specification at 4,000 volts, high-voltage holiday
19  test, the Mod 5 revision to the contract maintained that
20  holiday-free standard?
21  A.  I believe so.
22  Q.  And, therefore, that would have required you to
23  perform high-voltage holiday testing over all coated surfaces on
24  bents 6 through 12?
25  A.  If not me, the contractor's QC.  More likely the

(Pages 384 to 387)

Buell Realtime Reporting, LLC
206-287-9066

Exh. B ; p. 1 of 2



EXHIBIT B

Absolute v. McKinley                                            Jerry R. Hardenbergh, Vol. II
42

Page 388

1  contractor's QC.
2     Q.  Well, you performed high-voltage holiday tests
3  yourself, though, right?
4     A.  I did, uh-huh.
5     Q.  And you performed high-voltage holiday tests
6  throughout the entirety of the cargo wharf bents 1 through 33?
7     A.  Yes.  Not entirely on every surface.  I did more of a
8  QA oversight function.
9     Q.  And you did that when Swalling was performing the
10 work, you did it when Imperial was performing the work, and you
11 did it when Absolute was performing the work?
12    A.  That's correct.
13    Q.  And the standard of testing that you utilized was
14 identical in all circumstances?
15    A.  That's correct.
16    Q.  And the method of testing that you utilized was
17 identical in all circumstances?
18    A.  That's correct.
19    Q.  And the frequency of testing you utilized was
20 identical in all circumstances?
21    A.  I believe so.
22    Q.  And what you were willing to accept as being
23 consistent with the holiday-free criteria remained uniform
24 throughout all circumstances?
25    A.  With the exception of the caulked areas on the

Page 389

1  nonstructural appurtenances.
2     Q.  Why did you make an exception in that area?
3     A.  Those were the pieces that were not to be warrantied
4  by the Coast Guard, so I did not holiday test those.
5     Q.  Were they required to be repaired in some way?
6     A.  Yes, I believe so.
7     Q.  And how were they required to be repaired?
8     A.  I'm not -- I don't understand your question.
9     Q.  Did they have to be cut off?  Did they have to be seal
10 welded?  Could they be caulked?
11    A.  Yes, they could be caulked, they could be cut off at
12 contractor's option, and I believe Absolute elected to cut off
13 most of those members.
14    Q.  What about Swalling?
15    A.  I think Swalling cut some of them off, not all of
16 them.
17    Q.  Let's mark 20331 as the next exhibit.
18        (Exhibit No. 79 marked.)
19    MR. DICKSON:  What number?
20    MR. MARSTON:  79.
21    MR. KREGER:  How are we doing on time?
22    MR. STOETZER:  I think it's getting close in time to
23 turning over the microphone.
24    MR. MARSTON:  It might have been but for the extended
25 breaks.

Page 390

1     MR. STOETZER:  We've had no lunch break.  I think
2  it's unfair to say we've had extended breaks.  The witness has
3  been in that chair since --
4     MR. MARSTON:  I'm not quarreling with --
5     MR. STOETZER:  I just want to make sure the other
6  people get time.
7     MR. MARSTON:  Other people will have time.
8     Q.  Have you seen that document before?
9     A.  No, I have not.
10    Q.  And is that -- what's the bottom page number on that?
11    A.  20331.
12    Q.  I'll represent to you that Brechan has informed us
13 that this is the subcontract modification that it entered into
14 with Swalling on or about March 13th, 2002.
15       Do you see the first item on there under "Description
16 of work," it says, "Reduced scope of H-pile section from 12,800
17 square feet to 8,100 square feet"?
18    A.  Yes, I do.
19    Q.  With $145,000 credit?
20    A.  Yes, I see that.
21    Q.  Look down at Item No. 5.  Was it your understanding
22 that Swalling's performance of the work was included in
23 modification to the preparation spec as per Option 2 of the
24 surface preparation technical proposal, dated February 26, 2002,
25 and prepared by Coffman Engineers?

Page 391

1     A.  I'm sorry, was that a question there?
2     Q.  Yeah.
3         Did you know that Swalling -- that Brechan had signed
4  a subcontract modification with Swalling that said that it was
5  to perform the work on bents 6 through 12 per Option 2 as stated
6  in Coffman's technical proposal?
7     A.  No.
8     MR. STOETZER:  Object to the form of the question.
9     Q.  Do you have any reason to doubt the authenticity of
10 this document?
11    A.  No.
12    MR. KREGER:  We'll stipulate to the authenticity of
13 that document.
14    MR. MARSTON:  Okay.
15       Let's mark that as the next exhibit.  This will be
16 Mod 5.
17       (Exhibit No. 80 marked.)
18    MR. KREGER:  Is there a Bates number or some
19 identifier that we'll be able to follow on?
20    MR. MARSTON:  It's page 20366, 67, 68, 69 and 70, and
21 it begins with a transmittal from Anita Repanich to Matt
22 Holmstrom, and this is a composite document.  What you'll find
23 on top of it is the transmittal.  You'll find a first version of
24 Mod 5, which doesn't reference any descoping of the contract,
25 and then a second version of Mod 5, which here at the bottom

(Pages 388 to 391)

Buell Realtime Reporting, LLC
206-287-9066

Exh. B; p. 2 of 2