Absolute v. McKinley

Jerry R. Hardenbergh, Vol. II
37

### Page 368

1  A.  I could have.
2  Q.  Well, I'm asking you what the contract documents
3  required of you.
4  A.  I believe it gave me the option of increasing it to
5  that -- the actual thickness.
6  Q.  Did it give you any options to decrease it?
7  A.  I didn't decrease it below the minimum specified DFT.
8  Q.  But you did decrease it from the voltage recommended
9  by the manufacturer based on the mil thickness?
10         MR. STOETZER:  Object to the form of the question.
11  A.  I did not increase the voltage on the thicker sections
12  of coating, resulting in identifying fewer numbers of holidays.
13  Q.  You were trying to do the contractor a favor?
14         MR. STOETZER:  Object to the form of the question.
15  Q.  I just want to know what his point is.
16  A.  I don't know if I was trying to do him a favor or not.
17  I just thought that was a fair setting, to set the machine at
18  the lowest DFT that was required by the specifications.
19  Q.  Mr. Stears states:  "The intent of the surface
20  preparation requirements was to provide the surface cleanliness
21  and anchor profile conditions conducive to the specified
22  coating, while minimizing imperfections related to prior
23  construction techniques, slivers, scabs, weld splatter,
24  et cetera."
25         Do you agree with that statement?

### Page 369

1  A.  Can you ask me that again?
2  Q.  Yes, the last sentence in the second paragraph.  Do
3  you agree with the statement made there?
4  A.  Well, yes, certainly.
5  Q.  How about the last sentence in the next paragraph?
6  A.  (Witness reviews document.)
7      Yes, I agree with that.
8  Q.  Do you think that the intent of the project only
9  applies to Phase I?
10  A.  No.
11  Q.  Was it the intent of Phase II also to provide a
12  coating system for the dock and not to extensively and
13  structurally modify welds?
14  A.  I believe that to be true, yes.
15  Q.  Did Absolute extensively and structurally modify
16  welds?
17  A.  No, not at all.
18  Q.  Absolute did not extensively modify welds in its work
19  on Phase II?
20  A.  No.
21  Q.  Did Absolute grind all the welds on Phase II?
22  A.  I believe they ground some welds.
23  Q.  What percentage of the welds do you believe Absolute
24  ground?
25  A.  I don't -- I can't give you a percentage.  I don't

### Page 370

1  know what percentage.
2  Q.  So if Absolute were to testify, somebody at Absolute
3  were to testify that they ground effectively all of the welds on
4  bents 13 through 33, you would not be able to quantify in any
5  way a lesser portion of the welds that you think they ground?
6         MR. STOETZER:  Object to the form of the question.
7  A.  It's my recollection, I don't remember exactly how
8  much of the welds they ground.  I'm sure there was some of them
9  that needed no grinding at all.  There were some that were
10  ground, but I do know that there was not enough -- there was not
11  defective welds that resulted in a large amount of grinding of
12  the welds.
13  Q.  So what your testimony is, is that the only grinding
14  that was done by Absolute was grinding that was necessitated by
15  the minimal amount of weld defects in the form of slivers,
16  scabs, weld splatter, et cetera?
17  A.  That's right.
18         MR. STOETZER:  Object to the form of the question, to
19  the extent it misstates prior testimony.
20  Q.  Your answer was "that's right"?
21  A.  Yes.
22  Q.  So it's also your testimony, then, that it was as easy
23  to coat the welds on Phase II as it would be to coat the flat
24  surfaces on Phase II with respect to the appearance of holidays?
25         MR. STOETZER:  Object to the form of the question.

### Page 371

1  A.  No, I wouldn't say that.
2  Q.  The welds -- you said the welds -- the problems with
3  the welds, with the exception of omitted welds, and I think
4  there was one other thing that you said that persisted
5  throughout the project --
6  A.  Right.
7  Q.  -- went away by the time Absolute started its work.
8  A.  Right.
9  Q.  ==Therefore, except in the minimal number of areas that==
10  ==a contractor would normally expect to encounter sliver, scabs,==
11  ==weld splatter, et cetera, the only -- well, the welds were good,==
12  ==right?==
13  A.  ==That's right.==
14  Q.  And if the welds were good, then you should expect no
15  more holidays forming over the welds than the adjacent flat
16  surfaces on the steel?
17  A.  Not necessarily.
18  Q.  Okay.
19      How would you distinguish the two?
20  A.  Well, if you're talking specifically about the splash
21  plate area and the holidays or the difficulties in coating the
22  welds around the splice plate, it's not that there were
23  defective welds there.  There's an issue of access, the
24  configuration of the splice plates, and being able to get in to
25  spray the coating was difficult.

(Pages 368 to 371)

