ERIC J. BROWN, ESQ.
JERMAIN DUNNAGAN & OWENS, P.C.
3000 A. Street, Suite 300
Anchorage, Alaska 99503-4097
Telephone: (907) 563-8844
Facsimile: (907) 563-7322 (ebrown@jdolaw.com)

PATRICK J. DUFFY, III, ESQ.
WILLIAM R. BAERG, ESQ.
MONTELEONE & McCRORY, LLP
725 S. Figueroa Street, Suite 3200
Los Angeles, California 90017-5446
Telephone: (213) 612-9900
Facsimile: (213) 612-9930 (baerg@mmlawyers.com)

Attorneys for Defendant Forrest J. McKinley and
Defendant and Counter-Claimant EMERCO, INC.,
dba Imperial Industrial Coatings

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaskan Corporation,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>FORREST J. McKINLEY and "JANE DOE" McKINLEY, and the marital community property composed thereof d/b/a/ "Imperial Industrial Coatings" and EMERCO, INC., a California Corporation d/b/a/ Imperial Industrial Coatings,<br><br>　　　　Defendants. | CASE NO. A-03-0199<br>Civil (RRB)<br><br>**TRIAL BRIEF OF DEFENDANT FORREST J. McKINLEY AND DEFENDANT AND CROSS-CLAIMANT EMERCO, INC., DBA IMPERIAL INDUSTRIAL COATINGS** |
| EMERCO, INC., a California Corporation d/b/a Imperial Industrial Coatings, and the United States for the Use and Benefit of EMERCO, Inc.,<br><br>　　　　Counter-Claimant/Third Party Claimant,<br><br>　　v.<br><br>ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaskan Corporation, et al.,<br><br>　　　　Cross-Defendants/Third Party Defendants. | |

```
THE UNITED STATES OF AMERICA for the use  )
and benefit of ABSOLUTE ENVIRONMENTAL      )
SERVICES, INC., and Alaska corporation,    )
                                           )
        Plaintiff,                         )
                                           )
v.                                         )
                                           )
SAFECO INSURANCE COMPANY OF                )
AMERICA, a Washington corporation,         )
                                           )
        Defendant.                         )
_____)
                                           )
BRECHAN ENTERPRISES, INC., an Alaska       )
corporation,                               )
                                           )
        Counterclaim Plaintiff,            )
                                           )
v.                                         )
                                           )
ABSOLUTE ENVIRONMENTAL SERVICES,           )
INC., an Alaska corporation,               )
                                           )
        Counterclaim Defendant.            )
_____)
                                           )
BRECHAN ENTERPRISES, INC., an Alaska       )
corporation,                               )
                                           )
        Third-Party Plaintiff,             )
                                           )
v.                                         )
                                           )
COFFMAN ENGINEERS, INC., a Washington      )
corporation,                               )
                                           )
        Third-Party Defendant.             )
_____)
```

## 1.  SUMMARY OF ACTION

### A.  The Parties.

This lawsuit arises from a federal project that generally consisted of removing existing coal tar epoxy coatings from a United States Coast Guard ("USCG") cargo wharf and applying new coatings. The project was known as "Cargo Wharf Pile Coating Phase II," (hereinafter "Project"), and was located in Kodiak, Alaska. The owner of the Project was the USCG. The prime contractor was Brechan Enterprises, Inc. ("Brechan"). Brechan's surety was Safeco

Insurance Company of America ("Safeco"). The subcontractor was Absolute Environmental Services, Inc. ("Absolute"). Absolute subcontracted the coating work to Emerco, Inc., dba Imperial Industrial Coatings ("Imperial"). The president of Imperial is Forrest J. McKinley ("McKinley"). The Project's engineer was Coffman Engineers, Inc. ("Coffman"). The supplier of the product (who also certified the applicators of the product) used for the coating materials was Specialty Polymer Coatings USA, Inc. ("SPC").

