```
                                                              Page 1
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ALASKA

 3
     ABSOLUTE ENVIRONMENTAL
 4   SERVICES, INC., an Alaska Corporation.

 5         Plaintiff,

 6   -vs-

 7   FORREST J. MCKINLEY, an individual
     d/b/a "Imperial Industrial Coatings",
 8   EMERCO, INC., a California corporation,
     d/b/a Imperial Industrial Coatings;
 9   BRECHAN ENTERPRISES, INC., an
     Alaska corporation; and SAFECO
10   INSURANCE COMPANY OF AMERICA,
     a Washington corporation,
11
           Defendants.
12   _____/
     EMERCO, INC., a California corporation,
13   d/b/a Imperial Industrial Coatings, and
     the United States for the use and benefit
14   of EMERCO, INC.,

15         Counterclaimant/Third-Party Claimant,

16   -vs-

17   ABSOLUTE ENVIRONMENTAL
     SERVICES, INC., an Alaska corporation,
18   et al.,

19         Cross-defendants/Third-party Defendants,
     _____/
20

21           Alaska Stenotype Reporters

22              511 West Ninth Avenue

23             Anchorage, Alaska 99501

24   Phone: (907) 276-1680     Fax (907) 276-8016

25   Fred Getty, RPR, Ret.    Rick McWilliams, RPR, Ret.
```

Page 106

1  the quality of the work that you and the crew did?
2      A. Not that I'm aware of.
3      Q. Did the amount of time and manpower that you had
4  to devote to correcting defects in the work that Imperial
5  had done increase the amount of time that you and your
6  crew had to spend on the job?
7      A. Yes.
8      Q. Did it have a significant effect on the amount
9  of time that you folks had to spend out there?
10     A. Yes.
11     Q. Did you rent some of your equipment to Absolute
12 as well as being an employee?
13     A. Yes.
14     Q. And you had -- did you have a contract or
15 something, or just a word-of-mouth deal?
16     A. Verbal.
17     Q. And that got completed, taken care of --
18     A. No.
19     Q. How -- in what way not?
20     A. I didn't get paid.
21     Q. Do you have any idea sitting here today as to
22 how much is owed to you?
23     A. About 70, 80,000, plus interest.
24     Q. And do you have any understanding or agreement
25 with Mr. Olson how that's going to be taken care of?

Page 107

1      A. Soon as his ship comes in, he'll pay me.
2      Q. And can I assume, as far as he told you, his
3  ship is this particular lawsuit?
4      A. He didn't say that.
5      Q. Just some ship?
6      A. Some ship, any ship. We don't care.
7      Q. Have you ever discussed with Mr. Olson the
8  issues that are involved in this lawsuit?
9      A. No.
10     Q. So you don't know exactly what Absolute is
11 claiming against the other parties in this case?
12     A. I have a vague, general idea what's going on,
13 that's it. I know it's complicated and I don't -- I
14 don't really know.
15     Q. Did you have any dealings with Mr. McLeod, Keith
16 McLeod?
17     A. No. Refresh my memory.
18     Q. Was he the QC -- he had been the QC person for
19 Imperial, did he continue --
20     A. No, I've never met him, that I can recall, you
21 know. I don't recall any other QC person.
22     Q. How about somebody from KTA-Tator?
23     A. Yes, okay.
24        Yes, I remember Keith.
25     Q. Okay.

Page 108

1      A. It takes me a while here.
2      Q. What were your dealings with him?
3      A. Well, let me see. He came on -- you know, I'm
4  not really sure if he worked for Absolute or if he worked
5  for Imperial. I really don't recall. I didn't have a
6  lot of dealings with him. He kind of worked with Jerry.
7  And, you know, he was taking ambience and doing general
8  stuff -- he seemed like an amicable fellow, and wasn't
9  there all that long and then left.
10     Q. Do you know if, as part of his QC work, if he
11 found a holiday or some other inadequate condition, that
12 he would mark it for repair?
13     A. Yes, he did that.
14     Q. And do you remember how he marked things that he
15 found?
16     A. I can't remember. I think it was spray painted
17 on. I'm not sure. Then he'd document it. I'm not
18 really sure. He tied ribbons around a bunch of stuff.
19     Q. On the one exhibit --
20     A. He tied, like, orange ribbons, like surveyor's
21 tape on things.
22     Q. For instance if, going back to Exhibit 4 that
23 Mr. Kreger showed you, that's the July 30th, 2003 report
24 Coffman.
25     A. Okay.

