# Annotation Report

# Anita Repanich - Default

|            |                     |
|-----------:|---------------------|
| **Created by** | terry           |
| **Creation date** | Sep 27, 2006 |
| **Project** | aesi-bei-cei       |
| **Sort order** | Transcript, Location |

## Repanich, Anita
**5:14-15**

```
5:14    Q.    Could you please state your full legal name.
  15    A.    Anita Bernstein Repanich.
```

## Repanich, Anita
**6:1-22**

```
6: 1    Q.    You're employed by FDCC Pacific?
   2    A.    Yes.
   3    Q.    What is your title?
   4    A.    Contracting officer.
   5    Q.    How long have you been a contracting officer?
   6    A.    Eight years.  I think I've been here eight years.
   7    Q.    And what are the unique authorizations that
   8 contracting officers have on behalf of the government?
   9    A.    We have our contracting warrants that allow us to
  10 contract.  Mine is an unlimited warrant.
  11    Q.    Unlimited in terms of dollar value?
  12    A.    Dollar value.
  13    Q.    And in the absence of a contracting warrant, you're
  14 not allowed -- a government employee is not allowed --
  15    A.    Right, only contracting officers are allowed to
  16 obligate contracting dollars for the government.
  17    Q.    So, for instance, a project manager such as Lieutenant
  18 Rendon or Andy Brown would not have that authorization?
  19    A.    True.
  20    Q.    They would manage the project, but anything that had
  21 to do with commitment of dollars would have to come through --
  22    A.    A contracting officer, true.
```

## Repanich, Anita
**7:1-8**

```
7: 1          Are you familiar with the terminology "Alpha team"?
   2    A.    As used in this office?
   3    Q.    Yes.
   4    A.    Yes.
   5    Q.    What is Alpha team?
   6    A.    The group of people that did work in Alaska.  It was
   7 an Alpha and a Beta.  Alaska was Alpha.  Beta was
   8 California/Hawaii.
```

## Repanich, Anita
**7:15-20**

```
7:15    Q.    Are you familiar with the terminology of Phase I and
  16 Phase II of the cargo wharf project?
  17    A.    Yes.
  18    Q.    Do you recall who the members of Alpha team were
  19 during Phase I of the cargo wharf project?
```

20    A.    Yes.


## Repanich, Anita
8:9-9:7

8: 9    Q.    **And were you on Alpha team?**
  10    A.    No, no.  The contracting officers are not divided up
  11 by teams.
  12    Q.    **So Alpha team, with respect to the Kodiak Cargo Wharf**
  13 **project, consisted of Jerry Johnson, Paul Rendon as project**
  14 **manager and Steve Locher as structural engineer?**
  15    A.    Yes.
  16    Q.    **I see on some documentation him being referred to as**
  17 **EIC?**
  18    A.    Yes, engineer in charge.  It's another term that they
  19 would used.  Typically they use that for the engineer, the EIC,
  20 engineer in charge.  The lieutenants, the military in our
  21 office, are typically project managers, more on the construction
  22 side, not design.
  23    Q.    **What was your understanding of the responsibility of**
  24 **Mr. Locher on the cargo wharf --**
  25    A.    Steve Locher would advise and assist more on the
9: 1 design portion of it, because it was a design-build.  He would
  2 assist with the design portion, and Paul Rendon would do more
  3 the construction portion of it.
  4    Q.    **When you say "construction," you mean administration**
  5 **of the construction contract?**
  6    A.    Yes, of the actual construction.  He would project
  7 manage them.


## Repanich, Anita
9:12-10:11

9:12    Q.    **What was your relationship to Alpha team as the**
  13 **contracting officer?**
  14    A.    At that time, because I was the contracting officer on
  15 the IDIQ, I primarily did work for the Alpha team.  Primarily
  16 all of my contracts came out of there because most of my
  17 contracts were in Alaska at that time.
  18    Q.    **Can you describe what IDIQ refers to.**
  19    A.    Indefinite delivery, indefinite quantity contract.
  20 It's a contract with one contractor -- well, it can be with
  21 several -- but this is with one contractor for undetermined work
  22 for a period of time.  Indefinite quantities, so we don't know
  23 how much work we're going to do.  Indefinite delivery, we don't
  24 know when we're doing it.
  25    Q.    **Are you familiar with the term "job order contract"?**
10: 1    A.    Uh-huh.
  2    Q.    **What's the relationship between a job order contract**
  3 **and a IDIQ contract?**
  4    A.    I think I would say they're the same.  A job order
  5 contract is what the Coast Guard chooses to call it.  Other
  6 agencies have different names for it, but the contract type is
  7 an IDIQ, a fixed price IDIQ.
  8    Q.    **So would it be within the normal range of conversation**
  9 **to refer to Brechan as the JOC contractor for the Kodiak**

```
10 project?
11      A.    Uh-huh.
```

## Repanich, Anita
10:15-11:3

```
10:15          Are you aware that Brechan had two IDIQ contracts on
    16 ISE Kodiak?
    17      A.    At the same time?
    18      Q.    No, consecutively.
    19      A.    Yes, I was the contracting officer for both.
    20      Q.    And those were IDIQ contracts?
    21      A.    Yes, both.
    22      Q.    And being the contractor for an IDIQ contract made
    23 Brechan the JOC contractor?
    24      A.    Yes.
    25      Q.    And the way IDIQ contract works is that there is a
11: 1 master contract signed --
     2      A.    Yes.
     3      Q.    -- at the outset of the contractual relationship?
```

## Repanich, Anita
11:4-5

```
11: 4          MR. KREGER:  Objection.  Leading.
     5      A.    Yes.
```

## Repanich, Anita
11:6-15

```
11: 6      Q.    Well, why don't you describe how an IDIQ contract
     7 works so I can avoid some of the objections.
     8      A.    Okay.  We would solicit with a general scope of work
     9 in a general listing of projects that we anticipate doing, and
    10 we would solicit and select somebody based on their technical
    11 capabilities, which is what we did with both of them.
    12          We then would task them with specific projects after
    13 award, so it was competed, and the contractor was awarded based
    14 on his technical capabilities.  And then afterward, we entered
    15 into negotiations with that contractor for specific jobs.
```

## Repanich, Anita
11:16-19

```
11:16      Q.    So is there any competition on prices on an IDIQ?
    17      A.    Yes, there's a coefficient.  Price always has to be
    18 considered a coefficient is what we use.  Because the work
    19 itself isn't identified.  We compete it based on a coefficient.
```

**Repanich, Anita**
11:20-12:4

11:20     Q.     So when you refer to the contractor's technical
   21 capabilities, did you mean to exclude the coefficient or was
   22 that --
   23     A.     No, the coefficient was evaluated too.  It was a
   24 best-value selection.  On the first one, to the best of my
   25 knowledge, the technical capabilities were of greater importance
12: 1 than the price or the coefficient; and on the second, I think
    2 they were of equal.
    3     Q.     Weight?
    4     A.     Yes.


**Repanich, Anita**
12:7-16

12: 7     Q.     On the Phase I JOC contract, what is the coefficient?
    8 And I'm not asking what the percentage is.  I want to know
    9 conceptually what the coefficient is.
   10     A.     A coefficient is used, and it's a -- I'm trying to
   11 think of the right word to use -- adjustment maybe to the Means
   12 book.  We -- the Means is an estimating system, and so we used
   13 the Means, and we used the Means for Alaska for different trades
   14 of work.  The coefficient would be an adjustment that would be
   15 made for the areas that the Means did not adequately reflect or
   16 maybe overly reflected specific areas of work for Kodiak.


**Repanich, Anita**
12:17-24

12:17     Q.     How does that compare to a city code?
   18     A.     City code is included in that.  In the Means, I
   19 believe there's a city code also.  So the contractors were --
   20 one of the things we evaluated them on was how well the Means
   21 reflected costs of doing work in their area, along with the city
   22 code.  I think it's city index, I think it's called.  And then
   23 they were to add this multiplier or a coefficient onto that
   24 number to adjust for what it really cost them to work in Kodiak.


**Repanich, Anita**
12:25-13:2

12:25     Q.     Did the coefficient have any component of overhead or
13: 1 profit?
    2     A.     Yes.  It was all-inclusive.


