```
 7  decision that you made or was that a decision that was made by
 8  Marty Boivin and the captain?
 9        A.    I would say more by Marty.  I really don't remember
10  the captain even being involved in this.  Typically a captain
11  would not be involved in a project in any sense.
12              That would be a decision that Marty would have made.
```

## Repanich, Anita
102:21-103:8

```
102:21    Q.    So your recollection is that Marty Boivin was the one
    22  who instructed the group not to attend the meeting on February
    23  8th?
    24     A.    Uh-huh, yes.
    25     Q.    And did he tell you what his rationale for that was?
103: 1     A.    Just that he would like us to try a different approach
     2  and position somewhat differently.
     3     Q.    Did he tell you why he wanted you to use a different
     4  approach?
     5     A.    No, I don't think he gave specific reasons.  His
     6  rationale would be it's a design-build.  Let's put it back to
     7  the prime contractor, who provided the design, as to why there's
     8  a problem with the design.
```

## Repanich, Anita
103:9-11

```
103: 9     Q.    I'm going to hand you what's been marked as Exhibit 66
    10  to the deposition of Jerry Hardenbergh.
    11              I would like to have you read through that.
```

## Repanich, Anita
103:19-24

```
103:19    Q.    Are you familiar with that?
    20     A.    Yes.
    21     Q.    Is that document included in your files?
    22     A.    It -- well, it must be.  It must be in one of the
    23  files somewhere, because I have seen this -- I've seen this
    24  document in the last two months, so it's that familiar to me.
```

## Repanich, Anita
104:2-5

```
104: 2     Q.    Do you recall having -- well, when's the first time
     3  you recall having seen that document?
     4     A.    I would have seen it when Paul wrote it.  I was copied
     5  on it.
```

**Repanich, Anita**
105:10-106:22

```
105:10      Q.     I'm going to peel off the first stack here, and I'm
     11 going to have this marked as Exhibit 9.  Can you identify that
     12 as the package to the basic Task Order 7?
     13      A.     Yes, yes.
     14                   (Exhibit No. 9 marked.)
     15      Q.     The package I'm handing you now, that pertaining to
     16 Mod 1, to Task Order 7 --
     17      A.     Yes.
     18      Q.     -- that will be marked as Exhibit No. 10.
     19                   (Exhibit No. 10 marked.)
     20      Q.     The package I'm handing you now is a single document
     21 actually, and that is Mod 2 to Task Order No. 7.
     22      A.     Yes.
     23      Q.     That will be marked as Exhibit No. 11.
     24                   (Exhibit No. 11 marked.)
     25      Q.     Now I am showing you a package that appears to be
106: 1 Mod 3 to Task Order No. 7.
      2      A.     Yes.
      3      Q.     And that will be marked as Exhibit 12.
      4                   (Exhibit No. 12 marked.)
      5      Q.     Now I'm showing you what appears to be the package
      6 pertaining to Mod 4 to Task Order 7; is that right?
      7      A.     Yes.
      8      Q.     That will be marked as Exhibit No. 13.
      9                   (Exhibit No. 13 marked.)
     10      Q.     And the last package is a package that pertains to
     11 Mod 5 to Task Order No. 7; is that right?
     12      A.     Yes, yes.
     13      Q.     And that will be marked as Exhibit No. 14.
     14                   (Exhibit No. 14 marked.)
     15      Q.     What is in each of these packages?
     16      A.     What would be in them?  Probably e-mails, supporting
     17 documentation for the change itself, negotiation memorandum
     18 maybe, funding documents certainly.
     19      Q.     Is there any rule regarding what type of documentation
     20 is intended to be kept in the file that pertains to a particular
     21 contract modification?
     22      A.     It would just be supporting documents.
```

**Repanich, Anita**
107:6-108:5

```
107: 6      Q.     Do you recall when you first saw it?
      7      A.     I would have recalled -- I don't recall it, but I
      8 would have first saw it on February 5th or shortly after when
      9 Paul wrote it, since I'm copied on it.
     10      Q.     Do you recall discussing it with him on or about that
     11 time?
     12      A.     No, I don't.
     13      Q.     Did he ever tell you why he labeled it "confidential"?
     14      A.     No.
     15      Q.     Is that common for him, in your experience, for him to
     16 label e-mails confidential?
     17      A.     No.
```

```
18      Q.      Do you have any idea why he would have labeled this
19  e-mail, "Importance: High, Sensitivity: Confidential"?
20      A.      No, I don't.
21      Q.      The first line reads:  "Matt" -- and that would be
22  Matt Holmstrom, the addressee above -- "Change of plans from my
23  end."  And I take it that change of plans was he wasn't going to
24  be attending the February 8th meeting?
25      A.      Yes, that would be my understanding.
108: 1      Q.      "I think I told you I was having a meeting with Marty
2  and the captain today regarding project status, et cetera"?
3      A.      Yes.
4      Q.      Is that the meeting you were just describing to us?
5      A.      Yes.
```

## Repanich, Anita
108:15-110:9

```
108:15      Q.      Next line reads:  "Well, Marty wants to take a
16  different approach, the design-build approach."
17              Is that statement consistent with the statements
18  Mr. Boivin made in the meetings you did attend?
19      A.      Yes.
20      Q.      "And postpone our Coast Guard involvement until later.
21  We won't be meeting with you this week in Anchorage."  He
22  continues on to say, "I'll follow up with a formal e-mail letter
23  or letter, probably e-mail, though."
24              Do you know whether he followed up with a formal
25  e-mail or letter later?
109: 1      A.      The only -- I think what he would have followed up to
2  would be referring to a letter that I signed off that didn't go
3  out until some time later.  I don't know of any other e-mail
4  that Paul -- or letter -- a letter would not have went out
5  because project managers are not allowed to sign letters out.
6  So the only other letter would be the one in March.
7      Q.      I'm looking at Exhibit 14, which is the package of
8  documentation pertaining to Change Order 5.
9      A.      Okay.
10      Q.      And as I thumb back through here, I come across a
11  letter, dated February 25th, 2002, that is, in fact, signed by
12  you.
13      A.      Uh-huh.
14      Q.      And it is identified as project, Serial No. 33-S01047.
15  Is it your routine practice -- is this what's referred to as a
16  serial letter?
17      A.      No.
18              I have a copy of it.
19      Q.      Is that letter the formal letter that went out that
20  you believe Mr. Rendon was referring to in Exhibit 66 to the
21  Hardenbergh deposition?
22      A.      Yes.
23      Q.      Who drafted the February 25th letter that you signed?
24      A.      Paul Rendon.
25      Q.      Did you have any role in drafting it or was it all
110: 1  done by Mr. Rendon?
2      A.      It would have been done by Mr. Rendon, but I'm sure it
3  was -- I'm sure he was assisted.
4      Q.      Assisted by --
5      A.      Probably Jerry and Mr. Boivin both reviewed it.
```

```
6    Q.    Jerry Johnson and Marty Boivin?
7    A.    Yes.
8    Q.    How about you?
9    A.    No.  I would have seen it after it was written.
```

## Repanich, Anita
110:10-15

```
110:10    Q.    Did you carefully review this letter to verify that
    11 all of the information stated here was correct as opposed to
    12 relying upon Mr. Rendon and the review of others?
    13    A.    I have read it, and I would have reviewed it.  I would
    14 not have went back and verified their schedule or anything like
    15 that.  That, I would have assumed Paul's dates were correct.
```

## Repanich, Anita
110:21-111:10

```
110:21            He says, "I'll follow up with a formal e-mail or
    22 letter, probably e-mail, though, with our requests," and you've
    23 identified that your February 25th letter, Exhibit 14, is that
    24 follow-up?
    25    A.    (Witness nods head.)
111: 1    Q.    You have to answer audibly.
    2    A.    I would agree.
    3    Q.    "Basically Marty wants a formal proposal from the
    4 design-build team, Coffman, Swalling, Brechan and other affected
    5 parties."
    6            Did you request a formal proposal in your February
    7 25th --
    8    A.    Yes, I did -- I believe -- we requested them to
    9 present a solution back.  We requested them to present their
    10 solution to us even.
```

## Repanich, Anita
111:11-18

```
111:11    Q.    Present means actually --
    12    A.    Yes.
    13    Q.    -- to come here to Seattle?
    14    A.    Yes, yes.
    15    Q.    How often do you ask contractors to actually present
    16 their proposals to you in Seattle as opposed to transmitting
    17 something in some less formal fashion?
    18    A.    I don't know as we've done that before.
```

## Repanich, Anita
112:7-20

```
112: 7    Q.    Item No. 2 says, "Your letter will include an
    8 identification of what consideration the design-build team is
    9 going to give the Coast Guard due to Swalling's lack of
```

```
10  performance last summer."
11       A.   Uh-huh.
12       Q.   Did you understand what that was referring to?
13       A.   I understand it.
14       Q.   What was Swalling's lack of performance?
15       A.   They did not complete as much of the cargo work as
16  they were scheduled to.
17       Q.   So there was a delay in the work?
18       A.   Uh-huh.
19       Q.   And what was meant by "consideration"?
20       A.   What they would give us in return for that.
```

