# Annotation Report

# Martin Boivin - Default

|  |  |
|---|---|
| **Created by** | terry |
| **Creation date** | Sep 27, 2006 |
| **Project** | aesi-bei-cei |
| **Sort order** | Transcript, Location |

**Boivin, Martin**
4:11-16

```
4:11 BY MR. MARSTON:
  12    Q.    Would you please state your complete legal name.
  13    A.    Martin Boivin.
  14    Q.    And what is your current residential address?
  15    A.    19308 - 65th Avenue Northeast, and that's Kenmore
  16 98028.
```

**Boivin, Martin**
4:24-5:20

```
4:24    Q.    Prior to your employment with Shannon & Wilson, were
  25 you employed by Facilities Development and Construction Center
5: 1 Pacific?
   2    A.    Facilities Design and Construction Center Pacific.
   3    Q.    Thank you.  I miss that every time I try.
   4    A.    Yes, I was.
   5    Q.    And your position at the time you left was
   6 executive -- well, why don't you tell me what your position was.
   7    A.    I was executive director.
   8    Q.    What, in general terms, were your duties as executive
   9 director?
  10    A.    I was the head civilian.  I was responsible for
  11 supervision of the contracting section, the design and
  12 construction group, the planning and management group; four
  13 sections.
  14    Q.    And what was the general role of FDCC Pacific within
  15 the Coast Guard?
  16    A.    It varied, but basically, we were the design and
  17 construction agent for the Pacific region for all the AC&I
  18 projects.  We also did AFC 43 projects for Kodiak and selected
  19 AFC 43 projects for civil engineering units on the coast as
  20 requested.
```

**Boivin, Martin**
6:2-7:2

```
6: 2    Q.    What was the organizational relationship between you
   3 and the Coast Guard commander assigned to FDCC Pacific?
   4    A.    He was my supervisor.
   5    Q.    He was your supervisor?
   6    A.    When you say "commander," what --
   7    Q.    (Indicating.)
   8    A.    Captain.
   9    Q.    Captain.
  10    A.    My supervisor.
  11    Q.    Your supervisor.
  12          So if I was to prepare an organizational chart, a
  13 generalized organizational chart that would apply to FDCC
  14 Pacific over time, the captain would be the highest level
  15 government employee?
  16    A.    That's correct.
```

```
17    Q.    And you would be second in command?
18    A.    That's correct.
19    Q.    As the executive director?
20    A.    Correct.
21    Q.    Who were your immediate subordinates?
22    A.    There was Kyle Hicks, John Metcalf.
23    Q.    And what was his title?
24    A.    He was chief planning and management group.  There was
25 actually Mike Bolas, and he was the environmental chief.  There
7: 1 was Jerry Johnson, Alpha division leader, and Francis Breedle,
   2 he was the Beta division leader.
```

## Boivin, Martin
7:3-11

```
7: 3    Q.    What were the Alpha and Beta divisions?
   4    A.    They were a group of engineers that were responsible
   5 for design and overseeing the design and overseeing the
   6 construction of the projects that we had assigned to us.
   7    Q.    Was there any differentiation between Alpha and Beta
   8 as to what their responsibilities were?
   9    A.    We had them pretty much geographically separated.
  10 Alpha was pretty much responsible for Kodiak, and Beta for the
  11 rest of the coast.
```

## Boivin, Martin
8:4-9:11

```
8: 4    Q.    Are you familiar with the name Paul Rendon?
   5    A.    I am.
   6    Q.    Was he a project manager?
   7    A.    Yes, he was.
   8    Q.    Was he on Alpha team?
   9    A.    Yes, he was.
  10    Q.    Was Jerry Johnson his immediate superior?
  11    A.    He was.
  12    Q.    Was he an engineer?
  13    A.    Paul?
  14    Q.    Yes.
  15    A.    Yes.
  16    Q.    Did he have project management responsibility in both
  17 design and the construction areas?
  18    A.    Pretty much just construction area.  He might have had
  19 assigned one or two design projects, I just can't recall that he
  20 did.
  21    Q.    Do you recognize the name Steven Locher?
  22    A.    I do.
  23    Q.    Who is Steven Locher?
  24    A.    Steven Locher was a project engineer, a civil
  25 engineer.
9: 1    Q.    Was he civil service?
   2    A.    Yes, he was, and Paul was a military.
   3    Q.    Do you recall what Steven Locher's title was?
   4    A.    I believe he was project engineer.
   5    Q.    And what is the role of a project engineer on a FDCC
   6 project?
```

A. Coordinate the needs of the project with the customer, and either directly prepare the plans and specifications or supervise a consulting engineering firm that we might have hired to do that process. Pretty much stayed on the design side with some review of the construction as it went along.

## Boivin, Martin

**11:22-13:3**

saying.

**Q. But in any event, there is terminology that is used in this office, FDCC, regarding either an IDIQ or a JOC contract that with respect to construction work are used synonymously?**

A. I have heard them used synonymously.

**Q. Right.**

A. I refer to it as a JOC contract.

**Q. For the remainder of this deposition --**

A. Okay.

**Q. -- I too will refer to it as a JOC contract.**

A. Okay.

**Q. JOC refers to job order contract?**

A. Correct.

**Q. And under a job order contract, the contractor who is awarded the JOC contract is initially awarded a base contract that includes general conditions of the contract, but it doesn't identify the scope of any work or the actual price of any work to be performed subsequently; is that your understanding?**

A. Yes, and there's a fine point that you may want -- with the contracting officers, they don't award it until they have the first task, but I don't know whether they did in this case or not, but yes, basically you're correct.

**Q. And until the base JOC contract has a task order issued pursuant to it, there's no work identified to be performed?**

A. Correct.

**Q. And it's the task order itself that identifies the work to be performed?**

A. That's my understanding.

**Q. And when the task order is issued, then the task order also has a price associated with that scope of work?**

A. Correct.

## Boivin, Martin

**11:23-12:18**

**Q. But in any event, there is terminology that is used in this office, FDCC, regarding either an IDIQ or a JOC contract that with respect to construction work are used synonymously?**

A. I have heard them used synonymously.

**Q. Right.**

A. I refer to it as a JOC contract.

**Q. For the remainder of this deposition --**

A. Okay.

**Q. -- I too will refer to it as a JOC contract.**

A. Okay.

**Q. JOC refers to job order contract?**

```
 9   A.    Correct.
10   Q.    And under a job order contract, the contractor who is
11 awarded the JOC contract is initially awarded a base contract
12 that includes general conditions of the contract, but it doesn't
13 identify the scope of any work or the actual price of any work
14 to be performed subsequently; is that your understanding?
15   A.    Yes, and there's a fine point that you may want --
16 with the contracting officers, they don't award it until they
17 have the first task, but I don't know whether they did in this
18 case or not, but yes, basically you're correct.
```

## Boivin, Martin
12:19–13:3

```
12:19   Q.    And until the base JOC contract has a task order
  20 issued pursuant to it, there's no work identified to be
  21 performed?
  22   A.    Correct.
  23   Q.    And it's the task order itself that identifies the
  24 work to be performed?
  25   A.    That's my understanding.
13: 1   Q.    And when the task order is issued, then the task order
   2 also has a price associated with that scope of work?
   3   A.    Correct.
```

## Boivin, Martin
14:11–15:2

```
14:11   A.    Let me know when I should answer.
  12   Q.    All right.
  13         But is it a generally correct statement that the
  14 process preceding the issuance of a task order is an
  15 identification from the customer of work that the customer wants
  16 performed, then a statement of work is prepared by FDCC.  That
  17 statement of work is transmitted to the JOC contractor, along
  18 with a request for proposal.  The JOC contractor submits a
  19 proposal in response to FDCC.  That proposal is evaluated by
  20 FDCC, and subsequently a negotiation takes place between the
  21 contractor and the contracting officer and whatever parties
  22 might assist her in performing her work, culminating ideally in
  23 a negotiated agreement as to the price and scope, which is
  24 ultimately reduced to a task order that's issued?
  25         MR. KREGER:  Object to the form.
15: 1   Q.    Is that generally true?
   2   A.    Generally true.
```

