# Annotation Report

# Margaret Wilson - Default

|  |  |
|---|---|
| **Created by** | terry |
| **Creation date** | Sep 27, 2006 |
| **Project** | aesi-bei-cei |
| **Sort order** | Transcript, Location |

**Wilson, Margaret M.**
5:12-20

```
5:12      Q.    Good morning.  My name is Terry Marston.  I'm the
   13  attorney for Absolute Environmental Services, and we're going to
   14  ask you some questions regarding your knowledge of the Kodiak
   15  Cargo Wharf maintenance project to assist us in resolving a
   16  dispute that has arisen between a number of parties that were
   17  involved in that project.
   18              Could you please state your full legal name for the
   19  record.
   20      A.    Margaret Wilson.
```

**Wilson, Margaret M.**
6:4-20

```
6: 4      Q.    What is your occupation, Ms. Wilson?
    5     A.    Contract specialist.
    6     Q.    Do you sometimes go by "Maggie"?
    7     A.    Uh-huh.  Yes, I do.
    8     Q.    Are you a contracting officer?
    9     A.    Yes.
   10     Q.    Is there a limitation on your warrant?
   11     A.    No.
   12     Q.    How long have you been a contracting officer?
   13     A.    I knew you were going to ask me that one.  Since 1991.
   14     Q.    And do you have any post-high school education?
   15     A.    Yes.
   16     Q.    Can you describe what that is.
   17     A.    I spent three years in the Army, so the training that
   18  I received there, and I have taken some classes that are
   19  business-type that relate to my job, as well as any training
   20  that I've received to maintain my warrant with the Coast Guard.
```

**Wilson, Margaret M.**
9:3-17

```
9: 3      Q.    Did you have to take any particular courses in order
    4  to obtain your contracting officer's warrant?
    5     A.    Yes, sir.
    6     Q.    What were those courses?
    7     A.    I couldn't -- they were -- there's a list, there's a
    8  set thing by the CGAP, Coast Guard Procedures Manual that
    9  outlines what types of classes.  I couldn't tell you off the top
   10  of my head what they were.
   11     Q.    Have you been a contracting officer for any
   12  organization, other than the Coast Guard?
   13     A.    No.
   14     Q.    Is there any type of oath of officer associated with
   15  becoming a contracting officer?
   16     A.    Just the general one for general service, where I
   17  swear to uphold the Constitution.
```

```
10:  4      Q.    So the FAR would identify what the rights and
      5  responsibilities are of the government's contracting officer
      6  with respect to any particular acquisition, and that's what
      7  guides your conduct when you're acting as a contracting officer?
      8            MR. NIEMER:  Object to the form.
      9            Go ahead.
     10      A.    Yes.
```

## Wilson, Margaret M.
10:24-11:11

```
10:24            What is the duty in general terms of a contracting
     25  officer?
11:  1            MR. NIEMER:  Object to the form.
      2      A.    Well, first thing we have to do is we have to look out
      3  for the government's best interests, the contractor's best
      4  interests, while taking care of the social economic programs
      5  that have been outlined by Congress.
      6      Q.    The first thing you listed there was looking out for
      7  the government's best interests.  Does that include looking out
      8  for the government's financial interests as well?
      9      A.    Yes.
     10      Q.    How do you look out for the government's financial
     11  interests?
```

## Wilson, Margaret M.
11:17-12:8

```
11:17      A.    Make sure that we have a fair and reasonable price for
     18  the services or supplies or whatever we're purchasing.
     19      Q.    Does that also apply to modifications to contracts?
     20      A.    Yes, sir.
     21      Q.    Does that apply to both additive modifications and
     22  deductive modifications?
     23      A.    Yes, sir.
     24      Q.    In your tenure as a Coast Guard contracting officer,
     25  have you always been employed at FDCC Pacific?
12:  1      A.    Yes, sir.
      2      Q.    Can you give me a -- the organizational structure
      3  within FDCC Pacific that begins at the highest level person at
      4  FDCC Pacific and running down to you in a direct line of
      5  supervision?
      6      A.    Yes.  Yes, sir.  Start with the commanding officer,
      7  then the executive director, then the chief of the contracting
      8  office, and then my position.
```

## Wilson, Margaret M.
12:18-13:9

```
12:18      Q.    Are you familiar with a project that ISC Kodiak had
     19  that took place in the time frame of 2001 through 2003 that
     20  pertained to cargo wharf maintenance?
     21      A.    Yes.
```

```
22      Q.    Are you familiar with that project being divided into
23 two prime contracts:  one referred to as Phase I and then the
24 second referred to as Phase II?
25      A.    Yes.
13: 1   Q.    Were you the contracting officer responsible for Phase
 2 II?
 3      A.    Yes.
 4      Q.    Was Anita Repanich the contracting officer responsible
 5 for Phase I?
 6      A.    Yes.
 7      Q.    Was the executive director of FDCC Pacific during the
 8 time of both Phases I and II, Martin Boivin?
 9      A.    Yes.
```

## Wilson, Margaret M.
14:3-9

```
14: 3           Have you ever heard of Alpha team?
 4      A.    Yes.
 5      Q.    What is Alpha team?
 6      A.    They -- when they reorganized, they made three teams
 7 of engineers, and Alpha was one of those teams.
 8      Q.    What were the other two teams referred to as?
 9      A.    Beta and Gamma.
```

## Wilson, Margaret M.
16:16-17:25

```
16:16   Q.    So in terms of generalities, would it be a fair
17 characterization to say the division leader is the supervisor of
18 the team?
19           MR. NIEMER:  Object to the form.
20      A.    Yes, yes.
21      Q.    Was one or more of these teams, Alpha, Beta or Gamma
22 participating in Phase II of the cargo wharf maintenance
23 project?
24      A.    I have no idea.  I don't know -- I would assume that
25 one of them was.
17: 1   Q.    Why would you make that assumption?
 2      A.    Because they gave me the scope of work.
 3      Q.    They gave you the --
 4      A.    Scope of work.
 5      Q.    What do you mean by they gave you the scope of work?
 6      A.    To solicit for the prices.
 7      Q.    Were you involved in the solicitation of the IDIQ
 8 contract under which Phase II of the cargo wharf maintenance
 9 project was performed?
10      A.    No.
11      Q.    Was Anita Repanich involved in that?
12      A.    Yes.
13      Q.    Were you involved in the solicitation for each of the
14 task orders that were issued under the second IDIQ contract at
15 ISC Kodiak?
16      A.    Yes, to the best of my knowledge.  She may have placed
17 orders, but I don't recall.
18      Q.    How do you refer to the -- what I've heard referred to
```

```
19 alternatively as either task orders or delivery orders executed
20 under the main IDIQ contract?
21    A.    Task orders.
22    Q.    Task orders.
23          Are task orders also sometimes referred to as
24 delivery orders?
25    A.    Yes.
```

