Michael E. Kreger, Esq.
Jacob Nist, Esq.
Perkins Coie LLP
1029 W. Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561
(907) 276-3108 (Facsimile)
mkreger@perkinscoie.com

Attorneys for Defendants Brechan Enterprises, Inc. and Safeco Insurance Company of America

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska corporation,<br><br>Plaintiff,<br><br>v.<br><br>FORREST J. MCKINLEY, an individual, d/b/a "Imperial Industrial Coatings"; EMERCO, INC., a California corporation, d/b/a Imperial Industrial Coatings; BRECHAN ENTERPRISES, INC., an Alaska corporation; and SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation,<br>Defendant. | Case No. A03-0199 Civil (RRB)<br><br>AESI 3<br><br>**RESPONSES (INTERROGATORIES) TO BRECHAN ENTERPRISES' FIRST DISCOVERY REQUESTS TO ABSOLUTE ENVIRONMENTAL SERVICES** |

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE                   - 1 -                           [/BEI Rog Responses]

ORIGINAL

EXHIBIT B
PAGE 1 of 18

EMERCO, INC., a California corporation d/b/a Imperial Industrial Coatings, and the United States for the Use and Benefit of EMERCO, INC.,

   Counterclaimant/Third-Party Claimant,

v.

ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska corporation, et al.,

   Cross-defendants/Third-party Defendants.

THE UNITED STATES OF AMERICA for the use and benefit of ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska corporation,

                Plaintiff,

v.

SAFECO INSURANCE COMPANY OF AMERICA, a Washington corporation,

                Defendant.

BRECHAN ENTERPRISES, INC., an Alaska corporation,

               Counterclaim Plaintiff,

v.

ABSOLUTE ENVIRONMENTAL SERVICES, INC., an Alaska corporation,

             Counterclaim Defendant.

PERKINS COIE LLP
1t. st Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE      - 2 -     [/BEI Rog Responses]

EXHIBIT B
PAGE 2 of 18

## INTERROGATORIES

**INTERROGATORY NO. 1:** Identify each entitlement theory you are relying upon as a basis of your damages claim(s) in this action (e.g., non-payment, changes in the work, differing site conditions, interference, delay, misrepresentation, etc.).

**ANSWER:**

AESI's entitlement is based on its increased costs of performing its subcontract work arising in whole or part from the consequences of, and the cost of correcting, concealed defective and missing welds. These were costs AESI had no reason to anticipate and work that was beyond the scope of AESI's contract with Brechan. There are a number of independent legal theories available to remedy this situation among which are the doctrine of "superior knowledge," breach of the warranty of plans and specifications, breach of the warranty of good faith and fair dealing, differing site conditions, constructive change, negligent design, negligent misrepresentation, intentional misrepresentation, fraud, implied contract/quantum meruit, and restitution. The facts underlying each of these available entitlement theories are the same, however.

**INTERROGATORY NO. 2:** For each entitlement theory identified in your response to Interrogatory No. 1 above, please provide the following information:

(a) the material events upon which the claim is based:

(b) each person with knowledge of the material events:

(c) each document pertaining to the events:

(d) the portion of your total damages you attribute to this claimed item:

EXHIBIT B
PAGE 3/18

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE                    - 6 -                    [/BEI Rog Responses]

(e) the identity of the individual who calculated this aspect of your damages:

(f) the method used to quantify the damages:

**ANSWER:**

(a) the material events upon which the claim is based:

The United States Coast Guard's "Facilities Design and Construction Center" (FD&CC) in Seattle (the "USCG") awarded Brechan a "Job Order Contract" (JOC) to provide construction services for the Coast Guard Station in Kodiak, Alaska. Under the JOC contract, the USCG negotiated individual construction contracts, referred to as "Task Orders," with Brechan. Each Task Order had a unique "Task Order Number." Brechan's Task Order No. 0007 (the "Task Order" or "Project") was to perform maintenance work on the Cargo Wharf at the Kodiak Coast Guard Station. The Task Order obligated Brechan to perform both design and construction for the maintenance contract. Under the terms of the Task Order, Brechan's design was required to provide a twenty-five year service life for the Cargo Wharf's new coatings. Brechan hired the engineering firm of Trick, Nyman, Hayes, Inc. ("TNH") to prepare the design. TNH subcontracted the corrosion protection aspects of the design to Coffman Engineers, Inc. ("CEI"). To achieve the required twenty-five year service life, CEI's design specified the removal of existing pile coatings and application of a high-tech polyurethane coating under a "holiday-free" inspection standard. For contract administrative purposes, the Cargo Wharf was divided into three sections identified as Sections 1, 2A, and 2B. Section 1 was the newer portion of the wharf and was referred to as the "Wharf Extension." The "Wharf Extension" was built on cylindrical "round" piles. Sections 2A and 2B were the older portion of the wharf and were referred to as the "Original Cargo Wharf." The "Original Cargo Wharf" was built on angular "H"

