UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

ABSOLUTE ENVIRONMENTAL
SERVICES, INC., an Alaska Corporation

    Plaintiff,

vs.

FORREST J. MCKINLEY, an individual,
d/b/a "Imperial Industrial Coatings" and
EMERCO, INC., a California Corporation,
d/b/a/ Imperial Industrial Coatings, BRECHAN
ENTERPRISES, INC., an Alaska Corporation;
and SAFECO INSURANCE COMPANY OF
AMERICA, a washington Corporation.

    Defendants.



---

EMERCO, INC., a California corporation d/b/a
Imperial Industrial Coatings, and the States for
Use and benefit of EMERCO, INC.,

Counterclaimant/Third-party Claimant,

v.

Absolute Environmental Services
INC., an Alaska corporation, et al.,

Cross-defendants/Third-party Defendants.

---

THE UNITED STATES OF AMERICA for
The use and benefit of ABSOLUTE
ENVIRONMENTAL SERVICES, INC., an
Alaska Corporation,

    Plaintiff,

vs.

SAFECO INSURANCE COMPANY OF
AMERICA, a Washington Corporation.

    Defendants.

---

Page 1

Alaska Stenotype Reporters (907) 276-1680

EXHIBIT _A_
PAGE _1_ OF _5_

David Olson                           Deposition                           June 09, 2006

### Page 2

```
 1  _____
    Brechan Enterprises, INC., an Alaska
 2  Corporation,
 3      Counterclaim Plaintiff,
 4  vs.
 5  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., an Alaska Corporation,
 6
        Counterclaim Defendant.
 7  _____
    Brechan Enterprises, INC., an Alaska
 8  corporation,
 9      Third-Party Plaintiff,
10  vs.
11  COFFMAN ENGINEERS, INC, a Washington
    Corporation.
12
        Third-Party Defendant.
13  _____
    Absolute Environmental Services
14  INC., an Alaska Corporation,
15      Plaintiff/Cross-claimant,
16  vs.
17  COFFMAN ENGINEERS INC., a Washington
    Corporation.
18
        Third-Party Defendant.
19  _____
    Case No. A-03-0199CV (RRB)
20
21
22
23
24
25
```

### Page 3

```
 1
 2
 3
 4
 5
 6
 7          DEPOSITION OF DAVID OLSON
 8           Pages 1-128, inclusive
 9           Commencing at 9:12 a.m.
10            Friday, June 9, 2006
11              Anchorage, Alaska
12
13
14
15
16
17
18         Alaska Stenotype Reporters
             511 West Ninth Avenue
19         Anchorage, AK 99501-3520
            Serving Alaska Since 1953
20
21
22  Rick D. McWilliams, RPR, Ret.    Telephone 907.276.1680
    Fred M. Getty, RPR, Ret.    Email AkSteno@aol.com
23              Fax 907.276-8016
24
25
```

### Page 4

```
 1       UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF ALASKA
 2
    ABSOLUTE ENVIRONMENTAL
 3  SERVICES, INC., an Alaska Corporation
 4      Plaintiff,
 5  vs.
 6  FORREST J. MCKINLEY, an individual,
    d/b/a "Imperial Industrial Coatings" and
 7  EMERCO, INC., a California Corporation,
    d/b/a/ Imperial Industrial Coatings, BRECHAN
 8  ENTERPRISES, INC., an Alaska Corporation;
    and SAFECO INSURANCE COMPANY OF
 9  AMERICA, a washington Corporation.
10      Defendants.
    _____
11  EMERCO, INC., a California corporation d/b/a
    Imperial Industrial Coatings, and the States for
12  Use and benefit of EMERCO, INC.,
13  Counterclaimant/Third-party Claimant,
14  v.
15  Absolute Environmental Services
    INC., an Alaska corporation, et al.,
16
        Cross-defendants/Third-party Defendants.
17  _____
    THE UNITED STATES OF AMERICA for
18  The use and benefit of ABSOLUTE
    ENVIRONMENTAL SERVICES, INC., an
19  Alaska Corporation,
20      Plaintiff,
21  vs.
22  SAFECO INSURANCE COMPANY OF
    AMERICA, a Washington Corporation.
23
        Defendants.
24  _____
25
```

