LAW OFFICES OF

# MARSTON HEFFERNAN FOREMAN

A PROFESSIONAL LIMITED LIABILITY COMPANY

ANDERSON PARK BUILDING

16880 N.E. 79TH STREET

REDMOND, WASHINGTON 98052-0902

TERRY R. MARSTON II

———

E-MAIL
terry@mhf-law.com

TELEPHONE
425.861.5700

———

FACSIMILE
425.861.6969

December 15, 2004

Via Federal Express Next Day Air
William R. Baerg
MONTELEONE & MCCRORY
725 South Figueroa Street, Suite 3750
Los Angeles, California 90017-5402

> **Re:    Absolute Environmental Services, Inc. v. Emerco, Inc.**
> U.S.D.C. (Alaska) Cause No.  A-03-0199 Civil (RRB)
> *For Settlement Purposes Only; ER 408 Protected*

Dear Mr. Baerg:

This letter is addressed to you though it is for the principle consideration of your client, Mr. McKinley.

Just this week, the Kodiak Cargo Wharf Coatings project passed its final inspection. That being the case, the final costs of the project can be confirmed. Additionally, the parties to the suit now pending in the Federal District Court in Anchorage have had the opportunity to distill the issues that separate us, to review the largest portion of the relevant documents, and to interrogate your estimator and project manager, Tom Puett, for his views and admissions. The results of these (and other) processes have been uniformly unfavorable to your position in this lawsuit. A brief review of the issues will support this:

## *ABSOLUTE'S CLAIMS AGAINST IMPERIAL*

Imperial's subcontract obligated it to comply with the project schedule, to provide quality control services, to obtain (and maintain) manufacturer's certifications and to complete its work. Imperial defaulted on each of these obligations. Imperial expressly terminated the contract and abandoned the project with no prior notice to Absolute. A written notice of default and direction to cure from Absolute preceded every other default. See Appendices A, B, and C. In each instance, Imperial disregarded the notice, the direction, and the opportunity to cure. Rather than terminate Imperial's contract, Absolute chose to supplement Imperial's forces to obtain contract compliance and regain the schedule. The costs incurred by Absolute in doing so were necessary, reasonable, and well documented (as is born out by the opinions of the experts retained by

EXHIBIT 1                                                                                                          4

MARSTON HEFFERNAN FOREMAN

_____

William Baerg
December 15, 2004
Page - 2

Absolute to review these issues).  The damage claim totals $1,266,927, exclusive of attorneys' fees.

| | |
|---|---|
| Actual Costs | $ 2,077,825.00 |
| Minus As-Planned Costs | $ (956,845.00) |
| Minus AES Interference | $ (964.00) |
| Minus Conduit Removal | $ (850.00) |
| Minus Post-Litigation Legal | $ (33,267.00) |
| Plus Overhead | $ 24,560.00 |
| Plus Profit | $ 111,045.00 |
| Plus Extended Home Office Overhead | $ 45,423.00 |
| Total Claim | $ 1,266,927.00 |

This is an actual cost claim.  There are no creative calculations or exercise of judgment required to support these figures.  These figures are based upon contemporaneous cost records. The as-planned costs include credits for expenses that were properly Absolute's responsibility and additional work Brechan had Absolute perform as follow-up on Phase I (Swalling's contract).  The credits for interference and conduit removal are based on the amounts Mr. Puett requested for these items at the time they occurred on the project.

## IMPERIAL'S CLAIMS AGAINST ABSOLUTE

### Notice

Under the Federal Acquisition Regulations applicable to this Coast Guard facility, Imperial was obligated to comply with the provisions of the "Changes" clause (FAR § 52.243-4) to preserve any claims allegedly arising out of the work.  The Changes clause requires the submission of the following written notices:

- Submission within 20 days after claimed costs are incurred of written notice of the date, circumstances, and source of any order said to constitute a compensable change, and a statement that order is regarded as a change;

- A written assertion of the right to an equitable adjustment within 30 days after furnishing of the above notice, including a statement of the general nature and amount of the proposal; and

- A written proposal for equitable adjustment before final payment.