### B.    Background Facts.

The United States Coast Guard's Facilities Design and Construction Center in Seattle, Washington (FD&CC) awarded Brechan a Job Order Contract ("JOC") of indefinite duration and indefinite quantities to provide construction services for the USCG station at Kodiak on an as-needed basis. Under the JOC, the USCG was able to negotiate individual construction projects with Brechan without competitive bidding. The individual construction contracts were referred to as Task Orders and were assigned task order numbers to identify the contracts. In this case, the USCG issued Task Order No. 7 to Brechan to perform the Project that is the subject of this lawsuit. Brechan originally subcontracted with Swalling Construction ("Swalling") to coat the first half of the wharf in a project called "Phase I." Swalling, however, had a difficult time on the job and encountered numerous problems with the wharf that rendered completion of the Project commercially unreasonable. Ultimately, Brechan was forced to pay off Swalling, who left the job without completing it. Brechan then subcontracted the remainder of the Project to Absolute, and called the Project "Phase II," but failed to inform Absolute of the difficulties encountered by the prior contractor. Brechan and Absolute have performed over 30 projects together.

In order to do the work, Absolute was required to fabricate and erect scaffolding and containment around the piles of the wharf, remove the existing coal tar epoxy coating, prepare the surfaces for new coating, apply the new coating (which consisted of a plural polyurethane coating product manufactured by SPC), and perform quality control and repairs to ensure the coating was at the specified thickness, adhesion, and free of holidays (tiny holes).

Imperial is a painting contractor located in Grand Terrace, California. Imperial's involvement with the Project began in approximately May of 2002 with the hiring of its new project manager, Ralph Thomas Puett. Prior to working for Imperial, Mr. Puett had engaged in independent, intermittent discussions with David Olson and Jason Peterson, Absolute's president and vice-president, respectively, about the possibility of working on the Project. After discussing the Project with Imperial's president in May of 2002, Imperial agreed to submit a bid for the job.

The subcontract between Imperial and Absolute was negotiated over a period of several months. During these negotiations, Mr. Olson emphasized that Absolute needed Mr. Puett's coating experience in order to qualify for the Project. Mr. Peterson further advised Mr. Puett that Absolute needed a final price negotiated prior to mid-October 2002, because on-site work had to begin no later than April 1, 2003, in order to meet the August 31, 2003, deadline set by the USCG to finish the work. They also discussed the fact that because of the narrow construction schedule, pre-fabrication of the Project's coffer dams and other materials was crucial to the Project's timely construction deadline. Therefore, Absolute agreed that if Imperial purchased materials and pre-constructed the coffer dams and rigging in Grand Terrace, and delivered these items to Kodiak along with all the other materials then, upon delivery of said items to Kodiak, Absolute would pay for mobilization in the amount of $204,743.74 as "materials on hand."

Between May 2002 and September 2002, Absolute and Imperial negotiated and prepared budget estimates for the Project. Ultimately, sometime in or near October 2002, Imperial submitted a quote to perform the Project for the sum of $772,123.00. Between October 2002 and February 2003, the specific contract terms, including the schedule, were negotiated and finalized. Although deemed signed as of December 18, 2002, Forrest McKinley, Imperial's president, executed and signed the written portion of the subcontract in February, 2002. Absolute marked up Imperial's contract and charged Brechan the sum of $995,850 for the work. Brechan, in turn, charged the USCG $1,413,020 for the Project.

///

The subcontract between Imperial and Absolute contained a number of exclusions. For example, Imperial excluded from its work all welding, stripe coating and caulking of welds, structural repairs, removal of thermite grounds, removal of cathodic protection circuit headers, removal of rectifier cable bonds, removal of structural steel. These items were supposed to be performed by Absolute (or another subcontractor) prior to Imperial arriving on site. Otherwise, Imperial could not "hit the ground running" upon arriving at the job site.

As promised, Imperial pre-fabricated the coffer dams and delivered them, and other materials, to the job site on April 1, 2003. Instead of paying Imperial the full amount due for "materials on hand," Brechan, the prime contractor, inexplicably directly paid $50,815 to one of Imperial's suppliers, Polar Supply Company, Inc., over Imperial's objections. In addition to deducting this $50,815, Absolute also withheld an additional $40,948.15 for reasons it never identified. Imperial strongly objected to these improper deductions. Nevertheless, Absolute simply ignored Imperial's objections.