Page 109

1      Q. If you turn over to page 3 where there's the
2  yellow stuff that's showing on the picture in the left.
3      A. Uh-huh.
4      Q. Do you recall if Mr. McLeod marked problem areas
5  with yellow spray paint?
6      A. You know, I don't. The reason is, is because he
7  worked right with Jerry. I believe Jerry was gone for a
8  while and Keith came in, or something. They talked on
9  the telephone all the time. And he was over working
10 areas where I wasn't even at, doing test reports. And
11 when it came to us to actually getting directed to do the
12 repairs, they had either the orange fluorescent paint on
13 there or ribbons, or something.
14        And I would give them two or three guys,
15 whatever it took, and they would go down there with the
16 inspectors and do what he wanted. That's how that
17 happened. I wasn't always on site, or very rarely. I
18 walked through it a couple times with Keith, but it got
19 so extensive that I just designated people to him to get
20 the work done.
21     Q. Do you recall having had any particular problems
22 achieving holiday-free, or meeting the contract
23 specifications for the coating over the weld areas?
24     A. Yes.
25     Q. More so than you would have anticipated in any

Page 110

1  marine type metal-on-metal situation?
2     A. I thought it was, yeah, extensive.
3     Q. When you say extensive, how do you mean?
4     A. That the holiday detecting was extensive.
5     Q. Did you raise that concern to anybody during the
6  time you were on the project?
7     A. Yes.
8     Q. And who was that?
9     A. Dave Olson.
10    Q. And how did you raise it to Mr. Olson?
11    A. I told him, Dave, I think that the holiday
12 detection is extensive.
13    Q. Did you write this to him or just --
14    A. I think it was verbal when he was over on
15 inspection.
16    Q. On --
17    A. And then he got with Jerry Hardenbergher and
18 they worked out a, what we all felt was a more compatible
19 system for the project.
20    Q. And after that discussion, did things go more
21 smoothly?
22    A. Yes.
23    Q. Do you recall about at what time that -- was
24 this at a point after Imperial had left?
25    A. Yes.

Page 111

1     Q. Do you recall how much after Imperial had left?
2     A. I would say it had to be within, probably three
3  to four weeks after we had started doing coatings.
4  Imperial pretty much had left by the time we started
5  doing coatings.
6     Q. What specific change do you recall as having
7  been made or made the work go more smoothly?
8     A. The amount of times that you holiday detected
9  the steel, that you run the holiday detector over the
10 coated surfaces.
11    Q. It decreased?
12    A. It decreased.
13    Q. Was the concern that you were expressing to
14 Mr. Olson the amount of holiday detection or the specific
15 condition of the welds that you were encountering?
16    A. The amount of holiday detection.
17    Q. Not the condition of the welds that you
18 encountered?
19    A. No.
20    MR. PARTNOW: Give me just a second, I think I'm
21    just about done.
22 BY MR. PARTNOW:
23    Q. Is your business still actively involved in
24 coating work?
25    A. Yes.

Page 112

1     Q. And what's the -- is there a particular time of
2  year when you tend to be busier than others?
3     A. In outside coatings, yeah. It's when there
4  isn't any snow on the ground, pretty much.
5        We have shops, we have interior phases of work
6  and outside work, but the majority of the field work is
7  in the five months of our summer.
8     Q. Can I assume that it would be a disruption to
9  you and your work if you were called away from that work
10 to testify in court in the middle of the summer?
11    A. Yes.
12    Q. Less so if it happened in September or October?
13    A. More.
14    Q. More so or less so?
15    A. More so.
16    Q. Why is that?
17    A. Because that's when we're ending up most of our
18 field projects and my time is more demanded than in the
19 beginning of the year.
20    Q. When do you pretty much wrap up your work?
21    A. Between October 15th and December 1st.
22    Q. And your understanding on the warranty work you
23 did as to phase 1, that was essentially an extra, the
24 time was kept on, and it is your understanding that
25 Absolute was paid for that work?

Page 113

1     MR. ELISON: Object to the form of the question.
2     THE WITNESS: I don't know that. That was my
3  assumption, that was strictly up to Dave and whoever
4  he was working with on that; I don't know. I was
5  asked to keep track of the time; I assume it had
6  something to do with getting paid for it.
7     MR. PARTNOW: I have nothing further.
8        EXAMINATION
9  BY MR. ELISON:
10    Q. Mr. Yell, I am Jami Elison, counsel for
11 Absolute. Did you perform any holiday testing on this
12 project?
13    A. Not directly. My employees did.
14    Q. Which -- okay. Some of your employees did
15 perform holiday testing?
16    A. Only one.
17    Q. And in addition to that employee, Jerry
18 Hardenbergh or Keith McLeod, do you know of anyone else
19 that performed holiday testing?
20    A. No.
21    Q. Based on your observations, where were most of
22 the holidays?
23    A. Around welds, any aperture in the corner
24 confluences where the square steel connected the bent
25 poles was a bad area.