**Repanich, Anita**
13:8-9

13: 8     A.     The coefficient was not used in the first task.  One
    9 of the --

**Repanich, Anita**
13:13-19

```
13:13      Q.    Do you refer to the basic IDIQ contract as the master
   14  contract?
   15      A.    Yes.
   16      Q.    And then the individual work items that are issued
   17  under it, I've heard it referred to as either delivery orders or
   18  task orders.
   19      A.    We do use them interchangeably.
```

**Repanich, Anita**
13:23-14:4

```
13:23            Is the coefficient defined in the master contract?
   24      A.    Yes.
   25      Q.    And once the coefficient is defined in the master
14: 1  contract, does that coefficient ever change --
    2      A.    No.
    3      Q.    -- across different task orders?
    4      A.    No.  Throughout the life of the contract, it stays.
```

**Repanich, Anita**
16:5-10

```
16: 5      Q.    I've just handed to you what's been marked as Exhibit
    6  2.  Can you identify that document?
    7      A.    This is the second IDIQ contract that was awarded to
    8  Brechan.
    9      Q.    The second one?
   10      A.    Uh-huh.
```

**Repanich, Anita**
16:13-13

```
16:13      A.    It is the RFP.  It's not the contract award.
```

**Repanich, Anita**
17:24-18:11

```
17:24      Q.    And is Exhibit No. 3 the second IDIQ contract?
   25      A.    Yes.
18: 1      Q.    Can you open Exhibit No. 3, the second IDIQ contract,
    2  and who signed that contract on behalf of the government?
    3      A.    I did.
    4      Q.    Is there a definition of what the coefficient factor
    5  is included in that document?
    6      A.    Yes.
    7      Q.    And is that found on page 4?
```

```
 8      A.    Yes.
 9      Q.    And it's labeled "Notes, Coefficient," and then it has
10  "A," the coefficient factor?
11      A.    Yes.
```

## Repanich, Anita
19:4-20:5

```
19: 4      Q.    Can you identify for us the differences that you see
    5  between the two provisions, the most significant differences?
    6             MR. NIEMER:  Object to the form.
    7      A.    The difference that I see would be between what
    8  divisions within the Means should or should not be included in
    9  the contractor's coefficient.
   10      Q.    And what does the first IDIQ contract, Exhibit No. 2,
   11  say about that?
   12             MR. KREGER:  Objection.  Contract speaks for itself.
   13             MR. ROBISON:  Go ahead.
   14      A.    It appears that all of the divisions, 10 through 15,
   15  15 through 16, it appears that it is to be very inclusive.
   16      Q.    So which divisions are included, as you read that?
   17      A.    From my knowledge of the divisions, all of them.
   18      Q.    And what does the second IDIQ contract say, Exhibit 3?
   19      A.    It pulls out specific parts of divisions not to be
   20  included.
   21      Q.    And where are those identified?
   22      A.    On page 4, under the coefficient.
   23      Q.    So can you read that passage, please.
   24      A.    Section 1107 to 700, surveying.
   25      Q.    Field testing?
20: 1      A.    Field testing, scaffolding, scaffolding specialties
    2  under construction A.  It's an equipment rental.
    3      Q.    Aside from that difference, do you see any significant
    4  differences between the two?
    5      A.    Not insofar as the coefficient itself.
```

## Repanich, Anita
21:14-24

```
21:14      Q.    When the master contract is issued --
   15      A.    Uh-huh.
   16      Q.    -- is there a price for individual delivery orders
   17  determined at that time?
   18      A.    No.
   19      Q.    Is there a coefficient determined at that time?
   20      A.    Prior to award of the contract and at the time of
   21  award of a contract, a coefficient is.
   22      Q.    Are there particular work scopes defined at the time
   23  the IDIQ contract is issued?
   24      A.    No.
```

## Repanich, Anita
22:5-23:2

```
22: 5      Q.    So when a task order is issued under an IDIQ contract,
    6 the contractor is requested to provide a proposal?
    7      A.    Prior to it being issued.  A request for proposal
    8 would be issued first.  A price negotiated, then a task order
    9 issued.
   10      Q.    So the sequence of events, then, is the IDIQ contract
   11 is signed?
   12      A.    (Witness nods head.)
   13      Q.    Subsequently, the Coast Guard issues requests for
   14 proposals?
   15      A.    (Witness nods head.)
   16      Q.    You have to answer audibly.
   17      A.    Yes.
   18      Q.    After that, the contractor submits a proposal?
   19      A.    Yes.
   20      Q.    And then the contractor and the Coast Guard negotiate
   21 a price for that work?
   22      A.    Yes.
   23      Q.    And then the Coast Guard issues a task order based on
   24 the negotiated price?
   25      A.    Yes.
23: 1      Q.    And following that, the work is performed?
    2      A.    Yes.
```

## Repanich, Anita
23:20-25

```
23:20      Q.    Are there requirements for the form of the proposal
   21 submitted by the contractor in response to a request for
   22 proposal?
   23      A.    "The contractor shall prepare and submit a cost
   24 proposal RS Means.  Construction cost data shall serve as the
   25 basis for establishing the value of the work."
```

## Repanich, Anita
24:12-21

```
24:12      Q.    So at 3.02.04 of Exhibit 3, it states that "Upon
   13 receipt of the final task order package and within 14 days, the
   14 contractor shall prepare and submit his or her cost proposal for
   15 accomplishment of the task.  The RS Means facilities
   16 construction cost data shall serve as the basis for establishing
   17 the value of the work to be performed on a unit price basis."
   18            And then there's a series of subsections beneath
   19 that.  Does that further clarify what the requirements are of
   20 the contractor's proposal?
   21      A.    Yes.
```

## Repanich, Anita
25:9-26:3

```
25: 9      Q.    Are you familiar with the terminology "prepriced" and
   10 "nonprepriced"?
   11      A.    Yes.
```

```
 12    Q.    What does "prepriced" mean?
 13    A.    Means.
 14    Q.    Means guide?
 15    A.    Means guide.
 16    Q.    And what is "nonprepriced"?
 17    A.    Not covered under the Means.
 18    Q.    And the contractor is required to price both the work
 19 that is covered by the Means guide and the work that is not
 20 covered by the Means guide?
 21    A.    Yes.
 22    Q.    And the contractor is then to apply his coefficient to
 23 those Means guide prices?
 24    A.    Yes.
 25    Q.    Does the Means guide pricing include profit?
26: 1          MR. NIEMER:  Objection.  Lack of foundation.
  2    A.    To the best of my knowledge, it does not.  That's what
  3 the coefficient is for.
```

## Repanich, Anita
26:4-13

```
26: 4    Q.    Does the Means guide include home office overhead?
  5          MR. KREGER:  Objection.  Lack of foundation.
  6    A.    I don't believe it does.
  7    Q.    Does the Means guide include job site overhead
  8 expenses?
  9          MR. NIEMER:  Object to the form.
 10    A.    I'm not that versed on the Means guide.  I know
 11 there's some Division 1 items, which are specific to jobs, but
 12 it does include -- I think it has a factor for it, so I am not
 13 sure.
```

## Repanich, Anita
26:14-21

```
26:14    Q.    What is a city index?
 15    A.    The city in which the work is being done in, how it
 16 might differ city to city within one state.
 17    Q.    Is that a multiplier or a factor that is used to
 18 adjust the prices in the Means guide based upon local cost
 19 influences?
 20          MR. KREGER:  Objection.  Lack of foundation.
 21    A.    That would be my understanding.
```

## Repanich, Anita
27:4-14

```
27: 4    Q.    So when you're using -- when you're doing prepriced
  5 work, namely, work that's covered by Means, you would identify
  6 what type of work it is?
  7    A.    (Witness nods head.)
  8    Q.    The correlating unit price for that work?
  9    A.    (Witness nods head.) Yes.
 10    Q.    And the amount of that work to be performed, and you
```

```
11  would multiply those together to come up with a base price for
12  that particular aspect of the work?
13           MR. KREGER:  Object to the form.  It's leading.
14      A.   Yes.
```

## Repanich, Anita
**27:15-20**

```
27:15   Q.   And then after you've done that, what's the next step
    16  in assembling the price?
    17      A.   The coefficient would be the last step.
    18      Q.   And then you multiply the coefficient times the
    19  product of those other factors?
    20      A.   To the best of my recollection, yes.
```

## Repanich, Anita
**28:12-20**

```
28:12           My reading of the contract was that the city index
    13  was a Means guide factor.
    14      A.   Yes.
    15      Q.   And that it applied to pricing done pursuant to the
    16  Means guide.
    17      A.   Yes.
    18      Q.   But that nonprepriced items, the contractor used his
    19  actual projected costs for that work?
    20      A.   Yes.
```

## Repanich, Anita
**29:1-5**

```
29: 1   Q.   Is there a provision that addresses this directly?
     2      A.   Paragraph 3.03.1, Nonprepriced Items.  It's stating
     3  that "Nonprepriced work should be presented in an acceptable
     4  format.  Negotiated on an individual basis, nonprepriced items
     5  should be supported by three written estimates."
```

## Repanich, Anita
**29:14-22**

```
29:14   Q.   And can you tell us what the coefficient factor was
    15  on -- the actual percentage factor was on Brechan's second IDIQ
    16  contract?
    17      A.   1.12.
    18      Q.   So, effectively, it was a 12 percent add-on to the
    19  calculated price of the work or cost of the work?
    20           MR. KREGER:  Object to the form of the question.
    21  Leading.
    22      A.   That would be what I would understand.
```