## Repanich, Anita
**112:24-113:13**

```
112:24     Q.   The next item down is, "How is the design-build going
    25  to ensure Swalling completes what they've been contracted for
113: 1  this summer."
     2       A.   Uh-huh.
     3       Q.   The next one says, "Does the design-build team
     4  recommend staying with the current coating system but reducing
     5  the coating requirements, i.e., did not seal weld above the
     6  splash zone."
     7            Was it your understanding that the design-build
     8  contractor, as the party charged with preparing the design, had
     9  the ability to modify its design?
    10       A.   They could modify their design, but it would have to
    11  be with our approval, I think.  But as a design-build, they
    12  would have the ability to modify and change their design, as
    13  long as it still met our basic requirements.
```

## Repanich, Anita
**113:18-114:7**

```
113:18     Q.   Item No. 4 says, "Do they recommend going with a
    19  different coating system" --
    20       A.   Uh-huh.
    21       Q.   -- "that will eliminate, minimize the seal weld
    22  problem, reduce containment requirements and still give us a
    23  20-plus-year life span."
    24       A.   Uh-huh.
    25       Q.   I believe the technical requirements for the contract
114: 1  actually references a 25-year span of time.
     2       A.   That's my understanding too.
     3       Q.   What was your understanding of what was meant by
     4  "25-year life span"?  Was that for the wharf itself, for the
     5  coating on the wharf, or something else?
     6       A.   For the coating on the wharf, would be my
     7  understanding.
```

## Repanich, Anita
**114:8-17**

```
114: 8     Q.   So by that, are you saying that the coating on the
```

```
 9  wharf was supposed to last for 25 years until it would need to
10  be replaced again?
11       A.    You know, I don't know if I can really answer that, or
12  did they mean that the wharf itself would last for another 25
13  years.  I'm not sure.
14       Q.    Who would know?
15       A.    Any of the engineers probably.
16       Q.    Like Mr. Locher?
17       A.    Oh, I'm sure, yes.
```

## Repanich, Anita
114:18-115:3

```
114:18      Q.    No. 5 says, "Whatever changes are presented to the
    19  Coast Guard by the design-build team should be at no cost to the
    20  Coast Guard."
    21            Is that something that Mr. Boivin stated in the
    22  meeting that you had with him?
    23       A.    I'm sure that would be his position.
    24       Q.    You said "would be his position."  Was that his
    25  position at the time?
115: 1       A.    Yes.
     2       Q.    Did you agree with that position?
     3       A.    Not necessarily.
```

## Repanich, Anita
115:15-116:8

```
115:15            Whose idea was it to send the February 25th letter to
    16  Brechan?
    17       A.    I don't know.  I do know that it was not mine.  It was
    18  my and Paul's understanding we would meet with them and work
    19  through it.  The idea to write a letter instead and take a more
    20  conservative position would have been Marty's.
    21       Q.    Do you remember whether Marty suggested writing a
    22  letter to Brechan telling them about these positions?
    23       A.    Do I remember him suggesting it?
    24       Q.    You sent a February 25th letter?
    25       A.    Uh-huh.
116: 1       Q.    Was that pursuant to instructions you and Mr. Rendon
     2  received from Marty Boivin?
     3       A.    I don't know if he would have instructed us.  He
     4  didn't say, this is -- he would probably say, this is what I
     5  think we should do.
     6       Q.    And you believe what he said under that type of a
     7  communication was prepare a letter instead of going up there?
     8       A.    Oh, yes.
```

## Repanich, Anita
116:12-19

```
116:12      Q.    Did Mr. Boivin ask Mr. Rendon to send a confidential
    13  e-mail off to Brechan in advance of that?
    14       A.    I have no idea.
```

```
15      Q.    Is there anything about what Mr. Boivin said at the
16 meeting that you had with him and Mr. Rendon that would lead you
17 to conclude that he wanted Paul Rendon to send this confidential
18 e-mail to Matt Holmstrom on February 5th?
19      A.    No.
```

## Repanich, Anita
117:4-16

```
117: 4      Q.    Let's go down to the next line, "Now with all that
     5 said and written, I still feel that 'we,' you and me and Anita
     6 and whoever else, are in this together and have to figure out
     7 what to do."
     8            Do you have any idea what that means?
     9      A.    I think that what Paul would mean by that, knowing
    10 Paul, is -- what he is saying is, this is an approach that our
    11 management would like us to take, but in the meantime, let's
    12 still figure out what we need to do to figure out how to get
    13 where we need to be.
    14      Q.    Which may involve approaches that are not what
    15 management has said to do?
    16      A.    Yes.
```

## Repanich, Anita
117:19-118:3

```
117:19      Q.    "Can you terminate your subcontract with Swalling for
    20 default, poor performance, et cetera"?
    21      A.    Uh-huh.
    22      Q.    Were you aware of anything at that time that would
    23 have risen to the level of material breach of contract
    24 justifying the termination of Swalling for default?
    25      A.    No.  It would have been based on the -- I know they
118: 1 were frustrated with the performance of Swalling and the time it
     2 was taking, but I do not -- I do not know if they would have had
     3 any grounds for breach of contract, no.
```

## Repanich, Anita
119:13-120:3

```
119:13            The next bullet says, "We don't want to terminate our
    14 Task Order No. 7 with you or else we lose the remaining money,
    15 so we need to keep the task order open.  Who is in line to pick
    16 up the remaining work?  Will there be enough funds remaining to
    17 pay this new guy?"
    18      A.    Uh-huh.
    19      Q.    Do you know what he was talking about there?
    20      A.    When he says, "We don't want to terminate our task
    21 with you," he just means we want you to finish this work, or
    22 else we will lose the remaining money.  That goes back to the
    23 type of money that we do this work with has a life span of one
    24 year, and so from the time that we would have awarded this task,
    25 this money would be expired.  If I took it back off the
120: 1 contract, they would not -- it goes back to the big fiscal cloud
```

```
2 in the sky.  It wouldn't get to come back to us.  We could not
3 use it again.  So, for us, this would be lost money.
```

## Repanich, Anita
120:4-10

```
120: 4      Q.    So one way of solving the problem with the additional
     5 costs arising out of these defective welds might have been to
     6 simply terminate the contract with Brechan for convenience,
     7 except that the Coast Guard would lose all the money?
     8      A.    Yes.
     9      Q.    And it didn't want to do that?
    10      A.    No.
```

## Repanich, Anita
120:16-24

```
120:16      Q.    The question is not necessarily whether they could
    17 perform it, but at what price, because Brechan was complaining
    18 there was additional costs for doing this work, right?
    19      A.    Uh-huh.
    20            MR. KREGER:  Objection.  Leading.  Assumes facts not
    21 in evidence.
    22      Q.    You have to answer yes, rather than "uh-huh."
    23      A.    Okay.  The way he has written it is, we do not want to
    24 terminate our task, we will lose the remaining money.
```

## Repanich, Anita
121:2-12

```
121: 2      Q.    I'm asking about the discussions you had with him
     3 regarding this e-mail on or about the time of this e-mail, so
     4 what I'm asking for is your understanding of what his views were
     5 based on discussions that you had with him at this time.
     6      A.    What his views were is that Brechan should complete
     7 this task.
     8      Q.    Do you know what he meant by would there be enough
     9 funds left for the new guy?
    10      A.    I would imagine if you went to a new subcontractor,
    11 there would be mobilizations costs, things like that again that
    12 we would have to pay for somebody else.
```

## Repanich, Anita
121:21-122:1

```
121:21      Q.    Would bringing in a new guy avoid any costs associated
    22 with defective welds or containment issues?
    23      A.    Would it?  Maybe if they used a different method.  The
    24 welds, I would say not, but maybe just in their -- the
    25 containment in the method that they were working.  Maybe they
122: 1 had a different way of applying the coating.  I don't know.
```

122:8-123:8

122: 8      Q.     The next line says, "Do we descope the subcontract
       9 with Swalling?  We awarded 712,000 for 17,800 square feet of
      10 coatings work based on $40 a square foot.  I believe this square
      11 footage was chosen to keep us under the million dollar cap."
      12             Do you know whether that square footage was chosen
      13 for that purpose?
      14      A.     It would have been.
      15      Q.     "That gets us to bent 13.  Steve Locher figured out
      16 the square footage."
      17             Do you remember having any discussions with
      18 Mr. Rendon about descoping Brechan's contract in order to
      19 provide it with compensation?
      20      A.     Oh, when he is talking about descoping the
      21 subcontractor Swalling, I think he's concerned more about the
      22 amount of subcontract that Brechan has contracted for and the
      23 amount that we subcontracted for, or, I mean, that we contracted
      24 with Brechan for.
      25      Q.     If you read further down, it says, "If we descope the
123: 1 subcontract with Swalling from bent 15 to bent 13, this should
       2 clear up the $100,000 delta."
       3             Is the $100,000 delta that is being referred to
       4 there, does that confirm your belief that he's talking about the
       5 price differential between what Brechan agreed to pay Swalling
       6 for the coating application work and what the Coast Guard was
       7 going to pay Brechan for that same scope of work?
       8      A.     Yes.

## Repanich, Anita
125:10-15

125:10      Q.     Wasn't your budget about $747,000 for paying for that
      11 scope of work?
      12      A.     Uh-huh.
      13      Q.     And didn't Brechan contract with Swalling for
      14 $850,000?
      15      A.     Uh-huh.