## Boivin, Martin
14:12–15:2

```
14:12   Q.    All right.
  13         But is it a generally correct statement that the
  14 process preceding the issuance of a task order is an
  15 identification from the customer of work that the customer wants
  16 performed, then a statement of work is prepared by FDCC.  That
```

```
17  statement of work is transmitted to the JOC contractor, along
18  with a request for proposal.  The JOC contractor submits a
19  proposal in response to FDCC.  That proposal is evaluated by
20  FDCC, and subsequently a negotiation takes place between the
21  contractor and the contracting officer and whatever parties
22  might assist her in performing her work, culminating ideally in
23  a negotiated agreement as to the price and scope, which is
24  ultimately reduced to a task order that's issued?
25              MR. KREGER:  Object to the form.
15: 1       Q.    Is that generally true?
2       A.    Generally true.
```

## Boivin, Martin
17:11-16

```
17:11  witness's testimony.
12       Q.    Do you know whether Phase II was design-build?
13       A.    I have really no knowledge of Phase II.  I retired
14  from FD&CC on April 1st, 2003, and I really wasn't involved at
15  all in any portion, even preparing the plans and specs for Phase
16  II.  I really had no knowledge of Phase II as you've heard.
```

## Boivin, Martin
23:7-24

```
23: 7       A.    I did read it, yes.
8       Q.    And you are familiar with Paul Rendon?
9       A.    I am.
10       Q.    Did you understand him to be the project manager for
11  FDCC on Phase I of the Coast Guard Cargo Wharf Maintenance
12  Project?
13       A.    That's my understanding.
14       Q.    Do you recall a issue having arisen during the Phase I
15  portion of the cargo wharf maintenance contract regarding the
16  coating applicator having encountered an excessive amount of
17  omitted and defective welds, or what was said to be an excessive
18  amount of omitted and defective welds?
19       A.    I do not recall at the time, the omitted part of that.
20  I do recall them not -- I actually saw the fact that it was very
21  difficult to determine what was underneath the coatings that
22  were required to be removed, so I had heard that there was some
23  defective welds, but the omitted welds, I had not heard about,
24  until I read some of this stuff.
```

## Boivin, Martin
25:4-26:2

```
25: 4              MR. KREGER:  Sure enough.  I'm sorry.
5       Q.    How about did you hear there was an excessive amount
6  of steel connections that had not been welded?
7       A.    That were supposed to be welded or that weren't
8  supposed to be welded?
9       Q.    I am not in a position to say one way or the other.
10  I'm just saying that there were pieces of metal that were
```

11  **attached to other pieces of metal that were not welded around**
12  **the entire circumference.**
13      A.    That part, I can say yes to.  I was aware of that.
14      **Q.    You were aware that at the time of Phase I of the**
15  **project, that there had been discussion of the presence of what**
16  **was said to be an excessive amount of defective welds, and an**
17  **excessive amount of unwelded steel?**
18      A.    I was aware of the unwelded steel.  The defective part
19  of the equation, I was not aware of anywhere along my knowledge
20  of Phase I until I read some of these Exhibits 1, 2 and 3.
21      **Q.    So at the time of the project when you were the**
22  **executive director for FDCC, it came to your attention that**
23  **there was a -- it came to your attention that there was a**
24  **contention that there was an excessive amount of metal under the**
25  **coatings on the cargo wharf project that was not completely**
26: 1  **welded.**
2       A.    Yes.


## Boivin, Martin
26:4-28:18


26: 4  Brechan, the JOC contractor -- strike that.
5               Did the JOC contractor request additional
6  compensation for the situation?
7               MR. KREGER:  Objection.  Vague.
8               MR. ROBISON:  You can answer.
9       A.    Yes.
10      **Q.    And did the JOC contractor, Brechan, identify what its**
11  **rationale was for obtaining additional compensation for the**
12  **situation?**
13      A.    The fact that there was existing coating over some of
14  the members that could not be adequately bid at the time they
15  submitted their bid.  So they had to take the coatings off to be
16  able to determine what the actual condition was of the
17  structural steel members and the number of welds and the
18  condition of the welds so they couldn't do that until they had
19  taken the coating off.  So it wasn't -- it wasn't foreseeable on
20  their part.
21      **Q.    Do you know whether it was characterized as a**
22  **differing site condition problem?**
23      A.    In my understanding, it was.
24      **Q.    You're familiar with the phrase "differing site**
25  **condition" as it's used in government contracting?**
27: 1    A.    I am.
2       **Q.    And is it your understanding that the basis for**
3  **additional compensation that Brechan was seeking was that it was**
4  **characterizing the circumstance of the welds as being a**
5  **differing site condition?**
6               MR. KREGER:  Object to the form.
7       A.    Yes.
8       **Q.    Who was the contracting officer on Phase I?**
9       A.    Anita Repanich.
10      **Q.    And the project manager was Lieutenant Rendon?**
11      A.    Yes.
12      **Q.    Do you recall the circumstances of what I'll refer to**
13  **as the weld problems on Phase I of the cargo wharf, how they**
14  **first came to your attention?**
15      A.    I was up in Kodiak on another purpose, not to review

16 this contract, and Matt Holmstrom asked me to meet them -- I
17 believe Bill, you were there, I'm not sure -- but at least Matt
18 was there to take me underneath the pier and show me what the
19 conditions were, and that was the first I was aware of any
20 problem having to do with the welds.
21      **Q.    What did Matt show you?**
22      A.    We got under there, and it was snowing that day.  He
23 showed me that the -- basically the area with -- we were
24 looking -- I can't remember the actual bent, but the contractor
25 Swalling had prepared a certain number, I think two bents, and
28: 1 he was showing me the condition that existed prior to them
2 sandblasting, and the condition that existed after that, and was
3 demonstrating to me that it was very difficult indeed to -- if
4 not impossible -- to estimate the number of seal welds, linear
5 feet of seal welds that they were going to have to apply to
6 properly apply the coating.
7      **Q.    In other words, the circumstances were not observable?**
8      A.    Correct.
9      **Q.    During that meeting with Brechan personnel in Kodiak,**
10 **did they indicate that they were interested in seeking**
11 **additional compensation for dealing with that situation?**
12      A.    They indicated to me that they incurred more costs
13 than they had anticipated, and I don't recall whether they
14 actually said that.  Certainly I left there with the impression
15 they were going to seek additional compensation.
16      **Q.    Whether it was stated or not, that was your**
17 **impression?**
18      A.    Correct.


## Boivin, Martin
29:9-17

29: 9      A.    -- impression was that he did -- he was.
10      **Q.    Do you recall whether he expressed any view as to**
11 **whether the situation was one that entitled the contractor to**
12 **additional compensation?**
13      A.    I truly believe -- and this, again, this is my
14 impression, the best way I can remember it -- it was that
15 initial impression was that they were not, that they felt that
16 they had a design-build contract that somehow or other the
17 contractor had to be responsible for everything.


## Boivin, Martin
29:20-30:1

29:20      A.    No.
21      **Q.    Did you have a contrary view?**
22      A.    I did.
23      **Q.    What was your contrary view?**
24      A.    That it wasn't reasonable to expect the contractor to
25 submit a price for the conditions that existed up there with the
30: 1 coating not being removed.