## Wilson, Margaret M.
18:1-12

```
18: 1    Q.    What was your role in the solicitation of the delivery
   2 order for Phase II of the cargo wharf maintenance contract?
   3    A.    I requested a price proposal from Brechan, and then I
   4 had the technical person do his thing, and then to help make a
   5 determination of the fair and reasonable price, and then I
   6 awarded the task order.
   7    Q.    Who was the technical person?
   8    A.    Lieutenant Andy Brown.
   9    Q.    Is Lieutenant Andy Brown an engineer?
  10    A.    Yes.
  11    Q.    Do you know what type of engineer he is?
  12    A.    Civil.
```

## Wilson, Margaret M.
18:24-19:13

```
18:24    Q.    Was Andy Brown the project manager for Phase II?
  25    A.    Yes.
19: 1    Q.    What was your understanding of the responsibility of
   2 the project manager?
   3    A.    Day-to-day coordination with the contractor, as well
   4 as the COTR -- contracting officer's technical representative,
   5 sorry.  I forget I'm speaking Armanese [sic] here -- on the
   6 day-to-day progress of the work under that task order.
   7    Q.    Is there a difference between a contracting officer's
   8 representative and a contracting officer's technical
   9 representative?
  10    A.    No.
  11    Q.    Who was the contracting officer's technical
  12 representative on Phase II?
  13    A.    Chris Lynch.
```

## Wilson, Margaret M.
20:10-13

```
20:10    Q.    In what form did you request a price proposal from
  11 Brechan?
  12    A.    I usually send an e-mail to the project manager from
  13 Brechan requesting a price proposal.
```

**Wilson, Margaret M.**
20:21-24

```
20:21    Q.    What did that e-mail say, to the best of your
   22 recollection?
   23    A.    Please provide a price proposal for cargo wharf Phase
   24 II, the plans and specs are being FedExed to you.
```

**Wilson, Margaret M.**
21:9-16

```
21: 9    Q.    What did you say was transmitted by FedEx?
   10    A.    If there were any drawings or specifications, because
   11 of the size of the files.
   12    Q.    So by "drawings or specifications," you mean plans and
   13 specifications?
   14    A.    Uh-huh.
   15    Q.    Would anything else have been in that FedEx package?
   16    A.    No.
```

**Wilson, Margaret M.**
24:12-14

```
24:12    Q.    So what -- question No. 1 is, where did you obtain the
   13 statement of work package?
   14    A.    From Lieutenant Andy Brown.
```

**Wilson, Margaret M.**
27:3-5

```
27: 3    Q.    And what bents are to have work performed on them in
    4 Phase II?
    5    A.    12 through 33.
```

**Wilson, Margaret M.**
31:6-32:15

```
31: 6    Q.    When you became the contracting officer for Phase II,
    7 did you consult with Anita Repanich, the contracting officer for
    8 Phase I, to get an idea of what the work was about?
    9    A.    No.
   10    Q.    Did you ever consult with Anita Repanich regarding the
   11 Phase I work?
   12    A.    No.
   13    Q.    Where is your desk located spacially compared to her
   14 desk?
   15    A.    She is -- has the next cubicle over from me.
   16    Q.    So your desks are adjacent to each other?
   17    A.    Yes.
   18    Q.    Do you speak to each other frequently?
   19    A.    Yes.
   20    Q.    Did she ever inquire how things were going on the
```

```
21  Phase II project?
22       A.    No.
23       Q.    Did you ever offer any comments to her about how
24  things were going on the Phase II project?
25       A.    No.
32: 1    Q.    Did she ever mention to you that there had been a
 2  significant differing site condition encountered during Phase I
 3  of the cargo wharf maintenance project?
 4             MR. NIEMER:  Object to the form.
 5       A.    No.
 6       Q.    Did she ever mention to you that an excessive amount
 7  of omitted and defective welds had been encountered during Phase
 8  I of the cargo wharf maintenance project?
 9             MR. NIEMER:  Object to the form.
10             MR. KREGER:  Assumes facts not in evidence.
11       A.    No.  Sorry.
12       Q.    When you took over -- when you assumed responsibility
13  for Phase II of the cargo wharf maintenance project, did you get
14  a briefing from anybody regarding Phase I of that project?
15       A.    No.
```

## Wilson, Margaret M.
32:17-33:8

```
32:17    Q.    Did you seek any information from anybody within FDCC
18  about how Phase I of the project had gone?
19       A.    No.
20       Q.    Did you seek any information from anyone from FDCC
21  regarding any problems that may have been encountered during
22  Phase I?
23             MR. NIEMER:  Object to the form.
24       A.    No.
25       Q.    Did you speak with anyone from Brechan regarding any
33: 1  problems that may have been encountered during Phase I?
 2       A.    No.
 3       Q.    Did you speak with anyone from Coffman regarding any
 4  problems that may have been encountered during Phase I?
 5       A.    No.
 6       Q.    Did you speak to anybody at all about any problems
 7  that may have been encountered during Phase I?
 8       A.    No.
```

## Wilson, Margaret M.
33:16-34:2

```
33:16          During your tenure as the contracting officer for
17  Phase II of the cargo wharf project or at any time prior to
18  that, did you research the history of the project, and
19  especially the events of Phase I?
20       A.    No.
21       Q.    During your tenure as the contracting officer for
22  Phase II of the project, or any time prior to that, were you
23  informed by anybody of any challenges or difficulties or
24  disputes that arose during Phase I of the cargo wharf
25  maintenance contract?
34: 1          MR. NIEMER:  Object to the form.
```

2      A.    No.


## Wilson, Margaret M.
34:3-35:17

34: 3      Q.    Did you have any knowledge whatsoever about the cargo
    4 wharf maintenance project Phase I at the time that you took over
    5 responsibility as contracting officer for Phase II?
    6            MR. KREGER:  Object to the form.
    7      A.    No.
    8      Q.    By the time you had concluded your role as contracting
    9 officer for Phase II of the cargo wharf project, had you learned
   10 of the existence of any problems that had arisen during the
   11 course of Phase I of the cargo wharf maintenance contract?
   12            MR. KREGER:  Object.  Vague as to time.
   13      A.    Yes, by the time it was done.
   14      Q.    What problems had you learned of by the time the
   15 project was completed?
   16      A.    All I knew was there was a discussion going back and
   17 forth with Brechan regarding Phase I, and that's all I know
   18 about it.
   19      Q.    Who was discussing with Brechan?
   20      A.    Anita.
   21      Q.    Where did you learn this information?
   22      A.    I heard her on the phone one day.
   23      Q.    What did you hear?
   24      A.    Just that she was discussing Phase I with Brechan.  I
   25 didn't pay a lot of attention because it wasn't my project, and
35: 1 I -- it had nothing to do with me.
    2      Q.    Was this prior to the time that you commenced Phase
    3 II?
    4      A.    No.
    5      Q.    This was during your Phase II portion of the project?
    6      A.    Yes.
    7      Q.    Ms. Repanich was discussing with a Brechan
    8 representative something about the cargo wharf project?
    9      A.    Uh-huh, Phase I.
   10      Q.    Phase I of the cargo wharf project?
   11      A.    Uh-huh.
   12      Q.    What was the status of Phase II at the time you
   13 overheard this conversation?
   14      A.    Brechan was working on it.
   15      Q.    Did you hear what specific aspect of the project they
   16 were discussing?
   17      A.    No.