EXHIBIT _B_
PAGE _4 of 18_

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE                    - 7 -                    [/BEI Rog Responses]

piles. To accommodate USCG annual funding limitations, the coating work was further divided into two "Phases". Phase I of the work consisted of Sections 1 and 2A. Phase II consisted of Section 2B. When the TNH/CEI design was completed, Brechan solicited subcontract bids for the coating work. A subcontract was awarded to Swalling Construction Company, Inc. ("Swalling") to perform Phase I (Sections 1 and 2A). Swalling was not awarded a contract for, and did not perform any work on, Phase II (Section 2B). Swalling substantially completed the work on Section 1, the Wharf Extension. Swalling began but never completed the work on Section 2A. Brechan negotiated a pre-completion termination of Swalling's Phase I subcontract. Brechan then subcontracted with Absolute to perform Phase II plus the completion of Phase I. Brechan's project manager, Matt Holmstrom, told Absolute and its coatings application subcontractor Imperial Industrial Coatings ("IIC") that they would not have to compete for the work. Holmstrom told Absolute that it only needed to be able to justify its pricing under the Means construction estimating guide and be less than $1.0 million. Absolute's estimator, Jason Peterson, asked Holmstrom what problems Swalling had encountered on its portion of the work. Holmstrom told Peterson that, "Swalling fell behind on the project due to its work habits and containment set-up problems," including setting up containments on a daily basis at times. He also said that, "The big factor was working with the daily tides. I [Holmstrom] think the key to performing this project successfully is taking out the daily tidal factors that affect your work." Peterson and Holmstrom discussed other aspects of the project, such as the starting point for Absolute, where Swalling had stopped, adverse weather during certain months, keeping materials from entering the water, and coordinating access to and use of the dock with the Coast Guard cutters during the contract performance

EXHIBIT B
PAGE 5 of 18

PERKINS COIE LLP
st Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE         - 8 -            [/BEI Rog Responses]

period. The two never discussed technical aspects of performing the work, including specifically the existing coating/pile conditions, daily inspections, or the re-coating applications before Absolute and Brechan signed a subcontract. Brechan made no mention of the existence of the "enormous" amount of latent defective welds or how the defective welds would impact the application and testing of coatings. Brechan gave Absolute the same version of the project specifications Swalling had used on the Phase I work to prepare its subcontract bid price. Once Absolute had submitted its subcontract price quote of $995,850, Brechan gave Absolute a changed set of project specifications. Among the changes was a deletion of the instruction to assume 100 feet of defective welds. Brechan did not explain to Absolute why the change had been made other than to provide an email string between itself and Coffman that mentioned a change had been made to reflect, "lessons learned." The portion of the specifications that described the condition of the piles was not changed t include a description of the latent defective weld conditions. The specifications maintained the "holiday-free" coating requirement. Absolute's pricing did not change between the time it received the revised specifications from Brechan and the time it signed a subcontract. Before starting work, Absolute encountered problems with its subcontractor IIC. At the preconstruction conference, IIC demanded additional compensation to coat surfaces between Bents 12 and 13. IIC next failed to perform its quality control ("QC") work. Absolute issued the first of its three "Cure Notices" to IIC. Absolute instructed IIC to perform its contract QC responsibilities. When IIC failed to comply with the cure notice, Absolute hired a QC inspector for IIC. Brechan's quality assurance ("QA") inspector, Jerry Hardenbergh (a consultant employed by CEI) recognized that there was not enough time between tides to prepare the pile surface for coating, stripe coat

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE   - 9 -   [/BEI Rog Responses]