### Page 5

```
 1  _____
    Brechan Enterprises, INC., an Alaska
 2  Corporation,
 3      Counterclaim Plaintiff,
 4  vs.
 5  ABSOLUTE ENVIRONMENTAL
    SERVICES, INC., an Alaska Corporation,
 6
        Counterclaim Defendant.
 7  _____
    Brechan Enterprises, INC., an Alaska
 8  corporation,
 9      Third-Party Plaintiff,
10  vs.
11  COFFMAN ENGINEERS, INC, a Washington
    Corporation.
12
        Third-Party Defendant.
13  _____
    Absolute Environmental Services
14  INC., an Alaska Corporation,
15      Plaintiff/Cross-claimant,
16  vs.
17  COFFMAN ENGINEERS INC., a Washington
    Corporation.
18      Third-Party Defendant.
    _____
19  Case No. A-03-0199CV (RRB)
20      DEPOSITION OF DAVID OLSON, taken on behalf of the
21  Defendants, pursuant to notice, at the Law Offices of
22  Perkins, Coie, 1029 West Third Avenue, Suite 300
23  Anchorage, Alaska, before Rosie S. Scott, Certified
24  Shorthand Reporter for Alaska Stenotype Reporters and
25  Notary Public for the State of Alaska.
```

Page 10

1  Q. Would it be less than 2000?
2  A. I believe so.
3  Q. And what about your vendor contracts -- which
4  vendors?
5  A. Polar Supply sued me.
6  Q. Is that amount in dispute?
7  A. No, I don't believe so.
8  Q. So you admit that Absolute owes them the money?
9  A. Yes.
10 Q. Okay. And how much is that?
11 A. Again, I don't know the exact amount.
12 Q. Can you give me a rough order of magnitude?
13 A. I think right now it's around $20,000.
14    MR. MARSTON: Hang on just a second. Let me
15 converse with my client. Let's step outside.
16    MR. PARTNOW: Off record.
17    MR. NIST: Off record.
18    (Off record.)
19    MR. NIST: Back on record. Other than Polar
20 Supply, has Absolute failed to live up to its obligations
21 since the last time your deposition was taken?
22    MR. MARSTON: I didn't understand that
23 question. Could you read it back, please?
24    (Read into the record.)
25    MR. MARSTON: Objection. Vague.

Page 11

1    THE WITNESS: Could you define "live up to its
2  obligations"?
3  BY MR. NIST:
4  Q. Yeah. You mentioned that you were in default
5  on some vendor contracts. Other than Polar Supply, which
6  other vendors?
7     MR. MARSTON: Objection. Asked and answered.
8     THE WITNESS: I think Kodiak Rental Center has
9  filed suit against me.
10 BY MR. NIST:
11 Q. And what is that in regards to?
12 A. I believe the rental of some equipment.
13 Q. What equipment?
14 A. I don't recall.
15 Q. And you say a suit has been filed in that?
16 A. Yes.
17 Q. Okay. And to the tune of how much? Do you
18 know?
19 A. No.
20 Q. Can you give me a rough order of magnitude?
21 A. I don't know, but I can probably track it down
22 for you.
23 Q. Other than Polar Supply and Kodiak Rental
24 Center, any other issues with vendors?
25 A. Satori Group.

Page 12

1  Q. And what is that about?
2  A. Subcontractor.
3  Q. It's made a claim against you?
4  A. Yeah, they filed a lawsuit against me.
5  Q. And it's probably clear, but when you say you,
6  you're talking about Absolute?
7  A. That's correct.
8  Q. The Kodiak Rental Center lawsuit, is that
9  amount in dispute?
10 A. I don't --
11    MR. MARSTON: Objection. What's the relevance
12 of that?
13    MR. NIST: You can make your objection, Terry.
14    THE WITNESS: I don't believe so.
15 BY MR. NIST:
16 Q. And is it a -- the Kodiak Center lawsuit, does
17 that involve nonpayment?
18 A. Yes.
19 Q. And the Satori Group, what's the -- which
20 project is that in relation to?
21 A. I don't recall the specifics on it.
22 Q. Are they claiming straight nonpayment, or has
23 there been a change? Are they claiming some kind of
24 change?
25 A. Nonpayment, we have some disputes with.

Page 13

1  Q. Do you remember what the contract value was on
2  that?
3  A. No.
4  Q. Can you give me a rough order of magnitude?
5  A. I don't remember.
6  Q. Would it be less than $100,000?
7  A. Oh, yes.
8  Q. Less than 50?
9  A. I don't know.
10 Q. Since the last time your deposition has been
11 taken, has Absolute started any other projects?
12 A. I -- yeah, yes.
13 Q. And what are those projects?
14 A. When was my deposition last taken?
15 Q. I believe in March.
16 A. I don't know if we started one in Fairbanks --
17 I believe one in Ketchikan. May have started one here.
18 Q. Here in Anchorage?
19 A. Yeah, here in Anchorage. I can't recall where
20 exactly the rest of them were.
21 Q. Okay. Are these all asbestos or lead
22 remediation?
23 A. Yes.
24 Q. And can you give me the approximate dollar
25 value of each of these contracts?