Imperial failed to comply with any of these obligations, voiding each of its claims even before evaluating their merits.

EXHIBIT 1                                                                                        5

William Baerg
December 15, 2004
Page - 3

### "Conversion/Goods Sold & Delivered"

(Claimed: $518,320 – Actual: $78,959)

No credible evidence has been presented that Emerco was the legal owner of materials left behind by Imperial at the time it abandoned the project. Likewise, there is no admissible evidence of the alleged valuation of the materials. Absolute commissioned an independent appraisal (previously produced) that demonstrates the materials and equipment have a fair market value of only $78,959.

### "Lost Profits Due On Cargo Wharf Project"

(Claimed: $130,952 – Actual: $0)

Imperial has no legal basis to sue for "lost profits" because it failed to substantially complete the project. Instead, Imperial abandoned the project after unilaterally terminating the subcontract. In the absence of a prior "material breach" of contract by Absolute, Imperial's termination was wrongful.

There is no credible basis for arguing that Absolute materially breached the contract. Imperial cannot claim it was "thrown off" the job (as Tom Puett frequently asserts) because performance without certification was precluded by contract and Imperial was expressly directed by Absolute to correct the decertification problem and resume work. Imperial cannot rely on failure to make progress payments because progress payments were made and, even in the unlikely event Mr. Puett's allegation of percent complete were to be accepted, the modest differences between the percentages of completion claimed by Imperial and that authorized by the Coast Guard (and paid for by Absolute) are insufficient to rise to the level of a material breach. And, finally, Imperial cannot rely upon the presence of disputed contract claims as a basis for terminating the contract. Disputed claims are not a proper basis for suspending work (even were there meritorious claims).

The methodology used by Imperial to quantify its claim is in not in compliance with the law. For an alleged breach of contract, the proper damage calculation would be equal to the contract price minus the cost of the work avoided. The cost of the work Imperial avoided here exceeded the unpaid contract balance many times over meaning there is no damage claim arguable.

### "Lost Profits Due For Coating Fuel Tanks N12 & N60"

(Claimed: $119,752 – Actual: $0)

There was no contract between Absolute and Imperial for this work (and no credible evidence of a price and cost of the work with which to calculate a damage claim had there been a contract).

### "AES Failed To Pay IIC Amount Due For Completed Original Contract Work"

(Claimed: $116,309 – Actual: $0)

The same discussion applicable to the claim for "Lost Profit" applies here.

EXHIBIT 1                                                                                          6

MARSTON HEFFERNAN FREEMAN

---

William Baerg
December 15, 2004
Page - 4

### "Undisclosed Gray Paint"

(Claimed: $92,029 – Actual: $0)

Tom Puett conducted a prebid inspection on behalf of Imperial. The so-called "undisclosed" gray paint was plainly visible at that time. See Coffman's pre-job photographs, appendices D, E, and F.

Aside from its thickness, there is no evidence that the gray coating was more difficult to remove than the black coating.

Finally, Mr. Puett testified at his deposition that Imperial removed gray coating from 118 piles at 33 minutes per pile. This equals 65 hours (3894 minutes). At $35.47/hr (as he calculated at the time), this comes to $2,306. When asked to account for the disparity between this figure and Imperial's claim value of $92,029, Mr. Puett attributed it to the addition of jobsite overhead costs.

### "AES Failed To Pay IIC The Full Amount Due For Mobilization"

(Claimed: $91,763 – Actual: $0)

The same discussion applicable to the claim for "Lost Profit" applies here.

### "Failure Of AES To Removal [Sic] Non-Structural Steel"

(Claimed: $47,305 – Actual: $0)

The contract documents gave the contractor the option to either caulk around non-structural steel or remove it. Whether or not Imperial excluded steel removal, caulking was definitely included in its work scope (see discussion below of "Stripe Coating and Caulking"). Absolute agreed to allow Imperial to use its employee to do steel removal when he had time (which was done), but otherwise made no promise to remove steel for Imperial. There are no known witnesses of Imperial ever having removed any non-structural steel itself.