In addition to the failure to honor its agreement to pay for materials on hand, it quickly became apparent that Absolute had breached its contract with Imperial in other ways. At the initial job site meeting held on April 2, 2003, Imperial learned for the first time that Absolute failed to do any of the necessary preparatory work such as removing the non-structural steel from the wharf, cathodic protection circuit headers, rectifier cable bonds, and had failed to stripe coat and caulk the welds. Because of these failures, the wharf was not ready to be striped and recoated, and the objective to "hit the ground running," was thwarted. When Mr. Puett pointed out these breaches to Matt Holmstrom of Brechan and David Olson of Absolute during a walk-through of the wharf under bents 13 to 15, Absolute directed Imperial to perform the work itself. In addition, at the April 2, 2003, job site meeting, Imperial was directed to perform additional coating work at bent 12-13, which was never part of its subcontract agreement. Absolute told Imperial that if it did not perform this coating work, Imperial would be back-charged the costs to perform the work. Imperial performed the extra work under protest. Even so, Imperial was not paid for all its work.

///

Because Imperial exposed Absolute's failure to prepare the wharf for coating and refused to perform the non-contract work without added compensation, Absolute and Brechan assumed a hostile attitude toward Imperial for the duration of Imperial's time on the Project. Coffman, the inspector hired by Brechan, never approved Imperial's work and never approved its means and methods of work, even though the same quality and means and methods of the work had been accepted on the wharf both before Imperial was on the job and after Imperial was removed from the job.

The Coffman inspector also employed inappropriate and non-industry standard test methods to evaluate the work. For example, the Project's inspector, Jerry Hardenbergh of Coffman, would repeatedly sweep the high voltage holiday testing device back and forth over the same area of coating in order to test for holidays (i.e., pin holes). The device should only sweep over an area once; repeating the procedure can actually damage the coating and require the coating to be repaired – which is what happened on this Project. Thus, Coffman was actually creating holidays. An e-mail exchange between Coffman and SPC during the Project confirmed that Coffman was aware of this fact. To make matters worse, Coffman refused to allow Imperial to surgically repair the holidays by using a "hot stick" – even though the specifications allowed its use. Rather, Coffman made Imperial remove and re-coat the holiday areas. In addition, the inspector failed to follow the specified industry standard when performing a Dry Film Thickness (DFT) test. SPCPA-2 (the testing standard) provides for an averaging of coating thickness to determine if the coating meets specifications. Coffman, however, required Imperial to repeatedly "repair" spots that had a "low" DFT without regard to the *average* DFT. Coffman employed a similarly improper technique when performing adhesion testing, and required Imperial to exceed the specifications' requirements. The inspector refused to acknowledge differing site conditions and recommend necessary change orders, and used testing equipment for which he failed to provide calibration certificates from the manufacturer. The conduct undertaken by Absolute, Brechan and Coffman appeared to be solely designed to fabricate a reason to terminate Imperial's contract.

///

As is standard industry protocol, Imperial communicated its concerns about Mr. Hardenbergh's inappropriate inspection techniques to its upper-tier contractor, Absolute, but Absolute failed to take any action even though it was contractually obligated to pass on Imperial's concerns to Brechan as the prime contractor and/or Mr. Hardenbergh.

One of the more frustrating aspects of the Project encountered by Imperial was Brechan's and Absolute's refusal to acknowledge a differing site condition consisting of an undisclosed layer of gray paint found beneath the coal tar epoxy – which also had to be removed before the coating work could be performed. The Project's specifications did not indicate the existence of gray paint beneath the existing coal tar epoxy, which could not have been known to Imperial from a site inspection because it was completely hidden. After initially refusing to acknowledge the existence of the gray coating, Absolute ultimately ordered Imperial to remove it – but did not pay for the extra work.