**Page 114**

1 Pretty much anyplace that wasn't just a flat or,
2 you know, a flat area, anyplace where two pieces of steel
3 came together and there was a weld was a bad area.
4    Q. If I showed you a grid, could you -- would you
5 be able to show me that it was isolated to one area or
6 was that throughout the work that you observed?
7    A. It was throughout the work.
8       MR. KREGER: Objection, vague.
9       MR. ELISON: I don't have any other questions.
10      MR. JUDAY: I don't have any questions.
11      MR. KREGER: I have just a couple follow-up, if
12 I may, Mr. Yell.
13              EXAMINATION
14 BY MR. KREGER:
15   Q. Was the issue with the holiday detection that
16 you testified about, was that -- when you say that was
17 resolved by decreasing the amount of times that the
18 machine was used, is that what the resolution --
19   A. The amount of time that you pass the machine
20 over the coated surface.
21   Q. So the problem wasn't that there were too many
22 holidays being found, it was something about the way the
23 machine was being used, that was your concern?
24   A. The machine can create a pinhole.
25   Q. Okay. And did you believe that that was

**Page 115**

1 happening?
2    A. Yes, I did.
3    Q. Other than that, was there anything unusual
4 about the number of holidays that you found on the
5 project?
6       MR. ELISON: Object to the form.
7       THE WITNESS: The project had an unusual amount
8    of holidays -- not holidays, but pinholes, holiday
9    detections.
10 BY MR. KREGER:
11   Q. And that was, in your view, because of the way
12 the machine was being used?
13   A. Well, the machine is a 60,000 volts, it's a
14 high-voltage machine. If you hold it on a painted
15 surface, it will eventually burn a hole through the
16 substrate, creating its own holiday. Every time you pass
17 that over a surface, you're giving it a higher
18 opportunity to burn another hole through it.
19       So eventually the holidays you're fixing are the
20 ones you're creating from the machine. And since they're
21 microscopic, who is to say who? I mean, you got to stop
22 someplace. And usually, in my experience, it's passed
23 over the surface one time, you mark the holidays and fix
24 them, and that's it. Here we were doing it two and three
25 and four times, until finally we got that resolved down

**Page 116**

1 to, we would pass the holiday detector once and repair,
2 pass once more and repair and that was done.
3       That's the reason for the impressed current
4 that's added to the poles underneath, is to be an
5 additional source of cathodic protection.
6       MR. KREGER: That's all the questions I have.
7              EXAMINATION
8 BY MR. PARTNOW:
9    Q. I have just one or two follow-ups.
10      Who was the employee who did the testing?
11   A. Pete Williams.
12   Q. Do you know how to get in touch with
13 Mr. Williams?
14   A. I know he lives in Canada and he works for
15 CorePro, other than that I do not.
16   Q. Do you have a city where you think he lives in?
17   A. I don't remember what city he lives in.
18   Q. When you said that the area of the most holidays
19 were in the area that you described, were you talking
20 about the work that was done by Absolute or are you
21 talking about the Imperial work or both?
22   A. By Absolute.
23   Q. And in terms of the areas that you had to go
24 over two and three and four times and the testings, is
25 that the in the Absolute areas --

**Page 117**

1    A. It was the beginning of the Absolute areas
2 until we got that worked out.
3    Q. Was that also the repairs on the Imperial areas
4 or --
5    A. No. That was strictly up to Jerry, he went over
6 and marked those and we fixed what he marked and he did
7 what he did.
8    Q. Now, lots of the repairs in the Imperial area
9 were in flat areas, were they not?
10   A. That's correct, but a lot of those repairs had
11 to do with either light material, too heavy material or
12 foamed material or obvious -- obvious something was wrong
13 with the coatings, it looked kind of spongy, or whatever.
14 And he would do, I believe, some hardness tests with a
15 pocket knife.
16      He had his own thing going on over there. There
17 was all kinds of stuff going on. We didn't have those
18 problems. Our problems -- what we did is we did our
19 inspections on the bents as we went. In other words, I
20 didn't stop until I had a bent totally inspected and
21 passed before I moved off that bent. There wasn't going
22 to be no coming back and doing it after we got the
23 scaffolding down. So we stayed right there until all the
24 problems were solved and it was passed. Then we moved
25 on. So we did our process a little different than