**Repanich, Anita**
31:13-21

```
31:13      Q.     While we were off the record, your attorney directed
   14  me to page 27 of the second IDIQ contract, Exhibit 3, and can
   15  you describe for me what we find there.
   16      A.     It's a sample calculation of how one would use the
   17  pricing, the coefficient, and the Means in nonpriced work.
   18      Q.     So there's examples of different types of work
   19  activities here, numbers of units, unit prices, extensions, all
   20  of that on this example, right?
   21      A.     Yes.
```

**Repanich, Anita**
31:22-32:7

```
31:22      Q.     But if you were to distill this into an equation,
   23  would this represent that, with respect to the prepriced work,
   24  in other words, the work in Means, you multiply that by the city
   25  index in order to get the total of the prepriced costs, and then
32: 1  you multiply the contractor's estimate of the actual costs he's
    2  going to incur in performing the nonprepriced work to come up
    3  with the nonprepriced cost?
    4          MR. KREGER:  Object to the form.
    5          MR. NIEMER:  Join.
    6      Q.   Is that right?
    7      A.   Yes.
```

**Repanich, Anita**
32:8-18

```
32: 8      Q.     And then when you add the prepriced costs to the
    9  nonprepriced costs, you get a subtotal representing both the
   10  prepriced and nonprepriced?
   11      A.     Yes.
   12      Q.     And to that, is the factor coefficient applied?
   13      A.     Yes.
   14      Q.     And once you've applied the factor coefficient, you
   15  yield the pricing that is allowable under the JOC contract?
   16      A.     It would be the price of that task.
   17      Q.     Yes.
   18      A.     Yes.
```

**Repanich, Anita**
33:6-10

```
33: 6          Can the contractor come to you and say, on Project X,
    7  here's my lump-sum price.  I want to charge the Coast Guard a
    8  million dollars for this work.
    9      A.     Okay.  I understand what you're saying now.
   10          No, no.  He would need to present it in this format.
```

```
35: 8              One of the criteria that was used to evaluate the
    9 competitive proposals from alternate bidders for the IDIQ
   10 contract was the coefficient factor.
   11    A.    Yes.
   12    Q.    And as such, the coefficient factor was one of the
   13 primary aspects of the bid price of each bidder?
   14              MR. KREGER:  Objection.  Leading.
   15    A.    It was the only.  The coefficient was a result of
   16 their analysis of the Means and how it reflected their work.
   17 The number was one part of the evaluation, but the other part of
   18 the evaluation was how reasonable was that number.
```

## Repanich, Anita
35:24-36:2

```
35:24    Q.    Was it your intention, when you signed the contract on
   25 behalf of the government, to release the successful bidder from
36: 1 the requirements of complying with this coefficient factor?
    2    A.    No.
```

## Repanich, Anita
36:20-25

```
36:20    Q.    So the contractor cannot include his overhead and
   21 profit in the prepriced costs or the nonprepriced costs; is that
   22 your understanding?
   23    A.    Because that would be included in the coefficient.
   24    Q.    Yes.
   25    A.    Yes.
```

## Repanich, Anita
37:1-10

```
37: 1    Q.    And then it says the same thing about subcontractors,
    2 that that must also -- "the subcontractor's overhead and profit
    3 must also be included in the coefficient"?
    4              MR. KREGER:  Objection.  Argumentative.
    5    A.    Is it in the coefficient?  I'm not certain if it is in
    6 the coefficient or if it is in the work -- the Means work
    7 itself.  The price, the total price, must be inclusive of both
    8 the prime's and the subcontractor's profit.
    9    Q.    The total price or the price coefficient?
   10    A.    The price coefficient.
```

## Repanich, Anita
37:11-22

```
37:11    Q.    And the price coefficient on the second IDIQ contract
   12 was how much?
   13    A.    1.12.
   14    Q.    So that was 12 percent?
```

```
15    A.    Yes.
16    Q.    And on the first one, you previously testified was
17 5 percent?
18    A.    Yes.
19    Q.    So on the first JOC contract, the price coefficient
20 was inclusive of the prime contractor's and the subcontractor's
21 overhead and profit?
22    A.    Yes, it was.
```

## Repanich, Anita
37:23-38:4

```
37:23    Q.    Is it your understanding, then, that the prime
   24 contractor was not permitted, by virtue of this definition, to
   25 treat the subcontractor's overhead and profit as a cost and
38: 1 charge that in addition to the coefficient factor?
    2              MR. KREGER:  Objection.
    3              MR. NIEMER:  Join.
    4      A.     It would be inclusive in the coefficient.
```

## Repanich, Anita
38:5-12

```
38: 5    Q.    So can you get it in the coefficient and get it in the
    6 cost as well?
    7              MR. KREGER:  Objection.  Leading.
    8      A.     In priced or nonpriced?  Well, if it's in the
    9 coefficient, it's in either one.  But can you get it in addition
   10 to the coefficient?  Is that what you're asking?
   11    Q.    Yes.
   12      A.     No, it should be inclusive in the coefficient.
```

## Repanich, Anita
39:6-7

```
39: 6    Q.    No.  I'm saying, is it permissible?
    7    A.    No.
```

## Repanich, Anita
40:24-41:19

```
40:24    Q.    Let's leave out those items at the bottom of the page,
   25 beginning with surveying and running through equipment rentals.
41: 1 Those are exceptions --
    2              MR. MARSTON:  Gentlemen, please.
    3    Q.    -- those were exceptions to the coefficient factor, so
    4 those items, surveying through equipment rental, those can be
    5 treated as costs and priced as costs by the contractor in
    6 addition to the coefficient factor, right?
    7    A.    Yes.
    8    Q.    But with the exception of those items, all the rest of
    9 the items listed under paragraph A at the top of page 4 --
```

```
10      A.      Uh-huh.
11      Q.      -- may not be separately --
12      A.      True, yes.
13      Q.      -- treated as a cost by the contractor?
14      A.      Yes.
15      Q.      And that's because they were to have been factored in
16 in the price coefficient?
17              MR. KREGER:  Objection.  Leading.  Incomplete
18 hypothetical.
19      A.      Yes.
```

## Repanich, Anita
### 41:20-42:2

```
41:20     Q.      And the mobilization and demobilization costs include
21 both the prime contractor's and the subcontractor's mobilization
22 and demobilization, as you understand the terms of that
23 paragraph?
24              MR. KREGER:  Objection.  Lack of foundation.
25      A.      As I understand the first paragraph, paragraph A?
42: 1     Q.      Yes.
  2      A.      Yes, that's how I would understand it from reading it.
```

## Repanich, Anita
### 42:3-11

```
42: 3     Q.      And reading a couple lines down, it says, "The prime's
 4 overhead and profit on subcontractor's supervision,
 5 transportation, adjustment factors to account for small jobs,
 6 incidental tools and equipment, all of that cannot be treated as
 7 a cost by the contractor, a separate cost by the contractor, but
 8 can only be recouped through the price coefficient," as you
 9 understand the terms of this contract?
10              MR. KREGER:  Object to form.
11      A.      Yes.
```

## Repanich, Anita
### 42:12-24

```
42:12     Q.      The next line reads, "Means Division 1 items
13 identified below."
14              What does Means Division 1 apply to?
15      A.      My interpretation of Division 1 is usually
16 job-specific items.
17      Q.      Would that include general conditions costs for the
18 project?
19      A.      Specific jobs.
20      Q.      Would that include job site overhead costs?
21      A.      No, it would be more of special equipment for a
22 specific job, barriers, something like that.
23      Q.      How about job shack?
24      A.      No, that was included in the basic coefficient.
```

43:9-22

```
43: 9     Q.    And does that indicate that if it's included in the
   10 price coefficient, that it is not to be treated as a cost
   11 elsewhere and charged for again?
   12     A.    Yes, such as nonpriced.
   13     Q.    So the first item on the list we discussed already was
   14 the prime contractor's and subcontractor's overhead.  That can't
   15 be separately charged as a cost, right?
   16     A.    Yes.
   17     Q.    The profit for both can't be separately charged as a
   18 cost?
   19     A.    Yes.
   20     Q.    The bond premiums can't be separately charged as a
   21 cost?
   22     A.    Yes.
```

## Repanich, Anita
44:4-18

```
44: 4     Q.    The general insurances are not to be charged in
    5 addition to the coefficient?
    6     A.    Yes.
    7     Q.    Workman's compensation insurance costs are not to be
    8 charged for in any other way than through the coefficient?
    9     A.    Yes.
   10     Q.    State unemployment insurance costs are not to be
   11 charged in any way other than through the coefficient?
   12     A.    Yes.
   13     Q.    Federal unemployment insurance is not to be charged in
   14 any other way than through the coefficient?
   15     A.    Yes.
   16     Q.    Mobilization and demobilization costs are not to be
   17 charged in any other way than through the coefficient?
   18     A.    Yes, that is what it says.
```

## Repanich, Anita
44:24-45:5

```
44:24     Q.    "The prime's overhead and profit on subcontractors,
   25 supervision, transportation, adjustment factors to account for
45: 1 small jobs, incidental tools and equipment, Means Division 1
    2 items identified below are not to be charged in any other way
    3 than through the coefficient"?
    4           MR. KREGER:  Object to the form of the question.
    5     A.    Yes.
```

## Repanich, Anita
45:6-9

```
45: 6     Q.    And, "Any markups for materials and all contingencies
    7 in connection therewith are not to be charged for in any other
    8 means than through the coefficient factor"?
    9     A.    Yes.
```

**Repanich, Anita**
45:11-18

45:11      Q.      And what does that last phrase mean, as you understand
      12  it, "Since no allowance will be made later for additional
      13  costs"?
      14      A.      The purpose of that statement would have been to tell
      15  them to include that in your coefficient when you are
      16  calculating your coefficient for proposal purposes.  After task
      17  orders placed, an allowance would not be made for those costs, a
      18  request for adjustment later.