## Repanich, Anita
126:12-127:13

126:12             Do you know whether Brechan received a credit when
      13 Swalling's subcontract was descoped?
      14      A.     I don't have any evidence of that.
      15      Q.     So if I told you that Brechan had received a $145,000
      16 credit from Swalling in exchange for descoping its work from
      17 bent 15 down to bent 12, that would be the first time you had
      18 heard that?
      19      A.     No.
      20      Q.     So you had heard that?
      21      A.     That was our understanding of what was going to
      22 happen.
      23      Q.     That Brechan would --
      24      A.     That they would reduce their scope back to the bent
      25 12.

```
127: 1      Q.    And in exchange for that, Brechan would receive a
     2  credit on its contract price with Swalling?
     3      A.    But I have no idea to what extent.
     4      Q.    I didn't ask you to what extent.
     5      A.    Okay.
     6      Q.    I just simply asked you if they would receive a
     7  credit.
     8      A.    Yeah, they would renegotiate their contract.
     9      Q.    And the whole point was to enable Brechan to save
    10  money?
    11            MR. KREGER:  Objection.  Assumes facts not in
    12  evidence.  Mischaracterizes her testimony.
    13      A.    Yeah, I --
```

## Repanich, Anita
127:25-128:9

```
127:25      Q.    Your contract was with Brechan, right?
128: 1      A.    Right.
     2      Q.    You didn't have a contract with Swalling?
     3      A.    No.
     4      Q.    And whatever risks and obligations existed in the
     5  prime contract that you had with Brechan, you were a party to?
     6      A.    Uh-huh.
     7      Q.    But you were not a party to the risks and obligations
     8  that ran between Brechan and Swalling and their subcontract?
     9      A.    Uh-huh, uh-huh.
```

## Repanich, Anita
128:10-129:21

```
128:10      Q.    So can you tell me why it was of interest to Alpha
    11  team here in Seattle under the third bullet about descoping --
    12  it says, "Do we descope the subcontract with Swalling?"
    13      A.    Uh-huh.
    14      Q.    Why is that any of FDCC's business?
    15            MR. KREGER:  Objection.  Leading.  Argumentative.
    16      A.    That would be a position.  That would be a position
    17  that it isn't any of our business, and it is yours, not mine.
    18      Q.    No, I just asked --
    19            MR. KREGER:  Let her finish.
    20      A.    This uses the term "we."  I would use the term "we"
    21  too.  This is part of this partnership that we're working with
    22  Brechan on.  This is our problem.  We need to figure out how to
    23  take care of this.
    24      Q.    Because I get inconsistent statements from this office
    25  about what you have an interest in or don't have an interest in.
129: 1      A.    Uh-huh, uh-huh.
     2      Q.    The ordinary response that I get out of this office
     3  is --
     4      A.    Uh-huh.
     5      Q.    -- that we have a contract with the prime
     6  contractor --
     7      A.    Uh-huh.
     8      Q.    -- we don't know anything else that's going on.
     9      A.    Uh-huh, uh-huh.
```

```
10      Q.    But then I look through your files and I see --
11      A.    Uh-huh.
12      Q.    -- copies of the subcontractor's subcontract and I see
13 recommendations --
14      A.    Well --
15      Q.    -- from the project manager that says, "Do we descope
16 the subcontract with Swalling?"
17            MR. KREGER:   Objection.  Argumentative.
18      Q.    Can you reconcile those inconsistencies?
19      A.    Different people.  Different methods.  Different
20 people and different -- different ways of dealing with
21 contractors.
```

## Repanich, Anita
129:22-130:2

```
129:22     Q.    So the approach of you and Mr. Rendon was to be
   23 actively involved with the general contractor and its
   24 relationship with its subcontractors?
   25     A.    Not its relationship with its subcontractors, but
130: 1 actively involved with the prime contractor to, is there
    2 something we can do from our end that can help you with this?
```

## Repanich, Anita
130:7-13

```
130: 7     Q.    Did you agree with this descoping plan?
    8     A.    I don't think I agreed or disagreed with it.  I
    9 personally think it was a good idea, but it's something that's
   10 completely out of our control, and so I don't know if I really
   11 agreed or disagreed with it.
   12     Q.    Did you sign Mod 5?
   13     A.    Uh-huh.
```

## Repanich, Anita
130:14-131:21

```
130:14     Q.    Did Mod 5 include an original draft that didn't say
   15 anything about how many bents would be performed by Brechan?
   16     A.    Mod 5 had several attachments to it.  Are you talking
   17 about one of the attachments to it?
   18     Q.    I'm going to hand you Exhibit 80 that's been marked to
   19 the Hardenbergh deposition, and this is a package of a number of
   20 different documents.  The first -- and you can confirm this when
   21 I'm done describing it -- it appears to be a transmittal that
   22 went back and forth a couple times, at least once from you.
   23     A.    Uh-huh.
   24     Q.    The second is a version of Modification 5 to the
   25 contract --
131: 1     A.    Okay.
    2     Q.    -- that is signed by Mr. Holmstrom but not signed by
    3 you.
    4     A.    Okay.
    5     Q.    And then the second is another version of Modification
```

```
 6  No. 5 that appears to be signed by both of you.
 7       A.    Okay.
 8       Q.    Now, there are two differences that I have -- let me
 9  ask you that, to begin with.
10             Looking, again, at Exhibit 80 to the Hardenbergh
11  deposition, do you recognize this transmittal letter?
12       A.    It's our office transmittal.
13       Q.    And is this a transmittal --
14       A.    Uh-huh.
15       Q.    -- that you exchanged back and forth with Matt
16  Holmstrom?
17       A.    Uh-huh.
18       Q.    And the first part is your handwriting?
19       A.    Uh-huh.
20       Q.    And the second part is his response back to you?
21       A.    Yes.
```

**Repanich, Anita**
132:4-15

```
132: 4       Q.    Did Matt Holmstrom send you a signed copy backdated
     5  April 25th that broke out what the compensation was for under
     6  Item 1?
     7       A.    The only one I have in the file is -- yeah, I don't
     8  have that in the file.  Did Matt send that back to me?  I don't
     9  have it.  I don't recall it, but I do see it attached to that
    10  memo.
    11       Q.    I'm not even saying that it was originally attached to
    12  this.  This is just a package that I assembled and marked it as
    13  an exhibit, okay?
    14             Anyway, who drafted the narrative portion of Mod 5?
    15       A.    I did.
```

**Repanich, Anita**
133:17-20

```
133:17       Q.    Did they send you a letter that had -- did Bill Oliver
    18  in particular send you a letter that had had these two letters
    19  attached to it?
    20       A.    Yes.
```

**Repanich, Anita**
134:2-20

```
134: 2       Q.    It seems unlikely to me that a contracting officer
     3  with her education and background would have the knowledge to
     4  draft up specifications regarding how surface preparation for
     5  corrosion would be done.
     6       A.    This very well could have come from Paul Rendon too.
     7  You're absolutely right, I wouldn't draft something like this
     8  up.  Usually an engineer will draft up this part of it for me.
     9       Q.    Can you tell me whether any part of the second page of
    10  this -- well, we'll use the signed copy, the signed, executed
    11  change order, which is the last page of Exhibit 80 to the
```

12  **Hardenbergh deposition.  Can you tell me as a certainty whether**
13  **you drafted any portion of the information on this last page?**
14       A.    Oh, I'm sure I would have done the performance period,
15  the task order value of it, of course the final thing, the
16  release of claims that goes in it.  There's some standard -- I
17  remember pulling that from a letter, I guess, so that was a --
18  paragraph B was drafted by somebody else.  It's hard to say
19  what's drafted.  A lot of times, as I'm putting this together, I
20  will just ask them.


## Repanich, Anita
134:21-24

134:21      Q.    **Do you know as a certainty whether you drafted any**
22  **portion of it, this second page of Modification 5, other than**
23  **the segments, initials D, E and F?**
24       A.    No.


## Repanich, Anita
135:6-11

135: 6      Q.    **Is it your understanding that Mr. Rendon was an**
7  **engineer?**
8       A.    Yes.
9       Q.    **Was he a corrosion engineer?**
10       A.    Civil.
11       Q.    **Civil engineer.**


## Repanich, Anita
136:18-137:8

136:18           Is Item 1 an identification of a change in the scope
19  of the work and additional compensation as being paid for that
20  change in the scope of the work?
21       A.    Yes.
22       Q.    **And is the change in the scope of work, additional**
23  **surface prep, up to and including bent 12, as stated in Mod 5?**
24           **Why are you hesitating?**
25           MR. KREGER:  Objection.  Argumentative.
137: 1       A.    Because I think additional surface prep was taken up
2  to bent 5, and then we had a change in the scope of work from 6
3  through 12.
4       Q.    **What was the change in the scope of work from bent 6**
5  **through 12?**
6       A.    That was the requirements for the coating, what they
7  would have to coat and what they would not, where they could
8  deviate from the specifications.