**Boivin, Martin**
30:9-18

```
30: 9     Q.     I'm very familiar with partnering.
   10     A.     I was the senior representative for the office here,
   11 so I had some discussions based on me being the senior person on
   12 the contract of a technical nature.  When I left Kodiak, I
   13 specifically talked to Matt.  I said, Matt, if there's anything
   14 at all that you guys are going to want, you're going to have to
   15 work it out with the contracting officer.
   16            And I told Paul the same thing.  I told them, though,
   17 my professional opinion was that there was the basis for changed
   18 site conditions.
```

**Boivin, Martin**
34:8-17

```
34: 8     A.     Correct.
    9     Q.     In looking at Exhibit 1, the e-mail from Lieutenant
   10 Rendon that's dated February 5th, 2002, have you had an
   11 opportunity to determine whether the conversation that you had
   12 with Matt Holmstrom in which he showed you the missing welds
   13 underneath the wharf was on or about this date?
   14     A.     I believe it was prior to that date.
   15     Q.     Do you have any idea how long prior to that date?
   16     A.     It had to be -- there was snow on the float at Kodiak
   17 and snow in late September.
```

**Boivin, Martin**
34:23-37:18

```
34:23            MR. KREGER:  We already have asked you to swear.
   24     A.     Well, I meant give you an exact date.  My impression,
   25 after having read that, that it was in either October, November,
35: 1 December, January, it was prior to that e-mail being signed.
    2            MR. KREGER:  Thank you.
    3     Q.     Having read Exhibit 1, is there anything in Exhibit 1
    4 that is inconsistent with what you recall of the events that
    5 occurred at that time?
    6     A.     I need to look at that.
    7            MR. KREGER:  Objection.  Compound.
    8            MR. ROBISON:  Go ahead.
    9     A.     I'm a little troubled by the last sentence in this,
   10 and I don't know what -- I didn't see this obviously, at least I
   11 was not given a copy -- was not given a copy of this by Paul.  I
   12 was unaware that this e-mail existed until Jerry sent it to me,
   13 and I was a little troubled by the last sentence about "to
   14 settle with you on this later."  I'm not sure what he had in
   15 mind.
   16            I was referring to the compensation type of issue
   17 that was up there that would be settled on.  So I don't know
   18 what he had in mind when he wrote that, but that was my -- so to
   19 answer your question, I don't think anything that's in there was
   20 inconsistent with what I might have shared at that meeting.
   21     Q.     And the portion that you're saying you're a little
```

```
22  troubled by is the next-to-last line that reads, "One caveat,
23  Matt, whatever we decide to do, Marty did agree to settle with
24  you on this later, whether it be on another task order or
25  something else.  Anita and Kyle Hicks, chief of contracting,
36: 1  will need to figure out the best way to address this."
 2              Based upon your understanding of the way that these
 3  JOC contracts are administered and what the law is that governs
 4  the administration of contracts by government representatives,
 5  would it be appropriate, in your opinion, to compensate a
 6  contractor for a problem that occurred on one project on one
 7  contract on a different contract?
 8      A.    It would be inappropriate.
 9      Q.    Inappropriate.
10            And that's what troubled you about his statement?
11      A.    Uh-huh.
12      Q.    And when you say it troubles you, would it be proper
13  for me to infer that if that's what he was suggesting, that is
14  not anything that you would have said?
15      A.    That's correct.
16      Q.    Did you note that the fact that Lieutenant Rendon sent
17  this e-mail marked "confidential" --
18      A.    I did see that.
19      Q.    Did that trouble you at all?
20      A.    Certainly.  I don't know why he would do that, but...
21      Q.    Let me read through Exhibit 1.  It says, "Matt, change
22  of plans from my end.  I think I told you I was having a meeting
23  with Marty and the captain today regarding project status."
24            Who was the captain at that time?
25      A.    Rick Beseler.
37: 1      Q.    Beseler?
 2      A.    Yeah, the last one up there.
 3      Q.    Et cetera.
 4            "Well, Marty wants to take a different approach, the
 5  design-build approach, and postpone our Coast Guard involvement
 6  until later.  We won't be meeting with you this week in
 7  Anchorage."
 8            Do you recall having had any discussion with either
 9  Anita or Paul or Jerry Johnson, for that matter, of the prospect
10  of attending -- FDCC personnel attending a meeting in Anchorage
11  to discuss this issue?
12      A.    Do I actually recall that?
13      Q.    Yes.
14      A.    No, I don't.  That infers that I said something --
15  that I postponed it, but I don't recall it.
16      Q.    Is there anything about his statement that causes you
17  to doubt the truthfulness of it?
18      A.    No.
```

## Boivin, Martin
**43:10-24**

```
43:10                    (Exhibit No. 5 marked.)
11      Q.    I'm handing you what's been marked as Exhibit 5 to
12  your deposition, and I'll represent to you that that is a copy
13  of a note that was made by Matt Holmstrom of Brechan.
14      A.    Okay.
15      Q.    If you look at the top, he has an entry dated 2/27/02
16  that references a meeting with you and several other Brechan
```

17 **personnel via their initials.  Does that refresh your**
18 **recollection when the meeting took place between you and Brechan**
19 **personnel?**
20     A.    Datewise, I couldn't tell you. .No, it -- I can't
21 dispute it, but I can't verify it.
22     **Q.    How many meetings did you have with Brechan personnel**
23 **at the project site during Phase I?**
24     A.    One.


## Boivin, Martin
43:11-24

43:11     **Q.    I'm handing you what's been marked as Exhibit 5 to**
   12 **your deposition, and I'll represent to you that that is a copy**
   13 **of a note that was made by Matt Holmstrom of Brechan.**
   14     A.    Okay.
   15     **Q.    If you look at the top, he has an entry dated 2/27/02**
   16 **that references a meeting with you and several other Brechan**
   17 **personnel via their initials.  Does that refresh your**
   18 **recollection when the meeting took place between you and Brechan**
   19 **personnel?**
   20     A.    Datewise, I couldn't tell you.  No, it -- I can't
   21 dispute it, but I can't verify it.
   22     **Q.    How many meetings did you have with Brechan personnel**
   23 **at the project site during Phase I?**
   24     A.    One.


## Boivin, Martin
45:4-15

45: 4     A.    No, I cannot recall having that conversation.
    5     **Q.    Do you recall having any discussion with Brechan**
    6 **personnel regarding a $100,000 differential between the amount**
    7 **that Brechan had contracted with Swalling to perform the coating**
    8 **application work and the amount of compensation that Brechan**
    9 **would be receiving from the Coast Guard for that same scope of**
   10 **work?**
   11     A.    Somewhere along the lines, I recall hearing that
   12 information.  I can't give you whether it occurred here or some
   13 other time, but yes, I was aware that they had contracted with
   14 Swalling more than what we had awarded them for -- for the work,
   15 for that portion of the work.


## Boivin, Martin
46:12-19

46:12          So with that definition of buyout, was it your
   13 understanding that under the terms of the Phase II -- excuse
   14 me -- the Phase I JOC contract Task Order 7, that the Coast
   15 Guard had an obligation to reimburse Brechan for losses that it
   16 may have incurred in its buyout process?
   17          MR. KREGER:  Objection.  Leading.  Foundation.  Form
   18 of the question.
   19     A.    No.

**Boivin, Martin**
47:5-12

47: 5    Q.    What was your understanding of that issue?
     6    A.    I was dumbfounded by doing that.  I don't understand
     7  why anyone would award a subcontract more than what we would
     8  award the contract to them.
     9    Q.    Did you think it was appropriate to pay Brechan -- for
    10  the Coast Guard to pay Brechan for the extra amount that it had
    11  to pay its subcontractor under its subcontract?
    12    A.    No.


**Boivin, Martin**
48:17-49:16

48:17    Q.    Now, part 5 here again says that "Marty wants a formal
    18  proposal from the design-build team on" -- and this is sub part
    19  5 again, "whatever changes are presented to the Coast Guard by
    20  the design-build team should be at no cost to the Coast Guard."
    21          Question:  Is that consistent with what your position
    22  was at the time?
    23    A.    Correct.
    24    Q.    Now, I want you to help me resolve some confusion,
    25  because you indicated previously when you met with Mr. Holmstrom
49: 1  on site, you viewed the situation with the welds and it struck
     2  you as being a bona fide differing site condition, and that it
     3  was something that the contractor would ordinarily be entitled
     4  to additional compensation for.
     5    A.    Uh-huh, uh-huh.
     6    Q.    And yet, you agree with what Mr. Rendon has stated
     7  here that your position was that whatever changes are presented
     8  to the Coast Guard by the design-build team should be at no cost
     9  to the Coast Guard.
    10          Can you harmonize those two thoughts for me?
    11    A.    Certainly.  You can read the questions above that he
    12  was asking.  I was looking for an alternative that we basically
    13  wouldn't increase the cost of the task order, new coating, some
    14  other solution that we could come up that would minimize the
    15  cost to the Coast Guard and in essence wouldn't increase the
    16  overall cost to the Coast Guard.