## Wilson, Margaret M.
36:9-17

36: 9      Q.    Do you know anything other than that Anita Repanich
   10 was discussing cargo wharf Phase I with a Brechan representative
   11 on the telephone during the performance of Phase II?
   12      A.    No.
   13      Q.    That's all you know?
   14      A.    That's all I know.
   15      Q.    And you never asked her what prompted her

16  **conversation?**
17      A.   No.


## Wilson, Margaret M.
**36:21-37:4**

36:21      **Q.   So by the conclusion of your role as the contracting**
  22  **officer for Phase II of the cargo wharf project, you had no**
  23  **knowledge of anything pertaining to Phase I of the cargo wharf**
  24  **project, other than that Anita Repanich was the contracting**
  25  **officer, Brechan was the contractor on it, and that Anita had**
37: 1  **had a conversation with a Brechan representative about the Phase**
   2  **I project during the time that you were working on the Phase II**
   3  **project?**
   4      A.   Correct.


## Wilson, Margaret M.
**37:5-10**

37: 5      **Q.   Did you get a response from Brechan to your request**
   6  **for a proposal for Phase II?**
   7      A.   Yes, I did.
   8      **Q.   Can you identify that response?**
   9      A.   Yes, I can.  I received a letter dated December 4,
  10  2002, with a proposal attached.


## Wilson, Margaret M.
**37:13-16**

37:13      **Q.   Can you tell me what other documents -- what documents**
  14  **you understood to be part of the proposal?**
  15      A.   The work breakdown items and the Means breakdown.
  16  There's -- let's see, three pages of the Means breakdown.


## Wilson, Margaret M.
**38:8-39:1**

38: 8      **Q.   When you received Brechan's proposal, what did you do**
   9  **with it?**
  10      A.   I make a photocopy and give it to the lieutenant for
  11  technical evaluation.
  12      **Q.   Would that have been Lieutenant Brown?**
  13      A.   Yes.
  14      **Q.   What happened next with respect to the processing of**
  15  **the proposal as you understand it?**
  16      A.   He prepares a memo to me to -- and gives me his
  17  opinion of what there are differences between and if there's any
  18  things that he believes need to be looked at for negotiations.
  19      **Q.   Is that memo included in your file?**
  20      A.   Yes, sir.
  21      **Q.   And what does that memo look like?  What's the title**
  22  **on the memo?**

```
 23     A.     It says, "Pre/Post Negotiation Memorandum."
 24     Q.     Is it signed by you, Margaret Wilson, on December 11,
 25   2002?
39: 1   A.     Yes.
```

## Wilson, Margaret M.
40:9-41:5

```
40: 9     Q.     Item No. 2 reads:  "The government estimate was
   10   revised" -- or "GE was revised to reflect costs closer to what
   11   was actually paid on Phase I of the project for the coating and
   12   QA work."
   13           Is that government estimate revision reflected
   14   anywhere on this document?
   15     A.     Yes, where it says, "Revised government estimate" at
   16   the top of the page, in the blocks.
   17     Q.     We have seen a document somewhat similar to this that
   18   was prepared for Phase I, and on that document, it had, as we
   19   see here, a number of columns.  It says, "Contractor's proposal,
   20   Government estimate, Revised government estimate," and then
   21   "Negotiated amount."
   22     A.     Uh-huh.
   23     Q.     But in the rows, such as where it says, "Total labor,
   24   Total material equipment, Subtotal CCI, Nonprepriced work,
   25   Subtotal 3 and 4," there are actually values filled in under
41: 1   Government estimate and Revised government estimate.
    2           Do you know why there's no -- why the values
    3   reflected on this pre and post negotiation memorandum are
    4   indicated as 0 dollars?
    5     A.     I have no idea.
```

## Wilson, Margaret M.
41:17-42:4

```
41:17     Q.     Is the government estimate normally included in this
   18   file?
   19     A.     Yes, sir.
   20     Q.     And do you recall that there was one for this project?
   21     A.     Yes, to the best of my knowledge.
   22     Q.     And is it part of your job to look at that in the
   23   course of evaluating the pricing?
   24     A.     Uh-huh.
   25     Q.     And did you do that?
42: 1     A.     Uh-huh.
    2     Q.     Do you have any way of accounting for the
    3   disappearance of that government estimate document?
    4     A.     No.
```

## Wilson, Margaret M.
42:8-43:8

```
42: 8     Q.     Do you know who prepared the government estimate?
    9     A.     I don't recall.
   10     Q.     Was Steven Locher an estimator for the government?
```

```
11     A.    I have no idea.  He probably has prepared some
12 government estimates, but I don't know.  That's not his official
13 title.
14     Q.    Do you have an estimating -- do you have an official
15 title of estimator, anybody with the official title of estimator
16 within this office?
17     A.    Yes, yes.
18     Q.    More than one person?
19     A.    No.
20     Q.    Who is the estimator?
21     A.    Jeff McCallum.
22     Q.    Was Jeff McCallum the estimator at the time that the
23 estimate would have been prepared for Phase II?
24     A.    Yes.
25                (Mr. Stoetzer left the proceedings.)
43: 1     Q.    Would he have a copy of the estimate that he prepared?
2     A.    No.
3           MR. KREGER:  Objection.
4     Q.    Why would he not have a copy?
5     A.    I don't believe he prepared this one.
6     Q.    Who do you believe prepared this one?
7     A.    I don't know.  I don't recall, but I don't believe he
8 did this because Jeff was not familiar with Means.
```