EXHIBIT ___B___
PAGE _6_ /18

the welds, and then apply the coating. If the tide came in before the coating was applied, the surface of the pile would have to be re-blasted to remove contaminants from the saltwater before the pile would again be ready for coating. Rather than "lose the blast," Hardenbergh instructed IIC not to stripe coat the welds before spray coating the piles. Following Hardenbergh's instruction, the piles were sprayed without first stripe coating the welds. In the course of his QA inspection duties, Hardenbergh detected holidays in the coatings and marked them for correction by IIC. Hardenbergh admits that the vast majority of the holidays detected were in the area of the welds. Absolute required IIC to correct the defects noted before moving into new areas. IIC fell further and further behind schedule over time. Absolute issued its second cure notice instructing IIC to take measures to regain the schedule or else Absolute would hire additional workers to supplement IIC's forces and backcharge IIC for the expense. At the time of these events, Absolute believed that the holidays appearing in IIC's coating work, its failures to correct the problems, and its failure to stay on schedule were solely attributable to defective workmanship. In July, two of IIC's local painters quit and returned to Anchorage. When in Anchorage, one of these two painters informed Polar Supply, the vendor for the coatings on the Cargo Wharf Maintenance Project, that IIC was improperly thinning the coatings being applied to the piles. This information was passed along to Charley Mathias, a representative of the coating manufacturer, Specialty Polymer Coatings (SPC), who happened to be passing through on his way to Kodiak to train and certify painters hired by Absolute to supplement IIC's work force. After arriving on the project, Mathias was informed that neither Puett nor his son-in-law, Josh Belleville, IIC's supervisors, was present. In their absence, Mathias spoke to an IIC painter who confirmed what Mathias had been told

EXHIBIT _B_
PAGE _7 of 18_

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE                    - 10 -                    [/BEI Rog Responses]

PERKINS COIE LLP
...st Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

in Anchorage. Mathias then diagnosed a continuing problem IIC had been having with its computerized coating pump as being the result of inadequate cleaning after use. After getting everything prepared, Mathias proposed that he assist IIC's crew with their coating application that afternoon. IIC's crew refused to apply any coatings after placing a telephone call to Puett in California. Mathias informed IIC that SPC was rescinding its certification to apply the coatings based on Mathias' confirmation of IIC's disregard of the required coating procedures and its refusal to cooperate with his request to apply coatings that day. A manufacturer's certification was a requirement for the coatings applicator under the contract plans and specifications. Without a certification, IIC could not perform the work. When Absolute learned that IIC had been decertified, it issued its third and final cure notice instructing IIC to take whatever measures necessary to correct the decertification problem. At the request of the USCG, Absolute also informed IIC that it would not be allowed back onto the Kodiak Coast Guard Station until its decertification had been resolved. IIC provided written assurances of its intent to correct its decertification. Then, the following day, its attorney in Los Angeles wrote Absolute informing it that IIC was unilaterally terminating its subcontract before completing the work and would not be returning. Following IIC's decertification and abandonment of the project, Absolute completed the remainder of the subcontract work itself. Absolute eventually spent more than $1.2 million of its own money to complete the work. To recover its financial losses, Absolute sued Forrest J. McKinley, IIC's president, and Emerco, Inc., which McKinley claims as IIC's alter ego, rather than himself, for the losses it suffered in completing the project. During discovery, IIC provided Absolute with a supplemental document production that included documents IIC had acquired from the Coast Guard

PERKINS COIE LLP
1st Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

16.

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE                - 11 -

EXHIBIT B
PAGE 8 of 18
[/BEI Rog Responses]

through a "Freedom of Information Act" request. Among the documents IIC produced was a Hardenbergh QA memorandum dated October 30, 2001, a date when the first coating subcontractor, Swalling, was still performing and long before Brechan had contracted with Absolute to finish the coating work. Hardenbergh's October 30, 2001 QA memorandum mentioned that Swalling had encountered a "differing site condition" relating to inadequate surface preparation, including preparation of welds, from the time the piles were first coated in 1989. Among the comments in Hardenbergh's report are the following:

> During surface preparation inspection, after abrasive blasting, large number of surface defects became very apparent. The majority of these surface defects are almost impossible to see without removing the old coatings and corrosion build-up. Basically, there is a lot more surface preparation required, before coating application, than anyone anticipated. *** [T]he amount of poor welding and lack of consideration for corrosion engineering design has resulted in an enormous amount of surface preparation. *** The coating contactor is having difficulties obtaining a holiday free coating system on the H-pile splice weld locations. The only areas that are not passing the holiday testing are the welded areas; splice plate locations in the upper elevations. The contractor has tried numerous times to coat the holiday areas and has spent an excessive amount time trying to obtain a holiday free coating. But due to the nature of this coating system, accessibility and surface conditions its doing to be difficult to achieve a holiday-free coating at the H-pile splice locations.
>
> After many discussions about the surface preparation difficulties, Coffman Engineers has developed three options for the CG to choose from, considering that it is their structure and money involved.
>
> Option 1: Includes additional manpower, equipment, and time to spend on extensive surface preparation and stripe coating welds to achieve no coating holidays. Very expensive option, est[imate] $500,000 to complete remainder of wharf.
>
> Option 2: Includes additional manpower, equipment, and little extra time for a moderate surface preparation to result in a minimal level of holidays to remain. This would require establishing an acceptance

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

16.

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY REQUESTS TO ABSOLUTE       - 12 -       [/BEI Rog Responses]

EXHIBIT B
PAGE 9 of 18

criterion. The coating contactor is formulating a cost for this option.

Brechan never told Absolute of these enormous surface preparation problems encountered by Swalling until it received the Hardenbergh memorandum from IIC through discovery. After obtaining this document, Absolute began investigating and collecting documents pertaining to the work performed by Swalling on the Cargo Wharf contract. Absolute discovered that in the course of its original design preparation, Brechan failed to undertake a survey of the weld conditions and the extent of surface preparation problems. When the latent surface preparation problems were discovered by Swalling and Brechan was told that it would have to pay at least $500,000 more to complete the Cargo Wharf project, Brechan evaluated alternative ways to reduce the added cost of completing the work and/or to get the USCG to pay for that extra work. CEI was willing to recommend eliminating the holiday-free performance standard to reduce costs. The Coast Guard's project management team was receptive to accepting responsibility for a portion of the cost increase. However, this initial success came to an abrupt end on February 25, 2002, when Brechan's Matt Holmstrom received an email marked "Importance: High, Sensitivity: Confidential" from Lt. Paul Rendon on the Coast Guard's project management team.

> Matt,
>
> Change of plans from my end. I think I told you I was having a meeting with Marty & the Captain today regarding project status, etc. ... Well, Marty wants to take a different approach ... the "Design-Build" approach, and postpone our/CG involvement until later (we won't be meeting with you this week in Anchorage).
>
> I'll follow up with a formal email (or letter, probably email though ...) with our requests. Basically, Marty wants a formal proposal from the Design/Build team on [ (1) credit Brechan will provide USCG for

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE                 - 13 -                    [/BEI Rog Responses]

coating contractor's allegedly defective performance, (2) how Brechan will assure that coating contractor finishes coming summer work; (3) whether Brechan recommends reducing coating requirements, (4) whether Brechan recommends switching to a new type of coating], (5) whatever change are present to the CG by [Brechan] should be at "no cost" to the CG, and (6) that [Brechan] present this proposal to the CG here at FD&CC Pac ... I think that covers what he said.

Now, with all that said/written, I still fee that "We" (you & me & Anita & whoever else) are in this together & have to figure what to do.

OPTIONS:

Can you terminate your contract with Swalling for Default: (poor performance, etc.)

We don't want to terminate our Task Order #0007 with you, or else we lose the remaining money, so we need to keep the Task Order open. Who is in line to pick up the remaining work? Will there be enough funds remaining to pay this "new" guy?

A "follow up" letter referenced by Lt. Rendon arrived three weeks later signed by the Contracting Officer Anita Repanich. In addition to requiring Brechan to submit a formal technical proposal within two weeks explaining its intentions for completing the project, Repanich's letter confirmed that the USCG would not relax the 25-year service life requirement for the repairs or pay any portion of the added costs: "We are open to new ideas and different approaches that will provide the wharf with an additional 25 years of useful life. Please note that your recommendations and plans for continuing work should be at no additional cost to the government." The contracting officer's letter represented a $700,000 loss exposure to Brechan. As of the date of Repanich's letter, Brechan had been informed that the USCG would enforce the 25-year service life requirement (preventing Brechan from saving money by obtaining reducing the surface preparation requirements by reducing the acceptance standards).As of the date of Repanich's letter, Brechan had been informed that the