Page 14

1    A.   I don't know.
2    Q.   You can't tell me?
3    A.   I don't know with great specificity.
4    Q.   Okay. Can you get me within the tens of
5  thousands of dollars range?
6    A.   No, but I can get that information for you.
7    Q.   Are all of them worth over $100,000?
8    A.   No, I don't believe so.
9    Q.   Are any of them worth over $100,000?
10   A.   I don't know, to be honest with you -- between
11 any potential contract mods and base contracts, I don't
12 know.
13   Q.   Since the last time your deposition has been
14 taken, has Absolute finished any projects?
15   A.   I believe we have, yes.
16   Q.   Okay. And what was the -- which projects were
17 those?
18   A.   I guess we'd have to define finish in regards
19 to, you know, are we done with the labor on the job or
20 closed out the paperwork.
21        MR. MARSTON: He'll define it for you.
22 BY MR. NIST:
23   Q.   Okay. Well, let's take one step at a time. It
24 sounds like you finished the labor on the project, on
25 some projects?

Page 15

1    A.   I believe we have.
2    Q.   Okay. And which projects are those?
3    A.   I'd have to get back to you on that.
4    Q.   You can't say?
5    A.   I don't know for certain.
6    Q.   And --
7         MR. MARSTON: You don't know, but you can find
8  out?
9         THE WITNESS: Yeah, I can find out. I know we
10 finished up some little job at Dimond Center we did for
11 the Ashlock Firm.
12 BY MR. NIST:
13   Q.   Were these projects profitable for Absolute?
14   A.   I believe so.
15   Q.   Can you say to the tune of how much?
16   A.   No.
17   Q.   Can you give me a rough order magnitude?
18   A.   No, but I can find out for you.
19   Q.   Since the last time your deposition has been
20 taken, has Absolute bid on any new work?
21   A.   I believe so.
22   Q.   Which projects are those?
23   A.   I don't know, but I can find out.
24   Q.   And this would involve you going through
25 Absolute -- when you say you can find out, does that

Page 16

1  involve you going through Absolute's records and
2  gathering documents?
3    A.   Yes, and conferring with Mr. Peterson.
4    Q.   What about proposals? Has Absolute submitted
5  any proposals for any work since the last your deposition
6  has been taken?
7    A.   It will be the same answer as the last one. I
8  don't know, but I can find out.
9    Q.   Sad Leasing, as I understood it, you own a
10 company called Sad leasing?
11   A.   That's correct.
12        MR. MARSTON: Objection. This is a 30(b)(6) of
13 Absolute as I understand it. And now you're asking him
14 if he owns a company named Sad Leasing. And when you say
15 "he" in this instance, I think you're referring to
16 Mr. Olson in his personal capacity; is that correct?
17 BY MR. NIST:
18   Q.   Well, let's ask. When you say -- who is the
19 owner of Sad Leasing?
20        MR. MARSTON: Wait a minute. Objection. Are
21 you asking Absolute, or are you asking David Olson?
22        MR. NIST: I'm asking the 30(b)(6) designated
23 from this.
24        MR. MARSTON: Okay. Just a second. Why don't
25 you ask if Absolute owns Sad Leasing.

Page 17

1         MR. NIST: I'll ask my questions. If you want
2  to make the objections, please do.
3         MR. MARSTON: Okay. Objection. Beyond the
4  scope of the 30(b)(6) deposition. And if you continue to
5  insist on asking the witness questions beyond the scope
6  of the 30(b)(6) deposition, you'll force me to resume the
7  deposition and seek a protective order, which I will do.
8         MR. NIST: That's your prerogative.
9  BY MR. NIST:
10   Q.   Can you describe the relationship between Sad
11 Leasing and Absolute Environmental Services?
12        MR. MARSTON: Objection. Assumes facts not in
13 evidence, if there is such a relationship.
14        THE WITNESS: Between Absolute --
15 BY MR. NIST:
16   Q.   And Sad Leasing.
17   A.   And Sad Leasing?
18   Q.   Yes.
19   A.   Absolute will rent equipment from Sad Leasing
20 periodically.
21   Q.   Does Sad Leasing have its own employees?
22        MR. MARSTON: Objection. Beyond the scope of
23 the deposition. And I will instruct the witness not to
24 answer that. And because I cannot do that, under
25 accordance with the Civil Rules, without adjourning the