No project records exist documenting removal of any non-structural steel by Imperial. Mr. Puett's calculation of damages for this item alleges 354 hours consumed in non-structural steel removal. No documents supporting this (or any) number of hours are identified by Imperial or were found in the project record.

### "AES Makes Improper Deductions From IIC's Billings"

(Claimed: $42,879 – Actual: $0)

This is not an affirmative claim item; if anything, these would be defenses to claims of Absolute.

### "Failure of AES to Stripe Coat Welds and Caulking"

(Claimed: $29,898 – Actual: $0)

Imperial never performed any stripe coating. The requirement was waived by Coffman to assure that Imperial would not lose the blast.

---

EXHIBIT 1                                                                    7

MARSTON HEFFERNAN FOREMAN

William Baerg
December 15, 2004
Page - 5

Caulking was always expressly included in Imperial's work statements (e.g., scope letter (price quotation); schedule; schedule of values).

Stripe coating and caulking were not mentioned in the specification sections excluded by Imperial in its scope letter until an amended version came out after the date Imperial submitted its exclusions. Mr. Puett admits that his exclusions applied to the earlier version of the specifications.

Mr. Puett's calculation of damages is based on 12 days (423 hours) of such work. There is no reference to any documentation of these hours, nor have any been located through independent search.

### "Ordering IIC to Perform Non-IIC Work at Bent 12 – 13"

(Claimed: $29,202 – Actual: $0)

Imperial understood that its contract was for the purpose of finishing the application of coatings to a wharf upon which an earlier contractor had already performed a portion of the work. Omitting uncoated areas between bents 12 and 13 cannot be reconciled with such an understanding.

Mr. Puett admits he performed a pre-bid inspection from a vantage point that enabled him to see the area in question between bents 12 & 13. It is undeniable that he in fact noticed the area had not been coated because he personally mentioned the situation at the pre-construction meeting. If he had had any question about whether it was to be included within his scope, he had the ability to inquire about the area or to expressly exclude it within his scope letter. He did neither.

### "Failure of Absolute to Remove CP"

(Claimed: $7,476 – Actual: $0)

Imperial removed no cathodic protection. No documentation exists that Imperial modified its procedures or suffered any reduction in its production rate due to the presence of cathodic protection.

No project records exist documenting any number of extra hours consumed in performing this allegedly changed work. Mr. Puett's calculation of damages, based on 132 regular and over-time hours, is not supported by any project records.

### "Failure to Remove Conduit"

(Claimed: $850.00 – Actual: $850.00)

Absolute does not contest this item.

### "Interference/Delays"

(Claimed: $0 – Actual: $0)

Imperial offers no evidence of any improper type, frequency, or execution of inspections.

EXHIBIT 1

8

MARSTON HEFFERNAN FOREMAN

---

William Baerg
December 15, 2004
Page - 6

Imperial offers no evidence of how any "overinspection" caused it to incur additional time or expense. Imperial submitted no supporting damage quantification for this claim item.

## IMPERIAL'S CLAIMS AGAINST OTHERS

Imperial's claims against Brechan, Safeco, Coffman Engineers, and Specialty Polymer Coatings are predicated on three different theories depending on the party involved. These are joint venturer status, surety status, or complicity in a conspiracy against Imperial. The joint venture and surety claims are all predicated on Imperial's being entitled to a judgment in its favor. As shown above, there is no chance of this. Therefore, nothing further need be said.

The conspiracy claim is puzzling. There are no facts to support it, and no plausible motive to account for these different companies joining together to conspire against Imperial. The only plausible explanation left for the allegation then is that Imperial developed the conspiracy theory to rationalize away the view of all other project participants that Imperial's defective performance was its own fault. There are no damages associated with these claims, either.

## ABSOLUTE'S CLAIMS AGAINST McKINLEY PERSONALLY

Absolute is fully prepared to demonstrate at trial that Forrest McKinley is himself personally liable for the debts of Imperial Industrial Coatings. In addition to the absence of any disclosure of Imperial's alleged corporate status in the parties' contract, there is more than ample evidence to support a decision of the Court to disregard any alleged involvement and corporate status of Emerco, Inc. The classic elements of "corporate disregard" are amply present even prior to receipt of the detailed documentation the court has required Mr. McKinley to produce this week. These include disregard of corporate formalities, undercapitalization, and domination and control by a single individual.