From the beginning of the job, Tom Puett of Imperial was exposing breaches of contract and undisclosed site conditions on the Project, and refused to allow Brechan and Absolute to deviate from the contract and short change Imperial. From their perspective, Imperial had become a nuisance. Hence, on or near July 16, 2003, a meeting was held where a decision was made to terminate Imperial's contract. Imperial was not notified of this meeting. In an e-mail that day SPC's distributor, Polar Supply, alerted SPC that: "Tom [Puett] has been voted off the island *please give me a call so we can make arrangements*." Shortly after sending SPC this directive to begin making arrangements to remove Imperial from the Project, Absolute began to look for another coatings contractor. On July 22, 2003, it faxed a request to Corrpro Coating Services for a quote. Corrpro sent a bid proposal, and agreed to be on the job site by August 5, 2003: "**Current schedule tentatively has the two crew members arriving in Anchorage Alaska on August 5, 2003** and working at the USCG facility on Kodiak Island for four to five weeks." On July 28, 2003, SPC's representative Charlie Mathias wrote a letter from Kodiak, post-dated August 5, 2003, purportedly based on a yet-to-occur August 4 site visit, decertifying Imperial as an applicator for SPC, and sent it to SPC's offices in Canada for review. In furtherance of their July 16, 2003, plan to terminate Imperial's contract, SPC's representative

1. Charlie Mathias arrived on the job site on August 4, 2003, made a brief inspection of the wharf, and the next day handed a member of Imperial's crew a copy of the August 5, 2003 decertification letter.

The letter claimed that the basis of the decertification was that Imperial had made some poor repairs. Imperial wrote a letter to SPC protesting the decertification on the grounds that, *inter alia*, no opportunity to discuss a corrective procedure was given before decertification. No opportunity to correct any alleged deficiencies in Imperial's application of the product was given, because the purpose of Mr. Mathias' site visit was to fabricate a reason to terminate Imperial's contract. The next day, SPC issued a second letter that contained a bogus allegation that Imperial had introduced a thinning agent (MEK) into its coating materials. This allegation is false and has never been substantiated. In fact, the only party who ever suggested using MEK was Coffman when it was looking for a way to remove all of the spray paint it had applied to the wharf.

The individuals employed by Imperial who were actually applying the coatings, such as Mr. Puett and Josh Belville, remained certified by SPC and remained able to perform the coating work. Nevertheless Absolute used the de-certification of the corporation as an excuse to seize all of Imperial's equipment, including equipment being furnished under rental agreements, and locked Imperial and its staff out of the job site and escorted Imperial's staff off the job site. Having been locked out of the job site by Absolute, Imperial and its staff were unable to complete the work.

Because of this conduct, on August 7, 2003, Imperial declared Absolute in default of its subcontract and served Absolute with a notice of conversion which itemized the property seized by Absolute and located at the job site, demanding payment for the equipment in the sum of $518,320 by August 8, 2003. No payment was made, and Absolute retained all of the equipment and materials to finish the Project and, according to Mr. Olson himself, to provide "security" for any losses Absolute might incur as a result of Imperial leaving the Project.

Since this lawsuit was originally filed, documents produced by the USCG pursuant to a Freedom of Information Act request has disclosed what Imperial suspected all along: the USCG,

together with Brechan and Coffman, were aware of substantial defects in the wharf, but chose not to disclose them to Absolute or Imperial. Among the defects were massive defective welds and significant corrosion such that it would be impossible to achieve a "holiday free" coating surface by simply stripe coating and caulking the welds. These defects were discovered during "Phase I" of the Cargo Wharf Project when Swalling was the contractor. Unfortunately, during the time Imperial was on the Project, Absolute was not aware of these defects and believed Coffman's false assertions that Imperial was not adequately performing the work. For this reason, Absolute participated in the efforts to terminate Imperial from the Project.

### C.     The Claims and Pleadings Relevant to the Imperial/Absolute Dispute.

Plaintiff Absolute originally filed this action on August 29, 2003, against defendants McKinley, a non-existent Mrs. "Jane Doe" McKinley, and Imperial. [Docket No. 1]. An amended complaint alleging claims for breach of contract, breach of warranty, piercing the corporate veil and liability of agent for contract was filed on November 26, 2003. [Docket No. 7].

On December 9, 2003, Defendants McKinley and Imperial filed an answer, asserting affirmative defenses asserting that Imperial was excused from performance by the material breaches of contract by Absolute, as well as unclean hands. In that same pleading, Imperial asserted a counter-claim against Absolute for its contract balance, for breach of contract, and for goods sold and delivered. Imperial also asserted claims for co-venturer liability against Brechan, for conspiracy to cause economic damages and interference in the performance of a contract against Brechan, Coffman and SPC, and a bond claim against Safeco under the Miller Act. [Docket No. 8].