**Repanich, Anita**
45:19-24

45:19      Q.      So as a contracting officer for the government, if a
      20  contractor came back to you later and asked for an allowance to
      21  be made for some of these costs, would you be permitted to grant
      22  that?
      23      A.      Would I be permitted?  It would not be the intent of
      24  the contract.


**Repanich, Anita**
46:11-19

46:11      Q.      And then in sub part 1 on page 4 of Exhibit 3, the
      12  second IDIQ contract, there are specific exclusions from the
      13  above for surveying, field testing, scaffolding items, under
      14  construction aids, scaffolding specialties and equipment rental.
      15      A.      Uh-huh.
      16      Q.      And that would lead you to conclude that these items
      17  are permitted to be treated as costs and compensated separately
      18  from the coefficient factor?
      19      A.      Yes.


**Repanich, Anita**
47:17-48:2

47:17              And that is, did those have to do with requests by
      18  Brechan for additional compensation from the Coast Guard to
      19  address problems, unexpected problems, associated with defective
      20  and omitted welds?
      21      A.      Yes.
      22      Q.      Did Brechan submit any type of a written request for
      23  additional compensation?
      24      A.      Yes.
      25      Q.      What form did that take?
48: 1      A.      I believe it has come in the form of a proposal,
       2  letterhead-type proposal.  I believe also in the form of e-mail.

48: 3    Q.    The one fellow that we didn't mention in our
    4  discussion of personnel at FDCC that were involved in this
    5  project was Martin Boivin.  Does he go by Marty?
    6    A.    Yes.
    7    Q.    And his name is Marty Boivin?
    8    A.    Yes.
    9    Q.    His title is executive administrator?
   10    A.    Executive director.
   11    Q.    Executive director?
   12    A.    Was.


## Repanich, Anita
49:12-17

49:12    Q.    What is your understanding of whether that partnering
   13  agreement created a modification to the terms and conditions of
   14  the prime contract or the master contract, Task Order No. 7, the
   15  second master contract, or the task order for Phase II of the
   16  work, if any?
   17    A.    I would say it didn't have any relation to it.


## Repanich, Anita
50:6-21

50: 6    Q.    The process of negotiating and executing those
    7  subcontracts and supply contracts is referred to as the buyout
    8  process.
    9    A.    Okay.
   10    Q.    When contractors do that, sometimes they're able to
   11  obtain the work less expensively than they anticipated.
   12         MR. KREGER:  Objection.  Form of the question.
   13    Q.    So they can make a profit on the buyout.
   14    A.    That could be.
   15         MR. KREGER:  Objection to the form of the question.
   16    Q.    Conversely, sometimes they end up paying more, so they
   17  lose money on the buyout.
   18    A.    That's my understanding.
   19    Q.    So irrespective of the particular terminology, are you
   20  familiar with that circumstance in the construction industry?
   21    A.    Yes.


## Repanich, Anita
50:22-51:15

50:22    Q.    Under the terms of the two IDIQ contracts and the
   23  respective task orders pertaining to the cargo wharf maintenance
   24  project, was it your understanding that the general contractor,
   25  Brechan, was entitled to obtain additional compensation from the
51: 1  Coast Guard in the event that it had losses on its buyout?
    2         MR. KREGER:  Objection.  Vague.  Object to the form
    3  of the question, and also lack of foundation.  Compound.
    4         MR. ROBISON:  You can answer.
    5    A.    I cannot answer for the second phase.  I was not

```
 6  involved in the contract negotiations for the second phase.  I
 7  was involved in the negotiations on the first phase, and on this
 8  particular task, we did leave the negotiations saying, we may
 9  reopen the negotiations after award, because it was a
10  design-build, and a portion of the design had not been completed
11  yet, and we were not sure of what particular type of coating, I
12  believe it was, was going to be used.  So we agreed to a dollar
13  per square foot that we thought at that day was what we were
14  going to use, but we did leave the table saying, we may need to
15  reopen this again.
```

## Repanich, Anita
**51:16-25**

```
51:16     Q.    And were there any criteria for reopening it, or was
   17  it just a --
   18     A.    If the design changed.
   19     Q.    Okay.  So that means that if there were design changes
   20  that resulted in increased costs to the contractor --
   21     A.    Uh-huh.
   22     Q.    -- then the contractor could come to you, through the
   23  project manager perhaps, but come to you and seek additional
   24  compensation for the additional costs it incurred as a result of
   25  changes in the plans and specifications?
```

## Repanich, Anita
**54:3-55:17**

```
54: 3     Q.    To some extent, Brechan's pricing was left open on
    4  Task Order No. 7 after the negotiation?
    5     A.    To some extent.
    6     Q.    What was the extent to which it was left open?
    7     A.    To my understanding, it was on the type of cathodic
    8  protectioning or coating that we were going to use.
    9     Q.    What do you mean by "type"?
   10     A.    My understanding at that time would have been -- type
   11  would have been -- I don't know how else to say it.  The type we
   12  would have used, and I would imagine the reason it would change
   13  in price, is it would depend on the type you used how much work
   14  would be involved in applying it, or the cost of it itself.
   15  That had not been decided completely at the time of our
   16  negotiations.  The designer was still looking at different
   17  options for it.
   18     Q.    If the option that the designer went with was more
   19  expensive than the one that was specified in the May 8th bid
   20  set, would that be the type of thing that would be appropriate
   21  subject for a revisitation of the pricing?
   22     A.    Yes, that was the purpose.
   23     Q.    Likewise, if the pricing came in lower than what was
   24  specified, would that be an appropriate basis for revisiting the
   25  pricing?
55: 1     A.    That wasn't discussed at the time.  Our other option
    2  was going to cost more, not less.
    3     Q.    So there were specific options that were being
    4  considered at the time?
    5     A.    Uh-huh.
```

```
 6     Q.    What type of options were being considered with
 7  respect to cathodic protection?
 8     A.    I -- I don't recall, and I don't think that they would
 9  have had a lot of -- I wouldn't have understood the different
10  options.
11     Q.    Do you know that there were, in fact, in addition to
12  options pertaining to what particular brand or type of coating
13  to be used --
14     A.    Yes, that's where the different discussions and
15  Sherwin-Williams, and I don't know what the other -- there were
16  several names thrown out of who they might use and how they
17  might use it.
```

## Repanich, Anita
55:23-56:3

```
55:23     Q.    Was it also your understanding, in leaving some of the
   24  pricing open after the negotiation was concluded, that the
   25  contractor could request additional compensation if it made
56: 1  errors of its own in pricing?
    2     A.    No, that's -- no, that's not a -- that's not -- no, it
    3  wouldn't have been included.
```

## Repanich, Anita
56:10-25

```
56:10     Q.    I'm going to hand you what's been marked as Exhibit 4
   11  and ask you if you've seen that document before?
   12     A.    I may have, but I don't recall it.
   13     Q.    Can you read this handwritten language --
   14     A.    Uh-huh.
   15     Q.    -- at the bottom of the page?
   16           MR. KREGER:  Objection.  Foundation.
   17     A.    "Note for Paul R.  Additional scaffolding, costs
   18  associated with" -- I'm not sure -- "due to not completing it
   19  this year."
   20           MR. KREGER:  Objection.  Document speaks for itself.
   21     A.    I can't --
   22     Q.    Do you know Paul R.?
   23     A.    Paul Rendon.
   24     Q.    The project manager?
   25     A.    Yes.
```

## Repanich, Anita
58:12-23

```
58:12     Q.    I'm going to ask you about your understanding of what
   13  the first IDIQ contract permits or does not permit.
   14     A.    Okay.
   15     Q.    In terms of providing additional compensation to the
   16  contractor.
   17           Under Task Order No. 7, was Brechan Enterprises
   18  entitled to compensation outside of the coefficient factor for
   19  the costs of its subcontractor's mobilization?
```

```
20          MR. KREGER:  Objection.  Calls for a legal
21 conclusion.
22     A.   I -- without looking at it, I'm not sure, without
23 looking at the --
```