## Repanich, Anita
137:9-18

137: 9      Q.    **Do you think that Item 2 does not describe a change in**

```
10  the surface preparation?
11      A.    Yes, I think this part of 2 does.
12      Q.    So you agree that there was a change associated with
13  the costs incurred by the contractor on performing the work
14  between bents 1 and 5?
15      A.    Yes -- well, I don't think there was a change.  I
16  think there was additional work in what they did.
17      Q.    A constructive change?
18      A.    Okay.  I'll go with that.
```

## Repanich, Anita
139:7-14

```
139: 7      Q.    Is this $90,000, did you agree that this $90,000
     8  should be paid to Brechan because they had encountered a
     9  differing site condition on bents 1 through 5?
    10      A.    Yes.
    11      Q.    Is a portion of this $90,000 a compensation for
    12  Brechan because they had to adopt a different method of surface
    13  preparation for bents 6 through 12?
    14      A.    I'm not sure.
```

## Repanich, Anita
139:17-140:2

```
139:17      Q.    Let's turn to your -- would you go to the back to
    18  Exhibit 66 to the Hardenbergh deposition, and the fourth bullet
    19  down says there that "They claim T&M cost for additional prep
    20  work on bents 1 through 5."
    21            Would you understand "they" to be referring to
    22  Swalling Construction?
    23      A.    Yes.
    24      Q.    "Coast Guard JOC will not pay due to their poor
    25  performance last summer."
140: 1            That would be the delayed performance?
     2      A.    Yes.
```

## Repanich, Anita
140:3-15

```
140: 3      Q.    "The additional QA cost the Coast Guard had to pay for
     4  Hardenbergh due to their slow progress, they did not fully
     5  contain the blasting grit and contaminated the waterway.  Their
     6  project submittals, coating inspection equipment, CQC person
     7  were over a month late, et cetera."
     8            So do you understand that to be a representation from
     9  Mr. Rendon that the Coast Guard did not intend to pay for
    10  additional surface preparation for bents 1 through 5 because the
    11  Coast Guard had already had to pay for the costs associated with
    12  Swalling's earlier tardy performance?
    13      A.    The only costs we had were for our inspector, but I
    14  think it was also a -- we're not going to pay for additional
    15  work because the work was also very slow.
```

**Repanich, Anita**
140:16-18

140:16     Q.     "Change condition, additional prep work, Coffman is
    17 liable since they wrote the spec for 100 linear feet of seal
    18 welding.  What is their response?"


**Repanich, Anita**
140:21-141:5

140:21          Was there any discussion of Coffman's liability for
    22 the seal weld problem here at FDCC?
    23     A.     Yes.
    24     Q.     And where did that lead to?
    25     A.     It was a design-build task, but our design contract --
141: 1 well, our contract was with Brechan, and I believe it was our
    2 understanding that their subcontract was with Tryck Nyman.
    3 Tryck Nyman, in change, subcontracted with Coffman, I believe.
    4 So there was discussion about Coffman's liability, and there's
    5 correspondence in the file to show that.


**Repanich, Anita**
141:6-13

141: 6     Q.     As between Coast Guard and Brechan, which would be
    7 responsible for costs associated with negligent performance by
    8 Coffman?
    9          MR. KREGER:  Objection.  It calls for speculation.
    10 Calls for a legal conclusion.
    11          MR. NIEMER:  Join.
    12     Q.     In your view as the contract administrator?
    13     A.     Tryck Nyman; in turn, Brechan.


**Repanich, Anita**
141:24-142:22

141:24     Q.     You state in your February 25th letter that the Coast
    25 Guard will not pay for the differing site condition encountered
142: 1 by Brechan and will not pay for Brechan's -- the difference in
    2 the amount that Brechan had to pay Swalling under its coating
    3 contract?
    4     A.     I believe that is what we say.
    5     Q.     Can you find that passage and read it into the record,
    6 please.
    7     A.     (Witness reviews document.)
    8          I'm on page 3 of the letter.
    9     Q.     Okay.  Go ahead.
    10     A.     Under "Changed Site Condition," and at the very end of
    11 it, the last four or five lines here, we take the position "This
    12 clearly indicates this was a known condition that the
    13 design-build team should have knowledge of.  For these reasons,
    14 we do not agree with or accept Swalling's claims that a changed
    15 site condition exists."

16    Q.    Then it continues on to state:  "Please advise us how
17 you plan to address this issue for the remaining portion of the
18 work, and how you intend to hold Coffman Engineers and Swalling
19 Construction responsible for these errors."
20    A.    Uh-huh.
21    Q.    Is that right?
22    A.    Yes.


## Repanich, Anita
142:24-143:11

142:24    Q.    Is there any reference made here as to whether the
25 Coast Guard will or intends to compensate Brechan for the buyout
143: 1 loss that it had on its subcontract with Swalling?
2    A.    I think on the first page, we do.  Okay.  The first
3 page under Background, middle of that paragraph, "The
4 subcontract you initiated with Swalling was for $850,000, and we
5 have a copy of it as an enclosure.  Bents 1 through 15, this
6 discrepancy and contract fund needs to be resolved between
7 Brechan and Swalling.  We do not plan on increasing our $712,000
8 contracted for coating work.  Please advise us how you plan to
9 correct this discrepancy."
10    Q.    You read this before you signed it, correct?
11    A.    Yes.


## Repanich, Anita
143:25-144:7

143:25    Q.    But is that the same or different than saying, this
144: 1 problem is your problem, and we are not only not going to pay
2 you any additional money, we're not going to do anything else
3 that would cost us anything in order to help you?
4    A.    This was saying, that problem with your subcontract is
5 a problem, and you need to rectify it because we can't change it
6 on our end here with you.
7    Q.    Right.


## Repanich, Anita
144:8-15

144: 8    A.    We're not going to increase the work.  But it did not
9 say, we may not owe you additional money for other things.
10    Q.    I'm not asking about other things.  I'm asking about
11 that $100,000 --
12    A.    That hundred thousand, no, we probably saw it as a
13 mistake in the subcontract that needed to be contracted.
14    Q.    At the prime contractor/subcontractor level?
15    A.    Uh-huh.


## Repanich, Anita
144:16-22

144:16    Q.    Do you see that after that sentence, it says,
    17  "Enclosure 3"?
    18    A.    Uh-huh.
    19    Q.    Can you take a look at Enclosure 3 and tell me what
    20  the point of Enclosure 3 is?
    21    A.    Maybe.
    22          This is a Paul Rendon spreadsheet.


## Repanich, Anita
145:14-146:20


145:14    A.    I'm not sure.
    15    Q.    Did you ever know what Enclosure No. 3 was for?
    16    A.    I'm assuming it's because I've done some -- I see I've
    17  written "15,500." I think it's to do with -- I think he's
    18  recapping the costs.
    19    Q.    Did Mr. Rendon tell you that he and Mr. Locher had
    20  prepared a calculation that would result in a reduction of the
    21  amount of work that Brechan was to perform in order to allow
    22  Brechan to descope Swalling's contract obtaining a $145,000 or
    23  some amount of credit as a result of that descoping?
    24    A.    My understanding of it was never in the amount of work
    25  that Brechan was to perform. It was always the manner in which
146: 1  they would perform it.
    2    Q.    Was it your understanding, as you testified earlier,
    3  that Brechan's scope of work was 17,800 feet when you were
    4  looking --
    5    A.    Yes, yes.
    6    Q.    And do you see that number on your sheet?
    7    A.    Yes.
    8    Q.    It says "15,500."
    9          If bent 12 represents 15,500 feet of work rather than
    10  17,800 feet of work, would Mod 5, which states that the work
    11  would end at bent 12 constitute a descoping of Brechan's work?
    12          MR. KREGER: Objection. Assumes facts not in
    13  evidence.
    14    A.    I don't know -- I don't know what footage bent 12 is.
    15    Q.    Did anybody ever tell you that Brechan's work was
    16  being reduced to 15,500 feet from 17,800 feet?
    17    A.    I don't recall that.
    18    Q.    So nobody ever obtained your approval to do that, if
    19  it happened?
    20    A.    That's true. It was my understanding we were always


## Repanich, Anita
146:20-147:22


146:20    A.    That's true. It was my understanding we were always
    21  not descoping the amount of work. We were changing the method
    22  in which it was being done.
    23    Q.    Would you have agreed to descope Brechan's work from
    24  17,800 feet to 15,500 feet without the government getting a
    25  credit?
147: 1    A.    If the manner in which we were having them do the work
    2  and there were conditions that had created -- created that it
    3  was costing more in which for them to do it, I would have

```
 4  descoped the effort then.  I could have --
 5      Q.    Did you agree in Mod 5 to pay Brechan $90,000 for the
 6  increased cost of performing its work on bents 1 through 12 --
 7  excuse me -- yeah, bents 1 through 12?
 8      A.    Yes.
 9      Q.    Is there any question in your mind whether the Coast
10  Guard owed Brechan any more for the increased costs of
11  performing its work there?
12      A.    Above this?
13      Q.    Yes.
14      A.    No.
15      Q.    Okay.  So if Brechan has been compensated for the
16  increased cost of performing its work, would you have authorized
17  a reduction from 17,800 feet to 15,500 feet in Brechan's scope
18  of work without obtaining a price credit from Brechan?
19            MR. KREGER:  Objection.  Speculation.
20      Q.    In short, ma'am, were you misled by Mr. Rendon?
21      A.    I -- I don't know.  I don't know that, if I was or
22  not.  To my knowledge, I wasn't.
```