**Boivin, Martin**
51:8-17

51: 8    Q.    I want to go back to another point that you mentioned
     9  earlier, that you were -- that you recall having been informed
    10  of the issue of the missing welds, but that you weren't informed
    11  of the issue of any defective welds.
    12    A.    Correct.
    13    Q.    And that you weren't aware of any allegation of the
    14  existence of defective welds until in the last few days when you
    15  had an opportunity to read Exhibits 1, 2 and 3?
    16    A.    To the best of my recollection, that's what I recall,

    17  yes.


## Boivin, Martin
52:11-53:3

52:11       Q.      The next bullet reads, "We don't want to terminate our
    12  Task Order 7 with you or we lose the remaining money, so we need
    13  to keep the task order open."
    14              We have heard testimony from Ms. Repanich that given
    15  the way that appropriations are made for -- that ends up going
    16  into the coffers of the Coast Guard for construction work, that
    17  the appropriation for a given year has to be obligated within
    18  that given year or those funds are lost, and it returns back to
    19  some other pocket of the government; is that consistent with
    20  your understanding?
    21       A.      That's true for AFC 43 funding.
    22       Q.      I'm not certain what that refers to.
    23       A.      This project was funded with that funding.  So there's
    24  the other ACNI funding, which originally was a five-year
    25  funding.  It's now three years.
53: 1       Q.      So the funding for the work that was being performed
     2  up at Kodiak was use it or lose it funding?
     3       A.      Correct.


## Boivin, Martin
64:12-65:10

64:12              MR. MARSTON:  Thank you.
    13       Q.      So is it your understanding that the profit the job
    14  order contractor was to make on the job was to be captured in
    15  this coefficient factor?
    16              MR. KREGER:  Objection.  Foundation.  Calls for
    17  opinion testimony.  Calls to interpret a legal document.
    18       Q.      Your office's job is to administer contracts, correct?
    19       A.      That's correct.
    20       Q.      And your office's job is to make sure that, through
    21  your administration, you minimize to the maximum extent possible
    22  the likelihood that the government would lose money because of
    23  overcharging by contractors?
    24       A.      Certainly I was concerned about that.
    25       Q.      And based on this reading of the coefficient factor,
65: 1  is it your understanding as the former executive director of
     2  this agency, that the profiting JOC contractor was to earn on
     3  any given task order was to be found in the coefficient factor,
     4  or was to be obtained in the coefficient factor?
     5              MR. KREGER:  Objection.  Vague.  Lack of foundation.
     6  The document speaks for itself.
     7       Q.      Is that your understanding of what this requires?
     8       A.      You're asking my understanding of that, and that's the
     9  first I've seen that, okay?  So by your reading of that, that
    10  would be my interpretation.

**Boivin, Martin**
66:2-14

66: 2  I don't even know if it is, then you would be correct.
    3      Q.    I'll represent to you that Anita Repanich has
    4  identified that as the JOC contract.
    5      A.    Okay.
    6      Q.    And that that coefficient was used and that on Phase
    7  I, the multiplier was 1.05.
    8      A.    Okay.
    9      Q.    So with those additional facts, would it be your
   10  understanding that for Brechan to charge for mobilization and
   11  demobilization as a separate cost, in addition to charging the
   12  coefficient, would that be improper?
   13            MR. KREGER:  Objection.  Lack of foundation.
   14      A.    It would appear that it would be.


**Boivin, Martin**
67:2-23

67: 2            Under the JOC contract that work that was described
    3  in the Means estimating guide was to be priced using the Means
    4  guide?
    5      A.    That's my understanding.
    6      Q.    And the work that was not -- the types of work that
    7  was not included in the Means estimating guide would be priced
    8  by some other method?
    9      A.    That's my understanding.
   10      Q.    Based on that, would it be appropriate, in your
   11  opinion, for a contractor such as Brechan to obtain a Means
   12  priced subcontract, quote, to do coating application from a
   13  subcontractor such as Absolute Environmental Services in a firm
   14  cost proposal based on that Means priced work --
   15            MR. KREGER:  Objection.  Foundation.
   16      Q.    -- and then add --
   17            MR. KREGER:  I'm sorry, I thought you were finished.
   18      Q.    And then add -- or then change the Means pricing in
   19  order to incorporate $100,000 of additional costs into its Means
   20  pricing that it knew it would not have to pay in the course of
   21  putting its price together to the Coast Guard?
   22            MR. KREGER:  Objection.  Foundation.
   23      A.    No.


**Boivin, Martin**
68:25-69:24

68:25      Q.    Let us return, then, to Mr. Rendon's e-mail, Exhibit
69: 1  1.  The third bullet down here says, "Do we descope the
    2  subcontract with Swalling?  We awarded $712,000 for 17,800
    3  square feet of coatings work based on $40 a square foot.  I
    4  believe you contracted with Swalling for $43 a square foot for
    5  year one as follows:  $850,000 for 20,200 square feet" -- I'm
    6  going to skip some of the calculations he has in here and go
    7  toward the end where it says, "If we descope the subcontract
    8  with Swalling from bent 13 to 15, this should clear up the

```
 9  hundred thousand dollar delta.  Matt, can you fax me your latest
10  payment to Swalling, I would like to see what you have paid them
11  to date for mobilization, scaffolding, equipment, et cetera."
12              Based on your understanding of what Swalling's -- not
13  Swalling but Brechan's obligations were under the contract, do
14  you think it would be appropriate for the Coast Guard -- you've
15  already testified it would not be appropriate for the Coast
16  Guard to provide Brechan with additional compensation to cover
17  that loss.
18       A.    Uh-huh.
19       Q.    Would it be appropriate for the Coast Guard to reduce
20  the scope of Brechan's work without receiving a credit back for
21  that reduction in work as a means of compensating Brechan for
22  that loss?
23              MR. KREGER:  Objection.  Leading.
24       A.    No.
```

## Boivin, Martin
71:22-72:8

```
71:22       Q.    Is it a letter from Anita Repanich to Brechan
   23  addressing the weld situation?
   24       A.    Addressing a few issues, yes, quite a few issues.
   25       Q.    Among other things, the weld situation?
72: 1       A.    Yes.
    2       Q.    And does she state -- was this letter issued pursuant
    3  to instructions from you?
    4       A.    You know, I didn't get -- this is a normal type of
    5  letter that she would have done as a follow-on to what happened.
    6  I did not give her specific instructions to do that, but it's
    7  logical that after our meeting that she did that, but that's all
    8  I can tell you.
```

## Boivin, Martin
73:13-75:2

```
73:13       Q.    Now, return to the first page of Ms. Repanich's
   14  letter, and it continues on and says, "And included cargo wharf
   15  extension and bents 1 through 15 on the original cargo wharf."
   16       A.    Uh-huh.
   17       Q.    Enclosure 2?
   18       A.    Uh-huh.
   19       Q.    And at Enclosure 2, we actually have the subcontract
   20  form itself.
   21       A.    Okay.
   22       Q.    Now, while your copy doesn't have Enclosure 3, there's
   23  a reference to a third enclosure.
   24       A.    Uh-huh.
   25       Q.    It says, "This discrepancy in contract funds needs to
74: 1  be resolved between Brechan Enterprises and Swalling
    2  Construction."
    3       A.    Uh-huh.
    4       Q.    And I believe you stated that that is consistent with
    5  your view?
    6       A.    Correct.
    7       Q.    And it is a Brechan issue, not a Coast Guard issue to
```

```
 8  resolve?
 9      A.    That's correct.  That's correct.
10      Q.    And then the next line reads, "We do not plan on
11  increasing our $712,000 contracted amount for coatings work."
12      A.    Okay.
13      Q.    Again, that's consistent with your view?
14      A.    Correct.
15      Q.    Finally, it says, "Please advise how you plan to
16  correct this discrepancy."
17      A.    Uh-huh.
18      Q.    So is it your reading of that that Ms. Repanich is
19  informing Brechan that its $100,000 differential between what it
20  appeared to be paid and what it agreed to pay Swalling was a
21  problem that was Brechan's alone and the Coast Guard did not
22  intend to provide additional compensation for that?
23      A.    That's correct.
24      Q.    And do you believe that is the appropriate way to
25  administer an issue such as this?
75: 1             MR. KREGER:  Objection.  Foundation.
 2      A.    Yes.
```