## Wilson, Margaret M.
43:11-45:5

```
43:11     Q.    Would you ordinarily expect to see dollar values
12 reflected on this pre/post negotiation memorandum?
13     A.    Yes.
14     Q.    Do you have any explanation for why dollar values are
15 not included on this particular copy?
16     A.    No.
17     Q.    Item No. 2 reads:  "Government estimate was revised to
18 reflect costs closer to what was actually paid on Phase I of the
19 project for the coating and QA work.  Original government
20 estimate used $40 a square foot, plus some dollars for mob and
21 demob."
22           Let me ask you about mob and demob.  Are you familiar
23 with the factor coefficient that's used on IDIQ contracts?
24     A.    Yes.
25     Q.    Is it your understanding that the factor coefficient
44: 1 is a multiplier that the IDIQ contractor is allowed to apply to
2 the costs of the work in determining pricing for a particular
3 delivery order?
4     A.    Yes.
5     Q.    Is it your understanding that that factor is to
6 compensate the contractor for certain categories of costs, as
7 well as his profit on the project?
8     A.    Yes.
9     Q.    Is it your understanding that mobilization and
10 demobilization are included within that factor coefficient?
11     A.    I don't recall.  I'd have to look at the contract.
12     Q.    I'm handing you what's been marked as Exhibit 3 to the
13 Repanich deposition, and I have paper-clipped one page on page 4
14 where it says, "Notes," and there is a word "coefficient," and
15 it says, "A, the coefficient factor."  And then it proceeds to
16 describe what the coefficient factor is.
```

```
17              And I understand from the testimony of Ms. Repanich,
18  that Exhibit 3 is the second IDIQ or JOC contract that was
19  awarded to Brechan for ISC Kodiak.
20              Can you take a look at Exhibit 3 and verify that you
21  agree that Exhibit 3 is, in fact, the second IDIQ contract?
22      A.    Yes, this is J-55.  Yes, it's the contract for this.
23      Q.    And for "this," you mean the --
24      A.    This -- what this task would have been awarded under.
25      Q.    And this task order is the one that pertained to Phase
45: 1  II of the cargo wharf maintenance contract?
 2      A.    Correct, correct.
 3      Q.    And does the section that I have clipped there on page
 4  4 have the definition of factor coefficient under that contract?
 5      A.    Yes.
```

## Wilson, Margaret M.
**45:17-46:7**

```
45:17      Q.    Is that language on page 4 of Exhibit 3 the definition
  18  of coefficient factor to be used on the second IDIQ contract?
  19      A.    Yes.
  20      Q.    Does the coefficient factor include the contractor's
  21  and the subcontractor's mobilization and demobilization?
  22            MR. KREGER:  Object to the form.
  23      Q.    As you read that?
  24            MR. KREGER:  Object to the form.
  25      A.    Yes.
46: 1      Q.    As such, is it your understanding as the contracting
  2  officer on Phase II, that the contractor's cost for mobilization
  3  and demobilization, as well as the subcontractor's cost for
  4  mobilization and demobilization is to be paid for through the
  5  application of the coefficient factor to the other costs on the
  6  contract?
  7      A.    Yes.
```

## Wilson, Margaret M.
**46:15-47:7**

```
46:15             Would it be proper for the contractor to charge, in
  16  addition to the compensation it receives for mob and demob and
  17  the coefficient factor, the actual costs that he incurs for
  18  mobilization and demobilization as well?
  19      A.    No.  No.
  20      Q.    The next line on the pre/post negotiation memorandum
  21  contained within Exhibit 19 reads:  "Original government
  22  estimate was roughly $42 a square foot when we actually paid
  23  about $51 a square foot last year.  This square foot includes
  24  mobilization, demobilization, tools, scaffolding, containment,
  25  pile preparation and pile coating work.  Revised government
47: 1  estimate uses $50 a square foot for this work.  Negotiated
  2  amount works out to be just under $50 a square foot, which is
  3  consistent with what we paid last year."
  4             Do you know if the original government estimate was
  5  $40 a square foot, the government ended up paying $50 a square
  6  foot for the work in Phase I?
  7      A.    No.
```

**Wilson, Margaret M.**
47:17-48:15

```
47:17     Q.    This is Andy Brown's work you're telling us?
   18     A.    Uh-huh.
   19     Q.    And he's -- if I'm reading this consistently with your
   20 interpretation -- you correct me if I'm wrong -- isn't he
   21 telling us that last year, the original -- well, he says -- the
   22 first line says, "Original government estimate used $40 a square
   23 foot plus some dollars for mobilization and demobilization.  The
   24 original government estimate was roughly $42 a square foot."
   25 And then he says, "We actually paid $51 a square foot last
48: 1 year."
    2           And I believe your testimony was that you don't know
    3 why the price rose from $42 a square foot to $51 a square foot?
    4     A.    No, I don't.
    5     Q.    Did you ever ask when you saw this difference?
    6     A.    No.
    7     Q.    Why didn't you ask?
    8     A.    I assumed it was the actual cost that we paid.
    9     Q.    Is it your understanding that the task order for the
   10 Phase I work on cargo wharf project was a cost reimbursement
   11 contract?
   12     A.    No.
   13     Q.    Was it your understanding that it was a lump-sum
   14 contract?
   15     A.    Yes.
```

**Wilson, Margaret M.**
49:8-50:22

```
49: 8     Q.    Did you have any idea what that $51 a square foot
    9 referred to when you read this?
   10     A.    My understanding is that that's what it worked out to
   11 be after all the mods were in and everything, that that's what
   12 it cost us per square foot.
   13     Q.    Did you know whether the circumstances that
   14 precipitated the issuance of mods on Phase I existed in Phase
   15 II?
   16     A.    No.
   17     Q.    Did you, therefore, have any basis for determining
   18 whether that $51 a square foot effective price was an
   19 appropriate price to be paid for the work in Phase II?
   20     A.    The government estimate, I never believe always what I
   21 hear about the government estimate because it's prepared in a
   22 vacuum.  The actual price is usually much more accurate from
   23 what we paid if we have a similar-type thing, and the question I
   24 asked at the time was why we did not use the $51 as our basis
   25 for the government estimate.
50: 1     Q.    What was the basis for the government estimate for
    2 Phase II as you understand it?
    3     A.    I would imagine it would be what we paid per square
    4 foot under the previous phase.
    5     Q.    Do you know what the cost per square foot was that the
    6 government estimated for Phase II?
```

```
 7     A.    No.
 8     Q.    Is there any way that you can tell without the missing
 9 government estimate documentation?
10     A.    No.
11     Q.    Did Mr. Brown have it with him at the time that you
12 reviewed the pre/post negotiation memorandum?
13     A.    I had it in the file; the government estimate was in
14 the file at the time.
15     Q.    And did you have the file with it in there at the time
16 that you discussed the pre/post negotiation memorandum with Andy
17 Brown?
18     A.    Yes.
19     Q.    Was it your understanding that the government estimate
20 that was in that -- well, the price per square foot that was in
21 that government estimate was less than $51 a square foot?
22     A.    Yes.
```

## Wilson, Margaret M.
51:11-15

```
51:11   Q.    I thought you said you did recall that it was
   12 different than $51, because you were wondering why the
   13 government --
   14   A.    That's the only thing I recall is that they didn't use
   15 the 51.  That's all I recall.
```