USCG would not pay for any re-design work Brechan might request in order to find a less expensive means of achieving the 25-year service life requirement. As of the date of Repanich's letter, Brechan had been informed that the USCG would not pay for any portion of the additional $500,000 in surface preparation costs because it claimed to have disclosed the conditions to Brechan itself; As of the date of Repanich's letter, Brechan had been informed that the USCG would not pay for any portion of the $100,000 discrepancy between Brechan's subcontract price with Swalling (because Swalling had put the entire mobilization cost for both Phases 1 & 2 into its subcontract price for Phase I) and Brechan's own contract price for the same work with the Coast Guard; As of the date of Repanich's letter, Brechan had been informed that the USCG would not pay for any portion of Jerry Hardenbergh's time for the completion of Swalling's Phase I subcontract work in 2002. Brechan next attempted to induce Swalling to accept reduced compensation for the added surface preparation while still being subject to the holiday-free standard. Swalling declined Brechan's proposal. Brechan then negotiated an agreed termination of Swalling's Phase I subcontract that relieved Swalling of responsibility for completing the remainder of Phase I, its subcontract work. Brechan then contacted and invited Absolute to submit a bid to complete the remainder of the wharf coating work. Brechan could not avoid the expense of additional surface preparation by asking TNH/CEI to redesign the work because the two less expensive design options would not meet the 25-year service life required by the USCG. Brechan could not avoid the expense of additional surface preparation by making TNH/CEI pay the cost of added surface preparation because TNH/CEI's contract effectively excluded responsibility for this condition. Brechan could not avoid the expense of additional surface preparation by making Swalling pay

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE       - 15 -                  [/BEI Rog Responses]

the added surface preparation cost due to faulty or tardy workmanship because any defects in Swalling's performance could not justify a set-off of the magnitude that would be required. Brechan could not avoid the expense of additional surface preparation by terminating Swalling for default because Swalling had not committed a material breach of contract. Brechan asked Absolute to submit a proposal to complete the balance of the Phase I work and the entirety of Phase II. Instead of disclosing the existence of the enormous amount of additional surface preparation the project would require, Brechan deleted a prior statement instructing bidders to expect to encounter 100' of such defects and specified the stripe coating of all welds before spraying. Brechan later waived the stripe coating requirement after TNH/CEI determined that there was insufficient time between tides to stripe coat before spraying the coating without losing the surface profile Instead, IMPERIAL was instructed to spray onto the existing welds yielding a proliferation of holidays that had to be repaired at great expense, consumed additional time and materials, and delayed completion of the project. After IMPERIAL terminated its subcontract, Absolute took over the tasks of surface preparation, coating application, and repair work. Absolute elected to cut off all nonstructural steel and grind down the welds for the remainder of the work. This was costly and labor-intensive work, but it ended up reducing the number of holidays encountered on the remainder of the project. Nevertheless, Absolute was forced to return repeatedly to perform holiday repairs at great expense long after substantially completion. At all times relevant to these claims, Brechan had actual knowledge of material latent defective conditions that substantially interfered with the performance and completion of Absolute's work yet failed and refused to reveal the same causing massive financial injury to Absolute.

ERKINS COIE LLP
10.. ..st Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE        - 16 -                    [/BEI Rog Responses]

(b) each person with knowledge of the material events:

Those persons at present believed to have knowledge of the material events are Marty Boivin (Shannon & Wilson); Anita Repanich (FD&CC); Steven Locher (FD&CC); Paul Rendon (FD&CC); Bill Oliver (BEI); Mike Martin (BEI); Matt Holmstrom (BEI); Harold Hollis (CEI); Dan Stears (CEI); Lawrence Radcliffe (CEI); Jerry Hardenbergh (CEI); Mike Swalling (SCCI); Andrew Romine (SCCI); Mike Anderson (SCCI); David Olson (AESI); Jason Peterson (AESI); Ralph T. Puett (IIC)

(c) each document pertaining to the events:

The documents pertaining to the events consist of those documents selected by David Olson during the course of the document production at the offices of your attorneys (Perkins, Coie) and which, at your attorneys' request were segregated or otherwise identified at the time they were copied by Absolute. As such, Brechan is in possession of and can readily identify each of these documents. The one document not obtained from your own files was the October 30, 2001 Jerry Hardenbergh QA report (Phase I, Swalling's work) obtained by AESI from IIC's attorneys.