### Page 54

1  It's in the thousands of dollars. I know that.
2     Q.  Does Absolute Environmental Services create
3  profit and loss statements for its contracts, whether
4  completed or in progress?
5        MR. MARSTON: Individual contracts?
6        MR. NIST: Yes.
7        THE WITNESS: Absolute is in the habit of
8  creating profit and loss statements to a certain degree
9  on projects, yes.
10 BY MR. NIST:
11    Q.  We've requested the profit and loss statements
12 for Absolute Environmental Services services for 2004 and
13 I believe 2005. And your attorney's paralegal indicated
14 that she hasn't seen them yet. Have they been completed?
15    A.  I don't know if they have. I put the request
16 in to the bookkeeper. But you asked -- no.
17       (Exhibit 3 marked.)
18 BY MR. NIST:
19    Q.  Mr. Olson, you've been handed what's been
20 marked as Exhibit 3. Do you recognize this document?
21    A.  I do.
22    Q.  And what is this document?
23    A.  This is an internal profit and loss and balance
24 sheet put together by Absolute's bookkeeper and forwarded
25 to Absolute's counsel so it could be provided to you.

### Page 55

1     Q.  And who is Absolute's bookkeeper?
2     A.  Donny Haines.
3     Q.  Okay. I'm going to direct your attention to
4  the last page. Are you with me?
5     A.  I'm at the last page.
6     Q.  And it looks like Absolute Environmental
7  Services had a net loss of $1,060,000 or a little above
8  that; is that correct?
9        MR. MARSTON: Objection. Document speaks for
10 itself.
11       THE WITNESS: The net income as shown here is a
12 negative $1,060,402.90.
13 BY MR. NIST:
14    Q.  Do you know if that's true or not?
15       MR. MARSTON: Objection. Lack of foundation.
16       THE WITNESS: I would have to get with Donny.
17 I didn't prepare the document.
18 BY MR. NIST:
19    Q.  Do you have any basis to disagree with that
20 number?
21    A.  Sitting here today, I don't have any reason to
22 doubt Donny Haines' numbers.
23    Q.  Which projects was Absolute Environmental
24 Services working on in 2004? List them, if you will.
25    A.  I can't list them. I just can't --

### Page 56

1     Q.  Can you list the larger contracts?
2        MR. MARSTON: Let him finish the answer.
3        THE WITNESS: I can't remember the projects we
4  did from 2004 without looking at the records.
5  BY MR. NIST:
6     Q.  Can you list any of them?
7        MR. MARSTON: Objection.
8        THE WITNESS: No, no, I can't.
9  BY MR. NIST:
10    Q.  You can't list a single project that Absolute
11 Environmental Services worked on in 2004?
12    A.  We did do -- I believe we did a couple of
13 projects for your client. I can't remember how many we
14 did or what the names of them were. I'm pretty sure we
15 did a couple of projects for your client.
16    Q.  What did these projects include?
17       MR. MARSTON: You mean for your client?
18       THE WITNESS: I don't know exactly.
19       MR. MARSTON: Objection. Vague.
20       THE WITNESS: It wouldn't be hard to get a job
21 list for 2004.
22 BY MR. NIST:
23    Q.  Do you remember whether projects that Absolute
24 Environmental Services worked on in 2004 were profitable
25 or not?

### Page 57

1     A.  Without looking at each job I -- were any of
2  them profitable, or any of them, or all of them?
3     Q.  Were any of them profitable?
4     A.  Oh, I'm sure some of them were profitable.
5     Q.  Okay. Do you know which ones?
6     A.  No.
7     Q.  The general description of the work, even if
8  you don't remember the exact contract name?
9     A.  Not sitting here right this minute, no.
10    Q.  Do you remember what problems Absolute
11 Environmental Services encountered in 2004 to attribute
12 to this $1.06 million loss?
13    A.  I just remember a job.
14    Q.  Okay. And what was the job?
15    A.  It was the rest of the cargo pier. Gee, that
16 one, by the way, would answer your question. That one
17 would have contributed handily to the losses in 2004.
18    Q.  And would the amount of Absolute's loss be
19 included in Mr. Lembke's report for 2004?
20    A.  The loss we suffered on the cargo wharf?
21    Q.  Correct.
22    A.  In 2004, would that be in Mr. Lembke's report?
23    Q.  Yes.
24    A.  Oh, yeah.
25    Q.  So other than the cargo wharf project, can you