As documented in our reply brief on the recent motion to compel, Emerco was only formed a few years ago. Emerco has no office; it operates out of the offices of FJM, Inc., also owned by Mr. McKinley. There is no signage or business directory identifying Emerco, Inc. as being present in the Imperial Electric office, according to Tom Puett. Emerco has no office equipment. According to Tom Puett, Emerco has no home office employees other than himself.

Emerco's total initial capitalization was only $27,000. Emerco has suffered losses in every year of its existence. It has never made a profit. Emerco has stayed in business since the date of its incorporation only through annual loans – not capital contributions – made by its sole shareholder Mr. McKinley.

Forrest McKinley dominates and controls Emerco. He is the incorporator. He is the sole shareholder. He is the sole director. He is the president and sole executive. He is the party who loans Emerco its operating funds every year. Forrest J. McKinley is Emerco.

EXHIBIT 1                                                                              9

MARSTON HEFFERNAN FOREMAN

William Baerg
December 15, 2004
Page - 7

## ABSOLUTE'S CLAIMS FOR ATTORNEYS' FEES

The Absolute/Imperial subcontract includes an attorneys' fee clause entitling the prevailing party to a full award of its reasonable attorneys' fees. At present, Absolute's fees total $222,542. By the end of trial, those fees will be considerably higher.

Under ARCP 82 of the Alaska State Rules of civil procedure, a prevailing party is entitled to an award of a portion of its attorneys' fees in accordance with a published schedule. (This rule is applied by the Federal District Court when exercising its diversity jurisdiction.) Brechan, Safeco, Coffman Engineers, and Specialty Polymer Coatings will be entitled to a fee award based on this rule at the conclusion of trial, if not dismissal on a motion. The combined fees of these firms are expected to total more than $200,000. In addition, the Alaska rules allow for enhancement of fee awards in cases involving "vexatious or bad faith conduct." The "conspiracy" claim alone will open the door to such enhancements. ARCP 82(3)(G).

## SETTLEMENT

There is no basis to believe that pressing this litigation further would be to your advantage. To the contrary, the only things you could expect to accomplish by doing so would be to substantially increase (a) the amount of fees you will spend on your attorneys in both California and Anchorage; (b) the amount of attorneys' fees you will be required to reimburse Absolute under the terms of your subcontract; and (c) the amount of distraction from your business that unavoidably accompanies litigation. In short, it is time to settle this lawsuit. In addition a settlement now would provide you the following:

- Avoiding the prospect of a judgment at the time of trial against you in the amount of $1.6 to $1.8 million dollars, including fees.

- Avoiding the necessity of producing the volumes of financial records ordered by the Court.

- Avoiding the substantial expense of depositions (estimated at twenty depositions), including required preparation, coming before the end of discovery in January.

- Avoiding the inconvenience of your own two-day deposition and the depositions of Ms. Emery, your bookkeeper, and your CPA

- Avoiding the customary request for a substantial deposit of attorneys' trial fees by your attorneys (both California and Alaska counsel).

- Avoiding the consequences of litigating against Alaskans in an Alaskan court and before an Alaskan jury

Absolute Environmental is prepared to resolve this suit at trial, if necessary, but would prefer to resolve it here and now. Toward that end, I have been authorized by Absolute, as well as by Coffman, SPC, and Brechan, to offer the following settlement terms:

EXHIBIT 1

William Baerg
December 15, 2004
Page - 8

- Forrest J. McKinley will pay Absolute Environmental, Inc., the sum of **$1,327,899.00.**

- Absolute will turn over the equipment appraised in the Tope report to McKinley or his designee at the location of his choice in Anchorage, Alaska.

- McKinley/Emerco will waive all claims arising out of its participation in the Cargo Wharf project, including those against Specialty Polymer Coatings, Coffman Engineers, Brechan Enterprises, Safeco and Absolute Environmental Services

- Absolute Environmental Services, Specialty Polymer Coatings, Coffman Engineers, Brechan Enterprises, and Safeco will waive all claims against McKinley/Emerco.