Absolute filed its answer to Imperial's counter-claim on January 15, 2004, and asserted the affirmative defenses of failure to state a claim, unclean hands, estoppel, waiver, *laches*, and apportionment pursuant to AS 9.17.080. [Docket No. 27]. SPC filed its answer on January 15, 2004, and asserted affirmative defenses of failure to state a claim, failure to comply with statutory conditions precedent, privilege, lack of a contractual relationship, and AS 09.17.010.

[Docket No. 28]. Brechan and Safeco answered on January 15, 2005 [Docket No. 30] and Coffman answered on January 20, 2005 [Docket No. 31].

Imperial stipulated to a dismissal of all of its claims against Brechan, Coffman and Safeco and, on February 3, 2005, the court entered the dismissals. [Docket Nos. 74, 75]. Imperial and SPC settled their dispute at the August 30, 2006, mediation. Imperial's claims against Absolute remain at issue in this case.

### D. Pre-Trial Rulings Relevant to the Imperial/Absolute Dispute.

On April 5, 2005, the Court denied Absolute's Motion in Limine to exclude the expert testimony of Mark Schilling. [Docket No. 91]. On May 12, 2005, in response to SPC's Motion in Limine to Limit Expert Testimony to that which is contained in his expert reports, the Court noted, "Absent a motion to supplement expert reports, the instant motion appears meritorious. Generally, experts are limited to the opinions previously provided. With the information before it, the Court cannot respond more specifically than this to Defendant SPC's motion." [Docket No. 98]. On September 19, 2006, the Court issued its Order Regarding Pending Motions wherein Absolute's dispositive motions against Imperial [Docket Nos. 227, 229] were denied. [Docket No. 339].

## 2. SUMMARY OF IMPERIAL'S CLAIMS

All of Imperial's claims against Absolute are summarized in the chart attached hereto as Exhibit A.

### A. Counter-Claim One for Contract Balance Against Absolute.

Imperial seeks the balance due on its subcontract with Absolute. Imperial will present evidence consisting of the oral testimony of Tom Puett and Forrest McKinley as to the terms of the contract, the work performed, the quality, the money earned and billed and the money actually paid. Josh Belville will also testify as to the work performed. Mark Schilling will offer expert testimony as to the quality of the work, that it met specifications, and that work was improperly rejected by inspectors. Documentary evidence in the form of Imperial's subcontract

and attachments, Imperial's daily logs, the daily logs of Coffman and KTA-Tator, photographs, invoices, purchase orders, reports, and correspondence will further substantiate the work performed, the money earned, the duty to pay, and the money actually paid.

The total original Phase II contract work completed was 47%, or $362,897.81 earned. Absolute only paid $246,588.13, leaving a balance due of **$116,309.68** for the original contract work.

Imperial also seeks lost profits. On August 7, 2003, Absolute removed Imperial from the Project job site, which prevented Imperial from completing the Project. As a result, Imperial was not able to realize its profit from the work that remained to be completed. Although the existing coating removal was at 52% complete, the completed coating removal and coating application was 47% complete. Thus, 47% of the total contract price of $772,123.00 is $362,897.81. As noted above, Imperial's total original job costs were $248,097.01. Deducting those original job costs from the contract amount due for completing 47% of the work ($362,897.81), results in $114,800.80 for profit on that 47% of the work completed. Thus, Imperial is entitled to 32% profit on the remaining contract balance. The remaining contract balance was $409,225.19. Thus, 32% of that figure is **$130,952.06** in lost profits for the work Imperial was not allowed to complete on the Project.

In addition, Absolute requested Imperial to re-write portions of the specifications of a coatings project for Tanks N 12 and N 60, which are used for jet fuel storage, in order to facilitate the use of coating in a humid environment. Imperial ultimately selected Wasser material, which was going to be supplied by Polar Supply. Imperial was also requested to give Absolute a price to do the work. Imperial's price of $374,226.00 was given approval in July 2003 by Jason Peterson. Although Absolute used Imperial's specifications, it did not permit Imperial to perform the work, for which Imperial seeks the profit it would have made on the job. The damages are calculated based on the profit of 32% actually obtained by Imperial for the Project. $374,226.00 x 32% = **$119,752.32.**

/ / /

/ / /

The issues most likely to be in dispute are the percentage of completion on the Phase II work, and the terms of the agreement between Imperial and Absolute with respect to the tank project.