## Repanich, Anita
59:5-14

```
59: 5     Q.   Okay.  Take a look at Task Order No. 7.  Is that the
    6 coefficient factor definition?
    7     A.   Yes, it is.
    8     Q.   Can you read through that and tell me if the terms of
    9 that coefficient factor, at least that first paragraph there,
   10 are the same as the one that we went through on the second IDIQ
   11 contract?
   12     A.   Oh, yes, it does include prime contractor,
   13 subcontractor's contract.  It basically reads the same.
   14     Q.   All right.
```

## Repanich, Anita
59:15-21

```
59:15          Was the contractor allowed to charge the
   16 subcontractor's mobilization and demobilization costs as a
   17 separate cost item, in addition to being compensated for the
   18 coefficient factor as you understood the contract that applied
   19 to Task Order 7?
   20     A.   It is my recollection, without looking at it, we did
   21 not use the coefficient for Task Order 7.
```

## Repanich, Anita
59:22-25

```
59:22     Q.   The 1.05 coefficient was not used on Task Order No. 7?
   23     A.   We did not use the Means.  I would have to look at
   24 their price proposal to see if we used the coefficient.  We
   25 considered it to be nonprepriced work.
```

## Repanich, Anita
60:15-61:24

```
60:15     Q.   Was the entirety of Task Order No. 7 costed as
   16 nonprepriced work?
   17          MR. KREGER:  Objection.  Asked and answered.
   18     A.   Yes.
   19     Q.   Was a coefficient applied to the costs determined --
   20 to the nonprepriced costs determined?
   21     A.   Yes.
   22     Q.   Under the terms of the contract applicable to Task
   23 Order No. 7, did the coefficient factor include all the
   24 contractor's and subcontractor's overhead, profit, mobilization
   25 and demobilization costs?
```

```
61: 1      A.    I would assume so.
    2      Q.    Was it permissible, as you understood the terms of
    3 this contract, for the contractor to charge for mobilization and
    4 demobilization as a separate cost, in addition to application of
    5 the coefficient factor?
    6      A.    Not under the terms of the contract.  Not under the --
    7 well, it was nonpriced, so we would assume --
    8      Q.    Let me make sure that we're clear on --
    9            MR. KREGER:  Let her finish her answer here.
   10      Q.    Let's make sure we're clear on one point.
   11            The coefficient factor, is that applied to only the
   12 prepriced work, only the nonprepriced work, or both the
   13 prepriced and nonpriced work?
   14      A.    Both.
   15      Q.    So this is all nonprepriced work, correct?
   16      A.    Yes.
   17      Q.    And so the coefficient factor, if I understood your
   18 testimony correctly, would be applied to the nonprepriced work?
   19      A.    Yes.
   20      Q.    And, therefore, the coefficient factor is still
   21 applicable in exactly the same way to the nonprepriced work that
   22 it would be to the prepriced work?
   23      A.    Under the -- under the intent of the contract.
   24      Q.    Yes.
```

## Repanich, Anita
**61:25-62:9**

```
61:25            So all the things that we listed as being excluded
62: 1 from being treated as a separate cost, being compensated for
    2 outside of the coefficient factor, would apply to all of that
    3 nonprepriced work?
    4      A.    That would be the intent of the way the contract is
    5 written.
    6      Q.    And among the things that could not be separately
    7 costed, under the definition of coefficient factor, was
    8 mobilization and demobilization?
    9      A.    That would be the intent of it.
```

## Repanich, Anita
**62:25-63:16**

```
62:25      Q.    Was it allowable under the contract to charge for
63: 1 mobilization and demobilization in any way, other than through
    2 the coefficient factor?
    3      A.    I think that could be the discretion of the
    4 contracting officer.
    5      Q.    Where do you find that?
    6      A.    That the contracting officer would have the discretion
    7 to allow costs.
    8      Q.    Is that included in the contract?
    9      A.    I think that's inherent to a contracting officer.
   10      Q.    Is that consistent with the basis that this work was
   11 bid on, insofar as the coefficient factor was designed or
   12 defined to include all mob and demob?
   13            MR. NIEMER:  Object to the form.
```

```
14      A.      That was the intent -- that was the intent of the
15 contract when it was written, that it would include all mobs and
16 demobs.
```

## Repanich, Anita
63:24-64:2

```
63:24      Q.      Is it part of your responsibility as a contracting
   25 officer for the government to protect the financial interests of
64: 1 the government?
    2      A.      Yes.
```

## Repanich, Anita
65:12-66:5

```
65:12           But the essential question that I'm driving at is,
   13 would you ever agree to give the government's money away without
   14 getting -- the government getting something back in return or
   15 having already gotten something back in return?
   16           MR. KREGER:  Objection.  Vague.
   17      A.      I think we do that sometimes if our specifications are
   18 ambiguous or if there's a -- we do -- I suppose you could say,
   19 we do end up compensating a contractor sometimes without
   20 receiving something back if there was -- if something was
   21 unclear in what we were asking for.
   22      Q.      How about if there is no problem with clarity?
   23           MR. KREGER:  Object to the form of the question.
   24      A.      Would we then compensate a contractor for something we
   25 never received?  Is that what you're asking?
66: 1      Q.      Yes.
    2      A.      No.
    3      Q.      Would you compensate the contractor for something a
    4 second time, pay him twice for something that you had received?
    5      A.      No.
```

## Repanich, Anita
66:14-17

```
66:14      Q.      Does the language of the coefficient say that the
   15 subcontractor's mobilization and demobilization may only be
   16 compensated through that coefficient factor?
   17      A.      Yes.
```

## Repanich, Anita
66:18-67:7

```
66:18      Q.      If that's the case, would it be proper for the
   19 contractor, in this case Brechan, to charge you a separate cost
   20 for mobilization and demobilization --
   21           MR. KREGER:  Objection.
   22      Q.      -- and in addition to the coefficient factor?
   23           MR. KREGER:  Objection.  The contract speaks for
```

```
24  itself.
25      Q.    To your understanding?
67: 1   A.    It would depend on the -- it would depend on the task.
 2  It would depend on the work.
 3      Q.    I'm talking about Task Order No. 7.
 4      A.    I don't think Task Order No. 7 was ever considered in
 5  the coefficient.  The work of Task Order No. 7 was not
 6  considered in that coefficient, I don't think.  I think this
 7  work is somewhat unique.
```

## Repanich, Anita
**67:15-68:8**

```
67:15   Q.    Is that a price proposal that you received from
 16  Brechan for this particular task?
 17      A.    It is not.  It appears to be -- yes, it is,
 18  contractor's proposal.
 19      Q.    And is that for Task Order No. 7?
 20      A.    Yes.
 21      Q.    And was everything there treated as a nonprepriced
 22  item?
 23      A.    Yes.
 24      Q.    And was a coefficient factor of 5 percent applied to
 25  that?
68: 1   A.    Yes.
 2      Q.    And did the coefficient factor include the
 3  contractor's and subcontractor's mobilization and demobilization
 4  costs?
 5      A.    I couldn't tell you if it did or not.
 6      Q.    Can't you tell by looking at the terms of the
 7  contract?
 8      A.    By the terms of the contract, it would have, but I --
```

## Repanich, Anita
**68:9-16**

```
68: 9   Q.    Is there anything in your file that would state
 10  anything to the contrary?
 11          MR. KREGER:  Objection.  Form of the question.
 12      A.    The price proposal is not broken down by subcontractor
 13  costs.  It is broken down by elements of work, and from looking
 14  at it, I cannot tell if Brechan is doing this or somebody else
 15  is doing this, so I would assume by looking at it, all costs are
 16  included in that coefficient.
```

## Repanich, Anita
**68:17-69:6**

```
68:17   Q.    Is there a line item there for mobilization and
 18  demobilization?
 19      A.    No.
 20      Q.    If Brechan had included a line in there for
 21  mobilization and demobilization, would that have been
 22  permissible to be treated as a cost?
```

```
23    A.    Under this order, we may have considered that.
24    Q.    Well, you said you may have considered that.
25    A.    Uh-huh.
69: 1    Q.    My question is, under the terms of the contract, was
2  that permissible --
3          MR. KREGER:  Objection.  Asked and answered.
4    Q.    -- as you understand the terms of the contract?
5          MR. KREGER:  Objection.  Asked and answered.
6    A.    That was not the intent of the contract.
```

## Repanich, Anita
**69:18-70:8**

```
69:18    Q.    If Brechan had underestimated the scope and cost of
19  work associated with fender pile and timber repairs by $12,600,
20  would that be something that it would be entitled to additional
21  compensation for under this contract?
22          MR. KREGER:  Objection.  Calls for speculation.
23    A.    They could request it.  They could always request it.
24  Again, it would go back to how clear we were in the
25  specification.
70: 1    Q.    It says here that -- well, assuming that they are not
2  claiming that there was any lack of clarity in the
3  specification, that they just simply underestimated the cost and
4  scope, is a contractor entitled to be made whole for its losses
5  on its estimating errors --
6          MR. KREGER:  Objection --
7    Q.    -- under your understanding of the terms of this
8  contract?
```