## Repanich, Anita
147:23-149:19

```
147:23      Q.    At Mr. Kreger's request, I'm going to just get you to
    24  identify some documents for me.
    25            Would you go to your package, which is Mod 5.
148: 1      A.    Uh-huh.
     2      Q.    And in that letter, do you have a letter -- do you
     3  have your own letter --
     4      A.    Yes.
     5      Q.    -- of 2/25?
     6      A.    Yeah.
     7      Q.    And does it include all the enclosures?  I should say,
     8  does it include the enclosures?
     9      A.    Yes, seven.
    10      Q.    Do you also have a letter there from Bill Oliver?
    11      A.    Yes.
    12      Q.    Dated March 15th?
    13      A.    Yes.
    14      Q.    And did you understand that to be Mr. Oliver's
    15  response to your letter of February 25th?
    16      A.    Yes.
    17      Q.    Did Mr. Oliver's letter include enclosures?
    18      A.    I will have to look.
    19      Q.    And specifically, those would be a February 25 memo
    20  from Coffman Engineers?
    21      A.    Oh, yes.  Okay, yes.
    22      Q.    Actually, it's not date -- it's dated February 27th
    23  memo.
    24      A.    Uh-huh.
    25      Q.    And attached to that, are there two proposals from
149: 1  Swalling Construction?
     2      A.    Yes.
     3      Q.    One dated December 21st, '01, and the second dated
     4  February 12th, '02?
     5      A.    Yes.
     6            MR. KREGER:  Objection.  Characterization of the
     7  documents that speak for themselves as to what they are.
```

```
 8      Q.    And was it your understanding that Mr. Boivin was
 9 presenting his letter of March 15th with the enclosure -- excuse
10 me -- Mr. Oliver was presenting his letter to you of March 15
11 and its enclosures as a proposal from Brechan on how to perform
12 the balance of the work on Phase I?
13            MR. KREGER:  Objection.  Asked and answered.
14            I thought you were just going to be identifying
15 documents, Counsel.
16      A.    Yes.
17      Q.    Can we go to the Mod 5 again --
18      A.    Uh-huh.
19      Q.    -- the fully executed version of it.
```

## Repanich, Anita
149:24-150:4

```
149:24      Q.    The language there --
   25      A.    Uh-huh.
150: 1      Q.    -- does that indicate that this is a full and final
    2 settlement of this issue?
    3      A.    Yes.  It's a standard release we put on all our
    4 modifications.
```

## Repanich, Anita
159:11-14

```
159:11            Who prepared this January 2001 technical requirements
   12 document?
   13      A.    Probably a lot of Steve Locher, and maybe a little bit
   14 of Paul Rendon.
```

## Repanich, Anita
159:21-160:2

```
159:21      Q.    What was your involvement in the preparation of the
   22 technical requirements?
   23      A.    None.
   24      Q.    What was your involvement in the delivery of the
   25 statement of work and request for a proposal to Brechan?
160: 1      A.    My involvement would have been merely just, if I did,
    2 would have been to e-mail it to them requesting a proposal.
```

## Repanich, Anita
164:7-19

```
164: 7      Q.    Would you take a look at the March 8th document, under
    8 the section "Scope Changes."
    9      A.    Uh-huh.
   10      Q.    Would you read that into the record, please.
   11      A.    "The amount of piling to be recoated this year is
   12 15,860 square feet.  Our understanding is that the remaining
   13 piling will be recoated the next year."
```

14      Q.      Is that amount of square footage that is identified in
15  this document consistent with your understanding of the scope of
16  work requirement that was agreed to in Task Order 7?
17      A.      Not according to my negotiation memorandum.
18      Q.      What does your negotiation memorandum indicate?
19      A.      17,800.


## Repanich, Anita
165:12-22

165:12      Q.      Could you go to the -- go ahead, if you want to --
13      A.      I have an e-mail that I'm looking at talking about
14  square footage.  It's between Steve Locher and Matt Holmstrom,
15  that talks about construction numbers, square footage based on
16  your 3/12/01 e-mail for 17,800 square feet.
17      Q.      Right.  And what's the next sentence say, if you would
18  read that into the record.
19      A.      "This number is adjustable for the benefit of the
20  project."
21      Q.      What was your understanding of that?
22      A.      Funds available.


## Repanich, Anita
166:8-17

166: 8      Q.      On the March 14th memo, which was copied to you, do
9  you see where it says, "Square footage costs are based on your
10  3/12/01 e-mail for 17,8- square feet"?
11      A.      Yes.
12      Q.      And then the next sentence says, "This number is
13  adjustable for the benefit of the project."
14              What is the number that you understood at the time
15  you read this was being identified when it says, "This number is
16  adjustable"?
17      A.      The square footage.


## Repanich, Anita
170:19-171:6

170:19      Q.      Now, can you identify Exhibit 17 for the record.
20  Let's start with the first page, and we'll work our way through.
21              What's the first page?
22      A.      Just a transmittal sheet.
23      Q.      From whom to whom?
24      A.      From Brechan to Paul Rendon.
25      Q.      And on the right-hand side, it looks like there's a
171: 1  routing list.  Can you identify the names of the individuals.
2      A.      Jerry Johnson, Steve Locher.  I don't know who Bob is.
3              MR. ROBISON:  Ferguson?
4      A.      Bob Ferguson is our attorney here.  I don't know what
5  other Bob we have in the office.  Myself, Anita Repanich and --
6  myself -- and Paul Rendon last.

172:1-8

172:  1      Q.    If I may, I'll read into the record, then I'll ask you
      2  to make sure I've read it properly.  I'm going to read from the
      3  first sentence of the second paragraph, "The first and probably
      4  the most significant event that occurred to delay the progress
      5  of the project was the late arrival of the specialized equipment
      6  required to do the work, required for the project."
      7            Did I read that right?
      8      A.    Yes.


## Repanich, Anita
183:1-186:6

183:  1      Q.    So I'm going to try to work through this and see if I
      2  understand so far.
      3            There's an appropriation in advance of October 1 of
      4  each year; correct so far?
      5      A.    Uh-huh, a budget --
      6      Q.    A budget?
      7      A.    You've got to be better at this than I am.  A budget
      8  is put forth, I suppose from the Coast Guard.
      9      Q.    And as of October 1st, are there funds available to
     10  your FD&CC folks or other Coast Guard elements to commit to
     11  various contractors to perform work?
     12      A.    No, it isn't that fast.  After their budget is
     13  approved or disapproved, they may get a percentage of what
     14  they've asked for.
     15      Q.    "They" being whom?
     16      A.    The Coast Guard.
     17      Q.    Okay.
     18      A.    It will first go to our headquarters and be
     19  disseminated down then, the budgets to the MLCs, and then from
     20  the MLCs, it will be given to the different units.  We don't
     21  have the money right away.  Normally for services that you have
     22  to have continued, if you have a janitorial service or food
     23  service or something, you're given a continuing resolution,
     24  you're given a percentage of, and it's small, maybe 5 percent or
     25  10 percent of your expected budget that you can work from.
184:  1      Q.    What's an MLC?
      2      A.    It's our headquarters.  It would be our next level.
      3      Q.    Now, I want to -- I interrupted you, but I want to
      4  talk about what happens on September 30th of the next year, and
      5  what I'm trying to understand better is if -- let's assume you
      6  had a budget of $20 million, okay?
      7      A.    Uh-huh.
      8      Q.    If you had contracts for $22 million -- strike that.
      9            If you had contracts for $18 million, but only 15
     10  million had been spent as of September 30th to pay to the
     11  contractor --
     12      A.    Oh, uh-huh.
     13      Q.    How much goes back to the big pot in the sky?
     14      A.    None.  If I have obligated it, it stays alive.  It
     15  stays there if I've obligated it.  So if I contract for all 18
     16  million, it doesn't matter if they don't pay up until two or
     17  three years later.  I have contracted for them.
     18      Q.    Under my scenario, I had a $20 million budget with 18
     19  million obligated.

```
 20     A.    I lose two.
 21     Q.    What do you mean by that?
 22     A.    Before the fourth quarter came, sometime in July or
 23 August, somebody in our headquarters would be looking, looking,
 24 seeing I had $2 million sitting there.
 25     Q.    And what would happen?
185: 1  A.    They would take it back and somebody else would spend
  2 it.  Anybody who had obligated it.
  3     Q.    Is that called the spend-down process?
  4     A.    Yes, and if you aren't at a very high percentage, it
  5 might be at 90 percent, at the end of the third quarter, people
  6 are looking very hard to pull that money back so it doesn't
  7 expire.
  8     Q.    How does that work?  First-come first-serve?
  9     A.    Yeah.
 10     Q.    Is that a yes?
 11     A.    Yes.  And people like us who have IDIQ contracts in
 12 place and work that needs to be done really benefit from that.
 13     Q.    In what way do you benefit from it?
 14     A.    All I have to do is request a proposal from the IDIQ
 15 contractor, and ten days later, I can award it.  I can obligate
 16 that money.
 17     Q.    And what is the benefit that the Coast Guard gets, as
 18 far as its mission, from your capacity to take advantage of
 19 spend-down funds, if you know?
 20     A.    I don't know if -- the Coast Guard overall receives
 21 benefit, but who receives the most benefit probably is whoever
 22 had that project in line, who maybe wouldn't have gotten it the
 23 next year.
 24     Q.    Whichever contracting agency?
 25     A.    It's through our contracting office, but we support
186: 1 Kodiak, and Kodiak always has work that needs to be done.  We
  2 support the ISC down here in Seattle too, though, and that's who
  3 benefits from it, is the different stations.  If our office,
  4 which is a design center, has designs ready to go for projects
  5 and we have IDIQs in place, we can obligate money quite quickly
  6 and projects get done that maybe wouldn't have gotten done.
```