## Boivin, Martin
77:16-25

```
77:16   Q.    What do you base your understanding on, that the
17  contract with Brechan required them to perform the work from
18  bents 1 through 12 only of the original cargo wharf?
19      A.    What do I judge that on?
20      Q.    Right.
21      A.    Rereading some of this information and what I
22  understood to be at the time.
23      Q.    Have you looked at the contract documents themselves?
24      A.    I have never seen the original contract documents.
25      Q.    Okay.
```

## Boivin, Martin
77:16-25

```
77:16   Q.    What do you base your understanding on, that the
17  contract with Brechan required them to perform the work from
18  bents 1 through 12 only of the original cargo wharf?
19      A.    What do I judge that on?
20      Q.    Right.
21      A.    Rereading some of this information and what I
22  understood to be at the time.
23      Q.    Have you looked at the contract documents themselves?
24      A.    I have never seen the original contract documents.
25      Q.    Okay.
```

## Boivin, Martin
80:3-14

```
80: 3           What's your educational background, sir?
 4      A.    I have a -- up to a master's in civil engineering.  I
```

```
 5 have an M.B.A. and also have a degree from the Industrial
 6 College of the Armed Forces.
 7    Q.    Have you practiced -- are you a professional engineer?
 8    A.    I am a registered professional engineer in the state
 9 of Washington.
10    Q.    And are you practicing as a civil engineer at the
11 present time?
12    A.    My license is valid.
13    Q.    How long were you the executive director of FD&CC?
14    A.    From 1983 to 2003; April 1st, 2003.
```

## Boivin, Martin
80:3-14

```
80: 3             What's your educational background, sir?
 4    A.    I have a -- up to a master's in civil engineering.  I
 5 have an M.B.A. and also have a degree from the Industrial
 6 College of the Armed Forces.
 7    Q.    Have you practiced -- are you a professional engineer?
 8    A.    I am a registered professional engineer in the state
 9 of Washington.
10    Q.    And are you practicing as a civil engineer at the
11 present time?
12    A.    My license is valid.
13    Q.    How long were you the executive director of FD&CC?
14    A.    From 1983 to 2003; April 1st, 2003.
```

## Boivin, Martin
86:4-87:13

```
86: 4    Q.    And what recall did you have of the project prior to
 5 reviewing the documents that the current executive director
 6 provided you?
 7    A.    Okay.  I recalled -- the project sticks in my mind of
 8 Swalling not performing on a timely basis, very concerned about
 9 that.
10             I recall meeting with Matt Holmstrom underneath the
11 pier because it was snowing that day.  That's really high in my
12 recollection.  I had my dress shoes on going down this gangway
13 onto this plume.  I remember what I describe as changed site
14 conditions, visually recalling that was -- that was a condition
15 that I thought existed.  I faintly remember the problem with the
16 subcontractor price being greater than the amount of award that
17 the Coast Guard did to them.  I do remember specifically talking
18 to them on the site about whatever transpired from this thing
19 had to be coordinated directly with the contracting officer.  I
20 definitely remember making that statement there.
21             I remembered coming back, discussing the issues.  I
22 cannot recall, as I stated, that I had all Anita, Jerry and Paul
23 in one meeting at one time, but I do remember discussing my
24 observation up there, that we had a situation with changed site
25 conditions that we had to deal with.
87: 1    Q.    Other than that recall and the three documents that
 2 you were provided and what you've heard today, what other
 3 information do you have to express opinions or render
 4 interpretations about the project?
```

```
 5    A.    I really don't, other than knowing myself and knowing
 6 how I react to situations.  To be consistent, I can say that I
 7 could accept some of these -- the e-mail from Paul Rendon that
 8 I, in fact, might have inferred that or said that, because I
 9 fire out a lot of questions to people.  I don't get into a lot
10 of detail with them.  I expect them to do their job, but I do
11 try and make sure that I think they understand what the problem
12 is or what the solutions can possibly be.  Strictly in the form
13 of questions.  Not in direction.
```

## Boivin, Martin
86:4-25

```
86: 4    Q.    And what recall did you have of the project prior to
      5 reviewing the documents that the current executive director
      6 provided you?
      7    A.    Okay.  I recalled -- the project sticks in my mind of
      8 Swalling not performing on a timely basis, very concerned about
      9 that.
     10         I recall meeting with Matt Holmstrom underneath the
     11 pier because it was snowing that day.  That's really high in my
     12 recollection.  I had my dress shoes on going down this gangway
     13 onto this plume.  I remember what I describe as changed site
     14 conditions, visually recalling that was -- that was a condition
     15 that I thought existed.  I faintly remember the problem with the
     16 subcontractor price being greater than the amount of award that
     17 the Coast Guard did to them.  I do remember specifically talking
     18 to them on the site about whatever transpired from this thing
     19 had to be coordinated directly with the contracting officer.  I
     20 definitely remember making that statement there.
     21         I remembered coming back, discussing the issues.  I
     22 cannot recall, as I stated, that I had all Anita, Jerry and Paul
     23 in one meeting at one time, but I do remember discussing my
     24 observation up there, that we had a situation with changed site
     25 conditions that we had to deal with.
```

## Boivin, Martin
87:1-13

```
87: 1    Q.    Other than that recall and the three documents that
      2 you were provided and what you've heard today, what other
      3 information do you have to express opinions or render
      4 interpretations about the project?
      5    A.    I really don't, other than knowing myself and knowing
      6 how I react to situations.  To be consistent, I can say that I
      7 could accept some of these -- the e-mail from Paul Rendon that
      8 I, in fact, might have inferred that or said that, because I
      9 fire out a lot of questions to people.  I don't get into a lot
     10 of detail with them.  I expect them to do their job, but I do
     11 try and make sure that I think they understand what the problem
     12 is or what the solutions can possibly be.  Strictly in the form
     13 of questions.  Not in direction.
```

**Boivin, Martin**
92:3-7

92: 3    Q.    Do you know what seal welding was?
    4    A.    My interpretation of seal welding was if you had some
    5 voids or some other -- some holes and -- in some existing welds,
    6 you had to cover them up with a seal weld, you had to seal it,
    7 seal that area that was around the metal object with that weld.


**Boivin, Martin**
94:12-96:2

94:12 coating, that should have required that seal welding.
    13                        (Exhibit No. 7 marked.)
    14    Q.    It doesn't have a Bates number, it's an e-mail March
    15 7, 2002, from Mr. Boivin to Mr. Rendon, copied to Matt
    16 Holmstrom, Anita Repanich, Gerald Johnson, Steven Locher.
    17            MR. MARSTON:  3/7/02?
    18            MR. KREGER:  Yes.
    19            MR. NIEMER:  What Exhibit number?
    20            THE COURT REPORTER:  Exhibit 7.
    21    A.    (Witness reviews document.)
    22            Okay.
    23            MR. MARSTON:  Where did this come from?  Is this part
    24 of the production you were talking about?
    25            MR. KREGER:  Yes.
95: 1            MR. MARSTON:  Can you tell me how it ended up being
    2 produced so late?
    3            MR. KREGER:  It was an e-mail that was discovered,
    4 along with some others that we produced to you.  Let's ask some
    5 questions about this.
    6    A.    Okay.
    7    Q.    The statement, "Paul, I need to check with Mike."
    8            Do you see that?
    9    A.    Uh-huh.
    10    Q.    Did you have that deeper discussion on responsibility
    11 that you were hoping to have?
    12    A.    Responsibility for what?
    13    Q.    Well, I guess I need to ask you, what was the deeper
    14 responsibility for the change that you were referring to there?
    15    A.    The -- one of the suggestions was to go away from the
    16 weld and go to a caulk.
    17    Q.    Right.
    18    A.    And I wasn't -- I wasn't satisfied necessarily that
    19 that was going to give us what we needed.  This is Boivin --
    20 this is Boivin's Exhibit 3.
    21    Q.    Right.
    22    A.    As an enclosure to that, it has questions that we
    23 should ask that I proposed to the team.  I proposed those
    24 questions.  Like I indicated previously, I wasn't necessarily
    25 satisfied with those answers, but I was very concerned that the
96: 1 caulk wouldn't be a good substitution for the weld.  Even though
    2 I wanted to minimize the cost impact to the Coast Guard.