## Wilson, Margaret M.
53:16-54:1

```
53:16   Q.    In accordance with the terms of the JOC 2 contract, is
   17 it your understanding that pricing is to be established by
   18 identifying the costs of the work that can be quantified using
   19 the Means guide, identifying the costs of the work that cannot
   20 be identified using the Means guide and utilizing some
   21 alternative means -- poor choice of words -- some alternative
   22 method, and then adding those costs and applying the coefficient
   23 factor to it?
   24          MR. KREGER:  Object to the form.  Leading and
   25 compound, is the basis.
54: 1   A.    Yes.
```

## Wilson, Margaret M.
54:2-16

```
54: 2   Q.    And when you're pricing work, are you familiar with
    3 the terms "prepriced" and "nonprepriced"?
    4   A.    Yes.
    5   Q.    What does prepriced mean?
    6   A.    Prepriced means that it can be found in the Means.
    7   Q.    And is nonprepriced work, work that cannot be found in
    8 the Means?
    9   A.    Yes.
   10   Q.    Is any work that can be priced using the Means guide
   11 to be priced using the Means guide under this contract?
```

```
12      A.    Yes.
13      Q.    And the remainder of the work is treated as
14 nonprepriced work and is priced using some alternative method
15 that is fair and reasonable?
16      A.    Yes.
```

## Wilson, Margaret M.
54:22-55:2

```
54:22            For prepriced work, is it your understanding as the
   23 contracting officer for Phase II, that the contractor is to
   24 utilize the unit costs that are described in the most current
   25 edition of the Means guide for work that is priced in the Means
55: 1 guide?
    2      A.    Yes.
```

## Wilson, Margaret M.
55:6-13

```
55: 6      Q.    Do you know what unit prices are?
    7      A.    The Means is set up -- there's many different ways to
    8 use the Means.  I'm not that familiar with the whole thing.  I
    9 mean, I can look up numbers and things, but I'm not familiar
   10 with --
   11      Q.    You're not the estimator?
   12      A.    I'm not the estimator.  There's bare costs and all
   13 those fun things, so...
```

## Wilson, Margaret M.
56:1-21

```
56: 1      Q.    So is it your understanding that when the contractor
    2 utilizes the Means guide for the purpose of identifying the cost
    3 under the JOC 2 contract, that what he is to do is identify the
    4 number of units of work that is to be done, and then multiply
    5 that by the unit price?
    6            MR. KREGER:  Objection.
    7      A.    Yes.
    8      Q.    And then he does that same exercise for each different
    9 aspect of the work that is priced within the Means guide?
   10      A.    Yes.
   11      Q.    Are you familiar with the city index?
   12      A.    City cost index, yes.
   13      Q.    Is it your understanding that the JOC 2 contract
   14 allows Brechan to apply the Ketchikan city cost index?
   15      A.    Yes.
   16      Q.    So once the different aspects of the prepriced work is
   17 determined by multiplying the unit price times the number of
   18 units, and that is subtotaled, they're allowed to multiply that
   19 subtotal by the city cost index to represent what the cost of
   20 the work would be in Kodiak?
   21      A.    Yes.
```

56:22-58:1

```
56:22      Q.     And then with respect to the nonprepriced work, they
    23  provide the best available documentation of what their actual
    24  costs are going to be, and if that is satisfactory to the
    25  government, then they apply -- then they add that cost to the
57: 1  prepriced cost to get the subtotal of the costs of the work?
     2      A.     Yes.
     3      Q.     And then once that's done, they apply the factor
     4  coefficient to determine what the actual price for the work is
     5  going to be that the government will pay?
     6      A.     Yes.
     7      Q.     Are project managers authorized to independently
     8  negotiate contracts or contract prices with IDIQ contractors?
     9      A.     Not independently.
    10      Q.     Are you authorized to negotiate prices with IDIQ
    11  contractors?
    12      A.     Yes.
    13      Q.     Did you participate in a price negotiation meeting
    14  with Brechan Enterprises for the Phase II scope of work?
    15      A.     No.
    16      Q.     Did Mr. Brown do that?
    17      A.     No.
    18      Q.     Who negotiated the Phase II cargo wharf maintenance
    19  contract price with Brechan?
    20      A.     There wasn't a need for negotiation.
    21      Q.     Is it your testimony there was no negotiation?
    22      A.     No.
    23      Q.     How was the price arrived at, then?
    24      A.     We looked at the Means line items, we looked at the
    25  square footage comparison and determined that it was a fair and
58: 1  reasonable price.
```

## Wilson, Margaret M.
58:2-15

```
58: 2      Q.     Did you consider what the government's estimate was?
     3      A.     Yes.
     4      Q.     Did you compare those two?
     5      A.     Yes.
     6      Q.     Did you make an evaluation as to what the
     7  differences -- what the basis for the differences were between
     8  the government's price and the contractor's price?
     9      A.     We considered them.
    10      Q.     Who is "we"?
    11      A.     Andy -- Lieutenant Brown and I.
    12      Q.     So did you know what the basis for the differences
    13  were between the contractor's price and the government's
    14  estimate?
    15      A.     Yes.
```

## Wilson, Margaret M.
58:19-59:4

```
58:19      Q.     How did you know what the basis of the differences
    20  was?
```

```
21     A.     By looking at the Means line items that we had versus
22 what the contractor proposed, looking at the quantities.
23     Q.     So were they proposing on different line items or
24 different quantities or something else?
25     A.     There was a slight variance in some of the quantities
59: 1 than what we had in the government estimate.
 2     Q.     So the government estimate used the same line items,
 3 but they were just different quantities involved?
 4     A.     Correct, yes.
```

## Wilson, Margaret M.
59:8-13

```
59: 8     Q.     You indicated that you remembered that the
 9 government's estimate was estimated price per square foot was
10 lower than the contractor's proposed price per square foot.
11     A.     Uh-huh.
12     Q.     You have to answer audibly.
13     A.     Oh, I'm sorry, yes.
```

## Wilson, Margaret M.
59:25-60:19

```
59:25     Q.     If you look at the December 4th, 2002 transmittal --
60: 1     A.     Right.
 2     Q.     Doesn't it read:  "Please consider this our cost
 3 proposal for the subject task order in accordance with your RFP
 4 dated 11/29/02.  We propose to accomplish this work for
 5 $1,413,020"?
 6     A.     Yes.
 7     Q.     So is it your understanding that that was the
 8 contractor's offer to perform the work identified in your
 9 statement of work?
10     A.     Yes, sir.
11     Q.     And the second page has a breakdown of a portion of
12 the costs, specifically the nonprepriced work -- excuse me, I
13 take it back.   There's a Means coating total and then a
14 nonprepriced total.
15         Do you see that?
16     A.     Uh-huh, yes.
17     Q.     Did you understand that to be a breakdown of how
18 Brechan arrived at their 1 million 14 figure?
19     A.     Yes.
```