(d) the portion of your total damages you attribute to this claimed item:

All of them (the entitlement theories are all applicable to the same operative facts and are not reflective of different occurrences for which claims are being made).

(e) the identity of the individual who calculated this aspect of your damages:

The only damages calculation completed to date was prepared by Michael Lembke who calculated the losses suffered by AESI on the entire project in the process of quantifying AESI's damage claim against McKinley. The losses identified there are the losses AESI experienced on the project as a whole, excluding business devastation. When a business devastation damage calculation is completed, the author of that

PERKINS COIE LLP
1st Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

16.

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE                - 17 -                [/BEI Rog Responses]

calculation will be identified.

(f) the method used to quantify the damages:

Michael Lembke's damage calculation methodology is described in detail in the expert report he prepared, a copy of which will be provided.

DATED: .

        PERKINS COIE LLP
        Attorneys for Brechan Enterprises, Inc. and
        Safeco Insurance Company of America


By _____
    Jacob B. Nist
    Alaska Bar No. 0211051

PERKINS COIE LLP
...st Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE    - 18 -    [/BEI Rog Responses]

RESPECTFULLY SUBMITTED this \_14th\_ day of November, 2005

                                        MARSTON HEFFERNAN FOREMAN, PLLC

                                        By _/s/_____
                                        Terry R. Marston II, WSBA No. 14440
                                        Jami K. Elison, WSBA No. 31007
                                        Attorneys for Plaintiff Absolute Environmental Service, Inc.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE         - 19 -        [/BEI Rog Responses]

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury, under the laws of the State of Washington that I am now and at all times herein mentioned, a resident of the State of Washington, over the age of 18 years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

On the date given below I caused to be served in the manner noted copies of the following upon designated counsel:

1. ABSOLUTE ENVIRONMENTAL'S RESPONSES TO BRECHAN'S INTERROGATORIES

| | |
|---|---|
| *VIA US First Class Mail* <br> Eric J. Brown, Esq. <br> Jermain Dunnagan & Owens, P.C. <br> 3000 A Street, Suite 300 <br> Anchorage, AK 99503-4097 <br> *Atty for Forrest McKinley and Emerco* | *VIA US First Class Mail* <br> Robert J. Dickson <br> Atkinson, Conway & Gagnon, Inc. <br> 420 L Street, Suite 500 <br> Anchorage, AK 99501 <br> *Atty for Specialty Polymer Coatings* |
| *VIA e-mail (on 11/14/05) and US First Class Mail* <br> Jacob Nist <br> Perkins Coie, LLP <br> 1029 West Third Avenue, Suite 300 <br> Anchorage, AK 99501 <br> *Atty for Brechan and Safeco* | *VIA US First Class Mail* <br> Peter Partnow <br> Lane Powell Spears Lubersky <br> 301 W. Northern Lights Boulevard <br> Suite 301 <br> Anchorage, Alaska 99503 <br> *Atty for Coffman* |
| *VIA US First Class Mail* <br> James B. Stoetzer <br> Lane Powell Spears Lubersky <br> 1420 Fifth Avenue, Suite 4100 <br> Seattle, WA 98101 <br> *Atty for Coffman* | |

SIGNED at Redmond, Washington this 17th day of November, 2005.

Kristy L. Martyn

RESPONSES (INTERROGATORIES) TO BRECHAN'S FIRST DISCOVERY
REQUESTS TO ABSOLUTE                - 20 -                [/BEI Rog Responses]

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

# VERIFICATION

STATE OF IDAHO            )
                          ) ss.
IDAHO COUNTY              )

      I, DAVE OLSON, say on oath or affirm that I am the PRESIDENT of Absolute Environmental Services, and that I have read the foregoing document, and that the information provided is true to the best of my knowledge, information, and belief.

*[signature: Dave Olson]*

SUBSCRIBED AND SWORN TO OR AFFIRMED before me on November 17, 2005.

*[signature: Kathy Green]*        *[signature]*

      *[Notary seal: KATHY GREEN, NOTARY PUBLIC, STATE OF IDAHO]*

Notary Public in and for IDAHO
My commission expires:
July 05, 2011

B 18 of 18