- Absolute Environmental Services will waive all claims against Imperial Electric.

- Absolute will consider payment terms upon receipt of acceptable security if to facilitate settlement.

While these terms are doubtless not the ones you would have hoped for, they represent a reasonable compromise by your adversaries and – more importantly – realistically reflect your current exposure from this case. Imperial Industrial Coatings promised to properly complete this project by August 31, 2003, in exchange for $772,123. Instead, Imperial improperly performed its work, fell far behind schedule, abandoned the project, forced Absolute to incur more than a million dollars in excess of its subcontract price to complete (and correct) the work, and then blamed everyone but itself for the consequences of its actions. The costs that Absolute was forced to bear to finish your work are costs that you are rightly responsible for. This settlement is nothing more than that acknowledgement.

This offer of settlement shall remain open for 10 days from this date.

Very truly yours,

**Marston Heffernan Foreman PLLC**

Terry R. Marston II

TRM/klm
Enclosure(s)
cc:    Absolute Environmental, Inc.

EXHIBIT 1                                                                                    11

**A**

EXHIBIT 1

# *Absolute Environmental Services, Inc.*

. Box 112807 • Anchorage, AK 99511-2807 • Phone (907) 346-4490 • Fax (907) 346-4491

June 12, 2003

Imperial Industrial Coatings
 Forest (Mack) McKinley
128813 Pico Street, Unit D
Grande Terrace, CA 92313

RE:    Cargo Wharf Pile Coating Phase II, ISC Kodiak, Alaska
       33-S01171 Task 643P92

Subject:    Notice to Cure

Mr. McKinley;

As you are aware, we have repeatedly expressed dissatisfaction with your execution of the quality control procedures applicable to your work. Despite our complaints, you have yet to implement the required procedures. (See enclosed.) We are receiving continual complaints from both the Brechen Enterprises and the QA due to your nonperformance.

Because of your continuing failure to implement your CQC responsibilities, we are forced to issue this <u>cure notice</u>. Pursuant to the terms of our contract with you, you are hereby directed to cure your failure to fulfill your CQC responsibilities within three (3) days of your receipt of this notice.

Satisfactory cure will require of you the following things:

1. A written statement from you to Absolute confirming your receipt of this cure notice and stating your intent to comply with all CQC requirements as they pertain to your work.

2. An identification in your letter of the competent person(s) you have selected to perform these responsibilities.

3. Written confirmation in your letter that you have all necessary and required equipment on site, that is in compliance with the contract documents, to perform these responsibilities, including the following

   a. Portable holiday tester

   b. Chloride test kit

   c. DFT gage with calibration standards and proper range

   d. Environmental conditions gage

   e. A copy of the SSPC visual standards

   f. Shore "D" hardness gage

   g. Surface profile kit with necessary amount of extra coarse tape

AES002003

EXHIBIT 1                                                                                              13

h. Adhesion tester...

4. Commencement and proper performance of all necessary QC procedures and reporting requirements, including daily submission of QC reports to the Owner's QA person no later than three days after your receipt of this letter.

<u>In the event you fail to cure this defect in the time allotted, and thereafter continue with full and timely performance of these responsibilities. Absolute will take steps to perform your CQC responsibilities itself on your behalf and backcharge your contract for the value of this work.</u>

Sincerely,

David E. Olson
President
Absolute Environmental Services, Inc.

Cc:    Brechan Enterprises, Inc.

EXHIBIT 1

AES002004
14

**B**

*(310) 477-0700*

EXHIBIT 1

15

# Absolute Environmental Services, Inc.

O. Box 112807 • Anchorage, AK 99511-2807 • Phone (907) 346-4490 • Fax (907) 346-4491

June 26, 2003

Imperial Industrial Coatings
 Forest (Mack) McKinley
128813 Pico Street, Unit D
Grande Terrace, CA 92313

RE:     Cargo Wharf Pile Coating Phase II, ISC Kodiak, Alaska
        33-S01171 Task 643P92

Subject:     <u>Notice to Cure</u> - Schedule

Mr. McKinley;

As you are aware, we have repeatedly expressed our concern for IIC's inability to maintain and comply with the project schedule. Despite repeated assurances that your firm would be caught up to the end of Area C by July 1st, it does not appear that this is possible with your current staffing and production rate. As far as we know, the remaining work scheduled for completion by July 1, 2003, is as follows.