*Legal Authorities:* Subcontract Agreement between Absolute and Imperial, Article 1; *International Data Products Corp. v. United States* (2006) 70 Fed.Cl. 387, 398 ("To recover damages for a breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."); *Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148 (AK 1992) (a subcontractor's nonperformance is excused and subcontractor is entitled to damages as a result of prime contractor's breach of contract).

### B. Counter-Claim Two for Breach of Contract Against Absolute.

In addition to the balance owed for lost profits on deleted work and the unpaid balance on finished contract work, Imperial seeks damages against Absolute for breach of contract. Absolute owes Imperial money due for extra work and undisclosed site conditions that made work more expensive to perform. Imperial will present evidence consisting of the oral testimony of Tom Puett and Forrest McKinley as to the terms of the contract, the work performed, the money earned and billed and the money actually paid. Josh Bellville will testify as to the work performed. Documentary evidence in the form of Imperial's subcontract and attachments, Imperial's daily logs, the daily logs of Coffman and KTA-Tator, invoices, purchase orders, reports and correspondence will further substantiate the work performed, the money earned, the duty to pay, and the money actually paid.

**Extra Work** - As noted above, Imperial's subcontract and attachments show its scope of work as being piles (bents) 13, 14, 15 of 2A and 17 through 33 of 2B. Imperial's scope letter dated September 16, 2002, attachment II, set forth the following exclusions from its work: welding, stripe coating, caulking, structural repairs, removal of thermite grounds, removal of CP circuit headers, removal of rectifier cable bonds, and items 1.7 through 1.7.6 of the specifications.

The evidence will establish Absolute breached the contract when it failed to remove the CP as specified; when it failed to remove the non-structural steel; when it failed to stripe coat and caulk the welds; when Absolute failed to remove the conduits and directed Imperial to remove them, including conduit at bent 21-23 Pile I - Q, which were not part of Imperial's subcontract. Imperial was scheduled to start productive work on April 2, 2003. At the initial site meeting with Brechan, Absolute, the USCG, Local Electric ("Local"), Coffman and Imperial, it was discovered that Absolute had failed to do this work ahead of time. At the site meeting, the attendees went under the Wharf at bents 13 to 15 and Mr. Puett directed all the parties to the CP, conduit, structural steel and other items and advised them that they were supposed to have been removed and that the stripe coating and caulking had not been performed. Absolute thereafter ordered Imperial to proceed with blasting with CP in place even though it was excluded from the Imperial contract. Imperial did the work at an added cost, which has not been paid by Absolute. Imperial's cost to remove the conduit was $850; to stripe coat and caulk the welds totaled $29,898.64; to remove cathodic protection was $7,476.32; and to remove the nonstructural steel cost Imperial $47,305.69. These extra work items cost a total of $85,530.65.

The issue most likely to be in dispute with respect to this component of the claim is the cost of the extra work.

*Legal Authorities:*   Subcontract Agreement between Absolute and Imperial, Article 4; *Fox Valley Engineering, Inc. v. United States* (1960) 151 Ct.Cl. 228; and *Salem Engineering and Construction Corporation v. United States* (1983) 2 Cl.Ct. 803 (where contractor is compelled to perform extra or additional work by an act or omission of the owner or its designated agent, then contractor is entitled to compensation for said work despite the owner's failure to issue a change order on the theory that the owner has 'constructively changed' the contract requirements); *International Data Products Corp. v. United States* (2006) 70 Fed.Cl. 387, 398 ("To recover damages for a breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.").

///

**Bent 12-13** - Imperial's contract and attachments show its scope of work with Absolute was for work at piles (bents) 13, 14, 15 of 2A and 17 through 33 of 2B, and excluded work for items 1.7 through 1.7.6 of the specifications. The subcontract between Imperial and Absolute did not include bent 12-13. Nevertheless, on the first day of the job, Absolute ordered Imperial to perform work at bent 12-13, which Imperial did under protest at a cost of $29,202.64.

The issue most likely to be in dispute with respect to this component of the claim is the cost of the extra work.