## Repanich, Anita
**70:17-71:4**

```
70:17    A.    Would they be entitled to it?
18    Q.    Is it part of your job to evaluate whether it's
19  appropriate or not for the government to pay a contractor for
20  some charge that is being proposed?
21    A.    Yes.
22    Q.    And, in fact, that is one of your primary functions,
23  to protect the financial interests of the government from
24  inappropriate charges?
25    A.    True.
71: 1    Q.    And to that extent, isn't it your responsibility to
2  understand what constitutes something that is compensable and
3  not compensable under a contract?
4    A.    Yes.
```

## Repanich, Anita
**71:5-24**

```
71: 5    Q.    And under the terms of these IDIQ contracts, isn't it
6  true that mobilization and demobilization are defined as things
7  that are compensable, but only in the form of the contractor's
8  competitively bid price coefficient?
```

```
 9              MR. KREGER:  Objection.  Calls for a legal
10  conclusion.
11       Q.    Or am I misreading that?
12       A.    No, you're not misreading that, and that was used for
13  them to establish a coefficient, which we used for competitive
14  purposes.  After award, though, we would have some flexibility
15  in how we would use that with certain projects.  That's the
16  purpose of the nonpriced.
17              If --
18       Q.    I thought the purpose was --
19              MR. KREGER:  Let her finish, please, Counsel.
20       A.    I look at what I would -- I guess the purpose for
21  being so specific in that coefficient definition, although it is
22  meant to be enforced after the contract, is really to level the
23  field for competition purposes, and then the intent is that you
24  would follow through with that after award.  But...
```

## Repanich, Anita
**71:25-72:9**

```
71:25    Q.    That being the case, would you expect the unsuccessful
72: 1  bidders to be believing that the successful bidder would be
   2  bound by the percentage that he agreed --
   3       A.    Uh-huh.
   4       Q.    -- and not released from it?
   5              MR. KREGER:  Objection.  Calls for speculation.
   6       Q.    At the whim of the government?
   7              MR. KREGER:  Calls for speculation as to what other
   8  bidders might expect.
   9       A.    Other bidders would expect that.
```

## Repanich, Anita
**72:15-74:19**

```
72:15    Q.    Was it reasonable to allow Brechan to charge for
   16  mobilization and demobilization in addition to charging the full
   17  coefficient on Task Order No. 7?
   18       A.    I think it was.
   19       Q.    It was?
   20       A.    (Witness nods head.)
   21       Q.    And what's that based on?
   22       A.    That I don't think that they would have anticipated
   23  mobilizing all that equipment for a project they didn't know
   24  they were going to do when they calculated their coefficient.
   25       Q.    And so the language in the coefficient factor that
73: 1  says, "The offeror's coefficient must be all-inclusive" --
   2       A.    Uh-huh.
   3       Q.    And concluding with, "No allowance will be made for
   4  later additional costs" isn't necessarily enforced by the
   5  government?
   6              MR. KREGER:  Objection.  Mischaracterizes her
   7  testimony.
   8       A.    I did not enforce it on this order.
   9       Q.    You did not enforce it on this order?
   10       A.    (Witness nods head.)
   11       Q.    Okay.
```

12              **(Off-the-record discussion between**
13                  **the witness and Mr. Robison.)**
14      A.    That's true, and that was discussed too.  That was
15 discussed.
16          If Brechan did not want to do this task order, they
17 could have said, we don't want to do this task order.  And that
18 was a part of the negotiations was, we want them to do this task
19 order because we want them to do our work that's there.  And in
20 doing that, we sometimes have to have some flexibility and step
21 away from that, from some of the requirements of the contract.
22          You notice in the second contract, knowing we're
23 going to do another phase of this, we do pull those things out
24 and say scaffolding is not considered part of it.  Take these
25 things out, don't consider them in your coefficient, because we
74: 1 realized in the first one, it was probably unreasonable to
2 expect that.
3      **Q.    Is mobilization and demobilization taken out in the**
4 **second IDIQ contract?**
5      A.    No, it is not, but I think when I see scaffolding and
6 things are taken off, I don't know if you couldn't say does the
7 mob and demob go with them, what's associated with them?
8      **Q.    So what you're telling me is that my reading of this**
9 **contract as excluding separate compensation for mobilization and**
10 **demobilization is an accurate reading --**
11     A.    Uh-huh.
12     **Q.    -- but you, as a contracting officer, elected to**
13 **deviate from the contract requirements in order to induce the**
14 **contractor to perform the work?**
15          MR. KREGER:  Objection.  Misstates her testimony.
16 Inaccurate summary.  An incomplete summary.  Objection.  Asked
17 and answered.
18     A.    I don't know if I would say I deviated from it.  I did
19 not enforce that part of it.


## Repanich, Anita
74:24-75:14


74:24   **Q.    Were you required to obtain the advice and consent of**
25 **any of your superiors before allowing the deviation such as**
75: 1 **that?**
2      A.    Was I required to?  Probably not.  I do get legal
3 review of orders over a certain dollar amount.  Am I required to
4 get approval?  No, not on an order like this, I would not have
5 been required.  I'm sure it was discussed because we discussed
6 the amount of nonpriced work that I was doing.
7      **Q.    Did Brechan ask you to provide it with additional**
8 **compensation for the buyout loss that it had on the Swalling**
9 **coating application subcontract?**
10          MR. KREGER:  Objection.  Assumes facts not in
11 evidence.  Mischaracterizes the prior testimony.
12     A.    I think the -- no, I don't think they asked us to
13 do -- no, I wouldn't phrase it that way.  Compensation for the
14 buyout of their contract.

**Repanich, Anita**
76:1–18

```
76: 1            Did Brechan tell you that they had signed a contract
   2  with their subcontractor that would obligate them to pay
   3  $100,000 to their subcontractor more than they were being paid
   4  for the coating application work on Phase I?
   5       A.    They told us that, yes.
   6       Q.    And did Matt Holmstrom ask if you would agree to
   7  compensate them for that loss?
   8            MR. KREGER:  Objection.  Mischaracterizes her
   9  testimony.
  10       A.    I don't know if Matt ever asked us to do that.
  11       Q.    Did you ever tell Matt that you would agree to
  12  compensate him for that loss in the event -- or in any event?
  13       A.    I think we suggested they renegotiate their contract.
  14       Q.    Okay.
  15            Let's mark this.
  16            MR. KREGER:  Counsel, could you ask whether she meant
  17  renegotiated contract or subcontract?
  18            THE WITNESS:  Oh, I'm sorry, subcontract.
```

**Repanich, Anita**
76:20–77:1

```
76:20     Q.    Do you recognize that e-mail?
  21       A.    I do.
  22       Q.    Is that dated 12/27/01?
  23       A.    Yes.
  24       Q.    And is that an e-mail that you transmitted to Matt
  25  Holmstrom of Brechan Enterprises?
77: 1      A.    Yes.
```

**Repanich, Anita**
77:13–78:18

```
77:13     Q.    It says, "In regards to the cargo pier, I don't think
  14  Paul, Jerry and I really answered your concerns."
  15       A.    Uh-huh.
  16       Q.    Who are Paul and Jerry?
  17       A.    Paul Rendon, Jerry Johnson.
  18       Q.    What were the concerns that you had not answered?
  19       A.    I'm assuming at this time, it is what to do with the
  20  amount of work that Swalling is incurring and the costs.
  21       Q.    It says, "Let me try again.  I don't think you could
  22  have overpaid Swalling as you just pay what is requested and we
  23  approve that amount, progress and payment.  If they've been
  24  overpaid, then we all of us overpaid.  Fine.  About the
  25  100,000" -- 100 K is $100,000?
78: 1      A.    Yes.
   2       Q.    "About the $100,000 you have hanging out there, I can
   3  see Bill Oliver's concern."
   4            What were you referring to when you said the $100,000
   5  hanging out there?
   6       A.    I think it's the subcontract that they have written.
```

```
 7  Our contract was written with Brechan to -- I can't say how many
 8  feet it was, but to go to bent 12, but their subcontract with
 9  Swalling is written to go to a different bent 15.  It's written
10  to go farther than we ever contracted for, and I don't know why
11  that is.  I don't know.
12      Q.   Where did you get the idea that your contract was
13  written to go to bent 12?
14      A.   Based on correspondence.  I think in the actual task
15  order itself, it uses footage, and in all of the other documents
16  I read, it actually uses bents.  Now, I don't know how --
17      Q.   Why don't you take a look at the task order.  Do you
18  have your copy of your task order there, No. 7?
```