## Repanich, Anita
188:23-190:2

```
188:23     Q.    Well, I'm asking when task order -- when IDIQ XXO came
   24 to an end?
   25     A.    Yes, the basic contract.  It was supposed to last
189: 1 three years, I believe, and I think it only lasted about a year
   2 and a half, maybe two years, and we recompeted, so --
   3     Q.    Why did it only last --
   4     MR. MARSTON:  Excuse me.  She was still answering.
   5     Q.    I'm sorry.
   6     A.    I would have to look.  It lasted until the award date
   7 of JOC 2, and I'm not sure what the award date is without
   8 looking at it.
   9     Q.    Why did it only last a year and a half as opposed to
   10 three years?
   11     A.    Because of the -- we had exceeded our -- we had met
   12 our capacity.  We had an overall capacity on the contract, and
   13 we thought it would last three years, and I don't remember what
   14 our estimate per year was, and it didn't.  We were able to take
```

```
15  advantage of people not spending their money, and we did spend
16  the money and so we burned through our capacity quicker than we
17  anticipated.
18      Q.    So there was a maximum capacity on the amount of money
19  that could be expended under IDIQ ending in XXO?
20      A.    Our contracts are written for options, option years in
21  them.  The one they're currently under is five year, I believe,
22  and they either expire at one year or a certain amount of
23  dollars, so you can exercise the option three months into that
24  year if you burn that much capacity, or a year, if you don't.
25      Q.    And were each of the options exercised under the first
190: 1  IDIQ?
    2      A.    Yes.
```

## Repanich, Anita
191:16—25

```
191:16      Q.    Who was on that technical review committee?
    17      A.    On the second, I would have to look in the file.
    18  Normally we have Paul Rendon, the project manager, would have
    19  been on it -- are you talking about the first contract or the
    20  second?
    21      Q.    No, I'm on the second contract.
    22      A.    Again, Paul Rendon was here.  He was getting ready to
    23  leave, so he was on it.  I think Andy Brown was on it, because
    24  he was the one who was picking it up, so I think they would have
    25  put him on it.
```

## Repanich, Anita
192:3—10

```
192: 3      A.    The source selection, okay, we would have had somebody
    4  here from Kodiak, probably the facilities engineer, and I don't
    5  remember who it was at that time, Dolbeck maybe, a Commander
    6  Dolbeck.  We would have -- and I don't remember if we had
    7  another person from Kodiak also.  We'll bring our customer in
    8  sometimes and have them select with us.
    9      Q.    Customer being the --
   10      A.    ISC Kodiak.
```

## Repanich, Anita
192:11—21

```
192:11      Q.    Were there weighted factors that the technical review
   12  committee agreed or was required to apply to the technical
   13  proposals that the competitors submitted?
   14      A.    Uh-huh.  Those are determined before we ever solicit.
   15  They go in the solicitation, and the technical review committee
   16  also sign up and agree to the weights that we've put on those
   17  prior to ever publicizing it.
   18      Q.    Was past performance a criteria that was weighted as
   19  part of the selection of the IDIQ contractor for the IDIQ ending
   20  in J55?
   21      A.    Yes.
```

**Repanich, Anita**
194:13-19

194:13          Were the competitors' technical proposals all scored?
    14     A.    Yes.
    15     **Q.    Was Brechan's technical proposal scored -- how was**
    16 **Brechan's technical proposal scored?**
    17     A.    They are ranked numerically 1-3, and then they are
    18 also given an adjective ranking.
    19     **Q.    What was the numerical ranking?**


**Repanich, Anita**
196:6-15

196: 6     **Q.    As part of your responsibilities as the contracting**
    7 **officer for Task Order No. 7, did you review Brechan's**
    8 **performance on that task order?**
    9     A.    Yes.
    10     **Q.    Describe your review.**
    11     A.    All of Brechan's task orders over a dollar limit, and
    12 I'm not sure if it was $100,000 or $500,000 were reviewed, and
    13 they all received excellent ratings.
    14     **Q.    Including its performance on Task Order 7?**
    15     A.    Yes.


**Repanich, Anita**
198:12-25

198:12     **Q.    Did you form a personal opinion about Mr. Holmstrom**
    13 **during the time that you were the contracting officer under the**
    14 **first IDIQ?**
    15          MR. MARSTON:  Objection.  Vague with respect to what
    16 is meant by "personal opinion."
    17     A.    I did.  I had a high regard for him.  I -- I admired
    18 that he could maintain the relationship with our customer at the
    19 ISC, that he was able to.  They're very, very difficult to work
    20 with, and we know that from afar.  They have extremely high
    21 expectations of everyone, and Matt sat next to them every day,
    22 and he still was able to maintain a relationship, a working
    23 relationship with them.  I had a very high opinion of him,
    24 because he was also very low maintenance from our point of view.
    25 He took care of a lot of things.


**Repanich, Anita**
199:1-4

199: 1     **Q.    Are you aware of any facts that would indicate that**
    2 **Mr. Holmstrom ever misrepresented or concealed material**
    3 **information from you in your role as the contracting officer?**
    4     A.    No.

**202:24-203:4**

```
202:24            Can you give me a thumbnail sketch of your
    25 background, of your educational and work background.
203: 1     A.    I've worked for the federal government for 25 years,
     2 and I've been in contracting that entire time.
     3            I have a bachelor's degree in business administration
     4 and a master's degree in human relations.
```

## Repanich, Anita
**204:1-9**

```
204: 1 questions.  You said Kodiak always needs work.  Why does Kodiak
     2 always need work?
     3     A.    It's the largest Coast Guard base, miles or spacewise.
     4     Q.    Square mileage?
     5     A.    Yes.
     6     Q.    In the world?  In the country?
     7            MR. ROBISON:  For the Coast Guard.
     8     A.    For the Coast Guard.
     9     Q.    For the Coast Guard.
```

## Repanich, Anita
**205:20-206:1**

```
205:20     Q.    During actual construction of, let's just call it
    21 Phase I, did you ever go up and see it?
    22     A.    I don't think so.  I don't think so.  Because I
    23 remember going up before it started, and going out on the wharf
    24 and thinking the same thing I always do when I have a pier
    25 project, there's no way I'm going under there.  There's no way
206: 1 I'm going out on that.
```

## Repanich, Anita
**207:7-19**

```
207: 7     Q.    Have you spoken with Margaret Wilson regarding this
     8 project since your -- since it left your scope of concern?
     9     A.    Only since the depositions and stuff have come up.
    10 Otherwise, we did not speak about it at all.  I did Phase I; I
    11 awarded the next contract.  She did Phase II.  We sit right next
    12 to each other.  We sit across a wall from each other, but we
    13 don't particularly talk about the individual projects.  I
    14 honestly don't even know what projects are going on in Kodiak
    15 right now.
    16     Q.    So she never talked about any problems she may have
    17 encountered?
    18     A.    No, she didn't, and I just, from looking at the file,
    19 I see she had I think one modification or something.
```

**Repanich, Anita**
208:4-14

208: 4      Q.      It's my understanding that the Coast Guard's -- and
     5  forgive me if I'm not using the appropriate technical
     6  language -- but the Coast Guard's technical requirements was for
     7  something in the nature of a 25-year life for the coatings; is
     8  that correct?
     9      A.      I am not sure if it was -- I believe it was a 25-year,
    10  and that the coating would last 25 years, but I am not sure when
    11  the question was asked or was it to maintain the life of the
    12  wharf itself for 25 years.  I am not sure what the point of it
    13  was.  I think it was just the coating would be a 25-year
    14  coating.


**Repanich, Anita**
209:1-17

209: 1      Q.      Do you recall any discussion during your tenure on the
     2  project of relaxing that 25-year?
     3      A.      Uh-huh.
     4      Q.      You do recall that?
     5      A.      I recall that when we were restructuring, when we were
     6  looking at how else we might do the coating.
     7      Q.      Can I stop right there.  Who's "we"?
     8      A.      It would have been we, as a collective group in the
     9  office.  Marty Boivin, Jerry Johnson, Paul Rendon, Steve Locher
    10  and myself.  One of the ideas thrown out was maybe we don't want
    11  a 25-year warranty, but Marty Boivin was hard-pressed that it
    12  needed to stay a 25-year warranty.
    13      Q.      Do you recall him giving any reasons for that?
    14      A.      No.  I would imagine that was just an engineering call
    15  on his part.
    16      Q.      Is he an engineer?
    17      A.      Yes.


**Repanich, Anita**
210:1-6

210: 1      Q.      Do you recall Steve Locher chiming in on that
     2  discussion?
     3      A.      Yeah, he may have.  I mean, I would have -- if he did,
     4  he probably agreed.  I don't recall exactly.  I don't think
     5  anyone disagreed with it.  It was something that was thrown out
     6  there, no, that isn't what we want, we want to stay with 25.