**Boivin, Martin**
94:13-96:2

94:13                    (Exhibit No. 7 marked.)
    14    **Q.    It doesn't have a Bates number, it's an e-mail March**
    15  **7, 2002, from Mr. Boivin to Mr. Rendon, copied to Matt**
    16  **Holmstrom, Anita Repanich, Gerald Johnson, Steven Locher.**
    17            MR. MARSTON:  3/7/02?
    18            MR. KREGER:  Yes.
    19            MR. NIEMER:  What Exhibit number?
    20            THE COURT REPORTER:  Exhibit 7.
    21    A.    (Witness reviews document.)
    22            Okay.
    23            MR. MARSTON:  Where did this come from?  Is this part
    24  of the production you were talking about?
    25            MR. KREGER:  Yes.
95: 1            MR. MARSTON:  Can you tell me how it ended up being
    2  produced so late?
    3            MR. KREGER:  It was an e-mail that was discovered,
    4  along with some others that we produced to you.  Let's ask some
    5  questions about this.
    6    A.    Okay.
    7    **Q.    The statement, "Paul, I need to check with Mike."**
    8      **Do you see that?**
    9    A.    Uh-huh.
    10   **Q.    Did you have that deeper discussion on responsibility**
    11  **that you were hoping to have?**
    12   A.    Responsibility for what?
    13   **Q.    Well, I guess I need to ask you, what was the deeper**
    14  **responsibility for the change that you were referring to there?**
    15   A.    The -- one of the suggestions was to go away from the
    16  weld and go to a caulk.
    17   **Q.    Right.**
    18   A.    And I wasn't -- I wasn't satisfied necessarily that
    19  that was going to give us what we needed.  This is Boivin --
    20  this is Boivin's Exhibit 3.
    21   **Q.    Right.**
    22   A.    As an enclosure to that, it has questions that we
    23  should ask that I proposed to the team.  I proposed those
    24  questions.  Like I indicated previously, I wasn't necessarily
    25  satisfied with those answers, but I was very concerned that the
96: 1  caulk wouldn't be a good substitution for the weld.  Even though
    2  I wanted to minimize the cost impact to the Coast Guard.


**Boivin, Martin**
97:1-98:4


97: 1    **Q.    Were you aware from Ms. Repanich or from any other**
    2  **source, that there was a resolution to the issues that were**
    3  **raised regarding this differing site condition or alleged**
    4  **differing site condition by a modification to the contract?**
    5    A.    I was aware that they had solved the issue.
    6    **Q.    And what role, if any, did you have in solving the**
    7  **issue?**
    8    A.    None, other than emphasizing to the team that there
    9  was a changed site condition, and, you know, that's really about
    10  the extent of it.  I wanted to make sure that technically, we

```
11 had a sound solution how we proceeded forward.
12      Q.      And did you satisfy yourself that you had a sound
13 solution in proceeding forward?
14      A.      From the information I had available to me, yes.
15      Q.      And how did you convey that satisfaction to other
16 people on the team, including the contracting officer, if you
17 did?
18              MR. MARSTON:  Objection.  Assumes facts not in
19 evidence.
20      Q.      I didn't get my question all the way out.  I was going
21 to solve his objection.
22              Did you communicate that satisfaction to other people
23 on the design team?
24      A.      Nobody asked me to approve it, but I was happy that we
25 had the issue resolved with Brechan.
98: 1   Q.      Was it something that you would have been asked to
2 approve -- are you typically asked to approve contracting
3 officers' decisions to make modifications to the contract?
4       A.      No.
```

## Boivin, Martin
97:1-98:4

```
97: 1   Q.      Were you aware from Ms. Repanich or from any other
2 source, that there was a resolution to the issues that were
3 raised regarding this differing site condition or alleged
4 differing site condition by a modification to the contract?
5       A.      I was aware that they had solved the issue.
6       Q.      And what role, if any, did you have in solving the
7 issue?
8       A.      None, other than emphasizing to the team that there
9 was a changed site condition, and, you know, that's really about
10 the extent of it.  I wanted to make sure that technically, we
11 had a sound solution how we proceeded forward.
12      Q.      And did you satisfy yourself that you had a sound
13 solution in proceeding forward?
14      A.      From the information I had available to me, yes.
15      Q.      And how did you convey that satisfaction to other
16 people on the team, including the contracting officer, if you
17 did?
18              MR. MARSTON:  Objection.  Assumes facts not in
19 evidence.
20      Q.      I didn't get my question all the way out.  I was going
21 to solve his objection.
22              Did you communicate that satisfaction to other people
23 on the design team?
24      A.      Nobody asked me to approve it, but I was happy that we
25 had the issue resolved with Brechan.
98: 1   Q.      Was it something that you would have been asked to
2 approve -- are you typically asked to approve contracting
3 officers' decisions to make modifications to the contract?
4       A.      No.
```

## Boivin, Martin
99:25-100:6

```
  99:25              Did you work with Lieutenant Andy Brown at all in
 100: 1  connection with this project?
     2      A.    With this project, no.
     3      Q.    Do you have a recollection of actually working with
     4  Chris Lynch on this project?
     5      A.    No, I -- that was work that was given to me by John
     6  Miller.
```

**Boivin, Martin**
99:25-100:6

```
  99:25              Did you work with Lieutenant Andy Brown at all in
 100: 1  connection with this project?
     2      A.    With this project, no.
     3      Q.    Do you have a recollection of actually working with
     4  Chris Lynch on this project?
     5      A.    No, I -- that was work that was given to me by John
     6  Miller.
```

**Boivin, Martin**
106:17-20

```
 106:17      Q.    How long did you spend under the dock?
     18      A.    It was snowing, windy, rainy.
     19      Q.    It seemed like longer than it was probably.
     20      A.    I was in dress shoes.  I would say 15 minutes.
```

**Boivin, Martin**
107:8-19

```
 107: 8      Q.    Now, you indicated that you were not satisfied that
     9  the caulking would -- what my notes indicate you said -- would
    10  get you what you needed, what the Coast Guard would have needed
    11  on the dock.
    12      A.    I didn't say I wasn't satisfied.  I wanted to make
    13  sure the Coast Guard was satisfied, because it didn't sound
    14  right to me.
    15      Q.    Were you eventually satisfied?
    16      A.    My people said they looked into it and that it would
    17  work, and I said okay.
    18      Q.    What people?
    19      A.    Again, it was Paul Rendon through Jerry Johnson.
```

**Boivin, Martin**
107:8-19

```
 107: 8      Q.    Now, you indicated that you were not satisfied that
     9  the caulking would -- what my notes indicate you said -- would
    10  get you what you needed, what the Coast Guard would have needed
    11  on the dock.
    12      A.    I didn't say I wasn't satisfied.  I wanted to make
    13  sure the Coast Guard was satisfied, because it didn't sound
```

```
14  right to me.
15      Q.    Were you eventually satisfied?
16      A.    My people said they looked into it and that it would
17  work, and I said okay.
18      Q.    What people?
19      A.    Again, it was Paul Rendon through Jerry Johnson.
```

## Boivin, Martin
109:25-110:4

```
109:25      Q.    Were you aware that Modification 5 was incorporated
110: 1  into the specification for Phase II?
  2      A.    No.
  3            MR. MARSTON:  Objection.  Assumes facts not in
  4  evidence.
```

## Boivin, Martin
109:25-110:4

```
109:25      Q.    Were you aware that Modification 5 was incorporated
110: 1  into the specification for Phase II?
  2      A.    No.
  3            MR. MARSTON:  Objection.  Assumes facts not in
  4  evidence.
```

## Boivin, Martin
112:12-113:1

```
112:12      Q.    Do you recall any discussion in connection with Phase
  13  I and problems that arose regarding reducing the 25-year
  14  requirement in the specification?
  15      A.    I had some internal discussion on that.
  16      Q.    With whom?
  17      A.    With I think Steve Locher and Paul Rendon and maybe
  18  Jerry, but I wanted to see because of the nebulous nature, the
  19  question you previously asked me, how do you know it's 25 years,
  20  20 years.  I was very leery over the years of my experience of
  21  people who give you definitive years on warranties, so I did
  22  have some of that and what difference, what have you, whatever.
  23  So I wanted them to look into that.
  24      Q.    And to your understanding, did they look into it?
  25      A.    To the best of my knowledge, they did.  They chose to
113: 1  stay with the 25-year.
```