## Wilson, Margaret M.
61:7-62:8

```
61: 7     Q.     When you were reviewing the reasonableness of that
 8 lump-sum figure, 1 million 413, did you consider what the
 9 effective price per square foot of the work would be under that
10 figure?
11     A.     No, at the time we were looking at the Means line
12 items and the quantities within the Means.   That's where we
13 start from.
```

```
14    Q.    Did Mr. Brown look at the price per square foot?
15    A.    Apparently he did, because he could give me a total
16 there on that memo.
17    Q.    And that's the pre and post negotiation memorandum?
18    A.    Yes, sir.
19    Q.    And under Item No. 2, he in fact recites a number of
20 prices per square foot?
21    A.    Uh-huh.
22    Q.    And he uses his price per square foot analysis to
23 explain his conclusions regarding the reasonableness of the
24 price he has quoted?
25    A.    Right.
62: 1    Q.    Is there any document that you're aware of in the
2 existence of the Coast Guard that would confirm that the Coast
3 Guard actually did prepare its own government estimate of the
4 cost of each line item of work in the Means guide to determine
5 the reasonableness of Brechan's proposed pricing as opposed to
6 simply using a unit price comparison or a square foot price
7 comparison?
8    A.    I don't know.  I don't recall.
```

## Wilson, Margaret M.
64:4-65:1

```
64: 4          Say, for instance, the contractor came in and said,
5 my subcontractor priced this for me using the Means guide, and
6 he came up with a price of 995,000 to do this scope of work.
7 However, I have been able to use the Means guide and increased
8 the cost to $1.2 million, and I want to charge the government
9 1.2 in addition to my cost factor.  Would that be proper?
10          MR. KREGER:  Objection.
11    A.    No.
12    Q.    You wouldn't approve that?
13    A.    No, not if I knew about it.
14    Q.    Why wouldn't you approve that?
15    A.    Not without an explanation of what -- why he inflated
16 it.
17    Q.    What if the explanation for why he inflated it was
18 that by doing so, he could make more money on the contract, the
19 prime contractor?
20    A.    It's not my job to make him healthy.
21    Q.    Or rich?
22          MR. KREGER:  Object to the form.
23    A.    Or rich.
24    Q.    So if a contractor were to make an admission like that
25 to you, you would not approve of that pricing?
65: 1    A.    No.
```

## Wilson, Margaret M.
66:2-15

```
66: 2    Q.    Before we get into Exhibit No. 3, I wanted to ask you
3 if, in your capacity as contracting officer for Phase II, you
4 had any role in the execution or oversight of the warranty
5 repair work that was done for Phase I?
6    A.    No.
```

```
 7      Q.    Who handled that?
 8      A.    Probably Anita.
 9      Q.    So you didn't have any involvement with any of the
10  work that was done in Phase I?
11      A.    No.
12      Q.    Even though a portion of the work for Phase I was
13  completed during the time frame where Phase II was being
14  performed?
15      A.    No.
```

## Wilson, Margaret M.
66:16-67:16

```
66:16    Q.    Before we actually get into a discussion of 3, would
   17  you return once more to the pre/post negotiation memorandum?
   18  There's a question I have under Item No. 2.  I believe you
   19  earlier testified that there was no negotiation of this price
   20  because there was no need for negotiation?
   21      A.    Uh-huh.
   22      Q.    You have to answer yes or no.
   23      A.    Oh, I'm sorry, yes.
   24      Q.    If you look through the narrative portion of Item No.
   25  2 of the pre/post negotiation memorandum, it says, "Revised,
67: 1  whether an estimate uses $50 a square foot for this work, a
    2  negotiated amount works out to be just under $50 a square foot,
    3  which is consistent with what we paid last year."
    4      A.    Right.
    5      Q.    Is that statement, that there was a negotiated amount,
    6  consistent with your recollection that there was no negotiation?
    7      A.    The term "negotiated amount" basically is a phrase we
    8  use in this office to explain what amount we're planning on
    9  using.  That doesn't necessarily reflect that we negotiated, and
   10  to the best of my knowledge, we did not negotiate this.
   11      Q.    So in other words, you accepted the -- you agreed with
   12  the proposed price of the contractor at 1,413,020?
   13      A.    Yes.
   14      Q.    So when Mr. Brown said there was a negotiation, that
   15  was just a sloppy use of language on his part?
   16      A.    Correct.
```

## Wilson, Margaret M.
68:12-13

```
68:12         Do you see the second page of Exhibit 3?
   13      A.    Uh-huh, yes.
```

## Wilson, Margaret M.
68:25-69:12

```
68:25    Q.    Is a million 413 roughly -- or actually within $20 of
69: 1  what the Phase II price was?
    2         MR. KREGER:  Object to the form.
    3      Q.    At the time of award?
    4         MR. KREGER:  Objection.
```

```
 5      A.    Yes.
 6            MR. KREGER:  Lack of foundation.
 7      Q.    Beneath that, do you see a negative figure of
 8 $1 million or at least 1 million?
 9      A.    Yes.
10      Q.    Do you know what the initials of Absolute
11 Environmental Services are?
12      A.    No.
```

## Wilson, Margaret M.
69:21-71:7

```
69:21   Q.    Does the handwritten notation on the second page of
   22 Exhibit No. 3 appear to be a mathematical calculation to you?
   23   A.    Yes.
   24   Q.    Does it appear to start with the figure of 1,413,000
   25 from which three different figures are subtracted?
70: 1   A.    Yes.
    2   Q.    And the first one says $1 million, AES?
    3   A.    I'm not sure what the second letter is, but it could
    4 be, yes.
    5   Q.    And the second one of 113,000 says, "Coffman"?
    6   A.    Yes.
    7   Q.    And the final one of 20,000 says, "Local"?
    8   A.    Yes.
    9   Q.    Do you know who was providing the QA services on Phase
   10 II of the contract, cargo wharf contract?
   11   A.    QA services, no, I have no idea.
   12   Q.    If I were to mention the name Coffman Engineers, does
   13 that refresh your recollection as to whether that firm was
   14 providing the QA services?
   15   A.    No.
   16   Q.    Do you know a man by the name of Jerry Hardenbergh?
   17   A.    Yes.
   18   Q.    Do you know whether he was the QA person on Phase II?
   19   A.    Yes.
   20   Q.    Do you know whether he was employed by Coffman
   21 Engineers?
   22   A.    No.
   23   Q.    Have you ever heard of a subcontracting firm from
   24 Kodiak called Local Electric?
   25   A.    I'm not -- I don't recall.
71: 1   Q.    Do you know whether a firm by the name of Local
    2 performed any work on Phase II of the Kodiak Cargo Wharf
    3 maintenance contract?
    4   A.    I don't know.  I can look for the payrolls.
    5         Yes.
    6   Q.    Was Local Electric a subcontractor on Phase II?
    7   A.    Yes.
```