1.  Repairs to piles in Area A and Bents 13-15.

2.  Fulfillment of all QC testing obligations and final closeout in Area A and Bents 13-15

3.  All surface preparation and coating below elevation 110 in Area B.

4.  Fulfillment of all QC testing obligations and final closeout in Area B.

5.  All surface preparation and coating below elevation 110 in Area C.

6.  Surface preparation and coating on 60% of the elevations above 110 in Area C.

7.  Fulfillment of all QC testing obligations and final closeout in Area C.

AESI sees that given IIC's current production rate, this effectively leaves IIC a minimum of 3 weeks behind schedule.

Because of your continuing failure to meet the schedule requirements, we are forced to issue this <u>cure notice</u>. Pursuant to the terms of our contract with you, you are hereby directed to cure your failure to fulfill your scheduled production responsibilities within three (3) days of your receipt of this notice.

Satisfactory cure will require of you the following things:

1.  Preparation of a reasonable "recovery schedule" reflecting the current status of the project and the activities that will be completed on a daily basis until such time as the level of completion on the project has caught up with the original schedule.

AES002242

EXHIBIT 1

16

2.  Identification of the means and methods you intend to employ to timely perform in accordance with the recovery schedule (e.g., the additional manpower and/or resources you intend to bring to bear).

3.  Immediate implementation of the recovery schedule including implementation of the means and methods you have identified in response to requirement number two above.

In the event you fail to cure this defect in the time allotted, and thereafter continue with full and timely performance of these responsibilities, Absolute reserves the right to perform your work itself on your behalf and backcharge your contract for the cost it incurs.

Sincerely,

David E. Olson
President
Absolute Environmental Services, Inc.

Cc:     Brechan Enterprises, Inc.

C

EXHIBIT 1                                                                                18

*Absolute Environmental Services, Inc.*

. Box 112807 • Anchorage, AK 99511-2807 • Phone (907) 346-4490 • Fax (907) 346-4491

August 6, 2003

Imperial Industrial Coatings
 Forest (Mack) McKinley
128813 Pico Street, Unit D
Grande Terrace, CA  92313

RE:    Cargo Wharf Pile Coating Phase II, ISC Kodiak, Alaska
       33-S01171 Task 643P92

Subject:    Notice to Cure - Certification

Mr. McKinley;

Yesterday, your coatings supplier revoked Tom Puett's and, therefore, IIC's certification to
apply the coatings specified on the project. It is our understanding that without the certification
you are incapable of performing your work.

This is obviously an extremely serious situation and, unless corrected immediately, would
constitute a material breach of your contract with us. At present, we will be attempting to
maintain progress on your work scope with forces of our own and offsetting your contract price
for the cost we incur in the process.

You are hereby directed to contact the undersigned within twenty –four hours and provide us
with your immediate advice as to whether and how you intend to cure this breach. Should you
fail to do so or fail to provide us with reasonable and realistic assurances of your ability to
perform, we will be required to take over the balance of your work and pursue you for
reimbursement of any excess costs we incur in completing the work on your behalf.

Finally, because, at present, you lack the necessary certifications to permit you to perform, your
personnel are not authorized to continue work. Until such time as you have cured this breach by
producing necessary certifications enabling you to perform your work, your personnel will not be
allowed access onto the Coast Guard facility.

I MUST HEAR FORM YOU IMMEDIATELY.

Sincerely,

David E. Olson
President
Absolute Environmental Services, Inc.

Cc:    Brechan Enterprises, Inc.

AES000710

EXHIBIT 1                                                              19

**D**

*(310) 477-0700*

EXHIBIT 1                                                                                                20



EXHIBIT 1                                                                21

E

EXHIBIT 1



EXHIBIT 1

23

**F**

EXHIBIT 1                                                                                24



EXHIBIT 1                                                                                           25