*Legal Authorities*:    Subcontract Agreement between Absolute and Imperial, Article 4; *Fox Valley Engineering, Inc. v. United States* (1960) 151 Ct.Cl. 228; and *Salem Engineering and Construction Corporation v. United States* (1983) 2 Cl.Ct. 803 (where contractor is compelled to perform extra or additional work by an act or omission of the owner or its designated agent, then contractor is entitled to compensation for said work despite the owner's failure to issue a change order on the theory that the owner has 'constructively changed' the contract requirements); *International Data Products Corp. v. United States* (2006) 70 Fed.Cl. 387, 398 ("To recover damages for a breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.").

**Undisclosed Gray Paint** - The specifications for the Cargo Wharf Project did not indicate the existence of gray paint beneath the existing coal tar epoxy, and neither Absolute, Coffman, Brechan nor the USCG disclosed to Imperial the existence of the gray paint. The existence of the gray paint could not have been known to Imperial from a site inspection or at any time prior to the removal of the single coating of coal tar epoxy that had been represented to Imperial by Absolute/Coffman as the only coating Imperial would be obligated to remove. On the first day of water blasting, Imperial discovered this differing/changed condition shortly after the start of water blasting. Absolute ordered Imperial to remove the gray paint, which Imperial did. Imperial prepared an invoice to Absolute for this work, but it has not been paid. The invoice for this work was $92,029.21.

///

1  The issue most likely to be in dispute with respect to this component of the claim is the
2  cost of the extra work.
3  *Legal Authorities*:   United States v. Atlantic Dredging Co. (1920) 253 U.S. 1, 11-12,
4  64 L.Ed. 735, 40 S.Ct. 423; *United States v. Spearin* (1918) 248 U.S. 132, 63 L.Ed. 166, 39 S.Ct.
5  59; *Christie v. United States* (1915) 237 U.S. 234, 59 L.Ed. 933, 35 S.Ct. 565 (It is the general
6  rule that by failing to impart its knowledge of difficulties to be encountered in a federal project,
7  the owner of the project will be liable to the contractor for misrepresentation if the contractor is
8  unable to perform according to the contract provisions.  This is true notwithstanding a provision
9  in the contract that requires bidders to carefully examine the job site before submitting their bids,
10 or any provision in the contract that states the contractor affirms that by bidding the job the
11 contractor had made such an inspection.); *Donovan Construction Company v. United States*
12 (1957) 138 Ct.Cl. 97, 149 F.Supp. 898; *J.W. Terteling & Sons v. Central Nebraska Pub. P. & I
13 Dist.*, 8 F.R.D. 210, 213-14 (D.Neb. 1948); *Owens Corning Fiberglas Corp. v. United States* 419
14 F.2d 439 (Ct.Cl. 1969); *Bernard-Curtiss Company v. United States*, 157 Ct.Cl. 103, 301 F.2d
15 909 (1962) (In a pass-through claim, to the extent the prime contractor is liable to the
16 subcontractor, the public entity is liable to the prime contractor on the theory that the public
17 entity's breach of contract resulted in the prime contractor incurring liability to the
18 subcontractor.).

20  **C.   Counter-Claim Three for Goods Sold and Delivered Against Absolute.**
21  On August 5, 2003, Absolute escorted Imperial off the job site and kept all of Imperial's
22 materials and equipment.  On August 7, 2003, Imperial's counsel sent a demand to Absolute that
23 it return all of the materials and equipment, which were itemized in the letter by price.  The letter
24 advised Absolute that if it did not return the items, then it would have to purchase the items.  The
25 damages total **$518,320**, and are itemized in the August 7, 2003 letter of Imperial's attorney,
26 attached to this brief as Exhibit B.
27  Imperial will present the oral testimony of Forrest J. McKinley and Tom Puett as to the
28 ownership of the equipment and materials, its value, as well as the delivery and delivery charges

to the project site. The oral testimony of David Olson and Jason Peterson will confirm the fact that the equipment was confiscated by Absolute.

The issues most likely to be in dispute with respect to this claim is the value of the equipment, although Absolute has indicated that it will dispute Imperial's ownership of the equipment and materials Imperial delivered and used on the Project.