## Repanich, Anita
78:22-79:24

```
78:22   A.   Yeah.
  23    Q.   How does the task order define Brechan's scope of
  24  work?
  25    A.   It just says "Drawings and Specifications, dated March
79: 1  2001."
   2    Q.   Do you see any reference there to number of bents?
   3    A.   No.
   4    Q.   Do you see any reference there to number of square
   5  feet?
   6    A.   No.
   7    Q.   Is the March set of specifications attached?
   8    A.   Not in my file.  I mean, it's --
   9    Q.   Is there a March set of specifications?
  10    A.   Yes, yes.
  11    Q.   Where is that March set of specifications?
  12         MR. KREGER:  I would like the record to reflect she's
  13  looking at it.
  14    Q.   So you do have the March specifications?
  15    A.   Yes.
  16    Q.   Do you want me to take them out?
  17    A.   Let me look at them, to begin with.
  18         MR. KREGER:  I'd like to get those marked.
  19    Q.   What is the title of this document?
  20    A.   "Technical Requirements For Design-Build Contract."
  21    Q.   Do you understand that it's originally dated January
  22  2001, and that's been stricken out, and now it says "March
  23  2001"?
  24    A.   Yes.
```

## Repanich, Anita
80:11-20

```
80:11   Q.   I'll represent to you that I spoke with Ed Rockenstire
  12  of your office who told me that this language was in error, that
  13  there are no drawings and specifications dated March 2001.  Is
  14  that consistent or inconsistent with your understanding?
  15         MR. KREGER:  Objection.  Asked and answered.  Lack of
  16  foundation.  Leading.
  17    A.   But there is a specification.
  18    Q.   So you're referring to the technical requirements as a
```

19  **specification?**
20      A.    Yes.


## Repanich, Anita
81:20-82:3

81:20      **Q.    So, for the record, what we've marked as Exhibit 6 is**
   21  **the document entitled "USCG ISE Kodiak Cargo Wharf Maintenance**
   22  **Technical Requirements for Design-Build Contract," dated March**
   23  **2001; is that right?**
   24      A.    Yes.
   25      **Q.    And it's your understanding that that's what you were**
82: 1  **referring to in the task order that was issued for Phase I, Task**
    2  **Order 7.**
    3      A.    Uh-huh.


## Repanich, Anita
82:25-84:2

82:25      **Q.    So do you agree with Mr. Rockenstire, then, that this**
83: 1  **is an error?**
    2      A.    That is probably an error.  That is probably true.
    3  This would have been our task to Brechan to go and make drawings
    4  and specifications that later came out in 5 and 6 of 2001, and I
    5  would assume with those specifications in May and June, there
    6  were drawings.
    7      **Q.    I just want to make clear on that, because I receive**
    8  **repeated references to March, and even in Modification 5 to the**
    9  **contract, this reference is repeated, and yet I've never seen**
   10  **any March plans and specifications.**
   11      A.    No, because in March, it still would have been just a
   12  task to Brechan to go get a designer, and they already had a
   13  designer, but it still would have been -- this would have just
   14  been a task to Brechan to develop drawings and specs.
   15      **Q.    And as you look at Exhibit 6, is there any**
   16  **identification in that document as to how many bents or how many**
   17  **square feet are within the scope of Brechan's contract?**
   18      A.    Not in this document, there isn't, because this
   19  document --
   20      **Q.    Not in Exhibit 6?**
   21      A.    No.  This document is to design and draw the entire
   22  project, both phases.
   23      **Q.    And, therefore, where would we look to find the scope**
   24  **of work that was contracted to Brechan to perform?**
   25      A.    This would have been their task, and they would have
84: 1  performed off of the drawings and specs that their designer
    2  prepared.


## Repanich, Anita
84:3-24

84: 3      **Q.    Is it your understanding that their designer was**
    4  **preparing the plans and specs to conform with the task?**
    5      A.    Yes.

```
 6      Q.    If the plans and specifications that were utilized on
 7  Task Order No. 7 called for the work -- the scope of work to
 8  include all of the wharf extension and bents 1-15 of the
 9  original wharf, would that lead you to conclude that Brechan's
10  scope of work at the time Task Order 7 was issued included bents
11  1-15 of the original wharf?
12          MR. KREGER:  Objection.  Foundation.  Assumes facts
13  not in evidence.  Mischaracterizes the prior testimony and other
14  exhibits.
15          Go ahead.
16      A.    When we had them design it, we assumed we were going
17  to split it in half, so we might have asked him to design to 15
18  in one phase, but we didn't necessarily negotiate that.  The
19  design was a separate.
20      Q.    What would you have to look at to determine what it
21  was you did ask them to -- how much work you asked them to do?
22      A.    I think for me, it would be the negotiation memo.
23      Q.    Okay.  Let's look at that.
24      A.    But, again, I don't know if it has footage or bents.
```

## Repanich, Anita
86:6-87:9

```
86: 6          Is the document that's been marked as -- tell me what
    7  the document marked as Exhibit 7 is.
    8      A.    It's an attachment to a post-negotiation memorandum.
    9      Q.    And what information, in general terms, is provided on
   10  Exhibit 7?
   11          MR. KREGER:  Object, to the extent that the
   12  memorandum appears to be incomplete since it's an attachment to
   13  some other document that's not been included in Exhibit 7.
   14      A.    It's a summary of the contractor's proposal, our
   15  estimate, our revised estimate, and the amount that was
   16  negotiated.
   17      Q.    What is that document an attachment to?
   18      A.    Post-negotiation memorandum document.
   19      Q.    Let's mark that as Exhibit No. 8.
   20              (Exhibit No. 8 marked.)
   21      Q.    What's the discussion between the post-negotiation
   22  memorandum and the table that is Exhibit 7?
   23          MR. KREGER:  Objection.  Vague.
   24      A.    The table is only included because typically, it would
   25  all be on one document, on one memorandum, but this engineer
87: 1  preferred to put it onto a table.
    2      Q.    Do you know who the author of that document was?
    3      A.    Steve Locher.
    4      Q.    Is it customary for Mr. Locher to negotiate prices in
    5  his role?
    6      A.    It would not be customary for him to negotiate prices
    7  in his role.  It could or could not be customary for him to
    8  prepare documents, memorandums.  Often the engineers do that.
    9  Sometimes we do it.
```

## Repanich, Anita
87:10-21

87:10    Q.    Who signed the post-negotiation memorandum?
  11    A.    I do as the contracting officer.
  12    Q.    And is that your signature I see in blue there?
  13    A.    Yes.
  14    Q.    Let's return back to Exhibit 7.  Does Exhibit 7
  15 identify for you what the scope of work was that Brechan
  16 contracted to perform in exchange for the price that was stated
  17 on Task Order 7?
  18    A.    It would tell me they contracted to perform the design
  19 and the specification for the work, and then it would also tell
  20 me that they were going to perform the actual work, the
  21 construct of the work.

## Repanich, Anita
87:22-90:10

87:22    Q.    What does it mean on the first column where it says,
  23 "Pile and related work," and then there's two indented areas,
  24 "coating area" and "coating cost."
  25        Do you see that?
88: 1    A.    Yes.
  2    Q.    And then adjacent to the coating area, there's a
  3 series of entries across that table.  The first one says,
  4 "15,860 square feet"?
  5    A.    Uh-huh.
  6    Q.    Under "Contractor's proposal"?
  7    A.    Uh-huh.
  8    Q.    What does that mean to you?
  9    A.    That was how many feet he was proposing that he was
  10 going to do at that much per square feet, and I do not know what
  11 bent that goes to.
  12    Q.    But that was at $44 per square feet?
  13    A.    Uh-huh.
  14    Q.    And then "Government Estimate," it says, "9,444 square
  15 feet at $36 a square foot"?
  16    A.    Uh-huh.
  17    Q.    Is that what the FDCC engineering department would
  18 have calculated?
  19    A.    Our cost estimator would have calculated.
  20    Q.    Who was the cost estimator?
  21    A.    Jeff McCallum; we have an in-house cost estimator.
  22    Q.    And then the next column over says, "Revised Scope,
  23 GE"?
  24    A.    Uh-huh.
  25    Q.    Is that government estimate?
89: 1    A.    Yes.
  2    Q.    It says, "19,000 square feet at $40 a square foot"?
  3    A.    Uh-huh.
  4    Q.    Do you have any idea where that 19,000 square feet
  5 came from?
  6    A.    No, I don't.
  7    Q.    Then the final column says, "Negotiated Amount, 17,800
  8 square feet at $40 a square foot."
  9    A.    Uh-huh.
  10    Q.    What does 17,800 square feet mean under "negotiated
  11 amount"?
  12    A.    That's as far as we can go with the amount of money
  13 that we have.

```
14    Q.    And down beneath that, it has a subtotal figure of
15 $1,084,902.
16    A.    Uh-huh.
17    Q.    Do you recall what the contract price was for Task
18 Order No. 7?
19    A.    One thousand, eighty-four, 902 (sic).
20          MR. KREGER:  This would be the original contract
21 price?
22          THE WITNESS:  The original task order price.
23          MR. NIEMER:  Did you mean a million?
24          THE WITNESS:  Yes, right.
25    Q.    So the figure is $1,084,902?
90: 1    A.    Yes.
 2    Q.    And does that correlate with the figure that's footed
 3 at the -- on Exhibit 7?
 4    A.    Yes.
 5    Q.    So given those two pieces of information, can you
 6 determine what Brechan's scope of work was to include on Task
 7 Order No. 7, in terms of area to be coated?
 8    A.    17,800.
 9    Q.    Square feet?
10    A.    Square feet.
```