**Repanich, Anita**
210:7-13

210: 7      Q.      Do you recall any discussion about how that would be
     8  achieved, how the reduction in that standard would be achieved?
     9      A.      By lessening the warranty, the years for warranty, it
    10  really wasn't discussed a lot.  When it was thrown out there, no

```
11  one seemed really interested in that option.
12      Q.    Killed it?
13      A.    Yeah.
```

## Repanich, Anita
210:23-211:14

```
210:23      Q.    The Tryck Nyman report, which I believe is Exhibit
     24  16 -- you don't need to look at it, except to the extent you
     25  feel you need to -- do you recall the commissioning of that
211: 1  report, how that came about?
      2      A.    Was that the inspection report?
      3      Q.    Right, right.  You can go ahead and have a look.
      4      A.    Do I recall the commissioning of it?
      5      Q.    That's what I'm talking about.
      6      A.    I don't.  I'm looking at it.  It says it's prepared
      7  by, but I don't know how this was prepared.  I don't know if our
      8  office had this done, which is what I would assume, but it's
      9  also -- yeah, because I don't think Kodiak would have had the
     10  ability to have this study done.
     11      Q.    Do you have an understanding as to the purpose behind
     12  the Tryck Nyman inspection?
     13      A.    We do something similar to this or this on projects
     14  before we start them, just to find out what they're like.
```

## Repanich, Anita
212:7-12

```
212: 7      Q.    Was it your understanding that one of the purposes of
      8  that report was to have someone with expertise determine the
      9  existing condition of --
     10      A.    Yes.
     11      Q.    -- of the wharfs?
     12      A.    Yes.
```

## Repanich, Anita
216:20-217:25

```
216:20      Q.    And was that position later amended or revised in any
     21  way?
     22      A.    I don't -- I believe Coffman brought it to our
     23  attention later that they had -- there had been some concerns
     24  over the amount of welding, that placeholder they were putting
     25  in there of 100 feet.
217: 1      Q.    Coffman was expressing trepidation about including
      2  that in their specification?
      3      A.    They needed to quantify it in some way, because at the
      4  time when we're thinking about getting competitive bids out, we
      5  sometimes put a placeholder in there.  We put a quantifier in
      6  there, where people don't know if they should bid worst case or
      7  if they should bid none, so we put a quantifier in there.
      8            There were discussions, and I still don't remember
      9  ever discussing it with anybody with Coffman, so I don't recall
     10  where this was -- if this was in a teleconference or what it
```

```
11  was -- Coffman wanted to put a higher amount in there, I
12  believe, and we asked them not to because it made our estimate
13  so high.
14      Q.    Made the cost estimate so high?
15      A.    Yes.  So we asked them to reduce the amount of welding
16  that they identified.
17      Q.    That page goes on to state, a couple lines below that:
18  "While it is unfortunate that Coffman Engineers did not
19  accurately measure the amount of seal welding required, we find
20  it hard to believe that this change in condition could not have
21  been detected during the proper site inspection by both Coffman
22  Engineers during the design phase and Swalling Construction
23  during bid preparation."
24           Did I read that correctly?
25      A.    Yes.
```

## Repanich, Anita
222:16-25

```
222:16      Q.    Are you familiar with my client, Absolute
17  Environmental Services?
18      A.    I am not familiar with you personally, but I am
19  familiar with your firm.  I don't know if I've ever met anyone
20  from your firm, but I know you've done a ton of work up there.
21      Q.    Have you ever heard any reports on the quality of the
22  work that was performed by Absolute up there?
23      A.    It must be very good work because we're very happy
24  with it, and I know Brechan uses you over and over and over
25  again, so it must be very good work.
```

## Repanich, Anita
223:1-11

```
223: 1      Q.    Was there a lot of personnel changes, in terms of FDCC
2  personnel, when the project went from Phase I to Phase II?
3      A.    I think there was probably a complete changeover from
4  here.  Paul Rendon and I started the first contract and did the
5  first phase.  We awarded the second contract.  He then
6  transferred and Lieutenant Brown picked it up, and at the same
7  time, Maggie Wilson and I swapped areas, so she picked it up as
8  a contracting officer.
9      Q.    And Scott Bonney was replaced by Chris Lynch?
10      A.    Yes, that's the other -- yes.  Jerry Hardenbergh
11  probably would have been the consistency.
```

## Repanich, Anita
225:5-10

```
225: 5      Q.    Did you spend any time briefing Maggie Wilson on the
6  experience that you had had on the Phase I project before she
7  took it over?
8      A.    No, no, and I really didn't spend any time talking
9  about the contract overall with her because it was the same
10  contract that she was administering in Seattle already.
```

**Repanich, Anita**
225:18-226:3

225:18      Q.     But would it be fair to say that if your replacement
     19 by Maggie Wilson, Paul Rendon's replacement by Andy Brown and
     20 Scott Bonney's replacement by Chris Lynch and Mr. Locher's
     21 departing for the FAA, that there was a significant loss of
     22 institutional memory within FDCC as to what the history of that
     23 project was at the time Phase II began?
     24           MR. KREGER:  Objection.  Leading.
     25      A.     I'm sure that Andy, and I can see in Andy's files
226: 1 where he would have reviewed the project from previously.  I'm
     2 sure that we relied very heavily on the consistency of Jerry
     3 Hardenbergh.

**Repanich, Anita**
227:10-24

227:10      Q.     Do you know whether the substituted specifications,
     11 dated November 26, 2002, were submitted to FDCC in its final
     12 form for review and approval?
     13      A.     We would have generated them from this office.
     14      Q.     They were generated by Coffman Engineers?
     15      A.     The November 2002?
     16      Q.     The Phase II -- Phase II of the cargo wharf project.
     17      A.     Uh-huh.
     18      Q.     Was not performed in accordance with the June 21, '01
     19 Coffman specifications.  The specifications were revised by
     20 Coffman, and the date of the revision is November 26, 2002.
     21      A.     Okay.  I wasn't aware of that.  I assumed that Andy
     22 Brown did the revision to the spec.  I didn't know we went back
     23 to Coffman or Brechan went back to Coffman.  I don't know who
     24 went back to Coffman to do that.

**Repanich, Anita**
233:6-234:22

233: 6            You were being asked by Mr. Kreger whether or not you
     7 could identify with a certainty what the scope of work was that
     8 Brechan had contracted to perform, and we were going back and
     9 forth looking at the pre-, post-negotiation memoranda and the
     10 letter that he had presented to you and were looking at the Task
     11 Order No. 7 itself --
     12      A.     Oh, okay.
     13      Q.     I'm trying to determine whether or not an actual
     14 reliable square footage could be arrived at.  What I would like
     15 you to do is take a look at Exhibit 14, which is Task Order 7
     16 package -- 14 is modified.  Which is the Task Order 7 package?
     17      A.     Oh --
     18      Q.     Exhibit 9, thank you.
     19      A.     I'll just look at this here, okay.
     20      Q.     Is the negotiation document in that file?
     21      A.     Yes.

22      Q.      And that's the one that reflects the 17 ,800 square
23 feet?
24      A.      Yes.
25      Q.      Do you also have in that file a procurement request
234: 1 process rapidly form?  It looks like this (indicating).
 2      A.      Process rapidly.  Yes, I do.  Yes, I have that.
 3      Q.      Has that been marked up with handwritten notations?
 4      A.      Yes.
 5      Q.      Is there a phrase "government estimate" handwritten on
 6 there that's been crossed through?
 7      A.      Yes.
 8      Q.      Does that indicate that the marks that have been
 9 marked out down here on the bottom left represented the
10 government estimate, but since it's been revised, the revised do
11 not constitute the government estimate?
12              MR. KREGER:  Objection.  Leading.
13      A.      True.  They're negotiated amounts.
14      Q.      So the figures down here on the lower right represent
15 the negotiated amounts?
16      A.      Yes.
17      Q.      What is the date on this document?
18              MR. KREGER:  Objection.  It's got several dates on
19 it, it appears.
20      A.      Yeah, the date that it was initiated appears that
21 Jerry Johnson initiated it or Paul Rendon would have initiated
22 it on January 22nd.


## Repanich, Anita
235:1-237:1

235: 1      Q.      I'm going to ask you a different question.  What is
 2 this notation (indicating)?  Looks like somebody's initials,
 3 followed by a date.
 4      A.      Fiscal budget person again.  That's when she's saying
 5 you have funds.
 6      Q.      You have funds.  And that's 3/19/01, is the date that
 7 she did that?
 8      A.      Yes.
 9      Q.      And would her notation on it normally be the final
10 notation that's put on it?
11              MR. KREGER:  Objection.
12      A.      Yes.
13      Q.      So she doesn't get that document until your office is
14 ready to put the contract into effect?
15      A.      She gets it twice.  She gets it before we ever RFP,
16 and she gets it back again after we negotiate.
17      Q.      So does this indication of her initials and 3/19/01
18 with the other modifications on there suggest to you that it has
19 been negotiated by that point?
20      A.      Yes.
21      Q.      Now, would you compare for me on the first page the
22 dollar figures that she has written -- or excuse me -- that are
23 written on the lower right hand?  Do you see those there?
24      A.      Yes.
25      Q.      Does she have corrections for the different values in
236: 1 the three rows at the bottom?
 2      A.      Yes.
 3      Q.      And has she come up with a revised total value?

```
     4    A.    Yes.
     5    Q.    And what does that revised total value?
     6    A.    The amount that the task order was awarded for.
     7    Q.    And what was the amount the task order was awarded
     8  for?
     9    A.    $1,084,902.
    10    Q.    Can you compare that with the pre- and
    11  post-negotiation memorandum?
    12    A.    Yes.
    13    Q.    And can you confirm that the values that she has
    14  written or that are written on the procurement request form 4200
    15  are identical to the ones that fall into the column negotiated
    16  amount?
    17    A.    Yes.
    18    Q.    And do those numbers correlate with the dollar amount
    19  on Task Order No. 7?
    20    A.    Yes.
    21    Q.    So does that refresh your recollection as to what the
    22  actual square footage was that was negotiated in Brechan's scope
    23  of work?
    24    A.    It doesn't refresh my recollection.  All I can do is
    25  look at it and see, this is what my understanding of this task
237: 1  would have been, that square footage.
```