## Boivin, Martin
112:12-113:1

```
112:12      Q.    Do you recall any discussion in connection with Phase
  13  I and problems that arose regarding reducing the 25-year
  14  requirement in the specification?
  15      A.    I had some internal discussion on that.
  16      Q.    With whom?
```

```
17     A.    With I think Steve Locher and Paul Rendon and maybe
18 Jerry, but I wanted to see because of the nebulous nature, the
19 question you previously asked me, how do you know it's 25 years,
20 20 years.  I was very leery over the years of my experience of
21 people who give you definitive years on warranties, so I did
22 have some of that and what difference, what have you, whatever.
23 So I wanted them to look into that.
24     Q.    And to your understanding, did they look into it?
25     A.    To the best of my knowledge, they did.  They chose to
113: 1 stay with the 25-year.
```

## Boivin, Martin
113:11-13

```
113:11     Q.    Do you recall any discussion of reduced holiday
    12 testing?
    13     A.    No.
```

## Boivin, Martin
113:11-13

```
113:11     Q.    Do you recall any discussion of reduced holiday
    12 testing?
    13     A.    No.
```

## Boivin, Martin
116:1-10

```
116: 1     Q.    You mentioned, Mr. Boivin, that in the Anita Repanich
    2 letter of 2/25, that there's a reference to Brechan's original
    3 scope of work being bents 1 through 12 on Phase I of the
    4 contract?
    5     A.    Yes.
    6     Q.    And you're basing your understanding that that was the
    7 limitation of Brechan's scope of work on that reference?
    8     A.    Yes, basically, and my understanding also at the time,
    9 but I, again, that's just my recollection, and I -- I did not
   10 read the original contract award documents.
```

## Boivin, Martin
116:1-10

```
116: 1     Q.    You mentioned, Mr. Boivin, that in the Anita Repanich
    2 letter of 2/25, that there's a reference to Brechan's original
    3 scope of work being bents 1 through 12 on Phase I of the
    4 contract?
    5     A.    Yes.
    6     Q.    And you're basing your understanding that that was the
    7 limitation of Brechan's scope of work on that reference?
    8     A.    Yes, basically, and my understanding also at the time,
    9 but I, again, that's just my recollection, and I -- I did not
   10 read the original contract award documents.
```

**Boivin, Martin**
117:23-118:9

117:23      Q.      If, based on the comments on Task Order 7, describing
    24  the scope of work as being concluded in the drawings and
    25  specifications dated March 2001, and the contracting officer's
118: 1  representation that this Exhibit 6 was what she was referring
    2  to, is there anything in either the task order itself or the
    3  cargo wharf maintenance technical requirements for design-build
    4  contract, dated March of 2001, that would lead you to conclude
    5  that Brechan's scope of work was limited to bent 12 on the
    6  original wharf?
    7              MR. NIEMER:  Object to the form.
    8              MR. KREGER:  Join.
    9      A.      No.

**Boivin, Martin**
117:23-118:9

117:23      Q.      If, based on the comments on Task Order 7, describing
    24  the scope of work as being concluded in the drawings and
    25  specifications dated March 2001, and the contracting officer's
118: 1  representation that this Exhibit 6 was what she was referring
    2  to, is there anything in either the task order itself or the
    3  cargo wharf maintenance technical requirements for design-build
    4  contract, dated March of 2001, that would lead you to conclude
    5  that Brechan's scope of work was limited to bent 12 on the
    6  original wharf?
    7              MR. NIEMER:  Object to the form.
    8              MR. KREGER:  Join.
    9      A.      No.

**Boivin, Martin**
119:1-121:16

119: 1      Q.      Well, I'll represent to you that, once again, that
    2  Ms. Repanich testified that this was, and it has a description
    3  of the work for Task Order No. 7 on the left margin, it says,
    4  "Contractor's proposal, government estimate, revised scope,
    5  government estimate," and then "negotiated amount."
    6      A.      Uh-huh.
    7      Q.      And do you find that document in this package which is
    8  her file, Exhibit 9?
    9      A.      It certainly appears to be there.
   10      Q.      And it's been marked as Exhibit 7?
   11      A.      Right.
   12      Q.      Can you identify what the final negotiated amount
   13  of -- final negotiated square foot amount of coating area is
   14  identified on Exhibit 7?
   15      A.      What is shown here on Exhibit 7 is 17,800 square feet.
   16      Q.      Now, that's not necessarily a contract document, is
   17  it?
   18      A.      This thing?

19    Q.    Yes.
20    A.    No.
21    Q.    So let's move on, then, to some additional
22 documentation.
23          Are you familiar with a form that looks like that?
24    A.    Yes, I am.
25    Q.    I know that there's a copy of that in Exhibit 19 as
120: 1 well, so while you are taking a look at that... I imagine there
 2 was that form in here too.  I don't want to waste time trying to
 3 find it, so I'll just use this copy of it.
 4          Do you recognize this document as a form 4200
 5 procurement request utilized by FDCC?
 6    A.    Yes, I do.
 7    Q.    And what is the purpose of this form?
 8    A.    The purpose of this form is to certify that the funds
 9 are available prior to the contracting officer awarding the
10 contract.
11    Q.    And down at the bottom, there are some numbers that
12 are handwritten in.  What do those numbers represent?
13    A.    I can't give you the specifics of it, but basically
14 it's different funding codes used to fund the project.
15    Q.    And do you see a total value handwritten in?
16    A.    I do.
17    Q.    And is that total value $1,084,902?
18    A.    It is.
19    Q.    And does that correlate with the value of task
20 order -- the price of Task Order No. 7?
21    A.    It does.
22    Q.    And is that $1,084,902 broken out into its
23 subcomponents immediately below that number?
24    A.    Let me add those up --
25    Q.    I'll represent to you that they do add up and save you
121: 1 the effort.
 2    A.    Okay.
 3    Q.    Do you see those numbers appearing on the pre and post
 4 negotiation memorandum?
 5    A.    I do.
 6    Q.    Now, in light of the fact that the pre and post
 7 negotiation memorandum ties back to the procurement request
 8 form, which ties back to the value of the contract, and in the
 9 absence of any other restriction on the scope of work to bent
10 12, would this figure, 17,800 square feet represented as the
11 negotiated amount on this page within Exhibit No. 19, indicate
12 to you that that was the negotiated scope of work between FDCC
13 and Brechan?
14          MR. KREGER:  Object to the form of the question.
15 Assumes facts not in evidence.  Incomplete hypothetical.
16    A.    On the surface, it would appear that way, yes.


**Boivin, Martin**
119:1-121:16


119: 1    Q.    Well, I'll represent to you that, once again, that
 2 Ms. Repanich testified that this was, and it has a description
 3 of the work for Task Order No. 7 on the left margin, it says,
 4 "Contractor's proposal, government estimate, revised scope,
 5 government estimate," and then "negotiated amount."
 6    A.    Uh-huh.

```
 7      Q.     And do you find that document in this package which is
 8 her file, Exhibit 9?
 9      A.     It certainly appears to be there.
10      Q.     And it's been marked as Exhibit 7?
11      A.     Right.
12      Q.     Can you identify what the final negotiated amount
13 of -- final negotiated square foot amount of coating area is
14 identified on Exhibit 7?
15      A.     What is shown here on Exhibit 7 is 17,800 square feet.
16      Q.     Now, that's not necessarily a contract document, is
17 it?
18      A.     This thing?
19      Q.     Yes.
20      A.     No.
21      Q.     So let's move on, then, to some additional
22 documentation.
23            Are you familiar with a form that looks like that?
24      A.     Yes, I am.
25      Q.     I know that there's a copy of that in Exhibit 19 as
120: 1 well, so while you are taking a look at that... I imagine there
 2 was that form in here too.  I don't want to waste time trying to
 3 find it, so I'll just use this copy of it.
 4             Do you recognize this document as a form 4200
 5 procurement request utilized by FDCC?
 6      A.     Yes, I do.
 7      Q.     And what is the purpose of this form?
 8      A.     The purpose of this form is to certify that the funds
 9 are available prior to the contracting officer awarding the
10 contract.
11      Q.     And down at the bottom, there are some numbers that
12 are handwritten in.  What do those numbers represent?
13      A.     I can't give you the specifics of it, but basically
14 it's different funding codes used to fund the project.
15      Q.     And do you see a total value handwritten in?
16      A.     I do.
17      Q.     And is that total value $1,084,902?
18      A.     It is.
19      Q.     And does that correlate with the value of task
20 order -- the price of Task Order No. 7?
21      A.     It does.
22      Q.     And is that $1,084,902 broken out into its
23 subcomponents immediately below that number?
24      A.     Let me add those up --
25      Q.     I'll represent to you that they do add up and save you
121: 1 the effort.
 2      A.     Okay.
 3      Q.     Do you see those numbers appearing on the pre and post
 4 negotiation memorandum?
 5      A.     I do.
 6      Q.     Now, in light of the fact that the pre and post
 7 negotiation memorandum ties back to the procurement request
 8 form, which ties back to the value of the contract, and in the
 9 absence of any other restriction on the scope of work to bent
10 12, would this figure, 17,800 square feet represented as the
11 negotiated amount on this page within Exhibit No. 19, indicate
12 to you that that was the negotiated scope of work between FDCC
13 and Brechan?
14             MR. KREGER:  Object to the form of the question.
15 Assumes facts not in evidence.  Incomplete hypothetical.
```

```
16     A.     On the surface, it would appear that way, yes.
```