## Wilson, Margaret M.
72:14-73:6

```
72:14   Q.    Do you see in Exhibit No. 3, do you see a page,
   15 something that has a identification on the bottom corner that
   16 says page 20519?
```

```
17      A.      Oh, okay, yes.
18      Q.      And the two successive pages are numbered 20520 and
19  20521?
20      A.      Yes.
21      Q.      Does that look familiar to you?
22      A.      I don't recall.
23      Q.      Why don't you compare those three pages with the Means
24  spreadsheet in Brechan's proposal.  And tell me whether you
25  believe they're similar.
73: 1      A.      (Witness reviews document.)
 2              Okay.  Yes, they resemble the --
 3      Q.      Do you see any differences at all in these documents
 4  from your brief review?
 5              MR. NIEMER:  Object to the form.
 6      A.      No.
```

## Wilson, Margaret M.
73:14-74:2

```
73:14              In Exhibit 3, look at page 20521.
15      A.      Uh-huh.
16      Q.      Is there a subtotal identified there?
17      A.      Yes.
18      Q.      Is there a contractor markup identified there?
19      A.      Yes.
20      Q.      Is there a total estimate identified there?
21      A.      Yes.
22      Q.      Is the value opposite total estimate identical to the
23  value opposite the total estimate in Brechan's proposal for
24  Phase II?
25      A.      Is it what?  I'm sorry.
74: 1      Q.      Is it the same number?
 2      A.      Yes.
```

## Wilson, Margaret M.
74:3-21

```
74: 3      Q.      I'm going to ask you to turn to the page in Exhibit
 4  No. 3 that is labeled 20524.  Does the printed portion of the
 5  page 20524 follow the same format as the final page of Brechan's
 6  proposal on Phase II?
 7              MR. KREGER:  Object as vague.
 8      A.      Format, yes.
 9      Q.      Do you notice that there is different values on this
10  page opposite the phrase "the subtotal contractor markup and
11  total estimate"?
12              MR. KREGER:  Object to the form.
13      A.      Yes.
14      Q.      And on page 20524 of Exhibit 3, the number is
15  $1,334,799, rather than $1,249,982?
16      A.      Yes.
17      Q.      And beneath that, it says, "Reduce to $1,250,000"?
18      A.      Yes.
19      Q.      Would you recognize Matt Holmstrom's handwriting if
20  you saw it?
21      A.      No.
```

## Wilson, Margaret M.
77:24–78:7

```
77:24      Q.    Do you have any idea -- have you ever heard of
   25  Absolute Environmental Services?
78: 1      A.    Yes.
    2      Q.    When did you first hear of Absolute?
    3      A.    I don't know.  We've been using Absolute for a long
    4  time on other contracts as well.
    5      Q.    Are you familiar with Absolute's business reputation?
    6      A.    No, I just know they're environmental.  That's all I
    7  really know about them.
```

## Wilson, Margaret M.
78:17-25

```
78:17      Q.    What is the current status of the second IDIQ contract
   18  awarded to Brechan on the project -- or excuse me, on the ISC
   19  Kodiak?
   20      A.    It expires in July.
   21      Q.    How many options were under that contract?
   22      A.    There was the base, plus about four option years.
   23      Q.    Have all of the options been -- will all the options
   24  have been exercised at the time the contract expires?
   25      A.    No.
```

## Wilson, Margaret M.
80:6-8

```
80: 6      Q.    So the total number of options under the contract, did
    7  you say was five?
    8      A.    Was the base year, plus four option years.
```

## Wilson, Margaret M.
80:9-19

```
80: 9      Q.    So on average, if an even amount was awarded, each of
   10  the base year and option years, it would come out to about $2
   11  million per year?  Everybody's shaking their head and saying no,
   12  so my math --
   13      A.    No.
   14      Q.    $10 million cap did you say?
   15      A.    Per year.
   16      Q.    Oh, per year.
   17      A.    Yeah.
   18      Q.    Okay.  So that would be a $50 million cap?
   19      A.    Correct.
```

**Wilson, Margaret M.**
81:1-8

```
81: 1      Q.    And how many options did you say were left under the
     2  contract?
     3      A.    There are two -- or, no, I'm sorry, one.  I lied.
     4  One.
     5      Q.    One option left?
     6      A.    Yeah.
     7      Q.    Do you know why the last option is not being
     8  exercised?
```

**Wilson, Margaret M.**
91:3-92:14

```
91: 3      Q.    I would like to turn your attention once again to
     4  Exhibit 3.
     5      A.    I don't have Exhibit 3.  This one?
     6      Q.    Exhibit 3 to your deposition.
     7            MR. ROBISON:  I have a copy of that.
     8      Q.    And, again, the second page, the one that says page
     9  No. 20518 at the bottom.  I want to again draw your attention to
    10  the upper right-hand corner, where you see Brechan's Phase II
    11  contract price of 1,413,000?
    12      A.    Oh, yes.
    13      Q.    And beneath that, you see $1 million subtracted?
    14      A.    Right.
    15      Q.    Is that roughly $995,000?
    16      A.    Roughly.
    17            MR. NIEMER:  Object to the form.
    18      Q.    Which would reconcile with the initials AES, Absolute
    19  Environmental Services, adjoined to it?
    20            MR. NIEMER:  Same objection.
    21            MR. KREGER:  Join.
    22      A.    Approximately.
    23      Q.    In the same document now, I would like you to turn to
    24  the final page of the Means spreadsheet.
    25      A.    Okay.
92: 1      Q.    That's Brechan's Mean spreadsheet; is that right?
     2      A.    Yes.
     3      Q.    And the total estimated value as stated there is
     4  1,249,982?
     5      A.    Correct.
     6      Q.    And above that, it says, contractor markup of 133,927.
     7            Do you understand that to be the coefficient factor?
     8      A.    Yes.
     9      Q.    And above that is, it says, subtotal $1,116,055?
    10      A.    Yes.
    11      Q.    Would that then represent the cost of the work as
    12  estimated by Brechan?
    13            MR. KREGER:  Objection.  Assumes facts not in
    14  evidence.  Lack of foundation.
```