*Legal Authorities*:   *Felder, et al. v. Reeth*, 34 Fed. 722 (9th Cir. 1929) (The owner of property wrongfully taken by the defendant may waive the tort of conversion and sue the defendant for the value of the taken property under a contract implied by law.).

### D.   Prejudgment Interest.

The sums identified above became due on August 5, 2003, the day Absolute escorted Imperial off the job site. Accordingly, interest has accrued at the rate of 10 percent from that date, for a total of $175,905.77 on the contract balance and extra work ($157.20/day), and $158,904 on the materials and equipment ($142/day). *Fairbanks Builders, Inc. v. Morton DeLima, Inc.*, 483 P.2d 194 (AK 1971) (prejudgment interest accrues from the time the cause of action accrues).

### E.   Attorneys' Fees.

As the prevailing party to this action, Imperial will be entitled to recover its attorneys' fees. *See* Subcontract Agreement between Absolute and Imperial, Article 5.

### 3.   RESPONSE TO ALTER EGO ALLEGATIONS

Absolute and Imperial have agreed, subject to court approval, to bifurcate the alter ego allegations from the jury trial. In the event the alter ego allegations are tried with the rest of this case in front of the jury, however, Imperial will prevail. The evidence will establish that Emerco, Inc. duly published a notice that it would operate under the fictitious business name of Imperial Industrial Coatings. A fictitious business name is a trade name or a name that is descriptive of the type of business performed by the corporation. A corporation doing business

under another name does not create a separate legal entity apart from the corporation. Absolute has no basis for claiming it had a contract with McKinley rather than Imperial, just as it had no basis for suing the non-existent "Jane Doe" McKinley. Mr. McKinley signed the subcontract as "president," (just as David Olson did on behalf of Absolute) and the contract refers to Imperial's status as a corporation several times. Imperial has its own contractor's license, which is identified in the contract. Imperial has always complied with the corporate formalities of its home state, it duly registered to do business in the State of Alaska for the Project, and it has always filed its own tax returns separate and apart from McKinley. There is no factual, equitable or legal basis for disregarding the well recognized corporate shield that protects shareholders from personal liability for the debts of the corporation.

*Legal Authorities*:   *Pinkerton's v. Superior Court* (Cal.App. 1 Dist. 1996) 49 Cal.App.4th 1342, 1348-49, *citing inter alia*, *Duval v. Midwest Auto City, Inc.* (D.Neb. 1977) 425 F.Supp. 1381, 1387, aff'd. (8th Cir 1978) 578 F.2d 721; *Providence Washington Ins. Co. v. Valley Forge Ins. Co.* (Cal.App. 1 Dist. 1996) 42 Cal.App.4th 1194, 1200, 50 Cal.Rptr.2d 92.

### 4. ISSUES TO ARISE CONCERNING EVIDENCE

Imperial and McKinley anticipate, based on Absolute's witness statement filed with the court, that Absolute's president, David Olson, will attempt to testify about matters of which he has no percipient knowledge such as contract negotiations and field performance issues. Imperial will object to same under FRE Rule 602.

DATED:        September 22, 2006             MONTELEONE & McCRORY LLP
                                             Attorneys for Emerco, Inc., dba Imperial Industrial
                                             Coatings


                                             By _____
                                                PATRICK J. DUFFY III, ESQ.
                                                CSBN 45042
                                                WILLIAM R. BAERG, ESQ.
                                                CSBN 167399; WSBN 23052

# CERTIFICATE OF SERVICE BY ECF

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I certify that on September 22, 2006, a copy of the foregoing was served by ECF on:

Eric J. Brown, ebrown@jdolaw.com
Robert J. Dickson, acgecf@acglaw.com
Patrick J. Duffy, duffy@mmlawyers.com
Jami K. Elison, jamie@mhf-law.com
Michael E. Kreger, mkreger@perkinscoie.com
Terry R. Marston, terry@mhf-law.com
Peter C. Partnow, PartnowP@LanePowell.com
James B. Stoetzer, StoetzerJ@LanePowell.com

and by facsimile on:

Paul J. Nangle
Paul J. Nangle & Associates
101 Christensen Dr.
Anchorage, AK 99501
FAX NO.:    (907) 279-1794

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on September 22, 2006, at Los Angeles, California.

_____
WILLIAM R. BAERG