## Repanich, Anita
90:25–91:17

```
90:25    Q.    I would like to obtain a clarification, Ms. Repanich,
91: 1 as to when your involvement with this project as the responsible
 2 contracting officer ended?
 3    A.    With the task?
 4    Q.    Well, the cargo wharf maintenance project, you were
 5 the contracting officer assigned to Phase I?
 6    A.    Yes.
 7    Q.    Were you the contracting officer assigned to Phase II?
 8    A.    No.
 9    Q.    When was the transition made to Margaret Wilson?
10    A.    Prior to Phase II, I awarded the second, not task, but
11 overall contract.  I awarded the second IDC contract; I procured
12 that, and then turned administration over to Maggie Wilson.
13    Q.    Did Maggie award the second -- or excuse me -- the
14 second phase of --
15    A.    The cargo?
16    Q.    -- the cargo wharf project?
17    A.    Yes.
```

## Repanich, Anita
92:11–93:1

```
92:11    Q.    So if I refer to the task order for Phase II as P97 --
12          MR. KREGER:  P92.
13    Q.    -- P92, that would be appropriate; you would
14 understand what I was talking about?
15    A.    No.  If you called it Phase II, I would.  I'm not even
16 sure Maggie would recognize it.
17    Q.    Okay.  Then we'll call it Phase II.
18          So you awarded the second IDIQ?
```

```
  19     A.    Uh-huh.
  20     Q.    She awarded Phase II task order?
  21     A.    Yes.
  22     Q.    Did you have any involvement in evaluating the
  23 proposal that came in for the Phase II task order?
  24     A.    No.
  25     Q.    Did she have involvement with that?
93: 1    A.    Yes.
```

## Repanich, Anita
94:15-18

```
94:15    Q.    Did Mr. Locher, to your knowledge, work on Phase II?
  16     A.    I don't know if he was even here at that time or if he
  17 had already left, but I think he would have had minimal input
  18 into Phase II because, again, he would be working as a designer.
```

## Repanich, Anita
95:17-25

```
95:17    Q.    So, to your knowledge, did Brechan communicate to FDCC
  18 sometime in late 2001 that its subcontractor had encountered a
  19 differing site condition on the original cargo wharf?
  20     A.    I don't know who would have made us aware of that.
  21     Q.    Did somebody make you aware of it?
  22     A.    It might have come through the inspector.  It might
  23 have come through Coffman Engineering.  I don't know who first
  24 made us aware of it, and I'm sure the project managers were
  25 aware of it before I was too.
```

## Repanich, Anita
96:1-99:23

```
96: 1    Q.    Did Brechan request additional compensation for the
   2 cost of -- the additional costs associated with dealing with the
   3 defective and omitted welds?
   4           MR. KREGER:  Objection.  Foundation.
   5     A.    At some point, they requested it.
   6     Q.    Did you ever discuss this issue with Paul Rendon?
   7     A.    I'm sure.
   8     Q.    Did he ever inform you that he was of the opinion that
   9 the weld problems that Brechan was describing were, in fact, a
  10 compensable differing site condition?
  11     A.    Yes, Paul and I were in agreement on that.
  12     Q.    And did the two of you ever discuss the possibility of
  13 attending a meeting in Anchorage --
  14     A.    Yes.
  15     Q.    -- around February 8th of 2002?
  16     A.    I remember it was during the early part of the year,
  17 yeah.
  18     Q.    And was the purpose of attending a meeting in
  19 Coffman's office during the early part of the year to discuss
  20 resolution of the weld problems?
  21           MR. KREGER:  Objection.  Lack of foundation.
```

```
22     A.     I don't know if it was just of the weld problems or if
23 it was the progress overall and what to do with this coating,
24 but I'm sure the welds played a part in that.
25     Q.     Was there any intention on the part of -- well, who
97: 1 was going to -- who was in the plan to appear at that meeting up
 2 there?
 3     A.     It would have been Paul and myself.  Don't know if
 4 Jerry Johnson was included in that or not.  I would imagine Matt
 5 Holmstrom would have been there.
 6     Q.     I mean from FDCC.
 7     A.     From FD&CC.  Probably Paul, myself and Jerry Johnson.
 8     Q.     That is a fairly significant contingent of people --
 9     A.     Yeah, actually when I think of it, probably Steve
10 Locher too, because, again, he's a design engineer.  He might
11 have been.
12     Q.     Is there any reason that three or four of you were
13 planning on heading up there for that meeting?
14     A.     I -- it wouldn't have been uncommon for us to do
15 something like that if there was a project that was having that
16 much difficulty on.  Project managers don't always go on their
17 own because if a decision is made, no decision can be made
18 unless the contracting officer will agree to make the change, so
19 we get taken along with them.  Paul Rendon as the project
20 manager would have went, but I know would have consulted back
21 with Steve Locher on any changes he would have made, technical
22 changes, so Steve Locher would have probably been with.
23     Q.     Do you believe that meeting would have been scheduled
24 at the time it was, had there not been the problem with the
25 welds that had been brought to your attention?
98: 1     A.     I know we wouldn't have just routinely done that, no.
 2     Q.     So the principal reason for the three or four of you
 3 heading up there was, in fact, to discuss the weld issue, among
 4 other things?
 5     A.     Yes.
 6     Q.     And the principal reason that you were going along on
 7 the trip is that you were the only person that had
 8 contract-signing authority in the group?
 9     A.     Yes, yes.
10     Q.     So if, in fact, a resolution had been agreed upon by
11 all the participants that involved the Coast Guard providing
12 additional compensation to the contractor, you would have been
13 the person that ultimately would have had to authorize it and
14 sign off on it?
15     A.     Yes.
16     Q.     Was it in anticipation that that might be a
17 possibility at the time that the meeting was scheduled?
18     A.     Compensation could have been discussed, and also
19 change to specifications could have been discussed too.
20     Q.     And for a change in specifications, you would also
21 need to authorize that?
22     A.     Uh-huh, yes.
23     Q.     As the contracting officer?
24     A.     Yes.
25     Q.     And the other personnel accompanying you didn't have
99: 1 that authority?
 2     A.     No.
 3     Q.     So at the time you went up there, it was under active
 4 consideration that there might be either increase in the
 5 compensation paid to Brechan to address the problem with the
```

```
 6  welds, or a modification to its work scope for the same purpose?
 7       ·'        MR. KREGER:  Objection.  Misstates the testimony.
 8  Assumes facts not in evidence.
 9       A.    Possible compensation for work -- for past work that
10  had already been performed, and on change -- I think a change to
11  the specification, yeah.
12       Q.    Was there any active consideration of a change to the
13  specifications during the point in time when you were planning
14  on going up to the early 2000 --
15       A.    In February?
16       Q.    Yes.
17       A.    I think there would have been or we wouldn't have been
18  meeting with Coffman.
19       Q.    Do you know what changes were under consideration?
20       A.    It was my understanding it was to the type of coating
21  we would use so it would not require the extensive welding.
22       Q.    So a substitution of coating product?
23       A.    Yes.
```

## Repanich, Anita
99:24-100:11

```
99:24      Q.    Did you actually attend the meeting in February?
   25      A.    No, we never did meet.
100: 1      Q.    Prior to the time that the meeting in February was
    2  scheduled for, did something happen that preempted your
    3  attendance at that meeting?
    4      A.    The office decided overall, as an office, we decided
    5  we would take the position that we would have -- instead of
    6  meeting to discuss how to resolve it, we would move it back to
    7  Brechan more and have them present to us how to resolve it.
    8      Q.    Who was the "we" that you're referring to?
    9      A.    We in the office would have probably been myself and
   10  Paul, Jerry Johnson, I'm sure, Steve Locher -- don't know how
   11  much -- and Marty Boivin.
```

## Repanich, Anita
101:21-102:4

```
101:21      Q.    So you eventually came to the conclusion that it was a
   22  compensable differing site condition?
   23      A.    Yes.
   24      Q.    And did Marty Boivin agree with that?
   25      A.    I don't think he did.
102: 1      Q.    How about Steve Locher, did he agree with that?
    2      A.    I don't know.
    3      Q.    How about Paul Rendon, did he agree with that?
    4      A.    Yes, he did.
```

## Repanich, Anita
102:5-12

```
102: 5      Q.    When the decision was made that you weren't going to
    6  go to Anchorage for the February 8th meeting, was that a
```