## Repanich, Anita
238:5-239:18

```
238: 5    Q.    And notwithstanding the fact that your official
     6  document for the negotiated amount, with the dollar values
     7  footed at the bottom that correlates exactly with Form 4200, the
     8  dollar values reflected there and correlates exactly with a
     9  dollar value of the task order that was issued on this contract
    10  all ties back to a figure of 17,800 square feet --
    11    A.    Yes.
    12    Q.    -- it's your view that you still don't know whether
    13  the amount of surface area that Brechan contracted for to coat
    14  was 17,800 square feet?
    15    A.    In my view, that's what it is.
    16    Q.    17,800?
    17    A.    Yes, but I cannot say it is in Brechan's view, because
    18  this is a document they never see.
    19    Q.    Who do they negotiate it with?
    20    A.    Myself and the project manager and the EIC.
    21    Q.    Did they sit down with one or more individuals to have
    22  a negotiation over -- well, you start off on the negotiation
    23  table with a contractor's proposal, government estimate, revised
    24  scope of the government estimate and the negotiated amount.  Who
    25  did Brechan negotiate with to arrive at its final scope and
239: 1  final price?
     2          MR. KREGER:  Objection.
     3    A.    Paul Rendon, Steve Locher and myself.  This document
     4  reflects the negotiations after the negotiations, though.  This
     5  document isn't a part of the negotiations.
     6    Q.    Did you participate in the negotiation?
     7    A.    Yes, I did.
     8    Q.    Does this document reflect what you negotiated with
     9  Brechan?
    10    A.    It reflects the dollars, and I'm assuming it reflects
```

```
11  the square footage, but I don't remember what the square footage
12  was during the negotiations.
13      Q.    Is there any reason why -- who prepared this chart?
14      A.    I would say Paul Rendon prepared that.
15      Q.    Is there any reason why you can think of why
16  Mr. Rendon would have misrepresented the amount of square
17  footage?
18      A.    No.
```

## Repanich, Anita
239:20–240:2

```
239:20      Q.    Do you agree with the price per square foot that was
    21  agreed on of $40 per square foot?
    22      A.    Yes, I do recall seeing $40 per square foot.
    23      Q.    And do you agree that these other values are correct?
    24      A.    They are what's on the task order.
    25      Q.    So couldn't you, and couldn't frankly Brechan, by
240: 1  simple math, determine what the number of square feet was?
     2      A.    I don't know if I could.
```

## Repanich, Anita
240:3–5

```
240: 3      Q.    Let's take a look at your 2/25 memorandum.  I believe
     4  it is in Exhibit 14.
     5      A.    Okay.  Okay.
```

## Repanich, Anita
240:24–241:10

```
240:24      Q.    You read that letter before transmitting it, correct?
    25      A.    Yes.
241: 1      Q.    And you were transmitting it as a communication of the
     2  United States government, correct?
     3      A.    Yes.
     4      Q.    Can you read through that document and identify for me
     5  any statement that you made in that document that you do not
     6  believe was true at the time you made it?
     7          MR. KREGER:  Objection.  Asked and answered.
     8  Compound.
     9      Q.    And each time you find such an untrue statement,
    10  please read it into the record.
```

## Repanich, Anita
241:14–242:4

```
241:14      A.    In reading it, if there was something that I thought
    15  was an untruth in here, I wouldn't have signed it.  Because I
    16  actually do send letters back to people saying, that's not true,
    17  we can't say that.  I can continue to read it, but I -- I
    18  wouldn't say that it's an untruth.
```

```
19      Q.    So irrespective of whether or not you're saying it for
20 the purpose of establishing a bargaining position, is it
21 nonetheless the case that the statements that you made in that
22 letter or that you endorsed by signing that letter February 25th
23 were true?
24           MR. NIEMER:  Object to the form.
25           MR. KREGER:  Join.
242: 1      Q.    To the best of your knowledge and belief?
 2           MR. NIEMER:  Same objection.
 3      A.    I don't see the statements as being true or not true.
 4 I'm -- I'm -- they were positions.
```

**Repanich, Anita**
242:7-243:3

```
242: 7      Q.    What is a position as opposed to a statement -- let's
 8 go to just --
 9      A.    A truth is a person's perception.  I guess I can't say
10 that anything I write is the truth.  I mean, I'm not sure -- it
11 would be my position on something.  I would take a position on
12 something, but is it the right answer?  Is it the truth?  I
13 don't know what that -- I'm not sure --
14      Q.    So it's your testimony that you can't vouch for the
15 truthfulness of anything in the February 25th letter that you
16 signed?
17      A.    I can't vouch that -- I will assume that Paul Rendon
18 did -- has used the correct dates and numbers and letters on
19 this.
20      Q.    You're laughing, but there's nobody down at the end of
21 this table that's laughing, ma'am.
22           Background, it says, "On 20 March 2001, we entered
23 into a design-build contract with your firm to rebuild the cargo
24 wharf extension and original cargo wharf at $40 a square foot,
25 for a total of 17,800 square feet."
243: 1           Is that the truth or is that merely a position?
 2           MR. NIEMER:  Object to the form.
 3      A.    That's what we did.  That's what my documents show.
```

**Repanich, Anita**
243:4-17

```
243: 4      Q.    Did you believe that statement to be true when you
 5 made it?
 6      A.    Yes.
 7      Q.    "Other work items included repair, replacement of the
 8 cathodic protection system and miscellaneous repairs to fender
 9 piling and under pier utilities to name a few."
10           Did you believe that statement was true when you made
11 it?
12      A.    Yes.
13      Q.    "Subsequently, your firm entered into a subcontract
14 with Tryck Nyman Hayes, Incorporated and Coffman Engineers as
15 your design team, as well as Swalling Construction Company,
16 Incorporated as your coatings contractor."
17           Was that a true statement or merely a position?
```

**Repanich, Anita**
243:19–244:9

```
243:19    A.    It's a statement, to the best of my knowledge.
    20    Q.    So as far as you knew, that was a true statement at
    21 the time you signed this letter?
    22          MR. KREGER:  Object as to foundation.
    23    A.    Uh-huh.
    24    Q.    "The contract you entered with Swalling was for
    25 $850,000."
244: 1          Did you believe that to be a true statement at the
     2 time you made it?
     3    A.    Based on a copy of a subcontract we'd seen.
     4    Q.    Based on that, yes?
     5    A.    Based on a copy I had seen, I would believe that to be
     6 true.  Is it true?  I don't know.
     7    Q.    I didn't ask you for the absolute truth, ma'am --
     8    A.    That's where I'm going with this, though, is absolute
     9 truths, and I can't say what absolute truths are on this.
```

**Repanich, Anita**
244:16–245:3

```
244:16    Q.    Did you believe at the time that you signed the
    17 contract that --
    18          MR. KREGER:  Objection.
    19    Q.    -- the subcontract you initiated -- that was initiated
    20 with Swalling was for $850,000?
    21          MR. KREGER:  What contract are you referring to,
    22 Counsel?
    23          MR. MARSTON:  The one that she referred to in this
    24 letter, Counsel.
    25    A.    Did I believe that at the time I signed this letter or
245: 1 at the time I signed the task?  At the time I signed the letter,
     2 I did believe they had done that.
     3    Q.    Thank you.
```

**Repanich, Anita**
245:5–20

```
245: 5    Q.    The statement says, "We do not plan on increasing our
     6 $712,000 contract amount for coatings work."
     7          Did you believe that statement was true at the time
     8 you made it?
     9    A.    Yes, I knew we were not going to add more money.
    10    Q.    "Please advise how you plan to correct this
    11 discrepancy."
    12          That's a true statement or -- it's a direction?
    13    A.    It's kind of -- yeah.  It's a request.
    14    Q.    It says, "Enclosure 3 details the actual limits of
    15 coatings work for this contract taking into account Swalling's
    16 upfront cost for mobilization and equipment and material
    17 purchases."
    18          Was that a true statement?
    19    A.    I'm not -- we do have Enclosure 3, but I can't tell
```

    20  you if that truly is Swalling's costs and Swalling's --

## Repanich, Anita
### 245:21-246:18

245:21      Q.     **All the documents that you've presented here today,**
    22  **you brought along with you, are these documents that were either**
    23  **prepared or accumulated in the ordinary course of business**
    24  **pertaining to the cargo wharf project?**
    25      A.    Yes.
246: 1              MR. MARSTON:  What's the next exhibit number?  I'm
     2  making all of these exhibits.
     3              MR. ROBISON:  What's "all of these"?
     4              MR. MARSTON:  Everything you brought with you.
     5              MR. ROBISON:  We need to bring somebody to come and
     6  do some copying, if you want copies of these.  We'll give them a
     7  Xerox machine.  But they have to do -- now, again, everything
     8  that's in loose paper is yours, so there is no problem making
     9  them exhibits.  All that's left to copy are the two brown
    10  folders.
    11              MR. MARSTON:  The only reason I'm doing that is
    12  because I'm being cut off, Counsel.  I don't want to ruffle
    13  anyone's feathers, but when I get shut down, I need to make sure
    14  if there's anything in here that's relevant, and if this witness
    15  isn't going to appear at trial, I would like to get it entered.
    16                        (Exhibit No. 20 marked and retained by
    17                         Coast Guard.)
    18                        (Deposition concluded at 5:37 p.m.)