**Boivin, Martin**
122:12-123:18

```
122:12     Q.     Can you pull out that exhibit, Exhibit 3?
    13     A.     Did we find it earlier?
    14     Q.     I believe the -- beginning with the third page is the
    15 memorandum you were referring to.
    16     A.     Oh, the actual memorandum itself?
    17     Q.     No, no, no.
    18     A.     It looks like -- these are the questions right here
    19 (indicating).
    20     Q.     So that's Enclosure 2 to Mr. Rendon's memorandum?
    21     A.     Apparently.
    22     Q.     Who is Mr. Rendon's memorandum of April 2, 2002,
    23 addressed to?
    24     A.     Anita Repanich.
    25     Q.     So it was never just to you?
123: 1     A.     No.
     2     Q.     Can you identify -- and maybe you have already -- by
     3 some of your marginal notes on there, some of the questions that
     4 you didn't feel as though were adequately answered?
     5     A.     Okay.
     6            (Witness reviews document.)
     7     Q.     Actually --
     8     A.     You know, just an example.
     9     Q.     An example would be fine.
    10     A.     Looking at 4C under the paragraph, "The following
    11 question pertained to the letters from Brechan" --
    12     Q.     Yes.
    13     A.     -- "and Swalling, why are we paying for additional
    14 scaffolding?"
    15            "The Swalling letter that this question refers to was
    16 provided for informational purpose only and does not apply."
    17            That sort of blows me off, I feel.
    18            There's others in there, but...
```

**Boivin, Martin**
122:12-123:18

```
122:12     Q.     Can you pull out that exhibit, Exhibit 3?
    13     A.     Did we find it earlier?
    14     Q.     I believe the -- beginning with the third page is the
    15 memorandum you were referring to.
    16     A.     Oh, the actual memorandum itself?
    17     Q.     No, no, no.
    18     A.     It looks like -- these are the questions right here
    19 (indicating).
    20     Q.     So that's Enclosure 2 to Mr. Rendon's memorandum?
    21     A.     Apparently.
    22     Q.     Who is Mr. Rendon's memorandum of April 2, 2002,
    23 addressed to?
    24     A.     Anita Repanich.
    25     Q.     So it was never just to you?
123: 1     A.     No.
```

```
 2      Q.    Can you identify -- and maybe you have already -- by
 3 some of your marginal notes on there, some of the questions that
 4 you didn't feel as though were adequately answered?
 5      A.    Okay.
 6            (Witness reviews document.)
 7      Q.    Actually --
 8      A.    You know, just an example.
 9      Q.    An example would be fine.
10      A.    Looking at 4C under the paragraph, "The following
11 question pertained to the letters from Brechan" --
12      Q.    Yes.
13      A.    -- "and Swalling, why are we paying for additional
14 scaffolding?"
15            "The Swalling letter that this question refers to was
16 provided for informational purpose only and does not apply."
17            That sort of blows me off, I feel.
18            There's others in there, but...
```

## Boivin, Martin
**123:2-18**

```
123: 2      Q.    Can you identify -- and maybe you have already -- by
   3 some of your marginal notes on there, some of the questions that
   4 you didn't feel as though were adequately answered?
   5      A.    Okay.
   6            (Witness reviews document.)
   7      Q.    Actually --
   8      A.    You know, just an example.
   9      Q.    An example would be fine.
  10      A.    Looking at 4C under the paragraph, "The following
  11 question pertained to the letters from Brechan" --
  12      Q.    Yes.
  13      A.    -- "and Swalling, why are we paying for additional
  14 scaffolding?"
  15            "The Swalling letter that this question refers to was
  16 provided for informational purpose only and does not apply."
  17            That sort of blows me off, I feel.
  18            There's others in there, but...
```

## Boivin, Martin
**124:19-125:11**

```
124:19            Couple final questions here -- no, I'm going to take
  20 two.  Irrespective of the factual foundation for it, if it
  21 turned out that Mr. Rendon or Lieutenant Rendon orchestrated a
  22 reduction in Brechan's scope that allowed it to obtain $145,000
  23 credit from its subcontractor through the descoping and that
  24 Brechan's own contract was descoped by the same amount of work
  25 and did not give any credit back to the government, would that
125: 1 in your opinion be improper?
   2            MR. KREGER:  Objection.  Foundation.
   3      Q.    You can go.
   4            Go ahead and answer.
   5            MR. KREGER:  Lack of foundation.
   6      A.    Yes, it would be.
   7      Q.    And if the reason -- again, that same assumption,
```

```
 8  assuming that was done, and assuming it was done for the purpose
 9  of compensating -- providing a means of compensating Brechan for
10  its buyout loss on its contract with Swalling, would it still be
11  improper if it was done for that reason?
```

## Boivin, Martin
**124:19-125:11**

```
124:19            Couple final questions here -- no, I'm going to take
    20  two.  Irrespective of the factual foundation for it, if it
    21  turned out that Mr. Rendon or Lieutenant Rendon orchestrated a
    22  reduction in Brechan's scope that allowed it to obtain $145,000
    23  credit from its subcontractor through the descoping and that
    24  Brechan's own contract was descoped by the same amount of work
    25  and did not give any credit back to the government, would that
125: 1  in your opinion be improper?
     2            MR. KREGER:  Objection.  Foundation.
     3       Q.   You can go.
     4            Go ahead and answer.
     5            MR. KREGER:  Lack of foundation.
     6       A.   Yes, it would be.
     7       Q.   And if the reason -- again, that same assumption,
     8  assuming that was done, and assuming it was done for the purpose
     9  of compensating -- providing a means of compensating Brechan for
    10  its buyout loss on its contract with Swalling, would it still be
    11  improper if it was done for that reason?
```

## Boivin, Martin
**126:24-127:8**

```
126:24       Q.   -- do you see where the document dated 03/05/01 says,
    25  "Extent of the coating is not yet well defined, it is likely
127: 1  that something on the order of one-half of the original cargo
     2  wharf could be coated this year with the available funds"?
     3       A.   Yes, I see that.
     4       Q.   There's nothing in there that says the scope of work
     5  is bents 1 through 12 or bents 1 through 15, is there?
     6       A.   That's correct.
     7            MR. MARSTON:  Why don't you show him the date of that
     8  document while you're at it.
```

## Boivin, Martin
**126:24-127:8**

```
126:24       Q.   -- do you see where the document dated 03/05/01 says,
    25  "Extent of the coating is not yet well defined, it is likely
127: 1  that something on the order of one-half of the original cargo
     2  wharf could be coated this year with the available funds"?
     3       A.   Yes, I see that.
     4       Q.   There's nothing in there that says the scope of work
     5  is bents 1 through 12 or bents 1 through 15, is there?
     6       A.   That's correct.
     7            MR. MARSTON:  Why don't you show him the date of that
     8  document while you're at it.
```