**Wilson, Margaret M.**
92:15-93:9

```
92:15      Q.    As the contracting officer for the government with
   16  respect to Phase II, did you have oversight responsibility on
   17  issues of contract administration and pricing?
   18      A.    Yes.
   19      Q.    And as such, was it your responsibility or within the
   20  scope of your responsibility to review documents such as the one
   21  we're looking at now?
   22      A.    Yes.
   23      Q.    And are you familiar with reviewing and evaluating
   24  documents such as the one that we have before us now?
   25      A.    Yes.
93: 1      Q.    So based on your role on the Phase II project and your
    2  experience with evaluating spreadsheets such as this, would it
    3  be your understanding that the dollar value adjacent to the
    4  phrase "Subtotal of $1,116,055" would be the contractor's
    5  representation of what his costs were estimated to be on the
    6  project?
    7            MR. KREGER:  Objection.  Leading.  Assumes facts not
    8  in evidence.
    9      A.    Yes.
```

## Wilson, Margaret M.
93:10-10

```
93:10      Q.    If you look on the preceding page, page 2 --
```

## Wilson, Margaret M.
93:14-15

```
93:14      Q.    It says $252,903 Means adjustment?
   15      A.    That's the city cost index.
```

## Wilson, Margaret M.
94:3-22

```
94: 3            What does it appear this phrase at the bottom of the
    4  page is referring to where it says, "Estimated margin, $271,600"
    5  on a document entitled "Cargo Wharf Phase II Costs from the
    6  Brechan Files"?
    7            MR. NIEMER:  Object to the form.
    8            MR. KREGER:  Objection.
    9      A.    I don't know.  Looks like the difference between total
   10  costs and delivery order amount.
   11            MR. KREGER:  That was the -- that was the question
   12  and the answer?
   13            MR. ROBISON:  Yes.
   14      Q.    Does that appear to be a 12 percent -- representing 12
   15  percent increase over the costs of the work to you?
   16            MR. NIEMER:  Object to the form.
   17            MR. KREGER:  Object to the form.
   18      A.    Without a calculator, I can't give you an answer.
   19      Q.    Thank you.
   20            MR. KREGER:  That's a new question.  I'm going to
   21  start my examination at this point in time, Ms. Wilson.
```

```
  22            MR. ROBISON:  The answer is obvious.
```

## Wilson, Margaret M.
**105:25-107:10**

```
105:25                    (Discussion off the record.)
106: 1      Q.    I'm going to show you one that you may actually have
     2 some information about.
     3            And before I hand it to you, for the courtesy of
     4 counsel, I'm going to hand it around the table because they
     5 don't have a copy of it.
     6      A.    I'll read last.
     7                    (Exhibit No. 9 marked.)
     8            MR. MARSTON:  Are there multiple pages of this
     9 document?  It looks like it's an incomplete string.
    10            MR. KREGER:  I'm just going to ask her about the
    11 first e-mail on it, the one that she sent.
    12            MR. MARSTON:  In light of the fact that it looks like
    13 a portion of it was sent by Matt Holmstrom, can you explain why
    14 it doesn't have a Bate number on it as having been produced?
    15            MR. KREGER:  Sure.  If you look at the top there,
    16 it's printed out by Amy Gerald.  It has been produced, it's one
    17 she printed out from your disc that you gave us.
    18            MR. MARSTON:  So this one is out there?
    19            MR. KREGER:  Yes.
    20            MR. MARSTON:  Hang on.
    21            MR. KREGER:  It wasn't from the disc you gave us.
    22 We've sent you copies of that in our production.
    23            MR. MARSTON:  You sent us a disc?
    24            MR. KREGER:  No.  We sent you hard copies.
    25            MR. NIEMER:  Can I see it?
107: 1      Q.    Take a look at that, if you would, please.
     2      A.    (Witness reviews document.)
     3            MR. KREGER:  I'm thinking now, I'm not sure whether
     4 you got hard copies or whether we sent you supplemental
     5 production saying, available for review or these documents Bates
     6 stamped such and such and such and such.  Somebody came --
     7            MR. OLSON:  We were going to review documents the
     8 last time we were up in Anchorage, and he said, rather than
     9 bring them all down, we'll send you documents.
    10                    (Discussion off the record.)
```

## Wilson, Margaret M.
**110:17-111:19**

```
110:17 officer, technical representative.
    18      Q.    Did there come a time when you decided to withhold
    19 final payment on the task order until some corrective action was
    20 taken?
    21      A.    You're referring to this task order?
    22      Q.    Yes, I am.
    23      A.    Yes.
    24      Q.    And what were those circumstances?
    25      A.    There were some unacceptable areas that needed
111: 1 correction.
     2      Q.    And did you write an e-mail to Mr. Holmstrom regarding
```

```
 3  that?
 4      A.    Yes.
 5      Q.    And that's in your file there that's been marked?
 6      A.    Yes.
 7      Q.    And did you say that you considered these unacceptable
 8  areas to be a punch list item?
 9      A.    Yes.
10      Q.    And is that still your view, that these areas were a
11  punch list item?
12      A.    Yes.
13      Q.    Do you know how much was withheld for those punch list
14  items?
15      A.    Let's see.  $5,065.20.
16      Q.    5,000 -- say that --
17      A.    $5,065.20.
18            MR. MARSTON:  That was not withheld?
19            THE WITNESS:  Yes.
```

## Wilson, Margaret M.
110:18–111:1

```
110:18      Q.    Did there come a time when you decided to withhold
   19  final payment on the task order until some corrective action was
   20  taken?
   21      A.    You're referring to this task order?
   22      Q.    Yes, I am.
   23      A.    Yes.
   24      Q.    And what were those circumstances?
   25      A.    There were some unacceptable areas that needed
111: 1  correction.
```

## Wilson, Margaret M.
111:2–19

```
111: 2      Q.    And did you write an e-mail to Mr. Holmstrom regarding
    3  that?
    4      A.    Yes.
    5      Q.    And that's in your file there that's been marked?
    6      A.    Yes.
    7      Q.    And did you say that you considered these unacceptable
    8  areas to be a punch list item?
    9      A.    Yes.
   10      Q.    And is that still your view, that these areas were a
   11  punch list item?
   12      A.    Yes.
   13      Q.    Do you know how much was withheld for those punch list
   14  items?
   15      A.    Let's see.  $5,065.20.
   16      Q.    5,000 -- say that --
   17      A.    $5,065.20.
   18            MR. MARSTON:  That was not withheld?
   19            THE WITNESS:  Yes.
```

**Wilson, Margaret M.**
117:18-118:4

```
117:18      Q.    Do you know who Imperial was on this job?
   19       A.    I've heard their name, but that's all I know.
   20       Q.    You weren't aware that they did actually some of the
   21   application of the coating of part of the project?
   22       A.    No, no.
   23       Q.    Were you aware of a requirement under the
   24   specification that the applicator, the coatings applicator,
   25   become certified by the product's manufacturer?
118: 1       A.    There was some discussion of that.
    2       Q.    Can you tell me what you recall about that discussion?
    3       A.    That's all I recall, is Lieutenant Brown told me that
    4   they had to be certified by the manufacturer, if you will.
```